Michael P. Lehmann (Cal. Bar No. 77152)
Bonny E. Sweeney (Cal. Bar No. 176174)
Christopher L. Lebsock (Cal. Bar No. 184546)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel:  (415) 633-1908
Fax:  (415) 358-4980
E-mail:   mlehmann@hausfeld.com
E-mail:   bsweeney@hausfeld.com
E-mail:   clebsock@hausfeld.com

Michael D. Hausfeld
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
E-mail:   mhausfeld@hausfeld.com

*Counsel for Olean Wholesale Grocery Cooperative, Inc.*
*and Interim Lead Counsel for the Proposed Direct Purchaser Class*
[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No. 15-MD-2670 JLS (MDD) |
| | **CONSOLIDATED DIRECT PURCHASER CLASS COMPLAINT** |
| This filing relates to the Direct Purchaser Plaintiff Class Action Track | JURY TRIAL DEMANDED |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.    NATURE OF THE ACTION.................................................................1

II.    JURISDICTION AND VENUE. .......................................................2

III.    PLAINTIFFS.................................................................................3

IV.    DEFENDANTS.............................................................................4

   A.  Bumble Bee. ...........................................................................4

   B.  Thai Union Group And Tri-Union. .............................................5

   C.  Dongwon And StarKist. ...........................................................8

V.    AGENTS. ..................................................................................13

VI.    INTERSTATE TRADE AND COMMERCE. ...................................13

VII.    FACTUAL ALLEGATIONS........................................................13

   A.  The Nature Of, Concentration Of, And Consolidation In The Domestic PSP Market............................................................................13

      1.  Nature of the Domestic PSP Market.................................13

      2.  Concentration In The Domestic PSP Market.....................17

      3.  Consolidation In The Domestic PSP Market.....................17

      4.  Barriers To Entry In The Domestic PSP Market. ...............18

   B.  Demand, Supply, And Pricing in the Domestic PSP Market.........19

      1.  The Oversupply of Tuna. ..............................................19

      2.  Price Declines In Raw Skipjack Due To Oversupply...........21

      3.  Declining Domestic Consumption Of Canned Tuna. ...........21

      4.  Domestic Pricing Of Canned Tuna. .................................23

   C.  DOJ's Criminal Investigation Reveals That The Pricing for PSPs Produced By Defendants Was The Result of Collusion. .....................25

   D.  Methods By Which Defendants Effectuated Their Collusive Scheme...........29

      1.  Collusion On Can Size Changes.......................................30

      2.  Collusion On List Price Increases....................................31

      3.  Collusion On Promotional Activity. .................................33

4.  Collusion On Offering of "FAD Free" Branded Tuna Products. ...............33

5.  Other Opportunities To Collude. ..................................................................34

E.  Involvement Of High Level Executives In The Conspiracy...........................36

F.  Foreign Parents' Recognition Of The Conspiracy And Its Results. ...............38

VIII.  CLASS ACTION ALLEGATIONS ............................................................40

IX.  TOLLING OF THE STATUTE OF LIMITATIONS.....................................42

X.  CAUSE OF ACTION. ....................................................................................44

XI.  PRAYER FOR RELIEF...................................................................................45

XII.  JURY DEMAND ............................................................................................46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs, by and through their undersigned attorneys, complain and allege as follows. All allegations herein other than those relating directly to Plaintiffs are based on information and belief.

## I.   NATURE OF THE ACTION.

1.      This action arises out of a conspiracy by the three largest domestic producers (Bumble Bee Foods LLC, Tri-Union Seafoods LLC, and StarKist Company--along with certain parent entities described herein) of packaged seafood products ("PSPs") to fix, raise, maintain, and/or stabilize prices for PSPs within the United States, its territories and the District of Columbia in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3). The conspiracy began no later than August 1, 2008, and continues to the present (the "Class Period"). As used herein, the term "PSPs" refers to shelf-stable seafood products that are sold in cans, pouches or ready-to-eat serving packages. The principal type of PSP is canned tuna.

2.      As described in greater detail herein, this conspiracy was effectuated by various means, including, but not limited to:  (a) agreeing to decrease the sizes of cans in which canned tuna is sold; (b) agreeing to issue collusive list price increases on canned tuna; (c) agreeing to limit promotional activity for PSPs; and (d) agreeing not to compete by refraining from selling branded canned tuna with labels indicating it is "FAD Free" (a term that will be explained below). As a result, Defendants' PSP prices and profits have increased.

3.      Moreover, as confirmed in proceedings before this Court, the Antitrust Division of the United States Department of Justice ("DOJ") is currently conducting a criminal investigation of this conspiracy. And, critically, one of the key domestic PSP producers--Tri-Union Seafoods LLC--has been publicly reported to have sought leniency from the DOJ under the agency's program that grants immunity to the first company to admit antitrust violations.

## II.   JURISDICTION AND VENUE.

4.   This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages, obtain equitable relief, and recover costs of suit and reasonable attorneys' fees for violations of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

5.   Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

6.   Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the long-arm statute of California (Cal. Code of Civ. Procedure §410) because each has transacted business in this state and because the California long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the state of California to satisfy due process.

7.   This Court has personal jurisdiction over Defendants because, *inter alia,* each Defendant: (a) transacted business in this District, the United States and its territories, and the District of Columbia; (b) directly or indirectly sold and delivered PSPs in this District, the United States and its territories, and the District of Columbia; (c) has substantial aggregate contacts with this District, the United States and its territories, and the District of Columbia; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing

injury to, persons and entities residing in, located in, or doing business in this District, the United States and its territories, and the District of Columbia.

### III.   PLAINTIFFS.

8.     Plaintiff Olean Wholesale Grocery Cooperative, Inc. ("Olean") is a resident of the State of New York.  Operating out of a 380,000 square foot distribution center in Olean, New York, Olean currently services retail members and a large number of non-member retailers in Western and Central New York, Western Pennsylvania and Northeastern Ohio. During the Class Period, Olean purchased PSPs directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this complaint.

9.     Plaintiff Pacific Groservice Inc. d/b/a PITCO Foods ("PITCO") is a grocery wholesaler having its principal place of business in San Jose, California. During the Class Period, PITCO purchased PSPs directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this complaint.

10.     Plaintiff Piggly Wiggly Alabama Distributing Co., Inc. ("Piggly Wiggly") is an Alabama corporation with its principal place of business in Bessemer, Alabama. Piggly Wiggly distributes bakery/delicatessen items, groceries, meat, and produce to independent retailers in the Southeast. During the Class Period, Piggly Wiggly purchased PSPs directly from one or more Defendants, and has been injured in its business or property by reason of the antitrust violations alleged in this complaint.

11.     Plaintiff Central Grocers, Inc. ("CGI") is an Illinois corporation with its principal place of business in Joliet, Illinois. Plaintiff is a member owned grocery wholesaler supplying over 400 independent grocery retailers in the Chicago metropolitan area and Northwest Indiana. During the Class Period, CGI purchased PSPs directly from one or more Defendants, and has been injured in its business or property by reason of the antitrust violations alleged in this complaint.

12.    Plaintiff Associated Grocers of Florida, Inc. ("AGF") is a Florida corporation with its principal place of business in Pompano Beach, Florida. AGF is a food retail distribution company. During the Class Period, AGF purchased PSPs directly from one or more Defendants, and has been injured in its business or property by reason of the antitrust violations alleged in this complaint.

13.    Plaintiff Trepco Imports and Distribution Ltd. ("Trepco") is a California corporation with its principal place of business in San Diego, California.  Trepco is a wholesale grocery and convenience store supply company. During the Class Period, Trepco purchased PSPs directly from one or more Defendants, and was injured in its business or property by reason of the antitrust violations alleged in this complaint.

14.    Plaintiff Benjamin Foods LLC ("Benjamin") is a broadline food distributor located in Hatboro, Pennsylvania.  Benjamin distributes groceries, frozen foods, meat, poultry, seafood, dairy and produce, among other products, to public and private foodservice clients and government agencies.  During the Class Period, Benjamin purchased PSPs directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this complaint.

15.    Plaintiff John Gross & Co. ("Gross") is a food distributor servicing the away-from-home foodservice sector with its principal place of business in Mechanicsburg, Pennsylvania.  During the Class Period, Gross purchased PSPs directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this complaint.

## IV.    DEFENDANTS.

### A.    Bumble Bee.

16.    Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business located at 280 10th Avenue, San Diego, California 92101.  Bumble Bee produces and sells PSPs throughout the

United States (including this District), its territories and the District of Columbia. The Bumble Bee brand was created in 1910 by a group of canners who had organized themselves over a decade earlier as the Columbia Rivers Packer Association ("CRPA"). The first Bumble Bee Seafoods, Inc. was created in 1960 by Castle & Cook, a prominent Hawaii-based seafood company that had acquired the interests of CRPA. In 1997, the predecessor entity to Bumble Bee was acquired by International Home Foods, which was in turn was acquired by ConAgra Foods ("ConAgra") in 2000. In 2003, the present Bumble Bee entity was created through a spin-off by ConAgra to Bumble Bee's senior management, including its current President and Chief Executive Officer ("CEO"), Chris Lischewski ("Lischewski"). In 2004, Bumble Bee combined its business with Connors Bros. Income Fund to become the largest branded seafood company in North America and in 2008, Bumble Bee became a private company when it was acquired by Centre Partners. Two years later, Centre Partners sold Bumble Bee for $980 million to another private owner, Lion Capital ("Lion"), which is based in the United Kingdom. Lion is the current owner of Bumble Bee.

