# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

IN RE PACKAGED SEAFOOD
PRODUCTS ANTITRUST
LITIGATION

Case No. 15-MD-2670 JLS (MDD)

THIS FILING RELATES TO THE
DIRECT ACTION PLAINTIFF TRACK.

**FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL**

——————————————————/

Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holding, LLC ("Plaintiffs"), by and

through their undersigned attorneys, complain and allege as follows. All allegations

herein other than those relating directly to Plaintiffs are based on information and belief.

## NATURE OF THE ACTION

1.      This action arises out of a conspiracy by the three largest brand name

producers of packaged seafood products ("PSPs") in the United States -- Bumble Bee

Foods LLC, Tri-Union Seafoods LLC, and StarKist Company, which began no later than

January 1, 2008, and continues to the present (the "Relevant Period"), to fix, raise,

maintain, and/or stabilize prices for PSPs within the United States in violation of Sections

1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3). As used herein, the term

"PSPs" refers to shelf-stable seafood (predominantly tuna) that are sold in cans, pouches

or ready-to-eat serving packages.

2.      As described in greater detail herein, this conspiracy was effectuated by

various means, including, but not limited to: (a) agreeing to decrease the sizes of cans in

which canned tuna is sold; (b) agreeing to issue collusive list price increases on canned

tuna; (c) agreeing to limit promotional activity for PSPs; and (d) agreeing not to compete by refraining from selling branded canned tuna with labels indicating it is "FAD Free" (a term that will be explained below). As a result, Defendants' PSP prices and profits have increased.

3.     Moreover, as confirmed in proceedings before this Court, the Antitrust Division of the United States Department of Justice ("DOJ") is currently conducting a criminal investigation of this conspiracy. And, critically, one of the key domestic PSP producers--Tri-Union Seafoods LLC--has been publicly reported to have sought leniency from the DOJ under the agency's program that grants immunity to the first company to admit antitrust violations.

## JURISDICTION AND VENUE

4.     This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).  The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

5.     Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391(b), (c) and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and

a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

6.     This Court has personal jurisdiction over Defendants because, *inter alia*, each: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold and delivered PSPs in the United States, including in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PLAINTIFFS

7.     Plaintiff Winn-Dixie Stores, Inc. is a corporation organized, existing, and doing business under the laws of Florida with its principal place of business at 5050 Edgewood Court, Jacksonville, Florida 32254.  During the Relevant Period, Plaintiff directly purchased PSPs from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

8.     Plaintiff Bi-Lo Holding, LLC is a limited liability company organized under the laws of the State of Delaware.  Its principal place of business is 5050 Edgewood Court, Jacksonville, Florida 32254.  During the Relevant Period, Plaintiff directly purchased PSPs from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

## DEFENDANTS

9.     Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic

corporation with its principal place of business located at 9855 Granite Ridge Drive, Suite 100, San Diego, California 92123. Bumble Bee produces and sells PSPs throughout the United States (including this District). Bumble Bee is privately owned by Lion Capital ("Lion"), based in the United Kingdom.

10.     Defendant Tri-Union Seafoods LLC is a domestic corporation with its principal place of business located at 9330 Scranton Road, Suite 500, San Diego, California 92121. Tri-Union Seafoods LLC produces and sells PSPs through the United States (including this District). Unless otherwise indicated, Tri-Union Seafoods LLC will be referred to herein as "CoS." CoS is owned by Thai Union Frozen Products ("TUF"), a company based in Thailand. That entity eventually became wholly owned by Tri-Union's parent, Thai Union Frozen Products PCL ("TUF") (now known as Thai Union Group Public Company Limited ("TUG")) in 2000.

