Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
**KAPLAN FOX & KILSHEIMER LLP**
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone:  415-772-4700
Facsimile:   415-772-4707
Email: lking@kaplanfox.com
       mchoi@kaplanfox.com

*Attorneys for Plaintiffs*

[*Additional Counsel Appear on Signature Page*]

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No. 15-MD-2670 JLS (MDD) |

THIS DOCUMENT RELATES TO:

DIRECT ACTION PLAINTIFFS' CASES

| | |
|---|---|
| AFFILIATED FOODS, INC.; AFFILIATED FOODS MIDWEST COOPERATIVE, INC.; ASSOCIATED FOOD STORES, INC.; ASSOCIATED GROCERS OF NEW ENGLAND, INC.; ASSOCIATED GROCERS, INC.; BROOKSHIRE BROTHERS, INC.; BROOKSHIRE GROCERY COMPANY; CERTCO, INC.; GIANT EAGLE, INC.; MCLANE COMPANY, INC.; MEADOWBROOK MEAT COMPANY, INC.; UNIFIED GROCERS, INC.; URM STORES INC.; and WESTERN FAMILY FOODS, INC., | **CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1** |
| Plaintiffs, | |
| vs. | DEMAND FOR JURY TRIAL |
| TRI-UNION SEAFOODS, LLC, d/b/a CHICKEN OF THE SEA INTERNATIONAL; THAI UNION NORTH AMERICA, INC.; THAI UNION GROUP PUBLIC COMPANY, LTD.; BUMBLE BEE FOODS, LLC, f/k/a BUMBLE BEE SEAFOODS, LLC; STARKIST CO., DEL MONTE FOODS COMPANY; and DONGWON ENTERPRISES CO., LTD., | |
| Defendants. | |

# <u>TABLE OF CONTENTS</u>

NATURE OF THE CASE ...................................................................................... 1

JURISDICTION AND VENUE ............................................................................. 2

PARTIES ............................................................................................................... 3

     A.    Plaintiffs ........................................................................................... 3
     B.    Defendants ........................................................................................ 4

AGENTS AND CO-CONSPIRATORS ................................................................ 6

INTERSTATE TRADE AND COMMERCE ......................................................... 6

FACTUAL ALLEGATIONS ................................................................................. 7

     A.    Background ........................................................................................ 7
     B.    Defendants' Illegal Conspiracy in Violation of the Antitrust
            Laws .............................................................................................. 11

THE CHARACTERISTICS OF THE UNITED STATES  PACKAGED
     SEAFOOD MARKET ARE CONDUCIVE TO COLLUSION ................... 18

THE DOJ INVESTIGATION ............................................................................. 19

PLAINTIFFS SUFFERED ANTITRUST INJURY ............................................ 20

FRAUDULENT CONCEALMENT AND  TOLLING OF THE STATUTE
     OF LIMITATIONS .................................................................................... 21

COUNT I ............................................................................................................. 26

PRAYER FOR RELIEF ...................................................................................... 27

JURY DEMAND .................................................................................................. 28

Plaintiffs Affiliated Foods, Inc., Affiliated Foods Midwest Cooperative, Inc., Associated Food Stores, Inc., Associated Grocers of New England, Inc., Associated Grocers, Inc., Brookshire Brothers, Inc., Brookshire Grocery Company, Certco, Inc., Giant Eagle, Inc., McLane Company, Inc., Meadowbrook Meat Company, Inc., Unified Grocers, Inc., URM Stores Inc., and Western Family Foods, Inc. (collectively, "Plaintiffs"), by and through undersigned counsel, complain as follows:

## NATURE OF THE CASE

1.      This action arises from a conspiracy to raise, fix, stabilize, or maintain prices in the market for shelf-stable packaged seafood, including tuna, clams, crab, mackerel, oysters, salmon, sardines, and shrimp (collectively, "Packaged Seafood") sold in the United States, from at least as early as January 1, 2003, through  July 23, 2015 (the "Relevant Period"), by Defendants Tri-Union Seafoods, LLC d/b/a Chicken of the Sea, Thai Union North America, Inc., Thai Union Group Public Company, Ltd.,  Bumble Bee Foods, LLC f/k/a Bumble Bee Seafoods, LLC, StarKist Co., Del Monte Foods Company, and Dongwon Enterprises Co., Ltd. (collectively, "Defendants").

2.      Plaintiffs bring this action to (i) recover treble damages, attorneys' fees, litigation expenses, and court costs, and (ii) secure injunctive relief for violations of Section 1 of the Sherman Act of 1890 ("Sherman Act"), 15 U.S.C. § 1, pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15 and 26.

3.      As alleged more fully below, by early 2003, growth in the Packaged Seafood industry had slowed, and the prospects for growth were dim. Beginning at least as early as January 2003, in an effort to combat the prospect of diminishing profits, Defendants and their co-conspirators conspired to raise, fix, stabilize, or maintain prices in the market for Packaged Seafood sold in the United States. As a

direct and proximate result of Defendants' cartel activities, Plaintiffs were overcharged by Defendants for Packaged Seafood.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to Section 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

5.     Defendants and their co-conspirators engaged in conduct both inside and outside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States, and upon import trade and commerce with the United States.

6.     Venue is proper in this district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below was carried out in this district, and one or more Defendants reside, are found, have agents, are licensed to do business, are doing business, or transact business in this district.

7.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant (i) transacted business in the United States, including this district; (ii) directly or indirectly sold or marketed substantial quantities of Packaged Seafood throughout the United States, including this district; (iii) had substantial aggregate contacts with the United States as a whole, including this district; or (iv) engaged in an illegal conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including this district.

# PARTIES

### A.    Plaintiffs

8.    Plaintiff Affiliated Foods, Inc. is a Texas corporation with its principal place of business in Amarillo, Texas.

9.    Plaintiff Affiliated Foods Midwest Cooperative, Inc. is a Nebraska corporation with its principal place of business in Norfolk, Nebraska.

