JOHN H. DONBOLI (SBN: 205218)
jdonboli@delmarlawgroup.com
CAMILLE JOY DECAMP (SBN: 236212)
cdecamp@delmarlawgroup.com
DEL MAR LAW GROUP, LLP
12250 El Camino Real, Suite 120
San Diego, CA 92130
Telephone: 858.793.6244
Facsimile: 858.793.6005

*Counsel for Plaintiffs and Class*
[Additional Counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAPITOL HILL SUPERMARKET, DUTCH VILLAGE RESTAURANT, A-1 DINER, THYME CAFÉ & MARKET, INC., HARVESTERS ENTERPRISES d/b/a HARVESTER'S SEAFOOD AND STEAKHOUSE, LLC, JANET MACHEN, LESGO PERSONAL CHEF, LLC, SIMON-HINDI, LLC, and MAQUOKETA CARE CENTER, INC., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br><br>v.<br>BUMBLE BEE FOODS LLC, TRI-UNION SEAFOODS LLC, THAI UNION GROUP PUBLIC COMPANY LIMITED, STARKIST COMPANY, and DONGWON INDUSTRIES CO., LTD.<br><br>Defendants. | Case No. 3:15-md-02670-JLS-MDD<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Capitol Hill Supermarket, Dutch Village Restaurant, A-1 Diner, Thyme Café & Market, Inc., Harvesters Enterprises, LLC d/b/a Harvester's Seafood and Steakhouse, Janet Machen, LesGo Personal Chef, LLC, Simon-

Hindi, LLC, and Maquoketa Care Center, Inc., (collectively, "Plaintiffs"), by and through their undersigned attorneys, allege as follows. Other than those relating directly to Plaintiffs, all allegations herein are upon information and belief.

## NATURE OF THE ACTION

1.      Bumble Bee Foods LLC, Tri-Union Seafoods LLC, Thai Union Group Public Company Limited, StarKist Company, and Dongwon Industries Co., Ltd. (collectively, "Defendants") include the largest producers of packaged seafood products ("PSPs") in the United States, its territories, and the District of Columbia. This action concerns their conspiracy—which began no later than August 1, 2008 and continues to the present (the "Class Period")—to reduce the size of cans in which tuna is sold, to fix, raise, maintain, and/or stabilize prices for PSPs within the United States, to fix, contain, and/or diminish discounting of PSPs within the United States, and to forgo entering the market for "FAD-Free" PSPs (*i.e.* seafood caught without the aid of fish aggregating devices ("FADs"), rendering these products more sustainable) under major brand labels. As used in this Complaint, the term "PSPs" refers to shelf-stable seafood products (predominantly tuna) that are sold in cans, pouches, or ready-to-eat serving packages.

2.      Plaintiffs, indirect purchasers of PSPs, have paid supracompetitive prices for PSPs as a direct result of Defendants' conspiracy, and were not able to pass on these illegal overcharges. Plaintiffs bring this lawsuit as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of residents of jurisdictions which proscribe the Defendants' unlawful conduct, as described in this Consolidated Class Action Complaint.  These jurisdictions include Arizona, Arkansas, California, the District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island,

South Carolina, South Dakota, Utah, Vermont, West Virginia, and Wisconsin. Plaintiffs bring this lawsuit individually and on behalf of all incorporated and non-incorporated entities engaged in the preparation of food that indirectly purchased packaged seafood products for their own use in food preparation, rather than for shelf-stable resale, from one or more Defendant or any predecessor, subsidiary, or affiliate thereof, at any time after August 1, 2008.

## JURISDICTION AND VENUE

3.      Plaintiffs bring this state law class action to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees. Plaintiffs also seek nationwide injunctive relief. Plaintiffs seek damages in excess of $5,000,000. Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also asserts claims for actual and exemplary damages under state antitrust, unfair competition, and consumer protection laws, and seeks to obtain restitution, recover damages, and secure other relief against Defendants for violation of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d).

4.      Venue and personal jurisdiction are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22). Personal jurisdiction is proper in this district as each Defendant resides, is found, transacts business, or has an agent in the United States, including in this district. Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), and, because at least one of the Defendants resides is licensed in or is conducting business in this judicial district, and because a substantial portion of the unlawful and anticompetitive conduct affecting interstate trade and commerce was engaged in and carried out by Defendants in this judicial district.

# PARTIES

5.     Plaintiff Thyme Café & Market is a café and gourmet market located at 1630 Ocean Park Boulevard, Santa Monica, CA 90405. During the relevant period, Plaintiff Thyme Café & Market has purchased Tri-Union Seafoods LLC's PSPs—specifically, its shelf-stable tuna—from the food service distributor U.S. Foods, Inc. Plaintiff Thyme Café & Market used the PSPs it indirectly purchased from Defendants to make the various prepared foods for its customers. Plaintiff has never resold PSPs as such.

6.     Plaintiff A-1 Diner is a restaurant located at 3 Bridge St, Gardiner, Maine 04345. During the relevant period, Plaintiff A-1 Diner has purchased Bumble Bee's PSPs—specifically, its shelf-stable tuna—from the wholesale supplier Sam's Club. Plaintiff A-1 Diner uses the PSPs it indirectly purchases from Bumble Bee to make tuna salad plates for its customers. It does not resell PSPs.

7.     Plaintiff Dutch Village Restaurant is a restaurant located at 8729 East Main Street, Clymer, NY 14724. During the relevant period, Plaintiff Dutch Village Restaurant has purchased StarKist's PSPs—specifically, its shelf-stable tuna—from the food service distributor Maple Vale Farm, Inc. Plaintiff Dutch Village Restaurant purchased groceries, including StarKist's PSPs, on a weekly basis. Plaintiff Dutch Village Restaurant uses the PSPs it indirectly purchases from Defendants to make the following items for its customers: grilled tuna melts, tuna salad sandwiches, tuna salad stuffed tomato picnic platters, macaroni tuna salads, and tuna noodle casseroles. Plaintiff Dutch Village Restaurant never resells PSPs.

8.     Plaintiff Capitol City Supermarket is a sandwich shop located at 241 Massachusetts Avenue, N.E., Washington, D.C. 20002. For at least the past eight years, Plaintiff Capitol City Supermarket has purchased numerous Defendant Tri-Union Seafoods LLC's PSPs—specifically, its Chicken of the Sea brand of shelf-stable tuna—from wholesale suppliers located in the District of Columbia. Plaintiff Capitol City Supermarket uses the PSPs it indirectly purchases from Defendant

Tri-Union Seafoods LLC to make tuna salad for sandwiches for its customers.

9.      Plaintiff Janet Machen is a caterer located in Little Rock, Pulaski County, Arkansas. During the relevant period, Plaintiff Machen has purchased Defendants' PSPs—specifically, their shelf-stable tuna—from food distributors: Sam's Club, Wal-Mart, and Kroger. Plaintiff Machen uses the PSPs she indirectly purchases from Defendants to make food products and meals for her customers. She does not resell PSPs as such.

10.     Plaintiff LesGo Personal Chef, LLC is a caterer located in Mary Esther, Okaloosa County, Florida. The principal place of business is 1056 Bryn Mawr Blvd. Mary Esther, Florida 32569. During the relevant period, Plaintiff LesGo Personal Chef, LLC has purchased Defendants' PSPs—specifically, their shelf-stable tuna—from food distributors: Wal-Mart, Sysco and US Foods. Plaintiff LesGo Personal Chef, LLC uses the PSPs it indirectly purchases from Defendants to make food products and meals such as tuna salad, tuna canapes, tuna melts, tuna napoleon and sandwiches for its customers.

11.     Plaintiff Harvesters Enterprises, LLC, doing business as Harvester's Seafood and Steakhouse, is a restaurant located at 20735 Highway 12, Lexington, Mississippi 39095. During the relevant period, Plaintiff Harvesters Enterprises, LLC purchased Defendants' PSPs—specifically, their shelf-stable tuna—from food distributors. Plaintiff uses the PSPs it indirectly purchases from Defendants to make tuna fish sandwiches and tuna salads for its customers. It does not resell PSPs as such.

12.     Plaintiff Simon-Hindi LLC, doing business as Simon's, is a restaurant and catering company located at 501 1st Ave, San Diego, CA 92101. During the relevant period, Plaintiff Simon-Hindi LLC, purchased Defendants' PSPs—specifically, shelf-stable tuna, from food distributors, including but not limited to Costco Wholesale. Plaintiff Simon-Hindi LLC uses the PSPs it indirectly purchases from Defendants to make food products and meals for its customers and

1    does not resell PSPs as such.

2        13.    Plaintiff Maquoketa Care Center, Inc., is located at 1202 German Street

3    Maquoketa, Iowa 52060. During the relevant period, Plaintiff Maquoketa Care

4    Center, Inc., purchased Defendants' PSPs—specifically, Chicken of the Sea shelf-

5    stable tuna—from food distributors, including U.S. Foods. Plaintiff uses the PSPs

6    it indirectly purchases from Defendants to make tuna dishes. It does not resell

7    PSPs as such.

8        14.    Defendant Tri-Union Seafoods LLC is a domestic corporation with its

9    principal place of business at 9330 Scranton Road, Suite 500, San Diego, CA

10   92121. Tri-Union Seafoods LLC produces and sells PSPs throughout the United

11   States, its territories, and the District of Columbia. It markets these products under

12   the brand name Chicken of the Sea. CoS is owned by Thai Union Frozen Products,

13   now Thai Union Group Public Company Limited ("TUG"), a company based in

14   Thailand.

15       15.    Defendant TUG is a corporation organized and doing business under

16   the laws of Thailand. TUG is the world's largest canned tuna producer, processing

17   18% of the world's production. It is also the largest canned tuna producer in

18   Thailand. Its head office is located at 72/1 Moo 7, Sethakit 1 Road, Tambon

19   Tarsai, Mueang Samut Sakhon District, Amphur Muangsamutsakorn, Samutsakorn

20   74000, Thailand. TUG, through its wholly-owned subsidiary Tri-Union Seafoods

21   LLC, produces and sells PSPs throughout the United States (including this

22   District), its territories and the District of Columbia.

23       16.    Tri-Union is part of that business unit and is viewed by TUG as part of

24   its footprint in the United States. Indeed, TUG has its own fishing fleet and is thus

25   vertically integrated with Tri-Union. TUG also purposefully directs its activities

26   into the United States by operating Thai Union North America, Inc. ("TUNAI") (a

27   company formerly known as Thai Union International, Inc.), that was founded in

28   1996. TUNAI is a wholly-owned instrumentality of TUG and has its address at

9330 Scranton Road, Sorrento South Corporate Center, Suite 500, San Diego CA 92121 (the same address as Tri-Union). TUNAI's President is Thiraphong Chansiri (President and CEO of TUG). The Chansiri family is the largest single shareholder in TUG, owning 20.4% of its stock.

