# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

IN RE: PACKAGED SEAFOOD
PRODUCTS ANTITRUST LITIGATION

Case No: 3:15-md-2670-JLS-MDD

Judge: Janis L. Sammartino

THIS DOCUMENT RELATES TO:

*WINN-DIXIE STORES, INC., et al.*
*v. BUMBLE BEE FOODS, LLC, et al.,*
ECF No. 151

## WINN-DIXIE PLAINTIFFS' OPPOSITION TO:

**(1) DEFENDANTS' JOINT MOTION TO DISMISS ALL PLAINTIFFS' COMPLAINTS, INCLUDING THEIR (A) SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES ("*TWOMBLY* BRIEF") (ECF 207-2), (B) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS VARIOUS CLAIMS AS TIME BARRED ("STATUTE OF LIMITATIONS BRIEF") (ECF 207-4), AND (C) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' COMPLAINTS FOR LACK OF STANDING ("STANDING BRIEF") (ECF NO. 207-5);**

**(2) DEFENDANT THAI UNION GROUP PCL'S RULE 12 (b)(6) MOTION TO DISMISS AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES (ECF NO. 205).**

# Table of Contents

I.     Introduction ……………………………………………………… 1

II.    Winn-Dixie Plaintiffs' Allegations of Direct
Communcations Between and Among Defendants
Relating to and Resulting in Anticompetitive
Agreements Is More than Sufficient Under *Twombly* ……… 2

III.   Winn-Dixie Plaintiffs Make Sufficient Allegations
That Packaged Seafood Products (PSP) Are Part
of the Conspiracy ……………………………………………… 4

IV.   The WAC Alleges a Market Structure Conducive
to a Conspiracy ……………………………………………….. 6

V.     Defendants' Twombly Motion (ECF 207) Should
Be Denied ……………………………………………………… 6

A. Plaintiffs Have Alleged Sufficient Facts Under
Twombly and Ninth Circuit Law ………………………… 7

1. Neither Twombly Nor Ninth Circuit Law Require
Detailed "Who, What, Where and When"
Allegations Beyond What Plaintiffs Have Alleged …... 7

2. Plaintiffs Allege Not Only Direct Communications
Between and Among Defendants, But Also
"Plus Factors" ………………………………………… 11

3. Plaintiffs' Alleged PSP Conspiracy Is Plausible ……. 15

VI.   Defendants' Motion to Dismiss for Lack of Standing
Relating to PSP Claims (ECF 207-5) Should Be Denied ….. 16

VII.   Plaintiffs Have Sufficiently Pled Fraudulent
Concealment …………………………………………………… 17

VIII. Thai Union Group's Motion to Dismiss (ECF 205)
Should Be Denied ……………………………………………… 22

      **A. Sufficiency of Allegations of Agency at the Pleading Stage ……………………………………………………… 24**

**IX.**    **Leave to Amend Should Be Freely Granted ……………… 25**

**X.**    **Conclusion …………………………………………………... 26**

# Table of Authorities

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007)…………………………………………………….. 3

*Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962)……………………………………………… 3, 14

*Autotel v. Nev. Bell Tel. Co.*, 697 F.3d 846, 850 (9th Cir. 2012)……….. 6

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556–57 (2007)……………... 6

*In re Nat'l Ass'n of Music Merchs.*, 2011 U.S. Dist. LEXIS 94302……. 7

*In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1163 (D. Idaho 2011)………………………………………….. 7, 8

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1183 (N.D. Cal. 2009)……………………………………….. 8, 9, 25, 26

*In re Packaged Ice*, 723 F. Supp. 2d at 1005……………………………….. 8, 9, 11

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007)………………………………………. 8, 9

*In re Southeastern Milk Antitrust Litig., 555 F. Supp. 2d 934* (E.D. Tenn. 2008)…………………………………………………… 9

*Starr v. Sony BMG Entm't, 592 F.3d 314, 325* (2d Cir. 2010)……………. 9, 11

*Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1047 (9th Cir. 2008)……....... 10, 16

*In re High–Tech Emp. Antitrust Litig.,* 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012)…………………………………………………… 6, 17

*Hinds County, Miss. v. Wachovia Bank, N.A.,* 700 F. Supp. 2d 378, 394-95 (S.D.N.Y. 2010)…………………………………………… 11

*In re Flat Glass Antitrust Litig.,* 2009 WL 331361, at *2 (W.D.Pa. 2009)…………………………………………………… 11, 13

iii

*In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623,
631 (E.D.Pa. 2010)……………………………………………… 11, 13

*CRT*, 738 F. Supp. 2d at 1019……………………………… 11, 16,
21, 25,
26

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628-29
(7th Cir. 2010)…………………………………………………… 12, 14

*In re Musical Instruments and Equip. Antitrust Litig.*,
798 F.3d 1186, 1194 n.7 (9th Cir. 2015)……………………………… 12

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011)………… 13

*In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133,
1144-45 (N.D. Cal. 2009)………………………………………… 13

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
2011 WL 1753738, at *14 (N.D. Cal. 2011)………………………… 13

*Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir.2001)…………………….. 14

*United States v. Alcoa, Inc.*, 2001 WL 1335698 (D.D.C. 2001)……………. 14

*DIPF*, 2013 WL 812143…………………………………………………14

*In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538,
576 (M.D.Pa. 2009)………………………………………………… 14

*In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051,
1063 (N.D. Cal. 2015)……………………………………………… 15

*In re Lithium Ion Batteries Antitrust Litigation*, 2014 WL 309192
(N.D. Cal. 2014)…………………………………………………... 15, 23

*In re Auto. Parts Antitrust Litig.*, 2014 WL 4272772
(E.D. Mich. 2014)………………………………………………… 15

*In re Auto. Parts Antitrust Litig.*, 2014 WL 4272784
(E.D. Mich. 2014)………………………………………………… 15

*Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 898 (N.D. Ill. 2009)…………………………………………………… 15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008)…………………………………………... 16

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008)…………………………………16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)……………........... 17

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983)……………………...........17

*In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390 (S.D.N.Y. 2011)…………………………………………………...17

*High-Tech Emp.*, 856 F. Supp. 2d at 1122; *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995)…………………. 17

*Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012)………………………………………………… 18

*In re Rubber Chems Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007)…………………………………………………... 18

