1   BETSY C. MANIFOLD (182450)
manifold@whafh.com
2   RACHELE R. RICKERT (190634)
rickert@whafh.com
3   **WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
4   750 B Street, Suite 2770
San Diego, CA 92101
5   Telephone:  619/239-4599
Facsimile:   619/234-4599
6
*Interim Lead Counsel for the End Payer Plaintiffs*
7
[Additional counsel appear on signature page]
8

9              UNITED STATES DISTRICT COURT
10            SOUTHERN DISTRICT OF CALIFORNIA

11  | IN RE:    PACKAGED   SEAFOOD | ) | Case No.: 15-MD-2670 JLS (MDD) |
    | ANTITRUST LITIGATION | ) | |
12  | | ) | **INDIRECT PURCHASER END** |
    | | ) | **PAYER PLAINTIFFS'** |
13  | | ) | **MEMORANDUM OF POINTS** |
    | | ) | **AND AUTHORITIES IN** |
14  | | ) | **OPPOSITION TO** |
    | | ) | **DEFENDANTS' JOINT** |
15  | | ) | **MOTIONS TO DISMISS** |
    | | ) | |
16  | | ) | |
    | | ) | DATE:     Nov. 16, 2016 |
17  | | ) | TIME:       9:30 a.m. |
    | | ) | JUDGE: Hon. Janis L. Sammartino |
18  | | ) | COURT: 4A (4th Fl.—Schwartz) |

19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

**Page No.**

I.    INTRODUCTION ............................................................................... 1

    A.    Defendants' Joint *Twombly* Motion Should Be Denied ...................... 2

    B.    EPPs Have Standing ................................................................ 3

    C.    Statute of Limitations Does Not Bar Any of EPPs' Claims ............... 4

    D.    EPPs' State Law Claims Are Well-Pleaded ................................... 6

II.    STATEMENT OF FACTS ................................................................... 6

    ARGUMENT .................................................................................. 11

III.    DEFENDANTS' *TWOMBLY* MOTION SHOULD BE DENIED .............. 11

    A.    Defendants Fail to  Satisfy Their Burden Under Rule 12 ................... 11

    B.    The Complaint Plausibly Alleges an Antitrust Conspiracy
        Within The Legal Standard on a Motion to Dismiss. ....................... 13

    C.    EPPs Allege A Packaged Seafood Conspiracy ............................... 16

        1.    The Complaint's Factual Highlights Allege
            Defendants' Conspiracy ............................................... 16

        2.    EPPs' Allegations Support An Inference Of
            Anticompetitive Conspiracy. ........................................ 17

            a.    Defendants' explicit coordination of PSP
                list price increases support a plausible conspiracy ......... 18

            b.    Defendants' policing discounting from
                list prices supports a plausible conspiracy .................... 19

            c.    Defendants' joint refusal to introduce a new
                FAD-free tuna product supports a plausible
                conspiracy ............................................................... 19

            d.    Defendants' discussions and coordinated
                collusive decision to decrease and align tuna
                can sizes in 2008 in spite of competitive threats
                support a plausible conspiracy .................................... 20

            e.    Governmental investigation into
                anticompetitive practices in the industry is
                significant ............................................................... 21

            f.    Defendants' Industry Structure
                Facilitates Collusion and Supports
                EPPs' Conspiracy Allegations ................................... 22

- i -

3. EPPs' Allegations Encompass the Packaged
Seafood Industry .................................................... 24

D. EPPs Are Entitled to Plead an Injunction ................................ 26

IV. EPPs HAVE STANDING ................................................................ 26

A. EPPs Have Constitutional Standing ..................................... 26

1. Plaintiffs Have Plausibly Pled That EPPs'
Injuries Are Causally Connected To The
Alleged Conspiracy .................................................. 28

2. EPPs Have Plausibly Pled Injury-In Fact ................ 29

B. EPPs Satisfy State Standing Requirements ......................... 32

1. EPPs' Allegations Satisfy Any Applicable Test ...... 33

2. Defendants' *AGC* Arguments Have Been
Resoundingly Rejected ............................................ 35

V. EPPs' CLAIMS Are NOT Time-Barred .................................... 38

A. The Statutes of Limitation Do Not Limit EPPs'
Recoverable Damages ........................................................ 38

1. The Statutes of Limitation Were Tolled under the
Doctrine of Fraudulent Concealment ..................... 38

a. EPPs Sufficiently Allege that Defendants
Took Steps to Conceal Their Conspiracy .... 40

2. EPPs Sufficiently Allege That They Neither Knew
Nor Should Have Known about the Conspiracy ..... 42

3. Twenty-Two State Jurisdictions Employ the
Discovery Rule, Preventing the Statutes of Limitations
from Running ............................................................ 47

B. EPPs Can Recover for Injuries Sustained within the
Limitations Period, Regardless of When Certain Overt
Acts In Support of the Conspiracy Occurred ..................... 49

VI. EPPs HAVE PROPERLY ALLEGED STATE LAW CLAIMS
FOR CALIFORNIA AND OTHER STATES ............................. 50

A. EPPs' Nationwide Class Claims Are Properly
Brought Under California Law ........................................... 50

1. Defendants Fail To Demonstrate the Requisite
Material Differences ................................................. 52

2. No True Conflict Exists ............................................ 53

3. Not Applying California Law Would More Greatly

Impair California's Interest ......................................................55

B.   Plaintiffs' State Antitrust Law Claims Should Be Upheld ................56

1.   Missouri Explicitly Recognizes a Private
Right of Action ........................................................................56

2.   EPPs Have Private Right of Action in Illinois and
Arkansas ..................................................................................57

3.   Oregon's *Illinois Brick* Repealer Has
Retroactive Effect ....................................................................58

C.   Plaintiffs' Consumer Protection Claims Should Be Upheld .............59

1.   EPPs' Consumer Protection Claims Are Not
Precluded ................................................................................60

2.   A Flawed Unconscionability Requirement,
Designed by Defendants, Does Not Apply Here......................65

3.   Plaintiffs Properly Allege a Sufficient Nexus
Between Defendants' Conduct And Interstate Commerce ......70

4.   California, Illinois, Michigan, and Minnesota
Consumer Protection Claims Are Not Subject
to Rule 9(b)'s Heightened Pleading Requirements .................71

D.   Plaintiffs' Unjust Enrichment Claims Are Legally Sufficient. ...........72

1.   Neither *Illinois Brick* Nor The State Statutes At
Issue Preclude EPPs' Unjust Enrichment
Claims As Alternative Relief....................................................73

2.   Plaintiffs Plead Direct Benefit to Defendants .........................74

3.   Plaintiffs Properly Plead Unjust Enrichment
Claims Under California Law....................................................75

E.   Plaintiffs Are Entitled to Leave to Amend Should the
Court Grant Defendants' Motion in Part or in Whole ......................76

VII.   CONCLUSION ..........................................................................................77

# <u>TABLE OF AUTHORITIES</u>

**Page No.**

### Cases

*Absure, Inc. v. Huffman*,
   584 S.E.2d 507 (W.Va. 2003) ...............................................................48

*Agron, Inc. v. Lin*,
   No. 03-05872 (MMM) (JWJX), 2004 U.S.
   Dist. LEXIS 26605 (C.D. Cal. Mar. 16, 2004) ...........................51, 77

*Ames v. Oceanside Welding & Towing Co.*,
   767 A.2d 677 (R.I. 2001) ......................................................................64

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) .................................................................15

*Aryeh v. Canon Bus. Solutions Inc.*,
   55 Cal. 4th 1185 (2013) ........................................................................37

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) ................................................................31

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..............................................................................13

*Associated General Contractors v. Cal. State Council of Carpenters*
   459 U.S. 519 (1983) ........................................................................ passim

*Baptist Health v. Murphy*,
   226 S.W.3d 800 (Ark. 2006) .................................................................66

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................... passim

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979) .................................................................50

*Branca v. Nordstrom, Inc.*,
   Case No. 14-cv-2062-MMA (JMA), 2015 U.S. Dist.
   LEXIS 176888 (S.D. Cal. Oct. 9, 2015) ..............................................29

*Bristol-Myers Squibb Co. v. Super. Ct.*,
   No. S221038, 2016 Cal. LEXIS 7124 (Aug. 29, 2016) ..........6, 54, 55

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979) ..................................................................................16

*Bruno v. Eckhart Corp.*,
   280 F.R.D. 540 (C.D. Cal. 2012) ............................... 51, 52, 54, 55

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

*Bruton v. Gerber Product Company*,
  No. 12-cv-02412-LK, 2014 U.S. Dist.
  LEXIS 5493 (N.D. Cal. Jan. 15, 2014) ...............................................31

*Buckett v. Jante*,
  Appeal No. 2009AP2709-FT, 2010 Wisc. App.
  LEXIS 341, 2010 WI App 84 ¶ 12 (Wis. App. May 5, 2010) .........................48

*California v. ARC Am. Corp.*,
  490 U.S. 93 (1989) ...........................................................73

*Canyon County v. Syngenta Seeds, Inc.*,
  519 F.3d 969 (9th Cir. 2008) .................................................28

*Carder v. BASF Corp.*,
  919 So. 2d 258 (Miss. Ct. App. 2005) .........................................45

*Center for Food Safety v. Vilsack*,
  No. 15-cv-0159, 2016 U.S. Dist. LEXIS
  121629 (N.D. Cal. Sept. 8, 2016) .............................................27

*California v. ARC America Corp.*,
  490 U.S. 93 (1989) ...........................................................54

*Cholakyan v. Mercedes-Benz USA, LLC*,
  796 F. Supp. 2d 1220 (C.D. Cal. 2011) ........................................39

*Clancy v. The Bromley Tea Co.*,
  308 F.R.D. 564 (N.D. Cal. 2013) ..............................................50

*Clark v. Fresno Cnty.*,
  Nos. 87-1812, 87-2025, 1988 U.S. App.
  LEXIS 22531 (9th Cir. May 26, 1988) ..........................................39

*Clean Conversion Techs., Inc. v. CleanTech Biofuels, Inc.*,
  No. 12-cv-239-L (JMA), 2012 U.S. Dist. LEXIS
  117279 (S.D. Cal. Aug. 20, 2012) .............................................12

*Cleary v. Nat'l Distillers & Chem. Corp.*,
  505 F.2d 695 (9th Cir. 1974) .................................................16

*Conmar Corp. v. Mitsui & Co. (U.S.A.)*,
  858 F.2d 499 (9th Cir. 1988) ..............................................39, 43

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*,
  611 F.3d 495 (9th Cir. 2010) .................................................12

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ..........................................................14

*Cont'l T.V. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977) ...........................................................16

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

*Corbin v. Time Warner Entertainment-Advance/Newhouse Partnership*,
  821 F.3d 1069 (9th Cir. 2016) ............................................................................48

*Cortina v. Goya Foods, Inc.*,
  94 F. Supp. 3d 1174 (S.D. Cal. 2015) ...............................................................30

*CUMIS Ins. Soc., Inc. v. Raines*,
  No. 3:12-6277, 2013 U.S. Dist.
  LEXIS 21587 (S.D. W. Va. Feb. 11, 2013) .......................................................48

*Curtis Lumber Co., Inc. v. Louisiana P. Corp.*,
  618 F.3d 762 (8th Cir. 2010)................................................................................66

*Czuchaj v. Conair Corp.*,
  No. 13-CV-1901-BEN RBB, 2014 U.S. Dist.
  LEXIS 54413 (S.D. Cal. Apr. 17, 2014) ............................................................50

*Diamond v. Davis*,
  680 A.2d 364 (D.C. App. 1996)............................................................................48

*Dist. Cablevision Ltd. P'ship. v. Bassin*,
  828 A.2d 714 (D.C. App. 2003)............................................................................67

*E.W. French & Sons, Inc. v. Gen. Portland, Inc.*,
  885 F.2d 1392 (9th Cir. 1989)..............................................................................39

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003)..............................................................................76

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012)................................................................................15

*Erie R. Co. v. Tompkins*,
  304 U.S. 64 (1938) ...............................................................................................36

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013) ...........................................................................14, 15

*Fashion Originators' Guild of Am. v. Fed. Trade Comm'n*,
  312 U.S. 457, 463 (1941) .....................................................................................62

*Fed Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
  663 F.2d 253 (D.C. Cir. 1981) ......................................................................15, 16

*First Nationwide Sav. v. Perry*,
  11 Cal. App. 4th 1657 (1992)...............................................................................76

*Fitzpatrick v. General Mills, Inc.*,
  635 F.3d 1279 (11th Cir. 2011).............................................................................42

*Foman v. Davis*,
  371 U.S. 178 (1962) .............................................................................................76

- vi -

*Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.,*
No. 09-CV-00852, 2012 U.S. Dist.
LEXIS 125677 (E.D. Wis. Sept. 5, 2012)................................................68

*Forcellati v. Hyland's Inc.,*
876 F. Supp. 2d 1155 (C.D. Cal. 2012) ......................................59, 60

*Forcellati v. Hyland's,* Inc.,
No. CV 12-1983-GHK MRWX, 2014  U.S. Dist.
LEXIS 50600 (C.D. Cal. Apr. 9, 2014) ......................... 51, 52, 53, 54

*Freeman v. San Diego Ass'n Realtors,*
322 F.3d 1133 (9th Cir. 2003)................................................16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
528 U.S. 167 (2000) ................................................26

*FTC v. H.J. Heinz Co.,*
246 F.3d 708 (D.C. Cir. 2001) ................................................15

*Gelboim v. Bank of Am. Corp.,*
823 F.3d 759 (2d Cir. 2016)................................................15

*Ghirardo v. Antonioli,*
924 P.2d 996 (Cal. 1996) ................................................76

*Gibbons v. J. Nuckolls, Inc.,*
216 S.W.3d 667 (Mo. 2007) ("*Gibbons*")................................................56

*Goggin v. Goggin,*
299 P.3d 1079 (Utah 2013) ................................................38

*Goodhand v. U.S.,*
40 F.3d 209 (7th Cir. 1994)................................................48

*Gorski v. Gorski,*
262 N.W.2d 120 (Wis. 1978) ................................................49

*Gravquick A/S v. Trimble Nav. Int'l Ltd.,*
323 F.3d 1219 (9th Cir. 2003)................................................32

*Guild of Am. v. Fed. Trade Comm'n,*
312 U.S. 457 (1941) ................................................62

*Harbour Capital Corp. v. Allied Capital Corp.,*
Case No. 08-cv-506-PB, 2009 U.S. Dist.
LEXIS 63041 (D.N.H. July 22, 2009) ................................................71

*Harrington v. CACV of Colorado, LLC,*
508 F. Supp. 2d 128 (D. Mass. 2007) ................................................66

*Hexcel Corp. v. Ineos Polymers, Inc.,*
681 F.3d 1055 (9th Cir. 2012)................................................39, 47

- vii -

*Hirsch v. Bank of Am., N.A.*,
107 Cal. App. 4th 708 (2003) ............................................................. 76

*Hospital Building Co. v. Trustees of Rex Hospital*,
425 U.S. 738 (1976) ................................................................. 51, 77

*Hurtado v. Super. Ct.*,
11 Cal. 3d 574 (1974) ......................................................................... 54

*Immigration and Naturalization Service v. Pangilinan*,
486 U.S. 875 (1998) ........................................................................... 74

*In re Aftermarket Filters Antitrust Litig.*,
No. 08 C 4883, 2010 U.S. Dist. LEXIS
32652 (N.D. Ill. Apr. 1, 2010) ............................................... 29, 74, 75

*In re Aggrenox Antitrust Litig.*,
No. 3:14-md-2516 (SRU), 2016 U.S. Dist.
LEXIS 104647 (D. Conn., Aug. 9, 2016) ........................................... 57

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06-MDL-1775, 2010 U.S. Dist. LEXIS
146377 (E.D.N.Y. Sept. 22, 2010) ............................................ *passim*

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06-MDL-1775, 2014 U.S. Dist. LEXIS
180914 (E.D.N.Y. Oct. 15, 2015) ....................................................... 25

*In re Animation Workers Antitrust Litig.*,
123 F. Supp. 3d 1175 (N.D. Cal. 2015) ...................................... *passim*

*In re Auto Parts Antitrust Litig.*,
29 F. Supp. 3d 982 (E.D. Mich. 2014) ......................................... 53, 73

*In re Auto Parts Antitrust Litig.*,
50 F. Supp. 3d 836 (E.D. Mich. 2014) ......................................... 32, 74

*In re Auto Parts Antitrust Litig.*,
Case No. 12-md-02311, 2013 U.S. Dist.
LEXIS 80338 (E.D. Mich. June 6, 2013) ............................... 28, 64, 70

*In re Auto Parts Antitrust Litig.*,
Case No. 12-md-02311, 2014 U.S. Dist.
LEXIS 120725 (E.D. Mich. Aug. 29, 2014) ....................................... 14

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ............................................................... 16

*In re Blood Reagents Antitrust Litig.*,
756 F. Supp. 2d 623 (E.D. Pa. 2010) .......................................... 14, 23

*In re Bulk Extruded Graphite Products Antitrust Litig.*,
No. 02-6030, 2007 U.S. Dist.
LEXIS 25070 (D.N.J. Apr. 4, 2007) ........................................... 44, 45

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

*In re Capacitors Antitrust Litig.*,
106 F. Supp. 3d 1051 (N.D. Cal. 2015) ...................................................... *passim*

*In re Cardizem CD Antitrust Litig.*,
105 F. Supp. 2d 618 (E.D. Mich. 2000) ............................................................73

*In re Carrier IQ, Inc. Consumer Privacy Litig.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ..............................................................36

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*,
No. 1:14-md-2508, 2015 U.S. Dist.
LEXIS 121620 (E.D. Tenn. June 24, 2015)...............................................59, 70

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
738 F. Supp. 2d 1011 (N.D. Cal. 2010) ................................................... *passim*

*In re Charles Schwab Corp. Sec. Litig.*,
264 F.R.D. 531 (N.D. Cal. 2009) .....................................................................54

*In re Chocolate Confectionary Antitrust Litig.*,
602 F. Supp. 2d 538 (M.D. Pa. 2009) .................................................63, 67, 68

*In re Chocolate Confectionary Antitrust Litig.*,
607 F. Supp. 2d 701 (M.D. Pa. 2009) ..............................................................14

*In re Chocolate Confectionary Antitrust Litig.*,
749 F. Supp. 2d 224 (M.D. Pa. 2010) ...............................................................70

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015)..............................................................................16

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999)...........................................................................16

*In re Crude Oil Commodity Antitrust Litig.*,
No. 06-cv-6677, 2007 U.S. Dist.
LEXIS 47902 (S.D.N.Y June 27, 2007) ...........................................................22

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012)..........................................................62, 72

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011)..................................................... *passim*

*In re Dom. Drywall Antitrust Litig.*,
Civ. Action 13-2437, 2016 U.S. Dist.
LEXIS 90619 (E.D. Pa. July 13, 2016)..............................................................67

*In re Ductile Iron Pipe Fittings Antitrust Litig.*,
Civ. No. 12-169, 2013 U.S. Dist. LEXIS 142466 (D.N.J. 2013) ......................70

*In re Dynamic Random Access Memory Antitrust Litig.*,
546 F.3d 981 (9th Cir. 2008)......................................................................35, 58

- ix -

*In re Dynamic Random Access Memory Antitrust Litig.,*
516 F. Supp. 2d 1072 (N.D. Cal. 2009) ....................................64, 66, 68

*In re Flash Memory Antitrust Litig.,*
643 F. Supp. 2d 1133 (N.D. Cal. 2009) ...................................... *passim*

*In re G-Fees Antitrust Litig.,*
584 F. Supp. 2d 26 (D.D.C. 2008) ..................................................73

*In re Graphics Processing Units Antitrust Litig.,*
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..........................................35

*In re Graphics Processing Units Antitrust Litig.,*
540 F. Supp. 2d 1085 (N.D. Cal. 2007) .....................................32, 37

*In re K-Dur Antitrust Litig.,*
338 F. Supp. 2d 517 (D.N.J. 2004) ................................................72

*In re Lidoderm Antitrust Litig.,*
103 F. Supp. 3d 1155 (N.D. Cal. 2015) ..................................66, 70, 75

*In re Lithium Ion Batteries Antitrust Litig.,*
No. 13-MD-2420 YGR, 2014 U.S. Dist.
LEXIS 7516 (N.D. Cal. Jan. 21, 2014) ...................................... *passim*

*In re: Mercedes-Benz Antitrust Litig.,*
157 F. Supp. 2d 355 (D.N.J. 2001) ...........................................19, 40

*In re: Methionine Antitrust Litig.,*
No. 99-3491, 2001 U.S. Dist.
LEXIS 13402 (N.D. Cal. Aug. 24, 2001) ........................................26

*In re Monosodium Glutamate Antitrust Litig.,*
No. 00-MDL-1328, 2003 U.S. Dist.
LEXIS 1969 (D. Minn. Feb. 6, 2003) .............................................44

*In re Musical Instruments & Equipment Antitrust Litig.,*
798 F.3d 1186 (9th Cir. 2015)......................................................15

*In re New Motor Vehicle Canadian Exp. Antitrust Litig.,*
522 F.3d 6 (1st Cir. 2008) ..........................................................26

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.,*
350 F. Supp. 2d 160 (D. Me. 2004) ........................................ *passim*

*In re Niaspan Antitrust Litig.,*
42 F. Supp. 3d 735 (E.D. Pa. 2014) ..............................................70

*In re Nine W. Shoes Antitrust Litig.,*
80 F. Supp. 2d 181 (S.D.N.Y. 2000)..............................................46

*In re Optical Disc Drive Antitrust Litig.,*
Case No. 3:10-md-2143 RS, 2011 U.S. Dist.
LEXIS 101763(N.D. Cal. Aug. 3, 2011) .........................................36

*In re OSB Antitrust Litig.*,
No. 06-826, 2007 U.S. Dist.
LEXIS 56573 (E.D. Pa. Aug. 3, 2007) ........................................................18, 20

*In re Packaged Ice Antitrust Litig.*,
723 F. Supp. 2d 987 (E.D. Mich. 2010).........................................................14, 42

*In re Pharmaceutical Industry Average Wholesale Price Litig.*,
233 F.R.D. 229 (D. Mass. 2006) ..........................................................................65

*In re Pizza Time Theatre Sec. Litig.*,
112 F.R.D. 15 (N.D. Cal. 1986) ...........................................................................56

*In re Polyurethane Foam Antitrust Litig.*,
799 F. Supp. 2d 777 (N.D. Ohio 2011) ..........................................................14, 43

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
946 F. Supp. 2d 554 (E.D. La. 2013) ...................................................................56

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
566 F. Supp. 2d 363 (M.D. Pa. 2008) ..................................................................14

*In re Processed Egg Prods. Antitrust Litig.*,
312 F.R.D. 124 (E.D. Pa. 2015) ...........................................................................29

*In re Processed Egg Prods. Antitrust Litig.*,
851 F. Supp. 2d 867 (E.D. Pa. 2012) ............................................... 29, 67, 71, 76

*In re Processed Egg Prods. Antitrust Litig.*,
902 F. Supp. 2d 704 (E.D. Pa. 2012) ...................................................................14

*In re Rail Freight Surcharge Antitrust Litig.*,
587 F. Supp. 2d 27 (D.D.C. 2008) .......................................................................14

*In re Refrigerant Compressors Antitrust Litig.*,
No. 2:09-md-02042, 2012 U.S. Dist.
LEXIS 80269 (E.D. Mich. June 11, 2012)................................................22, 74, 75

*In re Rubber Chemicals Antitrust Litig.*,
504 F. Supp. 2d 777 (N.D. Cal. 2007) .....................................................40, 43, 44

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008).................................................................................40

*In re Seagate Techs. Sec. Litig.*,
115 F.R.D. 264 (N.D. Cal. 1987) .........................................................................55

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
No. 14-md-02503-DJC, 2015 U.S. Dist.
LEXIS 125999 (D. Mass. Aug. 16, 2015) ............................................................53

*In re Southeastern Milk Antitrust Litig.*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008) ...............................................................14

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) .....................................................22, 23, 64

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  No. 07-md-01819, 2008 U.S. Dist. LEXIS 120279
  (N.D. Cal. June 27, 2008)  ...........................................................................8, 18

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  No. 07-md-01819, 2010 U.S. Dist. LEXIS 132172
  (N.D. Cal. Dec. 10, 2010) ..........................................................................8, 18

*In re Terazosin Hydrochloride Antitrust Litig.*,
  160 F. Supp. 2d 1365 (S.D. Fla. 2001) ...............................................................74

*In re TFT–LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) ...............................................................25, 26

*In re TFT–LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ..................................................... *passim*

*In re TFT–LCD (Flat Panel) Antitrust Litig.*,
  MDL No. 1827, 2011 U.S. Dist. LEXIS 105151
  (N.D. Cal. Sept. 15, 2011).................................................................................76

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
  No. 07-0563, 2011 U.S. Dist.
  LEXIS 49853 (N.D. Cal. May 9, 2011) ..............................................................21

*In re Urethane Antitrust Litig.*,
  683 F. Supp. 2d 1214 (D. Kan. 2010) .................................................................42

*In re Urethane Antitrust Litig.*,
  913 F. Supp. 2d 1145 (D. Kan. 2012) .................................................................39

*In re Vitamins Antitrust Litig.*,
  No. 99-197 (TFH), 2000 U.S. Dist.
  LEXIS 7397 (D.D.C. May 9, 2000) ................................................ 13, 18, 19, 45

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
  903 F. Supp. 2d 880 (C.D. Cal. 2012) ...............................................................54

*In re Zinc Antitrust Litig.*,
  No. 14-cv-3728, 2016 WL 903864 (S.D.N.Y. Jan. 7, 2016) .............................22

*Iselin v. United States*,
  270 U.S. 245 (1926) ...........................................................................................60

*Kearney v. Salomon Smith Barney, Inc.*,
  39 Cal. 4th 95 (2006) ..........................................................................................51

