UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE: PACKAGED SEAFOOD
PRODUCTS ANTITRUST LITIGATION

Case No.: 15-MD-2670 JLS (MDD)

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS**

Presently before the Court are:

(1)   Defendant Thai Union Group PCL's Motion to Dismiss  ("TUG MTD") (ECF No. 205) all claims asserted against Thai Union in the: (a) Consolidated Amended Complaint of Direct Action Plaintiffs ("DAP Compl.") (ECF No. 152); (b) Consolidated Class Complaint of Direct Purchaser Plaintiffs ("DPP Compl.") (ECF No. 147); (c) Consolidated Class Action Complaint of Indirect Purchaser Commercial Food Preparers Class ("CFP Compl.") (ECF No. 153); (d) Amended Complaint of Direct Action "Kroger" Plaintiffs ("Kroger Compl.") (*The Kroger Co. et al. v. Bumble Bee Foods LLC et al.*, 16-cv-51-JLS (MDD), ECF No. 19); (e) Amended Complaint of Direct Action Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. ("Meijer Compl.") (*Meijer, Inc. et al. v. Bumble Bee Foods LLC, et al.*, 16-cv-398-JLS (MDD), ECF No. 11); (f) Amended Complaint of Direct Action Plaintiff Publix Super

1

Markets, Inc. and Wakefern Food Corp. ("Publix Compl.") (*Publix Super Markets, Inc. et al. v. Bumble Bee Foods LLC et al.*, 16-cv-247-JLS (MDD), ECF No. 12); and (g) Direct Action Plaintiff Winn-Dixie Stores and Bi-Lo Holding, LLC's First Amended Complaint ("Winn-Dixie Compl.") (ECF No. 151);

(2)   Defendant Dongwon Enterprise Co., Ltd.'s Motion to Dismiss ("Dongwon Enter. MTD") (ECF No. 206) all claims against Dongwon Industries and Dongwon Enterprise in the: (a) CFP Complaint; (b) DPP Complaint; (c) Kroger Complaint; (d) Meijer Complaint; (e) Publix Complaint; (f) Wegmans Amended Complaint ("Wegmans Compl.") (*Wegmans Food Markets, Inc. v. Bumble Bee Foods, LLC et al.*, 16-cv-264-JLS (MDD), ECF No. 11); (g) Affiliated Foods First Amended Complaint and Demand for Jury Trial ("Affiliated Foods Compl.") (ECF No. 152); and (h) Winn-Dixie Complaint;

(3)   Defendants StarKist Co.'s, Dongwon Enterprise Co., Ltd.'s, Bumble Bee Foods, LLC's, Tri-Union Seasfoods, LLC's, Thai Union Group PCL's, and Del Monte Foods Company's Joint Motion to Dismiss[1] ("Joint MTD") (ECF No. 207) without further leave to amend the: (a) DPP Complaint; (b) CFP Complaint; (c) Consolidated Class Action Complaint of the Indirect Purchaser End Payer Plaintiffs ("EPP Compl.") (ECF No. 149); (d) Affiliated Foods' Complaint; (e) Wegmans Complaint; (f) Meijer Complaint; (g) Kroger Complaint; (h) Publix Complaint; (i) Winn-Dixie Complaint; (j) Plaintiff W. Lee Flowers & Co., Inc.'s Complaint and Demand for Jury Trial ("Flowers Compl.") (*W. Lee Flowers & Co. v. Bumble Bee Foods, LLC, et al.*, 16-cv-1226-JLS (MDD));

---

[1] This Joint Motion to Dismiss is supported by four distinct briefs: (i) Memorandum of Points and Authorities in Support of Joint Motion to Dismiss All Complaints ("*Twombly* Br.") (ECF No. 207-2); (ii) Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss Plaintiffs' Complaints for Lack of Standing ("Standing Br.") (ECF No. 207-3); (iii) Memorandum of Point sand Authorities in Support of Defendants' Joint Motion to Dismiss Various Claims as Time Barred ("SoL Br.") (ECF No. 207-4); and (iv) Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss the Indirect Purchaser End Payer Plaintiffs' and Indirect Purchaser Commercial Food Preparers' Consolidated Class Action Complaints ("State Law Br.") (ECF No. 207-5).

(4)   Defendant Dongwon Industries Co., Ltd.'s Motion to Dismiss ("Dongwon Indus. MTD") (ECF No. 220) the Wegmans Complaint;

(5)   DPPs' Omnibus Opposition to Motions to Dismiss ("DPP Opp'n") (ECF No. 226) above labeled as: (a) Joint MTD regarding the (i) *Twombly* Brief, (ii) Standing Brief, and (iii) SoL Brief; and (b) TUG MTD;

(6)   CFPs' Memorandum of Law in Opposition to Defendants' Collective Motion to Dismiss Complaint ("CFP Opp'n") (ECF No. 227) above labeled as the: (a) Joint MTD regarding the (i) *Twombly* Brief, (ii) Standing Brief, (iii) SoL Brief, and (iv) State Law Brief; and (b) TUG MTD;

(7)   Affiliated Foods Plaintiffs' Opposition to ("Affiliated Foods Opp'n") (ECF No. 228) the above-labeled Motions to Dismiss: (a) Joint MTD regarding the (i) *Twombly* Brief, (ii) Standing Brief, and (iii) SoL Brief; (b) TUG MTD; and (c) Dongwon Enterprise MTD;

(8)   Certain Direct Action Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss ("Certain DAPs Opp'n") (ECF No. 229) above labeled as the: (a) TUG MTD; (b) Dongwon Enterprise MTD; (c) Joint MTD regarding the (i) *Twombly* Brief; and (d) Dongwon Industries MTD;

(9)   Winn-Dixie Plaintiffs' Opposition ("Winn-Dixie Opp'n") (ECF No. 230) to the: (a) Joint MTD regarding the (i) *Twombly* Brief, (ii) Standing Brief, and (iii) SoL Brief; and (b) TUG MTD;

(10)  EPPs' Memorandum of Points and Authorities in Opposition to Defendants' Joint Motions to Dismiss ("EPP Opp'n") above labeled as the Joint MTD regarding the (i) *Twombly* Brief, (ii) Standing Brief, (iii) SoL Brief, and (iv) State Law Brief;

(11)  Reply Memorandum of Points and Authorities in Support of Motion to Dismiss Plaintiffs' Complaints Against Dongwon Industries Co., Ltd. and Dongwon Enterprise Co., Ltd. ("Dongwon Reply") (ECF No. 233);

(12)  Defendant TUG PCL's Reply to Opposition to Motion to Dismiss ("TUG Reply") (ECF No. 235);

(13) Defendants' Reply Memorandum of Points and Authorities in Support of Joint Motion to Dismiss All Complaints ("*Twombly* Reply") (ECF No. 236);

(14) Reply Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss Various Claims as Time Barred ("SoL Reply") (ECF No. 237);

(15) Reply Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss EPPs' and CFPs' Consolidated Class Action Complaints ("State Law Reply") (ECF No. 238);

(16) Reply Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss Plaintiffs' Complaints for Lack of Standing ("Standing Reply") (ECF No. 239).

This Order is the first of two addressing the issues raised by these Defendants' motions to dismiss as set forth above. *See infra* pp. 5–6.

## BACKGROUND

In 2015, dozens of actions were instituted in federal district courts across the nation seeking various forms of relief relying on the same factual predicate: an alleged antitrust conspiracy, in violation of the Sherman Act and state antitrust laws, regarding packaged seafood products. *See generally* Transfer Order (ECF No. 1).  On December 9, 2015 the United States Judicial Panel on Multidistrict Litigation centralized pretrial proceedings ("*In re Packaged Seafoods Antitrust Litigation*") to this Court in the Southern District of California.  (*Id.* at 1–2 ("The vast majority of the related actions are already pending in this district, most before Judge Janis L. Sammartino, who has the related cases before her.").)

Several weeks later, the United States Government intervened in the action, noting that "[a] federal grand jury empanelled in the Northern District of California is investigating potential violations of the Sherman Act, 15 U.S.C. § 1, in the packaged seafood industry."  (U.S. Notice of Mot. to Intervene 1, ECF No. 34.)  The Court subsequently held several status conferences, (ECF Nos. 43, 108), appointed interim lead counsel, and set the leadership structure for purposes of pretrial proceedings, (ECF No. 119).  In so doing, the Court divided the Plaintiffs into four groups:

- **Direct Action Plaintiffs ("DAPs")**, who are direct purchasers proceeding against Defendants individually;
- **Direct Purchaser Plaintiffs ("DPPs")**, who are direct purchasers proceeding on behalf of a putative class;
- **Indirect Purchaser Commercial Food Preparer Plaintiffs ("CFPs")**, who are indirect purchasers proceeding on behalf of a putative class; and
- **Indirect Purchaser End Payer Plaintiffs ("EPPs")**, who are indirect purchasers proceeding on behalf of a putative class.

