UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No.: 15-MD-2670 JLS (MDD)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' REMAINING MOTIONS TO DISMISS** |

Presently before the Court are:

(1)  Defendant Thai Union Group PCL's Motion to Dismiss  ("TUG MTD") (ECF No. 205) all claims asserted against Thai Union in the: (a) Consolidated Amended Complaint of Direct Action Plaintiffs ("DAP Compl.") (ECF No. 152); (b) Consolidated Class Complaint of Direct Purchaser Plaintiffs ("DPP Compl.") (ECF No. 147); (c) Consolidated Class Action Complaint of Indirect Purchaser Commercial Food Preparers Class ("CFP Compl.") (ECF No. 153); (d) Amended Complaint of Direct Action "Kroger" Plaintiffs ("Kroger Compl.") (*The Kroger Co. et al. v. Bumble Bee Foods LLC et al.*, 16-cv-51-JLS (MDD), ECF No. 19); (e) Amended Complaint of Direct Action Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. ("Meijer Compl.") (*Meijer, Inc. et al. v. Bumble Bee Foods LLC, et al.*, 16-cv-398-JLS (MDD), ECF No. 11); (f) Amended Complaint of Direct

1  Action Plaintiff Publix Super Markets, Inc. and Wakefern Food Corp. ("Publix
2  Compl.") (*Publix Super Markets, Inc. et al. v. Bumble Bee Foods LLC et al.*, 16-
3  cv-247-JLS (MDD), ECF No. 12); and (g) Direct Action Plaintiff Winn-Dixie
4  Stores and Bi-Lo Holding, LLC's First Amended Complaint ("Winn-Dixie
5  Compl.") (ECF No. 151);

6  (2)  Defendant Dongwon Enterprise Co., Ltd.'s Motion to Dismiss ("Dongwon Enter.
7  MTD") (ECF No. 206) all claims against Dongwon Industries and Dongwon
8  Enterprise in the: (a) CFP Complaint; (b) DPP Complaint; (c) Kroger Complaint;
9  (d) Meijer Complaint; (e) Publix Complaint; (f) Wegmans Amended Complaint
10  ("Wegmans Compl.") (*Wegmans Food Markets, Inc. v. Bumble Bee Foods, LLC
11  et al.*, 16-cv-264-JLS (MDD), ECF No. 11); (g) Affiliated Foods First Amended
12  Complaint and Demand for Jury Trial ("Affiliated Foods Compl.") (ECF No. 152);
13  and (h) Winn-Dixie Complaint;

14  (3)  Defendants StarKist Co.'s, Dongwon Enterprise Co., Ltd.'s, Bumble Bee Foods,
15  LLC's, Tri-Union Seasfoods, LLC's, Thai Union Group PCL's, and Del Monte
16  Foods Company's Joint Motion to Dismiss[1] ("Joint MTD") (ECF No. 207) without
17  further leave to amend the: (a) DPP Complaint; (b) CFP Complaint; (c)
18  Consolidated Class Action Complaint of the Indirect Purchaser End Payer
19  Plaintiffs ("EPP Compl.") (ECF No. 149); (d) Affiliated Foods' Complaint; (e)
20  Wegmans Complaint; (f) Meijer Complaint; (g) Kroger Complaint; (h) Publix
21  Complaint; (i) Winn-Dixie Complaint; (j) Plaintiff W. Lee Flowers & Co., Inc.'s

22  / / /

---

[1] This Joint Motion to Dismiss is supported by four distinct briefs: (i) Memorandum of Points and Authorities in Support of Joint Motion to Dismiss All Complaints ("*Twombly* Br.") (ECF No. 207-2); (ii) Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss Plaintiffs' Complaints for Lack of Standing ("Standing Br.") (ECF No. 207-3); (iii) Memorandum of Point sand Authorities in Support of Defendants' Joint Motion to Dismiss Various Claims as Time Barred ("SoL Br.") (ECF No. 207-4); and (iv) Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss the Indirect Purchaser End Payer Plaintiffs' and Indirect Purchaser Commercial Food Preparers' Consolidated Class Action Complaints ("State Law Br.") (ECF No. 207-5).

Complaint and Demand for Jury Trial ("Flowers Compl.") (*W. Lee Flowers & Co. v. Bumble Bee Foods, LLC, et al.*, 16-cv-1226-JLS (MDD));

(4)   Defendant Dongwon Industries Co., Ltd.'s Motion to Dismiss ("Dongwon Indus. MTD") (ECF No. 220) the Wegmans Complaint;

(5)   DPPs' Omnibus Opposition to Motions to Dismiss ("DPP Opp'n") (ECF No. 226) above labeled as: (a) Joint MTD regarding the (i) *Twombly* Brief, (ii) Standing Brief, and (iii) SoL Brief; and (b) TUG MTD;

(6)   CFPs' Memorandum of Law in Opposition to Defendants' Collective Motion to Dismiss Complaint ("CFP Opp'n") (ECF No. 227) above labeled as the: (a) Joint MTD regarding the (i) *Twombly* Brief, (ii) Standing Brief, (iii) SoL Brief, and (iv) State Law Brief; and (b) TUG MTD;

(7)   Affiliated Foods Plaintiffs' Opposition to ("Affiliated Foods Opp'n") (ECF No. 228) the above-labeled Motions to Dismiss: (a) Joint MTD regarding the (i) *Twombly* Brief, (ii) Standing Brief, and (iii) SoL Brief; (b) TUG MTD; and (c) Dongwon Enterprise MTD;

(8)   Certain Direct Action Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss ("Certain DAPs Opp'n") (ECF No. 229) above labeled as the: (a) TUG MTD; (b) Dongwon Enterprise MTD; (c) Joint MTD regarding the (i) *Twombly* Brief; (d) Dongwon Industries MTD;

(9)   Winn-Dixie Plaintiffs' Opposition ("Winn-Dixie Opp'n") (ECF No. 230) to the: (a) Joint MTD regarding the (i) *Twombly* Brief, (ii) Standing Brief, and (iii) SoL Brief; and (b) TUG MTD;

(10) EPPs' Memorandum of Points and Authorities in Opposition to Defendants' Joint Motions to Dismiss ("EPP Opp'n") above labeled as the Joint MTD regarding the (i) *Twombly* Brief, (ii) Standing Brief, (iii) SoL Brief, and (iv) State Law Brief;

(11) Reply Memorandum of Points and Authorities in Support of Motion to Dismiss Plaintiffs' Complaints Against Dongwon Industries Co., Ltd. and Dongwon Enterprise Co., Ltd. ("Dongwon Reply") (ECF No. 233);

3

(12) Defendant TUG PCL's Reply to Opposition to Motion to Dismiss ("TUG Reply") (ECF No. 235);

(13) Defendants' Reply Memorandum of Points and Authorities in Support of Joint Motion to Dismiss All Complaints ("*Twombly* Reply") (ECF No. 236);

(14) Reply Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss Various Claims as Time Barred ("SoL Reply") (ECF No. 237);

(15) Reply Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss EPPs' and CFPs' Consolidated Class Action Complaints ("State Law Reply") (ECF No. 238);

(16) Reply Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss Plaintiffs' Complaints for Lack of Standing ("Standing Reply") (ECF No. 239).

## BACKGROUND

In 2015, dozens of actions were instituted in federal district courts across the nation seeking various forms of relief relying on the same factual predicate: an alleged antitrust conspiracy, in violation of the Sherman Act and state antitrust law, regarding packaged seafood products. *See generally* Transfer Order (ECF No. 1). On December 9, 2015 the United States Judicial Panel on Multidistrict Litigation centralized pretrial proceedings ("*In re Packaged Seafoods*") to this Court in the Southern District of California. (*Id.* at 1–2 ("The vast majority of the related actions are already pending in this district, most before Judge Janis L. Sammartino, who has the related cases before her.").)

Several weeks later, the United States Government intervened in the action, noting that "[a] federal grand jury empanelled in the Northern District of California is investigating potential violations of the Sherman Act, 15 U.S.C. § 1, in the packaged seafood industry." (U.S. Notice of Mot. to Intervene 1, ECF No. 34.) The Court subsequently held several status conferences, (ECF Nos. 43, 108), appointed interim lead counsel, and set the leadership structure for purposes of pretrial proceedings, (ECF No. 119). In so doing, the Court divided the Plaintiffs into four groups:

- **Direct Action Plaintiffs ("DAPs")**, who are direct purchasers proceeding against Defendants individually;
- **Direct Purchaser Plaintiffs ("DPPs")**, who are direct purchasers proceeding on behalf of a putative class;
- **Indirect Purchaser Commercial Food Preparer Plaintiffs ("CFPs")**, who are indirect purchasers proceeding on behalf of a putative class; and
- **Indirect Purchaser End Payer Plaintiffs ("EPPs")**, who are indirect purchasers proceeding on behalf of a putative class.

(Order Appointing Interim Lead Counsel 1–2, ECF No. 119.)

Several months later, Plaintiffs, Defendants, and the United States entered into a joint stipulation regarding a limited stay of discovery, in effect until December 31, 2016, (Joint Stipulation re: Limited Stay of Discovery 1–3, ECF No. 130), which the Court approved, (ECF No. 137). Despite this limited stay, both Plaintiffs and Defendants agreed to the filing of amended complaints and motions to dismiss. (ECF Nos. 138, 142.) On November 21, 2016, Plaintiffs, Defendants, and the United States entered into a second joint stipulation regarding a limited stay of discovery, in effect for many factual matters until March 31, 2017, and in effect for all party depositions until September 30, 2017. (Joint Stipulation re: Second Limited Stay of Discovery 1–3, ECF No. 256.) The Court and the parties conferred at a November 29, 2016 Status Conference, (ECF Nos. 257, 262), and decided to bifurcate oral argument on the Motions to Dismiss according to the classification of "federal" versus "state" issues. The federal issues—which were the subject of the Court's first Order, (ECF No. 283)—encompassed (1) the sufficiency of all relevant Plaintiffs' allegations under the Sherman Act for monetary damages; (2) the sufficiency of all relevant Plaintiffs' allegations under the Sherman Act for injunctive relief; (3) all relevant Plaintiffs' standing to prosecute non-tuna claims; and (4) all statute-of-limitations issues related to the Sherman Act claims. The state-law issues—which were the subject of the subsequent oral argument, (Hr'g Tr., ECF No. 291), and are the subject of this corresponding Order—encompass (1) the sufficiency of relevant Plaintiffs' allegations of Defendants Dongwon's and TUG's (A) direct participation in or (B) vicarious liability via (i) alter ego or (ii) agency principles under the alleged conspiracy;

5

(2) the legal permissibility of all relevant Plaintiffs' attempt to bring claims on behalf of a nationwide California class; (3) the sufficiency of all relevant Plaintiffs' allegations under the various state-law causes of action; (4) all relevant Plaintiffs' standing to sue under various state-law standards; and (5) all statute-of-limitations issues related to the various state-law causes of action.

Six days prior to the scheduled hearing on the federal issues, the United States submitted a filing to "inform[] the Court that the first criminal case in the packaged-seafood investigation has been filed in the Northern District of California." (U.S.' Status Report re Information Filed in N.D. Cal. 1, ECF No. 268.)  Several weeks later, the United States informed the Court "that the second criminal case in the packaged-seafood investigation has been filed in the Northern District of California." (U.S.' Status Report re Information Filed in N.D. Cal. 1, ECF No. 280.)

The Court held oral argument concerning the federal issues on December 13, 2016, (Tr. of Mot. Hr'g, ECF No. 276), and then took the matters under submission.  After considering all parties' arguments and the law, the Court issued its Order regarding the federal issues.  (Order Granting in Part and Denying in Part Defs.' Joint Mot. to Dismiss ("First MTD Order"), ECF No. 283.)  The Court has now heard oral argument concerning the remaining, state-law issues.  (ECF No. 291.)  After considering the parties arguments and the law, the Court rules as follows.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss.  The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Although Rule 8 "does not require 'detailed factual allegations,' . . . it [does] demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

6

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6).  A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*, 550 U.S. at 556).  That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief.  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Further, the Court need not accept as true "legal conclusions" contained in the complaint.  *Id.*  This review requires context-specific analysis involving the Court's "judicial experience and common sense."  *Id.* at 678 (citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id.*

## ANALYSIS

Regarding the state-law issues, Defendants effectively assert five overarching arguments: (1) all Plaintiffs fail to adequately plead that either Dongwon or TUG should be liable under the conspiracy either (A) directly or (B) because CotS or StarKist are (i) alter egos of or (ii) acted as agents of Dongwon or TUG; (2) EPPs' attempt to bring claims on behalf of a nationwide class under California law is legally impermissible under California choice-of-law analysis; (3) EPPs and CFPs fail to state plausible state law claims under various false advertising, consumer protection, and unjust enrichment laws; (4) EPPs

and CFPs lack standing to pursue various state law claims; and (5) many of EPPs' and CFPs' state law claims are time-barred under relevant statutes of limitation.  Analysis here follows the above outline, addressing in each corresponding section the various sub-arguments raised by the above overarching arguments.

# I.   Allegations Regarding Dongwon's & TUG's Liability For the Conspiracy

## A.   *Direct Participation*

Defendants TUG and Dongwon ("Parent Defendants") move to dismiss all Plaintiffs' Complaints for failure to state that either of the Parent Defendants directly participated in the alleged conspiracy.  (TUG MTD 3–7, Dongwon Enter. MTD 6–7, Dongwon Indus. MTD 5–6.)  The Court concludes that most Plaintiffs adequately plead that the Parent Defendants directly participated in the conspiracy.

Many of Plaintiffs' shared allegations fail to state a claim for direct participation. Plaintiffs generally allege that TUG (1) manufactured canned tuna and knowingly sold it under the CotS brand under conspiracy-inflated prices, (*see, e.g.*, Meijer Compl. ¶ 23); (2) shared a common objective with the other Defendants to realize investment-grade returns on its sales of tuna, (*see, e.g.*, *id.* ¶ 59); (3) abandoned a purported merger with Defendant Bumble Bee in the wake of an antitrust investigation, (*see, e.g.*, CAC ¶ 68; Meijer Compl. ¶¶ 70–71); (4) issued annual reports attributing profits to "more rational competition in the United States," (*see, e.g.*, CAC ¶¶ 100–01; Meijer Compl. ¶ 47); and (5) has been a member of a Thai trade association that "partnered" with the Tuna Council (a "non-profit organization" whose mission statement includes dedication "to education about seafood safety, sustainability, and nutrition[,]" (*see, e.g.*, Meijer Compl. ¶ 61)) to plan a U.S. advertising campaign, (*see, e.g.*, *id.* ¶ 62).

As an initial matter, the first allegation that TUG knowingly sold its tuna through CotS under conspiracy-inflated prices is conclusory, and the Court need not accept it as true.[2]  The remaining allegations, while more helpful to Plaintiffs' claims, can also be

---

[2] Though the Court credits the allegation that TUG catches, cans, and sells its tuna under the CotS brand.

15-MD-2670 JLS (MDD)

consistent with rational and legal market participation, and thus fail to state a plausible claim for relief. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" (citation omitted)). For example, it is not surprising that TUG—a for-profit organization—shares an objective to maximize profits on its sales of tuna, and it may have suspended its plans to buy Bumble Bee with that goal in mind. And perhaps TUG meant what it said when it praised more rational competition in the United States and partnered with the Tuna Council to launch an advertising campaign to stimulate demand for tuna in the United States. These collective allegations do not plausibly suggest that TUG directly participated in any conspiracy.

Nor do Plaintiffs' similar allegations against Dongwon fare any better. As above, Plaintiffs generally allege that Dongwon (1) manufactured canned tuna and knowingly sold it under the StarKist brand under conspiracy-inflated prices, (Meijer Compl. ¶ 16); and (2) shared a common objective with the other Defendants to realize investment-grade returns on its sales of tuna, (*see, e.g.*, *id.* ¶ 59). These allegations fail for the same reasons discussed above.

But Plaintiffs provide additional facts that plausibly demonstrate that the Parent Defendants directly conspired with their respective subsidiaries. For example, Plaintiffs allege that the Parent Defendants had (1) telephone conversations through their senior executives and sales personnel to announce collusive price increases, (*see, e.g.*, Meijer Compl. ¶ 64); (2) a teleconference during which the Parent Defendants agreed that they would not launch a FAD-free canned tuna product in the United States, (*id.* ¶ 65); and (3) telephone and email conversations wherein their senior executives and sales personnel assured one another that they would not compete regarding the price of tuna sold to customers, (*id.* ¶ 66). (*See also* Certain DAPs Opp'n 38–39.) The Court previously found that the majority of Plaintiffs adequately alleged a tuna-specific conspiracy, (*see* First MTD Order 17–22), and each of these allegations, taken as true, demonstrates that the Parent Defendants directly participated in that conspiracy. *See In re Animation Workers Antitrust*

*Litig.*, 123 F. Supp. 3d 1175, 1208 (N.D. Cal. 2015) ("[P]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." (quoting *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980))).

To be sure, some Plaintiffs generally refer to "Chicken of the Sea Defendants" and "StarKist Defendants," (*see, e.g.*, Meijer Compl. ¶¶ 62–69), or "Chicken of the Sea" and "StarKist," (*see, e.g.*, DAP Compl. ¶ 82), when reciting these allegations, which ostensibly include the respective Parent Defendants, (*see, e.g.*, Meijer Compl. ¶¶ 20, 26; DAP Compl. ¶¶ 26, 32). And the Court agrees with Defendants that Plaintiffs' allegations against the Parent Defendants must comply with the Supreme Court's directive under *Twombly* and *Iqbal* to state a plausible claim for relief against *each* defendant. *See Iqbal*, 556 U.S. at 678 (explaining that a claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that the <u>defendant</u> is liable for the misconduct alleged" (emphasis added) (citation omitted)). But some level of group pleading is permissible, especially where, as here, the Court is able to discern that these groups, and their actions, include the Parent Defendants. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) ("The complaints allege that group or 'crystal' meetings were <u>attended by employees at three general levels of defendants' corporations</u>, and contains details about the structure and content of these meetings, as well as the types of employees who attended the meetings." (emphasis added).) Because the Court finds that these allegations are sufficient to demonstrate the Parent Defendants' involvement in the conspiracy, it would be a meaningless exercise to force these Plaintiffs to re-allege, for instance, that TUG, Dongwon, CotS, and StarKist were individually involved in these conspiratorial communications when the Court can already see that. Accordingly, the

/ / /

/ / /

/ / /

Court finds that most Plaintiffs have adequately pled the Parent Defendants' direct involvement in the conspiracy.[3]

### B.   Alter Ego and Agency Theories

The Parent Defendants also move to dismiss all Plaintiffs' Complaints for failure to state a plausible claim for liability under either (1) alter ego or (2) agency theories.  (*See* TUG MTD 3–7, Dongwon Enter. MTD 7–15, Dongwon Indus. MTD 6–13.)

### (i)   Failure to Plead an Alter Ego Theory

"Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000) (citation omitted).  "A corporate identity may be disregarded—the 'corporate veil' pierced—where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation."  *Id.* (citing *Roman Catholic Archbishop v. Superior Court*, 15 Cal. App. 3d 405, 411 (1971)).  California courts have stated that "[t]he purpose behind the alter ego doctrine is to prevent defendants who are the alter egos of a sham corporation from escaping personal liability for its debts." *Hennessey's Tavern, Inc. v. Am. Air Filter Co.*, 204 Cal. App. 3d 1351, 1358 (citing *Hiehle v. Torrance Millworks, Inc.*, 272 P.2d 780, 783–84 (1954)).  There are two separate requirements to justify imposing alter ego liability:

> First, that the corporation is not only influenced and governed by [the defendant], but that there is such a unity of interest and ownership that the individuality, or separateness, of the said [defendant] and corporation has ceased; second, that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.

---

[3] Beyond the fact that they fail to name the Parent Defendants in their Complaint, the EPP Complaint (ECF No. 149) is not among those Complaints that adequately allege the Parent Defendants' direct participation in the conspiracy through use of acceptable group pleading or otherwise.

*Firstmark Capital Corp. v. Hempel Fin. Corp.*, 859 F.2d 92, 94 (9th Cir. 1988) (emphasis removed) (citing *Wood v. Elling Corp.*, 572 P.2d 755, 761–62 n.9 (1977)); *see also Sonora Diamond Corp.*, 83 Cal. App. 4th at 538.

Nonexclusive "[f]actors that can be used to support the first element, unity of interest, include commingling of funds, failure to maintain minutes or adequate corporate records, identification of the equitable owners with the domination and control of the two entities, the use of the same office or business locations, the identical equitable ownership of the two entities, the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual, and the failure to adequately capitalize a corporation." *Pac. Mar. Freight, Inc. v. Foster*, No. 10-CV-0578-BTM-BLM, 2010 WL 3339432, at *6 (S.D. Cal. Aug. 24, 2010) (citing *Assoc. Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838–40 (1962)). "The second element requires that an inequitable result occur by the recognition of the corporate form." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 539. "Alter ego is an extreme remedy, sparingly used." *Id.* at 539. Courts look to "all the circumstances to determine whether the doctrine should be applied." *Id.*

### (a)   TUG and CotS

Plaintiffs argue that the following allegations are sufficient to plausibly state a claim for alter ego liability against TUG:

#### (1)   Parent-Subsidiary Relationship Between TUG and CotS

Plaintiffs generally allege that CotS is a wholly owned subsidiary of TUG. (Kroger Compl. ¶ 25; Publix Compl. ¶ 22; Meijer Compl. ¶ 21; DPP Compl. ¶¶ 17–18; EPP Compl. ¶ 58; Winn-Dixie Compl. ¶¶ 10–11; DAP Compl. ¶ 23; CFP Compl. ¶ 14; Wegman's Compl. ¶ 21.) Plaintiffs additionally allege that CotS enables TUG to be vertically integrated and to sell the tuna that TUG catches and processes under the CotS brand. (*See, e.g.*, Kroger Compl. ¶ 27.)

/ / /

/ / /

(2)    Overlap of Officers and Employees

Plaintiffs allege that TUG and CotS share a number of executives between the two companies.  (Kroger Compl. ¶ 29; Publix Compl. ¶ 26; Meijer Compl. ¶ 25; DPP Compl. ¶ 19; Winn-Dixie Compl. ¶ 12; DAP Compl. ¶ 23; CFP Compl. ¶ 17; Wegman's Compl. ¶ 25.)  In their oppositions, Plaintiffs focus in particular on Thiraphong Chansiri, who is alleged to have served as the TUG President/CEO, the President of a TUG subsidiary, Thai Union North America, Inc. ("TUNAI"), and a director of CotS.  (*See, e.g.*, Affiliated Foods Opp'n 21–22.)  Plaintiffs additionally allege that TUG directs and controls CotS through CotS's President and CEO Shue Wing Chan, who is alleged to be a member of both the family that controls TUG and TUG's "Global Leadership Team."  (Kroger Compl. ¶ 29; Publix Compl. ¶ 26; Meijer Compl. ¶ 25; DPP Compl. ¶ 19; Winn-Dixie Compl. ¶ 12; Wegmans Compl. ¶ 25; CFP Compl. ¶ 17.)

(3)    Importance and Scale of TUG's U.S. Operations

Several Plaintiffs allege that TUG presented (and still presents) a common global marketing image with its CotS subsidiary, particularly as part of TUG's "Global Tuna Business" and "US Ambient Operations", which are controlled by TUG's board of directors.  (Kroger Compl. ¶¶ 28–29; Publix Compl. ¶¶ 25–26; Meijer Compl. ¶¶ 24–25; DPP Compl. ¶ 20; Winn-Dixie Compl. ¶ 11; DAP Wegmans Compl. ¶¶ 24–25).  Additionally, some Plaintiffs allege that TUG lists its U.S. corporate office locations at CotS offices or plants, (*e.g.*, Meijer Compl. ¶ 24), and others allege that, through its subsidiary TUNAI, TUG shares physical office space with CotS at its offices in the United States,  (*see, e.g.*, DPP Compl. ¶ 18).

(4)    Analysis

In sum, the Court is left with the following allegations to be considered together: (1) TUG is the parent company of its wholly owned subsidiary CotS; (2) TUG catches and cans the tuna that it sells through CotS (i.e., CotS is TUG's marketing conduit in the United States and elsewhere); (3) there is some overlap between TUG's and CotS's corporate governance; (4) TUG presents a common global marketing image with CotS and its public

materials, including websites, emphasize its control over CotS; and (5) TUG shares physical office space with CotS. Based on these allegations, the Court concludes that Plaintiffs have plausibly alleged the unity of interest required to impose alter ego liability.

In so concluding, the Court does not explicitly adopt—or reject—several other courts' reasoning that pleading two or three factors is sufficient to plausibly allege a unity of interest. *See, e.g.*, *Daewoo Elecs. Am. Inc. v. Opta Corp.*, No. C 13-1247 JSW, 2013 WL 3877596, at *5 (N.D. Cal. July 25, 2013). And the Court largely agrees with Defendants that these several allegations, standing alone, are not enough. But the Court finds that the allegations as a whole plausibly suggest a unity of interest between TUG and CotS. *See Sonora Diamond Corp.*, 83 Cal. App. 4th at 539 ("No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied."). Although Plaintiffs have not alleged a complete overlap between TUG's officers and CotS's board of directors, the credentials and leadership roles of some of the identified officers—particularly Thiraphong Chansiri and Shue Wing Chan—suggest that TUG has a high degree of influence in CotS's affairs. TUG's influence over CotS is slightly bolstered by its global marketing materials suggesting its unity and dominance over CotS, as well as by its public materials claiming that its U.S. corporate offices are also a CotS office or plant.[4] But most persuasive are Plaintiffs' allegations that TUG catches and cans the tuna that it thereafter sells under the label of its wholly-owned subsidiary CotS, since the "alter-ego test is satisfied" where "a parent corporation uses its subsidiary 'as a marketing conduit' and attempts to shield itself from liability based on its subsidiaries' activities." *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001). These allegations do not prove a unity of interest. They may, however, open the doors to discovery.

