Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
**KAPLAN FOX & KILSHEIMER LLP**
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone:  415-772-4700
Facsimile:   415-772-4707
Email: lking@kaplanfox.com
Email: mchoi@kaplanfox.com

*Attorneys for Plaintiffs*

[*Additional Counsel Appear on Signature Page*]

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No. 15-MD-2670 JLS (MDD) |
| THIS DOCUMENT RELATES TO:<br><br>DIRECT ACTION PLAINTIFFS' CASES | |
| AFFILIATED FOODS, INC.; AFFILIATED FOODS MIDWEST COOPERATIVE, INC.; ALEX LEE, INC.; ASSOCIATED FOOD STORES, INC.; ASSOCIATED GROCERS OF NEW ENGLAND, INC.; ASSOCIATED GROCERS, INC.; BIG Y FOODS, INC.; BROOKSHIRE BROTHERS, INC.; BROOKSHIRE GROCERY COMPANY; CERTCO, INC.; DOLLAR TREE DISTRIBUTION, INC.; GREENBRIER INTERNATIONAL, INC.; FAMILY DOLLAR STORES, INC.; FAMILY DOLLAR SERVICES, LLC; FAREWAY STORES, INC.; THE GOLUB CORPORATION; GIANT EAGLE, INC.; KMART CORPORATION; K-VA-T FOOD STORES, INC.;  MCLANE COMPANY, INC.; MEADOWBROOK MEAT COMPANY, INC.; MERCHANTS DISTRIBUTORS, LLC; SCHNUCK | **PLAINTIFFS' SECOND CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1**<br><br>**REDACTED VERSION**<br><br>**DEMAND FOR JURY TRIAL** |

1  MARKETS, INC.; UNIFIED GROCERS, INC.;
2  URM STORES INC.; WESTERN FAMILY
   FOODS, INC., and WOODMAN'S FOOD
3  MARKET, INC.,

4                          Plaintiffs,
5  vs.

6
7  TRI-UNION SEAFOODS, LLC, d/b/a
   CHICKEN OF THE SEA INTERNATIONAL;
8  THAI UNION GROUP PUBLIC COMPANY,
9  LTD.; BUMBLE BEE FOODS, LLC, f/k/a
   BUMBLE BEE SEAFOODS, LLC; STARKIST
10 CO., DEL MONTE CORPORATION; and
11 DONGWON INDUSTRIES CO., LTD.,

12                         Defendants.
13

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.     NATURE OF THE ACTION ....................................................................... 1

II.    JURISDICTION AND VENUE ................................................................. 4

III.   PLAINTIFFS ............................................................................................ 5

IV.    DEFENDANTS ....................................................................................... 10

    A.  Bumble Bee ..................................................................................... 10

    B.  Thai Union and Tri-Union ............................................................. 10

    C.  Dongwon, Del Monte, And StarKist ............................................. 15

V.     AGENTS ................................................................................................ 24

VI.    INTERSTATE TRADE AND COMMERCE ........................................... 24

VII.   FACTUAL ALLEGATIONS .................................................................. 25

    A.  Background ...................................................................................... 25

    B.  The DOJ's Criminal Investigation ................................................. 29

    C.  Pattern of Collusion ....................................................................... 30

    D.  Defendants' Overarching and Continuous Collusive Scheme .................. 35

        1.  Collusion on Light Meat and White Meat Tuna Price
            Increases in 2004 and 2006 .................................................. 35

        2.  Collusion on Package Size Changes in 2007-08 ................... 43

        3.  Collusion on 2008 List Price Increases ............................... 50

        4.  Collusion on 2010 Net Price Increases ................................ 52

        5.  Collusion on 2011 Price Increases ....................................... 55

        6.  Collusion on List Price Increases In 2011-12 ...................... 59

        7.  Collusion on Offering "FAD Free" Branded Tuna Products ............... 61

        8.  Collusion on Promotional Activity ...................................... 63

VIII.  THE UNITED STATES PACKAGED SEAFOOD MARKET
      IS CONDUCIVE TO COLLUSION ....................................................... 63

IX.    PLAINTIFFS SUFFERED ANTITRUST INJURY ................................ 65

X.      TOLLING OF THE STATUTE OF LIMITATIONS .................................... 65

XI.     DISCOVERY IS NECESSARY TO DETERMINE THE FULL
        SCOPE OF THE CONSPIRACY ............................................................. 76

COUNT I ............................................................................................................... 76

VIOLATION OF THE SHERMAN ACT § 1 ........................................................ 76

PRAYER FOR RELIEF ........................................................................................ 77

JURY DEMAND ................................................................................................... 78

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Affiliated Foods, Inc., Affiliated Foods Midwest Cooperative, Inc., Alex Lee, Inc., Associated Food Stores, Inc., Associated Grocers of New England, Inc., Associated Grocers, Inc., Big Y Foods, Inc., Brookshire Brothers, Inc., Brookshire Grocery Company, Certco, Inc., Dollar Tree Distribution, Inc., Greenbrier International, Inc., Family Dollar Stores, Inc., Family Dollar Services, LLC, Fareway Stores, Inc., Giant Eagle, Inc., The Golub Corporation, Kmart Corporation, K-VA-T Food Stores, Inc., McLane Company, Inc., Meadowbrook Meat Company, Inc., Merchants Distributors, LLC, Schnuck Markets, Inc., Unified Grocers, Inc., URM Stores Inc., Western Family Foods, Inc. and Woodman's Food Market, Inc. (collectively, "Plaintiffs"), by and through undersigned counsel, complain as follows:

## I.   NATURE OF THE ACTION

1.    This action arises out of an overarching, continuous conspiracy to fix, stabilize, or maintain the prices of shelf-stable packaged tuna products (*i.e.*, tuna in cans, pouches and ready-to-eat servings) ("Packaged Tuna") by Bumble Bee Foods LLC, Tri-Union Seafoods LLC d/b/a Chicken of the Sea, and StarKist Co. (along with certain other entities described below) (collectively, "Defendants"). It began at a time uncertain, but at least by 2004, and continued in force or effect, or both, until at least July 2015. (the "Relevant Period").

2.    This conspiracy was effectuated by at least the following means: (a) agreeing to decrease the sizes of pouches and cans in which Packaged Tuna is sold; (b) agreeing to issue collusive price increases on Packaged Tuna; (c) agreeing to follow each other's price increases; (d) agreeing to limit promotional offers for Packaged Tuna; and (e) agreeing not to sell branded canned tuna labeled as caught without the use of fish aggregation devices (*i.e.*, that it is "FAD-free"). As a result of Defendants' cartel, Plaintiffs have paid inflated prices for Defendants' products.

3.    The United States Department of Justice ("DOJ") is conducting a criminal investigation of this conspiracy. On December 7, 2016, it filed a criminal

information against Walter Scott Cameron, a Senior Vice-President of Sales for Bumble Bee, alleging a conspiracy to fix prices of packaged seafood, including Packaged Tuna. *United States v. Cameron*, No. 3:16-cr-00501-EMC (N.D. Cal.) (ECF No. 1). Cameron, who goes by the name "Scott" (and is referred to as Scott Cameron throughout this Complaint), has held senior sales positions at Bumble Bee since May 2000 and has served as Bumble Bee's Senior Vice President of Sales since May 2007. As detailed below, Cameron entered into agreements with Chicken of the Sea and StarKist to increase prices. Cameron pled guilty on January 25, 2017.

4.     On December 21, 2016, the DOJ filed a criminal information against Kenneth Worsham, a Senior Vice President of Marketing for Bumble Bee, alleging his participation in a conspiracy to fix the prices of packaged seafood, including Packaged Tuna. *United States v. Worsham*, No. 3:16-cr-00535-EMC-1 (N.D. Cal.) (ECF NO. 1). Kenneth Worsham has been a Bumble Bee Senior Vice President of Marketing since at least 2001. Kenneth Worsham frequently discussed future pricing and shared customer opportunities with his father, Bob Worsham, a StarKist pricing consultant since the 1980s, as well as with Mike White, Chicken of the Sea's Director of Marketing since the late 1980s. As detailed below, Kenneth Worsham entered into agreements to increase prices with the leadership of Bumble Bee and StarKist. Kenneth Worsham pled guilty on March 15, 2017.

5.     Both plea agreements for Scott Cameron and Kenneth Worsham state that:

> [T]he defendant participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood, the primary purpose of which was to fix, raise and maintain the prices of packaged seafood sold in the United States. In furtherance of the conspiracy, the defendant engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms. During

1
2
3
4

these conversations, discussions and meetings, agreements and mutual understandings were reached to fix, raise and maintain the prices of packaged seafood sold in the United States.

5

Worsham Plea Agreement, ¶4(b); Cameron Plea Agreement, ¶4(b).

6
7
8
9
10

6.      Chicken of the Sea has confirmed that it is an amnesty applicant with respect to packaged seafood. Under the DOJ's Leniency Guidelines, for Chicken of the Sea to receive conditional amnesty, the company must admit to its participation in a criminal antitrust violation, such as price fixing. *See* https://www.justice.gov/atr/page/file/926521/download.

