1  Linda P. Nussbaum
   Susan R. Schwaiger
2  NUSSBAUM LAW GROUP, P.C.
   1211 Avenue of the Americas
3  40th Floor
   New York, NY 10036-8718
4  Tel:   (917) 438-9189
   E-mail: lnussbaum@nussbaumpc.com
5          sschwaiger@nussbaumpc.com

6  *Attorneys for Direct Action Plaintiff Wegmans Food Markets, Inc.*

7

8

9  | IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No. 15-md-2670-JLS-MDD |
10 |  |  |
11 | This Document Relates to: | Judge: Janis L. Sammartino |
12 | *Wegmans Food Markets, Inc. v. Bumble Bee Foods LLC, et al*, Case No. 3:16cv00264 (JLS) (MDD) | **FILED UNDER SEAL** |
13 |  |  |

14

15                    **WEGMANS' SECOND AMENDED COMPLAINT**

16

17

18

19                          **FILED UNDER SEAL**

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.  NATURE OF ACTION ...................................................................................1

II.  BACKGROUND ..........................................................................................2

III.  VENUE AND JURISDICTION ...................................................................8

IV.  PARTIES ....................................................................................................11

    A.  Plaintiff ..............................................................................................11

    B.  Defendants .........................................................................................12

    (i)  Bumble Bee ........................................................................................12

    (ii)  The StarKist Defendants ...................................................................13

    (iii) The Chicken of the Sea Defendants ..................................................23

    C.  Co-Conspirators and Agents ..............................................................29

V.  TRADE AND COMMERCE .......................................................................30

VI.  THE PRODUCTION OF CANNED TUNA ..............................................31

VII.  TUNA SUPPLY, DEMAND, AND PRICING ...........................................32

    A.  The Supply of Canning-Grade Tuna Increased Substantially ..................32

    B.  The Demand for Canned Tuna in the United States Decreased
        Substantially ........................................................................................34

    C.  Prices Paid for Canned Tuna Increased Substantially as a Result of
        Defendants' Conspiracy ......................................................................35

    D.  Defendants' Pricing of Canned Tuna to Plaintiff and Others Was
        Against Defendants' Self-Interest But For Their Collusion ....................38

VIII. THE MARKET FOR THE PRODUCTION AND SALE OF CANNED TUNA
       WAS CONDUCIVE TO CARTELIZATION ..................................................39

    A.  There Are No Close Substitutes for Canned Tuna ....................................39

    B.  The Market for the Processing and Sale of Canned Tuna Is/Was
        Concentrated ........................................................................................39

    C.  Barriers to Entry ................................................................................40

    D.  Prevailing Supply and Demand Factors Incentivized Collusion ..............40

    E.  The Transfer of Executives Between Defendants Facilitated
        Collusion .............................................................................................41

F.      Select Trade Associations Facilitated Collusion ........................42

G.      Common Vendors and Co-Packing Arrangements Facilitated
        Collusion and Enforcement of the Cartel ..................................43

IX.   ADDITIONAL OVERT ACTS IN DEFENDANTS' CANNED TUNA
      CONSPIRACY .........................................................................................44

A.      Defendants' Collusive Price Increases Between 2004-2006 ....................44

B.      Defendants' Collusive Can Size Reduction and Price Increases in
        2007-2008 ...................................................................................51

C.      Defendants Collude on Net Prices in 2010.................................................57

D.      Defendants Colluded to Increase Canned Tuna Prices in 2011 ...............60

E.      Defendants Colluded on a Canned Tuna Price Increase in 2012 .............62

F.      Defendants' Collusion Not to Sell "FAD-Free" Branded Tuna
        Products in 2011 and Thereafter....................................................63

G.      Defendants Colluded on Promotional Activity and Pricing Terms in
        at Least 2011-2013 .......................................................................65

H.      Defendants' Communications in Furtherance of the Conspiracy
        After 2013 ..................................................................................65

I.      Defendants' Conspiracy Was Effective...........................................66

X.    DOJ INVESTIGATION AND AMNESTY APPLICATION .........................67

XI.   DISCOVERY IS NECESSARY TO DETERMINE THE FULL SCOPE OF
      THE CONSPIRACY ................................................................................69

XII.  TOLLING OF THE STATUTE OF LIMITATIONS ......................................69

XIII. ANTITRUST VIOLATIONS.........................................................................80

XIV.  PRAYER FOR RELIEF ............................................................................83

Plaintiff Wegmans Food Markets, Inc. ("Plaintiff") sues Bumble Bee Foods LLC ("Bumble Bee"), StarKist Company ("StarKist"), Dongwon Industries Co. Ltd. ("Dongwon"), Del Monte Corporation ("Del Monte"), Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc. ("COSI"), and Thai Union Group PCL (f/k/a Thai Union Frozen Products PCL) ("Thai Union" or "TUG") (collectively the "Defendants"), and alleges as follows:

## I.   NATURE OF ACTION

1.      Plaintiff is a supermarket chain that was victimized by the conspiracy alleged in this Second Amended Complaint.   Plaintiff brings this antitrust action against Defendants and their co-conspirators for violating Section One of the Sherman Act, 15 U.S.C. §1, by conspiring to increase prices of canned tuna (*i.e.*, shelf-stable packaged tuna of all varieties, including, without limitation, all light meat and white meat tuna in cans and pouches) sold to Plaintiff and others in the United States by, among other conduct, coordinating price increase announcements or pricing terms, secretly and collusively exchanging pricing information and prospective pricing announcements and business plans, and collectively reducing quantity and restraining output.  Plaintiff alleges that this unlawful, continuing and overarching conspiracy (or cartel) began at a time uncertain, but at least in 2004, and continued in force or effect, or both, until approximately July 2015.  Plaintiff alleges that it was a direct purchaser of canned tuna from one or more Defendants and co-conspirators during the conspiracy and, in accordance with and during the conspiracy, Defendants and co-conspirators overcharged Plaintiff and others for canned tuna.   As a result of this unlawful conspiracy, Plaintiff seeks damages against Defendants, jointly and severally, as provided in Section 4 of the Clayton Act, 15 U.S.C. §15, and such other relief as provided by law.

## II.   **BACKGROUND**

2.     Owing to a series of mergers and acquisitions, by the early 2000s, the shelf-stable packaged seafood industry operated as an oligopoly dominated by its "Big 3" producers: Bumble Bee, StarKist and COSI.   While the Defendants and co-conspirators attempted to market their products as though they were differentiated, consumers substitute between different brands of canned tuna in response to price changes.   Further, canned tuna possessed the economic characteristics of a commodity-like product with no close substitutes.   Indeed, Defendants openly recognized that if any individual brand were priced above the competitors, then the high-priced company would quickly lose market share to the lower priced competitors.   As a result, no Defendant or its co-conspirator(s) could profit, or sustainably profit, by unilaterally increasing its prices in the U.S.

3.     Further adding to Defendants' economic challenges by 2004 was the fact that, ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Consumer demand for canned tuna was dropping, a decline that was showing no signs of abating. As a result of this decline, Defendants controlled production capacity that was substantially in excess of the demand for canned tuna in the United States.

4.     All of the Defendants recognized the challenges to each of them presented by these market conditions.  The solution, embraced by all of them in 2004, was to enter into an unlawful agreement to increase prices of canned tuna sold to Plaintiff and others in the United States by, among other conduct, coordinating price increase announcements or pricing terms, secretly and collusively exchanging pricing information and prospective pricing announcements and business plans, and collectively reducing quantity and restraining output.

---

1    5.    ███████████████████████████████████

2    ███████████████████████████████████████

3    ████████████████████████████████

4    6.    Defendants and co-conspirators implemented this conspiracy over a

5    number of years through a series of meetings and other communications.

6    7.    During the early years of the conspiracy, between 2004 and 2006,

7    Defendants and co-conspirators developed a common agreement or understanding that

8    they would follow the price increases that each issued.  In furtherance of this common

9    agreement or understanding, Defendants exchanged information on their future

10   pricing plans via telephone and other channels.  ████████████████████

11   ███████████████████████████████████████

12   ███████████████████████████████████████

13   ███████████████████████████████████████

14   ███████████████████████████████████████

15   ███████████████████████████████████████

16   ████████████████    As a result of these and other collusive price information

17   exchanges, Defendants were able to and did increase prices of canned tuna sold to

18   Plaintiff and others in the United States at least twice in 2004 and again in 2006.

19   8.    By 2007, Defendants became more practiced and ambitious in their

20   collusive designs.  Del Monte – which operated StarKist – recognized that Defendants

21   could dramatically increase profits if each reduced its tuna can sizes from six ounces

22   to five.  ████████████████████████████████

23   ███████████████████████████████████████

24   ███████████████████████████████████████

25   ███████████████████████████████████████

26   ███████████████████████████████████████

27   ███████████████████████████████████████

28

WEGMANS' SECOND AMENDED COMPLAINT                    Case No: 15-md-2670-JLS-MDD

3

████████████████████████████████████████   Consequently, in accordance with their unlawful agreement, Bumble Bee, COSI and StarKist collusively downsized their six ounce tuna cans to five ounces.  This concerted action to reduce quantity itself constitutes price fixing.   But it also constitutes a conspiratorial price increase, as Defendants also colluded to *raise* prices on the newly downsized cans.

9.    Other collusive canned tuna price increases by the Defendants ensued.  In furtherance of their continuing unlawful agreement or understanding not to compete on price, Defendants were able to and did implement collusive price increases on canned tuna in at least 2008, 2010, 2011 and 2012.  Additionally, in at least 2011, 2012 and 2013, Defendants agreed to refrain from discounting and promotional practices and terms of sale of canned tuna to customers, including Plaintiff.  Further, in 2012, Defendants and their co-conspirators agreed not to sell under their own brands any canned tuna products containing tuna that were caught with the use of a Fish Aggregating Device.  Upon information and belief, this agreement remained in effect at least until July 2015.

10.    As explained below, the conspiracy was facilitated in part by the fact that during it, a number of executives and other employees left the employ of one Defendant to go work for another.  This familiarity helped in part to cultivate a culture of collusion in the packaged seafood industry.  A select number of industry trade associations also facilitated the conspiracy by providing Defendants with cover to meet and conduct conspiracy business.  Additionally, Defendants' use of a common vendor for their cans (Impress, a co-conspirator) and a co-packing arrangement between Bumble Bee and COSI also facilitated Defendants' collusion and enforcement of their cartel.

11.    As far back as 2004, Defendants and co-conspirators affirmatively and fraudulently concealed their unlawful conduct and coordinated their messaging to

their customers in order to create pretextual justifications for their collusive price increases.  These pretextual explanations by Defendants for their canned tuna price increases were intended by them at the time to create the illusion that the market for the pricing and sale of canned tuna in the United States was competitive when, in fact, it was not.  But Plaintiff did not know this at the time.  As a result of their many affirmative and fraudulent acts of concealment, described with particularity below, Defendants prevented Plaintiff from learning about the existence of the conspiracy until July 2015, when Thai Union admitted publicly that the DOJ was investigating the packaged seafood industry in the United States.

12.    The conspiracy alleged in this Second Amended Complaint was continuing and overarching in character.  During the time period relevant to Plaintiff's claims, Defendants and co-conspirators had one or more common objectives in the conspiracy, which they realized, including, without limitation, increasing, fixing, stabilizing or maintaining the price of canned tuna sold to Plaintiff and others.  There was an interdependence among the Defendants and co-conspirators regarding the overt acts alleged below to achieve the objective(s) over the course of the conspiracy period.  And there was substantial overlap in the participants in the overt acts in furtherance of the conspiracy.

13.    In the paragraphs below, Plaintiff alleges who communicated with whom, when, where (when they met in person) and what they agreed to or discussed in furtherance of the conspiracy alleged in this Second Amended Complaint.  These communications included in-person meetings, e-mails and telephone calls, and they involved the senior-most executives from each Defendant.  A list of the conspiracy's players, the company where each individual worked, and his or her title are listed in Appendix A.

