UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No.: 15-MD-2670 JLS (MDD)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS**<br><br>(ECF Nos. 408, 409, 412) |

Presently before the Court are:

(1) Defendants StarKist Co.'s, Dongwon Industries Co., Ltd.'s, Bumble Bee Foods, LLC's, Tri-Union Seafoods, LLC's, Thai Union Group PCL's, and Del Monte Corporation's ("Joint Defendants") Motion to Dismiss all Plaintiffs' Complaints[1] for (A) failure to allege

---

[1] Although substantively identical, Defendants filed two separate "*Twombly*" memoranda in support of dismissing (1) Direct Purchaser Plaintiffs', Affiliated Foods', Kroger's, Meijer's, Publix's, Super Store Industries', SuperValu's, W. Lee Flowers', WalMart's, Wegmans', and Winn-Dixie's Complaints (ECF No. 408-1); and (2) End Payer Plaintiffs' and Commercial Food Preparer Plaintiffs' Complaints (ECF No. 409-1), respectively.

any factual allegations supporting a post-2013 packaged tuna conspiracy, (B) improperly claiming an entitlement to discovery concerning non-tuna products, and (C) failing to allege a plausible claim for injunctive relief ("*Twombly* MTD," ECF Nos. 408-1, 409-1); and Motion to Dismiss (D) certain of End Payer Plaintiffs' ("EPPs") and Commercial Food Preparer Plaintiffs' ("CFPs") state law claims due to failure to comply with the Court's prior Order Granting in Part and Denying in Part Defendants' Remaining Motions to Dismiss (ECF No. 295), pleadings contrary to dispositive state law, and lack of Article III or statutory standing ("State Law Br.," ECF No. 409-2); and (2) Defendants StarKist Co.'s, Dongwon Industries Co., Ltd.'s, and Del Monte Corporation's ("StarKist Defendants") Motion to Dismiss (A) all Plaintiff's pre-2011 allegations and (B) all Plaintiffs' alter ego and agency allegations against Dongwon ("SK Defs.' MTD," ECF No. 412).

Also before the Court are various responses—including Direct Purchaser Plaintiffs' ("DPPs") Omnibus Opposition to Motions to Dismiss Second Consolidated Amended Complaints ("DPPs' Opp'n," ECF No. 423); EPPs' and CFPs' Joint Opposition to Defendants' Joint Motions to Dismiss Second Amended Complaints ("EPPs' & CFPs' Opp'n," ECF No. 438); and Direct Action Plaintiffs' ("DAPs") Joint Omnibus Response to Defendants' Motions to Dismiss ("DAPs' Opp'n," ECF No. 427)—and various replies—including Joint Defendants' Reply Memorandum of Points and Authorities in Support of Defendants' Joint Motion to Dismiss Operative Complaints ("*Twombly* Reply," ECF No. 452), and ("State Law Reply," ECF No. 453).[2]

Having considered the Parties' arguments and the law, the Court **GRANTS IN**

---

[2] Additionally, the Complaints primarily referenced in this Order are as follows: (1) DAP Kroger's Second Amended Complaint ("DAP Kroger's SAC," ECF No. 362); (2) Second Consolidated Direct Purchaser Class Compl. ("DPPs' SCCC," ECF No. 366); (3) Second Amended Consolidated Class Action Complaint of the Indirect Purchaser End Payer Plaintiffs ("EPPs' SACCAC," ECF No. 367); (4) Commercial Food Preparer Plaintiffs' Second Amended Complaint ("CFPs' SAC," ECF No. 361). Unless Defendants explicitly and clearly draw a distinction between various DAP Complaints, (e.g., DAP Kroger's Second Amended Complaint as compared to Direct Action Plaintiff Affiliated Foods Second Consolidated Amended Complaint ("DAP Affiliated Foods' SCAC," ECF No. 363), or a distinction necessarily arises from one of the Court's prior rulings, then the Court treats DAP Kroger's Second Amended Complaint as a valid exemplar of all DAPs' Complaints.

**PART AND DENIES IN PART** each Motion to Dismiss.[3]

## BACKGROUND

The case concerns a conspiracy to fix the prices of packaged seafood throughout the United States. Plaintiffs are proceeding against "the three largest domestic producers of packaged seafood products" and their parent corporations (*e.g.*, DPPs' SCCC ¶¶ 1, 23–53), and are composed of four distinct groups:

- **DAPs**, who are direct purchasers proceeding against Defendants individually;
- **DPPs**, who are direct purchasers proceeding on behalf of a putative class;
- **CFPs**, who are indirect purchasers proceeding on behalf of a putative class; and
- **EPPs**, who are indirect purchasers proceeding on behalf of a putative class.

(Order Appointing Interim Lead Counsel 1–2, ECF No. 119.) Defendants previously moved to dismiss all Plaintiffs' complaints, which the Court resolved by issuing two Orders together granting in part and denying in part Defendants' requested relief. (*See* Order Granting in Part and Den. in Part Defs.' Mots. to Dismiss ("Prior MTD Order I") 4–6, ECF No. 283; Order Granting in Part and Den. in Part Defs.' Remaining Mots. to Dismiss ("Prior MTD Order II") 4–6, ECF No. 295.) All dismissals in the two previous Orders were without prejudice. (Prior MTD Order II 102.) Accordingly, Plaintiffs have now filed amended complaints and Defendants have again moved to dismiss various aspects of those complaints.

However, the factual footing has shifted since the Court issued its prior Orders. Whereas previously the United States Department of Justice had merely convened a Grand Jury to investigate potential violations of the Sherman Act, 15 U.S.C. § 1, in the packaged

---

[3] This Order applies to the Motions to Dismiss filed in this matter (ECF Nos. 408, 409, 412) and to the identical Motions to Dismiss filed in related matters: 16-CV-247 (ECF Nos. 31, 34), 17-CV-951 (ECF Nos. 18, 21), 16-CV-398 (ECF Nos. 29, 33), 16-CV-1226 (ECF Nos. 30, 34), and 17-CV-950 (ECF Nos. 18, 21). The Court also **GRANTS** Defendants Starkist Co., Dongwon Industries Co., Ltd., and Del Monte Co.'s Motion for Leave to File Exhibit on Case Docket. This Order applies to the Motion filed in this matter (ECF No. 413) and to: 16-CV-247 (ECF No. 35); 17-CV-951 (ECF No. 22); 16-CV-398 (ECF No. 34); 16-CV-1226 (ECF No. 34); and 17-CV-950 (ECF No. 22).

seafood industry (U.S. Notice of Mot. to Intervene 1, ECF No. 34), there have now been multiple guilty pleas either entered or agreed to pursuant to the Grand Jury investigation, including by senior executives of the Bumble Bee Corporation (*e.g.*, DPPs' SCC ¶¶ 5–7), and the Bumble Bee Corporation itself. (*Id.* ¶¶ 8–9). Furthermore, "Tri-Union has confirmed to counsel for Plaintiffs that it has sought leniency from the DOJ" for its participation in the alleged conspiracy (*id.* ¶ 10), and a former StarKist and Del Monte executive, Stephen Hodge, has pled guilty to participating in the same conspiracy (DAPs' Opp'n Ex. 1).[4] Finally, a little over a month prior to Plaintiffs filing their amended complaints, Plaintiffs received approximately 2,000,000 pages of documents that were previously only available to the Grand Jury. (DAPs' Opp'n 3–4.) The ensuing Complaints therefore contain much more information than their predecessors.

Although the instant Complaints largely share the same factual material, they nonetheless vary such that—at least in this procedural posture—a comprehensive account of the facts would not here be appropriate. Accordingly, the Court below addresses Plaintiffs' distinct allegations within the specific context of each of Defendants' dismissal arguments.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss. The court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' . . . it [does] demand[] more than an unadorned, the-defendant-unlawfully-harmed-me

---

[4] Although not formally presented in Plaintiffs' Complaints, Mr. Hodge's guilty plea is properly the subject of judicial notice. *Compare* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."), *with* DAPs' Opp'n Ex. 1 (court transcript of proceeding during which the court accepted Mr. Hodge's guilty plea).

accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, the court need not accept as true "legal conclusions" contained in the complaint. *Id.* This review requires context-specific analysis involving the court's "judicial experience and common sense." *Id.* at 678 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.*

## ANALYSIS

Defendants diverge slightly in the particular arguments they advance: (I) Defendants StarKist Co., Dongwon Industries Co., Ltd., Bumble Bee Foods, LLC, Tri-Union Seafoods, LLC, Thai Union Group PCL, and Del Monte Corporation move to dismiss (A) all Plaintiffs' post-2013 conspiracy allegations; (B) all Plaintiffs' claimed right to discovery regarding non-tuna products; (C) all Plaintiffs' claims for injunctive relief; and (D) EPPs' and CFPs' state-law (i) anti-trust, (ii) consumer protection, (iii) unjust enrichment, and (iv) nationwide California class claims; along with (v) claims in states where EPPs' named

plaintiffs lack Article III or statutory standing. Separately, (II) Defendants StarKist Co., Dongwon Industries Co., Ltd., and Del Monte Corporation additionally move to dismiss all Plaintiffs' (A) pre-2011 conspiracy allegations as insufficient to state a claim regarding all three Defendants ((i) StarKist and Del Monte, and (ii) Dongwon), including allegations that any of the three Defendants reached an agreement with competitors to reduce can sizes, and time-barred as to StarKist; and (B) pre-2012 allegations against Dongwon, including under either (i) alter ego or (ii) agency theories of liability. The Court addresses each argument in turn.

