Jonathan W. Cuneo
Peter Gil-Montllor
Blaine Finley
CUNEO, GILBERT & LADUCA LLP
4725 Wisconsin Ave. NW, Suite 200 Washington, DC 20016
Tel: 202.789.3960
jonc@cuneolaw.com

*Interim Lead Counsel for Commercial Food Preparer Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | 3:15-md-02670-JLS-MDD **COMMERCIAL FOOD PREPARER PLAINTIFFS'** **THIRD AMENDED COMPLAINT** |
| This filing relates to the Commercial Food Preparer Class Action Track | **(REDACTED)** JURY TRIAL DEMANDED |

      Plaintiffs Capitol Hill Supermarket, Janet Machen, Thyme Café & Market, Simon-Hindi LLC, LesGo Personal Chef, Maquoketa Care Center, A-1 Diner, Francis T. Enterprises d/b/a Erbert & Gerbert's, Gladys LLC, Harvesters Enterprises, LLC d/b/a Harvester's Seafood and Steakhouse, Dutch Village Restaurant, Painted Plate Catering, GlowFisch Hospitality d/b/a Five Loaves Café, Rushin Gold LLC d/b/a The Gold Rush, and Erbert & Gerbert, Inc., (collectively, "Plaintiffs"), by and through their undersigned attorneys, allege as follows. Other than those relating directly to Plaintiffs, all allegations herein are upon information and belief.

1

## NATURE OF THE ACTION

1.      Defendants Bumble Bee Foods LLC, Tri-Union Seafoods LLC, Thai Union Group Public Company Limited, Del Monte Corporation, StarKist Company, and Dongwon Industries Co., Ltd. (collectively, "Defendants") include the largest producers of packaged seafood products in the United States. This action concerns a continuous conspiracy—which was in existence by May 1, 2004 and continued until at least July of 2015[1]—to fix prices for packaged tuna within the United States. The Class Period for purposes of this complaint comprises the time when Defendant's anticompetitive conduct affected the market for packaged tuna and runs from at least July 1, 2004 (when the first collusive price increases took effect) to May 8, 2017 (the date on which this complaint was filed).

2.      During the conspiracy, Defendants agreed to various means of eliminating competition, including, for example: issuing collusive price increases, decreasing the sizes of pouches and cans in which packaged tuna is sold, promising to follow each other's price increases, agreeing to limit promotional offers, and agreeing to refrain from selling or promoting, under their own brands, "sustainable" tuna caught with pole and line instead of more ecologically harmful methods.  As used in this complaint, the term "packaged tuna" refers to shelf-stable skipjack, albacore and yellowfin tuna products, typically in cans or pouches.

3.      The United States Department of Justice ("DOJ") is conducting a

---

[1] Discovery is necessary to determine the full scope of the conspiracy, including its duration, scope, and participants.  Plaintiffs have only begun reviewing the hundreds of thousands of merits-related documents produced by Defendants since the beginning of April of 2017. Third-party document productions remain far from complete. No depositions have been taken.

criminal investigation of this conspiracy. In December 2016, the DOJ filed criminal informations against Bumble Bee's Walter Scott Cameron and Kenneth Worsham, charging them with a conspiracy to fix prices of packaged seafood, including packaged tuna.

4.     Scott Cameron held senior sales positions at Bumble Bee since May 2000 and facilitated Bumble Bee's agreement with Chicken of the Sea and StarKist to increase prices. Cameron pleaded guilty on January 25, 2017.

5.     Kenneth Worsham ███████████████████████ ███████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████████ ████████████████████Kenneth Worsham pleaded guilty on March 15, 2017.

6.     Finally, on May 8, 2017, hours before this complaint was filed, the DOJ announced that Defendant Bumble Bee would plead guilty and pay a criminal fine of at least $25,000,000 "in the first charges to be filed against a corporation in the U.S. Department of Justice's ongoing antitrust investigation into the seafood industry." The DOJ press release indicated that the fine would rise to a maximum of $81,500,000 if Bumble Bee is sold to another entity under certain conditions.

7.     On May 30, 2017, the DOJ filed an Information against Steve Hodge ("Hodge"), a former Senior Vice-President of Sales for StarKist from May of 2010 to December of 2013, who was employed by Del Monte as a Director of Field Sales for StarKist from 2008-10. *See United States v. Hodge*, No. 17-CR-0297-EMC (N.D. Cal.). Hodge pled guilty to the charge on June 28,

CFPs' Third Amended Complaint

2017, admitting that "from at least 2011 through at least 2013" he "participated in a conspiracy . . . to fix, raise, and maintain the prices of packaged seafood sold in the United States" by, among other things, "engag[ing] in conversations and discussions and attend[ing] meetings with representatives of other major packaged-seafood-producing-fims." *Id.*, ECF No. 13 (plea agreement).

8.     Plaintiffs, indirect purchasers of packaged tuna, have paid supracompetitive prices for packaged tuna as a direct result of Defendants' conspiracy. Plaintiffs bring this lawsuit as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of residents of jurisdictions which proscribe the Defendants' unlawful conduct, as described herein.  These jurisdictions include Arkansas, California, the District of Columbia, Florida, Iowa, Maine, Minnesota, Mississippi, New York, North Carolina, South Carolina, Tennessee, and Wisconsin. Plaintiffs bring this lawsuit individually and on behalf of all persons and entities engaged in the preparation of food that indirectly purchased packaged seafood products for their own use in food preparation, rather than for resale, from one or more Defendant or any predecessor, subsidiary, or affiliate thereof, at any time after July 1, 2004.

## JURISDICTION AND VENUE

9.     Plaintiffs seek damages, restitution, treble damages, disgorgement, other monetary relief, injunctive and other equitable relief under various state antitrust, consumer protection and unfair trade practices laws, and state unjust enrichment laws, as alleged specifically herein, as well as costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of Defendants' violations of those laws.

10.     This Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1332 because the amount in controversy for each of the Classes exceeds $5,000,000, there are more than 100 members in each of the Classes, and there are members of some of the Classes who are citizens of different states than Defendants. This court also has supplemental subject matter jurisdiction under 28 U.S.C. § 1367 because of the federal claims raised by the Direct Action and Direct Purchaser class plaintiffs.

11.     Venue is proper in this Judicial District because (1) Defendants COSI and Bumble Bee each have their principal places of business within this District and (2) each Defendant transacts a substantial amount of business in this District, and (3) each Defendant and the conduct alleged has affected, and continues to affect, a substantial amount of trade and commerce in this District.

## **PARTIES**

**Plaintiffs**

12.     Plaintiff **Capitol Hill Supermarket** is a grocery and deli located at 241 Massachusetts Avenue, NE in Washington, D.C. For at least the past eight years, Plaintiff Capitol Hill Supermarket has purchased Defendant Tri-Union Seafoods LLC's packaged tuna—specifically, its Chicken of the Sea brand of shelf-stable tuna—from wholesale suppliers located in the District of Columbia and in Virginia. Plaintiff Capitol Hill Supermarket uses the packaged tuna it indirectly purchases from Defendants to make tuna salad for sandwiches for its customers.

13.     Plaintiff **Janet Machen** is a caterer located in Little Rock, Pulaski County, Arkansas. During the relevant period, Plaintiff Machen has purchased

CFPs' Third Amended Complaint

Defendants' packaged tuna from food distributors Sam's Club, Wal-Mart, and Kroger. Plaintiff Machen uses the packaged tuna she indirectly purchases from Defendants to make food products and meals for her customers. She does not resell packaged tuna as such.

14. Plaintiff **Thyme Café & Market** is a café and gourmet market located at 1630 Ocean Park Boulevard in Santa Monica, California. During the relevant period, Thyme Café & Market purchased Tri-Union Seafoods LLC's packaged tuna from the food service distributor U.S. Foods, Inc. Plaintiff Thyme Café & Market used the packaged tuna it indirectly purchased from Defendants to make various prepared foods for its customers and has never resold packaged tuna as such.

15. Plaintiff **Simon-Hindi LLC, d/b/a Simon's**, is a restaurant and catering company located at 501 1st Avenue, San Diego, California. During the relevant period, Plaintiff Simon-Hindi LLC purchased Defendants' packaged tuna from food distributors including Costco Wholesale. Plaintiff Simon-Hindi uses the packaged tuna it indirectly purchases from Defendants to make meals for its customers and does not resell packaged tuna as such.

16. Plaintiff **LesGo Personal Chef, LLC** is a caterer located in Mary Esther, Okaloosa County, Florida. The principal place of business is 1056 Bryn Mawr Boulevard, Mary Esther, Florida. During the relevant period, Plaintiff LesGo Personal Chef, LLC purchased Defendants' packaged tuna from food distributors Wal-Mart, Sysco and US Foods. Plaintiff LesGo Personal Chef, LLC uses the packaged tuna it indirectly purchases from Defendants to make food products and meals such as tuna salad, tuna canapes, tuna melts, tuna napoleon and sandwiches for its customers.

6

17.     Plaintiff **Maquoketa Care Center, Inc.**, is located at 1202 German Street in Maquoketa, Iowa. During the relevant period, Plaintiff Maquoketa Care Center, Inc., purchased Defendants' packaged tuna—specifically, Chicken of the Sea Light Skipjack in 43 ounce pouches—from food distributors, including U.S. Foods. Plaintiff uses the packaged tuna it indirectly purchases from Defendants to make tuna dishes. It does not resell packaged tuna as such.

