1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15
16

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No. 3:15-md-02670-JLS-MDD |
| This Document Relates to: ALL ACTIONS | |

17
18
19
20

## JOINT STATUS REPORT

21
22
23
24
25
26
27
28

In preparation for the upcoming status conference on July 30, 2018, the Parties submit their positions on the following agenda items.

# I. PROCEDURE TO DETERMINE THE ADMISSIBILITY OF DEPOSITION EXHIBITS

## A. DPPs' Position

The parties have been discussing procedures through which the parties can streamline challenges as to authenticity and admissibility of documents and crystalize the record reasonably in advance of trial and dispositive motions. The process was initiated by the DAPs, CFPs, and EPPS, who made an initial proposal that has now been withdrawn.  DPPs countered with a proposal, set forth below, that Defendants agree with in substance, but not in timing.

DPPs propose a process where the parties would exchange their anticipated exhibit lists at the end of January 2019.  Opposing parties would then have roughly a month to review the documents and either agree that a document is authentic and/or admissible or challenge the document and set forth their basis for doing so.  The parties would then engage in a good faith meet and confer process in March 2019 to attempt to resolve the challenges.  If any challenges remain, the parties would then be permitted to engage in reasonable limited discovery to acquire further support for the authenticity and admissibility of their desired exhibits.  That limited discovery would be complete by early June 2019 – two months in advance of dispositive motions.

Defendants have stated that they agree with DPPs' proposal, with one important caveat – they prefer to defer the meet and confer on questions of admissibility (and any further depositions on that subject) until after summary judgment motions are resolved.  DPPs do not believe that is appropriate because (1) admissibility of documents that may be used in connection with summary judgment needs to be resolved before summary judgment motions can be decided, and (2) deferring substantial meet and confers (and possible further depositions) until the time of final trial preparation will put undue pressure on all parties and risk delaying trial.  The

more sensible solution is to use the nearly 10 months between the end of discovery and the deadline for dispositive motions to resolve these issues and force the parties to really analyze and assess their evidence before summary judgment.

DPPs are presently not clear what position the DAPs, EPPs, and CFPs are taking with respect to these two proposals.

The parties will continue their meet and confer efforts and will provide an update to the Court at the hearing.

B.   **DAPs' Position**

DAPs are still conferring with the parties about the procedure to use to address evidentiary issues.   DAPs support the DPP position that such issues should be addressed before summary judgment and not afterward.   The defense suggestion that no Plaintiff group supports the DPPs' position is an overstatement, as the current posture of the parties is a product of timing and not substance.   Further, the temporal conspiracy and other issues noted by Defendants  merely reflects a condition inherent in this MDL Proceeding from the start, namely, that each of the classes and DAPs have their own cases, and each is to be adjudicated separately, as this Court has done. While the DPPs (and the other classes) have presumably moved for certification on terms that reflect their own needs and exigencies, DAPs are not participating in the direct class.   Thus, for example, that ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████, are facts that DAPs will not ignore in their cases.

C.   **Defendants' Position**[1]

The DPP Plaintiffs—on their own and without the support of DAPs, CFPs, EPPs, or Defendants—propose a process that would require the parties and the Court

---

[1] Defendants do not write on behalf of Lion Capital LLP, Lion Capital (Americas), Inc. or Big Catch Cayman L.P.

to make key evidentiary rulings long before any determinations have been made regarding the scope and nature of any claims or defenses to be tried in these matters. DPPs argue that entering such a process would be efficient. For the reasons explained below, they are wrong. Defendants respectfully submit that there is no reason for this Court to depart from the standard federal court practice of addressing evidentiary issues toward the end of the pre-trial process and after dispositive motions have been briefed and ruled upon.

Far from being efficient, proceeding as the DPPs propose would result in an enormous waste of time and resources. Under the current case management schedule, no trial in this matter will occur before *2020 at the earliest*. Between now and then, claims and allegations that were explored in discovery are sure to fall out of the case. Classes may or may not be certified. Summary judgment may or may not be granted with respect to some or all claims. And strategic considerations will cause the parties to narrow their focus. As a result of such changes in the scope of the claims, the scope of exhibits the parties intend to use at trial—and, thus, exhibits for which evidentiary determinations are required—will also change and narrow.

