Patrick J. Stueve (KS 13847)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: 816-714-7100
Facsimile: 816-714-7101
stueve@stuevesiegel.com

*Counsel for Plaintiff Associated*
*Wholesale Grocers, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

ASSOCIATED WHOLESALE
GROCERS, INC.,

        Plaintiff,

      v.

BUMBLE BEE FOODS LLC, LION
CAPITAL LLP, LION CAPITAL
(AMERICAS) INC., BIG CATCH
CAYMAN L.P., CHRISTOPHER D.
LISCHEWSKI, STARKIST
COMPANY, DONGWON
INDUSTRIES CO. LTD., DEL
MONTE CORPORATION, TRI-
UNION SEAFOODS LLC d/b/a
CHICKEN OF THE SEA
INTERNATIONAL, INC., AND
THAI UNION GROUP PCL,

        Defendants.

Case No. 15-md-2670-JLS-MDD
Case No. 2:18-cv-02212 (D. Kan.)

**FILED UNDER SEAL**

## FIRST AMENDED COMPLAINT

AWG'S FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

NATURE OF ACTION ..................................................................................1

BACKGROUND ...........................................................................................3

JURISDICTION AND VENUE ...................................................................11

PLAINTIFF .................................................................................................15

DEFENDANTS ...........................................................................................15

    The Bumble Bee Defendants .................................................................16

    The Tri-Union Defendants ....................................................................20

    Co-Conspirators and Agents.................................................................38

TRADE AND COMMERCE ........................................................................38

THE PRODUCTION OF CANNED TUNA .................................................39

TUNA SUPPLY, DEMAND, AND PRICING .............................................41

    The Supply of Canning-Grade Tuna Increased Substantially ...............41

    The Demand for Canned Tuna in the United States Decreased Substantially .....43

    Prices Paid for Canned Tuna Increased Substantially as a Result of
    Defendants' Conspiracy .......................................................................44

    Defendants' Pricing of Canned Tuna to Plaintiff and Others Was Against
    Defendants' Self-Interest But For Their Collusion ...............................47

THE MARKET FOR THE PRODUCTION AND SALE OF CANNED
TUNA WAS CONDUCIVE TO CARTELIZATION..................................48

    There Are No Close Substitutes for Canned Tuna ................................48

    The Market for the Processing and Sale of Canned Tuna
    Is/Was Concentrated.............................................................................48

    Barriers to Entry ..................................................................................49

AWG'S FIRST AMENDED COMPLAINT

Prevailing Supply and Demand Factors Incentivized Collusion...........................50

The Transfer of Executives Between Defendants Facilitated Collusion .............51

Select Trade Associations Facilitated Collusion....................................................53

Common Vendors and Co-Packing Arrangements Facilitated Collusions
and Enforcement of the Cartel...............................................................................53

ADDITIONAL OVERT ACTS IN DEFENDANTS' CANNED TUNA
CONSPIRACY ..........................................................................................................54

Defendants' Collusive Price Increases Between 2004-2006...............................55

Defendants' Collusive Can Size Reduction and Price Increases
in 2007-2008 ............................................................................................................63

Defendants Collude on Net Prices in 2010 ..........................................................70

Defendants Colluded to Increase Canned Tuna Prices in 2011 ...........................72

Defendants Colluded on a Canned Tuna Price Increase in 2012 .........................75

Defendants' Collusion Not to Sell "FAD-Free" Branded Tuna Products
in 2011 and Thereafter............................................................................................76

Defendants Colluded on Promotional Activity and Pricing Terms
in at Least 2011-2013 .............................................................................................78

Defendants' Communications in Furtherance of the Conspiracy
After 2013 ................................................................................................................79

Defendants' Conspiracy Was Effective .................................................................79

DOJ INVESTIGATION AND AMNESTY APPLICATION ...................................81

DISCOVERY IS NECESSARY TO DETERMINE THE FULL SCOPE
OF THE CONSPIRACY .........................................................................................87

TOLLING OF THE STATUTE OF LIMITATIONS ..............................................88

LION CAPITAL ......................................................................................................101

Lion Directly Participated in the Conspiracy ......................................................101

ii

Lion is Vicariously Liable For Bumble Bee's Conspiratorial Conduct Under an Alter Ego Theory .................................................................112

   1.    Undercapitalization ........................................................113

   2.    Unity of Interest and Inequitable Result .................................116

Lischewski is Liable for his Role in the Conspiracy ..............................120

EFFECTS OF THE DEFENDANTS' ILLEGAL COURSE OF CONDUCT ......121

CAUSES OF ACTION ...............................................................................122

   COUNT I ..............................................................................122

   COUNT II .............................................................................125

PRAYER FOR RELIEF ............................................................................126

JURY DEMAND .......................................................................................127

Plaintiff Associated Wholesale Grocers, Inc., ("Plaintiff") sues Bumble Bee Foods LLC ("Bumble Bee"), StarKist Company ("StarKist"), Dongwon Industries Co. Ltd. ("Dongwon"), Del Monte Corporation ("Del Monte"), Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc. ("COSI"), Thai Union Group PCL (f/k/a Thai Union Frozen Products PCL) ("Thai Union" or "TUG"), Lion Capital LLP ("Lion Capital"), Lion Capital (Americas), Inc. ("Lion Americas"), and Big Catch Cayman LP aka Lion/Big Catch Cayman LP ("Big Catch"), and Christopher D. Lischewski (collectively the "Defendants"), and allege as follows:

## NATURE OF ACTION

1.     This antitrust action arises out of a long-running conspiracy between and among the three largest domestic producers of shelf-stable tuna (*e.g.*, canned or pouched tuna) ("canned tuna" or "shelf-stable tuna") to fix, raise, and/or maintain the prices of canned tuna in the United States.

2.     As shown below, Defendants facilitated the conspiracy by, among other things, secretly and collusively exchanging price information and business plans, coordinating price announcements, and collectively reducing quantity and restraining output.  These coordinated efforts by Defendants were designed to and did dramatically increase the prices of shelf-stable tuna.

3.     The conspiracy, which began no later than May of 2004 and continued through at least July of 2015 (the "Relevant Period"), directly impacted Plaintiff. The conspiracy's effect on the price of shelf-stable tuna, on information and belief, continues to the present.  Discovery is required to determine the full nature of the period, participants, and packaged seafood products involved.

4.     Defendants include the largest domestic producers and sellers of canned tuna – Bumble Bee, StarKist, and COSI – as well as the parent entities of

1

AWG'S FIRST AMENDED COMPLAINT

1  those companies.  Together, these Defendants produced upwards of 80% of all
2  canned tuna sold in the United States during the Relevant Period.

3      5.      Although it had started at least by 2004, the price-fixing conspiracy
4  remained hidden and was not uncovered until after Defendant Thai Union Group
5  PCL, Tri-Union's parent entity, announced its intent to acquire Defendant Bumble
6  Bee for $1.5 billion in late 2014.  The acquisition, had it been completed, would
7  have created the largest canned tuna producer in the United States, with
8  approximately 38% of the market share.

9      6.      However, in connection with its review of the proposed acquisition,
10  the Antitrust Division of the United States Department of Justice ("DOJ")
11  determined that the market for canned tuna in the United States was not
12  functioning competitively and, in fact, was subject to a price-fixing conspiracy
13  involving Defendants.  This prompted the DOJ to open a criminal investigation
14  into the conspiracy alleged herein.

15     7.      In December 2015, and as a direct result of the DOJ's investigation,
16  Thai Union and Bumble Bee announced that the acquisition was being abandoned.

17     8.      The DOJ's investigation is ongoing.  To date, Defendant Bumble Bee,
18  two Bumble Bee senior sales and marketing executives, and a StarKist senior sales
19  executive all have pleaded guilty to charges related to the price-fixing conspiracy
20  alleged herein. An on May 16, 2018, a federal grand jury indicted Bumble Bee's
21  CEO Chris Lischewski on charges arising from the conspiracy alleged herein. Mr.
22  Lischewski has since resigned from his role as Bumble Bee's CEO and has taken a
23  leave of absence from the company.

24     9.      In addition, in September 2017, COSI's parent company Thai Union
25  announced that Tri-Union has received "conditional leniency" under the DOJ's
26  "Corporate Leniency Program" with respect to the DOJ's investigation into the
27
28

AWG'S FIRST AMENDED COMPLAINT

price-fixing conspiracy alleged herein. A recipient of conditional leniency must *admit* to a criminal violation of the antitrust laws as a prerequisite to receiving conditional leniency.

10. Because of the conspiracy alleged herein, Plaintiff has paid supra-competitive prices for canned tuna and therefore has been injured by Defendants' illegal actions.

## BACKGROUND

11. Owing to a series of mergers and acquisitions, by the early 2000s, the shelf-stable packaged seafood industry operated as an oligopoly dominated by its "Big 3" producers: Bumble Bee, StarKist and COSI. While the Defendants and co-conspirators attempted to market their products as though they were differentiated, consumers substitute between different brands of canned tuna in response to price changes. Further, canned tuna possessed the economic characteristics of a commodity-like product with no close substitutes. Indeed, Defendants openly recognized that if any individual brand were priced above the competitors, then the high-priced company would quickly lose market share to the lower priced competitors. As a result, no Defendant or its co-conspirator(s) could profit, or sustainably profit, by unilaterally increasing its prices in the U.S.

12. Further adding to Defendants' economic challenges by 2004 was the fact that, ██████████████████████████████████████████ ██████████████████████████████████████████ Consumer demand for canned tuna was dropping, a decline that was showing no signs of abating. As a result of this decline, Defendants controlled production capacity that was substantially in excess of the demand for canned tuna in the United States.

3

AWG'S FIRST AMENDED COMPLAINT

13.   All of the Defendants recognized the challenges to each of them presented by these market conditions. The solution, embraced by all of them in 2004, was to enter into an unlawful agreement to increase prices of canned tuna sold to Plaintiff and others in the United States by, among other conduct, coordinating price increase announcements or pricing terms, secretly and collusively exchanging pricing information and prospective pricing announcements and business plans, and collectively reducing quantity and restraining output.

14.   ███████████████████████████████████

The market continues to change due to the deteriorating raw material situation in both the light and albacore segments. Both competitors have again signaled a desire to increase selling prices. COSI will again attempt to support these reports by following closely with trade price increase announcements. As mentioned above the category will continue to decline at a rate higher than originally forecasted largely due to these price changes. The net change to the Retailer from June 2004 to September 1st 2004 will be an increase of $2.80 on cl ½'s and $4.00 on sw ½'s. This is a huge increase and will be met with similar resistance. Only with the unified efforts of all 3 national brands will the trade finally surrender and return to the same promotional levels prior to the increases. COSI management will monitor this very closely through trade intelligence and Nielsen shares. If it is determined that one or both of our competitors abandons the increase COSI will quickly adjust pricing in response. COSI will not tolerate share levels that do not meet the revised stated goals for longer than two consecutive periods.

15.   Defendants and co-conspirators implemented this conspiracy over a number of years through a series of meetings and other communications.

16.   During the early years of the conspiracy, between 2004 and 2006, Defendants and co-conspirators developed a common agreement or understanding that they would follow the price increases that each issued. In furtherance of this common agreement or understanding, Defendants exchanged information on their future pricing plans via telephone and other channels.

4

As a result of these and other collusive price information exchanges, Defendants were able to and did collusively increase prices of canned tuna sold to Plaintiff and others in the United States at least twice in 2004 and again in 2006.

17.    By 2007, Defendants became more practiced and ambitious in their collusive designs. Del Monte – which operated StarKist – recognized that Defendants could dramatically increase profits if each reduced its tuna can sizes from six ounces to five. In an effort to persuade Bumble Bee and COSI to agree to downsize their cans, Barry Mills of Del Monte approached John DeBeer of COSI and initiated discussions between the conspirators over the prospect of downsizing. Other anticompetitive discussions involving Defendants ensued and are described below. COSI eventually ratified or confirmed that Bumble Bee would join in the collusive can downsizing in a meeting between the CEO of Bumble Bee – Defendant Lischewski – and the CEO of COSI – Shue Wing Chan – over breakfast in the backroom of Milton's Restaurant in Del Mar, California, on March 13, 2008.

18.    Consequently, in accordance with their unlawful agreement, Bumble Bee, COSI and StarKist collusively downsized their six ounce tuna cans to five ounces. This concerted action to reduce quantity itself constitutes price fixing. But it also constitutes a conspiratorial price increase, as Defendants also colluded to raise prices on the newly downsized cans.

5

19.     Other collusive canned tuna price increases by the Defendants followed. In furtherance of their continuing unlawful agreement or understanding not to compete on price, Defendants were able to and did implement collusive price increases on canned tuna in at least 2008, 2010, 2011, and 2012. Additionally, in at least 2011, 2012 and 2013, Defendants agreed to constrain discounting and promotional practices and terms of sale of canned tuna to customers, including Plaintiff.

20.     Further, in 2012, Defendants and their co-conspirators agreed not to sell under their own brands any canned tuna products containing tuna that were caught with the use of a Fish Aggregating Device. Upon information and belief, this agreement remained in effect at least until July 2015.

21.     As explained below, the conspiracy was facilitated in part by the fact that during it, a number of senior sales and marketing executives and other employees left the employ of one Defendant to go work for another. This familiarity helped to cultivate a culture of collusion in the packaged seafood industry and resulted in communications by telephone between these senior sales and marketing executives for competing companies. A select number of industry trade associations also facilitated the conspiracy by providing Defendants with cover to meet and conduct conspiracy business.

22.     Additionally, Defendants' use of a common vendor for their cans (Impress, a co-conspirator) and a co-packing arrangement between Bumble Bee and COSI also facilitated Defendants' collusion and enforcement of their cartel.

23.     As far back as 2004, Defendants and co-conspirators affirmatively and fraudulently concealed their unlawful conduct and coordinated their messaging to their customers in order to create pretextual justifications for their collusive price increases. These pretextual explanations by Defendants for their canned tuna price

6

increases were intended by them at the time to create the illusion that the market for the pricing and sale of canned tuna in the United States was competitive when, in fact, it was not. However, Plaintiff did not know this at the time. As a result of their many affirmative and fraudulent acts of concealment, described with particularity below, Defendants prevented Plaintiff from learning about the existence of the conspiracy until July 2015, when Thai Union admitted publicly that the DOJ was investigating the packaged seafood industry in the United States.

24. The conspiracy alleged in this First Amended Complaint was continuing and overarching in character. During the time period relevant to Plaintiff's claims, Defendants and co-conspirators had one or more common objectives in the conspiracy, which they realized, including, without limitation, increasing, fixing, stabilizing or maintaining the price of canned tuna sold to Plaintiff and others. There was interdependence among the Defendants and co-conspirators regarding the overt acts alleged below to achieve the objective(s) over the course of the conspiracy period. In addition, there was substantial overlap in the participants in the overt acts in furtherance of the conspiracy.

