UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No.: 15-MD-2670 JLS (MDD) |
| | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS** |
| | (ECF Nos. 997, 999, 1248) |

Presently before the Court are three motions to dismiss. First, Defendants Lion Capital LLP, Big Catch Cayman LP, and Lion Capital (Americas), Inc. (the "Lion Defendants," "Lion Entities," or "Defendants") filed a Motion to Dismiss the Cherokee Nation's Complaint, (ECF No. 997). Plaintiff the Cherokee Nation's filed an Opposition to, ("Nation Opp'n," ECF No. 1233), the Motion.

Second, the Lion Defendants filed a Motion to Dismiss the Bashas' Plaintiffs' Complaint, ("MTD," ECF No. 999).[1] Plaintiffs Bashas' Inc., Marc Glassman, Inc., and 99 Cents Only Stores LLC's ("Bashas Plaintiffs") filed an Opposition to, ("Bashas Opp'n," ECF No. 1247), the Motion. Defendants filed a Reply in Support of, (ECF No. 1275), their

---

[1] The Lion Defendants' three motions are substantially similar. For ease of reference, all citations to Defendants' memorandum of points and authorities will be to the sealed document located at ECF No. 1005-1. However, the Court will reference Defendants' second and third motions, located at ECF No. 1006-1 and ECF No. 1254-1 to the extent those briefs diverge from the Motion against the Bashas' Plaintiffs.

motions, which respond to both the Cherokee Nation's and the Bashas Plaintiffs' Opposition briefs.

Third, the Lion Defendants filed a Motion to Dismiss, ("Four Track MTD," ECF No. 1248), the operative complaints[2] filed by the Indirect Purchaser End Payer Plaintiffs ("EPPs"), the Commercial Food Preparer Plaintiffs ("CFPs"), the Direct Purchaser Class Plaintiffs ("DPPs"), and the Direct Action Plaintiffs ("DAPs"). Those Plaintiffs filed Responses in Opposition to the Motion, ("DAP Opp'n," ECF No. 1273; "EPP/CFP Opp'n," ECF No. 1279; "DPP Opp'n," ECF No. 1282), and Defendants filed a Reply in Support of, ("Four Track Reply," ECF No. 1295), their Motion.

The Court heard oral argument for all three motions on July 30, 2018. Having considered the parties arguments, the evidence, and the law, the Court rules as follows.

## BACKGROUND

The case concerns an alleged conspiracy to fix the prices of packaged seafood throughout the United States. Plaintiffs Bashas' Inc., Marc Glassman, Inc., and 99 Cents Only Stores LLC are businesses that have purchased packaged seafood from the three largest domestic producers of packaged seafood products. ("Bashas Compl.," No. 17-CV-2487, ECF No. 1, ¶¶ 16–18.)[3] Plaintiff the Cherokee Nation is a federally recognized sovereign Indian nation and brings this action in its proprietary capacity and under its *parens patriae* authority. (First Am. Compl. ("Nation FAC"), ECF No. 823, ¶¶ 11–12.)[4] The remaining Plaintiffs have been divided into four tracks: (1) Direct Action Plaintiffs, who are direct purchasers proceeding against Defendants individually; (2) Direct Purchaser Plaintiffs, who are direct purchasers proceeding on behalf of a putative class; (3) Indirect Purchaser Commercial Food Preparer Plaintiffs ("CFPs"), who are indirect purchasers proceeding on behalf of a putative class; and (4) Indirect Purchaser End Payer Plaintiffs

---

[2] These are the complaints located at ECF Nos. 894, 897, 908, 910–13, 915–16, 918, 920, 923, 925, 929, 930, 933, and 1208.
[3] The sealed version of the Bashas Complaint is located at ECF No. 6 in No. 17-CV-2487.
[4] The sealed version of The Cherokee Nation's First Amended Complaint is located at ECF No. 825.

("EPPs"), who are indirect purchasers proceeding on behalf of a putative class. The various civil actions relating to this conspiracy were consolidated in a multi-district litigation ("MDL") and centralized pretrial proceedings to this Court on December 9, 2015, (*see* Transfer Order, ECF No. 1).

This particular aspect of the MDL deals with three Defendants, who are specially appearing: Lion Capital LLP, Lion Capital (Americas), Inc., and Big Catch Cayman LP. Defendant Lion Capital LLP ("Lion Capital") is a British private equity firm organized under the laws of the United Kingdom ("U.K."). (Bashas Compl. ¶ 270; MTD 10.)[5] Lion Capital contends it does not have any offices, employees, or operations in the United States and its only U.S.-based asset is Lion Capital (Americas), Inc.[6] (Declaration of Simon Brown ("Brown Decl."), ECF No. 997-2, ¶ 6.)

Defendant Lion Capital (Americas), Inc. ("Lion Americas") is a Delaware corporation with its principal place of business in Santa Monica, California. (MTD 11.) Lion Americas moved its office from New York to Santa Monica in October 2012. Lion Americas provides investment advice regarding investments in North America to Lion Capital, which Lion Capital considers on behalf of the investment funds that it manages. (*Id.*)

Defendant Big Catch Cayman LP ("Big Catch") is a holding company organized under the laws of the Cayman Islands and has no offices or employees. (Bashas Compl. ¶ 272; MTD 11.) Big Catch's only assets are its interest in Bumble Bee Holdco SCA, a subsidiary and owner of Bumble Bee's equity, and its interest in an unrelated technology company. (MTD 11.) Plaintiffs allege that Lion Capital owns a majority share of Big Catch. (Bashas Compl. ¶ 272.)

/ / /

---

[5] Pin citations to docketed material refer to the CM/ECF page numbers electronically stamped at the top of each page.
[6] The parties dispute whether Lion Americas' office and employees belong to or are controlled by Lion Capital. (*See, e.g.*, Bashas Compl. ¶ 270.)

# I.    Pre-Purchase Activities and Lion's Purchase of Bumble Bee

The Bashas Plaintiffs allege that Lion Capital purchased Bumble Bee in December 2010 from a private equity firm, Centre Partners Management LLC, for $980 million. (*Id.* ¶ 270.) Plaintiffs further allege on information and belief that Lion Capital had access to Bumble Bee's financial and other records in the course of due diligence that it conducted for the acquisition. This, along with access to Bumble Bee senior executives, allegedly caused Lion Capital to learn of the ongoing conspiracy.[7] (*Id.* ¶ 277.) In November 2010, Lion Americas executive Eric Lindberg[8] told Bumble Bee CEO Christopher Lischewski that he was going to Asia to meet with representatives of both Dongwon and Thai Union, who are also defendants in this MDL. (*Id.* ¶¶ 20, 38, 278.) Lischewski responded to Lindberg saying a ███████████████████████████████████████ ████████████████████████████ (*Id.* (alteration in original).)

Lion Capital's purchase of Bumble Bee was through a leveraged buyout ("LBO") by taking out debt secured only by Bumble Bee's assets. (*Id.* ¶ 300.) Lion Capital structured the LBO by creating an acquisition company to borrow money to acquire the subsidiary, Bumble Bee, and then placed the debt on Bumble Bee's books. (*Id.*) Thus, when Lion Capital completed the transaction, Bumble Bee had total liabilities of ████

---

[7] Plaintiffs point to the Department of Justice's ("DOJ") statements with regard to an aborted attempt by Thai Union Group to purchase Bumble Bee in late 2014 and 2015. DOJ said that "the parties knew or should have known from the get go—that the [packaged seafood] market is not functioning competitively today." (Bashas Compl. ¶ 277 & n.9 (citing Dep't of Justice, Press Release No. 15-1487, *Chicken of the Sea and Bumble Bee Abandon Tuna Merger After Justice Department Expresses Serious Concerns*, https://www.justice.gov/opa/pr/chicken-sea-and-bumble-bee-abandon-tuna-merger-after-justice-department-expresses-serious (Dec. 3, 2015)).)

[8] Plaintiffs allege that Mr. Lindberg was both director of Lion Americas and a partner at Lion Capital. (Bashas Compl. ¶ 271.) The Bashas Plaintiffs also request the Court judicially notice a picture taken from Lion Capital's website as it existed on October 19, 2014, which depicts Mr. Lindberg and states he is a partner at Lion Capital. (Bashas Opp'n 13 n.5 (citing, e.g., *Erickson v. Neb. Mach. Co.*, No. 15-cv-1147-JD, 2015 WL 4089849, at *1 n.1 (N.D. Cal. July 6, 2015)).) Courts have taken judicial notice of the contents of publicly available web pages, available through the "Wayback Machine" (www.archive.org) because the contents can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201; *Erickson*, 2015 WL 4089849, at *1 n.1. The Court **GRANTS** Plaintiffs' request.

▮▮▮▮ and total assets of ▮▮▮▮▮▮. (*Id.* ¶ 301.) Plaintiffs allege that Lion Capital was aware of the conspiracy and therefore undercapitalized Bumble Bee so that Bumble Bee would be unable to satisfy any judgment against it in the event the conspiracy was ever detected. (*Id.* ¶ 300.) Plaintiffs allege that before the Lion acquisition, Bumble Bee had a debt to total capital ratio of approximately sixty percent. (*Id.* ¶ 304.) According to Plaintiffs, Lion intentionally undercapitalized Bumble Bee as evidenced by the fact that Bumble Bee has a debt to total capital ratio of nearly ninety percent after acquisition. (*Id.*) Plaintiffs contend that but for the supra-competitive profits earned by Bumble Bee, it would not have been able to satisfy its debt obligations and would have instead defaulted by the end of 2011. (*Id.* ¶ 305.)

## II. Post-Purchase Activities by Lion Entities

Plaintiffs claim that after purchasing Bumble Bee, Lion Capital team members became "intimately familiar with Bumble Bee's business" and demonstrated that knowledge by regularly reporting facts concerning Bumble Bee to investors as part of periodic portfolio reviews. (*Id.* ¶ 280.) And, according to Plaintiffs, Lion Capital's acquisition of Bumble Bee, while Bumble Bee was earning "supra-competitive profits," positioned Lion to realize an increase in Bumble Bee's market value and eventual sale price. (*Id.* ¶ 279.)

In addition to receiving information, Plaintiffs allege Lion Capital took an active role in the ongoing conspiracy after ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (*Id.* ¶¶ 283–84.) Lindberg also met with Thai Union's chief executive in January 2011, where Plaintiffs allege "they discussed the conspiracy." (*Id.* ¶ 284.) In the months following Lion's purchase of Bumble Bee and Lindberg's meetings, defendants Chicken of the Sea, Bumble Bee, and Del Monte/StarKist agreed to increase their prices in May 2011. (*Id.* ¶ 285.) By the fall 2011, Chicken of the Sea, Bumble Bee, and StarKist increased their efforts to police each other's promotional pricing. (*Id.*) Lion allegedly took an active role in enforcement as evidenced by Lindberg deciding to meet again with senior executives at Dongwon. (*Id.* ¶ 286.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



. (*Id.*)

Plaintiffs allege that Bumble Bee continued to keep the Lion entities informed of anticompetitive behavior; for example, ███████████████████████████████████████████████████████████████████████. (*Id.* ¶ 287.) However, ███████████████████████████████████████. (*Id.*) Plaintiffs allege that ████████████████████████████████████████████████████████. (*Id.* ¶ 287 n.10.) ████████████████████████████. (*Id.*) Bumble Bee increased its prices on January 17, 2018. ████████████████████████. (*Id.* ¶ 288.) ██████████████████████████████████. (*Id.*) ██████████████████████████████.

(*Id.*) On February 3, 2012, Lindberg sent an email response to an executive at Thai Union, who had asked Lindberg if he had suggestions how they could "████████████████████. (*Id.* ¶ 289.) Lindberg's email stated: ██████████████████████████████████



." (*Id.*)

On ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ as well as an agreement between the defendants not to label their packaged tuna as "FAD-free."[9] (*Id.* ¶ 290.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* ¶ 291.)

Next, in March 2012, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* ¶ 293.) According to Plaintiffs, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*) Nonetheless, Lindberg encouraged Lischewski to make a statement and said:

(*Id.* (emphasis omitted).)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* ¶ 294.) In addition to Mr. Lindberg's meetings and communications, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* ¶ 296.)

---

[9] FAD means Fish Aggregation Device. (Bashas Compl. ¶ 210.) Fish aggregation devices are a means to catch more fish and thus decrease costs. As the Plaintiffs explain, environmental groups and consumers have pushed the defendants not to use fish aggregating devices; if packaged tuna had "FAD-free" labelling then the proponent of such labelling would stand to benefit against those who do not follow suit. (*See id.*)

7

In December 2014, Lion was able to report Bumble Bee's earnings (i.e., its earnings before interest, taxes, depreciation, and amortization or "EBITDA") were a "record-breaking $150 Million," based on revenue of $1 billion. (*Id.* ¶ 297.) Plaintiffs allege the "record-breaking" financial performance was due to the ongoing conspiracy. (*Id.*) On or about December 18, 2014, Thai Union announced that it intended to acquire Bumble Bee. (*Id.* ¶ 84.) ███████████████████████████████████████████████████████████████████████████. (*Id.* ¶ 279.) As part of the acquisition process, Thai Union and Bumble Bee submitted their proposal to the Department of Justice ("DOJ"). The merger review apparently led to a criminal investigation.

## III. Department of Justice Investigation

Since at least 2015, various defendants have been under criminal investigation for antitrust violations as evidenced by Thai Union Group's confirmation it received a subpoena and was fully cooperating with a DOJ investigation. (Nation FAC ¶ 214.) On July 23, 2015, Bumble Bee publicly acknowledged receipt of a grand jury subpoena. (*Id.* ¶ 217.) On December 3, 2015, Thai Union Group announced it was terminating its acquisition of Bumble Bee. (*Id.* ¶ 84.) And, the DOJ issued a press release stating:

> "Consumers are better off without this deal," said Assistant Attorney General Bill Baer [("Baer")] of the department's Antitrust Division. "Our investigation convinced us—and the parties knew or should have known from the get go—that the market is not functioning competitively today, and further consolidation would only make things worse."

(*Id.*)

On December 7, 2016, the DOJ filed a criminal information against Scott Cameron, Bumble Bee Senior Vice President, who pled guilty on January 25, 2017. (*Id.* ¶ 221.) On December 21, 2016, the DOJ filed a criminal information against Ken Worsham, also a Bumble Bee Senior Vice President, who pled guilty on March 15, 2017. (*Id.* ¶ 222.) The plea agreements for these two defendants, as well as a third executive at StarKist, stated

8

that they participated in a conspiracy within the packaged seafood industry to fix, raise and maintain the price of package seafood in the United States. (*Id.* ¶ 224.)

On May 8, 2017, DOJ filed criminal information against Bumble Bee and the entity pled guilty to its role in a conspiracy to fix the price of packaged seafood products in the United States on August 2, 2017. (*Id.* ¶¶ 227–28.) Bumble Bee agreed to pay a criminal fine of $25 million, but that amount will increase to a maximum fine of $81.5 million payable by Big Catch, in the event of a sale of Bumble Bee, subject to certain terms and conditions that are sealed in the criminal case. (*Id.* ¶ 228.) Most recently, Bumble Bee CEO Chris Lischewski was indicted on May 16, 2018.[10]

The Lion Defendants were not originally named in the various Plaintiffs' complaints. In late 2017 and early 2018, plaintiffs filed four motions to amend the scheduling order to add the Lion Defendants, (ECF Nos. 530, 724, 769, 811), which the Court granted in relevant part, (ECF No. 884). The Court's order resulted in amended complaints from a variety of parties. Defendants bring three motions to dismiss based on lack of personal jurisdiction, pursuant to Rule 12(b)(2), and failure to state a claim, under Rule 12(b)(6), against the Bashas Plaintiffs, the Cherokee Nation, and the EPPs, CFP, DPPs, and DAPs.

## LEGAL STANDARD

### I.    Rule 12(b)(2)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) challenges the Court's personal jurisdiction over a party. The plaintiff bears the burden of establishing that jurisdiction is proper. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). The Court may decide the

---

[10] Plaintiffs request the Court judicially notice Mr. Lischewski's indictment, (Ex. 45, ECF No. 1247-17). (Nation Opp'n 34 n.36; Bashas Opp'n 24 n.14.) Courts may take judicial notice of court dockets and filings in other courts. *Porter v. Ollison*, 620 F.3d 952, 954–55 (9th Cir. 2010). It is acceptable for courts to notice the indictment only as to evidence of the crime charged, not the truth of the matters asserted therein. *See CB Equities, LLC v. Am. Brokers Conduit Corp.*, No. 12-CV-05449-DMR, 2016 WL 4364320, at *3 n.2 (N.D. Cal. Aug. 16, 2016) (collecting cases). The Court **GRANTS** Plaintiffs' request and notices Mr. Lischewski's indictment.

motion without an evidentiary hearing, and thus "the plaintiff need only make a prima facie showing of the jurisdictional facts." *Id.* (quoting *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 127–28 (9th Cir. 1995)). A plaintiff makes a prima facie showing by producing admissible evidence, which, if believed, would be sufficient to establish the existence of personal jurisdiction. *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). "Uncontroverted allegations in the plaintiff's complaint must be taken as true," *Boschetto*, 539 F.3d at 1015, and "[c]onflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor," *id.* (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)); *see Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).

A court's power to exercise jurisdiction over a party is limited by both statutory and constitutional considerations. First, a long-arm statute must confer jurisdiction over a defendant. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154–55 (9th Cir. 2006) (citing *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 893 (9th Cir. 1996)). There is no general federal long-arm statute, *S.E.C. v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007), so a federal district court applies either the law of the state in which it sits, Fed. R. Civ. P. 4(k)(1)(A), or looks to specific federal statutes to supply the requisite service of process, Fed. R. Civ. P. 4(k)(1)(C), (k)(2); *Ross*, 504 F.3d at 1138. In an antitrust action, section 12 of the Clayton Act is the requisite federal long-arm statute and provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22; *see also KM Enters., Inc. v. Global Traffic Techs., Inc.*, 725 F.3d 718, 724 (7th Cir. 2013) ("[Section 12's] first clause sets venue anywhere the corporation is an 'inhabitant, is 'found,' or 'transacts business,' while the second clause provides for nationwide (indeed, worldwide) service of process and therefore nationwide personal

jurisdiction." (citations omitted)). The Ninth Circuit has held that "when a statute authorizes nationwide service of process, national contacts analysis is appropriate. In such cases, 'due process demands [a showing of minimum contacts with the United States] with respect to foreign defendants before a court can assert personal jurisdiction.'" *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (alteration in original) (quoting *Go–Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1416 (9th Cir. 1989)).

Second, the Fourteenth Amendment's Due Process clause limits the personal jurisdiction of state courts. *Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1779 (2017) (citations omitted). "For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger*, 374 F.3d at 801 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted)).

"In a statute providing for nationwide service of process, the inquiry to determine 'minimum contacts' is thus "whether the defendant has acted within any district of the United States or sufficiently caused foreseeable consequences in this country." *Action Embroidery*, 368 F.3d at 1180 (quoting *Sec. Investor Prot. Corp. v. Vigman*, 764 F.2d 1309, 1316 (9th Cir. 1985)). Under the minimum contacts test, jurisdiction can be either "general" or "specific." *Doe v. Unocal Corp.*, 248 F.3d 915, 923 (9th Cir. 2001) (per curiam), *abrogated on other grounds by Daimler AG v. Bauman*, 571 U.S. 117 (2014). If a defendant has sufficient minimum contacts for the court to exercise personal jurisdiction over him, the exercise of such jurisdiction must also be reasonable. *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987).

## II. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted,"

generally referred to as a motion to dismiss. The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' . . . it [does] demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 557).

In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when the facts pled "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 556). That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id.* This review requires context-specific analysis involving the Court's "judicial experience and common sense." *Id.* at 678 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.*

Where a complaint does not survive 12(b)(6) analysis, the Court will grant leave to amend unless it determines that no modified contention "consistent with the challenged

pleading . . . [will] cure the deficiency." *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schriber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).

# ANALYSIS

## I. General Jurisdiction

General personal jurisdiction allows a plaintiff to hale a nonresident defendant into the forum state's court "to answer for any of its activities anywhere in the world." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014) (quoting *Schwarzenegger*, 374 F.3d at 801), *cert. denied*, 135 S. Ct. 2310 (2015). A court has general personal jurisdiction over a foreign corporation to hear any and all claims against the foreign corporation when its affiliations with a State are "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler*, 571 U.S. at 127 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); and citing *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984)). To be essentially at home in the forum state, a foreign corporation must be comparable to a domestic enterprise in that state. *See id.*

A corporation will primarily be "at home" for the purposes of general jurisdiction in two paradigmatic forums: its place of incorporation and its principal place of business. *Id.* at 137 (citing *Goodyear*, 564 U.S. at 924). General jurisdiction is not limited to these two forums, but will only be available elsewhere in the "exceptional case" where its affiliations with a forum are "so substantial and of such nature as to render the corporation at home." *Id.* at 138 n.19; *see also Martinez*, 764 F.3d at 1070. Those affiliations or contacts must be "constant and pervasive." *Daimler*, 571 U.S. at 122. To determine whether an exceptional case exists that justifies general jurisdiction, the Court must conduct "an appraisal of a corporation's activities in their entirety, nationwide, and worldwide." *Id.* at 139 n.20. "A corporation that operates in many places can scarcely be deemed at home in all of them." *Id.*

/ / /

### A. Whether the Court Has General Jurisdiction over Lion Capital and Big Catch

#### 1. Defendants' Arguments

Defendants argue that there is no general jurisdiction over Lion Capital and Big Catch. (MTD 18.) Specifically, they contend Lion Capital is organized under the laws of the U.K. and has its principal place of business in the U.K. (*Id.* (citing Brown Decl. ¶ 3–4; 10–11, 15).) Big Catch is organized under the laws of the Cayman Islands and has no employees or offices in the United States. (*Id.* (citing Brown Decl. ¶ 18).) Defendants acknowledge that Big Catch has a New York mailing address but cite an unpublished district court opinion for the proposition that a mailing address is insufficient to establish a principal place of business. (*Id.* (citing *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09 MD 2087-BTM (AJB), 2010 WL 2998855, at *3 (S.D. Cal. July 29, 2010); and Brown Decl. ¶ 21).)