**B.      Thai Union Group And Tri-Union.**

17.     Defendant Tri-Union Seafoods LLC ("Tri-Union") is a domestic corporation with its principal place of business located at 9330 Scranton Road, Sorrento South Corporate Center, Suite 500, San Diego, California 92121.  It operates under the name "Chicken of the Sea." Tri-Union produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia.  Its initial predecessor entity was the Van Camp Seafood Company, created in 1914. That entity eventually became wholly owned by Tri-Union's

1  parent, Thai Union Frozen Products PCL ("TUF") (now known as Thai Union

2  Group Public Company Limited ("TUG")) in 2000.[1]

3      18.   Defendant TUG is a corporation organized and doing business under

4  the laws of Thailand. TUG is the world's largest canned tuna producer, processing

5  18% of the world's production. It is also the largest canned tuna producer in

6  Thailand. Its head office is located at 72/1 Moo 7, Sethakit 1 Road, Tambon Tarsai,

7  Mueang Samut Sakhon District, Amphur Muangsamutsakorn, Samutsakorn 74000,

8  Thailand. TUG, through its wholly-owned subsidiary Tri-Union Seafoods LLC,

9  produces and sells PSPs throughout the United States (including this District), its

10  territories and the District of Columbia.  In recent years, 40% or more of its sales

11  have originated in the United States, which is its largest market. TUG also

12  purposefully directs its activities to the United States by exporting PSPs, including

13  canned tuna, from Thailand to this country. TUG further purposefully directs its

14  activities to the United States through its method of conducting business. It

15  currently has three strategic business units, one of which is the "Ambient Seafood"

16  unit, which includes its global canned tuna business; Tri-Union is part of that

17  business unit and is viewed by TUG as part of its footprint in the United States.

18  Indeed, TUG has its own fishing fleet and is thus vertically integrated with Tri-

19  Union. TUG also purposefully directs its activities into the United States by

20  operating Thai Union North America, Inc. ("TUNAI")  (a company formerly

21  known as Thai Union International, Inc.), that was founded in 1996. TUNAI is a

22  wholly-owned instrumentality of TUG and has its address at 9330 Scranton Road,

23  Sorrento South Corporate Center, Suite 500, San Diego CA 92121 (the same

24  address as Tri-Union). TUNAI's President is Thiraphong Chansiri (President and

25

26  [1] TUG is a publicly-traded company that was first listed on the Stock Exchange of
    Thailand in 1994 as "Thai Union Frozen Products PCL", and which changed its
27  name to TUG in or about 2015. As used herein, the acronym "TUG" refers to both
    TUG and, with respect to the applicable time period, its predecessor entity TUF.
28

CEO of TUG). The Chansiri family is the largest single shareholder in TUG, owning 20.4% of its stock.[2]

19.    TUG directly participated in the conspiracy alleged herein and used its dominance and control over Tri-Union's PSP business to conspire with the other Defendants and their co-conspirators. Among the members of the Board of Directors of Tri-Union are Kraisorn Chansiri (Chairman of TUG), Cheng Niruttinanon (Executive Chairman of TUG),[3] and the aforementioned Thiraphong Chansiri. A former Director of Tri-Union was Chan Tin King, Executive Director and Chief Financial Officer ("CFO") of TUG. Shue Wing Chan ("Chan"), the President and CEO of Tri-Union since 2007, is a member of the Chansiri family, and is a member of TUG's self-styled "Global Leadership Team." Prior to joining Tri-Union, he served as the CFO of TUG.[4] TUG exercises control and dominance over Tri-Union through these individuals.  According to his own LinkedIn webpage, David Roszmann ("Roszmann"), the former Chief Operating Officer ("COO") of Tri-Union, who joined the company in March of 2013,  "only direct[ly] reported to CEO [Chan] relative of majority owning family of this foreign public company [TUG] with all functions direct[ly] reporting to COO including sales, marketing, procurement, supply chain, operations, finance, HR. legal and IT."

_____

[2] TUG sponsors the Issuance of American Depository receipts traded on NASDAQ that allow United States investors to trade its equities in the domestic securities market. In that connection, it regularly files reports with the United States Securities & Exchange Commission.

[3] The Niruttinanon family is the third largest shareholder in TUG, owning 7.0% of its stock.

[4] According to one report, as CFO of TUG, Chan "managed the TUF overall business development and financial operations, including day-to-day matters related to financial administration and business performance. He was responsible for managing the development and implementation of business plans and financial strategies for the expansion of TUF"s business."

Roszmann left Tri-Union in December of 2015, soon after Tri-Union's attempt to acquire Bumble Bee was assailed by the DOJ, as further described below. As far as Plaintiffs are aware, Roszmann has not been replaced, so TUG's CEO Chan now effectively runs the day-to-day operations of Tri-Union.

20.    TUG publicly acknowledges its dominance over Tri-Union. The following pertinent excerpt of an organizational chart that appears on TUG's website demonstrates that TUG views Tri-Union as part of its overall "Global Tuna Business" and "US Ambient Operations" that are controlled directly by TUG's Board of Directors and executives.



21.    Thus, Tri-Union is an instrumentality and *alter ego* of TUG. As set forth below in excerpts from TUG's Annual Reports, TUG knew of and profited from the conspiracy alleged herein.

22.    Unless otherwise indicated, TUG and Tri-Union will be referred to collectively herein as "CoS."

**C.      Dongwon And StarKist.**

23.    Defendant StarKist Company is a domestic corporation with its headquarters located at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania 15212.  StarKist Company produces and sells PSPs throughout the United States

(including in this District), its territories and the District of Columbia.  The predecessor to StarKist Company was the French Sardine Company, created by a group of fishermen in 1918. In 1942, it adopted the brand name "StarKist." It was acquired by the H.J. Heinz Co. in 1963 and, by the 1980s, was considered by many to be the leading brand of canned tuna in the United States. In 2002, Del Monte Company bought the StarKist Company. Defendant Dongwon Industries Co., Ltd. ("Dongwon") acquired the company in 2008 for $363 million.

24.    Defendant Dongwon is a corporation organized and doing business under the laws of South Korea, with its headquarters located at Dongwon Industries Building 7th floor, Mabang-ro 68 (Yangjae-dong), Seocho-gu, Seoul, Korea. Dongwon is a publicly traded company listed on the Korean Stock Exchange. It is the largest producer of canned tuna in South Korea. Dongwon itself has repeatedly availed itself of the jurisdiction of United States federal courts.[5]

---

[5] *Dongwon Indus. Co., Ltd. v. Yoshida*, No. 90-cv-00282 (D. Alaska); *Yu Sheng Fishery Co. v. Dongwon Indus. Co., Ltd.*, No. 91-00018, 1991 WL 126138, at *1 (D. Guam May 20, 1991) (denial of motion by Dongwon for *vacatur* of writ of maritime attachment, dismissal of *in rem* claims and release of security; court noted that "[t]here is no dispute of the fact that Dongwon has sufficient minimum contacts with Guam to subject it to general *in personam* jurisdiction and suit in this district".); *Matter of Yu Sheng Fishery Co., Ltd.*, 1993 A.M.C. 116 (D. Guam July 12, 1991); *Dongwon Indus. Co., Ltd. v. Ships Gear & Transit, Inc*., No. 93-cv-01691 (S.D. Cal.) (suit alleging contract and tort claims against seller of a purse seine skiff); *Perez v. Dongwon Indus. Co*., No. 1:02-cv-00025 (D. Guam Aug. 9, 2002) (admiralty suit against Dongwon that was settled); *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 69 F.Supp. 3d 416 (D. Del. 2014), *rev'd*, 812 F.3d 294 (3d Cir. 2016) ("*Moore*") (proceedings involving defendants' (including Dongwon) motion to dismiss claims under the False Claims Act relating to the sinking a United States-flagged vessel operated by Dongwon); *Hill v. Majestic Blue Fisheries, LLC*, Civ. No. 11-00034, 2013 WL 1499155 (D. Guam April 12, 2013) ("*Hill*") (denying Dongwon's motion to dismiss for failure to state a claim) and 2015 WL 3961421 (D. Guam June 30, 2015) (involving various motions dealing with pretrial settlement by Dongwon); *Yang v. Majestic Blue Fisheries, LLC*, Civ. No. 13-00015, 2015 WL 5001190 (D. Guam Jan. 14, 2015),

25.   According to StarKist Company's website:

> Founded in 1969, Dongwon Group began as a fisheries business and branched out into various sectors including a strong food & beverage manufacturing arm, Dongwon F&B. Dongwon F&B now owns 75% of the canned tuna market share in Korea. Dongwon Industries is one of the world's largest tuna catching companies with a fleet of 36 boats. Dongwon's world class fish procurement and processing capacity builds on StarKist's national brand recognition and distribution networks in the United States to bring world-class seafood to consumers worldwide.