11.     Defendant TUG is a corporation organized and doing business under the laws of Thailand. TUG is the world's largest canned tuna producer, processing 18% of the world's production. It is also the largest canned tuna producer in Thailand. Its head office is located at 72/1 Moo 7, Sethakit 1 Road, Tambon Tarsai, Mueang Samut Sakhon District, Amphur Muangsamutsakorn, Samutsakorn 74000, Thailand. TUG, through its wholly-owned subsidiary Tri-Union Seafoods LLC, produces and sells PSPs throughout the United States (including this District), its territories and the District of Columbia. In recent years, 40% or more of its sales have originated in the United States, which is its largest market. TUG also purposefully directs its activities to the United States by exporting PSPs, including canned tuna, from Thailand to this country. TUG further

4

purposefully directs its activities to the United States through its method of conducting business. It currently has three strategic business units, one of which is the "Ambient Seafood" unit, which includes its global canned tuna business; Tri-Union is part of that business unit and is viewed by TUG as part of its footprint in the United States. Indeed, TUG has its own fishing fleet and is thus vertically integrated with Tri-Union. TUG also purposefully directs its activities into the United States by operating Thai Union North America, Inc. ("TUNAI") (a company formerly known as Thai Union International, Inc.), that was founded in 1996. TUNAI is a wholly-owned instrumentality of TUG and has its address at 9330 Scranton Road, Sorrento South Corporate Center, Suite 500, San Diego CA 92121 (the same address as Tri-Union). TUNAI's President is Thiraphong Chansiri (President and CEO of TUG). The Chansiri family is the largest single shareholder in TUG, owning 20.4% of its stock.

12. TUG directly participated in the conspiracy alleged herein and used its dominance and control over Tri-Union's PSP business to conspire with the other Defendants and their co-conspirators. Among the members of the Board of Directors of Tri-Union are Kraisorn Chansiri (Chairman of TUG), Cheng Niruttinanon (Executive Chairman of TUG), and the aforementioned Thiraphong Chansiri. A former Director of Tri-Union was Chan Tin King, Executive Director and Chief Financial Officer ("CFO") of TUG. Shue Wing Chan ("Chan"), the President and CEO of Tri-Union since 2007, is a member of the Chansiri family, and is a member of TUG's self-styled "Global Leadership Team." Prior to joining Tri-Union, he served as the CFO of TUG. TUG exercises control and dominance over Tri-Union through these individuals. According to his own LinkedIn

webpage, David Roszmann ("Roszmann"), the former Chief Operating Officer ("COO") of Tri-Union, who joined the company in March of 2013, "only direct[ly] reported to CEO [Chan] relative of majority owning family of this foreign public company [TUG] with all functions direct[ly] reporting to COO including sales, marketing, procurement, supply chain, operations, finance, HR, legal and IT." Roszmann left Tri-Union in December of 2015, soon after Tri-Union's attempt to acquire Bumble Bee was challenged by the DOJ, as further described below. As far as Plaintiffs are aware, Roszmann has not been replaced, so TUG's CEO Chan now effectively runs the day-to-day operations of Tri-Union.

13.     TUG publicly acknowledges its dominance over Tri-Union. An organizational chart that appears on TUG's website demonstrates that TUG views Tri-Union as part of its overall "Global Tuna Business" and "US Ambient Operations" that are controlled directly by TUG's Board of Directors and executives.

14.     Tri-Union is an instrumentality and *alter ego* of TUG. As set forth below in excerpts from TUG's Annual Reports, TUG knew of and profited from the conspiracy alleged herein. Unless otherwise indicated, TUG and Tri-Union will be referred to collectively herein as "CoS."

15.     Defendant StarKist Company ("StarKist") is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania 15212. StarKist produces and sells PSPs throughout the United States (including this District). StarKist is privately owned by Dongwon Enterprises ("Dongwon"), based in South Korea.

16.    Defendant Dongwon is a corporation organized and doing business under the laws of South Korea, with its headquarters located at Dongwon Industries Building 7th floor, Mabang-ro 68 (Yangjae-dong), Seocho-gu, Seoul, Korea. Dongwon is a publicly traded company listed on the Korean Stock Exchange. It is the largest producer of canned tuna in South Korea. Dongwon itself has repeatedly availed itself of the jurisdiction of United States federal courts.

17.    According to StarKist Company's website:

Founded in 1969, Dongwon Group began as a fisheries business and branched out into various sectors including a strong food & beverage manufacturing arm, Dongwon F&B. Dongwon F&B now owns 75% of the canned tuna market share in Korea. Dongwon Industries is one of the world's largest tuna catching companies with a fleet of 36 boats. Dongwon's world class fish procurement and processing capacity builds on StarKist's national brand recognition and distribution networks in the United States to bring world-class seafood to consumers worldwide.