10.    Plaintiff Associated Food Stores, Inc. is a Utah corporation with its principal place of business in Salt Lake City, Utah.

11.    Plaintiff Associated Grocers of New England, Inc. is a New Hampshire corporation with its principal place of business in Pembroke, New Hampshire.

12.    Plaintiff Associated Grocers, Inc. is a Louisiana corporation with its principal place of business in Baton Rouge, Louisiana.

13.    Plaintiff Brookshire Brothers, Inc. is a Texas corporation with its principal place of business in Lufkin, Texas.

14.    Plaintiff Brookshire Grocery Company is a Texas corporation with its principal place of business in Tyler, Texas.

15.    Plaintiff Certco, Inc. is a Wisconsin corporation with its principal place of business in Madison, Wisconsin.

16.    Plaintiff Giant Eagle, Inc. is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.

17.    Plaintiff McLane Company, Inc. is a Texas corporation with its principal place of business in Temple, Texas.

18.    Plaintiff Meadowbrook Meat Company, Inc. is a North Carolina corporation with its principal place of business in Rocky Mount, North Carolina.

19.    Plaintiff Unified Grocers, Inc. is a California corporation with its principal place of business in Commerce, California.

20.    Plaintiff URM Stores, Inc. is a Washington corporation with its principal place of business in Spokane, Washington.

21.    Plaintiff Western Family Foods, Inc. is an Oregon corporation with its principal place of business in Tigard, Oregon.

22.    During the Relevant Period, each Plaintiff purchased Packaged Seafood directly from one or more Defendants, and was injured in its business or property by reason of the antitrust violations alleged in this complaint.

### B.    Defendants

23.    Defendant Tri-Union Seafoods, LLC d/b/a Chicken of the Sea International ("Tri-Union") is a Delaware limited liability company with its principal place of business at 9330 Scranton Road, Suite 500, San Diego, California 92121. Since 1996, Tri-Union has been a wholly-owned subsidiary of Thai Union North America, Inc. f/k/a Thai Union International, Inc., a California corporation. Thai Union North America, Inc., in turn, is a wholly-owned subsidiary of Thai Union Group Public Company, Ltd. ("Thai Union Group"). All three companies are led by Thiraphong Chansiri, who serves as the CEO and President of Thai Union Group, the President of Thai Union North America, Inc., and a Director of Tri-Union, at which Chansiri has a day-to-day leadership role. Thai Union Group and Thai Union North America, Inc. controlled and supervised the business, operations, and activities of Tri-Union, including the conduct alleged in this Consolidated Amended Complaint, throughout the Relevant Period.

24.    Defendant Thai Union North America, Inc. is a California corporation with its principal place of business at 9330 Scranton Road, Suite 500, San Diego, California 92121. Thai Union North America, Inc., processes and distributes frozen shrimp, fish products, and other types of frozen and Packaged Seafood through its subsidiaries, including Tri-Union.

25.    Defendant Thai Union Group, a publicly held company headquartered in Thailand, is a global processor and exporter of frozen seafood and Packaged Seafood.

26.   As used herein, "Chicken of the Sea" collectively refers to Defendants Tri-Union, Thai Union North America, Inc., and Thai Union Group.

27.   Defendant Bumble Bee Foods, LLC f/k/a Bumble Bee Seafoods, LLC ("Bumble Bee") is a Delaware limited liability company with its principal place of business at 9655 Granite Ridge Drive, Suite 100, San Diego, California 92123. Bumble Bee is a wholly-owned subsidiary of Lion Capital, a private investment firm headquartered in Great Britain.

28.   Defendant StarKist Co. ("StarKist") is a Delaware corporation with its principal place of business at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania 15212. From December 2002 until October 2008, StarKist was a wholly-owned subsidiary of Del Monte Foods Company, at which time it was sold to, and became a wholly-owned subsidiary of, Dongwon Enterprises Co., Ltd.

29.   Defendant Del Monte Foods Company ("Del Monte") is a Delaware corporation with its principal place of business at One Market @ The Landmark, San Francisco, California 94105.

30.   Defendant Dongwon Enterprises Co., Ltd. ("Dongwon") is a Korean company with its principal place of business at 275 Yangjae-dong, 68 Mabang-ro, Seoul, South Korea.

31.   Del Monte managed the operations of StarKist Co. during the time it owned StarKist, from December 2002 until October 2008, and thereafter continued to manage StarKist, including its sales and Packaged Seafood pricing, under an operating agreement with Dongwon until October 2010, at which time Dongwon became the operator of StarKist. Key StarKist executives also served as Del Monte executives during the time Del Monte owned and operated StarKist. For example, Don Binotto served as StarKist's CEO  from the 1990s through November 2010 when StarKist was owned first by Heinz, then by Del Monte, and finally by Dongwon. Joseph Tuza was a Del Monte marketing executive between May 2006 and August 2008, and  then was a StarKist Sr. VP of Marketing, from August 2008

1  until November 2011.  Dongwon controlled and supervised the business, operations,

2  and activities of StarKist, including the conduct alleged in this Consolidated

3  Amended Complaint, from at least October 2010 to the present.

4       32.    As used herein, "StarKist" collectively refers to Defendants StarKist,

5  Del Monte, from December 2002 until October 2010, and Dongwon, from October

6  2008 through the present.

7       33.    Defendants and their co-conspirators, directly and through their

8  affiliates, sold Packaged Seafood throughout the United States, including this

9  district, at artificially inflated prices during the Relevant Period. Defendants are

10  direct competitors in the United States Packaged Seafood market.

11  **AGENTS AND CO-CONSPIRATORS**

12       34.    Each Defendant acted as the principal of, or agent for, all other

13  Defendants with respect to the acts, violations, and common course of conduct

14  described in this complaint.

15       35.    Various other persons, firms, companies, and corporations not named

16  as Defendants knowingly and willingly conspired with Defendants, and performed

17  acts and made statements in furtherance of the conspiracy and the alleged

18  anticompetitive conduct.