17.    TUG participated in the conspiracy alleged herein. Among the members of the Board of Directors of Tri-Union are Kraisorn Chansiri (Chairman of TUG), Cheng Niruttinanon (Executive Chairman of TUG), and the aforementioned Thiraphong Chansiri. A former Director of Tri-Union was Chan Tin King, Executive Director and Chief Financial Officer ("CFO") of TUG. Shue Wing Chan ("Chan"), the President and CEO of Tri-Union since 2007, is a member of the Chansiri family, and is a member of TUG's self-styled "Global Leadership Team." Prior to joining Tri-Union, he served as the CFO of TUG. TUG exercises control and dominance over Tri-Union through these individuals.  According to his own LinkedIn webpage, David Roszmann ("Roszmann"), the former Chief Operating Officer ("COO") of Tri-Union, who joined the company in March of 2013, "only direct[ly] reported to CEO [Chan] relative of majority owning family of this foreign public company [TUG] with all functions direct[ly] reporting to COO including sales, marketing, procurement, supply chain, operations, finance, HR. legal and IT." Roszmann left Tri-Union in December of 2015, soon after Tri-Union's attempt to acquire Bumble Bee was assailed by the DOJ, as further described below. As far as Plaintiffs are aware, Roszmann has not been replaced, so TUG's CEO Chan now effectively runs the day-to-day operations of Tri-Union.

18.    TUG publicly acknowledges its dominance over Tri-Union. The following pertinent excerpt of an organizational chart that appears on TUG's website demonstrates that TUG views Tri-Union as part of its overall "Global Tuna Business" and "US Ambient Operations" that are controlled directly by TUG's Board of Directors and executives.

19.    Hereinafter, Tri-Union Seafoods LLC and Thai Union Group Public

Company Limited are collectively referred to as "CoS."

20.     Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business at 280 10th Avenue, San Diego CA 92101. Bumble Bee produces and sells PSPs throughout the United States, its territories, and the District of Columbia. Bumble Bee is privately owned by Lion Capital ("Lion"), which is based in the United Kingdom.

21.     Defendant StarKist Company is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh PA 15212. StarKist produces and sells PSPs throughout the United States, its territories, and the District of Columbia. StarKist is privately owned by Dongwon Enterprise ("Dongwon"), which is based in South Korea.

22.     Defendant Dongwon is a corporation organized and doing business under the laws of South Korea, with its headquarters located at Dongwon Industries Building 7th floor, Mabang-ro 68 (Yangjae-dong), Seocho-gu, Seoul, Korea. Dongwon is a publicly traded company listed on the Korean Stock Exchange. It is the largest producer of canned tuna in South Korea.

23.     Dongwon purposefully directs its activities to the United States through its "controlled" and wholly-owned subsidiary StarKist Company, through which it produces and sells PSPs throughout the United States (including in this District), its territories and the District of Columbia.  Indeed, Dongwon has its own fishing fleet and is vertically integrated with StarKist Company. Dongwon also purposefully directs its activities to the United States by exporting PSPs, including canned tuna, to this country. Dongwon directly participated in the conspiracy alleged herein, as well as using its control over StarKist Company's PSP business to conspire with the other Defendants and their co-conspirators.

24.     Dongwon dominates StarKist Company. The current President and CEO of StarKist Company is Andrew Choe, who took that position in September of 2014. Choe joined the company in 2010 as Senior Vice-President of its supply

chain and Director of Strategic Planning and Development; he had previously held an executive position at Dongwon. Likewise, Nam-Jung Kim (son of Dongwon Chairman Jae-chul Kim), who served as the COO of StarKist Company from 2012 until October of 2014, was Vice-President of Dongwon F&B and of Dongwon Enterprise Co. He now serves as a Director of both StarKist Company and Dongwon. Similarly, Hyung-Joo Kim, Chief Financial Officer ("CFO") of Dongwon F&B, became the CFO of the StarKist Company in 2012. Likewise, In-gu Park, the Chairman of the Board of StarKist Company, who also served as its Acting President from November of 2010 to March of 2011, serves as CEO of Dongwon Precision Machinery Company.

25.    According to StarKist Company's website:

> Founded in 1969, Dongwon Group began as a fisheries business and branched out into various sectors including a strong food & beverage manufacturing arm, Dongwon F&B. Dongwon F&B now owns 75% of the canned tuna market share in Korea. Dongwon Industries is one of the world's largest tuna catching companies with a fleet of 36 boats. Dongwon's world class fish procurement and processing capacity builds on StarKist's national brand recognition and distribution networks in the United States to bring world-class seafood to consumers worldwide.

26.    Dongwon's own website has this to say about its control over StarKist Company:

> StarKist is the world's best tuna brand with 65 years of history, and holds the No.1 position in the US tuna market. Like Dongwon Group in Korea, StarKist is an iconic tuna brand in the United States, and has been controlled by Dongwon Group since 2008, accompanying Dongwon Group on its journey to globalization. Dongwon Group, which has already become the dominant player in Korea's tuna market, has focused on the steady growth of the world's tuna market and determined that tuna can be one of

9

core resources that will lead future industries. Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna company, and will become de facto a globalized enterprise.

27.   Hereinafter, Dongwon and StarKist are collectively referred to as "StarKist."

28.   Upon information and belief, at all relevant times, other producers of PSPs willingly conspired with Defendants in their unlawful restraint of trade. All averments herein against Defendants are also averred against these unnamed co-conspirators.

29.   The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

30.   Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of packaged seafood products in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories, and the District of Columbia.

31.   Throughout the Class Period, Defendants transported substantial amounts of PSPs in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories, and the District of Columbia.

32.   Throughout the Class Period, Defendants' unlawful activities took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States, its territories, and the District of Columbia.

## FACTUAL ALLEGATIONS

**A.     PSPs and the Packaged Seafood Industry**

33.   PSPs are composed of seafood that has undergone a detailed processing

10

procedure to preserve and enhance flavor and to ensure product safety. They are sold in cans, pouches, and ready-to-eat serving packages. While the majority of the PSPs produced and sold by Defendants are tuna, Defendants also sell packaged clams, salmon, and sardines.  Additionally, CoS and Bumble Bee sell packaged crabs, mackerels, oysters, and shrimp ("Specialty PSPs").

34.   Defendants sell PSPs directly to, among other entities, restaurant wholesale suppliers, retail groceries, grocery cooperatives, and mass merchandisers. These direct purchasers then sell PSPs to various customers, including restaurants, entities that serve food (and vendors servicing such entities), and caterers.  As of 2010, the United States PSP industry generated annual sales of approximately $2.37 billion.  Shelf-stable tuna accounts for approximately $1.75 billion, or 74%, of those sales.

35.   Defendants are the three largest domestic manufacturers of PSPs. The industry is highly concentrated, with Defendants controlling approximately 75% of the market. In December of 2014, the *Wall Street Journal* reported that the Defendants' respective shares of the domestic market for canned tuna were 13% for CoS, 25% for Bumble Bee, and 36% for StarKist. Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28%, and CoS at 20%.

36.   The PSP industry's oligopolistic structure within the industry is the result of recent mergers and acquisitions. For example, in 1997, the investment group Tri-Union Seafoods LLC—of which Thai Union was a member—acquired Van Camp Seafood Company ("Van Camp"). Thereafter, Thai Union bought out the other investors to acquire Van Camp completely, which it renamed Chicken of the Sea International, an entity that was later merged into Tri-Union Seafoods LLC. In 2008, Dongwon acquired StarKist from Del Monte Foods for $363 million. Similarly, in 2014, Thai Union bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the United States.

37.     Then, in December of 2014, Thai Union announced the acquisition from Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion. The combination of CoS and Bumble Bee would have created a virtual duopoly, with the combined entity substantially exceeding the market share of StarKist. Thai Union had planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million.

**B.      The DOJ Investigation into the Packaged Seafood Industry**

38.     On July 23, 2015, Thai Union suspended the preferential public offering in light of a grand jury investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ"). Thai Union disclosed on that day that both Bumble Bee and CoS had received grand jury subpoenas relating to an antitrust investigation of PSPs. The publication *Undercurrent News* further reported in an article dated that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ." The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.

> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

39.     The article goes on to state:

> An Industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analyzing deals.

> It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.

> ****

> The source said others in the industry are now anticipating that they too will be subpoenaed . . . .

40.     Based on these statements, it appears that StarKist received a subpoena as well, and that the DOJ's investigation extends to the entire domestic PSP sector.

41.     The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual,* available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at lll-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at 111-83. "The investigation should be conducted by a grand jury in a judicial

1    district where venue lies for the offense, such as a district from or to which price-

2    fixed sales were made or where conspiratorial communications occurred." *Id.*

3       **C.    Economic Indicators of Collusion**

4       42.    There are economic indications that support the conclusion that there

5    was collusive pricing within the domestic PSP industry.