*Animation Workers II*, 123 F. Supp. 3d at 1195………………………….. 18, 19, 22

*In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377 (N.D. Cal. 2014)………………………………………………… 18

*E.W. French & Sons, Inc. v. Gen. Portland Inc.*, 885 F.2d 1392, 1394-95, 1399 (9th Cir. 1989)………………………………………. 19, 21

*Cathode Ray, 738 F. Supp. 2d at 1025*………………………………… 20

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 782 F. Supp. 487, 498 (C.D. Cal. 1991)…………………… 21

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 897 (N.D. Cal. 2009)……………………………………............ 23, 25

*In re Processed Egg Prod. Antitrust Litig.*, 2011 WL 5980001, at *8 (E.D.Pa. 2011)…………………………………………………… 22

*TFT-LCD*, 599 F. Supp. 2d at 1184-85……………………….............. 24

*Monaco v. Liberty Life Assur. Co.*, 2007 WL 1140460, at *7 (N.D. Cal. 2007)……………………………………………… 24

*In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 784 (N.D. Ohio 2011)……………………………………………..24

*Toppel v. Marriott Int'l, Inc.*, 2006 U.S. Dist. LEXIS 60529, at * 25 (S.D.N.Y. 2006)………………………………………….. 24

*Petersen v. Boeing Co.*, 715 F.3d 276, 280 (9th Cir. 2013)………………… 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    Introduction

Defendants try to obscure the facts that (1) there is an amnesty recipient in this alleged conspiracy, (2) there is an ongoing federal investigation into the alleged conspiracy, and (3) Plaintiffs allege direct communications between and among the Defendants that resulted in (a) an agreement to raise prices in 2011 and 2012, and (b) an agreement to refrain from and limit promotions.  These facts alone are sufficient for this Court to deny Defendants' motion to dismiss regarding the sufficiency of the conspiracy allegations.

Moreover, Plaintiffs have alleged pretextual and misleading statements by Defendants to conceal the conspiracy.  In addition, Plaintiffs have alleged no facts that would give rise to "storm warnings" or "red alerts," to put them on inquiry notice.  Based on the facts above, Plaintiffs were not required to engage in any due diligence, which is a factual issue unsuitable for a motion to dismiss, in any event.

Finally, Plaintiffs have alleged sufficient facts regarding Thai Union's control over Thai Union USA (Chicken of the Sea) to defeat Thai Union's motion to dismiss.  In addition, insofar as issues of control are factually intensive, Thai Union's argument is not appropriate on a motion to dismiss, and therefore should be denied on this additional basis. [1]

---

[1] The Winn-Dixie Plaintiffs incorporate by reference the arguments made in all of the other Responses to Defendants' various motions to dismiss, especially the Response of the Affiliated Foods Plaintiffs.

## II. Winn-Dixie Plaintiffs' Allegations of Direct Communications Between and Among Defendants Relating to and Resulting in Anticompetitive Agreements Are More than Sufficient Under *Twombly*.

Defendants' *Twombly* Brief ignores allegations of direct communications between and among Defendants relating to and resulting in anticompetitive agreements, including the following:

- One method by which the Defendants collusively raised prices was through *bilateral communications among them, in late 2011 and early 2012, in which they agreed to a price increase in the 2nd Quarter of 2012, and also on the timing of the price increase, including that Starkist would lead the price increase and CoS and BB would follow it.* In furtherance of that agreement, Starkist announced a price increase on January 13, 2012, and CoS and BB announced identical price increases on January 18, 2012, and January 17, 2012, respectively. The increases often resulted in identical list prices. For example, 48-can cartons of 5 oz. light tuna increased from $40.80 to $43.58 for all three companies. ¶ 44 (emphasis added);

- In addition, another method by which the Defendants colluded was through *bilateral communications among them, in which they reached an understanding that each of them would not engage in aggressive promotion of their PSP products. These communications took place in 2012 and 2013 and consisted of complaints from one or more of them against the third party, which responded that it would not engage in aggressive promotion and that the complained of promotion would not be repeated.* ¶ 48 (emphasis added);

- Another method by which the Defendants collusively raised prices was by decreasing the size of cans of tuna without also decreasing prices. Beginning in August of 2008, Bumble Bee, CoS and StarKist began distributing 5 oz. cans of tuna to replace their 6 oz. cans. The can size change was largely completed in January of 2009 and is reflected in the steep climb of prices depicted on the foregoing chart. This was portrayed as a response to rising prices, but it could only have been achieved if Bumble Bee, CoS, and StarKist all agreed to it beforehand. ¶ 49 (emphasis added);

- [T]he three companies entered into an agreement not to compete on the sale of "FAD free" canned tuna. ***Each company agreed that it would not sell any FAD***

2

*free product under its own label, despite strong and growing demand by consumers for FAD free products. Senior executives at StarKist, Bumble Bee and CoS began discussions in e-mails on this topic in late 2011, and reached agreement in a telephone conference among all three companies during the week of February 6, 2012. The participants in the conspiracy confirmed the agreement in an e-mail dated February 17, 2012.* ¶ 52 (emphasis added).

In short, the WAC (Winn-Dixie Plaintiffs' First Amended Complaint) pleads evidentiary facts: who did what to whom (or with whom) where and when.[2]

Not only do Defendants ignore the WAC's allegations, they improperly meld, contrast, scramble, dismember, misrepresent and distort the complaints filed by various plaintiff groups in an attempt to fashion a "one size fits all" dismissal argument. However, Defendants' attempt to obscure the allegations in each DAP complaint must be rejected because each complaint must be judged on its own merits,[3] and all of its allegations of each complaint must be considered as a whole and not dismembered. *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Furthermore, the plausibility of a conspiracy must be assessed on the allegations taken as a whole, and not each one in isolation. *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962).

---

[2] Tri-Union Seafoods LLC and Thai Union Group PCL (together, "Chicken of the Sea" or "COTS") do not join in that portion of the *Twombly* Brief (ECF 207-2) that asserts that non-tuna claims should be dismissed and that plaintiffs fail to allege a plausible tuna conspiracy. By failing to join these arguments, COTS effectively concedes the plausibility of the alleged conspiracy.

[3] Allegations in other complaints cannot be considered. On a motion to dismiss, the court "may not consider any material beyond the pleadings." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990).

### III. Winn-Dixie Plaintiffs Make Sufficient Allegations That Packaged Seafood Products (PSP) Are Part of the Conspiracy.