*Keilholtz v. Lennox Hearth Prods. Inc.*,
  268 F.R.D. 330 (N.D. Cal. 2010)........................................................................52

- xii -

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008)................................................15, 16, 76

*King & King Enterprises v. Champlin Petroleum Co.*,
   657 F.2d 1147 (10th Cir. 1981)...........................................................45

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
   702 F. Supp. 2d 514 (E.D. Pa. 2010) ..................................................73

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941)...........................................................................52

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997)...........................................................................49

*Kosta v. Del Monte Corp.*,
   No. 12-cv-01722-YGR, 2013 U.S. Dist.
   LEXIS 69319 (N.D. Cal. May 15, 2013) ............................................75

*Krehl v. Baskin-Robbins Ice Cream Co.*,
   664 F.2d 1348 (9th Cir. 1982)............................................................16

*Krell v. Prudential Inc. Co. of Am.*,
   148 F.3d 283 (3d Cir. 1998)...............................................................27

*LaChance v. United States Smokeless Tobacco Co.*,
   931 A.2d 571 (N.H. 2007) ...........................................................70, 71

*Lectrodryer v. SeoulBank*,
   77 Cal. App. 4th 723 (2000) ..............................................................76

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)......................................................................61, 68

*Lewis v. Casey*,
   518 U.S. 343 (1996)...........................................................................26

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014).......................................................................33

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
   No. 13-CV-01180-BLF, 2015 U.S. Dist.
   LEXIS 106292 (N.D. Cal. Aug. 11, 2015) ..........................................75

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...........................................................................28

*Manchester Pacific Gateway LLC v. California Coastal Comm'n*,
   No. 07cv1099 JM (RBB), 2007 U.S. Dist.
   LEXIS 73590 (S.D. Cal. Oct. 2, 2007) ...............................................12

*Marbry v. EMI Music Distrib.*,
   Civil Action No. 3731–00, 129
   Daily Wash. L. Rptr. 2065 (D.C. Super. Ct. June 12, 2001) ...............69

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

*Martinez v. Showa Denko, K.K.*,
  964 P.2d 176 (N.M. App. 1998).............................................................47

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)............................................................................15

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012)..............................................................54

*Meijer, Inc. v. Biovail Corp.*,
  533 F.3d 857 (D.C. Cir. 2008).............................................................12

*Merck & Co. Inc. v. Lyon*,
  941 F. Supp. 1443 (M.D.N.C. 1996)................................................70, 71

*Miller v. Ghiradelli Chocolate Co.*,
  912 F. Supp. 2d 861 (N.D. Cal. 2012) ...............................................30

*Moore v. Kayport Package Express, Inc.*,
  885 F.2d 531 (9th Cir. 1989)..........................................................39, 40

*Newcal Indus., Inc. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008).....................................................24, 29, 34

*NLRB v. Raytheon Co.*,
  398 U.S. 25 (1970)..............................................................................26

*Nordberg v. Trilegiant Corp.*,
  445 F. Supp. 2d 1082 (N.D. Cal. 2006) ...........................................75, 76

*North Star Int'l v. Arizona Corp. Comm'n*,
  720 F.2d 578 (9th Cir.1983).................................................................11

*Oliver v. SD-3C LLC*,
  751 F.3d 1081 (9th Cir. 2014).............................................................49

*Parkinson v. Hyundai Motor Am.*,
  258 F.R.D. 580 (C.D. Cal. 2008) ........................................................52

*Pecover v. Elec. Arts Inc.*,
  No. 08-282, 2010 U.S. Dist. LEXIS 140632
   (N.D. Cal. Dec. 21, 2010) ...................................... 52, 54, 55, 56

*Penney v. First National Bank of Boston*,
  385 Mass. 715 (Mass. 1982) .............................................................66

*Petrus v. New York Life Insurance Company*,
  2016 U.S. Dist. LEXIS 44873 (S.D. Cal. March 31, 2016).........................47

*Poller v. Columbia Broadcasting Sys*,
  368 U.S. 464 (1962) ..........................................................................8, 18

*Powell v. Bank of Am., N.A.*,
  842 F. Supp. 2d 966 (S.D. W. Va. 2012).............................................65

- xiv -

*Precision Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.,*
No. 08-42, 2011 U.S. Dist. LEXIS 51330 (E.D.N.Y. Jan. 4, 2011) ..................45

*Precision Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.,*
No. 08-42, 2013 U.S. Dist. LEXIS 177023 (E.D.N.Y. Sept. 20 2013) ..31, 32, 35

*Province v. Province,*
473 S.E.2d 894 (W.Va. 1996) ..................................................................49

*Reid v. LVNV Funding, LLC,*
2:14CV471DAK, 2016 U.S. Dist. LEXIS 7233 (D. Utah Jan. 20, 2016) ....66, 67

*Reiter v. Sonotone Corp.,*
442 U.S. 330 (1979) ..............................................................................28

*Rice v. Rabb,*
320 P.3d 554 (Ore. 2014) ......................................................................47

*Riggs Nat'l Bank of Wash. D.C. v. D.C.,*
581 A.2d 1229 (D.C. 1990)......................................................................67

*Rivera v. Grossinger Autoplex,*
274 F.3d 1118 (7th Cir. 2001) ................................................................43

*Rutledge v. Boston Woven Hose & Rubber Co.,*
576 F.2d 248 (9th Cir. 1978) ..................................................................39

*Ryman v. Sears, Roebuck & Co.,*
505 F.3d 993 (9th Cir. 2007) ..................................................................32

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
No. 14-1746, 2015 U.S. App.
LEXIS 18834 (4th Cir. Oct. 29, 2015) ......................................................15

*Shady Grove Orthopedics Assocs., P.A. v. Allstate Ins. Co.,*
559 U.S. 393 (2010) ..............................................................................57

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,*
737 F. Supp. 2d 380 (E.D. Pa. 2010) ...............................................57, 68

*Sidibe v. Sutter Health,*
No. 14-16234, 2016 U.S. App.
LEXIS 13032 (9th Cir. 2016)...................................................................34

*Siegel v. Shell Oil Co.,*
480 F. Supp. 2d 1034 (N.D. Ill. 2007) ......................................................61

*Silvas v. E*Trade Mortg. Corp.,*
514 F.3d 1001 (9th Cir. 2008).................................................................12

*Simon v. E. Ky. Welfare Rights Org.,*
426 U.S. 26 (1976) ................................................................................28

*Simpson v. California Pizza Kitchen, Inc.,*
989 F. Supp. 2d 1015 (S.D. Cal. 2013).....................................................30

- xv -

*Skalla v. Canepari*,
    430 S.W.3d 72 (Ark. 2013) ................................................................. 67

*Standard Iron Works v. ArcelorMittal*,
    639 F. Supp. 2d 877 (N.D. Ill. 2009) ........................................... 14, 22

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    No. CV F 09-0560 LJO SMS, 2011 U.S.
    Dist. LEXIS 72764 (E.D. Cal. July 7, 2011) .................... 15, 17, 18, 19

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010) ............................................................. 21

*State ex rel. Bryant v. R & A Inv. Co.*,
    985 S.W.2d 299 (Ark. 1999) ....................................................... 66, 67

*State ex rel. Rosenblum v. Johnson & Johnson*,
    362 P.3d 1197 (Or. App. 2015) ......................................................... 67

*State v. Weinschenk*,
    868 A.2d 200 (Me. 2005) .................................................................. 61

*Stonebridge Collection, Inc. v. Carmichael*,
    791 F.3d 811 (8th Cir. 2015) ............................................................ 67

*Strizver v. Wilsey*,
    150 P.3d 10 (Or. App. 2006) ............................................................. 59

*Sun Dun, Inc. of Wash. v. Coca-Cola Co.*,
    740 F. Supp. 381 (D. Md. 1990) ....................................................... 53

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .......................................................................... 14

*Texaco, Inc. v. Dagher*,
    547 U.S. 1 (2006) .............................................................................. 16

*The 'In' Porters v. Hanes Printables, Inc.*,
    663 F. Supp. 494 (M.D.N.C. 1987) ................................................... 71

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ............................................................... 4

*Toliver v. United States*,
    No. CV 07-08400 DDP (JCx), 2008 U.S. Dist.
    LEXIS 64396 (C.D. Cal. July 24, 2008) ........................................... 11

*Tripper Corp. v. Chrysler Corp.*, 484
    F. Supp. 507 (N.D. Cal. 1980) .......................................................... 16

*Tungate v. MacLean–Stevens Studios, Inc.*,
    714 A.2d 792 (Me. 1998) .................................................................. 62

- xvi -

*United Power Ass'n. Inc. v. L.K. Comstock & Co.*,
  No. 89-CIV-766, 1992 U.S. Dist.
  LEXIS 18874 (D. Minn. Oct. 27, 1992) ..............................................40

*United States v. Container Corp. of Am.*,
  393 U.S. 333 (1969) ...........................................................................22

*United States v. Socony–Vacuum Oil Co.*,
  310 U.S. 150 (1940) ...........................................................................61

*United States v. Texas*,
  507 U.S. 529 (1993) ...........................................................................73

*United States v. United Healthcare Ins. Co.*,
  No. 13-56746, 2016 U.S. App.
  LEXIS 14687 (9th Cir. Aug. 10, 2016)...............................................40

*United States v. W.T. Grant Co.*,
  345 U.S. 629 (1953) ...........................................................................26

*Valencia v. Volkswagen Grp. of Am. Inc.*,
  No. 15-CV-00887-HSG, 2015 U.S. Dist. LEXIS 105545
  (N.D. Cal. Aug. 11, 2015) ..................................................................50

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
  592 F.3d 954 (9th Cir. 2010) ..............................................................38

*Washington Mutual Bank, FA v. Super. Ct.*,
  24 Cal. 4th 906 (2001) .......................................................................51

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
  648 F.3d 452 (6th Cir. 2011)...............................................................15

*Wershba v. Apple Computer, Inc.*,
  91 Cal. App. 4th 224 (2001)................................................................55

*Wilder v. JP Morgan Chase Bank, N.A.*,
  No. 09-834 DOC, 2009 U.S. Dist.
  LEXIS 124242 (C.D. Cal. Nov. 25, 2009)....................................75, 76

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
  594 F.3d 1087 (9th Cir. 2010).............................................................42

*Zumpano v. Quinn*,
  849 N.E. 2d 926 N.Y.3d 666 (N.Y. 2006) ..........................................38

**Statutes**

15 U.S.C.
  § 1 .........................................................................................................9

Antitrust Criminal Reform Act of 2004,
  Pub. L. No. 108-237, ¶ 213, 118 Stat. 661, 655 ..................................9

Ark. Code Ann.
  § 4-75-211 ..................................................................................58

Ark. Code Ann.
  § 4-75-211(b)(3) .........................................................................58

Ark. Code Ann.
  § 4-75-315 ..................................................................................58

Ark. Code. Ann.
  §§ 4-88-101 ................................................................................65

D.C. Code
  §§ 28-3901 .................................................................................66

N.H. Rev. Stat. Ann. Tit. XXXI,
  § 358-A:2....................................................................................70

Me. Rev. Stat. Ann. tit. 5,
  § 208 ..........................................................................................60

Me. Rev. Stat. tit. 5,
  § 207 ..........................................................................................61

Mich. Comp. Laws
  § 445.903(s), (cc) .......................................................................62

Mich. Comp. Laws Ann.
  § 445.904 ...................................................................................60

Mo. Rev. Stat.
  § 407.010 *et seq* .......................................................................56

N.C. Gen Stat.
  § 75-1 .........................................................................................70

N.M. Stat.
  § 57-12-3 ....................................................................................63

N.M. Stat. Ann.
  §§ 57-12-7 ..................................................................................60

Or. Laws
  Ch. 304 § 2 (HB 2584) ..............................................................59

Or. Rev. Stat.
  § 646.607 ....................................................................................63

Or. Rev. Stat.
  § 646.608(1), (1)(s) ....................................................................63

Or. Rev. Stat.
  § 646.612 ....................................................................................60

Or. Rev. Stat. Ann.
  § 646.605(9) ...............................................................................66

Or. Rev. Stat. Ann.
  § 646.607 ....................................................................................66

Or. Rev. Stat. Ann.
  § 646.608 ....................................................................................66

R.I. Gen Laws
  § 6-13.1-1 ...................................................................................60

R.I. Gen Laws
§ 6-13.1-2 ..................................................................................64
R.I. Gen. Laws
§ 6-13.1-1(6)(xii)........................................................................64
R.I. Gen. Laws
§ 6-13.1-1(6)(xiii).......................................................................64
Utah Code Ann
§ 13-11-4 ...................................................................................67
Utah Code Ann
§ 13-11-5 ...................................................................................67
Utah Code Ann.
§ 13-11-2 ...................................................................................67
Utah Code Ann.
§ 13-11-5(2)...............................................................................68
Utah Code Ann.
§§ 13-11-1 .................................................................................66
W. Va. Code
§ 46A-6-104 ..............................................................................65
W. Va. Code Ann.
§ 46A-6-102 ..............................................................................65

**Other Authorities**

Arkansas Deceptive Trade Practices Act ("ADTPA").........................65
Newberg on Class Actions
§ 3:35 (5th ed.) ..........................................................................30

**Rules**

Fed. R. Civ. P.
9(b) ..............................................................................71, 72
12 ..................................................................... *passim*
12(b)(1)...........................................................................27
15(a) ..............................................................................76

## I.     INTRODUCTION

End-Payer Plaintiffs ("EPPs") have pled a plausible conspiracy to raise, fix and maintain prices of Packaged Seafood Products ("PSPs") by Defendants Tri-Union Seafoods, LLC d/b/a Chicken of the Sea International ("Tri-Union"), Bumble Bee Foods LLC ("Bumble Bee"), and StarKist Company ("StarKist") (collectively "Defendants").   In this multidistrict litigation, the EPP class is comprised of consumers, including people from every rung of the economic ladder, who purchased Defendants' products, staple protein foods, and who feel the harm directly in their grocery budgets.  This case is in San Diego because the industry, particularly the tuna sector, has a long and proud history in this port city, and two of the Defendants, though owned by foreign parents, remain headquartered in this District.  The conspiracy the EPPs allege to fix and inflate the prices of packaged seafood through smaller can sizes, coordinated price hikes and controlling product innovation, among other things, emanated from these headquarters throughout the US market, to shoppers in every city and town in America.  The collusive acts described in the EPP Complaint[1] go back as far as 2008, and include specifics about Defendants' pricing meetings and agreements to implement coordinated price increases in the face of falling consumer demand for PSPs.

Defendants have filed various motions to dismiss the EPP Complaint under Rule 12 of the Federal Rules of Civil Procedure. Defendants assert that EPPs' allegations regarding this price-fixing conspiracy are not sufficiently plausible;[2] and that state law statutes of limitations bar certain of EPPs' claims.[3]  Defendants

---

[1]     Consolidated Class Action Complaint Of The Indirect Purchaser End Payer Plaintiffs (May 23, 2016) (ECF No. 149) ("Complaint" or "CAC").

[2]     Defendants' Joint Motion To Dismiss Plaintiffs' Complaints (ECF No. 207); Defendants' Memorandum of Points and Authorities in Support of Joint Motion to Dismiss All Complaints (ECF No. 207-2) ("*Twombly* Motion").

[3]     Defendants' Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss Various Claims as Time Barred (ECF No. 207-4) ("Statute of Limitations Motion").

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

also argue that EPPs do not possess Article III and antitrust standing,[4] and move to dismiss certain of EPPs' consumer protection and related state law claims.[5] Defendants direct their 35-page *Twombly* motion at EPPs, their 19-page Statute of Limitations Motion is directed at EPPs among others, the Standing Motion (16 pages) concerns EPPs almost in its entirety, including the *Associated General Contractors* ("*AGC*") arguments which concern individual states; and Defendants' 23-page State Law Motion principally concerns EPPs.  EPPs respond to the *Twombly*, Standing, and Statute of Limitations Motions in just 56 pages, and the State Law Motion in just 20 pages, far fewer pages than the total 93 pages Defendants directed at dismissing EPPs' claims.

None of the motions satisfy Rule 12's mandates.  Defendants improperly import allegations from other pleadings, and do not identify any specific deficiency in the EPP CAC that warrants dismissal. Defendants' failure to meet their Rule 12 burden is reason enough to deny the motions.  But, there are other reasons as well.

## A.   Defendants' Joint *Twombly* Motion Should Be Denied

Viewed as a whole, the CAC alleges a plausible conspiracy by Defendants to raise, fix and maintain prices of PSPs through a variety of means in the face of falling demand.  The CAC pleads the conspiracy with specific facts, including certain methods by which the cartel members: (1) agreed to and executed coordinated list price increases in 2012; (2) monitored discounts from such price increases in order to police discounts; (3) agreed to limit their product offerings (*i.e.*, not to offer Fish Aggregating Device ("FAD")-Free products); and (4) agreed to and implemented a parallel reduction in can size in 2008 in order to further their

---

[4]      Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Plaintiffs' Complaints for Lack of Standing (ECF No. 207-5) ("Standing Motion").

[5]      Defendants' Joint Motion to Dismiss Indirect Purchaser Plaintiffs' and Indirect Purchaser Commercial Food Preparers' Consolidated Class Action Complaints (ECF No. 207-3) ("State Law Motion").

price-fixing conspiracy. Further, the CAC alleges that the federal government is investigating PSP industry collusion, and one Defendant has admitted conspiratorial conduct.  Contrary to Defendants' assertion, the Court may and should consider this holistically with all the other factual allegations: the several detailed conspiratorial acts, the collusion-supporting features of the industry's structure, the corroborating pattern of increased prices despite declining PSP demand, and Defendants' public concessions about decreased price competition. EPPs' conspiracy allegations, taken together, plead a plausible price-fixing conspiracy and satisfy *Twombly*.  Accordingly, the joint *Twombly* Motion by some Defendants[6] should be denied.

### B.    EPPs Have Standing

Defendants' Standing Motion purports to seek dismissal of the EPPs' CAC for all purposes.  However, the text of the Motion abandons any effort at full dismissal of the EPP claims, seeking instead to persuade this Court to recast the pleading as a conspiracy concerning only tuna, and not all PSPs as defined and plead in the CAC.  *See* Standing Motion at 1:2-19.

This Motion fails as well.  EPPs have a named plaintiff who purchased in every jurisdiction for which a claim is asserted, each alleging injury from the cartel members' overcharge on PSPs, thus making Article III standing universal.  The discussion of antitrust standing, again, provides Defendants no basis to dismiss: the PSP products at issue came to the named EPPs in the can, and "pass[ed] through the chain of distribution in substantially the same form from defendants to consumers," *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1071 (N.D. Cal. 2015) ("*Capacitors*").  In this case, where the theory of injury is simple overcharge on a consumer product, and the consumer receives it in the form the conspirators sent it into distribution, the allegations easily satisfy any test of

---

[6]    Tri-Union did not join the bulk of the joint *Twombly* Motion, but instead signed only as to injunctive relief.

antitrust standing, even the federal *Associated General Contractors* test that Defendants incorrectly assert applies to most state law claims.

Defendants' effort to recast the CAC's allegations fare no better, because it would require the Court to substitute Defendants' *ipse dixit* assertions about the product market for EPPs' factual allegations. Defendants concede (*Twombly* Motion at 22:15-18) that, while not an element of a *per se* claim, EPPs took the step of actually alleging a product market. CAC ¶¶ 81-84. These allegations, unless facially, fatally flawed, are proof against attempts to vivisect the market at the pleading stage. *See*, *e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 200-02 (2d Cir. 2001) (Sotomayor, J.) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."). Here, the alleged market is sound, and presents an issue of fact that may only be tested after discovery. Defendant's clever effort to recast their product market argument as a standing issue therefore fails.

## C.    Statute of Limitations Does Not Bar Any of EPPs' Claims

The CAC alleges that since at least August of 2008, Defendants engaged in a continuing conspiracy to artificially inflate prices for PSPs. EPPs further allege that Defendants affirmatively concealed their conspiracy by making false public statements about industry price increases and supply reductions and by coordinating and implementing their conspiracy in a manner that precluded detection. While Defendants reaped the rewards, American consumers paid the price in the check-out lines of their local grocery stores. Now that consumers seek to recover for their injuries, Defendants attempt to protect the increased profits gained by their unlawful cartel by, among other things, asserting that EPPs' claims are time-barred—that is, that they were caught too late.

Defendants seek to gain the protection of the statutes of limitation by misstating the requirements for pleading fraudulent concealment and largely ignoring state law discovery rules. But EPPs need only *plead*—not prove—their

concealment allegations at this stage of the proceedings.  Courts have routinely found allegations of concealment similar to EPPs' sufficient to survive a motion to dismiss.  Additionally, Defendants attempt to bar EPPs' claims by imposing unreasonable due diligence obligations.  Specifically, Defendants argue that the very same coordinated can-size reductions and pricing behavior for which they offered innocent explanations at the time, should have led EPPs—consumers at grocery stores, whose only information was what the retailers charge—to investigate Defendants' conspiracy. This argument is dreadfully ironic because Defendants simultaneously urge the court to dismiss those same allegations of misconduct as insufficient under *Twombly*.

Finally, Defendants make the specious claim that they should be immunized from liability for harm they visited on EPPs *within* the limitations period if that harm emanated from bad acts outside the limitations period.  It is a settled tenet of antitrust law, however, that even in the absence of fraudulent concealment and the discovery rule, harm emanating from a continuing conspiracy is recoverable, even if the conspiracy was set in motion outside the statute of limitations period.

Put simply, each of Defendants' arguments is flawed and has been repeatedly rejected by the courts.  EPPs have adequately pled Defendants' affirmative acts of concealment and that EPPs did not discover, and reasonably could not have discovered, the conspiracy prior to the DOJ investigation becoming public.  Consequently, state tolling and accrual laws, such as fraudulent concealment[7] and the discovery rule,[8] prevent relevant limitations periods from running prior to July 23, 2015.

---

[7]   Fraudulent concealment applies to all Arizona, Arkansas, California, District of Columbia, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, South Dakota, Utah, Vermont and Virginia claims, as well as claims under New York's antitrust statute, and West Virginia statutory claims.  *See* Appendix I: Summary of State Tolling and Accrual Rules.

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC

### D.   EPPs' State Law Claims Are Well-Pleaded

Defendants finally throw forth a host of arguments that relate to one or a handful of particular state law claims.   In particular, Defendants attack the application of California law to a national class of consumers.   But this claim is in keeping with the guidance of the California Supreme Court in its recent *Bristol-Myers Squibb Co. v. Super. Ct.*, No. S221038, 2016 Cal. LEXIS 7124, at *42 (Aug. 29, 2016) ("*Bristol-Myers Squibb*") opinion, and consonant with California's strong interest in enforcing its laws against misconduct committed by in-state defendants which took place in significant part within California.

Defendants then cast out arguments that flow from mostly incorrect or out-of-date understanding of state laws.   To the extent Defendants are correct, their state law arguments, if successful, defeat only one of multiple claims for a particular state.   They do not defeat all claims for plaintiffs from that state.

These defects in Defendants' arguments are discussed more fully below.

## II.   STATEMENT OF FACTS

The CAC alleges Defendants conspired against consumers and competition from at least August 1, 2008 to the present.   Defendants conspired to raise, fix, and maintain prices of PSPs by decreasing can sizes, increasing list prices, policing discounts, and agreeing not to offer a more environmentally sustainable product for which there was demand.   The result was record high prices despite falling consumer demand.   CAC ¶¶ 1-3.   Defendants' horizontal cartel was effectuated by specific communications and meetings which lead to collusive price adjustments on PSPs at near-identical times, and through trade organizations created by Defendants, in an industry marked by concentration, market domination, high barriers to entry, and sagging demand.

---

[8]   The discovery rule applies to all Arizona, Arkansas, District of Columbia, Guam, Illinois, Iowa, Massachusetts, Mississippi, Missouri, Nebraska, Nevada, New Mexico, New York, Oregon, Rhode Island, South Dakota, Utah and Vermont claims, as well as statutory claims in North Carolina, North Dakota, West Virginia and Wisconsin.  *See* Appendix I: Summary of State Tolling and Accrual Rules.

---

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

First, the Complaint alleges Defendants agreed upon a list price increase in 2012. The CAC makes these allegations with the sort of detail typically unavailable at the pleading stage absent discovery. More specifically, the CAC alleges that Tri-Union, Bumble Bee, and StarKist agreed to raise list prices in 2012. CAC ¶¶ 98, 107-110. After a series of bilateral communications, "which in aggregate constituted communications among all three brands' personnel with pricing responsibilities" between December 2011 and the first 18 days of January 2012, Defendants agreed to and implemented "new price lists." CAC ¶¶ 107-108, 110. Each of the three Defendants announced price increases during a six-day period in January 2012, each timed to take effect within days of each other three months later. CAC ¶¶ 108-10. The CAC alleges the "who, what, how and when" of the conspiracy (*i.e.*, who agreed to these particular actions to further the conspiracy, what they agreed to do, when and how they agreed to it, and when and how they implemented it).

Second, the CAC alleges Defendants "policed" the conspiracy by monitoring their price increases with bilateral telephone and email communications during 2012 and 2013 to ensure that they avoided price competition. The CAC further alleges that Defendants' executives assured each other in May 2012 by phone and email "that the discount or promotion was not intended to spark price competition between the cartel members but reflected particular circumstances and would not set a precedent." CAC ¶¶ 98, 111-12.