(Order Appointing Interim Lead Counsel 1–2, ECF No. 119.)

Several months later, Plaintiffs, Defendants, and the United States entered into a joint stipulation regarding a limited stay of discovery, in effect until December 31, 2016, (Joint Stipulation re: Limited Stay of Discovery 1–3, ECF No. 130), which the Court approved, (ECF No. 137). Despite this limited stay, both Plaintiffs and Defendants agreed to the filing of amended complaints and motions to dismiss. (ECF Nos. 138, 142.) On November 21, 2016, Plaintiffs, Defendants, and the United States entered into a second joint stipulation regarding a limited day of discovery, in effect for many factual matters until March 31, 2017, and in effect for all party depositions until September 30, 2017. (Joint Stipulation re: Second Limited Stay of Discovery 1–3, ECF No. 256.) The Court and the parties conferred at a November 29, 2016 Status Conference, (ECF Nos. 257, 262), and decided to bifurcate oral argument on the Motions to Dismiss according to the classification of "federal" versus "state" issues. The federal issues—which are the subject of this Order—encompass (1) the sufficiency of all relevant Plaintiffs' allegations under the Sherman Act for monetary damages; (2) the sufficiency of all relevant Plaintiffs' allegations under the Sherman Act for injunctive relief; (3) all relevant Plaintiffs' standing to prosecute non-tuna claims; and (4) all statue-of-limitations issues related to the Sherman Act claims. The state-law issues—which will be the subject of the subsequent oral argument and corresponding Order—encompass (1) the sufficiency of all relevant Plaintiffs' allegations under the various state-law causes of action; (2) the legal permissibility of all relevant Plaintiffs' attempt to bring claims on behalf of a nationwide California class; (3) all relevant Plaintiffs' lack of standing under various state-law

1  standards; (4) all statute-of-limitations issues related to the various state-law causes of

2  action; and (5) the sufficiency of relevant Plaintiffs' allegations of Defendants Dongwon's

3  and TUG's (a) direct participation in the alleged conspiracy, or (b) alter ego or agency

4  liability under the alleged conspiracy.

5  Six days prior to the scheduled hearing on the federal issues, the United States

6  submitted a filing to "inform[] the Court that the first criminal case in the packaged-seafood

7  investigation has been filed in the Northern District of California." (U.S.' Status Report re

8  Information Filed in N.D. Cal. 1, ECF No. 268.)

9  The Court held oral argument concerning the federal issues on December 13, 2016,

10  (Tr. of Mot. Hr'g ("Hr'g Tr."), ECF No. 276), and thereafter took the matters under

11  submission.   After considering all parties' arguments and the law, the Court rules as

12  follows.

13  **LEGAL STANDARD**

14  Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the

15  defense that the complaint "fail[s] to state a claim upon which relief can be granted,"

16  generally referred to as a motion to dismiss.   The Court evaluates whether a complaint

17  states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil

18  Procedure 8(a), which requires a "short and plain statement of the claim showing that the

19  pleader is entitled to relief."   Although Rule 8 "does not require 'detailed factual

20  allegations,' . . . it [does] demand[] more than an unadorned, the-defendant-unlawfully-

21  harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

22  *Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   In other words, "a plaintiff's obligation to

23  provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

24  conclusions, and a formulaic recitation of the elements of a cause of action will not do."

25  *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).   "Nor does

26  a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual

27  enhancement.'" *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 557).

28  / / /

6

1    "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

2    accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting

3    *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6).  A claim is facially plausible

4    when the facts pled "allow[] the court to draw the reasonable inference that the defendant

5    is liable for the misconduct alleged." *Id.*  (citing *Twombly*, 550 U.S. at 556).  That is not

6    to say that the claim must be probable, but there must be "more than a sheer possibility that

7    a defendant has acted unlawfully." *Id.*  Facts "'merely consistent with' a defendant's

8    liability" fall short of a plausible entitlement to relief. *Id.*  (quoting *Twombly*, 550 U.S. at

9    557).  Further, the Court need not accept as true "legal conclusions" contained in the

10   complaint. *Id.*  This review requires context-specific analysis involving the Court's

11   "judicial experience and common sense." *Id.* at 678 (citation omitted).  "[W]here the well-

12   pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

13   the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"

14   *Id.*

15       Where a complaint does not survive 12(b)(6) analysis, the Court will grant leave to

16   amend unless it determines that no modified contention "consistent with the challenged

17   pleading . . . [will] cure the deficiency." *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655,

18   658 (9th Cir. 1992) (quoting *Schriber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d

19   1393, 1401 (9th Cir. 1986)).

20                                          **ANALYSIS**

21       Defendants effectively assert three overarching arguments relevant to the federal

22   issues addressed in this Order: (1) all Plaintiffs fail to state a plausible conspiracy claim

23   under relevant Sherman Act provisions, as to (a) packaged seafoods generally; (b) tuna

24   specifically; and (c) an entitlement to injunctive relief; (2) CFPs, DPPs, EPPs, and various

25   DAPs all fail to adequately establish Article III standing regarding their "packaged

26   seafood" (i.e., non-tuna-based) claims; and (3) all Plaintiffs' claims that accrued prior to

27   2011 are time barred because (a) in the Ninth Circuit the injury, rather than discovery, rule

28   applies to Sherman Act claims, and (b) no Plaintiffs' allegations are saved by the tolling

doctrine of fraudulent concealment.  Analysis here follows the above outline, addressing in each corresponding section the various sub-arguments raised by the above overarching arguments.

## I.    *Twombly/Iqbal* and Failure to Adequately Plead a Plausible Conspiracy Under the Sherman Act

Plaintiffs together claim various violations of section one of the Sherman Act, which declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states . . . ."  15 U.S.C. § 1. The essential elements of such a cause of action are: "(1) an agreement among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition."  *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 844 (9th Cir. 1980).

Defendants StarKist Co., Dongwon Enterprise Co., Ltd., Bumble Bee Foods, LLC, Tri-Union Seafoods, LLC, Thai Union Group PCL, and Del Monte Foods Company (together, "*Twombly* Defendants") move to dismiss all Plaintiffs' Complaints under Federal Rule of Procedure 12(b)(6) for failure to state a plausible conspiracy under the Sherman Act.  (*Twombly* Br. 1–2.)  Specifically, the *Twombly* Defendants argue that Plaintiffs have failed to show the required element of an agreement.  (*See Twombly* Br. 5–6; *Codding*, 615 F.2d at 844.)  The *Twombly* Defendants—except for Tri-Union Seafoods, LLC and Thai Union Group PCL, (Joint Notice of Mot. and Mot. to Dismiss Pls.' Compls. 1 n.1, ECF No. 207)—argue that Plaintiffs fail to prove either (a) a packaged seafood conspiracy or (b) a tuna-only conspiracy; additionally, all *Twombly* Defendants argue that (c) Plaintiffs fail to plausibly allege entitlement to injunctive relief.  (*See Twombly* Br. i.) The Court addresses each argument in turn.

### A.  *Failure to Plead a Packaged Seafood Conspiracy*

The DPP, EPP, CFP, and DAPs Affiliated Foods, Winn-Dixie, and Flowers Complaints allege that Defendants conspired to "raise, fix, stabilize, or maintain prices in the market for shelf-stable packaged seafood" within the United States.  (Affiliated Foods

¶ 1; *see* DPP Compl. ¶ 1; EPP Compl. ¶ 2; CFP Compl. ¶ 1; Winn-Dixie Compl. ¶ 1; Flowers Compl. ¶ 1.)  EPP and Affiliated Foods Plaintiffs more specifically define the market for shelf-stable packaged seafood as including tuna, clams, crab, mackerel, oysters, salmon, sardines, and shrimp, (*see* EPP ¶ 1; Affiliated Foods ¶ 1); the remaining Plaintiffs merely note that the market includes shelf-stable seafood products (predominately/specifically/principally tuna) that are sold in cans, pouches, or ready-to-eat serving packages, (*see* DPP Compl. ¶ 1 ("principal[ly]"); CFP Compl. ¶ 1 ("predominately"); Winn-Dixie Compl. ¶ 1 ("predominately"); Flowers Compl. ¶¶ 1–2 ("specifically")).