But not yet. Unity of interest is just the first step of the alter ego analysis. To succeed on an alter ego theory of liability, Plaintiffs must also allege that an inequitable result would

---

[4] Though the Court finds less persuasive the allegations that TUG, through its <u>other subsidiary</u> TUNAI, shares some office space at CotS branches in the United States.

follow if the corporate veil is not pierced. In their oppositions to Defendants' motions to dismiss, some Plaintiffs identify that an inequitable result is required in the alter ego analysis; however, they make no attempt to demonstrate how any Complaint alleges an inequitable result.[5] (*See, e.g.*, DPP Opp'n 49.) Thus, Plaintiffs fail to plausibly allege that an inequitable result would follow if the corporate form is not disregarded. *See Castellanos v. JPMorgan Chase & Co.*, No. 09-CV-00969-H, 2009 WL 1833981, at *11 (S.D. Cal. June 23, 2009) (granting motion to dismiss where plaintiff did not allege an inequitable result); *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1116 (C.D. Cal. 2003) ("Conclusory allegations of 'alter ego' status are insufficient to state a claim. Rather, a plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each."); *cf. Hall-Magner Grp. v. Firsten*, No. 11-cv-312, 2011 WL 5036027, at *5 (S.D. Cal. Oct. 24, 2011) (Sammartino, J.) (concluding, in the personal jurisdiction context, that the plaintiff "provided no evidence at all that failure to disregard the corporation would result in fraud or injustice"). Accordingly, the Court finds that Plaintiffs collectively fail to state an alter ego claim against TUG.[6]

(b)    Dongwon and StarKist

Plaintiffs argue that the following allegations are sufficient to plausibly state a claim for alter ego liability against Dongwon:

/ / /

/ / /

/ / /

---

[5] And at the MTD hearing, Plaintiffs conceded that they did not specifically allege an inequitable result in their Complaints. (*See* Hr'g Tr. 39:6–10.) The Court declines to infer such a result from the pleadings as they stand, and will instead grant Plaintiffs the opportunity to amend their Complaints to allege an inequitable result.

[6] Because Plaintiffs collectively fail to allege an inequitable result as to both Parent Defendants, the Court need not address, and therefore makes no specific conclusion regarding, whether each individual Plaintiff's Complaint adequately alleges the unity of interest required for alter ego. However, each Plaintiff will have an opportunity to amend its Complaint consistent with the Court's Order.

(1)   Parent-Subsidiary Relationship Between Dongwon and StarKist

Plaintiffs generally allege that StarKist is a wholly owned subsidiary of Dongwon. (*See, e.g.*, Kroger Compl. ¶ 18; Publix Compl. ¶ 15; Meijer Compl. ¶ 14; Wegmans Compl. ¶ 14.)  Dongwon Enterprise Co., in turn, is the holding company that owns Dongwon Industries.  (*See, e.g.*, Kroger Compl. ¶ 23.)  Plaintiffs additionally allege that StarKist enables Dongwon to be vertically integrated and sells Dongwon's canned tuna under the StarKist brand.  (*See, e.g.*, *id.* ¶ 20.)

(2)   Overlap of Officers and Employees

Several Plaintiffs also detail an overlap between Dongwon's and Starkist's corporate governance.  For instance, in 2014 Andrew Choe became the President and CEO of StarKist, where he previously served as a Senior Vice President after first holding an executive position at Dongwon.  (*See, e.g.*, Kroger Compl. ¶ 23.)  Additionally, Nam-Jung Kim, son of Dongwon Chairman Jae-Chul Kim, served as the COO of StarKist from 2012 to 2014, when he was promoted to Vice Chairman of StarKist, and currently serves on the board of directors for both StarKist and Dongwon.  (*Id.*)  Moreover, Nam-Jung Kim is alleged to have owned a controlling interest in Dongwon while serving as StarKist's COO and Vice Chairman.  (*Id.*)[7]

(3)   Importance and Scale of StarKist's U.S. Operations

Plaintiffs generally allege that Dongwon presents a common global marketing image with StarKist.  According to Dongwon's website, "StarKist is an iconic tuna brand in the United States, and has been controlled by Dongwon Group since 2008," and, "each day, Dongwon casts its nets in oceans all around the world."  (*See, e.g.*, Kroger Compl. ¶ 21.)

/ / /

---

[7] Some Plaintiffs further allege overlap between Dongwon's other subsidiaries and StarKist's governing board.  (*See, e.g.*, Kroger Compl. ¶ 23.)  However, overlap between employees of Dongwon's other subsidiaries and StarKist says less about Dongwon's control over StarKist when compared to the overlap between Dongwon's officers and StarKist's corporate governance.

1

(4)    Analysis

2      As with TUG and CotS, the Court finds that these allegations are sufficient to plead

3 the unity of interest required for alter ego liability, with particular emphasis on Plaintiffs'

4 allegations that StarKist is a marketing conduit for Dongwon's tuna.[8]  Nevertheless, as with

5 TUG and CotS, no Plaintiff alleges that an inequitable result will follow if the veil is not

6 pierced.  Accordingly, the Court finds that Plaintiffs fail to state an alter ego claim against

7 Dongwon.

8           (ii)    *Failure to Plead an Agency Theory*

9      To sufficiently plead an agency relationship between a parent company and its

10 subsidiary, a plaintiff must allege facts that demonstrate the parent's "degree of control

11 exerted over [the subsidiary] . . . is enough to reasonably deem [the subsidiary] an agent of

12 [the parent] under traditional agency principles."  *Sonora Diamond Corp.*, 83 Cal. App.

13 4th at 541.  Under traditional agency principles, "[c]ontrol is the key characteristic."  *Id.*

14 "The parent's general executive control over the subsidiary is not enough; rather there must

15 be a strong showing beyond simply facts evidencing 'the broad oversight typically

16 indicated by [the] common ownership and common directorship' present in a normal

17 parent-subsidiary relationship."  *Id.* at 542 (citation omitted).  "As a practical matter, the

18 parent must be shown to have moved beyond the establishment of general policy and

19 direction for the subsidiary and in effect taken over performance of the subsidiary's <u>day-

20 to-day</u> operations in carrying out that policy."  *Id.* (citation omitted) (emphasis in original).

21          (a)    TUG and CotS

22      To support their agency theory, Plaintiffs generally rely on the same facts alleged

23 with regard to their alter ego theory. And at least one Plaintiff further alleges that TUG's

24 statement regarding CotS's receipt of a subpoena in connection with the DOJ investigation,

25 as well as its public statement announcing that it had suspended a planned public offering

26

27 ─────────────────

28 [8] Though the Court notes that allegations against Dongwon are measurably weaker than those against
TUG, including, for example, the lack of any allegation that Dongwon shares office space with StarKist.

15-MD-2670 JLS (MDD)

for Bumble Bee in light of the DOJ investigation, also supports an agency theory.  (*See, e.g.*, Affiliated Foods Opp'n at 22.)

While largely sufficient to plausibly demonstrate a unity of interest for alter ego liability, these facts fail to support a plausible agency theory (i.e., these allegations do not demonstrate that TUG enforced a shared unity of interest by dominating and controlling CotS to achieve it).  As discussed above, the overlap of TUG officers and CotS directors, as well as other CotS officers' relationship to the controlling family of TUG and membership in TUG's "Global Leadership Team," certainly suggest that TUG has a hand in directing CotS's business operations.  However, at best these facts collectively demonstrate that TUG, as CotS's parent, exercises a measurable degree of influence over its subsidiary—an unremarkable conclusion.  And under this view it comes as no surprise that TUG would issue a statement in connection with the DOJ investigation of its subsidiary, and that it might suspend its plans to purchase Bumble Bee pending the investigation.  Thus, it is not clear how these additional facts support Plaintiffs' allegation that CotS is an agent of TUG.

To be sure, some Plaintiffs further allege that "TUG dominated or controlled [CotS's] canned tuna business as reflected by, among other actions, TUG's domination or control of [CotS's] production, pricing, hiring, budgeting, capitalization, and/or marketing of canned tuna."  (*See, e.g.*, Meijer Compl. ¶ 23.)  But reciting the legal characteristics of agency is insufficient.  And simply listing those aspects of CotS's business that TUG dominates or controls is no better.[9]  Notably missing are <u>any</u> facts showing <u>how</u> TUG "dominates or controls" these aspects of CotS's business.  Accordingly, these allegations do not plausibly suggest that TUG has "moved beyond the establishment of general policy and direction for [CotS] and in effect taken over performance of the subsidiary's <u>day-to-</u>

/ / /

---

[9] At the MTD Hearing, counsel argued that these are specific allegations.  (Hr'g Tr. 24:24–25:12.)  The Court disagrees, but is willing to find that these are specific conclusions.

15-MD-2670 JLS (MDD)

day operations in carrying out that policy." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 542 (emphasis in original).

That is why Plaintiffs' reliance on *Axon Solutions, Inc. v. San Diego Data Processing Corp.*, No. 09 CV 2543 JM RBB, 2010 WL 1797028 (S.D. Cal. May 4, 2010), is misplaced. There, the court found that the plaintiff adequately pled an agency relationship based on factual allegations demonstrating control:

> The City's audit committee determined that the City needed to upgrade its computer systems. The Mayor outlined a plan for doing so, and the City Council approved the plan. The City then directed SDDPC to issue a request for proposals, which Axon answered. A committee of nine City representatives and four SDDPC representatives selected Axon's bid. Then SDDPC entered the MSA agreement with Axon. Per these allegations, SDDPC could legitimately be described as "nothing more than an incorporated department of the" City that manages information technology services for the City. *Id.* The City, and its elected leaders, were the decision-makers; SDDPC merely followed the City's directions. Therefore, Axon's agency allegations are sufficient to survive the City's motion to dismiss.

*Id.* at *2; *see also In re Hydroxycut Mktg. & Sales Practices Litig.*, 810 F. Supp. 2d 1100, 1119–21 (S.D. Cal. 2011) (finding, in the personal jurisdiction context, a plausible allegation of agency liability where the plaintiffs provided substantial factual allegations to support their claim). Here, in contrast, Plaintiffs have merely set the chess board with CotS's pieces. But they have not demonstrated that TUG's hand directs the game.

### (b)   Dongwon and StarKist

To support their agency theory, Plaintiffs rely on the same facts alleged with regard to their alter ego theory.[10]   And as discussed above, Plaintiffs' allegations against Dongwon are measurably weaker when compared to those alleged against TUG. Accordingly, the

///

---

[10] Including the deficiently pled allegation that "Dongwon dominated or controlled StarKist's canned tuna business as reflected by, among other actions, Dongwon's domination or control of StarKist's production, pricing, hiring, budgeting, capitalization, and/or marketing of canned tuna." (*E.g.*, Meijer Compl. ¶ 16.)

Court applies the same agency analysis with respect to TUG and CotS and finds that Plaintiffs fail to state a plausible agency claim against Dongwon.

### C.    Conclusion

For the foregoing reasons, the Court **DENIES** the Parent Defendants' Motions to Dismiss as to direct involvement in the conspiracy and **GRANTS** the Parent Defendants' Motions to Dismiss as to alter ego and agency theories of liability.

## II.    The Proposed Nationwide California Class

The EPPs seek to bring claims under Section 16720 of the California Business and Professions Code (the "Cartwright Act") and Section 17200 *et seq.* of the California Business and Professions Code (the "UCL") on behalf of a proposed nationwide class. (EPP Compl. ¶¶ 173–87.)  Defendants move to dismiss these proposed nationwide class claims for failure to satisfy California's choice-of-law analysis under *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012).  (State Law Br. 18–23.)  However, before examining California choice-of-law analysis, the Court first addresses EPPs' threshold contention that "such a decision is premature as courts routinely defer such decisions until after plaintiffs have had an adequate opportunity to develop the factual record."  (EPP Opp'n 50.)

### A.    Whether Choice-of-Law Analysis Is Appropriate on a Motion to Dismiss

EPPs cite several cases in support of delaying until the class certification stage any decision regarding the proposed nationwide class, all focused largely on the fact that discovery regarding class certification is especially fact intensive.  (EPP Opp'n 50–51.) Defendants offer competing authority holding that dismissing nationwide class claims on a motion to dismiss is appropriate, especially when discovery will not substantially inform the choice-of-law analysis.  (State Law Reply 27–29; *see* State Law Br. 18–19.)  The Court agrees with Defendants.

*Czuchaj v. Conair Corp.*—one of EPPs' cited cases—nicely describes "whether a choice-of-law analysis can be properly conducted at the motion to dismiss stage," noting that "it depends on the individual case."  No. 13-cv-1901-BEN (RBB), 2014 WL 1664235,

20

*9 (S.D. Cal. April 18, 2014).  As long as a court has sufficient information to thoroughly analyze the choice-of-law issue, *see id.*; *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1028 (N.D. Cal. 2007), and discovery will not likely affect the analysis, *see Frezza v. Google Inc.*, No. 5:12–cv–00237–RMW, 2013 WL 1736788, *5–6 (N.D. Cal. April 22, 2013), it is appropriate for a Court to undertake choice-of-law analysis at the motion to dismiss stage.

In the present case, the Court concludes that it has adequate information to consider choice-of-law analysis within the context of these Motions to Dismiss.  Plaintiffs are here seeking to certify a nationwide California class based on the same factual conduct underlying the alleged Sherman Act violations, (EPP Compl. ¶¶ 174, 179), and discovery will likely not affect the legal analysis implicated by the circumstances of this particular case.  Accordingly, the Court conducts choice-of-law analysis.

### B.    Choice-of-Law Analysis

"California law may only be used on a classwide basis if 'the interests of other states are not found to outweigh California's interest in having its law applied.'"  *Mazza*, 666 F.3d at 590 (quoting *Wash. Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1082 (2001)).  To guide such a determination, California choice-of-law analysis requires a three-step test to determine which state's laws should apply.  *Wershba v. Apple Comput., Inc.*, 91 Cal. App. 4th 224, 241–42 (2001).

First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.

Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.

Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more

15-MD-2670 JLS (MDD)

1
2

impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

3

4
5

*Mazza*, 666 F.3d at 590 (quoting *McCann v. Foster Wheeler LLC*, 225 P.3d 516, 527 (Cal. 2010)).

6

(i)      Conflict of Laws

7      "The fact that two or more states are involved does not itself indicate that there is a

8  conflict of law problem." *Wash. Mut. Bank*, 15 P.3d at 1080. "A problem only arises if

9  differences in state law are material, that is, if they make a difference in this litigation."

10 *Mazza*, 666 F.3d at 590 (citing *Wash. Mut. Bank*, 15 P.3d at 1080–81). To analyze

11 materiality in the present case requires a cursory discussion of federal antitrust law as it

12 applies to indirect purchasers.

13     In 1977 the Supreme Court issued its opinion in *Illinois Brick Co. v. Illinois*, holding

14 that indirect purchasers of goods or services are barred from recovering monetary damages

15 for federal antitrust injuries. 431 U.S. 720, 736, 746–48 (1977). Subsequently, many state

16 laws were either passed or judicially interpreted to permit indirect-purchaser recovery for

17 state antitrust violations, and the Supreme Court held that such state laws are not federally

18 preempted by *Illinois Brick*. *California v. ARC Am. Corp.*, 490 U.S. 93, 105–06 (1999).

19 The result is that some states, like California, permit indirect-purchaser recovery. *E.g.*,

20 CAL. BUS. & PROF. CODE § 16720. Others do not. *E.g.*, DEL. CODE ANN. tit. 6, §§ 2103,

21 2113.

22     In the present case, Plaintiffs assert two California-law claims on behalf of a

23 nationwide class. To make such claims available nationwide would necessarily extend

24 California's indirect purchaser recovery to states which have not enacted legislation

25 allowing for the same. Because this is a threshold issue governing whether EPPs in certain

26 states could bring monetary antitrust claims at all, EPPs proposed nationwide class

27 allegations create a clear, material conflict of laws.

28 / / /

22

(ii)    *Interests of Foreign Jurisdictions*

It is a principle of federalism that "each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders." *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 422 (2003). "[E]very state has an interest in having its law applied to its resident claimants." *Mazza*, 666 F.3d at 592–93 (citing *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001)). California law also acknowledges that "a jurisdiction ordinarily has 'the predominant interest' in regulating conduct that occurs within its borders . . . ." *McCann*, 225 P.3d at 534 (citations omitted).

In the present case, it is clear that just as many states have enacted post-*Illinois Brick* legislation permitting indirect purchaser suits, so also have many states refused to do so. *E.g.*, Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice* § 20.8, 1007 (5th ed. 2016) [hereinafter Hovenkamp, *Antitrust*] ("[A]bout half of the states have adopted indirect purchaser repealers, either by legislation or by judicial rule."). Indeed, in *Illinois Brick* itself the Supreme Court struggled with the policies underlying its decision. *See ARC Am. Corp.*, 490 U.S. at 103 ("It is one thing to consider the congressional policies identified in *Illinois Brick* and *Hanover Shoe* in defining what sort of recovery federal antitrust law authorizes; it is something altogether different, and in our view inappropriate, to consider them as defining what federal law allows States to do under their own antitrust law."). And so too have states, post-*Illinois Brick*, struggled in deciding whether to extend monetary recovery to indirect purchasers. *See, e.g.*, *Bunker's Glass Co. v. Pilkington plc*, 47 P.3d 1119, 1125 (Ariz. Ct. App. 2002) (exhaustively considering *Illinois Brick*, Arizona statutory text, legislative history, public policy, and history in determining whether statute provided monetary damages for indirect purchasers), *as corrected*, (June 28, 2002), *aff'd*, 75 P.3d 99 (Ariz. 2003). It is therefore clear that foreign jurisdictions have strong interests in seeing their particular legislative decisions regarding *Illinois Brick* honored.

/ / /

1

(iii)    *Which State Interest Is Most Impaired*

2    As an initial matter, both California courts and the Ninth Circuit have held that "the

3    place of the wrong" has the predominant interest in regulating the conduct at issue.

4    *Hernandez v. Burger*, 102 Cal. App. 3d 795, 801–02 (1980), *cited with approval by*

5    *Abogados v. AT & T, Inc.*, 223 F.3d 932, 935 (9th Cir. 2000). The "place of the wrong" is

6    the state where the last event necessary to make the actor liable occurred.  *Mazza*, 666 F.3d

7    at 593 (citing *Zinn v. Ex–Cell–O Corp.*, 306 P.2d 1017, 1032 n.6 (Cal. Dist. Ct. App. 1957)

8    (concluding in a fraud case that the place of the wrong was the state where the

9    misrepresentations were communicated to the plaintiffs, not the state where the intention

10   to misrepresent was formed or where the misrepresented acts took place)).  "The test

11   recognizes the importance of our most basic concepts of federalism, emphasizing . . . 'the

12   appropriate scope of conflicting state policies,' not evaluating their underlying wisdom."

13   *Mazza*, 666 F.3d at 593 (citing *McCann*, 225 P.3d at 534).

14   In the present case, EPPs' purported nationwide class will necessarily encompass

15   individuals who were only harmed by purchasing the allegedly cost-inflated products

16   somewhere other than California.  Thus, for those class members the last event necessary

17   to make the actor liable will have occurred in states other than California.  Of course, this

18   alone cannot destroy a plaintiff's purported nationwide-class claims, otherwise *Mazza*

19   would almost always act as a bar to a plaintiff choosing California law over that of another

20   state.  However, the Court here concludes that in states without legislation or interpretation

21   permitting indirect-purchaser recovery such choices evince a policy judgment by those

22   states that should not be cast aside.  *See, e.g.*, *In re Graphics Processing Units Antitrust*

23   *Litig.* ("*GPU*"), 527 F. Supp. 2d 1011, 1028 (N.D. Cal. 2007) (dismissing plaintiffs' *Illinois*

24   *Brick*-circumventing California-law claims and noting that "[i]t is hard to see why the laws

25   of other states should be tossed overboard and their residents remitted to California law for

26   transactions that, for individual consumers, are local in nature").  And, "[c]onversely,

27   / / /

28   / / /

24

California's interest in applying its law to residents of foreign states is attenuated." *Mazza*, 666 F.3d at 594.[11]

Given the foregoing, the Court **GRANTS** Defendants' motion to dismiss EPPs' purported nationwide class claims.

### III.   *Twombly/Iqbal* **and Failure to Adequately Plead State Law Claims**

Defendants move to dismiss the CFP and EPP Complaints as insufficiently pled under various states' (A) antitrust laws, (State Law Br. 2–5); (B) consumer protection laws, (*id.* at 5–14); and (C) variations on the common-law doctrine of unjust enrichment, (*id.* at 14–18). The Court addresses each type of law in turn, analyzing the sufficiency of Plaintiffs' pleadings on a state-by-state basis.

#### A.   *State Antitrust Laws*

Defendants assert that EPPs may not bring antitrust claims under the Arkansas, Illinois, and Missouri antitrust laws, (i)–(iii), and that CFPs' and EPPs' Oregon and Rhode Island antitrust claims must be limited in time, (iv)–(v). (State Law Br. 2.) The Court address each state in turn.

##### (i)   *Arkansas*

Defendants argue that "[o]nly the Arkansas Attorney General may bring suit on behalf of indirect purchasers under Arkansas's state antitrust statute[,]" and that therefore

---

[11] Plaintiffs at the hearing further urged the Court to delay deciding this question until the class certification stage. (Hr'g Tr. 42:20–60:15.) In part, Plaintiffs referenced several district courts that have concluded that in antitrust cases it "is a close question" whether to apply California law in a state that would otherwise bar indirect-purchaser recovery. *E.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M 07-1827 SI, 2013 WL 4175253, at *3 (N.D. Cal. July 11, 2013); *Pecover v. Electronic Arts Inc.*, No. C 08-2820 VRW, 2010 WL 8742757, at *20 (N.D. Cal. Dec. 21, 2010). However, there are many other Courts that do not find the inquiry to be so close; in fact, the final case Plaintiffs provided the Court at the hearing explicitly notes that "[g]iven that the action simply could not go forward in non-repealer states, however, it is too much of a stretch to employ California law as an end run around the limitations those states have elected to impose on standing." *In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2017 WL 235052, at *22 (N.D. Cal. Jan. 19, 2017) (alteration in original) (citing *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-2143 RS, 2016 WL 467444, at *12 (N.D. Cal. Feb. 8, 2016)). The Court here agrees. And because Plaintiffs have brought a putative class consisting of "[a]ll persons and entities who resided in the United States . . . during the Class Period[,]" (EPP Compl. ¶ 68), this is fatal to such a class. However, Plaintiffs here—as with all other claims—will be granted leave to amend.

EPPs' claims on behalf of a putative indirect purchaser class are not permitted. EPPs argue that the doctrine of *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), and its progeny—namely *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010)—permit class actions like those in the present case because the Arkansas statutory limitation is merely procedural, rather than substantive. The Court agrees with Defendants.

    *Shady Grove* concerned a putative New York class seeking to maintain a class action under a statute that permitted class adjudication generally, but barred from class treatment the specific types of recovery the *Shady Grove* Plaintiffs sought. Ultimately, the *Shady Grove* plurality decided the case prior to reaching *Erie* analysis, holding that Federal Rule of Civil Procedure 23 (governing class actions) and the relevant New York law were directly in conflict, and thus the Federal Rule controlled. By contrast, in the present case Arkansas flatly outlaws indirect-purchaser antitrust claims *ab initio* unless asserted <u>by a particular third party</u>, the State Attorney General. In other words, Federal Rule of Civil Procedure 23 does not conflict with the Arkansas statute at all—no Plaintiff except for the State Attorney General may validly bring a class action claim, and thus Rule 23 may <u>not</u> be triggered unless that particular circumstance is met. *See Shady Grove*, 559 U.S. at 399 ("There is no reason, in any event, to read Rule 23 as addressing only whether <u>claims made eligible for class treatment</u> by some <u>other</u> law should be certified as class actions. . . . . Courts do not maintain actions; <u>litigants do</u>. The discretion suggested by Rule 23's 'may' is <u>discretion residing in the plaintiff</u>: <u>He</u> may bring <u>his claim</u> in a class action if he wishes." (second emphasis original, all other emphases added)).[12]

    Accordingly, the inquiry here is different than in *Shady Grove*, and the Court must consider whether the Arkansas law is procedural or substantive in nature. *See Shady Grove*, 559 U.S. at 417–18; *Hanna v. Plumer*, 380 U.S. 460, 464 (1965). However, the analysis from the preceding paragraph also answers this second question—Arkansas's law

---

[12] Additionally, pursuant to Ninth Circuit precedent *Shady Grove*'s result is the only portion of that case that is useful to this court. *Infra* Part IV.B.(xv).

1   is inherently substantive in nature. Under Arkansas antitrust law, indirect purchasers have

2   no individual claim, no class claim; no claim pursuant to their discretion, period. The

3   Arkansas legislature has made the determination that only one party, <u>in her official</u>

4   <u>discretion</u> as State Attorney General, may seek relief for harms indirect purchasers may

5   have suffered.[13]  Accordingly, the Court concludes that the Arkansas rule, for purposes of

6   *Erie*-doctrine application, is one of substance rather than procedure.

7        EPPs additionally argue, even if the Arkansas rule is considered to be substantive,

8   "Arkansas' general prohibition against monopolies, etc. is cumulative, [and] allows for a

9   private action by anyone . . . including an action for treble damages . . . for price fixing."

10  (EPP Opp'n 58.)  Defendants contend that Arkansas' statutory price-fixing provisions

11  appear in a distinct subchapter that only permits suits by the Attorney General, and that

12  therefore EPPs' argument fails.   (State Law Reply 2, n.3.)   Defendants are correct.

13  *Compare* ARK. CODE ANN. § 4-75-211 (located in "Subchapter 2—Unfair Practices Act"

14  and providing "Civil remedy"), *with* § 4-75-315 (located in "Subchapter 3—Monopolies

15  Generally" and providing for "Civil actions and settlements by the Attorney General" as

16  supplementary "to the other remedies <u>provided in this subchapter</u>" (emphasis added)).

17  Accordingly, the Court concludes that Arkansas does not permit civil suits by indirect

18  purchasers and therefore **DISMISSES** Plaintiffs' Arkansas antitrust claims. *In re Cast*

19  *Iron Soil Pipe and Fittings Antitrust Litig.* ("*Cast Iron*"), No. 1:14-MD-2508, 2015 WL

20  5166014, at *22 (E.D. Tenn. June 24, 2015) ("Thus, as this subsection of the [Arkansas

21  antitrust] statute does not provide for a private individual to bring an action and only

22  permits actions by the Attorney General, the Indirect Purchasers' claim must be

23  **DISMISSED.**" (boldface and capitalization original)).

24  / / /

25  / / /

26

27  _____

    [13] This, of course, implicates the procedure of when indirect purchasers may recover. But the fact that an

28  indirect purchaser may nonetheless recover under the statute pursuant to a suit by the Attorney General

    does not alter the substance of indirect purchasers' <u>personal</u> remedy—they have none.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### (ii)    Illinois

Defendants argue that Illinois's "antitrust statute expressly prohibits indirect purchasers from bringing class actions and reserves that right for Illinois's Attorney General." (State Law Br. 3.)  EPPs assert that the same *Erie*- and *Shady Grove*-based argument regarding Arkansas's statute applies to the Illinois statute.  Accordingly, the same result adheres—the Court concludes that Illinois does not permit civil suits by indirect purchasers and therefore **DISMISSES** Plaintiffs' Illinois antitrust claims.

### (iii)    Missouri

Defendants argue that "EPPs frame their antitrust claim as a violation of the Missouri Merchandising Practices Act [("MMPA")], Missouri's consumer protection statute." (State Law Br. 4.)  Defendants' definitional sleight-of-hand aside, this means that EPPs assert a claim under the MMPA.  Accordingly, the Court addresses Defendants' arguments under Part III.B (dealing with state consumer protection laws).