11
12
13
14
15
16
17
18
19
20
21
22
23

7.      On May 8, 2017, Bumble Bee agreed to plead guilty and to pay a criminal fine in the amount of no less than $25 million, and potentially as high as $81.5 million, in connection with charges that it had fixed the prices of packaged seafood, which was defined as consisting of shelf-stable tuna (*i.e.,* Packaged Tuna). Specifically, the information filed by the DOJ stated that Bumble Bee had (a) engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms; (b) agreed and reached mutual understandings during these conversations, discussions and meetings, to fix, raise, and maintain the prices of packaged seafood sold in the United States; and (c) negotiated prices with customers and issued price announcements for packaged seafood in accordance with the agreements and mutual understandings reached. Bumble Bee has also agreed to cooperate in the DOJ's ongoing investigation.

24
25
26
27

8.      This Second Consolidated Amended Complaint ("Complaint") is filed under Section 4 of the Clayton Act (15 U.S.C. § 15), to recover treble damages, costs of suit and reasonable attorneys' fees for violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

28

## II.   JURISDICTION AND VENUE

9.     The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 of the Clayton Act (15 U.S.C. § 15).

10.     During the Relevant Period, Defendants, directly or through one or more their affiliates, sold Packaged Tuna throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this district.

11.     Defendants and their co-conspirators engaged in conduct both inside and outside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States, and upon import trade and commerce with the United States.

12.     The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce in that Defendants deprived Plaintiffs of the benefits of free and open competition in the purchase of Packaged Tuna within the United States.

13.     Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, or have agents within this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below was carried out in this district.

14.     Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the long-arm statute of California (Cal. Code Civ. P. §410) because each has transacted business in this state and because the California long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the state of California to satisfy due process.

15.     This Court has personal jurisdiction over Defendants because, *inter alia,* each Defendant: (a) transacted business in this district, the United States and its territories, and the District of Columbia; (b) directly or indirectly sold and delivered Packaged Tuna in this district, the United States and its territories, and the District of Columbia; (c) has substantial aggregate contacts with this district, the United States and its territories, and the District of Columbia; and (d) engaged in anticompetitive conduct that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District, the United States and its territories, and the District of Columbia.

## III.   PLAINTIFFS

16.     Plaintiff Affiliated Foods, Inc. is a Texas corporation with its principal place of business in Amarillo, Texas. During the Relevant Period, Affiliated Foods, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

17.     Plaintiff Affiliated Foods Midwest Cooperative, Inc. is a Nebraska corporation with its principal place of business in Norfolk, Nebraska. During the Relevant Period, Affiliated Foods Midwest Cooperative, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

18.     Plaintiffs Alex Lee, Inc. and its wholly-owned subsidiary, Merchants Distributors, LLC (together, "Alex Lee") are, respectively, a North Carolina corporation and a North Carolina limited liability company, with their principal places of business in Hickory, North Carolina. During the Relevant Period, Alex Lee purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

19. Plaintiff Associated Food Stores, Inc. is a Utah corporation with its principal place of business in Salt Lake City, Utah. During the Relevant Period, Associated Food Stores, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

20. Plaintiff Associated Grocers of New England, Inc. is a New Hampshire corporation with its principal place of business in Pembroke, New Hampshire. During the Relevant Period, Associated Grocers of New England, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

21. Plaintiff Associated Grocers, Inc. is a Louisiana corporation with its principal place of business in Baton Rouge, Louisiana. During the Relevant Period, Associated Grocers, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

22. Plaintiff Big Y Foods, Inc. is a Massachusetts corporation with its principal place of business in Springfield, Massachusetts. During the Relevant Period, Big Y Foods, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

23. Plaintiff Brookshire Brothers, Inc. is a Texas corporation with its principal place of business in Lufkin, Texas. During the Relevant Period, Brookshire Brothers, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

24. Plaintiff Brookshire Grocery Company is a Texas corporation with its principal place of business in Tyler, Texas. During the Relevant Period, Brookshire

Grocery Company purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

25.   Plaintiff Certco, Inc. is a Wisconsin corporation with its principal place of business in Madison, Wisconsin. During the Relevant Period, Certco, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

26.   Plaintiff Dollar Tree Distribution, Inc., a wholly-owned subsidiary of Dollar Tree, Inc., is a Virginia corporation with its principal place of business in Chesapeake, Virginia.  During the Relevant Period, Dollar Tree Distribution, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

27.   Plaintiff Greenbrier International, Inc., a wholly-owned subsidiary of Dollar Tree, Inc., is a Delaware corporation with its principal place of business in Chesapeake, Virginia. During the Relevant Period, Greenbrier International, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

28.   Plaintiff Family Dollar Stores, Inc., a wholly-owned subsidiary of Dollar Tree, Inc., is a Delaware corporation with its principal place of business in Matthews, North Carolina.  During the Relevant Period, Family Dollar Stores, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

29.   Plaintiff Family Dollar Services, LLC (formerly known as Family Dollar Services, Inc.), a wholly-owned subsidiary of Plaintiff Family Dollar Stores,

Inc., is a North Carolina limited liability company with its principal place of business in Matthews, North Carolina. During the Relevant Period, Family Dollar Services, LLC purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

30.     Plaintiff Fareway Stores, Inc. is an Iowa corporation with its principal place of business in Boone, Iowa. During the Relevant Period, Fareway Stores, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

31.     Plaintiff Giant Eagle, Inc. is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania. During the Relevant Period, Giant Eagle, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

32.     Plaintiff The Golub Corporation, whose retail operating banners include Price Chopper and Market 32, is a Delaware corporation with its principal place of business in Schenectady, New York. During the Relevant Period, The Golub Corporation purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

33.     Plaintiff Kmart Corporation is a Michigan corporation with its principal place of business in Hoffman Estates, Illinois. During the Relevant Period, Kmart Corporation purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

34.     Plaintiff K-VA-T Food Stores, Inc., doing business as Food City, is a Virginia corporation with its principal place of business in Abingdon, Virginia.

During the Relevant Period, K-VA-T Food Stores, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

35.   Plaintiff McLane Company, Inc. is a Texas corporation with its principal place of business in Temple, Texas. During the Relevant Period, McLane Company, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

36.   Plaintiff Meadowbrook Meat Company, Inc. is a North Carolina corporation with its principal place of business in Rocky Mount, North Carolina. During the Relevant Period, Meadowbrook Meat Company, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

37.   Plaintiff Schnuck Markets, Inc. is a Missouri corporation with its principal place of business in St. Louis, Missouri. During the Relevant Period, Schnuck Markets, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

38.   Plaintiff Unified Grocers, Inc. is a California corporation with its principal place of business in Commerce, California. During the Relevant Period, Unified Grocers, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

39.   Plaintiff URM Stores, Inc. is a Washington corporation with its principal place of business in Spokane, Washington. During the Relevant Period, URM Stores, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

40.     Plaintiff Western Family Foods, Inc. is an Oregon corporation with its principal place of business in Tigard, Oregon. During the Relevant Period, Western Family Foods, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

41.     Plaintiff Woodman's Food Market, Inc. is a Wisconsin corporation with its principal place of business in Janesville, Wisconsin. During the Relevant Period, Woodman's Food Market, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

## IV.     DEFENDANTS

### A.     Bumble Bee

42.     Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business at 280 10th Avenue, San Diego, California 92101.  Bumble Bee produces and sells Packaged Tuna throughout the United States (including this District), its territories and the District of Columbia. Bumble Bee is a wholly-owned subsidiary of Lion Capital, a private investment firm headquartered in Great Britain.

### B.     Thai Union and Tri-Union

43.     Defendant Tri-Union Seafoods, LLC d/b/a Chicken of the Sea International ("Tri-Union") is a Delaware limited liability company with its principal place of business at 9330 Scranton Road, Suite 500, San Diego, California 92121.

44.     Defendant Thai Union Group Public Company, Ltd. ("Thai Union"), a publicly held company headquartered in Thailand, is a global processor and exporter of frozen seafood and Packaged Tuna.

45.     Since 2000, Tri-Union has been a wholly-owned subsidiary of Thai Union North America, Inc. ("TUNAI"), a California corporation with its principal

1   place of business at 9330 Scranton Road, Suite 500, San Diego, California 92121.
2   TUNAI, in turn, is a wholly-owned subsidiary of Thai Union. All three vertically-
3   integrated companies have been led by Thiraphong Chansiri, who serves as the
4   CEO and President of Thai Union, the President of TUNAI, and a Director of Tri-
5   Union, at which Chansiri has a day-to-day leadership role.

6       46.   Throughout the Relevant Period, Thai Union controlled and
7   supervised the business, operations, and activities of Tri-Union, including the
8   conduct alleged in this Complaint. Thai Union has been described in the media as
9   "the world's biggest producer of canned tuna," and is reported to export
10  approximately 55% of its tuna to the United States.

11      47.   