14.    That the canned tuna conspiracy existed cannot credibly be doubted.  This is because on January 25, 2017 and March 15, 2017, Bumble Bee executives

Walter Scott Cameron ("Cameron") and Kenneth Worsham ("K. Worsham"), respectively, pled guilty to the felony charge of violating the U.S. antitrust laws by participating in an unlawful "conspiracy to suppress and eliminate competition by reaching agreements to fix, raise and maintain the prices of packaged seafood sold in the United States from at least 2011 through at least 2013 in violation of the Sherman Antitrust Act, 15 U.S.C. §1."  The Cameron and K. Worsham Plea Agreements both state that "[p]ackaged seafood includes shelf-stable tuna fish."  They further state that during the relevant period, defined as between at least 2011 through at least 2013, Cameron and Worsham each participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood, the primary purpose of which was to fix, raise and maintain the prices of packaged seafood sold in the United States.  In furtherance of the conspiracy, [Cameron and Worsham each] engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms. During these conversations, discussions and meetings, agreements and mutual understandings were reached to fix, raise and maintain the prices of packaged seafood sold in the United States."

15.    Additionally, on May 8, 2017, DOJ announced that Bumble Bee had agreed to plead guilty to price-fixing shelf-stable tuna products in the United States between 2011 and 2013.  Bumble Bee will pay a $25,000,000 criminal fine for its criminal conduct.  Acting Assistant Attorney General Andrew Finch commented that DOJ's antitrust division "along with our law enforcement colleagues, will continue to hold these companies and their executives accountable for conduct that targeted a staple in American households."

16.    The Cameron and Worsham guilty pleas and the Bumble Bee plea agreement establish that a conspiracy did exist.  But by operation of law, a guilty plea merely establishes the minimum parameters of a conspiracy.  *See, e.g., In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1475705, at *11 (D.D.C. May 9, 2000) ([T]he

Court rejects the notion that the guilty pleas … foreclose a broader conspiracy.  Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention.").   Thus, the scope of the conspiracy actionable in a civil antitrust action – including the timing of, and products and participants in, the conspiracy – may be (and as alleged in this Second Amended Complaint is) broader than the criminal convictions to date.  Discovery is necessary to determine the full scope of the conspiracy in terms of products, time period and participants.

17.    Another reason that the existence of this conspiracy cannot credibly be doubted is that COSI has confirmed that it is the amnesty applicant in this case. Under the United States Department of Justice's ("DOJ") Leniency Guidelines, for COSI to receive conditional amnesty, the company itself had to admit to a criminal violation of the U.S. antitrust laws involving, among other conduct, price fixing.  *See* www.justice.gov/atr.frequently-asked-questions-regarding-antitrust-divisions-leniency-program.

18.    The existence of the canned tuna conspiracy alleged in this Second Amended Complaint is further supported by additional evidence alleged below, including, without limitation, the following:

(a)    On December 3, 2015, Thai Union and Bumble Bee announced that they had abandoned their proposed merger in the face of DOJ's criminal investigation of them, prompting William Baer, then head of the DOJ's Antitrust Division, to state later that day that "[the DOJ's] investigation convinced us – and the parties knew or should have known from the get go – that the market is not functioning competitively today, and further consolidation would only make things worse."

(b)    During time periods relevant to Plaintiff's claims, Defendants and their co-conspirators' pricing of canned tuna to Plaintiff and others in the United

States is explainable only through conspiratorial action.  During the conspiracy, there was a large increase in the supply of canning-grade tuna coupled with decreasing U.S. demand for canned tuna.  These conditions should have caused canned tuna prices in the U.S. to decline precipitously.   Instead, the price increased (significantly). Additionally, the market for the production and sale of canned tuna was conducive to cartelization because: (i) as noted above, it is a commodity-like product for which there are no close substitutes; (ii) together, Defendants dominated the market for the processing of tuna and the production and sale of canned tuna in the United States; and (iii) there were barriers to entry into the market for the production and sale of canned tuna in the United States.

19.    The allegations in this Second Amended Complaint are pled in the alternative if necessary to avoid inconsistency.

## III.    VENUE AND JURISDICTION

20.    This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

21.    This Court has subject matter jurisdiction of each of the claims in this action pursuant to 28 U.S.C. §§ 1331 & 1337.

22.    Venue is proper in this Court pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 & 22, and 28 U.S.C. § 1391, for any one or more of the reasons stated in the subparagraphs below.

(a)    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in this District, including the sale of canned tuna to one or more Plaintiff and others at supracompetitive prices;

(b)    Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because each Defendant is subject to personal jurisdiction in this District;

(c)     Defendants transact business or are found in this District, and, therefore, venue is proper under 15 U.S.C. § 22; and/or

(d)     To the extent that there is no District in which this action may otherwise be brought, then venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is/are found in this District.

23.     Defendants are subject to the personal jurisdiction of this Court for any one or more of the reasons stated below:

(a)     Defendants are amenable to service of process because, as alleged in this Second Amended Complaint, each inhabits, transacts business in, has continuous or systematic contacts with, or is found or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)     Defendants are amenable to service of process because, as alleged in this Second Amended Complaint, each inhabits, transacts business in, or is found in this District.  Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling canned tuna throughout the United States, including in this District;

(c)     Defendants are amenable to service of process because, as alleged in this Second Amended Complaint, each Defendant belonged to the conspiracy alleged in this Second Amended Complaint, and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling canned tuna to one or more Plaintiff and others in this District at artificially inflated prices;

(d)     Defendants are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and the long-arm statute of the State in which this Federal Court sits because, as alleged in this Second Amended Complaint, each Defendant has transacted business in the State and because the State's long-arm statute extends jurisdiction to the limits of due process and each

Defendant has sufficient minimum contacts with the State to satisfy due process; and/or

(e)    This Court has personal jurisdiction over Defendants because, as alleged in this Second Amended Complaint, they and one or more of their co-conspirators contracted to supply services or goods, including canned tuna, in the State where this Federal Court sits; money flowed from Plaintiff or other purchasers in the State to pay Defendants and their co-conspirators for canned tuna; Defendants and one or more of their co-conspirators transact business in the State in furtherance of the conspiracy; Defendants and their co-conspirators did or caused one or more unlawful acts alleged in this Second Amended Complaint to be done, or consequences to occur, in the State; Defendants and their co-conspirators engaged in unlawful conduct described in this Second Amended Complaint outside of the State causing injury to one or more Plaintiff in the State, and because this Court's exercise of jurisdiction is not inconsistent with the Constitution of this State or the Constitution of the United States.

(f)    Based on the allegations in this Second Amended Complaint, Dongwon and TUG are subject to the general and specific personal jurisdiction of this Court because they have purposefully directed their contacts and conspiratorial conduct at the United States (including the forum State) and have purposefully availed themselves of the laws of the United States.  As alleged in this Second Amended Complaint, Dongwon and TUG, either directly, or indirectly through their subsidiaries (StarKist and COSI, respectively), engaged in price-fixing activities and anticompetitive conduct that were intended to have, and did have, direct, substantial and reasonably foreseeable effects on the commerce of the forum State and the United States.

---

(g)   In addition to the foregoing, or in the alternative, TUG[1] and Dongwon[2] have each consented to or waived objection to this Court's personal jurisdiction over each of them.

## IV.   PARTIES

### A.   Plaintiff

24.   Plaintiff Wegmans Food Markets, Inc. ("Wegmans" or "Plaintiff") is a New York corporation with its principal place of business located at 1500 Brooks Avenue, Rochester, New York 14624.  Wegmans owns and operates retail stores that

---

[1]   TUG sponsors American Depository Receipts, which are traded on NASDAQ, which will allow U.S. investors to trade equities of TUG in the United States securities market.  In connection with those U.S. securities transactions, TUG regularly files and discloses required financial information with the U.S. Securities and Exchange Commission.

[2]   Moreover, Dongwon has availed itself of the personal jurisdiction of courts in the United States and U.S. territories, and maintained that it is the alter ego of its wholly-owned subsidiary (StarKist) doing business in U.S. territories.  For example, and without limitation: (i) In *Dongwon Industries Co., Ltd., v. Ships Gear & Transit, Inc.*, 93-cv-01691 (S.D. Cal.), Dongwon submitted to the personal jurisdiction of *this* Court by commencing an action for breach of contract and tort claims against a ship manufacturer from which Dongwon purchased three purse-seining vessels for tuna fishing; (ii) In *Dongwon Industries Co., Ltd, v. Yoshida*, 90-cv-00282 (D. Alaska), Dongwon availed itself of the jurisdiction of the U.S. courts by commencing an action in the District of Alaska; (iii) In *Hill v. Majestic Blue Fisheries, LLC*, 10-cv-23886 (S.D. Fla.), and *In the Matter of Majestic Blue Fisheries, LLC*, 11-cv-00032 (D. Guam), Dongwon consented to the jurisdiction of the courts in actions arising out of the sinking of a U.S. flagged vessel operated and managed by Dongwon; (iv) In *Yu Sheng Fishery Co., Ltd., v. Dongwon Industries Co., Ltd.*, 1991 WL 126138 (D. Guam), the District Court found that Dongwon had satisfied the requirements of *in persona* jurisdiction based on Dongwon's assertions that it had sufficient minimum contacts with Guam and was the alter-ego of its cannery located in Guam; (v) In *Yang et al v. Majestic Blue Fisheries, LLC*, et al, 13-cv-00015 (D. Guam), Dongwon maintained that as the agent of a U.S.-flagged vessel, it (Dongwon) was the beneficiary of and had right to enforce an arbitration provision in a seaman's contract, and Dongwon was entitled to enforce the arbitration provision because its conduct was substantially interdependent and arose out of the same misconduct attributable to the U.S. vessel owner; and (vi) In *United States of America ex rel. Moore & Co. v. Majestic Blue Fisheries LLC, et al*, 12-cv-01562 (D. Del.), litigation arose from Dongwon's scheme (along with relatives of company insiders) to form U.S. corporations for the purpose of acquiring two fishing vessels flagged under U.S. law and certified as such under the South Pacific Tuna Treaty.

---

sell canned tuna.   During the time period relevant to Plaintiff's claims, Wegmans directly purchased canned tuna in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Second Amended Complaint.

25.    Plaintiff is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.

**B.    Defendants**

(i)    Bumble Bee

26.    Defendant Bumble Bee Foods LLC is a Delaware limited liability company, with its headquarters and principal place of business in San Diego, California.   During the time period relevant to Plaintiff's claims, Bumble Bee manufactured canned tuna and shelf stable salmon, clams, crabs, sardines, mackerel, oysters, and shrimp.   Bumble Bee is defined to include its managers, officers, employees, and agents acting on its behalf.   Bumble Bee maintains canned tuna processing facilities in San Diego, California, and it maintained a plant in Puerto Rico that it closed in approximately June 2012.   Bumble Bee's 2014 annual revenue exceeded $1 Billion.   Bumble Bee is owned by Lion Capital LLP ("Lion Capital"), a private equity firm based in the United Kingdom.   Lion Capital purchased Bumble Bee in 2010 for approximately $980 Million from Centre Partners Management LLC, a U.S.-based private equity firm.   In 2014, Lion Capital agreed to sell Bumble Bee to Thai Union for $1.51 Billion.   However, due to concerns about the antitrust violations alleged in this Second Amended Complaint, Lion Capital and Thai Union announced on December 3, 2015, that they were not proceeding with the merger.[3]   During the time period relevant to Plaintiff's claims: Bumble Bee directly participated in the conspiracy alleged in this Second Amended Complaint; Bumble Bee produced and

---

[3]    *See*    https://www.law360.com/competition/articles/734219/bumble-bee-thai-co-drop-1-5b-tuna-tieup-over-doj-fears.

sold canned tuna throughout the United States and its territories; Bumble Bee directly sold canned tuna to Plaintiff and others in the United States; and Bumble Bee engaged in the unlawful conduct alleged in this Second Amended Complaint in violation of Section 1 of the Sherman Act.