## I. StarKist's, Dongwon's, Bumble Bee's, Tri-Union's, TUG's, and Del Monte's Motions to Dismiss

### A. All Plaintiffs' Post-2013 Conspiracy Allegations

Defendants move to dismiss all Plainitffs' post-2013 allegations as implausible. (*Twombly* Br. 3–8.) However, Plaintiffs argue that the Court need not even reach Defendants' arguments pursuant to Federal Rule of Civil Procedure 12(g)(2). (*E.g.*, DAPs' Opp'n 37–38.) The Court agrees with Plaintiffs.

Specifically, when "a party . . . makes a motion under [Federal Rule of Civil Procedure 12(b) then she generally] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). The sole Rule 12 exception is that a party may subsequently raise the foreclosed issue "in a post-answer motion under Rule 12(c)"; otherwise, the party may validly raise the issue "in a pleading under Rule 7 . . . or at trial." *In re Apple Iphone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017) (citing *English v. Dyke*, 23 F.3d 1086, 1091 (6th Cir. 1994)); *see also Hernandez v. City of San Jose*, __ F. Supp. 3d __, No. 16-CV-03957-LHK, 2017 WL 977047, at *19 (N.D. Cal. Mar. 14, 2017) ("[U]nder Rule 12(g)(2) and Rule 12(h)(2), a party that seeks to assert a defense pertaining to a failure to state a claim that was available but omitted from an earlier Rule 12 motion can only do so in a pleading, a Rule 12(c) motion, or at trial."). Nonetheless, a court may exercise its discretion to consider a defense or objection that would be otherwise barred by Rule

12(g)(2) if such consideration would further the primary command "that the Federal Rules 'be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.' " *See In re Apple Iphone Antitrust Litig.*, 846 F.3d at 318 (quoting Fed. R. Civ. P. 1). Although such an exercise of discretion is technically "error," the Ninth Circuit recently held that on appeal the circuit "should generally be forgiving of a district court's ruling on the merits of a late-filed Rule 12(b)(6) motion." *Id.* at 319.

However, it was not the *Apple* court's purpose to completely strike Rule 12(g)(2) from the rulebook. Nor will this Court adopt Defendants' tacit suggestion, (*Twombly* Reply 3–4), to transform Rule 12(g)(2) into one that only applies when a court is faced with "repetitive motion practice, delay, [or] ambush tactics." *See In re Apple Iphone Antitrust Litig.*, 846 F.3d at 318 (quoting *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1175 (C.D. Cal. 2011)). Rule 12(g)(2)'s plain language does not require such a finding before its restrictions apply, and its intended policy goals stretch beyond the three set forth by the *Apple* and *Allstate* courts. Indeed, in a case as broad as this, where there are many claims and many potential arguments to be made, to refuse to enforce Rule 12(g)(2)'s clear command on such a foundational argument as the one Defendants here urge (i.e., over two years of alleged conspiratorial reach which Defendants' prior dismissal motion did not previously directly address) would set a dangerous precedent regarding the ability to continually hamstring a plaintiff with wave after wave of motions to dismiss.

Nor is the Court persuaded by Defendants' arguments that by earlier moving to dismiss Plaintiffs' complaints "in [their] entirety" (*Twombly* Reply 2), Defendants are therefore permitted to raise any argument regarding any time period alleged in the first round of complaints. Parties often move in the alternative for incrementally more-specific relief in case the court finds a broader argument unpersuasive. Defendants did not so move in their previous Motion to Dismiss. (*See generally* ECF No. 207-2.) Otherwise put, Defendants here correctly argue that they necessarily previously moved to dismiss Plaintiffs' post-2013 allegations because they moved to dismiss Plainitffs' prior complaints

in their entirety; but the Court in its prior Order "conclude[d] that . . . all [but one] Plaintiff[] . . . alleged sufficient factual material to nudge their overarching allegations of a conspiracy over the line from possible to plausible." (Prior MTD Order I 22.) This means that by the terms of Defendants' own argument the Court previously ruled on Defendants' motion to dismiss Plaintiffs' post-2013 allegations and <u>denied</u> the requested relief. (*E.g.*, *id.* Prior MTD Order I 31 ("[T]he Court . . . **DENIES** Defendants' Motion to Dismiss all Plaintiffs' allegations of a tuna-specific conspiracy as to all but the Flowers Complaint.")).[5] Defendants may not now again request that same relief.

To be clear, there is no evidence here that Defendants brought this motion in bad faith or with any intent to delay the proceedings; all evidence and argument instead points to Defendants' valid belief that the factual footing of the case shifted such that it would be advantageous to press a new, more-particularized argument that they failed to previously raise. However, the Court here declines to exercise its discretion to disregard Rule 12(g)(2), despite the fact that the Ninth Circuit might well be "forgiving of . . . [this] court's failure to follow Rule 12(g)(2)." *In re Apple Iphone Antitrust Litig.*, 846 F.3d at 318.

Even if Rule 12(g)(2) did not bar Defendants' argument regarding Plaintiffs' post-2013 conspiracy allegations, the argument would still fail. In their opposition, DAPs included a list of allegations against Defendants from 2014 and 2015 regarding the

---

[5] Defendants therefore have a point regarding the Flowers Complaint, in that the Court previously granted Defendants' requested relief as to that particular Plaintiff. However, Flowers' Amended Complaint is now replete with factual information firmly establishing a plausible conspiracy beginning as early as 2004. (*See generally W. Lee Flowers & Co. Inc. v. Bumble Bee Foods LLC et al.*, 16cv1226-JLS (MDD), ECF No. 20 ¶¶ 1–162; *see also infra* Section II.A.i (finding to be plausible Plaintiffs' 2004 allegations regarding Defendants Del Monte and StarKist).) And once a conspiracy is established "it remains actionable until its purpose has been achieved or abandoned." *United States v. Inryco, Inc.*, 642 F.2d 290, 293 (9th Cir. 1981). For a defendant to abandon a conspiracy it must take affirmative action—"[p]assive nonparticipation in the continuing scheme is not enough to sever the meeting of minds that constitutes the conspiracy." *Smith v. United States*, 568 U.S. 106, 112–13 (2013). And here the Flowers Complaint easily passes the plausibility standard for the continuation of the alleged conspiracy, detailing, for example, several private meetings between Defendants at odd times and at undisclosed locations. (*W. Lee Flowers & Co. Inc. v. Bumble Bee Foods LLC et al.*, 16cv1226-JLS (MDD), ECF No. 20 ¶ 163.) Accordingly, the Court **DENIES** Defendants' Motion to Dismiss on this front regarding the Flowers Complaint.

continued conspiracy. (DAPs' Opp'n 49–50.) For example, DAPs reference an email from Bumble Bee's CEO regarding keeping "prices up at current levels[,]" private meetings between various Defendants' CEOs, exchanged price lists, and the distribution of conspiracy proceeds. (*Id.*) DAPs' allegations are sufficient to support a plausible inference that Defendants' conspiracy continued post-2013. DPPs also allege the conspiracy extended past 2013. (DPPs' Opp'n 17). To support their allegation, DPPs reference a company Board Book circulated by Roszman (former COO of Chicken of the Sea [CotS]) in 2014 regarding a "collusion[,]" and irregularly scheduled meetings between Roszman and Lischewski (CEO of Bumble Bee) in 2014. (*Id.* at 17.) The allegations are similarly sufficient to support a plausible inference that Defendants' conspiracy continued post-2013. Finally, EPPs and CFPs allege Defendants continued to monitor the conspiracy beyond 2013 once the conspiracy was established. (EPPs & CFPs Opp'n 28.) They allege this monitoring was demonstrated by the steady price increase of packaged tuna even when there were significant decreases in raw material costs. (*Id.*) EPPs and CFPs also allege Thai Union Group acknowledged anticompetitive behavior in 2014. (*Id.*) The allegations are sufficient to support a plausible inference that Defendants' conspiracy continued post-2013. Accordingly, the Court **DENIES** Defendants' Motion to Dismiss on this ground.[6]

## B. Discovery Regarding Non-Tuna Products

Defendants argue that "Plaintiffs' asserted right to discovery regarding non-tuna products is improper and the Court should strike such claims from the SACs." (*Twombly* Br. 8–11.). In particular, Defendants argue the language in many Plaintiffs' SACs asserting that "discovery is necessary to determine whether and the extent to which, if at all, Defendants and co-conspirators conspired on other packaged seafood products . . . ." should be stricken. (*Twombly* Br. 8–9.) Although presented within the context of Defendants'

---

[6] In DAPs' Opposition, Winn-Dixie concedes that it "will not pursue its allegations of post-July 2015 conspiratorial conduct[,]" (DAPs' Opp'n 41 n.43). Accordingly, Winn-Dixie **SHALL** file an amended complaint reflecting this concession within fourteen days of the date on which this Order is electronically docketed.