18.     Plaintiff **A-1 Diner** is a restaurant located at 3 Bridge Street in Gardiner, Maine. During the relevant period, Plaintiff A-1 Diner has purchased Bumble Bee's packaged tuna from the wholesale supplier Sam's Club. Plaintiff A-1 Diner uses the packaged tuna it indirectly purchases to make tuna salad plates for its customers. It does not resell packaged tuna.

19.     Plaintiff **Francis T. Enterprises** d/b/a Erbert & Gerbert's, operates sandwich shops in St. Cloud, Minnesota. During the relevant period, Francis T. Enterprises purchased Defendants' packaged tuna products—specifically, 43 ounce pouches from Starkist and Chicken of the Sea —from food distributors, including U.S. Foods. Francis T. Enterprises uses the packaged tuna it indirectly purchases to make tuna sub sandwiches for its customers. It does not resell packaged tuna.

20.     Plaintiff **Gladys, LLC d/b/a Gladys'** is a restaurant located at 107 Hillside Street in Lexington, Mississippi. Gladys M. Williams opened the restaurant in 1996.  During the relevant period, Gladys, LLC purchased Defendants' packaged tuna—specifically, Starkist tuna—from food distributors, including Sam's Club. Gladys uses the packaged tuna it indirectly purchases to make tuna dishes for its customers and does not resell packaged tuna.

21.     Plaintiff **Harvesters Enterprises, LLC**, doing business as

7

Harvester's Seafood and Steakhouse, is a restaurant located at 20735 Highway 12 in Lexington, Mississippi. During the relevant period, Plaintiff Harvesters Enterprises, LLC purchased Defendants' packaged tuna from food distributors. Plaintiff uses the packaged tuna it indirectly purchases from Defendants to make tuna fish sandwiches and tuna salads for its customers. It does not resell packaged tuna as such.

22.     Plaintiff **Dutch Village Restaurant** is a restaurant located at 8729 East Main Street in Clymer, NY. During the relevant period, Plaintiff Dutch Village Restaurant purchased StarKist's packaged tuna from the food service distributor Maple Vale Farm, Inc. Plaintiff Dutch Village Restaurant purchased groceries, including StarKist's packaged tuna, on a weekly basis. Dutch Village Restaurant uses the packaged tuna it indirectly purchases from Defendants to make the following items for its customers: grilled tuna melts, tuna salad sandwiches, tuna salad stuffed tomato picnic platters, macaroni tuna salads, and tuna noodle casseroles. Dutch Village Restaurant never resells packaged tuna.

23.     Plaintiff **Painted Plate Catering** is a catering business located in Greensboro, North Carolina. During the relevant period, Painted Plate purchased Defendants' packaged tuna products—specifically, Chicken of the Sea Chunk Light Tuna in 66.5 ounce cans—from food distributors including Sysco, Southern Foods, Pate Dawson, and Cheyney Brothers. Painted Plate uses the packaged tuna it indirectly purchases from Defendants to make tuna dishes. It does not resell packaged tuna as such.

24.     Plaintiff **GlowFisch Hospitality d/b/a Five Loaves Café** operates multiple cafés located in and around Charleston, South Carolina. During the relevant period, GlowFisch purchased Defendants' packaged tuna products from

8

food distributors, including Costco, US Foods, PFG, and Sysco. Plaintiff GlowFisch uses the packaged tuna it indirectly purchases from Defendants to make tuna dishes. It does not resell packaged tuna as such.

25.     Plaintiff **Rushin Gold LLC d/b/a The Gold Rush** is a bar and restaurant located in Nashville, Tennessee. During the relevant period, Rushin Gold purchased Defendants' packaged tuna products —specifically, Chicken of the Sea tuna in approximately five-pound cans—from food distributors including Sysco and PFG. Rushin Gold uses the packaged tuna it indirectly purchases from Defendants to make tuna salad sandwiches and does not resell packaged tuna.

26.     Plaintiff **Erbert & Gerbert's, Inc.** operates s sandwich shop in Eau Claire, Wisconsin. During the relevant period, Erbert & Gerbert's, Inc. purchased Defendants' packaged tuna products—specifically, Starkist and Chicken of the Sea tuna in 43 ounce pouches—from food distributors, including U.S. Foods. Erbert & Gerbert's uses the packaged tuna it indirectly purchases from Defendants to make tuna sub sandwiches. It does not resell packaged tuna as such.

**Defendants**

## Bumble Bee Defendants

27.     Defendant **Bumble Bee Foods LLC** ("Bumble Bee") is a domestic Delaware corporation with its principal place of business at 280 10th Avenue, San Diego CA 92101. Bumble Bee produces and sells packaged tuna throughout the United States, its territories, and the District of Columbia. Bumble Bee is privately owned by Lion Capital ("Lion"), which is based in the United

9

Kingdom. Bumble Bee's annual revenue in 2014 exceeded $1 billion. Bumble Bee produces and sells PSPs throughout the United States (including in this District), its territories, and the District of Columbia. As noted herein, Bumble Bee has pled guilty to its role in a conspiracy to fix prices of packaged seafood products in the United States.

28.     Defendant Lion Capital LLP ("Lion Capital") was founded in June 2004 by Lyndon Lea ("Lea") and two others, which specializes in buying out and controlling investments in the consumer products sector. Lion Capital forms private equity funds, such as Lion Capital Fund I, which included capital commitments with investments in entities like Kettle Foods (potato chips) and Jimmy Choo (designer shoes and accessories). In 2010, Lion Capital formed its third private equity fund, Lion Capital Fund III, which included capital commitments of €1.5 billion with investments in Bumble Bee, among others. Lion Capital is based in the United Kingdom, and according to its website, it also operated offices in the United States during the relevant period, including in New York at 888 7th Ave #4302, New York, NY 10106 and Los Angeles at 100 Wilshire Blvd, Santa Monica, CA 90401.[2]  The Lion Capital executives who managed and were involved in decision-making for Bumble Bee were based in Los Angeles County, California, ████████████████████████████ ████████████████████████ Lion Capital purposefully directs its activities to the United States by operating offices in the United States and through its ownership and control of companies doing business in the United

---

[2]     Lion Capital's website states that in October of 2012, it "[r]elocated [its] North American office from New York to Los Angeles." http://www.lioncapital.com/about/#!overview. Its current United States address is the Los Angeles address indicated above.

States, including Bumble Bee. Lion Capital is named as a Defendant in this case as a result of its direct participation in the conspiracy alleged herein and as the alter ego for Bumble Bee. Both Bumble Bee and Lion Capital are privately-held business entities, and Plaintiffs only learned about the details of their internal structure and ownership relationship, as well as the conspiratorial facts alleged herein, through document productions made in this litigation.[3]

29.     Defendant Lion Capital (Americas), Inc. ("Lion Americas") is the subsidiary by which Lion Capital elects to operate in the United States; there is no meaningful distinction between these Lion entities. Lion Americas is headquartered at Lion Capital's Los Angeles office referenced above. Additionally, during the relevant period identified in this Complaint, ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

_____

[3]      Lion Capital was previously referenced in Plaintiffs' Second Amended Consolidated Class Action Complaint first filed on May 8, 2017 (ECF No. 322) ("SAC"), but was not named as a Defendant. While it was known that Lion Capital would have profited from Bumble Bee's role in the conspiracy alleged herein, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

11

███████████████████████ and both Lion Capital and Lion Americas use the same website without distinguishing between the two entities. Further, █ ████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████ Lion Americas is named as a Defendant in this case as a result of its direct participation in the conspiracy alleged herein and as the alter ego for Bumble Bee. Hereafter, "Lion" shall refer to both Lion Capital and Lion Americas.

30.     [intentionally omitted]

31.     Defendant Lion/Big Catch Cayman LP ("Big Catch") is the entity that █████ owns Bumble Bee. Big Catch ████████████████████████ and its principal place of business was formerly "c/o Lion Capital (Americas) Inc., 888 7th Avenue, 43rd Floor, New York, NY 10019"—Lion's former office address in New York; it is now located in Lion's Los Angeles Office. █████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████ Big Catch has obligated itself to pay a substantial portion of the DOJ's criminal fine resulting from Bumble Bee's guilty plea for antitrust violations in the event that Bumble Bee is sold. Big

1  Catch is the *alter ego* of Lion and Bumble Bee. In light of the foregoing and the
2  discussion that follows, it would be an inequitable result for Big Catch to avoid
3  liability here if the corporate form is not discarded.