This is not a matter of speculation—it has already started to happen. Early motion practice substantially narrowed the scope of this case from an alleged agreement concerning all packaged seafood products to one limited to shelf-stable packaged tuna. Order Granting in Part and Denying in Part Defs.' Mot. to Dismiss at 11 (ECF No. 283). And now, having taken large amounts of discovery—and introducing hundreds of deposition exhibits—relating to allegations of a conspiracy that "began no later than 2004,"[2] the DPP, EPP, and CFP Plaintiffs have all recently cut *more than seven years* out of their cases.[3] In moving for class certification, they

---

[2] *See* Direct Purchaser Plaintiffs' Third Am. Compl., ECF No. 911; Commercial Food Preparers' Third Am. Compl., ECF. No. 933; and, Indirect Purchaser End Payer Plaintiffs' Fifth Am. Compl. ECF No. 1208.

[3] Indirect Purchaser End Payer Plaintiffs' Mem. P. & A. in Supp. of Mot. for Class Cert., ECF No. 1130-1, 4; Direct Purchaser Class Plaintiffs' Mem. P. & A. in Supp. of Mot. for Class Cert., ECF No. 1140-1, 1; Commercial Food Preparer Plaintiffs' Mem. P. & A. in Supp. of Mot. for Class Cert. and Appt. of Lead Counsel, ECF No. 1197-1, 2–3.

---

now limit their claims to an alleged "conspiracy period" that begins in mid-2011.[4]
Documents from before then will be largely, if not entirely, irrelevant to those
claims.  Moreover, dispositive motion practice may well limit the scope of the
products at issue or the temporal period of the case—as has happened in other
antitrust MDLs.  *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F.
Supp. 2d 857, 872 (N.D. Cal. Nov. 29, 2012) (granting partial summary judgment
and ruling that direct purchaser class plaintiffs lacked standing to sue for certain
alleged overcharges); *In re Processed Egg Prods. Antitrust Litig.*, No. 08-MD-2002,
2016 WL 4771865 (E.D. Pa. Sept. 12, 2016) (granting in part defendants' motion for
summary judgment because the state action doctrine required the exclusion of
certain sales from plaintiffs' damages model; also noting that direct action
purchasers had, in the motion briefing at issue, abandoned claims based on
purchases from non-defendants); *In re Domestic Drywall Antitrust Litig.*, 163 F.
Supp. 3d 175, 258–59 (E.D. Pa. Feb. 28, 2016) (granting one defendant's motion for
summary judgment because plaintiffs failed to proffer evidence that it participated in
the alleged agreement); *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, (D.D.C.
Apr. 8, 2004) (same).

And yet, DPPs would have the parties exchange trial exhibit lists and then
litigate any disputes over whether a document is "authentic and/or admissible"
*before* dispositive motions are even filed.  The inevitable result will be a
proliferation of additional discovery and motion practice about issues that, by the
time of trial (if not before), will be rendered entirely academic.  As discussed above,
it makes no sense for the parties to try to predict what documentary exhibits they
will use at trial—and what admissibility objections they may or may not have to the
other side's exhibits—until after the scope of the claims and defenses to be tried has
been determined through rulings on dispositive motions.

---

[4] *Id.*

Further, DPPs are wrong that "admissibility of documents that may be used in connection with summary judgment needs to be resolved before summary judgment motions can be decided." Contrary to the DPPs' argument, "[f]or a motion for summary judgment, 'a party does *not* necessarily have to produce evidence in a form that would be admissible at trial.'" *Obesity Research Institute, LLC* v. *Fiber Research Int'l, LLC*, ---F. Supp. 3d ----, 2018 WL 1001089, at *6 (S.D. Cal. Feb. 21, 2008) (quoting *Block* v. *City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)) (emphasis added). Rule 56 requires only that material cited to support or dispute a fact at summary judgment *can* be "presented in a form that would be admissible in evidence," not that it already has been deemed admissible. Fed. R. Civ. P. 56(c)(2); *see Celotex* v. *Catrett*, 477 U.S. 317, 324 (1986). The advisory committee notes to the Rule further emphasize that distinction by providing that the "burden is on the proponent to show that the material is admissible as presented *or to explain the admissible form that is anticipated*," as well as by pointing out that "[i]f the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial." Fed. R. Civ. P. 56, 2010 adv. comm. notes (emphasis added). Clearly, the Rules do not contemplate that evidentiary objections be lodged or waived, and a final admissibility determination be made, *before* summary judgment as the DPPs' proposal would require.