25. In the paragraphs below, Plaintiff alleges who communicated with whom, when, where (when they met in person) and what they agreed to or discussed in furtherance of the conspiracy alleged in this First Amended Complaint. These communications included in-person meetings, e-mails, and telephone calls, and they involved the senior-most executives from each Defendant.

26. That the canned tuna conspiracy existed cannot credibly be doubted. This is because on November 7, 2016, December 21, 2016, and June 28, 2017, Bumble Bee executives Walter Scott Cameron and Kenneth Worsham ("K. Worsham"), and StarKist executive Stephen L. Hodge, respectively, pled guilty to

AWG'S FIRST AMENDED COMPLAINT

the felony charge of violating the U.S. antitrust laws by participating in an unlawful "conspiracy to suppress and eliminate competition by reaching agreements to fix, raise and maintain the prices of packaged seafood sold in the United States from at least 2011 through at least 2013 in violation of the Sherman Antitrust Act, 15 U.S.C. §1." The Cameron, K. Worsham, and Hodge Plea Agreements all state that "[p]ackaged seafood includes shelf-stable tuna fish." They further state that during the relevant period, defined as between at least 2011 through at least 2013, each participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood, the primary purpose of which was to fix, raise and maintain the prices of packaged seafood sold in the United States. In furtherance of the conspiracy, [Cameron, K. Worsham, and Hodge each] engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms. During these conversations, discussions and meetings, agreements and mutual understandings were reached to fix, raise and maintain the prices of packaged seafood sold in the United States."

27.     Additionally, on May 8, 2017, DOJ announced that Bumble Bee had agreed to plead guilty to price-fixing shelf-stable tuna products in the United States between 2011 and 2013. Bumble Bee will pay a $25,000,000 criminal fine for its criminal conduct. Acting Assistant Attorney General Andrew Finch commented that DOJ's antitrust division "along with our law enforcement colleagues, will continue to hold these companies and their executives accountable for conduct that targeted a staple in American households."

28.     The Cameron and Worsham guilty pleas and the Bumble Bee plea agreement establish that a conspiracy did exist. But by operation of law, a guilty plea merely establishes the minimum parameters of a conspiracy. *See, e.g., In re*

AWG'S FIRST AMENDED COMPLAINT

1   *Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1475705, at \*11 (D.D.C. May 9,

2   2000) ("[T]he Court rejects the notion that the guilty pleas ... foreclose a broader

3   conspiracy. Guilty pleas are negotiated instruments which take into account not

4   only the culpability of the accused but the Justice Department's resources and

5   other cases requiring the government's attention."). Thus, the scope of the

6   conspiracy actionable in a civil antitrust action – including the timing of, and

7   products and participants in, the conspiracy – may be (and as alleged in this First

8   Amended Complaint is) broader than the criminal pleas to date. Discovery is

9   necessary to determine the full scope of the conspiracy in terms of products, time

10  period and participants.

11       29.     Another reason that the existence of this conspiracy cannot credibly

12  be doubted is that COSI has confirmed that it is the amnesty applicant in this case.

13  Under the United States Department of Justice's ("DOJ") Leniency Guidelines, for

14  COSI to receive conditional amnesty, the company itself had to admit to a criminal

15  violation of the U.S. antitrust laws involving, among other conduct, price fixing.

16  *See* www.justice.govc/atr.frequently-asked-questions-regarding-antitrust-divisions-

17  leniency-program.

18       30.     Additionally, defendants such as Bumble Bee have admitted in civil

19  discovery that its senior executives engaged in meetings and discussions in

20  violation of antitrust laws during the relevant period.  Specifically, Bumble Bee

21  has admitted that "Senior Vice Presidents of the Sales and Marketing departments

22  at Bumble Bee coordinated certain list price increases relating to certain canned

23  tuna products through a series of bilateral communications with executives at the

24  other companies (including, at various time, communications with Steve Hodge

25  and Chuck Handford of StarKist," and "Senior Vice Presidents and Vice Presidents

26  of the Sales and Trade Marketing departments at Bumble Bee coordinated certain

27

28                                    9

AWG'S FIRST AMENDED COMPLAINT

promotional levels and changes to certain pricing guidance on certain canned tuna products through a series of bilateral communications with executives at the other companies (including, at various times, communications with Steve Hodge and Chuck Handford of StarKist and Mike White of Chicken of the Sea."

31. ████████████████████████████████████████

32.     The existence of the canned tuna conspiracy alleged in this First Amended Complaint is further supported by additional evidence alleged below, including, without limitation, the following:

(a)     On December 3, 2015, Thai Union and Bumble Bee announced that they had abandoned their proposed merger in the face of DOJ's criminal investigation of them, prompting William Baer, then head of the DOJ's Antitrust Division, to state later that day that "[the DOJ's] investigation convinced us – and the parties knew or should have known from the get go – that the market is not functioning competitively today, and further consolidation would only make things worse."

(b)     During the time period relevant to Plaintiff's claims, Defendants and their co-conspirators' pricing of canned tuna to Plaintiff and others in the United States is explainable only through conspiratorial action. During the conspiracy, there was a large increase in the supply of canning-grade tuna coupled with decreasing U.S. demand for canned tuna. These conditions should have caused canned tuna prices in the U.S. to decline precipitously. Instead, the price increased (significantly). Additionally, the market for the production and sale of canned tuna was conducive to cartelization because: (i) as noted above, it is a

AWG'S FIRST AMENDED COMPLAINT

commodity-like product for which there are no close substitutes; (ii) together, Defendants dominated the market for the processing of tuna and the production and sale of canned tuna in the United States; and (iii) there were barriers to entry into the market for the production and sale of canned tuna in the United States.

33.     The allegations in this First Amended Complaint are pled in the alternative if necessary to avoid inconsistency.

## JURISDICTION AND VENUE

34.     This civil antitrust action arises under Sections 1 of the Sherman Act, 15 U.S.C. § 1 for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and for treble damages and permanent injunctive relief pursuant to the Kansas Restraint of Trade Act, K.S.A. 50-101, et seq.

35.     This Court has subject matter jurisdiction over each of the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1337. This Court further has subject matter jurisdiction over each of the claims in this action pursuant to 28 U.S.C. § 1332, as, upon information and belief, this action is between citizens of different States and has an amount in controversy in excess of $75,000, exclusive of interest and costs.

36.     Venue is proper in this Court pursuant to 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) & (d), because:

(a)     a substantial part of the events giving rise to these claims occurred in this District, including the sales to Plaintiff of shelf-stable tuna at artificially high prices;

(b)     each Defendant is subject to personal jurisdiction in this District; and Defendants transact business in this District.

37.     Defendants are subject to the personal jurisdiction of this Court because:

11

AWG'S FIRST AMENDED COMPLAINT

1       (a)    they are amenable to service of process because each transacts business in, has continuous or systematic contacts with, or has sufficient minimum contacts in the United States sufficient to satisfy due process;

       (b)    they are amenable to service of process because each transacts business in, has continuous or systematic contacts with, or has sufficient minimum contacts in this District, and Defendants headquartered outside this District are nevertheless engaged in the business of manufacturing, distributing, advertising and/or selling shelf-stable tuna throughout the United States, including in this District;

       (c)    they are amenable to service of process because each Defendant belonged to the conspiracy alleged in this Complaint and one or more of them performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling shelf-stable tuna to Plaintiff and others in this District at artificially inflated prices;

       (d)    they are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and/or the Kansas Long Arm Statute, K.S.A. 60-308, because each Defendant, either personally or through their co-conspirators in furtherance of the conspiracy, has sufficient minimum contacts with Kansas, including that each Defendant: transacted (and continues to transact) business in this state, committed tortious acts within Kansas; entered into contracts with a Kansas resident that were to be performed in whole or in part in Kansas; and caused injury in Kansas arising out of acts or omissions outside of Kansas while Defendants were engaged in solicitation or service activities within Kansas.  In addition, Defendants have submitted to the jurisdiction of the Court because of their continuous and systematic contacts with Kansas;

(e)     they contracted to supply services or goods, including shelf-stable tuna, or have agents who contracted to supply materials or goods, including shelf-stable tuna, in this District; money flowed from Plaintiff in Kansas to pay Defendants for shelf-stable tuna; Defendants transact business in the District or have agents who transact business on their behalf in the District in furtherance of the conspiracy; Defendants committed unlawful acts or caused one or more unlawful acts to be done, or consequences to occur, in the District; and Defendants engaged in unlawful conduct described below outside of the District causing injury to Plaintiff in the District;

(f)     they and one or more of their coconspirators contracted to supply services or goods, including canned tuna, in the State where this Federal Court sits; money flowed from Plaintiff or other purchasers in the State to pay Defendants and their co-conspirators for canned tuna; Defendants and one or more of their co-conspirators transact business in the State in furtherance of the conspiracy; Defendants and their co-conspirators did or caused one or more unlawful acts alleged in this First Amended Complaint to be done, or consequences to occur, in the State; Defendants and their co-conspirators engaged in unlawful conduct described in this First Amended Complaint outside of the State causing injury to Plaintiff in the State, and because this Court's exercise of jurisdiction is not inconsistent with the Constitution of this State or the Constitution of the United States;

(g)     Dongwon and TUG are subject to the general and specific personal jurisdiction of this Court because they have purposefully directed their contacts and conspiratorial conduct at the United States (including the forum State and the District of Kansas) and have purposefully availed themselves of the laws of the United States. As alleged in this First Amended Complaint, Dongwon and

TUG, either directly, or indirectly through their subsidiaries (StarKist and COSI, respectively), engaged in price-fixing activities and anticompetitive conduct that were intended to have, and did have, direct, substantial and reasonably foreseeable effects on the commerce of the forum State and the United States;

(h)     Lion Americas is subject to the general and specific personal jurisdiction of this Court because its principal place of business in in California;

(i)     Lion Capital is subject to the general and specific personal jurisdiction of this Court because they have purposefully directed their contacts and conspiratorial conduct at the United States (including the forum State and the District of Kansas) and have purposefully availed themselves of the laws of the United States. As alleged in this First Amended Complaint, Lion Capital and Big Catch engaged in intentional acts such as monitoring Bumble Bee projects, corresponding with Bumble Bee executives, investors, and competitors, and exchanging confidential information. This conduct was and is intentionally directed at the United States and it was foreseeable that it would cause harm in the United States; and

(j)     Big Catch Cayman is subject to the general and specific jurisdiction of this Court because, as a mere shell company, it is the alter ego and/or agent of Lion Capital, Lion Americas, and/or Bumble Bee.

AWG'S FIRST AMENDED COMPLAINT

## PLAINTIFF

38.     Plaintiff Associated Wholesale Grocers, Inc. ("AWG"), is a Kansas corporation with its headquarters and principal place of business in Wyandotte County, Kansas, at 5000 Kansas Avenue, Kansas City, Kansas, 66106.  Founded in 1924, AWG provides over 3,800 grocery stores and other retail outlets with a complete assortment of grocery, fresh meat, fresh produce, specialty foods, and general merchandise items.  From its Kansas corporate headquarters, AWG purchased canned tuna sold by one or more of the Defendants, their subsidiaries, divisions, units, or affiliates.  As a result, AWG has been injured by reason of the antitrust violations alleged herein.

39.     AWG is a direct purchaser of canned tuna.

40.     During the Relevant Period, AWG purchased canned tuna directly from Defendants, which it then re-sold to retailers.  AWG directly purchased many millions of dollars' worth of shelf-stable tuna products during the Relevant Period.

## DEFENDANTS

41.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered or committed by duly authorized officers, managers, agents, employees or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

### The Bumble Bee Defendants

42.     Defendant Bumble Bee Foods LLC is a Delaware limited liability company, with its headquarters and principal place of business in San Diego,

15

California. During the time period relevant to Plaintiff's claims, Bumble Bee manufactured canned tuna and shelf stable salmon, clams, crabs, sardines, mackerel, oysters, and shrimp. Bumble Bee is defined to include its managers, officers, employees, and agents acting on its behalf. Bumble Bee maintains canned tuna processing facilities in San Diego, California, and it maintained a plant in Puerto Rico that it closed in approximately June 2012. Bumble Bee's 2014 annual revenue exceeded $1 Billion. Bumble Bee is owned by Lion Capital LLP, a private equity firm based in the United Kingdom. Lion Capital purchased Bumble Bee in 2010 for approximately $980 Million from Centre Partners Management LLC, a U.S.-based private equity firm.  In 2014, Lion Capital agreed to sell Bumble Bee to Thai Union for $1.51 Billion. However, due to concerns about the antitrust violations alleged in this First Amended Complaint, Lion Capital and Thai Union announced on December 3, 2015, that they were not proceeding with the merger. During the time period relevant to Plaintiff's claims: Bumble Bee directly participated in the conspiracy alleged in this First Amended Complaint; Bumble Bee produced and sold canned tuna throughout the United States and its territories; Bumble Bee directly sold canned tuna to Plaintiff and others in the United States; and Bumble Bee engaged in the unlawful conduct alleged in this First Amended Complaint in violation of Section 1 of the Sherman Act.

43.     Defendant Lion Capital LLP is a British private equity firm specializing in investments in the consumer sector. Lyndon Lea cofounded the company in 2004. Lion Capital purchased Bumble Bee in 2010 for approximately $980 Million from Centre Partners Management LLC ("Centre"), a United States-based private equity firm. According to its website, Lion Capital maintained offices in New York and Los Angeles during a time period covered by the alleged conspiracy. Lion Capital's Los Angeles office was responsible for overseeing the

AWG'S FIRST AMENDED COMPLAINT

Bumble Bee investment.  The Lion Capital executives in this office included Eric Lindberg, Jeff Chang, and Jacob Capps.

44.     Defendant Lion Capital (Americas), Inc., is another parent company of Bumble Bee identified as such in Bumble Bee's plea agreement.  It is the subsidiary through which Lion Capital operates in the United States. There is no meaningful distinction between Lion Capital and Lion Americas.  Lion Americas is headquartered in the same Los Angeles office as Lion Capital. In terms of personnel, Lion Americas has significant overlap with Lion Capital. For example, Lindberg was both a director of Lion Americas and a partner at Lion Capital, while Capps was President of Lion Americas and a partner at Lion Capital. At all times relevant to this First Amended Complaint, Lindberg and Capps were acting on behalf of both Lion Capital and Lion Americas. Additionally, Lion Americas and Lion Capital use the same website without distinguishing between the two entities.

45.     Defendant Big Catch Cayman LP aka Lion/Big Catch Cayman LP is a holding company that wholly owns Bumble Bee. Big Catch was established in November 2010, and its principal place of business is c/o Lion Capital (Americas) Inc., 888 7th Avenue, 43rd Floor, New York, N.Y. 10019. Big Catch is the entity referenced in Bumble Bee's criminal plea agreement as the entity that would receive the proceeds from the sale of Bumble Bee. As part of that plea agreement, Big Catch must pay up to $56.5 million in criminal fines in the event that Bumble Bee is sold. Upon information and belief, Big Catch is a shell company and does not engage in any operations separate from those of Lion Capital and Bumble Bee.