#### 2. Plaintiffs' Arguments

Plaintiff the Cherokee Nation contends that Lion Capital and Big Catch are subject to the Court's general jurisdiction.[11] (Nation Opp'n 27–28.) Plaintiff points to several facts purporting to show Lion Capital's presence in the United States. These include: Lion Capital repeatedly held itself out as having a presence in New York, (*id.* at 28 (citing LION_6955, at 2; and LION_4213)),[12] Lion Capital availed itself of the U.S. Patent and Trademark Office by registering two trademarks and using the United States judicial system to defend those trademarks, (*id.*); Lion Capital members reside in the United States, (*id.* at 28); and Lion Capital members attended Bumble Bee and industry-related meetings,

---

[11] In advancing this theory, the Cherokee Nation aggregates two arguments together: first, that Lion Capital, by itself, has sufficient contacts to subject it to general jurisdiction; and second, that Lion Americas' contacts should be imputed to Lion Capital because the former is an alter ego of the latter. (*See* Nation Opp'n 28–31.) The Court addresses the first argument here and the second (alter ego) argument below, *see infra* section I.C. The Bashas Plaintiffs do not assert that the Court has general personal jurisdiction over either Lion Capital or Big Catch. (*See* Bashas Opp'n 31–43.)

[12] A brief explanation of exhibit pin citations is relevant here. The Cherokee Nation decided not to organize their evidentiary filings into numbered exhibits, other than one single exhibit numbering more than 4,200 pages. Instead, Plaintiff cites to the individual page numbers produced during discovery. These pages start with the prefix LION_. The Court will cite these pages as the Cherokee Nation does.

as well as regular board meetings in California, (*id.* at 28–29). Plaintiff, therefore, contends that Lion Capital has continuous and systemic contacts with California to justify general personal jurisdiction. (*Id.* at 30.)

The DPP Plaintiffs also argue general jurisdiction is appropriate. They contend that the vast majority of Lion Capital's business focuses on the United States. (DPP Opp'n 24.) For example, Lion Capital previously testified in another lawsuit that two-thirds of its capital comes from U.S. investors and many of the companies owned by Lion Capital's funds are U.S. companies. (*See id.* (citing *Lion Capital LLP v. Stone Lion Capital Partners L.P.*, No. 91191681, 2013 WL 2329834, at *4 (T.T.A.B. Jan. 18, 2013)).) The DPP Plaintiffs also point out that Lion Capital advertises a "hands on" approach with respect to its portfolio companies, including Bumble Bee; thus, Defendants are involved in U.S. businesses. (*See id.* at 25.) Thus, the DPP Plaintiffs urge the Court to find Lion Capital subject to the "exceptional case" requirement.

### 3. *Defendants' Reply*

In reply, Defendants reiterate that Plaintiffs fail to establish either Lion Capital or Big Catch are essentially at home in the United States and that general jurisdiction does not exist despite the presence of a few former Lion Capital members and Big Catch shareholders in the United States. (Reply 10.) In support of this proposition, Defendants cite cases holding that a court should not exercise general personal jurisdiction over a limited partnership based solely on the citizenship of its members. (*Id.* at 10–11 (citing *Carruth* v. *Michot*, No. A-15-CA-189-SS, 2015 WL 6506550, at *7 (W.D. Tex. Oct. 26, 2015); and *Duncanson* v. *Wine & Canvas IP Holdings LLC*, No. 16-cv-788-SEB-DML, 2017 WL 6994541, at *4 n.3 (S.D. Ind. Apr. 20, 2017)).)

### 4. *Court's Analysis*

#### a. Paradigmatic Locations

The paradigmatic location for general jurisdiction depends, in part, on the type of entity; for an individual it is her domicile, or for a corporation it is where the corporation

15-MD-2670 JLS (MDD)

is fairly regarded as "at home."[13]  *Daimler*, 571 U.S. at 137 (citing *Goodyear*, 564 U.S. at 924).  "With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'"[14]  *Id.* (alterations in original) (citation omitted).

Considering the evidence submitted by the parties, the overwhelming conclusion is that Lion Capital can fairly be regarded at home in the United Kingdom.  Lion Capital's

———————————

[13] Plaintiff the Cherokee Nation argues that Defendants' reliance on *Daimler* is "wholly inapposite." (Nation Opp'n 28 n.31.)  Plaintiff attempts to distinguish *Daimler* as turning on whether there could be jurisdiction over a foreign defendant based on events occurring outside the United States, but the events here took place inside, and the harm occurred within, the United States.  (*See id.*)

Plaintiff's reading of *Daimler* is incorrect.  The location of the events in question and the location of the harm is irrelevant for general jurisdiction.  General jurisdiction arises where "the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit . . . *on causes of action arising from dealings entirely distinct from those activities*."  *Daimler*, 571 U.S. at 138 (alterations in original) (quoting *Int'l Shoe*, 326 U.S. at 318).  Any argument regarding events and harms directly tied to this case are appropriately made with regard to specific jurisdiction, not general jurisdiction.  *See also BNSF Railway Co. v. Tyrrell*, 137 S. Ct. 1549, 1558–59 (2017) ("The Fourteenth Amendment due process constraint described in *Daimler* . . . applies to all state-court assertions of general jurisdiction over nonresident defendants; the constraint does not vary with the type of claim asserted or business enterprise sued.").

[14] Neither Lion Capital nor Big Catch is a corporation; they are a limited liability partnership and a limited partnership, respectively.  (*See* Brown Decl. ¶¶ 3, 18.)  Generally, courts apply *Daimler* to non-corporate business entities.  *See Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 332 (2d Cir. 2016), ("[T]here is no reason to invent a different test for general personal jurisdiction depending on whether the defendant is an individual, a corporation, or another entity."); *see also McCullough v. Royal Caribbean Cruises, Ltd.*, 268 F. Supp. 3d 1336, 1344 (S.D. Fla. 2017) (agreeing with *Waldman* and applying *Daimler* to a limited liability company); *see also Am. Guarantee & Liability Ins. Co. v. Arch Ins. Co.*, No. 17-582, 2017 WL 4842413, at *6 (W.D. Pa. Oct. 26, 2017) (collecting cases).  The Court agrees with *Waldman* and applies it here to the non-corporate entities.

One final question remains: should the Court apply the place of organization and principal place of business paradigm to limited partnerships?  *Waldman* did not distinguish between where the association was formed and its principal place of business and instead characterized the appropriate test as: where the defendants were "fairly regarded as at home" and answered the test as a singular location.  835 F.3d at 332.  Likewise, the district court in *McCullough* limited its analysis to a singular location where the defendant limited liability company could fairly be regarded as at home and did not consider the principal place of business—place of organization dichotomy.  *See* 268 F. Supp. 3d at 1344–45.  But, as the district court in *Finn v. Great Plains Lending, LLC*, No. 15-4658, 2016 WL 705242, at *3 n.3 (E.D. Pa. Feb. 23, 2016), points out, *Daimler* itself considered a subsidiary (Mercedes-Benz USA, LLC) that was a limited liability company and applied the corporation's paradigmatic locations to the LLC.  *See* 571 U.S. at 121.  The Court follows *Daimler*'s two-part paradigmatic location approach for general jurisdiction and tests both the place of organization and the principal place of business.

principal place of business is the United Kingdom because its primary office is located in London, its employees are located in the U.K., and the majority of Lion Capital's designated members and members are domiciled in the U.K. (*See* Brown Decl. ¶¶ 4, 8–11; LION_14427, at 27–39.)[15] Lion Capital was organized under the laws of the U.K. (Brown Decl. ¶ 3.) The clear import is that Lion Capital is at home in the United Kingdom, not the United States.

Big Catch is a holding company with no employees and no offices and was organized under the laws of the Cayman Islands. (Brown Decl. ¶¶ 18, 21.) Its partnership agreement recites that Big Catch's principal place of business was the former Lion Americas' office in New York or wherever the general partner designates. (LION_14788, at 794.) Defendants maintain that the New York address is simply a mailing address and is insufficient for general jurisdiction. (MTD 18 n.5 (citing *In re Hydroxycut Mktg. & Sales Practices Litig.*, 2010 WL 2998855, at *3).) Plaintiff's only counterargument is that the partnership agreement says "principal place of business," thus Big Catch must have a principal place of business in New York. (Nation Opp'n 13.)

The Court agrees with Defendants as to Big Catch. Big Catch has no office of its own; it listed Lion Americas' New York office as its principal place of business in the general partnership agreement. But, the New York office is simply a mailing address for Big Catch. This is evident because the partnership agreement says "c/o" or care of the New

---

[15] Mr. Brown's declaration only discusses the residency of current Lion Capital members and does not account for Lion Capital members, with U.S. domicile, who have apparently resigned from the firm before the filing of these motions. There is limited case law discussing the appropriate time period to assess general jurisdiction. "[C]ourts must examine the defendant's contacts with the forum at the time of the events underlying the dispute when determining whether they have jurisdiction." *Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987); *see Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569 (2d Cir. 1996) (noting that courts will assess general jurisdiction over a period of years prior to the plaintiff's filing of a complaint). Accordingly, the Court considers the Lion Capital members who were members during the alleged conspiracy, which would include members domiciled in the U.S. This recognition does not alter the ultimate conclusion here: the majority of Lion Capital's contacts point to it being "at home" in the U.K. For example, as of a September 2012 reporting, twenty-one out of twenty-five of Lion Capital's partners were domiciled in the United Kingdom. (*See* LION_14360.) The four non-U.K. partners were the Lion Americas executives residing in America.

15-MD-2670 JLS (MDD)

York address and there is no indication whether or not Big Catch conducts independent activities there. Big Catch is merely a holding company and designating an already existing office to act as a mailing address does not confer general personal jurisdiction. Therefore, the Court finds neither Lion Capital nor Big Catch is at home in the United States under the two paradigmatic locations.

b. Exceptional Case Requirement

Finally, the Court turns to the exceptional case requirement; two cases illustrate the requirements to apply general jurisdiction. In *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. at 418, the Supreme Court held that a Texas state court did not have general personal jurisdiction over a Colombian corporation. There, the corporation did not have a place of business in Texas and was never licensed to do business in Texas. *Id.* at 416. Instead, the contacts amounted to the chief executive traveling to Houston for negotiations, accepting checks drawn from a Houston bank, purchasing helicopters from a Texas corporation, and sending personnel to Texas for training. *Id.* The Supreme Court held that these contacts were insufficient to satisfy the due process requirements of personal jurisdiction. *Id.* at 418. Next, in *Ranza v. Nike, Inc.*, the Ninth Circuit held that no general personal jurisdiction existed in Oregon where a subsidiary sent employees and products to Oregon and engaged in some business there. 793 F.3d 1059, 1070 (9th Cir. 2015). Instead, the relevant inquiry "examines a corporation's activities worldwide—not just the extent of its contacts in the forum state—to determine where it can be rightly considered at home." *Id.* (citing *Daimler*, 571 U.S. at 139 n.20). The *Ranza* court applied *Daimler* and recognized that Nike's Dutch-based subsidiary's activities in Oregon were limited compared to its extensive European contacts. *Id.* Therefore, the subsidiary could not be considered at home in Oregon. *Id.* at 1069–70.

Here, Lion Capital's designated member allegedly traveled to the United States to attend board of directors' meetings. (*See, e.g.*, LION_4334.) Lion Capital availed itself of the PTO by registering two trademarks and later defended those trademarks in the U.S. judicial system. Lion members attending board meetings are similar to the facts of

1   *Helicopteros* and *Ranza* because, like those cases, Lion's executive(s) traveled to the
2   relevant forum.   And, using the PTO and the courts to defend a trademark is similar to
3   conducting limited business in *Helicopteros* (purchasing helicopters) and *Ranza* (sending
4   products to Oregon).   Neither is sufficient to meet the exceptional case requirement.

5        The presence and holding out to the public of the office in New York and, later, Los
6   Angeles, presents a more viable contact to assess the exceptional case requirement.   It is
7   clear that Lion Capital held out Lion Americas' North American office as belonging to
8   Lion Capital generally or Lion Capital specifically.   (*See* LION_6955, at 2; LION_4213.)
9   Yet, post-*Daimler*, the presence of offices in the forum state does not, by itself, render a
10  defendant subject to general jurisdiction.   *See* 571 U.S. at 158 (Sotomayor, J., concurring
11  in the judgment) ("[T]he majority holds today that Daimler is not subject to general
12  jurisdiction in California despite its multiple offices, continuous operations, and billions of
13  dollars' worth of sales there.").   Lion Capital held out the North America office as one of
14  its own, but the North American office was not Lion Capital's primary office.   Its London
15  office was and is home to the majority of Lion Capital employees and was where the Lion
16  members ultimately directed operations.   (Brown Decl. ¶ 4.)   Lion Capital manages its four
17  investment funds from the London office because, as Plaintiffs recognize, Lion Americas
18  is a "non-discretionary investment advisor" to Lion Capital.   (*Id.* ¶¶ 29–30; *see* Nation
19  Opp'n 29.)

20       *Daimler* teaches that it is appropriate to compare business operations in the forum
21  state with an entity's worldwide business activities.   571 U.S. at 139 n.20.   The DPP
22  Plaintiffs elucidate evidence demonstrating that two-thirds of Lion Capital's capital is from
23  U.S. investors and Lion Capital's portfolio companies include U.S. and California-based
24  companies.   (DPP Opp'n 24–25.)   Again, this evidence does not rise to the level necessary
25  for general jurisdiction; the fact that capital comes from the United States and is invested
26  in the United States does not derogate the fact that Lion Capital controlled its investments
27  from London.   *See Daimler*, 571 U.S. at 130 n.8 (noting that the Court's opinion in *Perkins*
28  turned on the following: "All of [the defendant company's] activities were directed by the

company's president from within Ohio" (citing *Perkins*, 342 U.S. at 447–48)).  The evidence demonstrates that Lion Capital's operations in the United Kingdom are greater than those in the United States and it is at home in the U.K.  Thus, Lion Capital's activities do not rise to an exceptional case where general jurisdiction would be appropriate.

Further, Big Catch does not meet the exceptional case requirement because it is a holding company.  Plaintiff has not alleged any actions undertaken by Big Catch, which is not surprising as Big Catch is a holding company and not an operating company.  Thus, it cannot meet the exceptional case requirement.

In sum, the foregoing activities do not suggest that Lion Capital's operations were "so substantial and of such a nature as to render [it] at home in" the United States.  *Daimler*, 571 U.S. at 139 n.19.  The Court finds that neither Lion Capital nor Big Catch meet the exceptional case requirement.  The Court finds it does not have general personal jurisdiction over Lion Capital or Big Catch, based on their contacts alone.

### B. Whether the Court Has General Jurisdiction over Lion Americas

Defendants do not dispute that Lion Americas is properly before this Court.  Lion Americas has a principal place of business in Santa Monica, California, which would subject it to general jurisdiction in California, and thus the United States.  (*See* Brown Decl. ¶ 24.)  Accordingly, this Court has personal jurisdiction over Lion Americas.

### C. Whether Lion Americas' Contacts Impute to Lion Capital

Plaintiff the Cherokee Nation argues "it is through [Lion] Americas that Lion Capital solicits and engages in business in California, making itself 'at home' there."  (Nation Opp'n 29 (citing *Newport Components, Inc. v. NEC Home Electronics, Inc.*, 671 F. Supp. 1525, 1534 n.10 (C.D. Cal. 1987); and *Daimler*, 571 U.S. at 136).)[16]  While the Cherokee

---

[16] The Bashas Plaintiffs briefly argue that Lion Capital is the alter ego of Lion Americas and, therefore, Lion Americas' contacts should impute to Lion Capital.  (Bashas Opp'n 34.)  They contend, in one sentence, that "Lion Capital and Lion Americas had significant employee overlap, held themselves out as a single entity in emails and on their website, shared offices, and jointly control[led] the funds that purchased Bumble Bee."  (*Id.*)  They make this argument only with regard to specific (not general)

Nation does not explicitly define its legal theory, essentially it seeks to impute Lion Americas' contacts to Lion Capital for purposes of general jurisdiction. The DPP Plaintiffs are more explicit; they argue that Lion Capital and Lion Americas "function as one," (DPP Opp'n 26), and Lion Capital is subject to the Court's general personal jurisdiction because of Lion Americas' California office, (*see id.* at 30).

"The existence of a parent-subsidiary relationship is insufficient, on its own, to justify imputing one entity's contacts with a forum state to another for the purpose of establishing personal jurisdiction." *Ranza*, 793 F.3d at 1070 (citing *Unocal*, 248 F.3d at 925–26). Generally, a parent corporation and its subsidiary are separate corporate forms, *id.* (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003)), and the rule of corporate separateness "insulates a parent corporation from liability created by its subsidiary, notwithstanding the parent's ownership of the subsidiary," *id.* at 1071 (citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). Despite the traditional rule of corporate separateness, the corporate veil may be pierced in limited circumstances, including in determining whether to exercise personal jurisdiction over a foreign defendant. *Unocal*, 248 F.3d at 926.

The Ninth Circuit previously held that district courts could test corporate separateness through either an agency relationship or an alter ego test. *See id.* (citing *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996)). Following the Supreme Court's opinion in *Daimler*, the Ninth Circuit has held that only the alter ego test remains viable to analyze corporate separateness for purposes of general jurisdiction. *Ranza*, 793 F.3d at 1071. Federal courts apply the law of the forum state to determine whether a corporation is an alter ego of an individual.[17] *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003) (citing *Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1391 (9th

_____

jurisdiction. Because the Bashas Plaintiffs' argument is duplicative of the Cherokee Nation's arguments, the Court only discusses the latter here.

[17] While the relevant forum to measure contacts for the Clayton Act is the United States, the parties rely on California law with reference to the alter ego theories and the Court will do the same.

Cir. 1993)). To satisfy the alter ego exception, the plaintiff must demonstrate "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Unocal*, 248 F.3d at 926 (alterations in original) (quoting *AT&T*, 94 F.3d at 591); *accord Automotriz Del Golfo De Cal. S. A. De C. V. v. Resnick*, 47 Cal. 2d 792, 796 (1957).

*Daimler* also makes clear that even if the Court determines that one entity is the alter ego of the other, then foreign entity's activities in the forum jurisdiction must still meet the general jurisdiction requirements of being essentially "at home." 571 U.S. at 136 ("Even if we were to assume that [the domestic subsidiary] is at home in California, and further to assume that [its] contacts are imputable to [the foreign parent corporation], there would still be no basis to subject [the parent] to general jurisdiction in California, for [the parent's] slim contacts with the State hardly render it at home there." (footnote omitted)).

The Court applies the two-part alter ego test to determine whether Lion Americas' contacts with the United States impute to Lion Capital.

### 1. Unity of Interest

#### a. Plaintiffs' Arguments

Plaintiffs elucidate three broad categories of control by Lion Capital over Lion Americas. First, Plaintiffs rely on the method by which Lion Capital does business and holds itself out to the public. For example, Lion Capital held itself out as having offices in both London and New York, and later California. (Nation Opp'n 11 (citing LION_6955, at 2; LION_4213; LION_28076); *id.* at 28 (citing LION_6955, at 2); DPP Opp'n 27–28.) At least eight of Lion Capital's members[18] lived, worked, and were domiciled in the United States. (*Id.* (citing LION_14427); *id.* at 29 (citing, *e.g.*, LION_12617).) And, one of Lion

---

[18] The individuals cited are Lion Americas' employees: Jeff Chang, Eric Lindberg, and Jacob Capps, Kelly Patrick Mayer, and Rory O'Connor. (*See* Nation Opp'n 14–15.) Plaintiff submits evidence that these Lion Americas' executives were also Lion Capital members. (*Id.* at 14 (citing, *e.g.*, LION_5919; LION_14310, at 316).) These executives had Lion Capital email addresses and corresponded to third-party entities "on behalf of Lion Capital." (*Id.* at 28 (quoting LION_4213).)

Capital's designated members allegedly attended at least nine board meetings in California. (*Id.* at 11–12 (citing, *e.g.*, LION_4334).) The Cherokee Nation points to Lion Capital's own admission that Lion Americas lacks any authority to make any investment decisions because Lion Americas is a "non-discretionary investment advisor" to Lion Capital. (*Id.* at 29 (quoting MTD 10–11).) The DPP Plaintiffs contend that Lion Capital entered into a "management agreement" with Bumble Bee to provide "advisory services," but Lion Americas employees were the ones providing the advisory services. (DPP Opp'n 28.)

Second, several employees had roles in both Lion Capital and Lion Americas. For example, Mr. Richard Lewis was the director of Lion Capital Management Services Limited, which is a Lion Capital member; Mr. Lewis was also the Chief Compliance Officer of Lion Americas. (Nation Opp'n 14 (citing LION_14076, at 90).) And, Mr. Rory O'Connor was designated as Lion Americas' agent for service of process, (*id.* at 14–15 (citing LION_14062)), while also a Lion Capital member, (*id.* at 15 (citing LION_14360, at 377)). Lion's websites of these gentlemen do not distinguish between Lion Capital and Lion Americas. (DPP Opp'n 28–29.) And, Lion Capital has disclosed that it was paying wages to select Lion Americas' employees at the same time Lion Americas was paying those individuals. (*Id.* at 29 (citing Brown Decl., Ex. E).) Finally, Lion Capital's annual return identified Lion Americas' executives (Chang and Capps) as members of Lion Capital. (*Id.* (citing Declaration of Samantha Stein ("Stein Decl."), Ex. 34, ECF No. 1292-13).)

Third, Lion Capital submitted a Securities and Exchange Commission ("SEC") Form ADV. That form identified Lion Americas as a "related person" controlled by Lion Capital, states the two entities are under common control, and states the two entities share supervised persons. (Nation Opp'n 29 (citing LION_14557, at 563; and LION_14667, at 673–74).) Further, the same filing disclosed that Lion Americas kept its "books and records" with Lion Capital (DPP Opp'n 27.) Based on this evidence, Plaintiffs conclude that Lion Capital controls Lion Americas such that personal jurisdiction would be appropriate over Lion Capital. (*Id.* at 29–30.)