---

*adopted in part and rejected in part*, 2015 WL 5003606 (D. Guam Aug. 24, 2015), *recon. denied*, 2016 WL 1411335 (D. Guam April 11, 2016) (all dealing with Dongwon's participation in a scheme with relatives of corporate insiders to acquire two United States flagged vessels). The *Hill, Yang* and *Moore* cases are of significance here. The underlying facts are laid out in *Majestic Blue*, 2014 WL 3728556, at *10-35 and the *qui tam* complaint filed in the *Moore* case in November of 2012. Dongwon owned the F/V *Majestic Blue*, a tuna fishing vessel. Jae-woong Kim, the brother of Dongwon Chairman Jae-chul Kim, was the General Manager of Dongwon's office in Guam and had two daughters who were American citizens born on Guam. In 2008, those women became the figureheads for Majestic Blue Fisheries LLC ("MBFLLC"), a United States limited liability company. The F/V *Majestic Blue* was sold to that entity for $10. MBFLLC thereupon entered into maintenance and ship manning contracts with Dongwon whereby the latter essentially ran the vessel, which, because it was owned by American citizens, could fly the American flag. A series of American captains was hired to lead the vessel, but they were figureheads; largely Korean personnel selected by Dongwon really held the reins of control. The crew on the vessel engaged in repeated violations of, *inter alia*, MARPOL (the International Convention on the Prevention of Pollution from Ships) and certain laws relating to fishing practices. In June of 2010, the vessel sank after a series of poor repairs by Dongwon. MBFLLC sued for a limitation of its liability. Chief Engineer Chang Cheol Yang and Captain David Hill both died in the incident and their next of kin sued both MBFLLC and Dongwon. Dismissal of the *Moore* case was recently reversed, and the findings of fact made by the Magistrate Judge in *Majestic Blue* are being appealed to the Ninth Circuit. Adam Baske, a tuna expert formerly with the Pew Charitable Trusts, has, in an article on the F/V *Majestic Blue*, called Dongwon "one of the international bad boys in terms of illegal fishing activity." < https://medium.com/matter/mutiny-on-the-majestic-blue-80e3d2fbb345#.4wrwj94gy >.

Dongwon's own website has this to say about its control over StarKist Company:

> StarKist is the world's best tuna brand with 65 years of history, and holds the No.1 position in the US tuna market. Like Dongwon Group in Korea, ***StarKist is an iconic tuna brand in the United States, and has been controlled by Dongwon Group since 2008***, accompanying Dongwon Group on its journey to globalization. Dongwon Group, which has already become the dominant player in Korea's tuna market, has focused on the steady growth of the world's tuna market and determined that tuna can be one of core resources that will lead future industries. ***Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna company, and will become de facto a globalized enterprise***. (Emphases added).

26. Dongwon purposefully directs its activities to the United States through its "controlled" and wholly-owned subsidiary StarKist Company, through which it produces and sells PSPs throughout the United States (including in this District), its territories and the District of Columbia. Indeed, Dongwon has its own fishing fleet and is vertically integrated with StarKist Company. Dongwon also purposefully directs its activities to the United States by exporting PSPs, including canned tuna, to this country. Dongwon directly participated in the conspiracy alleged herein, as well as using its control over StarKist Company's PSP business to conspire with the other Defendants and their co-conspirators.

27. Dongwon dominates StarKist Company. The current President and CEO of StarKist Company is Andrew Choe ("Choe"), who took that position in September of 2014. Choe joined the company in 2010 as Senior Vice-President of its supply chain and Director of Strategic Planning and Development; he had previously held an executive position at Dongwon. Likewise, Nam-Jung Kim (son of Dongwon Chairman Jae-chul Kim), who served as the COO of StarKist Company from 2012 until October of 2014, was Vice-President of Dongwon F&B

and of Dongwon Enterprise Co. He now serves as a Director of both StarKist Company and Dongwon.[6] Similarly, Hyung-Joo Kim, Chief Financial Officer ("CFO") of Dongwon F&B, became the CFO of the StarKist Company in 2012. Likewise, In-gu Park, the Chairman of the Board of StarKist Company, who also served as its Acting President from November of 2010 to March of 2011, serves as CEO of Dongwon Precision Machinery Company.

28.    After the acquisition, American executives at StarKist Company began to leave—voluntarily and involuntarily. One report indicated that a "plethora of executives from Dongwon Industries' Seoul headquarters—complete with translators" had "descend[ed] on Pittsburgh to sort out the 'challenges' the company is going through"; one source stated that "there is so much American management leaving and probably even more so after this announcement…."[7]

29.    Thus, StarKist Company is the instrumentality and *alter ego* of Dongwon and, as explained below, the latter knew of and profited from the conspiracy alleged herein.

---

[6] According to one article, "Kim Nam-Jung is the younger son of Dongwon chairman Kim Jae-Chul, who founded the business in 1969 to fish for tuna and established his first overseas base in the Republic of Ghana in 1973…. In preparation for succession, the founder has been transferring ownership of the private family holding company, Dongwon Enterprise Co., which owns stakes in various listed affiliates, to Nam-Jung. Jae-Chul holds a 24.5% stake and Nam-Jung, 68%."

[7] Dongwon is no stranger to antitrust violations in the food industry. In June of 2011, one of its subsidiaries, Dongwon Dairy Foods, was fined 1.31 billion Korean won by the Korean Fair Trade Commission ("KFTC") for conspiring with three other firms to rig prices in the South Korean cheese market. According to the KFTC, employees of the Dongwon subsidiary were found to have participated in "a covert organization established for the purpose of such price-fixing"; they had multiple meetings with competitors in 2007-08, in which they agreed to raise cheese prices by 15-20%. http://www.koreaherald.com/view.php?ud=20110626000297.

30.     Unless otherwise indicated, Dongwon and StarKist Company will be referred to collectively herein as "StarKist."

## V.    AGENTS.

31.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## VI.    INTERSTATE TRADE AND COMMERCE.

32.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of PSPs in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories and the District of Columbia.

33.     Throughout the Class Period, Defendants transported substantial amounts of PSPs in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

34.     Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

## VII.    FACTUAL ALLEGATIONS.

### A.    The Nature Of, Concentration Of, And Consolidation In The Domestic PSP Market.

#### 1.    Nature of the Domestic PSP Market.

35.     PSPs are sold directly by Defendants to club warehouses, wholesale grocery suppliers, grocery cooperatives, mass merchandisers, retailers, and drug stores, among others. According to a May 2012 presentation by Bumble Bee, total United States retail sales of shelf-stable seafood products were $2.346 billion in 2011 and were forecasted to be $2.397 billion in 2012.  Bumble Bee estimated that

canned tuna represents 73% of this value. In the same report, Bumble Bee estimated that total United States retail sales of shelf-stable tuna were $1.719 billion in 2011 and were forecasted to be $1.750 billion in 2012.

36.    As noted above, the primary type of PSP is canned tuna. Canned tuna is a commodity product. The United States Department of Labor ("DoL") has referred to canned tuna as a "relatively undifferentiated commodity…with widespread consumer indifference to its country of origin or brand name."

37.    CoS's website describes the processing procedures for canned tuna made from frozen or refrigerated tuna loins:

> Sourcing
>
> Tuna is highly migratory and found in all the major oceans around the globe. Once our wild-caught tuna is caught, it is flash frozen and delivered to one of our processing facilities.
>
> Fish Receiving
>
> Fish are delivered to canneries frozen or refrigerated. Quality evaluations are performed during unloading, which include monitoring the temperature and condition of the fish and collecting samples for histamine and salt analysis. Lots found unacceptable are rejected.
>
> Cold Storage
>
> Fish are maintained at temperatures near 0° until processing
>
> Pre-Processing Evaluation
>
> Prior to being scheduled for processing, representative samples from each lot are test-packed and samples are evaluated before and after canning to assess quality. Test-pack results are used to determine acceptability and process requirements of fish remaining in each lot.

Thawing

When lots are scheduled for processing in our canneries, fish are brought out of cold storage and thawed to backbone temperatures sufficient to facilitate evisceration and sensory evaluation.

Evisceration & Evaluation

Viscera are removed and each fish is evaluated by trained staff for physical characteristics associated with decomposition or contamination. Any fish exhibiting unacceptable characteristics is rejected.

Pre-Cooking

Acceptable fish are placed on racks and transferred to large ovens, where they are cooked sufficiently to facilitate cleaning of the fish.

Cleaning

Each fish is manually cleaned and inspected for quality attributes. The cleaning operation consists of removing the head, tail, skin, bones and dark flesh known as red meat.

Can Filling

Cleaned tuna loins are fed into filling machines where prescribed amounts of fish are placed into cans. Via a separate system, empty cans are conveyed to filling machines after having been inverted and flushed with air jets and/or water sprays.

Ingredient Addition

Cans leaving the filling machine are conveyed past points where prescribed amounts of spring water or canola oil and other ingredients are added.

Can Sealing

Filled cans are conveyed to sealing machines where lids
are put in place and the cans hermetically sealed. Each
can or lid is affixed with a permanent production code
that identifies plant, product, date packed, batch and
other pertinent information. The integrity of the hermetic
seal is evaluated at frequent intervals during processing
to ensure product safety.

Thermal Processing

Sealed cans are retorted (cooked) under pressure utilizing
process time and temperature schedules designed by
processing experts to render the product commercially
sterile. All aspects of thermal processing are strictly
monitored and controlled.

Finished Product Evaluation

Samples of each finished production code receive
qualitative (e.g., color, odor, flavor, texture and cleaning)
and quantitative evaluations prior to being released for
labeling.