18.    Dongwon's own website has this to say about its control over StarKist Company:

StarKist is the world's best tuna brand with 65 years of history, and holds the No.1 position in the US tuna market. Like Dongwon Group in Korea, *StarKist is an* iconic tuna brand in the United States, and has been ***controlled by Dongwon Group since 2008***, accompanying Dongwon Group on its journey to globalization. Dongwon Group, which has already become the dominant player in Korea's tuna market, has focused on the steady growth of the world's tuna market and determined that tuna can be one of core resources that will lead future industries. ***Through the acquisition of StarKist, Dongwon Group has secured an*** opportunity to take off as the world's biggest tuna ***company, and will become de facto a globalized enterprise***. (Emphases added).

19.    Dongwon purposefully directs its activities to the United States through its "controlled" and wholly-owned subsidiary StarKist Company, through which it produces and sells PSPs throughout the United States (including in this District), its territories and

the District of Columbia. Indeed, Dongwon has its own fishing fleet and is vertically integrated with StarKist Company. Dongwon also purposefully directs its activities to the United States by exporting PSPs, including canned tuna, to this country. Dongwon directly participated in the conspiracy alleged herein, as well as using its control over StarKist Company's PSP business to conspire with the other Defendants and their co-conspirators.

20.     Dongwon dominates StarKist Company. The current President and CEO of StarKist Company is Andrew Choe ("Choe"), who took that position in September of 2014. Choe joined the company in 2010 as Senior Vice-President of its supply chain and Director of Strategic Planning and Development; he had previously held an executive position at Dongwon. Likewise, Nam-Jung Kim (son of Dongwon Chairman Jae-chul Kim), who served as the COO of StarKist Company from 2012 until October of 2014, was Vice-President of Dongwon F&B and of Dongwon Enterprise Co. He now serves as a Director of both StarKist Company and Dongwon. Similarly, Hyung-Joo Kim, Chief Financial Officer ("CFO") of Dongwon F&B, became the CFO of the StarKist Company in 2012. Likewise, In-gu Park, the Chairman of the Board of StarKist Company, who also served as its Acting President from November of 2010 to March of 2011, serves as CEO of Dongwon Precision Machinery Company.

21.     Thus, StarKist Company is the instrumentality and *alter ego* of Dongwon and, as explained below, the latter knew of and profited from the conspiracy alleged herein. Unless otherwise indicated, Dongwon and StarKist Company will be referred to collectively herein as "StarKist."

## UNNAMED CO-CONSPIRATORS

22.    On information and belief, at all relevant times, other producers of PSPs willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

## AGENTS

23.    The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

24.    Throughout the Relevant Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of PSPs in interstate commerce between and among offices of Defendants and their customers located throughout the United States.

25.    Throughout the Relevant Period, Defendants transported substantial amounts of PSPs in a continuous and uninterrupted flow of interstate commerce throughout the United States.

26.    Throughout the Relevant Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States.

## FACTUAL ALLEGATIONS

27.    PSPs are sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others.    According to a May 2012 presentation by Bumble Bee, total United States retail sales of shelf-stable seafood products were $2.346 billion in 2011 and were estimated to be $2.397 billion in 2012.    In one report, Bumble Bee estimated that canned tuna represents 73% of this value.    In the same report, Bumble Bee estimated that total United States retail sales of shelf-stable tuna were $1.719 billion in 2011 and were estimated to be $1.750 billion in 2012.

28.    Defendants are the three largest domestic manufacturers of PSPs.    The industry is highly concentrated.    According to the aforementioned presentation by Bumble Bee, it had 29% of the domestic shelf-stable seafood market, CoS had 18.4% and StarKist had 25.3%.    The remaining market share was comprised of smaller companies and private label brands.    With respect to shelf-stable tuna, StarKist had 34.6% of the market, Bumble Bee had 27.8% and CoS had 19.4%.    In December of 2014, the Wall Street Journal reported that the Defendants' respective shares of the domestic market for canned tuna were 13% for CoS, 25% for Bumble Bee, and 36% for StarKist.    Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28% and CoS at 20%.