19       36.    The wrongful acts alleged to have been done by any one Defendant or

20  co-conspirator were authorized, ordered, or done by its directors, officers, managers,

21  agents, employees, or representatives while actively engaged in the management,

22  direction, or control of such Defendant's or co-conspirator's affairs.

23  **INTERSTATE TRADE AND COMMERCE**

24       37.    Defendants Chicken of the Sea, Bumble Bee, and StarKist are the

25  leading manufacturers and suppliers of Packaged Seafood sold in the United States.

26       38.    The referenced Packaged Seafood products are produced by Defendants

27  or their affiliates in the United States and overseas.

28

39.     During the Relevant Period, Chicken of the Sea, Bumble Bee, and StarKist, directly or through one or more of their affiliates, sold Packaged Seafood throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this district.

40.     The activities of Defendants and their co-conspirators were within the flow of, intended to, and  had a substantial effect on interstate commerce in the United States.

41.     Defendants' and their co-conspirators' conduct, including the marketing and sale of Packaged Seafood, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States and upon import trade and commerce with foreign nations.

42.     The conspiracy alleged in this complaint has directly and substantially affected interstate commerce in that Defendants deprived Plaintiffs of the benefits of free and open competition in the purchase of Packaged Seafood within the United States.

43.     Defendants' agreement to inflate, fix, raise, maintain, or artificially stabilize prices of Packaged Seafood, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing Packaged Seafood prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States  and on import trade and commerce with foreign nations.

## FACTUAL ALLEGATIONS

### A.     Background

44.     Packaged Seafood is composed of raw seafood processed to preserve and enhance flavor, and ensure product safety. Because it is typically caught far offshore, raw seafood is usually delivered to canneries frozen or refrigerated.

45.     Upon delivery to a processing plant, an initial quality control inspection is performed to ensure the seafood is stored and transported at the proper temperature, and is in acceptable condition. The seafood is maintained at temperatures ranging from 0°C to -18°C until processed. Seafood passing the initial quality control inspection is prepared for packaging.

46.     Accepted seafood is initially transferred to large ovens for "pre-cooking." After further cleaning, the seafood is fed into filling machines where product packages (either cans, pouches, or cups) are filled with pre-set amounts. Filled packages are moved to sealing machines where they are closed and sealed.

47.     Each package is affixed with a permanent production code identifying plant, product, date packed, batch, and other information. Filled and sealed packages are then cooked under pressure to make the products commercially sterile.

48.     StarKist, Bumble Bee, and Chicken of the Sea sell Packaged Seafood in the United States, including packaged tuna, clams, salmon, and sardines. Bumble Bee and Chicken of the Sea also sell packaged crabs, mackerel, oysters, and shrimp.

49.     The United States Packaged Seafood industry generates annual sales of approximately $2.6 billion. Tuna is the largest category within Packaged Seafood, generating estimated annual sales of approximately $1.7 billion.

50.     Defendants dominated the United States market for Packaged Seafood throughout the Relevant Period, with a combined market share of 80-85%. Each Defendant's share of the market is almost identical to what it was at the beginning of the Relevant Period: StarKist 40-44%; Bumble Bee 24-25%; and Chicken of the Sea 15-17%.

51.     After decades of growth, since 2003, demand for Packaged Seafood has been declining. From about 1950 until 2003, packaged tuna was the most popular seafood in the United States. In 1990, the International Trade Commission estimated that Americans consumed between one-half and two-thirds of the global supply of packaged tuna.

52.     Since the 1990s, health and sustainability concerns, which range from fears of mercury poisoning to fury over dolphin bycatch, have taken their toll. So, too, has a national dietary shift away from Packaged Seafood.

53.     As a result, domestic consumption of Packaged Seafood has steadily declined since 2003. Yet, as shown in Figure 1 below, which contains data through 2014 and projections thereafter, the prices, as represented by the spread between dollar sales and volume sales of Packaged Seafood, increased steadily from 2003 to 2014.

### *Figure 1*



54.     In particular, packaged tuna saw a steady decline in U.S. per capita consumption between 2003 and 2014 (*see* Figure 2 below).

*Figure 2*



55.     Given the decline in consumption of Packaged Seafood, one would expect rational businesses to reduce the prices of Packaged Seafood, but that did not happen. The following Bureau of Labor Statistics chart depicts the change in U.S. city average prices for Packaged Seafood, from January 1999 through March 2015, confirming a substantial increase in price between 2003 and 2015.

*Figure 3*



56.     In a competitive environment, a decline in demand for a product will normally lead to a decline in the price of that product. However, because Defendants controlled the market and agreed with each other to fix the prices of Packaged Seafood, such prices were intentionally and collaboratively set at artificially high levels throughout the Relevant Period.

57.     The price increases since the beginning of 2003 were a direct result of Defendants' conspiracy to fix the prices of Packaged Seafood in the United States. As a result, Plaintiffs paid artificially inflated prices for Packaged Seafood purchased from the Defendants.

**B.     Defendants' Illegal Conspiracy in Violation of the Antitrust Laws**

58.     During the Relevant Period, Defendants Chicken of the Sea, Bumble Bee, and StarKist participated together in anticompetitive communications, including telephone calls (sometimes multiple times a day) and frequent face-to-face meetings at pre-arranged locations, such as hotels and restaurants. During these meetings and telephone calls, Defendants shared sensitive business and bid information, and entered into agreements to fix, raise, stabilize, and maintain prices of Packaged Seafood sold in the United States. Among other things, they agreed not to charge below a certain price, and coordinate price increases.

59.     During the Relevant Period, senior executives of the Defendants met at least twice a year, and regularly discussed prices and shared sensitive customer information.

60.     During the Relevant Period, executives of the Defendants also communicated regularly by telephone to discuss prices and sensitive customer information. For example, upon information and belief, during at least one telephone conversation between Bumble Bee and StarKist executives, StarKist informed Bumble Bee that StarKist and Chicken of the Sea agreed to raise prices.