6       43.    From about 1950 until 2000, packaged tuna was the most popular

7    seafood product in the United States. Since then, however, national demand for

8    PSPs, particularly canned tuna, has declined. The annual per person consumption

9    of canned tuna was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013

10   (approximately a 100,000-ton net reduction in demand). An article in the

11   *Washington Post* graphically represented this decline by measuring United States

12   annual *per capita* consumption from 1930 to 2010:

13

14



15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-md-02670-JLS-MDD

The same article presented this graph, showing that, while Americans are buying less canned seafood, they are paying more for what they do buy:



44. A National Marine Fisheries Service report outlines the following consumption trends for canned fish from 1985 to 2013:

| Year | Salmon | Sardines | Tuna | Shellfish | Other | Total |
|---|---|---|---|---|---|---|
| **U.S. ANNUAL PER CAPITA CONSUMPTION OF CANNED FISHERY PRODUCTS, 1985-2013** | | | | | | |
| | | | | - - - - - - - - - - Pounds - - - - - - | | |
| 1985 | 0.5 | 0.3 | 3.3 | 0.5 | 0.4 | 5.0 |
| 1986 | 0.5 | 0.3 | 3.6 | 0.5 | 0.5 | 5.4 |
| 1987 | 0.4 | 0.3 | 3.5 | 0.5 | 0.5 | 5.2 |
| 1988 | 0.3 | 0.3 | 3.6 | 0.4 | 0.3 | 4.9 |
| 1989 | 0.3 | 0.3 | 3.9 | 0.4 | 0.2 | 5.1 |
| **1990** | **0.4** | **0.3** | **3.7** | **0.3** | **0.4** | **5.1** |
| 1991 | 0.5 | 0.2 | 3.6 | 0.4 | 0.2 | 4.9 |
| 1992 | 0.5 | 0.2 | 3.5 | 0.3 | 0.1 | 4.6 |
| 1993 | 0.4 | 0.2 | 3.5 | 0.3 | 0.1 | 4.5 |
| 1994 | 0.4 | 0.2 | 3.3 | 0.3 | 0.3 | 4.5 |
| 1995 | 0.5 | 0.2 | 3.4 | 0.3 | 0.3 | 4.7 |
| 1996 | 0.5 | 0.2 | 3.2 | 0.3 | 0.3 | 4.5 |
| 1997 | 0.4 | 0.2 | 3.1 | 0.3 | 0.4 | 4.4 |

| 1998 | 0.3 | 0.2 | 3.4 | 0.3 | 0.2 | 4.4 |
|------|-----|-----|-----|-----|-----|-----|
| 1999 | 0.3 | 0.2 | 3.5 | 0.4 | 0.3 | 4.7 |
| **2000** | **0.3** | **0.2** | **3.5** | **0.3** | **0.4** | **4.7** |
| 2001 | 0.4 | 0.2 | 2.9 | 0.3 | 0.4 | 4.2 |
| 2002 | 0.5 | 0.1 | 3.1 | 0.3 | 0.3 | 4.3 |
| 2003 | 0.4 | 0.1 | 3.4 | 0.4 | 0.3 | 4.6 |
| 2004 | 0.3 | 0.1 | 3.3 | 0.4 | 0.4 | 4.5 |
| 2005 | 0.4 | 0.1 | 3.1 | 0.4 | 0.3 | 4.3 |
| 2006 | 0.2 | 0.2 | 2.9 | 0.4 | 0.2 | 3.9 |
| 2007 | 0.3 | 0.2 | 2.7 | 0.4 | 0.3 | 3.9 |
| 2008 | 0.1 | 0.2 | 2.8 | 0.4 | 0.4 | 3.9 |
| 2009 | 0.2 | 0.2 | 2.5 | 0.4 | 0.4 | 3.7 |
| **2010** | **0.2** | **0.2** | **2.7** | **0.4** | **0.4** | **3.9** |
| 2011 | 0.2 | 0.2 | 2.6 | 0.4 | 0.4 | 3.8 |
| 2012 | 0.2 | 0.2 | 2.4 | 0.4 | 0.4 | 3.6 |
| **2013** | **0.4** | **0.2** | **2.3** | **0.4** | **0.4** | **3.7** |

45.   Given this decline in consumption of the signature PSP, one would expect rational businesses to reduce the prices for PSPs. But that did not happen. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted U.S. city average prices for shelf-stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84



used as a baseline.

46.     A recent report by Globefish.org likewise notes that PSP prices have increased as demand has decreased:

> The US canned market continues declining as a result of weakening household demand. . . . For the 52 weeks ending March 2014, consumption was reported at 65.9% compared with 68.1% recording during the same period of 2010. Sale volumes of shelf stable tuna during the reporting period also declined from USD 30.8 million (equivalent to 27.3 million cases), excluding sales in the catering sector. However, in value terms sales were stable at around USD 1.68 billion, reflecting the increase in canned tuna prices.

47.     Raw material costs do not adequately explain these price increases. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it then declined precipitously.

48.      Specifically, while the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. According to the April 19, 2015 issue of *Tuna Market Intelligence,* "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year." Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1400 to $800. And the United Nations Food & Agriculture Organization stated in its May 2015 "Food Outlook" biannual report noted that tuna prices had dropped considerably in 2014: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low." Despite these drastically declining raw material costs, Defendants neither decreased prices nor tried to obtain more market share.

49.     Thai Union's Annual Reports discuss this situation. In its 2013 Annual Report, Thai Union stated that "our branded tuna business showed resilient growth

from 2012 thanks to the price adjustments in Europe and more rational market competition in the US."

50.    Similarly, Kelly Mayer, a partner in Lion Capital (the owner of Bumble Bee) released a memorandum in December of 2014 to limited partners that stated: "With respect to earnings development under our ownership, Bumble Bee maintained and grew gross margins *through disciplined pricing actions*, leading to adjusted EBITDA climbing to over $150 million this year, the highest level of EBITDA in the company's history." (Emphases added).

51.    Likewise, in its 2014 Annual Report, Thai Union explicitly noted that this goal had been achieved:

> Thanks to reduced price competition (absence of cut throat pricing) and generally lower fish cost, our own tuna brands marked a great year of increased profitability. Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand.

The same report went on to note that "sensible market competition, supported by raw material costs, made it possible for our own tuna brands to expand their margins through the year despite limited volume growth." It indicated that future revenue growth would again be dependent upon "[r]easonable US canned tuna market competition that focuses more on consumption creation than market share alone." The "reasonable market conditions", "more rational market competition", "sensible market competition", avoidance of battles for market share and "absence of cut throat pricing" that the reports note could only have come about through collusion. It would have been against the individual self-interest of each Defendant to eschew increasing market share during this period by lowering prices.

52.    In 2008, in contrast to prior minor isolated changes in can sizes, Defendants each modified their primary can size to 5 ounces, following StarKist's lead. This change resulted in a uniform standard size for cans of tuna for the

dominate brands. In so doing, Defendants increased the commodification of the market for PSPs and facilitated price monitoring and collusion.

53.     StarKist, Bumble Bee and CoS collusively raised prices by decreasing the amount of tuna in cans sold to putative class members without also decreasing prices. On May 28-30, 2008, representatives of the three companies gathered at the annual Infofish conference in Bangkok, Thailand. Lischewski of Bumble Bee gave a keynote address, urging fellow "global tuna industry leaders" to undertake the challenge to drive the development of "sustainable tuna management practices." Thereafter, beginning in or about August of 2008, Bumble Bee, CoS and StarKist began distributing 5 oz. cans of tuna to replace their 6 oz. cans. As the Arizona Department of Health Services said in a September 2008 circular, "[t]he tuna industry recently reduced the size of the can from 6 ounces to 5 ounces." Indeed, a spokesperson for CoS stated that the move was a collective one: "Chicken of the Sea followed its competition and industry in the reduction of package sizes." The can size change was largely completed in 2009 and increased the price per ounce of canned tuna sold to Defendants' customers.

## D.     Defendants' Opportunities to Collude

54.     There were numerous business opportunities for Defendants to meet and engage in such collusion. The Tuna Council provides one such opportunity. As explained on that organization's website:

> The National Fisheries Institute's Tuna Council represents the largest processors and household names for canned and pouch tuna in the U.S. including *BumbleBee®, Chicken of the Sea® and StarKist®*. The Tuna Council speaks for the tuna industry on numerous issues including food safety, labeling, sustainability, nutrition education and product marketing.

55.     "Tuna the Wonderfish" advertising campaign in 2011-12 exemplifies such joint conduct. This campaign was bankrolled by the Defendants and carried

1   out under the auspices of the Tuna Council with the support of Thai processors. In
2   it, the Defendants teamed up for marketing purposes. Joe Tuza, Senior Vice-
3   President of Marketing for StarKist, reportedly said that "[w]e worked together
4   surprisingly well." He said further that the campaign, intended to increase
5   consumption of tuna, was based on the hope that "as the water level rises . . . all
6   boats rise with the tide," referring to the three Defendant companies. The same
7   philosophy appears to undergird the alleged price-fixing conspiracy.

8       56.     Defendants also work together through co-packing agreements, which
9   provide them another opportunity to collude. Specifically, Bumble Bee copacks for
10  CoS at the former's plant located in Santa Fe Springs, California with respect to
11  West Coast sales. CoS does the same for Bumble Bee at the former's plant in
12  Georgia with respect to East Coast sales. Thus, even before the proposed merger,
13  these two companies were cooperating closely. These interlocking relationships
14  provided an excellent opportunity to collude on pricing.

15      57.     At least since 2011, Jill Irvin of Bumble Bee, Shue Wing Chan of CoS,
16  and In-Soo Choo of StarKist have directly communicated with each other and with
17  the United States Food and Drug Administration concerning, among other matters,
18  the standards for calculating the package weight of tuna products.