Contrary to Defendants' contention, the WAC specifically alleges that the conspiracy involved all of Defendants' packaged seafood products:

- This action arises out of a conspiracy by the three largest brand name producers of packaged seafood products ("PSPs") in the United States -- Bumble Bee Foods LLC, Tri-Union Seafoods LLC, and StarKist Company, which began no later than January 1, 2008, and continues to the present (the "Relevant Period"), to fix, raise, maintain, and/or stabilize prices for PSPs within the United States in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3). As used herein, the term "PSPs" refers to shelf-stable seafood (predominantly tuna) that are sold in cans, pouches or ready-to-eat serving packages. (¶ 1);

- As described in greater detail herein, this conspiracy was effectuated by various means, including, but not limited to: (a) agreeing to decrease the sizes of cans in which canned tuna is sold; (b) agreeing to issue collusive list price increases on canned tuna; (c) ***agreeing to limit promotional activity for PSPs;*** and (d) agreeing not to compete by refraining from selling branded canned tuna with labels indicating it is "FAD Free" (a term that will be explained below). ***As a result, Defendants' PSP prices and profits have increased.*** (¶ 2);

- Moreover, as confirmed in proceedings before this Court, the Antitrust Division of the United States Department of Justice ("DOJ") is currently conducting a criminal investigation of this conspiracy. And, critically, ***one of the key domestic PSP producers--Tri-Union Seafoods LLC--has been publicly reported to have sought leniency from the DOJ under the agency's program that grants immunity to the first company to admit antitrust violations.*** (¶ 3);

- During the Relevant Period, Plaintiff directly purchased PSPs from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violation alleged herein. (¶¶ 7-8);

- PSPs are sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others. According to a May 2012 presentation by Bumble Bee, total United States retail sales of shelf-stable seafood products were $2.346 billion in 2011 and were estimated to be $2.397 billion in 2012. (¶ 28);

- Defendants are the three largest domestic manufacturers of PSPs. The industry is highly concentrated. According to the aforementioned presentation by Bumble Bee, it had 29% of the domestic shelf-stable seafood market, CoS had 18.4% and StarKist had 25.3%. The remaining market share was comprised of smaller companies and private label brands. (¶ 29);

- On July 23, 2015, TUF suspended the preferential public offering in light of a grand jury investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ"). … Undercurrent News further reported … that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ." The publication *Global Competition Review* similarly reported as follows:

  > In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.

  > He said … Tri-Union Seafoods, which operates … under the Chicken of the Sea brand, had received a subpoena ***"requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."*** (¶ 30);

- [I]t appears that StarKist received a subpoena as well and that the DOJ's investigation extends to the entire domestic PSP sector. (¶ 32);

- There are economic indications that support the conclusion that there was collusive pricing within the domestic PSP industry. (¶ 39);

- Consumption of PSPs … has declined over the last ten years in the United States. The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013. This trend has been widely reported. (¶ 40);

- Given this decline in consumption of the signature PSPs, one would expect rational businesses to reduce the prices for PSPs, but that did not happen. (¶ 43);

- … Defendants colluded … through bilateral communications among them, in which they reached an understanding that each of them would not engage in

aggressive promotion of their PSP products. These communications took place in 2012 and 2013 and consisted of complaints from one or more of them against the third party, which responded that it would not engage in aggressive promotion and that the complained of promotion would not be repeated. (¶ 48);

## IV. The WAC Alleges a Market Structure Conducive to Conspiracy

The WAC alleges that a market structure conducive to a conspiracy: higher concentration (¶¶ 27-28); oligopolistic industry (¶ 29); and interlocking business relationships, such as co-packing agreements and arrangements (¶ 39). Plaintiffs also plead how the PSP market behaved in a non-competitive manner consistent with the conspiracy, … despite a steady decline in U.S. PSP consumption since 2003, prices for PSP increased steadily from 2005 to 2015. (¶¶ 43, 45)

## V. Defendants' *Twombly* Motion (ECF 207) Should Be Denied

In evaluating a motion to dismiss, a court must construe the complaint in the light most favorable to the non-moving party. *Autotel v. Nev. Bell Tel. Co.*, 697 F.3d 846, 850 (9th Cir. 2012). Pleading an antitrust conspiracy only "requires a *complaint* with enough factual matter (taken as true) to suggest that an agreement was made," and "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556–57 (2007). A court should also avoid "tightly compartmentalizing the various factual components" of a plaintiff's case "and wiping the slate clean after scrutiny of each." *In re High–Tech Emp. Antitrust Litig.,* 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012).

**A. Plaintiffs Have Alleged Sufficient Facts Under *Twombly* and Ninth Circuit Law.**

Contrary to Defendants' arguments, (1) neither *Twombly* nor Ninth Circuit law require "who, what, where, when" allegations beyond what Plaintiffs have alleged, and (2) Plaintiffs allege more than mere parallel conduct; they allege, inter alia, direct communications between and among the Defendants that resulted in (a) an agreement to raise prices in 2011 and 2012, and (b) an agreement to refrain from and limit promotions.

**1. Neither *Twombly* Nor Ninth Circuit Law Require "Who, What, Where and When" Allegations Beyond What Plaintiffs Have Alleged.**

Defendants here, like defendants in many other cases, have pushed the argument that *Twombly* and the Ninth Circuit decision in *Kendall* have erected a stringent "who, what, where, when" standard for allegations for an antitrust conspiracy. However, many courts within and outside of the Ninth Circuit have rejected this argument. *See In re Nat'l Ass'n of Music Merchs.*, 2011 U.S. Dist. LEXIS 94302, at * 11-12 ("Like [*Twombly*], *Kendall*…requires allegations of "facts such as 'specific time, place, or person involved in the conspiracy…'"); *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1163 (D. Idaho 2011) (noting that "[m]any courts have rejected such arguments (including districts courts within the Ninth Circuit), concluding that the Supreme Court did not impose the elaborate "who-what-when-where-when" pleading requirement"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1183 (N.D. Cal. 2009)

("Contrary to defendants' suggestions, neither *Twombly* nor the Court's prior order requires elaborate fact pleading."); *In re Packaged Ice*, 723 F. Supp. 2d at 1005 ("*Twombly* imposed no such requirement"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (plaintiffs need not plead "specific back-room meetings between specific actors at which specific decisions were made").