Third, the CAC alleges that Defendants colluded to decrease tuna can sizes in 2008 to further the overall agreement to prop up PSP prices. CAC ¶¶ 102-106. After a series of gradual moves over time to "change the size of the standard tuna can," StarKist "abruptly changed the size of its standard six-ounce tuna can to five ounces," and was swiftly followed by Tri-Union and Bumble Bee. CAC ¶¶ 102-04. These three competitors and Defendants maintained this can size even though a smaller competitor maintained the six-ounce can size and then increased to seven

ounces.  CAC ¶ 105.  "The uniform move by the three leading brands to sharply drop the most common can size, even in the face of a competitive move by a private label to differentiate their product selling a larger seven ounce size canned tuna product is suggestive of collusion."  CAC ¶ 106.[9]

Fourth, Defendants collectively bound themselves not to offer a new higher cost product, FAD-free tuna.  CAC ¶¶ 98, 113-19.  During 2011, the industry was under pressure to sell more sustainably fished products, especially to stop using FADs.  CAC ¶¶ 113-14.  There was "unmet consumer demand for a more sustainable, FAD-free tuna product," but Bumble Bee, StarKist and Tri-Union, in calls that were then memorialized in email, agreed "on or about February 6, 2012" "to prevent the launch of a FAD-free tuna product under the brand name of any of the major brands for the US market."[10]  CAC ¶¶ 115-19.  "This agreement enabled Defendants to maintain their price-fixing conspiracy, and to further effectuate their agreement not to compete on the basis of price or distinguishing product choice, such as FAD-free tuna."  *Id.* ¶ 119.

Fifth, Defendants created organizations, including the National Fisheries Institute ("NFI"), the Better Seafood Board ("BSB"), and the International Sustainable Seafood Foundation ("ISSF"), and their "Tuna the Wonderfish" campaign, that offered opportunities for collusive communication – and in the case of the FAD-free ban, they used a trade organization as the vehicle for coordinating their anticompetitive agreement.  CAC ¶¶ 99-101, 120-122.

---

[9]    Even though Costco sold its in-house brand that Defendants' smaller competitor Tri-Marine provided in seven-ounce cans, Defendants continued to sell their smaller cans to Costco.  CAC ¶ 105.

[10]    The agreement as alleged in the CAC was quite specific: not to forbear from selling FAD-free tuna, but not to offer FAD-free tuna further legitimacy by offering it under one of the major brand names.  This sort of detail, again, is typically unavailable, and typically not required, at the pleading stage.  *Poller v. Columbia Broadcasting Sys*, 368 U.S. 464, 473 (1962) (antitrust conspiracy evidence "largely in the hands of the alleged conspirators"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-01819, 2010 U.S. Dist. LEXIS 132172, at *42 (N.D. Cal. Dec. 10, 2010) (same).

1    Sixth, the public statements of Defendant Tri-Union's parent company, Thai

2    Union, about market competition, profit margins and reduced competition in 2012,

3    support the allegations of collusion. Thai Union said that profit margins increased

4    "[t]hanks to reduced price competition (absence of cut throat pricing)." CAC ¶¶

5    142-43. "In its 2013 Annual Report, Thai Union Frozen Products stated that 'our

6    branded tuna business showed resilient growth from 2012 thanks to the price

7    adjustments in Europe and *more rational market competition in the US*.'" CAC ¶

8    142 (emphasis added). In its 2014 Annual Report, Thai Union Frozen Products

9    stated, "*Thanks to reduced price competition (absence of cut throat pricing)* and

10   generally lower fish cost Chicken of the Sea, *our own tuna brands marked a great*

11   *year of increased profitability*." CAC ¶ 142 (emphasis added). In a cartel-free

12   market, the declining demand would have led to "cut throat pricing," that is, to

13   Defendants' cutting prices to keep or gain market share. CAC ¶ 135-36.

14   Seventh, the CAC alleges that there is a federal criminal investigation and an

15   ACPERA cooperator.[11] Pursuant to this criminal investigation, the DOJ has issued

16   grand jury subpoenas that Bumble Bee described as relating to potential antitrust

17   violations "in the packaged seafood industry." CAC ¶ 150; *see* ¶¶ 146-51. Both

18   these civil cases and the DOJ's "criminal cases pertain to allegations of collusive

19   conduct among packaged seafood manufacturers, in violation of Section 1 of the

20   Sherman Act, 15 U.S.C. ¶ 1." Memorandum Of Points And Authorities in Support

21   of United States' Motion To Intervene, at 3-4 (Jan. 13, 2016) (ECF No. 34-1).

22   Eighth, "one Defendant has applied for and been accepted into the DOJ's

23   corporate leniency program under the Antitrust Criminal Penalty Enhancement and

24   Reform Act of 2004," which is "specifically related to Defendants' price-fixing

25   activities and other anticompetitive conduct in violation of Section 1 of The

26   

27   ---

   [11]    *See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub.
   L. No. 108-237, ¶ 213, 118 Stat. 661, 665 (codified as amended at 15 U.S.C. § 1
28   note) ("ACPERA")

Sherman Act in the United States PSP market."  CAC ¶ 154.  This amnesty requires admission of "a criminal act." CAC ¶ 154.

Ninth, the PSP industry context supports the inference that Defendants conspired to fix prices.  PSPs are fungible, commodity-like products, susceptible to effective price-fixing cartel.  CAC ¶ 126.  The PSP industry has consolidated and is dominated by Defendants in the U.S.  CAC ¶ 130.  Formidable barriers to entry, including the high cost of processing plants, restricted access to raw materials and distribution channels, and incumbent brands built up over a century, are all exacerbated by Defendants' co-packing ventures.   CAC ¶¶ 123, 127-29.  Defendants' price increases were extraordinary because they were implemented in an industry with falling demand: for tuna, "more than 31%" over the period from 2000 to 2014. *See* CAC ¶¶ 95, 134.  Price increases here were inconsistent with competitive market conditions because rational businesses should ordinarily reduce prices to compete for a larger share of a declining market. *Id. ¶* 96.

The CAC also identified Defendants' efforts to conceal the conspiracy, including pretextual explanations for increased prices.  For example, in June 2011 and January 2012, COSI told customers that price increases were due to global increases in fish prices.  CAC ¶ 145 (StarKist and Bumble Bee did likewise).  In or around August 2008, StarKist falsely claimed that package size reductions resulted from "environmental" concerns while Defendants actually implemented package size reductions to decrease costs and increase profits.  CAC ¶ 103.  Moreover, EPPs allege Defendants agreed to keep their conspiracy secret, and that to do so, they "met and communicated secretly concerning the pricing and marketing of PSPs so as to avoid detection."  CAC at ¶ 161-162.

///

///

///

///

- 10 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ARGUMENT**

## III.  DEFENDANTS' *TWOMBLY* MOTION SHOULD BE DENIED

### A.  Defendants Fail to Satisfy Their Burden Under Rule 12

The Court, in the course of multiple hearings, spent considerable time and effort ensuring that the interest of each plaintiff group in this consolidated multidistrict litigation will be represented as a separate "track" identified by each group's position in the PSP chain of commerce (*i.e.*, Direct Purchaser, Commercial Food Preparer, Indirect Purchaser End-Payer, and Direct Action Plaintiff).  *See* ECF Nos. 42, 119, 143.  Each track of Plaintiffs, and specifically the EPPs, pleaded extensive factual allegations that outline a plausible price conspiracy in contravention of the Sherman Act and state antitrust statutes.  Defendants' motions to dismiss ignore the Court's structural considerations.  Rather than file separate motions directed to the specific allegations of each plaintiff group's complaint, Defendants opted to challenge the entirety of those allegations in single, joint motion to dismiss.  ECF No. 207-2 at 2-5.

Defendants' strategy, designed to leverage differences in the various pleadings, presents a problem. The fictional pleading quilt Defendants stitch together for their joint motion does not exist.  Thus, the central purpose of a Rule 12 motion, to test the legal sufficiency of claims stated in **each** complaint now before the Court,[12] cannot easily be accomplished.  Defendants have not identified how any single complaint is legally insufficient, and this Court need not do their work for them.  It can simply deny Defendants' motion for failure to satisfy Rule 12's mandates.

Additionally, by cobbling together allegations from different complaints, Defendants would have this Court evade Rule 12's requirement that it must look to

---

[12]     *See Toliver v. United States*, No. CV 07-08400 DDP (JCx), 2008 U.S. Dist. LEXIS 64396, at *6 (C.D. Cal. July 24, 2008) (citing *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.1983) ('"The purpose of [Rule 12(b)(6)] is to test the legal sufficiency of the complaint."')

the face of a particular complaint to determine whether that pleading contains defects. The Court should use caution in considering the pleadings of one complaint to test the legal adequacy of another complaint. *See, e.g., Manchester Pacific Gateway LLC v. California Coastal Comm'n*, No. 07cv1099 JM (RBB), 2007 U.S. Dist. LEXIS 73590, at *6 (S.D. Cal. Oct. 2, 2007). Comparing different parties' complaints on a motion to dismiss, as Defendants attempt to do, runs afoul of the principal that a complaint's "allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008) (citation omitted). *See also Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010); *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 866 (D.C. Cir. 2008); *see also Clean Conversion Techs., Inc. v. CleanTech Biofuels, Inc.*, No. 12-cv-239-L (JMA), 2012 U.S. Dist. LEXIS 117279, at *6-8 (S.D. Cal. Aug. 20, 2012). Accordingly, each complaint's material allegations should be taken as true in evaluating that complaint.

Substantively, moreover, the allegations in the four plaintiff group complaints are not contradictory, as Defendants contend. All of the complaints plead an illegal conspiracy to fix the prices of PSPs,[13] identify the participants in the conspiracy,[14] the dates of various price-fixing meetings,[15] the topics of those meetings,[16] and the various steps Defendants took to carry out their conspiracy. The End Payer Plaintiffs do plead a class period of August 1, 2008 to the present, while some other plaintiff groups allege different class periods,[17] but these

---

[13]     CAC ¶¶ 1-3, 98; Direct Purchaser Plaintiffs' ("DPP") Complaint ¶¶ 1-2, 72.

[14]     CAC ¶¶ 57-60, 102-104, 106, 107-119; DPPs' Complaint ¶¶ 16-30, 70, 72-73, 75.

[15]     CAC ¶¶ 107-112, 116-119, 124; DPPs' Complaint ¶¶ 70, 72-76.

[16]     CAC ¶¶ 108, 111, 116-118; DPPs' Complaint ¶¶ 70, 72, 75.

[17]     CAC ¶ 1 (Aug. 1, 2008); DPPs' Complaint ¶ 1(Aug. 1, 2008); Indirect Purchaser Food Preparer Plaintiffs' ("CFP") Complaint ¶ 1 (Aug. 1, 2008); Kroger Complaint ¶ 1 (2011); Flowers Complaint ¶ 3 (Jan. 1, 2010); Winn-Dixie

1    differences are immaterial under Rule 12. *See Capacitors*, 106 F. Supp. 3d at 1063

2    (differences between IPP and DPP complaints did not affect conspiracy

3    allegations). The real question posed by Defendants' joint motion is not whether

4    any conspiracy existed, but how far it reached. "That question is ultimately one of

5    fact, and cannot be resolved in the present procedural posture, where the Court

6    tests the sufficiency of the pleadings." *In re Lithium Ion Batteries Antitrust Litig.*,

7    No. 13-MD-2420 YGR, 2014 U.S. Dist. LEXIS 7516, at *36 (N.D. Cal. Jan. 21,

8    2014); *see also In re Vitamins Antitrust Litig.*, No. 99-197 (TFH), 2000 U.S. Dist.

9    LEXIS 7397, at *43-44 (D.D.C. May 9, 2000) (accord).

10        A joint motion to dismiss containing common defense arguments might be

11   of some assistance to the Court, to the extent it is directed to the factual allegations

12   of a specific pleading and otherwise satisfies the requirements of Rule 12.

13   Defendants' motion fails on both counts, however, and should be denied.

### B.   The Complaint Plausibly Alleges an Antitrust Conspiracy Within The Legal Standard on a Motion to Dismiss.

The CAC extensively pleads allegations and supporting facts of Defendants'

conspiracy to raise, fix, and maintain prices of PSPs during the period August 1,

2008, to the present by coordinating list prices, policing discounting, and colluding

in product development in order to increase prices to record highs despite reduced

consumer interest and falling demand. The Complaint establishes a plausible

antitrust conspiracy within current pleading standards.

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007). The facts alleged need only "state a claim to relief that is plausible on its

face." *Twombly*, 550 U.S. at 570. *Accord Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009).

Complaint ¶ 1 (Jan. 1, 2008); Affiliated Foods Complaint ¶ 1 (Jan. 1, 2003 through
July 23, 2015).

1
2
3
4
5
6

In the context of horizontal price-fixing claims, a complaint is sufficient if it contains "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.  Thus, the CAC need only allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*; *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 44-45 (1st Cir. 2013) (same).

7
8
9
10
11
12
13
14
15

In determining whether the CAC identifies a plausible conspiracy, the Court should consider the CAC in its entirety, and should not view each allegation in isolation.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *In re Processed Egg Prods. Antitrust Litig.*, 902 F. Supp. 2d 704, 710 (E.D. Pa. 2012) (*Twombly* does not permit "dismember[ing] plaintiffs' Complaint in order to show how each allegation, in isolation, fails to sufficiently aver plausibility . . . . the allegations in the Complaint must be viewed as a whole.") (citing *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630-31 (E.D. Pa. 2010)).[18]

16

17
18
19
20
21
22
23
24
25
26
27
28

---

[18]     *See In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 782 (N.D. Ohio 2011) (courts "view the individual allegations in [the] context of the whole complaint"); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1006 (E.D. Mich. 2010) (*Southeastern Milk* court declined to "parse and dismember the complaints, contrary to the Supreme Court's admonition''") (quoting *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 1006 (E.D. Tenn. 2008)) (alterations in original); *see also Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009) ("Defendants' attempt to parse the complaint and argue that none of the allegations (*i.e.*, quoted public statements, parallel capacity decisions, trade association and industry meetings) support a plausible inference of conspiracy—is contrary to the Supreme Court's admonition [against] 'dismembering it and viewing its separate parts.'") (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)); *In re Chocolate Confectionary Antitrust Litig.*, 607 F. Supp. 2d 701, 705 (M.D. Pa. 2009) (following this principle); *In re Rail Freight Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 33 (D.D.C. 2008); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 373 (M.D. Pa. 2008) (nothing in *Twombly* "contemplates [a] 'dismemberment' approach to assessing the sufficiency of a complaint.  Rather, a district court must consider a complaint in its entirety without isolating each allegation for individualized review"); *In re Automotive Parts Antitrust Litig.*, No. 12-md-02311, 2014 U.S. Dist. LEXIS 120725, at *171-72 (E.D. Mich. Aug. 29, 2014).

- 14 -

1    Under *Twombly*, placing allegations of parallel conduct in a context that

2    suggests agreement is sufficient to survive a motion to dismiss.   *See, e.g.,*

3    *Evergreen.*, 720 F.3d at 44-45; *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860,

4    869 (6th Cir. 2012); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 186-

5    87 (2d Cir. 2012).   *Twombly* provided examples of such context, including conduct

6    that "indicates the sort of restricted freedom of action and sense of obligation that

7    one generally associates with agreement" and "complex and historically

8    unprecedented changes in pricing structure made at the very same time by multiple

9    competitors, and made for no other discernible reason."   550 U.S. at 557 & n.4;

10   *Evergreen,* 720 F.3d at 45 (quoting this *Twombly* language); *see also id.*,

11   (plausibility "does not impose a probability requirement at the pleading stage"); *id.*

12   at 45-46 (competing inferences on motion to dismiss "are properly left to the

13   factfinder").[19]

14   Defendants' frequent citations to *In re Musical Instruments & Equipment*

15   *Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015), and *Kendall v. Visa U.S.A., Inc.*,

16   518 F.3d 1042 (9th Cir. 2008), are inapposite.   In both cases, motions to dismiss

17   were granted, but only after the plaintiffs were allowed discovery prior to filing an

18   amended complaint.[20]   *Musical Instruments*, 798 F.3d at 1190-91; *Kendall*, 518

19

_____

20   [19]   *Accord Anderson*, 680 F.3d at 189-90 ("the question is whether there are
sufficient factual allegations to make the complaint's claim plausible"); *Watson*
21   *Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc*., 648 F.3d 452, 458 (6th Cir.
2011) (deciding "the most likely reason" for actions "is not appropriate at the
22   pleadings stage."); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781-82 (2d Cir.
2016) (only plausibly suggesting an inference of conspiracy required, despite
23   alternate interpretation) (following *Anderson*).

[20]   Summary judgment standards do not support a motion to dismiss because
24   the standards under Rule 56 are vastly different from those under Rule 12(b)(6).
*See, e.g., SD3, LLC v. Black & Decker (U.S.) Inc*., No. 14-1746, 2015 U.S. App.
25   LEXIS 18834, at *22-24 (4th Cir. Oct. 29, 2015); *see also Stanislaus Food Prods.*
*Co. v. USS-POSCO Indus*., No. CV F 09-0560 LJO SMS, 2011 U.S. Dist. LEXIS
26   72764, at *21-22 (E.D. Cal. July 7, 2011).   Defendants inappropriately rely
extensively on summary judgment or post-trial cases, none of which are
27   controlling at the pleading stage.   *See Twombly* Motion (citing *Matsushita Elec.*
*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *FTC v. H.J. Heinz Co.*, 246
28   F.3d 708 (D.C. Cir. 2001); *Fed Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663

1   F.3d at 1046.  And, in *Kendall*, the complaint was bereft of any factual allegations

2   of an alleged conspiracy.   Here, the EPPs' detailed Complaint was prepared

3   without the benefit of any Rule 26 discovery which was stayed at the insistence of

4   the Defendants and has not resulted in any discovery production because

5   Defendants have objections even to those items clearly called for under this

6   Court's limited stay order.  *See* ECF No. 137.  In short, viewing the Complaint as a

7   whole, and construing all inferences in Plaintiffs' favor, the requirements of

8   *Twombly* and *Iqbal* are satisfied.

9      **C.**  **EPPs Allege A Packaged Seafood Conspiracy**

10       **1.**  **The Complaint's Factual Highlights Allege Defendants' Conspiracy**

11

12     EPPs' Complaint sufficiently alleges that Defendants conspired to raise, fix,

13  stabilize and maintain prices for PSPs by coordinating PSP's pricing, and

14  increasing prices to record highs despite reduced consumer interest and falling

15  demand.  CAC ¶¶ 1-3, 98.  Defendants agreed to artificially inflate PSP prices

16  through specific private communications and meetings and by acting through their

17  trade organizations to communicate and implement anticompetitive programs.

18  CAC ¶¶ 98-101, 107-110.  EPPs allege specific facts related to conspiratorial

19  meetings and agreements, and about the conspiracy as a whole:

20  - At least as early as August 2008, Defendants Tri-Union, Bumble Bee, and StarKist agreed to reduce can sizes, CAC ¶¶ 102-106;

21  - In December 2011, Defendants' senior sales and management personnel discussed prices by telephone and email and agreed on and implemented a substantially identical price increase in early 2012, CAC ¶¶ 98, 107-10;

23

24  F.2d 253 (D.C. Cir. 1981);  *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999);
    *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015); *In re*
25  *Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999); *Krehl v. Baskin-Robbins
    Ice Cream Co.*, 664 F.2d 1348 (9th Cir. 1982); *Cleary v. Nat'l Distillers & Chem.*
26  *Corp.*, 505 F.2d 695 (9th Cir. 1974); *Tripper Corp. v. Chrysler Corp.*, 484 F. Supp.
    507 (N.D. Cal. 1980);  *Cont'l T.V. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977);
27  *Freeman v. San Diego Ass'n Realtors*, 322 F.3d 1133 (9th Cir. 2003); *Broad.
    Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979); and *Texaco, Inc. v.
28  Dagher*, 547 U.S. 1 (2006)).

- 16 -
EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

- Defendants announced these price increases to their customers within six days of each other in January 2012; their price increases were all effective on either March 26 or April 1, 2012, CAC ¶ 110;
- Defendants monitored pricing and communicated with each other via telephone and email in 2012 and 2013, with at least one specific discussion including assurances that a discount or promotion was not intended to spark price competition, CAC ¶¶ 98, 111-12;
- Defendants discussed and agreed to collectively refuse to offer FAD-free tuna, CAC ¶¶ 98, 113-119;
- Defendants had the ISSF, NFI and BSB organizations- for collusive communication, in person and telephone meetings, and did at times use trade meetings for anticompetitive agreement, CAC ¶¶ 99-101, 121-22;
- Defendants made pretextual public statements about market competition, profit margins and reduced competition in 2012, CAC ¶¶ 142-43, suggesting knowledge of wrongdoing;
- A Defendant has agreed to cooperate with the grand jury investigation, effectively admitting culpability to receive corporate lenity and the benefits of cooperation under ACPERA, CAC ¶ 154;
- A grand jury has issued a series of subpoenas to other Defendants, CAC ¶ 146; and,
- Defendants' industry featured declining PSP demand combined with increased PSP prices that outstripped any rising costs, supported by economic evidence of collusive pricing in the packaged seafood market, CAC ¶¶ 95-97, 133-142.

These conspiracy allegations, taken together, are sufficient evidence of a conspiratorial agreement to survive a motion to dismiss. *Accord Stanislaus*, 2011 U.S. Dist. LEXIS 72764, at *22-27 (denying dismissal; specific direct allegations raised inference of plausible conspiracy and survived motion to dismiss). In this case, the ACPERA applicant's admissions are direct evidence of Defendants' conspiracy. Accordingly the Joint *Twombly* Motion should be denied.

### 2. EPPs' Allegations Support An Inference Of Anticompetitive Conspiracy.

EPPs' Complaint includes extensive evidentiary facts of coordinated list pricing, conspiratorial behavior, opportunities to collude, an industry conducive to

1   collusion, economic evidence, and an ongoing government investigation and

2   amnesty applicant.

3       Defendants argue that, for example, can size modifications and industry

4   association memberships may be innocuous.  This "atomizing approach"[21] of

5   attempting to attack each allegation in isolation has been repeatedly rejected.

6   Taking the Complaint as a whole, it easily satisfies the *Twombly* standard.

### a.   Defendants' explicit coordination of PSP list price increases support a plausible conspiracy

Defendants collectively increased PSP list prices, including by a specific December 2011 agreement for "a near simultaneous increase in" list prices "by the same amount."  CAC ¶¶ 98, 107-10.  After a series of bilateral communications "which in aggregate constituted communications among all three brands' personnel with pricing responsibilities" between December 2011 and the first 18 days of January 2012, Defendants agreed to and then implemented "new price lists" announced within six days in January 2012 to take effect within days of each other at the end of March.  CAC ¶¶ 108-10.  *Vitamins*, 2000 U.S. Dist. LEXIS 7397, at *53 ("a single overt act . . . is enough to sustain a conspiracy claim"); *Stanislaus*, 2011 U.S. Dist. LEXIS 72764, at *22-27 (specific agreements alleged); *In re OSB Antitrust Litig.*, No. 06-826, 2007 U.S. Dist. LEXIS 56573, at *11-12 (E.D. Pa. Aug. 3, 2007) ("explicit allegations of Defendants' agreement to fix prices" enough to sustain complaint); *compare, e.g.*, *Poller,* 368 U.S. at 473 (defendants control evidence); *In re Static Random Access Memory (SRAM) Antitrust Litig.,* No. 07-md-01819 CW, 2010 U.S. Dist. LEXIS 132172, at *45-48 (N.D. Cal. Dec. 10, 2010) (same).

The CAC does not need an inference of an agreement's existence for *Twombly* analysis because it explicitly and directly pleads specific facts of an

---

[21]   *Lithium Ion Batteries*, 2014 U.S. Dist. LEXIS 7516, at *71.

agreement, based on direct evidence, in a litigation where an ACPERA cooperator is known to have sought leniency.  This pleading is thus a factual assertion of agreement, from which the scope of the alleged cartel may plausibly be inferred.  *See Stanislaus*, 2011 U.S. Dist. LEXIS 72764 at *20 ("[s]pecific agreements" alleged; § 1 claims sustained); *Vitamins*, 2000 U.S. Dist. LEXIS 7397, at *53; *cf. In re: Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 375 (D.N.J. 2001) (scope of conspiracy subject to inference as to meetings particular defendant attended).

### b.  Defendants' policing discounting from list prices supports a plausible conspiracy

Plaintiffs allege specific bilateral communications amongst *all* Defendants via telephone and email, beginning not later than May 2012, to police discounts. Defendants' sales and management executives announced to each other particularly aggressive discounts from list price, and in turn the discounting Defendant's executives assured the others that the discount or promotion reflected particular circumstances and would not spark price competition between the cartel members or set a precedent.  CAC ¶¶ 98, 111-12.  In context, EPPs allege much more than the mere exchange of price information, which with other facts may infer agreement.  *See In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1214 (N.D. Cal. 2015).  Here, the CAC also alleges policing of discounts and communication to avoid price competition; *i.e.* agreement is directly alleged.

### c.  Defendants' joint refusal to introduce a new FAD-free tuna product supports a plausible conspiracy

Despite "unmet consumer demand for a more sustainable, FAD-free tuna product," Defendants agreed to not introduce or offer FAD-free PSPs, so as to avoid price competition in the PSP market. CAC ¶¶ 113-119.  The CAC alleges Bumble Bee, StarKist and Tri-Union formed this particular agreement by telephone conference call on February 6, 2012, and memorialized it via email on

1   February 17, 2012.  CAC ¶ 118.  Their pact was to not offer a FAD-free tuna

2   product under any of their major brand names.  CAC ¶ 119.  Defendants thereby

3   effectuated a horizontal agreement not to compete on the basis of *distinguishing*

4   *product choice.*  CAC ¶ 119.  In addition, this agreement allowed Defendants to

5   continue selling their existing products at high prices without competition from a

6   new, FAD-free competing product in their own product lines.

7        These allegations, in context with other facts, are of direct collusive conduct

8   and render the entire cartel as alleged plausible.  The collective refusal to offer a

9   new product (FAD-free tuna), a specific instance of cartel behavior, taken together

10  with the rest of the Complaint, supports a plausible conspiracy.