In support of their Joint Motion to Dismiss, Defendants argue that in each complaint the above packaged seafood allegations stand alone; i.e., "not a single Plaintiff has even attempted to allege any collusive conduct regarding any type of packaged seafood product other than tuna." (*Twombly* Br. 1; *see Twombly* Reply 8.)  In response, Plaintiffs first frame the inquiry with generous legal statements, urging that "there simply is no requirement that an antitrust plaintiff draw the boundaries of the alleged conspiracy (or conspiracies) in a complaint with the precision of a diamond cutter."  (DPP Opp'n 10 (quoting *In re Capacitors Antitrust Litig.* ("*Capacitors*"), 106 F. Supp. 3d 1051, 1063 (N.D. Cal. 2015)); Winn-Dixie Opp'n 15 (quoting same *Capacitors* language); Affiliated Foods Opp'n 12 (also quoting *Capacitors*); CFP Opp'n 10–12 ("Though the complaint focuses on tuna, it contains sufficient allegations to create an inference of a larger conspiracy.").)  Factually, Plaintiffs argue that (1) Defendant Bumble Bee, the Bureau of Labor Statistics, and the DOJ at times refer to "the packaged seafood industry" or "shelf-stable seafood products" as a category (of which canned tuna is a segment of that category);[2] (2) Defendant TUG,

---

[2] At the hearing, several Plaintiffs noted that the United States' communication regarding the recent criminal filing—and, indeed, the criminal filing itself—describes the first criminal case as concerning "the packaged-seafood industry . . . ." (*E.g.*, Hr'g Tr. 18:7–12; *see also* U.S.' Status Report re Information Filed in N.D. Cal 1; Notice of Suppl. Information Relevant to Defs.' Joint Mots. to Dismiss and Pls.' Opp'ns to Same, Ex A, 2–4, ECF No. 269-1.)  However, as Defendants noted, a plea in that case has not yet been finalized and, more importantly, relying on any aspect of the criminal filing would be external to

both in a letter to the Bangkok stock exchange and in the September 16, 2015 minutes of an Extraordinary General Meeting of Shareholders held by TUG, noted that the DOJ was investigating the "packaged seafood industry" as a whole; (3) that DOJ investigator Bauer, in announcing the abandonment of Defendants CotS's and Bumble Bee's merger, noted that the DOJ "investigation convinced [the DOJ]—and the parties knew or should have known from the get go—that the market is not functioning competitively today[;]" (4) the economic data which analyze "tuna together with other shelf-stable seafood show[] suspicious price fluctuations that occurred across these other products[;]" and (5) the entire packaged seafood industry was vulnerable to collusion, and no complaints reveal any "reason to segregate tuna from an overall market that bears all the hallmark features of one that is vulnerable to collusion." (*E.g.*, DPP Opp'n 10; CPP Opp'n 11–12.)[3]

As an initial matter, Plaintiffs' reliance on *Capacitors* as a framing device is misplaced. At issue in the specific *Capacitors* order cited by Plaintiffs, 106 F. Supp. 3d at 1061, were the defendants' motions to dismiss both the direct and the indirect purchaser plaintiffs' complaints, in part due to the disparate "one vs. two conspiracy theories" respectively alleged in the DPP and IPP complaint. However, those partially dissonant complaints overlapped in many of their allegations—including identifying the same alleged key players—regardless whether the ultimate allegation was that the key players engaged in one overarching conspiracy or instead two smaller conspiracies. *Id.* at 1063–64. Further, the "diamond cutter" line several Plaintiffs cite is supported by a sole citation to *In re Lithium Ion Batteries Antitrust Litigation* ("*Batteries I*"), No. 13–MD–2420 YGR,

_____

the complaints currently before the Court and therefore improper within the context of the pending 12(b)(6) motions.

[3] Plaintiffs also note the purported leniency applicant in the DOJ investigation and "that the issuance of criminal subpoenas by the DOJ will normally be authorized 'if a grand jury investigation developed evidence concerning the alleged anticompetitive conduct.'" (DPP Opp'n 12 (quoting DPP Compl. ¶ 66.)) As the Court later addresses, the DOJ investigation and the purported leniency applicant support only the inference of a general conspiracy, and thus has no bearing on analysis here regarding the specifics of a packaged seafood conspiracy. *See infra* Section I.B.ii.

2014 WL 309192, at *2 (N.D. Cal. Jan. 21, 2014) ("The question in this case is not whether any conspiracy existed, only how far it reached. That question is ultimately one of fact, and cannot be resolved in the present procedural posture, where the Court tests only the sufficiency of the pleadings."), a case where the plaintiffs' pleadings specifically alleged "certain defendants' actual agreements to refrain from competing on price[,]" and the Court had the benefit of documents "produced to the grand jury and then turned over to Plaintiffs" and "criminal guilty pleas entered by two defendants . . . ." *Id.*

In the present case, there is no question that the factual circumstances are distinguishable.  True, like *Capacitors*, here there are disparate conspiracy allegations (some complaints encompass only tuna and other complaints the entire collection of packaged seafood products).  However, unlike *Capacitors*, where there were specific allegations regarding the defendants' participation in <u>both</u> disparate conspiracies, here Plaintiffs have put forth specific allegations almost principally regarding tuna and ask the Court to draw the inference that there is no reason to segregate tuna from the overall packaged seafood market.  This is improper.  A conspiracy requires an agreement, and Plaintiffs have not alleged any agreement—inferential or direct—between the Defendants to fix prices across the entire packaged seafood industry.  The DOJ investigation and alleged leniency applicant have no bearing on this inquiry, *see infra* Section I.B.ii, and Plaintiffs' remaining allegations simply do not hurdle the *Twombly* bar to alleging a packaged-seafood-wide conspiracy.  The economic data analyzing packaged seafood price fluctuations are insufficient standing on their own to suggest collusion (and furthermore includes tuna within their calculations, thus further attenuating any alleged inference of packaged-seafood-wide collusion).  (*See* DPP Compl. ¶¶ 58–59.)  And sufficient allegations of a tuna-specific conspiracy, even taken with Plaintiffs other packaged seafood allegations, do not therefore suggest an agreement encompassing all of the products within the packaged seafood classification.  Unlike capacitors, which in any form are fundamental to almost all manufactured electronics, packaged seafood as a category includes many different types of sea creatures which vary—non-exhaustively—in price, availability, taste,

1    and potential for consumer allergies.[4]   In short, sufficient allegations of a tuna-specific

2    conspiracy do not on these facts therefore create a correspondingly viable conspiracy

3    encompassing the entire packaged seafood product category.

4        Given the foregoing, the Court concludes that no Plaintiff has plausibly alleged a

5    packaged-seafood conspiracy as to Defendants StarKist Co., Dongwon Enterprise Co.,

6    Ltd., Bumble Bee Foods, LLC, and Del Monte Foods Company.   However, because

7    Defendants Thai Union Group and Tri-Union Seafoods did not bring a motion to dismiss

8    on this ground, all Plaintiffs claims of a packaged-seafood conspiracy relating to these two

9    Defendants are still live pending resolution of the second-half of the pending motions to

10   dismiss.[5]

11   **_B. Failure to Plead a Tuna-Specific Conspiracy_**

12       Defendants move to dismiss all Plaintiffs' Complaints for failure to state a plausible

13   tuna-specific conspiracy.   (*Twombly* Br. 11.)   Defendants broadly assert that (1) Plaintiffs'

14   allegations amount to "nothing more than parallel conduct[;]" (2) opportunities to collude

15   do not support an inference of conspiracy; (3) allegations that an industry is conducive to

16

17
18   [4] At oral argument Plaintiffs also suggested *In re Domestic Airline Travel Antitrust Litigation* ("*Airline
19   Travel*"), __ F. Supp. 3d __, 2016 WL 6426366 (D.D.C. Oct. 28, 2016), bolsters the proposition that
     Plaintiffs' packaged-seafood allegations are sufficient.   (*See* Hr'g Tr. 21:22–26:13.)   However, despite
20   being external to our circuit, *Airline Travel* serves as an excellent example of why Plaintiffs' complaints
     here fail to state a valid industry-wide conspiracy.   The *Airline Travel* plaintiffs alleged a conspiracy
21   regarding "air passenger transportation services within the United States, its territories, and the District of
     Columbia . . . ."   *Id.* at *2.   As factual support, the plaintiffs alleged that airline industry leaders had
22   "discussed the importance of focusing on capacity within the industry[,]" that despite the economy
     improving and jet-fuel cost falling the defendants "made a conscious, joint decision not to return to the
23   previous industry practice of adding airline capacity and decreasing fares," and that ultimately the
     conspiracy "resulted in a 10% reduction in capacity by United States airlines in 2009."   *Id.* at *7 (emphases
24   added).   The *Airline Travel* Court thus concluded that the plaintiffs' claims were "not limited to certain
     routes or city-pairs[,]" *id.*, but instead alleged "a system-wide conspiracy to limit capacity in order to drive
25   up fares within the nationwide air passenger transportation market[,]" *id.* at 12.   And in so concluding the
     *Airline Travel* Court relied on precisely the type of industry-wide allegations Plaintiffs' complaints here
26   lack.