### (iv)    Oregon

Defendants argue that, although Oregon now permits antitrust recovery pursuant to recently passed *Illinois Brick*-repealer legislation, such legislation was prospective in nature and therefore Plaintiffs' claims for damages "should be dismissed to the extent that they seek recovery for alleged overcharges pre-dating 2010 . . . ." (State Law Br. 4–5.) CFPs argue, without a single citation, that in Oregon "[a]n action filed after 2009 can claim damages for violations that predate the filing." (CFP Opp'n 23–24.) EPPs argue the same, noting that Defendants-cited *Cast Iron* "tacitly allowed claims from Oregon indirect purchasers as far back as January 1, 2006 to stand[,]" and inferentially arguing that Defendants-cited *In re Niaspan Antitrust Litig.* ("*Niaspan*"), 42 F. Supp. 3d 735 (E.D. Pa. 2014), relied on flawed analysis.  (EPP Opp'n 59.)

Plaintiffs are correct that *Cast Iron* tacitly allowed pre-repealer claims to proceed; however, as Defendants point out, the Court did not even address the substance of the Oregon claims because no Defendant "raised specific arguments for dismissal" regarding Oregon.  2015 WL 5166014, at *35 n.11.  By contrast, *Niaspan* directly addressed

Oregon's repealer statute, finding that the case of *Strizver v. Wilsey,* 150 P.3d 10, 12 (Or. Ct. App. 2006), conclusively establishes that Oregon's repealer statute applies only prospectively. *Niaspan*, 42 F. Supp. 3d at 759.  However, the *Niaspan* Court in part relied on *Striver* because "[t]he [*Niaspan*] end-payer plaintiffs . . . cited no [contrary] evidence." *Id.*   Contrastingly, in the present case EPPs directly address *Striver* and argue that it establishes that Oregon's repealer statute should apply retroactively.  (EPP Opp'n 59.)  The Court agrees with EPPs.

*Striver* comprehensively sets forth the manner in which courts should analyze whether an Oregon statute applies retroactively or prospectively—"like all other matters of statutory construction, [it is] an exercise in discerning the legislature's intent." *Striver*, 150 P.3d at 12.   Specifically, "in the absence of an express retroactivity clause," grammatical or legislative-history indicators, or dispositive maxims of statutory construction, courts are "most often . . . left to examine whether a provision is 'remedial' versus 'substantive' in nature." *Id.* at 12–13.  "If it is remedial, it presumptively applies retroactively; if it is substantive, it presumptively applies prospectively only." *Id.* at 12.

> The basic test for whether a law is "substantive" concerns whether application of it will "'impair existing rights, create new obligations or impose additional duties with respect to past transactions * * *.'" . . . . "Remedial" statutes, by contrast, are those "which pertain to or affect a remedy, as distinguished from those which affect or modify a substantive right or duty."

*Id.* at 13 (citations omitted).[14]

_____

[14] Defendants also argue in their Reply that (1) a fundamental tenet of statutory construction is to assume only prospective application; and (2) the Oregon legislature could have easily indicated any intent to make the statute apply retroactively.  (1) Defendants are correct that the Supreme Court has articulated this maxim of construction, but the animating concern behind such construction is to avoid constitutional conflict, *Vartelas v. Holder*, 132 S.Ct. 1479, 1486–87 (2012), and Oregon's retroactivity test embraces this concern.  (2) Defendants are correct that the Oregon legislature could have easily indicated any intent to make the statute apply retroactively, but the legislature could just as easily have indicated any intent to make the statute apply only prospectively.  And the case Defendants cite for that proposition itself recognizes that "remedial and procedural statutes are [often] applied retroactively." *Perkins v. Willamette Indus., Inc.*, 542 P.2d 473, 475 (1975).

15-MD-2670 JLS (MDD)

In the present case, EPPs argue—and the Court agrees—that "Oregon's state antitrust laws have always barred price fixing, so Defendants' substantive rights are not impaired." (EPP Opp'n 59.)  Further, Defendants' legislative-history argument in their Reply actually bolsters EPPs' position.  Specifically, Defendants' note a post-passage legal position taken by the Oregon Attorney General regarding the initial version of Oregon's *Illinois Brick*-repealer Statute.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.* ("*TFT-LCD*"), No. C 10-4346 SI, 2011 WL 1113447, at *2 (N.D. Cal. Mar. 25, 2011) ("Defendants contend that claims based on conduct prior to January 1, 2002 must be dismissed because Oregon's *Illinois Brick* repealer statute was enacted on that date, and the legislative history indicates that the statute was intended to apply only prospectively. Oregon concedes this point . . . .").  The implications of *TFT-LCD* for EPPs' argument are twofold: (1) the legislative history of the statute's initial passage revealed legislative intent to make the statute apply only prospectively, yet there is no indication of the same intent regarding the recent amendment here at issue; and (2) whereas the initial version of Oregon's repealer created a completely new remedy—one for indirect purchasers, thus expanding liability for damages to a whole new class—the recent amendment does not expand liability or potential damages, it simply permits indirect purchasers themselves, rather than the Attorney General, to be the masters of their claims.

Accordingly, the Court concludes that the recent amendment to Oregon's *Illinois Brick*-repealer statute is properly classified as remedial and procedural, and that the surrounding evidence and context further supports applying the presumption of retroactivity.  Defendants' Motion to Dismiss on this point is therefore **DENIED**.

### (v)    Rhode Island

Defendants argue that Plaintiffs' antitrust claims under "Rhode Island law should be dismissed to the extent they seek recovery for alleged overcharges pre-dating . . . 2013" because prior to that year "indirect purchasers were barred from seeking antitrust damages[;] . . . [Rhode Island] abided by the *Illinois Brick* rule." (State Law Br. 4–5.)

///

1  EPPs and CFPs concede this argument.  (CFP Opp'n 23–24; *see* EPP Opp'n 56–59.)

2  Accordingly, Plaintiffs claims for overcharges prior to 2013 are **DISMISSED**.

3  ### *B. State Consumer Protection Laws*

4  Defendants, for various reasons, move to dismiss many Plaintiffs' consumer

5  protection claims.  The Court addresses these claims in alphabetical order by state.

6  ### *(i)    Arkansas*

7  Defendants argue that Plaintiffs have not pled unconscionable conduct as required

8  by the Arkansas Deceptive Trade Practices Act ("ADTPA"), Arkansas Code Annotated §

9  4-88-107(a).  (State Law Br. 8–10).  Plaintiffs respond by noting that "[a]lthough the

10  Arkansas Supreme Court has yet to squarely decide whether the ADTPA encompasses

11  price-fixing conduct," (CFP Opp'n 27), the Arkansas Supreme Court has adopted a broad

12  definition of the term unconscionable and has noted "that liberal construction of the

13  [A]DTPA is appropriate[,]" *State ex rel. Bryant v. R & A Inv. Co.*, 985 S.W.2d 299, 302

14  (Ark. 1999); *see also Baptist Health v. Murphy*, 226 S.W.3d 800, 811 (Ark. 2006) (noting

15  that definition of unconscionable "includes conduct violative of public policy or statute").

16  Given this liberal construction, and the fact that several other district courts have found

17  well-pleaded price-fixing claims to constitute ADTPA violations, *In re Flash Memory*

18  *Antitrust Litig.* ("*Flash Memory*"), 643 F. Supp. 2d 1133, 1157 (N.D. Cal. 2009); *In re*

19  *Chocolate Confectionary Antitrust Litig.* ("*Chocolate Confectionary*"), 602 F. Supp. 2d

20  538, 582–83 (M.D. Pa. 2009); *In re New Motor Vehicles Canadian Export Antitrust Litig.*

21  ("*NMV*"), 350 F. Supp. 2d 160, 178 (D. Me. 2004), the Court concludes that Plaintiffs have

22  stated a valid claim under the ADTPA.

23  ### *(ii)    California*

24  Defendants argue that Plaintiffs' California consumer-protection claims necessarily

25  sound in fraud, and that Plaintiffs do not meet Federal Rule of Civil Procedure 9(b)'s

26  heightened pleading standard requiring fraud to be alleged with particularity.  (State Law

27  Br. 7–8; Reply 11–12.)  Plaintiffs argue that their claims do not sound in fraud, but instead

28  are simply based on antitrust violations such that Rule 9(b) does not apply.  (EPP Opp'n

71–72.)[15]   Indeed, California's Unfair Competition Law explicitly directs that "unfair competition shall mean and include <u>any unlawful</u>, <u>unfair</u> or fraudulent <u>business act or practice</u> . . . ." CAL. BUS. & PROF. CODE § 17200 (emphasis added).  And Defendants' cited cases in response, (Reply 11 n.11), were all subject to Rule 9(b) because allegations of fraudulent conduct were required to make out the principal claims at issue.  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) ("[F]raud is not a necessary element of a claim under the CLRA and UCL . . . .]").  Accordingly, the Court concludes that Plaintiffs have plausibly alleged unlawful and unfair business acts by Defendants such that Defendants' Motion to Dismiss as to this issue is **DENIED**.  *See In re Processed Egg Prod. Antitrust Litig.* ("*Eggs*"), 851 F. Supp. 2d 867, 895 (E.D. Pa. 2012) ("The Court agrees that it is an analytically sensible and entirely fair operation of pleading standards and substantive law to conclude that the . . . allegations giving rise to alleged antitrust violations also give rise to the Plaintiffs' UCL claim.").

(iii)   *District of Columbia*

(a)   Unconscionable Conduct

Defendants argue that Plaintiffs have not pled unconscionable conduct as required by the District of Columbia Consumer Protection and Procedures Act ("DCCPPA"), District of Columbia Official Code § 28-3904.  (State Law Br. 8–10.)  Plaintiffs respond that the DCCPPA does not require a showing of unconscionable conduct, (CFP Opp'n 27; EPP Opp'n 67);[16] instead,

---

[15] CFPs additionally argue that Plaintiffs' allegations satisfy Rule 9(b).  (CFP Opp'n 25–26.)  Given that the Court concludes Plaintiffs' allegations do not sound in fraud, the Court does not address this argument.

[16] Defendants' Reply asserts that "Plaintiffs acknowledge that unconscionability is a required element of . . . District of Columbia . . . consumer protection claims."  (State Law Reply 12.)  Aside from mischaracterizing EPPs' and CFPs' positions, (CFP Opp'n 27 ("[A] violation of the . . . DCCPPA . . . does not require 'unconscionable conduct.'"); EPP Opp'n 67 (explaining "[n]or do all of the statutes require a complaint to allege unconscionable conduct." and citing D.C. authority), this position is also legally incorrect.  *See, e.g., Eggs*, 851 F. Supp. 2d at 897–98 ("The DCCPPA prohibits 'unlawful trade practices,' and, although certain of the enumerated 'unlawful trade practices' as defined by D.C. Code § 28–3904 may require the element of unconscionable conduct to be alleged, Defendants have not identified any authority that suggests that an allegation of 'unconscionable conduct' is required in order for a

32

1

2    [w]hile the CPPA enumerates a number of specific unlawful trade practices

3    . . . the enumeration is not exclusive. . . . .   A main purpose of the CPPA is to

     "assure that a just mechanism exists to remedy <u>all</u> improper trade practices."

4    D.C. Code § 28-3901(b)(1) (emphasis added).   Trade practices that violate

5    other laws, including the common law, also fall within the purview of the

     CPPA.

6

7    *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 723 (D.C. 2003) (citation omitted).

8    Given this clear statement from D.C.'s highest court, and that Plaintiffs have plausibly

9    alleged a violation of federal antitrust law (among other laws), the Court therefore

10   **DENIES** Defendants' motion to dismiss on this ground.

11                    (b)      Household, Personal, or Family Purpose

12           Defendants argue that CFPs have not pled the requisite household, personal, or

13   family purposes to bring a valid claim under the DCCPPA.   (State Law Br. 12.)   CFPs

14   concede that such requirement exists, but argues that courts interpreting similar statutory

15   provisions have expanded the purpose requirement to encompass "'conduit[s] or

16   intermediary[ies],' obtaining goods so as to 'pass them along' to the ultimate consumer."

17   (CFP Reply 29 (quoting *Slobin v. Henry Ford Health Care*, 666 N.W.2d 632, 635 (Mich.

18   2003)).)   Defendants' Reply cites many cases to the contrary.   *E.g.*, *Cast Iron*, 2015 WL

19   5166014, at *30 (collecting cases and noting that "[c]ourts overseeing multidistrict

20   litigation as well as state courts in the District of Columbia have correctly held that

21   '[t]ransactions along the distribution chain that do not involve the ultimate retail customer

22   are not "consumer transactions" that the [DCCPPA] seeks to reach'" (second and third

23   alteration original)).   In particular:

24

25           If the purchaser is regularly engaged in the business of buying the goods or

26           service in question for later resale to another in the distribution chain, or at

             retail to the general public, then a transaction in the course of that business is

27   _____

28   violation of the Antitrust Act to constitute an unlawful trade practice under the DCCPPA for pleading

     purposes.").

33

not within the Act.  If, on the other hand, the purchaser is not engaged in the regular business of purchasing this type of goods or service and reselling it, then the transaction will usually fall within the Act.

*Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. 1989).  Given the foregoing, the Court concludes that CFPs, as intermediary purchasers who later repackage and resell prior purchases to consumers, do not fall within the provisions of the DCCPPA.

(c)     Conclusion

Plaintiffs validly plead a violation of the DCCPPA, but CFPs are not part of the class permitted to bring suit for such violation.  Accordingly, the Court **DENIES** Defendants' Motion to Dismiss as to EPPs but **GRANTS** Defendants' Motion to Dismiss as to CFPs.

(iv)    *Illinois*

(a)     Consumer Protection Pleading Requirements

Defendants argue that Plaintiffs' claims under Illinois's Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA"), 815 Illinois Compiled Statutes 505 *et seq.*, necessarily sound in fraud, and that Plaintiffs do not meet Federal Rule of Civil Procedure 9(b)'s heightened pleading standard requiring fraud to be alleged with particularity.  (State Law Br. 7–8; Reply 11–12.)  Plaintiffs argue that their claims do not sound in fraud, but instead are simply based on antitrust violations such that Rule 9(b) does not apply.  (EPP Opp'n 71–72; *see also supra* note 15.)  Indeed, the ICFDBPA explicitly declares unlawful

[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . whether any person has in fact been misled, deceived or damaged thereby.

815 Ill. Comp. Stat. 505/2 (emphases added); *compare Soules v. Gen. Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980) (setting forth common-law fraud elements: "(1) false statement of material fact[;] (2) known or believed to be false by the party making it; (3) intent to

34

induce the other party to act; (4) action by the other party in reliance on the truth of the statement; . . . (5) damage to the other party resulting from such reliance[;]" and "the reliance by the other party must be justified").  And Defendants' cited case in response, (Reply 11 n.11), was subject to Rule 9(b) only because allegations of fraudulent conduct were required to make out the principal claims at issue.  *In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 433 n.11 (D.N.J. 2015) ("Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b).").  Accordingly, the Court concludes that Plaintiffs have plausibly alleged unlawful and unfair business acts by Defendants such that Defendants' Motion to Dismiss as to this issue is **DENIED**.

> (b)   Actionability of Price-Fixing Under Illinois's Consumer Protection Statute

Defendants argue that the Illinois Supreme Court has explicitly held that "[t]here is no indication that the legislature intended that the Consumer Fraud Act be an additional antitrust enforcement mechanism."  *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990); (State Law Br. 7; State Law Reply 7).  Plaintiffs argue that they "have properly pled their [ICFDBPA] claim under the text of the statute[,]" citing *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034 (N.D. Ill. 2007), for support.  (EPP Opp'n 60–61.)  Although the *Siegel* Court explicitly permitted price-fixing claims to proceed, it did so because "*Laughlin*, however, is silent as to the situation here: whether consumers can elect to pursue a remedy under the Consumer Fraud Act where the Illinois Antitrust Act may <u>also provide relief.</u>" *Id.* at 1048 (emphasis original).  That is not the case here, where EPPs seek to bring an indirect-purchaser suit the Illinois Antitrust statute does not permit.  (*See supra* Part III.A.(ii).)  Accordingly, the Court concludes that the ICFDBPA does not permit indirect-purchaser recovery for price fixing, and therefore **GRANTS** Defendants' Motion to Dismiss on this point.  *See Laughlin*, 550 N.E.2d at 993 ("It would be inconsistent to

/ / /

1    provide that the very conduct which is not sufficient to state a cause of action under the

2    Antitrust Act is sufficient to state a cause of action under the Consumer Fraud Act.").

3                    *(v)     Maine*

4            Defendants argue that Maine's Unfair Trade Practices Act ("MUTPA"), 5 Maine

5    Revised Statutes Annotated § 207, does not recognize a cause of action for price fixing,

6    citing *Flash Memory* for support.  (State Law Br. 6.)  Plaintiffs argue that their pleadings

7    satisfy the "unfair methods of competition" prong of MUTPA, and distinguish *Flash*

8    *Memory* as incorrectly interpreting the Maine Supreme Court's opinion in *Tungate v.*

9    *MacLean–Stevens Studios, Inc.*, 714 A.2d 792 (Me. 1998), holding that "[i]n pricing cases

10   under the Act the inquiry is whether the price has the effect of deceiving the consumer, or

11   inducing her to purchase something that she would not otherwise purchase[,]" *id.* at 797.

12   *Tungate*, Plaintiffs argue, should be limited only to the "unfair or deceptive acts" prong.

13   *See NMV*, 350 F. Supp. 2d at 187 n.40 (articulating and agreeing with Plaintiffs' position).

14   However, the wealth of authority is contrary to Plaintiffs' position and explicitly disagrees

15   with *NMV*.  *Chocolate Confectionary*, 602 F. Supp. 2d at 585 n.59; *TFT-LCD*, 586 F. Supp.

16   2d at 1126; *GPU*, 527 F. Supp. 2d at 1031; *Flash Memory*, 643 F. Supp. 2d at 1159.

17   *Chocolate Confectionary* is particularly persuasive, and notes that "[t]he decisions cited by

18   *Tungate* confirm that a <u>change in consumer conduct</u> forms the marrow of a MUTPA

19   violation."[17]  602 F. Supp. 2d at 585 n.59 (emphasis original).  Accordingly, this Court

20   joins the vast majority of our sister courts to have considered the subject, and concludes

21   that Plaintiffs fail to state a claim under MUTPA.[18] Defendants' Motion to Dismiss as to

22   this point is therefore **GRANTED**.

23   _____

24   [17] Additionally, it seems unlikely that Plaintiffs would be able to show "substantial injury," something
     Plaintiffs admit is required to meet the unfairness prong of MUTPA.  (EPP Opp'n 61); *see Tungate*, 714

25   A.2d at 797 ("The difference between some portrait packages in schools that received a commission and

26   those that did not is as little as $1.25, in the case of a $7 package. Such a difference would clearly be
     insubstantial . . . .").

27   [18] Defendants effectively rehash this argument later in their brief under the ground that Maine requires a
     showing of "deceptive inducement of purchase" pursuant to *Tungate*. (State Law Br. 13–14.) Regardless

28   of its classification, this additional line of argument is now moot.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(vi)   *Michigan*

(a)   Consumer Protection Pleading Requirements

Defendants argue that Plaintiffs' claims under Michigan's Consumer Protection Act ("MCPA"), Michigan Compiled Laws § 445.903, necessarily sound in fraud, and that Plaintiffs do not meet Federal Rule of Civil Procedure 9(b)'s heightened pleading standard requiring fraud to be alleged with particularity.  (State Law Br. 7–8; Reply 11–12.) Plaintiffs argue that their claims do not sound in fraud, but instead are simply based on antitrust violations such that Rule 9(b) does not apply, (EPP Opp'n 71–72), and, in the alternative, that even if Rule 9(b) applies Plaintiffs have satisfied the heightened pleading standard, (*id.* at 72; CFP Opp'n 25–26).

Unlike several others states' broad consumer protection laws, (*see supra* Parts III.B.(ii), (iv)), Michigan's is much more narrowly circumscribed.  MICH. COMP. LAWS § 445.903(1) ("Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful and are defined as follows . . . .").  Plaintiffs do not point to a specific provision of the MCPA definitional section covering antitrust violations, and the Court is unable to find one. *See generally id.* §§ (a)–(kk).  Accordingly, the only manner in which Plaintiffs may assert a violation of the MCPA is through fraud, and therefore Rule 9(b)'s heightened pleading standard applies.[19]  *See In re Packaged Ice Antitrust Litig.* ("*Packaged Ice*"), 779 F. Supp. 2d 642, 666 (E.D. Mich. 2011) ("When the [MCPA] claim is based on breach of express or implied warranties, these pleading strictures do not apply but otherwise, the allegations must include the specificity required by Fed. R. Civ. P. 9(b).").

To validly plead a fraud-based cause of action under the MCPA, a plaintiff must plead "with particularity that [a defendant] employed fraudulent and deceptive means with the intent to deceive[,]" and that the plaintiff "relied on such deceptive conduct when

---

[19] As in the fraudulent concealment context, the Court applies Rule 9(b)'s particularity requirement in light of the relevant state-law enunciations of the requirements to validly plead a fraud cause of action. *See infra* note 29.

making a purchase." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 701 (E.D. Pa. 2014), *on reconsideration in part sub nom. In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.* ("*Suboxone*"), No. 13-MD-2445, 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015). However, "[r]eliance and causation may be satisfied under the [MCPA] by demonstrating that plaintiffs purchased and consumed the product." *Id.*; *see Dix v. Am. Bankers Life Assur. Co. of Fla.*, 415 N.W.2d 206, 209 (Mich. 1987). And the "remedial provision of the Consumer Protection Act should be construed liberally to broaden the consumers' remedy, especially in situations involving consumer frauds affecting a large number of persons." *Dix.*, 415 N.W.2d at 209.

In the present case, EPPs allege fraud generally in the form of "secret meetings, misrepresentations to customers, and surreptitious communications among Defendants and their co-conspirators via telephone or in-person meetings." (EPP Compl. ¶¶ 157–66.) These general allegations are in turn supported by more specific allegations detailing public statements, explanations, and press releases—organized by the month in which each was made—wherein Defendants Bumble Bee, Starkist, and CotS offered pretextual explanations for the 2012 price increases. (*Id.* ¶ 144–45.) Given the Michigan Supreme Court's instruction to liberally construe the MCPA's remedial provisions, and that EPPs specifically allege each Defendant using fraudulent and deceptive means on which EPP relied, the Court finds—in the absence of authority to the contrary—that EPPs have validly stated a claim under the MCPA. *See Suboxone*, 64 F. Supp. 3d at 701 (concluding that claim under MCPA was valid, in part because "the End Payors' complaint pleads with particularity that Reckitt employed fraudulent and deceptive means with the intent to deceive").

By contrast, CFPs' Complaint alleges fraud with much less specificity. The strongest allegations are regarding 2013 and 2014 reports by several Defendants explaining that various aspects of their respective seafood brands had grown, (CFP Compl. ¶¶ 49–52), and general legal conclusions that "Defendants concealed, suppressed, and omitted to

disclose material facts to Plaintiff," (*id.* ¶ 140(d)), and "took efforts to conceal their agreements form Plaintiffs[,]" (*id.* ¶ 141(a)).   Accordingly, the only allegations that arguably satisfy Rule 9(b)'s particularity requirement are the year-specific allegations of several Defendants' brand-growth explanations.   But these allegations actually cut <u>against</u> a finding of fraudulent concealment; as CFP Plaintiffs themselves note: "[t]he 'reasonable market conditions', 'more rational market competition', 'sensible market competition', avoidance of battles for market share and 'absence of cut throat pricing' that the reports note could only have come about through collusion.   It would have been against the individual self-interest of each Defendant to eschew increasing market share during this period by lowering price."   (CFP Compl. ¶ 51.)   Accordingly, the Court concludes that CFPs have failed to sufficiently allege a cause of action under the MCPA and therefore **GRANTS** Defendants' Motion to Dismiss on this point.

(b)   Actionability of Price-Fixing Under Illinois' Consumer Protection Statute

Defendants also argue more generally that the MCPA does not recognize a cause of action for price fixing, citing *NMV*, 350 F. Supp. 2d at 189, for support.   (State Law Br. 6–7.)[20]   Plaintiffs argue that their allegations fit squarely within the MCPA's prohibitions on "'[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;' and '[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.'"   (EPP Opp'n 62 (citing MICH. COMP. LAWS §§ 445.903(s), (cc)).   Indeed, Plaintiffs have alleged that Defendants affirmatively represented that increased

---

[20] Defendants cite two additional cases in their reply: *Packaged Ice*, 779 F. Supp. 2d at 665, and *Cast Iron*, 2015 WL 5166014, at *29.   One is not useful.   *Cast Iron*, 2015 WL 5166014, at *29 (dismissing claim because "the Indirect Purchasers have neither addressed Defendants' argument with respect to Michigan nor cited any authority specific to the state of Michigan").   The other inferentially undercuts Defendants' position.   *Packaged Ice*, 779 F. Supp. 2d at 666 (noting that the "[d]efendants argue that the IP [p]laintiffs' claims under the Michigan Consumer Protection Act . . . must be dismissed for failure to allege an intent to deceive on the part of the Defendants" and because "[t]he [relevant complaint] fails to allege such conduct . . . the Court dismisses the claim for this reason").

1   prices were caused by various non-conspiratorial circumstances while at the same time
2   concealing a price-fixing conspiracy.   And *NMV* does not speak to Defendants' argument;
3   *NMV* instead dismissed the plaintiffs' claims because "[m]ost of the listed unlawful
4   practices involve deception, . . . which . . . the plaintiffs have failed to allege." 350 F. Supp.
5   2d at 189.   This same deficiency is not present here.   Accordingly, in the absence of
6   authority to the contrary, the Court concludes that EPPs have validly stated a claim under
7   the MCPA and therefore **DENIES** Defendants' Motion to Dismiss on this point.