24      48.   Since the acquisition, Thai Union has fully integrated Tri-Union into
25  its global Packaged Tuna business. In 2007, Tri-Union's President, John Signorino,
26  was replaced by Thai Union's former Executive Director and Chief Financial
27  Officer, Shue Wing Chan, who is both a member of the Chansiri family and Thai
28  Union's self-styled "Global Leadership Team." Prior to joining Tri-Union, he

1  served as the CFO of Thai Union.[1] REDACTED

2  

3

4

5

6  49. REDACTED

7

8

9

10

11

12

13

14

15

16

17  50. REDACTED

18

19

20

21

22

23

24

25  [1] REDACTED

26

27

28

1  REDACTED

2

3   51.   REDACTED

4

5

6

7

8

9   52.   REDACTED

10

11

12

13

14

15   53.   REDACTED

16

17

18

19

20

21

22

23

24

25   54.   As described herein, Thai Union approved Tri-Union's participation

26  in the 2008 collusive resizing of canned tuna. It was aware of and supported

27  collusive price increases for Packaged Tuna. It was aware of and supported the

28  2012 agreement among Bumble Bee, Tri-Union and StarKist Company to refrain

1  from labeling their respective brands of canned tuna as "FAD-free," *i.e.*, caught in

2  an environmentally friendly manner.

3     55. REDACTED ████████████████████████████████

4  ████████████████████████████████████████████

5  ████████████████████████████████████████████

6  ████████████████████████████████████████████

7  ████████████████████████████████████████████

8  ████████████████████████████████████████████

9  ███████████████

10     56.    Thus, Tri-Union has been and is the *alter ego* and agent of Thai

11  Union. Moreover, Thai Union directly participated in the conspiracy described

12  herein through personnel who had duties at Thai Union, such as Chan.

13     57.    Thai Union also profited from the conspiracy. REDACTED ████████

14  ████████████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████████████████

17  ████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ██████████████████████████████

20     58. REDACTED ██████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████

23  ████████████████████████████████████████████

24  ██████████████████████████████████████

25     59.    Thai Union and Tri-Union pitched themselves to Chicken of the Sea

26  customers as one company, *i.e.*, Thai Union, the world's largest canned seafood

27  company. Given the breadth and scope of the conspiracy, and the benefits received

28  by Thai Union as a direct result of the collusion alleged herein, it would be

1    inequitable to allow Thai Union to escape responsibility for the actions of the
2    combined enterprise.

3        60.    As used herein, "Chicken of the Sea" collectively refers to Defendants
4    Tri-Union and Thai Union.

5        **C.    Dongwon, Del Monte, And StarKist**

6        61.    Defendant StarKist Co. is a Delaware corporation with its principal
7    place of business at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania
8    15212. From December 2002 until October 2008, StarKist was an operating
9    segment of Del Monte Corporation, at which time it was sold to three members of
10   the family-owned and managed Korean chaebol Dongwon Group. The purchasing
11   companies were Dongwon Industries Co., Ltd. ("Dongwon Industries"), Dongwon
12   Enterprise Co., Ltd. ("Dongwon Enterprise"), and Dongwon F&B Co. After the
13   purchase, StarKist became a majority-owned subsidiary of Dongwon Industries,
14   and since September 23, 2012, StarKist has been a wholly-owned subsidiary of
15   Dongwon Industries. Each of the Dongwon Group affiliates is ultimately owned by
16   Dongwon Enterprise, a family-owned holding company. Jae-chul Kim, who
17   founded the conglomerate in 1969, owns 24.5% of Dongwon Enterprise, while his
18   son and successor, Nam-jung Kim, owns 68%.

19       62.    Defendant Del Monte Corporation ("Del Monte"), now known as Big
20   Heart Pet Brands, Inc., is a Delaware corporation with its principal place of
21   business at 1 Strawberry Lane, Orrville, Ohio, 44667. Del Monte acquired StarKist
22   in 2002. Through StarKist, Del Monte produced and sold Packaged Tuna
23   throughout the United States (including in this District), its territories and the
24   District of Columbia. Del Monte sold StarKist to Dongwon on October 6, 2008.
25   According to a filing by Del Monte with the Securities & Exchange Commission,
26   "[a]t the time of sale, Del Monte entered into a two-year Operating Services
27   Agreement (which was completed in September 2010) pursuant to which [Del

28

Monte] provided operational services to Starkist Co. such as warehousing, distribution, transportation, sales, information technology and administration."

63. Del Monte managed the operations of StarKist Co. during the time it owned StarKist, from December 2002 until October 2008, and thereafter continued to manage StarKist under an operating agreement with Dongwon Industries until October 2010, at which time Dongwon Industries became the operator of StarKist. Key StarKist executives also served as Del Monte executives during the time Del Monte owned and operated StarKist. For example, Don Binotto served as StarKist's CEO from the 1990s through December 2005 when StarKist was owned first by Heinz, then by Del Monte, and then was rehired by Dongwon Industries. Joseph Tuza was a Del Monte marketing executive between May 2006 and August 2008, and then was a StarKist Sr. VP of Marketing.

64. Defendant Dongwon Industries Co., Ltd. is a publicly traded company with its principal place of business at Dongwon Industries Building, 7th Floor, Mabang-ro 68 (Yangjae-dong), Seocho-gu, Seoul, South Korea. Dongwon Industries is part of the Dongwon Group, which has annual Packaged Tuna revenue of approximately $1.4 billion. Dongwon Group is a chaebol, a family-controlled Korean conglomerate, in which corporate lines between member entities are often blurred. StarKist regularly describes itself as a subsidiary of Dongwon Group and as a subsidiary of Dongwon Industries.

65. Chaebols are closely-knit business groups in South Korea under the control of an extended family, with key flagship firms which are used as the instruments of control of other firms within the group. They have four key features: (1) the governance structure of the group involves family or extended family control; (2) the formal organizational structure of the group involves a group headquarters, located in an actual or *de facto* holding company, sometimes known as a "flagship" company, which controls a network of subsidiaries, which fall under the control of the family, the group as a whole, and of flagship firms

within the group; (3) the business structure of the firm encompasses a number of discrete products and services, some of which are wholly unrelated and others that are effectively vertically integrated; and (4) these groups are characterized by strong internal cultures of hierarchy, familism, and loyalty, with family members of the founder or his cohorts also occupying key managerial positions within the group.

66.   The Dongwon Group is a Chaebol. The company started in 1969 and is dominated by Chair Jae-chul Kim ("J.C. Kim") and members of his family or extended family, as described in more detail below. The group is headquarters is in Seoul, South Korea, where its holding company, Dongwon Enterprise, is located. Through its subsidiaries, it operates in a number of business sectors including, among other things, marine products, other food products, feed products, and pet food, packing materials, and aluminum foil products. REDACTED

REDACTED

In other words, as a chaebol, Dongwon does not follow the principles of corporate separateness that are expected of companies incorporated in the United States. Instead, the Dongwon entities, including Dongwon Industries and StarKist, operated as a single entity.

67.   Dongwon Group controls approximately 75% of the Korean canned tuna market. At the time of the StarKist acquisition, it was reported that "the

transaction will help the Dongwon Group, whose affiliates include the world's biggest tuna fishing company, Dongwon Industries, and processed food maker Dongwon F&B, to create the world's biggest canned tuna business. 'We believe that the acquisition of StarKist seafood will help Dongwon establish a strong foothold and penetration in the U.S. market,' said Park In-gu, vice chairman of Dongwon Enterprise, which is the holding company for the conglomerate." Park also stated that the deal was "a great opportunity for us to initiate operations in the United States."

68.   Dongwon Group's website describes its mission to become the "world's biggest tuna company," through StarKist, which it describes as follows:

> StarKist is the world's best tuna brand with 65 years of history, and holds the No.1 position in the US tuna market. Like Dongwon Group in Korea, StarKist is an iconic tuna brand in the United States, and has been controlled by Dongwon Group since 2008, accompanying Dongwon Group on its journey to globalization. Dongwon Group, which has already become the dominant player in Korea's tuna market, has focused on the steady growth of the world's tuna market and determined that tuna can be one of core resources that will lead future industries. Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna company, and will become de facto a globalized enterprise.

69.   Dongwon Group purchased StarKist with the goal of globalizing and integrating StarKist with its existing seafood businesses. According to former StarKist CEO, In-soo Cho, "StarKist used to own boats and catch its own tuna and process and sell it" until the "business was sold and became part of larger parts of businesses." StarKist's purchase by Dongwon Group, which owns one of the largest fishing fleets in the world, was done with the goal of returning StarKist to an integrated business model, "from the sea to the shelves." To do so, executives

from other Dongwon Group companies were brought to StarKist to oversee the company; the media reported a contemporaneous "string of exits" by StarKist's U.S. executives.