(ii)    The StarKist Defendants

27.    Defendant StarKist Company is a corporation organized, existing, and doing business under the laws of the State of Pennsylvania, with its headquarters and principal place of business in Pittsburgh, Pennsylvania.   During the time period relevant to Plaintiff's claims, StarKist manufactured canned tuna and shelf stable salmon.  StarKist is defined to include its officers, employees, and agents acting on its behalf.  StarKist operates its tuna processing facility in Pago Pago, American Samoa. Although StarKist's annual revenue is not publicly reported, the Pittsburgh Post-Gazette reported in early 2010 that StarKist's annual revenue was between $650 and $670 million.  That figure likely grew to approximately $1 Billion in 2014.  In 2008, Dongwon Industries Co. Ltd. ("Dongwon") purchased StarKist for approximately $363 Million and thereafter, including during the time period relevant to these allegations, StarKist operated as a wholly-owned subsidiary of Dongwon.  During the time period relevant to Plaintiff's claims, StarKist directly or on behalf of Dongwon: participated in the conspiracy alleged in this Second Amended Complaint; produced and sold canned tuna throughout the United States and its territories; sold canned tuna to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Second Amended Complaint in violation of Section 1 of the Sherman Act.

28.    Defendant Dongwon Industries Co. Ltd. is a corporation organized, existing, and doing business in South Korea, with its headquarters located in Seoul, South Korea.  Dongwon is a vertically integrated fishing conglomerate that owns the world's largest fishing fleet.  Dongwon has an ownership stake in U.S. businesses

besides StarKist, including a 12.5% stake in Silver Bay Seafoods, LLC (a fishery in Sitka, Alaska) and a 50% majority interest in DW Global, Inc. (a shipping and import/export company located in Commerce, California).   As noted above, in 2008, Dongwon bought StarKist, and Dongwon is StarKist's parent.   Dongwon sells a substantial volume of canned tuna (and other shelf-stable packaged seafood products) in the United States, and according to its quarterly and annual reports, it typically derives more than 50% of its global revenue from the United States.

29.     Before describing the interrelationship between StarKist and Dongwon Industries, we explain briefly the concept of the Korean *chaebol*, which is a recognized concept in the academic business literature focused on South Korean companies. *See generally* David Hundt, Korea's Developmental Alliance: State, Capital and the Politics of Rapid Development (2009); R. M. Steers, K.S. Yoo, & G. Ungson, The Chaebol: Korea's New Industrial Might (1989). The term "*chaebol*" is made up of the words "*chae*" (wealth or property) and "*bol*" (clan or group). Chaebols are closely-knit business groups in South Korea under the control of a single family or extended family, with key flagship firms that are used as the instruments of control of other firms within the group.   They have four key features: (1) the governance structure of the group involves family or extended family control; (2) the formal organizational structure of the group involves a group headquarters, located in an actual or de facto holding company, sometimes known as a "flagship" company, which controls a network of subsidiaries, which fall under the control of the family, the group as a whole, and of flagship firms within the group; (3) the business structure of the firm encompasses a number of discrete products and services, some of which are wholly unrelated and others that are effectively vertically integrated; and (4) these groups are characterized by strong internal cultures of hierarchy, familism and loyalty, with family members of the founder or his cohorts also occupying key managerial positions within the group.

30.     The Dongwon family of companies fits this definition. The company started in 1969 and is dominated by Chairman Jae-chul Kim ("Chairman Kim") and members of his family or extended family, as described in more detail below. The group headquarters is in Seoul, South Korea, where its holding company, Dongwon Enterprises, is located. Through its subsidiaries, it operates in a number of business sectors including, *inter alia*, marine products, other food products, feed products and pet food, packing materials, and aluminum foil products. As explained below, the Dongwon family of companies has an internal culture of hierarchy, familism and loyalty. Defendants Dongwon and Starkist exhibit that culture with members of J.C. Kim's family being put in key positions in both companies and executives at Dongwon, Dongwon Enterprises and various other Dongwon subsidiaries being routinely seconded to StarKist to fill managerial roles. Dongwon, run by Chairman Kim, is the parent entity for StarKist, but his control over the Dongwon family of companies was such that, with the stroke of a pen, he could (and in fact did) command executives of the holding company or from sister subsidiary companies to either oversee the business of StarKist from Korea or relocate in the United States and help run StarKist.   This was done without regard for which Dongwon subsidiary the individual worked for, and for the purposes of involvement in StarKist's management, all Dongwon personnel were functionally Dongwon Industries personnel subject to the direct control of Chairman Kim.   In other words, as a chaebol, Dongwon does not follow the principles of corporate separateness that are expected of companies incorporated in the United States and instead acts as a single integrated enterprise. Accordingly, acts taken by employees of Dongwon's corporate affiliates in furtherance of the conspiracy, as alleged in detail below, were taken on behalf of the interests of the chaebol and under the control of Dongwon (and Chairman Kim) as the chaebol's flagship.

31.     Dongwon directly participated in the conspiracy alleged in this Second Amended Complaint and purposefully directed this conduct at the United States (including the forum State); produced and sold canned tuna in the United States and its territories; intentionally sold price-fixed canned tuna to Plaintiff and others in the United States; used its dominance or control of StarKist's raw material purchasing and tuna business to conspire with the other Defendants and their co-conspirators; and engaged in the unlawful conduct alleged in this Second Amended Complaint in violation of Section 1 of the Sherman Act.

32.     Alternatively, during the time period relevant to Plaintiff's claims, and as more fully alleged throughout this Second Amended Second Complaint, Dongwon participated in the conspiracy by and through StarKist, which acted as Dongwon's alter ego or agent.  Dongwon dominated or controlled StarKist's canned tuna business as reflected by, among other actions, Dongwon's domination or control of StarKist's production, pricing, hiring, budgeting, capitalization and/or marketing of canned tuna. During this time period, Dongwon effectively controlled and took over performance of the day-to-day operations of StarKist's canned tuna business, and there was such unity of interest and ownership between Dongwon and StarKist that the individuality or separateness of the two companies ceased with respect to StarKist's canned tuna business.  StarKist's status as the alter ego or agent of Dongwon is evidenced by, among other facts, one or more of the facts alleged below that occurred during the time period relevant to Plaintiff's claims:

(a)     Dongwon used StarKist as a mere shell, instrumentality or conduit for a single venture involving the sale of price-fixed canned tuna in the United States caught, processed and/or packaged by Dongwon in South Korea and Thailand for the ultimate benefit of Dongwon and the Kim family. ███████████████

███████████████████████████████████

█████████████████     Dongwon used StarKist to market Dongwon's product.

StarKist enabled Dongwon to be vertically integrated with respect to the U.S. operations. As a result of this vertical integration, Dongwon and StarKist effectively functioned as a single entity for purposes of the conspiracy. With respect to the canned tuna produced by Dongwon in South Korea and Thailand and sold in the United States, StarKist merely acted as Dongwon's marketing conduit to sell Dongwon's canned tuna under the Dongwon-owned StarKist label.

(b)    Dongwon dominated or controlled StarKist's marketing of canned tuna in the United States. For example, and without limitation, Dongwon's website states: "StarKist is an iconic tuna brand in the United States, *and has been controlled by Dongwon Group since 2008*, accompanying Dongwon Group on its journey to globalization.... Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna company, and will become de facto a globalized enterprise." (Emphasis added). Dongwon has presented a common global marketing image with StarKist. As Dongwon stated in 2008, it acquired StarKist to "establish a strong foothold in penetrating the U.S. market," and the purpose of Dongwon's acquisition was "to add a stable buyer of its tuna and to place other products in the U.S. through StarKist's distribution network." Dongwon and StarKist presented themselves to Plaintiff as a single, vertically integrated entity. StarKist's website states that "Dongwon Industries is one of the world's largest tuna catching companies with a fleet of 36 boats. Dongwon's world class fish procurement and processing capacity builds on StarKist's national brand recognition and distribution networks in the United States to bring world-class seafood to consumers worldwide."[4]

(c)    Dongwon and StarKist used the same offices or locations in the United States. Dongwon's website lists StarKist's U.S. office as one of its global branch offices.

---

[4]    *See* http://starkist.com/about-starkist.

(d)     Dongwon and StarKist had overlapping Board Members and key executives who dominated or controlled StarKist.   For example, and without limitation, in about September 2014, Andrew Choe ("A. Choe") became the President and CEO of StarKist.   A. Choe was seconded to StarKist in April 2012 as the Senior Vice-President of its supply chain.   Previously, Mr. Choe had held an executive position at Dongwon as Director of Strategic Planning.   Nam-Jung Kim ("NJ Kim"), son of Chairman Kim ("Chairman Kim"), served as the COO of StarKist from about 2012 until October 2014, when he was promoted to Vice Chairman of StarKist.   He currently serves on the board of directors for StarKist and Dongwon.[5]   Prior to his being sent to join StarKist, NJ Kim was Vice-President of Dongwon F&B (a Dongwon subsidiary) and Dongwon Enterprise Co. (the Kim family's holding company that owns Dongwon Industries).   Since 2008, NJ Kim has served as the Head of the Finance and Planning Department at Dongwon Systems and served as Vice President of its construction unit.   Additionally, according to Forbes, in preparation for Chairman Kim's succession, "the founder has been transferring ownership of the private family holding company, Dongwon Enterprise Co., which owns stakes in [Dongwon and other affiliates], to Nam-Jung.  Jae-Chul holds a 24.5% stake and Nam-Jung, 68%."   Accordingly, NJ Kim owned a controlling interest in Dongwon while serving as StarKist's COO and Vice Chairman.  The position of COO was created specifically for him, so that he could lead the "continued growth and expansion of Dongwon-StarKist global business."   Also, Hyung-Joo Kim, Chief Financial Officer ("CFO") of Dongwon F&B, was seconded to StarKist in 2012 to serve as CFO.  In-Gu Park ("IG Park"), the Chairman of the Board of StarKist, also served as its Acting President from November 2010 to March 2011.  IG Park serves as CEO of Dongwon Precision Machinery Company, and has also served as CEO and

---

[5]     *See*   http://www.4-traders.com/business-leaders/Nam-Jung-Kim-066XMH-E/biography/.

Vice Chairman at Dongwon F&B and Dongwon Enterprise.  During time periods relevant to these allegations, IG Park chaired StarKist's board of directors while simultaneously sitting on the board or serving as an officer (or both) of other Dongwon companies.  Additionally, StarKist's board meetings were often held in South Korea so that Dongwon executives could easily attend them.

(e)     Dongwon appointed people who were involved in the day-to-day operations of StarKist, including people who participated in the conspiracy as Dongwon intended.  For instance, and without limitation, Dongwon appointed senior executives at StarKist – including at least In-Soo Cho (IS Cho), A. Choe and Sam Lee.  Additionally, Dongwon dismissed several StarKist executives in 2012 and replaced them with employees from within the Dongwon corporate family, including Hyung-Joo Kim as CFO. After Dongwon's acquisition of StarKist, American executives at StarKist Company began to leave – voluntarily and involuntarily.  One report indicated that a "plethora of executives from Dongwon Industries' Seoul headquarters – complete with translators" had "descend[ed] on Pittsburgh to sort out the 'challenges' the company is going through;" one source stated that "there is so much American management leaving and probably even more so after this announcement…."

(f)     Dongwon micromanaged StarKist's affairs and disregarded principles of corporate separateness with respect to StarKist.  For example, and without limitation:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          (g)     Dongwon, as the parent, owned StarKist, the wholly-owned

26   subsidiary of Dongwon.  Dongwon purchased 100% of StarKist in 2008.