12(b)(6) Motion, Defendants' request falls under Federal Rule of Civil Procedure 12(f), which permits a court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." "Motions to strike are 'generally disfavored because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice.' " *Cortina v. Goya Foods, Inc.*, 94 F. Supp. 3d 1174, 1182 (S.D. Cal. 2015) (quoting *Rosales v. Citibank*, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001)). Accordingly, "motions to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Colaprico v. Sun Microsys., Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991). "When ruling on a motion to strike, this Court 'must view the pleading under attack in the light most favorable to the pleader.' " *Id.* (citing *RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 561 (C.D. Cal. 2005)).

In the present case, Defendants are correct that the Court previously dismissed all Plaintiffs' non-tuna claims (Prior MTD Order I 11–12) and that all Plaintiffs' amended complaints abandon non-tuna claims (*see Twombly* Br. 8). However, as Plaintiffs point out, (1) the fact that their amended complaints currently only seek redress for tuna-specific harms necessarily limits the scope of permissible discovery (*see, e.g.*, EPPs' & CFPs' Opp'n 21–22), (2) "on-going discovery and investigation may lead to amendment under Rule 15 when justice so requires" (*id.*), and (3) amendment may in fact be necessary given "that Defendants have produced voluminous documents to the civil plaintiffs that were previously produced to the DOJ in response to criminal subpoenas" that encompass "non-tuna products, in whole or in part." (DPPs' Opp'n 17). Viewed in this context, and against Plaintiffs' assertions that they do "not seek inappropriate discovery," the Court cannot say that these few lines of Plaintiffs' complaints are immaterial or impertinent. Accordingly, the Court **DENIES** Defendants' Motion to Dismiss on this ground.

### C. Entitlement to Injunctive Relief

Defendants argue that "CFPs, EPPs, DPPs, and Winn-Dixie again seek [unwarranted] injunctive relief under Section 16 of the Clayton Act." (*Twombly* Br. 12.)

However, each of these Plaintiffs assert that they are "not seeking injunctive relief at this time" (DPP Opp'n 18; DAPs' Opp'n 37 n.39; EPPs' & CFPs' Opp'n 21) and that any reference to injunctive relief is either "an inadvertent holdover from the original . . . complaint[s']" discussion of common class issues (DPP Opp'n 17), or merely a statement regarding "other and further relief . . . the Court may deem just and proper after trial." (EPPs' & CFPs' Opp'n 21.)[7] Accordingly, given Plaintiffs' concessions, the Court **DENIES** Defendants' Motion to Dismiss on this ground. However, the Court **ORDERS** that DPPs **SHALL** amend their Complaint to remove the "inadvertent holdover" <u>within fourteen days of the date on which this Order is electronically docketed.</u>

### D. EPPs' and CFPs' State-Law Claims

#### (i)    Antitrust Claims

Defendants argue that EPPs' Illinois antitrust claim must be dismissed because this Court previously stated that "Illinois does not permit civil suits by indirect purchasers" (State Law Br. 3 (quoting Prior MTD Order II 28)), and that CFPs' South Carolina antitrust claim must be dismissed because South Carolina bars indirect purchasers from recovery. (*Id.* (collecting authority).) The Court addresses each in turn.

#### (a) Illinois Antitrust Claims

Defendants move to dismiss EPPs' Illinois antitrust class claims; however, EPPs in their Opposition clarify that they seek only individual relief (EPPs' & CFPs' Opp'n 15) and note that the Illinois Antitrust Act explicitly provides that "[n]o provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages." 740 Ill. Comp. Stat. 10/7(2) (2010). Given this concession, Defendants withdraw their motion on this front. (State Law Reply 8 n.6.) Accordingly, the court **CONCLUDES** that this argument is now **MOOT**.

---

[7] Winn-Dixie is the sole outlier, acknowledging that it drafted its Complaint in such a way that it alleged a claim for injunctive relief, but now conceding that it "will no longer pursue its claim for injunctive relief." (DAPs' Opp'n 37.) Accordingly, the Court **ORDERS** that Winn-Dixie **SHALL** amend its Complaint to reflect this concession <u>within fourteen days of the date on which this Order is electronically docketed.</u>

Defendants argue that the law is clear in foreclosing recovery for a violation of South Carolina's antitrust laws. (State Law Br. 3–4.) Plaintiffs respond—in a footnote located in a totally unrelated section of their brief—that any South Carolina antitrust allegations are "merely a scrivener's error" and therefore "[t]here is no South Carolina state antitrust claim to dismiss." (EPPs' & CFPs Opp'n 22 n.21.) However, CFPs' Complaint explicitly brings causes of action for violations of state antitrust statutes (CFPs' SAC 58), which includes a listing for South Carolina. (*Id.* ¶ 205).[8] And the Court agrees with Defendants that—unlike with Plaintiffs' claims under the distinct statutory section containing South Carolina's Unfair Trade Practices Act—South Carolina "follow[s] the rule of *Illinois Brick* limiting recovery under the South Carolina antitrust statute to direct purchasers." *E.g.*, *In re Wiring Device Antitrust Litig.*, 498 F. Supp. 79, 88 (E.D.N.Y. 1980). Accordingly, to the extent Plaintiffs bring claims under Chapter 3 of the South Carolina Code, the Court **GRANTS** Defendants' Motion to Dismiss such claims.

### *(ii)    Consumer Protection Claims*

Defendants move to dismiss EPPs' (a) Illinois and (b) Michigan consumer protections claims, and (c) CFPs' New York consumer protection claims. (State Law Br. 4–8.) The Court addresses each in turn.

### (a) Illinois Consumer Protection Claims

Defendants argue that the Court previously dismissed EPPs' claim under the Illinois Consumer Fraud and Deceptive Business Practices Act and that, nonetheless, EPPs have asserted the same claim without modification. (State Law Br. 4.) EPPs do not address this point directly in their Opposition, (*see* EPPs' & CFPs' Opp'n 15–16 (discussing only the Illinois Antitrust Act and Illinois unjust-enrichment claims)), and the Illinois Supreme

---

[8] This same paragraph in substance alleges violations of "the South Carolina Unfair Trade Practices Act" (CFPs' SAC ¶ 205) and thus falls under a different Chapter of the South Carolina Code than South Carolina's Antitrust Act. (*Compare* S.C. Code. Ann. ch. 3 ("Trusts, Monopolies and Restraints of Trade"), *with id.* ch. 5 ("Unfair Trade Practices").)

Court has strongly suggested that "[t]here is no indication that the legislature intended that the Consumer Fraud Act be an additional antitrust enforcement mechanism." *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990).[9] Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss on this front and **DISMISSES** EPPs' claim under the Illinois Consumer Fraud and Deceptive Business Practices Act.