4    32.  The Bumble Bee brand was first created in 1910 by a group of
5  canners who had organized themselves over a decade earlier as the Columbia
6  River Packers Association ("CRPA"). Bumble Bee Seafoods, Inc. was created in
7  1960 by Castle & Cook, a prominent Hawaii-based seafood company that had
8  acquired the interests of CRPA. In 1997, the predecessor entity to Bumble Bee
9  was acquired by International Home Foods. In 1999, Lischewski joined Bumble
10  Bee Seafoods as its President and CEO, leaving StarKist where he had been the
11  Vice President of Procurement and Operations Development. Shortly thereafter,
12  Bumble Bee Seafoods was acquired by ConAgra Foods ("ConAgra") in 2000. In
13  2003, the present Bumble Bee entity was created. Centre Partners ("Centre")
14  purchased Bumble Bee from ConAgra in May 2003 through an asset acquisition.
15  In 2004, Bumble Bee combined its business with Connor Bros. Income Fund
16  ("Connor Bros.") through a reverse merger to become the largest branded
17  seafood company in North America, and Centre sold a portion of its interest to
18  Connor Bros.; Connor Bros. then purchased Centre's remaining interest in 2005.

19    33.  Centre returned in 2008, acquiring Connors Bros. and its interest in
20  Bumble Bee in the process. ██████████████████████████
21  ████████████████████████████████████████
22  ███████████████████████████████████████
23  ███████████████████████████████████████
24  ██████████████████████████████████
25  ████████████████████

26

34.     Two years later, in December of 2010, Centre sold Bumble Bee for $980 million to Lion.



14

35.     Despite annual revenues of over $900 million—███████████ ████████████████████████████████████████ Bumble Bee carries over ██████████ of debt. Following its guilty plea, and as a result of this debt, the DOJ allowed Bumble Bee to pay a reduced criminal fine of only $25 million, to be paid on an installment schedule over a five-year period, in connection with its involvement in the antitrust conspiracy alleged herein. Bumble Bee and the DOJ acknowledged that under the United States Sentencing Guidelines ("Guidelines") the appropriate fine range was between $136.2 million and $272.4 million—an amount predicated on a volume of impacted commerce for only 2011 to 2013. The ultimate fine of $25 million is therefore approximately 80% to 90% less than the Guidelines' recommended range. The primary explanation for this tremendous fine reduction is due to a downward departure under §8C3.3 of the Guidelines, which was applied for Bumble Bee's purported inability to pay a full criminal fine without substantially jeopardizing the continued viability of the organization. Bumble Bee's fine may increase up to $81.5 million, an amount to be paid by Big Catch if Bumble Bee is sold, subject to certain terms and conditions. Those terms and conditions, the plea agreement, and the declarations supporting Bumble Bee's poverty defense remain under seal. Even with Big Catch's potential payment of up to $81.5 million, that amount is still approximately 40% less than the minimum fine contemplated by the Guidelines and approximately 70% less than the maximum fine. The DOJ

15

left restitution for Bumble Bee's criminal conduct to the civil cases filed before this Court.

36.     Due to the unlawful conduct alleged herein—to part of which Bumble Bee has expressly pled guilty—Lion earned profits in excess of what it would have earned in a competitive market. 

And meanwhile, it has left Bumble Bee intentionally severely under-capitalized. For example, under United States tax laws, interest on debt is typically deductible from a corporation's taxable income.

16



17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



39.

18



40.     The corporate separateness of these entities is a fiction.

19

1

2

3

4

5

6

7

8

9

10    ████ Lion and Big Catch were unjustly enriched solely because of the illegal

11    conduct that occurred here.

12    41. ████████████████████████████████

13    ████████████████████████████████████████

14    ████████████████████████████████████████

15    ████████████████████████████████████

16    ████ Lion's website states that it "ensure[s] that [its] companies have the

17    bestmanagement talent to execute the vision that we develop in a collaborative

18    partnership" while never forgetting "the responsibility for successful outcomes

19    in our companies rests with us." Lea explained that "you have to get down to a

20    very granular knowledge of the business." ████████████████

21    ████████████████████████

22    42. ████████████████████████████████

23    ████████████████████████████████████

24    ████████████████████████████████████████

25    ───────────

26    4 ████████████████████████████████

CFPs' THIRD AMENDED COMPLAINT

27

28



43.

CFPs' Third Amended Complaint



44.



45.

23



46.

47.



As a result of these facts, considered alone or in combination with other facts, adherence to the fiction of the separate existence of Lion and Big Catch from Bumble Bee would sanction a fraud or promote an injustice; and an inequitable result or an injustice would occur if the corporate form were elevated over substance.

48.

25



49.     As used hereafter, the term "Bumble Bee" will refer to Bumble Bee Foods LLC, Lion, and Big Catch for the time period after Lion's acquisition of Bumble Bee Foods LLC in December of 2010 and to Bumble Bee Foods LLC prior to that period. Lion and Big Catch are only being sued for participation in the alleged conspiracy for the time period after Lion's acquisition of Bumble Bee Foods LLC.

**Chicken of the Sea Defendants: Tri-Union & Thai Union Group**

50.     Defendant Tri-Union Seafoods LLC **("Tri-Union")** is a Delaware corporation with its principal place of business located at 9330 Scranton Road, Suite 500, San Diego, California 92121.  Tri-Union sells the tuna brand "Chicken of the Sea" and absorbed a former entity known as "Chicken of the

Sea International," and is therefore often referred to as "COSI." Tri-Union produces and sells packaged tuna throughout the United States (including this District).

51. Defendant Thai Union Group (**"TUG"**) is a corporation organized and doing business under the laws of Thailand. TUG is the world's largest canned tuna producer, processing 18% of the world's production. It is also the largest canned tuna producer in Thailand. Its head office is located at 72/1 Moo 7, Sethakit 1 Road, Tambon Tarsai, Mueang Samut Sakhon District.

52. Since 2000, Tri-Union has been a wholly-owned subsidiary of Thai Union North America, Inc. ("TUNAI"), a California corporation with its principal place of business at 9330 Scranton Road, Suite 500, San Diego, California 92121. TUNAI, in turn, is a wholly-owned subsidiary of TUG. All three vertically-integrated companies have been led by Thiraphong Chansiri, who serves as the CEO and President of TUG, the President of TUNAI, and a Director of Tri-Union, at which Chansiri has a day-to-day leadership role. The Chansiri family is the largest single shareholder in TUG, owning approximate 25% of its stock during the relevant time period.

53. TUG, through its wholly-owned subsidiary Tri-Union produces and sells packaged tuna throughout the United States (including this District). In recent years, 40% or more of its sales have originated in the United States, which is its largest market. TUG also purposefully directs its activities to the United States by exporting packaged tuna, including canned tuna, from Thailand to this country. Tri-Union is viewed by TUG as TUG's presence in the United States.

54. TUG publicly acknowledges its dominance over Tri-Union. An

27

organizational chart that appears on TUG's website depicts Tri-Union as part of TUG's overall "Global Tuna Business" and "US Ambient Operations," both of which fall directly under the control of TUG's Board of Directors and executives.  As set forth below, TUG directly participated in the conspiracy alleged herein and used its dominance and control over Tri-Union's packaged tuna business to conspire with the other Defendants and their co-conspirators.

55.     TUG has fully integrated Tri-Union into its global packaged tuna business. In 2007, Tri-Union's President, John Signorino, was replaced by TUG's former Executive Director and Chief Financial Officer, Shue Wing Chan, who is both a member of the Chansiri family and of TUG's "Global Leadership Team." Prior to joining Tri-Union, Chan served as the CFO of TUG.[5] During Chicken of the Sea "Meetings of Managers," Chan was identified as present both as the President of COSI (in which role he presided over the meetings) and as a Director of TUG. Chan, as alleged throughout this Complaint, actively participated in the collusive activities described on behalf of both Tri-Union and TUG. On June 28, 2016, it was reported that Chan would leave Tri-Union and take up the role of the head of business development for TUNAI; his position at Tri-Union was filled by Valentin Ramirez, who also reports directly to TUG.

56.     Tri-Union's Board of Directors includes Kraisorn Chansiri (Chairman of TUG) and his son Thiraphong Chansiri (President and CEO of TUG) as well as Cheng Niruttinanon ("Niruttinanon") (Executive Chairman of

---

[5] According to one report, as CFO of Thai Union, Shue Wing Chan "managed the [Thai Union] overall business development and financial operations, including day-to-day matters related to financial administration and business performance. He was responsible for managing the development and implementation of business plans and financial strategies for the expansion of [Thai Union's] business."

TUG).  The Niruttinanon family is the third largest shareholder in TUG, owning 7.0% of its stock. A former Director of Tri-Union was Chan Tin King, the Executive Director and Chief Financial Officer of TUG.

57.    TUG exercises control and dominance over Tri-Union. Some examples are as follows. TUG held weekly "interdepartmental meetings" that Shue Wing Chan often attended telephonically, where it closely managed the packaged seafood business of Tri-Union.  Although based in San Diego, Tri-Union conducted Board Meetings and Manager Meetings at TUG's executive offices in Thailand, requiring travel for TUG's convenience. In addition, TUG executives regularly attended meetings of the "Managers of Tri-Union Seafoods, LLC" in San Diego. In March 2006, these "Managers" included TUG's Cheng Niruttinanon (TUG Executive Director), Thiraphong Chansiri (President of TUG), and Shue Wing Chan (then-Director of TUG), all of whom attended a Manager's Meeting in San Diego.

58.    TUG's Thiraphong Chansiri ████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████

59.     Internally, TUG and Tri-Union / COSI 

60.     TUG and its executives also participated directly in the alleged conspiracy. TUG approved

61.     Due to the unlawful conduct alleged herein, Tri-Union earned in excess of what it would have earned in a competitive market.