Although Defendants believe that other aspects of the DPPs' proposal could be workable—including the exchange of exhibit lists, a meet-and-confer process, and the opportunity to engage in reasonable limited discovery to address authenticity and other admissibility issues—we believe that this should occur *after* dispositive motions are briefed and ruled on, as is the normal procedure. The parties can then tailor their exhibit lists in light of the Court's dispositive motion rulings, and address only those evidentiary issues that actually matter for trial while avoiding unnecessary disputes.

Defendants respectfully request that the Court reject the DPPs' proposal to the extent it calls for trial exhibit lists to be exchanged and admissibility determinations to be made in advance of briefing and rulings on dispositive motions.

## II.   CLARIFICATION OF THE THIRD LIMITED STAY ORDER

### A.   Plaintiffs' Position

Recently, a dispute has arisen between the parties during depositions about the scope of the Paragraph 2 of the Third Limited Stay, which provides that: "No discovery shall be conducted under the Federal Rules of Civil Procedure that refers or relates to the criminal grand jury investigation being conducted by the United States concerning packaged seafood, including any party's or witness's communications with the United States or with the grand jury investigating package seafood."  This was a provision all parties, including the Department of Justice (DOJ) agreed on, and the Court approved. *See* ECF No. 480.  The issue is that defense counsel has at various times used Paragraph 2 to instruct witnesses not to answer any questions related to the criminal case, such as questions about whether the witness knows that a colleague pled guilty or asking about facts relating to a guilty plea.

For example, Defendants have instructed witnesses not to answer the following questions:



The Court already has rejected Defendants' unreasonably broad interpretation of Paragraph 2 in the context of overruling Bumble Bee's objection to Plaintiffs' interrogatory No. 1.  This interrogatory asked for the identity and description of all "agreements … between or among You [Bumble Bee] and any other Defendant or Defendants or any other manufacturer of PSP [packaged seafood products], identify persons with knowledge with respect to each, and the time period during which each existed."  Bumble Bee argued that the Third Limited Stay prohibited this discovery by Plaintiffs because it refers or relates to the criminal grand jury investigation concerning packaged seafood or communications with the government or the grand jury.  Judge Dembin rejected this argument:

> [T]he Court does not see a conflict between the [Third Limited Stay Order] and responding to Interrogatory No. 1. … There is nothing in the Interrogatory that refers or relates to the grand jury investigation nor requires any disclosures of any communications with the Unites States or the grand jury.  That a grand jury may have been provided some or all of this information by Bumble Bee or others is not a relevant concern in responding to this Interrogatory.  Bumble Bee is not being asked to identify all information regarding business relationships *provided to the grand jury*.  The Stipulation does not bar from a full response from Bumble Bee to the question asked."  ECF No. 772 at 4 (italics added).

Judge Sammartino sustained this ruling after Bumble Bee objected to it.  ECF No. 856.  Notably, the Court stated that "the interrogatory is not requesting anything specifically related to the grand jury proceedings *and simply because the grand jury may be in possession of the information requested by the interrogatory does not mean the information is barred by the stay.*"  *Id.* at 5 (italics added).

The parties have been meeting and conferring about this issue, and it appears that Defendants now agree that Plaintiffs may ask a witness about whether he/she knows about the guilty pleas and indictment and what facts he/she has regarding the facts about the conspiracy indicated in the pleas and indictment, provided the question is not phrased in terms of whether the witness actually communicated this information

8

to the DOJ or the Grand Jury. The parties have provisionally put together a non-exhaustive stipulation addressing other questions Plaintiffs may ask and also agree they will not ask, which they may use as an internal guideline or perhaps submit to the Court if deemed necessary. There is, however, one remaining issue for which they seek the Court's guidance.