AWG'S FIRST AMENDED COMPLAINT

46.     Lion Capital and Lion Americas participated in the conspiracy alleged in this First Amended Complaint through Lindberg, Chang, and Capps (as well as other employees of both entities), and the actions taken by these individuals in furtherance of the conspiracy (as alleged below) were taken on behalf of both Lion Capital and Lion Americas in their official capacities as senior executives of both entities.   Additionally, upon information and belief, at least one among Chang, Lindberg and Capps is an officer of Big Catch, and took steps in furtherance of the conspiracy (as alleged in this First Amended Complaint) on behalf of both Lion and Big Catch.

47.     Lion Capital, Lion Americas, and Big Catch are all parent companies of Bumble Bee. Further discovery will reveal the exact relationship between and among these companies. As alleged in this pleading, "Lion" shall refer to Lion Capital, Lion Americas, and Big Catch unless otherwise specifically noted. As described below, during the time period after Lion acquired Bumble Bee in 2010, Lion: (i) directly participated in the conspiracy; and/or (ii) Bumble Bee is the alter

AWG'S FIRST AMENDED COMPLAINT

ego of Lion. Lion is only being sued in its direct capacity and/or based on vicarious liability for the time period between 2010 (when it acquired Bumble Bee) and 2015. Further discovery will be necessary to determine what Lion knew about the conspiracy before it bought Bumble Bee.

48.   Defendant Christopher D. Lischewski was Bumble Bee's CEO and President during the entirety of the Relevant Period. He is a resident of San Diego County, California. Plaintiff sues Lischewski in both his individual and official capacity for his participation in the conspiracy between at least 2004 and 2015.

49.   Upon information and belief, Lischewski, Bumble Bee's CEO since 1999, ensured that customers paid more for canned tuna by personally directing and engaging in the illegal price-fixing conspiracy alleged herein.

50.   On numerous occasions, Lischewski has publicly encouraged Defendants to maintain the illegal conspiracy alleged herein.  For example, at an Infofish industry conference in late May 2008, Defendant Lischewski gave a keynote address in which he urged fellow "global industry leaders" to undertake the challenge to drive the development of "sustainable tuna management practices."  Thereafter, beginning in or about August of 2008, Defendants all collusively shrunk the size of their cans of tuna from 6 oz. to 5 oz.

51.   Lischewski has been charged by the DOJ for conduct in violation of the US antitrust laws for actions beginning no later than November of 2010.

52.   In 2011, Defendant Lischewski complained that tuna was "too cheap" and that it was "important to persuade customers to pay more for canned tuna."

53.   In October 2011, Lischewski briefed Lion Capital's Lindberg on the "current competitive situation" before Lindberg met with Dongwon executives. On information and belief, this was code Lischewski used when discussing the

AWG'S FIRST AMENDED COMPLAINT

conspiracy.   The DOJ's indictment charged that Lischewski "us[ed] code" to conceal the conspiracy.

54.     In January of 2012, Lischewski sent emails regarding the conspiracy to Lion's Jerry Capps and Lindberg, some forwarded directly from Bumble Bee's senior tuna sales and marketing executives Ken Worsham and Scott Cameron—both of whom have pleaded guilty to violating the antitrust laws.   Lischewski emailed Lion's Capps and Lindberg that Bumble Bee's competitors COSI and StarKist were "cheating" on pricing, a solid indication that these competitors had already agreed on collusive pricing.

55.     Upon information and belief, Defendant Lischewski played an active role in helping Lion Capital to undercapitalize Bumble Bee and reaped substantial personal profits from the price-fixing conspiracy alleged herein.

### The Tri-Union Defendants

56.     Defendant Tri-Union Seafoods LLC, doing business as Chicken of the Sea International, Inc., is a limited liability company organized, existing and doing business under the laws of the State of California, with its headquarters and principal place of business in San Diego, California. COSI is defined to include its managers, officers, employees and agents acting on its behalf. COSI operates its tuna processing facility in Lyons, Georgia. In 1997, Tri-Union Seafoods LLC acquired COSI (which was then called Van Camp Seafood Company), with Thai Union Group PCL (f/k/a Thai Union Frozen Products PCL) owning a 50% ownership interest in the limited liability company. In 2000, TUG acquired the remaining 50% share of Tri-Union Seafoods LLC, and COSI became a wholly-owned subsidiary of TUG (and has remained a TUG subsidiary ever since). In 2014, TUG earned gross profit of $547 Million on worldwide revenue of $3.339 Billion. During the time period relevant to Plaintiff's claims, COSI directly, or on

AWG'S FIRST AMENDED COMPLAINT

behalf of TUG: participated in the conspiracy alleged in this First Amended Complaint; produced and sold canned tuna throughout the United States and its territories; sold canned tuna to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this First Amended Complaint in violation of Section 1 of the Sherman Act.

57.     Defendant Thai Union Group PCL is a corporation organized, existing and doing business in Thailand, with its headquarters located in Amphar Muang, Thailand. After its acquisition, COSI became a wholly-owned subsidiary of TUG.

58.     During the time period relevant to Plaintiff's claims, and as alleged in this First Amended Complaint, TUG directly participated in the conspiracy and purposefully directed this conduct at the United States (including the forum State); produced and sold canned tuna in the United States and its territories; sold canned tuna to Plaintiff and others in the United States; used its dominance or control of COSI's raw material purchasing and tuna business to conspire with the other Defendants and their co-conspirators; and engaged in the unlawful conduct alleged in this First Amended Complaint in violation of Section 1 of the Sherman Act. Cheng is Kraisorn Chansiri's brother and the second largest shareholder of Thai Union.

59.     Alternatively, during the time period relevant to Plaintiff's claims, and as more fully alleged throughout this First Amended Complaint, Thai Union participated in the conspiracy by and through COSI, which acted as and was Thai

AWG'S FIRST AMENDED COMPLAINT

Union's alter ego or agent. Thai Union dominated or controlled COSI's canned tuna business as reflected by, among other actions, Thai Union's domination or control of COSI's production, pricing, hiring, budgeting, capitalization and/or marketing of canned tuna. During this time period, Thai Union effectively controlled and took over performance of the day-to-day operations of COSI's canned tuna business, and there was such unity of interest and ownership between Thai Union and COSI that the individuality or separateness of the two companies ceased with respect to COSI's canned tuna business. COSI's status as the alter ego or agent of Thai Union is evidenced by, among other facts, one or more of the facts alleged below that occurred during the time period relevant to Plaintiff's claims:

(a)     Thai Union used COSI as a mere shell, instrumentality or conduit for a single venture involving the sale of price-fixed canned tuna in the United States caught, processed and canned or pouched by Thai Union in Thailand for the ultimate benefit of Thai Union. COSI enabled Thai Union to be vertically integrated with respect to the U.S. operations. As a result of this structure, Thai Union and COSI effectively functioned as a single entity for purposes of the conspiracy. In the words of Thai Union, COSI and Thai Union were not just "family," but "Thai Union + COSI = One Company." With respect to the canned tuna produced by Thai Union in Thailand and sold in the United States, COSI merely acted as Thai Union's marketing conduit to sell Thai Union's canned tuna under the Thai Union-owned COSI label.  This comes as no surprise, because TUG's website demonstrates that TUG views COSI as part of TUG's overall "Global Tuna Business" and "US Ambient Operations" controlled directly by TUG's Board of Directors and executives.

22

(b)     Thai Union dominated or controlled COSI's marketing of canned tuna in the United States. For example, and without limitation, TUG presented (and does present) a common global marketing image with COSI. TUG's 2015 Annual Report lists COSI as "our strong brand in North America." TUG's 2001 Annual report states: "The principal activities of the overseas subsidiaries such as the subsidiaries in United States are the manufacture and distribution of canned seafood, and the import of shrimp and other frozen seafood products for sale to restaurant chains, retailing, wholesaling and food processing."

(c)     Thai Union and COSI used the same offices or locations in the United States. TUG's 2015 Annual Report, identifying "Thai Union's footprint," lists itself as having corporate offices in Portsmouth, New Hampshire; New York, New York; El Segundo, California; San Diego, California; and Lyons, Georgia. Each of these offices is an office or plant of COSI.

AWG'S FIRST AMENDED COMPLAINT

1      (d)    Thai Union and COSI had overlapping Board Members and key

2   executives who dominated or controlled COSI. For example, and without

3   limitation, according to a corporate organizational chart on its website, TUG

4   represents that it treats COSI as part of its overall "Global Tuna Business" and "US

5   Ambient Operations" that are controlled directly by TUG's Board of Directors and

6   executives.  Kraisorn Chansiri, the Chairman of TUG, is a member of the Board of

7   Directors of COSI; Cheng Niruttinanon ("C. Niruttinanon"), Executive Chairman

8   of TUG, is a member of COSI's Board of Directors; and Thiraphong Chansiri ("T.

9   Chansiri"), President and CEO of TUG, is a member of COSI's Board of Directors

10  and President of Thai Union North America, Inc., a wholly-owned subsidiary of

11  TUG and the holding company through which TUG owns COSI and does business

12  in the United States. Additionally, Shue Wing Chan ("Chan"), a member of the

13  family that controls TUG, and a member of TUG's self-styled "Global Leadership

14  Team," is President and CEO of COSI. David Roszmann, the former Chief

15  Operating Officer of COSI, joined COSI in March 2013 and directly reported to

16  CEO Chan on matters including sales, marketing, procurement, supply chain,

17  operations, finance, HR, legal and IT. Mr. Roszmann left COSI in December 2015,

18  soon after the DOJ questioned TUG's attempt to acquire Bumble Bee. Upon

19  information and belief, Chan now holds executive positions at COSI and other

20  subsidiaries controlled by TUG. Further, Chang Tim King served as Executive

21  Director and CFO of TUG and a member of the COSI Board of Directors.

22      (e)    Thai Union appointed people who were involved in the day-to-

23  day operations of COSI, including people who participated in the conspiracy as

24  Thai Union intended.

AWG'S FIRST AMENDED COMPLAINT



(f)    Thai Union micromanaged COSI's affairs and disregarded principles of corporate separateness with respect to COSI.



25



(g)     Thai Union, as the parent, owned COSI, the wholly-owned subsidiary of Thai Union.

(h)     Due to the unlawful conduct alleged in this First Amended Complaint, COSI earned profits in excess of what it would have earned in a competitive market. COSI transferred this ill-gotten gain to its parent, Thai Union, by paying out the unlawfully obtained profits and other conspiracy proceeds to Thai Union in the form of dividends and other transfer payments.

Accordingly, Thai Union knowingly profited from COSI's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched. Further, TUG charged COSI prices for tuna that were higher than COSI would have paid had COSI been free to acquire tuna at market rates. As a result of these facts,

26

AWG'S FIRST AMENDED COMPLAINT

1  considered alone or in combination with one or more of the foregoing other facts,
2  adherence to the fiction of the separate existence of Thai Union and COSI would
3  sanction a fraud or promote an injustice, and an inequitable result or an injustice
4  would occur if the corporate form were elevated over substance.

5      60.    Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc.,
6  and Thai Union Group PCL, are collectively referred to in this First Amended
7  Complaint as the "COSI Defendants."

8  The StarKist Defendants

9      61.    Defendant StarKist Company is a corporation organized, existing, and
10 doing business under the laws of the State of Pennsylvania, with its headquarters
11 and principal place of business in Pittsburgh, Pennsylvania. During the time period
12 relevant to Plaintiff's claims, StarKist manufactured canned tuna and shelf stable
13 salmon. StarKist is defined to include its officers, employees, and agents acting on
14 its behalf. StarKist operates its tuna processing facility in Pago Pago, American
15 Samoa.    Although StarKist's annual revenue is not publicly reported, the
16 Pittsburgh Post-Gazette reported in early 2010 that StarKist's annual revenue was
17 between $650 and $670 million. That figure likely grew to approximately $1
18 Billion in 2014. In 2008, Dongwon Industries Co. Ltd. ("Dongwon") purchased
19 StarKist for approximately $363 Million and thereafter, including during the time
20 period relevant to these allegations, StarKist operated as a wholly-owned
21 subsidiary of Dongwon. During the time period relevant to Plaintiff's claims,
22 StarKist directly or on behalf of Dongwon: participated in the conspiracy alleged
23 in this First Amended Complaint; produced and sold canned tuna throughout the
24 United States and its territories; sold canned tuna to Plaintiff and others in the
25 United States; and engaged in the unlawful conduct alleged in this First Amended
26 Complaint in violation of Section 1 of the Sherman Act.

27
28

27

62.     Defendant Dongwon Industries Co. Ltd. is a corporation organized, existing, and doing business in South Korea, with its headquarters located in Seoul, South Korea. Dongwon is a vertically integrated fishing conglomerate that owns the world's largest fishing fleet. Dongwon has an ownership stake in U.S. businesses besides StarKist, including a 12.5% stake in Silver Bay Seafoods, LLC (a fishery in Sitka, Alaska) and a 50% majority interest in DW Global, Inc. (a shipping and import/export company located in Commerce, California). As noted above, in 2008, Dongwon bought StarKist, and Dongwon is StarKist's parent. Dongwon sells a substantial volume of canned tuna (and other shelf-stable packaged seafood products) in the United States, and according to its quarterly and annual reports, it typically derives more than 50% of its global revenue from the United States.

63.     Before describing the interrelationship between StarKist and Dongwon Industries, we explain briefly the concept of the Korean chaebol, which is a recognized concept in the academic business literature focused on South Korean companies. *See generally* David Hundt, Korea's Developmental Alliance: State, Capital and the Politics of Rapid Development (2009); R. M. Steers, K.S. Yoo, & G. Ungson, The Chaebol: Korea's New Industrial Might (1989). The term "chaebol" is made up of the words "chae" (wealth or property) and "bol" (clan or group). Chaebols are closely-knit business groups in South Korea under the control of a single family or extended family, with key flagship firms that are used as the instruments of control of other firms within the group. They have four key features: (1) the governance structure of the group involves family or extended family control; (2) the formal organizational structure of the group involves a group headquarters, located in an actual or de facto holding company, sometimes known as a "flagship" company, which controls a network of subsidiaries, which

AWG'S FIRST AMENDED COMPLAINT

fall under the control of the family, the group as a whole, and of flagship firms within the group; (3) the business structure of the firm encompasses a number of discrete products and services, some of which are wholly unrelated and others that are effectively vertically integrated; and (4) these groups are characterized by strong internal cultures of hierarchy, familyism and loyalty, with family members of the founder or his cohorts also occupying key managerial positions within the group.