15-MD-2670 JLS (MDD)

b. Defendants' Reply

Defendants argue that Plaintiffs fail to establish unity of interest. (Four Track Reply 17.)[19] Mr. Brown declared that Lion Americas and Lion Capital maintain strict divisions between their management structures. (Brown Decl. ¶¶ 27, 30.) Defendants contend that none of Plaintiffs' arguments to the contrary rebut this testimony. First, there is an SEC filing that purports to show "control" of Lion Americas by Lion Capital Defendants state that "ownership of securities" is sufficient to satisfy the SEC's definition of control and, here, Lion America's is a wholly-owned subsidiary, i.e., an asset. (*Id.* at 18.) Second, Defendants aver that the existence of common officers and directors between a parent and subsidiary do not demonstrate unity of interest and Plaintiffs fail to rebut the fact that each common officer or director wore the appropriate "hat" when making corporate and operational decisions. (*See id.* at 19 (citing *Sonora Diamond*, 83 Cal. App. 4th at 548–49).) For example, documents produced by Defendants show that Lion Capital and Lion Americas separately compensated their personnel. (*See* Brown Decl., Ex. E.) Thus, the two entities maintained corporate formalities.

Third, Defendants contend that Lion Americas' oversight of Bumble Bee supports their jurisdictional arguments. (*See id.*) It was Lion Americas, not Lion Capital that monitored Bumble Bee. Fourth, Defendants argue that a website and email signatures that listed Lion Americas' personnel as working for Lion Capital do not demonstrate control. (*Id.* (citing *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 984 (N.D. Cal. 2016)).)

c. Court's Analysis

The unity of interest element requires "a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Ranza*, 793 F.3d at 1073 (quoting *Unocal*, 248 F.3d at 926). The Ninth Circuit has described various situations where piercing the corporate veil may be appropriate. For

---

[19] Defendants do not address the Lion Americas/Lion Capital alter ego argument in their Bashas/Cherokee Nation moving papers. Instead, they rebut the arguments in the Four Track Reply brief.

example, the unity of interest test may be satisfied where the parent uses the subsidiary as a "marketing conduit" and attempts to shield itself from liability based on the subsidiary's activities. *Unocal*, 248 F.3d at 926 (citing *United States v. Toyota Motor Corp.*, 561 F. Supp. 354, 359 (C.D. Cal. 1983)). Unity of interest may also be met when the parent corporation directs every facet of the subsidiary, "from broad policy decisions to routine matters of day-to-day operation[s]." *Id.* at 926–27 (quoting *Rollins Burdick Hunter of S. Cal., Inc. v. Alexander & Alexander Servs., Inc.*, 206 Cal. App. 3d 1, 11 (Ct. App. 1988)).

Conversely, in *Unocal*, the Ninth Circuit discussed situations when alter ego is not appropriate. There, the court held that the plaintiff did not meet the unity of interest prong when the evidence demonstrated "an active parent corporation involved directly in decision-making about its subsidiaries' holdings," but the parent and subsidiaries "observe[d] all of the corporate formalities necessary to maintain corporate separateness." 248 F.3d at 928. The *Unocal* court determined the following evidence to be insufficient to establish unity of interest:

> (1) involvement in its subsidiaries' acquisitions, divestments and capital expenditures; (2) formulation of general business policies and strategies applicable to its subsidiaries, including specialization in particular areas of commerce; (3) provision of loans and other types of financing to subsidiaries; (4) maintenance of overlapping directors and officers with its subsidiaries; and (5) alleged undercapitalization of its subsidiaries.

*Unocal*, 248 F.3d at 927; *see also Ranza*, 793 F.3d at 1073–74 (citing facts with approval). Likewise, in *Ranza*, the Ninth Circuit had evidence that each entity "lease[d] its own facilities, maintain[ed] its own accounting books and records, enter[ed] into contracts on its own and pa[id] its own taxes." *Ranza*, 793 F.3d at 1074. The court also recognized that the two entities had separate boards of directors, though one director served on both company's boards. *Id.* The *Ranza* court found such evidence insufficient to establish unity of interest, noting that "[s]ome employees and management personnel move between the entities, but that does not undermine the entities' formal separation." *Id.* (citing *Kramer*

*Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir. 1980)).

Turning to the case at hand, the Court begins with the baseline observation that Lion Americas is a wholly owned subsidiary of Lion Capital. (Brown Decl. ¶ 6.) Defendants state that Lion Capital and Lion Americas "maintain strict divisions between their management structures in order to comply with the Alternative Investment Fund Managers Directive ("AIFMD"), a European Union regulation." (*Id.* ¶ 27.) To ignore the corporate distinction between these two entities, Plaintiffs must demonstrate more than direct involvement in financing and macro-management of the subsidiary; Lion Capital must "dictate [e]very facet [of Lion Americas'] business." *Unocal*, 248 F.3d at 926 (first alteration in original) (internal quotation and citations omitted).

Plaintiffs point to shared offices between Lion Americas and Lion Capital. It is clear that Lion Americas had an office in New York, which later moved to Los Angeles. It is also certain that both Lion Americas and Lion Capital held out these North America offices as generally belonging to the Lion entities. It is not evident from the record which entity actually owned the offices. Other district courts have found that simply because a parent holds out its subsidiary's office without the parent mentioning that the latter is a separate entity is not definitive evidence that the parent controls day-to-day operations over the subsidiary. *See Pokemon Co. Int'l, Inc. v. Shopify, Inc.*, No. 16-MC-80272-KAW, 2017 WL 697520, at *4 (N.D. Cal. Feb. 22, 2017) (citing *Maple Leaf Adventures Corp. v. Jet Tern Marine Co.*, No. 15-cv-2504-AJB-BGS, 2016 WL 3063956, at *4, 8 (S.D. Cal. Mar. 11, 2016)). The Court does not discount that use of the same office is one factor under California alter ego analysis, *see Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 839 (Ct. App. 1962), but without further evidence of day-to-day control, a shared office is unpersuasive.

Next, Plaintiffs point to shared members between Lion Americas and Lion Capital. For example, Messrs. Lindberg, Lewis, O'Connor all had roles in both Lion Americas and Lion Capital And, those individuals held themselves out to the public, both on websites and email as working for Lion Capital Yet, *Unocal* and *Ranza* both make clear that shared

members is not sufficient to establish alter ego liability. *See Ranza*, 793 F.3d at 1074 *Unocal*, 248 F.3d at 927; *see also Kramer Motors*, 628 F.2d at 1177 (finding no alter ego relationship where parent company guaranteed loans for subsidiary, approved major decisions, placed several directors on the subsidiary's board, and was closely involved in pricing decisions); *In re Conseco Ins. Co. Annuity Mktg. & Sales Practices Litig.*, No. C-05-04726 RMW, 2008 WL 4544441, at *5 (N.D. Cal. Sept. 30, 2008) (finding insufficient unity of interest where officers shared positions and share the same headquarters). The overlap of board members or executive officers here does not demonstrate that Lion Capital exercised day to day control over the operations of Lion Americas. This conclusion is buttressed by Lion Capital's compensation structure, which demonstrates that the two entities maintained different pay structures. Lion Americas paid Lion Americas' employees; Lion Capital generally did not compensate Lion Americas' employees.[20] The Court is not persuaded by Lion entities sharing a website or email signature. Separate corporate entities that hold themselves out to the public via websites as a singular entity does not demonstrate unity of interest. *See Corcoran*, 169 F. Supp. 3d at 984 (collecting cases).

The remaining evidence submitted by Plaintiffs is likewise unpersuasive. Lion Capital's Form ADV demonstrates that Lion Americas was a "related person" and that the two entities are under common control. (*See* LION_14557, at 563; LION_14667, at 673–74.) As the DPP Plaintiffs explain, the SEC defines control as "[t]he power, directly or indirectly, to direct the management or policies of [Lion Americas] whether through ownership of securities, by contract, or otherwise." (DPP Opp'n 27 (alterations in original).) Directing the management or policies of a wholly owned subsidiary is entirely in line with *Ranza* and *Unocal*'s admonition that a parent may be involved in managing its subsidiary as long as they maintain corporate formalities necessary for corporate

---

[20] However, it does appear that Lion Capital did compensate a few Lion Americas employees who also received distributions for their status as Lion Capital partners. The Court addresses those contacts below. *See infra* section II.D.

separateness. Moreover, the fact that Lion Capital complied with the SEC's disclosure requirements in the first instance buttresses the conclusion that it observes corporate formalities. Finally, Lion Americas' status as a "non-discretionary investment advisor" to Lion Capital does not explain how such a status deviates from the normal parent-subsidiary relationship.

To summarize the Ninth Circuit's guidance concerning unity of interest: "A parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego." *Ranza*, 793 F.3d at 1074 (quoting *Unocal*, 248 F.3d at 927). The evidence demonstrates that Lion Capital exercised some level of control over Lion Americas and shared some personnel with it. However, Plaintiffs have not carried their burden to demonstrate that Lion Capital crossed from macro-management to day-to-day control over its subsidiary. The Court finds there was no unity of interest between Lion Americas and Lion Capital.

## 2. Alter Ego Conclusion

The DPP Plaintiffs argue that an inequitable result would follow because Lion Capital would not be held accountable for its acts and involvement in Bumble Bee. (DPP Opp'n 29.) Because Plaintiffs fail to carry their burden to demonstrate unity of interest, the Court does not reach the inequitable result argument.

Deviating from the rule of corporate separateness is an extreme remedy, sparingly used. *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 539 (Ct. App. 2000) (citing *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995)). The facts here do not rise to such an extreme level. Accordingly, the Court finds that Plaintiffs fail to demonstrate Lion Americas' contact impute general personal jurisdiction to Lion Capital.

Finally, even if the Court were to assume that Lion Americas' contacts impute to Lion Capital, there is no still no basis to subject Lion Capital to general jurisdiction because the combined Lion Americas and Lion Capital contacts with the United States are not sufficient to render Lion Capital at home in the United States when considering the entirety

of Lion Capital's contacts. *See Daimler*, 571 U.S. at 136–37. Even considering the Lion Americas' employees, the majority of Lion's employees reside and work in the U.K. (*See* Brown Decl. ¶¶ 15, 26.) The majority of Lion Capital's partners are domiciled in the U.K. (*Id.* ¶¶ 8–11.) And, Lion Capital manages their investment funds from London; the United States office operates in an advisory capacity. (*See id.* ¶¶ 4, 12.) Lion Capital is at home in the United Kingdom, not the United States.

## II. Specific Jurisdiction

Due process "constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)). "A nonresident defendant must have 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (alteration in original) (quoting *Int'l Shoe*, 326 U.S. at 316). "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden*, 571 U.S. at 283–84 (internal quotation marks omitted) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)).

There are two principles undergirding the defendant-focused inquiry. "First, the relationship between the nonresident defendant, the forum, and the litigation 'must arise out of contacts that the "defendant *himself*" creates with the forum State.'" *Axiom Foods*, 874 F.3d at 1068 (quoting *Walden*, 571 U.S. at 284). "Second, the minimum contacts analysis examines 'the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'" *Id.* (quoting *Walden*, 571 U.S. at 285).

Courts apply a three-part test to exercise specific jurisdiction over a non-resident defendant:

> (1) the defendant either "purposefully direct[s]" its activities or "purposefully avails" itself of the benefits afforded by the forum's laws; (2) the claim "arises out of or relates to the defendant's forum-related activities; and (3) the exercise of

29

jurisdiction [] comport[s] with fair play and substantial justice,
i.e., it [is] reasonable."

*Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1023 (9th Cir. 2017) (alterations in original) (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)). The burden is on the plaintiff to establish the first two prongs. *Axiom Foods*, 874 F.3d at 1068 (citing *Schwarzenegger*, 374 F.3d at 802). If the plaintiff satisfies the first two prongs then the defendant must present a "'compelling case' that exercise of jurisdiction would not be reasonable." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

Where a case sounds in a tort, courts employ the purposeful direction test. *See Axiom Foods*, 874 F.3d at 1069 (citing *Schwarzenegger*, 374 F.3d at 802). Courts in this circuit apply the purposeful direction test to antitrust cases. *See In re Capacitors Antitrust Litig.*, No. 14-cv-3264-JD, 2015 WL 3638551, at *2 (N.D. Cal. June 11, 2015) (citing *In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 743 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015); and *Fleury v. Cartier Int'l*, No. C–05–4525 EMC, 2006 WL 2934089, at *2 (N.D. Cal. Oct. 13, 2006)).

Before applying the Ninth Circuit's three-part test for specific jurisdiction, the Court takes a detour into the realm of alter egos and imputing contacts. Plaintiffs assert a variety of facts and theories for the purposes of imputing the contacts of two entities already subject to the Court's jurisdiction—Bumble Bee and Lion Americas—to the two entities beyond the Court's jurisdiction—Lion Capital and Big Catch. The Court addresses Plaintiffs' Bumble Bee alter ego arguments first and then applies the traditional specific jurisdiction test. Finally, the Court will address Big Catch's alter ego status.

### A. Whether Bumble Bee's Contacts May Be Imputed to Lion Capital

The Bashas Plaintiffs contend that Lion Capital is an alter ego of Bumble Bee and the Court should exercise personal jurisdiction over Lion Capital because of Bumble Bee's contacts. (Bashas Opp'n 27–31, 33.)

/ / /

*1. Whether Lion Capital or Lion Americas Must Own Bumble Bee*

Before applying the two-part alter ego test, the Court addresses Defendants' threshold argument. Defendants argue that neither Lion Capital nor Lion Americas is a parent corporation to Bumble Bee. (MTD 25 (citing Brown Decl. ¶ 20); Reply 19.) From that premise, Defendants conclude that Plaintiffs' alter ego analysis fails because Plaintiffs admit that the Lion entities are not equitable owners of Bumble Bee. (Reply 19 (citing *Sonora Diamond*, 83 Cal. App. 4th at 538).) Plaintiffs contend that the alter ego test is a functional, not formal test and does not turn on formal corporate ownership. (Nation Opp'n 39 n.39 (citing *United States v. Standard Beauty Supply Stores, Inc.*, 561 F.2d 774, 777 (9th Cir. 1977); Bashas Opp'n 30 n.20 (same).)

The general rule is that a subsidiary corporation is "one that is controlled by another corporation by reason of the latter's ownership of at least a majority of the shares of capital stock." 1 William Meade Fletcher, *Cyclopedia of the Law of Corporations*, § 26 (rev. ed. 2017); *see also Dole Food*, 538 U.S. at 475 (discussing general rule for subsidiaries of subsidiaries). The Ninth Circuit has previously held that "[o]wnership is a prerequisite to alter ego liability, and not a mere 'factor' or 'guideline.'" *Hickey*, 322 F.3d at 1128. However, the circuit later clarified in *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010), that "*Hickey* . . . did not foreclose the possibility that equitable ownership might be sufficient in some contexts." *Schwarzkopf* went on to consider several California decisions finding equitable ownership. *See id.* at 1038–39.

Here, neither Lion Capital nor Lion Americas directly owns Bumble Bee.[21] Rather, one of Lion Capital's investment funds owns Big Catch, which owns Bumble Bee's assets.

---

[21] Big Catch ultimately holds Bumble Bee's assets and a limited holding company—Lion/Big Catch Ltd.—controls Big Catch. (Brown Decl. ¶¶ 20, 23.) Lion Capital is not one of the sixty-seven owners of Big Catch stock. (LION_14788, at 845–915, 937–42.) It appears that Lion/Latimer GP II (Guernsey) Ltd. is the general partner of Lion/Big Catch Ltd. (LION_14788, at 917.) In turn, the Lion/Latimer GP II fund is a related party to a third party entity, Lion Capital General Partnership LLP. (Ex. 54, at 11.) Lion Capital General Partnership LLP's designated members are the same as Lion Capital—Lyndon Lea and Robert Darwent. (*Id.* at 4.)

Lion Capital does not own its investment fund, but controls the fund and directs its investments. Thus, there is some nexus of control between Lion Capital and Bumble Bee, but Plaintiffs have not demonstrated direct stock ownership.

The next issue is whether Lion Capital has equitable ownership of Bumble Bee, despite not having direct ownership. *Schwarzkopf* indicates that equitable ownership is permitted under California law. The DPP Plaintiffs take up this argument stating that Lion Capital acts as Bumble Bee's owner and holds itself out as such; thus, Lion Capital is Bumble Bee's equitable owner. (DPP Opp'n 15 n.9.) Defendants aver that Lion Capital and Lion Americas are not the equitable owners of Bumble Bee because one of Lion Capital's funds owns Big Catch. (Reply 19.) For example, the DPP Complaint discloses an organizational chart that shows that the one of the funds owns Bumble Bee. (Four Track Reply 15 (citing "DPP Compl." ¶ 43, ECF No. 911).) Defendants distinguish cases finding equitable ownership because the Lion entities are not part of the "chain" of Bumble Bee's ownership. (*Id.* at 16 (citing *Tatung Co. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1177 (C.D. Cal. 2016)).)

In *Tatung Co.*, the district court discussed whether equitable ownership was sufficient to impose alter ego liability. 217 F. Supp. 3d at 1178. There, several individuals did not own shares of the defendant company, but were alleged to act as owners of the defendant. *Id.* The court found that the fact that the individuals owned no shares in the defendant was not dispositive and that sufficient facts existed to demonstrate the individuals "acted as owner[s]" of the defendant by giving assets to the company and using assets to support loans by taken out by the defendant company. *Id.* (alteration in original). In *Schwarzkopf*, the Ninth Circuit cited with approval a California Court of Appeal case where the court imposed alter ego liability on a managing agent of an interinsurance exchange. 626 F.3d at 1039 (citing *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1343 (Ct. App. 2009)). The *Troyk* court reasoned that "[a]lthough the [interinsurance exchange] is legally owned by its subscribers (i.e., its insureds), its business activities are effectively controlled by its managing agent and attorney-in-fact." *Id.*; *see also id.* at 1343

n.27 ("[G]iven that the subscribers are required to appoint the attorney-in-fact as managerial agent, the 'ownership' element of the alter ego doctrine is not applicable in this context." (quoting *Tran v. Farmers Grp., Inc.*, 104 Cal. App. 4th 1202, 1219 n.7 (Ct. App. 2002))).

Here, Defendant Lion Capital is similar to the managing agent, its funds are similar to interinsurance exchange, and Lion's investors are similar to the subscribers who actually own the fund. Lion Capital may not have owned the fund that ultimately owned Bumble Bee, but it exercised control over the fund and where the fund directed its investments. Further, Lion Americas executives seemed to think that the Lion entities owned Bumble Bee. In November 2012, Mr. Capps of Lion Americas received an email asking to confirm the Bumble Bee ownership structure including a statement to the effect "Lion's share is more than 70%." (LION_4712.) Capps forwarded the email internally, asking "Chang, [please] confirm that we all have ownership at the [Bumble Bee] Holdco level." (*Id.*) Chang responded, "Our ownership . . . is at a Cayman LP which sits above Bumble Bee HoldCo." (*Id.*) This suggests that Lion Americas believed that they, i.e., the Lion entities, "owned" Bumble Bee in some respect. At oral argument, the Bashas Plaintiffs directed the Court to Bumble Bee's criminal plea agreement where the parties to that agreement defined Bumble Bee's "parent companies" to include Lion Capital LLP, Lion Americas, and Big Catch. (*See* Ex. 55, ECF No. 1247-25, ¶ 13.) It does not appear that the plea agreement defined "parent companies," but presumably Lion Capital and Lion Americas would not be parties to the plea agreement without some modicum of control over Bumble Bee. In light of the foregoing facts, the Court follows *Schwarzkopf* and *Tatung* and finds that Lion Capital's equitable ownership over Big Catch and Bumble Bee is appropriate in this case. The Court will proceed with the alter ego analysis.

### 2. *Unity of Interest*

#### a. Defendants' Arguments

Defendants advance three broad arguments why Plaintiffs have not established unity of interest between Bumble Bee and Lion Capital. First, Defendants take issue with

Plaintiffs' allegation that Bumble Bee was purposefully undercapitalized by the Lion entities as evidenced by the fact that Bumble Bee maintained a high debt to total capital ratio. (MTD 26 (citing Bashas Compl. ¶ 304).) Defendants cite the proposition that "[d]ifficulty in enforcing a judgment or collecting a debt does not satisfy th[e] [alter ego] standard." (*Id.* at 26–27 (quoting *Sonora Diamond*, 83 Cal. App. 4th at 539).) Further, Defendants distinguish this case from cases involving inadequate capitalization because the latter occur "where the organizers failed to invest any money at all or put up only token amounts; or where the principals reduce an operating corporation to a mere shell by stripping it of its assets." (*Id.* at 27 (quoting *Aliya Medcare Fin., LLC v. Nickell*, No. CV 14-7806 VAP (Ex), 2016 WL 7448095, at *9 (C.D. Cal. June 24, 2016)).) Defendants likewise argue that simply because Lion Capital financed the Bumble Bee acquisition as a "debt push-down" this does not illustrate an uncommon or illegitimate way for a private equity firm to direct an investment. (*Id.*)

Second, Defendants assert there is no alter ego liability through the four Lion members who sat on Bumble Bee's board of directors. (*Id.*) Defendants cite *United States v. Bestfoods*, 524 U.S. at 69, for the proposition that "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." (*Id.* at 28.) Defendants parry Plaintiffs' allegations that Bumble Bee executives received shares in Big Catch, (*id.* (citing Bashas' Compl. ¶ 309)), by arguing that "a parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego," (*id.* (citing *Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1068 (C.D. Cal. 2012))).

Third, Defendants consider various activities in the Bashas' Complaint including: employees at Lions Americas receiving regular, detailed reports about Bumble Bee's finances and operations; one of the Lion entities entering into a management agreement to provide advisory services to Bumble Bee; and unspecified Lion executives being involved

in four Bumble Bee projects.[22]  (*Id.* (citing Bashas Compl. ¶¶ 312–14).)  Defendants distinguish the foregoing facts because they do not demonstrate Lion's direction of "every facet of the subsidiary's business" required for alter ego liability.  (*Id.* (quoting *Ranza*, 793 F.3d at 1073).)  Defendants argue that the alleged facts reflect a pattern of legitimate conduct whether it be Lion Capital's investor status in Bumble Bee or Lion Americas' advisory relationship to Lion Capital.  (*Id.* at 29 (citing *Unocal*, 248 F.3d at 926).)