Labeling & Casing

Product lots meeting finished product evaluation criteria
are delivered to labeling lines where they are labeled and
cased. Cased products are appropriately marked with
information necessary to facilitate product tracing.

Warehousing & Shipping

Cased products are shipped or are staged in warehouses
for later shipment.

Bumble Bee's website has a similar description of processing of tuna loins for use
in canned tuna.

38.   StarKist's processing and canning of tuna is slightly different, as
explained at its FAQ webpage. At its facility in American Samoa, it receives frozen

tuna from fishing vessels; thaws and cleans it; processes it into loins, which are cut into sizes suitable for canning; and packs the processed fish into cans that are then sealed at the facility.

### 2. Concentration In The Domestic PSP Market.

39.     Defendants StarKist, Bumble Bee and CoS are the three largest domestic manufacturers of PSPs generally and processed tuna in particular. The industry is highly concentrated. According to the aforementioned 2012 presentation by Bumble Bee, it had 29% of the domestic shelf-stable seafood market, CoS had 18.4% and StarKist had 25.3%. The remaining market share was comprised of smaller companies and private label brands (which are often produced by Bumble Bee, CoS, or StarKist). With respect to shelf-stable tuna, StarKist had 34.6% of the market, Bumble Bee had 27.8% and CoS had 19.4%.

40.     In December of 2014, the *Wall Street Journal* reported that the Defendants' respective shares of the domestic market for canned tuna were 13% for CoS, 25% for Bumble Bee, and 36% for StarKist. Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28% and CoS at 20%.

### 3. Consolidation In The Domestic PSP Market.

41.     This oligopolistic structure of the domestic PSP market is the result of recent mergers and acquisitions.[8] For example, in 1997, Van Camp Seafood Company ("Van Camp") was acquired by the investment group Tri-Union, of which TUG was a member. Thereafter, in 2000, TUG bought out the other investors to acquire Van Camp completely, which it renamed Chicken of the Sea International, an entity that was later merged into Defendant Tri-Union.

---

[8] An oligopoly is a market or industry dominated by a small number of sellers.

42.     In 2008, Dongwon acquired the StarKist entity then in existence from Del Monte Foods for $363 million. A *Wall Street Journal* article noted the following about the acquisition:

> "We believe this acquisition will help Dongwon establish a strong foothold in penetrating the U.S. market, from which we can advance to Latin America and Europe," said Park In-gu, vice chairman of Dongwon Group's holding company Dongwon Enterprise Co. "The Starkist seafood brand and platform will fortify Dongwon's presence as a leading provider of marine products in the global market."

43.     Similarly, in 2014, TUG bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the United States. King Oscar is now 100% owned by TUG.

44.     And in December of 2014, TUG announced the acquisition from Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion. The combination of CoS and Bumble Bee would have created a virtual duopoly, with the combined entity substantially exceeding the market share of StarKist. TUG had planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million. As explained below, that acquisition did not take place.

### 4.  Barriers To Entry In The Domestic PSP Market.

45.     The oligopolistic structure of the domestic PSP industry is further reinforced by barriers to entry formed by high initial capital investment for processing and canning facilities and domestic tariffs that limit foreign competition.

46.     As is clear from the foregoing, there are significant capital outlays associated with production of PSPs. Bumble Bee and CoS have a co-packing agreement, and share tuna processing facilities in Santa Fe Springs, California and Lyons, Georgia. StarKist operates a processing facility in American Samoa. StarKist, CoS and Bumble Bee also have major investments in operations outside

the United States. CoS used to operate a fish processing facility in American Samoa. In 2009, it sold that facility to Tri Marine International, Inc. which spent $70 million over six years to bring it back in operation.

47.    In addition to capital outlays forming a barrier to entry, United States tariffs on imported canned tuna deter significant domestic sales by foreign producers. The DoL has noted that tariff rates are six percent *ad valorem* on canned tuna not packed in oil weighing seven kilograms or less and 12.5 percent *ad valorem* for the same product weighing over seven kilograms.

**B.**    **Demand, Supply, And Pricing in the Domestic PSP Market.**

**1.  The Oversupply of Tuna.**

48.    The primary types of tuna used in canned tuna sold in the United States are skipjack and albacore. Skipjack accounts for the vast majority of canned tuna sold and is often described on labels as "light tuna."

49.    There is currently and has been in recent years an oversupply of skipjack being caught, due, *inter alia*, to the use of purse seining as a method of capture,[9] In 2011, the Pacific Islands Forum Fisheries Agency reported that in the Western Centric Pacific Ocean, the total purse seine catch increased from 113,000 metric tons in 1980 to 1.8 million metric tons in 2009; the catch per vessel climbed from 3,750 metric tons in 1986 to 7,100 metric tons in 2007.

50.    The issues of excessive capture have been aggravated in recent years by the extensive use of fish aggregating devices ("FADs")—man-made objects such as

---

[9] As Lischewski of Bumble Bee described purse seining in an article published last year, "[w]ith a purse seiner, they can set a net, encircle a school of tuna, then we pull a rope through the bottom of the net to close it and that's our purse. And then we can bring that net into the boat, and we can actually scoop the tuna--generally still alive, right out of the nets, and into refrigerated sea water until we ultimately freeze them on board."

floats or buoys that are used to attract certain ocean-going fish. As stated in a

February 2016 article in *Undercurrent News*:

> A tuna industry veteran believes that there is a "major
> shakeout" coming if vessel owners don't act fast to
> address issues leading to the sector's current oversupply.
>
> Henk Brus, of the firm Sustunable, told attendees at the
> Americas Tuna Conference on Jan 29 that he believes the
> explosion in the use of fish aggregating devices (FADs)
> in the Eastern Pacific Ocean is the main cause of the
> oversupply and the recent plunge that skipjack tuna
> prices have experienced in recent years.
>
> "With the software that is available now today, we're
> increasingly going to select FADs and we're not even
> going to catch it anymore. We're basically going to
> harvest it. If the FAD is ripe we're going to pick the
> FAD," he said.

Various organizations like Greenpeace have been vocal advocates of

"sustainability" in fish harvesting: fishing practices that do not result in undue

depletion of fisheries.

    51.   The following chart, taken from the Western & Central Pacific

Fisheries Commission's 2014 "Tuna Fishery Yearbook" published in 2015 shows

how annual global catches of skipjack increased between 1990 and 2014.



1

2

### 2.  Price Declines In Raw Skipjack Due To Oversupply.

3      52.    The increasing catches of skipjack have led to decreases in the price of

4  raw skipjack. The most recent example is what happened in 2013-15. Between May

5  of 2013 and January of 2014, the price per ton of skipjack in Bangkok fell from

6  $2350 to $1250. The price rebounded briefly, but then fell again even further.

7  According to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as

8  June last year, skipjack was selling at US$1,800 in Bangkok. But the price has

9  since plummeted to US$1,000 since the beginning of the year, with industry

10  officials anticipating further reductions in price this year." The United Nations

11  Food & Agriculture Organization ("FAO") noted in its May 2015 "Food Outlook"

12  biannual report that raw tuna prices had dropped considerably in 2014: "tuna prices

13  declined significantly due to excess supply, with frozen skipjack prices hitting a 6-

14  year low." Tuna exporters in Ecuador noted in January of 2015 that the price per

15  metric ton had declined from $1400 to $800. By December of 2015, prices out of

16  Ecuador had dropped to $950 per ton and Thai prices were expected to be between

17  $950 and $980 per ton.

### 3.  Declining Domestic Consumption Of Canned Tuna.

18

19      53.    In the United States, this increase in the amount of tuna caught has not

20  been matched by increases in demand for canned tuna. Consumption of PSPs,

21  particularly canned tuna, has declined over the last ten years in the United States

22  due in large part to changing consumer tastes and concerns over how tuna is fished

23  and the effect on other species, such as dolphins. The annual consumption per

24  person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013. This trend has been

25  widely reported.

26      54.    An article in the *Washington Post* graphically represented this decline

27  by measuring United States annual *per capita* consumption from 1930 to 2010:

28

1

2

3

4

5

6

7

8



55.    Similarly, the National Marine Fisheries Service reported that

consumers in 2013 consumed a pound less of tuna per year than they had in 1985:

**U.S. ANNUAL PER CAPITA CONSUMPTION OF CANNED FISHERY PRODUCTS, 1985-2013**

| Year | Salmon | Sardines | Tuna | Shellfish | Other | Total |
|------|--------|----------|------|-----------|-------|-------|
| | | | Pounds | | | |
| 1985 | 0.5 | 0.3 | 3.3 | 0.5 | 0.4 | 5.0 |
| 1986 | 0.5 | 0.3 | 3.6 | 0.5 | 0.5 | 5.4 |
| 1987 | 0.4 | 0.3 | 3.5 | 0.5 | 0.5 | 5.2 |
| 1988 | 0.3 | 0.3 | 3.6 | 0.4 | 0.3 | 4.9 |
| 1989 | 0.3 | 0.3 | 3.9 | 0.4 | 0.2 | 5.1 |
| **1990** | **0.4** | **0.3** | **3.7** | **0.3** | **0.4** | **5.1** |
| 1991 | 0.5 | 0.2 | 3.6 | 0.4 | 0.2 | 4.9 |
| 1992 | 0.5 | 0.2 | 3.5 | 0.3 | 0.1 | 4.6 |
| 1993 | 0.4 | 0.2 | 3.5 | 0.3 | 0.1 | 4.5 |
| 1994 | 0.4 | 0.2 | 3.3 | 0.3 | 0.3 | 4.5 |
| 1995 | 0.5 | 0.2 | 3.4 | 0.3 | 0.3 | 4.7 |
| 1996 | 0.5 | 0.2 | 3.2 | 0.3 | 0.3 | 4.5 |
| 1997 | 0.4 | 0.2 | 3.1 | 0.3 | 0.4 | 4.4 |
| 1998 | 0.3 | 0.2 | 3.4 | 0.3 | 0.2 | 4.4 |
| 1999 | 0.3 | 0.2 | 3.5 | 0.4 | 0.3 | 4.7 |
| **2000** | **0.3** | **0.2** | **3.5** | **0.3** | **0.4** | **4.7** |
| 2001 | 0.4 | 0.2 | 2.9 | 0.3 | 0.4 | 4.2 |
| 2002 | 0.5 | 0.1 | 3.1 | 0.3 | 0.3 | 4.3 |
| 2003 | 0.4 | 0.1 | 3.4 | 0.4 | 0.3 | 4.6 |
| 2004 | 0.3 | 0.1 | 3.3 | 0.4 | 0.4 | 4.5 |
| 2005 | 0.4 | 0.1 | 3.1 | 0.4 | 0.3 | 4.3 |
| 2006 | 0.2 | 0.2 | 2.9 | 0.4 | 0.2 | 3.9 |
| 2007 | 0.3 | 0.2 | 2.7 | 0.4 | 0.3 | 3.9 |
| 2008 | 0.1 | 0.2 | 2.8 | 0.4 | 0.4 | 3.9 |
| 2009 | 0.2 | 0.2 | 2.5 | 0.4 | 0.4 | 3.7 |
| **2010** | **0.2** | **0.2** | **2.7** | **0.4** | **0.4** | **3.9** |
| 2011 | 0.2 | 0.2 | 2.6 | 0.4 | 0.4 | 3.8 |
| 2012 | 0.2 | 0.2 | 2.4 | 0.4 | 0.4 | 3.6 |
| **2013** | **0.4** | **0.2** | **2.3** | **0.4** | **0.4** | **3.7** |

1

**4.  Domestic Pricing Of Canned Tuna.**

2      56.    Canned tuna sold in the United States by StarKist, Bumble Bee and

3   CoS is subject to a "list price." All three producers engage in limited promotions,

4   which are calculated with reference to that list price.

5      57.    In a competitive market, increased supply of raw materials, with

6   expected lower input costs, combined with stagnant demand, should have resulted

7   in significantly lower list prices and extensive promotions for canned tuna. The

8   domestic canned tuna industry used to be that type of market. In the past, as

9   Lischewski of Bumble Bee had noted at an Infofish conference held in Bangkok,

10  Thailand, the canned tuna industry was highly competitive. Fiercely competing for

11  market share, producers sacrificed profit margins for greater sales volume.  In

12  1985-99, 54.5 percent of the canned tuna sold in the United States was sold with

13  some sort of promotion, with average price discounting of "a staggering 31

14  percent." Over this period, retail prices of chunk light half-pound canned tuna had

15  declined from $43.19 per case to $20.35, a 53 percent decline in constant dollars.

16  As Lischewski explained:

17          The fault for this poor performance falls squarely on the
18          shoulders of the tuna industry. Rather than focus on
            innovation and growth, the three major brands have
19          fought an "unwinnable" war to steal shares from one
            another in a flat to declining category. Nowhere is this
20          more evident than in profit margins.…  Our results
21          estimate that compared to 1980-84, profit margins have
            eroded by approximately US $6.75 per case. Multiplying
22          this loss by the 35 million case retail market represents
23          an annual profit loss of more than $200 million to the
            tuna industry.
24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

58.   In other words, the domestic canned tuna industry used to engage in real competition involving cut-throat pricing and substantial discounting. Since 2008, however, the industry has abandoned that competition. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted United States average prices for shelf stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 (before the period of intense competition identified by Lischewski) identified as a baseline.



59.   Indeed, the same *Washington Post* article cited above presented the following graph, which showed that while Americans are buying less canned seafood, they are paying more for what they do buy, as explained further below.



Americans are buying less, but more expensive canned seafood

C.   **DOJ's Criminal Investigation Reveals That The Pricing for PSPs Produced By Defendants Was The Result of Collusion.**

60.   The regulatory proceedings concerning the proposed merger between CoS and Bumble Bee revealed that Defendants collusively agreed to fix the domestic prices of PSPs. The DOJ's investigation of conduct in violation of the antitrust laws is continuing.

61.   On July 23, 2015, TUG suspended the preferential public offering in connection with CoS's proposed acquisition of Bumble Bee in light of a grand jury investigation commenced by the DOJ. TUG disclosed on that day that both Bumble Bee and CoS had received grand jury subpoenas relating to an antitrust investigation of PSPs. The publication *Undercurrent News* further reported in an article dated that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US

seafood producers have also received a subpoena requiring the production of relevant information to the DOJ."

62. The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.

> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

The article goes on to state:

> An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analysing deals.

> It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.

> ****

> The source said others in the industry are now anticipating that they too will be subpoenaed….

63. TUG held an Extraordinary General Meeting of Shareholders on September 16, 2015. The minutes of that meeting state:

> Khun Thiraphong Chansiri [Chairman of TUG's Board of Directors] clarified: on the capital increase issue, the

Company had a resolution from the Board of Directors and had the approval from the Office of Securities and Exchange Commission to delay the capital increase process for 6 months. The main reason for the delay request was that the week prior to the due date of the capital increase payment, ***Tri-Union Seafood or Chicken of the Sea International in the United States of America was notified by the Department of Justice of the USA that the investigation on illegal actions regarding Anti-Trust of the whole packaged seafood industry in USA was being carried out, not limited to only on the Company***. Hence the Company had consulted with the Board of Directors and the legal consultants who shared their viewpoints that ***the Company should delay its capital increase due to a high degree of uncertainty in such serious matter*** and to provide time to the shareholders to thoroughly and completely study the facts. The Company had no urgent need to use the fund from the capital increase whatsoever. The Company thus returned the fund to the shareholders. On the lawsuit issues, the Company has been keeping an eye on but still retains no clear facts and data because ***the investigation was on the whole industry***. Also the Company has been informed that the investigation process takes 2-3 years. (Emphases added)

64.    This statement indicates that StarKist received a subpoena as well as because the DOJ's investigation extends to the entire domestic PSP sector. The presence of such an industry-wide investigation is confirmed by the DOJ's intervention in this multidistrict litigation and its negotiation with the parties of a nine-month limited stay of discovery.

65.    The fact that these companies received subpoenas from a federal grand jury is significant because it indicates that the DOJ is considering a criminal prosecution, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury

investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division." *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.*

66.     On October 13, 2015, a news article in *Mlex* revealed that an industry participant had applied for leniency from the DOJ:

> It is understood that during the course of the DOJ's merger review, evidence of the cartel was uncovered. Chicken of the Sea then sought leniency from the DOJ, which grants full immunity to the first company to come forward and admit to cartel violations.
>
> It is likely that Chicken of the Sea is seeking so-called "Type B" leniency, in which the DOJ uncovers wrongdoing first and then uses a company's cooperation to build out its case.

67.     The significance of a company seeking Type B leniency cannot be understated. According to the DOJ, an applicant for Type B leniency must admit to participating in a *criminal violation* of the antitrust laws (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**

Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. ***Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.*** Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program. (Emphases added).

As indicated on the same DOJ webpage, the leniency applicant must also establish "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

68.    On December 3, 2015, it was announced that the planned merger of CoS and Bumble Bee was being abandoned. According to a press release on the DOJ's website:

"Consumers are better off without this deal," said Assistant Attorney General Bill Baer [("Baer")] of the department's Antitrust Division. "***Our investigation convinced us – and the parties knew or should have known from the get go – that the market is not functioning competitively today, and further consolidation would only make things worse***." (Emphases added).[10]

**D.     Methods By Which Defendants Effectuated Their Collusive Scheme.**

69.    As noted above, Defendants' scheme to fix domestic prices for PSPs had four main facets: (a) agreements to reduce can sizes across the industry; (b)

---

[10] Lischewski of Bumble Bee was unrepentant about the collapse of the deal. He was quoted as saying that "[d]uring the last year, Bumble Bee has conducted business as usual and now has a renewed focus to execute its vision for the company well into the future."

1  agreements to issue collusive list prices; (c) agreements to limit promotional or

2  discount activity; and (d) agreements to refrain from offering "FAD Free" products

3  to consumers. Defendants carried out these aspects of their conspiracy through

4  secret e-mails and telephone calls, as wells as through conversations and meetings

5  facilitated by various industry groups. Each of these types of conduct is described

6  below.