29.    This oligopolistic structure within the industry is the result of recent mergers and acquisitions.    For example, in 1997, Van Camp Seafood Company ("Van Camp") was acquired by the investment group Tri-Union Seafoods LLC, of which TUF was a member.    Thereafter, TUF bought out the other investors to acquire Van Camp completely, which it renamed Chicken of the Sea International, an entity that was later

merged into Tri-Union Seafoods LLC. In 2008, Dongwon acquired StarKist from Del Monte Foods for $363 million. Similarly, in 2014, TUF bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the United States. And in December of 2014, TUF announced the acquisition from Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion. The combination of CoS and Bumble Bee would have created a virtual duopoly, with the combined entity substantially exceeding the market share of StarKist. TUF had planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million.

30. On July 23, 2015, TUF suspended the preferential public offering in light of a grand jury investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ"). TUF disclosed on that day that both Bumble Bee and CoS had received grand jury subpoenas relating to an antitrust investigation of PSPs. The publication Undercurrent News further reported in an article dated that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ." The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.
>
> He said the Thai Union subsidiary Tri-Union Seafoods,

which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

31.     The article goes on to state:

An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analysing deals.

It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.

***

The source said others in the industry are now anticipating that they too will be subpoenaed….

32.     Based on these statements, it appears that StarKist received a subpoena as well and that the DOJ's investigation extends to the entire domestic PSP sector.

33.     On October 13, 2015, it was revealed that Tri Marine also received a subpoena in connection with the DOJ's investigation.

34.     The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the

Division would proceed with a criminal prosecution." Id. At III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division." *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." Id. At III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.*

35. TUG held an Extraordinary General Meeting of Shareholders on September 16, 2015. The minutes of that meeting state:

> Khun Thiraphong Chansiri [Chairman of TUG's Board of Directors] clarified: on the capital increase issue, the Company had a resolution from the Board of Directors and had the approval from the Office of Securities and Exchange Commission to delay the capital increase process for 6 months. The main reason for the delay request was that the week prior to the due date of the capital increase payment, Tri-Union Seafood or Chicken of the Sea International in the United States of America was notified by the Department of Justice of the USA that the investigation on illegal actions regarding Anti -Trust of the whole packaged seafood industry in USA was being carried out, not limited to only on the Company. Hence the Company had consulted with the Board of Directors and the legal consultants who shared their viewpoints that the Company should delay its capital increase due to a high degree of uncertainty in such serious matter and to provide time to the shareholders to thoroughly and completely study the facts. The Company had no urgent need to use the fund from the capital increase whatsoever. The Company thus returned the fund to the shareholders. On the lawsuit issues, the Company has been keeping an eye on but still retains no clear facts and data because the investigation was on the whole industry. Also the Company has been informed that the investigation process takes 2-3 years.

36. On October 13, 2015, it was further revealed in an Mlex news article that:

> It is understood that during the course of the DOJ's merger review, evidence of the cartel was uncovered. Chicken of the Sea then sought leniency from the DOJ, which grants full immunity to the first company to come forward and admit to cartel violations.
>
> It is likely that Chicken of the Sea is seeking so-called "Type B" leniency, in which the DOJ uncovers wrongdoing first and then uses a company's cooperation to build out its case.

37. The significant of CoS seeking Type B leniency is explained on one of the DOJ's webpages (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

As indicated on the webpage, the leniency applicant must also establish "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

38. Plaintiffs, therefore, allege on information and belief that Tri-Union has

confessed its participation in the conspiracy alleged herein and that CoS, Starkist Company and Bumble Bee participated in it.

39.     There are economic indications that support the conclusion that there was collusive pricing within the domestic PSP industry.

40.     Consumption of PSPs, particularly canned tuna, has declined over the last ten years in the United States.  The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013.  This trend has been widely reported.