61. As part of the conspiracy, Defendants discussed pricing, and agreed to coordinate the timing and amount of price increases for Packaged Seafood sold to customers in the United States.

62. Throughout the Relevant Period, Defendants agreed to exchange, and did exchange, information during their telephone conversations and meetings for the purpose of monitoring and enforcing adherence to their anticompetitive agreements.

63. Defendants had ample opportunities for collusion. Defendants routinely attended trade shows and conferences during which they discussed Packaged Seafood pricing and other aspects of their anticompetitive conspiracy. Defendants regularly attended the biannual "tuna conference" — typically held in Bangkok, but never held in the United States (where there is more active antitrust enforcement) — as well as regular meetings of the International Seafood Sustainability Foundation ("ISSF") and its governing body, the International Seafood Sustainability Association. Defendants also collaborated on many projects during the Relevant Period, including their joint "Tuna the Wonderfish" advertising campaign, the Tuna Council (formerly known as the U.S. Tuna Foundation), and efforts of the ISSF. Among other things, Chicken of the Sea leadership, including former President and CEO John Signorino and former Sr. VP of Sales John Sawyer, attended a retirement party held at the residence of Chris Lischewski, President and CEO of Bumble Bee.

64. The "Tuna the Wonderfish" advertising campaign, which ran from early 2011 through early 2012, was designed to stem the tide of declining sales of Packaged Seafood in the United States. The "Tuna the Wonderfish" campaign gave Defendants ample opportunities to conspire to raise and fix Packaged Seafood prices. Although the campaign was unsuccessful in boosting consumption, Defendants nonetheless jointly implemented price increases at least three times in 2011 and 2012 in the face of falling demand.

65. There also were numerous interlocking relationships between Chicken of the Sea, Bumble Bee, and StarKist, which fostered frequent high-level

1   discussions among the leadership of these companies. For example, between the late

2   1990s and 2009, StarKist and Chicken of the Sea had a co-packing agreement

3   concerning their facilities in American Samoa.

4       66.     During the Relevant Period, Bumble Bee and Chicken of the Sea also

5   co-operated on seafood processing and packaging. Bumble Bee co-packed for

6   Chicken of the Sea on the west coast in Bumble Bee's Santa Fe Springs, California

7   plant, while Chicken of the Sea returned the favor on the east coast at its Lyons,

8   Georgia plant.

9       67.     During the Relevant Period, it was commonplace for former executives

10  of one Defendant to later become executives at their former competitors. Within the

11  past 20 years, numerous individuals have held executive or senior sales/marketing

12  positions for more than one Defendant (while maintaining close interlocking

13  relations with former colleagues), including, but not limited to:  Chris Lischewski

14  (VP of Procurement at StarKist from 1991 to 1998, and then President and CEO of

15  Bumble Bee, from 1999 to present); Jan Tharp (Sr. VP of Supply Chain at StarKist,

16  from December 2008 to July 2010, Sr. VP, Operations at  Bumble Bee, from July

17  2010 to September 2012, and then Executive VP/COO at Bumble Bee, from

18  September 2012 to present); J. Douglas Hines (Sr. VP, Sales & Marketing at

19  Chicken of the Sea in the 1990s, joining Bumble Bee in 1997, where he served as

20  Bumble Bee's Executive VP and COO from September 2008 to September 2012);

21  Joseph Clancy (VP Sales/Marketing at StarKist, from 1985 to 2002, and then VP

22  Retail Sales at Chicken of the Sea, from November 2002 to December 2010); Kevin

23  McClain (VP of Supply Chain at Chicken of the Sea, from 1979 to 2009, and then

24  VP Resourcing at Bumble Bee, from 2009 to present); David Burt (General

25  Manager – Marketing at StarKist from 2000 to 2004, and then VP Sales Specialty

26  Markets at Bumble Bee, from March 2004 to present); Hubert Tucker (Sales

27  Manager at Chicken of the Sea, from December 1997 to July 2012 and then

28  Starkist's Director of Sales Eastern Zone, from July 2012 to present); Donald

1   Stanton (General Manager Inventory Control at StarKist, from 1985 to 2001 and

2   then VP Supply Chain at Bumble Bee, from October 2005 to January 2009); and

3   Dennis Hixson (VP Sales Specialty Markets at Chicken of the Sea, from 2005 to

4   2013, and then Sr. Retail Operations Manager at StarKist, from 2014 to present).

5          68.     The fluid movement of executives among Defendants resulted in a web

6   of personal and professional relationships that facilitated anticompetitive agreements

7   and frequent exchanges of confidential and future price information.

8          69.     W. Scott Cameron has held senior sales positions at Bumble Bee since

9   May 2000 and has served as Bumble Bee's Sr. VP of Sales since May 2007.  He

10  frequently shared future pricing and customer information with the leadership of

11  Chicken of the Sea and StarKist.  From October 2009 to September 2012, Cameron

12  regularly communicated with Charles "Chuck" Handford, StarKist's VP of Trade

13  Marketing, sometimes several times per day.

14         70.     During the Relevant Period, Scott Cameron held frequent internal sales

15  conference calls at Bumble Bee attended by numerous account managers. On these

16  calls, he stated, inter alia, that he had been communicating with Chuck Handford of

17  StarKist about future pricing for customers.

18         71.     During the Relevant Period, Bumble Bee's Scott Cameron also spoke

19  about future pricing with Frank Connelly, who was a Chicken of the Sea regional

20  sales manager from at least 2000 until his death in April 2012.