19      **E.      Likely Existence of a Cooperating Defendant**

20      58.     The Antitrust Criminal Penalty Enhancement and Reform Act
21  ("ACPERA") provides leniency benefits for a participant in a price-fixing
22  conspiracy that voluntarily discloses its conduct to the DOJ.  In most recent cases
23  in which guilty pleas for price-fixing conduct have been obtained, there has been a
24  cooperating party that has been accepted into the DOJ's ACPERA program as an
25  "amnesty applicant."  One of the leniency benefits for a conspirator that is accepted
26  into the ACPERA program is that it is not charged with a criminal offense and is
27  not required to plead guilty to criminal charges.

28      59.     In light of the intervention and request for stay by the DOJ, it is

reasonable for this Court to infer that there is a criminal investigation and an ACPERA "amnesty applicant" in this case.

60.     The significance of a company seeking Type B leniency cannot be understated. According to the DOJ, an applicant for Type B leniency must admit to participating in a criminal violation of the antitrust laws (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

61.     As indicated on the same DOJ webpage, the leniency applicant must also establish "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

**F.     Illustrative Examples of Collusion**

62.     Illustrative examples of Defendants' conspiratorial conduct in the market for PSPs include, but are not limited to, the following:

**i.     Coordinated Price Increase**

63.     In late 2011 and early 2012, top executives and sales persons from each of the Defendants coordinated a price increase for canned tuna to be implemented in the second quarter of 2012 for the United States market. This coordination was accomplished via, *inter alia*, telephone calls and email communications.

64.     Prices for PSPs are traditionally announced with 60-90 days of lead

1   time to allow retailers to adjust their marketing material.

2   65.   In January of 2012, the planned price increases were announced by each

3   Defendant within a 3-week period. The increases took effect in March (Starkist)

4   and April (Bumble Bee and CoS). The increases by each Defendant were identical,

5   or nearly identical. To take but one example, a 48-pack of 5 oz. cans of chunk light

6   tuna in water increased to $43.68 for all companies, approximately a 7% increase,

7   despite diminishing demand.

8   66.   This price increase "stuck" and was never rescinded in subsequent

9   years, across sizes and brands of tuna.

10   **ii.   Coordinated Responses to Discount Requests**

11   67.   Starting no later than 2012 and extending at least June 2013, senior

12   executives from each Defendant engaged in a series of communications via

13   telephone calls and email communications limiting discounts and promotions

14   afforded to their customers. For example, one executive would call another to

15   voice displeasure with aggressive promotions which were perceived as a possible

16   road to erosion of price increases.

17   68.   These communications served the function of both disciplining

18   competitors for engaging in discounting or promotions to the degree they did and

19   as a prophylaxis against increased discounting and promotion. The coordination

20   involved, *inter alia*, assurances to competitors that specific discounts did not

21   represent price erosion, and fruitful monitoring of competitors' pricing.

22   **iii.   Agreement Not to Compete in the Market for FAD-Free PSPs**

23   69.   In addition to increasing market share by private or white-label PSPs

24   products (*i.e.* retailer launched brands), Defendants have been facing increasing

25   pressure to monitor and increase the sustainability of the seafood industry,

26   particularly tuna.  In 2011, there was a particular focus on the usage of Fish

27   Aggregation Devices ("FADs").

28   70.   FADs are nautical artificial devices which attract schools of fish. By

drawing large groups of fish together in one place, FADs facilitate their mass capture. Approximately one third of the global tuna catch is facilitated by FADs. Generally, FAD-caught tuna results in a lower quality PSP product, and results in greater "by-catch"—non-target seafood being caught and killed as a result of fishing—than tuna caught by other means. Much of the world's tuna is caught by purse-seine netting, in which a large net is deployed under an entire school of fish and hoisted upwards.  This technique is distinct from methods involving towed nets, or pole-and-line ("P&L") fishing, where fish are hooked.  The most cost-effective method of catching tuna is to use a FAD to draw schools of tuna into a small area, and a purse-seine net to capture them.

71.     Though Defendants products may contain mixes of FAD and P&L tuna, the major brands had not introduced a product under their brands that was all "FAD-Free" or marketed as such as of 2011.

72.     Through the NFI's Tuna Council, Defendants and co-conspirators agreed not to create FAD-free PSPs for the United States market. The agreement was reached on or around February 6, 2012, during a telephonic conference facilitated by the NFI. The agreement was memorialized and its participants listed in in an email disseminated on February 17, 2012. This was an unlawful restraint of trade.

73.     Moreover, this agreement prevented competition on other vectors amongst the branded PSP products. By ensuring that the dominate brands in the market remained largely commoditized, Defendants facilitated their price-fixing conspiracy and reduced competition.

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this action on behalf of themselves individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of the following defined class (the "Nationwide Class"):

1

2

3        All incorporated and non-incorporated entities engaged in
4        food preparation that indirectly purchased packaged
         seafood products for their own use in commercial food
5        preparation, including institutional purchasers such as
6        hospitals, nursing homes, and schools, and not for resale as
         such, within the United States, its territories, and the
7        District of Columbia, from one or more Defendant or any
8        predecessor, subsidiary, or affiliate thereof, at any time
         between August 1, 2008 and the present. Excluded from
9        the Nationwide Class are governmental entities,
10       Defendants, any parent, subsidiary or affiliate thereof, and
         Defendants' officers, directors, employees, and immediate
11       families.

12       75.    Plaintiffs bring this action on behalf of themselves individually and as a

13   class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3),

14   on behalf of the following defined class (the "Damages Class"):

15

16       All incorporated and non-incorporated entities engaged in
         food preparation that indirectly purchased Defendants' or
17       co-conspirators' packaged seafood products for their own
         use in commercial food preparation, including institutional
18       purchasers such as hospitals, nursing homes, and schools,
         and not for resale as such, in Arizona, Arkansas,
19       California, the District of Columbia, Florida, Iowa,
20       Kansas, Maine, Michigan, Minnesota, Mississippi,
         Missouri, Nebraska, Nevada, New Hampshire, New
21       Mexico, New York, North Carolina, North Dakota,
         Oregon, Rhode Island, South Carolina, South Dakota,
22       Utah, Vermont, West Virginia, or Wisconsin, from one or
23       more Defendant or any predecessor, subsidiary, or affiliate
         thereof, at any time between August 1, 2008 and the
24       present. Excluded from the Damages Class are Defendants,
         parent companies, predecessors, subsidiaries and affiliates,
25       and all governmental entities.

26       76.    Plaintiffs reserve the right to amend the definitions of the Classes,

27   including temporally.

28

---

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-md-02670-JLS-MDD

77.     Due to the nature of the trade and commerce involved, Plaintiffs believe that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories, and the District of Columbia so that joinder of all Class members is impracticable.

78.     There are questions of law and fact which are common to the claims of Plaintiffs and the Class, including, but not limited to:

(a)     Whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, and/or stabilize the prices for PSPs;

(b)     Whether the purpose or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, maintain, and/or stabilize the prices for PSPs;

(c)     Whether Defendants engaged in unfair, false, deceptive, or unconscionable behavior;

(d)     Whether Defendants' conduct resulted in PSPs being sold at an artificially high and noncompetitive level;

(e)     Whether Defendants were unjustly enriched by the sale of PSPs at artificially high and non-competitive levels

(f)     Whether Plaintiffs and the members of the Classes were denied the benefit of free and open competition for "FAD-free" PSPs;

(g)     Whether, and to what extent, Defendants' conduct caused injury to Plaintiffs and members of the Classes, and, if so, the appropriate measure of damages; and

(h)     Whether Plaintiffs and the Nationwide Class are entitled to injunctive relief.

79.     Plaintiffs' claims are typical of the claims of the members of the Classes.

80.     Plaintiffs will fairly and adequately assert and protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those

1    of the other members of the Classes.

2        81.    Plaintiffs are represented by counsel competent and experience in the

3    prosecution of antitrust and class action litigation.

4        82.    The questions of law and fact common to the members of the Classes

5    predominate over any questions affecting only individual members.

6        83.    A class action is superior to other available methods for the fair and

7    efficient adjudication of this controversy because:

8        (a)    The prosecution of separate actions by individual members of the

9    Classes would create a risk of inconsistent or varying adjudications, establishing

10   incompatible standards of conduct for Defendants.

11       (b)    The Classes are readily ascertainable.

12       (c)    Prosecution as a class action will eliminate the possibility of repetitious

13   litigation.

14       (d)    Treatment as a class action will permit a large number of similarly

15   situated   persons   to   adjudicate   their   common   claims   in   a   single   forum

16   simultaneously, efficiently, and without the duplication of effort and expense that

17   numerous individual actions would require.

18       (e)    Class treatment will permit the adjudication of relatively small claims

19   by many Class members who otherwise could not afford to litigate an antitrust

20   claim such as is asserted in this complaint on an individual basis.

21       84.    This class action presents no difficulties of management that would

22   preclude its maintenance as a class action.

23                              ## COUNT I

24                 **Violation of Sections 1 the Sherman Act**

25           **(on behalf of Plaintiffs and the Nationwide Class)**

26       85.    Plaintiffs incorporate by reference the preceding paragraphs as if fully

27   set forth herein.

28       86.    Defendants and unnamed conspirators entered into and engaged in a

26

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-md-02670-JLS-MDD

contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

87.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

88.     At least as early as August 1, 2008, and continuing through at least the present, the exact dates being unknown to Plaintiffs, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, raise, maintain, and/or stabilize at artificial and non-competitive levels the prices of PSPs.

89.     The anti-competitive acts were intentionally directed at the United States market for PSPs and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for PSPs throughout the United States.

90.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for PSPs.

91.     As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated members of the Nationwide Class who purchased PSPs manufactured by Defendants have been harmed by being forced to pay inflated, supra-competitive prices for such products.

92.     In formulating and effectuating their contract, combination, or conspiracy, Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain, and/or stabilize the price of PSPs.