Perhaps the best analysis of this argument is found in *In re Fresh and Process Potatoes Antitrust Litigation, supra*. In that case, the Court rejected an overly broad interpretation of *Kendall*, while still harmonizing the appropriate standard with it. First, after describing *Twombly*, the Court started with a brief discussion of interplay between *Twombly* and *Kendall*:

> Less than a year after the Supreme Court handed down *Twombly*, the Ninth Circuit decided *Kendall*. In reciting the new plausibility standard announced in *Twombly*, the *Kendall* Court cited *Twombly*'s footnote 10, stating that Supreme Court "suggested that to allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies,' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Id. at 1047* (citing *Twombly, 550 U.S. at 565 n.10*). Notably, the *Kendall* complaint was as barren as *Twombly*'s. In dismissing the complaint, the Court found that even after conducting discovery, "the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Id. at 1048*.

834 F. Supp. 2d at 1163. The Court went on to describe defendants' attempt to turn *Twombly* and *Kendall* into a detailed "who, what, where and when" standard:

> In the wake of *Twombly* and *Kendall*, antitrust defendants have relied on footnote 10 and the who-what-where-when language in *Kendall* to argue that

8

complaints filed against them are deficient - even when complaints contain detailed "evidentiary factual" allegations connecting them to the alleged conspiracy. *See, e.g., In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d at 1008* ("Defendants continue to sound the who, what, when and where refrain throughout their briefs . . . .").

*Id.* The Court concluded that this argument was not sound, citing numerous decisions rejecting this argument:

> Many courts have rejected such arguments (including district courts within the Ninth Circuit), concluding that the Supreme Court did not impose the elaborate "who-what-where-when" pleading requirement defendants insisted upon.[13]
>
> 13 *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig., 599 F. Supp. 2d 1179, 1183 (N.D. Cal. 2009)* ("Contrary to defendants' suggestions, neither *Twombly* nor the Court's prior order requires elaborate fact pleading.");
>
> *In re Packaged Ice, 723 F. Supp. 2d at 1005* ("*Twombly* imposed no such requirement");
>
> *In re Southeastern Milk Antitrust Litig., 555 F. Supp. 2d 934 (E.D. Tenn. 2008)* (holding sufficient complaints that "while not answering all specific questions about 'who, what, when and where,' do put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist");
>
> *see also Starr v. Sony BMG Entm't, 592 F.3d 314, 325 (2d Cir. 2010)*;
>
> *In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007)* (plaintiffs need not plead "specific back-room meetings between specific actors at which specific decisions were made").

*Id.* Harmonizing *Twombly* and *Kendall* with federal notice pleading and the elements of a Section 1 conspiracy claim, the Court held that the allegations in that case – 23 grower companies met in 2004 and agreed to limit potato planting, a horizontal agreement to restrict output – were sufficient and met an appropriate "who, what, where and when" standard.  Thus, it held:

> Turning to plaintiffs' allegations in this case, the Court finds that plaintiffs have alleged sufficient evidentiary facts connecting the moving grower defendants to the alleged conspiracy.  This complaint does answer the basic who-what-where-when question. Specifically: **Who? Twenty-three growers, including the**

> ***moving grower defendants. What? Met and agreed to reduce potato supply
> and fix prices. When? Fall 2004. Where? An office in Blackfoot, Idaho.***
>
> ***Because these basic questions are answered,*** and the defendants have supplied
> additional factual detail regarding the activities of the group thereafter (albeit
> not on a defendant-by-defendant basis) ***the moving defendants have "an idea
> of where to begin" in responding to the complaint.*** *See Kendall, 518 F.3d at
> 1047.*

*Id.* at 1163-64 (emphasis added)(footnote omitted). In the ruling above, it was

sufficient to allege that the Defendant grower companies met; it was not necessary

to say who at the Defendant grower companies met. For When?, it was sufficient

that it was in the Fall of 2014, a specific date was not necessary. For What?, it was

sufficient to describe what the Defendants agreed to; it was not necessary to allege

exactly what was said. Thus, applying the Court's appropriate "who, what, where

and when" standard to the allegations here:

> Who?: Starkist, Chicken of the Sea and Bumble Bee
>
> What? Communications and agreement to raise prices in 2011 and 2012, with
> specific prices and dates that they agreed to.
>
> Where? Bilateral communications.
>
> When? Late 2011 and early 2012 for the 2012 price increase; and 2012 and
> 2013 for the agreement to limit promotions.

Thus, under the appropriately understood and applied "who, what, where and

when" standard, Plaintiffs' allegations are sufficient to allege a Section 1

conspiracy.

Finally, contrary to Defendants' arguments, the existence of a government

investigation and an amnesty recipient mean something on a motion to dismiss. In

*CRT*, the Court noted the pending government investigation in denying a motion to dismiss. *CRT,* 738 F. Supp. 2d at 1019.[4]  In addition, Plaintiffs have not only alleged that there is an amnesty recipient (¶ 37), but also that, based on the requirements to qualify as an amnesty recipient, Thai Union confessed to its participation in the conspiracy with Bumble Bee and Starkist. (¶ 38.)  This is more than just alleging the existence of an amnesty recipient.  It is an allegation of direct participation by Thai Union, and Bumble Bee and Starkist, in the conspiracy.  Finally, assuming arguendo that Thai Union is the amnesty recipient, at some point it will be required to provide substantial assistance under APCERA if it wants the benefit of detrebling and no joint and several liability.  Given the stay in place in the case due to the pending government investigation, this Court should not dismiss with prejudice any allegations until after Plaintiffs have had the opportunity to obtain information from Thai Union unfettered from the stay and the government investigation.

**2. Plaintiffs Allege Not Only Direct Communications Between and Among Defendants, But Also "Plus Factors."**

As pointed out above, Plaintiffs have alleged direct communications between and among Defendants relating to and resulting in at least two anticompetitive

---

[4] The weight of authority indicates that an ongoing government investigation can be considered, along with other allegations, in determining whether all of the allegations are sufficient to state a claim for a Section 1 conspiracy. *See e.g., Starr v. Sony BMG Music Entm't, Inc.,* 592 F.3d 314, 325 (2nd Cir. 2010); *Blood Reagents,* 756 F. Supp. 2d at 632; *Packaged Ice,* 723 F. Supp. 2d at 1009; *Hinds County, Miss. v. Wachovia Bank, N.A.,* 700 F. Supp. 2d 378, 394-95 (S.D.N.Y. 2010); *In re Flat Glass Antitrust Litig.,* 2009 WL 331361, at *2 (W.D.Pa. 2009).

agreements. Even if these allegations are not sufficient – and they are – Plaintiffs have also alleged circumstantial evidence sufficient to plead an antitrust conspiracy. *See, e.g. In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628-29 (7th Cir. 2010). Indeed, adequately pled "[p]lus factors coupled with parallel conduct can take a complaint from merely possible to plausible." *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.7 (9th Cir. 2015). "[P]lus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Id.* at 1194.