> **d.   Defendants' discussions and coordinated collusive decision to decrease and align tuna can sizes in 2008 in spite of competitive threats support a plausible conspiracy**

14       After gradual moves to change tuna cans' size, StarKist "abruptly changed

15  the size of its standard six-ounce tuna can to five ounces."  Tri-Union and Bumble

16  Bee swiftly followed.  CAC ¶¶ 102-04.  Defendants maintained this can size even

17  though a smaller competitor used a larger size.  CAC ¶ 105.  Defendants' uniform

18  move to drop the most common can size, despite a competitor's move to a larger

19  can suggests collusion.  CAC ¶ 106; *see, e.g.*, *In re OSB*, No. 06-826, 2007 U.S.

20  Dist. LEXIS 56573, at 12 (parallel conduct in combination with explicit allegations

21  of specific price-fixing discussions during industry events "is certainly 'enough to

22  raise a right to relief above the speculative level'").  It is against each Defendant's

23  self-interest not to compete with a competitor offering a larger serving at a lower

24  effective price.  Defendants' joint action in the context of their other collusive

25  moves further supports an unlawful price agreement.

26

27

28

1

2

### e. Governmental investigation into anticompetitive practices in the industry is significant

3   The DOJ's investigation of Defendants, including an accepted ACPERA

4   leniency application (CAC ¶ 154), together with the CAC's other facts further

5   supports the plausibility of EPPs' conspiracy allegations. Government

6   investigations, along with other facts, help provide a plausible "suggestion of a

7   preceding agreement." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323-24

8   (2d Cir. 2010); *Lithium Ion Batteries*, 2014 U.S. Dist. LEXIS 7516 at *71

9   (investigation part of "holistic[]" view to consider in analyzing a complaint); *In re*

10  *Transpacific Passenger Air Transp. Antitrust Litig.*, No. 07-0563, 2011 U.S. Dist.

11  LEXIS 49853, at *53 (N.D. Cal. May 9, 2011) (investigation part of plausible

12  allegations). Here, the DOJ is investigating "the entire domestic PSP sector."

13  CAC ¶¶ 146-51. Defendants Tri-Union and Bumble Bee have received grand jury

14  subpoenas, suggesting a serious criminal probe with indictments likely. *See* CAC

15  ¶¶ 146, 152-53. ACPERA amnesty requires admitting "the commission of a

16  criminal act." CAC ¶ 154.

17  The ACPERA application and its necessary culpability admission

18  strengthens the "suggestion of a preceding agreement" in this case. An amnesty

19  applicant's existence means that one of the Defendants has reported illegal antitrust

20  activity to the DOJ. *See* Department of Justice, Corporate Leniency Policy,

21  available at https://www.justice.gov/atr/file/810281/download (last visited Aug.

22  31, 2016). An amnesty applicant's application to the DOJ necessarily constitutes

23  its direct admission that an antitrust violation has occurred. At the very least, the

24  application and its acceptance into the DOJ's program support a very strong

25  inference an illegal anticompetitive agreement occurred in the PSP industry. That

26  report of illegal activity, combined with the DOJ actively investigating Defendants

27  for price-fixing in the PSP market, supports a strong inference that Defendants

28  engaged in an unlawful conspiracy.

1   Defendants argue the investigation and the existence of a cooperator should
2   be ignored.  Defendants do not cite a single authority with an ACPERA cooperator
3   that was dismissed on the pleadings, nor can they. The proposition argued makes
4   no sense as it is a defendant itself that admits to the conspiracy claim.  Importantly,
5   of the cases Defendants cite for the proposition that a cooperator should be
6   accorded no weight, most denied the *Twombly* motion – that is, courts that have
7   said they accorded cooperators no weight did so only after concluding that the
8   pleading survived even if those allegations were excised.[22]

9   **f.    Defendants' Industry Structure Facilitates**
10  **Collusion and Supports EPPs' Conspiracy**
    **Allegations**

11  Certain characteristics predispose a product market to price-fixing by
12  making collusion more effective and more attractive to producers, including high
13  barriers to market entry, concentration of a few large producers, and inelastic
14  pricing.  *See, e.g., United States v. Container Corp. of Am.*, 393 U.S. 333, 337
15  (1969) (few sellers and inelastic demand facilitated collusion); *In re Static Random*
16  *Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902-03 (N.D. Cal.
17  2008) (market concentration and entry barriers encouraged collusion) ("*SRAM II*");
18  *Standard Iron Works*, 639 F. Supp. 2d at 883 (concentrated producers and entry
19  barriers conducive to collusion).  These are "economic factors that courts, antitrust
20  experts, and economists agree make an industry conducive to collusion."  *Id.*  The

21

22  _____
    [22]    Of cases dismissing claims, *In re Crude Oil Commodity Antitrust Litig.*, No.
23  06-cv-6677, 2007 U.S. Dist. LEXIS 47902 (S.D.N.Y June 27, 2007) was a fraud
    case applying Rule 9(b) pleading standards, and *In re Zinc Antitrust Litig.*, No. 14-
24  cv-3728, 2016 WL 903864 (S.D.N.Y. Jan. 7, 2016) did not explain how it
    evaluated investigations.  In *Capacitors*, the question was whether there was one
25  conspiracy or separate conspiracies in differing time periods.  106 F. Supp. 3d
    at 1061.  In that "unusual factual circumstance" the court declined to infer the
26  scope of the conspiracy or conspiracies from the amnesty application.  *Id.* at 1064-
    65.    Nevertheless, the Court found that complaint's conspiracy sufficiently
27  grounded in fact to go forward.  *Id.* at 1061.  Defendants' case of *In re Refrigerant*
    *Compressors Antitrust Litig.*, No. 2:09-md-02042, 2012 U.S. Dist. LEXIS 80269
28  (E.D. Mich. June 11, 2012), does not discuss an ACPERA applicant.

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC

PSP market structure has three such factors, including: (1) high market entry barriers that protect cartelists from potential new competitors, including millions of dollars in plant costs, well established incumbent brands and vertical integration (CAC ¶¶ 127-30); (2) high concentration whereby three Defendants control nearly 80 % of U.S. PSP tuna sales (CAC ¶¶ 80, 94 & 131), giving Defendants market power, collectively, to raise prices[23] (CAC ¶ 131); and (3) inelastic pricing – e.g., canned tuna is highly inelastic, so if makers can limit supply by 3%, they can raise prices by 10% (CAC ¶ 133), which encourages price-fixing because cartelists can gain revenue by raising prices, even in the face of decreasing sales.

Similarly, Defendants' anomalous pricing for a competitive market supports the conspiracy allegations because despite falling demand, PSP prices rose drastically and *faster* than input costs.  CAC ¶¶ 95-97, 133-41.  Such allegations tend "to prove that output was restricted or prices were above a competitive level." *Flash Memory*, 643 F. Supp. 2d at 1146 (citation omitted); *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1115–16 (N.D. Cal. 2008) ("*TFT-LCD*") (unnatural price stability and increases supported alleged conspiracy).

Still another PSP industry feature is Defendants' use of their trade organizations to facilitate their price-fixing.  *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024 (N.D. Cal. 2010) (participation at trade association meetings used to further conspiracy); *Blood Reagents*, 756 F. Supp. 2d at 632 (trade associations feature of the factual background to conspiracy).  Defendants' trade organizations provided numerous opportunities to collude.  CAC ¶¶ 99-101, 120-24.  For example, Defendants' "Tuna the Wonderfish" campaign from 2011 to 2012 led up to their joint January 2012 price

---

[23]    *See In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1145 (N.D. Cal. 2009); *see also SRAM II*, 580 F. Supp. 2d at 896 (denying dismissal in part because market concentration allegations, with others, supported price-fixing inference).

1   increase.  *Compare* CAC ¶¶ 107-10 *with* ¶¶ 121-22.  In at least one instance, the

2   Defendants are known to have used the opportunity for collusion provided by these

3   industry fora: the joint refusal to offer a FAD-free tuna product, agreed through

4   NFI.  CAC ¶¶ 117.

5       Finally, Defendants admit that competition in the U.S. market is anemic.

6   *See* CAC ¶¶ 142 ("rational," "[r]easonable" and "reduced" U.S. competition) &

7   143 ("sensible market competition" focused "more on consumption creation than

8   market share alone").  These admissions should be viewed together with the

9   ACPERA applicant's necessary admission of collusion.  *See* CAC ¶ 154.

### 3.  EPPs' Allegations Encompass the Packaged Seafood Industry

12      EPPs allege a single conspiracy artificially to raise prices throughout the

13  packaged seafood industry.  The CAC further alleges that shelf-stable packaged

14  seafood products, including tuna, crab, mackerel, oyster, salmon, sardines and

15  shrimp constitute the relevant market, which EPPs allege as a single relevant

16  product market.  CAC ¶¶ 1, 81-83.[24]  This is consistent with the scope of the DOJ

17  investigation.  CAC ¶ 149.  Tuna makes up approximately 70% of the market, so

18  CAC's allegations understandably emphasize tuna, but EPPs allege a conspiracy

19  that encompasses the entire PSP product market.  *See*, *e.g.*, CAC ¶¶ 2-3, 80-85, 89-

20  101, 107-12, 125-30, 132, 135-37, 146-56.  The CAC alleges that PSPs are

21  commodity products treated similarly throughout a concentrated industry with high

22  barriers to entry that were the subject of industry-wide collusion and an agreement

23  to fix, raise, stabilize or maintain prices of and restrict capacity within the market

24  during the class period.  *See* CAC ¶¶ 1-3.

---

[24]     "There is no requirement that these elements [relevant markets] of the antitrust claim be pled with specificity.  An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect."  *Newcal Industries,* 513 F.3d at 1045.

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

1    Plaintiffs also allege that Defendants engaged in meetings at industry-wide

2    fora in order to engage in collusive communications and effectuate an

3    anticompetitive agreement.  CAC ¶¶ 99-101, 113-118, 120-24.  While not every

4    defendant sells each individual PSP, PSPs are commodity products "sold in similar

5    amounts in similar sizes with similar shelf life and in similar types of packaging."

6    CAC ¶¶ 93-94, 126.  Contrary to Defendants' assertions, these allegations, taken as

7    true, establish that PSPs other than tuna are commodity products treated industry-

8    wide in a similar fashion.  Taken together, the CAC's allegations provide "enough

9    fact to raise a reasonable expectation that discovery will reveal evidence of" an

10   industrywide "illegal agreement."  *Twombly*, 550 U.S. at 556.

11   Defendants may not re-characterize EPPs' allegations of a single conspiracy

12   to support an "alternative theory" that there are multiple types of relationships

13   between types of different PSPs.  *See Animation Workers*, 123 F. Supp. 3d at 1212;

14   *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 606-07 (N.D. Cal.

15   2010) ("[D]efendants may not recast plaintiffs' allegations, and plaintiffs have

16   consistently alleged a single, overriding conspiracy spanning the entire class

17   period.") *amended in part*, No. M 07-1827 SI, 2011 U.S. Dist. LEXIS 84476 (N.D.

18   Cal. July 28, 2011).  "[T]he mere fact that the defendants have a different case

19   theory should not deprive the plaintiffs of the opportunity to prove theirs." *In re

20   Air Cargo Shipping Servs. Antitrust Litig.,* 06-MD-1175, 2014 U.S. Dist. LEXIS

21   180914, at *200 (E.D.N.Y. Oct. 15, 2014).

22   Further, "there simply is no requirement that an antitrust plaintiff draw the

23   boundaries of the alleged conspiracy (or conspiracies) in a complaint with the

24   precision of a diamond cutter." *Capacitors*, 106 F. Supp. 3d at 1063. Even where

25   multiple tracks of direct and indirect plaintiffs pled different factual allegations,

26   "[s]o long as an alleged conspiracy is supported by enough facts to make it

27   plausible, as it is here, it is of no matter whether it involves three conspirators or a

28   score or more." *Id.* at 1063-64.  This analysis applies to differing allegations

1   related to the type of products at issue, and the competitors included.  *Id.* at 1062.

2   Here, any differences between the scope of the conspiracy alleged by EPPs and

3   other Plaintiffs are irrelevant because the CAC stands on its own.

### D.   EPPs Are Entitled to Plead an Injunction

4

5   Finally, EPPs plead a plausible allegation of threatened future injury.  First,

6   EPPs allege that the conspiracy is ongoing.  CAC ¶¶ 1, 98, Prayer for Relief at (e).

7   This is sufficient to establish an ongoing antitrust injury.  *See In re New Motor*

8   *Vehicle Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 13-14 (1st Cir. 2008); *see In*

9   *re: Methionine Antitrust Litig.*, No. 99-3491, 2001 U.S. Dist. LEXIS 13402, at *9

10  (N.D. Cal. Aug. 24, 2001) (denying motion to strike injunctive relief).  Second,

11  Defendants present no evidence that either the DOJ investigation or one

12  defendant's DOJ leniency application ended the conspiracy.  To the contrary,

13  conspiracies often continue through a government investigation.  *See In re TFT-*

14  *LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. at 596 (rejecting argument collusion

15  ended after investigation became public).[25]

## IV.   EPPS HAVE STANDING

16

### A.   EPPs Have Constitutional Standing

17

18  In a class action, each named plaintiff must allege and show that he or she

19  personally has been injured. *Lewis v. Casey*, 518 U.S. 343, 357 (1996). "Once

20  threshold individual standing by the class representative is met, a proper party to

21  raise a particular issue is before the court, and there remains no further separate

22  _____

[25]   A defendant's claim to have voluntarily ceased committing illegal activity
23  does not provide a basis for it to argue a controversy is moot.  *See United States v.*
    *W.T. Grant Co.*, 345 U.S. 629, 632-33 (1953) (right to Clayton Act injunction
24  survives voluntary cessation of illegal conduct); *Friends of the Earth, Inc. v.*
    *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).  Given their history
25  of illegal conduct, Defendants bear a "heavy" burden to establish there is "no
    reasonable expectation" that "the wrong will be repeated."  *W.T. Grant Co.*, 345
26  U.S. at 633; *see Laidlaw*, 528 U.S. at 189 (must be "absolutely clear" the alleged
    violations "could not reasonably be expected to recur"); *NLRB v. Raytheon Co.*,
27  398 U.S. 25, 27-28 (1970).  Here, Defendants had no reason to cease their
    conspiracy, other than the government looking over their shoulders, so their
28  industry structure and other circumstances encourage them to recidivate.

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

class standing requirement in the constitutional sense." *Krell v. Prudential Inc. Co. of Am.*, 148 F.3d 283, 306-07 (3d Cir. 1998) (citation and quotation marks omitted). The CAC sufficiently alleges injury to confer Article III standing because all Plaintiffs allege injury through the purchase of a price-fixed PSP at artificially high prices. [26]

EPPs are consumers who indirectly purchased (*i.e.*, through a third-party or retail channel) for their own consumption PSPs sold in the United States by Defendants.[27] Plaintiffs allege that as a direct result of Defendants' price-fixing conspiracy, price competition for PSPs was restrained or eliminated, resulting in artificially inflated prices.[28]  EPPs further allege that Plaintiffs paid these artificially prices when they purchased PSPs through a third-party or retailer.[29] The PSPs sold by Defendants and purchased by Plaintiffs in the United States include crab, mackerel, oyster, salmon, sardines, shrimp and tuna.  CAC ¶¶ 1, 4-56, 89, 90, 92, 93.  The CAC alleges that all are the subject of a single conspiracy.

---

[26]    Defendants attack standing under Fed. R. Civ. P. 12(b)(1), but without offering additional evidence.  In such circumstances, the standard is effectively a 12(b)(6) analysis.  *See Center for Food Safety v. Vilsack*, No. 15-cv-0159, 2016 U.S. Dist. LEXIS 121629, at *4 (N.D. Cal. Sept. 8, 2016) ("There are two permissible jurisdictional attacks under Rule 12(b)(1):  a facial attack, where the Court's inquiry is limited to the allegations in the complaint; and a factual attack, which permits the Court to look beyond the complaint at affidavits or other evidence.").

[27]    CAC ¶¶ 1, 4-56, 210, 215, 221, 230, 237, 242, 248, 254, 260, 267, 275, 281, 288, 296, 302, 308, 320, 326, 332, 338, 344, 355, 381, 384, 398, 427, 575, 597, 605, 609, 616, 622, 628, 634, 640, 647, 653, 659, 664, 674, 668, 679, 686, 691, 696, 704, 712, 718, 724, 730, 736, 742, 748.

[28]    CAC ¶¶ 3, 97, 155-156, 168, 170(c), 192, 200, 211, 217, 222, 223, 232, 238, 244, 250, 256, 262, 269, 277, 283, 290, 298, 304, 310, 314, 322, 328, 334, 340, 344, 360, 366, 377, 388, 399, 408, 417, 428, 438, 439, 448, 449, 458, 459, 469, 478, 479, 490, 500, 510, 511, 520, 521, 531, 532, 545, 556, 567, 577, 581, 591.

[29]    CAC ¶¶ 97, 136-137. 156, 170, 177, 186, 210, 215, 221, 230, 237, 242, 248, 254, 260, 267, 275, 281, 288, 296, 302, 308, 320, 326, 332, 338, 344, 355, 381, 384, 398, 427, 575, 597, 605, 609, 616, 622, 628, 634, 640, 647, 653, 659, 664, 668, 674, 679, 686, 691, 696, 704, 712, 718, 724, 730, 736, 742, 748.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1. Plaintiffs Have Plausibly Pled That EPPs' Injuries Are Causally Connected To The Alleged Conspiracy

The causation requirement for constitutional standing is easily satisfied where, as here, plaintiffs allege "a causal connection between the injury and the conduct complained of." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) (holding that injury must be "fairly . . . trace[able] to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court").

All EPPs purchased PSPs.  There is no requirement that they allege every detail of their purchases, including specifically, which types or brands of PSPs were purchased, where they were purchased, or when, to plead causation. Allegations that Plaintiffs paid unlawfully inflated prices for goods or services, as EPPs allege here, demonstrate Plaintiffs have suffered an injury-in-fact as a result of the alleged conspiracy, and do so for every jurisdiction alleged.[30]   These allegations also provide the necessary causal connection for Article III standing. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) ("[W]here petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct, she has alleged an injury in her 'property' under § 4 [of the Clayton Act]."); *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 976 (9th Cir. 2008) (payment of artificially inflated price constitutes and injury sufficient to state a claim for RICO violation); *In re Auto Parts Antitrust Litig.*, Case No. 12-md-02311, 2013 U.S. Dist. LEXIS 80338, at *47 (E.D. Mich. June 6, 2013) ("*Auto Parts I*") ("[A] buyer who is induced to pay an unlawfully inflated price for goods or services obviously suffers an actual injury, that is, an injury in fact."); *see also Capacitors*, 106 F. Supp. 3d at 1071 (citing *TFT-LCD*, 586 F. Supp. 2d 1109 at 1122-23 and

---

[30]   *See* fn.27, 28 and 29, *supra*.

1    sustaining IPP claims on similar allegations); *In re Processed Egg Products*

2    *Antitrust Litig.*, 851 F. Supp. 2d 867, 887 (E.D. Pa. 2012) ("*Eggs*") (same).

3                    **2.    EPPs Have Plausibly Pled Injury-In-Fact**

4            Defendants contend that EPPs have suffered no injury-in-fact absent detailed

5    allegations attesting that each Plaintiff purchased ***each brand or type*** of PSP.  This

6    is an attempt to end-run the CAC's pleading of a conspiracy across a single PSP

7    market, which market cannot be divided at the pleading stage.[31]  Defendants rely

8    on *Branca v. Nordstrom, Inc.*, Case No. 14-cv-2062-MMA (JMA), 2015 U.S. Dist.

9    LEXIS 176888, at *9-15 (S.D. Cal. Oct. 9, 2015), yet concede there is no Ninth

10   Circuit opinion that supports this argument.  Standing Motion at 5:26-6:1.  *Branca*

11   is not an antitrust case and has no applicability to the proper pleading of an

12   antitrust relevant market, but Defendants nonetheless argue that any individual

13   Plaintiff's claim that alleges the purchase of some, but not every, type of price-

14   fixed PSP must be dismissed as a matter of law. *Id.*

15          Indeed, whether Plaintiffs have purchased adequately similar products is

16   generally not considered at the pleadings stage, but on a motion for class

17   certification. *See*, *e.g.*, *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276

18   F.R.D. 364, 374 (C.D. Cal. 2011) ("[i]n an antitrust price fixing case in which the

19   class representative has alleged a broad conspiracy, courts have not required . . .

20   that the representative ha[s] purchased from all of the defendants or that he ha[s]

21   been adversely affected by all of the means and methods by which the alleged

22   conspiracy was implemented") (internal quotation omitted); *In re Processed Egg*

23   *Prods. Antitrust Litig.*, 312 F.R.D. 124, 134-135 (E.D. Pa. 2015) ("[i]n price-fixing

24   actions, the proposed class representative's claims are generally held to be typical

25   of the class members' claims even if there are variations in the manner in which

26   _____

27   [31]     *See, e.g., Newcal Industries*, 513 F.3d at 1045 (relevant market need not be
     pleaded with specificity and is intensely factual, so that its extent should be tested
28   after discovery and not on pleadings).

members of the class purchased from the defendant, variations in the kind of product purchased, differences in price, and other factors.") (quoting NEWBERG ON CLASS ACTIONS § 3:35 (5th ed.)).

Moreover, most courts do not follow Defendants' view even outside the context of an antitrust conspiracy. Rather, "[t]he majority of the courts that have carefully analyzed the question hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products [and allegations at issue] are substantially similar." *Miller v. Ghiradelli Chocolate Co*., 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012); *accord Branca*, 2015 U.S. Dist. LEXIS 176888, at *10-11 ("the majority of courts—as well as the *Miller* Court – have analyzed the similarity between the various products and alleged misrepresentations at issue.").

In *Simpson v. California Pizza Kitchen, Inc*., 989 F. Supp. 2d 1015, 1023 (S.D. Cal. 2013), also not an antitrust case, this Court rejected Defendants' "matter of law" approach and "agree[d] with Plaintiff that she has standing to sue for products she never purchased because she is asserting her claims on behalf of a nationwide class and the products in question—frozen pizzas—are sufficiently similar to the products [other defendant-produced foods containing artificial trans fatty acids] Plaintiff purchased." *Id*., at 1023 n.2 (citations omitted). Other courts similarly have held that Article III standing exists where plaintiffs assert claims related to products that are substantially similar to the products plaintiffs purchased. *See Cortina v. Goya Foods, Inc*., 94 F. Supp. 3d 1174 (S.D. Cal. 2015) (plaintiffs could assert claims that several of defendants' beverages contain a carcinogen, though plaintiffs had not purchased every specific type of beverage). "[I]n asserting claims based on products a plaintiff did not purchase, but which are nevertheless substantially similar to products plaintiff *did* purchase, a plaintiff is not suing over an injury she did not suffer. Rather a plaintiff in that scenario is suing over an injury she personally suffered and asserting that others who

purchased similar products suffered substantially the same injury, even if the products that caused the injury were not identical in every respect." *Bruton v. Gerber Product Company*, No. 12-cv-02412-LK, 2014 U.S. Dist. LEXIS 5493, at *27 (N.D. Cal. Jan. 15, 2014) (italics in original, additional citations omitted).[32]

"When determining what constitutes the same type of relief or same kind of injury, [the court] must be careful not to employ too narrow or too technical an approach.  Rather, [it] must examine the questions realistically:  [the court] must reject the temptation to parse too finely, and consider the context of the injury." *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2001).

Here, each named EPP alleges a purchase of a PSP, primarily canned tuna, indirectly from one or more defendants, and payment of an artificially inflated prices, resulting from Defendants' conspiracy.[33] The PSPs at issue are substantially similar:  they all start as raw seafood that is processed, cooked and packaged as a shelf-stable seafood product.  CAC ¶¶ 81, 89.  Each package has a code that identifies the plan, product, date, batch and other identifying information, and each PSP product is sold in its original packaging, such that each PSP is traceable

---

[32]   This is implicit, if not explicit, in antitrust precedent. *See, e.g., Capacitors*, 106 F. Supp. 3d at 1071-1072 (where plaintiffs "purchased electrolytic **and/or** film capacitors as stand-alone products from one or more distributors that purchased such capacitors as stand-alone products from one or more defendants during the respective class periods" (emphasis added) "and paid supracompetitive prices for them . . . [t]hese allegations are sufficient to establish injury in fact fairly attributable to the defendants for standing purposes."

[33]   Defendants erroneously contend that "no named EPP" Plaintiff has purchased PSPs containing crab, mackerel, oysters, salmon, sardines or shrimp. Standing Motion at 7.  Defendants' misconstrue End Payer Plaintiffs' allegations. The Complaint alleges that each End Payer Plaintiff "purchased PSPs . . . indirectly from one or more Defendants . . . during the Class Period." CAC ¶¶ 4-56.  While the PSPs the Plaintiffs purchased were "*primarily* canned tuna," it is nowhere alleged that these purchases consisted *entirely* of canned tuna.  *Id.* Plaintiffs need only plead that they purchased *one* type of PSP to satisfy Article III standing and represent the putative Class.  *See Precision Assocs. v. Panalpina World Transp., (Holding) Ltd.*, No. 08-cv-42, 2013 U.S. Dist. LEXIS 177023, at *51 (E.D.N.Y. Sept. 20, 2013) ("*Precision Associates*") (plaintiffs satisfied Article III standing where they alleged to have paid "at least one of the conspiratorial surcharges at issue").