27   [5] Specifically, Thai Union Group has separately moved for dismissal as to all complaints under Federal
28   Rule of Procedure 12(b)(6) because "Thai Union is not sufficiently alleged to have actually conspired or
     otherwise violated the antitrust laws."   (TUG MTD 1.)

collusion do not support a conspiracy claim; (4) a conspiracy cannot be inferred from a DOJ investigation; and (5) references to prior unrelated litigation and foreign antitrust violations do not support an inference of conspiracy. (*Id.* at i.) All Plaintiffs oppose these arguments, often asserting that Defendants lump all of Plaintiffs' Complaints together and that the Court instead must consider each Plaintiff's Complaint on its own merits. (*See, e.g.*, DPP Opp'n 14, 14 n.9; Affiliated Foods Opp'n 1–2, 2 n.5; Certain DAPs Opp'n 2; Winn-Dixie Opp'n 3, 3 n.3; EPP Opp'n 2, 11–12.) However, common to all complaints except the Flowers Complaint are the following allegations: (1) the pending DOJ investigation and (2) the purported leniency applicant; and that Defendants colluded regarding (3) tuna can-size changes and tuna list-price increases; (4) the scope of tuna-related promotional activity; and (5) a joint refusal to offer FAD-free tuna for sale under their respective brands. (DPP Compl. ¶¶ 56–84; EPP Compl. ¶¶ 98–119; CFP Compl. ¶¶ 58–73; Affiliated Foods Compl. ¶¶ 58–83, 90–94; Wegmans Compl. ¶¶ 60–73; Meijer Compl. ¶¶ 59–73; Kroger Compl. ¶¶ 63–77; Publix Compl. ¶¶ 60–74; Winn-Dixie Compl. ¶¶ 44–54, 30–38.) Accordingly, if these allegations together are sufficient to suggest a plausible tuna-specific conspiracy, the Court may deny almost in total Defendants' Joint MTD on this point. The Court therefore considers these allegations first.

### (i) *Pending DOJ Investigation*

The Court first addresses Plaintiffs' allegations regarding the pending DOJ investigation and purported leniency applicant. (*E.g.*, DPP Compl. ¶¶ 60–68.) As an initial matter, Defendants argue that "[i]t is undisputed that government investigations 'carr[y] no weight in pleading an antitrust conspiracy claim.'" (*Twombly* Br. 32 (quoting *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (second alteration in original)).) Plaintiffs disagree, arguing that at the very least government investigations may bolster the sufficiency of additional conspiracy allegations. (*E.g.*, DPP Opp'n 12.) The Court recognizes the limitations of and caution required in relying on a pending investigation to support the validity of an alleged

/ / /

13

conspiracy, but nonetheless agrees with Plaintiffs that a pending investigation may bolster additional allegations.

There are problems with relying solely or too heavily on pending government investigations in analyzing the sufficiency of a conspiracy complaint.  "It is unknown whether the investigation will result in indictments or nothing at all.  Because of the grand jury's secrecy requirement, the scope of the investigation is pure speculation.  It may be broader or narrower than the allegations at issue."  *GPU*, 527 F. Supp. 2d at 1024.  However, this does not mean that any pending government investigation always has zero bearing on a corresponding civil conspiracy allegation.  *See In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) ("A plaintiff may surely rely on governmental investigations, but must also, under FRCP 11, undertake his own reasonable inquiry and frame his complaint with allegations of his own design."); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010) (considering "a pending investigation by the New York State Attorney General and two separate investigations by the Department of Justice" in holistic analysis of the sufficiency of a corresponding civil complaint).

In the present case, as noted by Plaintiffs, the DOJ's Antitrust Division Manual explicitly states that prior to requesting a grand jury investigation "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  U.S. DEP'T OF JUSTICE, ANTITRUST DIV. MANUAL § F.1 (5th ed. Apr. 2015), available at https://www.justice.gov/atr/file/761141/download.  This includes a requirement that staff "prepare a memorandum on behalf of the section or field office chief to the DAAG [(Deputy Assistant Attorney General)] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement detailing the information forming the basis of the request."  *Id.*  Within the context of a motion to dismiss, the inquiry is whether a Plaintiff has alleged sufficient factual material to "unlock the doors of discovery . . . ."  *Iqbal*, 556 U.S. at 678.  Accordingly, it would be improper to draw a <u>conclusion</u> that a pending government investigation on its own supplies sufficient factual material to survive

a 12(b)(6) motion to dismiss.  However, it is perfectly permissible to take as true the <u>fact</u> that a government investigation has been instituted, and that therefore at least several individuals within the governmental chain of command thought certain facts warranted further inquiry into a potential criminal conspiracy.  Framed in this manner, and here supported by the additional allegations that several Defendants have admitted to receiving criminal subpoenas, (*e.g.*, DPP Compl. ¶¶ 62–63), and of a DOJ press release regarding an abandoned merger between CotS and Bumble Bee which noted that the Antitrust Division's "investigation convinced us—and the parties knew or should have known from the get go—that the market is not functioning competitively today, and further consolidation would only make things worse[,]" *Chicken of the Sea and Bumble Bee Abandon Tuna Merger After Justice Department Expresses Serious Concerns*, DEP'T OF JUSTICE, OFFICE OF PUBLIC AFFAIRS (Dec. 3, 2015), https://www.justice.gov/opa/pr/chicken-sea-and-bumble-bee-abandon-tuna-merger-after-justice-department-expresses-serious, the Court thus may validly consider the pending DOJ investigation in concert with Plaintiffs' other allegations.

### (ii)   Purported Leniency Applicant

Plaintiffs and Defendants disagree as to whether the existence of a purported leniency applicant may properly be considered by the Court in evaluating the sufficiency of Plaintiffs' complaints.  (*Compare, e.g.*, DPP Opp'n 12–14, *with, e.g.*, *Twombly* Br. 33.) However, the Court need not determine this issue.  Plaintiffs have not identified a single news source detailing the existence of a leniency applicant that actually provides any proof of such applicant.  In fact, the first report of a leniency applicant in this case came directly from counsel for one of the Plaintiffs.  *Hausfeld Partner Christopher Lebsock on Criminal Price Fixing in the Tuna Industry*, CORPORATE CRIME REPORTER (Sept. 29, 2015 7:10 AM) (counsel noting "[o]ften in criminal antitrust cases, one of the companies will come in as an amnesty applicant," and saying "I have a feeling, and this is just my speculation, that Tri-Union                     is                     the                     amnesty                     applicant"), http://www.corporatecrimereporter.com/news/200/hausfeld-partner-christopher-lebsock-

15

15-MD-2670 JLS (MDD)

on-criminal-price-fixing-in-the-tuna-industry; *see also* Tom Seaman, *Lawyer in Tuna Price Fixing Suits: DOJ Focuses on "Most Culpable" Execs*, UNDERCURRENT NEWS (July 25, 2016 5:21 PM) ("The complaint for the direct buyers' section of the class action, which Lebsock's firm Hausfeld are representing, indicates the DOJ likely has an amnesty applicant." (emphasis added)), https://www.undercurrentnews.com/2016/07/25/lawyer-in-tuna-price-fixing-suits-doj-focuses-on-most-culpable-execs.   The only news story Plaintiffs identify that does not directly rely on Plaintiffs' counsel's or complaints' assertion of a leniency applicant is an October 13, 2015 article[6]—fourteen days after Plaintiffs' counsel's assertion of a leniency applicant—that substantiates its leniency-applicant claims by saying the publication "has learned" and that "[i]t is understood . . . ." Joshua Sisco and Leah Nylen, *Chicken of the Sea Applies for Leniency in DOJ Packaged Seafood Probe*, MLEX MARKET INSIGHT (Oct. 13, 2015), http://mlexmarketinsight.com/wp-content/uploads/2016/01/MLex_The-Best-of-2015-Reduced-Size2.pdf.