8                    *(vii)   Minnesota*

9             Defendants argue that Plaintiffs' Minnesota consumer-protection claims necessarily
10   sound in fraud, and that Plaintiffs do not meet Federal Rule of Civil Procedure 9(b)'s
11   heightened pleading standard requiring fraud to be alleged with particularity.   (State Law
12   Br. 7–8; Reply 11–12.)   Plaintiffs argue that their claims do not sound in fraud, but instead
13   are simply based on antitrust violations such that Rule 9(b) does not apply.   (EPP Opp'n
14   71–72.)   Indeed, Minnesota's consumer protection statute explicitly proscribes "[t]he act,
15   use, or employment by any person of <u>any</u> fraud, false pretense, false promise,
16   <u>misrepresentation, misleading statement or deceptive practice</u>, with the intent that others
17   rely thereon in connection with the sale of any merchandise, <u>whether or not any person has</u>
18   <u>in fact been misled, deceived, or damaged thereby</u> . . . ."  MINN. STAT. §§ 325F.69
19   (emphases added), 8.31 (permitting private actions for violations of consumer protection
20   statute); *see also LeSage v. Norwest Bank Calhoun-Isles, N.A.*, 409 N.W.2d 536, 539
21   (Minn. Ct. App. 1987).   However, the specific provisions under which Plaintiffs bring their
22   claims are found in the "Prevention of Consumer Fraud" subsection of the statute, one of
23   fifty-three subsections, many of which contain specific penalty and liability provisions.
24   *E.g.*, MINN. STAT. §§ 325f.84 *et seq.*, 325 f.56 *et seq.*   And district courts that have
25   addressed the issue are of one mind—Rule 9(b) applies to <u>any</u> claim under Minnesota's
26   consumer fraud provisions.   *Suboxone*, 64 F. Supp. 3d at 701 ("Minnesota requires that the
27   pleadings contain specific allegations of fraud or deceit that comply with the heightened
28   standard of Federal Rule of Civil Procedure 9(b)."); *E-Shops Corp. v. U.S. Bank Nat'l*

40

*Ass'n*, 795 F. Supp. 2d 874, 879 (D. Minn. 2011) ("'Notwithstanding the relative breadth of the consumer protection statutes, Rule 9(b) applies where, as here, the gravamen of the complaint is fraud.'" (citing *Tuttle v. Lorillard Tobacco Co.*, 118 F. Supp. 2d 954, 963 (D. Minn. 2000))), *aff'd*, 678 F.3d 659 (8th Cir. 2012).  Accordingly, the Court concludes that the analysis regarding Plaintiffs' claims under the Michigan Consumer Protection Act, *supra* Part III.B.(vi) applies with equal force here; i.e., EPPs have validly pled a cause of action under Minnesota's consumer fraud provisions through Defendants' misrepresentations and misleading statements made with the intent that others rely thereon in connection with the sale of any merchandise, but CFPs have not pled with sufficient particularity any claim under Minnesota's consumer fraud act. Defendants' Motion to Dismiss on these points is therefore **GRANTED** as to CFPs and **DENIED** as to EPPs.

### (viii)  Missouri

#### (a)  Whether Indirect Purchasers May Sue Under the MMPA

Defendants argue that "Missouri follows *Illinois Brick* in prohibiting indirect-purchaser claims[,]" regardless whether a plaintiff's claims are brought "under the Missouri Antitrust laws [or] the Missouri Merchandising Practices Act [("MMPA")] . . . ." (State Law Br. 4 (second part quoting *Ireland v. Microsoft Corp.*, No. 00CV-201515, 2001 WL 1868946, at *1 (Mo. Cir. Ct. Jan. 24, 2001))).  Plaintiffs argue that a recent opinion by the Missouri Supreme Court, *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007), changed the legal landscape such that post-*Gibbons* "indirect purchaser classes may be maintained on behalf of Missouri indirect purchasers." (EPP Opp'n 56.)  In response, Defendants argue both that *Gibbons* did not address antitrust claims under the MMPA and that EPPs' cited post-*Gibbons* cases were all merely "based on speculation" as to how the Missouri Supreme Court might now rule regarding indirect-purchaser antitrust suits.  (State Law Reply 4, n.5.)  The better course, Defendants contend, is to recognize as controlling "Missouri's policy barring indirect purchaser antitrust class actions."  (*Id.*)

What Defendants cast as speculation is in fact mandatory: when a federal court sitting in diversity is presented with a novel issue of state law, the federal court must

consider how that state's highest court would likely decide the issue. *See, e.g.*, *Nolan v. Transocean Air Lines*, 365 U.S. 293, 296, (1961) (remanding case for reconsideration due to recent state court case containing "considered, relevant dictum of general scope"). The question then is whether *Gibbons* altered Missouri's legal landscape to the extent EPPs argue. Many of our sister courts have concluded it has. *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 571 (E.D. La. 2013); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 415 (E.D. Pa. 2010); *In re Lithium Ion Batteries Antitrust Litig.* ("*Batteries*"), No. 13-MD-2420 YGR, 2014 WL 4955377, at *19 (N.D. Cal. Oct. 2, 2014) ("The post-*Gibbons* cases cited to the Court have been uniform in reaching the same conclusion that indirect-purchaser status alone does not bar Missouri consumers from bringing claims under the MMPA."); *see also TFT-LCD*, 2011 WL 4501223, at *15. And the sole opinion Defendants cite in opposition to these cases is one where the court apparently did not have the benefit of our sister courts' opinions. *See Suboxone*, 64 F. Supp. 3d at 702 ("The End Payors have failed to identify any cases where indirect purchasers were permitted to bring claims under Missouri's consumer protection law for antitrust injury."), *on reconsideration in part sub nom. In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, No. 13-MD-2445, 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015).

This Court joins the majority of our sister courts and concludes that *Illinois Brick* does not bar indirect-purchaser claims under the MMPA. In particular, in extending *Illinois Brick* as a bar to indirect-purchaser damage recovery for antitrust claims, Missouri Courts have largely relied on the fact that Missouri's antitrust statute contains a harmonization clause requiring the statute to "be construed 'in harmony with ruling judicial interpretations of comparable federal antitrust statutes.'" *E.g.*, *Duvall v. Silvers, Asher, Sher & McLaren, M.D.'s* [sic], 998 S.W.2d 821, 824 (Mo. Ct. App. 1999) (citing MO. REV. STAT. § 416.141). By contrast, the MMPA has no such clause, and the *Gibbons* Court has specifically permitted indirect-purchaser recovery under the statute. True, the same conduct lies at the heart of indirect-purchasers' claims both under the MMPA and Missouri's antitrust statute.

However, just because the same course of conduct gives rise to recovery under two distinct statutory provisions does not mean that a bar to recovery under one necessarily applies with equal force to the other. *See* FED. R. CIV. P. 8(a)(3). Accordingly, the Court **DENIES** Defendants' Motion to Dismiss on this ground.[21]

(b)     Household, Personal, or Family Purpose

Defendants argue that CFPs have not pled the requisite household, personal, or family purposes to bring a valid claim under the MMPA, Missouri Revised Statutes § 407.010 *et seq.* (State Law Br. 12.) CFPs concede that such requirement exists, and then discuss why courts "[i]nterpreting consumer protection statutes nearly identical to those of the District of Columbia" set forth relevant analysis that should apply to the MMPA. (*See* CFP Opp'n 29–28.) This argument's application, which the Court already addressed and rejected regarding the District of Columbia, *supra* Part III.B.(iii)(b), is necessarily more attenuated when applied to Missouri. Accordingly, the Court concludes that here the same analysis counsels the same result—CFPs' MMPA claims are **DISMISSED**. *See Cast Iron*, 2015 WL 5166014, at *31 ("While the Indirect Plaintiffs argue that the Court should extend this language to include businesses, they have not provided convincing authority that supports their interpretation of the MMPA.").

(ix)     *Nevada*

Defendants argue that EPPs' claim under the Nevada Deceptive Trade Practices Act ("NDTPA"), Nevada Revised Statutes § 598.0903 *et seq.*, should be dismissed because no named plaintiff is alleged to be elderly or disabled, a requirement for private enforcement of the NDTPA. (State Law Br. 12–13.) Plaintiffs argue that section 41.600 of Nevada's Revised Statutes explicitly provide a cause of action for any "person who is a victim of . . . [a] deceptive trade practice as defined in [the NDTPA]." (EPP Opp'n 72 (second alteration

---

[21] Defendants effectively re-raise this argument later in their brief, arguing that "CFPs' Missouri consumer protection claims should be dismissed because Missouri bars indirect purchasers from recovery under its state laws." (State Law Br. 7.) Accordingly, the Court **DENIES** Defendants' motion to dismiss on this ground.

1   original) (quoting NEV. REV. STAT. § 41.600).)  Defendants do not address this contention

2   in their reply, instead arguing that "EPPs did not distinguish Defendants' authority."  (State

3   Law Reply 17.)

4          Plaintiffs are correct that "any person who is a victim of consumer fraud" pursuant

5   to "[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive[,]" is

6   provided a cause of action.  NEV. REV. STAT. §§ 41.600.1, .2(e).  Nevada further defines a

7   "deceptive trade practice" in part as when a person "[m]akes false or misleading statements

8   of fact concerning the price of goods or services for sale[,]" *id.* § 598.0915.13, "[f]ails to

9   disclose a material fact in connection with the sale . . . of goods or services[,]" *id.*

10  § 598.0923(2), or "[v]iolates a state or federal statute or regulation relating to the sale . . .

11  of goods or services[,]" *id.* § 598.0923(3).   Accordingly, and given that Defendants

12  nowhere directly contest Plaintiffs' ability to bring a claim under section 41.600, the Court

13  concludes that Plaintiffs state a valid cause of action under the NDTPA and therefore

14  **DENIES** Defendants' Motion to Dismiss this claim.  *See In re DDAVP Indirect Purchaser*

15  *Antitrust Litig.* ("*DDAVP*"), 903 F. Supp. 2d 198, 227 (S.D.N.Y. 2012) (permitting indirect

16  purchaser claims under the NDTPA and noting that "any victim of consumer fraud may

17  bring a civil action" under the NDTPA).

18                      *(x)*   *New Hampshire*

19         Defendants argue that claims under the New Hampshire Consumer Protection Act

20  ("NHCPA"), New Hampshire Revised Statutes Annotated § 358-A:1 *et seq.*, must allege

21  unfair or deceptive conduct that occurred within the state, and "sales of an allegedly price-

22  fixed product do not fulfill this requirement."  (State Law Br. 10–11.)  EPPs respond, citing

23  relevant authority, that a showing of "indirect effects" on state consumers is sufficient to

24  state a claim under the NHCPA.  (EPP Opp'n 70–71.)  Defendants' Reply does not address

25  Plaintiffs' authority directly, instead arguing that "EPPs do not allege any conduct other

26  than nationwide sales of packaged seafood products."  (State Law Reply 13–14.)

27         The New Hampshire Supreme Court's position strongly supports Plaintiffs'

28  argument.  In particular, in *LaChance v. U.S. Smokeless Tobacco Co.* the Court noted both

44

1   that the NHCPA "generally is given broad sweep," and that the statute permitting actions

2   for effects to consumers occurring both "'directly or indirectly' is further evidence of the

3   broad sweep the legislature intended for the CPA." 931 A.2d 571, 578 (N.H. 2007). The

4   *LaChance* Court further held that "it cannot be denied that the plaintiffs' allegations"—

5   that nationwide tobacco conglomerates "engaged in conduct that excluded competitors,

6   limited customers' product choices, and negatively affected the advertising and display of

7   competing brands[,]" *id.* at 573—"encompass conduct which was part of trade or

8   commerce that had direct or indirect effects on the people of this state[,]" *id.* at 578. *See*

9   *also id.* at 573 (permitting suit under NHCPA and noting that the plaintiffs' NHCPA-

10  specific allegations were that the defendants "increase[ed] . . . the price and limit[ed] and

11  reduc[ed] the supply of moist snuff tobacco products[,] [acts which] constitute[d] and

12  w[ere] intended to constitute unfair and deceptive competition and unfair and deceptive

13  business acts and practices within the meaning of RSA 358–A" (alterations original)).

14  True, several other district courts have distinguished *LaChance*. *E.g.*, *Batteries*, 2014 WL

15  4955377, at *22 ("The question presented in *LaChance* was whether consumers were

16  required to bring 'antitrust-type actions' under New Hampshire's antitrust statute rather

17  than under the CPA, a question the *LaChance* court answered in the negative. . . . . The

18  *LaChance* court did not say, nor does its [sic] suggest, that the CPA applies to proscribed

19  conduct occurring out of state."); *Flash Memory*, 643 F. Supp. 2d at 1159 ("*LaChance*

20  merely states that 'indirect purchasers may bring claims under the CPA.'"). However, the

21  Court does not agree with this line of analysis. In particular, *LaChance* pointed out that by

22  the very terms of the statute "[i]t shall be unlawful for any person to use any unfair method

23  of competition or any unfair or deceptive act or practice in the conduct of <u>any trade or</u>

24  <u>commerce</u> within this state," N.H. REV. STAT. § 358-A:2 (emphasis added), and "'[t]rade'

25  and 'commerce' shall include . . . <u>any trade or commerce directly or indirectly affecting</u>

26  <u>the people of this state</u>[,]" *id.* § 358-A:1.II (emphasis added). In the absence of state

27  authority to the contrary, the Court cannot ignore both *LaChance* and the plain meaning of

28  the statute. Accordingly, at least in the present posture of a Motion to Dismiss, the Court

1 joins several of our sister courts and concludes that Plaintiffs state a plausible claim under

2 the NHCPA such that Defendants' Motion to Dismiss on this point is **DENIED**.  *See*

3 *Chocolate Confectionary*, 749 F. Supp. 2d at 234–35; *In re Ductile Iron Pipe Fittings*

4 *(DIPF) Indirect Purchaser Antitrust Litig.*, No. CIV. 12-169, 2013 WL 5503308, at *22

5 (D.N.J. Oct. 2, 2013).

6                         *(xi)*   *New Mexico*

7                  (a)   Unconscionable Conduct

8          Defendants argue that Plaintiffs have not pled unconscionable conduct as required

9 by the New Mexico Unfair Trade Practices Act ("NMUTPA"), New Mexico Statutes

10 Annotated § 57-12-3.  (State Law Br. 8–10).  Plaintiffs respond that they have alleged a

11 "gross disparity" in pricing such that any unconscionability requirement is met.  (CFP

12 Opp'n 26; EPP Opp'n 67–68.)  Although New Mexico courts have not clearly defined what

13 constitutes a "gross disparity" in pricing, courts have accepted disparities of thirty percent,

14 *NMV*, 350 F. Supp. 2d at 196, allegations of "significant artificial increases" to product

15 price, *TFT-LCD*, 586 F. Supp. 2d at 1127, and even allegations solely of "pa[ying] more

16 for" products, *Chocolate Confectionary*, 602 F. Supp. 2d at 586, as validly pled for

17 purposes of NMUTPA.  Although in the present case Plaintiffs have not alleged specific

18 numerical values for the pricing discrepancies caused by the alleged antitrust violations,

19 Plaintiffs have alleged a gross disparity and price increases, sales tactics, and refusal to

20 offer certain products under flagship labels that, taken together, plausibly allege a gross

21 disparity in pricing.  (*See* First MTD Order 19–21.)  Accordingly, the Court concludes that

22 Plaintiffs have validly pled a gross disparity in pricing such that the claims survive

23 Defendants' 12(b)(6) motion.

24                  (b)   Actionability of Price-Fixing Under New Mexico's Consumer

25                         Protection Statute

26          Defendants also argue more generally that NMUTPA does not recognize a cause of

27 action for price fixing, citing *GPU*, 516 F. Supp. 2d at 1029–30, for support.  (State Law

28 Br. 6–7.)  Plaintiffs respond that allegations of a gross disparity in pricing may adequately

support a NMUTPA claim, (EPP Opp'n 62; CFP Opp'n 24), and Defendants concede this point in their reply, (State Law Reply 9 ("New Mexico's consumer protection law recognizes price-fixing claims only if the plaintiff alleges a 'gross disparity' between the price paid and the value received by the plaintiff.")).  Accordingly, and given the Court's immediately preceding analysis, *supra* Part III.B.(xi)(a), the Court concludes that Plaintiffs have validly pled a gross disparity in pricing such that Defendants' Motion to Dismiss as to this point is **DENIED**.

### (xii)   North Carolina

Defendants argue that North Carolina's Unfair and Deceptive Trade Practices Act ("NCUDTPA"), North Carolina General Statutes § 75-1 *et seq.*, addresses "primarily local concerns" such that to validly plead a cause of action under the same requires a showing of "a substantial effect" on intrastate commerce.  (State Law Br. 14 (quoting *Cast Iron*, 2015 WL 5166014, at *33, and *Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996)).)  CFPs counter that the "NCUDTPA may reach extraterritorially when justified by local concerns and when there is a sufficient state interest in the litigation . . . ."  (CFP Opp'n 28–29 (collecting cases).)  EPPs distinguish Defendants' cases and cite opposing authority.  (EPP Opp'n 70–71.)  Defendants in turn reply that CFPs and EPPs mischaracterize the authorities cited in their opposition papers.

After reviewing Plaintiffs' cases, the Court agrees with Defendants that they do not sweep as broadly as Plaintiffs represent.  In particular, two of CFPs cases explicitly "limit[] the applicability of [the NCUDTPA] to cases having a substantial effect on plaintiff's in-state operations[,]" *The In Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 502 (M.D.N.C. 1987) (emphasis in original); *Duke Energy Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 676 (S.D. Tex. 2010) (same, citing *In Porters*); and the other stands—in a highly attenuated manner—against the proposition that the NCUDTPA should apply absent a showing of substantial effects, *ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 55 n.9 (4th Cir. 1983) ("Absent some reason to believe that the North Carolina act is an attempt directly to regulate interstate commerce, and is not an act designed to address

47

primarily local concerns which happens to have an occasional incidental, but not excessive, effect upon interstate commerce, we perceive no cause for constitutional concern."), *on reh'g*, 742 F.2d 170 (4th Cir. 1984).  Thankfully for CFPs, EPPs fare better; several of their cases actually decline to follow *In Porters* and its progeny.  *In re Lidoderm Antitrust Litig.* ("*Lidoderm*"), 103 F. Supp. 3d 1155, 1173–74 (N.D. Cal. 2015) ("[T]he NCUDTPA itself does not contain or mandate a 'substantial effects' analysis.").  *Lidoderm* points out that *In Porters* relied extensively on *Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 640 F. Supp. 1411 (E.D.N.C. 1986), for its analysis.  In particular, *American Rockwool* notes that

> before 1977, § 75–1.1 was specifically limited to dealings between persons "within this state."  In 1977, however, the Legislature amended the statute and deleted this geographic limitation.  In re-writing § 75–1.1, the General Assembly expanded an effective cause of action for individuals and businesses in North Carolina who have been victimized by unscrupulous methods of competition or trade practices.

*Am. Rockwool*, 640 F. Supp. at 1427.  And nearly all Defendants' cited cases dealt with either the constitutionality of the NCDUPTA or plaintiffs who suffered no in-state injury.  *See Lidoderm*, 103 F. Supp. 3d. at 1174 (explaining the same).  Accordingly, the Court is not convinced that the NCDUPTA requires a plaintiff to show "substantial effects" in order to state a valid claim.  Further, even if "substantial effects" is, in fact, a required showing under the NCUDTPA, in the present case Plaintiffs have each alleged "substantial effects," (EPP Compl. ¶¶ 498–507; CFP Compl. ¶¶ 143), and there is no showing by Defendants that the alleged conspiracy's effect in North Carolina was somehow less than in all the other affected states. (*See* CFP Compl ¶ 2; EPP Compl. ¶ 2).  The effect, therefore, is at worst inferentially substantial, and thus the Court concludes that Defendants' Motion to Dismiss should be **DENIED** at this time.  *See, e.g.*, *In re Auto. Parts Antitrust Litig.* ("*Auto Parts*"), No. 12-MD-02311, 2014 WL 2993753, at *16 (E.D. Mich. July 3, 2014) ("This Court is not persuaded that an incidental versus a substantial in-state injury, which is a fact-based inquiry, can be assessed at this stage of the proceedings.").

1          *(xiii)  Oregon*

2                    (a)    Unconscionable Conduct

3          Defendants argue that Plaintiffs have not pled unconscionable conduct as required

4    by the Oregon Unfair Trade Practices Act ("OUTPA"), Oregon Revised Statutes § 646.607.

5    (State Law Br. 8–10.)  Plaintiffs counter that OUTPA is to be construed liberally to protect

6    consumers, (EPP Opp'n 67); *State ex rel. Rosenblum v. Johnson & Johnson*, 362 P.3d

7    1197, 1202–03 (Or. Ct. App. 2015), *review denied*, 369 P.3d 386 (2016), and that

8    Plaintiffs' allegations of "false or misleading representations or conduct" are sufficient to

9    state a claim under OUTPA, (EPP Opp'n 66 n.71).  Specifically, Defendants rely on *In re*

10   *Dynamic Random Access Memory (Dram) Antitrust Litig.* ("*DRAM*"), which dismissed

11   price-fixing claims under OUTPA, while Plaintiffs distinguish the case by pointing to the

12   *DRAM* Court's statement that "[n]one of the allegations of plaintiffs' complaint specifically

13   allege false and misleading representations made by defendants to plaintiffs, or set forth

14   conduct that caused plaintiffs confusion or misunderstanding, as is intended by OUTPA."

15   516 F. Supp. 2d 1072, 1115 (N.D. Cal. 2007).  In the present case, given that OUTPA is to

16   be liberally construed to protect consumers, and that Plaintiffs here (unlike the *DRAM*

17   Plaintiffs) plausibly allege affirmative misrepresentations regarding and concealment of

18   the alleged conspiracy, (*see infra* Part V.C), the Court concludes that Plaintiffs have stated

19   a valid claim under OUTPA.

20                    (b)    Actionability of Price-Fixing Under Oregon's Consumer

21                           Protection Statute

22         Defendants also argue more generally that OUTPA does not recognize a cause of

23   action for price fixing, citing *DRAM*, 516 F. Supp. 2d at 1115–16, for support.  (State Law

24   Br. 6–7.)  Plaintiffs respond that allegations of misrepresentations may adequately support

25   an OUTPA claim, (EPP Opp'n 63–64), and Defendants reply that, regardless, the

26   allegations both in *DRAM* and the present case are substantively identical such that the

27   logic of *DRAM* compels dismissal of Plaintiffs' OUTPA claims in the present case, (State

28   Law Reply 9–10).  These arguments almost exactly mirror those presented by both sides

regarding unconscionability. *See supra* Part III.B.(xiii)(a). Accordingly, and given the Court's immediately preceding analysis, *id.*, the Court concludes that Plaintiffs have validly stated a claim under OUTPA such that Defendants' Motion to Dismiss on this point is **DENIED**.

### (xiv)   Rhode Island

Defendants argue generally that Rhode Island's Deceptive Trade Practices Act ("RIDTPA") does not recognize a cause of action for price fixing, citing *DRAM*, 516 F. Supp. 2d at 1116, for support. (State Law Br. 6–7.) Plaintiffs respond that RIDTPA broadly prohibits unfair practices and acts, including when the act or practice (1) "violates public policy, as expressed by the law; (2) is immoral, unethical, oppressive or unscrupulous; and (3) causes substantial injury to consumers." (EPP Opp'n 64 (citing *Ames v. Oceanside Welding and Towing Co., Inc.*, 767 A.2d 677, 681 (R.I. 2001).) "Numerous courts have found price-fixing to meet this test." *Id.* (collecting cases). Defendants' one-sentence reply quotes *DRAM* and adds a *see* cite to *GPU*. (State Law Reply 10.)

What Defendants do not point out, (and surprisingly neither do Plaintiffs), is that the *DRAM* Court in a subsequent order explicitly <u>allowed</u> claims to proceed under RIDTPA based on the exact argument Plaintiffs here present. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1145 (N.D. Cal. 2008) ("This time around, plaintiffs' argument prevails. Plaintiffs rely on the Supreme Court of Rhode Island's decision in *Ames* . . . ."). Given the foregoing, the Court concludes that Plaintiffs state a valid claim under RIDTPA under *Ames*—Plaintiffs allege a violation of public policy as expressed by law (price fixing), which oppresses consumers, and which causes injury to consumers.[22] Defendants' Motion to Dismiss on this point is therefore **DENIED**.

---

[22] Defendants do not here argue that the alleged injury is not "substantial" within the meaning of *Ames*. Indeed, *Ames* relied on *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972), for its articulation of the Rhode Island unfairness inquiry. *Ames*, 767 A.2d at 681, 681 n.6. And *Sperry* explicitly sets forth the three discrete inquiries as <u>factors</u> rather than <u>elements</u>, 405 U.S. at 244, n.5, such that a finding of "substantial" injury may not in all cases be required.

1

*(xv)    South Carolina*

Defendants argue that class actions are not permitted under South Carolina's Unfair Trade Practices Act ("SCUTPA"), Code of Laws of South Carolina Annotated § 39-5-10 *et seq.*, pursuant both to statutory command, *id.* § 39-5-140(a), and South Carolina Supreme Court precedent, *Dema v. Tenet Physician Servs.-Hilton Head, Inc.*, 678 S.E.2d 430, 432 (S.C. 2009).  (State Law Br. 13.)  CFPs concede this point, but respond that *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010), permits class-action lawsuits under Federal Rule of Civil Procedure 23 notwithstanding South Carolina's bar.  (CFP Opp'n 30–31 (collecting post-*Shady Grove* federal cases permitting class actions under SCUTPA).)  Defendants counter with a post-*Shady Grove* federal case denying a class action under SCUTPA.  (State Law Reply 17–18.)

Defendants' and Plaintiffs' cases fundamentally disagree regarding the scope and applicability of *Shady Grove*.  Of the various cases' analyses, this Court concludes that *In re Hydroxycut Marketing & Sales Practices Litigation* ("*Hydroxycut*"), offers the most persuasive analysis.  299 F.R.D. 648 (S.D. Cal. 2014).  As mentioned earlier, *supra* Part III.A.(i), *Shady Grove* was decided by a deeply divided Court.  Accordingly, lower courts have been left to wonder which opinion (or subset of reasoning) should ultimately control. *Hydroxycut* acknowledged that many courts in circuits other than the Ninth have embraced Justice Stevens' *Shady Grove* opinion as controlling, but concluded that under Ninth Circuit precedent the outcome is not the same.  Specifically, analysis of plurality opinions is generally controlled by *Marks v. United States*—"[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'"  430 U.S. 188, 193 (1977). However, the Ninth Circuit has instructed that *Marks* is only useful "where one opinion can be meaningfully regarded as narrower than another *and* can represent a common denominator of the Court's reasoning."  *Lair v. Bullock*, 697 F.3d 1200, 1205 (9th Cir. 2012) (emphasis in original).  Justice Stevens' *Shady Grove* opinion does not meet this

standard; he would have examined the particular state law at issue, whereas the plurality opinion explicitly considered only the federal rule.  *Compare Shady Grove*, 559 U.S. at 423 ("A federal rule, therefore, cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right."), *with id.* at 406 ("Rule 23 unambiguously authorizes <u>any</u> plaintiff, in <u>any</u> federal civil proceeding, to maintain a class action if the Rule's prerequisites are met.  We cannot contort its text, even to avert a collision with state law that might render it invalid." (emphases in original)).  The two opinions view the fundamental focus of the inquiry entirely differently.  There is simply no way to read Justice Stevens' opinion as "a common denominator of the Court's reasoning."  *See Lair*, 697 F.3d at 1205 (holding that for *Marks* to apply "requires that the narrowest opinion is actually the 'logical subset of other, broader opinions,' such that it 'embod[ies] a position implicitly approved by at least five Justices who support the judgment.'" (alteration in original)).  Accordingly, "the only binding aspect of [this] splintered decision is its specific result."  *Id.*

In a federal suit based on diversity jurisdiction, when a state rule conflicts with a federal rule "federal courts are to apply state substantive law and federal procedural law." *Hanna*, 380 U.S. at 465.  When the federal rule at issue is a Federal Rule of Civil Procedure, "the federal rule must be applied if it does not 'abridge, enlarge, or modify any substantive right' in violation of the Rules Enabling Act."  *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

> "The line between procedural and substantive law is hazy," *Erie . . .*, 304 U.S. [at] 92 . . . (1938) (Reed, J., concurring), and matters of procedure and matters of substance are not "mutually exclusive categories with easily ascertainable contents," *Sibbach* [*v. Wilson & Co.*], 312 U.S. [1,] at 17, . . . [(1941)] (Frankfurter, J., dissenting).  Rather, "[r]ules which lawyers call procedural do not always exhaust their effect by regulating procedure," *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 555 . . . (1949), and in some
> / / /
> / / /

1    situations, "procedure and substance are so interwoven that rational separation
2    becomes well-nigh impossible," *id.* at 559 . . . (Rutledge, J., dissenting).