70.    REDACTED

71.    REDACTED

REDACTED

72.     In 2012, Dongwon Industries dismissed several StarKist executives and replaced them with executives from the Dongwon entities—a move intended to "better align and leverage Dongwon's expertise and streamline the organization." Among the Dongwon executives brought on to closely manage and control StarKist was Nam-jung Kim, who currently owns 68% of Dongwon Enterprise. Nam-jung Kim (the son of Dongwon Chair J.C. Kim) was appointed to the newly created position of chief operating officer to lead the "continued growth and expansion of Dongwon-StarKist global business." His biography, according to Bloomberg, demonstrates the seamless integration between the Dongwon affiliates, including StarKist:

> Nam-jung Kim served as Vice President of Dongwon F&B Co., Ltd. Mr. Kim served as the Chief Operating Officer of StarKist Co. since 2012 until October 2014. Mr. Kim's lasting relationship with the tuna industry took off in 1996 at the Dongwon F&B tuna plant in Changwon. He served as the Chief of Management Supporting Division at Dongwon Industry Co., Ltd. He served as a Director of Construction Division at Donwon Systems Corporation and Vice President of Dongwon Enterprise Co., Ltd. He became Product Manager of the sea laver category in 1999. Mr. Kim returned to Dongwon F&B in 2004 to work as Marketing Strategy Manager until 2006. He continued to diversify his business acumen by leading the Finance & Planning Department of Dongwon Industries Co. Since 2008, he served as the Head of the Finance and Planning Department at Dongwon Systems and served as its Vice President of its construction arm. Immediately before joining StarKist, he served as Executive Vice President at Dongwon Enterprise since 2011, the holding company of the Dongwon conglomerate.

According to Bloomberg, Nam-jung Kim currently serves on the Board of Dongwon F&B, and as Vice Chair of StarKist.

73.    Nam-jung Kim was to lead the growth of the combined Dongwon-StarKist global business. At the same time, Dongwon Industries stated its commitment to supply StarKist directly with a steady stream of tuna, and purchased a dedicated vessel to operate for StarKist in American Somoa. Dongwon added Jae Hoon Choi to the StarKist procurement team to lead the effort.

74.    Also in 2012, Hyung-joo Kim was transferred from Dongwon F&B, where he served as chief financial officer, to become StarKist's senior vice president, finance. Andrew Choe joined Dongwon Enterprise in 2010 and was sent to StarKist in 2012 to work as senior vice president of supply chain and operations, before being named StarKist president and CEO in 2014. In addition, Ingu Park, the vice chair of Dongwon Enterprise, became the board chair of StarKist and served as interim president after Don Binotto left in November 2010, reporting directly to the Chair of Dongwon. According to Bloomberg, Ingu Park currently serves as both the CEO of Dongwon Precision Machinery Co. Ltd. and as Chair of the StarKist board of directors. He had previously served as Vice Chair and Director of Dongwon F&B.

75.    Dongwon micromanaged StarKist's affairs and disregarded principles of corporate separateness with respect to StarKist. REDACTED



REDACTED

76.  REDACTED

77.  REDACTED

78.  REDACTED

REDACTED

79.    Dongwon, including J.C. Kim and other senior Dongwon executives, not only established policy and direction for StarKist, but was the decision-maker concerning even routine matters at StarKist, and effectively took over the performance of StarKist's day-to-day operations in carrying out that policy and direction.  Further, because of the disregard of corporate separateness and the lack of any meaningful distinction between the two companies, StarKist employees that performed acts in furtherance of the conspiracy did so on behalf of both Dongwon and StarKist (and Dongwon employees similarly acted on behalf of both StarKist and Dongwon).

80.    REDACTED

81.    StarKist Co. is the agent, instrumentality and *alter ego* of Dongwon, which directly participated in, and profited from, the conspiracy described herein.

82.    REDACTED

83.    REDACTED

REDACTED

84.     As set forth below, Del Monte participated directly in various acts in furtherance of the conspiracy during the time it owned and operated StarKist. During the Del Monte years, StarKist functioned as an operating segment of Del Monte and was not an independent company. Multiple Del Monte employees served dual roles in both StarKist and Del Monte, including in their direct participation in the improper exchange of competitive information and illegal agreements. REDACTED

85.     As used herein, "StarKist" collectively refers to Defendants StarKist, Del Monte (December 2002 until October 2010), and Dongwon (from October 2008 through the present).

## V.     AGENTS

86.     Defendants' alleged wrongful acts were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## VI.     INTERSTATE TRADE AND COMMERCE

87.     Defendants and their co-conspirators, directly and through their affiliates, sold Packaged Tuna throughout the United States, including this district,

1   at artificially inflated prices during the Relevant Period. Defendants are direct

2   competitors in the United States Packaged Tuna market.

3         88.   Throughout the Relevant Period, there was a continuous and

4   uninterrupted flow of invoices for payment, payments, and other documents

5   essential to the sale of Packaged Tuna in interstate commerce between and among

6   offices of Defendants and their customers located throughout the United States, its

7   territories and the District of Columbia.

8         89.   Throughout the Relevant Period, Defendants transported substantial

9   amounts of Packaged Tuna in a continuous and uninterrupted flow of interstate

10   commerce throughout the United States, its territories and the District of Columbia.

11         90.   Throughout the Relevant Period, Defendants' unlawful activities, as

12   described herein, took place within and substantially affected the flow of interstate

13   commerce and had a direct, substantial and reasonably foreseeable effect upon

14   commerce in the United States, its territories and the District of Columbia.

## VII.   FACTUAL ALLEGATIONS

### A.   Background

17         91.   Packaged Tuna is composed of raw seafood processed to preserve and

18   enhance flavor, and ensure product safety. Because it is typically caught far

19   offshore, raw seafood is usually delivered to canneries frozen or refrigerated.

20         92.   Upon delivery to a processing plant, an initial quality control

21   inspection is performed to ensure the seafood is stored and transported at the

22   proper temperature, and is in acceptable condition. The seafood is maintained at

23   temperatures ranging from 0°C to -18°C until processed. Seafood passing the

24   initial quality control inspection is prepared for packaging.

25         93.   Accepted seafood is initially transferred to large ovens for "pre-

26   cooking." After further cleaning, the seafood is fed into filling machines where

27   product packages (either cans, pouches, or cups) are filled with pre-set amounts.

28   Filled packages are moved to sealing machines where they are closed and sealed.

94.     Each package is affixed with a permanent production code identifying plant, product, date packed, batch, and other information. Filled and sealed packages are then cooked under pressure to make the products commercially sterile.

95.     StarKist, Bumble Bee, and Chicken of the Sea sell Packaged Tuna in the United States. The United States Packaged Tuna industry generates annual sales of approximately $1.7 billion.

96.     Defendants dominated the United States market for Packaged Tuna throughout the Relevant Period, with a combined market share of 80-85%. Each Defendant's share of the market is almost identical to what it was at the beginning of the Relevant Period: StarKist (40-44%); Bumble Bee (24-25%); and Chicken of the Sea (15-17%).

97.     After decades of growth, since 2004, demand for Packaged Tuna has been declining. From about 1950 until 2003, Packaged Tuna was the most popular seafood in the United States. In 1990, the International Trade Commission estimated that Americans consumed between one-half and two-thirds of the global supply of Packaged Tuna.

98.     Since the 1990s, health and sustainability concerns, which range from fears of mercury poisoning to fury over dolphin bycatch, have taken their toll. So, too, has a national dietary shift away from Packaged Tuna.

99.     As a result, domestic consumption of Packaged Tuna has steadily declined since 2004. Yet, as shown in Figure 1 below, which contains data through 2014 and projections thereafter, the prices, as represented by the spread between dollar sales and volume sales of Packaged Tuna, increased steadily from 2004 to 2014.

*Figure 1*



100.   In particular, Packaged Tuna saw a steady decline in U.S. per capita consumption between 2004 and 2014 (*see* Figure 2 below).

*Figure 2*



101.   In addition, the use of environmentally destructive methods of fishing, including purse seiners and fish aggregating devices ("FADs"), have led to an oversupply of skipjack. Skipjack accounts for the vast majority of tuna sold in the

United States and is often described as "light tuna." The following chart, taken from the Western & Central Pacific Fisheries Commission's 2014 "Tuna Fishery Yearbook" published in 2015 shows that annual global catches of skipjack increased between 1990 and 2014:

*__Figure 3__*



102.    Given the oversupply of raw tuna (the main ingredient in Packaged Tuna) and the decline in consumption of Packaged Tuna, one would expect rational businesses to reduce the prices of Packaged Tuna, but that did not happen. Instead, the Packaged Tuna prices paid by Plaintiffs to Bumble Bee, StarKist and Chicken of the Sea remained flat or declined from at least as early as 2001 until the collusive price increases in 2004 went into effect, at which time prices began to rise, and continued to rise throughout the duration of the conspiracy, and remained elevated well into at least 2015.

In a competitive environment, a decline in demand for a product will normally lead to a decline in the price of that product, all other things being equal. However, because Bumble Bee, StarKist, and Chicken of the Sea controlled the market and agreed with each other to fix the prices of Packaged Tuna, such prices were intentionally and collaboratively set at artificially high levels throughout the Relevant Period.

103. The price increases since August 2004 were a direct result of Defendants' conspiracy to fix the prices of Packaged Tuna in the United States. As a result, Plaintiffs paid artificially inflated prices for Packaged Tuna purchased from Bumble Bee, StarKist, and Chicken of the Sea.