27

28

(h)   Due to the unlawful conduct alleged in this Second Amended Complaint, StarKist earned profits in excess of what it would have earned in a competitive market. ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ Accordingly, Dongwon knowingly profited from StarKist's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched.  As a result of these facts, considered alone or in combination with one or more of the foregoing other facts, adherence to the fiction of the separate existence of Dongwon and StarKist would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over substance.

33.   Del Monte Corporation ("Del Monte"), now known as Big Heart Pet Brands, Inc., is a privately held corporation organized under the laws of Delaware with its headquarters and principal place of business located at 1 Strawberry Lane, Orrville, Ohio 44667.   Prior to October 2008, Del Monte owned and operated StarKist.  Although Del Monte sold StarKist to Dongwon in 2008, it continued to operate StarKist on behalf of Dongwon until approximately September 2010, under an Operating Services Agreement entered into between Del Monte and Dongwon pursuant to which Del Monte provided the sales force that sold StarKist products in the United States.  In a filing with the Securities & Exchange Commission, Del Monte explained that under the Operating Services Agreement with Dongwon, Del Monte provided operational services to StarKist Co. such as "warehousing, distribution, transportation, sales, information technology and administration."

34.    During the time period relevant to Plaintiff's claims, Del Monte participated directly in the conspiracy.   As alleged in this Second Amended Complaint, Del Monte employees including, and without limitation, ███████████ ████████████████████████████████████████████████████████████ – attended meetings and engaged in other overt acts in furtherance of the conspiracy on behalf of StarKist and Del Monte.   Additionally, during periods relevant to Plaintiff's claims, Del Monte sold StarKist-branded canned tuna at prices affected by the conspiracy directly to Plaintiff and others in the United States, in violation of Section 1 of the Sherman Act.

35.    From the period prior to October 2008, the term "StarKist Defendants" refers to StarKist and Del Monte, collectively.   From October 2008 until October 2010, the term "StarKist Defendants" refers to StarKist, Del Monte and Dongwon, collectively.   From November 2010 until the July 2015, the term "StarKist Defendants" refers to StarKist and Dongwon, collectively.

(iii)    The Chicken of the Sea Defendants

36.    Defendant Tri-Union Seafoods LLC, doing business as Chicken of the Sea International, Inc., is a limited liability company organized, existing and doing business under the laws of the State of California, with its headquarters and principal place of business in San Diego, California.   COSI is defined to include its managers, officers, employees and agents acting on its behalf.   COSI operates its tuna processing facility in Lyons, Georgia.   In 1997, Tri-Union Seafoods LLC acquired COSI (which was then called Van Camp Seafood Company), with Thai Union Group PCL (f/k/a Thai Union Frozen Products PCL) owning a 50% ownership interest in the limited liability company.   In 2000, TUG acquired the remaining 50% share of Tri-Union Seafoods LLC, and COSI became a wholly-owned subsidiary of TUG (and has remained a TUG subsidiary ever since).   In 2014, TUG earned gross profit of $547 Million on worldwide revenue of $3.339 Billion.   During the time period relevant to

Plaintiff's claims, COSI directly, or on behalf of TUG: participated in the conspiracy alleged in this Second Amended Complaint; produced and sold canned tuna throughout the United States and its territories; sold canned tuna to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Second Amended Complaint in violation of Section 1 of the Sherman Act.

37.   Defendant Thai Union Group PCL is a corporation organized, existing and doing business in Thailand, with its headquarters located in Amphar Muang, Thailand.  After its acquisition, COSI became a wholly-owned subsidiary of TUG.

38.   During the time period relevant to Plaintiff's claims, and as alleged in this Second Amended Complaint, TUG directly participated in the conspiracy and purposefully directed this conduct at the United States (including the forum State); produced and sold canned tuna in the United States and its territories; sold canned tuna to Plaintiff and others in the United States; used its dominance or control of COSI's raw material purchasing and tuna business to conspire with the other Defendants and their co-conspirators; and engaged in the unlawful conduct alleged in this Second Amended Complaint in violation of Section 1 of the Sherman Act.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████ Cheng is Kraisorn Chansiri's brother and the second largest shareholder of Thai Union.

39.   Alternatively, during the time period relevant to Plaintiff's claims, and as more fully alleged throughout this Second Amended Complaint, Thai Union participated in the conspiracy by and through COSI, which acted as and was Thai Union's alter ego or agent.  Thai Union dominated or controlled COSI's canned tuna

business as reflected by, among other actions, Thai Union's domination or control of COSI's production, pricing, hiring, budgeting, capitalization and/or marketing of canned tuna.  During this time period, Thai Union effectively controlled and took over performance of the day-to-day operations of COSI's canned tuna business, and there was such unity of interest and ownership between Thai Union and COSI that the individuality or separateness of the two companies ceased with respect to COSI's canned tuna business.  COSI's status as the alter ego or agent of Thai Union is evidenced by, among other facts, one or more of the facts alleged below that occurred during the time period relevant to Plaintiff's claims:

> (a)    Thai Union used COSI as a mere shell, instrumentality or conduit for a single venture involving the sale of price-fixed canned tuna in the United States caught, processed and canned or pouched by Thai Union in Thailand for the ultimate benefit of Thai Union.  COSI enabled Thai Union to be vertically integrated with respect to the U.S. operations.  As a result of this structure, Thai Union and COSI effectively functioned as a single entity for purposes of the conspiracy.  In the words of Thai Union, COSI and Thai Union were not just "family," but "Thai Union + COSI = One Company."  With respect to the canned tuna produced by Thai Union in Thailand and sold in the United States, COSI merely acted as Thai Union's marketing conduit to sell Thai Union's canned tuna under the Thai Union-owned COSI label. This comes as no surprise, because TUG's website demonstrates that TUG views COSI as part of TUG's overall "Global Tuna Business" and "US Ambient Operations" controlled directly by TUG's Board of Directors and executives.



(b)  Thai Union dominated or controlled COSI's marketing of canned tuna in the United States.  For example, and without limitation, TUG presented (and does present) a common global marketing image with COSI.  TUG's 2015 Annual Report lists COSI as "our strong brand in North America."  TUG's 2001 Annual report states: "The principal activities of the overseas subsidiaries such as the subsidiaries in United States are the manufacture and distribution of canned seafood, and the import of shrimp and other frozen seafood products for sale to restaurant chains, retailing, wholesaling and food processing."

(c)  Thai Union and COSI used the same offices or locations in the United States.  TUG's 2015 Annual Report, identifying "Thai Union's footprint," lists itself as having corporate offices in Portsmouth, New Hampshire; New York, New York; El Segundo, California; San Diego, California; and Lyons, Georgia.  Each of these offices is an office or plant of COSI.

(d)  Thai Union and COSI had overlapping Board Members and key executives who dominated or controlled COSI.  For example, and without limitation, according to a corporate organizational chart on its website, TUG represents that it treats COSI as part of its overall "Global Tuna Business" and "US Ambient Operations" that are controlled directly by TUG's Board of Directors and executives. Kraisorn Chansiri, the Chairman of TUG, is a member of the Board of Directors of

COSI; Cheng Niruttinanon ("C. Niruttinanon"), Executive Chairman of TUG, is a member of COSI's Board of Directors; and Thiraphong Chansiri ("T. Chansiri"), President and CEO of TUG, is a member of COSI's Board of Directors and President of Thai Union North America, Inc., a wholly-owned subsidiary of TUG and the holding company through which TUG owns COSI and does business in the United States. Additionally, Shue Wing Chan ("Chan"), a member of the family that controls TUG, and a member of TUG's self-styled "Global Leadership Team," is President and CEO of COSI. David Roszmann, the former Chief Operating Officer of COSI, joined COSI in March 2013, and directly reported to CEO Chan on matters including sales, marketing, procurement, supply chain, operations, finance, HR, legal and IT. Mr. Roszmann left COSI in December 2015, soon after the DOJ questioned TUG's attempt to acquire Bumble Bee. Upon information and belief, Chan now holds executive positions at COSI and other subsidiaries controlled by TUG. Further, Chang Tim King served as Executive Director and CFO of TUG and a member of the COSI Board of Directors.

(e)     Thai Union appointed people who were involved in the day-to-day operations of COSI, including people who participated in the conspiracy as Thai Union intended. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████

1    (f)    Thai Union micromanaged COSI's affairs and disregarded
2    principles of corporate separateness with respect to COSI. ████████████

3    ████████████████████████████████████████████████
4    ████████████████████████████████████████████████
5    ████████████████████████████████████████████████
6    ████████████████████████████████████████████████
7    ████████████████████████████████████████████████
8    ████████████████████████████████████████████████
9    ████████████████████████████████████████████████
10   ████████████████████████████████████████████████
11   ████████████████████████████████████████████████
12   ████████████████████████████████████████████████
13   ████████████████████████████████████████████████
14   ████████████████████████████████████████████████
15   ████████████████████████████████████████████████
16   ████████████████████████████████████████████████
17   ████████████████████████████████████████████████
18   ████████████████████████████████████████████████
19   ████████████████████████████████████████████████
20   ████████████████████████████████████████████████
21   ████████████████████████████████████████████████
22   ████████████████████████████████████████████████
23   ████████████████████████████████████████████████
24   ████████████████████████████████████████████████
25   ████████████████████████████████████████████████
26   ████████████████████████████████████████████████
27   ████████████████████████████████████████████████
28

1   ████████████████████████████████████████████

2   █████████████████████████████████████

3       (g)   Thai Union, as the parent, owned COSI, the wholly-owned

4   subsidiary of Thai Union.

5       (h)   Due to the unlawful conduct alleged in this Second Amended

6   Complaint, COSI earned profits in excess of what it would have earned in a

7   competitive market.  COSI transferred this ill-gotten gain to its parent, Thai Union, by

8   paying out the unlawfully obtained profits and other conspiracy proceeds to Thai

9   Union in the form of dividends and other transfer payments.  ███████████████

10  ████████████████████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████████████

13  ███████████████████████   Accordingly, Thai Union knowingly profited from

14  COSI's participation in the conspiracy and knowingly accepted the proceeds of the

15  conspiracy and has been unjustly enriched.  Further, TUG charged COSI prices for

16  tuna that were higher than COSI would have paid had COSI been free to acquire tuna

17  at market rates.  As a result of these facts, considered alone or in combination with

18  one or more of the foregoing other facts, adherence to the fiction of the separate

19  existence of Thai Union and COSI would sanction a fraud or promote an injustice, and

20  an inequitable result or an injustice would occur if the corporate form were elevated

21  over substance.

22      40.   Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc., and

23  Thai Union Group PCL, are collectively referred to in this Second Amended

24  Complaint as the "COSI Defendants."

25      **C.**   **Co-Conspirators and Agents**

26      41.   Other entities and individuals not named as Defendants combined,

27  conspired, or agreed with Defendants and committed acts in furtherance of the

28

unlawful conspiracy alleged in this Second Amended Complaint.   Conspirators currently known to Plaintiff include Impress USA, Inc. ("Impress") and its employees.

42.   The individuals employed by Defendants and co-conspirators who participated in the conspiracy did so on behalf of their respective employer Defendant or co-conspirator, and their conduct in furtherance of the conspiracy was undertaken by each of them during the course and scope of their employment by their Defendant employer or co-conspirator.

## V.   **TRADE AND COMMERCE**

43.   During the time period relevant to Plaintiff's claims, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial.  In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that:

(a)   Defendants and their co-conspirators sold and shipped substantial quantities of canned tuna in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the canned tuna;

(b)   Data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States;

(c)   Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States; and/or

(d)   Defendants and their co-conspirators imported substantial quantities of raw materials for canned tuna from outside the United States.

44.    The effect of Defendants and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiff's claims.

## VI.    THE PRODUCTION OF CANNED TUNA

45.    There are several levels in the production of canned tuna.  Initially, the tuna is caught by fishing vessels, which operate in the Pacific, Atlantic and Indian Oceans (although the majority of tuna comes from the Pacific Ocean).  After it is caught, the fish is frozen or refrigerated.  Both Dongwon and TUG control extensive tuna fishing fleets used, at least in part, to supply fish to StarKist and COSI, respectively.