### (b) Michigan Consumer Protection Claims

Defendants move to dismiss EPPs' Michigan consumer protection claims for various reasons. However, EPPs argue that they raised "substantively identical" claims in their prior complaint and that Defendants failed to move to dismiss those previous claims; thus, under Rule 12(g)(2), Defendants "have waived their right to present this argument now." (EPPs' & CFPs' Opp'n 16.) The Court incorporates its earlier analysis of Rule 12(g)(2), (*supra* Section I.A), and agrees with EPPs—Defendants were previously on notice of EPPs' claims under the Michigan Consumer Protection Act, (*see* ECF No. 149, at ¶¶ 436–45 (prior complaint)), and yet Defendants did not previously move to dismiss those claims on the grounds they now raise (*compare* Mem. of P. & A. in Supp. of Defs.' Joint Mots. to Dismiss Compls. ("Prior State Law Br.") 6 (previous state law brief presenting sole argument for dismissal that "Price-Fixing Conduct Is Not a Consumer Protection Violation (. . . Michigan . . . )"), ECF No. 207-3, *with* State Law Br. 2 ("EPPs Plead Neither a Misrepresentation Directed <u>to Consumers</u> upon Which <u>Consumers</u> Relied Nor an Intent to Deceive <u>Consumers</u> (Michigan).").

Furthermore, even if the Court did not conclude that Rule 12(g)(2) here bars Defendants' argument, the argument would still fail in this procedural posture. EPPs'

---

[9] In addressing Defendants' prior Motions to Dismiss, Plaintiffs relied on *Siegel v. Shell Oil Co.* for the proposition that "*Laughlin,* however, is silent as to the situation here: whether consumers can elect to pursue a remedy under the Consumer Fraud Act where the Illinois Antitrust Act may <u>also provide relief</u>." 480 F. Supp. 2d 1034, 1048 (N.D. Ill. 2007). However, Plaintiffs here have not re-raised this argument and thus the Court instead takes *Laughlin* at face value for the proposition that Illinois's consumer protection statute "is a statute directed against fraud and not one designed to be an additional antitrust enforcement mechanism . . . ." *Laughlin*, 550 N.E.2d at 993.

Complaint does not cabin in the intended audience of Defendants' allegedly pretextual statements, but instead several times notes that the statements were "public justifications" that at times directly mentioned customers and consumers generally. (*See* EPPs' Compl. ¶¶ 334–44.) This is sufficient to plausibly satisfy the direction and intent components of a claim under the relevant sections of Michigan's Consumer Protection Act—Defendants' "public justifications" were allegedly false, so as to deceive customers and consumers as to the real reason for increased prices. *Cf. Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 413 (E.D. Pa. 2010) (dismissing claims in factually distinguishable case where "plaintiffs have pleaded [only] that defendants knowingly filed sham litigation against generic drug manufacturers" when plaintiffs were consumers ostensibly harmed by the resulting price increases).

And the Court does not agree with Defendants that it "'simply does not make sense'" that "alleged misstatements regarding Defendants' costs and higher prices <u>caused</u> consumers to purchase more canned tuna than they would have otherwise . . . ." (State Law Reply 10–11 (quoting *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1031 (N.D. Cal. 2007), and *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1159 (N.D. Cal. 2009)).) Defendants pull the "simply does not make sense" language from two cases discussing Maine statutory law as interpreted by Maine-specific caselaw. But Michigan arguably applies a different standard. *See In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 701 (E.D. Pa. 2014) ("Reliance and causation may be satisfied under the Michigan consumer protection law by demonstrating that plaintiffs purchased and consumed the product." (citing *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 226 (S.D.N.Y. 2012))), *on reconsideration in part on different grounds*, No. 13-MD-2445, 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015). Furthermore, Defendants' cited cases made <u>only</u> the discrete determination that "the higher prices plaintiffs allegedly paid . . . because of the price-fixing conspiracy could not have induced plaintiffs to purchase them." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1031. By contrast, in this case

Plaintiffs allege that they <u>relied on Defendants' statements</u> in deciding to purchase the allegedly price-fixed tuna (*see* EPPs' SAC ¶ 655 ("Defendants' conduct misled consumers . . . .")), and such reliance is not entirely implausible; i.e., Plaintiffs may have (1) been unwilling to pay higher tuna prices when the prices appeared inflated solely to increase Defendants' profits, but (2) instead accepted as true in this case that the price increases stemmed from uncontrollable outside forces and therefore became willing to pay more for their tuna purchases.

Given all of the foregoing, and limited to the current procedural posture, the Court **DENIES** Defendants' Motion to Dismiss on this ground.

### (c) New York Consumer Protection Claims

Defendants move to dismiss CFPs' New York consumer protection claims for various reasons. (State Law Br. 6–8.) Although "CFPs disagree with Defendants'" arguments, they nonetheless "concede the claim and will rely on New York antitrust law for a remedy." (EPPs' & CFPs' Opp'n 18.) Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss on this ground and **DISMISSES** CFPs' New York consumer protection claim.

### (iii) Unjust Enrichment

Defendants move to dismiss EPPs' and CFPs' unjust enrichment claims under Florida, Illinois, Maine, Rhode Island, and South Carolina law. (State Law Br. 8–9.) EPPs and CFPs only oppose Defendants' motion regarding Rhode Island and South Carolina, (*see* EPPs' & CFPs' Opp'n 18); accordingly, the Court **GRANTS** Defendants' Motion to Dismiss regarding the unopposed states and **DISMISSES** EPPs' and CFPs' unjust enrichment claims under Florida, Illinois, and Maine law. The Court addresses Rhode Island and South Carolina in turn.

### (a) Rhode Island Unjust Enrichment Claims

Defendants argue that the Court should dismiss with prejudice EPPs' Rhode Island unjust enrichment claims for overcharges prior to 2013. (State Law Br. 9.) But EPPs explicitly temporally define their Rhode Island class claims as "between July 15, 2013 and

the present." (EPPs' Compl. ¶ 94(y).) Accordingly, the Court **DENIES AS MOOT** this aspect of Defendants' Motion to Dismiss.

(b) South Carolina Unjust Enrichment Claims

Defendants argue that South Carolina bars indirect-purchaser recovery, and that therefore the Court should dismiss with prejudice EPPs' and CFPs' South Carolina unjust enrichment claims. (State Law Br. 8–9.) Plaintiffs respond that, under the terms of the Court's prior Order, their claims under the South Carolina Unfair Trade Practices Act survive and therefore their South Carolina unjust enrichment claims may proceed as well. (EPPs' & CFPs' Opp'n 18.) And although the Court in its prior Order only addressed Defendants' argument that class actions are not permitted under South Carolina's Unfair Trade Practices Act (Prior MTD Order II 51), Defendants' only support for their current Motion to Dismiss Plaintiffs' South Carolina unjust enrichment claims come from cases construing South Carolina's <u>antitrust</u>, rather than consumer protection, statute. (*See* State Law Br. 3–4 (explaining each case as dealing with antitrust-statute–based claims)); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 232 (S.D.N.Y. 2012) (Defendants' only other case supporting dismissal) (dismissing South Carolina unjust enrichment claims on antitrust grounds). At least in this threshold procedural posture, and without any authority addressing South Carolina's consumer protection statute, the Court **DENIES** this aspect of Defendants' Motion to Dismiss.

(iv) *Nationwide California Class*

Defendants move to dismiss EPPs' and CFPs' nationwide class, brought under California's Cartwright Act (California Business and Professions Code Section 16720 *et seq.*), both for including purchasers from states which do not provide indirect-purchaser recovery for antitrust violations and for violating California choice-of-law rules. (State Law Br. 10–17.) Plaintiffs vigorously oppose, noting both that several other district courts have upheld similar nationwide classes and that each prong of analysis under *Mazza v. American Honda Motor Co.*, 666 F.3d 581, 587 (9th Cir. 2012)—the seminal Ninth Circuit case analyzing the propriety of extra-California classes under the Cartwright Act—

16

counsels in favor of denying Defendant's motion. (EPPs' & CFPs' Opp'n 3–15.) The Court, at least at this preliminary stage, in large part agrees with Plaintiffs.

As the Court previously explained, *Mazza* sets forth a three-element test to examine California choice-of-law analysis and determine whether a putative class is valid under the Cartwright Act. (Prior MTD Order 21–22.) The threshold issue is "whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different." *Mazza*, 666 F.3d at 590 (quoting *McCann v. Foster Wheeler LLC*, 225 P.3d 516, 527 (Cal. 2010)). However, "[t]he fact that two or more states are involved does not itself indicate that there is a conflict of law problem." *Id.* (citing *Wash. Mut. Bank, FA v. Superior Court*, 15 P.3d 1071 (Cal. 2001)). "A problem only arises if differences in state law are material, that is, if they make a difference in this litigation." *Id.* (citing *Wash. Mut. Bank*, 15 P.3d at 1080–81). For instance, in *Mazza* the defendant "exhaustively detailed the ways in which California law differs from the laws of the 43 other jurisdictions in which class members reside[,]" including different and unique remedies stemming from and elements required to show violation of the relevant state laws. *Id.* at 591.