30

1

2

3

4

5 ████████████████ As a result of these facts, considered alone or in

6 combination, adherence to the fiction of the separate existence of TUG and Tri-

7 Union / COSI would sanction a fraud or promote an injustice, and an inequitable

8 result or an injustice would occur if the corporate form were elevated over

9 substance.

10     62.      Hereinafter, Tri-Union Seafoods LLC and Thai Union Group

11 Public Company Limited are collectively referred to as Chicken of the Sea

12 International, (**"COSI"**).

13              **StarKist Defendants: Starkist, Dongwon, & Del Monte**

14     63.      Defendant StarKist Co. is a Delaware corporation with its principal

15 place of business at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania

16 15212. From December 2002 until October 2008, StarKist was an operating

17 segment of Del Monte Corporation, at which time it was sold to three members

18 of the family-owned and managed Korean conglomerate Dongwon Group. After

19 the purchase, StarKist became a majority-owned subsidiary of Dongwon

20 Industries, and since September 23, 2012, StarKist has been a wholly-owned

21 subsidiary of Dongwon Industries Co. Ltd. **("Dongwon")**.

22     64.      Defendant Del Monte Corporation **("Del Monte")**, now known as

23 Big Heart Pet Brands, Inc., is a Delaware corporation with its principal place of

24 business at 1 Strawberry Lane, Orrville, Ohio, 44667. Del Monte acquired

25 StarKist in 2002. Through StarKist, Del Monte produced and sold packaged tuna

26

27

28

31

throughout the United States (including in this District), its territories and the District of Columbia. On June 6, 2008, Del Monte entered into a contract to sell StarKist to Dongwon; the sale was completed on October 6, 2008. According to a filing by Del Monte with the Securities & Exchange Commission, "[a]t the time of sale, Del Monte entered into a two-year Operating Services Agreement (which was completed in September 2010) pursuant to which [Del Monte] provided operational services to Starkist Co. such as warehousing, distribution, transportation, sales, information technology and administration."

65.     Key StarKist executives also served as Del Monte executives during the time Del Monte owned and operated StarKist.

66.     As set forth below, Del Monte participated directly in various acts in furtherance of the conspiracy during the time it owned and operated StarKist. During the Del Monte years, StarKist functioned as an operating segment of Del Monte and was not an independent company. Multiple Del Monte employees served dual roles in both StarKist and Del Monte, including in their direct participation in the improper exchange of competitive information and illegal agreements. For example, ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████
█████████████████████

67.     During Del Monte's ownership, ██████████████████
████████████████████████████████████████
████████████████████████████████████████

1  ███████████████ For example, ██████████████████████

2  ████████████████████████████████████████████████████

3  ████████████████████████████████████

4              Dongwon & StarKist

5       68.     Before describing the interrelationship between StarKist Compny

and Dongwon Industries, it is first necessary to explain briefly the concept of the

Korean *chaebol*, which is a recognized concept in the academic business

literature. *See, e,g*., the general discussions in David Hundt, *Korea's*

*Developmental Alliance: State, Capital and the Politics of Rapid Development*

(2009); R. M. Steers, K.S. Yoo, & G. Ungson, *The Chaebol: Korea's New*

*Industrial Might* (1989); Jae Jean Suh, The Social and Political Networks of the

Korean Capitalist Class, *Asian Perspective*, Vol. 13 No. 2 (Fall-Winter 1989) at

116.

       69.     The term "*chaebol*" is made up of the words "*chae*" (wealth or

property and "*bol*" (clan or group). Chaebols are closely-knit business groups in

South Korea under the control of a single family or extended family, with key

flagship firms used as instruments of control over other firms within the group.

Chaebols have four key features: (1) the governance structure of the group

involves family or extended family control; (2) the formal organizational

structure of the group involves a group headquarters, located in an actual or *de*

*facto* holding company, sometimes known as a "flagship" company, which

controls a network of subsidiaries, which fall under the control of the family, the

group as a whole, and of flagship firms within the group; (3) the business of the

firm encompasses a number of discrete products and services, some of which are

wholly unrelated and others that are effectively vertically integrated; and (4) the

group is characterized by strong internal cultures of familism and loyalty, with family members of the founder or his cohorts also occupying key managerial positions within the group.

70.     The Dongwon family of companies fits this definition. The company was created in 1969 by Chairman Jae-chul Kim ("J.C. Kim"), himself a fisherman, and is dominated by members of his family or extended family, as described in more detail below. The group headquarters is in Seoul, South Korea, where its holding company, Dongwon Enterprises, is located. Through its subsidiaries, it operates in a number of business sectors including, *inter alia*, marine products, other food products, feed products and pet food, packing materials, and aluminum foil products. ███████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████████In other words, as a *chaebol*, Dongwon does not follow the principles of corporate separateness that are expected of companies incorporated in the United States – it acts as a single integrated enterprise.

71.     With that in mind, Defendant Dongwon Industries Co., Ltd. (**"Dongwon"**) is a publicly traded company with its principal place of business at Dongwon Industries Building, 7th Floor, Mabang-ro 68 (Yangjae-dong), Seocho-gu, Seoul, South Korea. Dongwon Industries has annual packaged tuna revenue of approximately $1.4 billion. Dongwon has repeatedly availed itself of the jurisdiction of United States District Courts in filings as a plaintiff.

72.     Dongwon Group controls approximately 75% of the Korean canned tuna market. At the time of the StarKist acquisition, In-Gu Park, vice chairman of the Dongwon conglomerate's holding company, said "We believe that the acquisition of StarKist seafood will help Dongwon establish a strong foothold and penetration in the U.S. market." Park also stated that the deal was "a great opportunity for us to initiate operations in the United States."

73.     StarKist regularly describes itself as a subsidiary of Dongwon Group and as a subsidiary of Dongwon Industries. Dongwon and StarKist used the same offices or locations in the United States.  Dongwon's website lists StarKist's U.S. office as one of its global branch offices

74.     Dongwon Industries controlled and supervised the business, operations, and activities of StarKist, including the conduct alleged in this Complaint, from at least October 2008 to the present. ███████████

████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████



75.    In 2012, Dongwon dismissed several StarKist executives and replaced them with executives from the Dongwon entities

76.    Dongwon micromanaged StarKist's affairs and disregarded principles of corporate separateness with respect to StarKist.

36

1 ███████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ██████████████████████████████████ Due to the unlawful conduct

5 alleged in this complaint, StarKist charged supracompetitive prices, to the

6 benefit of Dongwon. Due to the unlawful conduct alleged herein, StarKist

7 Company earned profits in excess of what it would have earned in a competitive

8 market. StarKist Company transferred its ill-gotten gain obtained through the

9 alleged conspiracy to Dongwon, by paying out the unlawfully obtained profits

10 and other conspiracy proceeds to Dongwon in the form of dividends and other

11 transfer payments. For example, for each year between at least 2009 and 2015,

12 Dongwon directed StarKist Company to disburse a large portion of the

13 conspiracy proceeds that the subsidiary received to Dongwon in South Korea.

14 Between 2009 and 2015, Dongwon received more than $100,000,000 in

15 conspiracy proceeds from StarKist Company. Accordingly, Dongwon

16 knowingly profited from StarKist Company's participation in the conspiracy and

17 knowingly accepted the proceeds of the conspiracy and has been unjustly

18 enriched. As a result of these facts, considered alone or in combination with one

19 or more of the foregoing other facts, adherence to the fiction of the separate

20 existence of Dongwon and StarKist Company would sanction a fraud or promote

21 an injustice; and an inequitable result or an injustice would occur if the corporate

22 form were elevated over substance. It would be inequitable for Dongwon to now

23 hide behind the corporate veil for StarKist Company's actions under Dongwon's

24 watch. Thus, StarKist Company is the agent, instrumentality, and *alter ego* of

25 Dongwon.

26

27

28

1      77.    Once it acquired StarKist Company in June of 2008, Dongwon

2 participated <u>directly</u> in the alleged conspiracy. For example, 

As set forth below, Bumble Bee and StarKist

continued to work together after Dongwon's purchase to keep prices in the

packaged tuna market at collusive levels.

78.    Dongwon's

---

[6] Choe remained a Dongwon Enterprise employee, with a Dongwon title and a Dongwon email address, until March 26, 2012, at which time he became a StarKist employee. Choe nonetheless was so deeply involved in StarKist management and strategy that as of the date of this Complaint, StarKist's own website describes Choe (StarKist's current CEO and President) as having joined StarKist in 2010.

CFPs' Third Amended Complaint

1

2

3

4

5

6  79.  Dongwon, including J.C. Kim and other senior Dongwon

7  executives, not only established policy and direction for StarKist, but was the

8  decision-maker concerning even routine matters at StarKist, and effectively took

9  over the performance of StarKist's day-to-day operations in carrying out that

10  policy and direction.  Further, because of the disregard of corporate separateness

11  and the lack of any meaningful distinction between the two companies, StarKist

12  employees that performed acts in furtherance of the conspiracy did so on behalf

13  of both Dongwon and StarKist (and Dongwon employees similarly acted on

14  behalf of both StarKist and Dongwon).