Specifically, Plaintiffs' counsel have asked and would like to continue to ask whether the witness' employer, one of the Defendants, paid for the witness' counsel and legal fees in both the civil *and* criminal cases. Plaintiffs believe that whether a Defendant has paid for the witness' counsel – in the civil or criminal case – goes to bias of the witness. *See, e.g.*, *United States v. Pac. Gas & Elec. Co.*, No. 14-cr-175, 2016 WL 1212091, at *7 (N.D. Cal. Mar. 28, 2016) ("the Court agrees with the government that the fact of PG&E's payment of witnesses' attorneys might be relevant to the witnesses' bias as witnesses could feel they owe something to PG&E or fear financial exposure without PG&E's assistance"); Wright & Miller, 8 FED. PRAC. & PROC. CIV. § 2015 (collecting cases noting that, in civil cases, the fact that evidence relates only to impeachment "does not take it out of the realm of discoverable material if it is otherwise relevant"). Defendants do not oppose Plaintiffs' deposition to discovery "underlying facts" (Defendants' verbiage), but do oppose questions that reveal a witnesses' bias. However, bias is a recognized subject for discovery and questioning of a witness.

The question as to whether a Defendant paid for an individual witnesses' legal fees in the civil and criminal cases does not seek information about what, if anything, the witness said to the grand jury or DOJ. It does not even reveal whether the witness talked to DOJ or the Grand Jury. Rather, the question is designed to assess what motivations the witness may have to testify a certain way in these civil cases. Stated differently, whether a corporate Defendant has paid or is paying for an individual witness' attorney fees does <u>not</u> reveal what, if anything, the witness told the DOJ or

grand jury – which this Court has ruled is essentially the purpose of Paragraph 2 in the Stay Order.   Indeed, as noted, the Court has already drawn this distinction in overruling Defendants' objections to earlier discovery.  ECF No. 856 at 5.  Still, the current dispute demonstrates that the Defendants continue to rely on the language in Paragraph 2 regarding discovery that "refers or relates to the criminal grand jury investigation" to give an unreasonably broad, proscriptive reading of Paragraph 2 in terms of discovery in this civil case *that this Court has already rejected.*

Defendants have opposed these questions because they broadly relate to the criminal case, but as this Court has previously suggested, where Plaintiffs' counsel is not seeking to elicit information about the grand jury proceedings or the DOJ investigation, but have another legitimate reason for seeking this information – here, the potential bias of the witness – Paragraph 2 should not prevent them from asking these questions.  *See* ECF No. 856.  Defendants do not disagree that payment of a witness' attorneys' fees and costs goes to bias – the only dispute is how broadly Paragraph 2 limits Plaintiffs' inquiry into an otherwise legitimate and important topic.

Defendants' argument that Plaintiffs want to ask a defense witness whether a corporate Defendant has paid his/her attorneys' fees in the civil or the criminal case because Plaintiffs want "to intimidate the witness" or "generate some prejudicial inference" is baseless and wrong.  Plaintiffs stand by our reasons stated above for wanting to ask the referenced questions to determine and demonstrate the witnesses' bias.  Period.

The defense argues below that Plaintiffs propose to ask if a corporate Defendant has paid a witness' attorneys' fees in the criminal investigation in order to determine what, if anything, the witness told the government or the Grand Jury. Plaintiffs have informed Defendants that they do not intend to ask such questions.

Accordingly, Plaintiffs seek the Court's guidance as to this bias question and the scope of Paragraph 2, and how the Court would prefer to resolve this issue.

B.   **Defendants' Position**

Paragraph 2 of the Joint Stipulation re: Third Limited Stay of Discovery—to which Plaintiffs, Defendants, and the DOJ all agreed and which this Court entered as an order in September of last year—is clear on its face about what discovery Plaintiffs are prohibited from taking.  It states:   "*No discovery* shall be conducted under the Federal Rules of Civil Procedure that *refers or relates* to the criminal grand jury investigation."  ECF Nos. 477, 480 (emphasis added).  Plaintiffs have repeatedly ignored this Court-ordered prohibition by asking deposition witnesses questions that directly refer or relate to the grand jury investigation.  Indeed, Plaintiffs' deposition conduct has already prompted an admonition by the DOJ, which noted that "some counsel have attempted to depose witnesses regarding topics that fall within the scope of Paragraph 2," and warned Plaintiffs about engaging in any "further attempts to circumvent Paragraph 2 of the Third Limited Stay."  5/21/18 E-Mail from L. Wulff to S. Randall et al. (attached hereto as Exhibit 1).  Nonetheless, Plaintiffs now want to modify the prior stipulated order by defining several specific categories of questions that are and are not off-limits.  Defendants believe there is no need for such a change, but that in any event the Court should reject Plaintiffs' request that they be authorized to ask deposition witnesses about whether, and under what terms, they are represented by counsel *in the grand jury investigation*.