64.    The Dongwon family of companies fits this definition. The company started in 1969 and is dominated by Chairman Jae-chul Kim ("Chairman Kim") and members of his family or extended family, as described in more detail below. The group headquarters is in Seoul, South Korea, where its holding company, Dongwon Enterprises, is located. Through its subsidiaries, it operates in a number of business sectors including, inter alia, marine products, other food products, feed products and pet food, packing materials, and aluminum foil products. As explained below, the Dongwon family of companies has an internal culture of hierarchy, familyism and loyalty. Defendants Dongwon and StarKist exhibit that culture with members of J.C. Kim's family being put in key positions in both companies and executives at Dongwon, Dongwon Enterprises and various other Dongwon subsidiaries being routinely seconded to StarKist to fill managerial roles. Dongwon, run by Chairman Kim, is the parent entity for StarKist, but his control over the Dongwon family of companies was such that, with the stroke of a pen, he could (and in fact did) command executives of the holding company or from sister subsidiary companies to either oversee the business of StarKist from Korea or relocate in the United States and help run StarKist. This was done without regard for which Dongwon subsidiary the individual worked for, and for the purposes of involvement in StarKist's management, all Dongwon personnel were functionally

AWG'S FIRST AMENDED COMPLAINT

Dongwon Industries personnel subject to the direct control of Chairman Kim. In other words, as a chaebol, Dongwon does not follow the principles of corporate separateness that are expected of companies incorporated in the United States and instead acts as a single integrated enterprise. Accordingly, acts taken by employees of Dongwon's corporate affiliates in furtherance of the conspiracy, as alleged in detail below, were taken on behalf of the interests of the chaebol and under the control of Dongwon (and Chairman Kim) as the chaebol's flagship.

65. Dongwon directly participated in the conspiracy alleged in this First Amended Complaint and purposefully directed this conduct at the United States (including the forum State); produced and sold canned tuna in the United States and its territories; intentionally sold price-fixed canned tuna to Plaintiff and others in the United States; used its dominance or control of StarKist's raw material purchasing and tuna business to conspire with the other Defendants and their co-conspirators; and engaged in the unlawful conduct alleged in this First Amended Complaint in violation of Section 1 of the Sherman Act.

66. Alternatively, during the time period relevant to Plaintiff's claims, and as more fully alleged throughout this First Amended Complaint, Dongwon participated in the conspiracy by and through StarKist, which acted as Dongwon's alter ego or agent. Dongwon dominated or controlled StarKist's canned tuna business as reflected by, among other actions, Dongwon's domination or control of StarKist's production, pricing, hiring, budgeting, capitalization and/or marketing of canned tuna. During this time period, Dongwon effectively controlled and took over performance of the day-to-day operations of StarKist's canned tuna business, and there was such unity of interest and ownership between Dongwon and StarKist that the individuality or separateness of the two companies ceased with respect to StarKist's canned tuna business. StarKist's status as the alter ego or agent of

AWG'S FIRST AMENDED COMPLAINT

Dongwon is evidenced by, among other facts, one or more of the facts alleged below that occurred during the time period relevant to Plaintiff's claims:

(a)    Dongwon used StarKist as a mere shell, instrumentality or conduit for a single venture involving the sale of price-fixed canned tuna in the United States caught, processed, and/or packaged by Dongwon in South Korea and Thailand for the ultimate benefit of Dongwon and the Kim family. ████████ ██████████████████████████████████████████████████████ Dongwon used StarKist to market Dongwon's product. StarKist enabled Dongwon to be vertically integrated with respect to the U.S. operations. As a result of this vertical integration, Dongwon and StarKist effectively functioned as a single entity for purposes of the conspiracy. With respect to the canned tuna produced by Dongwon in South Korea and Thailand and sold in the United States, StarKist merely acted as Dongwon's marketing conduit to sell Dongwon's canned tuna under the Dongwon-owned StarKist label.

(b)    Dongwon dominated or controlled StarKist's marketing of canned tuna in the United States. For example, and without limitation, Dongwon's website states: "StarKist is an iconic tuna brand in the United States, *and has been controlled by Dongwon Group since 2008*, accompanying Dongwon Group on its journey to globalization.... Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna company, and will become de facto a globalized enterprise." (Emphasis added). Dongwon has presented a common global marketing image with StarKist. As Dongwon stated in 2008, it acquired StarKist to "establish a strong foothold in penetrating the U.S. market," and the purpose of Dongwon's acquisition was "to add a stable buyer of its tuna and to place other products in the U.S. through StarKist's distribution

31

network." Dongwon and StarKist presented themselves to Plaintiff as a single, vertically integrated entity. StarKist's website states that "Dongwon Industries is one of the world's largest tuna catching companies with a fleet of 36 boats. Dongwon's world class fish procurement and processing capacity builds on StarKist's national brand recognition and distribution networks in the United States to bring world-class seafood to consumers worldwide."

(c)     Dongwon and StarKist used the same offices or locations in the United States. Dongwon's website lists StarKist's U.S. office as one of its global branch offices.

(d)     Dongwon and StarKist had overlapping Board Members and key executives who dominated or controlled StarKist. For example, and without limitation, in about September 2014, Andrew Choe ("A. Choe") became the President and CEO of StarKist. A. Choe was seconded to StarKist in April 2012 as the Senior Vice-President of its supply chain. Previously, Mr. Choe had held an executive position at Dongwon as Director of Strategic Planning. Nam-Jung Kim ("NJ Kim"), son of Chairman Kim, served as the COO of StarKist from about 2012 until October 2014, when he was promoted to Vice Chairman of StarKist. He currently serves on the board of directors for StarKist and Dongwon.  Prior to his being sent to join StarKist, NJ Kim was Vice-President of Dongwon F&B (a Dongwon subsidiary) and Dongwon Enterprise Co. (the Kim family's holding company that owns Dongwon Industries). Since 2008, NJ Kim has served as the Head of the Finance and Planning Department at Dongwon Systems and served as Vice President of its construction unit. Additionally, according to Forbes, in preparation for Chairman Kim's succession, "the founder has been transferring ownership of the private family holding company, Dongwon Enterprise Co., which owns stakes in [Dongwon and other affiliates], to Nam-Jung. Jae-Chul holds a

AWG'S FIRST AMENDED COMPLAINT

24.5% stake and Nam-Jung, 68%." Accordingly, NJ Kim owned a controlling interest in Dongwon while serving as StarKist's COO and Vice Chairman. The position of COO was created specifically for him, so that he could lead the "continued growth and expansion of Dongwon-StarKist global business." Also, Hyung-Joo Kim, Chief Financial Officer ("CFO") of Dongwon F&B, was seconded to StarKist in 2012 to serve as CFO. In-Gu Park ("IG Park"), the Chairman of the Board of StarKist, also served as its Acting President from November 2010 to March 2011. IG Park serves as CEO of Dongwon Precision Machinery Company, and has also served as CEO and Vice Chairman at Dongwon F&B and Dongwon Enterprise. During the time period relevant to these allegations, IG Park chaired StarKist's board of directors while simultaneously sitting on the board or serving as an officer (or both) of other Dongwon companies. Additionally, StarKist's board meetings were often held in South Korea so that Dongwon executives could easily attend them.

(e)     Dongwon appointed people who were involved in the day-to-day operations of StarKist, including people who participated in the conspiracy as Dongwon intended. For instance, and without limitation, Dongwon appointed senior executives at StarKist – including at least In-Soo Cho (IS Cho), A. Choe and Sam Lee. Additionally, Dongwon dismissed several StarKist executives in 2012 and replaced them with employees from within the Dongwon corporate family, including Hyung-Joo Kim as CFO. After Dongwon's acquisition of StarKist, American executives at StarKist Company began to leave – voluntarily and involuntarily.  One report indicated that a "plethora of executives from Dongwon Industries' Seoul headquarters – complete with translators" had "descend[ed] on Pittsburgh to sort out the 'challenges' the company is going through;" one source

AWG'S FIRST AMENDED COMPLAINT

1    stated that "there is so much American management leaving and probably even

2    more so after this announcement…."

3            (f)    Dongwon micromanaged StarKist's affairs and disregarded

4    principles of corporate separateness with respect to StarKist. For example and

5    without limitation:



AWG'S FIRST AMENDED COMPLAINT

(g)



35

AWG'S FIRST AMENDED COMPLAINT



(h)     iDongwon, as the parent, owned StarKist, the wholly-owned subsidiary of Dongwon.  Dongwon purchased 100% of StarKist in 2008.

(i)     Due to the unlawful conduct alleged in this First Amended Complaint, StarKist earned profits in excess of what it would have earned in a competitive market.

Accordingly, Dongwon knowingly profited from StarKist's participation in the conspiracy and knowingly

36

accepted the proceeds of the conspiracy and has been unjustly enriched. As a result of these facts, considered alone or in combination with one or more of the foregoing other facts, adherence to the fiction of the separate existence of Dongwon and StarKist would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over substance.

67. Del Monte Corporation ("Del Monte"), now known as Big Heart Pet Brands, Inc., is a privately held corporation organized under the laws of Delaware with its headquarters and principal place of business in Orrville, Ohio. Prior to October 2008, Del Monte owned and operated StarKist. Although Del Monte sold StarKist to Dongwon in 2008, it continued to operate StarKist on behalf of Dongwon until approximately September 2010, under an Operating Services Agreement entered into between Del Monte and Dongwon pursuant to which Del Monte provided the sales force that sold StarKist products in the United States. In a filing with the Securities & Exchange Commission, Del Monte explained that under the Operating Services Agreement with Dongwon, Del Monte provided operational services to StarKist such as "warehousing, distribution, transportation, sales, information technology and administration."

68. During the time period relevant to Plaintiff's claims, Del Monte participated directly in the conspiracy. As alleged in this First Amended Complaint, Del Monte employees including, and without limitation, ███████████████████████████████████████ attended meetings and engaged in other overt acts in furtherance of the conspiracy on behalf of StarKist and Del Monte. Additionally, during periods relevant to Plaintiff's claims, Del Monte sold StarKist-branded canned tuna at prices affected

AWG'S FIRST AMENDED COMPLAINT

by the conspiracy directly to Plaintiff and others in the United States, in violation of Section 1 the Sherman Act.

69.    From the period prior to October 2008, the term "StarKist Defendants" refers to StarKist and Del Monte, collectively. From October 2008 until October 2010, the term "StarKist Defendants" refers to StarKist, Del Monte and Dongwon, collectively. From November 2010 until the July 2015, the term "StarKist Defendants" refers to StarKist and Dongwon, collectively.

### Co-Conspirators and Agents

70.    Other entities and individuals not named as Defendants combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this First Amended Complaint. Conspirators currently known to Plaintiff include Impress USA, Inc. ("Impress") and its employees.

71.    The individuals employed by Defendants and co-conspirators who participated in the conspiracy did so on behalf of their respective employer Defendant or co-conspirator, and their conduct in furtherance of the conspiracy was undertaken by each of them during the course and scope of their employment by their Defendant employer or co-conspirator.

AWG'S FIRST AMENDED COMPLAINT

## TRADE AND COMMERCE

72.     During the time period relevant to Plaintiff's claims, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial. In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that:

(a)     Defendants and their co-conspirators sold and shipped substantial quantities of canned tuna in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the canned tuna;

(b)     Data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States;

(c)     Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States; and/or

(d)     Defendants and their co-conspirators imported substantial quantities of raw materials for canned tuna from outside the United States.

73.     The effect of Defendants and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiff's claims.

## THE PRODUCTION OF CANNED TUNA

74.     There are several levels in the production of canned tuna. Initially, the tuna is caught by fishing vessels, which operate in the Pacific, Atlantic and Indian Oceans (although the majority of tuna comes from the Pacific Ocean). After it is caught, the fish is frozen or refrigerated. Both Dongwon and TUG control

AWG'S FIRST AMENDED COMPLAINT

extensive tuna fishing fleets used, at least in part, to supply fish to StarKist and COSI, respectively.

75.    In addition to the fleets controlled by Dongwon and TUG, tuna trading companies buy the fish from fishing vessels and coordinate transshipment of catches to processors, including Defendants. During the time period relevant to Plaintiff's claims, the major trading companies were: the Tri-Marine Group, a foreign organization that does business in the United States through Tri-Marine International, Inc., Tri-Marine Management Company, LLC, Tri Marine Fishing Management LLC, Tri Marine Fish Company, and The Tuna Store, LLC; Itochu Corporation, a Japanese company in the fishing business through its Food Company, which it owns and controls; and Fong Cherng Fishery Company Ltd. ("FCF"), a privately-held Taiwanese company.

76.    After fish trading companies buy the fish or Dongwon- or TUG-controlled vessels catch the tuna, they arrange its delivery to a processing plant where it is cooked (usually by steaming), cleaned, filleted, and prepared for canning or packaging. For example, Bumble Bee describes the process for tuna as follows:

> Upon arrival to the local processing plant, the whole frozen tuna rounds are put into cold storage. The rounds are first inspected for quality, then grouped by size and weight for the most accurate thawing and cooking times. The processing begins when the tuna is removed from the plant freezer, thawed in water and prepared for cleaning. The tuna is then loaded into metal racks, which are wheeled into large steam pre-cookers.   Tuna is cooked for a prescribed time and temperature depending upon the size of the fish. Once the tuna is cooled, the tuna meat is removed from the bones. The tuna loins are placed in bags, blast frozen to lock in moisture and placed on pallets for shipment to canneries in the United States. The frozen loins are shipped directly to the cannery

AWG'S FIRST AMENDED COMPLAINT

> where the canning process is entirely automated. The tuna
> move in a single line from the filling machine to the
> packaging sealer. The sealed product is then cooked, cooled,
> and labeled. Once they pass Quality Assurance approval, the
> cans are prepared for shipment to your local market.

77.     After processing, the tuna is canned or packaged. Chunk-style tuna is conveyed through a chopper, while solid-style tuna is packed directly into the can. Along with the tuna, the can is filled with varying types of liquid (usually vegetable oil or water) before it is sealed. After the can is sealed, it is cooked under pressure to allow for sterility and a long shelf life. The tuna can are then sold to retailers and wholesalers, including Plaintiff.   Prices paid by retailers and wholesalers for canned tuna may vary depending upon several factors, including the type of tuna (*e.g.*, light or white meat), packaging (can or pouch), water or oil, flavoring, brand, and package size.

78.     The StarKist Defendants maintain facilities in South Korea, Thailand, Ecuador, and American Samoa. The COSI Defendants maintain facilities in Thailand and Lyons, Georgia. Bumble Bee conducts the majority of its canning operations in the United States, at its production facility near San Diego. Bumble Bee also buys light meat loins from traders in the Western/Central Pacific Ocean (*e.g.*, Papua New Guinea), the Indian Ocean (*e.g.*, Thailand) and the Eastern Pacific Ocean (*e.g.*, Ecuador), and the product is shipped to its California cannery for canning and sale in the United States.