### b.  Plaintiffs' Arguments

Both the Bashas Plaintiffs and the Cherokee Nation submit three broad arguments that Lion entities dominated and controlled Bumble Bee.  First, Lion executives received daily, monthly, and other periodic reports regarding Bumble Bee's operations and had direct input into Bumble Bee's business.  (Nation Opp'n 38 (citing Nation FAC ¶¶ 47–50); Bashas Opp'n 29 (citing Bashas Compl. ¶¶ 309–15).)  Plaintiffs cite one district court opinion that found daily, weekly, and monthly financial reports a relevant factor in the alter ego test.  (Nation Opp'n 38 (citing *Parker v. DPCE, Inc.*, No. CIV. A 91-4829, 1992 WL 501273, at *6 (E.D. Pa. Nov. 3, 1992)); Bashas Opp'n 29 (same).)

Second, the Lion entities appointed three of the four Bumble Bee directors on Bumble Bee's board.  (Nation Opp'n 39; Bashas Opp'n 30.)  Messrs. Lea, Lindberg, and Capps have all served on the board of directors.  (Nation Opp'n 39; Bashas Opp'n 30.)  Plaintiffs acknowledge that dominion of the board of directors alone is not sufficient for alter ego, but urges the Court to consider it as a relevant factor in the unity of interest analysis.  (Nation Opp'n 39 (citing ECF No. 295, at 14); Bashas Opp'n 30 (same).)

Third, Plaintiffs point to their allegations that Bumble Bee was undercapitalized by the Lion entities.  (Nation Opp'n 39 (citing *NetApp, Inc. v. Nimble Storage, Inc.*, No. 13-CV-5058-LHK HRL, 2015 WL 400251, *7 (N.D. Cal. Jan. 29, 2015)); Bashas Opp'n 28

---

[22] These projects are: (1) Lion executives "facilitated and helped oversee" a co-packing venture with Chicken of the Sea; (2) executives advised Bumble Bee on public relations issues concerning fish aggregating devices; (3) executives "communicated" on Bumble Bee's behalf regarding sustainability issues; and (4) "assisted" with "rolling out" Bumble Bee's frozen food products. (Bashas Compl. ¶ 314.)

(same); DPP Opp'n 17.) The factual allegations include: (1) Bumble Bee took on debt from the Lion acquisition that left Bumble Bee with a negative net worth, (Nation FAC ¶¶ 41–42); (2) the Internal Revenue Service labeled Bumble Bee a "thinly capitalized corporation," (*id.* ¶ 43); and (3) Bumble Bee's public debt was downgraded by Standard & Poor's in 2016, despite Bumble Bee being profitable, (*id.* ¶ 42). (*See* Nation Opp'n 39; Bashas Opp'n 28.) Plaintiffs cite several cases where courts found alter ego liability when a subsidiary was undercapitalized and urges a similar result here. (Nation Opp'n 39 (citing, e.g., *VIA Techs., Inc. v. ASUS Computer Int'l*, No. 14-CV-3586-BLF, 2015 WL 3809382, at *5 (N.D. Cal. June 18, 2015)); Bashas Opp'n 28 n.18 (same).)

### c. Defendants' Reply

Defendants characterize many of the activities adduced by Plaintiffs as falling within the routine types of oversight that the Ninth Circuit held did not support an alter ego finding in *Ranza* and *Unocal*. (Reply 20.) Bumble Bee sending reports to Lion executives, Lion getting involved at a "very granular [level of] knowledge," appointment of board members, and supervision of finances are all consistent with the legitimate actions of a private-equity fund manager. (*Id.* at 20–21.)

Defendants also take issue with Plaintiffs' undercapitalization theory. They cite a Ninth Circuit definition for undercapitalization as requiring Plaintiffs to demonstrate "the corporate owner" has caused "a corporation [to be] so undercapitalized that it is unable to meet debts that may be reasonably be expected to arise in the normal course of business." (*Id.* at 24 (alteration in original) (quoting *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 677 (9th Cir. 2017)).) If a business has sufficient capital to "operate its normal business" then it is not undercapitalized. (*Id.* (quoting *In re Hydroxycut Mktg. & Sales Practices Litig.*, 810 F. Supp. 2d 1100, 1123 (S.D. Cal. 2011)).) Defendants characterize all of Plaintiffs' allegations as concerning the amount and character of debt held by Bumble Bee and not that Bumble Bee lacks sufficient capital to conduct its normal course of business. (*See id.* at 24–25.)

/ / /

d.  Court's Analysis

As before, the Court examines unity of interest to determine whether "the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Unocal*, 248 F.3d at 926.  The parties draw different conclusions from generally three categories of facts.

First, Plaintiffs argue that the Lion entities' involvement went beyond oversight typical of a portfolio company.  This is evident to Plaintiffs because Lion executives received daily, monthly, and other periodic reports regarding Bumble Bee's operations and had direct input into Bumble Bee's business.  (Nation Opp'n 38.)  Receiving information and providing input on business decisions are exactly the sort of evidence that both the *Unocal* and *Ranza* courts examined and held to be insufficient to demonstrate unity of interest.  In *Unocal*, the court was presented with evidence demonstrating the parent was involved in "its subsidiaries' acquisitions, divestments and capital expenditures" as well as "formulation of general business policies and strategies applicable to its subsidiaries." 248 F.3d at 927.  In *Ranza*, the parent was "heavily involved" in its subsidiary's operations, including but not limited to control over the subsidiary's overall budget, approval authority of large purchases, and operating information tracking systems. 793 F.3d at 1074.  In both cases, such a level of active involvement was insufficient to overcome the observance of corporate formalities.

Here, Plaintiffs have not demonstrated that a Lion entity was involved in, for example, hiring and firing decisions, negotiating contracts, making routine purchase decisions, and other routine day-to-day management operations for Bumble Bee.  *Cf. id.*  Plaintiffs cite a single unreported district court opinion for the proposition that receiving reports supports finding alter ego liability.  *See Parker*, 1992 WL 501273, at *6.  That case has limited applicability; receiving reports was one factor among others the court considered and the reasoning supporting the court's conclusion was not extensive.  This Court focuses on the guiding principles from *Unocal* and *Ranza*—requiring evidence that the parent dictated every facet of the subsidiary from broad policy to day-to-day decisions.

The oversight of Bumble Bee did not rise above the permissible level of oversight outlined in *Unocal* and *Ranza*.

Second, Plaintiffs contend that a Lion entity dominated Bumble Bee's board of directors. As all the parties recognize, several leading cases hold that shared directors, by itself, does not expose the parent corporation to liability for the subsidiary's acts. *See Bestfoods*, 524 U.S. at 69 (citing *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir.), *cert denied*, 488 U.S. 852 (1988)); *Unocal*, 248 F.3d at 926. For its part, California law views identical directors as one factor in the unity of interest analysis, *Associated Vendors*, 210 Cal. App. 2d at 839 (collecting cases), but does not view shared directors as dispositive, *see Sonora Diamond*, 83 Cal. App. 4th at 548–49 ("It is considered a normal attribute of ownership that officers and directors of the parent serve as officers and directors of the subsidiary."). Here, Plaintiffs only demonstrate that Lion placed directors on Bumble Bee's board, but does not take the next step to explain how shared directors amounted to unity of interest. Therefore, the Court takes note of the directors Lion placed on Bumble Bee's board, but such a recognition is not dispositive in the analysis. *See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003) (holding no unity of interest where two companies were "run by the same senior officers and directors," shared the same offices in London, and shared some of the same staff).

Third, the Court addresses undercapitalization.[23] The Cherokee Nation alleges that

---

[23] Both the Cherokee Nation and the Bashas Plaintiffs cite *Slottow v. American Casualty Co. of Reading, Pennsylvania*, 10 F.3d 1355, 1360 (9th Cir. 1993), for the proposition that inadequate capitalization alone maybe be a sufficient basis for alter ego liability. In turn, *Slottow* only cites *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.2d 1538, 1544 (9th Cir. 1988), for the same proposition and *Nilsson* ultimately cites *Minton v. Cavaney*, 56 Cal. 2d 576 (1961).

Federal courts apply the law of the forum state to determine whether an entity is the alter ego of an individual. *Hickey*, 322 F.3d at 1128. California courts have relied on a variety of factors to determine unity of interest; for example, *Minton* did not explicitly hold or state in dicta that inadequate capitalization alone was sufficient. *See* 56 Cal. 2d at 579–80. In 1957, in *Automotriz Del Golfo de California S.A. De C. V. v. Resnick*, the California Supreme Court cited with approval the rule that "inadequate financing, where such appears, is a factor, and an important factor, in determining whether to remove the insulation to stockholders normally created by the corporate method of operation." 47 Cal. 2d 792, 797 (1957) (internal quotation marks omitted) (quoting *Carlesimo v. Schwebel*, 87 Cal. App. 2d 482, 493 (Ct. App.

Lion directed Bumble Bee to take on debt so that Bumble Bee had a negative net worth. (Nation FAC ¶¶ 41–42.) Plaintiff alleged that at one point in time Bumble Bee carried over $843 million in debt despite having annual revenues of over $900 million. (*Id.* ¶ 42.) The Cherokee Nation further alleges that Bumble Bee's debt to total capital ratio before Lion's acquisition of Bumble Bee was around sixty percent and after acquisition the debt to capital ratio was around ninety percent from 2010 to 2015, which was well above the food processing industry's average. (*Id.* ¶ 44 (including table alleging food processing industry debt to total capital ratios ranging from fifty to forty percent).) The Bashas Plaintiffs allege that but for the "█████████████████████████████████████████████████████████████████████████████████████████. (Bashas Compl. ¶ 305.) To wit, ████████████████████████████████████████████████████████████████████████████████████████████████. (*Id.*)

These allegations are insufficient to demonstrate the type of undercapitalization necessary to pierce the corporate veil. There is no doubt that Bumble Bee carried a higher debt load post-acquisition than it did pre-acquisition. But, whether Bumble Bee had a high debt leverage does not paint the full picture. "Adequate capitalization means 'capital reasonably regarded as adequate to enable [the corporation] to operate its business and pay

---

1948)). California has not modified this rule in the time since. *See Zoran Corp. v. Chen*, 185 Cal. App. 4th 799, 812 (Ct. App. 2010) ("No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." (citations omitted)); *Sonora Diamond*, 83 Cal. App. 4th at 539 ("No one characteristic governs . . . ."); *Harris v. Curtis*, 8 Cal. App. 3d 837, 841 (Ct. App. 1970) ("Appellants would have us declare that, per se, inadequate capitalization renders the shareholders, officers and directors liable for the obligations of the corporation. They cite no case so holding, and we know of none."); *Associated Vendors*, 210 Cal. App. 2d at 841–42 ("Evidence of inadequate capitalization is, at best, merely a factor to be considered by the trial court in deciding whether or not to pierce the corporate veil.").

The rule in California appears to be: inadequate capitalization is an important factor and, where it appears, an important one. *See Enter. Tech. Holdings, Inc. v. Noveon Sys., Inc.*, No. 05-CV-2236 W (CAB), 2008 WL 11338356, at *11 (S.D. Cal. July 29, 2008). However, while the Court notes the divergence between Ninth Circuit and California law, it need not rest on either formulation of the law because Plaintiffs fail to demonstrate inadequate capitalization as a factor, *ex ante*.

15-MD-2670 JLS (MDD)

its debts as they mature.'" *Laborers Clean–Up Contract Admin. Trust Fund v. Uriarte Clean–Up Service, Inc.*, 736 F.2d 516, 524 (9th Cir. 1984) (alteration in original) (quoting Lattin, *Lattin on Corporations*, § 15(a), at 77 (2d ed. 1971)). Thus, the relevant question is whether Bumble Bee's capital was sufficient to "operate its normal business." *In re Hydroxycut Mktg. & Sales Practices Litig.*, 810 F. Supp. 2d at 1123. Bumble Bee's roughly ninety percent debt to capital ratio does not demonstrate it had insufficient capital to operate its normal business and pay its debts as they matured.

Moreover, the level of debt here does not rise to the same level of undercapitalization in the cases Plaintiffs cite. For example, in *Slottow*, the entity's initial capitalization was $500,000 and its liabilities were $10 million. 10 F.3d at 1360. Thus, the defendant in *Slottow* could not pay its debts. In *VIA Technologies*, the entity had at most $500,000 in capital compared to anywhere from $400 million to $2 billion in annual sales. 2015 WL 3809382, at *5. The inference there was that the parent entity was funneling all the profits from its alter ego subsidiary. Here, Plaintiffs generally allege that Bumble Bee carried a high debt to total capital ratio; they do not allege that Bumble Bee could not meet its operating expenses.

The exception to this is an allegation Bumble Bee would have defaulted in 2011 but for the price fixing conspiracy. The basis for Plaintiffs' for the allegation is that the United States Sentencing Guidelines presumes a ten percent surcharge in price fixing cases and if one were to assume Bumble Bee's profits were reduced by ten percent then Bumble Bee would have defaulted. (*See* Bashas Compl. ¶ 305 & n.13.)

> If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability . . . . If the capital is illusory or trifling compared with the business to be done and the risk of loss, this is a ground for denying the separate entity privilege.

*Automotriz Del Golfo De Cal.*, 47 Cal. 2d at 797 (quoting Henry Winthrop Ballantine,

*Ballantine on Corporations*, at 302–03 (1946)). Plaintiffs do not demonstrate that Defendants stripped Bumble Bee of its assets or that Bumble Bee's capital was "illusory or trifling." Indeed, while Bumble Bee had ███████████ in liabilities, it also had ███████ in assets at the end of 2010. *See Perfect 10*, 847 F.3d at 678. Had Bumble Bee actually defaulted then it had capital on the line to meet its liabilities. The foregoing is simply not the pervasive undercapitalization required to demonstrate unity of interest.

In sum, the factors Plaintiffs allege do not demonstrate unity of interest to the extent necessary to ignore the traditional corporate separateness. Accordingly, the Court finds that Plaintiffs have not demonstrated unity of interest between Lion Capital and Bumble Bee.

### 3. Alter Ego Conclusion

Because the Court has determined that Plaintiffs fail to allege unity of interest, the Court need not proceed to the fraud or injustice prong. In sum, the Court finds Lion Capital is not the alter ego of Bumble Bee. The Court turns to the three-part specific jurisdiction test.

## B. Purposeful Direction

The first prong of the specific jurisdiction analysis may be satisfied "even by a defendant 'whose only "contact" with the forum state is the 'purposeful direction' of a foreign act having effect in the forum state.'" *Schwarzenegger*, 374 F.3d at 803 (citations omitted) (quoting *Dole Food Co.*, 303 F.3d at 1111). The Court analyzes purposeful direction under the *Calder* effects test, which requires the defendant to have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citing *Calder v. Jones*, 465 U.S. 783 (1984)). All three parts of the test must be satisfied. *Schwarzenegger*, 374 F.3d at 805.

### 1. Intentional Act

The first prong of the *Calder* effects test, the intentional act requirement, simply attempts to differentiate between an actual, physical act and an intent to accomplish a result

or consequence of an act. *See Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015) (citing *Schwarzenegger*, 374 F.3d at 806).

Defendants argue that Plaintiffs do not allege that Lion Capital committed a single intentional act directly affecting the pricing, marketing, or sale of package tuna. (MTD 19.) Defendants implicitly concede that intentional acts occurred but instead argue those acts should not be imputed to Lion Capital and any intentional acts by Lion Capital do not directly affect the conspiracy. Thus, their argument is better suited for the express aiming prong.

Plaintiff the Cherokee Nation elucidates the following intentional acts. First, Lion Capital placed three Lion Americas executives on Bumble Bee's board of directors, which met in California on a regular basis. (Nation Opp'n 20 (citing Nation FAC ¶ 47).) Lion Americas executives also received financial information from Bumble Bee including ███████████████████████████████████████████████████ ██████████████████████. (*Id.* (citing, e.g., Nation FAC ¶ 49; Lion_3190–93).) Lion Capital members also received detailed information from Bumble Bee executives regarding raw material costs, acquisition issues, and competitive activity. (*Id.* at 21 (citing, e.g., LION_547).)

Plaintiff also points to Lion Capital executives engaging in Bumble Bee's business operations by:



(*Id.* at 20–21 (alterations in original) (quoting Nation FAC ¶ 50).) Lion Americas executives also communicated with Bumble Bee executives allegedly concerning the ongoing conspiracy to set prices. For example, ██████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████. (*Id.* at 22 (citing LION_3445–58; and LION_3484; and LION_12605).)

Next, Lion Americas executives reported Bumble Bee dealings to Lion Capital investors, but did not reveal any information relating to price-fixing. (*Id.* at 22–23 (citing Nation FAC ¶ 51; and LION_4455–64).) Lion Americas executives also attended industry conferences with Bumble Bee executives and met and corresponded with industry competitors and their parent corporations. (*Id.* at 23 (citing, e.g., Nation FAC ¶ 52; and LION_1772; and LION_2429).)

The Bashas Plaintiffs contend that the intentional acts are intertwined with and reliant on the factual allegations contained in their complaint and that Defendants' argument to the contrary depends on the Court finding that Plaintiffs failed to allege any acts connecting Defendants to the broader conspiracy. (Bashas Opp'n 34–35.) To that end, Plaintiffs assert that they have adequately alleged that Lion, especially Mr. Lindberg, knew of and took acts in furtherance of the conspiracy. (*Id.* at 35.) Thus, Plaintiffs contend that they have stated a claim and those facts establish the intentional acts required under *Calder*.

The intentional act threshold is not a high bar. In *Bancroft & Masters, Inc. v. Augusta National Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000), for instance, the act of sending a letter satisfied this requirement. Moreover, the Ninth Circuit has held that "[f]or purposes of personal jurisdiction, the actions of an agent are attributable to the principal." *Sher*, 911 F.2d at 1362 (citing *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 419 (9th Cir. 1977)); *see also Ziegler v. Indian River Cnty.*, 64 F.3d 470, 475 (9th Cir. 1995) (applying *Sher* to executive vice-president acting on behalf of defendant corporation); *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 466 (1st Cir. 1990) ("The general rule is that jurisdiction over a partner confers jurisdiction over the partnership. Primarily, this comes about because a partner is deemed by law and contract to be the partnership's general agent." (citing 59A Am. Jur. 2d, *Partnership*, §§ 248–50 (1987); and Restatement

(Second) of Agency § 14A, cmt. a (1958))). Thus, the intentional acts taken by Lion Capital's partners also may be properly considered.

Here, Plaintiffs detail a variety of intentional acts undertaken by Defendants including receiving information, monitoring Bumble Bee projects, corresponding with Bumble Bee executives, investors, and competitors, and exchanging confidential information. These includes actions taken by Lion Capital partners Lindberg, Capps, and Chang in the scope of their partnership.[24] *See also infra* section V. The Four Track Plaintiffs jointly submitted evidence including Lion Capital's partnership deed, (ECF No. 1318, at 8), a list of persons who were members (including Capps and Chang), (*id.* at 24), and an addenda adding Lindberg as a member, (*id.* at 113). The Court finds these facts sufficient to demonstrate Lindberg, Capps, and Chang were partners and that their intentional acts impute to Lion Capital. The Court further finds that there were sufficient intentional acts to satisfy the first element of the *Calder* effects test with regard to Lion Capital.

With regard to Big Catch, Plaintiffs do not adduce any intentional acts taken by Big Catch itself. Instead, they argue that Big Catch acted through its limited partners, i.e., shareholders, who are themselves members of the conspiracy.[25] (*See* Bashas Opp'n 38.)

---

[24] Finding that the actions taken by partners of Lion Capital impute to the partnership for purposes of specific jurisdiction does not run afoul of the Supreme Court's holding in *Daimler*, which dealt with general jurisdiction over wholly owned subsidiaries. *See* 571 U.S. at 134–35; *see also id.* at 135 n.13 ("Agency relationships, we have recognized, may be relevant to the existence of *specific* jurisdiction."). One Ninth Circuit panel has expressed its opinion that *Daimler* voided an agency approach for specific jurisdiction. *Williams*, 851 F.3d at 1023–25. *Williams* dealt with the question of whether a subsidiary's contacts impute to a parent corporation via an agency relationship; it did not deal with whether a partner's actions can impute to his or her own partnership, without reference to a parent-subsidiary relationship. *See Heber v. Toyota Motor Sales U.S.A., Inc.*, No. SACV1601525 AGJ CGX, 2018 WL 3104612, at *2 (C.D. Cal. June 11, 2018) ("The Ninth Circuit has left open the question of whether an agency relationship *between a parent and a subsidiary* might impute the subsidiary's forum contacts to the parent." (emphasis added)).

[25] At oral argument, the Bashas Plaintiffs argued that Big Catch borrowed $145 million against Bumble Bee's assets to distribute to its shareholders. (*See* ECF No. 1321, at 41; Bashas Opp'n 15.) This fact is not persuasive for two reasons. First, it appears that Lion Capital and Bumble Bee were the entities responsible for intentionally acting. (*See* Bashas Opp'n 15.) Second, the Bashas Plaintiffs do not connect the borrowing of additional funds to the price-fixing conspiracy.

44

Plaintiffs go on to assert that the acts taken by Bumble Bee and its executives in furtherance of the conspiracy suffice to establish personal jurisdiction over Big Catch. (*See id.*) The Court has already discussed whether Bumble Bee's acts impute to Big Catch, *see supra* section II.D, and Big Catch's status as a holding company means that it does not undertake intentional acts; others act on its behalf. Therefore, the Court finds that Plaintiffs fail to establish the first element of the *Calder* effects test with regard to Big Catch, but will proceed with the *Calder* analysis as to Lion Capital.