7  **1. Collusion On Can Size Changes.**

8       70.   The conspiracy began when StarKist, Bumble Bee and CoS collusively

9  raised prices by decreasing the amount of tuna in cans sold to putative class

10  members without also decreasing prices. On May 28-30, 2008, representatives of

11  the three companies gathered at the annual Infofish conference in Bangkok,

12  Thailand (where TUG is headquartered). Lischewski of Bumble Bee gave a keynote

13  address, urging fellow "global tuna industry leaders" to undertake the challenge to

14  drive the development of "sustainable tuna management practices." Thereafter,

15  beginning in or about August of 2008, Bumble Bee, CoS and StarKist began

16  distributing 5 oz. cans of tuna to replace their 6 oz. cans. As the Arizona

17  Department of Health Services said in a September 2008 circular, "[t]he tuna

18  industry recently reduced the size of the can from 6 ounces to 5 ounces." Indeed, a

19  spokesperson for CoS stated that the move was a collective one: "***Chicken of the***

20  ***Sea followed its competition and industry in the reduction of package sizes***."

21  (Emphases added). The can size change was largely completed in 2009 and

22  increased the price per ounce of canned tuna sold to Defendants' customers.

23       71.   Even with this alteration in can size for processed tuna, the Defendants

24  were still unhappy with the prices they obtained. Lischewski of Bumble Bee

25  complained in April of 2011 that canned tuna was "too cheap." He said it was

26  important to persuade customers to pay more for canned tuna.

27

28

### 2.  Collusion On List Price Increases.

72.    Bumble Bee, CoS and StarKist also collusively increased prices for canned tuna sold to customers in the United States by agreeing on list price increases.  The Defendants implemented these coordinated price increases through face-to-face meetings, telephone calls, and e-mails among senior executives and sales personnel at each company, including through communications conducted in connection with or under the auspices of the NFI and the International Seafood Sustainability Foundation ("ISSF"), an organization that was jointly founded by StarKist, Bumble Bee and CoS (among others) in 2009 and is currently chaired by Lischewski of Bumble Bee.

73.    For example, and without limitation, Bumble Bee, CoS and StarKist collusively agreed to a series of list prices increases for canned tuna in 2011 and 2012.

74.    StarKist announced list price increases for canned tuna on March 11, 2011, which were also implemented by Bumble Bee and CoS. Bumble Bee announced a price increase on March 14, 2011 and CoS did likewise on June 15, 2011.

75.    The coordination of list price increases by StarKist, Bumble Bee and CoS continued in late 2011 and 2012. In a series of telephone conversations between senior executives and sales representatives for each of these three Defendants beginning in December of 2011 and continuing for the first 18 days of January of 2012, they agreed to coordinate the announcement and implementation of identical or very similar list price increases.

76.    All three companies announced coordinated list price increases on canned tuna in the first quarter of 2012 that took effect in the second quarter of 2012. StarKist's announcement was made on January 13, 2012 and became effective on March 26, 2012. Bumble Bee's announcement was made on January 17, 2012 and became effective on April 1, 2012. CoS's announcement was made on

January 18, 2012 and became effective on April 1, 2012. The increases often resulted in identical list prices. For example, 48-can cartons of 5 oz. light tuna went from $40.80 to $43.58 for all three companies. The increases were orchestrated and agreed to through bilateral telephone calls among senior executives and sales personnel at each company.

77.   The FAO reported that canned tuna wholesale and retail prices in the United States increased by 10.9% and 6.6%, respectively, between 2010 and 2012. At the same time, canned tuna consumption continued to decline across the United States, falling by 7.7% between 2011 and 2012. One FAO newsletter noted in December of 2012 that "[s]luggish demand for canned tuna continues in the US market. Under the current economic conditions consumers are reluctant to accept higher canned tuna prices, while supermarkets are unable to promote the product as a low-priced item as they could in the past." Thus, Defendants' pricing conduct was contrary to the individual self-interest of each of them.

78.   These price increases in 2011-12 achieved Lischewski of Bumble Bee's goal of ensuring that the industrywide prices for canned tuna were no longer "too cheap." Lischewski himself noted in a July 2012 interview that "we believe the market will adjust to the new price levels over the next year as tuna remains a healthy and affordable protein." He went on to add that "[u]nfortunately, higher prices—*up more than 40 percent over the last 18 months*—are negatively impacting overall consumption and promotional sales volume is down as retailers are not able to achieve the 'hot' price points that historically enabled them to drive tuna volume." (Emphases added). Thus, Lischewski was conceding that the previous 18 months of price increases were driving down consumer demand and promotional volume--again something contrary to the individual self-interest of CoS, Bumble Bee and StarKist. Likewise, in a March 2012 interview, In-Soo Cho ("Cho") (former President and CEO of StarKist) stated that the company was taking

action to increase prices. He said that "[i]n America, all they have done is say: 'two cans for a dollar, three cans for a dollar'–but that has to change."

79.    The 2011-12 list price increases set benchmarks that affected all subsequent list prices of canned tuna.

### 3. Collusion On Promotional Activity.

80.    In order to ensure that their various collusive price increases were not eroded, Defendants also colluded on limiting promotional activity. For example, commencing in at least May of 2012 and continuing through at least June of 2013, there were bilateral communications involving executives from each of the three companies that were conducted through e-mails and telephone calls on the coordination of promotions for canned tuna. As an example, one company executive would call another about what was perceived to be an aggressive promotion and was assured that it was limited in nature and was not intended to upset agreed-upon market prices.

### 4. Collusion On Offering "FAD Free" Branded Tuna Products.

81.    The Defendants also conspired not to compete by collectively agreeing not to offer branded tuna products that were labeled as being "FAD free."

82.    As early as November of 2011, Lischewski of Bumble Bee, Chan of Tri-Union and CoS, and Cho of StarKist had collaborated on an article attacking Greenpeace and other environmental groups for criticizing the way tuna is harvested. The issue of sustainability came up in late 2011 in debates within the National Fisheries Institute ("NFI"), which had been founded in 2007 with the support of Thai processors and to which StarKist, Bumble Bee and CoS belonged.

83.    Separately from these debates, the three companies entered into an agreement not to compete on the sale of "FAD free" canned tuna.  Each company agreed that it would not sell any FAD free product under its own label, despite strong and growing demand by consumers for FAD free products. Senior executives at StarKist, Bumble Bee and CoS began discussions in e-mails on this

1   topic in late 2011, and reached agreement in a telephone conference among all three

2   companies during the week of February 6, 2012. The participants in the conspiracy

3   confirmed the agreement in an e-mail dated February 17, 2012. By this agreement,

4   the Defendants ensured that they did not compete on the dimension of advertising

5   the sustainably-caught nature of any of their branded tuna products.

6       84.   Defendants' agreement not to compete by producing branded canned

7   tuna labeled "FAD Free" had the effect of ensuring that such canned tuna, which

8   would be more costly to produce and have a lower profit margin, did not

9   cannibalize sales of their products subject to the price-fixing conspiracy.

10              **5.  Other Opportunities To Collude.**

11       85.   In addition to secret e-mails and telephone calls described above, the

12   Defendants had numerous other opportunities to meet and collude.

13       86.   One such opportunity is provided by the previously-mentioned annual

14   Infofish conventions held in Bangkok, Thailand during the Class Period.

15       87.   Another was provided by the Tuna Council of the aforementioned NFI.

16   As explained on the NFI's website:

17          The National Fisheries Institute's Tuna Council
18          represents the largest processors and household names
            for canned and pouch tuna in the U.S. including *Bumble*
19          *Bee®, Chicken of the Sea® and StarKist®.* The Tuna
            Council speaks for the tuna industry on numerous issues
20          including food safety, labeling, sustainability, nutrition
21          education and product marketing.

22       88.   Bumble Bee, CoS and StarKist jointly sponsored the "Tuna the

23   Wonderfish" advertising campaign of 2011-12 under the auspices of the Tuna

24   Council to remedy the perception that canned tuna was a "cheap" product. This

25   campaign was bankrolled by the three companies and the Defendants teamed up for

26   collective marketing purposes. Joe Tuza, former Senior Vice-President of

27   Marketing for StarKist, reportedly said that "[w]e worked together surprisingly

28   well." He said further that the campaign, intended to increase consumption of tuna,

was based on the hope that "as the water level rises…all boats rise with the tide", referring to the three aforementioned companies. The same philosophy was applied in Defendants' subsequent collusive activities with respect to list price increases and promotions.

89.    Yet another opportunity to collude was provided through meetings of the ISSF. Lischewski is the chair of that organization.

90.    A further opportunity to collude was provided through bilateral co-packing agreements between Bumble Bee and CoS entered into in 2011. Bumble Bee co-packs seafood for CoS at the former's plant located in Santa Fe Springs, California, with respect to West Coast sales. CoS does the same for Bumble Bee at the former's plant in Lyons, Georgia with respect to East Coast sales. Indeed, in March of 2016, Bumble Bee had to recall 2,745 cases of canned tuna packed for it by CoS. Thus, even before the proposed merger, these two companies were cooperating and communicating closely. These interlocking relationships provided additional opportunities to collude on pricing.

91.    The interlocking relationships among Defendants are also demonstrated by the movement of executives among the companies. For example, in July of 2014, Brett Butler, the former Plant Manager of StarKist's plant in American Samoa, left the company to join Bumble Bee, and relocated to Bumble Bee's San Diego headquarters, where CoS is also based. It was only a few months later, in December of 2014, that the proposed acquisition of Bumble Bee by CoS was announced. Likewise, prior to joining Bumble Bee in 1999, Lischewski had been a top executive of StarKist, having been its Vice-President of Global Procurement and Business Operations in 1991-96 and its Group Vice-President of Global Procurement and Operations in 1996-98. Such movement of executives and the common friendships that were formed fostered collusion among all three companies.