41.     An article in the *Washington Post* graphically represented this decline by measuring United States annual *per capita* consumption from 1930 to 2010:



The same article presented this graph, showing that while Americans are buying less canned seafood, they are paying more for what they do buy:



42.     Similarly, the National Marine Fisheries Service reported the following consumption trends for canned fish from 1985 to 2013:

### U.S. ANNUAL PER CAPITA CONSUMPTION OF CANNED FISHERY PRODUCTS, 1985-2013

| Year | Salmon | Sardines | Tuna | Shellfish | Other | Total |
|------|--------|----------|------|-----------|-------|-------|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - Pounds - - - - - - - - - - - - - - - - - - - - - - - - - - - | | | | | | |
| 1985 | 0.5 | 0.3 | 3.3 | 0.5 | 0.4 | 5.0 |
| 1986 | 0.5 | 0.3 | 3.6 | 0.5 | 0.5 | 5.4 |
| 1987 | 0.4 | 0.3 | 3.5 | 0.5 | 0.5 | 5.2 |
| 1988 | 0.3 | 0.3 | 3.6 | 0.4 | 0.3 | 4.9 |
| 1989 | 0.3 | 0.3 | 3.9 | 0.4 | 0.2 | 5.1 |
| **1990** | **0.4** | **0.3** | **3.7** | **0.3** | **0.4** | **5.1** |
| 1991 | 0.5 | 0.2 | 3.6 | 0.4 | 0.2 | 4.9 |
| 1992 | 0.5 | 0.2 | 3.5 | 0.3 | 0.1 | 4.6 |
| 1993 | 0.4 | 0.2 | 3.5 | 0.3 | 0.1 | 4.5 |
| 1994 | 0.4 | 0.2 | 3.3 | 0.3 | 0.3 | 4.5 |
| 1995 | 0.5 | 0.2 | 3.4 | 0.3 | 0.3 | 4.7 |
| 1996 | 0.5 | 0.2 | 3.2 | 0.3 | 0.3 | 4.5 |
| 1997 | 0.4 | 0.2 | 3.1 | 0.3 | 0.4 | 4.4 |
| 1998 | 0.3 | 0.2 | 3.4 | 0.3 | 0.2 | 4.4 |
| 1999 | 0.3 | 0.2 | 3.5 | 0.4 | 0.3 | 4.7 |
| **2000** | **0.3** | **0.2** | **3.5** | **0.3** | **0.4** | **4.7** |
| 2001 | 0.4 | 0.2 | 2.9 | 0.3 | 0.4 | 4.2 |
| 2002 | 0.5 | 0.1 | 3.1 | 0.3 | 0.3 | 4.3 |
| 2003 | 0.4 | 0.1 | 3.4 | 0.4 | 0.3 | 4.6 |
| 2004 | 0.3 | 0.1 | 3.3 | 0.4 | 0.4 | 4.5 |
| 2005 | 0.4 | 0.1 | 3.1 | 0.4 | 0.3 | 4.3 |

| | | | | | |
|---|---|---|---|---|---|
| 2006 | 0.2 | 0.2 | 2.9 | 0.4 | 0.2 | 3.9 |
| 2007 | 0.3 | 0.2 | 2.7 | 0.4 | 0.3 | 3.9 |
| 2008 | 0.1 | 0.2 | 2.8 | 0.4 | 0.4 | 3.9 |
| 2009 | 0.2 | 0.2 | 2.5 | 0.4 | 0.4 | 3.7 |
| **2010** | **0.2** | **0.2** | **2.7** | **0.4** | **0.4** | **3.9** |
| 2011 | 0.2 | 0.2 | 2.6 | 0.4 | 0.4 | 3.8 |
| 2012 | 0.2 | 0.2 | 2.4 | 0.4 | 0.4 | 3.6 |
| **2013** | **0.4** | **0.2** | **2.3** | **0.4** | **0.4** | **3.7** |

43.　Given this decline in consumption of the signature PSPs, one would expect rational businesses to reduce the prices for PSPs, but that did not happen. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted U.S. city average prices for shelf stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 used as a baseline.