21         72.     Chris Lischewski, President and CEO of Bumble Bee from 1999 to

22  present, had meetings at his office with Chicken of the Sea executives.  He also had

23  discussions with StarKist executives by phone.  Among others, Lischewski spoke

24  frequently with John Signorino, Chicken of the Sea President and CEO, from

25  January 2005 to October 2007, Shue Wing Chan (Signorino's successor since

26  October 2007), and Don Binotto of StarKist (StarKist CEO from the 1990s through

27  November 2010) to discuss pricing and customers.  Lischewski and Ken Worsham,

28  Sr. VP of Marketing at Bumble Bee since at least 2001, regularly attended meetings

with Chicken of the Sea and StarKist executives.  Lischewski attended meetings with competitors at least twice a year.

73.     During the Relevant Period, Ken Worsham, Bumble Bee's Sr. VP of Marketing since at least 2001, frequently discussed future pricing and shared customer opportunities with his father, Bob Worsham, a StarKist pricing consultant since the 1980s, and then shared StarKist's future pricing information with executives at Bumble Bee.

74.     During the Relevant Period, Bumble Bee's Don George discussed future pricing with former Chicken of the Sea associates.  Don George was Sr. VP of Trade Marketing and Innovation at Chicken of the Sea from June 1979 until May 2006, when he became VP of Trade Marketing at Bumble Bee.

75.     In or around 2011, Jan Tharp, then Bumble Bee's Sr.VP Operations, attended a meeting at a hotel with executives from StarKist and Chicken of the Sea, at which the executives agreed that all three companies would collectively raise prices. Tharp had previously served as StarKist's Sr. VP Supply Chain from December 2008 through July 2010. In March 2011, effective May 2011, at least Bumble Bee and StarKist announced a price increase.

76.     During the Relevant Period, Chicken of the Sea held weekly executive meetings on Fridays at 10:00 a.m. They were led by its CEO (John Signorino and later Shue Wing Chan), and attended by all department heads, including John Sawyer, Sr. VP Sales and Marketing, from 2006 until August 2013; Bob Blatt, CFO from the late 1990s to 2013; Jim Davet, Sr. VP Operations, from 2005 until 2008; Mike White, Director of Marketing since the late 1980s; and Kevin McClain, VP of Supply Chain until 2009.  At these meetings Sawyer, White, and Signorino/Chan discussed competitors' future price increases for Packaged Seafood products. On multiple occasions, Sawyer presented the group with StarKist's future price lists

(described as "market intelligence"), which Sawyer received from StarKist.[1]

77.     During the Relevant Period, Mike White, Chicken of the Sea's Director of Marketing since the late 1980s, regularly contacted his counterparts at StarKist (including Joseph Tuza, a Del Monte executive and StarKist Sr. VP of Marketing, from August 2008 until November 2011), and Bumble Bee to confirm price quotations that customers claimed to have received from his competitors.

78.     During the Relevant Period, top leadership from all three companies, including Shue Wing Chan (Chicken of the Sea President and CEO since November 2007), Chris Lischewski (Bumble Bee President and CEO), and Don Binotto (StarKist CEO from the late 1990s to November 2010) agreed to underfill tuna cans, and had numerous conference calls to discuss their agreement.

79.     Discussions among the Defendants led to periodic coordinated price increases at similar times and similar amounts during the Relevant Period, including, as examples:

a.     In the summer of 2003, at least Chicken of the Sea and Del Monte, on behalf of StarKist, announced list price increases on certain Packaged Seafood products;

b.     In the first quarter of 2004, Bumble Bee, Chicken of the Sea, and Del Monte, on behalf of StarKist, announced list price increases on certain Packaged Seafood products;

c.     In September 2004, effective in October 2004, Bumble Bee, Chicken of the Sea, and Del Monte, on behalf of StarKist, announced list price increases of 8% on packaged tuna products;

d.     In the summer of 2008, Bumble Bee, Chicken of the Sea, and Del Monte, on behalf of StarKist, announced list price increases of approximately

---

[1] Chuck Handford, who was the StarKist VP of Trade Marketing, from October 2009 until September 2012, was formerly employed by Bumble Bee, and a close friend of Messrs. White and Sawyer at Chicken of the Sea.

8.5%, and the reduction of the most popular packaged tuna size from 6 oz. to 5 oz., which resulted in an effective  price increase of approximately 20%;

     e.    In March 2011, effective May 2011, at least Bumble Bee and StarKist announced list price increases;

     f.    In January 2012, effective late March or early April 2012, Chicken of the Sea, StarKist, and Bumble Bee announced list price increases across their lines of tuna products; and

     g.    In March-April 2012, effective July 2012, at least StarKist and Bumble Bee announced list price increases.

80.    Further to the conspiracy, between late December 2011 and January 18, 2012, extensive telephone communications occurred between senior executives and sales personnel of Bumble Bee, Chicken of the Sea, and StarKist (including, on information and belief, Chris Lischewski and Scott Cameron of Bumble Bee, and John Sawyer of Chicken of the Sea) that resulted in an agreement to raise list prices across their lines of tuna products. Advanced copies of price announcements were circulated among Defendants' executives. Pursuant to the agreement, StarKist announced a list price increase on January 13, 2012, effective March 26, 2012; Bumble Bee announced a virtually identical list price increase on January 17, 2012, effective April 1, 2012; and Chicken of the Sea announced a virtually identical list price increase on January 18, 2012, effective April 1, 2012. Depending on the product, the price increases led to virtually identical list prices or price increases by a virtually identical amount.

81.    Bumble Bee, Chicken of the Sea, and StarKist also colluded to resist efforts by environmental groups, such as Greenpeace, to make their products more sustainable and less harmful to oceanic ecosystems. For example, Defendants were subjected to substantial outside pressure to curtail the use of fish aggregating devices ("FADs"), which have been widely criticized as environmentally damaging because of, among other things, the large number of bycatch (including endangered sea

1  turtles, sharks, and other non-targeted animals) inadvertently ensnared by the

2  devices.

3       82.     Executives from Bumble Bee, Chicken of the Sea, and StarKist were

4  concerned that a switch to a more sustainable method of fishing would decrease

5  supply and put pressure on their margins. In late 2011, executives from the three

6  companies began discussing the issue via email. They reached an agreement not to

7  sell any branded FAD-free packaged tuna product during a teleconference the week

8  of February 6, 2012, that was confirmed in a February 17, 2012 email. As a result of

9  the agreement, to this date, the three companies still do not offer any branded FAD-

10  free packaged tuna products.