93.     The illegal combination and conspiracy alleged herein had the following effects, among others:

(a)     The prices charged by Defendants for PSPs were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

(b)     Plaintiffs and other similarly situated members of the Nationwide Class have been deprived of free and open competition in the purchase of PSPs;

(c)     Plaintiffs and other similarly situated members of the Nationwide Class have been required to pay more for PSPs than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy;

(d)     Plaintiffs and other similarly situated members of the Nationwide Class were denied choice as a result of the agreement not to produce a branded "FAD-Free" product—essentially a supply constraint;

(e)     Competition in the sale of PSPs has been restrained, suppressed, or eliminated.

94.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for PSPs than they would have paid and will pay in the absence of the conspiracy.

95.     Plaintiffs were unable to pass-through these overcharges through the sale of food products.

96.     The alleged contract, combination, or conspiracy is *a per se* violation of the federal antitrust laws.

97.     Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

98.     Under 15 U.S.C. § 26, Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II

### Violation of State Antitrust Statutes

### (on behalf of Plaintiffs and the Damages Class)

99.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

100.     At least as early as August 1, 2008, and continuing through at least the

present, the exact dates being unknown to Plaintiffs, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, raise, maintain, and/or stabilize at artificial and non-competitive levels the prices of such PSPs.

101.  The contract, combination, or conspiracy consisted of an agreement among the Defendants to fix, raise, inflate, stabilize, and/or maintain artificially supra-competitive prices for PSPs.

102.  In formulating and effectuating this conspiracy, Defendants performed acts in furtherance of the combination and conspiracy, including participating in meetings and conversations among themselves during which they agreed to price PSPs at certain levels and otherwise to fix, increase, inflate, maintain, and/or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to PSPs sold in the United States.

103.  Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, and/or stabilize prices of PSPs.

104.  Defendants' anticompetitive, unfair acts described above were knowing and willful, and constituted violations or flagrant violations of the below-listed state antitrust statutes.

105.  Defendants caused Plaintiffs injury-in-fact through their unlawful conspiracy, in the form of overcharges for the PSPs purchased indirectly by Plaintiffs. Plaintiffs and those similarly situated could not recoup these overcharges by means of pass through.

106.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

(a)  Defendants' combinations or conspiracies had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout Arizona; (2) PSP prices were raised, fixed, maintained, and/or stabilized at

29

1   artificially high levels throughout Arizona; (3) Plaintiffs and members of the

2   Damages Class were deprived of free and open competition; and (4) Plaintiffs and

3   members of the Damages Class paid supracompetitive, artificially inflated prices

4   for PSPs.

5       (b)    During the Class Period, Defendants' illegal conduct substantially

6   affected Arizona commerce.

7       (c)    As a direct and proximate result of Defendants' unlawful conduct,

8   Plaintiffs and members of the Class have been injured in their business and

9   property and are threatened with further injury.

10      (d)    By reason of the foregoing, Defendants entered into agreements in

11  restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly,

12  Plaintiffs and members of the Damages Class seek all forms of relief available

13  under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

14      107.   Defendants have entered into an unlawful agreement in restraint of

15  trade in violation of the California Business and Professions Code, §§ 16700, *et*

16  *seq.*

17      (a)    During the Class Period, Defendants entered into and engaged in a

18  continuing unlawful trust in restraint of the trade and commerce described above in

19  violation of Section 16720 of the California Business and Professions Code.

20  Defendants, each of them, have acted in violation of Section 16720 to fix, raise,

21  stabilize, and/or maintain PSP prices at supracompetitive levels.

22      (b)    The aforesaid violations of Section 16720, California Business and

23  Professions Code, consisted, without limitation, of a continuing unlawful trust and

24  concert of action among the Defendants, the substantial terms of which were to fix,

25  raise, maintain, and/or stabilize the prices of PSPs.

26      (c)    For the purpose of forming and effectuating the unlawful trust, the

27  Defendants have done those things which they combined and conspired to do,

28  including but in no way limited to the acts, practices, and course of conduct set

1   forth above.

2      (d)   The combination and conspiracy alleged herein has had, *inter alia*, the

3   following effects upon the commerce of California: (1) Price competition in the

4   sale of PSPs has been restrained, suppressed, and/or eliminated in the State of

5   California; (2) Prices for PSPs sold by Defendants have been fixed, raised,

6   stabilized, and pegged at artificially high, non-competitive levels in the State of

7   California and throughout the United States; and (3) Those who purchased PSPs

8   from entities who purchased PSPs directly from Defendants have been deprived of

9   the benefit of free and open competition.

10     (e)   As a direct and proximate result of Defendants' unlawful conduct,

11  Plaintiffs and members of the Damages Class have been injured in their business

12  and property in that they paid more for PSPs than they otherwise would have paid

13  in the absence of Defendants' unlawful conduct. As a result of Defendants'

14  violation of Section 16720 of the California Business and Professions Code,

15  Plaintiffs and members of the Damages Class seek treble damages and their cost of

16  suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the

17  California Business and Professions Code.

18     108.  Defendants have entered into an unlawful agreement in restraint of

19  trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

20     (a)   Defendants' combinations or conspiracies had the following effects: (1)

21  PSP price competition was restrained, suppressed, and eliminated throughout the

22  District of Columbia; (2) PSP prices were raised, fixed, maintained, and/or

23  stabilized at artificially high levels throughout the District of Columbia; (3)

24  Plaintiffs and members of the Damages Class who resided in the District of

25  Columbia and/or purchased PSPs in the District of Columbia were deprived of free

26  and open competition in the District of Columbia; and (4) Plaintiffs and members

27  of the Damages Class who resided in the District of Columbia and/or purchased

28  PSPs in the District of Columbia paid supracompetitive, artificially inflated prices

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-md-02670-JLS-MDD

1   for PSPs in the District of Columbia.

2   (b)   During the Class Period, Defendants' illegal conduct substantially
3   affected District of Columbia commerce.

4   (c)   As a direct and proximate result of Defendants' unlawful conduct,
5   Plaintiffs and members of the Damages Class have been injured in their business
6   and property and are threatened with further injury.

7   (d)   By reason of the foregoing, Defendants have entered into agreements in
8   restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et*
9   *seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of
10  relief available under District of Columbia Code Ann. §§ 28-45601, *et seq.*

11  109.  Defendants have entered into an unlawful agreement in restraint of
12  trade in violation of the Iowa Code §§ 553.1, *et seq.*

13  (a)   Defendants' combinations or conspiracies had the following effects:
14  (1) PSP price competition was restrained, suppressed, and eliminated throughout
15  Iowa; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially
16  high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class
17  were deprived of free and open competition; and (4) Plaintiffs and members of the
18  Damages Class paid supracompetitive, artificially inflated prices for PSPs.

19  (b)   During the Class Period, Defendants' illegal conduct substantially
20  affected Iowa commerce.

21  (c)   As a direct and proximate result of Defendants' unlawful conduct,
22  Plaintiffs and members of the Damages Class have been injured in their business
23  and property and are threatened with further injury.

24  (d)   By reason of the foregoing, Defendants have entered into agreements in
25  restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs
26  and members of the Damages Class seek all forms of relief available under Iowa
27  Code §§ 553.1, *et seq.*

28  110.  Defendants have entered into an unlawful agreement in restraint of

32

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-md-02670-JLS-MDD

1   trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

2       (a)     Defendants' combinations or conspiracies had the following effects: (1)

3   PSP price competition was restrained, suppressed, and eliminated throughout

4   Kansas; (2) PSP prices were raised, fixed, maintained, and/or stabilized at

5   artificially high levels throughout Kansas; (3) Plaintiffs and members of the

6   Damages Class were deprived of free and open competition; and (4) Plaintiffs and

7   members of the Damages Class paid supracompetitive, artificially inflated prices

8   for PSPs.

9       (b)     During the Class Period, Defendants' illegal conduct substantially

10  affected Kansas commerce.

11      (c)     As a direct and proximate result of Defendants' unlawful conduct,

12  Plaintiffs and members of the Damages Class have been injured in their business

13  and property and are threatened with further injury.

14      (d)     By reason of the foregoing, Defendants have entered into agreements in

15  restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly,

16  Plaintiffs and members of the Damages Class seek all forms of relief available

17  under Kansas Stat. Ann. §§ 50-101, *et seq.*

18      111.   Defendants have entered into an unlawful agreement in restraint of

19  trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§

20  1101, *et seq.*

21      (a)     Defendants' combinations or conspiracies had the following effects:

22  (1) PSP price competition was restrained, suppressed, and eliminated throughout

23  Maine; (2) PSP prices were raised, fixed, maintained, and/or stabilized at

24  artificially high levels throughout Maine; (3) Plaintiffs and members of the

25  Damages Class were deprived of free and open competition; and (4) Plaintiffs and

26  members of the Damages Class paid supracompetitive, artificially inflated prices

27  for PSPs.

28      (b)     During the Class Period, Defendants' illegal conduct substantially

1    affected Maine commerce.

2        (c)    As a direct and proximate result of Defendants' unlawful conduct,

3    Plaintiffs and members of the Damages Class have been injured in their business

4    and property and are threatened with further injury.

5        (d)    By reason of the foregoing, Defendants have entered into agreements in

6    restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

7    Accordingly, Plaintiffs and members of the Damages Class seek all relief available

8    under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

9        112.    Defendants have entered into an unlawful agreement in restraint of

10   trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

11       (a)    Defendants' combinations or conspiracies had the following effects:

12   (1) PSP price competition was restrained, suppressed, and eliminated throughout

13   Michigan; (2) PSP prices were raised, fixed, maintained, and/or stabilized at

14   artificially high levels throughout Michigan; (3) Plaintiffs and members of the

15   Damages Class were deprived of free and open competition; and (4) Plaintiffs and

16   members of the Damages Class paid supracompetitive, artificially inflated prices

17   for PSPs.