The plus factors here plausibly suggest a horizontal agreement.[5] The WAC provides such context through (i) facts implying a traditional conspiracy; (ii) a market structure conducive to conspiracy; and (iii) actions against economic self-interest. *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 361 (3d Cir. 2004).

First, Plaintiffs allege facts "implying a traditional conspiracy," the most probative "plus factor." *Id.* at 361. This includes allegations of a "manifest agreement not to compete, which may include proof that the Defendants got together and

---

[5] Unlike *Musical Instruments*, there is no business justification countering the cumulative weight of the WAC's allegations. In *Musical Instruments*, plaintiffs' theory was that the leading manufacturers of guitars conspired to set minimum advertised prices. *Musical Instruments*, 798 F.3d at 1189, 1193. However, "the complaint itself, perhaps maladroitly, provide[d] ample independent reasons" for the parallel conduct. *Id.* at 1195. Plaintiffs alleged that each manufacturer was pressured by its largest customer to adopt the policy. No plus factor could explain why a horizontal agreement was needed beyond this self-inflicted explanation for the defendants' conduct. *Id.* at 1195, 1198.

exchanged assurances of common action or otherwise adopted a common plan[.]" *Burtch v. Milberg Factors, Inc.,* 662 F.3d 212, 227 (3d Cir. 2011).[6] The WAC alleges that Defendants engaged in bilateral communications relating to and resulting in (a) an agreement to raise prices in 2011 and 2012, and (b) an agreement to refrain from and limit promotions. Obviously, communications among the Defendants to raise and fix prices in 2011 and 2012, including the timing of the price increase announcements, is evidence of a "traditional conspiracy."

Second, from Plaintiffs' allegations regarding the structure of the market, this Court can infer that "the structure of the market was such as to make secret price fixing feasible." *Flat Glass*, 385 F.3d at 360; s*ee also In re Flash Memory Antitrust Litig.,* 643 F. Supp. 2d 1133, 1144-45 (N.D. Cal. 2009) (high market concentration, cross-licensing and joint venture agreements … may be "relied upon as a factor to suggest price collusion").[7] The WAC pleads each of these factors. ¶¶ 28-29, 61-62.

Third, Defendants acted against their self-interest by raising prices while demand was falling, supporting the plausibility of collusion, as basic economics should lead competitors in a commodity market to lower prices to compete for a

---

[6] *See Flash Memory*, 643 F. Supp. 2d at 1143 (discussing weight to accord allegations of competitor communications about pricing); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *14 (N.D. Cal. 2011).

[7] *Text Messaging*, 630 F.3d at 627-29; *In re Blood Reagents Antitrust Litig.,* 756 F. Supp. 2d 623, 631 (E.D.Pa. 2010); *Todd v. Exxon Corp.,* 275 F.3d 191, 208 (2d Cir.2001); *United States v. Alcoa, Inc.,* 2001 WL 1335698, at *12 (D.D.C. 2001).

shrinking customer base. *DIPF*, 2013 WL 812143, at \*12 ("it is against economic self-interest to raise prices during a downturn in product demand."); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576 (M.D.Pa. 2009) ("Allegations that demand is in decline . . . may . . . implicate an agreement when joined with averments of anticompetitive or parallel conduct"). The materials outside the WAC cited by Defendants, asserting that prices were rising because costs were increasing (*Twombly* Br. 14) cannot be considered by this Court on a motion to dismiss.

Defendants also argue that the following allegations, standing alone, cannot support "a reasonable inference of conspiracy": "(1) Defendants' participation in industry trade associations; [and] (2) the existence of co-packing business ventures." *Twombly* Br. 24. However, Defendants' attempt to view these allegations standing alone violates the admonition of *Continental Ore.* Viewed together with the allegations of bilateral communications between and among Defendants, the WAC's allegations about opportunities to conspire (¶¶ 61-62) constitute additional "plus factors" requiring the denial of Defendants' *Twombly* motion.[8]

---

[8] *Transpacific Passenger*, 2011 WL 1753738, at \*13 ("Joint participation in various trade organizations 'cannot alone support Plaintiffs' claims, but such participation demonstrates how and when Defendants had opportunities to exchange information or make agreements.'"); *Flash Memory*, 643 F. Supp. 2d at 1148 (While allegations regarding "trade organizations and trade meetings, *standing alone,* may not state a claim under the Sherman Act, they may properly be considered along with . . . other allegations in the Complaint . . . for purposes of the assessing the sufficiency of the Complaint."); *Id.* at 1147 (joint venture and cross-licensing agreements).

14

### 3. Plaintiffs' Alleged PSP Conspiracy Is Plausible.

Contrary to Defendants' argument that a PSP conspiracy is implausibly broad, the "mere size or breadth alone is not a reason to peremptorily jettison a conspiracy allegation." *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1063 (N.D. Cal. 2015).[9] Moreover, at the pleading stage of a case, "there is simply no requirement that an antitrust plaintiff draw the boundaries of the alleged conspiracy … with the precision of a diamond cutter." *Id.* Furthermore, the question of how far a conspiracy reaches is "ultimately one of fact, and cannot be resolved" on a motion to dismiss. *In re Lithium Ion Batteries Antitrust Litigation,* 2014 WL 309192, at *2 (N.D. Cal. 2014). Finally, the WAC pleads sufficient facts to make the alleged conspiracy plausible, *id.* at 1063, and sufficient facts to give a "defendant seeking to respond to [the] allegations of [ ] conspiracy an idea of where to begin[.]" *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1047 (9th Cir. 2008). For example, some of the alleged collusive communications related to PSPs in general. (¶ 48.)