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

through the distribution chain to the Defendant that produced it (CAC ¶ 91-92), which helps to establish that changes in prices by direct purchasers are passed on to EPPs.  Defendants all sell PSPs.  They collectively dominate the United States' highly-concentrated PSP industry, and have done so for decades. CAC ¶¶ 93, 94. Finally, Plaintiffs allege that Defendants, in furtherance of the conspiracy, communicated about PSP pricing, coordinated increases to list prices of PSPs, and shared information about and policed discounting from list prices of PSPs.  CAC ¶¶ 98, 107-112.[34]

## B.   EPPs Satisfy State Standing Requirements

Defendants next try again a shopworn and thoroughly rejected tactic, arguing that all or substantially all the state law claims are dismissible under the federal *Associated General Contractors v. Cal. State Council of Carpenters*[35] analysis or something like it.  A multiplicity of courts within this Circuit have upheld state law indirect claims over the exact same argument.[36]   The argument is so weak that, as with the Article III standing argument, it appears Defendants only raise it (Standing Motion at 11) to repackage their attack on the EPPs' alleged product market, which includes all PSPs.  Standing Motion at 14-16.  This, too, should be rejected. *AGC* applies to claims under state rather than federal antitrust law ***only***

---

[34]    Courts have held these types of allegations sufficient to plead injury-in-fact in antitrust cases. *See, e.g., In re Flash Memory*, 643 F. Supp. 2d at 1155; *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1098 (N.D. Cal. 2007) ("*GPU I*"); *Lithium Ion Batteries*, 2014 U.S. Dist. LEXIS 141358, at *99-100; *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 887 (E.D. Mich. 2014); *Precision Associates*, 2013 U.S. Dist. LEXIS 177023, at *42-48.

[35]    459 U.S. 519 (1983) ("*AGC*").  *AGC* imposes an additional standing test beyond Article III standing for claims for damages under the Sherman Act, typically formulated in the Ninth Circuit as follows:  (1) the nature of plaintiffs' injuries and whether plaintiffs were participants in the relevant markets; (2) the directness of the alleged injury; (3) the speculative nature of the alleged harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *See CRT*, 738 F. Supp. 2d at 1023.

[36]    *Gravquick A/S v. Trimble Nav. Int'l Ltd.*, 323 F.3d 1219 (9th Cir. 2003) does not cite or address *AGC*.  *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993 (9th Cir. 2007) also does not cite or address *AGC*.  Neither is an antitrust case.

---

- 32 -

where the State's highest court has or clearly would adopt it, which is not the case for most of the jurisdictions at issue; but here, the Court need not reach each state, because the CAC allegations survive under any test applicable to an indirect purchaser claim.

### 1. EPPs' Allegations Satisfy Any Applicable Test

Even if the Court examined arguendo the *AGC* standard, the allegations of the EPP allegations easily pass muster. The factors are: (1) the nature of plaintiffs' injuries and whether plaintiffs were participants in the relevant markets; (2) the directness of the alleged injury; (3) the speculative nature of the alleged harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 U.S. Dist. LEXIS 141358, at *84-85 (N.D. Cal. Oct. 2, 2014). In *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), the Supreme Court clarified that *AGC* is simply a specialized proximate cause analysis. The facts alleged in the CAC are straightforward, and easily meet it.

EPPs' purchases compare so favorably with those found to meet the standard in the District Courts of this Circuit[37] that the Defendants limit their arguments to the non-tuna portions of the proposed class, and then only address the first through third prongs.

As to factor (1), because it is undisputable that purchasers of canned tuna are participants in the market for canned tuna, and because overcharge from a horizontal cartel presents the simplest possible kind of injury, Defendants do not challenge the bulk of the EPP class in this regard, but attempt to separate out non-tuna PSP purchasers. The CAC defines the Relevant Market (¶¶ 80-84) as all PSPs, not only tuna, and defines them by easily understood, market-relevant,

---

[37] *See, e.g., CRT*, 738 F. Supp. 2d at 1023-4 (purchasers of monitors and televisions that included CRTs had standing); *TFT-LCD*, 586 F. Supp. 2d at 1123-4 (purchasers of monitors and televisions that included LCDs had standing).

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

1    objective criteria (such as shelf-stability such that they may be brought to market

2    without a cold-chain).  Several industry organizations, including one though which

3    collusive activity is expressly pleaded (¶¶ 113-119), were seafood-specific and not

4    tuna-specific (International Sustainable Seafood Foundation, not "Tuna

5    Foundation" and National Fisheries Institute, not "Tuna Institute," *see* ¶¶ 100-101).

6    This argument merely recasts the question of the market, made in Defendants'

7    *Twombly* Brief at 22:15-23:9, and addressed *supra* at 24-26, and is not ripe for

8    determination at this time.  *See Sidibe v. Sutter Health*, No. 14-16234, 2016 U.S.

9    App. LEXIS 13032, at *4 (9th Cir. 2016) ("[T]he validity of the 'relevant market'

10   is typically a factual element rather than a legal element," . . . [and is] more

11   appropriately addressed at summary judgment or trial" (citing *Newcal Indus., Inc.

12   v. IKON Office Solution*, 513 F.3d 1038, 1044-45 (9th Cir. 2008).  Defendants'

13   only factual basis to interpose the distinction is a reference to the CFPs' complaint,

14   for which the EPPs cannot be faulted.

15        As to factors (2) and (3), Defendants again challenge only the non-tuna

16   portions of the EPP class.  The CAC expressly pleads that the pricing data that

17   displays the effects of the cartel show an impact visible in the PSP market as a

18   whole, and not just on tuna.  CAC ¶ 135.  Where, as here, the evidence facially

19   supports the entire relevant market as defined, the Court should not at the pleading

20   stage pick and choose between the scope of the PSP market as Plaintiffs allege it,

21   and the tuna-only market Defendants prefer to be responsible for.

22        *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 403-5 (S.D.N.Y.

23   2011), on which Defendants place far too much reliance, is a District Court opinion

24   from outside the Ninth Circuit that has never been cited in any decision within this

25   Circuit.  There, the complaint itself alleged a conspiracy that encompassed only

26   one product, internet music with different classes for purchasers of internet music,

27   and for music on CDs; the class purchasing the latter was alleged to have been

28   injured by the knock-on effects of the price fixing of internet music; *i.e.* that in the

absence of the inflated prices of internet music due to the cartel's actions, prices for CDs would have been lower. *Id.* at 397.  *See id.* at 401 ("the allegedly unlawful conduct has only to do with Internet Music . . . ").  Here, the CAC admits no such complexity.  EPPs allege that the cartel agreed to fix the prices of Packaged Seafood, all of it (CAC ¶¶ 2-3), not some portion thereof.  The whole proposed EPP class suffered from injury from the purchase of products within the scope of the price fixing conspiracy alleged in the CAC. [38]

### 2. Defendants' *AGC* Arguments Have Been Resoundingly Rejected

Courts in this Circuit and beyond have been asked repeatedly apply *AGC* or something like it to indirect claims, and dismiss all the state law claims on standing grounds.  Overwhelmingly, these arguments have been rejected.  *See Lithium Ion Batteries,* 2014 U.S. Dist. LEXIS 141358 at *52 (denying entirely motions to dismiss state law claims on *AGC* grounds)[39]  Against the tide of cases rejecting the argument that *AGC* operates to bar all or most indirect claims, Defendants' only in-Circuit counterweight is *In re Dynamic Random Access Memory Antitrust Litig.,* 546 F.3d 981 (9th Cir. 2008) ("*DRAM*").  However, the reasoning of that case has been, if not entirely rejected, closely limited to the concerns raised by litigation over a component within a larger complex product, *see Lithium Ion Batteries*, 2014 U.S. Dist. LEXIS 141358, at *93 (discussing *DRAM*), *see also TFT-LCD.*, 586 F. Supp. 2d at 1120-21 (similarly distinguishing *DRAM*).  Here, where the product

---

[38]    *See Precision Associates*, 2013 U.S. Dist. LEXIS 177023, at *55, distinguishing *Digital Music* on the same basis.

[39]    *See TFT-LCD*, 586 F. Supp. 2d at 1123 (state claims satisfied *AGC*, even though blanket application of *AGC* was inappropriate); *CRT*, 738 F. Supp. 2d at 1023 (denying motions to dismiss on *AGC* grounds, because *AGC* applied only to three jurisdictions, and the pleadings fully met the *AGC* standard); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007) ("*GPU II*") (denying blanket motion to dismiss state indirect claims on *AGC* grounds); *Flash Memory*, 643 F. Supp. 2d at 1156 (denying all motions to dismiss all *AGC* challenges fourteen because *AGC* did not apply and three because the pleading met the *AGC* standard).

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

1    purchased by the EPPs is the entire product produced and sealed in the can by

2    Defendants, no such concern is at play.

3        Defendants sweep nearly all states in with a single broom. Standing Motion

4    at 11:4-6. This is deficient. *See*, *generally*, the in-depth discussion of defendants'

5    identical approach, in *Lithium Ion Batteries*, 2014 U.S. Dist. LEXIS 141358, at

6    *68-75.[40]  The application of state law by federal court is a matter of the *Erie*

7    Doctrine. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 71 (1938). The federal court may

8    only apply a federal doctrine (such as *AGC*) when that state itself does so, either

9    because its highest court has so directed, or where it may infer that the highest

10   court would do so from the clear evidence. *See, e.g., In re Carrier IQ, Inc.*

11   *Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1090 n.7 (N.D. Cal. 2015). "[I]t is

12   inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the repealer

13   states' laws in the absence of a clear directive from those states' legislatures or

14   highest courts." *TFT-LCD*, 586 F. Supp. 2d at 1123 (citing *GPU II*, 527 F. Supp.

15   2d at 1097). *See also In re Optical Disc Drive Antitrust Litig.*, Case No. 3:10-md-

16   2143 RS, 2011 U.S. Dist. LEXIS 101763, at *44-46 (N.D. Cal. Aug. 3, 2011)

17   (same). Therefore, each state law must be examined to determine if there is a clear

18   legislative or legal directive to apply *AGC* and, if so, what modification was made.

19       First, Defendants admit that for all but nine states, their argument lacks the

20   support of the state's highest court. Standing Motion at 11. In determining the

21   relevant standing inquiry, the Court should "not treat the decisions of a state's

22   lower courts as definitive pronouncements of that state's law simply by virtue of

23   the fact that they emanated from within the borders of that state." *Lithium Ion*

24   *Batteries*, 2014 U.S. Dist. LEXIS 141358, at *72. For example, Defendants

25   incorrectly assert that California is one of the two states wherein intermediate

26

27   ───────────────

     [40]   Similar discussion is contained in each of the Northern District of California
28   cases cited above in n.39.

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

appellate courts counsel the adoption of *AGC* as a standing test.  Standing Motion at 11 n.9.  To the contrary, in *Aryeh v. Canon Bus. Solutions Inc.*, 55 Cal. 4th 1185, 1195 (2013), the California Supreme Court held that "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act . . . ."  While the issue in *Aryeh* was a different doctrine, the California Supreme Court clearly rejects the grafting of federal antitrust doctrines onto Cartwright Act jurisprudence, and older, lower court decisions to the contrary are no longer persuasive as a guide to the California Supreme Court's stance.  *See Lithium Ion*, 2014 U.S. Dist. LEXIS 141358, at *81-82, for discussion of *Aryeh*, rejecting *AGC* for the Cartwright Act.[41]  *Compare Lithium Ion,* 2014 U.S. Dist. LEXIS 141358, at *74-75 n.11, noting the defendants' overstatement of their state law authority.  *See also GPU I*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) (favorable citations to *AGC* do not mandate that the *AGC* test applies).

Next, as to states where even appellate decisions provide no support, Defendants reach even farther for authority, to harmonized interpretation between the states' and federal antitrust laws that are not specific to standing, or even to the general similarity of the state and federal antitrust statutes.  As shown in Plaintiffs' Appendix, these arguments are similarly unavailing.  *Lithium Ion*, 2014 U.S. Dist. LEXIS 141358, at *78-79, citing *GPU I*, 540 F. Supp. 2d at 1097.[42]

Finally, as to the nine states where defendants point to distinguishable cases from the State's highest court, they are misled or misleading.  The Court in *Lithium Ion* surveyed the same arguments and largely the same state law, and concluded that only three states (New Mexico, Nevada and Nebraska) applied *AGC* "without

---

[41]   "*Aryeh* casts a significant shade over the reasoning of *Vinci*", *Lithium Ion*, 2014 U.S. Dist. LEXIS 141358, at *82, but Defendants here (Appendix B to Standing Motion at 7) rely on *Vinci* undaunted, and without discussion of *Aryeh*, or the *Lithium Ion* court's treatment.

[42]   As Defendants have used an appendix to compile authority state by state, EPPs follow suit, including Defendants' argument for the Court's convenience.

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

1   significant modification)" 2014 U.S. Dist. LEXIS 141358, at *83.   As noted in the

2   attached chart, only 5 states out of 24 in this case apply *AGC* as Defendants argue.

3   Most significantly, even there, EPPs' allegations fully satisfy *AGC*.

4   **V.   EPPS' CLAIMS ARE NOT TIME-BARRED**

5        In examining Defendants' arguments, the Court must accept the well-

6   pleaded factual allegations as true and draw all reasonable inferences in EPPs'

7   favor.  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969

8   (9th Cir. 2010) (en banc):   The Court should not dismiss the CAC's claims as

9   untimely "unless it appears beyond doubt that the plaintiff can prove no set of facts

10  that would establish the timeliness of the claim." *Von Saher*, 592 F.3d at 969.

11       **A.   The Statutes of Limitation Do Not Limit EPPs' Recoverable**
         **Damages**

12       **1.   The Statutes of Limitation Were Tolled under the**
13           **Doctrine of Fraudulent Concealment**

14       The fraudulent concealment doctrine stems from the fundamental principle

15  that wrongdoers should not benefit from their wrongdoing.  *See Goggin v. Goggin*,

16  299 P.3d 1079, 1097 (Utah 2013); *Zumpano v. Quinn*, 849 N.E. 2d 926, 929

17  N.Y.3d 666, 674 (N.Y. 2006).  The doctrine operates to prevent a defendant from

18  "concealing a [wrong] . . . until such a time as the party committing the [wrong]

19  could plead the statute of limitations to protect it."  *Animation Workers*, 123 F.

20  Supp. 3d at 1194. Thus, "[a] statute of limitations may be tolled if the defendant

21  fraudulently concealed the existence of a cause of action in such a way that the

22  plaintiff, acting as a reasonable person, did not know of its existence." *Id.*

23       To establish fraudulent concealment, which as Defendants acknowledge is

24  largely the same under state and federal law,[43] a plaintiff must allege that: (1)

25  Defendants took affirmative steps to "keep the plaintiff unaware of his cause of

26  action," and (2) the plaintiff neither knew nor should have known of the existence

27

28  _____
    [43]     *See* Statute of Limitations Motion at 16:6-7.

of his cause of action.  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012); *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 502 (9th Cir. 1988); *Animation Workers*, 123 F. Supp. 3d at 1194, 1204.  Reliance is not an element of fraudulent concealment under federal law,[44] nor of the laws of most state jurisdictions.[45]

Since Rule 9(b) applies to the doctrine of fraudulent concealment, EPPs need to identify "the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations."  *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1232 (C.D. Cal. 2011) (citation omitted).  "[S]tatements of the time, place and nature of the alleged fraudulent activities are sufficient."  *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir.

---

[44]     *See In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1164-65 (D. Kan. 2012) ("the elements of [fraudulent concealment] do not include reliance; rather, plaintiffs must show that they did not know or by the exercise of due diligence could not have known that they might have had a cause of action.").  In some cases, a showing of reliance has been required where a plaintiff was suspicious of wrongdoing but did not investigate because the defendant denied any wrongdoing. In such cases the Ninth Circuit has held that where a plaintiff was suspicious of wrongdoing but did not investigate because the defendant denied any wrongdoing, plaintiff must show that it relied on defendant's statement and that its reliance was reasonable (*i.e.*, a reasonable person in plaintiff's shoes would not have investigated further and discovered the cause of action). *See Clark v. Fresno Cnty.*, Nos. 87-1812, 87-2025, 1988 U.S. App. LEXIS 22531, at *7 (9th Cir. May 26, 1988) ("Clark's purported 15-year reliance on the defendants' assurances that their activities were proper was clearly unreasonable because Clark was suspicious of the legitimacy of the administrative proceedings as early as 1971."); *Conmar*, 858 F.2d at 505 ("An affirmative act of denial, however, is enough if the circumstances make the plaintiff's reliance on the denial reasonable."); *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978) (because plaintiff was already suspicious, his reliance on defendant's denial of price discrimination was not reasonable).  The Ninth Circuit, however, has not required a showing of reliance on affirmative acts other than denials of wrongdoing. *See E.W. French & Sons, Inc. v. Gen. Portland, Inc.*, 885 F.2d 1392, 1399–400 (9th Cir. 1989) (noting that reliance is required with regard to denials of wrong doing, but not requiring reliance on defendant's use of "plain white envelopes" to conceal its wrongful conduct).

[45]     Defendants are correct that Iowa's and Kansas' fraudulent concealment doctrines require proof of reliance.  The same is true in Rhode Island and Wisconsin.  However, the remaining state jurisdictions do not require a showing of reliance. *See* Appendix II: State Fraudulent Concealment Law.  Nevertheless the complaint satisfies those states' laws

---

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

1    1989).[46]   However, "[i]t is generally inappropriate to resolve the fact-intensive

2    allegations of fraudulent concealment at the motion to dismiss stage, particularly

3    when the proof relating to the extent of the fraudulent concealment is alleged to be

4    largely in the hands of the alleged conspirators."   *Capacitors*, 106 F. Supp. 3d at

5    1065; *CRT*, 738 F. Supp. 2d at 1024; *In re Rubber Chemicals Antitrust Litig.*, 504

6    F. Supp. 2d 777, 789 (N.D. Cal. 2007).

7                          a.    **EPPs Sufficiently Allege that Defendants Took**
                                 **Steps to Conceal Their Conspiracy**

8

9           The CAC fulfills the above stated requirements to establish fraudulent

10   concealment by identifying numerous affirmative steps Defendants took to conceal

11   facts that might otherwise have led plaintiffs to discover Defendants'

12   wrongdoing.[47]   For example, EPPs allege that Defendants gave the following

13   *specific* pretextual explanations for increasing their prices:

14       • "In June, 2011, COSI explained these increases to its customers –
           wholesalers and grocery chains – as arising from persistent global
15          increases in fish prices."

16       • "StarKist, in July 2011, attributed increases to 'continuously rising
           fish costs.'"
17

18

19   _____

20   [46]    While Defendants state that Rule 9(b) requires a plaintiff to detail with
     particularity the role of each defendant in each scheme, *see* Statute of Limitations
     Motion at 8, "[t]here is no flaw in a pleading . . . where . . . collective allegations
21   are used to describe the actions of multiple defendants who are alleged to have
     engaged in precisely the same conduct." *United States v. United Healthcare Ins.*
22   *Co.*, No. 13-56746, 2016 U.S. App. LEXIS 14687, at *45 (9th Cir. Aug. 10, 2016).
     "Under these circumstances, [plaintiff's] allegations, although collective,
23   nonetheless afford each defendant ample notice of its alleged role." *Id.*

     [47]    In a conspiracy case, the acts of fraudulent concealment by one defendant on
24   behalf of the conspiracy are imputed to all the members of the conspiracy and thus
     toll the statute of limitations as to all defendants. *In re Scrap Metal Antitrust Litig.*,
25   527 F.3d 517, 538 (6th Cir. 2008); *In re Mercedes-Benz Anti-trust Litig.*, 157 F.
     Supp. 2d at 375; *United Power Ass'n. Inc. v. L.K. Comstock & Co.*, No. 89-CIV-
26   766, 1992 U.S. Dist. LEXIS 18874, at *20 (D. Minn. Oct. 27, 1992) (where the
     conspiracy contemplates or is furthered through concealment, "the affirmative acts
27   of concealment of one or more of the conspirators may be imputed to their co-
     conspirators for purposes of tolling the statute of limitations.").

28

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

- "In January, 2012, COSI again attributed rising prices to 'high fish prices.'"
- "Bumble Bee's Scott Cameron publicly stated on March 30, 2012 that 'unforecasted elements' would drive price increases for the second half of 2012, and in April, 2013, Bumble Bee projected an increase of $120 to $200 per metric ton of skipjack tuna to explain rising prices."

CAC ¶ 145. Similarly, EPPs allege that in or around August 2008, StarKist falsely and publicly claimed package size reductions resulted from "environmental" concerns (saving water) while the Defendants actually implemented the package size reductions to decrease costs and increase profits. CAC ¶ 103.

EPPs also allege that Defendants "wrongfully concealed and conducted [their conspiracy] in a manner that precluded detection." CAC ¶ 160. For example, EPPs allege that in 2011 and 2012, COSI, Star-Kist and Bumble Bee *covertly* discussed PSP pricing, agreed to coordinate prices, and acted pursuant to those *covert* agreements. CAC ¶ 107-110. Similarly, Defendants privately discussed pricing and agreed to avoid sparking price competition. CAC ¶ 111-12. The CAC also alleges:

- "Defendants and their co-conspirators agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy." CAC ¶ 161.
- "Defendants and their co-conspirators met and communicated secretly concerning the pricing and marketing of PSPs so as to avoid detection." CAC ¶ 162.
- "Defendants' conspiracy was fraudulently concealed by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers, and surreptitious communications among Defendants and their co-conspirators via telephone or in-person meetings." CAC ¶ 163.

These allegations, combined with the CAC's allegations outlining specific misrepresentations designed to mislead the public and prevent investigation into

potential wrongdoing, provide ample bases to apply the fraudulent concealment doctrine to toll the relevant statutes of limitations.  *See Animation Workers*, 123 F. Supp. 3d at 1201 (plaintiffs sufficiently alleged fraudulent concealment where they alleged that defendants gave pretextual explanations and "actively took measures to ensure the secrecy of the conspiracy," such as meeting in-person or over the telephone); *CRT*, 738 F. Supp. 2d at 1024 (allegations that defendants gave pretextual explanations for inflated prices and undertook efforts to ensure secrecy were sufficient to allege fraudulent concealment); *TFT–LCD,* 586 F. Supp. 2d at 1119 (same); *Packaged Ice*, 723 F. Supp. 2d at 1018 (plaintiffs sufficiently alleged fraudulent concealment where they alleged that defendants gave pretextual explanations and defendants' conspiracy "was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection."); *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1236 (D. Kan. 2010) (same).

### 2. EPPs Sufficiently Allege That They Neither Knew Nor Should Have Known about the Conspiracy

To establish fraudulent concealment, EPPs must also allege that they did not and should not have known about Defendants' conspiracy, which they do by alleging that they "did not discover . . . the existence of the conspiracy and Defendants' and their co-conspirators' involvement in the conspiracy before July 23, 2015, when the DOJ's investigation became public."  CAC ¶ 158; *see also* CAC ¶¶ 159, 164.  The relevant question is whether EPPs *should* have discovered the conspiracy earlier, *i.e.* whether a reasonable person in the plaintiffs' shoes would have discovered they had been injured by the conspiracy.  *Animation Workers*, 123 F. Supp. 3d at 1194, 1204.[48]  Here the answer is a resounding "no."

---

[48]    *See, e.g., Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011) (what is misleading to a "reasonable consumer" is an objective standard); *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087,1089-92 (9th Cir. 2010) (standard of what would mislead a reasonable consumer under the consumer protection laws was objective, not particularized to an individual consumer);

1    While Defendants assert that this question requires EPPs to allege that they "acted

2    diligently in trying to uncover the facts giving rise to [their] claim[s]," the law does

3    not put plaintiffs "under a duty continually to scout around to uncover claims

4    which they have no reason to suspect they might have." *Rubber Chemicals*, 504 F.

5    Supp. 2d at 788.  Nor does due diligence demand "unmitigated cynicism on the

6    part of consumers." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MDL-

7    1775, 2010 U.S. Dist. LEXIS 146377, at *165 (E.D.N.Y. Sept. 22, 2010) *report*

8    *and recommendation adopted* No. 06-MDL-1775 (E.D.N.Y. Nov. 01, 2010); *see*

9    *also In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 804 (N.D.

10   Ohio 2011) (the law requires "*reasonable* diligence, not constant cynicism.")

11   (emphasis in original).  Indeed, the two cases Defendants cite for the proposition

12   that due diligence must be plead regardless of context actually state the opposite:

13   that "[t]he requirement of diligence is only meaningful . . . when facts exist that

14   would excite the inquiry of a reasonable person." *Conmar*, 858 F.2d at 504;

15   *Animation Workers*, 123 F. Supp. 3d at 1204.[49]  Put differently, when there are no

16   facts that would excite the inquiry of a reasonable person, any diligence

17   requirement is satisfied, and plaintiffs need not allege what diligence (if any) they

18   exercised in investigating their claims.

19        Here, there is no reason to believe a reasonable consumer, shopping at a

20   local food market for dinner for his or her family, would suspect a conspiracy to

21   fix PSP prices before July 23, 2015.  *See* CAC ¶¶ 158, 164-65.  As EPPs allege,

22   Defendants conducted their conspiracy in secret and issued misleading statements

23   regarding the reasons for price increases and changes in package size which

24

25   *Rivera v. Grossinger Autoplex*, 274 F.3d 1118, 1121-22 (7th Cir. 2001)
     (sufficiency of disclosures examined on an objective test, what a reasonable

26   consumer would understand).  *See also* Appendix II: State Fraudulent Concealment
     Law.

27   [49]   *See* Statute of Limitations Motion at 18:13-25 (citing *Conmar* and *Animation*

28   *Workers*).

effectively covered-up Defendants' conspiracy until July 23, 2015 and prevented them from uncovering facts that would excite the inquiry of a reasonable person. *See, e.g.*, CAC ¶¶ 107-112, 145-54, 157-58, 160-163.  Though they try, Defendants can make no credible argument to the contrary.  For purposes of motions to dismiss, courts have found allegations such as these more than sufficient to show that plaintiffs were not on inquiry notice and thus should not have discovered the conspiracy earlier.  *See Animation Workers*, 123 F. Supp. 3d at 1204 (finding allegations nearly identical to those here to be sufficient); *TFT-LCD*, 586 F. Supp. 2d at 1119 (same); *Rubber Chemicals*, 504 F. Supp. 2d at 788 (same).