Given the foregoing, Plaintiffs' leniency-applicant allegation ultimately amounts only to an unsubstantiated conclusion that there has been a leniency applicant in the present case.   The Court need not accept this conclusion as true, *Iqbal*, 556 U.S. at 679, and therefore need not consider whether the actual existence of a leniency applicant would affect the Court's analysis as to the sufficiency of Plaintiffs' conspiracy allegations.

/ / /

/ / /

/ / /

---

[6] Several Plaintiffs noted this article in their complaint (DPP Compl. ¶ 66; Winn-Dixie Compl. ¶ 36), and counsel for DPPs additionally flagged the article at oral argument in response to one of the Court's questions. (Hr'g Tr. 27:24–28:14.)  At oral argument, counsel for DPPs additionally noted that subsequent to the relevant filings "we have been provided information.  That information has been provided to us in a way that we agreed to take some information without disclosing it publicly, but — so that information confirms our belief and the information that we had previously received that Chicken of the Sea or Tri-Union is the leniency applicant."  (*Id.* at 28:8–14.)  However, the Court—without more—declines to accept counsel's assertion as established for purposes of this 12(b)(6) motion.

(iii)   *Collusion Regarding Tuna Can-Size Changes & Tuna List-Price Increases*

Plaintiffs allege that on approximately May 30, 2008 Bumble Bee President and CEO Chris Lischewski gave a speech at a conference attended by StarKist, Bumble Bee, and CotS urging "global tuna industry leaders" to develop "sustainable tuna management practices." (*E.g.*, DPP Compl. ¶ 70.)  In the wake of this speech, and over the course of the coming year, these three major brands lowered the standard tuna can size from 6 ounces to 5 ounces without any corresponding change in price. (*E.g.*, EPP Compl. ¶¶ 102–106.)

Next, Plaintiffs allege that from approximately December 2011 to January 18, 2012, senior sales and management personnel for these three brands engaged in communications ultimately resulting in an agreement to increase list prices "for the products sold at retail in the United States . . . and by the same amount." (*E.g.*, *id.* ¶¶ 107–10.)  Price increases pursuant to the alleged agreement were (1) announced on January 13, 2012, effective March 26, 2012 for StarKist; (2) announced January 17, 2012, effective April 1, 2012 for Bumble Bee; and (3) announced January 18, 2012, effective April 1, 2012 for CotS. (*E.g.*, *id.* ¶ 110.)

These two sets of allegations nicely illustrate the contours *Twombly* and *Iqbal* define regarding the sufficiency of a plaintiff's allegations.  The policy behind *Twombly*'s and *Iqbal*'s distinction between plausibility and mere possibility is largely grounded in ensuring the burdens of often costly and time-consuming discovery are taken into account when a court considers a motion to dismiss. *Twombly*, 550 U.S. at 559.  *Twombly*, itself an antitrust case, discusses in great specificity the incredibly high cost and extensive scope of antitrust discovery. *Id.*  *Iqbal* reaffirmed these overarching discovery-based policy considerations, noting further that "the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls placed upon the discovery process." *Iqbal*, 556 U.S. at 685.

In the present case, Plaintiffs' first set of allegations are precisely the type which *Twombly* and *Iqbal* proscribe.  Plaintiffs' allegations set forth a possibility that Lischewski

carefully chose the words of his speech to suggest to StarKist and CotS that they should together lower can sizes, and that the plan was then ultimately accomplished by each company lowering can sizes over the course of a year, rather than all companies doing so at once. However, it is equally as possible that Bumble Bee thought it could make more money by lowering can sizes, and StarKist and CotS, not wanting to lose profits or seem the odd ones out, thus followed suit. Further, because there are no allegations of particular agreements or communications leading to the can-size decreases, Defendants are left with little notice as to what Plaintiffs might seek in discovery. The Court thus finds no support for the ultimate plausibility of Plaintiffs' overall conspiracy allegations in these specific allegations.

By contrast, Plaintiffs' second set of allegations set forth a specific set of communications between defendants over the course of at most forty-nine days, ultimately resulting in an agreement between the companies to raise prices. To be sure, standing alone the alleged implementation of the agreement looks much the same as Plaintiffs first set of allegations—industry competitors adopting similar policies over a short period of time. But in this case the similarity, and corresponding equipoise between innocuous and conspiratorial inferences, is partially removed by the alleged agreement and tighter timeline during which the relevant communications occurred. Within the context of Plaintiffs' other allegations this may well "nudge[] their claims across the line from conceivable to plausible . . . ." *Twombly*, 550 U.S. 570. Accordingly, the Court accepts Plaintiffs' second set of allegations as relevant to whether Plaintiffs have plausibly alleged an overarching conspiracy.

> (iv)   *Collusion Regarding the Scope of Tuna-Related Promotional Activity*

Plaintiffs allege that for at least a year from 2012, and perhaps longer, there were email and telephone communications involving executives at each company where "one company executive would call another about what was perceived to be an aggressive promotion and was assured that it was limited in nature and was not intended to upset agreed-upon market prices." (DPP Compl. ¶ 80; *e.g.*, EPP Compl. ¶¶ 111–12; CFP Compl.

¶¶ 67–68; Affiliated Foods Compl. ¶ 83.)  Defendants argue that these allegations are "not indicative of a conspiracy to fix prices," and that "there are alternative non-collusive, pro-competitive reasons why Defendants would monitor each other's promotions with customers, including ensuring that each Defendant's products remain competitive." (*Twombly* Br. 17.)

While Defendants are correct that these allegations, standing alone, are equally suggestive of conspiracy as they are of rational business behavior, Defendants fail to place these allegations in the context of Plaintiffs' other allegations.  As discussed in the previous subsection, *supra* Section II.B.iii, the Court accepts as weighing in favor of a plausible conspiracy Plaintiffs' allegations of an agreement between StarKist, CotS, and Bumble Bee to simultaneously raise prices in 2012.  And these price-raising allegations in turn inform and bolster Plaintiffs' allegations here that for a year or more, starting in 2012, the companies would monitor each other's pricing and promotional offerings and call each other to effectively "check up" on the status of the earlier alleged agreement.  Properly placed in this context, the Court accepts Plaintiffs' allegations here as relevant to whether Plaintiffs have plausibly alleged an overarching conspiracy.

*(v)   Collusion Regarding a Joint Refusal to Offer FAD-Free Tuna for Sale*

Plaintiffs assert that StarKist, Bumble Bee, and CotS each agreed that they would not sell any FAD-free products[7] under their own labels, despite strong and growing demand by consumers.  (*E.g.*, DPP Compl. ¶ 83.)  Senior executives at each company began discussing the agreement in late-2011 emails, reached an agreement by telephone conference call during the week of February 6, 2012, and confirmed the agreement in an email dated February 17, 2012.  (*Id.*)  "By this agreement, the Defendants ensured that they did not compete on the dimension of advertising the sustainably . . . caught nature of any

---

[7] FAD is short for "Fish Aggregation Device[,]" which is a "man-made object[] such as [a] float[] or buoy[] that [is] used to attract certain fish."  (*E.g.*, Publix Compl. ¶ 39.)  "Various organizations . . . have been vocal advocates of 'sustainability' in fish harvesting[,]" and thus are against excessive use of FADs. (*E.g.*, DPP Compl. ¶ 50.)

of their branded tuna products." (*Id.*)  For clarity, at oral argument Defendant Bumble Bee noted that several of the Defendant companies offer FAD-free products under different labels.  (*See* Hr'g Tr. 49:14–51:12.)  However, regardless whether or not a particular Defendant offers FAD-free products for sale under a different label, Defendants assert that the underlying agreement not to sell FAD-free tuna under each company's flagship label should be considered under "rule of reason" analysis, (*Twombly* Br. 22), whereas Plaintiffs contend that "*per se*" analysis is appropriate, (*e.g.*, DPP Opp'n 21).