3  *Shady Grove*, 559 U.S. at 419 (Stevens, J., concurring) (fourth alteration in original).

4         The instant case presents exactly the type of difficult-to-classify distinction countless
5   versions of the United States Supreme Court have recognized.  On balance, however, the
6   Court concludes that the SCUTPA class-action bar is a procedural rather than substantive
7   rule.  In particular, the bar does not in any way affect the putative South Carolina litigants'
8   ability to pursue claims under the statute—there is no question that SCUTPA provides
9   them all with a cause of action.  The only difference is that in federal Court the putative
10  class members may pursue a different method of obtaining the same relief.  *See Freund*,
11  347 F.3d at 762 (applying federal rule rather than state rule because the federal rule's
12  "application 'affects only the process of enforcing litigants' rights and not the rights
13  themselves.'" (quoting *Burlington N.R. Co. v. Woods*, 480 U.S. 1, 8 (1987))); *In re Greene*,
14  223 F.3d 1064, 1072 (9th Cir. 2000) ("Nevertheless, applying a purportedly procedural
15  rule in a manner that alters <u>the rules of decision</u> by which a court determines the rights of
16  the parties is substantive; such application does not become 'procedural' simply because
17  the impact upon substantive rights is, according to one of the parties, a modest one."
18  (emphasis in original)); *see also Shady Grove*, 559 U.S. at 399 ("Thus, Rule 23 provides a
19  one-size-fits-all formula for deciding the class-action question.  Because [New York's]
20  § 901(b) attempts to answer the same question—*i.e.*, it states that Shady Grove's suit 'may
21  <u>not</u> be maintained as a class action' (emphasis added) because of the relief it seeks—it
22  cannot apply in diversity suits unless Rule 23 is ultra vires.").  Given the foregoing,
23  Defendants Motion to Dismiss is **DENIED** as to this issue.

24              *(xvi)   Utah*

25         Defendants argue that Plaintiffs have not pled unconscionable conduct as required
26  by the Utah Consumer Sales Practices Act ("UCSPA"), Utah Code Annotated § 13-11-4.
27  (State Law Br. 8–10.)  Plaintiffs counter that the UCSPA is to be construed liberally to
28  protect consumers, (EPP Opp'n 67); UTAH CODE ANN. § 13-11-2, any "unconscionable act

or practice by a supplier in connection with a consumer transaction violates th[e] act," UTAH CODE ANN. § 13-11-5, and "[i]f it is claimed or appears to the court that an act or practice may be unconscionable, the parties shall be given a reasonable opportunity to present evidence as to its setting, purpose, and effect to aid the court in making its determination[,]" *id.* § 13-11-5. In the present case, given that the UCSPA is to be liberally construed to protect consumers—including permitting presentation of evidence if it appears an act even <u>may</u> be unconscionable—and that Plaintiffs here plausibly allege affirmative misrepresentations regarding and concealment of the alleged conspiracy, (*see infra*, Part V.C), the Court concludes that Plaintiffs have stated a valid claim under the UCSPA and therefore **DENIES** Defendants' Motion to Dismiss on this point. *See Reid v. LVNV Funding, LLC*, No. 2:14CV471DAK, 2016 WL 247571, at *6 (D. Utah Jan. 20, 2016) (concluding that "a fact finder could find that Defendants's conduct was deceptive[,]" in part because "there [wa]s at least a question of fact for the jury as to whether Defendants[] acted knowingly or intentionally" and "there [wa]s evidence in the record from which a jury could find that Defendants knew or should have known that they were making false representations").

### (xvii) West Virginia

Defendants argue generally that West Virginia's Consumer Credit and Protection Act ("WVCCPA"), West Virginia Code § 46A-6-101 *et seq.*, does not recognize a cause of action for price fixing, citing *Flash Memory*, 643 F. Supp. 2d at 1162, and *DRAM*, 516 F. Supp. 2d at 1116, for support. (State Law Br. 6–7.) Plaintiffs respond that the WVCCPA is drafted with broad language and that the West Virginia Supreme Court of Appeals has indicated that the WVCCPA is to be construed broadly. (EPP Opp'n 64–65.) Defendants reply by distinguishing Plaintiffs' cases. (State Law Reply 10–11.)

As an initial matter, Plaintiffs are in a difficult position because multiple district courts have concluded that price fixing is not within the ambit of the WVCCPA. *E.g.*, *Flash Memory*, 643 F. Supp. 2d at 1162; *TFT-LCD*, 586 F. Supp. 2d at 1130–31; *DRAM*, 516 F. Supp. 2d at 1118–19. However, those decisions are not binding on this Court, and

none of these courts had the benefit of the West Virginia Legislature's 2015 amendment to the WVCCPA intending that "in construing this article, the courts be guided by the policies of the Federal Trade Commission and interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act . . . ." W. Va. Code § 46A-6-101.  And although each Northern-District court addressed the statutory provision declaring that the WVCCPA should be liberally construed, each court dismissed the allegations at issue because price fixing was not listed among the "unfair methods of competition and unfair or deceptive acts or practices" proscribed by the statute.  *DRAM*, 516 F. Supp. 2d at 1164; *see TFT-LCD*, 586 F. Supp. 2d at 1131; *Flash Memory*, 643 F. Supp. 2d at 1162.  Only *DRAM* noted that the statute explicitly provides that "the list of enumerated acts and practices is not meant to be exclusive[,]" *DRAM*, 516 F. Supp. 2d at 1164; W. Va. Code § 46A-6-102(7), and upon addressing a later, amended complaint, *DRAM* permitted once-dismissed Rhode Island claims to proceed pursuant to the Rhode Island Supreme Court's recent adoption of Supreme Court "unfairness" analysis within the context of the FTC Act.  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1145 (N.D. Cal. 2008) ("This time around, plaintiffs' argument prevails. Plaintiffs rely on the Supreme Court of Rhode Island's decision in *Ames* . . . .").  Although in the present case Plaintiffs have not presented any West Virginia Supreme Court case adopting the same unfairness analysis, there is no reason why that United States Supreme Court precedent regarding FTC unfairness analysis cannot apply here with equal force.  While admittedly not as strong a case as Rhode Island, this precludes dismissal here by supplying a plausible theory of West Virginia-based recovery.  Accordingly, the Court concludes that Plaintiffs state a valid claim under the WVCCPA such that Defendants' Motion to Dismiss on this point is **DENIED**.  *See also DRAM*, 516 F. Supp. 2d at 1118 (noting that statute is aimed in part at "false, or misleading statements and representations in connection with goods, services and businesses"); *TFT-LCD*, 586 F. Supp. 2d at 1131 (same).

/ / /

1   ### (C)   *Unjust Enrichment*

2   #### (i)   *Global Issues*

3   As an initial matter, CFPs claim unjust enrichment generally, and do not list any

4   particular jurisdiction to which the allegations should apply.  (CFP Compl. ¶¶ 145–50.)

5   This alone is fatal to CFPs' unjust enrichment claim.  *E.g.*, *Packaged Ice*, 779 F. Supp. 2d

6   at 667 (dismissing global unjust enrichment count because "[s]tate law requirements under

7   unjust enrichment law vary widely" and collecting numerous cases); *In re Wellbutrin XL*

8   *Antitrust Litig.*, 260 F.R.D. 143, 149 (E.D. Pa. 2009) ("Finally, because the plaintiffs' third

9   count for unjust enrichment refers to no law or jurisdiction, the Court will dismiss the

10   plaintiffs' claims under that count.").   Accordingly, the Court **GRANTS** Defendants'

11   Motion to Dismiss CFPs' global count of unjust enrichment.

12   Defendants also move to globally dismiss EPPs' unjust enrichment claims to the

13   extent that they merely "circumvent clear state law bars to recovery under antitrust and

14   consumer protection theories."  (State Law Br. 14.)  EPPs respond that "[n]o reason or

15   logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses

16   a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses

17   the same person of his right to pursue a common law equitable remedy."  (EPP Opp'n 73–

18   74 (quoting *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 46 (D.D.C. 2008), and

19   collecting cases).)   Defendants reply that "[t]he vast majority of courts have held that

20   indirect purchasers may not bring state claims for unjust enrichment if they otherwise

21   would be barred from bringing a claim under that state's antitrust and consumer protection

22   statutes, absent a showing that the common law of the state in question expressly allows

23   for such recovery."  (State Law Reply 19–20 (quoting *Niaspan*, 42 F. Supp. 3d at 763).).

24   The Court is unconvinced by EPPs' cited cases.  *Niaspan* is instead correct, and the

25   vast majority of courts rightly hold that unjust enrichment may not supply a valid cause of

26   action in states where plaintiffs are otherwise barred from recovery under relevant antitrust

27   and consumer protection statutes.  *See, e.g.*, *Niaspan*, 42 F. Supp. 3d at 763; *In re Digital*

28   *Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011); *DDAVP*, 903 F. Supp.

2d at 232–33.  This makes sense.  The crux of a plaintiff's claim will be the same, and, after all, unjust enrichment is an equitable remedy, *see McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1089 (9th Cir. 2003), and it would be inequitable to permit relief where the state has clearly made a policy determination that no such relief should lie.  Accordingly, the Court joins the majority of our sister courts to have addressed the issue and **GRANTS** Defendants' Motion to Dismiss regarding all EPPs' unjust enrichment claims where the state otherwise bars indirect-purchaser recovery.

This leaves only EPPs' unjust enrichment arguments in states where their claims are not otherwise barred under relevant antitrust and consumer protection laws.  The Court addresses each state in turn, first based off of (ii) states where Defendants' argue allegations of a direct benefit are required, and next turning to (iii)–(iv) two alleged state-specific requirements.

### *(ii)  What Constitutes a Direct Benefit*

Defendants argue that EPPs do not allege they conferred a direct benefit upon Defendants, allegedly a requirement to validly plead unjust enrichment in Arizona, the District of Columbia, Florida, Kansas, Maine, Massachusetts, Michigan, North Carolina, Rhode Island, Utah, West Virginia, and Wisconsin.  (State Law Br. 16–17.)  EPPs distinguish Defendants' cases and argue that they need only allege "unjust benefit to Defendants and Plaintiffs' damages, which flow from Defendants' illegal conduct."  (EPP Opp'n 74–75.)  Defendants reply by doubling down on their position—"EPPs' status as indirect purchasers makes it impossible for them to allege that they conferred a direct benefit on Defendants."  (State Law Reply 20–21.)

It appears the truth lies somewhere in the middle.  States with unjust enrichment laws requiring a "direct benefit" vary in how they define the term.  *E.g.*, *Lidoderm*, 103 F. Supp. 3d at 1176 (noting, e.g., that (1) in Arizona the "'critical inquiry' [i]s not whether a benefit was conferred directly[;]" and (2) in North Carolina "[t]here is a split in authority" regarding the type of direct benefit required).  Accordingly, the Court must address each state's law.  It does so in turn.

(a)    Arizona

Defendants cite one case for the proposition that Arizona law requires a showing of a "direct benefit" in order for a plaintiff to assert a valid unjust enrichment claim. *In re Refrigerant Compressors Antitrust Litig.* ("*Refrigerant Compressors*"), No. 2:09-MD-02042, 2013 WL 1431756, at *25 (E.D. Mich. Apr. 9, 2013). However, *Refrigerant Compressors* did not cite a single case so concluding under—or even discussing—Arizona law. And the Court has been unable to locate a single Arizona case which required conferral of a direct benefit. *See, e.g.*, *Stapley v. Am. Bathtub Liners, Inc.*, 785 P.2d 84, 88 (Ariz. Ct. App. 1989); *City of Sierra Vista v. Cochise Enters., Inc.*, 697 P.2d 1125, 1131 (Ariz. Ct. App. 1984). Accordingly, the Court concludes that Arizona does not require a showing of direct benefit, and **DENIES** Defendants' Motion in this regard. *See, e.g.*, *Lidoderm*, 103 F. Supp. 3d at 1176 (noting problem with *Refrigerant Compressors* and denying motion to dismiss the plaintiffs' complaint for failure to show direct benefit under Arizona law).

(b)    District of Columbia

Defendants cite one case for the proposition that District of Columbia law requires a showing of a "direct benefit" in order for a plaintiff to assert a valid unjust enrichment claim. *Refrigerant Compressors*, 2013 WL 1431756, at *25. However, *Refrigerant Compressors* did not cite a single case so concluding under—or even discussing—District of Columbia law. And the Court has been unable to locate a single District of Columbia case which required conferral of a direct benefit. *See, e.g.*, *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005); *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 63 (D.C. 2005). Accordingly, the Court concludes that the District of Columbia does not require a showing of direct benefit, and **DENIES** Defendants' Motion in this regard. *See, e.g.*, *Lidoderm*, 103 F. Supp. 3d at 1176–77 (noting problem with *Refrigerant Compressors* and denying motion to dismiss the plaintiffs' complaint for failure to show direct benefit under District of Columbia law).

/ / /

(c)     Florida

Prior to oral argument, Defendants cited only one case for the proposition that Florida law requires a showing of a "direct benefit" in order for a plaintiff to assert a valid unjust enrichment claim. *Refrigerant Compressors*, 2013 WL 1431756, at *25. However, at oral argument Defendants presented the Court with the just-decided case of *Kopel v. Kopel*, in which the Florida Supreme Court explicitly acknowledged that "to prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant." __ So. 3d __, No. SC13-992, 2017 WL 372074, at *5 (Fla. Jan. 26, 2017).  Although the opinion is not yet technically final, the Court views it—at minimum—as highly persuasive. Given the foregoing, the Court concludes that Florida law requires a showing of direct benefit, and therefore **GRANTS** Defendants' Motion in this regard.  As with all other causes of action, Plaintiffs are granted leave to amend, and may address any subsequent developments in Florida law if relevant.  *See, e.g.*, *Eggs*, 851 F. Supp. 2d at 928–29 (discussing Florida unjust enrichment law in depth and collecting at least four Florida cases that permitted unjust enrichment claims on a showing of merely indirect benefit).

(d)     Kansas

Defendants cite two cases for the proposition that Kansas law requires a showing of a "direct benefit" in order for a plaintiff to assert a valid unjust enrichment claim. *Refrigerant Compressors*, 2013 WL 1431756, at *25; *In re Aftermarket Filters Antitrust Litig.* ("*Aftermarket Filters*"), No. 08 C 4883, 2010 WL 1416259, at *2 (N.D. Ill. Apr. 1, 2010).  *Refrigerant Compressors* and *Aftermarket Filters* both relied on a case which in turn relied on an unpublished Tenth Circuit case that upheld dismissal of a Kansas-based unjust enrichment claim where the "[p]laintiffs . . . pointed to nothing in Kansas law that supports an indirect unjust enrichment claim." *Spires v. Hosp. Corp. of Am.*, 289 F. App'x 269, 273 (10th Cir. 2008).  However, the *Spires* Court did not point to any Kansas authority supporting a direct benefit requirement, *id.*, and the Court has been unable to locate a single Kansas case which required conferral of a direct benefit.  *See, e.g.*, *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996).  Accordingly, in the absence

of contrary authority, the Court concludes that Kansas does not require a showing of direct benefit, and therefore **DENIES** Defendants' Motion in this regard.  *See, e.g.*, *Lidoderm*, 103 F. Supp. 3d at 1177–78 (concluding same).

(e)   Maine

Defendants cite two cases for the proposition that Maine law requires a showing of a "direct benefit" in order for a plaintiff to assert a valid unjust enrichment claim. *Refrigerant Compressors*, 2013 WL 1431756, at *25; *Aftermarket Filters*, 2010 WL 1416259, at *2.  *Refrigerant Compressors* relied only on *Aftermarket Filters*, which in turn relied on *Rivers v. Amato*, No. CIV. A. CV-00-131, 2001 WL 1736498 (Me. Super. Ct. June 22, 2001) ("No authority can be found for this 'indirect benefit' theory, which is, in any case, based on speculation.").  Although Maine's unjust-enrichment articulation does not appear to require conferral of a direct benefit, *see, e.g.*, *Howard & Bowie, P.A. v. Collins*, 759 A.2d 707, 710 (Me. 2000); *see also id.* ("[T]he most significant element of the doctrine [of unjust enrichment] is whether the enrichment of the defendant is <u>unjust</u>." (emphasis original)), the Plaintiffs have tendered no Maine-specific support in opposition of Defendants' Motion to Dismiss.  (*See* CFP Opp'n 31–32; EPP Opp'n 74–75.) Accordingly, in the absence of authority to the contrary, the Court **GRANTS** Defendants' Motion in this regard.

(f)   Massachusetts

Defendants cite one case for the proposition that Massachusetts law requires a showing of a "direct benefit" in order for a plaintiff to assert a valid unjust enrichment claim.  *Refrigerant Compressors*, 2013 WL 1431756, at *25.  However, *Refrigerant Compressors* did not cite a single case so concluding under—or even discussing— Massachusetts law.  And the Court has been unable to locate a single Massachusetts case which required conferral of a direct benefit.  *See, e.g.*, *Salamon v. Terra*, 477 N.E.2d 1029, 1031 (Mass. 1985); *Finard & Co., LLC v. Sitt Asset Mgmt.*, 945 N.E.2d 404, 407 (Mass. Ct. App. 2011).  Accordingly, in the absence of authority to the contrary, the Court **DENIES** Defendants' Motion in this regard.

1          (g)     Michigan

2          Defendants cite one case for the proposition that Michigan law requires a showing

3 of a "direct benefit" in order for a plaintiff to assert a valid unjust enrichment claim.

4 *Refrigerant Compressors*, 2013 WL 1431756, at *25. *Refrigerant Compressors* drew

5 support from an unpublished Michigan appellate case upholding a denial of amendment

6 for non-unjust-enrichment-specific reasons, and concluding in the alternative that the trial

7 court's dismissal was proper because in the context of indirect-purchaser suit "the unjust

8 enrichment doctrine does not apply . . . ." *A & M Supply Co. v. Microsoft Corp.*, No.

9 274164, 2008 WL 540883, at *2 (Mich. Ct. App. Feb. 28, 2008). However, the Michigan

10 Supreme Court has explicitly allowed at least one unjust enrichment claim based on

11 conferral of an indirect benefit. *Kammer Asphalt Paving Co. v. E. China Twp. Sch.*, 504

12 N.W.2d 635, 641 (Mich. 1993). And the Michigan-specific unjust-enrichment elements

13 do not explicitly require conferral of a direct benefit. *See, e.g.*, *Morris Pumps v. Centerline

14 Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. Ct. App. 2006). Accordingly, the Court

15 concludes that, on balance, Michigan at least does not always require conferral of a direct

16 benefit in order to validly plead a claim of unjust enrichment, and therefore **DENIES**

17 Defendants' Motion in this regard. *Auto Parts*, 2014 WL 2999269, at *32 (distinguishing

18 *A & M Supply* and permitting claims absent direct-benefit showing to persist).

19          (h)     North Carolina

20          Defendants cite one case for the proposition that North Carolina law requires a

21 showing of a "direct benefit" in order for a plaintiff to assert a valid unjust enrichment

22 claim. *Aftermarket Filters*, 2010 WL 1416259, at *2. *Aftermarket Filters* relied on an

23 unpublished North Carolina Court of Appeals case explaining that "this Court has limited

24 the scope of a claim of unjust enrichment such that the benefit conferred must be conferred

25 directly from plaintiff to defendant, not through a third party." *Baker Const. Co. v. City of

26 Burlington*, 683 S.E.2d 790, 2009 WL 3350747, at *6 (N.C. Ct. App. 2009), citing *Effler

27 v. Pyles*, 380 S.E.2d 149, 151 (N.C. Ct. App. 1989). However, some Courts disagree with

28 this construction, *e.g.*, *Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 72 F.

App'x 916, 921 (4th Cir. 2003) (disagreeing with *Effler*, on which *Baker Construction* relied, and noting that "[u]nder North Carolina law, it is sufficient for a plaintiff to prove that it has conferred some benefit on the defendant, without regard to the directness of the transaction"), and the North Carolina Supreme Court has never adopted the direct benefit language, *see, e.g.*, *Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988); *Embree Const. Grp., Inc. v. Rafcor, Inc.*, 411 S.E.2d 916, 923 (N.C. 1992) (allowing third-party unjust enrichment claim to proceed). Accordingly, the Court concludes that, on balance, North Carolina at least does not always require conferral of a direct benefit in order to validly plead a claim of unjust enrichment, and therefore **DENIES** Defendants' Motion in this regard. *Eggs*, 851 F. Supp. 2d at 930–32 (conducting thorough analysis of North Carolina law and concluding same); *Lidoderm*, 103 F. Supp. 3d at 1178 (same).

(i)     Rhode Island

Defendants cite one case for the proposition that Rhode Island law requires a showing of a "direct benefit" in order for a plaintiff to assert a valid unjust enrichment claim. *Refrigerant Compressors*, 2013 WL 1431756, at *25. However, *Refrigerant Compressors* did not cite a single case so concluding under—or even discussing—Rhode Island law. And the Court has been unable to locate a single Rhode Island case which required conferral of a direct benefit. *See, e.g.*, *Emond Plumbing & Heating, Inc. v. BankNewport*, 105 A.3d 85, 90 (R.I. 2014). Accordingly, in the absence of authority to the contrary, the Court **DENIES** Defendants' Motion in this regard.

(j)     Utah

Defendants cite one case for the proposition that Utah law requires a showing of a "direct benefit" in order for a plaintiff to assert a valid unjust enrichment claim. *Aftermarket Filters*, 2010 WL 1416259, at *2. *Aftermarket Filters* relied on a Utah Supreme Court case which held that a third-party unjust enrichment claim was impermissible, in part, because "[n]o direct benefit . . . [wa]s present . . . ." *Concrete Prod. Co., a Div. of Gibbons & Reed v. Salt Lake Cty.*, 734 P.2d 910, 911–12 (Utah 1987). However, this aspect of *Concrete Products* was based on the distinction between a direct

and <u>incidental</u>, rather than "indirect," benefit.  *Id.* at 912 (explaining that on the facts of the case the third-party was not conferred a direct benefit, but "[i]nstead . . . w[ould] incur the expenses of cleaning and maintaining curbs and gutters with no resale value or intrinsic economic worth.").  This juxtaposition between direct and incidental benefit finds further support in Utah case law.  *See, e.g.*, *Emergency Physicians Integrated Care v. Salt Lake Cty.*, 167 P.3d 1080, 1086 (Utah 2000) ("While unjust enrichment does not result if the defendant has received only an incidental benefit from the plaintiff's service, . . . this court has found that a large variety of items fall under the definition of 'benefit,' including an 'interest in money, land, chattels, or choses in action; beneficial services conferred; satisfaction of a debt or duty owed by [the defendant]; or anything which adds to [the defendant's] security or advantage.'" (citations removed) (alterations in original)); *Jeffs v. Stubbs*, 970 P.2d 1234, 1248 (Utah 1998) ("Nor are services performed by the plaintiff for his own advantage, and from which the defendant benefits incidentally, recoverable."); *see also Emergency Physicians*, 167 P.3d at 1086 ("The first element of quantum meruit requires the court to measure the benefit conferred on the defendant by the plaintiff. . . . . The benefit conferred satisfies this requirement if the defendant's retention of the benefit would be unjust without providing compensation." (citations removed)).   Given the foregoing, the Court concludes that Utah requires a direct benefit, but that Plaintiffs here sufficiently allege a direct benefit to Defendants, who profited directly from the alleged price-fixing conspiracy.  *See Eggs*, 851 F. Supp. 2d at 932 (conducting thorough analysis of Utah law and concluding the same).   Defendants' Motion to Dismiss is therefore **DENIED** on this point.

(k)    West Virginia

Defendants cite one case for the proposition that West Virginia law requires a showing of a "direct benefit" in order for a plaintiff to assert a valid unjust enrichment claim.  *Refrigerant Compressors*, 2013 WL 1431756, at *25.  However, *Refrigerant Compressors* did not cite a single case so concluding under—or even discussing—West Virginia law.  And the Court has been unable to locate a single West Virginia case which

required conferral of a direct benefit.  *See, e.g.*, *Dunlap v. Hinkle*, 317 S.E.2d 508, 512 (W. Va. 1984).  Accordingly, in the absence of authority to the contrary, the Court **DENIES** Defendants' Motion in this regard.

(l)     Wisconsin

Defendants cite one case for the proposition that Wisconsin requires a showing of a "direct benefit" in order for a plaintiff to assert a valid unjust enrichment claim.  *Refrigerant Compressors*, 2013 WL 1431756, at *25.  However, *Refrigerant Compressors* did not cite a single case so concluding under—or even discussing—Wisconsin law.  And the Court has been unable to locate a single Wisconsin case which required conferral of a direct benefit.  *See, e.g.*, *Lawlis v. Thompson*, 405 N.W.2d 317, 319–20 (Wis. 1987). Accordingly, in the absence of authority to the contrary, the Court **DENIES** Defendants' Motion in this regard.

(iii)   *California*

Defendants argue that Plaintiffs' unjust enrichment claims under California law fail because "California law does not provide for any such cause of action."  (State Law Br. 17–18.)  CFPs admit that "this is correct as a matter of nomenclature," but argue that their unjust enrichment claim should be construed as one in quasi-contract for restitution.  (CFP Opp'n 34.)  EPPs argue there is a split in authority and that courts in the Ninth Circuit often recognize claims for unjust enrichment.  (EPP Opp'n 75–76.)  Defendants' Reply admits that the Ninth Circuit permits courts to construe unjust enrichment claims as ones for restitution, but argues that in the present case Plaintiffs' California unjust enrichment claim is "entirely redundant of Plaintiffs' actual restitution claims," and therefore should be dismissed.  (State Law Reply 21–22.)  Given the foregoing, the Court construes Plaintiffs' unjust enrichment claims as ones in quasi-contract for restitution.  And, because Federal Rule of Civil Procedure 8(d)(2) permits pleading in the alternative, the Court **DENIES** Defendants' motion to dismiss on this point.  *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762–63 (9th Cir. 2015) ("To the extent the district court concluded that the [quasi-contract] cause of action was nonsensical because it was duplicative of or superfluous to

[the plaintiff's] other claims, this is not grounds for dismissal.  Fed. R. Civ. P. 8(d)(2) ('A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.').").