## B. The DOJ's Criminal Investigation

104. On or around December 18, 2014, Thai Union announced that it intended to acquire Bumble Bee. However, regulatory proceedings concerning the proposed merger revealed Defendants had engaged in an anticompetitive price-fixing conspiracy concerning packaged seafood, including Packaged Tuna.

105. On July 23, 2015, Thai Union suspended the preferential public offering to fund its proposed acquisition of Bumble Bee in light of a criminal investigation commenced by the DOJ. Thai Union disclosed that both Bumble Bee and Chicken of the Sea had received grand jury subpoenas relating to an antitrust investigation of packaged seafood, including Packaged Tuna. The publication *Undercurrent News* reported that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ."

106. On December 3, 2015, the termination of the planned merger of Chicken of the Sea and Bumble Bee was announced. According to a DOJ press release:

> "Consumers are better off without this deal," said Assistant Attorney General Bill Baer [("Baer")] of the department's Antitrust Division. "Our investigation convinced us – and the parties knew or should have known from the get go – that the market is not functioning competitively today, and further consolidation would only make things worse."

107.   As noted above, Bumble Bee and two Bumble Bee executives have pled guilty to price-fixing Packaged Tuna, in violation of the Sherman Act.

## C.   Pattern of Collusion

108.   During the Relevant Period, the Packaged Tuna industry was rife with collusion, often stemming from the close interpersonal relationships that had developed over many years. Defendants Chicken of the Sea, Bumble Bee, and StarKist participated together in anticompetitive communications, including telephone calls (sometimes multiple times a day), text messages, emails (often using private email accounts to avoid detection), and frequent face-to-face meetings at pre-arranged locations, such as hotels and restaurants. In these meetings, emails, text messages and telephone calls, Defendants shared sensitive business and bid information, and entered into agreements to fix, raise, stabilize, and maintain prices of Packaged Tuna sold in the United States. Among other things, they agreed not to charge below a certain price, and to coordinate price increases.

109.   Defendants had ample opportunities for collusion. Senior executives from Del Monte, StarKist, Bumble Bee, Chicken of the Sea, Dongwon, and Thai Union routinely attended trade shows and conferences during which they discussed Packaged Tuna pricing and other aspects of their anticompetitive conspiracy. Defendants regularly attended the multi-day biannual Infofish "tuna conference" — typically held in Bangkok, but never held in the United States (where there is more active antitrust enforcement) — as well as regular meetings of the International Seafood Sustainability Foundation ("ISSF") and its governing body, the International Seafood Sustainability Association. Defendants also collaborated on many projects during the Relevant Period, including their joint "Tuna the Wonderfish" advertising campaign, the National Fisheries Institute's ("NFI") Tuna Council (formerly known as the U.S. Tuna Foundation), and the collective efforts of the ISSF.

110. Frequent international trade meetings provided opportunities for fostering warm relationships with competitors and ultimately facilitated high-level collusion. REDACTED

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

111. Meetings hosted by the NFI and ISSF were typically limited to Defendants' high-level executives, and perhaps one organizer from the trade associations. The organizers often had roots in the defendant companies. REDACTED

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

112. For example, the NFI's "Tuna the Wonderfish" advertising campaign, which ran from early 2011 through early 2012, was designed to stem the tide of declining sales of Packaged Tuna in the United States. The "Tuna the Wonderfish" campaign gave Defendants ample opportunities to conspire to raise and fix Packaged Tuna prices. Although the campaign was unsuccessful in boosting consumption, Defendants nonetheless jointly implemented price increases at least three times in 2011 and 2012 in the face of falling demand.

113.   There also were numerous interlocking relationships between Chicken of the Sea, Bumble Bee, and StarKist, which fostered frequent high-level discussions among the leadership of these companies. For example, between the late 1990s and 2009, StarKist and Chicken of the Sea had a co-packing agreement concerning their facilities in American Samoa.

114.   During the Relevant Period, Bumble Bee and Chicken of the Sea also co-operated on seafood processing and packaging. Bumble Bee co-packed for Chicken of the Sea on the west coast at Bumble Bee's Santa Fe Springs, California plant, while Chicken of the Sea co-packed for Bumble Bee on the east coast at its Lyons, Georgia plant.

115.   During the Relevant Period, it was commonplace for former executives of one Defendant to later become executives at their former competitors. Within the past 20 years, numerous individuals have held executive or senior sales/marketing positions for more than one Defendant (while maintaining close interlocking relations with former colleagues), including, but not limited to: Chris Lischewski (VP of Procurement at StarKist from 1991 to 1998, and then President and CEO of Bumble Bee, from 1999 to present); Jan Tharp (Sr. VP of Supply Chain at StarKist, from December 2008 to July 2010, Sr. VP, Operations at Bumble Bee, from July 2010 to September 2012, and then Executive VP/COO at Bumble Bee, from September 2012 to present); J. Douglas Hines (Sr. VP, Sales & Marketing at Chicken of the Sea in the 1990s, joining Bumble Bee in 1997, where he served as Bumble Bee's Executive VP and COO from September 2008 to September 2012); Joseph Clancy (VP Sales/Marketing at StarKist, from 1985 to 2002, and then VP Retail Sales at Chicken of the Sea, from November 2002 to December 2010); Kevin McClain (VP of Supply Chain at Chicken of the Sea, from 1979 to 2009, and then VP Resourcing at Bumble Bee, from 2009 to present); David Burt (General Manager – Marketing at StarKist from 2000 to 2004, and then VP Sales Specialty Markets at Bumble Bee, from March 2004 to present); Hubert

Tucker (Sales Manager at Chicken of the Sea, from December 1997 to July 2012 and then Starkist's Director of Sales Eastern Zone, from July 2012 to present); Donald Stanton (General Manager Inventory Control at StarKist, from 1985 to 2001 and then VP Supply Chain at Bumble Bee, from October 2005 to January 2009); and Dennis Hixson (VP Sales Specialty Markets at Chicken of the Sea, from 2005 to 2013, and then Sr. Retail Operations Manager at StarKist, from 2014 to present).

116.   The fluid movement of executives among Defendants resulted in a web of personal and professional relationships that facilitated anticompetitive agreements and frequent exchanges of confidential and future price information.

117.   W. Scott Cameron, who recently pled guilty to price-fixing Packaged Tuna, has held senior sales positions at Bumble Bee since May 2000 and has served as Bumble Bee's Sr. VP of Sales since May 2007.   He frequently shared future pricing and customer information with the leadership of Chicken of the Sea and StarKist.   From October 2009 to September 2012, Cameron regularly communicated with Charles "Chuck" Handford, StarKist's VP of Trade Marketing, about future pricing and customer information, sometimes several times per day.

118.   During the Relevant Period, Cameron held frequent internal sales conference calls at Bumble Bee attended by numerous account managers. During these calls, he stated, inter alia, that he had been communicating with Chuck Handford of StarKist about future pricing for customers.

119.   During the Relevant Period, Bumble Bee's Cameron also spoke about future pricing with Frank Connelly, who was a Chicken of the Sea regional sales manager from at least 2000 until his death in April 2012.

120.   Chris Lischewski, President and CEO of Bumble Bee from 1999 to present, regularly had meetings at his office with Chicken of the Sea executives. He also had discussions with StarKist executives by phone.   Among others, Lischewski spoke frequently with Dennis Mussell Chicken of the Sea President

1    and CEO prior to 2005, John Signorino, Chicken of the Sea President and CEO,
2    from January 2005 to October 2007, Shue Wing Chan (Signorino's successor after
3    October 2007), and Don Binotto of Del Monte/StarKist (StarKist CEO from the
4    1990s through November 2010) to agree on pricing and customers.  Lischewski
5    and Kenneth Worsham, Sr. VP of Marketing at Bumble Bee since at least 2001,
6    regularly attended meetings with Chicken of the Sea and StarKist executives.
7    Lischewski attended meetings with competitors at least twice a year.

8         121.   During the Relevant Period, Kenneth Worsham, Bumble Bee's Sr. VP
9    of Marketing since at least 2001, frequently discussed future pricing and shared
10   customer opportunities with his father, Bob Worsham, a StarKist pricing
11   consultant since the 1980s, and then shared StarKist's future pricing information
12   with executives at Bumble Bee. Kenneth Worsham recently pled guilty to price-
13   fixing Packaged Tuna.

14        122.   During the Relevant Period, Bumble Bee's Don George discussed
15   future pricing with former Chicken of the Sea associates, including Mike White.
16   Don George was Sr. VP of Trade Marketing and Innovation at Chicken of the Sea
17   from June 1979 until May 2006, when he became VP of Trade Marketing at
18   Bumble Bee.