46.    In addition to the fleets controlled by Dongwon and TUG, tuna trading companies buy the fish from fishing vessels and coordinate transshipment of catches to processors, including Defendants.  During the time period relevant to Plaintiff's claims, the major trading companies were: the Tri-Marine Group, a foreign organization that does business in the United States through Tri-Marine International, Inc., Tri-Marine Management Company, LLC, Tri Marine Fishing Management LLC, Tri Marine Fish Company, and The Tuna Store, LLC; Itochu Corporation, a Japanese company in the fishing business through its Food Company, which it owns and controls; and Fong Cherng Fishery Company Ltd. ("FCF"), a privately-held Taiwanese company.

47.    After fish trading companies buy the fish or Dongwon- or TUG-controlled vessels catch the tuna, they arrange its delivery to a processing plant where it is cooked (usually by steaming), cleaned, filleted, and prepared for canning or packaging.  For example, Bumble Bee describes the process for tuna as follows:

> Upon arrival to the local processing plant, the whole frozen tuna rounds are put into cold storage.  The rounds are first inspected for quality, then grouped by size and weight for the most accurate thawing and cooking times.  The processing begins when the tuna is removed from the plant freezer, thawed in water and prepared for cleaning.  The tuna is then loaded into metal racks, which are wheeled into large steam pre-cookers.  Tuna is cooked

for a prescribed time and temperature depending upon the size of the fish.  Once the tuna is cooled, the tuna meat is removed from the bones.  The tuna loins are placed in bags, blast frozen to lock in moisture and placed on pallets for shipment to canneries in the United States.   The frozen loins are shipped directly to the cannery where the canning process is entirely automated.   The tuna move in a single line from the filling machine to the packaging sealer.  The sealed product is then cooked, cooled, and labeled.  Once they pass Quality Assurance approval, the cans are prepared for shipment to your local market.[6]

48.     After processing, the tuna is canned or packaged.  Chunk-style tuna is conveyed through a chopper, while solid-style tuna is packed directly into the can. Along with the tuna, the can is filled with varying types of liquid (usually vegetable oil or water) before it is sealed.  After the can is sealed, it is cooked under pressure to allow for sterility and a long shelf-life.   The tuna cans are then sold to retailers, including Plaintiff.  Prices paid by retailers for canned tuna may vary depending upon several factors, including the type of tuna (*e.g.*, light or white meat), packaging (can or pouch), water or oil, flavoring, brand, and package size.

49.     The StarKist Defendants maintain facilities in South Korea, Thailand, Ecuador, and American Samoa.  The COSI Defendants maintain facilities in Thailand and Lyons, Georgia.  Bumble Bee conducts the majority of its canning operations in the United States, at its production facility near San Diego.  Bumble Bee also buys light meat loins from traders in the Western/Central Pacific Ocean (*e.g.*, Papua New Guinea), the Indian Ocean (*e.g.*, Thailand) and the Eastern Pacific Ocean (*e.g.*, Ecuador), and the product is shipped to its California cannery for canning and sale in the United States.

# VII.   TUNA SUPPLY, DEMAND, AND PRICING

## A.      The Supply of Canning-Grade Tuna Increased Substantially

50.     The higher prices witnessed during the conspiracy did not stem from global reductions in the supply of harvested tuna or other fish.   To the contrary,

---

[6]        *See* http://www.BumbleBee.com/tracemycatch/results.

technological advances in fishing over the last 40 years, due mostly to the advent of the purse seine for tuna fishing (a method of fishing involving the use of large nets that capture entire schools of fish), and the use of Fishing Aggregation Devices ("FADs") (man-made objects such as floats or buoys that are used to attract certain fish), have increased the volume of skipjack and albacore caught annually.  Compared to 1975, when purse seining accounted for a negligible share of the global tuna fish catch, this method is now responsible for 66% percent of all tuna caught globally.

51.    The following chart demonstrates the proliferation of purse seining in the Western and Central Pacific Ocean (which sources approximately 60% of the world's tuna) relative to other methods of tuna fishing, such as longline and pole fishing methods:



52.    The advances in fishing technology have increased the efficiency of fishing and substantially lowered the cost necessary to fish for tuna on a commercial scale.  According to the Pacific Islands Forum Fisheries Agency ("FFA"), between 1986 and 2007, the average catch per tuna fishing vessel roughly doubled, from 3,750 metric tons to 7,100 metric tons per year.  This, in turn, has spurred substantial recent investment in fishing vessels.  Between approximately 2007 and 2011, the number of tuna fishing vessels increased by more than 25%.

WEGMANS' SECOND AMENDED COMPLAINT

Case No: 15-md-2670-JLS-MDD

53.     The combination of increased investment in fishing vessels and improved efficiency of those vessels has resulted in a dramatic increase in the volume of canning-grade tuna caught annually.   As the following chart depicts, between 1984 and 2014, the volume of skipjack caught annually increased roughly three-fold:



**B.     The Demand for Canned Tuna in the United States Decreased Substantially**

54.     The higher prices for canned tuna during the conspiracy did not result from increasing demand for the product.  To the contrary, there has been a substantial decline in both the demand for and consumption of canned tuna in the United States over the last 25 years.   As publicly available information reflects, consumption of canned tuna in the United States peaked at nearly four pounds per person in the early 1990s, and then began to fall, to 3.4 pounds per capita in 2003 and to approximately 2.5 pounds per capita in 2009, with consumption and demand continuing to decline thereafter.   The following chart, based on publicly available information, depicts the declining per capita consumption of canned tuna in the U.S:

55. Demand for canned tuna in other developed countries has also declined per capita. In Japan, consumption of canned tuna declined by approximately 20% from 1995 to 2007, while overall consumption in Western Europe remained stagnant between 2000 and 2010. Notwithstanding this trend of declining demand, the United States, Western Europe and Japan accounted for more than 50% of all global canned tuna consumption in 2008 according to the FFA. Further, the United States remained the largest consumer of canned tuna in the world, accounting for approximately 28% of global consumption in 2010.

**C.** **Prices Paid for Canned Tuna Increased Substantially as a Result of Defendants' Conspiracy**

56. In the face of declining U.S. demand for canned tuna and the increasing supply of canning-grade tuna and other species of fish, market forces should have put substantial pressure on Defendants to attain greater market share and increase production so as to garner economies of scale that would reduce the price of canned tuna sold to Plaintiff and others in the United States. Instead, because of the conspiracy, the opposite occurred.

57. As discussed above, the higher prices paid by Plaintiff were due to the conspiracy and not other supply and demand factors. During the conspiracy (and

because of it), canned tuna prices sold to U.S. retailers, including Plaintiff, increased (or were otherwise above competitive levels) while the tuna catch increased and U.S. demand for canned tuna declined.  This incongruity is also reflected in the chart below, which shows that although per capita U.S. canned tuna consumption continued to decline after approximately 2004, the dollar amount spent on canned tuna and other packaged seafood in the United States actually increased (canned tuna accounts for approximately 75% of all canned seafood spending):



58.    Defendants and their co-conspirators' pricing of canned tuna sold to Plaintiff and others in the United States is not consistent with expected pricing given the excess supply and production capacity coupled with declining U.S. demand.  To the contrary, during the conspiracy, the prevailing market conditions in the U.S. canned tuna industry would predict *decreasing* prices.  However, as alleged in this Second Amended Complaint, canned tuna prices – including the prices Defendants and their co-conspirators charged Plaintiff – are explained by the conspiracy.

59.   The higher canned tuna prices resulted in substantial profits for Defendants.   TUG saw its net profit increase from $61 Million in 2008 to $140 Million in 2014.   The following year, in its 2014 Annual Report issued in February 2015, TUG explained that "[d]espite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand."

60.   A substantial portion of TUG's profits were the result of the conspiratorial agreements alleged in this Second Amended Complaint.   ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

61.   Bumble Bee has been similarly profitable due to the conspiracy.   As alleged earlier, Lion Capital purchased Bumble Bee for $980 Million in 2010, and reached an agreement to sell it to TUG in 2014 for $1.51 Billion.   In announcing the sale, Lion Capital noted that Bumble Bee's EBITDA in 2014 was a record-breaking $150 Million, on revenue of $1 Billion.   Kelly Mayer, in a memo to her partners at Lion Capital, attributed Bumble Bee's record year to the growth of "gross margins through disciplined pricing actions."[7]   Discovery is necessary to determine whether Lion Capital was aware of and participated, if at all, in the conspiracy alleged in this Second Amended Complaint.

62.   StarKist, who has the largest U.S. market share, ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████   Accordingly, Dongwon registered substantial additional income in the period following the collusion alleged in this Second Amended

---

[7]   *See* https://www.undercurrentnews.com/2014/12/22/lion-capital-to-more-than-quadruple-its-investment-in-bumble-bee/.

Complaint, and received the proceeds of the conspiracy from StarKist knowing the ill-gotten nature of these funds. ████████████████████████████████

████████████████████

63.    In a Korean-language publication, Dongwon stated that "[t]he canned tuna market in the U.S. is approximately a $1,700,000,000 USD market, but it is a mature market where growth has stopped, and it maintains an oligopolistic system with StarKist (40%), Bumble Bee (25%), and COSI (15%), and represents a structure in which the price of tuna cannot be efficiently reflected in the sales price of products."   Instead, during time periods relevant to these allegations, the price of canned tuna reflected the conspiracy price.

> **D.    Defendants' Pricing of Canned Tuna to Plaintiff and Others Was Against Defendants' Self-Interest But For Their Collusion**

64.    As alleged above, during the conspiracy, the market for the production and sale of canned tuna in the United States was concentrated in a relatively few firms, *i.e.*, Bumble Bee, the COSI Defendants and the StarKist Defendants.  However, none of these companies had the power, unilaterally, to profitably increase the price of canned tuna sold in the United States, and instead needed to maintain a unified front in order to increase prices to the highly profitable levels that existed during the conspiracy.   Because Defendants' canned tuna products were close substitutes, unilateral attempts by any one of them to manipulate canned tuna price or supply posed substantial commercial risks.  A unilateral increase in price not followed by others would simply lead to lost sales.  A unilateral reduction in production would be costly because market share would be lost and revenue would likely fall while fixed costs (*e.g.*, labor, distribution, overhead, facility operation, facility maintenance, etc.) would remain relatively the same.  Under the circumstances, Defendants and their co-conspirators' canned tuna pricing actions during the conspiracy would have been against their self-interest unless they were colluding.

## VIII.  THE MARKET FOR THE PRODUCTION AND SALE OF CANNED TUNA WAS CONDUCIVE TO CARTELIZATION

### A.    There Are No Close Substitutes for Canned Tuna

65.    Canned tuna includes both "white" tuna fish, which consists of albacore tuna, and "light" tuna fish, which consists primarily of skipjack tuna.  Both varieties of canned tuna are typically packed in either water or vegetable oil.  Light tuna accounts for approximately two thirds of total sales in the United States by volume.

66.    Canned tuna possess commodity-like characteristics in that the product of one seller is interchangeable with the product of another.  As such, all things equal, it would not be profitable for Defendants and co-conspirators to unilaterally increase canned tuna prices in the U.S., because a unilateral price by any Defendant would allow another Defendant to steal substantial market share by simply holding its price.

### B.    The Market for the Processing and Sale of Canned Tuna Is/Was Concentrated

67.    Over the past two decades, the canned tuna industry has undergone a high degree of consolidation.  As a result of this consolidation, and during the conspiracy, the U.S. canned tuna industry had become highly concentrated.