By contrast, in the present case Defendants only point to allegedly material differences regarding (1) differing statutes of limitation and (2) state indirect-purchaser bars.[10] Regarding the first issue, Defendants cite only four state statutes of limitation (including California's) and one case in support of the distinct proposition that statutes of limitation here constitute a material difference of laws. However, Defendants nowhere address whether the statutes of limitations might actually preclude certain claims <u>given the</u>

---

[10] Defendants also argue more generally that because the Cartwright Act is not a consumer protection statute there is an inherent conflict of laws in states that here only permit recovery under relevant consumer protection statutes or unjust enrichment law. (State Law Reply 3–4.) However, as the Court previously recognized, "Plaintiffs are here seeking to certify a nationwide California class <u>based on the same factual conduct underlying the alleged Sherman Act violations</u> . . . ." (Prior MTD Order II 21 (emphasis added).) And the mere fact that Plaintiffs may obtain redress under different state statutory regimes or common-law doctrines does not, by itself, create a <u>material</u> conflict that would necessarily "make a difference in this litigation." *Mazza*, 666 F.3d at 590.

facts of this case, and even Defendants' sole authority (which is contradicted by several cases Plaintiffs offer (*see* EPPs' & CFPs' Opp'n 8)) rested its relevant analysis on such a showing. *See Glenn v. Hyundai Motor Am.*, No. SACV152052DOC(KESx), 2016 WL 3621280, at *7 (C.D. Cal. June 24, 2016) (explaining that "[t]hese statute[s] of limitations may be relevant in this case given . . . Plaintiffs' " proposed class definition). Furthermore, Plaintiffs assert that "all the consumer claims at issue are timely under any of the relevant statutes of limitation" (EPPs' & CFPs' Opp'n 11), and Defendants nowhere counter this statement. Accordingly, Defendants have not here shown that the differing statutes of limitation are material within the meaning of *Mazza*. The only remaining question is whether the alleged state indirect-purchaser bars here constitute material differences.

Previously, the Court dismissed Plaintiffs' putative nationwide class claims in large part because the putative class included plaintiffs "in states without legislation or interpretation permitting indirect-purchaser recovery" and in those states, "such choices evince a policy judgment . . . that should not be cast aside." (Prior MTD Order II 24). In response, Plaintiffs have now attempted to limit their claims under the Cartwright Act "only to states that offer indirect purchasers a private right of action akin to California's Cartwright Act." (EPPs' & CFPs' Opp'n 1.) However, Defendants argue that Plaintiffs have failed in this attempt, and that Plaintiffs' "two proposed classes include states that do not allow indirect purchasers to bring antitrust claims, such as Arkansas, Florida, Massachusetts, Rhode Island, . . . South Carolina, . . . Illinois, Missouri, and Virginia." (State Law Br. 10.) Plaintiffs argue that (a) the Court previously refused to dismiss indirect-purchaser claims in Arkansas, Missouri, Rhode Island, and South Carolina (EPPs' & CFPs' Opp'n 8–10); and (b) under Federal Rule of Civil Procedure 12(g)(2) Defendants have waived their ability to challenge indirect-purchaser claims Florida, Massachusetts, and Virginia, (*id.* at 10–11).[11] The Court addresses each argument in turn and then (c) briefly

_____

[11] "Plaintiffs no longer include [Illinois] in the Cartwright Class[,]" (EPPs' & CFPs' Opp'n 5 n.5); accordingly, the Court **ORDERS** that Plaintiffs **SHALL** amend their Complaint to reflect this change in class definition within fourteen days of the date on which this Order is electronically docketed.

concludes.

(a) Indirect-Purchaser Claims in Arkansas, Missouri, Rhode Island, and South Carolina

Plaintiffs point out that the Court previously declined to dismiss claims for price-fixing under the relevant state laws in Arkansas (Prior MTD Order II 31), Missouri (*id.* at 41–42),[12] and Rhode Island (*id.* at 50). Plaintiffs also include South Carolina in this group, (EPPs' & CFPs' Opp'n 8–9), and although the Court's prior Order did not directly address the viability of indirect-purchaser claims under South Carolina law (*see supra* Section I.D.(iii).(b) (citing Prior MTD Order II 51)), the Court's analysis above counsels in favor of denying Defendants' Motion to Dismiss here on the same grounds. (*Id.* (denying Defendants' Motion to Dismiss because Defendants provided no authority supporting their arguments)).

(b) Indirect-Purchaser Claims in Florida, Massachusetts, and Virginia

Plaintiffs argue that Federal Rule of Civil Procedure 12(g)(2) bars Defendants' arguments here because Defendants were previously aware of Plaintiffs' class claims in these states and failed to move to dismiss these claims in their previous motion. (EPPs' & CFPs' Opp'n 10.) The Court concludes that its earlier analysis (*supra* Section I.A) applies with equal force here <u>as to Florida and Massachusetts</u>, and Defendants were indeed on notice of Plaintiffs' class allegations in these two states (*compare* EPPs' First Am. Compl. ¶¶ 393–404 (claim for violation of Florida Deceptive and Unfair Trade Practices Act), 425–35 (claim for violation of Massachusetts Consumer Protection Act), ECF No. 149, *with* Prior State Law Br. 23–25 (addressing Florida and Massachusetts only with regards to unjust-enrichment claims); *see also* State Law Reply 13–14 (sole section addressing Plaintiffs' 12(g)(2) arguments, and solely addressing them in context of whether Plaintiffs

_____

[12] Although the Court previously determined that CFPs did not state a valid claim under Missouri law, CFPs do not now include Missouri within their Cartwright Act definition. (*See* CFPs' SAC ¶ 178(a)).

validly pled a right to relief under Michigan consumer protection laws)). Accordingly, Defendants have waived argument regarding these two states as to this issue and in the present procedural posture.

<u>As to Virginia</u>, Plaintiffs similarly raised its class allegation in this state in its First Amended Complaint. (EPPs' First Am. Compl. ¶¶ 579–88 (claim for violation of Virginia Consumer Protection Act). Defendants did challenge Plaintiffs' Virginia claims in its prior motion, however cursorily. (Prior Law Br. 29 ("Unlike California, the state[] of … Virginia do[es] not allow consumer protection class actions. *Gianino v. Alacer Corp.*, 846 F. Supp. 2d 1096, 1101 (C.D. Cal. 2012).") In their current Motion, Defendants argue Virginia does not allow indirect purchasers to bring antitrust claims, citing *Cal. v. Infineon Tech. AG*, 531 F. Supp. 2d 1124, 1151 (N.D. Cal. 2007) and Va. Code Ann. § 59.1-9.17 for the proposition that Virginia antitrust law does not provide for indirect purchaser standing. (State Law MTD 17–19.) Plaintiffs include Virginia in their "*Illinois Brick* repealers" class and argue Virginia provides the ability for its consumers to recover for price-fixing under relevant consumer protection laws. (EPPs & CFPs Opp'n 19 (citing *In re TFT-LCD (Plat Panel) Antitrust Litig.*, No. C07-1827 SI, 2013 WL 6327490, at *4 (N.D. Cal. Dec. 3, 2013)).)

The Court in *In re TFT-LCD (Plat Panel) Antitrust Litigation* held:

> Virginia has not expressly articulated a position regarding indirect purchaser lawsuits. The Virginia legislature enacted its federal harmonization statute in 1974. *See* Va. Code Ann. § 59.1–9.17. Unlike several other states, including California, Virginia did not pass an *Illinois Brick* repealer statute following the 1977 decision. *See* 431 U.S. 720 (1977). However, Virginia courts have not yet expressly ruled on the issue of indirect purchaser standing. Thus, the Court cannot say that Virginia has manifested a particular commitment to barring indirect purchaser lawsuits. Nor can anything significant be divined regarding the function and purpose of Virginia's law in this area."

*In re TFT-LCD,* 2013 WL 5327490, at *4 (citation omitted). This Court agrees, and Defendant has not cited any conclusive case law to the contrary. *See also supra* footnote 10.

(c) Conclusion

Defendants have not shown that Plaintiffs' newly defined Cartwright Classes create material differences between California and the relevant states' laws. And Plaintiffs are correct that the question presently before the Court regarding this issue is not the propriety of class certification, but instead only whether Plaintiffs' have stated a plausible Cartwright Class. Defendants have not met their burden to dismiss Plaintiffs' Cartwright Class claims at this stage; accordingly, the Court **DENIES** Defendants' Motion to Dismiss on this ground.