15  80.  Accordingly, Dongwon knowingly profited from StarKist's

16  participation in the conspiracy and knowingly accepted the proceeds of the

17  conspiracy and has been unjustly enriched.  As a result of these facts, considered

18  alone or in combination, adherence to the fiction of the separate existence of

19  Dongwon and StarKist would promote an injustice, and an inequitable result

20  would occur if the corporate form were elevated over substance.

21  81.  As used herein, "**StarKist**" collectively refers to Defendants

22  StarKist, Del Monte (December 2002 until October 2010), and Dongwon (from

23  October 2008 through the present).

24

25  **<u>INTERSTATE TRADE AND COMMERCE</u>**

26

27  CFPs' Third Amended Complaint

28

82.    Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payments and other documents essential to the sale of packaged tuna products in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories, and the District of Columbia.

83.    Throughout the Class Period, Defendants transported substantial amounts of packaged tuna in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories, and the District of Columbia.

84.    Throughout the Class Period, Defendants' unlawful activities took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States, its territories, and the District of Columbia.

## **RELEVANT MARKETS**

85.    The relevant geographic market is the United States. The relevant product market is packaged tuna.  Defendants collectively control the U.S. market for packaged tuna and together account for nearly 80% of packaged tuna sales in the United States.  Unlike packaged tuna manufacturers and sellers located outside of the United States, Defendants have U.S. facilities, relationships and distribution assets in the United States that enable Defendants to avoid foreign product import tariffs and to effectively constrain prices for packaged tuna packed and sold in the United States.

86.    The market in the United States for packaged tuna is approximately $1.7 billion annually. Packaged tuna is sold nationwide to consumers in a few

standard sizes and predominantly in standard grades.  Each brand's offerings compete with each other brand's comparable offerings.

87.    Canned tuna is regulated by the United States Department of Agriculture, at 21 C.F.R. § 161.190 (2016).  The regulations govern the species, parts, packaging, packing media, additives and flavoring, and labeling of canned tuna.

## **FACTUAL ALLEGATIONS**

### **The packaged tuna industry**

88.    Defendants are the three largest domestic manufacturers of packaged tuna, which is pre-cooked tuna sold in a can or pouch. StarKist, Bumble Bee, and COSI together account for about 80% of the tuna market, and the remaining share is divided among private label brands, typically associated with and distributed by a single retailer.  In December of 2014, the *Wall Street Journal* reported that the Defendants' respective shares of the domestic market for canned tuna were 36% for StarKist, 25% for Bumble Bee, and 13% for COSI.  Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28%, and COSI at 20%.

89.    Packaged tuna is a commodity product. Although there are some exceptions to the rule, the albacore and yellowfin species of tuna are sold as such, and the product known simply as "tuna" is the skipjack species of tuna, which is not as threatened by overfishing and other stressors on marine life.

90.    Beginning in or about 2000, national demand for packaged tuna

began to decline for numerous reasons.  Between 2000 and 2014, the U.S. average annual tuna consumption decreased from approximately 3.5 pounds per person per year to 2.4 pounds per person per year.

91.    In a competitive environment, a decline in demand will normally lead to a decline in price. However, because Defendants controlled the market and agreed with each other to fix the prices of packaged tuna, such prices were intentionally and collaboratively set at artificially high levels throughout the Class Period, and prices did not decline. Instead, while volume sales decreased, annual dollar sales of packaged seafood, around 70% of which is packaged tuna, increased. U.S. consumers on the whole were paying more for less. The following chart shows observed data through 2014 with projections thereafter.



92.    Raw material costs do not explain the rising prices: the rising price of packaged tuna since 2007 has outpaced the price of its major component, skipjack tuna. Global catches of skipjack have been increasing since the early 90s and the debut of fish-aggregating devices ("FADs") together with purse-seining methods has caused skipjack oversupply and falling prices.

42

93.     The packaged seafood industry is tightly knit by family connections, employee swaps, and co-packing agreements. Within the past 20 years, numerous individuals have held executive or senior sales/marketing positions for more than one Defendant (while maintaining close relations with former colleagues), including, but not limited to:



94.     Co-packing also brought Defendants together. Between the late 1990s and 2009, StarKist and COSI had a co-packing agreement concerning their facilities in American Samoa. During the class period, Bumble Bee and COSI also cooperated on seafood processing and packaging. Bumble Bee co-packed for COSI on the west coast in Bumble Bee's Santa Fe Springs, California plant, while COSI co-packed for Bumble Bee on the east coast at its Lyons, Georgia plant. These connections between Defendants facilitated trust and cooperation and made the conspiracy possible.

**Overview: the packaged tuna conspiracy**

95.     At least as early as Mar 1, 2004, Defendants COSI (including TUG), Bumble Bee and StarKist (at that time owned by Del Monte) participated in an anticompetitive horizontal cartel, perpetuated through organizations the Defendants themselves created, including the International Seafood Sustainability Foundation ("ISSF") and National Fisheries Institute ("NFI"). The conspiracy included communications by telephone and by email, in-person meetings of senior officials from each Defendant, and the sharing of sensitive pricing and sales information directly and through intermediaries.  For example, Defendants (1) coordinated increases to prices of  packaged tuna; (2) coordinated a reduction in tuna can sizes; (4) shared information about and policed discounting from list prices on packaged tuna; and (4) collectively agreed to suppress the market for "sustainable" tuna by refusing to sell under their brands any tuna specifically labeled as having been caught with sustainable methods such as pole-and-line fishing (as opposed to trawling scoop nets or purse seining with the use of FADs).  Defendants' horizontal collusion was

44

intended to, and did, fix, raise, stabilize, and/or maintain the prices of packaged tuna sold to customers in the United States. The overarching scheme to fix prices began at least as early as 2004. The following sections describe specific instances of collusion that illustrate the conspiracy.

### Collusion on price increases in 2004

96.    The evidence indicates that Defendants were involved in collusion in the packaged tuna market since at least 2004. At the time, prices for canned tuna in the U.S. were below the level needed to deliver the profits expected by COSI.

97.    COSI's then-CEO, Dennis Mussell,

98.    As part of this new strategy, on May 4, 2004,



99.    During May 2004, Mussell was in close contact with

100.    As a result of the discussions among the COSI, Bumble Bee and Del Monte/StarKist executives and employees between March and May 2004, a conscious commitment to an unlawful common scheme, i.e., a conspiracy, developed among Defendants to increase prices of canned tuna sold to Plaintiffs and others in the U.S. by coordinating price increase announcements or pricing terms, by secretly and collusively exchanging pricing information and

46

prospective pricing announcements and business plans, and by collectively reducing quantity and restraining output.

101.    

102.

103.    In support and confirmation of their unlawful agreement, and so its rival could conform its pricing plans accordingly, on or about June 2, 2004 (or possibly earlier), upon information and belief,



104.

105.    On June 11, 2004,

48



For example, each Defendant set a list price of $26.00 for a case of light meat tuna.

106. ▮▮▮▮▮▮▮▮▮▮

[7]

107. Between August 20, 2004 and September 2, 2004, ▮▮▮▮

108. ▮▮▮▮▮▮▮ and these prices remained at supracompetitive levels throughout the Class Period.

**Collusion on price increases in 2006**

109. In or about January 2006, ▮▮▮▮▮▮

---

[7] Within months, Del Monte increased StarKist's prices no fewer than three times: (i) a June 2004 increase in solid white tuna; (ii) a July 2004 increase in chunk light tuna; and (iii) an October 2004 increase in chunk light tuna.

1

2

3

4       110.    Over the course of about the next two months,

5

6

7

8

9

10      111.    Beginning on January 16, 2006,

11

12

13      112.    By this point in time,

14

15

16

17

18

19

20

21

22   _____

23      8

24

25

26   _____

27                                       CFPs' Third Amended Complaint

28

113.     On February 3, 2006, 

114.     Upon receipt of the

115.



116.    Between early February and early March 2006,

117.    Consequently, on March 6, 2006,

118.    Thereafter, Bumble Bee announced

119.    The conspiracy had immediate results. For example, the popular six-ounce chunk light tuna price, which had decreased to 54 cents a can by early

CFPs' THIRD AMENDED COMPLAINT

2004, increased to 58 cents a can by late 2004 and early 2005, and to 62 cents a can by August 2005.



**Collusion to decrease package sizes in 2008**

120.    In late 2007,

121.    On or about April 5, 2007,



122.    COSI and Bumble Bee

123.    On December 10, 2007,

124.    On January 4, 2008,



125.

126.    The package-reduction conspiracy was

127.

CFPs' THIRD AMENDED COMPLAINT

128. On February 1, 2008,

129. In late February of 2008,

130. On March 7, 2008,

131. COSI and Bumble Bee

132. One day after

133.

CFPs' THIRD AMENDED COMPLAINT



134.    On April 29, 2008,

135.    Thereafter, beginning in or about July 21, 2008, Bumble Bee, COSI, and Del Monte/StarKist began distributing five ounce cans of tuna to replace their six ounce cans, as well as smaller servings of tuna in pouch form. The can size change was largely completed in 2009 and, in effect, increased the price per ounce of canned tuna sold to Defendants' customers.

136.    This effective price increase was accompanied by pretextual statements. 

137.