As a compromise, Defendants have proposed to allow Plaintiffs, in future depositions, to ask the vast majority of their desired questions without an instruction from defense counsel to the witness not to answer based on Paragraph 2.  At the same time, Defendants believe that Plaintiffs remain prohibited from asking questions that seek to discover information relating specifically to the grand jury process itself (and not to any underlying facts that the grand jury is investigating)— including  whether a witness is represented by separate counsel in connection with

the grand jury investigation.

Plaintiffs try to paint this dispute as if it concerns discovery of underlying facts that are the subject of the ongoing grand jury investigation.  It does not. Plaintiffs have had every opportunity to take unfettered discovery regarding their factual allegations of a conspiracy in the packaged tuna industry, and they have done so—through millions of documents and hundreds of hours of deposition testimony. At no point has any Defendant's counsel instructed a witness, based on Paragraph 2, not to answer questions that pertain to the underlying facts at issue—*e.g.*, who said what to whom, when, or where, concerning prices of packaged tuna.  And none of the examples of supposedly objectionable instructions that Plaintiffs present here relate to such facts.  Accordingly, Plaintiffs' reference to Judge Dembin's order— which held that Bumble Bee was required to provide, in response to an interrogatory, factual "information about its agreements with other manufacturers, regardless of whether that information was also provided, at some point and in some fashion, to the United States," ECF No. 772—is a red herring.  None of the deposition questions at issue here have anything to do with facts concerning any alleged agreements among tuna manufacturers.

Rather, what this dispute concerns are questions that seek information about the grand jury investigation itself—including, for example, whether a witness is represented by an attorney in connection with that investigation and, if so, who is paying for the witness's attorney.  Such questions do not reveal any information about the existence, nature, or effects of an alleged price-fixing conspiracy.  But they do reveal information about the witness's role and participation in the grand jury investigation.  That is exactly what Paragraph 2 prohibits—as the DOJ has made clear as recently as in an email dated May 21, 2018.  *See* Exhibit 1.

Plaintiffs argue that they should be allowed to ask questions about who is paying for a witness's attorney(s) because such questions are relevant to bias.

Defendants disagree.  But, in any case, supposed relevance to bias does not create an exception under Paragraph 2—which prohibits discovery that refers or relates to the grand jury investigation *regardless* of whether such discovery would otherwise be relevant.  Nor is there any reason why Plaintiffs should have to ask specifically about the retention of counsel in connection with the grand jury investigation, as opposed to framing their questions in a way that is limited to the civil cases and does not seek to elicit prohibited testimony referring or relating to the grand jury investigation.

Despite their professed interest in uncovering bias or underlying facts, what Plaintiffs actually want permission to do is to ask questions designed to show a witness's involvement in the grand jury's investigation—presumably to intimidate the witness, or to generate some prejudicial inference, or both.  This is clear from Plaintiffs' refusal to accept the compromise order that Defendants have proposed, as well as from the questions they have asked at prior depositions.  For example:

[text redacted]





Such questions plainly refer or relate to the grand jury investigation, and thus violate Paragraph 2. It is this sort of questioning that prompted the DOJ's prior admonition and warning to Plaintiffs' counsel, as noted above. *See* Exhibit 1. And yet, Plaintiffs now want this Court to authorize them to ask these same sorts of questions (at least insofar as they relate to attorney representation in connection with the grand jury investigation) at future depositions.

Defendants respectfully submit that the Court should deny Plaintiffs' request.