AWG'S FIRST AMENDED COMPLAINT

## TUNA SUPPLY, DEMAND, AND PRICING

### The Supply of Canning-Grade Tuna Increased Substantially

79.     The higher prices witnessed during the conspiracy did not stem from global reductions in the supply of harvested tuna or other fish. To the contrary, technological advances in fishing over the last 40 years, due mostly to the advent of the purse seine for tuna fishing (a method of fishing involving the use of large nets that capture entire schools of fish), and the use of Fishing Aggregation Devices ("FADs") (man-made objects such as floats or buoys that are used to attract certain fish), have increased the volume of skipjack and albacore caught annually. Compared to 1975, when purse seining accounted for a negligible share of the global tuna fish catch, this method is now responsible for 66% percent of all tuna caught globally.

80.     The following chart demonstrates the proliferation of purse seining in the Western and Central Pacific Ocean (which sources approximately 60% of the world's tuna) relative to other methods of tuna fishing, such as longline and pole fishing methods:

AWG'S FIRST AMENDED COMPLAINT



81.    The advances in fishing technology have increased the efficiency of fishing and substantially lowered the cost necessary to fish for tuna on a commercial scale. According to the Pacific Islands Forum Fisheries Agency ("FFA"), between 1986 and 2007, the average catch per tuna fishing vessel roughly doubled, from 3,750 metric tons to 7,100 metric tons per year. This, in turn, has spurred substantial recent investment in fishing vessels. Between approximately 2007 and 2011, the number of tuna fishing vessels increased by more than 25%.

82.    The combination of increased investment in fishing vessels and improved efficiency of those vessels has resulted in a dramatic increase in the volume of canning-grade tuna caught annually. As the following chart depicts, between 1984 and 2014, the volume of skipjack caught annually increased roughly three-fold:



U.S. annual per capita canned tuna consumption                4.0 pounds

**The Demand for Canned Tuna in the United States Decreased Substantially**

83.     The higher prices for canned tuna during the conspiracy did not result from increasing demand for the product. To the contrary, there has been a substantial decline in both the demand for and consumption of canned tuna in the United States over the last 25 years. As publicly available information reflects, consumption of canned tuna in the United States peaked at nearly four pounds per person in the early 1990s, and then began to fall, to 3.4 pounds per capita in 2003 and to approximately 2.5 pounds per capita in 2009, with consumption and demand continuing to decline thereafter. The following chart, based on publicly available information, depicts the declining per capita consumption of canned tuna in the U.S

AWG'S FIRST AMENDED COMPLAINT

84.     Demand for canned tuna in other developed countries has also declined per capita. In Japan, consumption of canned tuna declined by approximately 20% from 1995 to 2007, while overall consumption in Western Europe remained stagnant between 2000 and 2010. Notwithstanding this trend of declining demand, the United States, Western Europe and Japan accounted for more than 50% of all global canned tuna consumption in 2008 according to the FFA. Further, the United States remained the largest consumer of canned tuna in the world, accounting for approximately 28% of global consumption in 2010.

**Prices Paid for Canned Tuna Increased Substantially as a Result of Defendants' Conspiracy**

85.     In the face of declining U.S. demand for canned tuna and the increasing supply of canning-grade tuna and other species of fish, market forces should have put substantial pressure on Defendants to attain greater market share and increase production so as to garner economies of scale that would reduce the price of canned tuna sold to Plaintiff and others in the United States. Instead, because of the conspiracy, the opposite occurred.

86.     As discussed above, the higher prices paid by Plaintiff were due to the conspiracy and not other supply and demand factors. During the conspiracy (and because of it), canned tuna prices sold to U.S. retailers, including Plaintiff, increased (or were otherwise above competitive levels) while the tuna catch increased and U.S. demand for canned tuna declined. This incongruity is also reflected in the chart below, which shows that although per capita U.S. canned tuna consumption continued to decline after approximately 2004, the dollar amount spent on canned tuna and other packaged seafood in the United States actually increased (canned tuna accounts for approximately 75% of all canned seafood spending):

45



87.   Defendants and their co-conspirators' pricing of canned tuna sold to Plaintiff and others in the United States is not consistent with expected pricing given the excess supply and production capacity coupled with declining U.S. demand. To the contrary, during the conspiracy, the prevailing market conditions in the U.S. canned tuna industry would predict *decreasing* prices. However, as alleged in this First Amended Complaint, canned tuna prices – including the prices Defendants and their co-conspirators charged Plaintiff – are explained by the conspiracy.

88.   The higher canned tuna prices resulted in substantial profits for Defendants. TUG saw its net profit increase from $61 million in 2008 to $140 million in 2014. The following year, in its 2014 Annual Report issued in February 2015, TUG explained that "[d]espite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand."

89.   A substantial portion of TUG's profits were the result of the conspiratorial agreements alleged in this First Amended Complaint. ████████

46

AWG'S FIRST AMENDED COMPLAINT

1

2

3

4    90.    Bumble Bee has been similarly profitable due to the conspiracy.  As

5    alleged earlier, Lion Capital purchased Bumble Bee for $980 million in 2010, and

6    reached an agreement to sell it to TUG in 2014 for $1.51 billion. In announcing the

7    sale, Lion Capital noted that Bumble Bee's EBITDA in 2014 was a record-

8    breaking $150 Million, on revenue of $1 Billion. Kelly Mayer, in a memo to her

9    partners at Lion Capital, attributed Bumble Bee's record year to the growth of

10   "gross margins through disciplined pricing actions."   Discovery is necessary to

11   determine whether Lion Capital was aware of and participated, if at all, in the

12   conspiracy alleged in this First Amended Complaint.

13   91.    StarKist, who has the largest U.S. market share

14

15

16                                    Accordingly, Dongwon registered substantial

17   additional income in the period following the collusion alleged in this First

18   Amended Complaint, and received the proceeds of the conspiracy from StarKist

19   knowing the ill-gotten nature of these funds.

20

21   92.    In a Korean-language publication, Dongwon stated that "[t]he canned

22   tuna market in the U.S. is approximately a $1,700,000,000 USD market, but it is a

23   mature market where growth has stopped, and it maintains an oligopolistic system

24   with StarKist (40%), Bumble Bee (25%), and COSI (15%), and represents a

25   structure in which the price of tuna cannot be efficiently reflected in the sales price

26

27

28

AWG'S FIRST AMENDED COMPLAINT

of products." Instead, during the time period relevant to these allegations, the price of canned tuna reflected the conspiracy price.

### Defendants' Pricing of Canned Tuna to Plaintiff and Others Was Against Defendants' Self-Interest But For Their Collusion

93. As alleged above, during the conspiracy, the market for the production and sale of canned tuna in the United States was concentrated in a relatively few firms, *i.e.*, Bumble Bee, the COSI Defendants and the StarKist Defendants. However, none of these companies had the power, unilaterally, to profitably increase the price of canned tuna sold in the United States, and instead needed to maintain a unified front in order to increase prices to the highly profitable levels that existed during the conspiracy. Because Defendants' canned tuna products were close substitutes, unilateral attempts by any one of them to manipulate canned tuna price or supply posed substantial commercial risks. A unilateral increase in price not followed by others would simply lead to lost sales. A unilateral reduction in production would be costly because market share would be lost and revenue would likely fall while fixed costs (*e.g.*, labor, distribution, overhead, facility operation, facility maintenance, etc.) would remain relatively the same. Under the circumstances, Defendants and their co-conspirators' canned tuna pricing actions during the conspiracy would have been against their self-interest unless they were colluding.

### THE MARKET FOR THE PRODUCTION AND SALE OF CANNED TUNA WAS CONDUCIVE TO CARTELIZATION

#### There Are No Close Substitutes for Canned Tuna

94. Canned tuna includes both "white" tuna fish, which consists of albacore tuna, and "light" tuna fish, which consists primarily of skipjack tuna. Both varieties of canned tuna are typically packed in either water or vegetable oil. Light

48

tuna accounts for approximately two thirds of total sales in the United States by volume.

95.     Canned tuna possess commodity-like characteristics in that the product of one seller is interchangeable with the product of another. As such, all things equal, it would not be profitable for Defendants and co-conspirators to unilaterally increase canned tuna prices in the U.S., because a unilateral price by any Defendant would allow another Defendant to steal substantial market share by simply holding its price.

**The Market for the Processing and Sale of Canned Tuna Is/Was Concentrated**

96.     Over the past two decades, the canned tuna industry has undergone a high degree of consolidation. As a result of this consolidation, and during the conspiracy, the U.S. canned tuna industry had become highly concentrated.

97.     During the conspiracy, the market for the production of canned tuna was dominated by Defendants and their co-conspirators. But for the conspiracy alleged in this First Amended Complaint, Defendants and their co-conspirators would have had to compete on price. Although estimates of their respective market shares vary somewhat, StarKist, Bumble Bee and COSI's branded products account for approximately 80% of the canned tuna market in the United States. Also, COSI, which has the smallest domestic market share of the three Defendants for branded canned tuna, is the largest supplier of private-label canned tuna in the United States. During the conspiracy, Defendants processed at least 85% of all canned tuna sold in the United States.

**Barriers to Entry**

98.     During the time period relevant to Plaintiff's claims, there were barriers to entry into the market for the production and sale of canned tuna in the United States, including, without limitation:

AWG'S FIRST AMENDED COMPLAINT

(a)     New entrants were faced with substantial start-up costs, including the need to gain access to distribution channels and retail outlets. Additionally, substantial manufacturing expertise was required to enter the U.S. market.  These startup costs reduced the opportunity or ability for rivals to enter the U.S. market and undercut Defendants and their conspirators' supracompetitive pricing.

(b)     New entrants and existing market participants faced substantial upfront, industry-specific costs to build a plant to process tuna loins into canned tuna.  For example, the cost for Tri-Marine simply to modernize the plant it acquired from COSI in Pago Pago, American Samoa, in 2010, was approximately $70 million. (The plant did not reopen until approximately 2015.)

(c)     The method used for processing canned tuna in the United States was capital intensive. Given the cost to Tri-Marine of modernizing COSI's Pago Pago plant, the purchase of real estate and the construction of a new canned tuna processing facility in the mainland United States would likely cost in excess of $70 million, and require substantial industry expertise to build and operate.

(d)     Restrictive tariffs of between approximately 6% and 35% on the importation of canned tuna into the United States impaired the ability of foreign suppliers from capitalizing on supracompetitive domestic pricing of canned tuna.

**Prevailing Supply and Demand Factors Incentivized Collusion**

99.    As discussed above, during the conspiracy, Defendants and co-conspirators faced supply and demand factors that should have led to declining prices for canned tuna in the United States. The declining consumption of canned tuna in the United States resulted in excess production capacity for canned tuna. Defendants and co-conspirators had sufficient production capacity in the United

AWG'S FIRST AMENDED COMPLAINT

States to supply consumers with 3.4 pounds of canned tuna per capita in 2003. However, by 2009, when annual per capita consumption had fallen to 2.5 pounds, a large portion of Defendants and their co-conspirators' capacity went unused.

100.   On top of the excess production capacity standing idle as a result of declining demand, Defendants also took steps prior to 2009 to increase their own efficiency and production capacity of canned tuna. For example, COSI's Lyons, Georgia plant – which opened in 2009 – had a production capacity that was approximately 50% higher than the production capacity of the Pago Pago plant that it displaced (and that was reopened by Tri-Marine in 2015). And when Dongwon purchased StarKist in 2008, it transferred equipment and technology that increased the manufacturing capacity of the StarKist Defendants' plant in Pago Pago.

101.   Accordingly, the expanding global supply of canning-grade tuna and other fish coupled with declining demand for shelf-stable seafood and the excess domestic production capacity controlled by Defendants left the canned tuna industry ripe for collusion.

**The Transfer of Executives Between Defendants Facilitated Collusion**

102.   During the conspiracy alleged in this First Amended Complaint, executives left one conspirator to take a position at another.

103.   For example, Don George, Bruce Bollmer, and Herbert Tucker all worked at COSI when the conspiracy began in 2004, and later took positions at Bumble Bee (George) and StarKist (Tucker and Bollmer). Joe Clancy was a former StarKist employee who joined COSI in 2002 and, as alleged below, continued to exchange confidential information with former colleagues after joining COSI. Similarly, Jan Tharp left StarKist and joined Bumble Bee in a senior role, and maintained a close relationship with several StarKist executives after joining Bumble Bee.

AWG'S FIRST AMENDED COMPLAINT

104.   In these and other instances, the executives exchanged confidential and sensitive pricing information with colleagues at their former employer after joining the new conspirator.

105.   Additionally, there were a number of close personal relationships between key members of the conspiracy.

106.

AWG'S FIRST AMENDED COMPLAINT



107.  Phone communications like these during the Relevant Period were often followed by price increases.

**Select Trade Associations Facilitated Collusion**

108.  The culture of collusion that existed in the packaged seafood industry during the time period relevant to Plaintiff's claim was also facilitated and enhanced by certain trade associations that counted Defendants among their major, or *only*, members.

109.  For example, one such trade association was the National Fisheries Institute ("NFI"), which existed as early as 2004. Defendants Bumble Bee, COSI and Del Monte/StarKist were among its members. In 2007, NFI created the Tuna

53

1    Council, whose *only* members were Bumble Bee, COS and Del Monte/StarKist. As
2    soon as the Tuna Council was created, Defendants used it to facilitate their
3    collusion. For example, in January 2008, as Defendants were discussing their
4    collusive can-size reduction,
5
6
7                                                           As Plaintiff allege in further detail
8    below, Defendants discussed and exchanged confidential information about canned
9    tuna pricing in furtherance of the conspiracy under the cover of NFI and the Tuna
10   Council.

11        110.   On information and belief, Bumble Bee's CEO Lischewski used the
12   trade association meetings to provide cover for one on one meetings with the
13   senior leaders of Bumble Bee's competitors to re-inforce the collusive price
14   increases.

15   **Common Vendors and Co-Packing Arrangements Facilitated Collusions and**
     **Enforcement of the Cartel**
16

17        111.   During the time period relevant to Plaintiff's claims, but particularly
18   between approximately 2004 and 2010, Defendants shared a common canner in
19   American Samoa, Impress. Bumble Bee, Del Monte/StarKist and COSI each knew
20   at the time that Impress was sharing production and other information about each
21   of them with the others, and Defendants used Impress as a conduit to facilitate the
22   exchange of information regarding the conspiracy. As alleged in this First
23   Amended Complaint, Impress is a co-conspirator, and its role in this regard is
24   illustrated in connection with the collusive can size reduction that occurred in 2007
25   and 2008.

26        112.   In addition to economic and other conditions that facilitated the
27   conspiracy, in 2011, Bumble Bee and the COSI Defendants entered into co-

28                                                54

packing agreements in which Bumble Bee's factory in Santa Fe Springs, California, packed and canned the tuna for COSI's west coast operations, and COSI's plant in Lyons, Georgia, packed the canned tuna for Bumble Bee's east coast operations. This copacking arrangement enabled Bumble Bee and the COSI Defendants to monitor each other's output and pricing.