### 2. Express Aiming

For the express aiming element, the Ninth Circuit has made clear that *Calder* requires "something more" than a foreign act that has foreseeable effects in the forum state. *See, e.g.*, *Bancroft*, 223 F.3d at 1087; *Schwarzenegger*, 374 F.3d at 805. "[T]he requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Bancroft*, 223 F.3d at 1087. "The 'express aiming' analysis depends, to a significant degree, on the specific type of tort or other wrongful conduct at issue." *Schwarzenegger*, 374 F.3d at 807.

"An antitrust defendant 'expressly aims' an intentional act at a forum state when its allegedly anticompetitive behavior is targeted at a resident of the forum, or at the forum itself." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1011 (N.D. Cal. 2014) (citing *In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d at 743). These cases discuss the relevant facts to support finding express aiming by an antitrust defendant. In *CRT*, the court described evidence demonstrating the defendants shared U.S. marketing information with co-conspirators, coordinated pricing decisions in relation to the United States, and discussed prices in U.S. dollars. *See id.*

Next, in *Western States*, the plaintiffs alleged that the defendant's

> officers or directors made agreements "which tended to advance or control the market prices of natural gas that its affiliates sold in the United States or in Wisconsin" and that these officers or directors made "strategic marketing policies and decisions" to

15-MD-2670 JLS (MDD)

report prices to natural gas price indices "that affected the market prices of natural gas."

715 F.3d at 744.  The policies and decisions were then implemented by affiliates.  *Id.*  The plaintiffs went on to allege that the conspiracy was "ordered and performed by [the defendants'] officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of defendants' business or affairs."  *Id.*  The Ninth Circuit found "these alleged facts, taken as true, establish that the . . . [d]efendants' price manipulation was 'expressly aimed' at Wisconsin, because the . . . [d]efendants knew and intended that the consequences of their price manipulation would be felt in Wisconsin."  *Id.* (citing *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1258 (9th Cir. 2008)).

### a.  Defendants' Arguments

Defendants contend that none of the intentional acts demonstrated that Lion Capital or its employees acted directly to affect the pricing, marketing, or sale of packaged tuna. (MTD 19.)  Defendants cite authority for the proposition that Plaintiffs cannot impute personal jurisdiction from Bumble Bee to Lion Capital because the Ninth Circuit has not adopted, and several district courts have rejected, a conspiracy theory of personal jurisdiction.  (*Id.* at 20 (citing *Hilsenrath* v. *Equity Trust (Jersey) Ltd.*, No. C 07-3312 CW, 2008 WL 728902, at *4 n.5 (N.D. Cal. Mar. 17, 2008), *aff'd*, 402 Fed. App'x 300 (9th Cir. 2010); and *UMG Recordings, Inc.* v. *Global Eagle Entm't, Inc.*, No. CV 14-3466 MMM (JPRx), 2015 WL 12752879, at *8–9 (C.D. Cal. July 2, 2015)).)

Defendants also contend that Mr. Lindberg's meetings with competitors do not support the inference of wrongful conduct nor personal jurisdiction over Lion Capital.  (*Id.*) Defendants state that there are no allegation that the meetings were aimed at the United States or resulted in harm to persons in the United States.  (*Id.*)

### b.  Plaintiffs' Arguments

Plaintiffs argue that Lion Capital undertook two broad categories of actions: first, managing and oversight of Bumble Bee; second, meeting and communicating in

15-MD-2670 JLS (MDD)

furtherance of the conspiracy. With regard to managing and oversight, Plaintiffs contend Lion Capital placed three executives on Bumble Bee's board of directors, which met in California on a regular basis. (Nation Opp'n 20; Bashas Opp'n 37.) Next, Lindberg, Capps, Chang, and Bondy received regular sales and financial reports from Bumble Bee; Lion executives were also involved in day-to-day operations including implementing new projects. (Nation Opp'n 20–21; Bashas Opp'n 37.) Plaintiffs further allege that after board meetings, Lion and Bumble Bee executives would meet in private sessions and did not record minutes. (Nation Opp'n 21 (citing Nation FAC ¶ 50).) Lion executives also approved bonuses and were involved in Bumble Bee's 2011 restructuring request. (*Id.*)

As to meeting and communications, Plaintiffs allege that Mr. Lindberg and others at the Lion entities communicated with Bumble Bee CEO Lischewski about the conspiracy. (*Id.* at 22; Bashas Opp'n 36.) For example, Mr. Lischewski wrote to Messrs. Lindberg and Capps about an April 1, 2012 price increase and forwarded to them emails from other Bumble Bee executives with competitive pricing information, (Nation Opp'n 22 (citing LION_3445–58; LION_3484; LION_12605)), including an email chain complaining about ▓▓▓▓▓▓ by competitors, (Bashas Opp'n 36 (quoting Ex. 69)). Lion Americas executive Chang communicated to Lion Capital general manager Lea that ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" (Nation Opp'n 22 (quoting LION_3926).) And, a slide deck prepared for the August 2012 Bumble Bee board of directors' meeting stated "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓," and there was an "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." (*Id.* (quoting LION_4334, at 369, 374).)

Next, Mr. Lischewski had longstanding relationships with industry competitors and reported information from those meetings to the Lion entities. (*Id.* at 23 (citing, e.g., LION_4307).) Mssrs. Lindberg, Smialek, and others from Lion attended industry conferences and corresponded with competitors. (*Id.* (citing, e.g., LION_6953).) The Bashas Plaintiffs argue that the conspiracy was U.S.-centric; for example, in 2008

Lischewski told Dongwon's CEO that ninety percent of Bumble Bee's sales came from the United States. (Bashas Opp'n 35 (citing Ex. 62; Ex 63, at 875–76).)

### c. Court's Analysis

Here, the uncontroverted factual allegations and the record supports Plaintiffs' contention that Lion Capital expressly aimed anticompetitive behavior at the relevant forum, the United States. Before Lion Capital acquired Bumble Bee, Lion Capital executives and partners communicated internally about the packaged seafood market, including the U.S., in the context of purchasing Bumble Bee. (LION_6953.) Lion Capital executives apparently met with market competitors, before acquisition, in London. (LION_7074.) Importantly, Lion Capital's designated member, Mr. Lyndon Lea, and limited members Lindberg, Capps, and Chang, were members of Bumble Bee's board of directors. It is unclear whether Mr. Lea actually attended any board meetings in California;[26] however, at the very least he received the presentations before the board meetings, (*see, e.g.*, LION_4569; LION_7406), and email summaries after the meetings, (*see, e.g.*, LION_3926; LION_12614). This information included alleged anticompetitive behavior. In March 2012, Mr. Chang, both a Lion Americas employee and Lion Capital limited member, reported to Mr. Lea that "[a]fter April 1, all three brands will be closely aligned on tuna list pricing" and offered to call to discuss further. (Nation FAC ¶ 51; LION_3926.)

Mr. Lea continued to communicate with Lion Americas executives concerning Bumble Bee. (LION_1575 (merger and acquisition information); LION_2529 (receiving information on Lindberg's meetings in Bangkok); LION_4714, at 22 (discussing meeting

---

[26] Plaintiffs contend Mr. Lea attended board meetings in California. (*See* Nation Opp'n 22 (citing LION_4334).) The evidence supporting this inference is that his name appears on slide deck as an attendee at board meetings. Yet, emails sent after the meetings suggest Mr. Lea was not present, but received information. (*See* LION_3926; LION_12618.) The Supreme Court has stated that physical presence in the forum is not dispositive as long as "a commercial actor's effects are 'purposefully directed' toward residents of another state." *Burger King*, 471 U.S. at 476 ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines . . . .").

with Lyndon).) On July 30, 2012, Mr. Lindberg sent an email to Mr. Lea in which the former stated:



(LION_547.)  The reference to StarKist being in "███████" with Bumble Bee and "██████ █████████████" suggests an agreement by Lion Capital to set prices in coordination with Dongwon.  Mr. Lea also received information concerning Bumble Bee's 2012 financial results including an increase in net sales following "the price increases implemented through [2012]." (LION_12617.)  At oral argument, Defendants argued that the express aiming needs to be tortious and suggested none of the conduct business-related conduct elucidated by Plaintiffs was tortious. (ECF No. 1321, at 55)  This reasoning depends, in part, on the Court's determinations with regard to liability, i.e., whether Plaintiffs state a federal antitrust claim.  If the Court finds the allegations sufficient to state a claim, then the same business activities support an express aiming.  Plaintiffs have the burden of establishing express aiming.  As will be seen below, the Court has determined that Plaintiffs state a claim for which relief can be granted as to the same conduct at issue here for express aiming. *See infra* section V.  Accordingly, the same acts involving Lion Capital partners, discussed below, which support an antitrust violation likewise support a finding of express aiming of anticompetitive behavior.

Like the defendants in *Western States*, Lion Capital executives and partners were involved in the direction and control of Bumble Bee during the relevant period of the conspiracy.  They received information from their Lion Americas counterparts and communicated with Lion Americas about the alleged conspiracy.  Some members of Lion Americas were also Lion Capital partners.  Bumble Bee is a U.S.-based company and Defendant Lion Capital's activities concerning Bumble Bee were expressly aimed at the

49

United States.  Accordingly, the Court finds Lion Capital meets the second prong of the *Calder* effects test.

### 3. Foreseeable Harm

As the Supreme Court made clear in *Walden v. Fiore*, something more is required than "imposition of an injury . . . to be suffered by the plaintiff while she is residing in the forum state."  571 U.S. at 289 n.8.  *Walden* suggests the injury should be "tethered" to the forum state in a "meaningful way" in order to create a jurisdictionally relevant contact.  *Id.* at 290.  For example, in *Walden*, the defendant, a deputized agent of the Drug Enforcement Administration ("DEA"), allegedly unlawfully seized the plaintiffs' cash at an Atlanta airport.  *Id.* at 280.  The plaintiffs, Nevada residents, attempted to hale the deputized DEA agent into federal court in Nevada for injuries related to the seized funds.  *Id.* at 281.  The Supreme Court held there was no personal jurisdiction and reasoned, the injury would follow the plaintiffs around no matter the state they chose to reside in, and thus the injury was not meaningfully tethered to Nevada.  *See id.* at 289–90.

The Ninth Circuit has stated "[o]ur case law does not require that the 'brunt' of the harm be suffered in the forum state; as long as 'a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state."  *W. States*, 715 F.3d at 744 (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) (en banc) (per curiam)).  Here, it is foreseeable that Bumble Bee's anticompetitive behavior, overseen by Lion Capital, would cause harm suffered in the United States.  Bumble Bee is a U.S. company and its sales are largely in the U.S. market.  (Nation FAC ¶ 34; Bashas Compl. ¶ 19.)  The harm falls on American consumers and the facts here clearly meet the foreseeability requirements articulated in *Calder*, *Walden*, and *Western States*.  The Court finds Lion Capital meets the foreseeable harm requirement.

### C. Arises Out of Forum Related Activities

A court determines whether a claim arises out of defendant's forum-related activities in terms of "but for" causation.  *Unocal*, 248 F.3d at 924 (citing *Ballard*, 65 F.3d at 1500).

The but for test requires "some nexus between the cause of action and the defendant's activities in the forum." *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 387 (9th Cir. 1988), *overruled on other grounds*, 499 U.S. 585 (1991). In the context of a federal antitrust case the but for test can be met by establishing the plaintiffs paid artificially high prices for the relevant products as a result of the defendant's activities. *CRT*, 27 F. Supp. 3d at 1013.

Defendants argue that Plaintiffs do not allege any activity without which Plaintiffs' claim would not have arisen. (MTD 21.) Instead, the conspiracy existed before any Lion entity purchased Bumble Bee and Plaintiffs' allegations only speak to receiving information about the conspiracy, receiving profits from the conspiracy, and Lion's purported guilt by association. (*Id.*) Defendants conclude by arguing that Plaintiffs fail to allege a harm of which a Lion entity was a but for cause. (*Id.*)

The Bashas Plaintiffs characterize the nexus between their claims and Lion as deriving from the latter's "efforts to sustain the conspiracy." (Bashas Opp'n 39.) Plaintiffs also contend that Defendants misstate the arising out of test. They argue the test is satisfied because but for Lion taking action to further the conspiracy to raise tuna prices in the U.S., plaintiffs would not have any claim against Lion. (*Id.* at 39 n.35 (citing *Tatung Co. v. Shu Tze Hsu*, 43 F. Supp. 3d 1036, 1049–50 (C.D. Cal. 2014)).) The Cherokee Nation also argues that Defendants' contacts are part of the ongoing conspiracy and thus sufficient for the arising out of prong. (Nation Opp'n 25.)

Plaintiffs allege that they paid artificially high prices because of a conspiracy in the packaged seafood industry. (Bashas Compl. ¶ 324; Nation FAC ¶ 250.) The only question in dispute is whether those artificially high prices were the result of Defendants' forum-related activities. Plaintiffs put forward evidence supporting affirmative actions taken by Defendants Lion Americas and Lion Capital to further the conspiracy in their oversight of Bumble Bee, a California and U.S.-based company. *See supra* section II.E.2; *infra* section V. Accordingly, the Court finds Plaintiffs' claim arise out of Defendants' forum related activities.

/ / /

### D. Fair Play and Substantial Justice

For a court to exercise personal jurisdiction, whether general or specific, over a defendant, such assertion of jurisdiction must be "reasonable." *Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 851 (9th Cir. 1993). The defendant has the burden of making a "compelling case" that the exercise of jurisdiction is not reasonable. *Martensen v. Koch*, 942 F. Supp. 2d 983, 993 (N.D. Cal. 2013). In assessing reasonableness, a court must weigh seven factors: (1) the extent of the defendant's purposeful interjection in the forum; (2) the burden on the defendant; (3) the extent of any conflict with the sovereignty of the defendant's domicile; (4) the forum state's interest in adjudicating the dispute; (5) the efficient resolution of the dispute; (6) the convenience and effectiveness of the plaintiff's relief; and (7) the existence of an alternative forum. *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1198–99 (9th Cir. 1988) (citations omitted).

Defendants contend the exercise of jurisdiction over them is unreasonable because it would plunge Lion Capital into a large American antitrust litigation to which the Lion entities have only a tenuous connection. (MTD 22.) Further, involvement in the case would place a severe burden on Lion Capital because its employees would be forced to travel from the United Kingdom to Southern California to participate in the litigation. (*Id.* (citing *Asahi*, 480 U.S. at 114–16).)

Plaintiffs counter that Defendants have inserted themselves into California's affairs by owning a San Diego-based company. (Bashas Opp'n 40.) They further contend that the majority of relevant witnesses and documents reside in California and there "is little to no burden on either Lion entity to defend itself in California. (*Id.*) Plaintiffs also point out that Defendants do not argue that the remaining reasonableness factors militate against personal jurisdiction. (*Id.* at 41.) Plaintiffs conclude that personal jurisdiction is reasonable based on California's interest in enforcing antitrust laws, the interest of Plaintiffs in adjudicating the dispute where they were harmed, the importance of Bumble Bee to the local economy, and that any alternative forum would not provide effective relief

for Plaintiffs.  (*See id.*; *see also* Nation Opp'n 26–27 (advancing same arguments as Bashas Plaintiffs).)

Defendants have more than a tenuous connection with this case.  Lion Capital manages the investment funds that purchased and continues to own Bumble Bee.  Lion Americas oversees Bumble Bee.  Both entities had employees on Bumble Bee's board of directors.  By undertaking these actions, Defendants have interjected themselves into the forum.  The Court is mindful of the burden that would be imposed on Lion Capital to appear in California.  Plaintiffs' assurances that the majority of relevant witnesses and documents reside with Bumble Bee would, at most, support finding personal jurisdiction over Bumble Bee and Lion Americas.  Lion Capital's witnesses are in London, which militates against reasonableness.  *See Asahi*, 480 U.S. at 114.  However, it is notable that Defendants do not address much less carry their burden on the remaining six factors.

Unlike *Asahi*, where the Supreme Court determined California had only a slight interest in adjudicating an indemnification claim, *see id.*, the forum here has a greater interest in an antitrust claim affecting American consumers.  Further, the MDL has progressed before this Court for several years, which supports Plaintiffs' interests in convenient and effective relief—judicial economy would not be served if Plaintiffs litigated against Lion Capital in the United Kingdom.  Finally, Defendants do not put forward arguments concerning any conflict with the United Kingdom or the existence of an alternative forum, though the Court assumes that the U.K. likely could provide effective relief.  In sum, the Court finds that finding personal jurisdiction over Lion Capital would comport with fair play and substantial justice.  The Court finds that it has personal jurisdiction over Lion Capital.  Accordingly, the Court **DENIES** Defendants' Rule 12(b)(2) Motions to Dismiss as to Lion Capital, LLP.

## III.  Imputing Personal Jurisdiction to Big Catch

Having determined that Lion Americas and Lion Capital are properly within the Court's personal jurisdiction, the remaining personal jurisdiction issue is Big Catch.  In addressing this issue, Plaintiffs maintain Big Catch is subject to personal jurisdiction

because Big Catch is the alter ego of Bumble Bee. (Bashas Opp'n 33; DPP Opp'n 20.) The DPP Plaintiffs also submit that Big Catch is the alter ego of Lion Capital[27] (DPP Opp'n 20.) And, the Cherokee Nation advances a theory where "Big Catch can only act through its shareholders" and therefore should be subject to general personal jurisdiction. (Nation Opp'n 30–31.)

### A. Whether Bumble Bee or Lion Capital's Contacts Impute to Big Catch

This Court has general personal jurisdiction over Bumble Bee because its principal place of business is in the United States, specifically San Diego, California, and is incorporated in Delaware. (Nation FAC ¶ 34; Bashas Compl. ¶ 19.) Additionally, the Court has determined that it has specific personal jurisdiction over Lion Capital. Plaintiffs advance several arguments why those respective contacts should impute to Big Catch.

#### 1. Plaintiffs' Argument

The Cherokee Nation contends that Big Catch has systematic and continuous contacts with California based on its ownership of Bumble Bee. (Nation Opp'n 30.) It further argues that Big Catch can only act through its shareholders or its subsidiaries. (*Id.* (citing *Wells Fargo*, 556 F.2d at 419).) Fifty-four of Big Catch's sixty-seven owners are U.S. citizens. Ten of those owners are Bumble Bee executives. And, one hundred percent of Big Catch's revenue comes from Bumble Bee. (*Id.* (citing LION_14788, at 848–915, 937–42).)

The Bashas Plaintiffs assert that Big Catch is a shell company and because shell companies are disregarded for purposes of personal jurisdiction[28] then the acts taken by Bumble Bee and its executives in furtherance of the conspiracy imputes to Big Catch.

---

[27] The DPP Plaintiffs' alter ego arguments are located in the section of their brief pertaining to Rule 12(b)(6), (*see* DPP Opp'n 20–22), but later in their Opposition brief they contend the alter ego analysis is a basis for general jurisdiction, (*see id.* at 30–31). Therefore the Court addresses the alter ego argument here.

[28] Plaintiffs' moving papers are not particularly clear as to what theory supports their argument. At oral argument, the Bashas Plaintiffs clarified that that their theory rested on *Howard* and *Transamerica*, both of which relied on an alter ego theory. *See infra* section III.A.3. Therefore, the Court considers Plaintiffs' arguments as attempting to make out an alter ego theory.

15-MD-2670 JLS (MDD)

(Bashas Opp'n 38.)  They also argue Big Catch is an alter ego of Bumble Bee and Lion Capital.  (*Id.* at 33.)  Plaintiffs assert that a "complex corporate structure" used to establish Big Catch and purchase Bumble Bee translates into Lion Capital dominating Big Catch. (*Id.*)

The DPP Plaintiffs maintain that both Big Catch and Lion Capital are the alter egos of Bumble Bee.  The DPP Plaintiffs advance three general arguments to demonstrate unity of interest between Bumble Bee and Big Catch.  First, Big Catch was established by Lion Capital for the purpose of purchasing Bumble Bee and has no presence outside of Lion and Bumble Bee.  (*Id.* at 20 (citing Third Am. Consolidated Compl. ("TACC"), ECF No. 911, ¶ 45).)  To that end, Big Catch does not have any employees of its own and does not engage in any business operations separate from Lion Capital and Bumble Bee.  (*Id.* (citing TACC ¶ 37).)  Second, Plaintiffs maintain that Bumble Bee and Lion executives make decisions for Big Catch and the only business Big Catch conducts is during Bumble Bee board meetings.  (*See id.*)  As a subset of the decisions made by Bumble Bee and Lion Capital, executives from those entities awarded shares in Big Catch as part of a "management incentive plan," which created an equity interest in Big Catch for Bumble Bee employees. (*Id.* at 20–21.)  Plaintiffs allege that the equity interests were a conduit to transfer Bumble Bee profits to those persons holding Big Catch stock.  (*Id.* at 21.)  Third, the DPP Plaintiffs state that Big Catch is liable to pay a portion of Bumble Bee's criminal fine and argue Bumble Bee could not obligate Big Catch to guarantee the criminal fine unless Bumble Bee had control over Big Catch.  (*See id.*)  Plaintiffs conclude that it would be inequitable to allow Big Catch to escape potential judgment while at the same time receiving allegedly illicit profits from the price fixing conspiracy.  (*See id.*)

### 2. Defendants' Reply

Defendants do not address Plaintiffs' alter ego argument until their Reply brief to the Four Track Plaintiffs.  (*See* Four Track Reply 20–21; *see also* MTD 24–30; Four Track MTD 18–19; Reply 19–25.)  Defendants refute the unity of interest argument by citing the proposition that a holding company is not presumed to be an alter ego of its subsidiary

because it does not conduct independent business. (Four Track Reply 20 (citing *Corcoran*, 169 F. Supp. 3d at 984; and *China Basin Props., Ltd. v. One Pass, Inc.*, 812 F. Supp. 1038, 1041 (N.D. Cal. 1993)).) Defendants assert that Plaintiffs' allegations have not overcome that presumption. Thus, the citizenship of Big Catch's limited partners, i.e., shareholders, is irrelevant to personal jurisdiction. (*Id.* at 20–21 (citing *Duncanson v. Wine & Canvas IP Holdings LLC*, No. 16-cv-788-SEB-DML, 2017 WL 6994541, at *4 n.3 (S.D. Ind. Apr. 20, 2017)).) Additionally, Defendants characterize the ability of Bumble Bee's board of directors to approve shares in Big Catch as a "commonplace system of compensation." (*Id.* at 21 (citing *Ames v. Whitman's Chocolates, Div. of Pet Inc.*, No. 91-3271, 1991 WL 281798, at *5 (E.D. Pa. Dec. 30, 1991)).)