1

### E.    Involvement Of High Level Executives In The Conspiracy.

2    92.    The aforementioned practices involving collusion on list prices,

3   promotional activities and refraining from offering "FAD Free" branded tuna

4   products were conducted by the highest executives of StarKist, Bumble Bee and

5   CoS.

6    93.    As public records reflect, among the top management who led Bumble

7   Bee after its spin-off from ConAgra in 2003 were Lischewski and Lawrence

8   Hathaway (COO and former President). Other key personnel who led Bumble Bee

9   during the Class Period included: (a) David Melbourne, Jr. ("Melbourne") (Senior

10  Vice-President of Marketing, who joined the company in 2005); (b) Ken Worsham

11  (Senior Vice-President of Trade Marketing); and (c) Scott Cameron ("Cameron")

12  (Senior Vice-President of U.S. Sales).

13   94.    For StarKist, the key executives who led the company during the class

14  period included: (a) Choe (President and CEO from November of 2014 on and

15  Senior Vice-President of its supply chain and Director of Strategic Planning and

16  Development from 2010 until he became President); (b) Sam Hwi Lee (President

17  and CEO from November of 2012 to September of 2014 and a member of

18  StarKist's Board of Directors since 2008); (c) Cho (President and CEO from March

19  of 2011 to October of 2012); (d) In-gu Park (Acting President from November of

20  2010 to March of 2011); and (e) Nam-Jung Kim (COO from 2012 to October of

21  2014).

22   95.    Tri-Union's management structure is relatively lean, as reflected in the

23  following organization chart.

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10



11    96.    Thus, in 2012, the top leadership of Tri-Union consisted only of nine
12 people. As noted above, the company was headed during the class period by Chan,
13 who became its President and CEO in November of 2007.

14    97.    In March of 2013, Roszmann was added as a COO for Tri-Union and
15 he served at that position through December of 2015. As noted above, he claims in
16 his LinkedIn profile that "all functions" reported to him and that he "[m]anaged key
17 external relationships (*e.g.*, Board of Directors, Washington DC lobbying, large
18 external suppliers, and key relationships at top customers)."

19    98.    Other key executives who served the company during the Class Period
20 included: (a) Don George (Senior Vice-President of Marketing, who has been with
21 CoS since at least the 1990s); (b) Dennis Hixson (Vice-President of Sales, who
22 joined the company in March of 2005); (c) John Sawyer (Senior Vice-President of
23 Sales & Marketing, who joined the company in January of 2006); (d) Anthony
24 Montoya (Senior Vice-President); and (e) Christie Fleming (Senior Vice-President
25 of Marketing).

26
27
28

**F.      Foreign Parents' Recognition Of The Conspiracy And Its Results.**

99.     TUG, Dongwon, and Lion were all fully aware of what was happening in the United States market for PSPs and, as averred above, the first two participated directly in the conspiracy.

100.  In its 2013 Annual Report, TUG stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US*." (Emphases added). It said in the same report that its future profit margins would depend upon "[r]easonable US canned tuna competition *without unnecessary price* [*sic*]." (Emphases added). In its 2014 Annual Report, TUG explicitly noted that this goal had been achieved. It stated:

> *Thanks to reduced price competition (absence of cut throat pricing) and generally lower fish cost, our own tuna brands marked a great year of increased profitability.* Despite minimal sales growth in the US, competitive inventory cost and *reasonable market conditions* helped lift the margin of our US brand. (Emphases added).

101.  The same report went on to note that "*sensible market competition*, supported by lower raw material costs, made it possible for our own tuna brands to expand their margins through the year despite limited volume growth." (Emphases added). It indicated that future revenue growth would again be dependent upon "*[r]easonable US canned tuna market competition that focuses more on consumption creation than market share alone*." (Emphases added).

102.  Similarly, Kelly Mayer, a partner in Lion (the owner of Bumble Bee) released a memorandum in December of 2014 to limited partners that stated:

> With respect to earnings development under our ownership, Bumble Bee maintained and grew gross margins *through disciplined pricing actions*, leading to adjusted EBITDA climbing to over $150 million this

year, the highest level of EBITDA in the company's history. (Emphases added).

103.  And Dongwon has stated that "[t]he canned tuna market in the U.S. is approximately a $1,700,000,000 USD market, but it is a ***mature market where growth has stopped, and it maintains an oligopolistic system*** with Starkist Co. (40%), Bumble Bee (25%), and Chicken of the Sea (15%), and ***represents a structure in which the price of tuna cannot be efficiently reflected in the sales price of products***." (Emphases added).[11]

104.  The "reasonable market conditions", "more rational market competition", "sensible market competition", avoidance of battles for market share, "absence of cut throat pricing", pricing structure that fails to efficiently reflect input costs, and pricing "discipline" that the various Defendants' reports and statements note came about through collusion. In a truly competitive market, it would have been in the individual self-interest of each Defendant to increase market share during this period of declining costs and declining demand by lowering prices and offering more promotions.

105.  TUG, Dongwon and Lion all directly profited as a result of the conspiracy.

106.  As noted above, Lion saw substantial increases of Bumble Bee's gross margins in recent years.

107.  Similarly, Dongwon registered substantial additional income in the period following the series of list price increases described above.

108.   Likewise, TUG stated in its 2014 Annual Report stated that "[t]he overall gross margin of tuna in 2014 improved to 17.0 percent (from 12.5 percent in 2013) mainly due to gross margin expansion of branded business from lower fish costs, price adjustments of EU operation in early 2014 as well as ***rational market competition in the US***." (Emphases added).

---

[11] The foregoing quotation is a translation from the Korean language.

1

## VIII.   CLASS ACTION ALLEGATIONS

2   109.  Plaintiffs bring this action on behalf of themselves and as a class action

3   pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on

4   behalf of the following Class (the "Class"):

> All persons and entities that directly purchased packaged
> seafood products within the United States, its territories
> and the District of Columbia from any Defendant or any
> predecessor, subsidiary or affiliate thereof, at any time
> between August 1, 2008 and the present.  Excluded from
> the class are governmental entities, Defendants, any
> parent, subsidiary or affiliate thereof, and Defendants'
> officers, directors, employees, and immediate families.

Plaintiffs reserve the right to amend the Class definition as additional facts become

known through discovery.

110.  Plaintiffs do not know the exact number of members of the Class

because such information is in the exclusive control of Defendants.  Due to the

nature of the trade and commerce involved, however, Plaintiffs believe that Class

members number at least in the thousands and are sufficiently numerous and

geographically dispersed throughout the United States, its territories and the

District of Columbia so that joinder of all Class members is impracticable.

111.  There are questions of law and fact which are common to the claims of

Plaintiffs and the Class, including, but not limited to:

a.      Whether Defendants engaged in a combination or conspiracy

with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for

PSPs;

b.      Whether Defendants engaged in a combination or conspiracy

with their co-conspirators to refrain from selling branded canned tuna labeled as

"FAD Free";

c.     Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for PSPs;

d.     The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for PSPs;

e.     Whether Defendants violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

f.     Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

g.     Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and members of the Class, and, if so, the appropriate measure of damages; and

h.     Whether Plaintiffs and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

112.  Plaintiffs' claims are typical of the claims of the members of the Class.

113.  Plaintiffs will fairly and adequately assert and protect the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

114.  Plaintiffs are represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

115.  The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

116.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b.      The Class is readily definable and one for which records should exist in the files of Defendants.

c.      Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.      Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.      Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

117.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## IX.   <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>

118.  Plaintiffs had neither actual nor constructive knowledge of the facts constituting its claim for relief.

119.  Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least July of 2015. Indeed, the conspiracy was apparently only uncovered by DOJ in the process of reviewing internal company documents relating to the proposed merger between CoS and Bumble Bee.

120.  Defendants engaged in a secret conspiracy and did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was an agreement to

fix prices for PSPs.  By their very nature, price-fixing conspiracies are inherently self-concealing. Plaintiffs believe that Defendants agreed among themselves to conceal their unlawful conspiracy, including by agreeing not to discuss the conspiracy publicly and by other means of avoiding detection and maintaining secrecy, such as the use of nonpublic e-mails and private telephone calls, as described above. Accordingly, Plaintiffs could not have had either actual or constructive knowledge of the price fixing scheme until the public disclosure of the DOJ's criminal investigation.

121.  Defendants also gave pretextual reasons for their price increases in order to conceal their unlawful conduct. For example, in connection with the reduction of can sizes in 2008-09, Defendants asserted that it was due to high input costs or similar causes. Similarly, in connection with the 2011-12 price increases discussed above, CoS, StarKist, and Bumble Bee attributed the changes to rising costs, a weakening United States dollar, or other factors, Examples of these pretextual statements include: (a) a March 2011 letter from Bumble Bee to customers saying that canned tuna price increases were due to "increases in the costs of protein, packaging, and transportation and fuel over the last two years"; (b) a June 2011 letter from CoS attributing price increases to "persistent global inflationary trends" and " increased raw material costs and a weak U.S. dollar; (c) a July 2011 StarKist letter announcing prices increases for canned tuna that were attributed to "continuously rising fish costs"; (d) a January 2012 CoS letter saying that "[h]igh fish prices have made it necessary to increase the list price of both light and white [tuna]. All indicators are that these higher raw material costs will not return to levels that were seen as recently as a year ago"; (e) Melbourne of Bumble Bee saying in an August 2012 *Intrafish* article that "[t]he leading brands took pricing action due to escalating fish costs"; and (f) Cameron of Bumble Bee saying in a March 2012 letter to customers that "unforecasted elements", some of which would occur in the latter part of 2012, necessitated canned tuna price increases.