44.　One method by which the Defendants collusively raised prices was through bilateral communications among them, in late 2011 and early 2012, in which they agreed to a price increase in the 2nd Quarter of 2012, and also on the timing of the

price increase, including that Starkist would lead the price increase and CoS and BB would follow it. In furtherance of that agreement, Starkist announced a price increase on January 13, 2012, and CoS and BB announced identical price increases on January 18, 2012, and January 17, 2012, respectively. The increases often resulted in identical list prices. For example, 48-can cartons of 5 oz. light tuna increased from $40.80 to $43.58 for all three companies.

45. Canned tuna wholesale and retail prices in the United States increased by 10.9% and 6.6%, respectively, between 2010 and 2012. At the same time, canned tuna consumption continued to decline across the United States, falling by 7.7% between 2011 and 2012. One FAO newsletter noted in December of 2012 that "[s]luggish demand for canned tuna continues in the US market. Under the current economic conditions consumers are reluctant to accept higher canned tuna prices, while supermarkets are unable to promote the product as a low-priced item as they could in the past." Thus, Defendants' pricing conduct was contrary to the individual self-interest of each of them.

46. These price increases in 2011-12 achieved Lischewski of Bumble Bee's goal of ensuring that the industrywide prices for canned tuna were no longer "too cheap." Lischewski himself noted in a July 2012 interview that "we believe the market will adjust to the new price levels over the next year as tuna remains a healthy and affordable protein." He went on to add that "[u]nfortunately, higher prices—***up more than 40 percent over the last 18 months***—are negatively impacting overall consumption and promotional sales volume is down as retailers are not able to achieve the 'hot' price points that historically enabled them to drive tuna volume." (Emphases added). Thus,

Lischewski was conceding that the previous 18 months of price increases were driving down consumer demand and promotional volume--again something contrary to the individual self-interest of CoS, Bumble Bee and StarKist. Likewise, in a March 2012 interview, In-Soo Cho ("Cho") (former President and CEO of StarKist) stated that the company was taking action to increase prices. He said that "[i]n America, all they have done is say: 'two cans for a dollar, three cans for a dollar'–but that has to change."

47.     The 2011-12 list price increases set benchmarks that affected all subsequent list prices of canned tuna.

48.     In addition, another method by which the Defendants colluded was through bilateral communications among them, in which they reached an understanding that each of them would not engage in aggressive promotion of their PSP products. These communications took place in 2012 and 2013 and consisted of complaints from one or more of them against the third party, which responded that it would not engage in aggressive promotion and that the complained of promotion would not be repeated.

49.     Another method by which the Defendants collusively raised prices was by decreasing the size of cans of tuna without also decreasing prices.  Beginning in August of 2008, Bumble Bee, CoS and StarKist began distributing 5 oz. cans of tuna to replace their 6 oz. cans.  The can size change was largely completed in January of 2009 and is reflected in the steep climb of prices depicted on the foregoing chart.  This was portrayed as a response to rising prices, but it could only have been achieved if Bumble Bee, CoS, and StarKist all agreed to it beforehand.

50.     Even with this alteration in can size for processed tuna, the Defendants

were still unhappy with the prices they obtained. Chris Lischewski, Bumble Bee's President and CEO, publicly complained that canned tuna was "too cheap."

51. The Defendants also conspired not to compete by collectively agreeing not to offer branded tuna products that were labeled as being "FAD free." As early as November of 2011, Lischewski of Bumble Bee, Chan of Tri-Union and CoS, and Cho of StarKist had collaborated on an article attacking Greenpeace and other environmental groups for criticizing the way tuna is harvested. The issue of sustainability came up in late 2011 in debates within the National Fisheries Institute ("NFI"), which had been founded in 2007 with the support of Thai processors and to which StarKist, Bumble Bee and CoS belonged.

52. Separately from these debates, the three companies entered into an agreement not to compete on the sale of "FAD free" canned tuna. Each company agreed that it would not sell any FAD free product under its own label, despite strong and growing demand by consumers for FAD free products. Senior executives at StarKist, Bumble Bee and CoS began discussions in e-mails on this topic in late 2011, and reached agreement in a telephone conference among all three companies during the week of February 6, 2012. The participants in the conspiracy confirmed the agreement in an e-mail dated February 17, 2012.

53. By this agreement, the Defendants ensured that they did not compete on the dimension of advertising the sustainably-caught nature of any of their branded tuna products.