11      83.     Chicken of the Sea, Bumble Bee, and StarKist also entered into an

12  agreement to limit promotions and discounts on Packaged Seafood that undercut

13  their published pricing; the agreement was policed by senior executives of each

14  company. For example, between approximately May 2012 and June 2013, there

15  were complaints exchanged, predominantly by emails between senior executives of

16  the companies, about incidents of perceived overly aggressive promotions.  A

17  complaint would typically result in reassurances among the companies that the

18  particular advertisement or promotion was an isolated incident, rather than a play for

19  additional market share, and that the promotion would not undercut the market price.

20  **THE CHARACTERISTICS OF THE UNITED STATES**
**PACKAGED SEAFOOD MARKET ARE CONDUCIVE TO COLLUSION**

21

22      84.     The structure and characteristics of the Packaged Seafood market in the

23  United States are conducive to a price-fixing agreement.

24      85.     Packaged Seafood is a commodity product sold directly to retail

25  grocery chains, grocery wholesalers, and food distributors. Packaged Seafood

26  varieties contain similar amounts of seafood, and is marketed in packages, including,

27  but not limited to, cans, pouches, and cups. Purchasers of Packaged Seafood are

28  more likely to be influenced by price when making a purchasing decision.

86.     There are substantial barriers precluding, or reducing, entry into the Packaged Seafood market, including high start-up costs (processing plants can cost tens of millions of dollars to build or refurbish), manufacturing expertise, access to raw materials, and access to distribution channels. Therefore, Defendants could collectively raise prices, and did in fact raise prices, without fear of being undercut by new entrants.

87.     Purchasers routinely source virtually all their Packaged Seafood from Defendants. Retailers and distributors must carry each of the Defendants' product lines in order to stay competitive in the markets in which they do business. As a result, Defendants dominated the United States Packaged Seafood market during the Relevant Period, and continue to do so.

88.     Defendants possessed significant market power to raise prices for Packaged Seafood above competitive levels in the United States with a combined market share of 80-85% during 2003-2015, and upon information and belief, they conspired to ensure they would stabilize and maintain their market shares in the Packaged Seafood market despite declining demand.

89.     There are no economically reasonable substitutes for Packaged Seafood. Alternative forms of seafood, such as frozen seafood or fresh seafood, require refrigeration and preparation, such as cooking, before they can be consumed, and lack the convenience, consistent portion size, and ease of use of Packaged Seafood.

## THE DOJ INVESTIGATION

90.     The San Francisco office of the Antitrust Division of the United States Department of Justice ("DOJ") is conducting an investigation into anticompetitive practices in the United States Packaged Seafood industry. The DOJ has convened a grand jury in the Northern District of California. In its motion to intervene in this MDL litigation, DOJ stated:  "Both the civil and criminal cases pertain to allegations

1    of collusive conduct among packaged seafood manufacturers in violation of

2    Section 1 of the Sherman Act, 15 U.S.C. § 1." (ECF 34-1 at pp 3-4).

3          91.    On July 23, 2015, Thai Union confirmed that its subsidiary, "Tri-Union

4    Seafoods LLC, operating in the United States under the brand Chicken of the Sea

5    ha[d] received a subpoena requiring the production of relevant information to the

6    DOJ," and that "Chicken of the Sea is cooperating fully with the investigation."

7          92.    As an indication of the seriousness of the DOJ's investigation, Thai

8    Union, on July 17, 2015, announced it had suspended a planned public offering. The

9    company stated that it wanted additional clarity on the DOJ investigation before

10   proceeding with the public offering. Thai Union notified the Securities and

11   Exchange Commission of the suspended public offering.

12         93.    On July 23, 2015, Bumble Bee acknowledged receipt of a grand jury

13   subpoena, stating, "[t]he Company did receive a grand jury subpoena relating to a

14   US Department of Justice investigation into potential antitrust violations in the

15   packaged seafood industry. The Company is cooperating fully with the

16   investigation."

17         94.    On December 3, 2015, Assistant Attorney General Bill Baer of the

18   DOJ's Antitrust Division, commented on the abandoned plan for a merger between

19   Thai Union and Bumble Bee, stating that "[o]ur investigation convinced us – and the

20   parties knew or should have known from the get go – that the market is not

21   functioning competitively today, and further consolidation would only make things

22   worse."

23                  **PLAINTIFFS SUFFERED ANTITRUST INJURY**

24         95.    During the Relevant Period, Defendants' conspiracy had the following

25   effects, among others:

26               a.    Price competition was restrained or eliminated with respect to

27   Packaged Seafood; and

28

1          b.     The prices of Packaged Seafood were fixed, raised, maintained,

2    or stabilized at artificially inflated levels.

3         96.     During the Relevant Period, Defendants charged supra-competitive

4    prices for Packaged Seafood sold to Plaintiffs. By reason of Defendants' alleged

5    violations of the antitrust laws, Plaintiffs sustained damages, injury, and harm to

6    their businesses or property in an amount to be determined, having paid higher

7    prices for Packaged Seafood than they otherwise would have paid absent

8    Defendants' alleged illegal contract, combination, or conspiracy. This is an antitrust

9    injury of the type the antitrust laws were meant to punish and prevent.

10   **FRAUDULENT CONCEALMENT AND**

11   **TOLLING OF THE STATUTE OF LIMITATIONS**

12        97.     Throughout the Relevant Period, Defendants affirmatively and

13   fraudulently concealed their unlawful conduct from discovery by Plaintiffs.