18       (b)    During the Class Period, Defendants' illegal conduct substantially

19   affected Michigan commerce.

20       (c)    As a direct and proximate result of Defendants' unlawful conduct,

21   Plaintiffs and members of the Damages Class have been injured in their business

22   and property and are threatened with further injury.

23       (d)    By reason of the foregoing, Defendants have entered into agreements in

24   restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

25   Accordingly, Plaintiffs and members of the Damages Class seek all relief available

26   under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

27       113.    Defendants have entered into an unlawful agreement in restraint of

28   trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for PSPs.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

114.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class who resided in Mississippi and/or purchased PSPs in Mississippi were deprived of free and open competition in Mississippi; and (4) Plaintiffs and members of the Damages Class who resided in Mississippi and/or purchased PSPs in Mississippi paid supracompetitive, artificially inflated prices in Mississippi for PSPs.

(b)     During the Class Period, Defendants' illegal conduct substantially

1   affected Mississippi commerce.

2      (c)   As a direct and proximate result of Defendants' unlawful conduct,

3   Plaintiffs and members of the Damages Class have been injured in their business

4   and property and are threatened with further injury.

5      (d)   By reason of the foregoing, Defendants have entered into agreements in

6   restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*

7   Accordingly, Plaintiffs and members of the Damages Class seek all relief available

8   under Mississippi Code Ann. § 75-21-1, *et seq.*

9      115.  Defendants have entered into an unlawful agreement in restraint of

10   trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

11      (a)   Defendants' combinations or conspiracies had the following effects: (1)

12   PSP price competition was restrained, suppressed, and eliminated throughout

13   Nebraska; (2) PSP prices were raised, fixed, maintained, and/or stabilized at

14   artificially high levels throughout Nebraska; (3) Plaintiffs and members of the

15   Damages Class were deprived of free and open competition; and (4) Plaintiffs and

16   members of the Damages Class paid supracompetitive, artificially inflated prices

17   for PSPs.

18      (b)   During the Class Period, Defendants' illegal conduct substantially

19   affected Nebraska commerce.

20      (c)   As a direct and proximate result of Defendants' unlawful conduct,

21   Plaintiffs and members of the Damages Class have been injured in their business

22   and property and are threatened with further injury.

23      (d)   By reason of the foregoing, Defendants have entered into agreements in

24   restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*

25   Accordingly, Plaintiffs and members of the Damages Class seek all relief available

26   under Nebraska Revised Statutes §§ 59-801, *et seq.*

27      116.  Defendants have entered into an unlawful agreement in restraint of

28   trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout Nevada; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class who resided in Nevada and/or purchased PSPs in Nevada were deprived of free and open competition in Nevada; and (4) Plaintiffs and members of the Damages Class who resided in Nevada and/or purchased PSPs in Nevada paid supracompetitive, artificially inflated prices in Nevada for PSPs.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

117.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for PSPs.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

118.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices PSPs.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

119.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:

(1) PSP price competition was restrained, suppressed, and eliminated throughout New York; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class who resided in New York and/or purchased PSPs in New York were deprived of free and open competition in New York; and (4) Plaintiffs and members of the Damages Class who resided in New York paid supracompetitive, artificially inflated prices for PSPs when they purchased PSPs in New York, or purchased in New York PSPs that were otherwise of lower quality than would have been absent the conspirators' illegal acts, or were unable to purchase PSPs that they would have otherwise purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

120.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class who resided in North Carolina and/or purchased PSPs in North Carolina were deprived of free and open competition in North Carolina; and (4)

Plaintiffs and members of the Damages Class who resided in North Carolina and/or purchased PSPs in North Carolina paid supracompetitive, artificially inflated prices in North Carolina for PSPs.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

121.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for PSPs.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available

1    under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

2    122. Defendants have entered into an unlawful agreement in restraint of

3    trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

4    (a)    Defendants' combinations or conspiracies had the following effects:

5    (1) PSP price competition was restrained, suppressed, and eliminated throughout

6    Oregon; (2) PSP prices were raised, fixed, maintained, and/or stabilized at

7    artificially high levels throughout Oregon; (3) Plaintiffs and members of the

8    Damages Class were deprived of free and open competition; and (4) Plaintiffs and

9    members of the Damages Class paid supracompetitive, artificially inflated prices

10   for PSPs.

11   (b)    During the Class Period, Defendants' illegal conduct had a substantial

12   effect on Oregon commerce.

13   (c)    As a direct and proximate result of Defendants' unlawful conduct,

14   Plaintiffs and members of the Damages Class have been injured in their business

15   and property and are threatened with further injury.

16   (d)    By reason of the foregoing, Defendants have entered into agreements in

17   restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*

18   Accordingly, Plaintiffs and members of the Damages Class seek all relief available

19   under Oregon Revised Statutes §§ 646.705, *et seq.*

20   123. Defendants have entered into an unlawful agreement in restraint of

21   trade in violation of the Rhode Island General Laws §§ 6-36-4, *et seq.*

22   (a)    Defendants' combinations or conspiracies had the following effects: (1)

23   PSP price competition was restrained, suppressed, and eliminated throughout

24   Rhode Island; (2) PSP prices were raised, fixed, maintained, and/or stabilized at

25   artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the

26   Damages Class were deprived of free and open competition; and (4) Plaintiffs and

27   members of the Damages Class paid supracompetitive, artificially inflated prices

28   for PSPs.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-md-02670-JLS-MDD

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

124.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Rhode Island General Laws §§ 6-36-4, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws §§ 6-36-4, *et seq.*

125.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1., *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) PPSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class who resided in South Dakota and/or purchased PSPs in South Dakota were deprived of free and open competition in South Dakota; and (4) Plaintiffs and members of the Damages Class who resided in South Dakota and/or purchased PSPs in South Dakota paid supracompetitive, artificially inflated prices in South Dakota for PSPs.

(b)    During the Class Period, Defendants' illegal conduct has a substantial effect on South Dakota commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available

1    under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

2        126.   Defendants have entered into an unlawful agreement in restraint of

3    trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

4        (a)    Defendants' combinations or conspiracies had the following effects:

5    (1) PSP price competition was restrained, suppressed, and eliminated throughout

6    Utah; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially

7    high levels throughout Utah; (3) Plaintiffs and members of the Damages Class

8    were deprived of free and open competition; and (4) Plaintiffs and members of the

9    Damages Class paid supracompetitive, artificially inflated prices for PSPs.

10       (b)    During the Class Period, Defendants' illegal conduct had a substantial

11   effect on Utah commerce.

12       (c)    As a direct and proximate result of Defendants' unlawful conduct,

13   Plaintiffs and members of the Damages Class have been injured in their business

14   and property and are threatened with further injury.

15       (d)    By reason of the foregoing, Defendants have entered into agreements in

16   restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.*

17   Accordingly, Plaintiffs and members of the Damages Class seek all relief available

18   under Utah Code Annotated §§ 76-10-911, *et seq.*

19       127.   Defendants have entered into an unlawful agreement in restraint of

20   trade in violation of the Vermont Stat. Ann. 9 §§ 2451, *et seq.*

21       (a)    Defendants' combinations or conspiracies had the following effects:

22   (1) PSP price competition was restrained, suppressed, and eliminated throughout

23   Vermont; (2) PSP prices were raised, fixed, maintained, and/or stabilized at

24   artificially high levels throughout Vermont; (3) Plaintiffs and members of the

25   Damages Class were deprived of free and open competition; and (4) Plaintiffs and

26   members of the Damages Class paid supracompetitive, artificially inflated prices

27   for PSPs.

28       (b)    During the Class Period, Defendants' illegal conduct had a substantial

1   effect on Vermont commerce.

2   (c)   As a direct and proximate result of Defendants' unlawful conduct,

3   Plaintiffs and members of the Damages Class have been injured in their business

4   and property and are threatened with further injury.

5   (d)   By reason of the foregoing, Defendants have entered into agreements in

6   restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2451, *et seq.* Plaintiffs is

7   entitled to relief pursuant to Vermont Stat. Ann. 9 § 2465 and any other applicable

8   authority. Accordingly, Plaintiffs and members of the Damages Class seek relief

9   available under Vermont Stat. Ann. 9 §§ 2451, *et seq.*

10   128.   Defendants have entered into an unlawful agreement in restraint of

11   trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

12   (a)   Defendants' combinations or conspiracies had the following effects:

13   (1) PSP price competition was restrained, suppressed, and eliminated throughout

14   West Virginia; (2) PSP prices were raised, fixed, maintained, and/or stabilized at

15   artificially high levels throughout West Virginia; (3) Plaintiffs and members of the

16   Damages Class who resided in West Virginia and/or purchased PSPs in West

17   Virginia were deprived of free and open competition in West Virginia; and (4)

18   Plaintiffs and members of the Damages Class who resided in West Virginia and/or

19   purchased PSPs in West Virginia paid supracompetitive, artificially inflated prices

20   in West Virginia for PSPs.

21   (b)   During the Class Period, Defendants' illegal conduct had a substantial

22   effect on West Virginia commerce.

23   (c)   As a direct and proximate result of Defendants' unlawful conduct,

24   Plaintiffs and members of the Damages Class have been injured in their business

25   and property and are threatened with further injury.

26   (d)   By reason of the foregoing, Defendants have entered into agreements in

27   restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.*

28   Accordingly, Plaintiffs and members of the Damages Class seek all relief available

1   under West Virginia Code §§ 47-18-1, *et seq.*

2   129.   Defendants have entered into an unlawful agreement in restraint of

3   trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

4   (a)   Defendants' combinations or conspiracies had the following effects:

5   (1) PSP price competition was restrained, suppressed, and eliminated throughout

6   Wisconsin; (2) PSP prices were raised, fixed, maintained, and/or stabilized at

7   artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the

8   Damages Class were deprived of free and open competition; and (4) Plaintiffs and

9   members of the Damages Class paid supracompetitive, artificially inflated prices

10  for PSPs.