In addition, the alleged market structure facilitating collusive behavior encompasses the PSP industry. StarKist, Bumble Bee, and COTS commanded 70-75% of the market throughout the time period (¶ 28). Between 2003 and 2014,

---

[9] Arguments of overbreadth are frequently denied where courts find the alleged conspiracy plausible. *See In re Auto. Parts Antitrust Litig.*, 2014 WL 4272772, at *7 (E.D. Mich. 2014); *In re Auto. Parts Antitrust Litig.*, 2014 WL 4272784, at *7 (E.D. Mich. 2014); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 898 (N.D. Ill. 2009).

demand for all PSP "steadily declined" while prices "increased steadily." ¶¶ 40-43. Finally, the WAC reveals no reason to segregate tuna from an overall market that bears all the hallmark features of one that is vulnerable to collusion.[10]

## VI. Defendants' Motion to Dismiss For Lack of Standing Relating to PSP Claims (ECF 207-5) Should Be Denied

Defendants incorrectly argue that Plaintiffs lack Article III standing to pursue "non-tuna" claims because they "plead only conduct related to the tuna market" and resulting from their purchases of PSP. Standing Br. 3-4. That is incorrect: the WAC adequately pleads PSP purchases directly from Defendants and injury resulting from supra-competitive prices caused by Defendants' conspiracy to fix prices of PSP. ¶¶ 1, 7-8, 75. Thus, the WAC's allegations are sufficient to show constitutional standing to bring PSP claims. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).[11]

Defendants also argue that Plaintiffs fail to meet the three prongs of standing established by *Associated Gen. Contractors of California, Inc. v. California State*

---

[10] *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008) (conspiracy plausible where complaint pled pricing inconsistent with market forces, pretextual reasons for price increases, and an exchange of pricing information through trade association meetings, private communications, and published data); *CRT*, 738 F. Supp. 2d at 1019; *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008).

[11] Defendants' reliance on *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390 (S.D.N.Y. 2011) is misplaced. There, plaintiffs alleged a price-fixing theory in which setting a wholesale price floor for *digital music* allowed Defendants to maintain supracompetitive *compact disc* (CD) prices. *Id.* at 401. The court held that the pleading was insufficient absent allegations of conduct directed at the CD market, or a direct link between the CD market and the online music market. *Id.* at 403.

*Council of Carpenters*, 459 U.S. 519 (1983): (i) market participation; (ii) directness of injury; and (iii) speculative nature of the harm. However, their argument is based on facts either (1) invented by Defendants[12] or (2) from other complaints.[13]

Here, the WAC does not allege harm resulting from the price-fixing of tuna alone; it alleges harm resulting from the price-fixing of all PSP. *See*, *e.g.*, *TFT-LCD*, 586 F. Supp. 2d at 1118–19 (allegations "that the direct purchaser plaintiffs purchased TFT-LCD products directly from cartel members at supra-competitive prices as the result of a conspiracy to fix prices" satisfy standing). Further, "at this stage of the litigation, the Court's review is limited to the pleadings, … the Court may not consider factual assertions about the nature of [defendants'] business." *Id*. at 1117-18.[14]

## VII. Plaintiffs Have Sufficiently Pled Fraudulent Concealment.

"A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, *acting as a reasonable person*, did not know of its existence." *Hexcel Corp. v. Ineos Polymers, Inc.,* 681 F.3d 1055, 1060 (9th Cir. 2012) (emphasis added). To plead fraudulent concealment, a

---

[12] *See* Standing Br. 14-15 (improperly asserting "separate" and "distinct markets" for different types of packaged seafood). Moreover, the WAC alleges *per se* violations of the Sherman Act, which obviates the need for an analysis of the relevant market at this stage. *See*, *e.g.*, *High-Tech Emp.*, 856 F. Supp. 2d at 1122; *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995).

[13] *See* Standing Br. 15 (citing to the CFP's complaint to support false assertion that the WAC recognizes different markets for different kinds of Packaged Seafood).

[14] *See also In re Lithium Ion Batteries Antitrust Litig.,* 2014 WL 4955377, at *13-14 (N.D. Cal. 2014).

plaintiff must allege (i) the defendant took affirmative acts to mislead the plaintiff, (ii) the plaintiff did not have "actual or constructive knowledge of the facts giving rise to its claim," and (iii) the plaintiff acted diligently in trying to uncover the facts giving rise to its claim. *Id.* Finally, because the proof is largely in the hands of the alleged conspirators, it is generally inappropriate to dismiss fraudulent concealment claims at the pleading stage. *In re Rubber Chems Antitrust Litig.,* 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007).

It is sufficient that Plaintiffs have alleged misleading and pretextual statements; it is not required to allege such statements <u>and</u> affirmative efforts to keep a conspiracy secret. *Animation Workers II*, 123 F. Supp. 3d at 1195 (citing cases). This latter view is based on a misreading of *Animation Workers I.* Moreover, allegations of fraudulent concealment may include acts in furtherance of the conspiracy itself. *Animation Workers II*, 123 F. Supp. 3d at 1196-97; *E.W. French & Sons, Inc. v. Gen. Portland Inc.,* 885 F.2d 1392, 1394-95, 1399 (9th Cir. 1989).

In *Animation Workers I,* the Court dismissed Plaintiffs' allegations because they had made conclusory allegations about pretextual and misleading statements. The Court did not hold that it was required for Plaintiffs to allege both such statements and other affirmative conduct to conceal the conspiracy – such as an agreement among the participants not to publicize the conspiracy, to hold meetings in secret, or not to take notes and/or destroy any notes. Thus, the Court held:

Moreover, to the extent Plaintiffs rely on the bare allegation that "Defendants provided pretextual, incomplete or materially false and misleading explanations for hiring, recruiting and compensation decisions made pursuant to the conspiracy," CAC ¶ 130, the Court finds this conclusory allegation insufficient under *Rule 9(b)*. Plaintiffs offer no specific facts showing the "who, what, where, when" of these alleged incomplete or materially false statements. *See Swartz, 476 F.3d at 764*. This allegation would not satisfy *Twombly*, much less the heightened pleading standard in *Rule 9(b)*.