Nevertheless, without any factual basis, Defendants make the sweeping argument that the PSP price increases and can-size reduction should have caused local shoppers to investigate Defendants' conspiracy long ago. *See* Statute of Limitations Motion at 18.  This argument can safely be rejected out of hand.  EPPs are ordinary consumers, buying PSPs from the shelves of retail stores, and in a position to readily observe only the retail prices.  They had no access to the wholesale prices, they had no ability to determine the components of the price that were set by the Defendants as distinct from the distributors or retailers, and little ability to study the timing of increases.  There simply was not sufficient evidence of misconduct prior to July 23, 2015 to excite a reasonable person in the EPPs' consumer posture to investigate.  Further, courts have found evidence much more inculpatory to be insufficient to place a plaintiff on inquiry notice. *See, e.g*, *In re Bulk Extruded Graphite Products Antitrust Litig.*, No. 02-6030, 2007 U.S. Dist. LEXIS 25070, at *10-15 (D.N.J. Apr. 4, 2007) (government investigations in the graphite industry, combined with knowledge of parallel price increases, insufficient to put plaintiffs on inquiry notice); *In re Monosodium Glutamate Antitrust Litig.*, No. 00-MDL-1328, 2003 U.S. Dist. LEXIS 1969, at *13 (D. Minn. Feb. 6, 2003) ("that the government was investigating alleged conspiracies into

1   some food additives does not, as a matter of law, mean that any purchaser of any

2   food additive is on notice.").[50]

3         The law is clear that knowledge of parallel conduct—such as price and

4   packaging changes—is insufficient to start the limitations period running.[51]  *See*

5   *Air Cargo*, 2010 U.S. Dist. LEXIS 146377, at *164 (knowledge of parallel conduct

6   is not sufficient to put plaintiffs on inquiry notice); *In re Vitamins Antitrust Litig.*,

7   No. MISC 99-197 (TFH), 2000 U.S. Dist. LEXIS 7397, at *33 (D.D.C. May 9,

8   2000) ("Market trends as a matter of law do not constitute notice that particular

9   defendants were engaged in acts of price fixing."); *Precision Associates, Inc. v.*

10  *Panalpina World Transp. (Holding) Ltd.*, No. 08-42, 2011 U.S. Dist. LEXIS

11  51330, at *181 (E.D.N.Y. Jan. 4, 2011), *report and recommendation adopted*, No.

12  08-00042, U.S. Dist. LEXIS 113829 (E.D.N.Y. Aug. 13, 2012) ("parallel conduct

13  by itself does not necessarily give 'rise to the duty to inquire'").  Even if we

14  imagine EPPs as super-consumers with Sherlock Holmesian powers of observation

15  and encyclopedic knowledge of retail prices and the timing of price changes,

16  Defendants fail to point to anything beyond parallel behavior that would put EPPs

17  on inquiry notice.  Indeed, Defendants' pretextual statements and efforts to keep

18  the conspiracy secret prevented even that parallel conduct from appearing

19  suspicious.

20

21  _____

[50]      *See also Carder v. BASF Corp.*, 919 So. 2d 258, 261 (Miss. Ct. App. 2005)

22  (only widespread publication describing Vitamins conspiracy triggered plaintiffs'
    duty to investigate and file its antitrust claim).

[51]      To the extent that Defendants argue that EPPs' awareness of Defendants'

23  retail prices triggered a duty to investigate a potential antitrust conspiracy, the law

24  clearly rejects this argument.  *See Bulk Extruded Graphite Products*, 2007 U.S.
    Dist. LEXIS 25070, at *10 ("Courts have held that knowledge of 'apparent parallel

25  price increases' is not sufficient to demonstrate that plaintiffs should have known
    that they had an antitrust cause of action."); *King & King Enterprises v. Champlin*

26  *Petroleum Co.*, 657 F.2d 1147, 1156 (10th Cir. 1981) ("Mere knowledge that
    [defendant] was raising and lowering prices does not provide knowledge that

27  [defendant] was agreeing with other members of the gasoline industry to fix
    prices.").

28

1       Not only were EPPs not on inquiry notice, but it is equally clear that if EPPs

2   had investigated, they would have uncovered nothing—just as Defendants

3   intended.  Defendants wisely do not argue that "diligent inquiry by the plaintiffs

4   would have actually uncovered any anti-competitive conduct."  *Air Cargo*, 2010

5   U.S. Dist. LEXIS 146377, at *164; *see also In re Nine W. Shoes Antitrust Litig.*, 80

6   F. Supp. 2d 181, 192 (S.D.N.Y. 2000) (plaintiff must show that its ignorance "was

7   not the result of lack of diligence").  When plaintiffs are on inquiry notice, they are

8   charged with constructive knowledge of what they could discover using ordinary

9   diligence.  *Air Cargo*, 2010 U.S. Dist. LEXIS 146377, at *162-64.  Plaintiffs are

10  not charged with constructive notice of undiscoverable facts or facts only

11  discoverable as a result of "unmitigated cynicism."  *Id.*

12      Where, as here, plaintiffs allege that the exercise of due diligence would not

13  have uncovered the defendants' conspiracy, and no reasonable inference can be

14  drawn to the contrary, the diligence prong is satisfied.  As EPPs allege:

15  • "Plaintiffs did not discover, nor could have discovered through the exercise
16     of due diligence, the existence of the conspiracy and Defendants' and their
       co-conspirators' involvement in the conspiracy before July 23, 2015, when
17     the DOJ's investigation became public." CAC ¶ 158.

18  • "Plaintiffs could not have discovered the alleged conspiracy at an earlier
19     date by the exercise of reasonable diligence because of the deceptive
       practices and techniques employed by Defendants and their co-conspirators
20     to avoid the detection of, and fraudulently conceal, their contract,
21     conspiracy, or combination." CAC ¶ 163.

22  • "None of the facts or information available to [them] prior to July 23, 2015,
23     if investigated with reasonable diligence, could or would have led to the
       discovery of the conspiracy prior to July 23, 2015." CAC ¶ 165. [52]

24

25

26  _____

    [52]   Indeed, Defendants argue in their *Twombly* brief that even after the DOJ
27  investigation became public, EPPs still have not uncovered or alleged facts
    sufficient to assert a cause of action.  Thus, there is little reason to believe that
28  EPPs would have discovered a cause of action *prior* to the DOJ investigation
    becoming public.

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

1  Such allegations are more than sufficient to survive a motion to dismiss.  *See, e.g.*,

2  *Air Cargo*, 2010 U.S. Dist. LEXIS 146377, at *19 (finding the "diligence" prong

3  satisfied where plaintiffs could not have discovered the conspiracy through the

4  exercise of due diligence).

### 3.  Twenty-Two State Jurisdictions Employ the Discovery Rule, Preventing the Statutes of Limitations from Running

7  In addition to the doctrine of fraudulent concealment, twenty-two state

8  jurisdictions have adopted what is commonly referred to as the "discovery rule,"[53]

9  under which the statutes of limitation do not begin to run until the plaintiff

10  discovered or with reasonable diligence should have discovered that they have a

11  cause of action.[54]  This rule is functionally identical to the last prong of fraudulent

12  concealment.  *Hexcel Corp.*, 681 F.3d at 1062.  For example, under the discovery

13  rule, whether EPPs should have discovered Defendants' wrongdoing is an

14  objective test that asks whether a "reasonable person of ordinary prudence" "in the

15  same or a similar situation" would have discovered that they had been injured by a

16  conspiracy.  *See, e.g.*, *Rice v. Rabb*, 320 P.3d 554, 557 (Ore. 2014).  Similarly,

17  while some articulations of the discovery rule include a diligence requirement,

18  such a requirement applies only to the extent that facts exist that would cause a

19  reasonable person to inquire.  *See, e.g.*, *Petrus v. New York Life Insurance*

20  *Company*, 2016 U.S. Dist. LEXIS 44873, at *23 (S.D. Cal. March 31, 2016) (if

21  there are "no circumstances that would have aroused Plaintiff's suspicion" the

22  statute does not begin to run); *Martinez v. Showa Denko, K.K.*, 964 P.2d 176, 182

23  (N.M. App. 1998) ("the tolling of the applicable statute of limitation by the rule

24  ends when the person claiming the benefit of the rule acquires knowledge of facts,

25  conditions, or circumstances which would cause a reasonable person to make an

---

[53]   *See* Appendix III: State & Territory Discovery Rules.

[54]   *See* Appendix III: State & Territory Discovery Rules.

inquiry leading to the discovery of the concealed cause of action."). Ultimately, the material differences between the two doctrines are: (1) the discovery rule applies regardless of whether the defendant took steps to conceal the existence of the conspiracy;[55] and (2) because allegations concerning the discovery rule do not sound in fraud, they are subject to the normal notice pleading rules of Rule 8(a) rather than the heightened pleading rules of Rule 9(b).[56]

For the reasons explained above in relation to fraudulent concealment, EPPs have adequately pled that they neither knew nor could have known about the conspiracy prior to the DOJ investigation becoming public on July 23, 2015. Consequently, the statutes of limitations for claims in state jurisdictions with the discovery rule did not begin to run until July 23, 2015, and the EPPs' claims are therefore timely.[57]

---

[55]   *See* Appendix III: State & Territory Discovery Rules; *see generally Goodhand v. U.S.*, 40 F.3d 209, 212 (7th Cir. 1994) (The discovery of the injury and its cause start the statute of limitations running because "[u]ntil the plaintiff knows that he has been injured and by whom or by what, he has no reason to take steps to determine whether he might have a legal claim. This is obvious if he doesn't even know that he has been injured . . . . Even if he knows that he has been injured, if he does not know who or what inflicted the injury, he again has no reason to suppose that he might have a legal claim against someone.").

[56]   In some jurisdictions, the level of notice required to start the statute of limitations running is different under the discovery rule than it is under fraudulent concealment. *See, e.g.*, *Diamond v. Davis*, 680 A.2d 364, 376 (D.C. App. 1996) ("heightened notice" required under fraudulent concealment, where as "inquiry notice" is required under the discovery rule). However, these jurisdictions have raised the level of notice required to begin the clock when there is fraudulent concealment, not lowered the level of notice required under the discovery rule. *Id.*

[57]   The doctrine of laches applies to the West Virginia and Wisconsin unjust enrichment claims. *See CUMIS Ins. Soc., Inc. v. Raines*, No. 3:12-6277, 2013 U.S. Dist. LEXIS 21587, at *8 (S.D. W. Va. Feb. 11, 2013) (because unjust enrichment is an equitable claim, the laches doctrine rather than a statute of limitations governs whether such claims are timely); *Absure, Inc. v. Huffman*, 584 S.E.2d 507, 511 (W.Va. 2003) ("The unjust enrichment claim, as previously stated, was equitable in nature, and thus principles of laches rather than the Statute of Limitations govern the bringing of it"); *Buckett v. Jante*, 2009AP2709-FT, 2010 Wisc. App. LEXIS 341, at *8-9, 2010 WI App 84 ¶ 12 (Wis. App. May 5, 2010) (same). Laches is an affirmative defense. *See Corbin v. Time Warner Entertainment-Advance/Newhouse Partnership*, 821 F.3d 1069, 1079-80 (9th Cir. 2016). Wisconsin's laches defense requires that defendants prove: (1) an unreasonable delay in filing the case; (2) plaintiffs' knowledge of the course of events and acquiescence therein; and (3) prejudice to the Defendants from the delay. *See*

---

- 48 -

1

### B.   EPPs Can Recover for Injuries Sustained within the Limitations Period, Regardless of When Certain Overt Acts In Support of the Conspiracy Occurred

2

3     Defendants make the novel argument that unless the discovery rule and

4     fraudulent concealment doctrine extend their liability, any claims based on

5     conspiratorial conduct that occurred outside the limitations period are facially

6     time-barred.   Statute of Limitations Motion at 5.   But Plaintiffs have alleged a

7     continuing conspiracy.   And as Defendants well know, "[t]he rule is different for a

8     continuing conspiracy," where "'the violator's actions consist not only of some

9     definitive act in violation of the antitrust laws, but also of a series of subsequent

10    acts that cause further injury to the plaintiff.'" *Air Cargo*, 2010 U.S. Dist. LEXIS

11    146377, at *146-47 (quoting 2 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶

12    320(c), p. 285 (3d ed. 2007).

13    Here, EPPs allege that from as early as August 2008 until at least July 23,

14    2015, Defendants engaged in a continuing conspiracy to fix the price of PSPs at

15    artificially inflated levels.   *See, e.g.*, CAC ¶¶ 1, 98, 168.   EPPs further allege that

16    "[t]he impacts of Defendants' unlawful and anticompetitive conduct [*i.e.*, sales at

17    artificially inflated levels] are ongoing and continue to this day."   CAC ¶ 3; *see*

18    *e.g.*, CAC ¶¶ 66, 186.   In a continuing conspiracy to fix prices as alleged here,

19    "'each overt act that is part of the violation and that injures the plaintiff,' *e.g.*, each

20    sale to the plaintiff, 'starts the statutory period running again,'" *Klehr v. A.O. Smith*

21    *Corp.*, 521 U.S. 179, 189 (1997); *see also Oliver v. SD-3C LLC*, 751 F.3d 1081,

22    1086 (9th Cir. 2014); *Air Cargo*, 2010 U.S. Dist. LEXIS 146377, at *146.   This is

23    because "the 'taint of an impure origin does not dissipate after four years if a

24

---

25    *Gorski v. Gorski*, 262 N.W.2d 120, 126 (Wis. 1978).   West Virginia law requires that defendants prove "(1) unreasonable delay and (2) prejudice" to establish a

26    laches defense.   *Province v. Province*, 473 S.E.2d 894, 904 (W.Va. 1996).   Here, it cannot reasonably be argued that EPPs unreasonably delayed in bringing the

27    action, that EPPs' knew and acquiesced to Defendants' conduct, or that Defendants would somehow be prejudiced.   Thus, EPPs' unjust enrichment claims in West

28    Virginia and Wisconsin are timely.

---

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC

[conspirator] continues to extract excessive prices because of [the original conspiratorial conduct].'" *Air Cargo*, 2010 U.S. Dist. LEXIS 146377, at *148 (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979)).

Where defendants continued to sell at artificially inflated prices in accordance with the conspiracy and plaintiffs suffered injury within the limitations period, plaintiffs' claims will not be barred regardless of when the conspiratorial conduct commenced. *See id.* at *15 ("That all of the particular allegations against the [defendants] occurred prior to the limitations period is a point that has some superficial appeal and perhaps may have an impact on the recoverable damages, but it offers little reason to find that the claim against them is barred by the statute of limitations."). Thus, even in the absence of tolling, EPPs can recover damages for injuries stemming from purchases within the limitations period.

## VI.   EPPS HAVE PROPERLY ALLEGED STATE LAW CLAIMS FOR CALIFORNIA AND OTHER STATES

### A.   EPPs' Nationwide Class Claims Are Properly Brought Under California Law

Defendants incorrectly assert that EPPs' national class cannot "satisfy California's choice of law analysis" (State Law Motion at 18), yet it is Defendants who fail to meet their burden.  First and foremost, such a decision is premature as courts routinely defer such decisions until after plaintiffs have had an adequate opportunity to develop the factual record.  *See Clancy v. The Bromley Tea Co*., 308 F.R.D. 564, 572 (N.D. Cal. 2013) (denying motion to strike nationwide class allegation because "such a fact-heavy inquiry should occur during the class certification stage, after discovery."); *Czuchaj v. Conair Corp*., No. 13-CV-1901-BEN RBB, 2014 U.S. Dist. LEXIS 54413, at *6 (S.D. Cal. Apr. 17, 2014) (same); *Valencia v. Volkswagen Grp. of Am. Inc.*, No. 15-CV-00887-HSG, 2015 U.S. Dist. LEXIS 105545, at *5 n.2 (N.D. Cal. Aug. 11, 2015) ("It would be improper to allow Defendants to slip through the backdoor what is essentially an opposition to

1    a motion for class certification before Plaintiffs have made such a motion and

2    when discovery on the issue is still on-going."); *Agron, Inc. v. Lin*, No. 03-05872

3    (MMM) (JWJX), 2004 U.S. Dist. LEXIS 26605, at *18 (C.D. Cal. Mar. 16, 2004)

4    (finding that "in antitrust cases, where the proof is largely in the hands of the

5    alleged conspirators, dismissals prior to giving the plaintiffs ample opportunity for

6    discovery should be granted very sparingly.") (quoting *Hospital Building Co. v.

7    Trustees of Rex Hospital*, 425 U.S. 738, 746 (1976)).

8         Second, Defendants conveniently ignore that California was the center of

9    gravity for the U.S. portion of the conspiracy here, as further indicated by the

10   grand jury impaneled in San Francisco.  *See* US DOJ motion to intervene, ECF No.

11   34-1, at 1.  Given that the wrongdoing has substantial contact with California by

12   virtue of the conspiracy allegedly coming to the U.S. via California, the law is

13   clear that California law may be applied across the board, and Defendants shoulder

14   the burden of demonstrating that non-California law should apply to class claims.

15   *See Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 545 (C.D. Cal. 2012) ("*Bruno*")

16   ("California's choice-of-law analysis, also referred to as the 'governmental interest

17   test,' places the burden on the *defendant* to show that another state's law, rather

18   than California law, should apply to class claims.") (citing *Washington Mutual

19   Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 921 (2001)).[58]

20        Whether now or later, Defendants fail to carry their burden of

21   demonstrating: (1) that the relevant law of the potentially affected foreign

22   jurisdictions materially differs from the law of California; (2) that the foreign

23   jurisdictions have an interest in the application of their own law to the particular

24

---

25   [58]    *See also Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107–08
      (2006) (requiring an analysis of various states' laws "under the circumstances of
26   the particular case" given "the particular [legal] issue in question."); *Forcellati v.
      Hyland's*, Inc., No. CV 12-1983-GHK MRWX, 2014 U.S. Dist. LEXIS 50600, at
27   *5 (C.D. Cal. Apr. 9, 2014) ("*Forcellati I*") (emphasizing that such a showing
      requires "engaging in an analytically rigorous discussion of each prong")
28

circumstances of the case such that a "true conflict" exists; and finally (3) that the foreign jurisdictions' interests would be more impaired by not having their law applied than would be California's interest in not having its law applied. *Forcellati I*, 2014 U.S. Dist. LEXIS 50600, at *2.[59]

### 1. Defendants Fail To Demonstrate the Requisite Material Differences

Defendants do not provide the necessary "rigorous" case-specific analysis of their claimed material differences between the laws of California and other jurisdictions. Instead, they submit the type of list or appendix of conclusory assertions, primarily either misunderstandings or inconsequential procedural issues that they claim "are material because they 'will spell the difference between the success and failure of a claim'" (State Law Motion, at 20:26-27), frequently found insufficient. *See Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 341 (N.D. Cal. 2010) (defendants had not met their burden where they "attach[ed] an appendix which catalogue[d] state-by-state variations"); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (C.D. Cal. 2008) (finding no conflict with regard to plaintiffs' California claims despite defendant's appendix cataloging state-by-state variations in "elements necessary to plaintiffs' claims").[60] "Merely citing other courts' choice-of-law analysis, based on the facts before those courts, fails to discharge Defendants' burden of showing a 'compelling reason' justifying the displacement of California law on Plaintiff[s'] claims." *Forcellati I*, 2014 U.S. Dist. LEXIS 50600, at *5-6. *See also Pecover v. Elec. Arts Inc.,* No. 08-282, 2010

---

[59]     California law applies to the choice-of-law analysis. *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 546 (2012) ("The burden in determining choice-of-law is substantive state law.") (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

[60]     Defendants broadly assert that "at least 26 states prohibit indirect purchaser damages claims." State Law Motion, at 19:22. This broad-brush approach is deficient. Defendants do not show that any, let alone each, non-repealer sate presents a true conflict.

1   U.S. Dist. LEXIS 140632, at *47-48 (N.D. Cal. Dec. 21, 2010).[61]   Beyond their

2   sweeping assertions, Defendants' arguments fail as they do nothing more than

3   avoid the real question of whether the policies supporting Plaintiffs' various state

4   claims collide (they do not) and whose impairment is greatest (California).   As

5   such, Defendants fail to satisfy the first prong, and the choice-of-law inquiry

6   should end here because their "fact-specific materiality analysis ranges from sparse

7   to nonexistent." *Forcellati I*, 2014 U.S. Dist. LEXIS 50600, at *6.

8   ### 2.      No True Conflict Exists

9        Defendants also fail to show that a true conflict exists under the second

10  prong.   For example, with respect to any jurisdictions that may not allow indirect

11  purchaser claims, there is no interest that ***conflicts*** with the ability of the residents

12  of these jurisdictions to invoke the Cartwright Act or UCL against Defendants.

13  Defendants do not contend that these unidentified jurisdictions do not proscribe

14  anticompetitive activity or price-fixing conspiracies, or that these jurisdictions

15  have a policy of ***precluding*** compensation for victims of such conduct under

16  another state's law and in a different court system.   A jurisdiction's mere omission

17  of a particular form of recovery under its own antitrust or consumer protection

18  laws is not indicative of an intent to deny its residents recovery under other

19  jurisdictions' laws for injuries caused by out-of-state defendants committing

20

21

22  [61]      As such, Defendants citation to *dicta* such as *Sun Dun, Inc. of Wash. v.*

23  *Coca-Cola Co.*, 740 F. Supp. 381, 397 (D. Md. 1990) to assert that the District of
    Columbia antitrust law only applies to intrastate conduct, is not persuasive in the
    face of the numerous other cases upholding similar claims under D.C. law.   *See,*

24  *e.g.*, *In re Auto Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 990 (E.D. Mich. 2014)
    ("*Auto Parts II*") (denying motion to dismiss and finding application of D.C. law to

25  the claims of D.C. residents is fair); *Digital Music*, 812 F. Supp. 2d at 408
    (denying motion to dismiss and noting that "states may not regulate wholly

26  interstate activity, but they are not limited to regulating wholly intrastate activity");
    *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503-

27  DJC, 2015 U.S. Dist. LEXIS 125999, at *63 (D. Mass. Aug. 16, 2015) (denying
    motion to dismiss D.C. antitrust claims because allegations of nationwide conduct

28  that "had substantial intrastate effects" were sufficient).

1   intentional torts out-of-state.[62]  The forum wishes to protect in-state defendants, not

2   to thwart in-state plaintiffs.  Indeed, the California Supreme Court has held that a

3   jurisdiction's "interest in limiting the amount of recovery . . . is directed at resident

4   defendants, not resident plaintiffs."  *Hurtado v. Super. Ct.*, 11 Cal. 3d 574, 586

5   (1974).   Defendants cite no authority that states otherwise, and Defendants'

6   reliance on the general proposition that states have an interest in regulating

7   misconduct within their borders (State Law Motion at 21), is unavailing because

8   "California law requires a case-specific analysis to demonstrate a true conflict."

9   *Forcellati I*, 2014 U.S. Dist. LEXIS 50600, at *7 (rejecting similar argument). [63]

10   Conversely, courts have repeatedly recognized California's express interest

11   in entertaining claims by nonresident plaintiffs against resident defendants, as most

12   recently upheld by the California Supreme Court in *Bristol-Myers Squibb*, 2016

13   Cal. LEXIS 7124, at *42 (finding that defendant's extensive contacts with

14   California permitted the exercise of specific jurisdiction over claims of

15   nonresidents as well, noting "our courts have frequently handled nationwide class

16   actions involving numerous nonresident plaintiffs.").  *See also Pecover*, 2010 U.S.

17   Dist. LEXIS 1406327, at *55-56 (collecting cases).  Thus, that certain EPPs reside

18   in jurisdictions that do not provide monetary recovery for indirect purchasers is not

19   a true conflict, particularly since two of the Defendants are residents of California

20

21   _____
     [62]    *Cf. California v. ARC America Corp.*, 490 U.S. 93, 103 (1989) state laws
22   may allow indirect purchaser claims:  "It is one thing to consider the congressional
     policies identified in *Illinois Brick* and *Hanover Shoe* in defining what sort of
23   recovery federal antitrust law authorizes; it is something altogether different, and
     in our view inappropriate, to consider them as defining what federal law allows
     States to do under their own antitrust law.").

24   [63]    None of Defendants' cited cases address whether a true conflict exists based
     on any of the purported differences raised here.  *See Mazza v. Am. Honda Motor*
25   *Co.*, 666 F.3d 581, 591-92 (9th Cir. 2012); *In re WellPoint, Inc. Out-of-Network*
     *UCR Rates Litig.*, 903 F. Supp. 2d 880, 908 n.4 (C.D. Cal. 2012); and *In re*
26   *Charles Schwab Corp. Sec. Litig.*, 264 F.R.D. 531, 538 (N.D. Cal. 2009).   The
     mere fact that a court found a conflict between California law and the law of
27   another jurisdiction is not dispositive as to whether a true conflict exists here.  *See*
     *Bruno*, 280 F.R.D. at 547; *Forcellati I*, 2014 U.S. Dist. LEXIS 50600, at *5.

28

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

and a large portion of the misconduct likely occurred in California.  CAC ¶¶ 57, 59.  *See Bristol-Myers Squibb*, 2016 Cal. LEXIS 7124, at *49 (upholding nonresident plaintiffs' claims due to "identifiable interests our state holds in providing a forum for both the resident and nonresident plaintiffs.").