Although allegedly anticompetitive behavior may implicate distinct categories of antitrust analysis—usually either "rule of reason" or "*per se*"—the Supreme Court has noted on several occasions that "there is often no bright line separating *per se* from Rule of Reason analysis." *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 779 (1999) (citing *National Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 110 (1984)).  The touchstone, if any, is whether the challenged conduct amounts to a "naked restraint on price and output . . . ." *Id.*

> One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. . . .  This Court has reiterated time and time again that '[h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.'  Such limitations are *per se* violations of the Sherman Act.

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990) (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972)); *see also F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986) ("'[A]s a matter of law, the absence of proof of market power does not justify a naked restriction on price or output,' and . . . such a restriction 'requires some competitive justification even in the absence of a detailed market analysis.'" (quoting *National Collegiate Athletic Ass'n.*, 468 U.S. 85, 109 (1984))).

In the present case, the Court is satisfied that the alleged agreement between Defendants to completely refuse to offer under their flagship labels a seemingly viable

/ / /

product constitutes a *per se* violation of the Sherman Act.[8]   Three main market competitors entering an agreement to flatly refuse to offer an in-demand product under their primary brand evinces no other purpose than to horizontally restrict output in the most extreme sense, with an end result of stifling any potential competition between the flagship brands. But even if the alleged agreement is examined under the more exacting "rule of reason" standard, Defendants do not offer any pro-competitive reason for entering into the agreement, instead arguing that they simply each adopted a "common policy" that "had to do with product development."   (*See Twombly* Br. 21–23; *Twombly* Reply 13–14.) Accordingly, the Court accepts Plaintiffs' allegations here as a relevant factor weighing in favor of the plausibility of Plaintiffs' alleged overarching conspiracy.

### *(vi)*   *Conclusion*

Given the foregoing analysis, the Court is left with the following allegations to be considered together: (1) there is a pending DOJ investigation regarding potential antitrust violations, the institution of which necessarily required the exercise of judgment by the DOJ in expending limited resources; (2) an alleged agreement between StarKist, CotS, and Bumble Bee, resulting from a maximum of forty-nine days of communications, that ultimately resulted in matching tuna list-price increases announced and implemented by each company within days of each other; (3) alleged communications overlapping with and following the announcement and implementation of the aforementioned list-price increases, in which executives from StarKist, CotS, and Bumble Bee would call to monitor and seek assurances regarding newly formulated promotions that might adversely affect

_____

[8] The Court does not find persuasive Defendants' citations to *In re Citric Acid Litigation*, 191 F.3d 1090, 1101 (9th Cir. 1999), and other cases for the general proposition that "[f]aulting a company for expanding too slowly . . . would subject countless strategic business decisions to second-guessing by courts."   *But see Twombly*, 550 U.S. at 569 ("[F]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets." (quotation marks omitted)).   Plaintiffs here have alleged an actual agreement, and the corresponding time-frame for discussion and memorialization of the same, wherein three Defendants flatly horizontally refused to pursue a viable market.   That is not slow expansion; it is a complete bar to even considering such expansion.

the agreed-upon list-price increases; and (4) a joint refusal to offer for sale FAD-free tuna under each company's flagship label, agreed to and memorialized over the course of approximately eleven days.  Taken together, the Court concludes that almost all Plaintiffs have alleged sufficient factual material to nudge their overarching allegations of a conspiracy over the line from possible to plausible.[9]

The sole complaint not encompassed by the above discussion is the Flowers Complaint, which overall contains fewer allegations than those just discussed.  The Flowers Complaint alleges (1) the existence of the DOJ investigation, as well as Assistant Attorney General Baer's statements regarding the abandoned Thai Union and Bumble Bee merger,[10] (Flowers Compl. ¶¶ 20–26); (2) economic factors allegedly suggesting collusion, namely that while tuna consumption has decreased the Defendants' pricing has instead increased, (*id.* ¶¶ 28–31); (3) the above-discussed tuna can-size decrease and tuna list-price

---

[9] At oral argument the parties argued at length over *In re Musical Instruments & Equipment Antitrust Litigation* ("*Musical Instruments*"), 798 F.3d 1186, 1189 (9th Cir. 2015), and its persuasive value to either side's arguments.  (Hr'g Tr 70:1–76:17.)  Given this spirited debate, the Court is obliged to at least quickly distinguish *Musical Instruments* from the present case.  As Defendants note, *Musical Instruments* holds that allegations of mere parallel conduct, or even conscious parallelism, are alone insufficient to allege a plausible conspiracy.  However, unlike the present case, *Musical Instruments* involved no specific allegations of a horizontal agreement between competitors; instead the plaintiffs relied solely on inferences drawn from the overall allegations of vertical agreements and horizontally consistent behavior.  The very first paragraph of *Musical Instruments* articulating the question presented on appeal makes this clear:

> Where a large musical-instrument retailer pressures individual guitar manufacturers to set the lowest prices at which the manufacturers will permit any retailer to advertise the manufacturers' products—and each manufacturer acquiesces—can we infer the manufacturers conspired among themselves to fix prices?

*Id.* at 1189.  In stark contrast, Plaintiffs in the present case have presented allegations of several specific horizontal agreements—encompassing joint list-price increases and a joint refusal restricting Defendants' FAD-free tuna offerings—where conversations negotiating and memorialization of the agreements took place within a very short period of time.  To discredit such allegations would both move beyond *Musical Instruments* and effectively transform *Twombly*'s standard from one of plausibility to one of probability.

[10] The Flowers Complaint also discusses the purported leniency applicant.  (Flowers Compl. ¶¶ 23–26.)  However, as previously discussed, *supra* Section I.B.ii, the purported leniency applicant adds nothing to any Plaintiffs' allegations.

22

increase, <u>absent any allegations of a preceding agreement</u>, (*id.* ¶¶ 32–34); and (4) that certain Defendants have copacking agreements and share the same supplier for tuna, (*id.* ¶¶ 36–37).

However, the Flowers Complaint nowhere alleges any particular agreement between the Defendants to fix prices, instead relying exclusively on the circumstantial evidence catalogued above.   This is insufficient to meet Flowers' *Twombly* burden because each allegation is equally susceptible to non-conspiratorial interpretation.   The economic factors, can-size decrease, and list-price increase, in the absence of an agreement, merely show parallel behavior. *See Musical Instruments*, 798 F.3d at 1195 ("An action that would seem against self-interest in a competitive market may just as well reflect market interdependence giving rise to conscious parallelism."); (*Twombly* Br. 11–12 ("[W]hen allegations of parallel conduct are set out in order to make a § 1 [Sherman Act] claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." (alterations original) (quoting *Twombly*, 550 U.S. at 557)).)  Defendants assert many potential justifications for these actions and circumstances, such as "rising costs, decreasing supply, and increasing global demand," to name a few.  (*Twombly* Br. 14, 18–23.)  And, even assuming that Defendants consciously acted in a parallel manner, this shows nothing more than that they were "cognizant of—and reacting to—similar market pressures."  *Musical Instruments*, 798 F.3d at 1193.  Nor do the allegations of copacking agreements or a shared supplier carry Flowers' burden.  *See Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all.").  This leaves only the pending DOJ investigation, and as previously discussed, *supra* Section I.B.ii, the existence of a government investigation alone is insufficient to state a plausible conspiracy claim.

Given the foregoing, the Court concludes that Flowers has not alleged a plausible tuna-specific conspiracy as to any Defendant except for Thai Union Group and Tri-Union

1   Seafoods who, as discussed above, *supra* note 5 and accompanying text, have not joined
2   in Defendants' motion to dismiss on this ground.

3          ### C. Failure to Plead an Entitlement to Injunctive Relief

4          Section 16 of the Sherman Act provides that "[a]ny person, firm, corporation, or
5   association shall be entitled to sue for and have injunctive relief, in any court of the United
6   States having jurisdiction over the parties, against threatened loss or damage by a violation
7   of the antitrust laws . . . ." 15 U.S.C. § 26.  Injunctive relief pursuant to this section must
8   accomplish at least one of the following: "(1) putting an end to the illegal conduct, (2)
9   depriving violators of the benefits of their illegal conduct, [or] (3) restoring competition in
10  the market place."  *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 234 (9th Cir.
11  1976).  Defendants argue that Plaintiffs "have not plead facts that plausibly establish the
12  continuing risk of threatened injury, which is the essential predicate for such relief."
13  (*Twombly* Br. 34.)  In contrast, Plaintiffs argue that "acts in furtherance of the conspiracy
14  may well be ongoing," (DPP Opp'n 23), such as (1) the use of five ounce cans; (2) the non-
15  labeling of Defendants' branded tuna products as FAD-free, (*id.* at 24; Certain DAPs Opp'n
16  22–23); and that (3) "[w]ithout injunctive relief, Defendants could readily continue to sell
17  and/or resume selling PSPs at higher prices, continually exposing plaintiffs to harm from
18  those price increases," (CFP Opp'n 13; *see* EPP Opp'n 26).  The Court agrees with
19  Defendants.