### (iv) West Virginia

Defendants argue that Plaintiffs fail to plead unconscionability, a requirement under West Virginia's articulation of unjust enrichment pursuant to *Wittenberg v. First Independent Mortgage Co.*, No. 3:10-CV-58, 2011 WL 1357483, at *15 (N.D.W. Va. Apr. 11, 2011).  (State Law Br. 18.)  CFPs distinguish Defendants' case citation, (CFP Opp'n 34–35); EPPs do not respond to Defendants' argument at all, (*see* EPP Opp'n 72–77).  Defendants reply by arguing that CFPs mischaracterize *Wittenberg*.

*Wittenberg* relied on a West Virginia Supreme Court case, *Realmark Developments, Inc. v. Ranson*, 542 S.E.2d 880, 885 (W. Va. 2000), that reviewed a grant of summary judgment, in part, regarding an unjust enrichment claim.  The *Realmark* Court described the law of unjust enrichment <u>as applied to the facts of the particular case</u> as follows:

> [I]f one person improves the land of another either through the direction of services to the land, or through the affixation of chattels to the land, that person is entitled to restitution for the improvements if certain other circumstances are present.  See, Restatement, *Restitution* § 53 (1937).  The Court has also indicated that if benefits have been received and retained under such circumstance that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving the benefits to pay their reasonable value.  *Copley v. Mingo County Board of Education,* 195 W.Va. 480, 466 S.E.2d 139 (1995).

*Id.* at 884–85 (footnote omitted) (italicization in original).  However, several paragraphs later the *Realmark* Court reversed the grant of summary judgment, stating that "[a]t the very least, the Court believes that further inquiry concerning the facts is desirable to clarify whether it would be inequitable or unconscionable" to permit non-payment under the facts of the case.  *Id.* at 885.  Putting aside the very real doubt as to whether *Realmark* meant to announce a broad-based rule where unconscionability must form a part of every West

Virginia unjust enrichment claim, there is nothing in either *Wittenberg* or *Realmark* that indicates unconscionability is a magic word that must be invoked lest a plaintiff forfeit her claim.

In the present case, Plaintiffs allege a price-fixing conspiracy over the course of many years, an aspect of which concerned Defendants fraudulently concealing the conspiracy from Plaintiffs.  (*See infra* Part V.C.)  The Court concludes this is sufficient to survive 12(b)(6) dismissal, with or without an explicit unconscionability requirement.  *See Auto. Parts*, 29 F. Supp. 3d at 1028 (concluding that allegations of a lengthy price-fixing conspiracy satisfied inequitable and unconscionable prongs).  Defendants' Motion to Dismiss is therefore **DENIED** on this point.

## IV.    Standing to Prosecute State Law Claims

Because the Court previously dismissed all Plaintiffs' non-tuna claims, (First MTD Order, 8–12, 25), Defendants' only non-mooted standing argument is that "CFPs . . . lack constitutional standing to pursue claims under the laws of 19 states because none of the named CFP Plaintiffs purchased any type of packaged seafood (not even canned tuna) in those states[,]" (Standing Br. 8).  CFPs argue that (A) "standing under state laws is a class certification issue, not a 12(b)(6) issue," and that because named CFP Plaintiffs all allege "injury-in-fact and trace it to the conspiracy" they may bring claims "on behalf of putative class members" in any state, and (B) that "[n]early all of the states' antitrust and consumer protection laws have broad language" that permits non-residents to bring suit.  (CFP Opp'n 15–18.)  The Court agrees with Defendants and addresses each argument in turn.

### A.    *Article III Standing and Class Certification*

Under Article III of the United States Constitution, a federal court may only adjudicate an action if it constitutes a justiciable "case" or a "controversy" that has real consequences for the parties.  *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  A threshold requirement for justiciability in federal court is that the plaintiff have standing to assert the claims brought.  *Lujan*, 504 U.S. at 560; *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) ("Article III

standing . . . enforces the Constitution's case-or-controversy requirement.") (citations omitted).

The essence of the standing inquiry is to determine whether the party seeking to invoke the Court's jurisdiction has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Baker v. Carr*, 369 U.S. 186, 204 (1962). Three elements form the core of the standing requirement:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560–61 (quotations, citations, and footnote omitted).

The overwhelming majority of courts have held that Article III standing for state law claims is necessarily lacking when no plaintiff is alleged to have purchased a product within the relevant state. *E.g.*, *In re Capacitors Antitrust Litig.* ("*Capacitors*"), 154 F. Supp. 3d 918, 926 (N.D. Cal. 2015) (noting "the strong trend in this district and in other courts is to require an in-state purchase to establish Article III standing for state antitrust and related consumer protection claims like the ones alleged in this case" and collecting cases). This is because injury in fact is not established. *Id.* Indeed, the Supreme Court has explicitly defined "injury in fact" as "an invasion of a <u>legally protected</u> interest" that is "not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (emphasis added). In the absence of a named Plaintiff who has purchased a product within the relevant state—even if there are sufficient allegations of injury under other States' or federal law—there can be no determination that an interest was harmed that was <u>legally protected under the relevant state's laws</u>. Further, to merely posit that putative class members suffered a particular

injury that no member currently before the Court even allegedly suffered is the very definition of conjecture.[23]

Despite this wealth of authority, CFPs argue that *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), *cert. denied sub nom. Maricopa County, Arizona v. Melendres*, 136 S. Ct. 799 (2016), changes the landscape such that *Capacitors* and its cited authority in support no longer counsel the same outcome. The *Melendres* Court addressed the defendants-appellants' argument that the named plaintiffs lacked standing to represent the claims of unnamed class members, noting that "[t]he difficulty with Defendants' argument is that it conflates standing and class certification." *Id.* at 1261. Although the Court explained that the "class certification" and "standing" approaches both examine "a disjuncture between the injuries suffered by named and unnamed plaintiffs," the Court ultimately determined that the class certification approach was more appropriate. *Id.* at 1262.

"The 'class certification approach,' . . . holds that once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." *Id.* Notably, this definition requires that a named plaintiff <u>must exhibit Article III standing for the relevant claims</u>. *See id.* ("[A] court must first determine whether 'at least one named class representative has Article III standing,' then 'question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others . . . .'" (citing *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279–80 (11th Cir. 2000)). This is CFPs' exact problem in the present case: no

---

[23] This also necessarily implicates the redressability requirement. Even if other named Plaintiffs allegedly suffered validly pled harms under similar state statutes, to assume that those same harms occurred to individuals in other states—not a single one of which is before this Court—leaves the Court able only to speculate that granting relief under those state statutes without any identified plaintiffs would redress those hypothetical harms. *See Warth v. Seldin*, 422 U.S. 490, 505, (1975) (noting that individuals asserting harm on behalf of a third party, while not necessarily barred under Article III standing, may have difficulty showing that "relief will remove the harm").

68

named class member has standing under the state laws here at issue.  And *Melendrez* itself supports the inadequacy of CFPs' position: "[E]ven where named and unnamed plaintiffs state the same general . . . injury, if the remedy sought by the named plaintiffs would not redress the injury of the unnamed plaintiffs, the claims raise a 'significantly different set of concerns' that consequently makes the named plaintiffs inadequate representatives of the unnamed plaintiffs' claims."  784 F.3d at 1264.  CFPs in the present case—barred from global federal recovery under *Illinois Brick*—seek inherently state-individualized forms of recovery; e.g., recovery by a named North Carolina Plaintiff and corresponding putative North Carolina class will in no way redress the alleged injury to a named New York Plaintiff and corresponding putative New York class.  Accordingly, CFPs argument here fails to alter the Court's conclusion that no named Plaintiff has standing in the nineteen relevant states, and that therefore CFPs claims in those nineteen states must be dismissed.

### B.    *State Laws Permitting Non-Residents to Bring Suit*

As previously discussed, Article III standing is an absolute requirement to litigate in federal Court.  *Raines*, 521 U.S. at 818–20; *see also Bennett v. Spear*, 520 U.S. 154, 164–66 (1997).  But this particular standing inquiry is solely federal in nature; state judiciaries are not constrained by Article III's requirements.  *See* U.S. Const. art. III § 1; *Fiedler v. Clark*, 714 F.2d 77, 80 (9th Cir. 1983) ("[In] determining jurisdiction, district courts of the United States must look to the sources of their power, article III of the United States Constitution and Congressional statutory grants of jurisdiction, not to the acts of state legislatures.  However extensive their power to create and define substantive rights, the states have no power directly to enlarge or contract federal jurisdiction.") (quoting *Duchek v. Jacobi*, 646 F.2d 415, 419 (9th Cir. 1981)).  Therefore, "a plaintiff whose cause of action is perfectly viable in state court under state law may nonetheless be foreclosed from litigating the same cause of action in federal court, if he cannot demonstrate the requisite [Article III standing]."  *Lee v. Am. Nat. Ins. Co.*, 260 F.3d 997, 1001–02 (9th Cir. 2001).  Accordingly, even if CFPs are correct that many state laws permit non-residents to bring

/ / /

1  suit, (CFP Opp'n 18), such state laws would in no way alter the constitutionally mandated

2  standing inquiry.  CFPs' argument here fails.

3        ***C.    Conclusion***

4        Given the foregoing, CFPs' state-law claims in Arizona, Kansas, Michigan,

5  Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina,

6  North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Vermont, West

7  Virginia, and Wisconsin, are **DISMISSED** for lack of constitutional standing.

8  **V.    State Law Statutes of Limitation and Relevant Tolling Doctrines**

9        As an initial matter, the Court's First MTD Order concluded "that no Plaintiff alleges

10  fraudulent concealment with sufficient particularity regarding any pre-2011 Sherman Act

11  claims."  Because the same facts underlie Plaintiffs' fraudulent concealment allegations

12  regarding any pre-2011 state law claims, the Court again concludes that no Plaintiff alleges

13  fraudulent concealment with sufficient particularity, this time regarding any pre-2011 state

14  law claims.  However, the interplay between Defendants' and Plaintiffs' state law

15  arguments may result in later allegations being time-barred for purposes of several state

16  law causes of action.  In particular, the Defendants here additionally move to dismiss

17  several 2011-foward allegations under various states' statutes of limitations, encompassing

18  allegations as late as August 25, 2014.  (SoL Br. 5, 7.)  These 2011-forward allegations

19  include three particular sets of facts the Court previously concluded weighed in favor of a

20  finding of an overarching conspiracy: 2011–2012 list-price increases and a corresponding

21  agreement; 2012 (and perhaps also in subsequent years) collusion regarding the scope of

22  tuna-related promotional activity; and early-2012 communications and a corresponding

23  agreement between Defendants to jointly refuse to offer FAD-free tuna for sale under each

24  company's flagship label.  (First MTD Order 17–22.)  However, unlike the Sherman Act's

25  injury-rule-based accrual date, (*id.* at 26–27), Plaintiffs argue that several of these states

26  employ the discovery rule in determining when the statutes of limitations began to run on

27  several relevant claims.  (EPP Opp'n 47–49; *see* CFP Opp'n 2 n.1.)  Plaintiffs also argue

28  that Defendants' conduct amounted to a "continuing conspiracy" such that subsequent

overt acts reset the statutory period, thus saving all EPPs claims from the relevant time bars.  (EPP Opp'n 49–50; *see* CFP Opp'n 2 n.1.)  Because this final line of argument may be dispositive, the Court first addresses (A) whether Defendants' conduct amounted to a continuing conspiracy such that none of Defendants' argued time bars are applicable.  The Court next (B) sets forth the general discovery rule standard, and addresses Defendants' arguments that Plaintiffs fail to adequately plead diligence in investigating their claims even in states where Defendants otherwise concede the discovery rule should apply.  The Court next determines, state by state (i)–(ii)(r), whether the discovery rule or injury rule should apply to Plaintiffs' relevant state law causes of action.  Finally, the Court (C) sets forth the general fraudulent concealment standard, and determines, in states where the injury rule applies, whether the doctrine of fraudulent concealment tolls the relevant statute of limitation; analysis here (i)–(xiii) proceeds state by state. Finally, the Court (D) provides a chart summarizing the information discussed in Parts V.A.–C.

## A.    Whether a "Continuing Conspiracy" Rationale Applies to This Case

Plaintiffs argue that "in a continuing conspiracy to fix prices as alleged here, '"each overt act that is part of the violation and that injures the plaintiff," e.g., each sale to the plaintiff, "starts the statutory period running again."'"  (EPP Opp'n 49 (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997), and citing *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014))).  *Klehr*, however, addressed "the date upon which a civil action accrues under the Rackateer [sic] Influenced and Corrupt Organizations Act[,]" 521 U.S. at 182 (emphasis added); and *Oliver* merely analogized general federal law regarding the Sherman Act's statute of limitations in order to determine whether "the equitable doctrine of laches" barred the plaintiffs' antitrust claim, 751 F.3d at 1084–86.  The law regarding whether the continuing conspiracy doctrine applies to Sherman Act damage claims is less clear.  *E.g.*, Hovenkamp, *Antitrust* § 16.7, 844, 844 n.169 (noting that "[s]everal courts have also held that if the defendants' antitrust violation consists of a series of 'overt acts,' each act starts the statute anew" and citing Third- and Seventh-Circuit caselaw (emphasis added)).  Further, while some courts that recognize the continuing

conspiracy doctrine hold that each price-fixed sale constitutes an "overt act" that starts the statute of limitations anew, *e.g.*, *Oliver*, 751 F.3d at 1086, others require something more, such as another meeting in furtherance of the conspiracy, *see, e.g.*, *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 815 F.2d 270, 277 (3d Cir. 1987).[24]   Accordingly, accepting Plaintiffs' position would require the Court to assume (1) our circuit would be one of the few that endorse applying the continuing conspiracy doctrine to Sherman Act damage claims generally, and (2) our circuit would be one of the few that apply the more-lenient standard wherein each sale of a price-fixed product constitutes an overt act that resets the underlying statute of limitations.   In the absence of more explicit guidance within our circuit, the Court therefore declines to apply Plaintiffs' desired continuing conspiracy rationale to the present case.

## B.      State-by-State Application of Discovery Rule or Injury Rule

A statute of limitations does not begin to run on a claim until all the elements of such claim are satisfied; i.e., until a plaintiff may validly sue under a particular cause of action. *See Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1054 (9th Cir. 2008). "Although this ordinarily occurs on the date of the plaintiff's injury," under the discovery

---

[24] Several of Plaintiffs' cited cases rely on the following language from *Zenith Radio Corp. v. Hazeltine Research, Inc.* to support the proposition that each new injury restarts the statute-of-limitation clock as to all injuries:

> In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act. . . . . However, each separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial.

401 U.S. 321, 338–39 (1971).  However, the Court declines to extend this forward-looking logic in a backwards manner.  In other words, each new injury constitutes Sherman-Act-compensable harm, and—when timely litigated—permits redress for any additional injuries flowing from the first injury, during and after the pendency of litigation.  It does not therefore necessarily follow that each new injury constitutes Sherman-Act-compensable harm that—when timely litigated—provides an avenue of redress for <u>past</u>, non-timely-pursued harms.

1    rule "accrual is postponed until the plaintiff either discovers or has reason to discover," by

2    exercise of reasonable diligence, all the elements of a cause of action.  *Id.*  This generally

3    means that "[t]he injury or the act causing the injury, or both, must have been difficult for

4    the plaintiff to detect."  *Id.*; *see Lyons v. Michael & Assocs*., 824 F.3d 1169, 1171 (9th Cir.

5    2016).

6            In the present case, EPPs and CFPs argue that—even more so than DAPs or DPPs—

7    they could not have detected the underlying conspiracy until "at least July 23, 2015," when

8    Defendants "disclosed their receipt of subpoenas and revealed the DOJ investigation."

9    (CFP Opp'n 21; EPP Opp'n 42–47.)  This is because EPP and CFP plaintiffs were made

10   up of "ordinary consumers" who were "in a position to readily observe only retail prices,"

11   (EPP Opp'n 44), and caterers and "restaurateurs who deal in many different kinds of food

12   products and cannot comprehensively monitor upstream activity[,]" (CFP Opp'n 21).

13   Further, Plaintiffs allege "it is equally clear that if [they] had investigated, they would have

14   uncovered nothing—just as Defendants intended."  (EPP Opp'n 46; *see* CFP Opp'n 21–

15   23, 2 n.1.)  Defendants counter that Plaintiffs failed to diligently investigate their alleged

16   claims, and that, therefore, "[b]y Plaintiffs' own arguments, their claims are not subject to

17   the discovery rule and are time-barred because Plaintiffs have relied on public information

18   known to them since at least the year 2008 to form the basis of their Complaints."  (SoL

19   Br. 18, 18 n.25.)  The Court agrees with Plaintiffs.

20          Defendants effectively argue that Plaintiffs' conspiracy allegations which are

21   supported by publicly available information cannot simultaneously be suggestive of a

22   conspiracy when employed by Plaintiffs and insufficient to suggest a conspiracy when

23   employed by Defendants.  Although this argument has some base-level appeal, to credit

24   such an argument would divorce all context from the publicly available information.

25   Simply put, there is no reason a particular piece of information should have a fixed amount

26   of relevance regardless of the context in which it is viewed.  For example, a lone puzzle

27   piece may, in isolation, give no further indication as to the larger picture into which it fits,

28   and yet at the same time be an integral component of the final product once all

73

corresponding pieces are assembled. *See, e.g.*, *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 782 F. Supp. 487, 497 (C.D. Cal. 1991) ("Whether [the] plaintiffs should have realized that an investigation of their own was warranted, following up on 10 years of multiple federal grand jury investigations without a single indictment being returned, and whether they should have uncovered wrongdoing of the type they currently are complaining about is an issue for the jury.").

In the present case, the most a reasonable EPP or CFP Plaintiff could have known prior to the investigation announcement was that prices for tuna were going up and can size was shrinking. These facts alone would almost certainly be insufficient to put Plaintiffs on notice that they should investigate the possibility of a tuna cartel. *See, e.g.*, *Platt*, 522 F.3d at 1055 (holding that after ten years of product failures the plaintiff was ultimately placed on inquiry notice once a product recall was instituted, the plaintiff was "statutorily required to bear a portion of the recall's costs[,]" and the plaintiff "was named a defendant in a class action concerning the [product's] defects"). However, Plaintiffs here find further support in their allegations that Defendants gave varying, non-conspiratorial reasons for these changes, and agreed to conceal the underlying agreements in order to avoid detection. (CFP Compl. ¶¶ 136(a), 140(d), 141(a), 142(a), 143(a); EPP Compl ¶¶ 145, 160); *see Petrus v. N.Y. Life Ins. Co.*, No. 14-CV-2268-BAS-JMA, 2016 WL 1255812, at *7 (S.D. Cal. Mar. 31, 2016) ("If there are no circumstances to arouse the suspicion of a reasonably prudent person, the . . . statute will not commence to run, even though the means of obtaining the information are available."). Finally, both EPPs and CFPs brought suit almost exactly one month after Defendants first disclosed their receipt of subpoenas and revealed the DOJ investigation. (*Compare* CFP Opp'n 21, *with* SoL Br. 5.) That only after Plaintiffs brought suit and began to examine the scope of the alleged conspiracy did they discover certain publicly available facts, seemingly innocuous when devoid of context, subsequently revealed aspects of the alleged conspiracy that could not have been previously detected by a reasonable consumer is normal and proper. Accordingly, the

///

74

1    Court concludes that the discovery rule may validly be applied up to July 23, 2015, when
2    the DOJ investigation came to light.

3             (i)      *States Where the Parties' Do Not Dispute the Discovery Rule Applies*

4             Although Defendants do not directly concede that the discovery rule applies in any
5    state, comparing Defendants' and Plaintiffs' discovery-rule-based charts reveals that
6    Defendants do not directly contest applying the discovery rule to (1) Plaintiffs' antitrust
7    claims in Arkansas, Guam, Massachusetts, Nevada, North Dakota, and Vermont or (2)
8    Plaintiffs' other state law claims in Arizona, Guam, Illinois, Iowa, Massachusetts,
9    Mississippi, Missouri, Nevada, New Hampshire, New York, North Carolina (as to statutory
10   claims only), Oregon, South Dakota, Vermont, and Wisconsin (as to statutory claims
11   only).[25]  (*Compare* EPP Opp'n, app. III, *with* SoL Reply, app. II.)[26]

12   _____

13   [25] CFPs do not address the relevant accrual rule under South Carolina law, despite the fact that CFPs bring
14   a claim under South Carolina's Unfair Trade Practices Act (S.C. CODE §§ 39-5-10, *et seq.*).  (CFP Compl.
     ¶ 144.)  Accordingly, Defendants have not moved to dismiss on this ground and the Court does not here
15   determine what accrual rule governs claims under South Carolina's Unfair Trade Practices Act.

16   [26] Upon review, the Court concludes that the discovery rule indeed should apply in these states. *See, e.g.*,
     *Taitano v. Calvo Fin. Corp.*, 2008 Guam 12, ¶¶ 45, 55 ("[T]his court has held that 'the statute of limitations
17   [for an action sounding in fraud] will begin to run when the plaintiff suspects or should suspect that his
     injury was caused by wrongdoing or that someone has done something wrong to him.'" (quoting *Gayle v.*
18   *Hemlani*, 2000 Guam 25, ¶ 24)); *Passatempo v. McMenimen*, 960 N.E.2d 275, 293 (Mass. 2012) ("This
     court has developed a discovery rule [for actions sounding in fraud] to determine when the statute of
19   limitations begins to run in circumstances where the plaintiff did not know or could not reasonably have
     known that he or she may have been harmed by the conduct of another." (quoting *Koe v. Mercer*, 876
20   N.E.2d 831, 836 (Mass. 2007))); *Bemis v. Estate of Bemis*, 967 P.2d 437, 443 (Nev. 1998) ("In dealing
     with statutes that do not specify when a cause of action accrues, we have held that the discovery rule
21   would apply."); *Torrealba v. Kesmetis*, 178 P.3d 716, 723 (Nev. 2008) ("An action for fraud accrues when
     the aggrieved party discovers the facts constituting the fraud."); *Rose v. United Equitable Ins. Co.*, 632
22   N.W.2d 429, 433–34 (N.D. 2001) (holding that, for purposes of the statute of limitations in fraud cases,
     "the discovery rule postpones a claim's accrual until the plaintiff knew, or with the exercise of reasonable
23   diligence should have known, of the wrongful act and its resulting injury"); *Gust, Rosenfeld & Henderson*
     *v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 968 (Ariz. 1995) (en banc) ("[T]he important inquiry in
24   applying the discovery rule is whether the plaintiff's injury or the conduct causing the injury is difficult
     for plaintiff to detect, not whether the action sounds in contract or in tort."); *Hermitage Corp. v.*
25   *Contractors Adjustment Co.*, 651 N.E.2d 1132, 1136 (Ill. 1995) ("[T]he courts have been more concerned
     with whether the underlying facts support application of the discovery rule than how the action was
26   characterized.  An injured party may be unaware of an injury and its wrongful cause whether the action is
     deemed to involve tort, tort arising from contract, or other breach of contractual duty.  . . . .  The reasons
27   behind the discovery rule may support application regardless of how an action is characterized." (citations

28

omitted)); *Husker News Co. v. Mahaska State Bank*, 460 N.W.2d 476, 477 (Iowa 1990) (noting that Iowa courts "have applied the discovery rule in a wide variety of cases, including breach of warranty, . . . professional malpractice, . . . workers' compensation, . . . and tortious interference with a contract, . . . . The rule is designed to mitigate the harsh results which might otherwise flow from strict adherence to the statute of limitations when an injured party 'is wholly unaware of the nature of his injury and the cause of it.'" (citations omitted)); *Creative Playthings Franchising, Corp. v. Reiser*, 978 N.E.2d 765, 770 (Mass. 2012) (explaining that the discovery rule "'may arise in three circumstances: where a misrepresentation concerns a fact that was "inherently unknowable" to the injured party, where a wrongdoer breached some duty of disclosure, or where a wrongdoer concealed the existence of a cause of action through some affirmative act done with the intent to deceive'" (quoting *Albrecht v. Clifford*, 767 N.E.2d 42 (2002))); *Raddin v. Manchester Educ. Found., Inc.*, 175 So. 3d 1243, 1249 (Miss. 2015) (explaining that "[t]he discovery rule tolls the statute of limitations for (1) latent injuries or (2) nonlatent injuries where the negligence that caused the injury is not known[,]" and that "[f]or an injury to be latent it must be undiscoverable by reasonable methods"); *DeCoursey v. Am. Gen. Life Ins. Co.*, 822 F.3d 469, 474 (8th Cir. 2016) (explaining that, among others, Missouri consumer-protection "claims accrue 'when the evidence was such to place a reasonably prudent person on notice of a potentially actionable injury,' and at this point the plaintiff is obliged to discover potential damages and to seek redress" (quoting *Huffman v. Credit Union of Tex.*, 758 F.3d 963, 967–68 (8th Cir. 2014))); *Aozora Bank, Ltd. v. Deutsche Bank Secs. Inc.*, 137 A.D.3d 685, 689 (N.Y. App. Div. 2016) (noting that statute of limitations for causes of action sounding in fraud "run from the time plaintiff discovered the fraud, or with reasonable diligence could have discovered it"); *Nash v. Motorola Commc'ns & Elecs., Inc.*, 385 S.E.2d 537, 538 (N.C. Ct. App. 1989) (explaining that causes of action sounding in fraud accrue "at the time the fraud is discovered or should have been discovered with the exercise of reasonable diligence" (emphasis removed)), *aff'd*, 400 S.E.2d 36 (N.C. 1991); *Rice v. Rabb*, 320 P.3d 554, 556–61 (Ore. 2014) (noting that, in the absence of express legislative guidance, causes of action where the injury is difficult to detect trigger the discovery rule, and runs from "the date when a person exercising reasonable care should have discovered the injury, including learning facts that an inquiry would have disclosed"); *Strassburg v. Citizens State Bank*, 581 N.W.2d 510, 514, 515 (S.D. 1998) (explaining that "[e]ither actual or constructive notice . . . will equally suffice to start the statute of limitations' clock running[,]" and that constructive notice requires a plaintiff who has "actual notice of circumstances sufficient to put a prudent person on inquiry about 'a particular fact, [but] who omits to make such inquiry with reasonable diligence" (quoting S.D. CODIFIED LAWS § 17-1-4); *Univ. of Vt. v. W.R. Grace & Co.*, 565 A.2d 1354, 1357 (Vt. 1989) (explaining that "it is clear that the discovery rule . . . applies even where the statute is silent on the matter" and holding that "the discovery rule should be read into [Vermont's general six-year statute of limitations for civil actions]"); *Hansen v. A.H. Robins, Inc.*, 335 N.W.2d 578, 583 (Wis. 1983) ("In the interest of justice and fundamental fairness, we adopt the discovery rule for all tort actions other than those already governed by a legislatively created discovery rule. Such tort claims shall accrue on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first."). Finally, Arkansas and New Hampshire likely— as a purely definitional matter—recognize the doctrine of fraudulent concealment, rather than following the "discovery rule;" but the result of applying both states' law in the present case is the same regardless, *see infra* Section V. *E.g.*, *Chalmers v. Toyota Motor Sales, USA, Inc.*, 935 S.W.2d 258, 261 (Ark. 1996) ("Fraud suspends the running of the statute of limitations, and the suspension remains in effect until the party having the cause of action discovers the fraud or should have discovered it by the exercise of reasonable diligence." (citing *First Pyramid Life Ins. Co. v. Stoltz*, 843 S.W.2d 842 (1992), *cert. denied*, 510 U.S. 908 (1993))); *Perez v. Pike Indus.*, 889 A.2d 27, 30 (N.H. 2005) ("[T]he discovery rule exception does not apply unless the plaintiff did not discover, and could not reasonably have discovered, either the alleged injury or its causal connection to the alleged negligent act.").