19        123.   During the Relevant Period, Chicken of the Sea held weekly executive
20   meetings on Fridays at 10:00 a.m. They were led by its CEO (John Signorino and
21   later Shue Wing Chan), and attended by all department heads, including John
22   Sawyer, Sr. VP Sales and Marketing, from 2006 until August 2013; Bob Blatt,
23   CFO from the late 1990s to 2013; Jim Davet, Sr. VP Operations, from 2005 until
24   2008; Mike White, Director of Marketing since the late 1980s; and Kevin
25   McClain, VP of Supply Chain until 2009.  At these meetings Sawyer, White, and
26   Signorino/Chan discussed competitors' future price increases for Packaged Tuna
27   products. On multiple occasions, Sawyer presented the group with StarKist's

28

1  future price lists (described as "market intelligence"), which Sawyer received from
2  StarKist.

3     124.   During the Relevant Period, Mike White, Chicken of the Sea's
4  Director of Marketing since the late 1980s, regularly contacted his counterparts at
5  StarKist (including Joseph Tuza, a Del Monte executive and StarKist Sr. VP of
6  Marketing, from August 2008 until November 2011), and Bumble Bee to confirm
7  price quotations that customers claimed to have received from his competitors.

8     **D.     Defendants' Overarching and Continuous Collusive Scheme**

9     125.   Defendants' overarching and continuous scheme to fix prices for
10  Packaged Tuna began at least as early as 2004, as demonstrated by the following
11  specific examples:

12         **1.     Collusion on Light Meat and White Meat Tuna Price**
13                 **Increases in 2004 and 2006**

14  126.   REDACTED

23  127.   REDACTED

27  128.   REDACTED

1    REDACTED

2

3

4

5

6

7    129.    REDACTED

8

9

10

11

12

13

14

15

16

17

18

19

20    130.    REDACTED

21

22

23

24

25

26

27

28

1   REDACTED ████████████████████████████████████████

2   ████████████

3       131.  As a result of the discussions among the Chicken of the Sea, Bumble

4   Bee and Del Monte/StarKist executives and employees between March and May

5   2004, a conscious commitment to an unlawful common scheme, *i.e.*, an agreement,

6   developed among Defendants and co-conspirators to increase prices of canned tuna

7   sold to Plaintiffs and others in the U.S. by, among other conduct, coordinating

8   price increase announcements or pricing terms, secretly and collusively

9   exchanging pricing information and prospective pricing announcements and

10  business plans, and collectively reducing quantity and restraining output.

11      132.  REDACTED ████████████████████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████

23      133.  REDACTED ████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28



134. REDACTED

135. REDACTED

REDACTED

REDACTED

136.   Pursuant to their agreement, all three brands, Chicken of the Sea, Bumble Bee, and StarKist, increased their net prices on light and white meat Packaged Tuna in June and July of 2004. This was followed by a list price increase by each Defendant that was announced in late August and early September of 2004. By September 2, 2004, Bumble Bee, StarKist, and Chicken of the Sea had all collusively raised list prices on light meat Packaged Tuna by an additional $2.00 per case in accordance with their unlawful agreement to increase Packaged Tuna prices to Plaintiffs and others in the United States.

137.   REDACTED

138.   REDACTED

139.   REDACTED



140. REDACTED

141. REDACTED

142. REDACTED

143. REDACTED

4 REDACTED

1    144.   REDACTED

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    REDACTED

17

18

19

20    145.   REDACTED

21

22

23

24

25

26

27    REDACTED

28

SECOND AMENDED CONSOLIDATED          41          Case No. 15-MD-2670 JLS (MDD)
ACTION COMPLAINT



146. REDACTED

148. REDACTED

149. REDACTED

5 REDACTED

1   REDACTED

2

3

4   150.   REDACTED

5

6

7

8   151.   REDACTED

9

10

11

12

13

14

15

16

17        **2.    Collusion on Package Size Changes in 2007-08**

18   152.   REDACTED

19

20

21

22

23

24

25

26   153.   REDACTED

27

28



1   REDACTED

5   154.   REDACTED

11   155.   REDACTED

21   156.   REDACTED

25   REDACTED



1  REDACTED

5  157.  REDACTED

16  158.  REDACTED

25  159.  REDACTED

1   REDACTED

2

3   160.   REDACTED

4

5

6

7

8

9

10

11

12   161.   REDACTED

13

14

15

16

17

18

19   162.   REDACTED

20

21

22

23   163.   REDACTED

24

25

26

27   164.   REDACTED

28

REDACTED

165.   REDACTED

166.   As discussed above, any Defendant that downsized their packages unilaterally would have faced fierce customer backlash and market share loss.

REDACTED

167.   REDACTED

1    REDACTED

2    

3    168.   REDACTED

4    

5    

6    

7    

8    

9    

10   

11   

12   

13   

14   169.   REDACTED

15   

16   

17   

18   

19   

20   

21   

22   

23   

24   

25   Chicken

26   of the Sea and Del Monte/StarKist began distributing five ounce cans of tuna to

27   replace their six ounce cans, as well as downsized pouched tuna. The size change

28   increased the price per ounce of packaged tuna sold to Plaintiffs by 20 percent. In



1    addition, as detailed below, by the time the downsize was announced, Defendants

2    were colluding on a list price increase.

3    171.   REDACTED



8

9    172.   REDACTED

13

14    173.   REDACTED

17

18    174.   REDACTED

23

24    REDACTED

26

27    176.   As reflected above, Thai Union authorized Chicken of the Sea to go

28    forward with the collusive downsizing scheme.

### 3. Collusion on 2008 List Price Increases

177. Not content with making customers pay the same amount for a smaller package of tuna, Defendants also colluded to raise list prices for Packaged Tuna in 2008.

178. REDACTED

179. REDACTED

180. REDACTED

181. REDACTED



182. REDACTED

183. REDACTED

184. REDACTED

185. Del Monte, Chicken of the Sea, and Bumble Bee issued list price increases in the third quarter of 2008, many of which were nearly identical for various types of Packaged Tuna. Bumble Bee's list was issued on or around June 27, 2008, effective September 29, 2008. Chicken of the Sea advised its customers of its list price increase on or around July 3, 2008, effective September 1, 2008. On

1   or around June 17, 2008, Del Monte issued a list price increase effective July 21,

2   2008.

186.   REDACTED

**4.      Collusion on 2010 Net Price Increases**

187.   REDACTED

188.   REDACTED

189.   REDACTED



190. REDACTED

191. REDACTED

192. REDACTED

193. REDACTED

194.   REDACTED

195.   REDACTED

196.   REDACTED

197.   REDACTED

198.   REDACTED

1    199.   REDACTED ████████████████████████████████
2   ██████████████████████████████████████████████████
3   ██████████████████████████████████████████████████
4   ██████████████████████████████████████████████████
5   ██████████████████████████████████████████████████
6   ██████████████████████████████████████████████████
7   ████████

8    200.   REDACTED ████████████████████████████████
9   ██████████████████████████████████████████████████
10  ████████████████████████████

11   201.   REDACTED ████████████████████████████████
12  ██████████████████████████████████████████████████
13  ██████████████████████████████████████████████████
14  ██████████████████████

15   202.   REDACTED ████████████████████████████████
16  ██████████████████████████████

17   203.   On or about May 21, 2010, Bumble Bee issued its net price increase

18  letter, which was effective in or around August 2010. All of the net price increase

19  announcements were set at nearly identical levels. Like StarKist and Chicken of

20  the Sea, Bumble Bee pretextually blamed fishing restrictions for its price increases.

21           **5.    Collusion on 2011 Price Increases**

22   204.   REDACTED ████████████████████████████████
23  ██████████████████████████████████████████████████
24  ██████████████████████████████████████████████████
25  ██████████████████████████████████████████████████
26  ██████████████████████████████████████████████████
27  ████████████████████████████████████████████████out

28



205.

206.

207.

208.

209.

56   Case No. 15-MD-2670 JLS (MDD)

210.   REDACTED

211.   REDACTED

212.   REDACTED

213.   REDACTED

214.   REDACTED

215.   On or around March 10, 2011, Bumble Bee announced to its brokers "broad scale list price increases" across many of its Packaged Tuna products, effective May 29, 2011, citing cost increases "with no signs of relief in the near future."

216.   REDACTED



217. REDACTED

218. REDACTED

219. REDACTED

220. REDACTED

221. REDACTED

REDACTED

222. As set out above, by exchanging pricing information among high-level executives, the erstwhile competitors were able to police whether each was adhering to their agreement.

223. REDACTED

### 6. Collusion on List Price Increases In 2011-12

224. REDACTED

225. REDACTED



REDACTED

226.  REDACTED

227.  REDACTED

228.  The 2008-12 list price increases set benchmarks that affected all of Defendants' subsequent Packaged Tuna list prices. However, the Defendants' Packaged Tuna collusion did not stop after the March 2012 price increase.

229. REDACTED

230. REDACTED

231. REDACTED

### 7.   Collusion on Offering "FAD Free" Branded Tuna Products

232.   Defendants also conspired not to compete by collectively agreeing not to offer branded tuna products labeled as being "FAD free." FAD-free tuna is tuna caught without the use of fish aggregation devices. Because FADs are considered



unsustainable and destructive to ocean ecosystems, there is a growing demand among consumers for FAD-free tuna. However, FAD-free methods of catching tuna are costly. Defendants saw FAD-free tuna as a threat to their selling margins. However, if any one Defendant put out such a product, the others would have to follow or risk losing sales.