68.    During the conspiracy, the market for the production of canned tuna was dominated by Defendants and their co-conspirators.  But for the conspiracy alleged in this Second Amended Complaint, Defendants and their co-conspirators would have had to compete on price.  Although estimates of their respective market shares vary somewhat, StarKist, Bumble Bee and COSI's branded products account for approximately 80% of the canned tuna market in the United States.  Also, COSI, which has the smallest domestic market share of the three Defendants for branded canned tuna, is the largest supplier of private-label canned tuna in the United States.  During the conspiracy, Defendants processed at least 85% of all canned tuna sold in the United States.

## C.     Barriers to Entry

69.     During the time period relevant to Plaintiff's claims, there were barriers to entry into the market for the production and sale of canned tuna in the United States, including, without limitation:

(a)     New entrants were faced with substantial start-up costs, including the need to gain access to distribution channels and retail outlets.   Additionally, substantial manufacturing expertise was required to enter the U.S. market.   These start-up costs reduced the opportunity or ability for rivals to enter the U.S. market and undercut Defendants and their conspirators' supracompetitive pricing.

(b)     New entrants and existing market participants faced substantial upfront, industry-specific costs to build a plant to process tuna loins into canned tuna. For example, the cost for Tri-Marine simply to modernize the plant it acquired from COSI in Pago Pago, American Samoa, in 2010, was approximately $70 million.  (The plant did not reopen until approximately 2015.)

(c)     The method used for processing canned tuna in the United States was capital intensive.   Given the cost to Tri-Marine of modernizing COSI's Pago Pago plant, the purchase of real estate and the construction of a new canned tuna processing facility in the mainland United States would likely cost in excess of $70 million, and require substantial industry expertise to build and operate.

(d)     Restrictive tariffs of between approximately 6% and 35% on the importation of canned tuna into the United States impaired the ability of foreign suppliers from capitalizing on supracompetitive domestic pricing of canned tuna.

## D.     Prevailing Supply and Demand Factors Incentivized Collusion

70.     As discussed in Section VII, supra, during the conspiracy, Defendants and co-conspirators faced supply and demand factors that should have led to declining prices for canned tuna in the United States.   The declining consumption of canned tuna in the United States resulted in excess production capacity for canned tuna.

---

Defendants and co-conspirators had sufficient production capacity in the United States to supply consumers with 3.4 pounds of canned tuna per capita in 2003. But by 2009, when annual per capita consumption had fallen to 2.5 pounds, a large portion of Defendants and their co-conspirators' capacity went unused.

71.     On top of the excess production capacity standing idle as a result of declining demand, Defendants also took steps prior to 2009 to increase their own efficiency and production capacity of canned tuna. For example, COSI's Lyons, Georgia plant – which opened in 2009 – had a production capacity that was approximately 50% higher than the production capacity of the Pago Pago plant that it displaced (and that was reopened by Tri-Marine in 2015). And when Dongwon purchased StarKist in 2008, it transferred equipment and technology that increased the manufacturing capacity of the StarKist Defendants' plant in Pago Pago.

(a)     Accordingly, the expanding global supply of canning-grade tuna and other fish coupled with declining demand for shelf-stable seafood and the excess domestic production capacity controlled by Defendants left the canned tuna industry ripe for collusion.

**E.     The Transfer of Executives Between Defendants Facilitated Collusion**

72.     During the conspiracy alleged in this Second Amended Complaint, executives left one conspirator to take a position at another.

73.     For example, Don George, Bruce Bollmer, and Herbert Tucker all worked at COSI when the conspiracy began in 2004, and later took positions at Bumble Bee (George) and StarKist (Tucker and Bollmer). Joe Clancy was a former StarKist employee who joined COSI in 2002 and, as alleged below, continued to exchange confidential information with former colleagues after joining COSI. Similarly, Jan Tharp left StarKist and joined Bumble Bee in a senior role, and

maintained a close relationship with several StarKist executives after joining Bumble Bee.

74.    In these and other instances, the executives exchanged confidential and sensitive pricing information with colleagues at their former employer after joining the new conspirator.

75.    Additionally, there were a number of close personal relationships between key members of the conspiracy. ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████

76.    Due to these close personal relationships, senior executives at each of the conspirators often spoke or texted with their counterparts from other Defendants on a frequent basis.   This familiarity bred or facilitated a culture of collusion in the packaged seafood industry during the time period relevant to Plaintiff's claims.

### F.    Select Trade Associations Facilitated Collusion

77.    The culture of collusion that existed in the packaged seafood industry during the time period relevant to Plaintiff's claim was also facilitated and enhanced by certain trade associations that counted Defendants among their major, or *only*, members.

(a)    For example, one such trade association was the National Fisheries Institute ("NFI"), which existed as early as 2004.  Defendants Bumble Bee, COSI and Del Monte/StarKist were among its members.  In 2007, NFI created the Tuna Council, whose only members were Bumble Bee, COS and Del Monte/StarKist.  As soon as the Tuna Council was created, Defendants used it to facilitate their collusion.  For

1  example, in January 2008, as Defendants were discussing their collusive can-size

2  reduction, ███████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████

5  ██████████████████████  As Plaintiff alleges in further detail below Defendants

6  discussed and exchanged confidential information about canned tuna pricing in

7  furtherance of the conspiracy under the cover of NFI and the Tuna Council.

8    **G.   Common Vendors and Co-Packing Arrangements Facilitated
          Collusion and Enforcement of the Cartel**

9

10   78.   During the time period relevant to Plaintiff's claims, but particularly

11  between approximately 2004 and 2010, Defendants shared a common canner in

12  American Samoa, Impress.  Bumble Bee, Del Monte/StarKist and COSI each knew at

13  the time that Impress was sharing production and other information about each of

14  them with the others, and Defendants used Impress as a conduit to facilitate the

15  exchange of information regarding the conspiracy.  As alleged in this Second

16  Amended Complaint, Impress is a co-conspirator, and its role in this regard is

17  illustrated in connection with the collusive can size reduction that occurred in 2007

18  and 2008.

19   79.   In addition to economic and other conditions that facilitated the

20  conspiracy, in 2011, Bumble Bee and the COSI Defendants entered into co-packing

21  agreements in which Bumble Bee's factory in Santa Fe Springs, California, packed

22  and canned the tuna for COSI's west coast operations, and COSI's plant in Lyons,

23  Georgia, packed the canned tuna for Bumble Bee's east coast operations.  This co-

24  packing arrangement enabled Bumble Bee and the COSI Defendants to monitor each

25  other's output and pricing.

26

27

28

## IX.   ADDITIONAL OVERT ACTS IN DEFENDANTS' CANNED TUNA CONSPIRACY

80.    Defendants and their co-conspirators carried out their continuing conspiracy regarding canned tuna through in-person meetings and communications, including e-mails and telephone calls.  During these meetings and communications, they agreed on conspiracy terms as alleged in this Second Amended Complaint, and coordinated price increase announcements or pricing terms, secretly and collusively exchanged pricing information and prospective pricing announcements and business plans, and collectively reduced quantity and restrained output of canned tuna sold to Plaintiff and others in the United States.

### A.   Defendants' Collusive Price Increases Between 2004-2006

81.    In the first half of 2004, the prevailing prices for canned tuna in the U.S. were below the level needed to deliver the profits expected by TUG.  Between 2001 and 2003, canned tuna prices had declined, as had profit margins.  ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████  COSI needed a new strategy.  ██████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████  TUG favored this strategy, because higher canned tuna prices accommodated higher prices for processed tuna sold by TUG to COSI and its rivals.  (Processed tuna is the main cost input to produce canned tuna).

82.    ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

83. ████████████████████████████████

84. ████████████████████████████████, a conscious commitment to an unlawful common scheme was formed, *i.e.*, an agreement, developed among Defendants and co-conspirators to increase prices of canned tuna sold to Plaintiff and others in the U.S. by, among other conduct, ██████

85. 

86.

87.

88.







96. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

97. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

98. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

99. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

100. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[8]



101.

102.

9

1

2

3

4

103.

5

6

7

8

9

104.

10

11

12

13

**B.**    **Defendants' Collusive Can Size Reduction and Price Increases in 2007-2008**

14

15

16    105.    The conspiracy among Defendants and co-conspirators continued in 2007

17    and 2008.

18    106.

19

20

21

22

23

24

25

26

27

28

107. 

108.

109.

110.   The collusive can-size reduction was facilitated by co-conspirator Impress, a canner with facilities in American Samoa.  In 2007-08, Impress had a

1  commercial relationship with Del Monte/StarKist, Bumble Bee and COSI. ███████

2  ████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████████.

7  111.  ███████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████

11  ███████████████████████████████

12  112.  ███████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████

20  ███████████████████████████

21  113.  ███████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  114.  ███████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████

28

115. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

116. Defendants also agreed to coordinate their messaging regarding their plans to downsize cans, so that customers would not learn that the decision was not driven by necessity, but was instead the result of collusion. ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

117. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

1 ████████████████████████████████████████████

2 ███████████████████████████████

3    118.  ███████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ████████████████████████████████████████████

20 ███

21    119.  ███████████████████████████████████

22 ████████████████████████████████████████████

23 █████████████████████████████████████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████████████

26 ████████████████████████████████████████████

27 ██████████████████████████████████████

28

120. █████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████

121. █████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████

122.   The conspiracy among Defendants and co-conspirators continued after the agreement to reduce the tuna can size.

123. █████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████

124. █████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████



125.

126.

127.

128.

**C.    Defendants Collude on Net Prices in 2010**

129.    The conspiracy among Defendants and co-conspirators continued into 2010, when they once again collusively raised net prices on canned tuna.  Net prices

are the prices disseminated to brokers of shelf stable seafood products, and represent the list price, less promotional allowances offered by Defendants to reduce the list price.  (Brokers present these prices to retailers like Plaintiff, who pay Defendants directly for the product.)   This collusive price increase was announced by each Defendant ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████.

130.   ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.

131.   ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.

132.   ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████.

1    133. ████████████████████████████████████████████████
2    ████████████████████████████████████████████████████
3    ████████████████████████████████████████████████████
4    ████████████████████████████

5    134. ████████████████████████████████████████████████
6    ████████████████████████████████████████████████████
7    ████████████████████████████████████████████████████
8    ████████████████████████████████████████████████████
9    ████████████████████████████████████████████████████
10   ██████████████████████████████

11   135. ████████████████████████████████████████████████
12   ████████████████████████████████████████████████████
13   ████████████████████████████████████████████████████
14   ████████████████████████████████████████████████████
15   ████████████████████████████████████████████████████
16   ████████████████████████████████████████████████████
17   ████████████████████████████████████████████████████
18   ████████████████████████████████████████████████████
19   ████████████████████████████████████████████████████
20   ████████████████████████████████████████████████████
21   ████████████████████████████████████████████████████
22   ████████████████████████████████████████████████████
23   ████████████████████████████████████████████████████
24   ████████████████████████████████████████████

25   136. ████████████████████████████████████████████████
26   ████████████████████████████████████████████████████
27   ██████████████████████████

28

137. ████████████████████████████████████████████████

████████████████████████████████████████

**D.**   **Defendants Colluded to Increase Canned Tuna Prices in 2011**

138.   Even with the alteration in can size for processed tuna and the prior collusive price increases, Defendants and co-conspirators were still unhappy with the prices they obtained.   Lischewski of Bumble Bee complained in April 2011 that canned tuna was "too cheap."  He said that it was important to persuade customers to pay more for canned tuna.   Unable to achieve this through lawful measures, Defendants continued to meet, communicate and conspire not to compete on canned tuna sold in the United States.

139. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

140. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

141. 

142.

143.

1

2

3

4  144.

5

6

7

8

9

10

11

12

13  **E.    Defendants Colluded on a Canned Tuna Price Increase in 2012**

14  145.  The conspiracy among Defendants and their co-conspirators continued

15  after 2011 and into 2012.

16

17

18

19  146.  In December 2011 and January 2012, telephone conversations occurred

20  between senior executives and sales personnel of Bumble Bee, the COSI Defendants

21  and the StarKist Defendants about coordinating and announcing a price increase for a

22  number of products in the second quarter of 2012.

23  147.