### *(v)    Article III & Statutory Standing*

Defendants move to dismiss for lack of Article III and/or statutory standing: (1) the New Mexico claims brought by named Plaintiffs Vivek Dravid and Laura Montoya; and (2) the Tennessee clams brought by named Plaintiff John Peychal. (State Law Br. 9–10.) Specifically, EPPs' Complaint alleges that each of these named Plaintiffs purchased tuna (or lives) in a state not tied to their specific claims. (*See id.* (citing relevant portions of EPPs' Complaint).) However, EPPs explain that each named Plaintiff did, in fact, purchase tuna (or live) in the relevant state—the discrepancies are merely "scrivener's error[s]"— and request leave to file a corrected Complaint. (EPPs' & CFPs' Opp'n 19.) Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss on these grounds, **DISMISSES** the aforementioned claims, and **GRANTS** EPPs leave to file a corrected complaint as set forth in their Opposition.[13]

---

[13] Defendants also note that one of EPPs' named plaintiffs for the Utah Class does not have statutory standing because he now lives in Ohio and therefore is not "[a] person who is a citizen of [Utah] or a resident of [Utah]" within the meaning of Utah Code § 76-10-3109 (State Law Reply 16). However, because Defendants raised this argument in their Reply, EPPs have not had a chance to address this construction of the Utah statute; therefore the Court will not at this time dismiss that Plaintiff's claims with prejudice. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) ("If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." (citing *Bonanno v. Thomas,* 309 F.2d 320, 322 (9th Cir. 1962))).

**II. StarKist's, Dongwon's, and Del Monte's Separate Motion to Dismiss**

### A. All Plaintiffs' Pre-2011 Conspiracy Allegations

The StarKist Defendants move to dismiss all Plaintiffs' pre-2011 conspiracy allegations against them for various reasons. (SK Defs.' MTD Mem. 7–28, ECF No. 412-1.) However, the circumstances surrounding Defendant Dongwon's involvement in the conspiracy differ slightly from those related to the other Defendants—Dongwon bought StarKist in 2008 and therefore may only be held liable for earlier allegedly conspiratorial acts based on co-conspirator liability. (*See, e.g.*, DAPs' Opp'n 26–27.) Accordingly, the Court first considers Defendants StarKist's and Del Monte's alleged direct involvement in the conspiracy, and then turns to Dongwon's liability.

#### (i)    Sufficiency as to StarKist and Del Monte

The StarKist Defendants argue that, for various reasons, Plaintiffs' allegations do not plausibly establish Defendants Starkist's and Del Monte's involvement in the conspiracy prior to 2011. (SK Defs.' MTD Mem. 7–19.) Plaintiffs all vigorously oppose these arguments, going as far as calling Defendants' arguments "absurd on [their] face." (*E.g.*, DAPs' Opp'n 5.) The Court agrees with Plaintiffs.

As the Court previously explained in this Order, *supra* footnote 5, once a conspiracy is established "it remains actionable until its purpose has been achieved or abandoned." *United States v. Inryco, Inc.*, 642 F.2d 290, 293 (9th Cir. 1981). For a defendant to later abandon a conspiracy (and therefore terminate continuing liability for any conspirator's actions taken in furtherance of the conspiracy) a defendant must take affirmative action—"[p]assive nonparticipation in the continuing scheme is not enough to sever the meeting of minds that constitutes the conspiracy." *Smith v. United States*, 568 U.S. 106, 112–13 (2013). This principle is especially important here, where the Court in its prior Order determined that Plaintiffs had validly alleged a conspiracy (Prior MTD Order I 12–22); thus, Plaintiffs now only need to plausibly " 'allege that [these] individual [D]efendant[s] joined the conspiracy and played some role . . . .' " *E.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (quoting *In re Elec. Carbon*

*Prods. Antitrust Litig.,* 333 F. Supp. 2d 303, 311–12 (D.N.J. 2004)).

Plaintiffs in the present case easily satisfy this requirement and survive StarKist's and Del Monte's Motion to Dismiss. For instance, Plaintiffs allege that in 2004 the Defendants first began considering price-based collusion in order to correct course after several years of declining profit margins. (*E.g.*, DAP Kroger's SAC ¶ 86.) In May of that year, CotS's CEO "instructed his sales team to put out feelers to Bumble Bee and [Del Monte's] StarKist to determine whether there was support for a [joint] price increase." (*Id.* ¶ 87; DPPs' SCCC ¶ 93; EPPs' SACCAC ¶ 166; *see* CFPs' SAC ¶ 75.) Subsequently, Bumble Bee received a CotS internal price list; the Bumble Bee Vice President of Sales asked to see the list by email or fax, but the Bumble Bee executive (who has now pled guilty to price fixing in the corresponding criminal case) in possession of the document instructed his assistant to "overnight [the list] to [Bumble Bee's Vice President of Sales] . . . no faxes or emails[;]" and, upon learning of the executive's instruction, the Vice President of Sales replied "PARANOID!!!!" (DAP Kroger's Compl. ¶ 87; DPPs' SCCC ¶ 94 (emphasis removed); EPPs' SACCAC ¶ 166; *see* CFPs' SAC ¶ 75 (not including "PARANOID" quote).) During this same month, the CEOs for each major Defendant— CotS, Bumble Bee, and StarKist (then owned by Del Monte)—were in close contact as they jointly prepared for "the industry's major trade event" which that year focused on "the state of the U.S. tuna market." (DAP Kroger's SAC ¶ 88; CFPs' SAC ¶ 76; *see* DPPs' SCCC ¶ 95 (not including first quote); EPPs' SACCAC ¶ 167 (not including second quote).) By the end of that month, CotS prepared a draft memo indicating it was "aware that StarKist and Bumble Bee would announce canned tuna price increases in June 2004[,]" and CotS's CEO soon thereafter "confirmed to . . . TUG that the StarKist Defendants and Bumble Bee would be significantly increasing prices by approximately 10% on . . . tuna products[,]" thus "requir[ing] a unified effort among the Big 3" tuna players. (DAP Kroger's Compl. ¶ 90; *see* DPPs' SCCC ¶ 97 (substantially same language but without explicitly noting draft memo); EPPs' SACCAC ¶ 169 (same); CFPs' SAC ¶ 78 (same).) The next day, "Del Monte announced a net price increase on StarKist's canned tuna

products" and soon thereafter "sent its non-public, highly confidential internal plan for pricing canned tuna to [CotS]." (DAP Kroger's Compl. ¶¶ 92–93; DPPs' SCCC ¶¶ 98–99; *see* EPPs' SACCAC ¶¶ 170–71 (substantially similar language); CFPs' SAC ¶ 80 (omitting first quote); *see also, e.g.*, DAP Kroger's Compl. ¶ 94 (describing in detail characteristics of the document, which included many instances of highly confidential information, including analyses of StarKist and the other Defendants' businesses, StarKist's long-term growth plans, and "the need to get nets up behind [the] 6/1/04 price increase".)

As a reminder, the Court has already determined that Plaintiffs validly pled a plausible conspiracy. And Plaintiffs now need only plead a plausible—not even likely—connection between the conspiracy and StarKist and Del Monte. *Twombly*, 550 U.S. at 556 ("And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.' " (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). The 2004 allegations outlined in the preceding paragraph alone easily satisfy Plaintiffs' required showing. Although Defendants attempt to treat categories of events in isolation and analyze them with broad principles, (SK Defs.' MTD Mem. I (table of contents outlining point headings including "Participation in Industry Association Meetings Does Not Suggest Collusion[,]" "Information Exchanges are Not Enough[,]" and "Plaintiffs' Allegations of DOJ Guilty Pleas and Investigations Have Nothing to Do with the 2004 to 2010 Time Period")), such a mode of argument fails to account for the entire picture revealed by Plaintiffs' complaints. Correspondingly, also unavailing is Defendants' argument that increased costs are an "[o]bvious [a]lternative [e]xplanation[]" for StarKist's and Del Monte's price increases. (SK Defs.' MTD Mem. 14–16.) Of course, increased costs could be an alternative explanation for Defendant's actions (as could any other possible reason Defendants may later argue); however, the question is whether Plaintiffs' plausibly allege that collusion is here a more viable explanation. The Court finds that Plaintiffs have plausibly made such allegations.