CFPs' THIRD AMENDED COMPLAINT



**Collusion on 2008 list price increases**

138.  In the spring of 2008, ███████████████

139.  ██████████████████████████████

140. 

141.     On June 30, 2008,

142.     Defendants' plan was carried out.

143.     Dongwon

CFPs' Third Amended Complaint



**Collusion to increase net prices in 2010**

144.    Defendants continued to conspire, and in 2010

145.

146.



147.    On or around April 26-27, 2010,

148.    On or around May 3, 2010,

149.    On May 4, 2010,

150.    Although the StarKist

151.    On May 5, 2010,

62

1 ██████████████████████████████████████████

2 ███████████████████████████████

3 152.    A dinner meeting ████████████████████████████

4 ███████████████████████████████████████████████

5 ██████████████████████████████████████████

6 ███████████████████████████████████████████████

7 ██████████████████████████████████████████████

8 ██████████████████████████████████████████████

9 ███████████

10 153.    On May 11, 2010, ███████████████████████

11 ██████████████████████████████████████

12 ███████████████████████████████████████████████████

13 ████████████

14 154.    On May 14, 2010, ████████████████████████

15 ████████████████████████████████████████████

16 ██████████████████████████████████████████████

17 ██████████████████

18 155.    On May 17, 2010, ████████████████████████

19 █████████████████████████████████████████████

20 ██████████████████████████████████████████████████

21 █████████████████████████████████████████████

22 ████████████████████████████████████████████

23 ██████████████████████████████████████████████████

24 ███████

25 156.    On May 19, 2010, ███████████████████████

26

63

27

28

1

2

3

157.    On May 20, 2010,

158.    On or about May 21, 2010,

7

8

9

10

**Collusion to increase prices in 2011**

159.    Defendants continued to collude on price increases for packaged

seafood products, including tuna.

14

15

16

17

160.    Discussions about the forthcoming price increase occurred among

19

20

21

22

161.

24

25

26

27

28



1

2      162.   

3

4

5

6      163.

7

8

9      164.   StarKist announced its list price increases on March 2, 2011, with

10   an effective date of May 30, 2011.

11

12

13

14

15

16

17      165.   Bumble Bee announced its list price increases on March 10, to take

18   effect on May 29, 2011. COSI then announced a net price increase on May 17,

19   2011, effective June 1, 2011. COSI's increase,

20

21

22

23      166.   Dongwon's

24

25

26                                         65

27

28



**Collusion to increase prices in 2011 and 2012**

167.    In December 2011 and January 2012,

These competitor discussions led to an agreement or understanding that the Defendants would increase packaged tuna prices by nearly identical amounts,

168.    Plans for the increase were hatched between

169.     Pursuant to the plan, the Defendants announced collusive price increases as follows:

170.

171.     The 2008-12 list price increases set benchmarks that affected all subsequent list prices of packaged tuna. However, the Defendants' collusion on prices did not stop after the March 2012 price increase.

172.

1 ████████████████████████████████████████

2 █████████████████████████████████████████

3 ████████████████████████████████████████

4 ██████████████████████████████████

5 ████████████████████

6

7 **Collusion on denying FAD-Free / P&L Tuna**

8       173.     For years, Defendants have been facing increasing pressure to

monitor their fish suppliers for unsustainable fishing practices, including

overfishing.   In 2011, there was a particular focus on the usage of Fish

Aggregation Devices ("FADs").  By early November 2011, ████████████

████████████████████████████████████████████ had

collaborated on an article attacking Greenpeace and other environmental groups

for criticizing the way tuna are caught. The sustainability issue came up in late

2011 in debates within the NFI.

      174.     There are three main ways to catch tuna: by classic pole and line

("P&L"), by towing a butterfly-style scoop net behind the ship (trawling), and

by cruising in a circle to deploy net around an entire a school of fish, drawing it

tight at the bottom, and hoisting the entire school upwards (purse seining). FADs

are nautical artificial devices which attract schools of fish. By drawing large

groups of fish together in one place, FADs facilitate their mass capture in purse

seine nets. Approximately one third of the global tuna catch is facilitated by

FADs. By its nature, FAD-caught tuna results in greater "bycatch"—dolphins,

sea turtles, and other marine life caught and often killed as a result of fishing—

than tuna caught by other means.

175.    Though Defendants' products may contain mixes of purse-seine and P&L tuna, the major brands had not introduced a product under their brands that was marketed as "FAD-Free" or "Pole and Line Only." Defendants were worried about public denouncement and a risk that consumers might demand FAD-free or P&L-only tuna in the same way that consumers learned to demand "dolphin-safe" tuna in the mid-1990s.

176.    In February 2012, StarKist, Bumble Bee and COSI continued their conspiracy not to compete by agreeing that it would not sell any "FAD-free" or "P&L only" product under its own label, despite strong and growing demand by consumers for FAD-free products. Senior executives at StarKist, Bumble Bee and COSI began discussions in e-mails on this topic in late 2011, and reached agreement in a telephone conference among all three companies during the week of February 6, 2012. ▮▮▮▮▮▮▮

177.    The plan remained in effect years later. ▮▮▮▮▮▮

178.    Defendants' agreement not to compete by producing branded canned tuna labeled "FAD Free" ensured that FAD-free tuna, which would be more costly to produce and have a lower profit margin, did not cannibalize sales of their products that were subject to the price-fixing conspiracy.

179.    Moreover, this agreement protected the price increases by preventing competition amongst the branded packaged tuna products. By ensuring that the dominant brands in the market remained largely commoditized, Defendants facilitated their price-fixing conspiracy and reduced competition.

**Collusion on reducing promotions**

180.    To ensure that their collusive tuna price increases would not erode, Defendants also agreed to limit promotions on such products. Commencing in at least ████████████████████████████████████████████████

70

1

2

3

4

5    181.    To preserve the prices that they had decided and implemented

6   together, Defendants engaged in monitoring of discounts and promotions and

7   policed one another.

8

9

10

11

12

13

14

15

16

17

18                                                                            By exchanging

19   such information among high-level executives, the competitors were able to

20   police whether each remained faithful to their overarching conspiracy.

21

22              **TOLLING OF THE STATUTE OF LIMITATIONS**

23    182.    Plaintiffs had neither actual nor constructive knowledge of the facts

24   constituting their claim for relief.

25    183.    Plaintiffs and members of the Class did not discover, and could not

26                                        71

27

28

have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least July of 2015. Indeed, the conspiracy was apparently only uncovered by the DOJ in the process of reviewing internal company documents relating to the proposed merger between COSI and Bumble Bee.

184.     Defendants engaged in a secret conspiracy and did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was an agreement to fix prices for packaged tuna.  By their very nature, price-fixing conspiracies are inherently self-concealing. Defendants agreed among themselves to conceal their unlawful conspiracy, including by agreeing not to discuss the conspiracy publicly and by other means of avoiding detection and maintaining secrecy, such as the use of personal e-mails and private telephone calls, as described above. Accordingly, Plaintiffs could not have had either actual or constructive knowledge of the price fixing scheme until the public disclosure of the DOJ's criminal investigation.

185.     With respect to the 2004 and 2006 price increases, phone calls were used to avoid detection. ███████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████

186.     Defendants also concealed their conspiratorial conduct by using

1    third-party facilitators.  For example, 

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16       187.

17

18

19

20

21       188.    Defendants avoided confirming or referencing their illegal

22   agreement in writing, instead conducting most of their conspiratorial

23   communications via direct conspirator-to-conspirator telephone calls, in-person

24   meetings among the conspirators, and in-person and telephonic communications

25   through Impress, the third-party facilitator.

26

27

28

73

1

2

3

4

5

6

7

8

9

10    189.    The guilty plea of Ken Worsham of Bumble Bee further raises the

11   inference that the conspiracy was affirmatively concealed. Ken Worsham is the

12   son of Robert "Bob" Worsham, who was a consultant for StarKist and, as

13   alleged above,

14

15

16

17

18

19    190.    Defendants also gave pretextual reasons for the package

20   downsizing in order to conceal their unlawful conduct.

21

22

23

24

25

26

27

28



Similarly, a published article at the time of the announcement of the can resizing stated that "a customer service representative for StarKist explained that tuna prices have reached an all-time high, and coupled with the increased costs of transportation and other ingredients, they had to make a change." And another article said "in August of 2008 when the move had been implemented, StarKist stated that it did this primarily for environmental reasons, including the purpose of 'sav[ing] two million gallons of water a year, while only taking out two teaspoons of tuna from each can.'" The existence of a price-fixing conspiracy as a reason for the price increase was not disclosed.