## III.   FIFTH AMENDMENT DEPOSITIONS

### A.   Defendants' Position

Plaintiffs have recently taken four depositions of non-party witnesses who refused to answer questions based on their Fifth Amendment rights against self-

incrimination and who, through their individual counsel, had notified the parties in advance of their depositions that they would do so.  In an effort to promote efficiency by avoiding the same witness having to be deposed twice, Defendants requested in advance that these depositions be postponed, as the witnesses may be able to testify substantively at a deposition before trial.  Plaintiffs refused, and have insisted on holding day-long depositions (with several lasting the entire allotted period of seven hours on the record) wherein the deponent invoked his rights under the Fifth Amendment hundreds of times.  For example, Plaintiffs deposed ███████████ ████████ in New York City on May 9.  Although ███████████ invoked his Fifth Amendment rights in response to all substantive questions, as his counsel had informed Plaintiffs in advance that he would, the deposition lasted from 10:00 a.m. until almost 7:30 p.m. (seven hours on the record plus breaks).  Seven Plaintiffs' lawyers, including three for the direct purchaser plaintiff class, attended the deposition in person.  At least one Plaintiffs' attorney traveled from across the country to be there, yet asked no questions of the witness.

Defendants believe that the scheduling of these depositions at this time, rather than near the end of discovery or at some point prior to trial, is wasteful of the parties' and the Court's resources.  Four months remain before the close of fact discovery.  Summary judgment is more than a year away.  And no trial has been scheduled.  As noted above, some or all of these witnesses may become able to testify substantively in that time, in which case Defendants will seek the Court's permission to allow the witnesses to provide substantive responses to those questions for which they previously invoked their Fifth Amendment rights.  Furthermore, Plaintiffs are not prejudiced by postponing the depositions.  Plaintiffs have not sought to exhaust their depositions of the many witnesses who are *not* invoking their Fifth Amendment rights, before deposing the witnesses who are.  And, Plaintiffs may indicate to the Court whenever this issue may become relevant (in briefing or

otherwise) those instances where individual counsel has indicated that a deponent would not testify substantively if deposed at this time.

Plaintiffs complain below that "Defendants are only willing to advise Plaintiffs one week in advance of the deposition as to whether it will be a Fifth Amendment deposition." That is both untrue and utterly beside the point. It was Plaintiffs, not Defendants, who (last February) originally proposed a one-week advance notice rule for these depositions, ECF No. 849 at 8, and Defendants *agreed*, *id.* at 8–9; *see also* 2/22/2018 Hearing Tr. at 27. Plaintiffs then never followed up with Defendants about a stipulation on this issue. *See id.* In any event, the witnesses who to date have invoked their Fifth Amendment rights have been represented by individual counsel, not by counsel for Defendants. And, it is our understanding that in most cases those witnesses' counsel advised Plaintiffs of the fact that their clients would be invoking the Fifth well more than one week in advance of the deposition. For example, Bumble Bee requested that ███████████ deposition be postponed nearly three weeks before it was scheduled to occur, and the parties had already been advised at that point by his counsel that ███████████ intended to invoke the Fifth.

Although Defendants do not seek a Court order addressing this issue at this time, Defendants believe the Court should be aware of what has transpired, as it may require relief at some point in the case (such as a request by Defendants that such deponents be permitted to testify substantively if they are able to at a future date).

## B. <u>Plaintiffs' Position</u>

Defendants – primarily Bumble Bee – have asked that Plaintiffs postpone the depositions of their witnesses who assert the Fifth Amendment at their deposition. They argue it is inefficient and wasteful of the parties' resources and time, but they do not seek at relief at this point, other than to advise the Court what "has transpired."

Plaintiffs respectfully disagree with the Defendants' position. Plaintiffs currently have until November 27, 2018 to complete fact discovery and have a duty to

collect evidence to support their case during this time.  While Plaintiffs ideally would be able to substantively depose people like ███████████ and ███████████ – who plead guilty to the price-fixing conspiracy in this case – it is possible they may never obtain that substantive testimony, let alone before the close of discovery.  Among other things, there is no guarantee that these witnesses will be sentenced before the close of discovery, or even if they were, that these individuals would have comfort that they would not be subject to other criminal actions under various state laws if they gave testimony.