## ADDITIONAL OVERT ACTS IN DEFENDANTS' CANNED TUNA CONSPIRACY

113.   Defendants and their co-conspirators carried out their continuing conspiracy regarding canned tuna through in-person meetings and communications, including e-mails and telephone calls. During these meetings and communications, they agreed on conspiracy terms as alleged in this First Amended Complaint, and coordinated price increase announcements or pricing terms, secretly and collusively exchanged pricing information and prospective pricing announcements and business plans, and collectively reduced quantity and restrained output of canned tuna sold to Plaintiff and others in the United States.

### Defendants' Collusive Price Increases Between 2004-2006

114.   In the first half of 2004, the prevailing prices for canned tuna in the U.S. were below the level needed to deliver the profits expected by TUG. Between 2001 and 2003, canned tuna prices had declined, as had profit margins.

COSI needed a new strategy.

TUG favored this strategy because higher canned tuna prices accommodated

AWG'S FIRST AMENDED COMPLAINT

higher prices for processed tuna sold by TUG to COSI and its rivals. (Processed tuna is the main cost input to produce canned tuna).

115. 

56



116.

117.

57



118. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a conscious commitment to an unlawful common scheme, *i.e.*, an agreement, developed among Defendants and co-conspirators to increase prices of canned tuna sold to Plaintiff and others in the U.S. by, among other conduct, ▮▮▮▮

119. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

120. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

58



121.

122.

123.

AWG'S FIRST AMENDED COMPLAINT



124.

125.

126.

60



AWG'S FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



62

AWG'S FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11    135.
12
13
14
15
16
17    136.
18
19
20
21
22
23
24    2
25
26
27
28



AWG'S FIRST AMENDED COMPLAINT



137.

138.

139.

**Defendants' Collusive Can Size Reduction and Price Increases in 2007-2008**

140.   The conspiracy among Defendants and co-conspirators continued in 2007 and 2008.

141.

AWG'S FIRST AMENDED COMPLAINT



142.

143.

65

AWG'S FIRST AMENDED COMPLAINT



145.   The collusive can-size reduction was facilitated by co-conspirator Impress, a canner with facilities in American Samoa. In 2007-08, Impress had a commercial relationship with Del Monte/StarKist, Bumble Bee and COSI.



66



148.

149.

150.

151.   Defendants also agreed to coordinate their messaging regarding their plans to downsize cans, so that customers would not learn that the decision was not driven by necessity, but was instead the result of collusion.

67



152.

153.

68



154.

155.

156.

69



157.   The conspiracy among Defendants and co-conspirators continued after the agreement to reduce the tuna can size.

158.

159.

160.

161.

AWG'S FIRST AMENDED COMPLAINT

162. 

163.

**Defendants Collude on Net Prices in 2010**

164.   The conspiracy among Defendants and co-conspirators continued into 2010, when they once again collusively raised net prices on canned tuna. Net prices are the prices disseminated to brokers of shelf stable seafood products, and represent the list price, less promotional allowances offered by Defendants to reduce the list price. (Brokers present these prices to retailers like Plaintiff, who pay Defendants directly for the product). This collusive price increase was announced by each Defendant

71

165. 

166.

167.

168.

169.

72



170.

171.

172.

**Defendants Colluded to Increase Canned Tuna Prices in 2011**

173. Even with the alteration in can size for processed tuna and the prior collusive price increases, Defendants and co-conspirators were still unhappy with

AWG'S FIRST AMENDED COMPLAINT

the prices they obtained. Lischewski of Bumble Bee complained in April 2011 that canned tuna was "too cheap." He said that it was important to persuade customers to pay more for canned tuna. Unable to achieve this through lawful measures, Defendants continued to meet, communicate and conspire not to compete on canned tuna sold in the United States.



AWG'S FIRST AMENDED COMPLAINT



177.

178.

75

AWG'S FIRST AMENDED COMPLAINT



179.

**Defendants Colluded on a Canned Tuna Price Increase in 2012**

180. The conspiracy among Defendants and their co-conspirators continued after 2011 and into 2012.

181. In December 2011 and January 2012, telephone conversations occurred between senior executives and sales personnel of Bumble Bee, the COSI Defendants and the StarKist Defendants about coordinating and announcing a price increase for a number of products in the second quarter of 2012.

182.



76

[REDACTED]

183.   These competitor discussions led to an agreement or understanding that the Defendants would increase prices by nearly identical amounts.  Pursuant to this agreement or understanding, the Defendants announced collusive price increases as follows: the StarKist Defendants on or about January 13, 2012, effective on March 26, 2012; Bumble Bee on or about January 17, 2012, effective on April 1, 2012; and the COSI Defendants on or about January 18, 2012, effective on April 1, 2012. Each price increase announced identical (or virtually identical) increases on a number of packaged seafood products. For example, a 48 pack of five ounce cans of chunk light tuna in water increased from $40.80 to $43.68. Other products also increased by identical percentages.

184.   [REDACTED]

**Defendants' Collusion Not to Sell "FAD-Free" Branded Tuna Products in 2011 and Thereafter**

185.   In 2011, employees and representatives of the StarKist Defendants, Bumble Bee, and the COSI Defendants discussed whether any of them would launch a "FAD-Free" product (*i.e.*, a canned tuna product containing only tuna that were caught without the use of a FAD device). These discussions included e-mails that occurred throughout 2011 and into 2012.

186.   [REDACTED]

AWG'S FIRST AMENDED COMPLAINT

187. █████████████████████████████████████

188.   Defendants came to believe that if any of them launched a FAD-Free product under one of their own branded labels, then it would work to the detriment of each of their companies. ████████████████████████████████████████

189.   On a teleconference during the week of February 10, 2012, the StarKist Defendants, Bumble Bee and the COSI Defendants agreed that none of them would launch a branded FAD-free canned tuna product in the United States. This agreement was later confirmed in writing during the week of February 17, 2012. Defendants agreed not to sell FAD-free canned tuna products in the United States under their own brand names to avoid competition in the sale of canned tuna in the United States. ████████████████████████████████████████

190. ████████████████████████████████████████

AWG'S FIRST AMENDED COMPLAINT

191. 

**Defendants Colluded on Promotional Activity and Pricing Terms in at Least 2011-2013**

192.   Between at least November 2011 and June 2013, senior executives and sales personnel of the StarKist Defendants, Bumble Bee and the COSI Defendants exchanged e-mails and had telephone conversations about discounting and promotional practices and terms for the sale of canned tuna to customers. As part of these e-mails and telephone conversations, these senior executives and sales personnel of Defendants assured each other that they would not compete regarding the pricing and sale of canned tuna sold to customers.

193. 

194.

79

**Defendants' Communications in Furtherance of the Conspiracy After 2013**

195.   Defendants and co-conspirators collusive activities regarding canned tuna continued after 2013.

**Defendants' Conspiracy Was Effective**

196.   Defendants' and co-conspirators' conspiracy alleged in this First Amended Complaint was effective. For example, and without limitation, Bumble Bee's Lischewski observed in 2012 that canned tuna prices had increased more than 40% in eighteen months during 2011 and 2012.

197.   As a proximate result of this conspiracy, and during the time period relevant to Plaintiff's claims, Defendants and co-conspirators charged Plaintiff and others in the United States supracompetitive prices (*i.e.*, prices above a competitive level) for canned tuna.

198.   Defendants and co-conspirators' conspiracy alleged in this First Amended Complaint overcharged Plaintiff on canned tuna that Plaintiff directly

80

purchased from one or more Defendants and co-conspirators regardless of whether the conspiracy price increase was on Defendants' list or net price of canned tuna. This is because Plaintiff directly purchased canned tuna from Defendants and co-conspirators, and Defendants and co-conspirators' collusive manipulation of canned tuna list and net prices had an adverse effect on the price each Plaintiff paid for canned tuna.

199.   As alleged in this First Amended Complaint, during the conspiracy, Defendants and co-conspirators agreed on the timing and amount of canned tuna price increases as reflected in price announcements. They were successful in achieving these price increases, which enabled them to impose supracompetitive prices on Plaintiff and others. This was because Defendants knew during the conspiracy that all of them were increasing canned tuna prices (or offering the same or similar prices); and the announced canned tuna price increases were higher than would have occurred if, in the absence of the conspiracy, each Defendant had competed and independently and unilaterally crafted its own price increase announcements. Defendants' coordinated canned tuna price increase announcements provided them with a higher, unified starting point for imposing canned tuna prices on Plaintiff and others than would have resulted if each Defendant had independently and unilaterally set its own price increases (if at all).

AWG'S FIRST AMENDED COMPLAINT

## DOJ INVESTIGATION AND AMNESTY APPLICATION

200.   A criminal antitrust investigation into Defendants' price-fixing conspiracy appears to have begun in July 2015, following Thai Union's announcement of its intention to acquire Bumble Bee for $1.5 billion.

201.   On December 3, 2015, Thai Union and Bumble Bee notified the DOJ that the proposed acquisition was being abandoned.   The decision to cancel the transaction was due directly to the DOJ's antitrust investigation and the companies' potential liability for anticompetitive behavior.

202.   The DOJ's criminal investigation of Defendants has resulted in guilty pleas for violations of federal antitrust laws. At the date of filing, the following high-placed sales executives involved in canned tuna pricing have pleaded guilty to criminal violations of 15 U.S.C. § 1:

(a)    Walter Scott Cameron, Senior Vice President of Sales for Bumble Bee (pleaded guilty on November 7, 2016);

(b)    Kenneth Worsham, Senior Vice President of Trade Marketing for Bumble Bee (pleaded guilty on December 21, 2016); and

(c)    Stephen L. Hodge, Senior Vice President of Sales for StarKist (pleaded guilty on June 28, 2017).

203.   The criminal Informations for all three executives state that beginning as early 2011 and continuing until or about 2013, the individuals and their coconspirators "knowingly entered into and engaged in a combination and conspiracy to fix, raise, and maintain the prices of packaged seafood sold in the United States."

204.   The Informations state that the exact dates of the conspiracy remain "unknown" to the DOJ.   They further provide that each defendant's conduct was an unreasonable restraint of interstate commerce in violation of Section 1 of the

82

Sherman Act, and specify that the "substantial terms" of the unlawful conduct "were to fix, raise, and maintain prices of packaged seafood." The Informations further specify that "[p]ackaged seafood includes shelf-stable tuna."

205.   The Informations for all three executives further state that the "means and methods" of the conspiracy included (a) engaging in conversations and discussions and attending meetings with representatives of "other major packaged-seafood-producing firms," (b) agreeing and reaching "mutual understandings" during these conversations, discussions and meetings to fix, raise and maintain the prices of packaged seafood sold in the United States, and (c) "negotiat[ing] prices and issu[ing] price announcements for packaged seafood in accordance with the agreements and mutual understandings reached."

206.   The Informations note, however, that "various business organizations" not made defendants in the Informations "participated as coconspirators in the offense charged in this Information."

207.   In ¶ 4(b) of each of Mr. Cameron's, Mr. Worsham's, and Mr. Hodge's Plea Agreements, each admits that:

> During the relevant period, the defendant participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood, the primary purpose of which was to fix, raise, and maintain the prices of packaged seafood sold in the United States. In furtherance of the conspiracy, the defendant engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms. During these conversations, discussions, and meetings, agreements and mutual understandings were reached to fix, raise, and maintain the prices of packaged seafood sold in the United States.

AWG'S FIRST AMENDED COMPLAINT

208.   The maximum penalties for each of the executives' crimes include imprisonment for 10 years and fines of up to the greater of $1 million or twice the gross pecuniary gain to the conspirators, or loss caused to the victims, derived from the illegal price-fixing conspiracy.

209.   However, the Plea Agreements for all three executives recommend a significant downward departure from those maximums.   The Plea Agreement for Walter Scott Cameron recommends a reduced penalty "because of the defendant's substantial assistance in the government's investigation and prosecutions of violations of federal criminal law in the packaged-seafood industry."   It specifically recommends a greatly reduced prison term and a $25,000 fine.

210.   Worsham's and Hodge's Plea Agreements recommend downward departures based on their agreement to "cooperate fully and truthfully with the United States in the prosecution of this case, the current federal investigation of violations of federal antitrust and related criminal laws involving the production or sale of packaged seafood in the United States," and other related investigations. As with Cameron's, those Plea Agreements recommend a reduced prison term and a $25,000 fine.

211.   Worsham will be sentenced on September 28, 2018.   Upon information and belief, Cameron and Hodge do not yet have Sentencing Hearings scheduled.

212.   On May 8, 2017, the DOJ announced that Bumble Bee itself had agreed to plead guilty to price-fixing shelf-stable tuna products in the United States between 2011 and 2013.

213.   In addition to agreeing to plead guilty, Bumble Bee agreed to pay a criminal fine of $25 million for its criminal conduct. The fine will increase to a

84

maximum of $81.5 million, to be paid by Defendant Big Catch Cayman, if Bumble Bee is sold.

214.   Both fines are below the DOJ's guideline fine range of $113.5 million.   According to the DOJ's Sentencing Memorandum, the downward departure was justified both because Bumble Bee has provided and will continue to provide substantial assistance and cooperation to the DOJ in its ongoing investigation into the conspiracy and because any higher fine would have "substantially jeopardize[ed] the continued viability of the organization." Indeed, the Sentencing Memorandum explicitly noted the ongoing related multidistrict litigation pending before The Honorable Janis Sammartino, United States District Judge for the Southern District of California, stating that "a fine reduction is required to the extent a guidelines fine would impair the defendant's ability to make restitution to victims in the civil lawsuits."

215.   The Honorable Edward M. Chen, United States District Judge for the Northern District of California, accepted Bumble Bee's guilty plea and entered judgment against it under the terms recommended by the DOJ on August 7, 2017.

216.   Bumble Bee's cooperation will very likely provide additional evidence in support of the allegations in this Complaint, evidence that will be uncovered through the course of discovery.

217.   On September 11, 2017, in a letter to The Stock Exchange of Thailand, Thai-Union announced that Tri-Union has received "conditional leniency" under the DOJ's "Corporate Leniency Program" with respect to the DOJ's investigation into the price-fixing conspiracy alleged herein.   The letter states:   "Provided Tri-Union continues to fully cooperate with the DOJ, Tri-Union's conditional leniency status means that neither Tri-Union nor any

AWG'S FIRST AMENDED COMPLAINT

1  cooperating executives or employees within the scope of the [conspiracy alleged

2  herein] will face criminal fines, jail time or prosecution."