### 3. Court's Analysis

Big Catch is a holding company that ultimately owns Bumble Bee through various corporate subsidiaries. (Brown Decl. ¶¶ 20, 23.) Bumble Bee and Big Catch are separate legal entities. Therefore, Plaintiffs must demonstrate that Bumble Bee's contacts impute to Big Catch. The law is clear that the general personal jurisdiction of a subsidiary entity cannot be imputed to a parent entity under an agency theory. *Daimler*, 571 U.S. at 135–36; *Ranza*, 793 F.3d at 1071. The only way to impute Bumble Bee's general personal jurisdiction to Big Catch is if Bumble Bee is an alter ego of Big Catch. The cases cited by the Bashas Plaintiffs at oral argument and in their brief, for example, stand for the same proposition: courts will disregard a holding company's status for jurisdiction only when an alter ego relationship exists. (*See* Bashas Opp'n 33 n.25 (citing, e.g., *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1069 n.17 (9th Cir. 2000); and *Transamerica Corp. v. Compana, LLC*, No. C 05-549 MJJ, 2005 WL 2035594, at *3 (N.D. Cal. Aug. 22, 2005)).)

Similarly, for purposes of imputing specific jurisdiction, plaintiffs must demonstrate an alter ego relationship between Bumble Bee and Big Catch. *See Williams*, 851 F.3d at 1024 ("[T]he *Daimler* Court's criticism of the *Unocal* standard found fault with the standard's own internal logic, and therefore applies with equal force regardless of whether

the standard is used to establish general or specific jurisdiction.").[29]  Thus, to establish either general or specific personal jurisdiction over Big Catch, Plaintiffs must meet the alter ego test.

Turning to the familiar alter ego test, the Court agrees with Defendants that the citizenship of Big Catch's shareholders does not demonstrate unity of interest.  Generally, the presence or citizenship of a limited partner, without more, is insufficient to confer personal jurisdiction over the limited partnership.  *See Goforit Entm't LLC v. Digimedia.com L.P.*, 513 F. Supp. 2d 1325, 1331 (M.D. Fla. 2007) (collecting cases).  The *Goforit* court went on to state, "[t]he argument with respect to a limited partner is even weaker than as to a general partner, especially where, as here, there is record evidence regarding the lack of power of the limited partners in the partnership."  *Id.* at 1332–33 (citations omitted).  The Court agrees with this approach and examines Big Catch's partnership agreement vis-à-vis its limited partners.  According to Big Catch's organizing document, it has several classes of partners; general partners have voting interests in the partnership.  Limited partners (who appear to be shareholders) have non-voting interests and are further divided into Classes A, B, and C.  (*See* Ex. 42, at 795.)  Furthermore, the general partner has the "exclusive right to manage and control the business and affairs of

---

[29] The *Williams* court did, however, apply the agency test for specific jurisdiction, in the alternative. *See* 851 F.3d at 1024–25.  Even if this Court were to follow a similar path and apply an agency test, *Unocal* distinguished the relationship between a parent and subsidiary, on the one hand, and between a holding company and its subsidiary on the other.  The court quoted a district court opinion for the proposition:

> Where a holding company is nothing more than an investment mechanism [, i.e.,] a device for diversifying risk through corporate acquisitions[,] the subsidiaries conduct business not as its agents but as its investments. The business of the parent is the business of investment, and that business is carried out entirely at the parent level.

*Unocal*, 248 F.3d at 929 (alterations in original) (quoting *Bellomo v. Pa. Life Co.*, 488 F. Supp. 744 (S.D.N.Y. 1980)).  The district courts in this circuit that have considered similar situations have applied *Unocal*'s reasoning to find that a parent holding company cannot be a subsidiary's agent.  *See Delacruz v. Serv. Corp. Int'l*, No. 18-CV-154-LJO-EPG, 2018 WL 2287962, at *7 n.3 (E.D. Cal. May 18, 2018) (collecting cases).  Thus, Plaintiffs must demonstrate an alter ego relationship between Big Catch and Bumble Bee and/or Lion Capital.

15-MD-2670 JLS (MDD)

the Partnership." (*Id.* at 804.) Conversely, "[n]o Limited Partner shall participate in the control of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership" unless provided in the partnership agreement. (*Id.* at 807.) The general partner is Lion/Big Catch Cayman Ltd. (*Id.* at 843.) Lion/Big Catch Cayman Ltd. is controlled by Lion/Latimer GP II (Guernsey) Ltd. and Lion Capital General Partner LLP is a related person to Lion/Latimer GP II (Guernsey) Ltd. (Ex. 54, at 12.) The fifty-four limited partners residing the United States do not have any right to control or transact in the business of Big Catch, nor is it apparent that they actually have done so.

The Court also agrees that establishing a compensation structure that awards shares of a company, without more, is a normal business practice. Likewise, the Court is unconvinced by the Bashas Plaintiffs' argument that a complex corporate structure somehow demonstrates unity of interest. Again, establishing investment funds and using shell companies to purchase other entities, without more, is a normal business practice. But, Lion Capital's use of Big Catch after its creation raises questions about its independent corporate status.

"Generally, alter ego liability is reserved for the parent-subsidiary relationship. However, under the single-enterprise rule, liability can be found between sister companies." *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1249 (Ct. App. 1991). "A court may also disregard the corporate form in order to hold one corporation liable for the debts of another affiliated corporation when the latter 'is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation.'" *Toho-Tawa Co. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1107 (Ct. App. 2013) (internal quotation marks omitted) (quoting *Las Palmas*, 235 Cal. App. 3d at 1249). "Thus, where there is 'such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal,' the affiliated corporations may be deemed to be a single business

enterprise, and the corporate veil pierced." *Id.* (quoting 1 Fletcher, *Cyclopedia of the Law of Corps.*, § 43).

Applying that formulation of unity of interest here, Big Catch was organized by Lion Capital for the purpose of purchasing and holding Bumble Bee's shares. (*See, e.g.*, Ex. 44, ECF No. 1246-33, at 5 (Bumble Bee corporate representative deposition).) As Mr. Brown has declared, Big Catch does not hold its own board meetings, has no offices, and no employees. (Brown Decl. ¶¶ 21–22.) Big Catch is owned by Big Catch Cayman Ltd., which is ultimately owned by one of Lion Capital's funds and controlled by Lion Capital (*See* Ex. 54, at 4.) None of its shareholders have any right to control Big Catch. Thus, Lion Capital executives made any and all decisions for Big Catch.

*Monje v. Spin Master Inc.*, No. CV-09-1713-PHX-GMS, 2013 WL 2390625 (D. Ariz. May 30, 2013), presents a useful comparison. There, the plaintiff sought to impute the Arizona contacts of a subsidiary to its Luxemburg holding company using an alter ego theory. *Id.* at *5. The evidence before the court demonstrated that the holding company "manage[s] its investments and the financing of the activities of its subsidiaries, provide[s] support, facilitate[s] communication and develop[s] resources that are available Group-wide." *Id.* (alterations in original) (citations omitted). The court determined that the evidence showed the holding company was "a typical parent company. It provide[d] general policies to its subsidiary, keeps track of its financial performance, and tried to implement a certain product culture." *Id.* at *6. This case is illustrative of a holding company that maintains corporate formalities and performs some functions as a holding company.

The facts here are similar to the facts in *Kayne v. Ho*, No. LA CV09-6816 JAK (CWx), 2012 WL 12878753 (C.D. Cal. Sept. 6, 2012). There, the plaintiffs sought to apply alter ego to three holding companies that had no employees and no office buildings. *See id.* at *6–7. The companies had directors and shareholders that met in Hong Kong, but generally their only business was "investment holding." *Id.* at *6. The court found these allegations of unity of interest sufficient at the motion to dismiss stage. *See id.* at *8

15-MD-2670 JLS (MDD)

("Plaintiffs allege that the Kimbergold Defendants have no day-to-day activities. They have no employees or office buildings; instead, they are alleged to exist solely as holding companies. It is unpersuasive in the context of a motion to dismiss to contend that they cannot be alter egos simply because they have no 'independent ego' in the first instance."). Here, Big Catch is a holding company that has no day-to-day activities, no employees, and no office buildings. Big Catch's business is Lion Capital's business and the Court finds Plaintiffs meet the unity of interest prong.

      b. Fraud or Injustice

      "[I]t would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit frauds and other misdeeds with impunity." *Las Palmas*, 235 Cal. App. 3d at 1249. "The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable, under the applicable rule above cited, for the equitable owner of a corporation to hide behind its corporate veil." *Associated Vendors*, 210 Cal. App. 2d at 842.

      The DPP Plaintiffs allege that Lion created Big Catch for the purpose of "provid[ing] a tax efficient structure for acquisition." (TACC ¶ 43.) The complaint goes on to allege that Big Catch was set up to transfer Bumble Bee's operating profits out of Bumble Bee. (*Id.* ¶ 45; *see also* Bashas Compl. ¶ 272 ("███████████████████ ████████████████████████████ . . . .").) The Bashas Plaintiffs allege that ███████████████████████████████████████ ███████████████████████████████████████. (*See* Bashas Compl. ¶ 316.)

      The DPP Plaintiffs also argue that further inequity is evidenced by the criminal guilty plea entered by Bumble Bee in the Northern District. The DOJ Sentencing Memorandum imposes an additional fine on Bumble Bee, to be paid by Big Catch, in the event of a qualifying sale of Bumble Bee. (*See* Stein Decl., Ex. 10, at 18.) The DPP Plaintiffs contend Big Catch would receive the proceeds of any sale of Bumble Bee and

that if the DOJ expressed an interest in preventing a windfall to investors, then this Court should find an inequitable result. (*See* DPP Opp'n 21.)

Defendants maintain that Plaintiffs do not allege facts to support the conclusory allegations. (MTD 29.) Thus, according to Defendants, Plaintiffs do not allege that Lion Capital ever collected the annual payment and admit that the payment was waived for some periods. (*Id.* (citing Bashas Compl. ¶ 297 n.12).) Defendants respond to the criminal guilty plea argument by stating that Bumble Bee's sale is hypothetical and Big Catch is not a defendant in any criminal proceedings. (Reply 22.)

The Court begins by noting that establishing a tax efficient structure to acquire a company is a routine business practice and does not establish inequity. Furthermore, Plaintiffs have not connected the annual EBITDA monitoring fees to Big Catch; instead, it appears that Lion Capital received the fees from Bumble Bee and there are no allegations connecting the fees to Big Catch. More persuasive, however, are the allegations concerning Bumble Bee's criminal fine. Plaintiffs allege the Sentencing Guidelines range was between $136.2 million and $272.4 million. (TACC ¶ 40.) Because Bumble Bee was unable to pay the full Guidelines penalty, the parties agreed that Bumble Bee would pay a $25 million fine and Big Catch guaranteed a fine of up to $81.5 million if Bumble Bee is sold, subject to undisclosed terms and conditions. (*Id.*; *see also* Stein Decl., Ex. 10, at 14–17.) While Defendants are correct that such a sale has not occurred to date, the motivating concern behind the fine guarantee was "to prevent an unjust outcome whereby Bumble Bee receives a reduction in its criminal fine due to its inability to pay and then shortly thereafter is sold, thereby eliminating the inability to pay." (Stein Decl., Ex. 10, at 18.) The DOJ Sentencing Memorandum went on to elaborate, "[b]y having Big Catch pay any additional fine, the government is essentially making a claim to a portion of the proceeds of a qualifying sale of Bumble Bee and ensuring that such a payment would be made before any distribution of the proceeds of the sale to investors." (*Id.*)

The government's claim to the proceeds of the sale ultimately depends on Bumble Bee's admission to participation in a criminal price fixing conspiracy. The investors, who

15-MD-2670 JLS (MDD)

would ostensibly reap the windfall of a sale, are Lion Capital's fund investors. Thus, there is a direct connection between preventing Lion Capital's investors from profiting from the price fixing conspiracy. And, Big Catch is the vehicle by which the government is preventing an injustice from occurring. This is sufficient for alleging an unjust result because as this Court has previously held, "at this early stage of litigation Plaintiffs need not prove that [Big Catch] was in fact [Lion Capital's] alter ego; instead, Plaintiffs here only need to plausibly allege that an inequitable result will follow if the corporate form is not discarded. (ECF No. 492, at 29.) The Court finds that Big Catch is the alter ego of Lion Capital and because Lion Capital is subject to Court's specific jurisdiction then the Lion Capital's contacts impute to Big Catch.

### B. Fair Play and Substantial Justice

The Court's finding that Lion Capital's contacts impute to Big Catch must still comport with fair play and substantial justice, i.e., that it would be reasonable to assert jurisdiction. Big Catch has no independent status outside of Lion Capital; it has no offices and no employees. If it is reasonable to subject Lion Capital to personal jurisdiction, then it would also be reasonable to subject Big Catch to the same jurisdiction under the same analysis. *See supra* section II.D.

In sum, the Court finds that Big Catch is subject to the Court's personal jurisdiction through Lion Capital's specific jurisdiction contacts. Therefore, the Court does not reach various arguments advanced by Plaintiffs, including Big Catch consented to personal jurisdiction and Big Catch purposefully availed itself of the forum. The Court **DENIES** Defendants' Rule 12(b)(2) Motions to Dismiss with respect to Big Catch Cayman LP.

## IV.  Indirect Purchaser State Law Claims

The Lion Defendants move separately to dismiss the majority of the state law claims brought by the indirect purchaser tracks—the EPPs and CFPs (or "Indirect Plaintiffs")—for lack of personal jurisdiction over certain state law claims. The Court addresses the Indirect Plaintiffs' state law claims separately because the issues are unique to the indirect purchasers.

15-MD-2670 JLS (MDD)

## A. Defendants' Arguments

Defendants argue that the Supreme Court's decision in *Bristol-Myers Squibb v. Superior Court*, 137 S. Ct. 1773, applies to the Indirect Plaintiff's state law claims and forecloses personal jurisdiction on those particular claims. (EPP/CFP MTD 21.) Defendants contend that "[t]here is no specific jurisdiction where '[t]he relevant plaintiffs are not [forum] residents and do not claim to have suffered harm in that State,' and 'all the conduct giving rise to the nonresidents' claims occurred elsewhere.'" (*Id.* at 21–22 (second and third alterations in original) (quoting *Bristol-Myers*, 137 S. Ct. at 1782)).) Defendants cite several district court opinions where courts applied the *Bristol-Myers* rule to dismiss claims brought by out-of-state plaintiffs based on out-of-state conduct. (*See id.* at 23 (citing, e.g., *In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, No. 16-cv-6391-BLF, 2018 WL 1576457, at *2 (N.D. Cal. Mar. 30, 2018)).)

Defendants assert the foregoing analysis applies to the Indirect Plaintiffs who are not California residents, are bringing claims under the state law where they reside, and assert the harm occurred in states outside of California. (*Id.* at 24.) Defendants argue that claims brought under California law fail the traditional purposeful direction test for the same reasons discussed in its moving papers as to the Bashas Plaintiffs and the Cherokee Nation. (*See id.* at 24–25.)

Next, Defendants argue that this case's status as an MDL does not save the Indirect Plaintiffs' claims. The general rule is that "[i]n an MDL proceeding, the MDL transferee court has jurisdiction over cases transferred under 28 U.S.C. § 1407 only if the court from which the case was transferred would have jurisdiction." (*Id.* at 26 (quoting *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, 164 F. Supp. 3d 1040, 1045 (N.D. Ill. 2016)).) Defendants assert that even if the individual Indirect Plaintiffs had filed their state-law claims in the forums where the respective claims arose, then those courts would still lack personal jurisdiction. (*See id.* at 26–27.) This is because, according to Defendants, the Indirect Plaintiffs have not established that Lion Capital or Big Catch formed minimal contacts with any of the states under whose laws the

various claims arose. (*Id.* at 27.) Defendants aver that even if the Court were to find specific jurisdiction over any other claim in this proceeding then it must still find specific personal jurisdiction for each remaining claim. (*Id.* (citing *Testosterone Replacement Therapy*, 164 F. Supp. 3d at 1048).)

Finally, Defendants address the California Cartwright Act claims. They posit that even if there were personal jurisdiction over the California-law claims of the indirect purchaser California residents, there is no jurisdiction to bring Cartwright Act claims on behalf of non-California residents. (*Id.* at 28.) Defendants cite a leading treatise that stated, "[t]he Supreme Court's recent cases point to the conclusion that neither general nor specific jurisdiction exists over nationwide class suits except in the defendant's home states." (*Id.* (quoting 2 *Newberg on Class Actions*, § 6.26 (5th ed. 2018)).) Accordingly, Defendants argue that the California residents cannot sponsor the nonresident indirect purchaser claims from other states. (*See id.* at 29.)

**B. Indirect Plaintiffs' Arguments**

The Indirect Plaintiffs respond that personal jurisdiction exists over the Cartwright Act and other state law claims.[30] Plaintiffs' first theory is that this Court has already determined that applying the Cartwright Act to out-of-state plaintiffs does not offend due process. (EPP/CFP Opp'n 18–19 (citing ECF No. 492, at 16–21; and *In re Korean Ramen Antitrust Litig.*, No. 13-cv-4115-WHO, 2017 WL 235052, at *21 (N.D. Cal. Jan. 19, 2017); and *In re Optical Disk Drive Antitrust Litig.*, No. 10-md-2143 RS, 2016 WL 467444, at *12 (N.D. Cal. Feb. 8, 2016)).) They also argue that out-of-state plaintiffs are protected by the Cartwright Act who are injured by acts centered in California. (*Id.* at 19 (citing *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1113–14 (9th Cir. 2013); and *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 905 (N.D. Cal. 2008)).)

---

[30] They also argue that specific jurisdiction exists based on purposeful direction and alter ego theories, which the Court has already discussed at great length. *See supra* sections I & II.

Next, the Indirect Plaintiffs contend that because the Court should find specific jurisdiction over Lion Capital and Big Catch for the Cartwright Act claims, Plaintiffs may bring their remaining state law claims under two different theories. First, Federal Rule of Civil Procedure 18(a) allows a party to join independent or alternative claims against an opposing party. (*Id.* at 22.) Second, this Court can exercise pendent personal jurisdiction over any remaining claims that arise out of the same common nucleus of operative facts as the claim for which jurisdiction exists. (*Id.* at 22–23 (citing *Picot*, 780 F.3d at 1211).)

Finally, the Indirect Plaintiffs contend that *Bristol-Myers* does not alter a finding of personal jurisdiction here. They assert that there is a sufficient affiliation between the forum and the underlying controversy because of the specific acts of alleged conspiratorial conduct took place in California. (*See id.* at 25.) The Indirect Plaintiffs then cite three district court opinions that determined *Bristol-Myers* does not apply to federal class actions. (*See id.* at 26 (citing, e.g., *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, No. 17-cv-564 NC, 2017 WL 4224723, at *4–5 (N.D. Cal. Sept. 22, 2017)).) Plaintiffs conclude that all of their injuries arose out of the Lion entities' illegal price-fixing actions, which largely occurred in the forum. (*See id.* at 26–27.)

## C. Defendants' Reply

Defendants first rebut Plaintiffs' claim that *Bristol-Myers* is distinguishable because it concerned a California mass tort action, but the claims here are federal class action claims. They cite two district court opinions that conclude that *Bristol-Myers* enunciated a generally applicable rule that due process requires a connection between the forum and specific claims at issue, regardless of the type of suit or court. (Four Track Reply 24.)

Next, Defendants contend that even if the Court were to consider only the named plaintiffs, those plaintiffs cannot allege any connection between their purchases and the Lion entities' activities in California. (*See id.* at 25–26.) Defendants then rebut Plaintiffs' Rule 18 argument by stating that personal jurisdiction must be satisfied before any claim is joined under Rule 18. (*Id.* at 26 (citing *Allied Prof'ls Ins. Co.* v. *Harmon*, No. 16-cv-1864-JLS-KESx, 2017 WL 5634861, at *4 (C.D. Cal. Mar. 7, 2017)).) They also cite a

district court opinion that casts doubt on the viability of the pendent personal jurisdiction doctrine post-*Bristol-Myers*. (*Id.* (citing *Greene v. Mizuho Bank, Ltd.*, 289 F. Supp. 3d 870, 875 (N.D. Ill. 2017)).)

Then, Defendants turn to the Cartwright Act claims. They argue that the cases cited by the Indirect Plaintiffs relate to choice-of-law due process principles, but Defendants are relying on specific personal jurisdiction due process principles. (*Id.* at 27.) They contend the nonresident Indirect Plaintiffs cannot establish specific personal jurisdiction in light of *Bristol-Myers*. (*See id.* at 29.)

### D. Court's Analysis

In the wake of the Supreme Court's opinion in *Bristol-Myers*, district courts are divided over how far to apply its holding and reasoning. Does *Bristol-Myers* apply to federal courts hearing federal class action claims? Does it overrule, *sub silentio*, the doctrine of pendent personal jurisdiction? These are open questions and the Court treads carefully.

But first the obvious. Plaintiffs argue that the multi-state Cartwright Act class satisfies due process and cite this Court's prior order as well as several other court opinions in support of that proposition. Every single case they cite deals with choice-of-law analysis. For example, this Court's prior order determined that the Ninth's Circuit's analysis in *Mazza v. American Honda Motor Co.*, 666 F.3d 581, 587 (9th Cir. 2012), "sets forth a three-element test to examine California choice-of-law analysis [to] determine whether a putative class is valid under the Cartwright Act." (ECF No. 492, at 17 (citation omitted).) Likewise, the district court opinions in *Optical Disk*, 2016 WL 467444, at *12–13, and *Korean Ramen*, 2017 WL 235052, at *21–22, as well as the Ninth Circuit decision in *AT&T Mobility*, 707 F.3d at 1113, all shared a common mode of analysis: choice-of-law. The Court agrees with Defendants that choice-of-law due process analysis is distinct from personal jurisdiction due process analysis. *See Kulko v. Superior Court*, 436 U.S. 84, 98 (1978); *Hanson v. Denckla*, 357 U.S. 235, 254 (1958) ("The issue is personal jurisdiction, not choice of law."). Thus, every single choice of law case cited by Plaintiffs

66

is not on point. The Court also agrees with Defendants that Rule 18 does not obviate the need for personal jurisdiction for each claim a plaintiff seeks to add. *See Allied Prof'ls*, 2017 WL 5634861, at \*4 (citing *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1289 n.8 (9th Cir. 1977); and 6A Wright et al., *Federal Practice and Procedure*, § 1588 (3d ed. 2018)). Plaintiffs must still establish that personal jurisdiction is appropriate in accordance with constitutional due process limitations before adding claims under Rule 18.