None of these communications ever mentioned Defendants' collusion or the fact that, as DOJ's Baer has stated, their industry was "not functioning competitively."

122.  Defendants thus actively misled their customers about the price-fixing scheme. Their various justifications for price increases did not disclose that they had agreed among themselves to fix, raise and/or stabilize the price of PSPs.  Defendants' justifications for their price increases were also misleading, to the extent they were true even in part, because of their failure to disclose that the price increases in fact resulted from their illegal agreement and conspiracy.

123.  Because Defendants' agreement, understanding and conspiracy was kept secret, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for PSPs during the Class Period.

## X.   CAUSE OF ACTION.

### Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

124.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

125.  Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of PSPs within the United States, its territories, and the District of Columbia in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

126.  Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of such PSPs.

127.  In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of PSPs.

128.  The illegal combination and conspiracy alleged herein had the following effects, among others:

a.      The prices charged by Defendants to, and paid by, Plaintiffs and members of the Class for PSPs were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.      Plaintiffs and members of the Class have been deprived of free and open competition in the purchase of PSPs;

c.      Plaintiffs and members of the Class have been required to pay more for PSPs than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy;

d.      Competition in the sale of PSPs has been restrained, suppressed or eliminated.

129.  As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

## XI.      <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.      That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Sections 1 and 3 f the Sherman Act;

C.      That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Class;

D.      That the Court award Plaintiffs and the Class treble damages;

E.      That the Court award Plaintiffs and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

F.      That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

G.      That the Court award Plaintiffs and the Class such other and further relief as may be deemed necessary and appropriate.

## XII.    JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(c), Plaintiffs demand a trial by jury on all matters so triable.

Dated: May 23, 2016                    Respectfully submitted,


By:  */s/ Bonny E. Sweeney*
     Michael P. Lehmann (Cal. Bar No. 77152)
     Bonny E. Sweeney (Cal. Bar No. 176174)
     Christopher L. Lebsock (Cal. Bar No. 184546)
     HAUSFELD LLP
     600 Montgomery Street, Suite 3200
     San Francisco, CA 94111
     Tel:   (415) 633-1908
     Fax:  (415) 358-4980
     E-mail:  mlehmann@hausfeld.com
     E-mail:  bsweeney@hausfeld.com
     E-mail:  clebsock@hausfeld.com

     Michael D. Hausfeld
     James J. Pizzirusso

1
2
3
4
5

HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
E-mail:   mhausfeld@hausfeld.com
E-mail:   jpizzirusso@hausfeld.com

6
7
8

*Counsel for Plaintiff Olean Wholesale*
*Grocery Cooperative, Inc. and Interim Lead*
*Counsel for the Direct Purchaser Class*

9
10
11
12
13
14
15
16

Arthur N. Bailey
Marco Cercone
RUPP BASE PFALZGRAF
CUNNINGHAM LLC
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
Telephone: (716) 664-2967
Facsimile: (716) 664-2983
E-mail: bailey@ruppbaase.com
E-mail: cercone@ruppbaase.com

17
18

*Additional Counsel for Plaintiff Olean*
*Wholesale Grocery Cooperative, Inc.*

19
20
21
22
23

Barbara  Hart
Sung-Min Lee
LOWEY DANNENBERG  COHEN
& HART, P.C.
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone:  (610) 941-2760

24
25
26
27
28

One North Broadway, Suite 509
White Plains, NY 10601-2301
Telephone:  (914) 997-0500
Facsimile:   (914) 997-0035
E-Mail: bhart@lowey.com
E-Mail: slee@lowey.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Counsel for Plaintiff Pacific Groservice Inc. d/b/a PITCO Foods and Member of Direct Purchaser Plaintiffs' Steering Committee*

Solomon B. Cera (Cal. Bar No. 99467)
Thomas C. Bright (Cal. Bar No. 169713)
Louis A. Kessler (Cal. Bar No. 243703)
CERA LLP
595 Market Street, Suite 2300
San Francisco, California 94105
Tel: (415) 777-2230
Fax: (415) 777-5189

C. Andrew Dirksen (Cal. Bar No. 130064)
CERA LLP
800 Boylston St., 16th Floor
Boston, MA 02199
Tel: (857) 453-6555
Fax: (415) 777-5189

*Counsel for Plaintiffs Associated Grocers of Florida, Inc., Central Grocers, Inc., and Piggly Wiggly Alabama Distributing Co., Inc. and Member of Direct Purchaser Plaintiffs' Steering Committee*

JOSEPH SAVERI LAW FIRM, INC.
Joseph R. Saveri (Cal. Bar No. 130064)
Andrew M. Purdy (Cal. Bar No. 261912)
Matthew S. Weiler (Cal. Bar No. 236052)
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Telephone: (415) 500-6800
Facsimile: (415) 395-9940

*Additional Counsel for Plaintiff Central Grocers, Inc.*

Jason S. Hartley (CA Bar No. 192514)
Jason M. Lindner (CA Bar No. 211451)
STEUVE SEIGEL HANSON LLP

| | |
|---|---|
| 1 | 550 West C Street, Suite 1750 |
| | San Diego, CA 92101 |
| 2 | Phone: (619) 400-5822 |
| 3 | Fax: (619) 400-5832 |
| | E-mail:  hartley@stuevesiegel.com |
| 4 | E-mail:  lindner@stuevesiegel.com |
| 5 | *Counsel for Plaintiff Trepco Imports &* |
| | *Distribution, Ltd. and Member of Direct* |
| 6 | *Purchaser Plaintiffs' Steering Committee* |
| 7 | |
| 8 | Abbas Kazerounian (Cal. Bar No. 249203) |
| | KAZEROUNI LAW GROUP, APC |
| 9 | 245 Fischer Avenue, Suite D1 |
| | Costa Mesa, CA 92626 |
| 10 | Tel:  (800) 400-6808 |
| 11 | Fax:  (800) 520-5523 |
| | E-mail:  ak@kazlg.com |
| 12 | |
| 13 | Josh Swigart (Cal. Bar No. 225557) |
| | HYDE & SWIGART |
| 14 | 2221 Camino del Rio South, Ste. 101 |
| 15 | San Diego, CA 92108 |
| | Tel:  619-233-7770 |
| 16 | Fax:  619-297-1022 |
| 17 | E-mail:  josh@westcoastlitigation.com |
| 18 | |
| 19 | Vincent J. Esades |
| | (Admitted *Pro Hac Vice*) |
| 20 | HEINS MILLS & OLSON, P.L.C. |
| | 310 Clifton Avenue |
| 21 | Minneapolis, MN 55403 |
| 22 | Telephone: (612) 338-4605 |
| | Facsimile: (612) 338-4692 |
| 23 | E-mail: vesades@heinsmills.com |
| 24 | |
| 25 | Robert Eisler |
| | (Admitted *Pro Hac Vice*) |
| 26 | GRANT & EISENHOFER |
| | 123 Justison Street |
| 27 | Wilmington, DE 19801 |
| 28 | Telephone:  (302) 622-7000 |
| | E-mail:  reisler@gelaw.com |

Daniel R. Karon
(*Pro Hac Vice* Forthcoming)
KARON LLC
700 W. St. Clair Avenue
Suite 200
Cleveland, OH 44113
Telephone:  (216) 622-1851
Fax:     (216) 241-8175
E-mail: dkaron@karonllc.com

*Additional Counsel for Plaintiff Trepco
Imports & Distribution, Ltd.*

Stephen R. Neuwirth
Sami H. Rashid
Julia Peck
Joseph N. Kiefer
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
E-mail:
stephenneuwirth@quinnemanuel.com
E-mail:  samirashid@quinnemanuel.com
E-mail: juliapeck@quinnemanuel.com
E-mail: josephkiefer@quinnemanuel.com


Ronald J. Aranoff
Dana Statsky Smith
BERNSTEIN LIEBHARD LLP
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
E-mail:  aranoff@bernlieb.com
E-mail:  dsmith@bernlieb.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Counsel for Plaintiff Benjamin Foods LLC*
*And Members of Direct Purchaser Plaintiffs'*
*Steering Committee*

Whitney E. Street (Cal. Bar No. 223870)
BLOCK & LEVITON LLP
520 Third Street, Suite 108
Oakland, CA 94607
Telephone: (415) 968-8999
Facsimile:  (617) 507-6020
E-mail: wstreet@blockesq.com

Erica G. Langsen
BLOCK & LEVITON LLP
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile:  (617) 507-6020
E-mail: elangsen@blockesq.com

*Member of Direct Purchaser Plaintiffs'*
*Steering Committee*

Allan Steyer (Cal. Bar No. 100318)
D. Scott Macrae (Cal. Bar No. 104663)
Jill M. Manning (Cal. Bar No. 178849)
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Suite 300
San Francisco, CA 94111
Telephone: (415) 421-3400
Facsimile: (415) 421-2234
E-mail: asteyer@steyerlaw.com
E-mail: smacrae@steyerlaw.com
E-mail: jmanning@steyerlaw.com

*Counsel for Plaintiff John Gross &*
*Company*