54. Defendants' agreement not to compete by producing branded canned tuna

labeled "FAD Free" had the effect of ensuring that such canned tuna, which would be more costly to produce and have a lower profit margin, did not cannibalize sales of their products subject to the price-fixing conspiracy.

55. In addition, Bumble Bee, CoS and StarKist jointly sponsored the "Tuna the Wonderfish" advertising campaign of 2011-12 to remedy this issue. This campaign was bankrolled by the Defendants and carried out under the auspices of the National Fisheries Institute's Tuna Council ("Tuna Council") with the support of Thai processors. In it, the Defendants teamed up for marketing purposes. Joe Tuza, Senior Vice-President of Marketing for StarKist, reportedly said that "[w]e worked together surprisingly well." He said further that the campaign, intended to increase consumption of tuna, was based on the hope that "as the water level rises…all boats rise with the tide," referring to the three aforementioned companies. The same philosophy appears to undergird the alleged price-fixing conspiracy.

56. The price increases for shelf stable seafood products in recent years are not explained by increases in raw material costs. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. According to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year." Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1400 to $800. And the United Nations Food & Agriculture Organization noted in its May 2015 "Food Outlook" biannual report noted

that tuna prices had dropped considerably in 2014: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low." Despite these drastically declining raw material costs, Defendants did not decrease prices and try to obtain more market share.

57. TUF's Annual Reports discuss this situation. In its 2013 Annual Report, TUF stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US*." (Emphases added). It said in the same report that its future profit margins would depend upon "[r]easonable US canned tuna competition *without unnecessary price*." (Emphases added). In its 2014 Annual Report, TUF explicitly noted that this goal had been achieved. It stated:

> *Thanks to reduced price competition (absence of cut throat pricing)* and generally lower fish cost, *our own tuna brands marked a great year of increased profitability*. Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped left the margin of our US brand. Emphases added).

58. The same report went on to note that "*sensible market competition*, supported by lower raw material costs, made it possible for our own tuna brands to expand their margins through the year despite limited volume growth." (Emphases added). It indicated that future revenue growth would again be dependent upon "*[r]easonable US canned tuna market competition that focuses more on consumption creation than market share alone*." (Emphases added).

59. Similarly, Kelly Mayer, a partner in Lion Capital (the owner of Bumble Bee) released a memorandum in December of 2014 to limited partners that stated.

> With respect to earnings development under our ownership,
> Bumble Bee maintained and grew gross margins *through
> disciplined pricing actions*, leading to adjusted EBITDA
> climbing to over $150 million this year, the highest level of
> EBITDA in the company's history.  (Emphases added).

60.     The "reasonable market conditions," "more rational market competition,"
"sensible market competition," avoidance of battles for market share, "absence of cut
throat pricing" and pricing "discipline" that the reports and statements note could only
have come about through collusion.  It would have been against the individual self-
interest of each Defendant to eschew increasing market share during this period by
lowering prices.

61.     There were numerous business opportunities for Defendants to meet and
engage in such collusion.  One such opportunity is provided by the annual Infofish
convention held in Bangkok, Thailand during the Relevant Period.  Another was provided
by the Tuna Council.  As explained on that organization's website:

> The National Fisheries Institute's Tuna Council represents
> the largest processors and household names for canned and
> pouch tuna in the U.S. including *Bumble Bee®, Chicken of
> the Sea® and StarKist®*.  The Tuna Council speaks for the
> tuna industry on numerous issues including food safety,
> labeling, sustainability, nutrition education and product
> marketing.

62.     Another opportunity to collude was provided through bilateral copacking
agreements between Bumble Bee and CoS.  Bumble Bee copacks for CoS at the former's
plant located in Santa Fe Springs, California with respect to West Coast sales.  CoS does
the same for Bumble Bee at the former's plant in Georgia with respect to East Coast
sales.  Thus, even before the proposed merger, these two companies were cooperating

closely. These interlocking relationships provided an excellent opportunity to collude on pricing.