14        98.     Defendants' collusive communications were conducted through private

15   meetings, telephone calls, and emails between and among executives that were not

16   disclosed beyond an inner circle of trusted high-level colleagues, and because

17   Defendants' communications with customers offered plausible yet pretextual

18   reasons for Defendants' similar price movements, Plaintiffs did not discover, and

19   could not have discovered through the exercise of reasonable diligence, the

20   existence of the conspiracy, and Defendants' and their co-conspirators' involvement

21   in the conspiracy, until July 23, 2015, when the DOJ's investigation first became

22   public.

23        99.     Because the conspiracy was actively concealed through secret

24   communications among Defendants and pretextual communications to customers

25   until July 23, 2015, Plaintiffs were unaware of Defendants' and their co-

26   conspirators' unlawful conduct, and did not know they were paying artificially high

27   prices for Packaged Seafood.

28

100.   The affirmative acts of Defendants and their co-conspirators, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

101.   Defendants and their co-conspirators agreed among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

102.   Defendants and their co-conspirators met and communicated secretly concerning the pricing and marketing of Packaged Seafood to avoid detection.

103.   Throughout the Relevant Period, Defendants secretly agreed to implement very similar or identical price increases on Packaged Seafood at similar times. To avoid detection by their customers, including Plaintiffs, Defendants issued announcements and made other communications to the market that were intended to mislead their customers, including Plaintiffs, into believing that the pricing actions were taken independently by each Defendant because of cost increases that Defendants falsely claimed were unavoidable and industry-wide.

104.   In the summer of 2003, at least Chicken of the Sea and Del Monte, on behalf of StarKist, announced price increases for certain packaged tuna products, pretextually citing raw material cost increases. Chicken of the Sea's announcement falsely blamed the increase on falling "[c]atch rates," and a resulting increase in Skipjack prices, among other things.

105.   In the first quarter of 2004, Defendants each collusively increased their packaged tuna prices by similar amounts. On September 2, 2004, Del Monte Foods (at the time the parent of StarKist) held an earnings conference call on which its Chair, Rick Wolford, falsely attributed the joint price increases not to collusion, but to a "similar experience that we all have with tight Skipjack as well as tight albacore supplies."

106.   In the summer of 2004, Chicken of the Sea, Del Monte, on behalf of StarKist, and Bumble Bee announced increases in the price of 6 oz. packages of

"chunk light" tuna, falsely attributing the price increase to increases of raw materials due to, among other things, dwindling supply of light tuna. In an August 30, 2004 communication to its sales agents, Chicken of the Sea falsely advised that the price increase was due to an increase of prices of raw material costs, including natural gas, steel, freight and fuel, as well as "poor catch rates and tight supply." It instructed its agents: "It is critical that this information be shared with all customers **immediately**." On September 2, 2004, Chicken of the Sea announced to all of its customers that it would increase prices by approximately 8% on 6 oz. light tuna, effective on orders placed after October 18, 2004. According to the announcement, the increase was attributable to, among other things, "poor fishing conditions."

107.   Plaintiffs accepted and relied on the proffered reasons for the price increases, in some cases incorporating the explanation into their contemporaneous internal communications about why all three suppliers were increasing their prices in very similar amounts. For example, on September 24, 2004, after receiving Defendants' misleading communications, Plaintiff Unified Grocers, Inc. circulated an internal memo advising of the joint increase, attributing its cause to the explanation provided by the suppliers: "dwindling Fish supplies and additional cost pressures."

108.   Defendants' above represented statements were false because during the time period of the price increases, the demand for packaged tuna was falling steeply, while catch volumes for both Skipjack (the dominant canning light grade tuna) and Yellowfin (another popular light grade tuna), were increasing; the falling demand for tuna, when coupled with increased catch volumes, should have led to price decreases – not increases. Defendants' statements were also misleading because they failed to disclose that the true reason for the increase was Defendants' illegal conspiracy.

109.   Another example of Defendants' efforts to mislead their customers, including Plaintiffs, occurred in the summer of 2008 when StarKist, Bumble Bee,

and Chicken of the Sea each announced that they would downsize their packaged
seafood products from six ounces to five ounces, and increase prices by an average
of approximately 8.5% across the board. To mask their lockstep pricing as
independent action, Defendants again falsely cited increases in industry costs. For
example, in its June 27, 2008 announcement, Bumble Bee attributed the joint move
to increases in the "[c]osts of protein, packaging, steel, aluminum, transportation and
fuel."

110.   On August 27, 2008, Del Monte Foods issued a price announcement to
all of its "Valued Customers," advising of a StarKist price increase, effective
November 3, 2008, due to "continued escalation of global Tuna fish prices," and
stating that "[o]ver the next several days our sales agency and/or local sales
management will be in contact with you to provide additional details and review
plans that will continue the growth of our mutual business." In accordance with its
announcement, Del Monte's agents and representatives contacted its customers over
the next several months to provide detailed, but misleading, explanations for both
recent and forthcoming StarKist price increases.

111.   For example, on or about October 1, 2008, Plaintiff Affiliated Foods,
Inc. received a copy of a presentation from a Del Monte/StarKist sales agent falsely
blaming the price increases on "significant fish price inflation since the start of
2007," and stating that additional increases would be necessary because "[s]ince the
7/21/08 price increase, fish costs have continued to increase. Light Meat costs are up
an additional 18% and White Meat costs are up an additional 14%," driven in part
by "high fuel costs."  These representations were false because the prices of both
crude oil and Skipjack tuna (a light meat tuna) were flat or declining at the time the
price increases were announced.  Del Monte/StarKist's statements also were
misleading because they failed to disclose that the true reason for the increase was
Defendants' illegal agreement.

112.   Pretextual and misleading reasons for price increases were included in Defendants' communications with Plaintiffs about Packaged Seafood price increases throughout the Relevant Period.