11  (b)   During the Class Period, Defendants' illegal conduct had a substantial

12  effect on Wisconsin commerce.

13  (c)   As a direct and proximate result of Defendants' unlawful conduct,

14  Plaintiffs and members of the Damages Class have been injured in their business

15  and property and are threatened with further injury.

16  (d)   By reason of the foregoing, Defendants have entered into agreements in

17  restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly,

18  Plaintiffs and members of the Damages Class seek all relief available under

19  Wisconsin Stat. §§ 133.01, *et seq.*

20  130.   Plaintiffs and members of the Damages Class have been injured in their

21  business and property by reason of Defendants' unlawful combination, contract,

22  conspiracy, and agreement. Plaintiffs and members of the Damages Class have

23  paid more for PSPs than they otherwise would have paid in the absence of

24  Defendants' unlawful conduct. This injury is of the type the antitrust laws of the

25  above states were designed to prevent and flows from Defendants' unlawful

26  conduct.

27  131.   In addition, Defendants have profited significantly from the aforesaid

28  conspiracy. Defendants' profits derived from their anticompetitive conduct come at

45

1     the expense and detriment of Plaintiffs and members of the Damages Class.

2     132. Accordingly, Plaintiffs and the members of the Damages Class seek

3 damages (including statutory damages where applicable), to be trebled or otherwise

4 increased as permitted by a particular jurisdiction's antitrust law, and costs of suit,

5 including reasonable attorneys' fees, to the extent permitted by the above state laws.

## COUNT III

### Violation of State Consumer Protection Statutes

### (on behalf of Plaintiffs and the Damages Class)

9     133. Plaintiffs incorporate by reference the allegations in the preceding

10 paragraphs.

11     134. Defendants knowingly engaged in unlawful, unfair competition or

12 unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the

13 state consumer protection and unfair competition statutes listed below.

14     135. Defendants caused Plaintiffs and those similarly situated injury-in-fact

15 through their unlawful conspiracy, in the form of overcharges for the PSPs

16 purchased indirectly by Plaintiffs. Plaintiffs and those similarly situated could not

17 recoup these overcharges by means of pass through.

18     136. Defendants have knowingly entered into an unlawful agreement in

19 restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

20     (a) Defendants knowingly agreed to, and did in fact, act in restraint of trade

21 or commerce by affecting, fixing, controlling, and/or maintaining at non-

22 competitive and artificially inflated levels the prices at which PSPs were sold,

23 distributed, or obtained in Arkansas and took efforts to conceal their agreements

24 from Plaintiffs and members of the Damages Class.

25     (b) The aforementioned conduct on the part of the Defendants constituted

26 "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code

27 Annotated § 4-88-107(a)(10).

28     (c) Defendants' unlawful conduct had the following effects: (1) PSP price

competition was restrained, suppressed, and eliminated throughout Arkansas; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for PSPs.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

137. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     During the Class Period, Defendants illegal conduct substantially affected California commerce and consumers.

(c)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged in this Class Action Complaint, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)     The Defendants' conduct as alleged in this Class Action Complaint violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the violations of Section 16720, *et seq.*, of the California Business and Professions Code, as set forth above;

(e)     Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent;

(f)     Defendants' acts or practices are unfair to purchasers of PSPs in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)     Defendants' unlawful conduct had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout California; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the classes who resided in California and/or purchased PSPs in California were deprived of free and open competition in California; and (4) Plaintiffs and members of the classes who resided in California and/or purchased PSPs in California paid supracompetitive, artificially inflated prices in California for PSPs.

(h)     Defendants' acts and practices are unlawful, fraudulent, or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)     Plaintiffs and members of the classes are entitled to full restitution

and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

(j) The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(k) The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the classes to pay supracompetitive and artificially inflated prices for PSPs. Plaintiffs and the members of the classes suffered injury in fact and lost money or property as a result of such unfair competition.

(l) The conduct of Defendants as alleged in this Class Action Complaint violates Section 17200 of the California Business and Professions Code.

(m) As alleged in this Class Action Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

138. Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a) Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which PSPs were sold, distributed, or obtained in the District of Columbia.

(b) The foregoing conduct constituted "unlawful trade practices" within the

1   meaning of D.C. Code § 28-3904.

2      (c)    During the Class Period, Defendants' illegal conduct substantially
3   affected District of Columbia commerce and consumers.

4      (d)    Defendants' unlawful conduct had the following effects: (1) PSP price
5   competition was restrained, suppressed, and eliminated throughout the District of
6   Columbia; (2) PSP prices were raised, fixed, maintained, and/or stabilized at
7   artificially high levels throughout the District of Columbia; (3) Plaintiffs and the
8   members of the Damages Class were deprived of free and open competition; and
9   (4) Plaintiffs and the members of the Damages Class paid supracompetitive,
10   artificially inflated prices for PSPs.

11      (e)    As a direct and proximate result of Defendants' conduct, Plaintiffs and
12   the members of the Damages Class have been injured in their business and
13   property and are threatened with further injury. Defendants have engaged in unfair
14   competition or unfair or deceptive acts or practices in violation of District of
15   Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and the members of
16   the Damages Class seek all relief available under that statute.

17      139.   Defendants have engaged in unfair competition or unlawful, unfair,
18   unconscionable, or deceptive acts or practices in violation of the Florida Deceptive
19   and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

20      (a)    Defendants' unlawful conduct had the following effects: (1) PSP price
21   competition was restrained, suppressed, and eliminated throughout Florida; (2)
22   PSP prices were raised, fixed, maintained, and/or stabilized at artificially high
23   levels throughout Florida; (3) Plaintiffs and the members of the Damages Class
24   were deprived of free and open competition; and (4) Plaintiffs and the members of
25   the Damages Class paid supracompetitive, artificially inflated prices for PSPs.

26      (b)    During the Class Period, Defendants' illegal conduct substantially
27   affected Florida commerce and consumers.

28      (c)    As a direct and proximate result of Defendants' unlawful conduct,

1 Plaintiffs and the members of the Damages Class have been injured in their

2 business and property and are threatened with further injury.

3 (d) Defendants have engaged in unfair competition or unlawful, unfair, or

4 deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and,

5 accordingly, Plaintiffs and the members of the Damages Class seek all relief

6 available under that statute.

7 140. Defendants have engaged in unfair competition or unlawful, unfair,

8 unconscionable, or deceptive acts or practices in violation of the Missouri

9 Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*

10 (a) Defendants engaged in the conduct described in this Class Action

11 Complaint in connection with the sale of PSPs in a market that includes Missouri.

12 (b) During the Class Period, Defendants' illegal conduct substantially

13 affected Missouri commerce and consumers.

14 (c) Defendants agreed to, and in fact did, fix, control, and maintain at

15 artificial and non-competitive levels, the price at which PSPs were sold,

16 distributed, or obtained in Missouri, which conduct constituted unfair practices in

17 that it was unlawful under federal and state law, violated public policy, was

18 unethical, oppressive, and unscrupulous, and caused substantial injury to Plaintiffs

19 and the members of the Damages Class

20 (d) Defendants concealed, suppressed, and omitted to disclose material

21 facts to Plaintiffs and the members of the Damages Class concerning Defendants'

22 unlawful activities and artificially inflated prices for PSPs. The concealed,

23 suppressed, and omitted facts would have been important to Plaintiffs and the

24 members of the Damages Class as they related to the cost of PSPs.

25 (e) Defendants' unlawful conduct had the following effects: (1) PSP price

26 competition was restrained, suppressed, and eliminated throughout Missouri; (2)

27 PSP prices were raised, fixed, maintained, and/or stabilized at artificially high

28 levels throughout Missouri; (3) Plaintiffs and the members of the Damages Class

1   were deprived of free and open competition; and (4) Plaintiffs and the members of
2   the Damages Class paid supracompetitive, artificially inflated prices for PSPs.

3       (f)   The foregoing acts and practices constituted unlawful practices in
4   violation of the Missouri Merchandising Practices Act.

5       (g)   As a direct and proximate result of the above-described unlawful
6   practices, Plaintiffs and the members of the Damages Class suffered ascertainable
7   loss of money or property.

8       (h)   Accordingly, Plaintiffs and the members of the Damages Class seek all
9   relief available under Missouri's Merchandising Practices Act, specifically Mo.
10  Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of
11  any deception, fraud, false pretense, false promise, misrepresentation, unfair
12  practice or the concealment, suppression, or omission of any material fact in
13  connection with the sale or advertisement of any merchandise in trade or
14  commerce," as further interpreted by the Missouri Code of State Regulations,
15  which provides for the relief sought in this Count.

16      141.   Defendants have engaged in unfair competition or unfair,
17  unconscionable, or deceptive acts or practices in violation of the New Mexico Stat.
18  § 57-12-1, *et seq.*

19      (a)   Defendants agreed to, and did in fact, act in restraint of trade or
20  commerce by affecting, fixing, controlling, and/or maintaining at a non-
21  competitive and artificially inflated levels, the price at which PSPs were sold,
22  distributed, or obtained in New Mexico and took efforts to conceal their
23  agreements from Plaintiffs and the members of the Damages Class.

24      (b)   The aforementioned conduct on the part of the Defendants constituted
25  "unconscionable trade practices" in violation of N.M.S.A. § 57-12-3, in that such
26  conduct, *inter alia*, and as set forth in N.M.S.A. § 57-12-2E, resulted in a gross
27  disparity between the value received by Plaintiffs and the members of the Damages
28  Class and the prices paid by them for PSPs.

(c)     Defendants' unlawful conduct had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for PSPs.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Now Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

142. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the price at which PSPs were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and the members of the Damages Class.