Indeed, in *Animation Workers II*, the Court made it clear that specifically-pled pretextual or misleading statements were sufficient. Thus, the Court stated:

As discussed above, the Court previously granted Defendants' motion to dismiss because Plaintiffs' "factual" allegations were comprised of conclusory allegations that "Defendants provided pretextual, incomplete or materially false and misleading explanations for hiring, recruiting and compensation decisions made pursuant to the conspiracy," and that "Defendants engaged in a secret conspiracy." *See* CAC ¶¶ 126, 130. In Plaintiffs' SAC, however, Plaintiffs have made specific factual allegations with "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." These factual allegations, taken as true, are sufficient to support a plausible claim of fraudulent concealment.

123 F. Supp. 3d at 1202 (citation omitted). Moreover, the Court in *Animation Workers II* also specifically rejected Defendants' argument that Plaintiffs had to allege that the pretextual and misleading statements were made by agreement:

Defendants also contend that Plaintiffs have failed to allege that any pretextual statements "were the product of any concerted activity between or among defendants for the purpose of concealing the alleged conspiracy." Mot. at 9 (citing *Cathode Ray, 738 F. Supp. 2d at 1025*). As Plaintiffs note, however, "Defendants' attempt to convert the fraudulent concealment doctrine into a conspiracy-to-fraudulently-conceal doctrine is wholly unsupported." Opp. at 8. It is true that the *Cathode Ray* court found that the plaintiffs' allegations that the defendants agreed, as part of price-fixing conspiracy, "'not to discuss publicly, or otherwise reveal, the nature and substance' of their dealings . . . . and to give 'false and pretextual reasons for . . . price increases," were sufficient to plead fraudulent concealment. *In re Cathode Ray, 738 F. Supp. 2d at 1025*. The *Cathode Ray* court did not, however, hold that such agreement was a necessary predicate to finding that the defendants had taken affirmative acts to fraudulently conceal their conspiracy. *See id.* Defendants' identification of a case where certain factual allegations were found sufficient to plead fraudulent concealment does not support Defendants' assertion that such allegations are *necessary* to plead fraudulent concealment. Here, for the reasons discussed above, Plaintiffs have sufficiently alleged that Defendants conspired to suppress compensation through their anti-solicitation and compensation setting

agreements, and that Defendants took affirmative steps to fraudulently conceal the alleged conspiracy. The Court declines to impose the novel requirement that any fraudulent concealment also have been an explicit, separate, and agreed-to term of the conspiracy.

Id. at 1203 (emphasis original). The WAC alleges multiple pretextual and false explanations regarding PSP price increases. Thus, Plaintiffs allege:

Defendants actively misled the public about the price-fixing scheme. For example, Defendants issued false and misleading announcements concerning the reason for their price increases, none of which disclosed that the Defendants had agreed amongst themselves to fix and raise the price of PSPs. Defendants also gave pretextual reasons for their price increases in order to conceal their unlawful conduct. For example, in connection with the reduction of can sizes in 2008-09, Defendants asserted that it was due to high input costs or similar causes. Similarly, in connection with the 2011-12 price increases discussed above, CoS, StarKist, and Bumble Bee attributed the changes to rising costs, a weakening United States dollar, or other factors. Examples of these pretextual statements include:

(a) a March 2011 letter from Bumble Bee to customers saying that canned tuna price increases were due to "increases in the costs of protein, packaging, and transportation and fuel over the last two years";

(b) a June 2011 letter from CoS attributing price increases to "persistent global inflationary trends" and " increased raw material costs and a weak U.S. dollar;

(c) a July 2011 StarKist letter announcing prices increases for canned tuna that were attributed to "continuously rising fish costs";

(d) a January 2012 CoS letter saying that "[h]igh fish prices have made it necessary to increase the list price of both light and white [tuna]. All indicators are that these higher raw material costs will not return to levels that were seen as recently as a year ago";

(e) Melbourne of Bumble Bee saying in an August 2012 *Intrafish* article that "[t]he leading brands took pricing action due to escalating fish costs"; and

(f) Cameron of Bumble Bee saying in a March 2012 letter to customers that "unforecasted elements", some of which would occur in the latter part of 2012, necessitated canned tuna price increases. (¶ 68.)

Attributing the anticompetitive effects of a conspiracy to some cause other than the collusive conduct is an affirmative act of fraudulent concealment.[15] These acts are precisely what Defendants did to hide their illegal conspiracy. Moreover, Defendants' assertion that Plaintiffs not allege "any actions by Defendants to conceal the purportedly collusive price increase(s) other than supposedly pretextual statements explaining the increases" (SOL Br. 14 n. 9) must be rejected because (1) as seen above, it is not necessary for Plaintiffs to allege both pretextual and misleading statements and other affirmative conduct concealing the conspiracy, and (2) Plaintiffs allege that, in connection with the agreement to fix prices in 2011 and 2012, Defendants agreed to stagger their price increase announcements. (¶ 44.) The only reason for this, having already agreed to fix prices, was to conceal the agreement. Thus, Plaintiffs have met the first element of fraudulent concealment.

Defendants' argument that Plaintiffs failed to plead diligence "puts the cart before the horse, however, as [plaintiffs were] not obligated to investigate plaintiffs' claims until [they] had reason to suspect." *Animation Workers II*, 123 F. Supp. 3d at 1204.[16]

---

[15] *See, e.g., E.W. French,* 885 F.2d at 1399 (finding affirmative acts where defendant attributed price uniformity to competition, rather than collusion); *see also CRT,* 738 F. Supp. 2d at 1024 (defendant acted affirmatively when it attributed "stubbornly" high prices to a shortage of critical input components); *TFT–LCD,* 586 F. Supp. 2d at 1119 (defendants' pretextual explanations for the inflated prices of LCDs, such as undercapitalization and undersupply, were affirmative acts of concealment).

[16] *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,* 782 F. Supp. 487, 498 (C.D. Cal. 1991) ("Due diligence is not required in the abstract. Plaintiffs are not under a duty continually to scout around to uncover claims which

The "question of constructive knowledge and inquiry notice [generally] presents a question for the trier of fact." *Id.*[17] As seen above, not only do Plaintiffs allege pretextual and misleading statements, but also there are no allegations of any facts that put them on inquiry notice – no "storm warnings" or "red flags."