### 3.    Not Applying California Law Would More Greatly Impair California's Interest

Finally, Defendants fail to satisfy the third prong of the analysis: California's interests *are* more impaired if its law is not applied.  "[T]he California Supreme Court requires that defendants analyze various states' laws under the circumstances of the particular case and given the particular [legal] issue in question" before they can "deprive consumers in several states who were exposed to misrepresentations of the most efficient vehicle for adjudication of their injury: a nationwide class action."  *Bruno*, 280 F.R.D. at 550 (citation and quotations omitted).  Defendants have failed to show that any other jurisdiction has an interest in denying its residents recovery under California law for injuries caused by California defendants based on acts that emanated from or were conducted in California that outweighs California's significant interest in enforcing its laws against wrongful conduct which occurs in-state. *See Pecover*, 2010 U.S. Dist. LEXIS 140632, at *57.   In class actions, courts applying California law have repetitively recognized that other jurisdictions' interest in having their own laws applied is outweighed by their interest in allowing their residents protection against illegal activities that have harmed them.  *See, e.g.*, *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 241-44 (2001) ("California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery"); *In re Seagate Techs. Sec. Litig.*, 115 F.R.D. 264, 269-70 (N.D. Cal. 1987) ("foreign state's interest in having the action proceed as a class action in California is greater than the foreign state's interest in not allowing the suit to proceed at all"); *see also, e.g.*, *Pecover*,

2010 U.S. Dist. LEXIS 140632, at \*60 ("Applying the laws of foreign states will not vindicate California's legitimate interests in deterring harmful conduct within its borders, whereas applying California law to nonresident plaintiffs will vindicate foreign states' interests in compensating their residents."); *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 20-21 (N.D. Cal. 1986) (same).

Defendants' bald assertion that "26 states prohibit indirect purchaser damages claims," State Law Motion at 19-20, covers a total failure to examine the public policy of non-*Illinois Brick* repealer states.  This is fatally insufficient.

### B.     Plaintiffs' State Antitrust Law Claims Should Be Upheld

#### 1.     Missouri Explicitly Recognizes a Private Right of Action

Defendants' contention that the Missouri Merchandising Practices Act ("MMPA", codified at Mo. Rev. Stat. § 407.010 *et seq.*) tacitly incorporates *Illinois Brick* fails because it entirely ignores a controlling decision by the state's highest court rejecting their narrow reading of the MMPA, and also an opinion by the Missouri Attorney General's Office.  *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007) ("*Gibbons*") held that the MMPA did not require privity between indirect purchasers and a defendant who sold the product upstream, and that indirect purchasers may sue a seller: "[Defendant] undertakes an exercise in strained statutory construction . . . . This Court declines to impose such a significant limitation on Missouri consumers."  *Id.* at 670.  This has led to a broad shift in recognition by courts nationwide that indirect purchaser classes may be maintained on behalf of Missouri indirect purchasers.  *See, e.g., Lithium Ion Batteries*, 2014 U.S. Dist. LEXIS 141358 at \*113-114 ("The post-*Gibbons* cases cited to the Court have been uniform in reaching the same conclusion that indirect-purchaser status alone does not bar Missouri consumers from bringing claims under the MMPA."); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 570 (E.D. La. 2013); *In re Cathode Ray Tube (CRT) Antitrust Litigation*,

No. 3:07-cv-5944-JST, ECF No. 4463 at 2, *Statement of Interest of the Commonwealth of Massachusetts and the State of Missouri* (Mar. 8, 2016) ( "our States may be considered 'repealer states' for the purpose of this settlement"); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,* 737 F. Supp. 2d 380, 415 (E.D. Pa. 2010) ("*Sheet Metal Workers*"). Defendants largely rely on case law that predates *Gibbons*, which is clearly controlling precedent under the *Erie* Doctrine. State Law Motion, at 4:8-18.

### 2.   EPPs Have Private Right of Action in Illinois and Arkansas

Defendants contend that state class action antitrust claims for indirect purchasers in both Arkansas and Illinois are the sole purview of the state attorney general. State Law Motion at 3:3-5, 17-19. This is only true in state court. The Supreme Court has specifically held that federal courts sitting in diversity are not governed by state laws limiting class actions when such laws attempt to control procedural, rather than substantive matters. *Shady Grove Orthopedics Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399 (2010) ("There is no reason, in any event, to read Rule 23 as addressing only whether claims made eligible for class treatment by some other law should be certified as class actions.") (emphasis omitted). In the wake of this ruling, federal courts in California and in other jurisdictions have found that state laws limiting the class action device to *parens patriae* claims brought by the attorney general are procedural, not substantive. *See Lithium Ion Batteries*, 2014 U.S. Dist. LEXIS 141358 at *119 ("Illinois and South Carolina . . . antitrust laws merely forbid procedural aggregation of individual claims; they do not change how a court decides whether such claims prevail or, importantly, the nature of any one individual's right to relief."); *In re Aggrenox Antitrust Litig.*, No. 3:14-md-2516 (SRU), 2016 U.S. Dist. LEXIS 104647, at *28-29 (D. Conn., Aug. 9, 2016) ("if New York's state-law bar is not a procedural rule

1    that alters the scope of a substantive right or remedy [under *Shady Grove*], then the

2    narrower scope of Illinois's state-law bar does not make it one that does.").

3         Defendants also wrongly rely on Ark. Code Ann. § 4-75-315, which does

4    not limit indirect purchasers to merely *parens patriae* actions by the Attorney

5    General ("(a) In addition to the other remedies provided in this subchapter, . . . the

6    Attorney General **may bring** an action in the name of the state against that

7    person:". . . "(b) The Attorney General **also may bring** a civil action in the name of

8    the state, as *parens patriae* on behalf of natural persons residing in this state, to

9    secure monetary relief. . . .") (emphasis added); *DRAM*, 516 F. Supp. 2d at 1108

10   (Arkansas law "merely provides an affirmative right of action for the attorney

11   general, which the attorney general "may," in his or her discretion, exercise . . .

12   even defendants concede . . . that Arkansas allows *some* indirect purchaser suits for

13   money damages . . . ."). Rather, Arkansas' general prohibition against monopolies,

14   etc. is cumulative, allows for a private right of action by anyone (Ark. Code Ann. §

15   4-75-211), including an action for treble damages (Ark. Code Ann. § 4-75-

16   211(b)(3)) for price fixing. This general prohibition against monopolies and the

17   like applies here such that the separate right of action for price fixing simply

18   provides an additional remedy for the state AG.

19         **3.    Oregon's *Illinois Brick* Repealer Has Retroactive**
20              **Effect**

21         Defendants state that Oregon law requires that claims preceding the date of

22   the State of Oregon's repeal of Illinois Brick must be dismissed. However, unlike

23   the Rhode Island law repealing Illinois Brick, which has been broadly interpreted

24   to refer only to prospective violations of state antitrust law (2013 R.I. ALS 365, ". .

25   .to deter. . .future violations of this chapter. . ."). The State of Oregon includes no

26   such language in its statute. The Oregon Legislative Assembly stated "[t]he

27   amendments to ORS 646.780 by section 1 of this 2009 Act apply to actions

28   commenced on or after the effective date of this 2009 Act." 2009 Or. Laws Ch.

304 § 2 (HB 2584).   However, this language refers only to the ***sufficiency of actions*** begun on or after January 1, 2010, not to the ***dates of violation*** for which those actions must be maintained.   In fact, Defendants cite *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.,* No. 1:14-md-2508, 2015 U.S. Dist. LEXIS 121620 (E.D. Tenn., June 24, 2015), in support of their contention for why pre-July 15, 2013 claims for Rhode Island and pre-January 1, 2010 claims for Oregon must be dismissed, but then fail to state that this decision tacitly allowed claims from Oregon indirect purchasers as far back as January 1, 2006 to stand.  *Id* at \*12, \*16.

Similarly, while the *Niaspan* court cited by Defendants did dismiss Oregon indirect purchaser claims prior to January 1, 2010 in its decision, *Niaspan* cited *Strizver v. Wilsey*, 150 P.3d 10, 12 (Or. App. 2006).  The *Strizver* court held that, when the legislature is silent on retroactivity, the legal application of that retroactivity can be either "substantive" or "remedial".  The *Strizver* court held:

> The basic test for whether a law is "substantive" concerns whether application of it will "impair existing rights, create new obligations or impose additional duties with respect to past transactions." "Remedial" statutes, by contrast, are those "which pertain to or affect a remedy, as distinguished from those which affect or modify a substantive right or duty." (citations omitted).

*Id*. at 13.   Oregon's state antitrust laws have always barred price fixing, so Defendants' substantive rights are not impaired.   Consumers in Oregon simply now have an additional remedy.   As such, the claims of the Oregon Subclass for the period of August 1, 2008 to December 31, 2009 should be allowed to stand.

## C.   Plaintiffs' Consumer Protection Claims Should Be Upheld

Defendants wage a piecemeal attack on Plaintiffs' extensive and well-founded antitrust claims under various state consumer protection statutes that should be rejected for those reasons set forth in greater detail below.[64]   Even so,

---

[64]   In addition, while EPPs believe such haphazard attacks are legally futile, these issues should be resolved after EPPs are provided with an opportunity to conduct some merits discovery and to brief these issues at class certification in line with Ninth Circuit precedent.  *Forcellati v. Hyland's Inc.*, 876 F. Supp. 2d 1155,

should the Court find their arguments with respect to the individual state statutes compelling, Plaintiffs' claims for each state still stand based on their other well-pled allegations and causes of action. *See* section VI A. and B., *infra*.

### 1. EPPs' Consumer Protection Claims Are Not Precluded

Plaintiffs' claims of deceptive conduct and illegal pricing allege the precise type of conduct required to show Defendants violated applicable consumer protection statutes in Illinois, Maine, Michigan, New Mexico, Oregon, Rhode Island, and West Virginia, and nothing in Defendants' motion compels their dismissal. Contrary to their arguments otherwise (State Law Motion, at 6-7), ***none*** of these statutes preclude claims based on antitrust violations either expressly or as interpreted by courts.[65] As such, these claims should be upheld.

**Illinois**:    The Illinois Fraud and Deceptive Business Practices Act ("IFDBP") prohibits ""[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact."  815 Ill. Comp. Stat.

1159 (C.D. Cal. 2012) ("*Forcellati II*") (denying motion to dismiss plaintiff's nationwide class claims because "until parties have explored the facts in the case, it would be premature to speculate about whether the differences in various states' consumer protection laws are material in this case.").

[65]    It is well-established that that legislative bodies are presumed to know how to create exceptions should they so choose. *Iselin v. United States*, 270 U.S. 245, 251 (1926).   Indeed, each of these legislatures clearly knew how to create exceptions because they did so, and importantly, ***none*** of their specifically enumerated exclusions from the purview of the applicable consumer protection statutes include antitrust conduct. *See e.g.,* Illinois Fraud and Deceptive Business Practices Act ("IFDBP"), 815 Ill. Comp. Stat. Ann. 505/10; Maine Unfair Trade Practices Act ("MUTPA"), Me. Rev. Stat. Ann. tit. 5, § 208; Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws Ann. § 445.904; New Mexico Unfair Practices Act ("NMUPA"). N.M. Stat. Ann. §§ 57-12-7; Oregon Unlawful Trade Practices Act ("OUTPA"), Or. Rev. Stat. § 646.612; Rhode Island Deceptive Trade Practices Act ("RIDTPA"), R.I. Gen Laws § 6-13.1-1; West Virginia Consumer Credit and Protection Act ("WVCCPA"), W. Va. Code § 46A-6-104. And as set forth in detail herein, all but one of Defendants' cases simply hold that the plaintiffs had failed to plead a requisite violation, ***not*** that antitrust claims were precluded.

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

505/2.  Here, Plaintiffs have specifically pled that Defendants: (1) fixed prices at artificially inflated levels (CAC ¶ 155(b)); (2) engaged in conduct that was designed to prevent disclosure of this fact to Plaintiffs (CAC ¶¶ 157-162); and (3) specifically misrepresented the reasons for their illegal price increases (CAC ¶¶ 144-145).  Thus, Plaintiffs have properly pled their IFDBP claim under the text of the statute.  *See Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1046-49 (N.D. Ill. 2007) (rejecting argument that *Laughlin*, the case Defendants cite, precludes plaintiffs from bringing price-fixing claims under the IFDBP).

**Maine**: The MUTPA prohibits "[u]nfair methods of competition and unfair *or* deceptive acts or practices in the conduct of any trade or commerce." Me. Rev. Stat. tit. 5, § 207 (emphasis added).  "To justify a finding of unfairness, the act or practice: (1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition."  *State v. Weinschenk*, 868 A.2d 200, 206 (Me. 2005).  Here, Plaintiffs allege the acts caused injury to consumers (*i.e.*, higher prices). *See* CAC ¶¶ 155-56, 246, 248, 251-52, 414, 421, 639-41).  Consumers could not reasonably avoid the higher prices because: (1) they did not know of the conspiracy (CAC ¶¶ 107-112, 145, 157-164); (2) Defendants control a large percentage of the market (CAC ¶¶ 80, 94, 131); and (3) there are no good substitutes for canned tuna (CAC ¶ 131).  Finally, there are no countervailing benefits to price fixing.[66]  Thus, Plaintiffs' allegations

---

[66]  *See*, *e.g.*, *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 218, (1940) ("[F]or over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense."); *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007)  ("A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful.").

1    unquestionably satisfy the "unfairness" prong of the MUTPA.[67]

2    **Michigan**: The Michigan Consumer Protection Act ("MCPA") prohibits,

3    among other things, "Failing to reveal a material fact, the omission of which tends

4    to mislead or deceive the consumer, and which fact could not reasonably be known

5    by the consumer;" and "Failing to reveal facts that are material to the transaction in

6    light of representations of fact made in a positive manner." Mich. Comp. Laws §

7    445.903(s), (cc).  Here, Plaintiffs have alleged concealment of the alleged price-

8    fixing conspiracy, as well as Defendants' failure to reveal the existence of the

9    price-fixing conspiracy despite the fact that Defendants made pretextual statements

10   regarding the price increases and packaging decreases sufficient for a MCPA

11   claim. *See, e.g.*, CAC at ¶¶ 157-163, 436, 440-442.[68]

12

13   _____

[67]      While Defendants rely on *In re Flash Memory*, 643 F. Supp. 2d at 1159 for the proposition that Maine requires a showing of "inducement" (State Law Motion at 13-14), *Flash Memory* was the result of a fundamental misunderstanding of Maine jurisprudence.  In *Flash Memory*, the district court interpreted *Tungate v. MacLean–Stevens Studios, Inc.*, 714 A.2d 792, 797 (Me. 1998) to mean that in all cases about pricing the plaintiff must show that they were deceived or induced into making a purchase they would not have otherwise made.  *Tungate* involved a photographer who took student pictures and sold them to the parents without disclosing the fact that it paid a commission to take the photos (and passed along the cost to the parents).  There—unlike here—the conduct in question clearly did not meet the three part test necessary to satisfy the "unfair" conduct or method prong of the MUTPA.  Thus, the Maine Supreme Court considered whether the conduct met the "deceptive conduct" prong, and found that it did not because the failure to inform the parents of the payment to the school did not deceive or induce them into purchasing the photos.  Furthermore, *Flash Memory* ignores the fact that the MUTPA is generally to be interpreted in accordance with the Federal Trade Commission Act, *see Tungate*, 714 A.2d at 797, which has been interpreted to prohibit price fixing. *See Fashion Originators' Guild of Am. v. Fed. Trade Comm'n*, 312 U.S. 457, 463 (1941).  Thus, as a potential violation of the FTC Act, Defendants' conduct "could violate [Maine's] prohibition on 'unfair methods of competition.'"  *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 187 (D. Me. 2004) ("*NMV*").

[68]      Defendants cite to *NMV*, 350 F. Supp. 2d at 189 for the proposition that price-fixing is not prohibited by the MCPA.  But that case merely held that the conduct must be alleged in a manner that satisfied one of the 37 different types of conduct proscribed by the MCPA. *See id.* at 189; *see also In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 225-26 (S.D.N.Y. 2012) (finding plaintiffs to have sufficiently alleged conspiracy to fall within the gambit of the enumerated conduct prohibited under the MCPA).

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

1    **New Mexico**: The New Mexico Unfair Practices Act ("NMUPA") prohibits

2    "[un]fair or deceptive trade practices and unconscionable trade practices in the

3    conduct of any trade or commerce."   N.M. Stat. § 57-12-3.   "'Unconscionable

4    trade practices' include all sales that either 'take[ ] advantage of the lack of

5    knowledge, ability, experience or capacity of a person to a grossly unfair degree'

6    or 'result[ ] in a gross disparity between the value received by a person and the

7    price paid.'" *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538,

8    585 (M.D. Pa. 2009) ("*Chocolate I*").   "Federal courts generally permit NMUPA

9    actions in price-fixing cases provided that the plaintiff alleges a 'gross disparity'

10   between the price paid for a product and the value received." *Id.*   "Allegations that

11   a plaintiff has paid approximately 30% more for a product as a result of price

12   fixing are sufficient to plead a NMUPA claim, . . . as are averments that a

13   conspiracy produced 'significant artificial increases in [product] price.'" *Id.* at 586

14   (citing *TFT-LCD*, 586 F. Supp. 2d at 1127; *see NMV*, 350 F. Supp. 2d at 196).

15   Here, Plaintiffs satisfy NMUPA by specifically alleging "a gross disparity between

16   the value received by New Mexico class members and the price paid by them for

17   PSPs." CAC at ¶ 494.

18   **Oregon**: The Oregon Unlawful Trade Practices Act ("OUTPA") prohibits

19   any "unconscionable tactic in connection with selling . . . goods or services . . . ."

20   Or. Rev. Stat. § 646.607.   Specifically, the OUTPA states that it is an unlawful

21   practice to make "false or misleading representations of fact concerning the

22   offering price of . . . goods . . . ." Or. Rev. Stat. § 646.608(1), (1)(s).   The term

23   "representation" may be "any manifestation of any assertion by words or *conduct*,

24   including, but not limited to, a *failure to disclose a fact*."   *Id.* at § 646.608(2)

25   (emphasis added).   Here, Plaintiffs have specifically pled a claim under the text of

26   OUTPA by alleging that Defendants: (1) fixed prices at artificially inflated levels

27   (CAC ¶ 155(b)); (2) engaged in conduct that was designed to prevent disclosure of

28

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC

1   this fact to Plaintiffs (CAC ¶¶ 157-162, 522-524); and (3) specifically

2   misrepresented the reasons for their illegal price increases (CAC ¶¶ 144-145).[69]

3   **Rhode Island**: The Rhode Island Deceptive Trade Practices Act

4   ("RIDTPA") prohibits "[u]nfair methods of competition and unfair or deceptive

5   acts or practices in the conduct of any trade or commerce…" R.I. Gen Laws § 6-

6   13.1-2. This includes, *inter alia*, "[e]ngaging in any act or practice that is unfair or

7   deceptive to the consumer." R.I. Gen. Laws § 6-13.1-1(6)(xiii). A practice or act is

8   unfair where it: (1) violates public policy, as expressed by the law; (2) is immoral,

9   unethical, oppressive or unscrupulous; and (3) causes substantial injury to

10  consumers. *Ames v. Oceanside Welding & Towing Co.*, 767 A.2d 677, 681 (R.I.

11  2001). Numerous courts have found price-fixing to meet this test. *See, e.g., Auto*

12  *Parts I*, 2013 U.S. Dist. LEXIS 80338, at *97-98; *TFT-LCD*, 586 F. Supp. 2d at

13  1129-30; *In re Static Random Access Memory (SRAM) Litig.*, No. M:07-01819

14  CW, 2008 U.S. Dist. LEXIS 120279, at *53 (N.D. Cal. June 27, 2008) ("*SRAM I*").

15  Further, the Act prohibits "[e]ngaging in any other conduct that similarly creates a

16  likelihood of confusion or of misunderstanding." R.I. Gen. Laws § 6-13.1-

17  1(6)(xii). Here, Defendants' conspiracy and pretextual statements created a

18  likelihood that Plaintiffs would be confused about whether they were paying fair

19  prices for PSPs. CAC ¶¶ 157-162, 144-145, 529. Such confusion is sufficient to

20  state a claim under the RIDTPA. *SRAM*, 2008 U.S. Dist. LEXIS 120279, at *53.

21  **West Virginia**: The West Virginia Consumer Credit and Protection Act

22

---

23  [69]   Defendants' reliance on *DRAM*, 516 F. Supp. 2d 1072 (N.D. Cal. 2007), is
    misplaced. In *DRAM*, the court did not hold that conduct violating the antitrust
24  laws could not constitute a claim under OUTPA. Rather, the court analyzed the
    text of the statute as compared to plaintiffs' allegations, and determined that
25  plaintiffs had not pled allegations sufficient to support a claim. *See id.* at 115-16
    ("None of the allegations of plaintiffs' complaint specifically allege false and
26  misleading representations made by defendants to plaintiffs, or set forth conduct
    that caused plaintiffs' confusion or misunderstanding, as is intended by OUTPA.").
27  Here, however, Plaintiffs here have alleged facts showing specific
    misrepresentation regarding Defendants' illegal pricing.

28

---

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

("WVCCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104. "The West Virginia Supreme Court of Appeals has indicated that the WVCCPA is to be construed broadly . . . . here an act is clearly remedial in nature, we must construe the statute liberally so as to furnish and accomplish all the purposes intended." *Powell v. Bank of Am., N.A.*, 842 F. Supp. 2d 966, 982–83 (S.D. W. Va. 2012) (internal citations omitted). Under the statute, "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby" is deemed to be an unfair or deceptive trade practice. W. Va. Code Ann. § 46A-6-102. Here, Plaintiffs have specifically pled that Defendants: (1) fixed prices at artificially inflated levels (CAC ¶¶ 155(b), 593); (2) engaged in conduct that was designed to prevent disclosure of this fact (CAC ¶¶ 157-162); and (3) misrepresented the reasons for their illegal price increases (CAC ¶¶ 144-145, 589). Thus, Plaintiffs have properly pled their WVCCPA claim. *See In re Pharmaceutical Industry Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-231 (D. Mass. 2006) (certifying antitrust and WVCCPA class).[70]

## 2.   A Flawed Unconscionability Requirement, Designed by Defendants, Does Not Apply Here

The Court should also reject Defendants' attempt to impose an improper and impossibly specific level of "unconscionability" to Plaintiffs' allegations under the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code. Ann. §§ 4-88-101, *et seq.*; District of Columbia Consumer Protection Procedures Act

---

[70]   Defendants' two cases (*DRAM* and *Flash Memory*) inexplicably ignored the broad and inclusive language of the WVCCPA and are of little value here.

1   ("DCCPPA"), D.C. Code §§ 28-3901, *et seq.*; NMUPA; OUTPA; and Utah

2   Consumer Sales Practices Act ("UCSPA"), Utah Code Ann. §§ 13-11-1, *et seq.*

3   State Law Motion, at 1, 8-9.

4        First, those statutes that use the word "unconscionable" do not uniformly

5   define it.  For example, independent sections of OUTPA (1) list at least 77 acts

6   designated by the Oregon Attorney General as OUTPA violations (Or. Rev. Stat.

7   Ann. § 646.608) with no mention of "unconscionability"[71]; (2) define an "unlawful

8   trade practice" as, in part, "any unconscionable tactic in connection with

9   selling . . . goods or services" (Or. Rev. Stat. Ann. § 646.607); and (3) provide a

10  baseline definition of "unconscionable acts" as "includ[ing], but not limited to"

11  certain specified conduct (Or. Rev. Stat. Ann. § 646.605(9)).  *See also NMV*, 350

12  F. Supp. 2d at 178 (discussing various definitions of "unconscionable");

13  *Harrington v. CACV of Colorado, LLC*, 508 F. Supp. 2d 128, 139 (D. Mass. 2007)

14  ("'there is no clear, all-purpose definition of unconscionable'") (quoting *Penney v.*

15  *First National Bank of Boston*, 385 Mass. 715, 721 (Mass. 1982)); *State ex rel.*

16  *Bryant v. R & A Inv. Co.*, 985 S.W.2d 299, 302 (Ark. 1999) (determining that

17  "liberal construction of the DTPA is appropriate.");[72] *Reid v. LVNV Funding, LLC*,

18

---

19  [71]    Nor does *DRAM,* 516 F. Supp. 2d at 1115, cited by Defendants.  The
    *Lidoderm* court did address unconscionability under the OUTPA, but only
20  concluded that the price fixing allegations at issue were "not sufficiently similar"
    to the statutory examples of "unconscionable acts."  *In re Lidoderm Antitrust*
21  *Litig.*, 103 F. Supp. 3d 1155, 1170-71 (N.D. Cal. 2015).  Neither *DRAM* nor
    *Lidoderm* held that allegations in a price-fixing case that defendants engaged in
22  false or misleading representations or conduct – such as those that EPPs make here
    – fail to state a claim under the OUTPA.

23  [72]    Although the Arkansas Supreme Court has yet to squarely decide whether
    the ADTPA encompasses price-fixing conduct, the court has signaled that it would
24  find such conduct actionable under the Act.  *See Lithium Ion Batteries*, 2014 U.S.
    Dist. LEXIS 141358, at *123-124 (emphasizing that the Arkansas Supreme Court
25  had adopted a broad definition of "unconscionable" in *Baptist Health v. Murphy*,
    226 S.W.3d 800, 811 n.6 (Ark. 2006), and rejecting defendant's contention that the
26  narrower definition applicable in contract cases and cited in *State ex rel. Bryant v.*
    *R&A Inv. Co.*, 985 S.W.2d 299, 302 (Ark. 1999) should control); *Curtis Lumber*
27  *Co., Inc. v. Louisiana P. Corp.*, 618 F.3d 762, 779-80 (8th Cir. 2010) (citing to
    Arkansas Supreme Court law and finding that in light of the Legislature's remedial
28  purpose in enacting the ADTPA, a "liberal construction" of the ADTPA to "protect

---

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

1   2:14CV471DAK, 2016 U.S. Dist. LEXIS 7233, at *16 (D. Utah Jan. 20, 2016)

2   (quoting Utah Code Ann. § 13-11-2) (UCSPA is to be "construed liberally" to

3   "protect consumers from suppliers who commit deceptive and unconscionable

4   sales practices" because it prohibits per se deceptive conduct as well as *any*

5   deceptive act or practice by a supplier); *State ex rel. Rosenblum v. Johnson &*

6   *Johnson*, 362 P.3d 1197, 1202–03 (Or. App. 2015) (OUTPA is to be construed

7   liberally to protect consumers).