20         As set forth above, *supra* Section I.B, Plaintiffs have sufficiently alleged a plausible
21  violation of section one of the Sherman Act.  However, these same allegations do not
22  automatically establish that the violation is ongoing, nor do they obviate the fact that the
23  allegedly conspiratorial actions taken—e.g., refusing to develop FAD-free tuna—might
24  otherwise be <u>permissibly</u> taken in the absence of an illegal agreement.[11]  And simply saying

25  _____

26  [11] At oral argument, Plaintiffs reiterated the aforementioned points and reminded the Court that after the
    Bumble Bee and CotS merger was abandoned last year, Bumble Bee President and CEO Chris Lischewski
27  stated that Bumble Bee was continuing to "conduct[] business as usual . . . ." (*E.g.*, DPP Compl. ¶ 68
    n.10).  However, absent further allegations or context, such a statement fails to hurdle the *Twombly* bar,
28  let alone the more stringent standard applied to requests for injunctive relief.  *See, e.g.*, *Melendres v.*

1   that the conspiracy "may" be ongoing and that Defendants "could" continue or resume

2   selling PSPs at higher prices are insufficient to carry Plaintiffs' burden.  *See, e.g.*, *Winter*

3   *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (allegations of solely speculative

4   injury will not support an injunction).  Accordingly, the Court concludes that no Plaintiff

5   has adequately alleged an entitlement to injunctive relief.

6   ## II.     Standing to Prosecute Non-Tuna Claims

7       Defendants argue that Commercial Food Preparers, Direct Purchaser Plaintiffs, End-

8   Payer Plaintiffs, Affiliated Foods, Flowers, and Winn-Dixie lack Article III and prudential

9   standing to prosecute non-tuna claims.  (Standing Br. 1.)  However, because the Court

10  concludes that all Plaintiffs' claims regarding a non-tuna conspiracy should be dismissed,

11  *supra* Section 1.A, Defendants' Motion to Dismiss regarding standing is now moot as to

12  all but those Plaintiffs asserting packaged-seafood claims against Thai Union Group and

13  Tri-Union Seafoods.  Further, the sole reason Plaintiffs' packaged-seafood claims endure

14  against Thai Union Group and Tri-Union Seafoods is because those Defendants did not

15  join in the Motions to Dismiss; no Plaintiffs' complaint asserts any additional packaged-

16  seafood allegations against these remaining Defendants that were not already discussed

17  and rejected, *supra* Section 1.A.  Among other things, for a Plaintiff to have Article III

18  standing she "must have suffered an 'injury in fact'—an invasion of a legally protected

19  interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not

20  "conjectural" or "hypothetical"' . . . ." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

21  In the present case, no Plaintiff alleges a plausible antitrust violation regarding packaged

22  seafood; therefore, no Plaintiff adequately establishes antitrust injury for purposes of

23  Article III standing.

24      Accordingly, the Court concludes that no Plaintiff has adequately alleged Article III

25  standing to prosecute non-tuna claims.

26  _____

27  *Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015), *cert. denied sub nom.*, *Maricopa Cty., Ariz. v. Melendres*,
28  136 S. Ct. 799 (2016) ("We have long held that injunctive relief 'must be tailored to remedy the specific harm alleged.'" (citing *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).

III.   **Sherman Act Statute of Limitations and Relevant Tolling Doctrines**

    *A. The Discovery Rule*

An antitrust action must be commenced within four years from the date when the cause of action accrues.  15 U.S.C. § 15b.  "Generally, a[n] [antitrust] cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  However, DPPs and CFPs argue that the "discovery rule" applies to antitrust cases, such that "the accrual of a cause of action" is postponed "until the plaintiff discovers, or has reason to discover, the cause of action . . . ."  (DPP Opp'n 24–26 (quoting *In re Processed Egg Prods. Antitrust Litig.*, 931 F. Supp. 2d 654, 657 (E.D. Pa. 2013); CFP Opp'n 18–21).  Contrastingly, Defendants argue that "the Ninth Circuit has unequivocally rejected the application of the discovery rule to Sherman Act Claims . . . ."  (SOL Reply 2–6 (citing *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1059–60 (9th Cir. 2012).)  The Court ultimately agrees with Defendants.

In *Hexcel Corp. v. Ineos Polymers, Inc.* the Ninth Circuit reviewed a grant of summary judgment denying application of the tolling doctrine of fraudulent concealment.  In setting forth the relevant law governing Sherman Act claims generally, the Ninth Circuit noted: "We do not require a plaintiff to actually discover its antitrust claims before the statute of limitations begins to run." *Hexcel*, 681 F.3d at 1060.  Although examining this quotation in isolation would seem to invoke the injury rule, when it is placed in *Hexcel*'s procedural context then Defendants' characterization of *Hexcel* as "unequivocally reject[ing] the application of the discovery rule to Sherman Act Claims[,]" (SOL Reply 3), is too extreme.  The issue of whether the discovery rule or the injury rule applies was not squarely before the *Hexcel* Court.

Nonetheless, the above rule statement in *Hexcel* suggests that application of the discovery rule to Sherman Act claims is inappropriate.  Further, the Ninth Circuit has given additional indications that it is inappropriate to apply the discovery rule to Sherman Act claims. *E.g.*, *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 274–75 (9th

Cir. 1988) (comparatively noting in RICO action that in antitrust actions "the plaintiff's knowledge is generally irrelevant to accrual, which is determined according to the date on which injury occurs").  Almost all our sister circuits apply the injury rather than the discovery rule.  *See In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1209–10 (N.D. Cal. 2015) (collecting cases).  And *Zenith Radio* itself supports application of the injury rather than the discovery rule.  401 U.S. at 338 ("Generally, a[n] [antitrust] cause of action accrues and <u>the statute begins to run when a defendant commits an act that injures a plaintiff's business</u>." (emphasis added)).[12]

Given the foregoing, the Court concludes that the injury, rather than discovery, rule applies to the present case.

### B. Fraudulent Concealment

Although the discovery rule does not apply to Plaintiffs' Sherman Act claims, "[a] statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence."  *Hexcel*, 681 F.3d at 1060 (9th Cir. 2012).  A plaintiff bears the burden of proving fraudulent concealment, and must show (1) the defendant affirmatively misled the plaintiff; (2) the plaintiff had neither actual nor constructive knowledge of the facts giving rise to its claim despite its diligence in trying to uncover those facts; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to its claim.  *Id.*  A plaintiff "must plead with particularity the circumstances of the concealment and the facts

---

[12] At oral argument Plaintiffs strongly urged that because Ninth Circuit law is not totally clear, our Circuit's command that "in general, the discovery rule applies to statutes of limitations in federal litigation" should control the instant case.  *Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 940 (9th Cir. 2009); (Hr'g Tr. 57:3–58:7).  However, the Supreme Court, in a case discussed at length by *Mangum*, has expressly noted both that (1) "[t]o the extent such a presumption exists. . . the Ninth Circuit [has] conspicuously overstated its scope and force[,]" and (2) "beyond doubt, we have never endorsed the Ninth Circuit's view that Congress can convey its refusal to adopt a discovery rule only by explicit command . . . ."  *TRW Inc. v. Andrews*, 534 U.S. 19, 27–28 (2001).  Accordingly, given the foregoing analysis of Supreme Court and Ninth Circuit guidance—as well as near circuit-wide consensus—that the injury rule applies to Sherman Act claims, the Court here concludes that any presumption of the discovery rule applying in the instant case is sufficiently rebutted.

supporting its due diligence." *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 502 (9th Cir. 1988). "Conclusory statements are not enough" to carry a plaintiff's burden. *Id.*

Defendants move to dismiss many Plaintiffs' Sherman Act claims as untimely. (SOL Br. 2–3.) Specifically, Defendants argue that any pre-2011 conduct is barred under the Sherman Act's four-year statute of limitations, and that Plaintiffs have not adequately pled that any tolling doctrine should apply to the claims at issue. (*Id.*) Given this argument, and that four particular Defendants plead that the conspiracy only began in 2011, Defendants do not seek to bar Kroger's, Meijer's, Publix's, or Wegmans' Sherman Act claims as untimely. (*Id.* at 2 n.2.) Defendants assert that the remaining complaints list or imply varying potential start dates for the overarching conspiracy claims:

- <u>2003</u>, (Affiliated Foods Compl. ¶ 79);
- <u>2008</u>, (Affiliated Foods Compl. ¶ 109–11; DPPs Compl. ¶ 70; CFP Compl. ¶ 52–53; EPP Compl. ¶ 102–04; Winn-Dixie Compl. ¶ 49);
- <u>2010</u>, (Flowers Compl. ¶ 32).