1
2
3
4
5
6
7
8
9
10
11

    *(ii)*  *States Where the Parties Dispute Whether the Discovery Rule Applies*

  Defendants and Plaintiffs disagree regarding whether the discovery rule should apply in the following states: Arkansas, Arizona, D.C., Illinois, Iowa, Mississippi, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Utah, West Virginia.  (*Compare* EPP Opp'n, app. III, *with* SoL Reply, app. II.)  These states further break down into contested categories of (1) state antitrust claims (Arizona, D.C., Illinois, Iowa, Mississippi, Missouri, Nebraska, New Hampshire, New York, North Carolina, Oregon, South Dakota, Utah) and (2) other state law claims (Arkansas, D.C., Nebraska, New Mexico, North Dakota, Rhode Island, Utah, West Virginia).  The Court addresses these states in alphabetical order and, when appropriate, separately addresses state antitrust and other state law claims.

12

    (a)  Arizona

13
14
15
16
17
18
19
20
21
22
23
24
25

  Although Arizona generally applies the injury rule to statutes of limitation, Arizona courts recognize an exception—at least in certain circumstances—where the discovery rule properly applies.  *E.g.*, *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 966–67 (Ariz. 1995) (recounting history of discovery rule in Arizona, and particular applications to medical malpractice and breach of contract actions).  However, Arizona Courts do not <u>always</u> apply the discovery rule, *see id.*, and when construing an Arizona antitrust claim the legislature has clearly stated its intent that "the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes."  ARIZ. REV. STAT. § 44-1412.  In the absence of Arizona authority to the contrary, the Court thus concludes that its prior analysis of federal antitrust law—particularly *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), and *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055 (9th Cir.), (First MTD Order 26–27, 27 n.12)—compels application of the injury rule to Plaintiffs' antitrust claims.

26

    (b)  Arkansas

27
28

  Arkansas law is indeed uncertain regarding whether the discovery rule or injury rule should apply to statutory claims.  *See, e.g.*, *Highland Indus. Park, Inc. v. BEI Def. Sys. Co.*,

357 F.3d 794, 796 (8th Cir. 2004) ("In *Arkansas v. Diamond Lakes Oil Co.*, 347 Ark. 618, 623, 66 S.W.3d 613, 616 (2002), the Arkansas Supreme Court first asserted that '[t]he limitation period found in § 16–56–105 begins to run when there is a complete and present cause of action, and, in the absence of concealment of the wrong, when the injury occurs, not when it is discovered.'  The court in *Diamond Lakes*, 347 Ark. at 624–25, 66 S.W.3d at 617–18, nevertheless went on to apply what is called a 'discovery rule' even though there was no active concealment of the injury . . . ."), *as revised*, (Mar. 12, 2004).[27] Ultimately, however, it appears that Arkansas at least applies the substance of the discovery rule, even if under a different name, *see id.*, and the Arkansas Supreme Court has been clear that courts must "strictly construe [a] statute [of limitations], and if there is any reasonable doubt, . . . resolve the question in favor of the complaint standing and against the challenge." *Dunlap v. McCarty*, 678 S.W.2d 361, 363 (Ark. 1984).  Accordingly, the Court here concludes that the discovery rule governs all Plaintiffs' claims under Arkansas law. *See Harry Stephens Farms, Inc. v. Wormald Americas, Inc.*, 571 F.3d 820, 821 (8th Cir. 2009) ("[W]e agree with the district court's application of the Arkansas three-year statute of limitations and its application of the 'discovery rule.'").

(c)     District of Columbia

In the District of Columbia, "[a] claim usually accrues for statute of limitations purposes when injury occurs, but in cases where '"the relationship between the fact of injury and the alleged tortious conduct [is] obscure," this court determines when the claim accrues through application of the discovery rule, i.e., the statute of limitations will not run until plaintiffs know or reasonably should have known that they suffered injury due to the

/ / /

---

[27] Defendants' sole citation to *Hipp v. Vernon L. Smith & Assocs., Inc.*, 386 S.W.3d 526, 530 (Ark. Ct. App. 2011) for support is inapposite. The parties in *Hipp* were not contesting when the statute of limitations began to run, but instead arguing about whether the statute should have been tolled under the doctrine of fraudulent concealment. *Id.* ("[A]ppellants do not dispute the fact that their complaint was not filed within either of the applicable limitations periods.  Nonetheless, appellants contend that the fraud perpetrated by the appellees tolled the limitations period." (emphasis added)).

defendants' wrongdoing.'"  *Doe v. Medlantic Health Care Grp., Inc.*, 814 A.2d 939, 945 (D.C. 2003) (second alteration in original).

(1)    Antitrust Claims

As with Arizona, the District of Columbia does not <u>always</u> apply the discovery rule, *id.*, and when construing a D.C. antitrust claim the Council of the District of Columbia has clearly stated its intent that "court[s] may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes."  D.C. CODE § 28-4515 (2016).  In the absence of D.C. authority to the contrary, the Court thus concludes that its prior analysis of federal antitrust law, (First MTD Order 26–27, 27 n.12), compels application of the injury rule to Plaintiffs' D.C. antitrust claims.

(2)    Other D.C. State Law Claims

Defendants observe that in at least one case regarding the D.C. Consumer Protection Act the District of Columbia Court of Appeals has applied the injury rule, stating "[w]here the fact of an injury can be readily determined, a claim accrues for purposes of the statute of limitations at the time the injury actually occurs."  *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 324 (D.C. 2008).  However, the appellants in *Murray* were arguing that "their causes of action against Wells Fargo and the foreclosure trustees did not accrue at the time the notice of foreclosure was issued because they had not yet suffered injuries or damages."  *Id.*  Because the notice of foreclosure clearly put the appellants on notice as to the substance of their claim—"the premature institution of foreclosure proceedings[,]" *id.*—the Court cannot conclude either that *Murray* announced a general presumption of injury-rule application specific to the D.C. Consumer Protection Act or overrides the general statement set forth in *Doe*, *supra*.

In the present case, there is no question that the fact of the injury and the alleged unlawful conduct was obscure; indeed, that is the hallmark of a conspiracy.  Accordingly, the Court concludes that the discovery rule governs all Plaintiffs' non-antitrust claims under D.C. law.

/ / /

79

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(d)    Illinois

Illinois courts "appl[y] the discovery rule in a wide variety of actions to postpone the running of the statute of limitation[,]" including varying actions in "tort, tort arising from contract, or other breach of contractual duty." *Hermitage Corp. v. Contractors Adjustment Co.*, 651 N.E.2d 1132, 1135–36 (Ill. 1995). This is because Illinois courts are generally "more concerned with whether the underlying facts support application of the discovery rule than how the action was characterized." *Id.* However, Illinois does not <u>always</u> apply the discovery rule, *id.*, and when construing an Illinois antitrust claim the Illinois legislature has clearly commanded that courts "<u>shall</u> use as a guide interpretations given by the federal courts to comparable federal antitrust statutes." ILL. COMP. STAT. ANN. 10/11 (2016). Accordingly, Illinois's arguably stronger presumption in favor of applying the discovery rule is nonetheless overcome by the explicit legislative requirement that courts interpret Illinois antitrust law in harmony with the Sherman Act. Given the foregoing, the Court concludes that the injury rule governs all Plaintiffs' antitrust claims under Illinois law.

(e)    Iowa

Iowa antitrust actions "must be commenced within four years after the cause of action accrues or, if there is a fraudulent concealment of this cause of action, within four years after the cause of action becomes known, whichever period is later."[28] IOWA CODE ANN. § 553.16 (2016). Further, Iowa courts do not, as a matter of course, apply the discovery rule, *see Ranney v. Parawax Co.*, 582 N.W.2d 152, 154 (Iowa 1998), and the Iowa legislature has commanded that Iowa antitrust actions "shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter" in order "to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic

---

[28] Plaintiffs characterize this statutory provision as follows: the "Iowa antitrust statute of limitations begins to run after the cause of actions accrues or is discovered, whichever is later." (EPP and CFP app. III, at 2.) The statute, however, clearly implicates fraudulent concealment rather than the discovery rule.

1  practices." IOWA CODE ANN. § 553.2 (2016). Accordingly, in the absence of Iowa
2  authority to the contrary, the Court thus concludes that its prior analysis of federal antitrust
3  law, (First MTD Order 26–27, 27 n.12), and the Iowa antitrust statute on its face compel
4  application of the injury rule to Plaintiffs' Iowa antitrust claims.

5                      (f)    Mississippi

6          Although the Fifth Circuit has "treated . . . state and federal antitrust claims as
7  analytically identical," *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1071 (5th Cir. 1984),
8  *on reh'g*, 747 F.2d 1011 (5th Cir. 1984), the Mississippi Court of Appeals has at least once
9  held that a price-fixing conspiracy is subject to the substance of the discovery rule, *Carder*
10 *v. BASF Corp.*, 919 So. 2d 258, 261–62 (Miss. Ct. App. 2005) ("The undertaking of a
11 criminal conspiracy is seldom if ever, announced to the public. The efforts of BASF to
12 engage in price fixing was just such a conspiracy. It is therefore subject to the period of
13 limitations for latent injuries. That is that the period of limitation commences on the date
14 of discovery, or when with due diligence, the injury could have been discovered."). Given
15 this highly persuasive, if not controlling, statement from the Mississippi Court of Appeals,
16 the Court concludes that the discovery rule applies to all Plaintiffs' Mississippi claims that
17 do not have a "prescribed period of limitation . . . ." MISS. CODE. ANN. § 15-1-49 (2016).

18                     (g)    Missouri

19         Missouri applies both the discovery rule and the injury rule depending on the claim,
20 *e.g.*, Missouri Revised Statutes § 516.100 (2016), and when construing a Missouri antitrust
21 claim the Missouri legislature has clearly commanded that courts "shall . . . construe[] [it]
22 in harmony with ruling judicial interpretations of comparable federal antitrust statutes."
23 MO. REV. STAT. § 416.141. Accordingly, in the absence of Missouri authority to the
24 contrary, the Court thus concludes that its prior analysis of federal antitrust law, (First MTD
25 Order 26–27, 27 n.12), compels application of the injury rule to Plaintiffs' Missouri
26 antitrust claims.

27 / / /

28 / / /

81

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(h)     Nebraska

The Nebraska Supreme Court applies the discovery rule "in certain categories of cases." *Shlien v. Bd. of Regents, Univ. of Neb.*, 640 N.W.2d 643, 650 (Neb. 2002). A case warrants application of the discovery rule when "the injury is not obvious and the individual is wholly unaware that he or she has suffered an injury or damage." *Id.* (emphasis removed). "In such cases, '"[i]t is manifestly unjust for the statute of limitations to begin to run before a claimant could reasonably become aware of the injury."'" *Id.* (alteration in original). Defendants cite this same rule statement, but from a Nebraska Court of Appeal case where the Court held that the statute of limitations began to run on the plaintiff's negligence claim on the exact date when she "stepped on a defective manhole cover" causing her injuries. *Mace-Main v. City of Omaha*, 773 N.W.2d 152, 156 (Neb. Ct. App. 2009). It is not clear to the Court why *Mace-Main* has any bearing on the present case. Accordingly, because Nebraska applies the discovery rule when the Plaintiff is unaware of the underlying injury until a later date, and because the conspiracy here shielded the injury from Plaintiffs, the Court concludes that the discovery rule applies to all Plaintiffs' Nebraska claims.

(i)     New Hampshire

New Hampshire Revised Statutes Annotated, Chapter 508—New Hampshire's catch-all statute of limitations—provides a three-year statute of limitations and appears to presumptively apply the injury rule, but permissively apply the discovery rule to "all personal actions, except actions for slander or libel, . . . when the injury and its causal relationship to the act or omission were not discovered and could not have been reasonably discovered at the time of the act or omission . . . ." N.H. REV. STAT. ANN. § 508.4; *see also Ed's Carpet, Tile, & Hardwood, Inc. v. Marshall Law Office*, No. 2015-0549, 2016 WL 3476476, at \*2 (N.H. Feb. 11, 2016). Once a Defendant establishes that an action was not brought within three years of "the challenged act or omission[,]" then "the burden shifts to the plaintiff to establish that the discovery rule applies." *Ed's Carpet*, 2016 WL 3476476, at \*2 (citing *Beane v. Dana S. Beane & Co., P.C.*, 7 A.3d 1284, 1289 (N.H. 2010)).

82

1   However, New Hampshire's antitrust statute provides a four-year statute of limitations,

2   N.H. REV. STAT. ANN. § 356:12, and specifically notes that "[i]n any action or prosecution

3   under this chapter, the courts may be guided by interpretations of the United States'

4   antitrust laws[,]" *id.* § 356:14.

5   Although a close call, further review of New Hampshire's catch-all statute of

6   limitations reveals a clear directive that "[t]he provisions of this chapter shall not apply to

7   cases in which a different time is limited by statute."  N.H. REV. STAT. ANN. § 508:1.

8   Further, the New Hampshire Supreme Court has specified that Chapter 508's purpose "is

9   to make [it] the source for 'catch-all' statutes of limitations <u>and tolling provisions</u>, and <u>to</u>

10  <u>ensure that more specific statutes found elsewhere remain controlling</u>."  *Doggett v. Town*

11  *of N. Hampton Zoning Bd. of Adjustment*, 645 A.2d 673, 675 (N.H. 1994) (emphases

12  added).  Given this construction and the three- versus four-year disparity between the

13  catch-all and antitrust statute respectively, the Court concludes that Chapter 508 is

14  inapplicable in the present case.  Accordingly, New Hampshire's general presumption of

15  applying the injury rule combined with the antitrust statute's federal harmonization clause

16  controls, and the Court thus concludes that its prior analysis of federal antitrust law, (First

17  MTD Order 26–27, 27 n.12), and the New Hampshire antitrust statue on its face compel

18  application of the injury rule to Plaintiffs' New Hampshire antitrust claims.

19                          (j)     New Mexico

20  Defendants concede that in New Mexico the discovery rule applies to antitrust

21  claims under New Mexico Statutes Annotated § 57-1-12 (2016).  *See Butler v. Deutsche*

22  *Morgan Grenfell, Inc.*, 140 P.3d 532, 539 (N.M. Ct. App. 2006).  However, Defendants

23  note that Plaintiffs supply no authority indicating that the discovery rule should apply to

24  Plaintiffs' other New Mexico claims.  (Def. Reply, app. II, at 7.)  Given this fact, and that

25  New Mexico does not apply the discovery rule to all claims, *see Butler*, 140 P.3d at 539,

26  the Court concludes that Plaintiffs have adequately demonstrated only that the discovery

27  rule should apply to Plaintiffs' antitrust claims under New Mexico law.

28  / / /

(k)     New York

New York's antitrust law and consumer protection law both apply the injury rule. *See* N.Y. GEN. BUS. LAW § 340 (antitrust); *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) ("[T]he [antitrust] statute runs from the time when the plaintiff was injured . . . ."); *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E.2d 1078, 1083 (N.Y. 2001) (discussing New York consumer protection laws and noting that "[i]n general, a cause of action accrues, triggering commencement of the limitations period, when all of the factual circumstances necessary to establish a right of action have occurred, so that the plaintiff would be entitled to relief").

(1)     Antitrust Claims

The New York Court of Appeals has noted that:

> Although we do not move in lockstep with the Federal courts in our interpretation of antitrust law . . . , the Donnelly Act—often called a "Little Sherman Act"—should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result.

*Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535, 539 (N.Y. 1988).  Although Plaintiffs contend that the New York Court of Appeals case of *People ex rel. Cuomo v. Liberty Mutual Ins. Co.* establishes that the discovery rule should apply to New York claims involving conspiratorial actions generally, (*see* EPP & CFP Joint app. III, at 4), *Liberty Mutual* only discusses the doctrine of fraudulent concealment, and thus does not adequately support Plaintiffs' assertion.  52 A.D.3d 378, 379 (N.Y. App. Div. 2008) ("[A]nd because bid-rigging is an activity that is inherently one of fraudulent concealment, the statute of limitations should be tolled . . . ." (citing *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (discussing fraudulent concealment only))).  Accordingly, the Court concludes that its prior analysis of federal antitrust law, (First MTD Order 26–27, 27 n.12), and construing New York's antitrust act in light of the same compel application of the injury rule to Plaintiffs' New York antitrust claims.

84

(2)     Other New York State Law Claims

As set forth above, *supra* Part V.B.(ii)(k)(1), the Court disagrees with Plaintiffs' contention that *Liberty Mutual* establishes the discovery rule should apply to New York claims involving conspiratorial actions generally.  52 A.D.3d 378, 379 (N.Y. App. Div. 2008) ("[A]nd because bid-rigging is an activity that is inherently one of fraudulent concealment, the statute of limitations should be tolled . . . ." (citing *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (discussing fraudulent concealment only))).  Accordingly, the Court concludes that, absent controlling authority to the contrary, New York's general presumption of applying the injury rule to consumer protection claims applies specifically to Plaintiffs' New York consumer-protection claims.

(l)     North Carolina

The North Carolina Court of Appeals has construed causes of action under North Carolina's antitrust law as sounding in fraud.  *See Weaver Inv. Co. v. Pressly Dev. Assocs.*, 760 S.E.2d 755, 765 (N.C. Ct. App. 2014); *Nash v. Motorola Commc'ns & Elecs., Inc.*, 385 S.E.2d 537, 538 (N.C. Ct. App. 1989), *aff'd*, 400 S.E.2d 36 (N.C. 1991).  This means that the statute of limitations "begins to run when the fraud is discovered or should have been discovered, rather than when the act is committed . . . ." *Weaver Inv. Co.*, 760 S.E.2d at 765 (discussing antitrust statute of limitations).  Defendants do not contest this point, but instead argue that the North Carolina Supreme Court has stated that "the body of law applying the Sherman Act, although not binding upon this Court . . . , is nonetheless instructive in determining the full reach of" North Carolina's antitrust law.  *Rose v. Vulcan Materials Co.*, 194 S.E.2d 521, 530 (N.C. 1973).  However, *Rose* does not <u>require</u> other courts to use federal Sherman-Act precedent, and the North Carolina Court of Appeals has at least twice concluded that the discovery rather than injury rule should apply to causes of action under North Carolina's antitrust statute.  Accordingly, the Court concludes that the North Carolina Court of Appeals' *Weaver* and *Nash* decisions evidence an affirmative decision by North Carolina courts to apply the discovery rule to causes of action under the North Carolina antitrust statute.

85

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(m)     North Dakota

North Dakota courts have not squarely addressed whether a claim under the North Dakota Unfair Trade Practices Law is governed by the discovery or the injury rule. However, the North Dakota Supreme Court, in extending the discovery rule to breach-of-contract actions, has noted that "it has long applied [the discovery rule] to other areas of the law" so as to avoid the "often harsh and unjust" injury rule. *Wells v. First Am. Bank W.*, 598 N.W.2d 834, 837–38 (N.D. 1999). This is because North Dakota recognizes that in certain categories of cases the discovery rule better balances "the need for prompt assertion of claims against the policy favoring adjudication of claims on the merits and ensuring that a party with a valid claim will be given an opportunity to present it." *Id.* Given this backdrop, and that this case presents similarly difficult-to-detect injuries as several cases in which the North Dakota Supreme Court has applied the discovery rule, *see, e.g.*, *id.*; *Hebron Pub. Sch. Dist. No. 13 of Morton Cty. v. U.S. Gypsum Co.*, 475 N.W.2d 120, 123–24 (N.D. 1991) (answering certified question in affirmative that discovery rule should apply, in part, because asbestos dangers and corresponding injuries only came to light well after initial installation, and collecting cases applying discovery rule where harms were committed in secret), the Court concludes that the discovery rule applies to all Plaintiffs' North Dakota claims.

(n)     Oregon

The Oregon Supreme Court has determined that "[t]he existence of a discovery rule cannot be assumed, but rather must be embodied in the applicable statute of limitations." *Rice v. Rabb*, 320 P.3d 554, 557 (Ore. 2014). If a statute uses the term "accrue" then the discovery rule applies. *Id.* at 558. Defendants do not dispute this statement of law, instead arguing that Oregon's antitrust statute specifies that "decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of" relevant Oregon antitrust laws. OR. REV. STAT. § 646.715. However, federal law is merely persuasive, and Oregon's binding antitrust statute of limitations specifically uses the term accrue. *Id.* § 646.800. Accordingly, the Court concludes that

86

the Oregon Supreme Court's command and the Oregon antitrust law's statute of limitation on its face establish that the discovery rule applies to all Plaintiffs' Oregon antitrust claims.

(o)      Rhode Island

Rhode Island has a general presumption in favor of the injury rule; however, "in certain 'narrowly circumscribed factual situations,' . . . 'when the fact of the injury is unknown to the plaintiff when it occurs, the applicable statute of limitations will be tolled and will not begin to run until, in the exercise of reasonable diligence, the plaintiff should have discovered the injury or some injury-causing wrongful conduct.'" *McNulty v. Chip*, 116 A.3d 173, 181 (R.I. 2015). Defendants emphasize the "narrowly circumscribed factual situations" language; but adding emphasis does not change the subsequent rule statement: "The reasonable diligence standard is based upon the perception of a reasonable person placed in circumstances similar to the plaintiff's, and also upon an objective assessment of whether such a person should have discovered that the defendant's wrongful conduct had caused him or her to be injured." *Id.* Furthermore, *McNulty* involved homeowner plaintiffs suing the relevant sellers for damage caused by a subsequent flood. *Id.* at 174–76. The *McNulty* Court determined that the discovery rule did not apply because the plaintiffs (1) were notified, prior to purchasing the home, of "water issues relating to the basement and that corrective action should be taken[;]" (2) prior to moving in "experienced significant flooding that resulted in two to three feet of water[;]" (3) were later informed "by the developer's son that, since 1968, the area was susceptible to significant flooding[;]" and (4) for many years prior to suit "experienced multiple instances of flooding or water penetration[,]" at least one of which "caused two feet of water to enter the basement." *Id.* at 181–82. The Court concludes that *McNulty* is distinguishable.

Furthermore, the Rhode Island Supreme Court's explicit command is that the discovery rule should be applied when the injury is unknown to Plaintiff. Because, as explained several times previously, *supra* Parts V.B–V.B.(ii)(e), Plaintiffs did not and should not have known of the injury until the DOJ investigation was revealed, the Court concludes that the discovery rule applies to all of Plaintiffs' Rhode Island claims.

(p)     South Dakota

South Dakota law is not entirely clear as to whether a discovery or injury rule generally applies.  *See, e.g.*, *Strassburg v. Citizens State Bank*, 581 N.W.2d 510, 514 (noting that "[a]bsent some tolling provision, [the plaintiff's] claim accrued . . . when the setoff occurred because, <u>had he known, he could have commenced an action at that time</u>[,]" and in very next sentence stating "[a] statute of limitations ordinarily begins to run when the plaintiff either has <u>actual notice</u> of a cause of action or <u>is charged with notice</u>" (emphases added)).  Further confusion stems from the fact that South Dakota recognizes a "fraud discovery rule," but characterizes it as a tolling doctrine.  *Id.*  And South Dakota also recognizes the tolling doctrine of fraudulent concealment, seemingly distinguishing it from the "fraud discovery rule" by extending its application to causes of action that do not sound in fraud.  *See id.*  Additionally, Defendants point out that "[i]t is the intent of the Legislature that in construing [South Dakota antitrust law], the courts may use as a guide interpretations given by the federal or state courts to comparable antitrust statutes."  S.D. CODIFIED LAWS § 37-1-22.

Despite the above uncertainty, South Dakota does not appear to always apply a discovery rule.  *See, e.g.*, *Jacobson v. Leisinger*, 746 N.W.2d 739, 746 (distinguishing cause of action there at issue for purposes of accrual date because *Strassburg* addressed a different statutory section and cause of action).  Accordingly, the Court concludes, absent authority to the contrary, that South Dakota precedent on the injury- versus discovery-rule issue is unclear, and thus South Dakota Codified Law section 37-1-22's permissive stance regarding federal interpretations of the Sherman Act should govern Plaintiffs' South Dakota claims such that the injury rule applies.

(q)     Utah

In Utah, "[f]or the equitable discovery rule to apply" a plaintiff must make an "initial showing that he did not know nor should have reasonably known the facts underlying the cause of action in time to reasonably comply with the limitations period."  *Berneau v. Martino*, 223 P.3d 1128, 1134–35 (Utah 2009).  Once such showing is made, for the

discovery rule to apply "one of two situations must exist: (1) 'a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct' or (2) 'the case presents exceptional circumstances and the application of the general rule would be irrational or unjust, regardless of any showing that the defendant has prevented the discovery of the cause of action.'" *Id.* at 1134.  Defendants do not dispute this statement of law, instead arguing that insofar as Plaintiffs' antitrust claims are concerned, "[t]he [Utah] Legislature intends that the courts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes." UTAH CODE § 76-10-3118. However, although the statute compels courts to examine other federal- and state-court interpretations of similar statutory provisions, the statute ultimately does not command courts to adopt the same logic.  And in the present case Plaintiffs satisfy both the initial-showing requirement and at least the first type of situation warranting application of the discovery rule.  *Supra* Parts V.B–V.B.(ii)(e).  Accordingly, the Court concludes that the discovery rule applies to all of Plaintiffs' Utah claims.

(r)   West Virginia

"EPPs do not cite—and Defendants have not located—any cases in which the discovery rule was applied to a West Virginia Consumer Credit and Protection Act claim." (Reply, app. II, at 8.)  This may be true, but it is clear that the discovery rule applies to claims under the West Virginia Antitrust Act, *see* West Virginia Code § 47-18-11 (2016), and that "the 'discovery rule' is generally applicable to all torts, unless there is a clear statutory prohibition to its application."  *Dunn v. Rockwell*, 689 S.E.2d 255, 264 (W. Va. 2009).  This exhibits a West Virginia preference for applying the discovery rule to causes of action embracing the underlying conduct at issue in this case, and accordingly—in the absence of authority to the contrary—the Court concludes that the discovery rule applies to all Plaintiffs' West Virginia statutory claims.