233.  REDACTED

234.  REDACTED

REDACTED

235.  REDACTED

REDACTED

236. REDACTED

237. Defendants' agreement not to compete by producing branded tuna labeled "FAD Free" ensured that FAD-free tuna, which would be more costly to produce and have a lower profit margin, did not cannibalize sales of their non-FAD-free tuna products that were the subject of their price-fixing conspiracy.

### 8. Collusion on Promotional Activity

238. REDACTED

## VIII. THE UNITED STATES PACKAGED SEAFOOD MARKET IS CONDUCIVE TO COLLUSION

239. The structure and characteristics of the Packaged Tuna market in the United States are conducive to a price-fixing agreement.

240.   Packaged Tuna is a commodity product sold directly to retail grocery chains, grocery wholesalers, and food distributors. Packaged Tuna varieties contain similar amounts of seafood, and are marketed in packages, including, but not limited to, cans, pouches, and cups. Purchasers of Packaged Tuna are more likely to be influenced by price than anything else when making a purchasing decision.

241.   There are substantial barriers precluding, or reducing, entry into the Packaged Tuna market, including high start-up costs (processing plants can cost tens of millions of dollars to build and maintain), manufacturing expertise, access to raw materials, and access to distribution channels. Therefore, Bumble Bee, Chicken of the Sea, and StarKist (and the related entities named herein) could collectively raise prices, and, in fact, raised prices, without fear of being undercut by new entrants.

242.   Purchasers routinely have sourced and do source virtually all their Packaged Tuna from Bumble Bee, Chicken of the Sea, and StarKist. Retailers and distributors must carry Defendants' product lines in order to stay competitive in the markets in which they do business. As a result, Bumble Bee, StarKist, and Chicken of the Sea dominated the United States Packaged Tuna market during the Relevant Period, and continue to do so.

243.   Defendants possessed significant market power to raise prices for Packaged Tuna above competitive levels in the United States with a combined market share of 80-85% during 2004-2015. Upon information and belief, they conspired to ensure the stabilization and maintenance of their respective market shares in the Packaged Tuna market despite declining demand.

244.   There are no economically reasonable substitutes for Packaged Tuna. Alternative forms of seafood, such as frozen seafood or fresh seafood, require refrigeration and preparation, such as cooking, before they can be consumed, and lack the convenience, consistent portion size, and ease of use of Packaged Tuna.

## IX.     PLAINTIFFS SUFFERED ANTITRUST INJURY

245.     During the Relevant Period, Defendants' conspiracy had the following effects, among others:

a.     Price competition was restrained or eliminated with respect to Packaged Tuna; and

b.     The prices of Packaged Tuna were fixed, raised, maintained, or stabilized at artificially inflated levels.

246.     During the Relevant Period, Defendants charged supra-competitive prices for Packaged Tuna sold to Plaintiffs. By reason of Defendants' alleged violations of the antitrust laws, Plaintiffs sustained damages, injury, and harm to their businesses or property in an amount to be determined, having paid higher prices for Packaged Tuna than they otherwise would have paid absent Defendants' alleged illegal contract, combination, or conspiracy. This is an antitrust injury of the type the antitrust laws were meant to punish and prevent.

## X.     TOLLING OF THE STATUTE OF LIMITATIONS

247.     Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claims for relief.

248.     Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least July 2015. Indeed, the conspiracy was so organized and effective that it was only accidentally discovered by the DOJ in the process of reviewing internal company documents relating to the proposed merger between Chicken of the Sea and Bumble Bee.

249.     Defendants engaged in a secret conspiracy and did not reveal facts that would put Plaintiffs on inquiry notice that there was an agreement to fix prices for Packaged Tuna. Defendants' collusive communications were conducted through private meetings, telephone calls, text messages, and emails between and among their executives that were not intended to be disclosed and were not

1   disclosed beyond an inner circle of trusted high-level colleagues. Defendants'
2   communications with customers also offered plausible pretextual reasons for their
3   similar price movements, Plaintiffs did not discover, and could not have discovered
4   through the exercise of reasonable diligence, the existence of the conspiracy, and
5   Defendants' and their co-conspirators' involvement in the conspiracy, until July
6   23, 2015, when the DOJ's investigation first became public.

7   250.   REDACTED

8   
9   
10   

11   251.   Because the conspiracy was actively concealed through secret
12   communications among Defendants and pretextual communications to customers
13   until July 23, 2015, Plaintiffs were unaware of Defendants' and their co-
14   conspirators' unlawful conduct, and did not know they were paying artificially
15   high prices for Packaged Tuna.

16   252.   The affirmative acts of Defendants and their co-conspirators,
17   including acts in furtherance of the conspiracy, were wrongfully concealed and
18   carried out in a manner that precluded detection.

19   253.   Defendants and their co-conspirators agreed among themselves not to
20   discuss publicly, or otherwise reveal, the nature and substance of the acts and
21   communications in furtherance of their illegal conspiracy.

22   254.   Defendants and their co-conspirators met and communicated secretly
23   concerning the pricing and marketing of Packaged Tuna to avoid detection.

24   255.   Throughout the Relevant Period, Defendants secretly agreed to
25   implement very similar or identical price increases on Packaged Tuna at similar
26   times. To avoid detection by their customers, including Plaintiffs, Defendants
27   issued announcements and made other communications to the market that were
28   intended to mislead their customers, including Plaintiffs, into believing that the

1   pricing actions were taken independently by each Defendant because of cost

2   increases that Defendants falsely claimed were unavoidable and industry-wide.

3   256.   REDACTED

256. REDACTED

257. REDACTED

258. REDACTED

REDACTED

259.   On September 2, 2004, Del Monte (at the time the owner of StarKist and the issuer of all StarKist price increases) held an earnings conference call on which its Chair, Rick Wolford, pretextually attributed the joint price increases not to collusion, but to a "similar experience that we all have with tight Skipjack as well as tight albacore supplies."

260.   REDACTED

261.   Plaintiffs accepted and relied on the proffered reasons for the price increases, in some cases incorporating the explanation into their contemporaneous internal communications about why all three suppliers were increasing their prices in very similar amounts. For example, on September 24, 2004, after receiving Defendants' misleading communications, Plaintiff Unified Grocers, Inc. circulated an internal memo advising of the joint increase, attributing its cause to the explanation provided by the suppliers: "dwindling Fish supplies and additional cost pressures.".

262.   REDACTED



266. REDACTED

267. REDACTED

268. REDACTED

1  REDACTED

2

3

4      269.   REDACTED

5

6

7

8

9

10

11

12      270.   On or around June 6, 2008, Chicken of the Sea sent a letter to its

13  brokers giving the following rationale for price increases that occurred at the same

14  time as the downsizing (prices were increased for remaining 6 oz. cans, and the

15  price for 5 oz. cans was set at the same level as the price for the 6 oz. cans):

16

17          [l]ight meat tuna raw material prices have gone up over
            $1,000 MT over the last two years.   Prices are not
18          expected to retreat due to the strong worldwide demand
            and a weak Dollar.  Combine this fact with increases in
19          production and supply chain costs Chicken of the Sea is
            announcing a list price increase on all chunk light tuna
20          items.. . .
21

22  The letter also cited the following "increases unrelated to fish price: 15% increase

23  in packaging; 29.5% increase in land and ocean freight; 30.0% increase in cannery

24  utility; 33.3% increase in labor."

25      271.   Similarly, a published article at the time of the announcement of the

26  can resizing stated that "a customer service representative for StarKist that

27  explained that tuna prices have reached an all-time high, and coupled with the

28  increased costs of transportation and other ingredients, they had to make a

SECOND AMENDED CONSOLIDATED          71          Case No. 15-MD-2670 JLS (MDD)
ACTION COMPLAINT

change." And another article said "in August of 2008 when the move had been implemented, StarKist stated that it did this primarily for environmental reasons, including the purpose of "sav[ing] two million gallons of water a year, while only taking out two teaspoons of tuna from each can." The existence of a price-fixing conspiracy as a reason for the price increase was not disclosed.

272.   On August 27, 2008, Del Monte issued a price announcement to all of its "Valued Customers," advising of a StarKist price increase, effective November 3, 2008, due to "continued escalation of global Tuna fish prices," and stating that "[o]ver the next several days our sales agency and/or local sales management will be in contact with you to provide additional details and review plans that will continue the growth of our mutual business." In accordance with its announcement, Del Monte's agents and representatives contacted its customers over the next several months to provide detailed, but misleading, explanations for both recent and forthcoming StarKist price increases.

273.   For example, on or about October 1, 2008, Plaintiff Affiliated Foods, Inc. received a copy of a presentation from a Del Monte/StarKist sales agent falsely blaming the price increases on "significant fish price inflation since the start of 2007," and stating that additional increases would be necessary because "[s]ince the 7/21/08 price increase, fish costs have continued to increase. Light Meat costs are up an additional 18% and White Meat costs are up an additional 14%," driven in part by "high fuel costs."  Del Monte/StarKist's statements were misleading because they failed to disclose that the true reason for the increase was Defendants' illegal agreement.