24

25

26

27

28

1 ███████████████████████████████████████████████

2 ████████████████████████████

3      148.   These competitor discussions led to an agreement or understanding that

4 the Defendants would increase prices by nearly identical amounts.   Pursuant to this

5 agreement or understanding, the Defendants announced collusive price increases as

6 follows: the StarKist Defendants on or about January 13, 2012, effective on March 26,

7 2012; Bumble Bee on or about January 17, 2012, effective on April 1, 2012; and the

8 COSI Defendants on or about January 18, 2012, effective on April 1, 2012.   Each

9 price increase announced identical (or virtually identical) increases on a number of

10 packaged seafood products.   For example, a 48 pack of five ounce cans of chunk light

11 tuna in water increased from $40.80 to $43.68.   Other products also increased by

12 identical percentages.

13      149.   ███████████████████████████████████████

14 ███████████████████████████████████████████████

15 ███████████████████████████████████████████████

16 ██████████████

17 **F.   Defendants' Collusion Not to Sell "FAD-Free" Branded Tuna**

18 **Products in 2011 and Thereafter**

19      150.   In 2011, employees and representatives of the StarKist Defendants,

20 Bumble Bee, and the COSI Defendants discussed whether any of them would launch a

21 "FAD-Free" product (*i.e.*, a canned tuna product containing only tuna that were

22 caught without the use of a FAD device).   These discussions included e-mails that

23 occurred throughout 2011 and into 2012.

24      151.   ███████████████████████████████████████

25 ███████████████████████████████████████████████

26 ███████████████████████████████████████████████

27 █████████████████████████████

28

1   152.   ███████████████████████████████████████████

2   ████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ██████████████████████████████████

6   153.   Defendants came to believe that if any of them launched a FAD-Free

7   product under one of their own branded labels, then it would work to the detriment of

8   each of their companies.   ███████████████████████████████

9   ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ████████

12  154.   On a teleconference during the week of February 10, 2012, the StarKist

13  Defendants, Bumble Bee and the COSI Defendants agreed that none of them would

14  launch a branded FAD-free canned tuna product in the United States.  This agreement

15  was later confirmed in writing during the week of February 17, 2012.  Defendants

16  agreed not to sell FAD-free canned tuna products in the United States under their own

17  brand names to avoid competition in the sale of canned tuna in the United States.   ███

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████

20  155.   ██████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ███████████████

25  156.   ███████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28

1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████

5    **G.**    <u>**Defendants Colluded on Promotional Activity and Pricing Terms in**</u>

6    <u>**at Least 2011-2013**</u>

7    157.    Between at least November 2011 and June 2013, senior executives and

8 sales personnel of the StarKist Defendants, Bumble Bee and the COSI Defendants

9 exchanged e-mails and had telephone conversations about discounting and

10 promotional practices and terms for the sale of canned tuna to customers.  As part of

11 these e-mails and telephone conversations, these senior executives and sales personnel

12 of Defendants assured each other that they would not compete regarding the pricing

13 and sale of canned tuna sold to customers.

14    158.    ████████████████████████████

15 ████████████████████████████████████████

16 ████████████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ████████████████████████████████████████

20 ██████████████████████

21    159.    ████████████████████████████

22 ████████████████████████████████████████

23 ████████████████████████████████████████

24 ██████████

25    **H.**    <u>**Defendants' Communications in Furtherance of the Conspiracy**</u>

26    <u>**After 2013**</u>

    160.    Defendants and co-conspirators collusive activities regarding canned tuna

27 continued after 2013.  ████████████████████████████

28

WEGMANS' SECOND AMENDED COMPLAINT

Case No: 15-md-2670-JLS-MDD

1

2

3

4

5

6

7

8

9

10

11

12

13     **I.**     **Defendants' Conspiracy Was Effective**

14     161. Defendants' and co-conspirators' conspiracy alleged in this Second

15 Amended Complaint was effective. For example, and without limitation, Bumble

16 Bee's Lischewski observed in 2012 that canned tuna prices had increased more than

17 40% in eighteen months during 2011 and 2012.

18     162. As a proximate result of this conspiracy, and during the time period

19 relevant to Plaintiff's claims, Defendants and co-conspirators charged Plaintiff and

20 others in the United States supracompetitive prices (*i.e.*, prices above a competitive

21 level) for canned tuna.

22     163. Defendants and co-conspirators' conspiracy alleged in this Second

23 Amended Complaint overcharged Plaintiff on canned tuna that Plaintiff directly

24 purchased from one or more Defendants and co-conspirators regardless of whether the

25 conspiracy price increase was on Defendants' list or net price of canned tuna. This is

26 because Plaintiff directly purchased canned tuna from Defendants and co-conspirators,

27

28

---

and Defendants and co-conspirators' collusive manipulation of canned tuna list and net prices had an adverse effect on the price Plaintiff paid for canned tuna.

164.   As alleged in this Second Amended Complaint, during the conspiracy, Defendants and co-conspirators agreed on the timing and amount of canned tuna price increases as reflected in price announcements.   They were successful in achieving these price increases, which enabled them to impose supracompetitive prices on Plaintiff and others.   This was because Defendants knew during the conspiracy that all of them were increasing canned tuna prices (or offering the same or similar prices); and the announced canned tuna price increases were higher than would have occurred if, in the absence of the conspiracy, each Defendant had competed and independently and unilaterally crafted its own price increase announcements.   Defendants' coordinated canned tuna price increase announcements provided them with a higher, unified starting point for imposing canned tuna prices on Plaintiff and others than would have resulted if each Defendant had independently and unilaterally set its own price increases (if at all).

## X.   DOJ INVESTIGATION AND AMNESTY APPLICATION

165.   In July 2015, published reports revealed that the United States Department of Justice had convened a Grand Jury to investigate potential antitrust violations by companies in the market for the production, pricing and/or sale of packaged seafood, including canned tuna.   DOJ has since publicly confirmed that it is investigating Defendants, explaining to this Court that "it is conducting an ongoing criminal investigation of Defendants for "potential violations of the Sherman Act, 15 U.S.C. § 1, in the packaged seafood industry."

166.   An indication that something was afoot occurred on July 17, 2015, when TUG – which had previously announced an initial public offering ("IPO") to finance the acquisition of Bumble Bee – publicly stated that it was suspending the IPO.   *See* http://www.nationmultimedia.com/business/TUF-suspends-preferential-public-

offering-over-US-30265095.html.  As alleged above, on December 3, 2015, TUG and Bumble Bee notified the DOJ that they would not proceed with the deal.  Their decision to cancel the sale was due to their concerns regarding the antitrust investigation and potential liability to their customers for anticompetitive behavior. *See* https://www.law360.com/competition/articles/734219/bumble-bee-thai-co-drop-1-5b-tuna-tieup-over-doj-fears.

167.   DOJ's criminal investigation of Defendants has thus far resulted in two convictions for violations of the U.S. antitrust laws.  As alleged earlier, two senior Bumble Bee executives – Cameron and K. Worsham – have pled guilty to and been convicted of criminal violations of the Sherman Act for their participation in the conspiracy with others to fix prices of packaged seafood between at least 2011 and 2013.  Additionally, Bumble Bee has reached a plea agreement with DOJ pursuant to which it will plead guilty to an Information charging that Bumble Bee engaged in price-fixing shelf-stable tuna fish in the United States in violation of Section 1 of the Sherman Act and pay a criminal fine of $25,000,000.

168.   As alleged above, COSI has admitted to the DOJ that it engaged in criminal violations of the Sherman and Clayton Acts regarding the pricing of packaged seafood.

169.   The StarKist Defendants are targets of the Grand Jury investigation, though they have not stated this publicly.  The StarKist Defendants are currently unindicted coconspirators whose conduct formed the basis, in part, for both Cameron's and K. Worsham's criminal price-fixing convictions.

170.   The DOJ's criminal investigation into the conduct alleged in this Second Amended Complaint is ongoing.  Following the announcement of K. Worsham's agreement to plead guilty, Acting Assistant Attorney General Renata Hesse, head of the DOJ's Antitrust Division, commented: "We [DOJ] will continue our work to root out the collusion among packaged seafood companies…."  After announcing that

Bumble Bee entered into a plea agreement, Acting Assistant Attorney General Attorney Andrew Finch stated that "the [Antitrust] division, along with our law enforcement colleagues, will continue to hold these companies and their executives accountable for conduct that targeted a staple in American households."

## XI. DISCOVERY IS NECESSARY TO DETERMINE THE FULL SCOPE OF THE CONSPIRACY

171. Discovery is necessary to determine the full scope of the conspiracy, including the time frame, products and participants. Plaintiff reserves the right to amend or supplement this Second Amended Complaint to add other Defendants, claims, time period, products or other allegations based upon discovery and further investigation. For example, discovery is necessary to determine whether and the extent to which, if at all, Defendants and co-conspirators conspired on other packaged seafood products – including salmon, shrimp, crab, clams, oysters, sardines and mackerel. While StarKist did not produce or sell many of these other packaged seafood products, Bumble Bee and COSI did, and their packaged seafood price increases in 2008, 2011 and 2012 (among others) warrant further scrutiny in discovery.

## XII. TOLLING OF THE STATUTE OF LIMITATIONS

172. The statutes of limitation as to Defendants and their co-conspirators' continuing antitrust violations alleged in this Second Amended Complaint were tolled because of one or more of the following events:

(a) The pendency of one or more Class Action Complaints, and any Amendments, against Defendants and their co-conspirators for conspiring to fix prices of packaged seafood products (including canned tuna) tolled the running of the statute of limitations on Plaintiff's claims; and/or

(b) On December 7, 2016, the DOJ filed a Criminal Complaint (or Information) charging Cameron with the criminal offense of violating the U.S.

antitrust laws by participating in a conspiracy to fix, raise and maintain the prices of packaged seafood sold in the United States.  The Cameron criminal proceedings, and others to follow regarding the packaged seafood (including canned tuna) conspiracy, tolls the running of the statutes of limitation on Plaintiff's claims during the criminal proceedings and for one year thereafter by operation of federal statute, under 15 U.S.C. § 16(i).

(c)   Defendants' affirmative acts of fraudulent concealment of the conspiracy prevented Plaintiff from having notice of its claims more than four years before filing its initial Complaint, and tolled the statute of limitations on Plaintiff's claims.

173.   Each of the overt acts in furtherance of the conspiracy alleged in this Second Amended Complaint was done with the purpose of concealing the conspiracy and preventing Plaintiff and other purchasers of canned tuna (and other packaged seafood products) from learning about the conspiracy's existence.   Accordingly, Plaintiff did not know or reasonably suspect the existence of its claims more than four years before filing its initial Complaint, nor were they aware of any facts more than four years before filing its initial Complaint that would have put them on reasonable notice of its claims.  More than four years before Plaintiff filed its initial Complaint, Defendants and their co-conspirators fraudulently concealed the existence of Plaintiff's antitrust claim so that Plaintiff, acting as a reasonable person, did not know of the existence of its claim at the time.

174.   During the time period relevant to Plaintiff's claims, including the time period more than four years before Plaintiff filed its initial Complaint, Defendants and their co-conspirators concealed the existence of Plaintiff's antitrust claims from Plaintiff as a result of the self-concealing nature of the conspiracy; and/or because Defendants and their co-conspirators engaged in affirmative and deceptive acts of concealment as described below.  As a result, Plaintiff did not know, and through the

1   exercise of due diligence (which they exercised) could not have known, about the

2   existence of its antitrust claims more than four years before filing its initial Complaint.

3       175.   Notwithstanding the self-concealing nature of their conspiracy, during

4   the time period relevant to Plaintiff's claims, including more than four years before

5   Plaintiff filed its initial Complaint, Defendants and their co-conspirators affirmatively

6   misled Plaintiff by wrongfully and affirmatively concealing the existence of Plaintiff's

7   antitrust claims from Plaintiff.   In addition to the overt acts alleged above that were

8   undertaken with the purpose of concealing the conspiracy, Defendants took additional

9   steps to conceal their illegal conduct from Plaintiff and others.   For example, and

10  without limitation:

11          (a)     During the conspiracy alleged in this Second Amended Complaint,

12  and as alleged above, Defendants and co-conspirators met in secret to affirmatively

13  conceal the existence of the conspiracy from those not involved in it.