Given the foregoing, and that Defendants nowhere argue that StarKist or Del Monte affirmatively withdrew from the conspiracy, the Court **DENIES** this aspect of the StarKist Defendants' Motion to Dismiss.[14]

### (ii) Sufficiency as to Dongwon

The StarKist Defendants move to dismiss all pre-2012 conspiracy claims against Dongwon. (*E.g.*, SK Def.'s MTD 19–24.) However, this pre-2012 time period potentially implicates two distinct temporal analyses—because Dongwon purchased StarKist in 2008, the only way Plaintiffs may validly assert conspiracy claims against Dongwon for the period prior to 2008 is via co-conspirator liability. (*E.g.*, DAPs' Opp'n 26–27.) Of course, if Plaintiffs plausibly allege such liability then the StarKist Defendants' motion must fail in total on this front. However, because the Court concludes that Plaintiffs do not at this time plausibly allege such backward-looking co-conspirator liability, the Court (a) first explains why Plaintiffs backward-looking liability claims fail, then (b) considers Dongwon's liability from 2008–2012, and finally (c) briefly concludes.

### (a) Backward-Looking Co-Conspirator Liability

The Court in its prior Order previously found that nearly all Plaintiffs had plausibly alleged Dongwon's direct participation in the conspiracy.[15] (Prior MTD Order 8–11.) Accordingly, Plaintiffs now argue that Dongwon is necessarily liable for the full temporal

---

[14] This necessarily **MOOTS** the StarKist Defendants' arguments that Plaintiffs do not allege Del Monte or StarKist reached an agreement with competitors to reduce can sizes (SK Defs.' MTD Mem. 16–18) and additionally compels the Court to **DENY** Defendants' Motion to Dismiss Plaintiffs' pre-2011 allegations as time-barred (*id.* at 18 ("Thus, to the extent the Court finds that Plaintiffs fail to plead that Del Monte, StarKist, and Dongwon were involved in pre-2011 conspiracy allegations, it should also dismiss these claims as time-barred." (emphasis added)).

[15] The only two complaints which previously failed to validly alleged Dongwon's direct participation were those of the EPPs (Prior MTD Order II 11, n.3) and Flowers (Prior MTD Order I 22–24.) However, those Plaintiffs have now—at least in relevant part—harmonized their amended complaints with the allegations the Court previously found to be sufficient to plausibly allege direct conspiracy. (*See* EPPs' SACCAC ¶¶ 129–45, 252–312; *W. Lee Flowers & Co. Inc. v. Bumble Bee Foods LLC et al.*, 16-CV-1226-JLS (MDD), ECF No. 20 ¶¶ 28–36, 148–163.) Accordingly, the Court concludes that both EPPs and Flowers have now plausibly alleged Defendant Dongwon's direct participation in the conspiracy from 2012 forward. (*See* Prior MTD Order I 12–22.)

scope of the amended complaints' claims because "[o]ne who enters a conspiracy late, with knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy." *Indus. Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970) (citing *United States v. Bausch & Lomb Optical Co.*, 34 F. Supp. 267 (S.D.N.Y. 1940), and *Rayco Mfg. Co. v. Dunn*, 234 F. Supp. 593, 598 (N.D. Ill. 1964)). However, as Defendants point out, for liability to attach under this principle in our circuit a defendant must enter the conspiracy "with knowledge of what has gone before[,]" *id.* (emphasis added); *see also, e.g.*, *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 930 (7th Cir. 2016) (quoting *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980) ("[A] co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators.") (alteration in original), *cert. denied*, 137 S. Ct. 1582 (2017)), and no Plaintiffs' complaint contains such an allegation regarding Dongwon. Of course, it is possible that Dongwon joined the conspiracy with full knowledge of the alleged co-conspirators' actions over the previous four years. However, it is also possible that Dongwon joined the alleged conspiracy only with knowledge of how present and future conspiratorial actions might benefit its business. This fails to nudge Plaintiffs' theory of backward-looking co-conspirator liability "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547. Accordingly, the Court **GRANTS** the StarKist Defendants' Motion to Dismiss on this front and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' pre-2008 claims.

(b) Liability from 2008–2012

Plaintiffs argue that, backward-looking co-conspirator liability notwithstanding, they have alleged sufficient factual material regarding Dongwon's participation in the conspiracy from 2008 onward. (*E.g.*, DPP Opp'n 35–37.) Plaintiffs, except for EPPs, are correct. Specifically, most Plaintiffs allege that after Dongwon acquired StarKist in 2008, a Dongwon Executive told Bumble Bee's President and CEO that "we must cooperate as

an industry to overcome those challenges we face." (DPPs' SCCC ¶ 49; *see* CFPs' SAC ¶ 120.) The Bumble Bee President and CEO in turn internally circulated the communication—including to two other Bumble Bee executives who have since pled guilty to conspiracy charges in the related criminal cases (DPPs' SCCC ¶ 148; *see* CFPs' SAC ¶ 120)—and expressed his hopes that Dongwon was "a company that will work with us to bring about a turnaround in the negative category trends we face."[16] (DPPs' SCCC ¶ 148.) Later in 2008, "Dongwon sought to ensure that all customers were charged the [allegedly agreed-upon] increased prices; Del Monte employees assured Dongwon that there were no exceptions." (CFPs' SAC ¶ 120.)

Although these allegations standing on their own would likely be insufficient to state a plausible claim of conspiracy (*see* StarKist Defs.' MTD 20–24 (treating 2008 to 2011 claims in isolation)), they must be viewed within the context of all Plaintiffs' other allegations of conspiracy. Specifically, Plaintiffs have alleged an incredibly large amount of factual material concerning the alleged conspiracy starting in 2004 (*see supra* Section II.A.1), and against this backdrop Dongwon and Bumble Bee's communications—between guilty-pleading executives—regarding "cooperation as an industry" is plausibly susceptible to conspiratorial inference.[17]

And although EPPs' Amended Complaint does not contain the same set of

---

[16] Plaintiffs allege further material from 2009–2011 (*e.g.*, DPPs' Opp'n 36–37); however, the Court need not consider these specific allegations since plausible 2008 allegations here establish forward-looking co-conspirator liability for the remainder of the conspiracy's alleged temporal scope.

[17] The DAP Kroger's Second Amended Complaint differs from the above allegations, but is nonetheless independently sufficient to plausibly allege Dongwon's 2008 participation in the conspiracy. Specifically, Kroger alleges that:

> "In July 2008, Del Monte informed Dongwon that Bumble Bee and the C[otS] Defendants were implementing the can downsizing, and gave Dongwon detailed information about each competitor's timetable for the can downsizing. Dongwon approved of the conspiratorial agreement and agreed to reduce the size of its cans intended for the United States to five ounces." (DAP Kroger's SAC ¶ 124; *see also id.* ¶ 133 ("In October 2008, Dongwon's headquarters sought to ensure that all customers were being charged the increased prices, and Del Monte employees assured Dongwon that there were no exceptions.").)

allegations,[18] it nevertheless includes information regarding a 2009 email from within Bumble Bee stating that recipients should "read and delete" and noting that the "Koreans . . . [are] overall pleased with the way things are going." (EPPs' Am. Compl. ¶ 225.) The email came in the wake of several near-simultaneous price increases, allegedly jointly discussed by members of at least StarKist, CotS, and Bumble Bee. (*Id.* ¶¶ 219–22). Against this backdrop, and again within the context of all Plaintiffs' overarching allegations, this raises a plausible inference of Dongwon's participation in the conspiracy as early as 2009. Finally, as the Court previously explained, Defendants nowhere argue that they affirmatively withdrew from the conspiracy. (*See supra* Section II.A.1). Accordingly, the first date on which each Plaintiff group plausibly pleads Dongwon's participation in the conspiracy establishes continuing liability throughout the remainder of the alleged conspiratorial period.

(c) Conclusion

Accordingly, and taken together, the Court **GRANTS IN PART** and **DENIES IN PART** this aspect of the StarKist Defendants' Motion to Dismiss. Specifically, the Court **DISMISSES WITHOUT PREJUDICE** (1) all EPPs' pre-2009 claims against Dongwon and (2) all other Plaintiffs' pre-2008 claims against Dongwon.

***B. Alter Ego and Agency Liability***

The StarKist Defendants argue that Plaintiffs fail to plausibly allege that Dongwon may be held liable for the acts of its subsidiary under either (i) alter ego or (ii) agency theories of liability. (StarKist Defs.' MTD 24–28.) The Court addresses each argument in turn.