191.    With respect to the 2008 list price increase,

192.    With respect to the 2010 net price increase,

CFPs' Third Amended Complaint



193.    The agreement on the 2010 net price increase was also further concealed by having a

194.    Similarly, in connection with the 2011-12 price increases discussed above, COSI, StarKist, and Bumble Bee interacted mostly through telephonic communications or face-to-face meetings, as described above. As alleged above,

195.    With respect to the agreement not to produce branded "FAD free" or "P&L only" tuna, that facet of the conspiracy was hatched in secret

CFPs' THIRD AMENDED COMPLAINT



196.    With respect to these various conspiratorial acts,

197.    While implementing the various collusive price increases, Defendants consistently gave pretextual public reasons for them, such as rising costs, a weakening United States dollar, or other factors. Examples of these pretextual statements include:

CFPs' THIRD AMENDED COMPLAINT



78

198.     Defendants thus actively misled their customers about the price-fixing scheme. Their various justifications for price increases did not disclose that they had agreed among themselves to fix, raise and/or stabilize the price of packaged tuna.  Defendants' justifications for their price increases were also misleading, to the extent they were true even in part, because of their failure to disclose that the price increases in fact resulted from their illegal agreement and conspiracy.

199.     Finally, as noted above, Defendants surreptitiously shared confidential information among themselves in furtherance of the conspiracy through surreptitious means, such ███████████████████████ ████████████████████████████████████ ████████████████   Defendants' representatives also had meetings with each other at locations outside of their respective offices for the purpose of concealing their conspiracy.

200.     Because Defendants' communications, agreements, understanding and overall conspiracy were kept secret and camouflaged through fraudulent, pretextual statements, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for packaged tuna during the Class Period.

## CLASS ACTION ALLEGATIONS

201.     Plaintiffs bring claims asserted in this action on behalf of themselves and as class claims under Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), seeking damages pursuant to various state antitrust, unfair competition, and consumer protection laws of the states listed below on behalf of the following classes:

(a)  *Illinois Brick* **Repealer Cartwright Act class**: All persons and entities in Arizona, Arkansas, California, the District of Columbia, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont,  West Virginia, and Wisconsin, that indirectly purchased packaged tuna products--produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator--for their own use in commercial food preparation, including institutional purchasers such as hospitals, nursing homes, and schools, and not for resale as such, during the Class Period (from at least July 1, 2004 to May 8, 2017).

(b)  **Damages Class**: All persons and entities engaged in food preparation in Arkansas, California, the District of Columbia, Florida, Iowa, Maine, Minnesota, Mississippi, New York, North Carolina, South Carolina, Tennessee, and Wisconsin that indirectly purchased packaged tuna products—produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator—for their own use in commercial food preparation, including institutional purchasers such as hospitals, nursing homes, and schools, and not for resale as such, during the Class Period (from at least July 1, 2004 to May 8, 2017).

202.     The *Illinois Brick Repealer* Cartwright Act Class and the Damages

Class are collectively referred to herein as the "Classes" unless otherwise indicated.

203.    Excluded from each of the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, all judges assigned to this matter, all jurors in this matter, and all persons and entities to the extent they purchased packaged tuna directly or for resale as such.

204.    Each of the Classes is so numerous that joinder of all members is impracticable.  While Plaintiffs do not know the exact number members of each of the Classes, Plaintiffs believe there are at least thousands of members in each of the Classes.

205.    Common questions of law and fact exist as to all members of each of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all members of each of the Classes, thereby making appropriate relief with respect to each Class as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

    (a)    Whether the Defendants and their co-conspirators engaged in a combination and conspiracy to fix, raise, maintain or stabilize the prices of packaged tuna sold in the United States and in each of the States alleged herein;

    (b)    The identity of the participants of the alleged conspiracy;

    (c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)   Whether Defendants' alleged conduct violated various state antitrust and restraint of trade laws;

(e)   Whether Defendants' alleged conduct violated various state consumer protection and unfair competition laws;

(f)   Whether the conduct of Defendants and co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(g)   The effect of Defendants' alleged conduct on the prices of packaged tuna sold in the United States during the Class Period; and

(h)   The appropriate relief for the Classes, including injunctive and equitable relief.

206.    Each Plaintiff's claims are typical of the claims of the members of the Classes each Plaintiff seeks to represent, and each Plaintiff will fairly and adequately protect the interests of the respective classes such plaintiff seeks to represent.  Each of the Plaintiffs and all members of the Classes that Plaintiffs seek to represent were similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices, for packaged tuna purchased indirectly from the Defendants and/or their co-conspirators, plus an additional cost imposed by distributors.

207.    Each Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of each of the Classes that each Plaintiff seeks to represent. Each Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the respective Classes that plaintiff seeks to represent.  Plaintiffs are represented by counsel

who are competent and experienced in the prosecution of antitrust and class action litigation.

208.     The questions of law and fact common to the members of each of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

209.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

210.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## CAUSES OF ACTION

### (1)

### Violation of Section 16720 of the California Business and Professions Code (Cartwright Act)

*(on behalf of Plaintiffs and the* Illinois Brick *Repealer Cartwright Act Class)*

83

211.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 to 193 as if fully set forth herein.

212.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of California Business and Professions Code section 16700, *et seq.*

213.    The states and jurisdictions included in the *Illinois Brick* Repealer Cartwright Class (as defined in ¶ 179, *supra*) each allow indirect purchasers to recover on a similar theory applicable to the facts alleged in this Complaint, which overwhelmingly took place within the State of California.

214.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of California Business and Professions Code section 16700, *et seq.* As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the *Illinois Brick* Repealer Cartwright Act Class have been injured in their business and property in that they paid more for packaged tuna than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of section 16720 of California Business and Professions Code, Plaintiffs and members of the *Illinois Brick* Repealer Cartwright Act Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 16750(a) of California Business and Professions Code.

**(2)**

**Violations of State Antitrust Statutes**

*(on behalf of Plaintiffs and the Damages Class)*

215.    Plaintiffs incorporate by reference the preceding paragraphs as if

84

fully set forth herein.

216.    Defendants entered into a continuing conspiracy in restraint of trade to fix, raise, maintain, and/or stabilize at artificial and non-competitive levels the prices of packaged tuna. The conspiracy began at least as early as July 1, 2004 and continued in force or effect to the present (May 8, 2017), the exact dates being unknown to Plaintiffs.

217.    In formulating and effectuating this conspiracy, Defendants performed acts in furtherance of the combination and conspiracy, including participating in meetings and conversations among themselves during which they agreed to price packaged tuna at certain levels and otherwise to fix, increase, inflate, maintain, and/or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to packaged tuna sold in the United States.

218.    Defendants' anticompetitive, unfair acts described above were knowing and willful, and constituted violations of the below-listed state antitrust statutes. Defendants caused Plaintiffs injury-in-fact through their unlawful conspiracy, in the form of overcharges for the packaged tuna purchased indirectly by Plaintiffs.

219.    Each of the following state law claims is asserted by the named plaintiff(s) from the corresponding state, on behalf of all Damages Class members in that state.

220.    **California**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.* During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions

Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and/or maintain packaged tuna prices at supracompetitive levels. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants, the substantial terms of which were to fix, raise, maintain, and/or stabilize the prices of packaged tuna. For the purpose of forming and effectuating the unlawful trust, the Defendants have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above. The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of packaged tuna has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for packaged tuna sold by Defendants have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased packaged tuna from entities who purchased packaged tuna directly from Defendants have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for packaged tuna than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of § 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to § 16750(a) of the California Business and Professions Code.

221.   **District of Columbia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code §§ 28-4501, et seq. Defendants' combinations or conspiracies had the following effects: (1) Packaged tuna price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class who resided in the District of Columbia and/or purchased packaged tuna in the District of Columbia were deprived of free and open competition in the District of Columbia; and (4) Plaintiffs and members of the Damages Class who resided in the District of Columbia and/or purchased packaged tuna in the District of Columbia paid supracompetitive, artificially inflated prices for packaged tuna in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq*.

222.   **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout Iowa; (2)

87

packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

223.    **Maine**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Title 10, §§ 1101, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout Maine; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have

entered into agreements in restraint of trade in violation of Maine Rev. Stat. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. 10, §§ 1101, *et seq.*

224.   **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class who resided in Minnesota and/or purchased packaged tuna in Minnesota were deprived of free and open competition in Minnesota; and (4) Plaintiffs and members of the Damages Class who resided in Minnesota and/or purchased packaged tuna in Minnesota paid supracompetitive, artificially inflated prices in Minnesota for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minn. Stat. §325D.49, *et seq.*

225.   **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, et seq. Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated

throughout Mississippi; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class who resided in Mississippi and/or purchased packaged tuna in Mississippi were deprived of free and open competition in Mississippi; and (4) Plaintiffs and members of the Damages Class who resided in Mississippi and/or purchased packaged tuna in Mississippi paid supracompetitive, artificially inflated prices in Mississippi for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

226. **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout New York; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class who resided in New York and/or purchased packaged tuna in New York were deprived of free and open competition in New York; and (4) Plaintiffs and members of the Damages Class who resided in New York paid supracompetitive, artificially inflated prices for packaged tuna when

90

they purchased packaged tuna in New York, or purchased in New York packaged tuna that were otherwise of lower quality than would have been absent the conspirators' illegal acts, or were unable to purchase packaged tuna that they would have otherwise purchased absent the illegal conduct. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

227.    **North Carolina**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class who resided in North Carolina and/or purchased packaged tuna in North Carolina were deprived of free and open competition in North Carolina; and (4) Plaintiffs and members of the Damages Class who resided in North Carolina and/or purchased packaged tuna in North Carolina paid supracompetitive, artificially inflated prices in North Carolina for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected North Carolina

commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the North Carolina Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the North Carolina Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

228.    **[Intentionally omitted in this Third Amended Complaint]**.