There is, however, value to taking the deposition of these witnesses now, even if they assert the Fifth Amendment, because Plaintiffs may be able to use the adverse inference to support their claims.  Additionally, there is never any guarantee that these witnesses necessarily will be able to testify later.  People fall ill, experience accidents, and a whole variety of other issues that may prevent them from testifying.  Plaintiffs have no interest in wasting time, but procuring evidence to support their claims is not a waste.  It is also worth noting that in the first Fifth Amendment deposition, of ███████, ████████████ in fact gave some useful testimony.[5]  Since then, the Bumble Bee witnesses have been instructed by their counsel to take the Fifth Amendment to every single question, which at least one Defendant (Del Monte) has objected to.

_____

[5]    Defendants seize on the *one-time* occurrence at ████████████ deposition where three attorneys representing DPPs attended.  First, this is a red-herring, and has nothing do with whether it is appropriate for Plaintiffs to continue taking Fifth Amendment depositions.  Second, Defendants know that this occurred on only one occasion, and was the result of scheduling uncertainties amo█████ (who, Defendants fail to note, were the primary examiners for ███████ deposition – one of the most impo██████n this case, with 60 key exhibits presented).  Bumble Bee itself felt ███████████ deposition was important enough that it had two law████████ on behalf of Bumble Bee (*plus* two additional lawy████ ██████loyee, ██████████████, and another on behalf of Bumble Bee's CEO).  ███████ deposition is thus unrepresentative of deposition practice in this case, and more specifically, DPPs' deposition policy in this case, which has been to send one or two attorneys, at most, to key depositions, and more recently has been to have one attorney attend the depositions virtually (over live video feed).

It is telling that Defendants do not ask for any relief from the Court. That is because – two months after the ████ and ████ depos, and one month after the ████ and ████ depos – there is still no indication that any of these witnesses ever intend to testify substantively regarding their involvement in the price-fixing conspiracy at issue in this MDL. Nor is there any indication that any future deponent who currently intends to invoke his Fifth Amendment rights might, later in the discovery period, withdraw that invocation and testify substantively. Defendants want Plaintiffs – and now the Court – to backload the deposition schedule based on nothing more than rank speculation.

Finally, the real "waste" of time here is the fact that Defendants are only willing to advise Plaintiffs one week in advance of the deposition as to whether it will be a Fifth Amendment deposition, which means substantial time is spent preparing for the deposition, only for Defendants to tell Plaintiffs they want to postpone the deposition. This is an inefficient process, but Defendants have thus far rejected proposals to change it.

## IV.   **CONCLUSION**

The Parties will be prepared to address the foregoing subjects, and any others raised by the Court, at the status conference on July 30, 2018.

Dated:  July 23, 2018

Respectfully submitted,
By: s/ William B. Michael

Kenneth A. Gallo (NY 4484457)
Michelle K. Parikh (NY 4293460)
Joseph J. Bial (NY 4151528)
Craig A. Benson (NY 5049861)
Heather C. Milligan (NY 5460829)

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: 202-223-7356
Facsimile: 202-204-7356
Email: kgallo@paulweiss.com
Email: mparikh@paulweiss.com
Email: jbial@paulweiss.com

Email: cbenson@paulweiss.com
Email: hmilligan@paulweiss.com

William B. Michael (NY 4296356)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3648
Facsimile: 212-492-0648
Email: wmichael@paulweiss.com

***Counsel for Defendant Bumble Bee
Foods, LLC***

LATHAM & WATKINS LLP

By: s/ Christopher S. Yates
    Alfred C. Pfeiffer
    Christopher S. Yates
    Belinda S Lee
    Niall E. Lynch
    Ashley M. Bauer
    505 Montgomery Street
    Suite 2000
    San Francisco, CA  94111-6538
    Tel:  (415) 391-0600
    Fax: (415) 395-8095
    E-mail: Al. Pfeiffer@lw.com
          Chris.Yates@lw.com
          Belinda.Lee@lw.com
          Niall.Lynch@lw.com
          Ashley.Bauer@lw.com

***Counsel for Defendants StarKist Co.
and Dongwon Industries Co., Ltd.***

PEPPER HAMILTON LLP

By: s/ Barbara Sicalides
Barbara Sicalides, Esq. (PA 57535)

Barak Bassman, Esq. (PA 85626)
18th and Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103-2799
Telephone: (215) 981-4000
Facsimile: (215) 981-4750
Email: sicalidesb@pepperlaw.com
Email: bassmanb@pepperlaw.com