3  218.   First implemented in 1978, the DOJ's Corporate Leniency Program

4  "allows corporations…involved in antitrust crimes to self-report and avoid

5  criminal convictions and resulting fines and incarceration," provided that the

6  corporation is the first corporate conspirator to confess, it fully cooperates with the

7  DOJ's investigation, and meets certain other conditions.

8  219.   The Corporate Leniency Program includes two types of leniency:

9  Type A and Type B.   Type A Leniency is available only before the DOJ has

10  received any information about the alleged illegal conduct, while Type B Leniency

11  is available when the DOJ uncovers wrongdoing and then uses a company's

12  cooperation to build its case.   Because the DOJ first uncovered evidence of the

13  conspiracy alleged herein as part of its review of the Tri-Union and Bumble Bee

14  consolidation, it is likely that Tri-Union is proceeding under Type B Leniency.

15  220.   In order to qualify for Type B Leniency, a company must, among

16  other things, be "the first one to come forward and qualify for leniency with

17  respect to the illegal activity being reported," "report[] the wrongdoing with candor

18  and completeness[,] and provide[] full, continuing and complete cooperation that

19  advances the [DOJ] in its investigation."   In addition, a company may qualify for

20  leniency only if the "confession of wrongdoing is truly a corporate act, as opposed

21  to isolated confessions of individual executives or officials."

22  221.   Critically, an applicant for leniency must *admit* to a criminal violation

23  of the antitrust laws *before* receiving a conditional leniency letter.   "Applicants that

24  have not engaged in criminal violations of the antitrust laws have no need to

25  receive leniency protection from a criminal violation and will not qualify for

26  leniency through the Leniency Program."

27

28                                                        86

222.   The DOJ "may also insist on interviews with key executives of the applicant who were involved in the violation before issuing the conditional leniency letter. A company that argues that an agreement to fix prices, rig bids, restrict capacity, or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement generally has no made a sufficient admission of a criminal antitrust violation to be eligible for leniency."

223.   Thus, Thai Union's public announcement that Tri-Union has received "conditional leniency" from the DOJ confirms that Tri-Union has *admitted* to a criminal antitrust violation arising out of its pricing of canned tuna and likely means that the DOJ has conducted interviews with high-level Thai Union and/or Tri-Union executives involved in the conspiracy who also have admitted to the conspiracy and have provided information and evidence about it. And because only the first member of conspiracy to come forward is entitled to conditional leniency, Thai Union's announcement indicates that Tri-Union was the initial whistleblower regarding the conspiracy.

224.   On May 16, 2018, Defendant Christopher Lischewski, Bumble Bee's longtime CEO and President, was indicted by a federal grand jury.

225.   Paragraph 7 of the Indictment states:

Beginning in or about November 2010 and continuing until in or about December 2013, the exact dates being unknown to the Grand Jury...the defendant and coconspirators knowingly entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing the prices for packaged seafood sold in the United States. The combination and conspiracy engaged in by the defendant and coconspirators was an

AWG'S FIRST AMENDED COMPLAINT

1    unreasonable restraint of interstate commerce in violation of Section 1 of the

2    Sherman Act (15 U.S.C. § 1).

3    226.   Paragraph 10 of the Indictment describes the "Means and Methods of

4    the Conspiracy," which include that Lischewski and coconspirators:   participated

5    in meetings, conversations, and communications concerning prices of packaged

6    seafood to be sold in the United States during which he agreed on prices and to

7    limit product categories; collected, exchanged, monitored, and discussed

8    information on prices; issued price announcements and pricing guidance for

9    packaged seafood in accordance with the agreements reached; sold packaged

10   seafood in the United States at collusive and noncompetitive prices; and employed

11   measures to conceal their conduct, including, but not limited to, using code when

12   referring to coconspirators, meeting at offsite locations to avoid detection, limiting

13   distribution and discouraging retention of documents reflecting conspiratorial

14   contacts, and providing misleading justifications for prices.

15   227.   On May 25, 2018, Lischewski resigned from his position as CEO of

16   Bumble Bee and took a leave of absence from the company.

17
## DISCOVERY IS NECESSARY TO DETERMINE THE FULL SCOPE OF
18
## THE CONSPIRACY

19   228.   Discovery is necessary to determine the full scope of the conspiracy,

20   including the time frame, products and participants. Plaintiff reserve the right to

21   amend or supplement this First Amended Complaint to add other Defendants,

22   claims, time period, products or other allegations based upon discovery and further

23   investigation. For example, discovery is necessary to determine whether and the

24   extent to which, if at all, Defendants and co-conspirators conspired on other

25   packaged seafood products – including salmon, shrimp, crab, clams, oysters,

26   sardines and/or mackerel. While StarKist did not produce or sell many of these

27

28                                          88

other packaged seafood products, Bumble Bee and COSI did, and their packaged seafood price increases in 2008, 2011 and 2012 (among others) warrant further scrutiny in discovery.

## TOLLING OF THE STATUTE OF LIMITATIONS

229. The statutes of limitation as to Defendants and their co-conspirators' continuing antitrust violations alleged in this First Amended Complaint were tolled because of one or more of the following events:

(a) The pendency of one or more Class Action Complaints, and any Amendments, against Defendants and their co-conspirators for conspiring to fix prices of packaged seafood products (including canned tuna) tolled the running of the statute of limitations on Plaintiff's claims; and/or

(b) On December 7, 2016, the DOJ filed a Criminal Complaint (or Information) charging Cameron with the criminal offense of violating the U.S. antitrust laws by participating in a conspiracy to fix, raise and maintain the prices of packaged seafood sold in the United States. The Cameron criminal proceedings, and others to follow regarding the packaged seafood (including canned tuna) conspiracy, tolls the running of the statutes of limitation on Plaintiff's claims during the criminal proceedings and for one year thereafter by operation of federal statute, under 15 U.S.C. § 16(i).

(c) Defendants' affirmative acts of fraudulent concealment of the conspiracy prevented Plaintiff from having notice of their claims more than four years before filing their initial Complaint, and tolled the statute of limitations on Plaintiff's claims.

230. Each of the overt acts in furtherance of the conspiracy alleged in this First Amended Complaint was done with the purpose of concealing the conspiracy and preventing Plaintiff and other purchasers of canned tuna (and other packaged

89

seafood products) from learning about the conspiracy's existence. Accordingly, Plaintiff did not know or reasonably suspect the existence of their claims more than four years before filing their initial Complaint, nor were they aware of any facts more than four years before filing their initial Complaint that would have put them on reasonable notice of their claims. More than four years before Plaintiff filed their initial Complaint, Defendants and their co-conspirators fraudulently concealed the existence of each Plaintiff's antitrust claim so that each Plaintiff, acting as a reasonable person, did not know of the existence of its claim at the time.

231. During the time period relevant to Plaintiff's claims, including the time period more than four years before Plaintiff filed their initial Complaint, Defendants and their co-conspirators concealed the existence of Plaintiff's antitrust claims from Plaintiff as a result of the self-concealing nature of the conspiracy; and/or because Defendants and their co-conspirators engaged in affirmative and deceptive acts of concealment as described below. As a result, Plaintiff did not know, and through the exercise of due diligence (which they exercised) could not have known, about the existence of their antitrust claims more than four years before filing their initial Complaint.

232. Notwithstanding the self-concealing nature of their conspiracy, during the time period relevant to Plaintiff's claims, including more than four years before Plaintiff filed their initial Complaint, Defendants and their co-conspirators affirmatively misled Plaintiff by wrongfully and affirmatively concealing the existence of Plaintiff's antitrust claims from Plaintiff. In addition to the overt acts alleged above that were undertaken with the purpose of concealing the conspiracy, Defendants took additional steps to conceal their illegal conduct from Plaintiff and others. For example, and without limitation:

AWG'S FIRST AMENDED COMPLAINT

(a)     During the conspiracy alleged in this First Amended Complaint, and as alleged above, Defendants and co-conspirators met in secret to affirmatively conceal the existence of the conspiracy from those not involved in it.

(b)     During the conspiracy alleged in this First Amended Complaint, Defendants and co-conspirators used personal e-mail for conspiracy communications in order to avoid detection of the conspiracy by those not involved in it. (Defendants did not typically use private e-mail accounts for any other business purposes and instead used their corporate e-mail accounts).

AWG'S FIRST AMENDED COMPLAINT



(c)     During the conspiracy alleged in this First Amended Complaint, Defendants and co-conspirators used misleading subject lines on e-mails to affirmatively conceal the conspiratorial nature of their communications from those not involved in the conspiracy.

(d)     During the conspiracy alleged in this First Amended Complaint, Defendants and co-conspirators met in places outside their offices to communicate about the conspiracy in order to affirmatively conceal the fact of their meeting and the existence of the conspiracy from those not involved in it.

AWG'S FIRST AMENDED COMPLAINT



(e)     During the conspiracy alleged in this First Amended Complaint, Defendants and co-conspirators applied warnings on documents not to disclose to others or instructions about transmission in order to affirmatively conceal the existence of the conspiracy from those not directly involved in it.

AWG'S FIRST AMENDED COMPLAINT



(f)

(g)     During the conspiracy alleged in this First Amended Complaint, Defendants and co-conspirators affirmatively concealed the existence of the

94

conspiracy from Plaintiff and others by providing pretextual explanations for Defendants and co-conspirators' collusive canned tuna can size reduction, price increases and other conspiracy activities. These explanations, while seemingly true on their face at the time, were actually intended by Defendants and co-conspirators to deflect attention from and conceal their conspiracy and to create the illusion of competition when, in fact, price competition was being systematically suppressed and eliminated. As such, these explanations were false and pretextual. For example, and without limitation:



AWG'S FIRST AMENDED COMPLAINT

1
2
3 iv.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



96

AWG'S FIRST AMENDED COMPLAINT

v.

vi.       Defendants and their co-conspirators cited their own predictions about where the tuna market was heading as the basis for a price increase. Because these future predictions were unverifiable by Plaintiff, they provided Defendants with pretexts that allowed for the implementation of collusive price increases. For example, on January 18, 2012, the COSI Defendants wrote to their customers, including Plaintiff, that "[h]igh fish prices have made it necessary to increase the list price of both light and white [tuna]. All indicators are that these higher raw material costs will not return to levels that were seen as recently as a year ago." Upon information and belief, this pretextual explanation was discussed between or among Defendants through e-mail and telephone

97

communications in the weeks and months that preceded COSI's announcement.

vii.     In a letter to customers (including Plaintiff) dated March 30, 2012, Bumble Bee's Cameron predicted that a number of "unforecasted elements," some of which would occur "in the second half of 2012," combined to require Bumble Bee to increase its own pricing.

viii.    In a March 30, 2012 interview, IS Cho explained the justification the StarKist Defendants were giving to retailers in pretextual support of the collusive price increases: "We had a tough year last year and we have taken a lot of price increases ... We are fixing it and retailers do understand.... The tuna industry is not going to offer a low-priced and quality product and lose money on it."

ix.     In a presentation to Kroger on April 19, 2013, Bumble Bee justified its canned tuna price increase by forecasting that the prices of skipjack and albacore would rise approximately $120 and $200 per metric ton, respectively, over the next six months.

x.      Between 2011 and 2013, Defendants repeatedly gave pretextual justifications to Plaintiff about their supposed inability to offer certain discounting on promotional terms. For example, and without limitation, in a presentation to Ahold in July 2013, the StarKist Defendants stated:  "we will aggressively manage costs and improve productivity to maintain competitive pricing aligned with market conditions."

AWG'S FIRST AMENDED COMPLAINT

xi.      Each of the foregoing examples of Defendants' explanations for canned tuna price increases was pretextual and false or misleading, as each price increase was the result of the conspiracy. The foregoing examples are representative of the pretextual and false or misleading explanations that Defendants and their co-conspirators provided Plaintiff during the conspiracy, including more than four years before Plaintiff filed its initial Complaint, in order to affirmatively conceal the conspiracy from Plaintiff and others.

(h)      During the conspiracy alleged in this First Amended Complaint, Defendants and co-conspirators affirmatively concealed the existence of the conspiracy from Plaintiff and others by using trade association meetings, which they attended, to create the illusion that they were meeting for legitimate purposes when, in fact, they were using these meetings as a cover to conceal the conspiracy from others not involved in it. These trade associations include the Tuna Council and the ISSF.  For example, and without limitation, in 2010, 2011 and 2012, Defendants, through the Tuna Council, partnered with the Thai Food Processors Association – of which TUG was a member – to plan and then launch a U.S. advertising campaign called "Tuna the Wonderfish," ostensibly to stimulate demand for canned tuna in the United States. ████████████████ ███████████████████████████ (The campaign was unsuccessful.)

AWG'S FIRST AMENDED COMPLAINT



(i)    During the conspiracy alleged in this First Amended Complaint, Defendants and co-conspirators affirmatively concealed the existence of the conspiracy from those not involved in it by confining knowledge and communication in furtherance of the conspiracy to a limited number of high ranking and/or key employees of each Defendant and co-conspirator, and limiting the creation of documents reflecting the existence of the conspiracy.

233.    During the conspiracy, including more than four years before Plaintiff filed their initial Complaint: Defendants and their co-conspirators' affirmative acts of concealment were intended by them to conceal the existence of their unlawful actions from Plaintiff; and Plaintiff were unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of concealment.

234.    As a direct result of Defendants' and their co-conspirators' affirmative and fraudulent acts of concealment alleged above, each Plaintiff did not have

AWG'S FIRST AMENDED COMPLAINT

actual or constructive knowledge of its antitrust claim, or the facts that might reasonably have led any Plaintiff (or a reasonable purchaser in Plaintiff's position) to discover or suspect that it had the antitrust claim against Defendants and their co-conspirators alleged in this First Amended Complaint, more than four years before Plaintiff filed their initial Complaint. Before then, no Plaintiff was aware of the facts that would have alerted it (or would have alerted a reasonably diligent purchaser in each Plaintiff's position) of the need to investigate whether it had the antitrust claim alleged in Plaintiff's initial Complaint or their First Amended Complaint.

235.   Further, throughout the conspiracy, each Plaintiff engaged in due diligence in seeking to ensure that it was receiving competitive pricing for canned tuna. For example and without limitation, each Plaintiff used a method of purchasing canned tuna – including, for example and without limitation, seeking price quotes and bids from their suppliers and/or investigating reasonably available public information – that caused it to believe in good faith at the time that it was receiving competitive prices for the canned tuna that it purchased from Defendants and their co-conspirators.   Upon learning of DOJ's investigation into Defendants' potential antitrust violations, Plaintiff diligently investigated Defendants' conduct and ultimately concluded that each of them had a claim. Unfortunately, as alleged in this First Amended Complaint, as a proximate result of the conspiracy, Defendants and their co-conspirators overcharged each Plaintiff for canned tuna during the time period relevant to each Plaintiff's claim despite each Plaintiff's due diligence during the alleged conspiracy, including the time period more than four years before Plaintiff filed their initial Complaint.

236.   Defendants and their co-conspirators' fraudulent concealment of their unlawful conduct tolled the statute of limitations for each Plaintiff's claim.