Turning to the difficult questions. In the aftermath of *Bristol-Myers*, several courts have determined that its reasoning applies to federal courts sitting in diversity jurisdiction because a court must apply the state personal jurisdiction statute, as well as considering constitutional limits. *See Fitzhenry-Russell*, 2017 WL 4224723, at \*4; *see also In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, 2018 WL 1576457, at \*2; *Greene*, 289 F. Supp. 3d at 874–75. Some of those courts have further determined that *Bristol-Myers* applies to federal class actions. *See Chavez* v. *Church & Dwight Co.*, No. 17 C 1948, 2018 WL 2238191, at \*10 (N.D. Ill. May 16, 2018) (collecting cases). Conversely, some courts have determined that even if *Bristol-Myers* applies generally while sitting in diversity; it does not categorically apply to federal class actions. *See Fitzhenry-Russell*, 2017 WL 4224723, at \*5; *see also In re Morning Song Bird Food Litig.*, No. 12CV01592 JAH-AGS, 2018 WL 1382746, at \*5 (S.D. Cal. Mar. 19, 2018). At least one district court has determined that *Bristol-Myers*' reasoning does not categorically extend to a federal court when the court sits in federal question jurisdiction. *See Sloan v. General Motors LLC*, 287 F. Supp. 3d 840, 858 (N.D. Cal. 2018).

Federal courts, sitting in diversity, apply the forum state's personal jurisdiction law. *See Picot*, 780 F.3d at 1211. The general consensus post-*Bristol-Myers* appears to be that because *Bristol-Myers* dealt with limits on state sovereign power within a federal system, its reasoning is applicable to federal courts sitting in diversity. *See, e.g.*, *Fitzhenry-Russell*, 2017 WL 4224723, at \*4. The opinion most skeptical of *Bristol-Myers*' applicability to federal courts expressly noted that it did "not address whether and how *Bristol-Myers* would apply if jurisdiction arose exclusively on the basis of diversity." *Sloan*, 287 F. Supp.

3d at 859 n.2. This MDL case is not, however, before this Court solely on the basis of diversity jurisdiction. Several Plaintiffs invoke the Court's federal question jurisdiction. (*See, e.g.*, Bashas Compl. ¶¶ 9, 322.) The Indirect Plaintiffs invoke the Court's federal question jurisdiction, (ECF No. 888, ¶ 111), but only bring state law causes of action, (*see id.* ¶ 402). The Court finds *Sloan* persuasive for the proposition that where a federal court sits in federal question jurisdiction, the due process concerns are different than those animating *Bristol-Myers* and a court would not apply *Bristol-Myers* when sitting in federal question jurisdiction. 287 F. Supp. 3d at 859. This Court, however, does not rest entirely on that proposition as a basis for personal jurisdiction because the Indirect Plaintiffs do not bring any causes of action arising under federal law.

Even if the Court were to apply *Bristol-Myers* to the Indirect Plaintiffs' state law claims, the doctrine of pendent personal jurisdiction would provide an independent basis to find personal jurisdiction. "[A] court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Action Embroidery*, 368 F.3d at 1180 (citations omitted). "Pendent personal jurisdiction is typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction." *Id.* at 1180–81.

Pendent personal jurisdiction is appropriate here. The Court has before it federal question claims arising out of the Clayton and Sherman Antitrust Acts, which provide for nationwide personal jurisdiction. *See* 15 U.S.C. § 22; *Action Embroidery*, 368 F.3d at 1177–79. Further, the Lion Defendants are properly within the Court's personal jurisdiction with respect to the federal antitrust claims. It is clear from the various Plaintiffs' complaints that they generally allege the same common nucleus of operative facts—the Defendants purchased Bumble Bee in 2010 and knowingly participated in a price-fixing conspiracy. Exercising pendent personal jurisdiction would best serve the

15-MD-2670 JLS (MDD)

motivating policies delineated by the Ninth Circuit; these include "judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties." *Action Embroidery*, 368 F.3d at 1181. These policies are served here because this Court can consolidate all pre-trial proceedings in one litigation. And, Defendants will be haled into this Court to defend the Sherman Act claims; adding state law claims reinforces the motivating policies.

Defendants contend that the doctrine of pendent personal jurisdiction cannot survive *Bristol-Myers* and cite *Greene*, 289 F. Supp. 3d at 874, for that proposition. Neither Defendants nor the *Greene* court explain their reasoning beyond this declarative statement. The district court in *Muir v. Nature's Bounty (DE), Inc.*, No. 15 C 9835, 2018 WL 3647115, at *4 (N.D. Ill. Aug. 1, 2018), provides a helpful discussion of *Bristol-Myers*' impact on pendent personal jurisdiction. The court reasoned where a district court has personal jurisdiction over a federal question cause of action then it can exercise pendent personal jurisdiction without running afoul of *Bristol-Myers*. *Id.* This is because the Supreme Court limited its holding to state courts and the interstate federalism concerns motivating *Bristol-Myers* are not as pronounced when a federal court exercises coercive power based on original jurisdiction. *Muir*, 2018 WL 3647115, at *4 (citing *Bristol-Myers*, 137 S. Ct. 1783–84; and *Sloan*, 287 F. Supp. 3d at 858–59). This Court joins in the reasoning of *Muir* and *Sloan* and finds that pendent personal jurisdiction may be exercised where, as here, a federal statute provides for nationwide service of process.

The Court also finds that even though the Indirect Plaintiffs themselves do not bring a federal question cause of action, pendent personal jurisdiction is appropriate because the other Plaintiffs allege federal causes of action. The *Sloan* court addressed the same issue and reasoned that *Action Embroidery* "focused on whether the new claims arose out of the same nucleus of operative facts, not whether the claims belonged to the same plaintiffs." 287 F. Supp. 3d at 860 (citing *Action Embroidery*, 368 F.3d at 1181). Thus, pendent personal jurisdiction is permissible when the other Plaintiffs bring federal questions based on the same nucleus of operative fact.

Exercising pendent personal jurisdiction also comports with fair play and substantial justice. *See Axiom Foods*, 874 F.3d at 1068; *Action Embroidery*, 368 F.3d at 1181. As previously discussed, the federal antitrust claims against the Lion Defendants will proceed before this Court. Therefore, the additional burden in litigating the pendent state law claims are minimal. And, as the *Action Embroidery* court reasoned, litigating all claims together in this MDL will reduce piecemeal litigation and improve judicial economy. The Court **DENIES** Defendants' Motion to Dismiss to the extent they seek to dismiss the Indirect Plaintiffs' state law claims. The Court now turns to Defendants' second argument: that Plaintiffs fail to state a claim for which relief may be granted.

## V.     Whether Plaintiffs State a Claim Against the Lion Entities

Plaintiffs bring a cause of action under section one of the Sherman Act. (*See, e.g.*, Bashas Compl. ¶ 322; Nation FAC ¶ 248.) Defendants advance two broad theses why Plaintiffs fail to state a claim. First, they contend that Plaintiffs fail to state a claim against the Lion entities under an alter ego theory. (MTD 24.) Second, Defendants assert that Plaintiffs fail to state a claim that Defendants are direct participants in the alleged conspiracy. (*Id.* at 30.)

The parties' arguments with regard to alter ego liability are coextensive with the personal jurisdiction alter ego arguments. Therefore, the Court's prior findings apply with equal weight here. The Court finds no alter ego liability between Bumble Bee and any Lion entity. The Court finds that Plaintiffs have sufficiently alleged that Big Catch is the alter ego of Lion Capital. With that in mind, the Court turns to the alleged direct participation in the conspiracy.

### A. *Defendants' Arguments*

Defendants posit three broad arguments why Plaintiffs fail to state a claim. First, Plaintiffs' theory is implausible and makes no economic sense. (MTD 30.) Second, the allegations concerning actions taken by non-Lion defendants do not support direct participation by Lion Defendants. (*Id.* at 31.) Third, the allegations concerning actions

taken by Lion Defendants themselves do not show direct and independent participation in the alleged conspiracy. (*Id.* at 32.)

### 1. *Economic Sense*

Plaintiffs' assert that Defendants uncovered the alleged price fixing conspiracy during due diligence for the Bumble Bee acquisition and then proceeded to direct a Lion investment fund to purchase Bumble Bee for the purposes of realizing supra-competitive profits from Bumble Bee's business. (*Id.* at 30 (citing Bashas Compl. ¶ 279).) Defendants argue this theory is implausible; specifically, it would make no economic sense for a private equity firm to risk its reputation so that one of its portfolio companies could earn profits from an illegal conspiracy. (*Id.*) According to Defendants, Plaintiffs fail to allege the Lion entities have "any rational motive to join the alleged conspiracy" or that "the conduct alleged 'was consistent with the [Lion Entities'] independent interest.'" (*Id.* at 31 (quoting *Cascades Comput. Innovation LLC v. RPX Corp.*, No. 12-CV-01143 YGR, 2013 WL 316023, at *11 (N.D. Cal. Jan. 24, 2013)).)

### 2. *Actions Concerning Non-Lion Actors*

Plaintiffs also allege actions taken by non-Lion, i.e., Bumble Bee, actors. As an initial matter, Defendants take issue with Plaintiffs' group pleading, i.e., Plaintiffs' allegations are directed towards "Lion" rather than discrete entities. Defendants argue Plaintiffs fail to provide any Lion entity with fair notice of the discrete acts by which each one participated in the conspiracy. (*Id.*) Turning to the substance of Plaintiffs' arguments, Defendants contend that most of Plaintiffs' factual allegations do not involve Lion entities or only involve communications that Lion executives passively received from Bumble Bee. (*Id.*) For example, several phone calls and meetings that Plaintiffs allege showing a conspiracy involving Bumble Bee executives and StarKist and Chicken of the Sea executives do not include Lion executives. (*Id.* at 31–32 (citing Bashas Compl. ¶¶ 292, 294–95).)

Many allegations center on actions taken by a non-Lion actor, Mr. Lischewski, towards Lion employees. For example, on a January 16, 2012 phone call Lischewski

conveyed to Chang what Lischewski believed to be a non-public price change by StarKist. But, Defendants point out that Plaintiffs concede that StarKist's price change was publicly announced three days earlier. (*Id.* at 32 (citing Bashas Compl. ¶ 287).) And, Plaintiffs do not allege that Chang was unaware of the announcement. (*Id.* (citing Bashas Compl. ¶ 287).) Further, Defendants discuss a January 26, 2012 email from Lischewski to Lindberg and Capps in which Lischewski raised concerns about "cheating" by StarKist in first quarter of 2012. (*Id.* (quoting Bashas Compl. ¶ 288).) Defendants argue that Plaintiffs provide no support for the claim that "cheating" refers to a conspiracy or that Lindberg or Capps understood the term to be referring to a conspiracy. (*Id.*) And, Plaintiffs do not allege any Lion entity were involved in underlying decision to increase prices. (*Id.*)

### 3. Actions Concerning Lion Actors

Finally, Defendants assert that Plaintiffs fail to allege sufficient facts that Lion directly and independently participated in the conspiracy. They characterize the facts presented by Plaintiffs in support of their theory as four meetings and two emails—Defendants contend these four meetings[31] and two emails support an inference of "economically legitimate activities." (*Id.* at 33.)

### 4. Arguments Specific to the Cherokee Nation's First Amended Complaint

The Cherokee Nation generally covers the same ground as the Bashas Plaintiffs except as to a few different facts demonstrating direct involvement. The Nation describes an email exchange between Lindberg and Chansiri where Lindberg sent Chansiri Bumble Bee's "strategic plan forecast and recent historical results" without "a formal [non-disclosure agreement]"; yet, despite the lack of a non-disclosure agreement, Lindberg made clear that the information was "very confidential." (ECF No. 1006-1, at 36 (quoting Nation FAC ¶ 53).) Defendants characterize this exchange as consistent with Lion's desire to sell

---

[31] The Cherokee Nation FAC only alleges two meetings: October 2011 and early 2012. (ECF No. 1006-1, at 35 (citing Nation FAC ¶¶ 52–53).) Defendants advance the same argument with respect to the Bashas Plaintiffs: these facts could just as easily suggest rational, legal behavior. (*See id.*) Because the Bashas Plaintiffs' allegations are the broadest concerning the meetings, the Court will only address the Bashas' arguments above the line.

Bumble Bee to the highest bidder and the exchange does not plausibly suggest direct participation in the conspiracy. (*Id.*)

Next, the Cherokee Nation alleges Lischewski shared information with the Lion entities he gleaned from his "relationships throughout the industry" including an instance where he told employees of the Lion entities that "[i]nternally no one at [Chicken of the Sea] knows what [Thai Union Group's statement] means." (*Id.* at 34 (quoting Nation FAC ¶ 52).) Defendants argue that Plaintiff does not allege what the "statement" was or meant, what Lion employees thought about the statement, what Lischewski's report about the statement meant, or how any of this was connected to the alleged conspiracy. (*See id.*)

In sum, Defendants recognize that this Court has previously held that the MDL plaintiffs have plausibly alleged the existence of a conspiracy in the packaged tuna industry, but the allegations here do not establish direct and independent participation. (MTD 35.) Instead, the allegations describe rational, legitimate business activity typical of a private equity firm. (*Id.*)

### B. Plaintiffs' Arguments

#### 1. Economic Sense

With regard to Defendants argument that it would make no economic sense for Lion to join the conspiracy, Plaintiffs contend that to accept Defendants' argument the Court would have to ignore the well-plead allegations in the Complaint and accept Defendants' inferences instead of Plaintiffs' inferences. (Bashas Opp'n 22.) Plaintiffs' inference is that Lion joined the conspiracy to boost Bumble Bee's market value and eventual sale price, which other courts have found to support conspiratorial conduct. (*Id.* at 22–23 (citing *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016)).)

#### 2. Direct Involvement by Lion

Next, as to Lion entities' direct involvement, Plaintiffs argue that their allegations go beyond four meetings and two emails, but even those events would be sufficient to state a claim. (*Id.* at 23.) For example, before Lion Capital purchased Bumble Bee, Lischewski told Lindberg that a "███████████" was that Lion Capital would "████████████████

73

█████████████████████." (*Id.* (quoting Bashas Compl. ¶ 278).) Plaintiffs argue that they have already pled that Bumble Bee and Dongwon were conspiracy participants, making it more likely that Lischewski was referring to the conspiracy. (*Id.*) And, Lischewski's recent criminal indictment charged that he "us[ed] code" to conceal the conspiracy. (*Id.* at 23–24 (quoting Ex. 45, at 4).)

With regard to the meetings, Plaintiffs contend they follow a similar pattern as previously alleged, whereby the conspiracy participants exchanged assurances and then their respective subsidiaries would adhere to the pricing agreements. (*See id.*) Plaintiffs posit that had Lion told Dongwon and Thai Union that Lion Capital would not abide by their conspiratorial price increases, then Dongwon and Thai Union would not have continued to meet with Lion executives. (*Id.*) Plaintiffs allege this did not happen; instead, several further meetings occurred between October 2011 and 2014, thus Lion Capital agreed to the conspiracy. (*Id.* at 24–25 (citing Bashas Compl. ¶¶ 284, 286, 289–91).) Plaintiffs take issue with Defendants' argument that Lindberg's meetings are entirely consistent with the Lion entities' efforts to oversee its investment in Bumble Bee. Plaintiffs maintain they allege concrete facts such as emails from Chansiri to Lindberg asking ████████████████████████████████████████████████ ██████████████████████. (*Id.* at 25.)

Plaintiffs return to Defendants' allegation that Lischewski thought he was relaying non-public information about StarKist's price increase to Lion Americas executives. They contend that, even though the information was public, Lischewski thought the information was private. He discussed Bumble Bee's agreed intention to implement a similar price increase and Lion accepted the information on those terms. (*Id.* at 26.) Finally, Plaintiffs reference the email that Lischewski sent to Lindberg and Capps about ████████████ ████████ Plaintiff states that Defendants offer no alternative argument as to what "████████" refers to beyond an agreement to fix prices. (*Id.*) Further, StarKist and Bumble Bee are already members of an adequately-pled conspiracy. According to Plaintiff, the most logical inference is that "████████" referred to the conspiracy. (*Id.*)

### C. Defendants' Reply

First, Defendants argue, again, that Plaintiffs' theory lacks economic sense. Defendants state that Plaintiffs agree that Lion Capital's business model is to strengthen and re-sell brands so that investors can achieve superior returns. (Reply 14.) Defendants distinguish the cases Plaintiffs cite because the defendants in those cases all stood to reap the profits from their conspiracies, but here, the Lion entities are not themselves in the packaged tuna business and do not directly profit from tuna sales. (*See id.* at 14–15 & n.9.) Defendants assert that Plaintiffs' theory would require the Court to believe that the Lion entities would risk their clients' funds and their own good name by knowingly buying a company engaged in criminal misconduct on the charge that the supra-competitive profits resulting from an illegal price fixing conspiracy improved Defendants own position, all without being exposed. (*See id.* at 15.)

Second, Defendants reiterate that Plaintiffs' allegations concerning Lindberg's meetings and communications do not support a conclusion he or any Lion entity participated in the alleged conspiracy. (*Id.* at 16–17.) Thus, for example, Defendants contend Plaintiffs' allegation that Lindberg telling Chansiri that ███████████████ ████████████████████████████████████████████████ ███" was code for a conspiracy is implausible. (*See id.* at 17.)

Third, Defendants address Plaintiffs' allegations that certain meetings and communications were for the purpose of facilitating a sale of Bumble Bee. Defendants argue that facts concerning a potential sale cannot support a price-fixing claim because they are "entirely consistent with [the Lion Entities] pursuing [their] own economic interests," and have nothing to do with packaged-tuna pricing. (*Id.* (alterations in original) (quoting *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 377 (M.D. Pa. 2008)).)

Fourth, Defendants dispute Plaintiffs' arguments concerning Mr. Lischewski's indictment and that he used "code to conceal the conspiracy." Defendants argue that the motivations Plaintiffs attribute to Dongwon, Thai Union Group, or Lischewski do not

support a plausible inference that any Lion entity evinced a "conscious commitment" to a price fixing conspiracy. (*Id.* at 18 (quoting *Greencycle Paint, Inc. v. Paintcare, Inc.*, No. 15-cv-4059-MEJ, 2016 WL 1402845, at *4 (N.D. Cal. Apr. 8, 2016)).)

Finally, Defendants turn to the January 26, 2012 email Mr. Lischewski sent to Lindberg and Capps. Defendants contend that by the time of this email, the April 2012 price increase was public knowledge and the inference the Court should take from the email is there was "aggressive pricing behavior in a highly competitive marketplace." (*Id.*)

### D. Court's Analysis

Section one of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. "A defendant may be held 'liable under § 1 of the Sherman Act if that person . . . [acted] either with the knowledge that the . . . [action] would have unreasonable anticompetitive effects or with the purpose of producing those effects." *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, —F.3d—, No. 16-17099, 2018 WL 3716026, at *4 (9th Cir. Aug. 6, 2018) (alterations in original) (quoting *United States v. Bailey*, 444 U.S. 394, 404–05 (1980)). "Because § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy,'" *Twombly*, 550 U.S. at 553 (alterations in original) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984)), "'[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express,'" *id.* (alterations in original) (quoting *Theatre Enters., Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540 (1954)). The essential elements of a § 1 cause of action are: "(1) an agreement among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition." *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 844 (9th Cir. 1980).

In *Twombly*, the Supreme Court emphasized the pleading requirements under section one of the Sherman Act:

> [A] plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level.
>
> In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement . . . . [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.

550 U.S. at 555 (second alteration in original) (citations and footnote omitted). The *Twombly* court "also suggested that to allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 565 n.10). With this general framework in mind, the Court turns to the parties' arguments.

*1. Whether Plaintiffs' Theory Makes Economic Sense*

"Antitrust claims must make economic sense." *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (citing *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 468 (1992)). "At the motion to dismiss stage, the determination turns on whether the defendants had 'any rational motive' to join the alleged conspiracy; and whether the conduct alleged 'was consistent with the defendant's independent interest.'" *Cascades Comput. Innovation*, 2013 WL 316023, at *11 (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97 (1986)).

Here, Plaintiffs allege that after decades of growth, demand for packaged tuna has been falling since 2004. (Bashas Compl. ¶ 74.) The U.S. demand for tuna has decreased from an average of 3.5 pounds of canned tuna per person in 2000 to under 2.5 pounds per

77

person in 2014. (*Id.* ¶ 77, fig. 2.) At the same time as the decline in consumption from 2004 to 2014, Plaintiffs allege that there was an oversupply of raw tuna. (*Id.* ¶¶ 78–79.) Plaintiffs conclude that an increase in supply and a decline in demand would result in a corresponding decrease in prices. Instead, prices remained constant or increased from 2004 to at least 2015. (*Id.* ¶ 79.)

Lion Capital purchased Bumble Bee, on behalf of its investment fund, in late 2010. The parties agree that Lion Capital's business model, as a private equity investment firm, was to strengthen and resell Bumble Bee for a profit. This profit would benefit Lion's investors through an increase in value to Lion Capital's funds, which hold a portfolio of different consumer brands. (*See* Brown Decl. ¶ 14.) And, Plaintiffs have alleged that Lion Capital would receive "'███████████████████████████████████████████████████████████████████████████████████████████." (Bashas Compl. ¶ 312.) Thus, Lion's economic imperative was to sell Bumble Bee for a profit, not a loss. Plaintiffs have alleged an economic theory that Bumble Bee, and thus Lion, needed the artificially inflated prices to maintain its market value and eventual resale value. Otherwise, as Plaintiffs allege, the natural market forces would drive prices down, drive Bumble Bee's value down, and thus drive Lion investors' profits down. This is a plausible economic theory. If the entire point of purchasing Bumble Bee was to eventually sell it for a profit, decreasing prices do not serve Lion's goal of reselling Bumble Bee.