63.     Additionally, starting no later than 2011, Jill Irvin of Bumble Bee, Shue Wing Chan of CoS, and In-Soo Choo of StarKist directly communicated with each other and with the United States Food and Drug Administration concerning, among other matters, the standards for calculating the package weight of tuna products. Collaborations such as this provided opportunities to meet and engage in anticompetitive conduct.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

64.     Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claims for relief.

65.     Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least July of 2015.

66.     Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix prices for PSPs. Accordingly, Plaintiffs could not have had either actual or constructive knowledge of the price fixing scheme until the public disclosure of the DOJ's criminal investigation.

67.     Because Defendants' agreement, understanding and conspiracy was kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for PSPs during the Relevant Period.

68.     Defendants actively misled the public about the price-fixing scheme.  For example, Defendants issued false and misleading announcements concerning the reason for their price increases, none of which disclosed that the Defendants had agreed amongst themselves to fix and raise the price of PSPs.  Defendants also gave pretextual reasons for their price increases in order to conceal their unlawful conduct. For example, in connection with the reduction of can sizes in 2008-09, Defendants asserted that it was due to high input costs or similar causes. Similarly, in connection with the 2011-12 price increases discussed above, CoS, StarKist, and Bumble Bee attributed the changes to rising costs, a weakening United States dollar, or other factors, Examples of these pretextual statements include: (a) a March 2011 letter from Bumble Bee to customers saying that canned tuna price increases were due to "increases in the costs of protein, packaging, and transportation and fuel over the last two years"; (b) a June 2011 letter from CoS attributing price increases to "persistent global inflationary trends" and " increased raw material costs and a weak U.S. dollar; (c) a July 2011 StarKist letter announcing prices increases for canned tuna that were attributed to "continuously rising fish costs"; (d) a January 2012 CoS letter saying that "[h]igh fish prices have made it necessary to increase the list price of both light and white [tuna]. All indicators are that these higher raw material costs will not return to levels that were seen as recently as a year ago"; (e) Melbourne of Bumble Bee saying in an August 2012 *Intrafish* article that "[t]he leading brands took pricing action due to escalating fish costs"; and (f) Cameron of Bumble Bee saying in a March 2012 letter to customers that "unforecasted elements", some of which would occur in the latter part of 2012, necessitated canned tuna price

increases.

69.     None of these communications ever mentioned Defendants' collusion or the fact that, as DOJ's Baer has stated, their industry was "not functioning competitively." Defendants thus actively misled their customers about the price-fixing scheme. Their various justifications for price increases did not disclose that they had agreed among themselves to fix, raise and/or stabilize the price of PSPs. Defendants' justifications for their price increases were also misleading, to the extent they were true even in part, because of their failure to disclose that the price increases in fact resulted from their illegal agreement and conspiracy.

70.     No Defendant has yet publicly disclosed its participation in an agreement among themselves to fix and/or raise the price of PSPs.

## <u>COUNT I</u>

**Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**

71.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

72.     Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of PSPs within the United States, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

73.     Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of such PSPs.

74.     In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of PSPs.

75.     The illegal combination and conspiracy alleged herein had the following effects, among others:

a.     The prices charged by Defendants to, and paid by, Plaintiffs for PSPs were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.     Plaintiffs have been deprived of free and open competition in the purchase of PSPs;

c.     Plaintiffs have been required to pay more for PSPs that they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy; and

d.     Competition in the sale of PSPs has been restrained, suppressed or eliminated.

76.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured and damaged in their business and property in an amount to be determined according to proof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

A.      That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

B.      That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff;

C.      That the Court award Plaintiffs attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

D.      That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

E.      That the Court award Plaintiffs such other and further relief as may be deemed necessary and appropriate.

## JURY DEMAND

Plaintiffs request a jury trial on any and all claims so triable.

Dated:  May 23, 2016

/s/ Patrick J. Ahern
Patrick J. Ahern
Mark Hamill
Kathleen Sanderson
Ahern and Associates, P.C.
Willoughby Tower
8 South Michigan Avenue
Suite 3600
Chicago, Illinois 60603
Ph: (312) 404-3760
patrick.ahern@ahernandassociatespc.com

*Attorneys for Plaintiffs Winn-Dixie*
*Stores, Inc., and Bi-Lo Holding, LLC*