113.   For example, in its March 2011 announcement of a price increase effective in May 2011, StarKist cited increases in "Crude index," "Packaging costs," and "Fish costs." In its January 2012 announcement of a price increase effective March 2012, StarKist cited increases in the costs of crude oil, metal, and transportation, as well as "Record high fish costs." Chicken of the Sea, in its January 2012 announcement of a price increase effective March 2012, placed the blame on "High fish prices" and "higher raw material costs." Again in its March 30, 2012 announcement to "Our Valued Customers" of another price increase effective July 2012, Bumble Bee cited "global inflation, transportation cost increases stemming from global demand on fossil fuel, and resource materials (most notably on fish)." And StarKist, in its April 2012 announcement to "Our Valued Customers" of a price increase, effective in July 2012, cited "numerous costs increases" and escalating "fish costs" as the reasons for the price increase.  These statements were misleading because they failed to disclose that the true reason for the increase was Defendants' illegal agreement.

114.   Plaintiffs could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and secrecy techniques employed by Defendants and their co-conspirators so as to avoid detection of, and fraudulently conceal, their contract, conspiracy, or combination. Defendants' conspiracy was fraudulently concealed by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers, and surreptitious communications among themselves and their co-conspirators via telephone and in-person meetings so as to prevent the existence of written records.

115.   Because the alleged conspiracy was affirmatively concealed by Defendants and their co-conspirators until July 23, 2015, Plaintiffs had no

1   knowledge of the alleged conspiracy, or any facts or information that would have

2   caused a reasonably diligent person to investigate whether a conspiracy existed.

3       116.   None of the facts or information available to Plaintiffs prior to July 23,

4   2015, if investigated with reasonable diligence, could or would have led to the

5   discovery of the conspiracy prior to July 23, 2015.

6       117.   As a result of Defendants' and their co-conspirators' fraudulent

7   concealment of the price-fixing conspiracy, the running of any statute of limitations

8   is tolled with respect to Plaintiffs' claims of anticompetitive conduct alleged in this

9   complaint.

10                                  **COUNT I**

11                  **VIOLATION OF THE SHERMAN ACT § 1**

12      118.   Defendants and their co-conspirators entered into, and engaged in, a

13  contract, combination, or conspiracy in unreasonable restraint of trade in violation of

14  Section 1 of the Sherman Act, 15 U.S.C. § 1.

15      119.   Defendants' anticompetitive acts were intentional, were directed at the

16  United States Packaged Seafood market, and had a substantial and foreseeable effect

17  on interstate commerce by raising and fixing Packaged Seafood prices throughout

18  the United States.

19      120.   The contract, combination, or conspiracy had the following direct,

20  substantial, and reasonably foreseeable effects upon commerce in the United States

21  and upon import commerce:

22           a.   Prices charged to, and paid by, Plaintiffs for Packaged Seafood

23  were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

24           b.   Plaintiffs were deprived of the benefits of free, open, and

25  unrestricted competition in the United States Packaged Seafood market; and

26           c.   Competition in establishing the prices paid for Packaged Seafood

27  was  unlawfully restrained, suppressed, or eliminated.

28

---

121.   Defendants' and their co-conspirators' anticompetitive activities directly and proximately caused injury and harm to Plaintiffs in the United States.

122.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs paid artificially inflated prices for Packaged Seafood.

123.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs were damaged in their businesses or property by paying prices for Packaged Seafood that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

A.      Adjudge and decree that Defendants' unlawful contract, combination, or conspiracy constituted a per se violation of Section 1 of the Sherman Act;

B.      Adjudge and decree that each Defendant, and its successors, assigns, parents, subsidiaries, affiliates, and transferees, and its respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf of any of them or in concert with them, be permanently enjoined and restrained from in any manner, directly or indirectly, continuing, maintaining, or renewing the combination, conspiracy, agreement, understanding, or concert of action, or adopting any practice, plan, program, or design having a similar purpose or effect in restraining competition in the United States Packaged Seafood market;

C.      Enter judgment against Defendants, jointly and severally, in favor of Plaintiffs for treble damages determined to have been sustained by Plaintiffs by virtue of Defendants' and their co-conspirators' violations of the Sherman Act;

D.      Award Plaintiffs their attorneys' fees, litigation expenses, court costs, and pre-judgment and post-judgment interest at the highest rates permitted by United States law; and

E.     Grant Plaintiffs such other and further relief as the case may require, or as the Court deems just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

Dated:  May 23, 2016

**KAPLAN FOX & KILSHEIMER LLP**

By:   _/s/ Laurence D. King_
Laurence D. King

Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone:  415-772-4700
Facsimile:   415-772-4707
Email: lking@kaplanfox.com
        mchoi@kaplanfox.com

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Gregory K. Arenson
Richard J. Kilsheimer
Elana Katcher
Matthew P. McCahill
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: rkaplan@kaplanfox.com
        garenson@kaplanfox.com
        rkilsheimer@kaplanfox.com
        ekatcher@kaplanfox.com
        mmccahill@kaplanfox.com

**SPROUSE SHRADER SMITH, PLLC**
Johnny K. Merritt
701 S. Taylor Street, Suite 500
Amarillo, TX 79101
Telephone: (806) 349-4713
Facsimile: (806) 373-3454
Email: johnny.merritt@sprouselaw.com

1

**THE COFFMAN LAW FIRM**
Richard L. Coffman
2
First City Building
505 Orleans St., Fifth Floor
3
Beaumont, TX 77701
Telephone: (409) 833-7700
4
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com
5

6
**MARCUS & SHAPIRA LLP**
Bernard D. Marcus
7
Moira C. Cain-Mannix
Erin Gibson Allen
8
One Oxford Center, 35th Floor
Pittsburgh, PA 15219
9
Telephone: (412) 471-3490
Facsimile: (412) 391-8758
10
Email:  marcus@marcus-shapira.com
           cain-mannix@marcus-shapira.com
11
           allen@marcus-shapira.com

12
**MAURIELLO LAW FIRM, APC**
Thomas D. Mauriello
13
1181 Puerta Del Sol, #120
San Clemente, CA 92673
14
Telephone: (949) 542-3555
Facsimile: (949) 606-9690
15
Email:  tomm@maurlaw.com

16
*Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28