(b)     Defendants deceptively led purchasers, such as Plaintiffs and the members of the Damages Class, to believe that the PSPs they had purchased had been sold at legal, competitive prices, when they had in fact been sold at a collusively obtained and inflated prices.

(c)     The conduct of the Defendants described in this Class Action Complaint constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Defendants' unlawful conduct had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout New York; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout New York; (3) Plaintiffs and the members of the Damages Class who reside in and/or made purchases of PSPs in New York were deprived of free and open competition and subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and the members of the Damages Class who reside in and/or made purchases of PSPs in New York paid supracompetitive, artificially inflated prices in New York for PSPs, and were subjected to Defendants' deceptive practice in New York.

(e)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

(f)     During the Class Period, each of the Defendants named in this Class Action Complaint directly, or indirectly and through affiliates, dominated and controlled, manufactured, sold, and/or distributed PSPs in New York.

(g)     Plaintiffs and the members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

143.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and

1    non-competitive levels, the price at which PSPs were sold, distributed, or obtained

2    in North Carolina and took efforts to conceal their agreements from Plaintiffs and

3    the members of the Damages Class.

4        (b)    The conduct of the Defendants described in this Class Action

5    Complaint constituted consumer-oriented deceptive acts or practices within the

6    meaning of North Carolina law, which resulted in consumer injury and broad

7    adverse impact on the public at large, and harmed the public interest of North

8    Carolina consumers in an honest marketplace in which economic activity is

9    conducted in a competitive manner.

10       (c)    Defendants' unlawful conduct had the following effects upon

11   purchasers in North Carolina: (1) PSP price competition was restrained,

12   suppressed, and eliminated throughout North Carolina; (2) PSP prices were raised,

13   fixed, maintained, and/or stabilized at artificially high levels throughout North

14   Carolina; (3) Plaintiffs and the members of the Damages Class who reside in North

15   Carolina and/or purchased PSPs in North Carolina were deprived of free and open

16   competition in North Carolina; and (4) Plaintiffs and the members of the Damages

17   Class who resided in North Carolina and/or purchased PSPs in North Carolina paid

18   supracompetitive, artificially inflated prices in North Carolina for PSPs.

19       (d)    During the Class Period, Defendants' illegal conduct substantially

20   affected North Carolina commerce and consumers.

21       (e)    During the Class Period, each of the Defendants named in this Class

22   Action Complaint, directly, or indirectly and through affiliated they dominated and

23   controlled, manufactured, sold, and/or distributed PSPs in North Carolina.

24       (f)    Plaintiffs and the members of the Damages Class seek actual damages

25   for their injuries caused by these violations in an amount to be determined at trial

26   and are threatened with further injury. Defendants have engaged in unfair

27   competition or unfair or deceptive acts or practices in violation of North Carolina

28   Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and the members of the

Damages Class seek all relief available under that statute.

144. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

(a)　Defendants' combinations or conspiracies had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for PSPs.

(b)　During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)　As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)　Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 29-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

145. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)　Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which PSPs were sold, distributed, or obtained in Vermont.

(b)     Defendants deliberately failed to disclose material facts to Plaintiffs and the members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for PSPs. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' PSP prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects: (1) PSP price competition was restrained, suppressed, and eliminated throughout Vermont; (2) PSP prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for PSPs.

(d)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and the members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of PSPs, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing PSPs at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

### COUNT IV

### UNJUST ENRICHMENT

### (on behalf of Plaintiffs and the Damages Class)

145.   Plaintiffs incorporate by reference the allegations in the preceding

1   paragraphs.

2      146.   As a result of their unlawful conduct described above, Defendants have

3   and will continued to be unjustly enriched. Defendants have been unjustly enriched

4   by the receipt of, as a minimum, unlawfully inflated prices and unlawful profits of

5   PSPs.

6      147.   Defendants have benefitted from their unlawful acts and it would be

7   inequitable for Defendants to be permitted to retain any of the ill-gotten gains

8   resulting from the overpayment made by Plaintiffs and the members of the

9   Damages Class for PSPs.

10      148.   Defendants caused Plaintiffs and those similarly situated injury-in-fact

11   through their unlawful conspiracy, in the form of overcharges for the PSPs

12   purchased indirectly by Plaintiffs. Plaintiffs and those similarly situated could not

13   recoup these overcharges by means of pass through.

14      149.   Plaintiffs and the members of the Damages Class are entitled to the

15   amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and

16   inequitable conduct. Plaintiffs and the members of the Damages Class are entitled

17   to the establishment of a constructive trust consisting of all ill-gotten gains from

18   which Plaintiffs and the members of the Damages Class may make claims on a pro

19   rata basis.

20      150.   Pursuit of any remedies against the entities from which Plaintiffs and

21   the members of the Damages Class purchased PSPs subject to Defendants'

22   conspiracy would have been futile, given that those entities did not take part in

23   Defendants' conspiracy.

24                          **PRAYER FOR RELIEF**

25   WHEREFORE, Plaintiffs pray:

26      A.      That the Court determine that this action may be maintained as a class

27   action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and

28   direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the

1 Federal Rules of Civil Procedure, be given to members of the Class;

2      B.     That the Court determine that this action may be maintained as a class

3 action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and

4 direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the

5 Federal Rules of Civil Procedure, be given to members of the Class;

6      C.     That the unlawful conduct, contract, conspiracy, or combination alleged

7 herein be adjudged and decreed:

8           1.     An unreasonable restraint of trade or commerce in violation of

9                Section 1 of the Sherman Act;

10           2.     A *per se* violation of Section 1 of the Sherman Act;

11           3.     An unlawful combination, trust, agreement, understanding, and/or

12                concert of action in violation of the state antitrust and unfair

13                competition, unjust enrichment, and consumer protection laws as

14                set forth herein;

15      D.     That Plaintiffs and the members of the Damages Class recover damages

16 to the maximum extent allowed under such laws, and that a joint and several

17 judgment in favor of Plaintiffs and the members of the Damages Class be entered

18 against Defendants in an amount to be trebled to the extent such laws permit;

19      E.     That Plaintiffs and the members of the Damages Class recover damages

20 to the maximum extent allowed by such laws, in the form of restitution and/or

21 disgorgement of profits unlawfully gained from them;

22      F.     That Defendants, their affiliates, successors, transferees, assignees and

23 other officers, directors, partners, agents and employees thereof, and all other

24 persons acting or claiming to act on their behalf or in concert with them, be

25 permanently enjoined and restrained from in any manner continuing, maintaining or

26 renewing the conduct, contract, conspiracy or combination alleged herein, or from

27 entering into any other contract, conspiracy or combination having a similar purpose

28 or effect, and from adopting or following any practice, plan, program or device

1    having a similar purpose or effect;

2         G.    That Plaintiffs and the members of the Damages Class be awarded pre-

3    and post- judgment interest as provided by law, and that such interest be awarded at

4    the highest legal rate from and after the date of service of this Complaint;

5         H.    That Plaintiffs and the members of the Damages Class recover their

6    costs of suit, including reasonable attorneys' fees, as provided by law; and

7         I.    That Plaintiffs and the members of the Damages Class have such other

8    and further relief as the case may require and the Court may deem just and proper.

9                              **Demand For Jury Trial**

10        Plaintiffs request a jury trial on all matters triable.

11   Dated: May 23, 2016              Respectfully submitted,

12                                    By */s/ John H. Donboli*_____

13                                    John H. Donboli (Cal. Bar No. 205218)
                                      Camille Joy DeCamp (Cal. Bar No. 236212)
14                                    DEL MAR LAW GROUP, LLP
                                      12250 El Camino Real, Suite 120
15                                    San Diego, CA 92130
                                      Telephone: 858.793.6244
16                                    Facsimile: 858.793.6005
                                      jdonboli@delmarlawgroup.com
17                                    cdecamp@delmarlawgroup.com

18

19                                    Jonathan W. Cuneo
20                                    Joel Davidow
                                      Daniel M. Cohen
21                                    CUNEO GILBERT & LADUCA, LLP
                                      507 C Street, NW
22                                    Washington, DC 20002
                                      Telephone: 202.789.3960
23                                    Facsimile: 202.589.1813
24                                    jonc@cuneolaw.com
                                      joel@cuneolaw.com
25                                    danielc@cuneolaw.com

26

27

28

                                        60
                        CONSOLIDATED CLASS ACTION COMPLAINT
                        Case No. 3:15-md-02670-JLS-MDD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Michael J. Flannery (Cal. Bar No. 196266)
CUNEO GILBERT & LADUCA, LLP
7733 Forsyth Boulevard, Suite 1675
St. Louis, MO 63105
Telephone: 314.226.1015
Facsimile: 202.789.1819
mflannery@cuneolaw.com

Benjamin D. Elga
CUNEO GILBERT & LADUCA, LLP
16 Court Street, Suite 1012
Brooklyn, NY 11241
Telephone: 202.789.3960
Facsimile: 202.589.1813
belga@cuneolaw.com

Don Barrett
David McMullan
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Maxwell M. Blecher
BLECHER COLLINS & PEPPERMAN
515 South Figueroa Street, Suite 1750
Los Angeles, CA 90071
Phone: 213-262-6787
Facsimile: 213-622-1656
mblecher@blechercollins.com

J. Barton Goplerud
HUDSON, MALLANEY, SHINDLER &
ANDERSON PC
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Telephone: 515.223.4567
Facsimile: 515.223.8887
jbgoplerud@hudsonlaw.net

61

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-md-02670-JLS-MDD

1

2

3

4

5

Dewitt Lovelace
Valerie Nettles
LOVELACE & ASSOCIATES, P.A.
12870 US Hwy 98 West Suite 200
Miramar Beach, FL 32550
Telephone: (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com

6

7

8

9

10

11

Thomas P. Thrash
THRASH LAW FIRM, P.A.
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net

*Counsel for Plaintiffs and Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-md-02670-JLS-MDD