Finally, Plaintiffs allege that they did not have actual or constructive knowledge of their claims until the Department of Justice investigation first became public on July 23, 2015, and they acted diligently once they learned of their claims. *See. e.g.*, ¶¶ 64-67.  Finally, issues relating to Plaintiffs' diligence have universally been held to involved factual issues not appropriate for resolution on a motion to dismiss.[18]

### VIII. Thai Union Group's Motion to Dismiss (ECF 205) Should Be Denied

Defendant Thai Union Group PCL ("TUG") argues that it is a mere parent company to Tri-Union (d/b/a Chicken of the Sea).  However, the Winn-Dixie

---

they have no reason to suspect they might have."); *In re Lithium Ion Batteries Antitrust Litig.,* 2014 WL 309192, at *16 (N.D. Cal. 2014) (not requiring searching inquiry of public record for information about market conditions sufficient to overcome defendants' subterfuge).

[17] *Id.* at 1205 (courts have 'been hesitant to dismiss an otherwise fraudulently concealed antitrust claim for failure to sufficiently allege due diligence,' because questions of inquiry notice are 'necessarily bound up with the facts of the case.'").

[18] *See, e.g. In re Processed Egg Prod. Antitrust Litig.*, 2011 WL 5980001, at *8 (E.D.Pa. 2011) ("Whether a reasonable plaintiff would be expected to read regional newspapers or egg industry publications … is simply not a question that can be resolved at this stage of the case because the answer would require looking to matters extraneous to the SAC.").

Plaintiffs seek to hold TUG liable on the basis of its direction and control of its agent, Tri-Union, in the anticompetitive conduct alleged in the WAC.

As a matter of general corporate law, "a parent corporation *may* be held liable for the acts of its subsidiary 'where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company.'" *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 897 (N.D. Cal. 2009) (quoting *U.S. v. Bestfoods*, 524 U.S. at 62-63).

TUG erroneously characterizes its role as Tri-Union's parent company as "taking a clear back seat in this litigation," arguing Plaintiffs do not sufficiently allege that it violated the antitrust laws. (ECF 205-1 at 2). In fact, rather than taking a back seat, Thiraphong Chansiri sat in the driver's seat for three of TUG's companies, including COTS: Chansiri is alleged to have served as the TUG President/CEO, the President of Thai Union North America, Inc. ("TUNA"), and a director of Tri-Union Seafoods, LLC (d/b/a Chicken of the Sea) ("Tri-Union"). ¶ 11. Under Chansiri's leadership, the companies orchestrated and engaged in anti-competitive behavior in the Packaged Seafood market, to the direct harm of Plaintiffs and their businesses or property (¶¶ 118-123).

Plaintiffs allege that TUG, through its subsidiary Tri-Union, engaged in anticompetitive activities in violation of the antitrust laws. ¶ 12. Chansiri led all three

companies in this anti-competitive behavior. Further, TUG controlled and supervised the business, operations, and activities of Tri-Union, including the anti-competitive and illegal conduct alleged in the CAC, throughout the Relevant Period. ¶¶ 11-14.

On July 23, 2015, TUG issued a statement regarding Tri-Union's receipt of a subpoena in connection with the Department of Justice investigation. ¶ 30. TUG also issued a public statement announcing that it had suspended a planned public offering in light of the DOJ investigation. Id.

## A. Sufficiency of Allegations of Agency at the Pleading Stage

District courts in the Ninth Circuit and elsewhere have noted that a motion to dismiss to resolve the intensely factual agency question is premature, that plaintiffs may require discovery to prove a parent's control over its subsidiary, and that allegations against corporate families are sufficient at the motion to dismiss stage.[19] To determine agency, courts apply a three-factor test: "(1) manifestation by a principal that the agent would act on its behalf; and (2) the agent's acceptance or consent to act on the principal's behalf; and (3) the understanding that the principal

---

[19] See, e.g., CRT, 738 F. Supp. 2d at 1019-22 (allegations against corporate families sufficient at the pleading stage; "Defendants' arguments for dismissal based on a failure to adequately plead against each Defendant rely upon arguments more appropriate at the summary-judgment stage of these proceedings"). Accord TFT-LCD, 599 F. Supp. 2d at 1184-85; Monaco v. Liberty Life Assur. Co., 2007 WL 1140460, at *7 (N.D. Cal. 2007); In re Polyurethane Foam Antitrust Litig., 799 F. Supp. 2d 777, 784 (N.D. Ohio 2011); Toppel v. Marriott Int'l, Inc., 2006 U.S. Dist. LEXIS 60529, at * 25 (S.D.N.Y. 2006).

would be in control of the agent's undertaking on its behalf." *Sun Microsystems*, 622 F. Supp. 2d at 898.

Plaintiffs allege that TUG and its subsidiary, Tri-Union, were led by the same individual, Chansiri, throughout the Relevant Period. ¶ 11. Moreover, Plaintiffs allege that TUG exercised control and dominance over Tri-Union through interlocking directors and officers. ¶¶ 11-12. Plaintiffs also allege that TUG publicly acknowledged its dominance over Tri-Union, Tri-Union was an instrumentality and alter ego of TUG, and TUG knew of and profited from the conspiracy. ¶¶ 13-14. Based on these allegations, it is plausible that Tri-Union agreed to act as an agent of TUG, at TUG's behest and with its consent. It also is plausible that TUG shared the same conscious commitment to a common scheme—collectively raising prices—as Tri-Union and the other Defendants. TUG's motion to dismiss should be denied.[20]

## IX.    Leave to Amend Should Be Freely Granted

If the Court grants any portion of Defendants' motions to dismiss, the Winn-Dixie Plaintiffs respectfully request leave to amend. *See, e.g., Petersen v. Boeing Co.*, 715 F.3d 276, 280 (9th Cir. 2013) ("dismissal without leave to amend is improper unless it is clear . . . that the complaint could not be saved by any amendment.").

---

[20] *See, e.g., CRT*, 738 F. Supp. 2d at 1019-22; *TFT-LCD*, 599 F. Supp. 2d at 1184-85.

**X. Conclusion**

    The Winn-Dixie Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss.

DATE: September 16, 2016

                                      **AHERN AND ASSOCIATES, P.C.**

                                      By: */s/ Patrick J. Ahern*
                                              Patrick J. Ahern

                                      Patrick J. Ahern
                                      Mark Hamill
                                      Ahern and Associates, P.C.
                                      8 South Michigan Avenue
                                      Suite 3600
                                      Chicago, Illinois 60603
                                      Telephone: 312-404-3760
                                      patrick.ahern@ahernandassociatespc.com

                                      *Attorneys for Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holding, LLC*