8   Nor do all of the statutes require a complaint to allege unconscionable

9   conduct. *Compare*, *e.g.*, Utah Code Ann § 13-11-4 (prohibiting deceptive acts by

10   supplier) with Utah Code Ann § 13-11-5 (prohibiting unconscionable acts by

11   supplier). *See also Eggs*, 851 F. Supp. 2d at 897-99 (upholding indirect price

12   fixing claims, as the DCCPPA prohibits "unconscionable terms . . . " but does not

13   require specific allegations of unconscionability); *Dist. Cablevision Ltd. P'ship. v.*

14   *Bassin*, 828 A.2d 714, 722–23 (D.C. App. 2003); *In re Dom. Drywall Antitrust*

15   *Litig.,* Civ. Action 13-2437, 2016 U.S. Dist. LEXIS 90619, at *25 (E.D. Pa. July

16   13, 2016) (under the NMUPA, "Plaintiffs did not need to plead unconscionable

17   conduct separate from pleading that they paid inflated prices for goods that were

18   worth substantially less than what they paid.").[73]   Whether conduct rises to

19   unconscionability cannot be done on pleadings and necessarily requires

20   consideration of facts developed in discovery. *See*, *e.g.*, Utah Code Ann. § 13-11-

21   _____

22   consumers from trade practices beyond common law fraud" is appropriate);
      *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015)
23   ("The elements of . . . a cause of action [under § 4-88-107(a)(10)] are (1) a
      deceptive consumer-oriented act or practice which is misleading in a material
24   respect, and (2) injury resulting from such act.") (quoting *Skalla v. Canepari*, 430
      S.W.3d 72, 82 (Ark. 2013) (emphasis omitted)).

25   [73]   *GPU II*, 527 F. Supp. 2d at 1029–30, on which Defendants rely, cites *Riggs*
      *Nat'l Bank of Wash. D.C. v. D.C.*, 581 A.2d 1229, 1251 (D.C. 1990) (on which
26   Defendants also rely) to conclude that the *GPU II* plaintiffs had not adequately
      alleged "unconscionable conduct."  But *Riggs*, and the other case cited in *GPU II*
27   (*Bryant*, 985 S.W.2d at 302), only involved unconscionable conduct in the contract
      context and thus have no relevance here.  *See Chocolate I*, 602 F. Supp. 2d at 583
28   n.57.

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

1   5(2) (a party "shall be given a reasonable opportunity to present evidence" to aid

2   the court in determining whether a particular act or conduct was unconscionable).

3       The critical inquiry is therefore not whether Defendants' alleged conduct

4   clears an arbitrary threshold of "unconscionability," but whether Plaintiffs'

5   allegations meet the pleading requirements of these statutes.  Here, Plaintiffs allege

6   that Defendants engaged in naked price-fixing—***felonious*** conduct that "is, and

7   ought to be, *per se* unlawful." *Creative Leather Products*, 551 U.S. at 893.[74]

8   Unsurprisingly, several courts analyzing the state unfair trade practice and

9   consumer protection statutes at issue here have held that anticompetitive

10  conspiracies, such as that alleged here, constitute unconscionable conduct.  *See,*

11  *e.g., Sheet Metal Workers*, 737 F. Supp. 2d at 405 (plaintiffs' monopolization

12  allegations fall under the catch-all provision of the ADTPA); *Chocolate I*, 602 F.

13  Supp. 2d at 583-585 (allowing indirect price-fixing claims under ADTPA,

14  DCCPPA and NMUPA); *Flash Memory*, 643 F. Supp. 2d at 1156–57 (illegal

15  conspiracy to fix prices at supracompetitive levels and overcharge customers was

16  substantively unconscionable because it was one-sided and unfairly benefitted

17  defendants at the expense of plaintiffs and the public); *DRAM*, 516 F. Supp. 2d at

18  1108–09 (finding price-fixing claim that did not specifically allege unconscionable

19  conduct viable under the ADTPA); *Fond du Lac Bumper Exch., Inc. v. Jui Li*

20  *Enter. Co., Ltd.,* No. 09-CV-00852, 2012 U.S. Dist. LEXIS 125677, at *24 (E.D.

21  Wis. Sept. 5, 2012) (price-fixing allegations sufficient to state ADTPA claim); *LIB*,

22

23  [74]     Antitrust violations – conspiracies in restraint of trade – are felonies.  The
24  current fine ranges are:  $100 million or 20% of the volume of commerce affected
    (U.S.S.G. § 2R1.1(b)(2)).  The canned tuna market in the U.S. is approximately $2
25  billion a year.  Thus, if Plaintiffs are correct and the Defendants conspired to raise
    tuna prices throughout the class period, the total commerce affected would be
26  about $14 billion, which would suggest a total fine of up to $2.8 billion.
    Defendants would be hard pressed to explain how such a violation could not be
27  considered unconscionable.  Similarly, the sentencing guidelines suggest long
    sentences for executives involved in a conspiracy, further supporting the finding
28  that such conduct was unconscionable.

1    2014 U.S. Dist. LEXIS 141358, at *123-124 (horizontal price-fixing allegations

2    sufficiently pleaded "deceptive and unconscionable" trade practices under the

3    ADTPA); *NMV*, 350 F. Supp. 2d at 178 (conspiracy to keep Canadian cars out of

4    the United States market found sufficient under ADTPA and DCCPPA); *Marbry v.*

5    *EMI Music Distrib.*, Civil Action No. 3731–00, 129 Daily Wash. L. Rptr. 2065,

6    2067 (D.C. Super. Ct. June 12, 2001) (upholding CPPA claim); *TFD-LCD*, 586 F.

7    Supp. 2d at 1126 (upholding price-fixing claim under DCCPPA).

8       EPPs assert that Defendants' price-fixing was "willful," "unfair,"

9    "unconscionable," "deceptive," conducted "with the intent to deceive,"[75] and that

10   Defendants' conduct "misled consumers, withheld material facts, and resulted in

11   material misrepresentations" to the Plaintiffs.[76]   Plaintiffs further contend that

12   Defendants agreed to conceal the existence and nature of their conduct and

13   conspiracy.  CAC ¶¶ 157-166.  As such, Plaintiffs' ADTPA, DCCPPA, NMUPA,

14   OUTPA, and UCSPA claims should be upheld.

15

16

17

---

18   [75]    CAC ¶¶ 367, 370, 389, 494, 495, 512, 522, 523, 549, 557. For example,
19   Plaintiffs allege that Defendants colluded to align can sizes, fix prices, police
     discounts, and deprive consumers of a more sustainable tuna product. CAC ¶¶ 102,
20   108, 111, 119.   EPPs also specifically allege that Defendants' price-fixing
     "resulted in a gross disparity between the value received" by the plaintiffs and the
21   New Mexico class members and "the price paid by them for PSPs as set forth in
     N.M. Stat. Ann. Section 57-12-2E." CAC ¶¶ 132-143, 489-496. *See NMV*, 350 F.
22   Supp. 2d at 195-96 (allegations that indirect purchasers paid up to 30% more for
     products properly alleged a "gross disparity" and an "unconscionable" business
23   practice).

     [76]    CAC ¶¶ 368, 492, 560; *see also* CAC ¶¶ 520-526 (conduct mislead
24   investors, withheld material facts).  Plaintiffs allege that, among other things, in
     2008 StarKist reduced the size of its tuna can, ostensibly for environmental
25   reasons, failing to disclose that this size reduction was the product of an
     anticompetitive agreement.  CAC ¶¶ 103, 106.  Defendants also participated in a
26   consumer-focused marketing campaign that afforded them additional opportunities
     to collude and fix prices.  CAC ¶ 122.  Each Defendant made deceptive and
27   misleading public, pretextual statements to explain away price increases.  CAC ¶
     145.
28

---

- 69 -

### 3. Plaintiffs Properly Allege a Sufficient Nexus Between Defendants' Conduct And Interstate Commerce

Plaintiffs' allegations that Defendants injected price-fixed Packaged Seafood Products into the New Hampshire and North Carolina marketplaces satisfy the statutory nexus requirement under the antitrust statutes of New Hampshire and North Carolina. *See* New Hampshire Consumer Protection Act ("NHCPA"), N.H. Rev. Stat. Ann. Tit. XXXI, § 358-A:2; North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), N.C. Gen Stat. § 75-1. Defendants' attempt to impose a territorial limit on such claims is contradicted by relevant authority and should be rejected.[77] *See LaChance*, 931 A.2d at 576, 578, 580-81 (holding that indirect purchasers could bring a NHCPA claim based on antitrust violations by an out-of-state defendant, including anticompetitive ***pricing*** of goods within New Hampshire); *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 234-35 (M.D. Pa. 2010) ("*Chocolate II*") (holding that "a pleading sufficiently states a claim if the 'allegations encompass conduct which was part of trade or commerce that had direct or indirect effects on the people of [New Hampshire].'"); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 760-61 (E.D. Pa. 2014) ("*Niaspan*") (same); *NMV,* 350 F. Supp. 2d at 193 (upholding NHCPA claim for sales made into New Hampshire); *In re Ductile Iron Pipe Fittings Antitrust Litig.*, Civ. No. 12-169, 2013 U.S. Dist. LEXIS 142466, at *65-66 (D.N.J. 2013); *Lidoderm*, 103 F. Supp. 3d at 1173-74 (NCUDTPA claim proper where plaintiffs allege injury within North Carolina by virtue of defendant selling product into North Carolina); *Auto Parts I*, 2013 U.S. Dist. LEXIS 80338, at *80 (same). [78]

---

[77]   As the New Hampshire Supreme Court stated, the NHCPA's purpose "is to provide broad protection for consumers." *LaChance v. United States Smokeless Tobacco Co.*, 931 A.2d 571, 579 (N.H. 2007) ("*LaChance*"). Plaintiffs' claim under the NHCPA is founded upon "the legislature's clear desire to promote the consumer protection policy of competitive pricing." *Id.*

[78]   Defendants' North Carolina citations are all inapposite. *See In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 1:14-md-2508, 2015 U.S. Dist. LEXIS 121620, at *75 (E.D. Tenn. June 24, 2015) (plaintiffs utterly failed to plead any allegations specific to North Carolina); *Merck & Co. Inc. v. Lyon*, 941 F. Supp.

EPPs' claims are cognizable NHCPA and NCUDTPA claims. *See* CAC ¶¶ 476-486; 498-507. *Harbour Capital Corp. v. Allied Capital Corp.*, Case No. 08-cv-506-PB, 2009 U.S. Dist. LEXIS 63041, at *24 (D.N.H. July 22, 2009) (a defendant who "injure[s] trade or commerce" does not "escape liability . . . by remaining outside the state.").[79]

### 4.  California, Illinois, Michigan, and Minnesota Consumer Protection Claims Are Not Subject to Rule 9(b)'s Heightened Pleading Requirements

Defendants incorrectly argue that four of Plaintiffs' state law claims are essentially fraud claims, which should subject them to the heightened pleading standard of Fed. R. Civ. P. 9(b). State Law Motion, at 7-8. As an initial matter, Defendants cite no authority to support a heightened pleading standard where state consumer protection claims are based on antitrust violations. To the contrary, Defendants' argument was recently rejected in a strikingly similar case, where the court held that claims based on price-fixing do not sound in fraud. *See Eggs*, 851 F. Supp. 2d at 895 (refusing to apply Rule 9(b) to claim under California's Unfair Competition Law where the claim was based on price-fixing, as the claims were "simply not grounded in fraud" and did not "sound in fraud.").

---

1443, 1463 (M.D.N.C. 1996) (plaintiffs failed to allege a "substantial effect"); *The 'In' Porters v. Hanes Printables, Inc.*, 663 F. Supp. 494, 501-02 (M.D.N.C. 1987) (looking at the applicability of a long-arm statute to a French defendant without any business in North Carolina and noting that application of the statute would be proper if defendants "had products in the North Carolina commerce through the ordinary course of business.").

[79]    The *Harbour* court also noted that "[i]n *Pacamor* [cited by Defendants here], the court denied the defendant's motion to exclude evidence relative to conduct outside of New Hampshire because the territoriality requirement was satisfied by the fact that the defendant conducted business within New Hampshire." *Id.* at *23. None of Defendants' other cases defeats the fact that Plaintiffs' allegations satisfy the statutory requirements of the NHCPA and NCUDTPA. *Lithium Ion Batteries*, 2014 U.S. Dist. LEXIS 141358, at *123; and *Flash Memory*, 643 F. Supp. 2d 1133 improperly rely on *Pacamor* while improperly ignoring the New Hampshire Supreme Court holding in *LaChance*. In matters of statutory interpretation, the New Hampshire Supreme Court is "the final arbiter[ ] of the legislature's intent as expressed in the words of the statute considered as a whole." *LaChance*, 931 A.2d at 576 (citation omitted).

1    In this instance, the consumer protection claims at issue are premised upon

2    facts alleging a horizontal price-fixing conspiracy.  Specifically, each of the four

3    state claims at issue incorporates the price-fixing allegations contained in the

4    Complaint.   *See* CAC ¶¶ 1-166; 373 (California); ¶ 405 (Illinois); ¶ 436

5    (Michigan); and ¶ 446 (Minnesota).  Because these consumer protection claims are

6    grounded in a theory based upon fair competition and business practices as

7    distinguished from a fraud theory, they do not "sound in fraud" and Fed. R. Civ. P.

8    9(b) is inapplicable.  *See Eggs*, 851 F. Supp. 2d at 895.  Assuming, *arguendo*

9    however, that Fed. R. Civ. P. 9(b) applies to the allegations of fraudulent

10   concealment contained in the CAC, Plaintiffs have nonetheless pled them

11   sufficiently with substantial detail.  *See* section III.C, *supra*.

12   Defendants also seek to impose a requirement under the Nevada Deceptive

13   Trade Practices Act ("NDTPA") that the named plaintiffs be elderly or disabled

14   (State Law Motion at 12).   However, Defendants overlook section 41.600 of

15   Nevada's Revised Statutes, which provides that "[a]n action may be brought by

16   any person who is a victim of . . . A deceptive trade practice as defined in [the

17   NDTPA]."  *See DDAVP*, 903 F. Supp. 2d at 226-27.  As that section makes clear,

18   all injured persons have a right of action to recover for a violation of the NDTPA,

19   not just the elderly or disabled.  Thus, Defendants' limited reading of the NDTPA

20   must be rejected.

21   **D.     Plaintiffs' Unjust Enrichment Claims Are Legally Sufficient.**

22   Defendants cite no authority demonstrating that state legislatures intended to

23   abrogate common law unjust enrichment claims because no such express statutory

24   language exists.[80]

25

26   ───────────────────────

[80]    Moreover, it is premature to consider individual state requirements for unjust
enrichment at the pleading stage.  Defendants' cite to *Mazza*, a decision on class

27   certification.  This is an issue for class certification.  *See In re K-Dur Antitrust
Litig.,* 338 F. Supp. 2d 517, 546 (D.N.J. 2004) ("Although individual states may

28   impose additional requirements . . . which may ultimately be fatal to Plaintiffs'

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

1

2

**1.    Neither *Illinois Brick* Nor The State Statutes At Issue Preclude EPPs' Unjust Enrichment Claims As Alternative Relief**

3

4

5

6

7

8

9

10

11

Plaintiffs have properly pled unjust enrichment claims in the alternative, as permitted by Rule 8, regardless of whether that state's antitrust law follows *Illinois Brick*.  "No reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy."  *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 46 (D.D.C. 2008).  *See also King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 702 F. Supp. 2d 514, 539-40 (E.D. Pa. 2010) ("unjust enrichment claims are viable regardless of the applicable state antitrust laws.") (citations omitted).

12

13

14

15

16

17

Defendants fail to demonstrate any express legislative intent to preclude such claims.  As the Supreme Court has held: "In order to abrogate a common-law principle, the statute must '***speak directly***' to the question."  *United States v. Texas,* 507 U.S. 529, 534 (1993) (emphasis added).  To the contrary, the Supreme Court has expressly limited the effects of *Illinois Brick* to claims under Section 4 of the Clayton Act.  *California v. ARC Am. Corp.*, 490 U.S. 93, 102-03 (1989).

18

19

20

21

22

23

24

25

26

Defendants "confuse[] Plaintiffs' right to recover an equitable remedy under a common law claim based upon principles of unjust enrichment with its right to recover a remedy at law for an alleged violation of a state's antitrust laws."  *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669-71 (E.D. Mich. 2000) (allowing unjust enrichment claims).  Yet courts have repeatedly upheld indirect purchasers' unjust enrichment claims that were premised on antitrust violations. *See, e.g., Auto Parts II*, 29 F. Supp. 3d 982 (sustaining unjust enrichment claims) *Digital Music*, 812 F. Supp. 2d at 413, upon which Defendants rely, contradicts

27

28

unjust enrichment claims, at this stage it is premature to consider these requirements on a state by state basis.")

- 73 -

1   their position.  There, the court ***permitted*** all direct purchaser unjust enrichment

2   claims to proceed "because they merely provide a different form of remedy."[81]  *Id.*

3   Defendants' remaining cases are factually distinguishable and do not speak to

4   whether *Illinois Brick* repealer state legislatures intended to abrogate the common

5   law unjust enrichment claims.  *In re Terazosin Hydrochloride Antitrust Litig.,* 160

6   F. Supp. 2d 1365, 1380 (S.D. Fla. 2001) is also distinguishable because the indirect

7   purchaser plaintiffs asserted ***one*** unjust enrichment claim in all 50 states and the

8   District of Columbia without saying which law applied.[82]

### 2.  Plaintiffs Plead Direct Benefit to Defendants

10        The EPPs have sufficiently pled the direct benefit as required by certain

11  states.  In asserting otherwise (State Law Motion at 16-17), Defendants ignore an

12  extensive body of cases rejecting their mistaken definition (and imposition of a

13  privity requirement) of "direct benefit."  "[S]tripped to its essence, a claim of

14  unjust enrichment requires . . . that Defendants received a benefit, and under the

15  circumstances of the case, retention of the benefit would be unjust."  *Auto Parts*

16  *III,* 50 F. Supp. 3d at 862.  Like the indirect purchasers in *Auto Parts III*, EPPs

17  have sufficiently pled unjust enrichment claims by identifying unjust benefit to

18  Defendants and Plaintiffs' damages, which flow from Defendants' illegal conduct.

19  *See* CAC ¶¶ 596-752.

20        Defendants rely on *In re Refrigerant Compressors Antitrust Litig.,* No. 2:09-

21  md-2042, 2013 U.S. Dist. LEXIS 50737 (E.D. Mich. Apr. 9, 2013) ("*Refrigerant*

22  *Compressors*") and *In re Aftermarket Filters Antitrust Litig.,* No. 08 C 4883, 2010

23  U.S. Dist. LEXIS 32652 (N.D. Ill. Apr. 1, 2010) ("*Aftermarket Filters*"), yet

---

[81]    In *Digital Music,* the court dismissed only these equitable claims premised solely on the laws of states that follow *Illinois Brick*.

[82]    *Immigration and Naturalization Service v. Pangilinan*, 486 U.S. 875 (1998) concerned the power to confer citizenship and had nothing to do with antitrust or consumer protection.

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD

1   neither case supports their challenge.[83]   First, both actions were both component

2   cases whereby the final product was not manufactured by defendants, unlike here.

3   *Aftermarket Filters*, 2010 U.S. Dist. LEXIS 32652, at *15; *Refrigerant*

4   *Compressors*, 2013 U.S. Dist. LEXIS 50737, at *46-47.  In addition, in *Refrigerant*

5   *Compressors*, the indirect purchaser plaintiffs pled ***one*** unjust enrichment claim

6   under the common law of eleven states, but failed to specify which states' laws

7   applied.  *Id.* at *74-79.  Many courts, including Defendants' own authority, have

8   specifically declined to follow these decisions for good reasons.   *See e.g.,*

9   *Lidoderm*, 103 F. Supp. 3d at 1175-80 (allowing several unjust enrichment claims

10   to proceed); *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, No. 13-

11   CV-01180-BLF, 2015 U.S. Dist. LEXIS 106292, at *96-97 (N.D. Cal. Aug. 11,

12   2015) (*Aftermarket Filters* was "incorrect" and *Lidoderm* and *Eggs* were "more

13   consistent" with certain state laws).

### 3.   Plaintiffs Properly Plead Unjust Enrichment Claims Under California Law

16   Finally, EPPs properly plead unjust enrichment under California law.  At

17   best there is a split of authority on the point—a split that "is essentially founded on

18   semantics, drawing a distinction—between unjust enrichment, restitution, and

19   quasi-contract--without a difference."  *Kosta v. Del Monte Corp.*, No. 12-cv-

20   01722-YGR, 2013 U.S. Dist. LEXIS 69319, at *45 n.8 (N.D. Cal. May 15, 2013).

21   *See also Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1100 (N.D. Cal.

22   2006) ("*Nordberg*") (the argument that California does not allow an unjust

23   enrichment cause of action is "essentially semantic").  Even so, "the weight of

24   authority indicates that California law recognizes a cause of action for unjust

25   enrichment/restitution."  *Wilder v. JP Morgan Chase Bank, N.A.,* No. 09-834

---

[83]   Also attached as Appendices A to D is a state-by-state analysis of cases where courts have rejected Defendants' assertion with respect to unjust enrichment claims Defendants have challenged.

DOC, 2009 U.S. Dist. LEXIS 124242, at *14 (C.D. Cal. Nov. 25, 2009). "California courts, including the Supreme Court of California, have acknowledged that parties may pursue causes of action arising from an unjust enrichment claim…" *Eggs,* 851 F. Supp. 2d at 913-14 (citing *Ghirardo v. Antonioli*, 924 P.2d 996, 1002-03 (Cal. 1996)). *See also Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000); *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1662-63 (1992); *Hirsch v. Bank of Am., N.A.*, 107 Cal. App. 4th 708, 721-22 (2003) (reversing dismissal of an independent unjust enrichment claim). Federal courts in the Ninth Circuit have also routinely upheld equitable claims for unjust enrichment under California law. *Nordberg*, 445 F. Supp. 2d at 1100; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, 2011 U.S. Dist. LEXIS 105151, at *20-23 (N.D. Cal. Sept. 15, 2011) (acknowledging a split of authority, but denying a motion to dismiss an unjust enrichment claim).

### E.   Plaintiffs Are Entitled to Leave to Amend Should the Court Grant Defendants' Motion in Part or in Whole

Should the Court grant Defendants' motions in part or in whole, an opportunity for at least some merits discovery and for briefing at the class certification stage is appropriate, as is leave to amend the complaint. Rule 15 dictates that "[t]he Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a). This right to amend is "to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (reversing lower court's decision denying plaintiffs' leave to amend, stating "A simple denial of leave to amend without any explanation by the district court is subject to reversal."); *see generally Foman v. Davis*, 371 U.S. 178, 182 (1962). Likewise, courts routinely allow plaintiffs the opportunity for discovery prior to dismissing their complaints with prejudice. *See, e.g.*, *Kendall*, 518 F.3d at 1046 (district court dismissed complaint with leave to amend and allowed plaintiffs to conduct discovery to uncover the necessary facts for their amended complaint);

1  *see also Agron*, 2004 U.S. Dist. LEXIS 26605, at *18 (C.D. Cal. Mar. 16, 2004)

2  ("in antitrust cases, where the proof is largely in the hands of the alleged

3  conspirators, dismissals prior to giving the plaintiff ample opportunity for

4  discovery should be granted very sparingly") (quoting *Hospital Building Co. v.*

5  *Trustees of Rex Hospital,* 425 U.S. 738, 746 (1976)).   Given the specific

6  allegations already in the CAC, the Court should allow leave to amend, and EPPs

7  hereby move for such relief if the Court finds the CAC's allegations insufficient.

8  Particularly in the arena of pleading the particularities of multiple states' law,

9  deficiencies are typically remediable, and no prejudice at this stage could be said to

10  result from granting leave to amend such claims.

11  **VII.   CONCLUSION**

12      Defendants' *Twombly*, Standing, Statute of Limitations, and State Law

13  Motions to Dismiss should be in all respects denied.

14

15  DATED:  September 16, 2016          **WOLF HALDENSTEIN ADLER**

16                                              **FREEMAN & HERZ LLP**
                                            BETSY C. MANIFOLD
                                            RACHELE R. RICKERT

17                                          MARISA C. LIVESAY
                                            BRITTANY N. DEJONG

18                          By:     */s/ Betsy C. Manifold*
                                            BETSY C. MANIFOLD

19
                                            750 B Street, Suite 2770
20                                          San Diego, CA 92101
                                            Telephone:  619/239-4599
21                                          Facsimile:  619/234-4599
                                            manifold@whafh.com

22
                                            **WOLF HALDENSTEIN ADLER**
23                                             **FREEMAN & HERZ LLP**
                                            FRED TAYLOR ISQUITH

24                                          isquith@whafh.com
                                            THOMAS H. BURT

25                                          burt@whafh.com
                                            270 Madison Avenue
26                                          New York, New York 10016
                                            Telephone:  212/545-4600
27                                          Facsimile:  212/545-4653
                                            burt@whafh.com

28

- 77 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
THEODORE B. BELL
tbell@whafh.com
CARL MALMSTROM
malmstrom@whafh.com
One South Dearborn St., Suite 2122
Chicago, IL 60603
Telephone: 312/984-0000
Facsimile:   312/212-4401

*Interim Lead Counsel for the*
*End Payer Plaintiffs*

TUNA: 23322.v3

EPPS' MPA IN OPP. TO DEFS' JOINT MTD EPP CONSOLIDATED CAC
Case No. 15-MD-2670-JLS-MDD