Because the Court concludes that the EPPs and CFPs do not plausibly allege an entitlement to Sherman Act injunctive relief, *supra* Section I.C, the Court need only here consider Defendants' arguments that the following allegations of conspiracy are time barred: (1) the Affiliated Foods Complaint's 2003 allegations; (2) the Affiliated Foods Complaint's, DPP Complaint's, and Winn-Dixie Complaint's 2008 allegations; and (3) the Flowers Complaint's 2010 allegations. The Court addresses each argument in turn.

### (i)    2003 Conspiracy Start Date

Affiliated Foods broadly alleges that "[b]eginning at least as early as January 2003 . . . Defendants and their co-conspirators conspired to raise, fix, stabilize, or maintain prices in the market for Packaged Seafood sold in the United States." (Affiliated Foods Compl. ¶ 3.) This manifested in the form of allegedly coordinated price increases despite decreased demand, (*id.* ¶¶ 53–57), such as in 2003–2004, 2008, 2011, and 2012, (*id.* ¶ 79). However, the remainder of Affiliated Foods' allegations are unclear regarding the timing of specific instances of conspiratorial conduct, and lists most actions as occurring "[d]uring

the Relevant Period . . . ." (*See, e.g.*, *id.* ¶¶ 65–78.)  Plaintiffs further argue that Defendants' many statements attributing similar tuna price increases to varying market and fishing conditions were active attempts to conceal underlying communications and agreements to raise tuna prices.  (*See id.* ¶¶ 104–17.)  In making this argument, Plaintiffs largely rely on the assertion that "during the time period of the price increases, the demand for packaged tuna was falling steeply, while catch volumes for both Skipjack (the dominant canning light grade tuna) and Yellowfin (another popular light grade tuna), were increasing," and that this should have led to lower rather than higher prices.  (*Id.* ¶ 108.)

However, as previously discussed, *supra* Section I.B (concluding the Flowers Complaint fails to state a tuna-specific claim as to most Defendants), in the absence of a substantive allegation of an agreement, the seeming disparity between price increases and higher fish supply and lower consumer demand may just as easily be explained by factors or business decisions that are completely independent of any conspiratorial conduct.  And Plaintiffs' further allegations of specific actions taken "during the Relevant Period"—i.e., 2003 to 2015—is simply far too broad to be considered pled with particularity. Accordingly, the Court concludes that Affiliated Foods fails to allege with sufficient particularity fraudulent concealment regarding the 2003 conspiracy claims.

### (ii)     2008 Conspiracy Start Date

The Affiliated Foods, DPP, and Winn-Dixie complaints generally allege that (1) price-fixing conspiracies are inherently self-concealing and (2) Defendants gave pretextual reasons for their price increases in order to conceal their unlawful conduct.  For purposes of the 2008 conspiracy allegations, DPPs, Winn-Dixie, and Affiliated Foods allege that "in connection with the reduction of can sizes in 2008–09, Defendants asserted that it was due to high input costs or similar causes."  (DPP Compl. ¶ 121; Winn-Dixie Compl. ¶ 68; *see* Affiliated Foods Compl. ¶ 109.)  Affiliated Foods additionally alleges that StarKist, Bumble Bee, and CotS announced joint price increases while "falsely cit[ing] increases in industry costs," and Del Monte and its agents and representatives additionally announced

/ / /

29

1  StarKist price increases while falsely attributing the increases to industry, fuel, and fish
2  costs.  (Affiliated Foods Compl. ¶¶ 110–12.)

3  As an initial matter, the Court earlier concluded that Plaintiffs' allegations regarding
4  the 2008/2009 can-size increase was equally susceptible to non-conspiratorial as to
5  conspiratorial inferences.  *Supra* Section I.B.iii.  That same conclusion applies here to the
6  DPPs', Winn-Dixie's, and Affiliated Foods' characterizations of Defendants' 2008/2009
7  increased-price justifications of "high input costs or similar causes."  Again, there is no
8  pleading of a specific agreement or plausible inference of an agreement.  And Affiliated
9  Foods' additional allegations fare no better.  Although Affiliated Foods specifically alleges
10  that Del Monte and its agents falsely attributed the relevant price increase to rising industry,
11  fuel, and fish costs, the substance supporting the allegations of falsity comes only from the
12  general and "Relevant Period" allegations previously discussed *supra* Section V.A.  Thus,
13  as in that previous Section, Affiliated Foods' allegations are here again insufficient to
14  allege fraudulent concealment with particularity.

15  *(iii)   2010 Conspiracy Start Date*

16  The Flowers Complaint alleges that "[b]y July 2010, and reportedly beginning
17  earlier," the Defendants "replaced their 6 oz. cans of tuna with 5 oz. cans" "without also
18  decreasing prices[,]" which was "[o]ne method by which the Defendants collusively raised
19  prices . . . ."  (Flowers Compl. ¶ 32.)  Although the Flowers Complaint does not explicitly
20  address a theory of fraudulent concealment, it does contain a section entitled "Tolling of
21  the Statute of Limitations."  (*Id.* ¶¶ 41–44.)  The allegations in that section with the most
22  specificity are that (1) Defendants concealed the conspiracy such that Flowers only learned
23  of the conspiracy upon "the public disclosure of the DOJ investigation[;]" (2) Defendants
24  concealed the conspiracy such that Flowers "did not know that it was paying artificially
25  inflated prices for packaged tuna products during the Relevant Period[;]" and (3)
26  "Defendants actively misled the public about the price-fixing scheme by issuing false and
27  misleading statements concerning their reasons for price increases . . . ."  (*Id.* ¶¶ 42–44.)
28  / / /

1  However, as with the just-discussed 2003 and 2008 allegations, such generalized
2  statements are insufficient to allege fraudulent concealment with particularity.

3              (iv)    *Conclusion*

4        Given the foregoing, the Court concludes that no Plaintiff alleges fraudulent
5  concealment with sufficient particularity regarding any pre-2011 Sherman Act claims.

6                              **CONCLUSION**

7        Pursuant to the above analysis, the Court: (1) **GRANTS** Defendants' Motion to
8  Dismiss all relevant Plaintiffs' allegations of a packaged-seafood conspiracy as to all but
9  Defendants Thai Union Group and Tri-Union Seafood, pending resolution of the remaining
10 motions to dismiss; (2) **DENIES** Defendants' Motion to Dismiss all Plaintiffs' allegations
11 of a tuna-specific conspiracy as to all but the Flowers Complaint, which remaining
12 allegations concerning Defendants Thai Union Group and Tri-Union Seafood survive
13 *Twombly* analysis, pending resolution of the remaining motions to dismiss; (3) **GRANTS**
14 Defendants' Motion to Dismiss all relevant Plaintiffs' claims for injunctive relief; (4)
15 **DENIES AS MOOT** all Defendants' Motion to Dismiss all relevant Plaintiffs for lack of
16 standing to prosecute non-tuna claims against all Defendants except Thai Union Group and
17 Tri-Union Seafoods; (5) **GRANTS** all Defendants' Motion to Dismiss all relevant
18 Plaintiffs for lack of standing to prosecute non-tuna claims against Thai Union Group and
19 Tri-Union Seafoods; and (6) **GRANTS** Defendants' Motion to Dismiss all pre-2011
20 conspiracy allegations as time-barred for purposes of any Sherman Act claims.  All denials
21 / / /
22 / / /
23 / / /
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

and dismissals are **WITHOUT PREJUDICE**.  All Plaintiffs are granted **LEAVE TO AMEND** any dismissed claim; however, no Plaintiff may make any such amendment until after the Court rules on the second half of the pending Motions to Dismiss.  All Plaintiffs **SHALL FILE** any amendments within thirty days of the date on which the Order regarding the second half of the pending Motions to Dismiss is electronically docketed.

      **IT IS SO ORDERED.**

Dated:  January 3, 2017

Hon. Janis L. Sammartino
United States District Judge

32