/ / /

/ / /

1

2

        *(iii)   States Where the Parties Do Not Dispute the Discovery Rule Does Not Apply*

3   Defendants note that Plaintiffs concede that the discovery rule does not apply to

4   claims in California, Florida, Kansas, Maine, Michigan, Minnesota, and Virginia. (Reply,

5   apps. I, II.) And after hearing no objections at oral argument, the Court concludes that the

6   injury rule applies in these states.

7         **C.   State- and Time-Based Application of Fraudulent Concealment**

8         Plaintiffs argue that many states' articulations of the general doctrine of fraudulent

9   concealment save any corresponding claims that would otherwise be time barred. (EPP &

10   CFP Joint apps. I, II.) Defendants argue that Plaintiffs have generally failed to plead

11   fraudulent concealment with sufficient particularity under any state-law standard. (SoL

12   Br. 8–9.) Plaintiffs admit that their allegations of fraudulent concealment must satisfy

13   Federal Rule of Civil Procedure 9(b), which requires that fraud be pled with particularity.

14   Specifically, a plaintiff "must plead with particularity the circumstances of the concealment

15   and the facts supporting its due diligence." *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858

16   F.2d 499, 502 (9th Cir. 1988). "Conclusory statements are not enough" to carry a plaintiff's

17   burden.[29] *Id.*

18         EPPs allege fraudulent concealment generally, due to Defendants' "secret meetings,

19   misrepresentations to customers, and surreptitious communications among Defendants and

20   their co-conspirators via telephone or in-person meetings." (EPP Compl. ¶¶ 157–66.)

21   These general allegations are in turn supported by more specific allegations detailing public

22

23

24   [29] Defendants arguably try to import other aspects of the Ninth Circuit's fraudulent concealment standard, such as the requirement that a plaintiff "detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme." (SoL MTD 16–19 (citing *Westinghouse Elec.*

25   *Corp. v. Pac. Gas & Elec. Co.*, 326 F.2d 575, 577 (9th Cir. 1991)). *Compare* SoL Reply 7 ("[W]here Plaintiffs' fraudulent concealment allegations fail under federal law, they similarly fail under state laws."),

26   *with* SoL MTD 16–19.) However, Rule 9(b) does not include these additional requirements. Accordingly,

27   the Court applies Rule 9(b)'s command that a party plead "with particularity the circumstances constituting fraud[,]" but does so in light of each individual state articulation of the applicable doctrine of

28   fraudulent concealment.

statements, explanations, and press releases—organized by the month in which each was made—wherein Defendants Bumble Bee, Starkist, and CotS offered pretextual explanations for the 2012 price increases. (*Id.* ¶¶ 144–45.) Furthermore, as previously discussed, EPPs argue that they are made up of "ordinary consumers" who were "in a position to readily observe only retail prices," and therefore it would be unreasonable to expect them to have vigorously monitored retail price fluctuations and corresponding market conditions for evidence of a conspiracy. (EPP Opp'n 44.)

Contrastingly, CFPs do not in their complaint affirmatively allege fraudulent concealment, instead arguing in their Opposition that the standard is nonetheless satisfied by their Complaint's factual allegations. (*See* CFP Opp'n 21–23.) The cited sections of CFPs' Complaint detail 2013 and 2014 reports by several Defendants explaining that various aspects of their respective seafood brands had grown, (CFP Compl. ¶¶ 49–52), and general legal conclusions that "Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff," (*id.* ¶ 140(d)), and "took efforts to conceal their agreements form Plaintiffs[,]" (*id.* ¶ 141(a)). Accordingly, the only allegations that arguably satisfy Rule 9(b)'s particularity requirement are the year-specific allegations of several Defendants' brand-growth explanations. But these allegations actually cut <u>against</u> a finding of fraudulent concealment; as CFP Plaintiffs themselves note: "The 'reasonable market conditions', 'more rational market competition', 'sensible market competition', avoidance of battles for market share and 'absence of cut throat pricing' that the reports note could only have come about through collusion. It would have been against the individual self-interest of each Defendant to eschew increasing market share during this period by lowering price." (CFP Compl. ¶ 51.) Accordingly, the Court concludes that CFPs have failed to sufficiently allege fraudulent concealment under any state-law standard.

/ / /

/ / /

/ / /

1    Given the foregoing, the sole remaining allegations of fraudulent concealment
2 relevant to the pending Motion to Dismiss are EPPs'.[30]   Further, given the Court's prior
3 analysis concerning discovery-rule versus injury-rule application in various states, *supra*
4 Part V.B, some of EPPs' fraudulent concealment arguments are now moot.[31]   The Court
5 addresses the remaining states in alphabetical order, based off of EPPs' fraudulent
6 concealment allegations as outlined above.

7         *(i)*   *Arizona*

8    Arizona broadly recognizes the doctrine of fraudulent concealment: "[f]raud
9 practiced to conceal a cause of action will prevent the running of the statute of limitations
10 until its discovery." *Walk v. Ring*, 44 P.3d 990, 999 (Ariz. 2002) (en banc).   And
11 "fraudulent concealment occurs with nondisclosure of the facts pertaining to" the relevant
12 cause of action. *Id.*  Defendants do not directly contest this statement of the law, instead
13 offering a similar articulation from the Arizona Court of Appeals: "[i]n instances involving
14 equitable tolling, courts have recognized that, as a matter of equity, a defendant whose
15 affirmative acts of fraud or concealment have misled a person from either recognizing a
16 legal wrong or seeking timely legal redress may not be entitled to assert the protection of
17 a statute of limitations." *Porter v. Spader*, 239 P.3d 743, 747 (Ariz. Ct. App. 2010).

18    In the present case, under either articulation of Arizona's fraudulent concealment
19 standard, EPPs have pled with particularity affirmative statements by Defendants in June
20 2011, July 2011, January 2012, March 2012, and April 2013 that offered price-increase
21 explanations that directly conflict with the conspiratorial allegations this Court previously
22 concluded weighed in favor of a validly pled conspiracy.  (First MTD Order 17–19.)

---

[30] Additionally, the Court previously dismissed EPPs' pre-2011 allegations as insufficient to plausibly allege a conspiracy under the Sherman Act. (First MTD Order 17–18.)  Because conspiratorial conduct lies at the heart of all EPPs' state law claims, the Court need only consider the doctrine of fraudulent concealment as it pertains to EPPs' post-2011 allegations; i.e., even if fraudulent concealment saved EPPs' pre-2011 allegations, they are nonetheless insufficient to plausibly support EPPs' corresponding state-law-based allegations.

[31] These mooted states are Arkansas, Massachusetts, Mississippi, and Nebraska.

1    Accordingly, the Court concludes that EPPs have pled fraudulent concealment with

2    sufficient particularity to invoke Arizona's articulation of the doctrine, and that therefore

3    the statute of limitations was tolled on EPPs' claims under Arizona's antitrust act.

4                    (ii)    California

5    California law regarding fraudulent concealment is framed very generally, e.g., "[a]

6    defendant's fraud in concealing a cause of action against him will toll the statute of

7    limitations, and that tolling will last as long as a plaintiff's reliance on the

8    misrepresentations is reasonable." *Grisham v. Philip Morris U.S.A., Inc.*, 151 P.3d 1151,

9    1159 (Cal. 2007) (en banc); *see also Lantzy v. Centex Homes*, 73 P.3d 517, 524 (Cal. 2003)

10   ("As with other general equitable principles, application of the equitable tolling doctrine

11   requires a balancing of the injustice to the plaintiff occasioned by the bar of his claim

12   against the effect upon the important public interest or policy expressed by the . . .

13   limitations statute."), *as modified* (Aug. 27, 2003); *Bernson v. Browning-Ferris Indus.*, 873

14   P.2d 613, 619 (Cal. 1994) (en banc) ("Accordingly, we hold that a defendant may be

15   equitably estopped from asserting the statute of limitations when, as the result of intentional

16   concealment, the plaintiff is unable to discover the defendant's actual identity.").  Federal

17   Courts within this Circuit have set forth the general guideline that "[a] plaintiff alleging

18   fraudulent concealment must establish that his failure to have notice of his claim was the

19   result of . . . affirmative conduct by the defendant." *Lauter v. Anoufrieva*, 642 F. Supp. 2d

20   1060, 1100 (C.D. Cal. 2009) (citing *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d

21   499, 505 (9th Cir. 1988), *cert. denied*, 488 U.S. 1010 (1989)).  In the present case, as

22   previously discussed, EPPs have alleged with particularity affirmative concealment by

23   Defendants, *supra* Part V.C.(i), and California case law indicates that the injustice to

24   Plaintiff of barring a claim where fraudulent concealment would otherwise apply counsels

25   in favor of applying equitable tolling in such circumstances.  *See Grisham*, 151 P.3d at

26   1159.  Accordingly, the Court concludes that fraudulent concealment tolled the statutes of

27   limitation applicable to all of EPPs' California state law claims.

28   / / /

1          (iii)   *District of Columbia*

2       The District of Columbia broadly recognizes the doctrine of fraudulent concealment.

3 For the doctrine to apply, "[g]enerally the defendant must have done something of an

4 affirmative nature designed to prevent discovery of the cause of action." *William J. Davis,*

5 *Inc. v. Young*, 412 A.2d 1187, 1191 (D.C. 1980). "[A]ny statement, word or act which

6 tends to suppress the truth raises the suppression to th[e] level" at which fraudulent

7 concealment should apply. *Id.* at 1192. In the present case, as previously discussed, EPPs

8 have alleged with particularity affirmative concealment by Defendants. *Supra* Part V.C.(i).

9 Accordingly, the Court concludes that fraudulent concealment tolled the statute of

10 limitation applicable to EPPs' D.C. antitrust claims.

11          (iv)   *Florida*

12       Plaintiffs cite the following rule statement for Florida's articulation of the doctrine

13 of fraudulent concealment: "[g]enerally, two elements are required before the equitable

14 principle of fraudulent concealment will be utilized to toll the statute of limitations, to-wit:

15 plaintiff must show both successful concealment of the cause of action and fraudulent

16 means to [achieve] that concealment." *W. Brook Isles Partner's 1, LLC v. Com. Land Title*

17 *Ins. Co.*, 163 So. 3d 635, 639 (Fla. Dist. Ct. App. 2015) (quoting *Nardone v. Reynolds*, 333

18 So. 2d 25, 37 (Fla. 1976), *holding modified by Tanner v. Hartog*, 618 So. 2d 177 (Fla.

19 1993), and *receded from on other grounds by Hearndon v. Graham*, 767 So. 2d 1179 (Fla.

20 2000)), *review denied*, 182 So. 3d 637 (Fla. 2015). In juxtaposition, Defendants cite the

21 Florida standard for equitable estoppel: "[t]he case law makes clear that an equitable

22 estoppel claim raised in response to a statute of limitations defense must allege that the

23 defendant acted with an intent to mislead or deceive the plaintiff into filing late, and that

24 the plaintiff's failure to timely file is directly attributable to the defendant's misconduct."

25 *Fox v. City of Pompano Beach*, 984 So. 2d 664, 668 (Fla. Dist. Ct. App. 2008). In the

26 present case, the Court accepts the first rule statement as controlling; it is both more specific

27 (i.e., addresses fraudulent concealment specifically rather than equitable estoppel

28 generally), directly quotes Florida's highest court, and had subsequent review from the

same court denied.  Applying that standard, as previously discussed, EPPs have alleged with particularity affirmative concealment by Defendants.  *Supra* Part V.C.(i).  Accordingly, the Court concludes that fraudulent concealment tolled the statutes of limitation applicable to all EPPs' Florida claims.

### (v)   Illinois

In Illinois, "[t]he concealment of a cause of action sufficient to toll the statute of limitations requires affirmative acts or representations designed to prevent discovery of the cause of action or to lull or induce a claimant into delaying the filing of his claim." *Dancor Int'l, Ltd. v. Friedman, Goldberg & Mintz*, 681 N.E.2d 617, 623 (Ill. Ct. App. 1997).  Additionally, "[t]he alleged acts or representations must in fact prevent inquiry or discovery of the claim or lull or induce a claimant into delaying the filing of his claim." *Id.*  In the present case, as previously discussed, EPPs have alleged with particularity affirmative concealment by Defendants.  *Supra* Part V.C.(i).  These acts of concealment in fact prevented EPPs from inquiring into the increased prices.  Accordingly, the Court concludes that fraudulent concealment tolled the statute of limitation applicable to EPPs' Illinois antitrust claims.

### (vi)   Michigan

In Michigan, "[i]f a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the" relevant statute of limitations will be tolled.  MICH. COMP. LAWS § 600.5855.  Michigan courts have further explained that "[f]raudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action." *Doe v. Roman Catholic Archbishop of Archdiocese of Detroit*, 692 N.W.2d 398, 405 (Mich. Ct. App. 2004).  And "[t]he acts relied on must be of an affirmative character and fraudulent." *Id.*  In the present case, as previously discussed, EPPs have alleged with particularity affirmative concealment by Defendants.  *Supra*

/ / /

Part V.C.(i).   Accordingly, the Court concludes that fraudulent concealment tolled the statutes of limitation applicable to all EPPs' Michigan claims.

> (vii)   Minnesota

In Minnesota, "the statute of limitations does not run during the time that the defendant fraudulently conceals from the plaintiff the facts constituting the cause of action," and "[a]ny concealment by positive affirmative act . . . is itself fraudulent so as to prevent the statute from running." *Minn. Laborers Health & Welfare Fund v. Granite Re, Inc.*, 844 N.W.2d 509, 514 (Minn. 2014) (first alteration original).[32]   In the present case, as previously discussed, EPPs have alleged with particularity affirmative concealment by Defendants.   *Supra* Part V.C.(i).   Accordingly, the Court concludes that fraudulent concealment tolled the statutes of limitation applicable to all EPPs' Minnesota claims.

> (viii)  Missouri

In Missouri, "[i]f any person, by absconding or concealing himself, or by any other improper act, prevent the commencement of an action, such action may be commenced within the time herein limited, after the commencement of such action shall have ceased to be so prevented."   MO. REV. STAT. § 516.280 ("Personal Actions and General Provisions" section).   Missouri courts have interpreted this provision as legislative desire to authorize application of the doctrine of fraudulent concealment, which generally requires a defendant to have "made positive efforts to avoid the bringing of suit against him or misled the claimants." *M & D Enters., Inc. v. Wolff*, 923 S.W.2d 389, 400 (Mo. Ct. App. 1996); *see also Smile v. Lawson*, 435 S.W.2d 325, 327 (Mo. 1968) (en banc).   In the present case, as previously discussed, EPPs have alleged with particularity affirmative concealment by Defendants.   *Supra* Part V.C.(i).   Accordingly, the Court concludes that fraudulent

---

[32] Plaintiffs cite *Frederick v. Wallerich*, No. A15-2052, 2016 WL 4068931, at *4 (Minn. Ct. App. Aug. 1, 2016), *review granted* (Oct. 26, 2016), for their rule statement.  Aside from now currently being slated for Minnesota-Supreme-Court review, *Frederick*—as opposed to *Minnesota Laborers*—additionally (1) is a lower court decision, that (2) was unpublished, and therefore may not be cited as precedent, and (3) articulates a standard specific to "[f]raudulent concealment . . . in an attorney-client relationship . . . ." Accordingly, the Court will use the *Minnesota Laborers* rule statement.

concealment tolled the statute of limitation applicable to EPPs' Missouri antitrust claims. *See Smile*, 435 S.W.2d at 327 ("The Missouri rule relating to the fraudulent concealment of a cause of action as it affects the tolling of statutes of limitations is in keeping with the decisions in a majority of the states.").

### (ix)    New Hampshire

In New Hampshire, "[t]he fraudulent concealment rule states that when facts essential to the cause of action are fraudulently concealed, the statute of limitations is tolled until the plaintiff has discovered such facts or could have done so in the exercise of reasonable diligence." *Beane v. Dana S. Beane & Co., P.C.*, 7 A.3d 1284, 1290 (N.H. 2010). In the present case, as previously discussed, EPPs have alleged with particularity affirmative concealment by Defendants. *Supra* Part V.C.(i). Accordingly, the Court concludes that fraudulent concealment tolled the statute of limitation applicable to EPPs' New Hampshire antitrust claims.

### (x)    New Mexico

In New Mexico,

> [t]o toll a statutory limitations period under the doctrine of fraudulent concealment, the plaintiff must prove that (1) the defendant knew of the alleged wrongful act and concealed it from the plaintiff or had material information pertinent to its discovery which he failed to disclose, and (2) the plaintiff did not know, or could not have known through the exercise of reasonable diligence, of the cause of action within the statutory period.

*Estate of Brice v. Toyota Motor Corp.*, 373 P.3d 977, 981 (N.M. 2016). In the present case, as previously discussed, EPPs have alleged with particularity affirmative concealment by Defendants. *Supra* Part V.C.(i). Accordingly, the Court concludes that fraudulent concealment tolled the statutes of limitation applicable to EPPs' New Mexico claims.

### (xi)    New York

New York's antitrust law should generally be construed in light of Federal antitrust precedent. *Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535, 539 (N.Y. 1988); *People ex rel. Cuomo v. Liberty Mut. Ins. Co.*, 52 A.D.3d 378, 379 (N.Y. Sup. Ct. App. Div. 2008).

This includes recognizing the doctrine of fraudulent concealment. *Liberty Mut.*, 52 A.D.3d at 379. The doctrine applies in extraordinary circumstances when a plaintiff shows that "(1) [a] defendant concealed the existence of [a plaintiff's] cause of action; (2) [the plaintiff] remained ignorant of that cause of action until some point within the limitations period; and (3) [the plaintiff's] continuing ignorance was not due to lack of diligence." *Coble v. Cohen & Slamowitz, LLP*, 824 F. Supp. 2d 568, 571 (S.D.N.Y. 2011). In the present case, as previously discussed, EPPs have alleged with particularity affirmative concealment by Defendants, EPPs' continuing ignorance, and no lack of diligence. *Supra* Part V.C.(i). Accordingly, the Court concludes that fraudulent concealment tolled the statute of limitation applicable to EPPs' New York antitrust claims. *See Liberty Mut.*, 52 A.D.3d at 379 ("[B]ecause bid-rigging is an activity that is inherently one of fraudulent concealment, the statute of limitations should be tolled.").

### (xii) South Dakota

In South Dakota, "fraudulent concealment applies . . . when actionable conduct or injury has been concealed by deceptive act or artifice." *Strassburg v. Citizens State Bank*, 581 N.W.2d 510, 515 (S.D. 1998). Fraudulent concealment requires "some affirmative act or conduct on the part of the defendant designed to prevent, and which does prevent, the discovery of the cause of action." *Id.* In the present case, as previously discussed, EPPs have alleged with particularity affirmative concealment by Defendants. *Supra* Part V.C.(i). Accordingly, the Court concludes that fraudulent concealment tolled the statute of limitation applicable to EPPs' South Dakota antitrust claims.

### (xiii) Virginia

In Virginia, "[w]hen the filing of an action is obstructed by a defendant's . . . using any . . . direct or indirect means . . . , then the time that such obstruction has continued shall not be counted as any part of the period within which the action must be brought." VA. CODE ANN. § 8.01-229. Virginia Courts have interpreted this legislative command as embracing the doctrine of fraudulent concealment, such that the doctrine tolls a statute of limitations when a defendant "conceal[s] . . . the existence of a cause of action" through

"affirmative acts of misrepresentation." *Newman v. Walker*, 618 S.E.2d 336, 339 (Va. 2005).[33]  In the present case, as previously discussed, EPPs have alleged with particularity affirmative concealment by Defendants.  *Supra* Part V.C.(i).  Accordingly, the Court concludes that fraudulent concealment tolled the statute of limitation applicable to all EPPs' Virginia claims.  *See, e.g.*, *Newman*, 618 S.E.2d at 338 ("We do not agree with Walker's argument implying that a statute of limitations is tolled under Code § 8.01-229(D) <u>only</u> when a defendant acts to conceal the existence of a cause of action." (emphasis added)).

###    D.    *Summary; Statute of Limitations Compendium*

Given the foregoing, the Court concludes that the following accrual rules and tolling doctrines apply to Plaintiffs' various state law claims:

| State Law Statute of Limitations Compendium | | |
|---|---|---|
| —*Legend*— | | |
| **\*** = Not Argued by Either Party; **\*\*** = Not argued by Plaintiffs; **I** = Injury Rule; **D** = Discovery Rule; **VP** = Validly Pled; **M =** Moot; **NR** = Not Recognized | | |
| | **Applicable Accrual Rule(s)** | **Fraudulent Concealment** |
| **Arizona:** | • Antitrust: **I**  • All Other State Law Claims: **D** | • Antitrust: **VP**  • All Other State Law Claims: **M** |
| **Arkansas:** | • All State Law Claims: **D** | • All State Law Claims: **M** |
| **California:** | • All State Law Claims: **I** | • All State Law Claims: **VP** |
| **D.C.:** | • Antitrust: **I**  • All Other State Law Claims: **D** | • Antitrust: **VP**  • All Other State Law Claims: **M** |

---

[33] Virginia also requires that "[t]he fraud which will relieve the bar of the statute . . . be of that character which involves moral turpitude, and must have the effect of debarring or deterring the plaintiff from his action.'" *Id.* at 340.  However, at least in the present case, this requirement is merely duplicative of the "affirmative acts of misrepresentation requirement," and thus is satisfied on the facts of this case.  *See id.* (discussing Virginia Supreme Court case explaining that moral turpitude requires that a "defendant . . . intend to conceal the discovery of the cause of action by trick or artifice").

| State Law Statute of Limitations Compendium | | |
|---|---|---|
| —*Legend*— | | |
| **\*** = Not Argued by Either Party; **\*\*** = Not argued by Plaintiffs; **I** = Injury Rule; **D** = Discovery Rule; **VP** = Validly Pled; **M** = Moot; **NR** = Not Recognized | | |
| | **Applicable Accrual Rule(s)** | **Fraudulent Concealment** |
| **Florida:** | • All State Law Claims: **I** | • All State Law Claims: **VP** |
| **Guam:** | • All State Law Claims: **D** | \*\* |
| **Illinois:** | • Antitrust: **I** <br> • All Other State Law Claims: **D** | • Antitrust: **VP** <br> • All Other State Law Claims: **M** |
| **Iowa:** | • Antitrust: **I** <br> • All Other State Law Claims: **D** | • **NR** |
| **Kansas:** | • All State Law Claims: **I** | • **NR** |
| **Maine:** | • All State Law Claims: **I** | • **NR** |
| **Massachusetts:** | • All State Law Claims: **D** | • All State Law Claims: **M** |
| **Michigan:** | • All State Law Claims: **I (\*\*)** | • All State Law Claims: **VP** |
| **Minnesota:** | • All State Law Claims: **I** | • All State Law Claims: **VP** |
| **Mississippi:** | • All State Law Claims: **D** | • All State Law Claims: **M** |
| **Missouri:** | • Antitrust: **I** <br> • All Other State Law Claims: **D** | • Antitrust: **VP** <br> • All Other State Law Claims: **M** |
| **Nebraska:** | • All State Law Claims: **D** | • All State Law Claims: **M** |
| **Nevada:** | • All State Law Claims: **D** | \*\* |
| **New Hampshire:** | • Antitrust: **I** <br> • All Other State Law Claims: D | • Antitrust: **VP** <br> • All Other State Law Claims: **M** |
| **New Mexico:** | • Antitrust: **D** <br> • All Other State Law Claims: \*\* | • Antitrust: **M** <br> • All Other State Law Claims: **VP** |
| **New York:** | • Antitrust: **I** | • Antitrust: **VP** |

15-MD-2670 JLS (MDD)

| State Law Statute of Limitations Compendium | | |
|---|---|---|
| *—Legend—* | | |
| * = Not Argued by Either Party; ** = Not argued by Plaintiffs; | | |
| **I** = Injury Rule; **D** = Discovery Rule; **VP** = Validly Pled; **M =** Moot; **NR** = Not Recognized | | |
| | **Applicable Accrual Rule(s)** | **Fraudulent Concealment** |
| | • Consumer Protection Claims: **I**<br>• All Other State Law Claims: **D** | • All Other State Law Claims: ** |
| **North Carolina:** | • Antitrust: **D**<br>• All Other State Statutory Claims: **D**<br>• All Other State Law Claims: * | • All State Law Claims: **M** |
| **North Dakota:** | • All State Law Claims: **D** | • All State Law Claims: **M** |
| **Oregon:** | • All State Law Claims: **D** | • All State Law Claims: **M** |
| **Rhode Island:** | • All State Law Claims: **D** | ** |
| **South Carolina:** | * | * |
| **South Dakota:** | • Antitrust: **I**<br>• All Other State Law Claims: **D** | • Antitrust: **VP**<br>• All Other State Law Claims: **M** |
| **Utah:** | • All State Law Claims: **D** | • All State Law Claims: **M** |
| **Vermont:** | • All State Law Claims: **D** | • All State Law Claims: **M** |
| **Virginia:** | • All State Law Claims: **I** | • All State Law Claims: **VP** |
| **West Virginia:** | • All State Statutory Claims: **D**<br>• All Other State Law Claims: * | • All State Law Claims: **M** |
| **Wisconsin:** | • All State Statutory Claims: **D** | ** |

/ / /

/ / /

15-MD-2670 JLS (MDD)

*E.     Conclusion*

Given the foregoing, the Court **DENIES** Defendants' Motion to Dismiss as time-barred Plaintiffs' (1) state law claims of any type in Arizona, Arkansas, California, the District of Columbia, Florida, Guam, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oregon, Rhode Island, South Dakota, Utah, Vermont, and Virginia; (2) state statutory claims in North Carolina, West Virginia, and Wisconsin; and (3) state antitrust claims in New York and North Carolina.

Regarding Plaintiffs' 2012-backward allegations, the Court **GRANTS** Defendants' Motion to Dismiss as time-barred Plaintiffs' (1) antitrust claims in Kansas and (2) consumer protection claims in New York.

Additionally, regarding Plaintiffs' 2008-backward allegations, the Court **GRANTS** Defendants' Motion to Dismiss as time-barred Plaintiffs' (1) antitrust claims in Iowa and (2) state law claims of any type in Maine.

## CONCLUSION

With the entry of this Order, the Court has now resolved all outstanding issues presented by Defendants' various Motions to Dismiss. All Plaintiffs are **GRANTED LEAVE TO AMEND** their respective Complaints in light of this Order and the Court's previous Order, (ECF No. 283). Plaintiffs **SHALL FILE** amended Complaints within thirty days of the date on which this Order is electronically docketed. Furthermore, Plaintiffs **SHALL** consolidate and coordinate filings to the maximum extent possible.[34]

**IT IS SO ORDERED.**

Dated: March 14, 2017

*Janis L. Sammartino*

Hon. Janis L. Sammartino
United States District Judge

---

[34] All aspects of this Order and the Court's prior Order, (ECF No. 283), apply with equal force to the pending motions in DAP member cases 16cv51, 16cv264, 16cv247, 16cv398, and 16cv1226.