274.   REDACTED

275.   The 2008 collusive price increase agreement was particularly difficult to detect because it was formed through meetings in Bangkok and phone calls

1    between a close-knit group of high-level executives at the competing firms. The

2    close ties and trust among executives, many of whom had previously worked

3    together before moving to competing firms, made discovery of the conspiracy by

4    their customers impossible.

5        276.   Pretextual and misleading reasons for price increases were included in

6    Defendants' communications with Plaintiffs about Packaged Tuna price increases

7    throughout the Relevant Period.

8        277.   REDACTED

9

10

11

12

13

14

15

16       278.   REDACTED

17

18

19

20       279.   In its March 2011 announcement of a price increase effective in May

21    2011, StarKist cited increases in "Crude index," "Packaging costs," and "Fish

22    costs." In its January 2012 announcement of a price increase effective March 2012,

23    StarKist cited increases in the costs of crude oil, metal, and transportation, as well

24    as "Record high fish costs." Chicken of the Sea, in its January 2012 announcement

25    of a price increase effective March 2012, placed the blame on "High fish prices"

26    and "higher raw material costs." Again in its March 30, 2012 announcement to

27    "Our Valued Customers" of another price increase effective July 2012, Bumble

28    Bee cited "global inflation, transportation cost increases stemming from global

demand on fossil fuel, and resource materials (most notably on fish)." And StarKist, in its April 2012 announcement to "Our Valued Customers" of a price increase, effective in July 2012, cited "numerous costs increases" and escalating "fish costs" as the reasons for the price increase.   These statements were misleading because they failed to disclose the true reason for the increase was Defendants' illegal agreement.

280.   In connection with the 2011-12 price increases discussed above, Chicken of the Sea, StarKist, and Bumble Bee interacted mostly through telephonic communications, emails sent from private accounts with misleading subject lines, or face-to-face meetings, as described above. By these means, Defendants ensured that a written record of their interactions with each other concerning this price increase was not created.  There was no way Plaintiffs could have discovered the existence of these communications any earlier than they did.

281.   None of these communications ever mentioned Defendants' collusion or the fact that, as DOJ's Bill Baer stated in December 2015, their industry was "not functioning competitively."

282.   The guilty plea of Kenneth Worsham of Bumble Bee further raises the inference that the conspiracy was affirmatively concealed. Kenneth Worsham is the son of Robert Worsham, who was a pricing consultant for StarKist and, as alleged above, participated in the 2008 agreement to increase list prices for Packaged Tuna. The involvement of both father and son in the collusive activity provided Defendants with an avenue to pass competitive information in private with no need to present an explanation for why they were meeting and communicating.

283.   Plaintiffs could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and secrecy techniques employed by Defendants and their co-conspirators so as to avoid detection of, and fraudulently conceal, their contract,

combination, or conspiracy. Defendants' conspiracy was fraudulently concealed by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers, utilization of personal email accounts, and surreptitious communications among themselves and their co-conspirators via telephone and in-person meetings so as to prevent the existence of written records.

284. Because the alleged conspiracy was affirmatively concealed by Defendants and their co-conspirators until July 23, 2015, Plaintiffs had no knowledge of it, or any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

285. None of the facts or information available to Plaintiffs prior to July 23, 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy prior to July 23, 2015.

286. Defendants thus actively misled their customers about the price-fixing scheme. Their various justifications for price increases did not disclose that they had agreed among themselves to fix, raise or stabilize the price of Packaged Tuna. Defendants' justifications for their price increases were also misleading, to the extent they were true even in part, because they failed to disclose that the price increases in fact resulted from their illegal agreement and conspiracy.

287. Because Defendants' agreement, understanding and conspiracy was kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein, and did not know they were paying artificially high prices for Packaged Tuna during the Relevant Period.

288. As a result of Defendants' and their co-conspirators' fraudulent concealment of the price-fixing conspiracy, the running of any statute of limitations is tolled with respect to Plaintiffs' claims of anticompetitive conduct alleged in this complaint.

## XI.   DISCOVERY IS NECESSARY TO DETERMINE THE FULL SCOPE OF THE CONSPIRACY

289.   Discovery is necessary to determine the full scope of the conspiracy, including the time frame, products and participants.  Plaintiffs reserve the right to amend or supplement this Complaint to add other Defendants, claims, time periods, products, or other allegations based upon discovery and further investigation.  While there has not been sufficient time thus far to review all the documents produced by Defendants to date, Defendants' and non-parties will produce more documents, and discovery is just starting in earnest. However, there are documents produced by Defendants that reveal communication and possible coordination between at least two Defendants regarding certain other packaged seafood products, including shelf-stable packaged salmon and specialty seafood products (shelf-stable packaged clams, mackerel, oysters, shrimp, and sardines) dating back to at least 2006. For example, REDACTED

.

## COUNT I

## VIOLATION OF THE SHERMAN ACT § 1

290.   Defendants and their co-conspirators entered into, and engaged in, a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

291.   Defendants' anticompetitive acts were intentional, were directed at the United States Packaged Tuna market, and had a substantial and foreseeable effect on interstate commerce by raising and fixing Packaged Tuna prices throughout the United States.

292.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States and upon import commerce:

a.   Prices charged to, and paid by, Plaintiffs for Packaged Tuna were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

b.   Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States Packaged Tuna market; and

c.   Competition in establishing the prices paid for Packaged Tuna was unlawfully restrained, suppressed, or eliminated.

293.   Defendants' and their co-conspirators' anticompetitive activities directly and proximately caused injury and harm to Plaintiffs in the United States.

294.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs paid artificially inflated prices for Packaged Tuna.

295.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs were damaged in their businesses or property by paying prices for Packaged Tuna that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

A.   Adjudge and decree that Defendants' unlawful contract, combination, or conspiracy constituted a per se violation of Section 1 of the Sherman Act;

B.   Enter judgment against Defendants, jointly and severally, in favor of Plaintiffs for treble damages determined to have been sustained by Plaintiffs by virtue of Defendants' and their co-conspirators' violations of the Sherman Act;

D.   Award Plaintiffs their attorneys' fees, litigation expenses, court costs, and pre-judgment and post-judgment interest at the highest rates permitted by United States law; and

SECOND AMENDED CONSOLIDATED
ACTION COMPLAINT
77
Case No. 15-MD-2670 JLS (MDD)

1     E.     Grant Plaintiffs such other and further relief as the case may require,

2  or as the Court deems just and proper under the circumstances.

3                     **JURY DEMAND**

4     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial

5  by jury.

6

7  Dated:  May 8, 2017

8                   **KAPLAN FOX & KILSHEIMER LLP**

9                   By:   /s/ *Laurence D. King*

10                     Laurence D. King

11                Laurence D. King (SBN 206423)

12                Mario M. Choi (SBN 243409)

13                350 Sansome Street, Suite 400

                   San Francisco, CA 94104

14                Telephone:  415-772-4700

15                Facsimile:   415-772-4707

                   Email: lking@kaplanfox.com

16                Email: mchoi@kaplanfox.com

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Gregory K. Arenson
Richard J. Kilsheimer
Elana Katcher
Matthew P. McCahill
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: rkaplan@kaplanfox.com
Email: garenson@kaplanfox.com
Email: rkilsheimer@kaplanfox.com
Email: ekatcher@kaplanfox.com
Email: mmccahill@kaplanfox.com

12

13

14

15

16

17

**HAJJAR PETERS, LLP**
Johnny K. Merritt
3144 Bee Cave Road
Austin, TX 78746
Telephone: (512) 637-4956
Facsimile: (512) 637-4958
Email: jmerritt@legalstrategy.com

18

19

20

21

22

23

**THE COFFMAN LAW FIRM**
Richard L. Coffman
First City Building
505 Orleans St., Fifth Floor
Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MARCUS & SHAPIRA LLP**
Bernard D. Marcus
Moira C. Cain-Mannix
Erin Gibson Allen
One Oxford Center, 35th Floor
Pittsburgh, PA 15219
Telephone: (412) 471-3490
Facsimile: (412) 391-8758
Email: marcus@marcus-shapira.com
Email: cain-mannix@marcus-shapira.com
Email: allen@marcus-shapira.com

**MAURIELLO LAW FIRM, APC**
Thomas D. Mauriello
1181 Puerta Del Sol, #120
San Clemente, CA 92673
Telephone: (949) 542-3555
Facsimile: (949) 606-9690
Email:  tomm@maurlaw.com

**WILLIAMS MONTGOMERY & JOHN, LTD.**
Eric R. Lifvendahl
233 S. Wacker Drive, Suite 6100
Chicago, IL 60606
Telephone: (312) 443-3230
Facsimile: (312) 630-8530
Email: ERL@willmont.com

**ANDERSON KILL, P.C.**
Lawrence Kill
Linda Gerstel
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 278-1722
Facsimile: (212) 278-1733
Email: lkill@andersonkill.com

*Attorneys for Plaintiffs*