14          (b)     During the conspiracy alleged in this Second Amended Complaint,

15  Defendants and co-conspirators used personal e-mail for conspiracy communications

16  in order to avoid detection of the conspiracy by those not involved in it.   (Defendants

17  did not typically use private e-mail accounts for any other business purposes and

18  instead used their corporate e-mail accounts). ████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28

[REDACTED]

       (c)    During the conspiracy alleged in this Second Amended Complaint, Defendants and co-conspirators used misleading subject lines on e-mails to affirmatively conceal the conspiratorial nature of their communications from those not involved in the conspiracy. [REDACTED]

1 ███████████████████████████████████████████████████████

2 ███████████████████████████

3          (d)     During the conspiracy alleged in this Second Amended Complaint,

4 Defendants and co-conspirators met in places outside their offices to communicate

5 about the conspiracy in order to affirmatively conceal the fact of their meeting and the

6 existence of the conspiracy from those not involved in it.  ████████████████████

7 ████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████

27

28

1  ████████████████████████████████████████████████████

2  ████████████████████.

3          (e)     During the conspiracy alleged in this Second Amended Complaint,

4  Defendants and co-conspirators applied warnings on documents not to disclose to

5  others or instructions about transmission in order to affirmatively conceal the

6  existence of the conspiracy from those not directly involved in it.  ███████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████

24 ███████████████████████████████

25         (f)     During the conspiracy alleged in this Second Amended Complaint,

26 Defendants and co-conspirators affirmatively concealed the existence of the

27 conspiracy from Plaintiff and others by providing pretextual explanations for

28

Defendants and co-conspirators' collusive canned tuna can size reduction, price increases and other conspiracy activities.  These explanations, while seemingly true on their face at the time, were actually intended by Defendants and co-conspirators to deflect attention from and conceal their conspiracy and to create the illusion of competition when, in fact, price competition was being systematically suppressed and eliminated.  As such, these explanations were false and pretextual.  For example, and without limitation:

(i) ███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████

(ii) ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

(iii) █████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████.

(iv) ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████████████.

1 ████████████████████████████████████
2 ████████████████████████████████████
3 ████████████████████████████████████
4 ████████████████████████████████████
5 ████████████████████████████████████
6 ████████████████████████████████████
7 ████████████████████████████████████
8 ████████████████████████████████████
9 ████████████████████████████████████
10 ████████████████████████████████████
11 ████████████████████████████████████
12 ████████████████████████████████████
13 ████████████████████████████████████
14 ████████████████████████████████████
15 ████████████████████████████████████
16 ████████████████████████████████████
17 ████████████████████████████████████
18 ████████████████████████████████████
19 ██████
20 (v)  ████████████████████████
21 ████████████████████████████████████
22 ████████████████████████████████████
23 ████████████████████████████████████
24 ████████████████████████████████████
25 ████████████████████████████████████
26 ████████████████
27
28

1    (vi)   Defendants and their co-conspirators cited their own
2    predictions about where the tuna market was heading as the basis for a price increase.
3    Because these future predictions were unverifiable by Plaintiff, they provided
4    Defendants with pretexts that allowed for the implementation of collusive price
5    increases.   For example, on January 18, 2012, the COSI Defendants wrote to their
6    customers, including Plaintiff, that "[h]igh fish prices have made it necessary to
7    increase the list price of both light and white [tuna].   All indicators are that these
8    higher raw material costs will not return to levels that were seen as recently as a year
9    ago."   Upon information and belief, this pretextual explanation was discussed between
10   or among Defendants through e-mail and telephone communications in the weeks and
11   months that preceded COSI's announcement.

12   (vii)   In a letter to customers (including Plaintiff) dated March 30,
13   2012, Bumble Bee's Cameron predicted that a number of "unforecasted elements,"
14   some of which would occur "in the second half of 2012," combined to require Bumble
15   Bee to increase its own pricing.

16   (viii)   In a March 30, 2012 interview, IS Cho explained the
17   justification the StarKist Defendants were giving to retailers in pretextual support of
18   the collusive price increases: "We had a tough year last year and we have taken a lot
19   of price increases ... We are fixing it and retailers do understand....   The tuna industry
20   is not going to offer a low-priced and quality product and lose money on it."

21   (ix)   In a presentation to Kroger on April 19, 2013, Bumble Bee
22   justified its canned tuna price increase by forecasting that the prices of skipjack and
23   albacore would rise approximately $120 and $200 per metric ton, respectively, over
24   the next six months.

25   (x)   Between 2011 and 2013, Defendants repeatedly gave
26   pretextual justifications to Plaintiffs about its supposed inability to offer certain
27   discounting or promotional terms.   For example, and without limitation, in a

28

presentation to Ahold in July 2013, the StarKist Defendants stated: "we will aggressively manage costs and improve productivity to maintain competitive pricing aligned with market conditions."

(xi)   Each of the foregoing examples of Defendants' explanations for canned tuna price increases was pretextual and false or misleading, as each price increase was the result of the conspiracy.  The foregoing examples are representative of the pretextual and false or misleading explanations that Defendants and their co-conspirators provided to Plaintiff during the conspiracy, including more than four years before Plaintiff filed its initial Complaint, in order to affirmatively conceal the conspiracy from Plaintiff and others.

(g)   During the conspiracy alleged in this Second Amended Complaint, Defendants and co-conspirators affirmatively concealed the existence of the conspiracy from Plaintiff and others by using trade association meetings, which they attended, to create the illusion that they were meeting for legitimate purposes when, in fact, they were using these meetings as a cover to conceal the conspiracy from others not involved in it.  These trade associations include the Tuna Council and the ISSF. For example, and without limitation, in 2010, 2011 and 2012, Defendants, through the Tuna Council, partnered with the Thai Food Processors Association – of which TUG was a member – to plan and then launch a U.S. advertising campaign called "Tuna the Wonderfish," ostensibly to stimulate demand for canned tuna in the United States.  A. ███████████████████████████████████████ (The campaign was  unsuccessful.)  ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

(h)　During the conspiracy alleged in this Second Amended Complaint, Defendants and co-conspirators affirmatively concealed the existence of the conspiracy from those not involved in it by confining knowledge and communication in furtherance of the conspiracy to a limited number of high ranking and/or key employees of each Defendant and co-conspirator, and limiting the creation of documents reflecting the existence of the conspiracy.

176.　During the conspiracy, including more than four years before Plaintiff filed its initial Complaint: Defendants and their co-conspirators' affirmative acts of concealment were intended by them to conceal the existence of their unlawful actions from Plaintiff; and Plaintiff was unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of concealment.

177.　As a direct result of Defendants and their co-conspirators' affirmative and fraudulent acts of concealment alleged above, Plaintiff did not have actual or constructive knowledge of its antitrust claim, or the facts that might reasonably have led Plaintiff (or a reasonable purchaser in Plaintiff's position) to discover or suspect

that it had the antitrust claim against Defendants and their co-conspirators alleged in this Second Amended Complaint, more than four years before Plaintiff filed its initial Complaint.  Before then, Plaintiff was not aware of the facts that would have alerted it (or would have alerted a reasonably diligent purchaser in Plaintiff's position) of the need to investigate whether it had the antitrust claim alleged in Plaintiff's initial Complaint or its Second Amended Complaint.

178.   Further, throughout the conspiracy, Plaintiff engaged in due diligence in seeking to ensure that it was receiving competitive pricing for canned tuna.  For example and without limitation, Plaintiff used a method of purchasing canned tuna – including, for example and without limitation, seeking price quotes and bids from their suppliers and/or investigating reasonably available public information – that caused it to believe in good faith at the time that it was receiving competitive prices for the canned tuna that it purchased from Defendants and their co-conspirators.  Upon learning of DOJ's investigation into Defendants' potential antitrust violations, Plaintiff diligently investigated Defendants' conduct and ultimately concluded that each of them had a claim.   Unfortunately, as alleged in this Second Amended Complaint, as a proximate result of the conspiracy, Defendants and their co-conspirators overcharged Plaintiff for canned tuna during time periods relevant to Plaintiff's claim despite Plaintiff's due diligence during the alleged conspiracy, including the time period more than four years before Plaintiff filed its initial Complaint.

179.   Defendants and their co-conspirators' fraudulent concealment of their unlawful conduct tolled the statute of limitations for Plaintiff's claim.

180.   Plaintiff's claims have been brought within the applicable statute of limitations period.

## XIII.  ANTITRUST VIOLATIONS

181.   Plaintiff incorporates by reference ¶¶ 1 through 180 above.

182.   Beginning at a time yet to be determined, but no later than 2004, and continuing in force or effect, or both, until at least approximately July 2015, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of canned tuna in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

183.   The contract, combination and conspiracy among Defendants and their co-conspirators described in the immediately preceding paragraph consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of canned tuna in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

184.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To fix, stabilize, maintain and/or raise prices of canned tuna sold to Plaintiff and others in the United States;

(b)    To allocate customers, the volume of sales and/or market shares of canned tuna sold to Plaintiff and others in the United States;

(c)    To control the production and/or sale of canned tuna to Plaintiff and others in the United States; and/or

(d)    To earn supracompetitive profits on the price of canned tuna sold to Plaintiff and others in the United States that resulted from Defendants' collusion.

185.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Second Amended Complaint):

---

WEGMANS' SECOND AMENDED COMPLAINT                              Case No: 15-md-2670-JLS-MDD

(a)    They agreed to exchange, and did exchange, current and future price information about canned tuna sold in the United States, including the prices quoted or charged to Plaintiff for the sale of canned tuna;

(b)    They agreed to coordinate, and did coordinate, price levels, price terms and/or price movements for sale of canned tuna sold in the United States;

(c)    They agreed on prices and price levels of canned tuna sold in the United States; and/or

(d)    They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

186.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of canned tuna to be sold to Plaintiff and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of canned tuna to Plaintiff and/or others in the United States.

187.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiff's claims:

(a)    Price competition in the sale of canned tuna among Defendants and their co-conspirators to Plaintiff and others in the United States has been restrained, suppressed and eliminated;

(b)    Prices for canned tuna sold by Defendants and their co-conspirators to Plaintiff and others have been raised, fixed, maintained and/or

stabilized at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiff and other direct purchasers of canned tuna produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

188.   Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained.  Plaintiff's injury as a direct purchaser of canned tuna is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

## XIV.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following relief:

A.     A jury verdict in the amount of the compensatory damages sustained by Plaintiff.

B.     A judgment against Defendants, jointly and severally, by the Court in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for attorney's fees, costs and interest as allowable by law.

C.     Such other and further relief as the Court may deem just and proper.

### <u>JURY DEMAND</u>

Plaintiff demands a trial by jury of all issues so triable.

Dated:  May 8, 2017                    Respectfully submitted,


By:  */s/ Linda P. Nussbaum*
            Linda P. Nussbaum

Linda P. Nussbaum
Susan R. Schwaiger
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas
40th Floor
New York, NY 10036-8718
Tel: (917) 438-9189

---

1

E-mail:    lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

2

3

***Counsel for Direct Action Plaintiff Wegmans Food Markets, Inc.***

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

I certify that on May 8, 2017, I filed the foregoing document with the Clerk of

3

the Court for the United States District Court, Southern District of California, by using

4

the Court's CM/ECF system, and also served counsel of record via this Court's

5

CM/ECF system and served counsel of record with the unredacted version of the

6

document by electronic mail.

7

8

NUSSBAUM LAW GROUP, P.C.

9

By:  */s/ Linda P. Nussbaum*

10

Linda P. Nussbaum

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28