*(i)    Alter Ego Liability*

The Court previously found that, although Plaintiffs plausibly alleged a unity of interest between Dongwon and StarKist, Plaintiffs failed to allege that any inequitable

---

[18] EPPs' sole 2008 allegations are insufficiently conclusory regarding Dongwon's alleged participation in the conspiracy: i.e., only that "Del Monte made a presentation to Dongwon . . . and . . . assured Dongwon that the new prices were being uniformly applied to StarKist customers." (EPPs' Compl. ¶ 214.)

result would follow if the corporate veil is not pierced—a required element of alter ego liability. (Prior MTD Order II 15–17.) In their amended complaints, however, all Plaintiffs (except for EPPs and CFPs) now explicitly plead an inequitable result: that failure to hold Dongwon liable would shield it from liability for over $100,000,000 it received when StarKist, at "Dongwon['s] direct[ion,]" "transferred its ill-gotten gain[s] . . . to Dongwon . . . by paying out the unlawfully obtained profits and other conspiracy proceeds to Dongwon in the form of dividends and other transfer payments." (DPPs' SCCC ¶ 48; *see* DAP Kroger's SAC ¶ 37(h) (substantively identical).) The StarKist Defendants argue that if such an allegation were sufficient to plausibly allege alter ego liability then "any parent would be liable for the acts of its subsidiary." (StarKist Defs.' MTD 26.) The Court disagrees.

Defendants are correct that "[t]he purpose of the [alter-ego] doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable, under the applicable rule . . . , for the equitable owner of a corporation to hide behind its corporate veil." *Mid-Century Ins. Co. v. Gardner*, 9 Cal. App. 4th 1205, 1213 (1992) (quoting *Assoc. Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 842 (1962)). However, at this early stage of litigation Plaintiffs need not prove that StarKist was in fact Dongwon's alter ego; instead, Plaintiffs here only need to plausibly allege that an inequitable result will follow if the corporate form is not discarded. And most Plaintiffs allege not just that Dongwon generally profited from the conspiracy,[19] but also that (1) StarKist illegally profited from the conspiracy; (2) Dongwon knew of and directed StarKist's actions; and (3) StarKist—at Dongwon's direction—subsequently transferred the illegal profits to Dongwon such that Dongwon was unjustly enriched solely because of the illegal actions. While this evidence is admittedly meager, it is nonetheless sufficient to defeat a motion to dismiss. *See Johnson v. Serenity Transp., Inc.*, 141 F. Supp.

---

[19] *See Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 539 (2000) ("Difficulty in enforcing a judgment or collecting a debt does not satisfy th[e] [alter-ego] standard.")

3d 974, 986 (N.D. Cal. 2015) (denying motion to dismiss where the plaintiff alleged "unjust enrichment" to the defendant and "explain[ed] how the alleged alter ego benefited from the purported misconduct" (emphasis omitted)); *Mesler v. Bragg Mgmt. Co.*, 702 P.2d 601, 606 (Cal. 1985) ("There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case.").

However, EPPs' and CFPs' complaints stand on different footing. They do not contain the just-discussed allegations, and instead both simply state that "[f]or the reasons" outlined in the relevant sections of each complaint "it would an unjust and inequitable result to permit Dongwon to escape liability for the conduct alleged herein." (EPPs' SACCAC ¶¶ 132–50; CFPs' SAC ¶¶ 40–58 (same general allegation).) The "reasons" outlined in each Complaint are merely allegations establishing the lack of separation between Dongwon and StarKist, and nowhere discuss any reason why continuing to recognize each company's distinct corporate form would sanction a fraud or promote an injustice. Accordingly, neither EPPs nor CFPs complaints plausibly allege the inequitable result required for a finding of alter ego liability.

Given the foregoing, the Court **GRANTS** the StarKist Defendants' Motion to Dismiss on this front as to the EPPs' and CFPs' Complaints and **DENIES** the StarKist Defendants' Motion to Dismiss on this front regarding all other complaints.

*(ii) Agency Liability*

The StarKist Defendants again move to dismiss Plaintiffs' agency allegations regarding Dongwon (StarKist Defs.' MTD 26–28), arguing that Plaintiffs "fall short once again" and fail to "allege anything close to [Dongwon's] control of StarKist's 'day-to-day operations.' " (*Id.* at 26–27). Plaintiffs respond that they have now alleged "three key points that establish [the plausibility of] Dongwon's vicarious liability under an agency theory." (DAPs' Opp'n 29.) The Court agrees with Plaintiffs.

As the Court previously stated:

To sufficiently plead an agency relationship between a parent company and its subsidiary, a plaintiff must allege facts that demonstrate the parent's

"degree of control exerted over [the subsidiary] . . . is enough to reasonably deem [the subsidiary] an agent of [the parent] under traditional agency principles." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 541. Under traditional agency principles, "[c]ontrol is the key characteristic." *Id*. "The parent's general executive control over the subsidiary is not enough; rather there must be a strong showing beyond simply facts evidencing 'the broad oversight typically indicated by [the] common ownership and common directorship' present in a normal parent-subsidiary relationship." *Id.* at 542 (citation omitted). "As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's <u>day-to-day</u> operations in carrying out that policy." *Id.* (citation omitted) (emphasis in original).

(Prior MTD Order II 17 (all alterations in original).) Previously, the Court found that Plaintiffs failed to plausibly allege the type of "day-to-day" control necessary to establish agency liability. (*See id.* 18–19.) However, Plaintiffs' new allegations have breathed sufficient life into their once-skeletal assertions such that dismissal at this stage would be inappropriate.

In particular, Plaintiffs now allege that Dongwon's CEO was both the immediate supervisor of StarKist's CEO and approved "day-to-day matters related to StarKist's business, including the retention and employment terms of StarKist employees, the contract terms with StarKist's raw material suppliers, and whether or not to launch new products in the United States." (DAP Kroger's SAC ¶ 37(f); CFPs' SAC ¶ 53; *see* DPPs' SCCC ¶¶ 46–47 (largely substantively identical); EPPs' SACCAC ¶¶ 135, 137, 142–43 (several of the same and many similar allegations).) Furthermore, Dongwon's CEO "controll[ed] StarKist's communications with the FDA over health violations at its plants[,]" and at least one other Dongwon Executive "routinely provided direction to StarKist regarding its pricing and volume terms for specific customers . . . ." (DAP Kroger's SAC ¶ 37(f) (noting also that the frequency of communication led one StarKist Vice President to remark to the Dongwon Executive that "I feel like we talk every day now"); CFPs' SAC ¶¶ 53, 55; EPPs' SACCAC ¶ 137 (identical except "frequently" used instead of "routinely"); *see* DPPs' SCCC ¶ 49 (largely substantively identical); *see also, e.g.*, DAP Kroger's SAC ¶ 37(f)

(noting that StarKist's corporate website lists the relevant Dongwon Executive as "having joined StarKist in 2010 as Director of Strategic Planning" even though that was instead his position <u>at Dongwon</u> until he joined StarKist <u>in 2012</u>).)

Taking the above in concert,[20] and mindful of the fact that the only question currently before the Court is whether Plaintiffs have alleged sufficient factual material from which to infer a <u>plausible</u> agency relationship, the Court **DENIES** the StarKist Defendants' Motion to Dismiss on this front. *See, e.g.*, *In re Hydroxycut Mktg. & Sales Practices Litig.*, 810 F. Supp. 2d 1100, 1119–21 (S.D. Cal. 2011) (finding, in personal jurisdiction context, plausible allegations of agency relationship where the plaintiffs alleged that the parent defendant met with and was involved in negotiations with manufacturers, reviewed new products, formulas, and packaging and approved new product labels, approved contract terms for agreements with third-party retailers and personally met and interacted with the retailers' representatives, and was involved in advertising-, marketing-, and business-based decisions).

\ \ \

\ \ \

\ \ \

---

[20] Plaintiffs also urge that because "Dongwon functioned as a textbook *chaebol*," (*e.g.*, DAPs' Opp'n 30–31)—i.e., a "closely knit business group[ ] in South Korea under the control of a single family or extended family, with key 'flagship' firms which are used as the instruments of control of other firms within the group[,]" *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 7805628, at *22 (N.D. Cal. Aug. 4, 2016) (internal quotation marks omitted)—Plaintiffs' agency allegations are more plausible. However, the term *chaebol* is simply a culture-specific label for a business organization exhibiting certain characteristics. That some of those characteristics overlap with those required for a finding of a plausible agency relationship does not alter Plaintiffs' requirement to show specific <u>facts</u> plausibly suggesting the latter classification (which may of course, in turn, plausibly suggest the former classification is equally apt).

## CONCLUSION

Given the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motions to Dismiss as set forth above. All dismissals **ARE** again **WITHOUT PREJUDICE**. All amended complaints **SHALL** be filed <u>within fourteen days of the date on which this Order is electronically docketed.</u>

**IT IS SO ORDERED.**

Dated:  September 26, 2017

Hon. Janis L. Sammartino
United States District Judge

15-MD-2670 JLS (MDD)