229.    **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed and eliminated throughout Tennessee; (2) packaged tuna prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) plaintiffs and members of the Tennessee Class were deprived of free and open competition; and (4) plaintiffs and members of the Tennessee Class paid more for packaged tuna products than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Tennessee Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §47-25-101 *et seq*. Accordingly, plaintiffs and members of the Tennessee Class seek all relief available under Tenn. Code Ann. §47-25-101 *et seq*.

230.    **Wisconsin**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Wisconsin Class were deprived of free and open competition; and (4) Plaintiffs and members of the Wisconsin Class paid supracompetitive, artificially inflated prices for packaged tuna. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Wisconsin Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

231.    Plaintiffs' injuries are of the type the antitrust laws of the above states were designed to prevent and flowed from Defendants' unlawful conduct.

232.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

233.    Accordingly, Plaintiffs and the members of the Damages Class seek damages (including statutory damages where applicable), to be trebled or

1  otherwise increased as permitted by a particular jurisdiction's antitrust law, and
2  costs of suit, including reasonable attorneys' fees, to the extent permitted by the
3  above state laws.

**(3)**

**Violation of State Consumer Protection Statutes**

*(on behalf of Plaintiffs and the Damages Class)*

234.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

235.    Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

236.    Defendants caused Plaintiffs and those similarly situated an injury-in-fact through their unlawful conspiracy, in the form of overcharges for the packaged tuna purchased indirectly by Plaintiffs.

237.    **Arkansas**: Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code § 4-88-101 *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels the prices at which packaged tuna products were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from plaintiffs and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) packaged tuna price competition was restrained, suppressed, and

94

eliminated throughout Arkansas; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

238.    **California**: Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.* During the Class Period, Defendants committed acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above. During the Class Period, Defendants illegal conduct substantially affected California commerce and consumers. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged in this Class Action Complaint, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. The Defendants' conduct as alleged in this Class Action

95

Complaint violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the violations of Section 16720, *et seq.*, of the California Business and Professions Code, as set forth above; Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent; Defendants' acts or practices are unfair to purchasers of packaged tuna in the State of California within the meaning of Section 17200, California Business and Professions Code; and Defendants' unlawful conduct had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout California; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the classes who resided in California and/or purchased packaged tuna in California were deprived of free and open competition in California; and (4) Plaintiffs and members of the classes who resided in California and/or purchased packaged tuna in California paid supracompetitive, artificially inflated prices in California for packaged tuna. Defendants' acts and practices are unlawful, fraudulent, or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the classes are entitled to full restitution and/or disgorgement of all revenues,

96

earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the classes to pay supracompetitive and artificially inflated prices for packaged tuna. Plaintiffs and the members of the classes suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Class Action Complaint violates Section 17200 of the California Business and Professions Code. As alleged in this Class Action Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

239.     **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq*. Defendants' unlawful conduct had the following effects: (1) packaged tuna price competition was restrained, suppressed and eliminated throughout Florida; (2) packaged tuna prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) plaintiffs and members of the Damages Class were deprived of free and open competition in the market for packaged tuna; and (4) plaintiffs and members of the Damages Class paid supracompetitive,

artificially inflated prices for packaged tuna.  During the Class Period, defendants' illegal conduct substantially affected Florida commerce and consumers.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201 *et seq.*, and, accordingly, plaintiffs and members of the Damages Class seek all relief available under that statute.

240.     [intentionally omitted from this Third Amended Complaint].

241.     **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the price at which packaged tuna were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and the members of the Damages Class. The conduct of the Defendants described in this Class Action Complaint constituted consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects upon purchasers in North Carolina: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high

levels throughout North Carolina; (3) Plaintiffs and the members of the Damages Class who reside in North Carolina and/or purchased packaged tuna in North Carolina were deprived of free and open competition in North Carolina; and (4) Plaintiffs and the members of the Damages Class who resided in North Carolina and/or purchased packaged tuna in North Carolina paid supracompetitive, artificially inflated prices in North Carolina for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named in this Class Action Complaint, directly, or indirectly and through affiliated they dominated and controlled, manufactured, sold, and/or distributed packaged tuna in North Carolina. Plaintiffs and the members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

242.     **South Carolina**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code §§ 39-5-10, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition;

and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for packaged tuna. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

### (4)
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

243. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

244. Plaintiffs from each of the following states in the Damages Class (Arkansas, California, the District of Columbia, Iowa, Minnesota, Mississippi, New York, North Carolina, South Carolina, Tennessee, Wisconsin) assert this cause of action on behalf of themselves and as representatives for all other class members of the same State, under the respective equity precedents and common law of each of the above-listed states. Plaintiffs plead this claim in the alternative to the aforementioned statutory remedies at law.

245. As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, as a minimum, unlawfully inflated prices and

unlawful profits of packaged tuna.

246.     Defendants have benefitted from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs and the members of the Damages Class for packaged tuna.

247.     Pursuit of any remedies against the entities from which Plaintiffs and the members of the Damages Class purchased packaged tuna subject to Defendants' conspiracy would have been futile, given that those entities did not take part in Defendants' conspiracy.

248.     Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

C.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

1.     An unreasonable restraint of trade or commerce in violation of

CFPs' THIRD AMENDED COMPLAINT

the Cartwright Act;

2. A *per se* violation of the Cartwright Act;

3. An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition, unjust enrichment, and consumer protection laws as set forth herein;

D. That Plaintiffs and the members of the Classes recover damages to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

E. That Plaintiffs and the members of the Classes recover damages to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

F. That Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

G. That Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H. That Plaintiffs and the members of the Damages Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I. That Plaintiffs and the members of the Damages Class have such

102

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

other and further relief as the case may require and the Court may deem just and proper.

CFPs' THIRD AMENDED COMPLAINT

1
2

## **Demand For Jury Trial**

3

4          Plaintiffs, on behalf of themselves and the Classes of all others similarly

5    situated, hereby demand a trial by jury on all issues so triable pursuant to Rule

6    38 of the Federal Rules of Civil Procedure.

7

8    Dated: April 17 2018                 Respectfully submitted,

9                                          By */s/ Jonathan W. Cuneo*
                                           St. Paul, MN 55101

10   John H. Donboli (Cal. Bar No. 196266)     Telephone: (651) 312-6518
     DEL MAR LAW GROUP, LLP                    sraiter@larsonking.com
11   12250 El Camino Real, Suite 120
     San Diego, CA 92130
12   Telephone: 858.793.6244                   Jonathan W. Cuneo
     Facsimile: 858.793.6005                   Joel Davidow
13   jdonboli@delmarlawgroup.com               Peter Gil-Montllor
                                               Blaine Finley
14   Don Barrett                               CUNEO GILBERT & LADUCA, LLP
15   David McMullan                            4725 Wisconsin Ave. NW, Suite 200
     BARRETT LAW GROUP, P.A.                   Washington, DC 20002
16   P.O. Box 927                              Telephone: 202.789.3960
     404 Court Square                          Facsimile: 202.589.1813
17   Lexington, MS 39095                       jonc@cuneolaw.com
18   Telephone: (662) 834-2488                 joel@cuneolaw.com
     dbarrett@barrettlawgroup.com              pgil-montllor@cuneolaw.com
19   dmcmullan@barrettlawgroup.com             bfinley@cuneolaw.com

20   Thomas P. Thrash                          Armand Derfner
21   THRASH LAW FIRM, P.A.                     DERFNER & ALTMAN
     1101 Garland Street                       575 King Street, Suite B
22   Little Rock, AR 72201                     Charleston, SC 29403
     Telephone: (501) 374-1058                 Telephone: (843) 723-9804
23   tomthrash@sbcglobal.net                   aderfner@derfneraltman.com

24   Shawn M. Raiter                           Dewitt Lovelace
25   LARSON KING LLP                           LOVELACE & ASSOCIATES, P.A.
     30 East Seventh Street, Suite 2800        12870 US Hwy 98 West Suite 200

26                                    104

27

28

Miramar Beach, FL  32550
Telephone: (850) 837-6020
dml@lovelacelaw.com

Arthur Bailey
ARTHUR N. BAILEY & ASSOCIATES
111 West 2ⁿᵈ Street, Suite 1100
Jamestown, NY 14701
Telephone: (716) 664.2967
artlaw@windstream.net

Charles Barrett
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: (615) 238-3647
cbarrett@nealharwell.com

Joseph J. DePalma
Steven J. Greenfogel
LITE DEPALMA GREENBERG, LLC
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Telephone: (267) 519-8306
sgreenfogel@litedepalma.com

J. Barton Goplerud
SHINDLER, ANDERSON, GOPLERUD
& WEESE PC
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Telephone: (515) 223-4567
goplerud@sagwlaw.com

*Counsel for Plaintiffs and Commercial
Food Preparer Class*

1

## **CERTIFICATE OF SERVICE**

2

3

I certify that on April 17, 2018 I filed the foregoing document with the

4

Clerk of the Court for the United States District Court, Southern District of

5

California, by using the Court's CM/ECF System, and also served counsel of

6

7

record via this Court's CM/ECF System.

8

9

By: /s/ *A. Blaine Finley*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28