***Counsel for Defendant Del Monte
Corporation***

ALLEN & OVERY LLP

By: s/ John Roberti

John Roberti, Esquire
(*pro hac vice*)
Kelse Moen, Esquire
(*pro hac vice*)
Jana Steenholdt, Esquire
(*pro hac vice*)
1101 New York Avenue, N.W.
Washington, D.C.  20005
Tel:   (202) 683-3800
Fax:   (202) 683-3999
E-mail: john.roberti@allenovery.com
kelse.moen@allenovery.com
jana.steenholdt@allenovery.com

Brian Fitzpatrick
(*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Tel: (212) 610-6300
Fax: (212) 610-6399

Email:
brian.fitpatrick@allenovery.com

***Counsel for Defendants Tri-Union
Seafoods LLC and Thai Union Group
PCL***

KENNY NACHWALTER, P.A.

W

By. _____

    Richard Alan Arnold, Esquire
    William J. Blechman, Esquire
    Kevin J. Murray, Esquire
    Douglas H. Patton, Esquire
    James Almon, Esquire
    Samuel J. Randall, Esquire
    Jalaine Garcia, Esquire
    1441 Brickell Avenue
    Suite 1100
    Miami, Florida  33131
    Tel:  (305) 373-1000
    Fax:  (305) 372-1861
    E-mail: rarnold@knpa.com
            wblechman@knpa.com
            kmurray@knpa.com
            dpatton@knpa.com
            jalmon@knpa.com
            srandall@knpa.com
            jgarcia@knpa.com

***Liaison Counsel for Direct Action
Plaintiffs***

CUNEO GILBERT & LADUCA, LLP

By:  s/Jonathan W. Cuneo
    Jonathan W. Cuneo, Esquire
    Joel Davidow, Esquire
    Daniel M. Cohen, Esquire
    507 C Street, N.W.
    Washington, D.C.  20002
    Tel:  (202) 789-3960
    Fax:  (202) 589-1813
    E-mail: jonc@cuneolaw.com
            joel@cuneolaw.com
            danielc@cuneolaw.com

    Michael J. Flannery, Esquire
    (Cal. Bar No. 196266)
    7733 Forsyth Boulevard
    Suite 1675
    St. Louis, MO  63105
    Tel:  (314) 226-1015
    Fax:  (202) 789-1819
    E-mail: mflannery@cuneolaw.com

    Benjamin David Elga, Esquire
    Taylor Asen, Esquire
    16 Court Street
    Suite 1012
    Brooklyn, NY 11241
    Tel:     (202) 789-3960
    Fax:     (202) 589-1813
    E-mail:  belga@cuneolaw.com
             tasen@cuneolaw.com

***Interim Lead Counsel for Indirect
Purchaser Commercial Food
Preparer Plaintiffs***

1

HAUSFELD LLP

**Interim Lead Counsel for Direct Purchaser Plaintiffs**

2

By: _s/ Bonny E. Sweeney_

3

Bonny E. Sweeney, Esquire
(Cal. Bar No. 176174)

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

4

Michael P. Lehmann, Esquire
(Cal. Bar No. 77152)

5

6

Christopher L. Lebsock, Esquire
(Cal. Bar No. 184546)

By: _s/ Betsy C. Manifold_

7

600 Montgomery Street
Suite 3200

Betsy C. Manifold
Rachele R. Rockert

8

San Francisco, CA  94111

Symphony Towers
750 B Street, Suite 2770

9

Tel:  (415) 633-1908

San Diego, CA  92101
Tel:  (619) 239-4599

10

Fax:  (415) 358-4980

11

E-mail:  bsweeney@hausfeld.com
mlehmann@hausfeld.com

12

clebsock@hausfeld.com

**Interim Lead Counsel for Indirect Purchaser End Payer Plaintiffs**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## ECF CERTIFICATION

I, William B. Michael, hereby certify that the content of the foregoing document is acceptable to all parties who are required to sign it.  Each party's counsel has authorized William B. Michael to affix his or her CM/ECF electronic signature to this document.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I certify that on July 23, 2018, I filed the foregoing document with the Clerk of the Court for the United States District Court, Southern District of California, by using the Court's CM/ECF system, and also served counsel of record via this Court's CM/ECF system.


By: /s/ William B. Michael
    William B. Michael