237.    Plaintiff's claims have been brought within the applicable statute of limitations period.

## LION CAPITAL

### Lion Directly Participated in the Conspiracy

238.    Lion directly participated in the conspiracy alleged in this First Amended Complaint and purposefully directed this conduct at the United States (including the forum State). Lion was aware of the conspiracy, took acts in furtherance of the conspiracy, and knowingly accepted the proceeds of Bumble Bee's unlawful conduct.

239.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ It bears noting that later, when the United States Department of Justice ("DOJ") conducted its due diligence review of TUG's announced plan in late 2014 to purchase Bumble Bee from Lion, DOJ discovered by late 2015 that "the parties knew or should have known from the get go – that the [packaged seafood] market is not functioning competitively today…" (At the time, TUG and Bumble Bee called off their deal.) In other words, a sophisticated entity with non-public access to Bumble Bee's executives (if they were truthful) and records regarding the company's packaged seafood business, pricing and communications with competitors would have discovered reasonably soon, i.e., "from the get go," the existence of the conspiracy. ███████████████████████████████████████████████████████████████████

AWG'S FIRST AMENDED COMPLAINT



240.

241.

103



242.

243.

244.

245.

104

246. 

247.

248.

105



249.

250.

106



251.

AWG'S FIRST AMENDED COMPLAINT



252.

253.

254.

108



AWG'S FIRST AMENDED COMPLAINT



AWG'S FIRST AMENDED COMPLAINT



256.

AWG'S FIRST AMENDED COMPLAINT



257.

258.

259.

112



260.

**Lion is Vicariously Liable For Bumble Bee's Conspiratorial Conduct Under an Alter Ego Theory**

261.   As an additional or alternative basis for Lion's liability as alleged in this pleading, Lion is vicariously liable to Plaintiff because Bumble Bee is Lion's alter ego. First, Lion is vicariously liable for Bumble Bee's conduct under an alter ego theory because Lion undercapitalized Bumble Bee at the time of the acquisition in 2010, and kept Bumble Bee undercapitalized thereafter. This undercapitalization alone is a legal basis to hold Lion vicariously liable for Bumble Bee's unlawful conduct. In the alternative, Lion is vicariously liable for Bumble Bee's conspiratorial actions because a unity of interest exists between Lion and Bumble Bee, and an inequitable result would occur if Lion were not liable for Bumble Bee's misconduct.  Accordingly, justice dictates holding Lion vicariously liable for Bumble Bee's conspiratorial activities.

**1.     Undercapitalization**

262.

5

113

1
2
3
4
5
6
7
8
9  263.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



114

AWG'S FIRST AMENDED COMPLAINT

264.

265.

266.

267.



115



268.

6

AWG'S FIRST AMENDED COMPLAINT



269.

270.

**2.    Unity of Interest and Inequitable Result**

271.

272.

117



273.   In fact, Lion's website advertises Lion as a private equity firm that closely manages the business affairs of the companies in which it invests. Lion's website states that Lion "ensure[s] that [its] companies have the best management talent to execute the vision that we develop in a collaborative partnership" while never forgetting "the responsibility for successful outcomes in our companies rests with us [Lion]." Lea, Lion's founder, echoed this sentiment in an interview on the website: "If all they [companies Lion acquires] want is a check, there are plenty of private equity firms that are delighted to write you a check and let you get on with your business. That's not us…We're not good at that. What we're good at doing is being your partner." Further, a video on the Lion website states that: "We [Lion Capital] built a team with an intimate knowledge of the way consumers and brands interact, allowing us to work with companies in a very different way to the average private equity firm…We work closely with management to see exactly what a brand is capable of achieving, and then take it to new heights…. We focus solely on retail and consumer businesses so our team is uniquely positioned to work with

118

AWG'S FIRST AMENDED COMPLAINT

1  management to identify the right strategies for revitalizing operations." (Emphasis

2  added.)

3       274.



22       275.

AWG'S FIRST AMENDED COMPLAINT



276.

277.   Accordingly, Lion and Bumble Bee share a unity of interest and a unity of purpose.

278.

279.

AWG'S FIRST AMENDED COMPLAINT

280.

█████████████████████████

281.   For all of these reasons, Bumble Bee and Lion's separate corporate existences should be disregarded because it would result in an injustice.

**Lischewski is Liable for his Role in the Conspiracy**

282.   Lischewski knowingly participated in, facilitated, and coordinated the conspiracy as shown by the facts alleged throughout this First Amended Complaint. Lischewski profited substantially from the conspiracy in numerous ways. He used his role to reap unlawful profits by selling Bumble Bee numerous times throughout the conspiracy period. He used Bumble Bee as his personal private banker, authorizing loans to himself from Bumble Bee even while Bumble Bee was woefully undercapitalized.

█████████████████████████

283.   Additionally, Lischewski took steps to conceal his own involvement (as well as Lion's involvement) in the conspiracy. Although Bumble Bee produced millions of pages of documents to Plaintiff in this case, crucial e-mails between Lischewski and Lion were not produced by Bumble Bee, and Plaintiff did not obtain these documents until they executed a subpoena on Lion. Upon information

AWG'S FIRST AMENDED COMPLAINT

and belief, Lischewski deleted these incriminating e-mails in an attempt to thwart Plaintiff's (and DOJ's) investigation of his unlawful conduct.

284.   For this conduct, and as alleged above, Lischewski has been criminally indicted by a federal grand jury.

## EFFECTS OF THE DEFENDANTS' ILLEGAL COURSE OF CONDUCT

285.   Defendants' conspiracy had the following effects, among others:

(a)   Price competition among the Defendants in the sale of shelf-stable tuna was restrained and suppressed;

(b)   Prices of shelf-stable tuna manufactured and sold in the United States by the Defendants were fixed, raised, maintained and/or stabilized at supra-competitive levels; and

(c)   Direct purchasers of shelf-stable tuna, including Plaintiff, were deprived of the benefits of free and open competition in the purchase of shelf-stable tuna.

286.   Defendants' contract, combination, and conspiracy described herein consists of a continuing agreement, understanding and concert of action among the Defendants, the substantial terms of which were to artificially fix, raise, maintain, and/or stabilize prices paid by Plaintiff and other purchasers for shelf-stable tuna in the United States.

287.   In formulating and effectuating the contract, combination, or conspiracy, Defendants in fact did those things that they unlawfully combined and conspired to do, including, among other things:  agreeing to artificially fix, raise, maintain and/or stabilize prices for shelf-stable tuna in the United States, and implementing and monitoring the conspiracy among the cartel members.

AWG'S FIRST AMENDED COMPLAINT

288.   The activities described above have been engaged in by Defendants for the purpose of effectuating the unlawful agreement to fix, raise, maintain and/or stabilize the prices for shelf-stable tuna sold in the United States.

289.   As a direct and proximate result of the contract, combination, or conspiracy alleged herein, Plaintiff was, and continues to be, damaged in its business or property in that it paid supra-competitive prices for shelf-stable tuna, higher than that which it would have paid in the absence of the contract, combination, or conspiracy.

## CAUSES OF ACTION

## COUNT I

### Conspiracy to Fix Prices in Violation of the Sherman Act
### 15 U.S.C. § 1
### (Against All Defendants)

290.   Plaintiff incorporates by reference the allegations above, as if fully set forth herein.

291.   Beginning at least as early as May 2004 and continuing through at least July 2015, Defendants engaged in a continuing agreement, understanding and conspiracy to manipulate the price of shelf-stable tuna in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

292.   Defendants each gave their assent to, and acted in furtherance of, activities prohibited by the Sherman Act.   Each Defendant is fully and jointly liable for all acts in furtherance of the conspiracy committed by each other co-conspirator, and by each co-conspirator's agents, employees, representatives, trade groups and other associates, whether named or unnamed in this Complaint.

293.   The contract, combination, and conspiracy among Defendants consisted of a continuing course, pattern, and practice of conduct regarding the

production, pricing, and sale of shelf-stable tuna, the substantial terms and purpose of which were:

(a)   To fix, stabilize, maintain and/or raise prices of shelf-stable tuna in the United States and elsewhere; and/or

(b)   To control or reduce the output of shelf-stable tuna in the United States and elsewhere.

294.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in one or more of the following overt acts:

(a)   They agreed to exchange and did exchange current and future price information and private and proprietary business information about shelf-stable tuna sold in the United States and elsewhere;

(b)   They agreed to coordinate and did coordinate price levels and price movements of shelf-stable tuna sold in the United States and elsewhere;

(c)   They agreed on prices and price levels of shelf-stable tuna sold in the United States and elsewhere;

(d)   They agreed to control or reduce, and did control or reduce, the output of shelf-stable tuna in the United States and elsewhere; and

(e)   They agreed to limit and or reduce the marketing of their products, including by agreeing not to advertise their products as "FAD free."

295.   Defendants entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including without limitation, participating in conversations and meetings in the United States and/or elsewhere to discuss the prices of shelf-stable tuna to be sold and/or the volume of shelf-stable tuna to be produced in the United States and elsewhere; participating in conversations and attending meetings in the United States and/or elsewhere concerning implementation of and adherence to their conspiracy; issuing

AWG'S FIRST AMENDED COMPLAINT

1   price announcements and/or price quotations in the United States and elsewhere in

2   accordance with the conspiracy; and/or exchanging information about the sale of

3   shelf-stable tuna in the United States and elsewhere.

4        296.   As a result of Defendants' conspiracy in violation of Section 1 of the

5   Sherman Act, 15 U.S.C. §, and during the Relevant Period:

6          (a)   Price competition in the sale of shelf-stable tuna among

7   Defendants to Plaintiff and others has been restrained, suppressed and eliminated;

8          (b)   Prices for shelf-stable tuna sold by Defendants have been

9   raised, fixed, maintained, and/or stabilized at artificially high and noncompetitive

10  levels throughout the United States and elsewhere; and

11         (c)   Plaintiff has been deprived of the benefit of free and open

12  competition.

13       297.   Plaintiff has been injured in its business or property by reason of

14  Defendants' antitrust violations in amounts not yet determined.  Plaintiff's injuries

15  as a direct purchaser of shelf-stable tuna are injuries of the type that the antitrust

16  laws were designed to prevent and flow from that which makes Defendants' acts

17  unlawful.

18       298.   Because Defendants controlled approximately 70-80% of the Relevant

19  Market during the Relevant Period, their collective price increases provided

20  sufficient cover, or a "price umbrella," for non-cartel companies who sold shelf-

21  stable tuna without fear of losing sales or market share.

22

23

24

25

26

27

28

AWG'S FIRST AMENDED COMPLAINT

## COUNT II

### Violation of the Kansas Restraint of Trade Act
### K.S.A. 50-101 et seq.
### (Against All Defendants)

299.   Plaintiff incorporates by reference the allegations above, as if fully set forth herein.

300.   Beginning at least as early as May 2004 and continuing through at least July 2015, Defendants engaged in a continuing agreement, understanding, arrangement, contract, trust, combination and conspiracy to manipulate the price of shelf-stable tuna in the United States, in violation of the Kansas Restraint of Trade Act K.S.A. 50-101 *et seq.*

301.   Defendants each gave their assent to, and acted in furtherance of, activities prohibited by the Kansas Restraint of Trade Act.  Each Defendant is fully and jointly liable for all acts in furtherance of the conspiracy committed by each other co-conspirator, and by each co-conspirator's agents, employees, representatives, trade groups and other associates, whether named or unnamed in this Complaint.

302.   Defendants' actions in violation of the Kansas Restraint of Trade Act include, but are not limited to, participating in a collusive agreement to artificially raise and maintain pricing on shelf-stable tuna through the implementation of coordinated price increases and/or supply manipulation.

303.   Defendants affirmatively concealed from Plaintiff and the general public the existence of their illegal understandings and agreements through misrepresentations and omissions regarding this conspiracy.

304.   As a direct and proximate result of Defendants' conduct, Plaintiff directly purchased shelf-stable tuna at prices higher than it would have paid and on

AWG'S FIRST AMENDED COMPLAINT

terms that are less favorable than would have been available in a competitive market.

305.   The anticompetitive effect of Defendants' illegal arrangements, contracts, agreements, combination, and conspiracy was to distort and/or artificially inflate the prices that Plaintiff paid for shelf-stable tuna.  Defendants' actions further restrained and controlled full and free competition in the market for shelf-stable tuna.

306.   Defendants' actions deprived Plaintiff of the right to make budgeting, accounting, resource allocations, and other financial and business decisions in a full and free competitive market for canned tuna.

307.   As a result of its purchases, Plaintiff thereby suffered loss, injury, and damage in an amount greater than $75,000.

308.   Plaintiff is entitled to recover in its capacity as a direct purchaser of canned tuna.

309.   Plaintiff seeks to recover treble the damages it sustained as a result of Defendants' conduct, as well as attorneys' fees, costs, and any additional remedies provided by law.

310.   There exists a significant threat of injury to Plaintiff because Defendants' anticompetitive actions continue through today and/or are likely to reoccur.

311.   Under K.S.A. 50-161, Plaintiff therefore seeks to have Defendants enjoined from directly or indirectly continuing the conspiracy and/or the agreement to artificially manipulate and inflate the price of shelf-stable tuna.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

AWG'S FIRST AMENDED COMPLAINT

1. Declaring that the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants, were in violation of Sections 1 of the Sherman Act, 15 U.S.C. § 1 and the Kansas Restraint of Trade Act, K.S.A. 50-101, et seq.;

2. A jury verdict against Defendants, jointly and severally, in treble the amount of Plaintiff's damages;

3. Awarding to Plaintiff its attorneys' fees, costs, and interest as allowable by law; and

4. Entering a permanent injunction prohibiting Defendants from future violations of the antitrust laws and from practices that facilitate those violations.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

Dated: August 10, 2018

Respectfully Submitted,

**STUEVE SIEGEL HANSON LLP**

/s/ Patrick J. Stueve
Patrick J. Stueve (KS 13847)
Steve N. Six (KS 16151)
C. Curtis Shank (KS 26306)
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:  816-714-7100
Facsimile:  816-714-7101
stueve@stuevesiegel.com
six@stuevesiegel.com
shank@stuevesiegel.com

*Counsel for Plaintiff Associated Wholesale Grocers, Inc.*

## SIGNATURE ATTESTATION

Under Section 2.f.4 of the Court's CM/ECF Administrative Policies, I hereby certify that authorization for filing this document has been obtained from each of the other signatories shown above, and that all signatories have authorized placement of their electronic signature on this document.

## **CERTIFICATE OF SERVICE**

I certify that on August 10, 2018, I filed the foregoing document with the Clerk of the Court for the United States District Court, Southern District of California, by using the Court's CM/ECF System, which sends notifications of such filings to all counsel of record.

/s/ Patrick J. Stueve
Patrick J. Stueve
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:  816-714-7100
Facsimile:  816-714-7101
stueve@stuevesiegel.com

130