Defendants raise valid counterarguments; most persuasive of which is their contention that the Lion entities would not risk their clients' investments[32] and their own reputation on the chance that the conspiracy would eventually bear fruit and, at the same

---

[32] At oral argument, Defendants emphasized that Lion Capital's investors contributed at least $300 million into the purchase of Bumble Bee. According to Defendants, that investment, in addition to potential civil and criminal fines, demonstrates the Lion investors would be on the hook for potential losses if the conspiracy were discovered. Further, Lion Capital knew it was going to sell Bumble Bee, which would trigger an antitrust review by the DOJ. The Court agrees that Defendants arguments are plausible; however, Plaintiffs' theory is also plausible. Plaintiffs do not have to allege a probability requirement, only that their theory is plausible.

time, never be discovered. Defendants would have a massive potential liability if they knowingly entered into a conspiracy. However, the opposite observation is also true; Defendants would have a large upside if they could sell Bumble Bee at a profit and not a loss. Further, Defendants' argument about risk to client investments and personal reputation could also be made for Bumble Bee and its executives, but guilty pleas in the Northern District gives pause to that reasoning. The Court is not persuaded that simply because Lion Capital and Lion Americas are not in the packaged tuna business, that they did not stand to reap the benefits from participation in the conspiracy. If Defendants sold Bumble Bee for a profit, then their investors benefit. If Lion's investors benefit, then Lion benefits, either through fees, its own investments in its fund, or continued investment in the fund for future purchases. In sum, Defendants had some rational motive to join the conspiracy and the conduct alleged was consistent with Lion Capital's interest in selling Bumble Bee for a profit. Thus, the Court finds Plaintiffs have stated a valid economic theory.

2. *Direct Participation by Lion Americas*

a. Conspiracy Between Two or More Persons

In *Twombly*, the Supreme Court distinguished between allegations resting on "descriptions of parallel conduct" and "any independent allegation[s] of actual agreement." 550 U.S. at 564. It is often the case that antitrust complaints do not include any direct and independent allegations of an agreement. *See Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1130 (9th Cir. 2015) (citing *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1450–51 (9th Cir. 1988)). "Because direct evidence of concerted action in violation of antitrust laws is so rare, the Supreme Court has traditionally granted fact finders some latitude to find collusion or conspiracy from parallel conduct and inferences drawn from the circumstances." *Oltz*, 861 F.2d at 1450–51 (citing *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)). That latitude has limits; the Court "cannot . . . infer an anticompetitive agreement when factual allegations 'just as easily

suggest rational, legal business behavior.'"  *Name.Space*, 795 F.3d at 1130 (quoting *Kendall*, 518 F.3d at 1049).

Here, there is no direct evidence of an agreement between Lion Americas' executives and the other members of the alleged conspiracy.  Therefore, the Court examines Plaintiffs' circumstantial evidence of an anticompetitive agreement.  *See id.* Several of Plaintiffs' allegations fail to state a claim for direct participation.  For example, Plaintiffs' allegation that Lischewski told Lindberg that a "████████████████████████████████████████████████████████████," (Bashas Compl. ¶ 278), does not plausibly lead to an inference of conspiracy.  The Court has previously found that references to rational behavior, without more, do not plausibly state a claim.  (*See* ECF No. 295, at 9 ("[P]erhaps [Thai Union Group] meant what it said when it praised more rational competition in the United States.").)  Plaintiffs allege that "████████████████████████████████████████████████████████████" (Bashas Compl. ¶ 284.)  This is not surprising given Lindberg's role as a board member and Lion Americas' oversight role in Bumble Bee and does not infer a conspiracy.  These allegations are insufficient to plausibly state a claim.

If that were the extent of the allegations, this would be an easy call.  However, Plaintiffs provide additional factual matter that plausibly demonstrates Lion Americas directly participated in the ongoing conspiracy.  At the macro-level, the following considerations are notable.  First, the ongoing DOJ inquiry: in its first order discussing direct participation in a price-fixing conspiracy, this Court noted that the ongoing DOJ inquiry "may bolster additional allegations." (ECF No. 283, at 13–14.)  The Court noted the problems in "relying solely or too heavily on pending government investigations in analyzing the sufficiency of a conspiracy complaint." (*Id.* at 14.)  As a district court in the Northern District stated, "[i]t is unknown whether the investigation will result in indictments or nothing at all. . . . the scope of the investigation is pure speculation.  It may be broader or narrower than the allegations at issue." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007).

In this instance, the outcome of the investigation is not "pure speculation." Bumble Bee has pled guilty to a conspiracy to fix prices in the packaged seafood market in the United States. (Bashas Compl. ¶ 268.) Two executives at Bumble Bee have also pled guilty and Mr. Lischewski has been indicted. (*See id.* ¶ 4; Ex. 45, ECF No. 1247-17.) The DOJ's investigation has moved beyond the nascent stages outlined in the Court's prior order, (*see* ECF No. 283, at 14–15), and the Court considers those facts as part of its analysis.

Also meriting discussion, Plaintiffs describe the market dynamics and Lion's knowledge of those realities. Plaintiffs have alleged that from 2004 through 2014 domestic U.S. consumption of tuna has declined. (Bashas Compl. ¶ 76.) And, the global supply of raw tuna increased over that same time period. (*Id.* ¶ 78.) In a normal market this would decrease prices. However, as Plaintiffs point out, the dollar sales of packaged tuna increased while the volume of sales has decreased, which supports a conclusion that prices increased. (*See id.* ¶ 76 fig. 1.) Defendants had access to sales and production data from Bumble Bee and, as they admit, Lion Capital is a "sophisticated investment firm." (Reply 15.) One might expect a sophisticated investment firm to diagnose why prices remained elevated despite decreasing demand and increasing supply.[33] The foregoing allegations are a backdrop. Yet, those macro-level observations remain unconnected to specific factual allegations, to which the Court now turns.

The period from January to March 2012 is particularly salient. Plaintiffs discuss a specific telephone conversation on January 16, 2012, where Lischewski thought he was giving Mr. Chang StarKist's non-public price list information. (Bashas Compl. ¶ 287.)

---

[33] At oral argument, Defendants acknowledge that Lion Capital is a sophisticated investment firm, but contend that a conspiracy agreement would not be discovered by a due diligence of the internal documents from Centre Partners Management. (ECF No. 1321, at 51.) The Court understands Defendants' argument; however, the market conditions are generally observable when a firm, such as Lion, conducts "marketing intelligence" on the other competitors in the market. (*Id.* at 52.) Thus, as the DOJ stated, "the parties knew or should have known from the get go—that the market is not functioning competitively today, and further consolidation would only make things worse." (Bashas Compl. ¶ 84.)

The information was already public. (*Id.*) However, Plaintiffs plausibly allege that Lischewski was unaware of that fact because the day after the call, Lischewski emailed Cameron "███████████████████████████████████," i.e., the day after the call. (*Id.* ¶ 287 n.10.) Plaintiffs do not allege what Chang knew or how he responded to Lischewski's information, but it is reasonable to infer that Chang had at least some context concerning the price increases. Two days later, Plaintiffs allege Lischewski forwarded to Lindberg and Capps an email exchange between Cameron and Worsham "███

████████████████████████████████████████████████████████████

███████████████████████████ (*Id.* ¶ 288.) Lischewski commented that Chicken of the Sea and StarKist were "█████████" on first quarter pricing, but "██████████████

████████████████████████████." (*Id.*) Defendants dismiss these allegations as concerning public information in a highly competitive marketplace. (*See* Reply 18.)

The word ██████████ is of particular interest; it carries negative connotations and likely would put the reader of an email on notice that some mischief is afoot. Combining this negative word with Lischewski's corollary hope that the price increase would correct "████

█████," yields a reasonable inference that the price increases were not legitimate business practice. Put differently, the allegations plausibly describe an instance where StarKist was undertaking some mischief that would be corrected by a price increase. And, Worsham and Cameron allegedly complained about a discrepancy between StarKist personnel and leadership over pricing tactics, which gives further context to the cheating or mischief. Defendants are correct that Plaintiffs do not plead that Lindberg or Capps knew what the email referred to; however, *Twombly* does not require certitude. It only requires enough factual matter to nudge allegations from mere possibility to plausible. *See Twombly*, 550 U.S. at 559.

A few weeks later, Lindberg and Chansiri corresponded via email. Plaintiffs allege that Chansiri asked ██████████████████████████████████████████████

██████████████████████. (Bashas Compl. ¶ 289.) Lindberg replied, "████████████

1

2

3 ." (*Id.*)[34]  The parties focus on the phrase "

4 ."  The Court is not convinced that a reference to "                    " demonstrates a

5 guilty mind.  More persuasive is the statement by Chansiri that

6                                                   and Lindberg was receptive to the offer

7 because he also understood there to be a "                                   ."  Taken in

8 conjunction with the previous month's email concerning cheating by StarKist, this also

9 raises an inference of "negative" practices that needed correction.

10      Finally, on March 30, 2012, Lischewski and Lindberg corresponded via email

11 concerning an article featuring StarKist's president and CEO, who had voiced support to

12 increase package tuna prices.  Lindberg allegedly wanted Lischewski to publicly echo those

13 comments, which Lischewski thought unnecessary because

14                                                   (*Id.* ¶ 293.)  Lindberg

15 encouraged Lischewki, stating:

16

17

18

19

20

21 (*Id.* (emphasis omitted).)  This exchange suggests that there was a discrepancy between

22 StarKist's and Bumble Bee's understanding of or interpretation of market prices and

23 Lindberg wanted to align both sides' understanding, i.e., StarKist was crazy, Bumble Bee

24 was rational, and Lindberg wanted both to be rational.

25

26

27

28 [34] The Court omits a bracket from this sentence that Plaintiffs inserted in their Complaint: [i.e., deviations from the conspiracy pricing].  (Bashas Compl. ¶ 289.)  This is a conclusory allegation and is not credited.

Defendants raise the possibility that the preceding events depict rational, legitimate business activity typical of a private equity firm. (MTD 35.) They raised similar arguments at the hearing; specifically, the discussions and emails concerned legitimate "marketing intelligence" by the Lion entities about their market competitors. (ECF No. 1321, at 52.) In its prior order, the Court noted that the "the similarity, and corresponding equipoise between innocuous and conspiratorial inferences, is partially removed by the alleged agreement and tighter timeline during which the relevant communications occurred." (ECF No. 283, at 18.) The concern between plausibility and possibility, as discussed in *Twombly* and *Iqbal*, is "largely grounded in ensuring the burdens of often costly and time-consuming discovery are taken into account when a court considers a motion to dismiss." (*Id.* at 17 (citing *Twombly*, 550 U.S. at 559).) Viewing the events of January to March 2012 as a whole, the DOJ investigation, and *Twombly* and *Iqbal*'s guidance, leads the Court to the conclusion that Plaintiffs have produced sufficient factual matter that nudges their conspiracy allegations from possible to plausible. Accordingly, the Court finds there is sufficient factual matter to meet the first element of a § 1 violation and proceeds to the second element.

b. Intent to Harm or Restrain Trade or Commerce

There are two modes of analysis to determine whether an agreement between conspirators was lawful: per se and rule of reason. Rule of reason is the default mode "unless the challenged action falls into the category of 'agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985) (quoting *N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958)). "The decision to apply the *per se* rule turns on 'whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to increase economic efficiency and render markets more, rather than less, competitive.'" *Id.*

84

at 289–90 (alteration in original) (internal quotation marks omitted) (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20 (1979)).

"In analyzing the reasonableness of an agreement under § 1, the Supreme Court has distinguished between agreements made up and down a supply chain, such as between a manufacturer and a retailer ('vertical agreements'), and agreements made among competitors ('horizontal agreements')." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015). Horizontal anticompetitive agreements are per se Sherman Act violations and "[o]nce the agreement's existence is established, no further inquiry into the practice's actual effect on the market or the parties' intentions is necessary to establish a § 1 violation." *Id.* (citing *N. Pac. Ry.*, 356 U.S. at 5). One example of a per se violation is an agreement among competitors to fix prices. *Id.* (citing *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397–98 (1927)).

Here, Plaintiffs have alleged an agreement amongst the dominant market competitors in the packaged tuna industry to fix prices. (*See* Bashas Compl ¶ 1; ECF No. 283, at 21 (finding per se violation of Sherman Act for a related allegation concerning FAD-free tuna labels).) The Court finds that Plaintiffs have sufficiently alleged a per se Sherman Act violation.

   c.  Antitrust Injury

The third element required to bring an antitrust claim is that a plaintiff must have suffered an antitrust injury. *See Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003). Antitrust injury must be "loss or damage of 'the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)). There are "four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999).

Here, Plaintiffs allege sufficient unlawful conduct as illustrated by the purported conspiracy to fix prices amongst market competitors. As previously discussed, this is a per se violation of the Sherman Act. They allege that they have been injured by increased prices, (Bashas Compl. ¶ 223–24, 324), which were the result of Defendants' anticompetitive acts, (*id.*).

Finally, with respect to the type of injury that antitrust laws were meant to protect, the Ninth Circuit has stated: "Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Am. Ad Mgmt.*, 190 F.3d at 1057. Plaintiffs are business entities within the packaged tuna market because they purchase tuna directly from one or more of the MDL defendants. (Bashas Compl. ¶¶ 16–18.)[35] Accordingly, the Court finds Plaintiffs have alleged sufficient factual matter to meet the third element of a § 1 Sherman Act violation. The Court further finds that Plaintiffs have stated a claim against Lion Americas for a § 1 Sherman Act violation.

### 3. Direct Participation by Lion Capital and Big Catch

Finally, the Court turns to direct participation by Lion Capital and Big Catch. The Court agrees with Defendants that Plaintiffs impermissibly attempt to engage in group pleading without differentiating between who was employed by what entity, (*see, e.g.*, Bashas Opp'n 10 n.1 ("'Lion' refers to Lion Capital, Lion Americas, and Big Catch.")). Plaintiffs allege that Lindberg was a Lion Capital partner, (TACC ¶¶ 36, 50), but do not advance any arguments why the actions of limited partners of Lion Capital who participated in the alleged price fixing should be imputed to Lion Capital[36] Plaintiffs do

---

[35] The Cherokee Nation's antitrust injury is the subject of a different motion to dismiss and will be discussed separately by the Court.

[36] The Bashas Plaintiffs argued at the hearing: "The same [employees] that worked for both companies were executives at both companies, and the actions taken by these individuals in furtherance of the conspiracy as alleged below were taken on behalf of both entities." (ECF No. 1321, at 46.) While Plaintiffs allege "significant overlap" between Lion Americas and Lion Capital, (Bashas Compl. ¶ 271),

address limited allegations to the actions of Mr. Lea; for example, he attended numerous meetings where Bumble Bee executives reported on key issues impacting Bumble Bee's business. (*Id.* ¶ 48.) To carry their burden, Plaintiffs must "allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall*, 518 F.3d at 1047. The Court finds that Plaintiffs have not alleged with any specificity the incidents involving Mr. Lea and his alleged connection to the conspiracy.

Further, the Complaint contains no factual matter concerning Big Catch's participation in the conspiracy, which is not surprising given its role as a holding company. Further, because Plaintiffs have not alleged sufficient facts to state a claim against Lion Capital, it does not matter that the Court has found that Big Catch is the alter ego of Lion Capital for personal jurisdiction purposes. Accordingly, the Court finds that Plaintiffs fail to state a claim with regard to Big Catch. Therefore, the Court **GRANTS IN PART** Defendants' Rule 12(b)(6) motions and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims as to Lion Capital, LLP and Big Catch Cayman LP.

In sum, the Court finds Plaintiffs have alleged sufficient facts to plausibly state a claim for a violation of section 1 of the Sherman Act by Lion Americas. The Court **DENIES IN PART** Defendants' Rule 12(b)(6) Motions to Dismiss with respect to Lion Americas.

## VI.    Statute of Limitations

Finally, Defendants argue that a four-year limitations period applies and should limit any liability for more than four years prior to when the various causes of action accrue. (MTD 36 (citing 15 U.S.C. § 15b; and *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1059–60 (9th Cir. 2012)).) They contend that Plaintiffs named the Lion entities as defendants on December 11, 2017 and, thus, Plaintiffs should be time-barred from asserting

---

they do not provide the Court with any argument why the actions of a limited partner should impute to the limited partnership or why the Court should determine Lindberg, Capps, and Chang were working for Lion Capital at the same time they were working for Lion Americas.

claims relating to conduct before December 11, 2013. (*Id.*) Defendants also contend that once the pre-December 11, 2013 conduct is removed, then Plaintiffs' allegations concerning Lion entities become practically nonexistent. (*See id.*)

Plaintiffs argue that the statute of limitations was tolled due to Defendants' fraudulent concealment. (Bashas Opp'n 43.) Plaintiffs go on to assert that they have alleged significant factual detail demonstrating affirmative acts by various defendants to conceal the conspiracy. (*See id.* (citing Bashas Compl. ¶¶ 183–86, 189–96, 203, 205, 207, 209, 225–66).) Finally, Plaintiffs cite other district court cases where the courts determined that there was no requirement for a plaintiff to allege specific acts of fraudulent concealment as to each defendant. (*See id.* at 44 (citing *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1207 (N.D. Cal. 2015); and *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-5944 SC, 2010 WL 9543295, at *10 (N.D. Cal. Feb. 5, 2010)).)

Defendants respond by citing this Court's prior order stating "allegations of fraudulent concealment must satisfy Federal Rule of Civil Procedure 9(b)." (Reply 25 (quoting ECF No. 295, at 90).) They also cite *Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1402 (9th Cir. 1995), for the proposition that, "[p]laintiffs may not generally use the fraudulent concealment by one defendant as a means to toll the statute of limitations against other defendants." (Reply 25.) Defendants would apply that rule here because Plaintiffs' allegations are generalized allegations concerning "defendants" and not specific to the Lion entities. (*See id.*)

"Antitrust actions under the Clayton Act are subject to a four year statute of limitations." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1119 (N.D. Cal. 2008) (citing 15 U.S.C. § 15(b) (2002); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)). As Defendants point out, "allegations of fraudulent concealment must satisfy Federal Rule of Civil Procedure 9(b), which requires that fraud be pled with particularity. Specifically, a plaintiff 'must plead with particularity the circumstances of the concealment and the facts supporting its due diligence.'" (ECF No. 295, at 90 (quoting *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 502 (9th Cir. 1988)).) Plaintiffs

bear the burden of pleading and proving fraudulent concealment.  *See Conmar*, 858 F.2d at 502.  "To plead fraudulent concealment, the plaintiff must allege that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have 'actual or constructive knowledge of the facts giving rise to [his] claim' as a result of the defendant's affirmative acts; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to his claim."  *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1073 (N.D. Cal. 2016) (alteration in original) (quoting *Hexcel*, 681 F.3d at 1060).

Plaintiffs' allegations concerning fraudulent concealment meet Rule 9(b)'s particularity requirement with respect to Bumble Bee, StarKist, and Chicken of the Sea and their employees involved in the alleged conspiracy.  The allegations include various affirmative acts, including telephonic conversations, emails from private accounts, and face-to-face meetings.  (*See* Bashas Compl. ¶ 258.)  Plaintiffs aver that they did not have knowledge of the facts giving rise to their claim and acted diligently in searching out the facts.  (*See id.* ¶¶ 261–66.)  The Court finds Plaintiffs have adequately alleged fraudulent conspiracy, at least as to some defendants but not the Lion Defendants.

This observation is only partially satisfactory because the Ninth Circuit has announced a general rule that fraudulent concealment may not be transferred or imputed from one defendant to another.  *See Barker*, 64 F.3d at 1402.  The district court in *In re Animation Workers* thoroughly and exhaustively discusses the issue of whether *Barker*'s general rule should apply to antitrust conspiracy cases.  *See* 123 F. Supp. 3d at 1206–08. Particularly dispositive for the *Animation Workers* court was the Ninth Circuit's admonition in *Beltz Travel Service, Inc. v. International Transportation Association*, 620 F.2d 1360, 1367 (9th Cir. 1980), that:

> If [a plaintiff] can establish the existence of a conspiracy in violation of the antitrust laws and that [defendants] were a part of such a conspiracy, [defendants] will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of [defendants'] own actions. Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each

conspirator may be performing different tasks to bring about the desired result.

*In re Animation Workers*, 123 F. Supp. 3d at 1207 (alterations in original). The *Animation Workers* court went on to find that *Barker*'s application is "incompatible" with *Beltz*'s holding and denied a motion to dismiss the plaintiffs' claims as time barred. *Id.* This Court agrees with the *Animation Workers* court and adopts its reasoning here. *Barker* did not involve an alleged conspiracy and does not address the unique legal intricacies of conspiracies. *See id.* at 1207–08. Thus, the Court finds that equitable tolling is appropriate given Plaintiffs' allegations concerning fraudulent concealment and the nature of the case as an antitrust conspiracy.

## CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motions to Dismiss, (ECF Nos. 997, 999, 1248). The Court **GRANTS** Defendants' Rule 12(b)(6) Motions with regard to Lion Capital, LLC and Big Catch and **DISMISSES WITHOUT PREJUDICE** those claims. The Court **DENIES** Defendants' Rule 12(b)(6) Motions as to the claims against Lion Capital (Americas), Inc. and **DENIES** Defendants' Rule 12(b)(2) Motions as to all Lion Defendants. The Court **GRANTS LEAVE TO AMEND** the respective Complaints to all Plaintiffs. Plaintiffs **MAY FILE** amended Complaints within thirty (30) days of the date on which this Order is electronically docketed. Plaintiffs **SHALL** consolidate and coordinate filings to the maximum extent possible.

**IT IS SO ORDERED.**

Dated:  September 5, 2018

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

90