Kenneth A. Gallo (NY 4484457)
Craig A. Benson (DC 473285)
Joseph J. Bial (NY 4151528)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC  20006-1047
Telephone: 202-223-7356
Facsimile:  202-204-7356
Email:  kgallo@paulweiss.com
Email:  cbenson@paulweiss.com
Email:  jbial@paulweiss.com

William B. Michael (NY 4296356)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3648
Facsimile:  212-492-0648
Email:  wmichael@paulweiss.com

*Attorneys for Defendant Bumble Bee Foods, LLC*

(Additional Counsel on Signature Pages)

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:  PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No. 15-md-2670-JLS-MDD<br><br>**[REDACTED] DEFENDANTS' OPPOSITION TO END PAYER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| This Document Relates To:<br><br>The Indirect Purchaser End Payer Actions | Date:      December 20, 2018<br>Time:      9:00 a.m.<br>Court:     Room 4D (4th Floor – Schwartz)<br>Judge:    Hon. Janis L. Sammartino |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................ 1

BACKGROUND .............................................................................................. 3

LEGAL STANDARD ...................................................................................... 6

ARGUMENT.................................................................................................. 11

I.    DR. SUNDING'S OVERCHARGE MODEL FAILS TO
      SUPPORT COMMON IMPACT OR DAMAGES AND IS
      UNRELIABLE BECAUSE HIS SELECTION OF TIME
      PERIODS IS BASELESS AND OUTCOME-DRIVEN. ............................ 11

      A.    Dr. Sunding Has No Economic Basis To Support His
            Treatment of Time Periods. ...................................................... 11

            1.    Cherry-picking an overcharge ................................... 12

            2.    "Holding out" periods of rising input costs ............... 15

            3.    Relying on a tainted time period ............................... 17

      B.    Dr. Sunding's Purported Documentary Analysis of Time
            Periods Is Not Based on Any Expertise, Employs No
            Methodology, and Is Unscientific and Arbitrary. ................... 18

II.   EVEN IF HIS TIME PERIOD SELECTIONS WERE VALID,
      DR. SUNDING'S OVERCHARGE MODEL IS
      UNRELIABLE AND INCAPABLE OF SHOWING
      COMMON IMPACT. .................................................................... 20

      A.    Dr. Sunding's Overcharge Model Ignores Individualized
            Price Negotiations and Improperly Assumes Common
            Impact by Using Averages Even Though Many Large
            Customers Did Not Sustain a Positive and Statistically
            Significant Overcharge. ........................................................ 21

      B.    Dr. Sunding's Overcharge Model Is Structurally
            Unsound Because It Generates Absurd Results................... 24

- i -

III.  DR. SUNDING'S PASS-THROUGH MODEL IS
      UNRELIABLE AND INCAPABLE OF SHOWING
      COMMON IMPACT. ...................................................................... 26

      A.  Dr. Sunding's Pass-Through Model Ignores Loss-Leader
          Pricing. ................................................................................ 27

      B.  Dr. Sunding's Pass-Through Model Ignores Focal-Point
          Pricing. ................................................................................ 30

      C.  Dr. Sunding's Pass-Through Model Ignores Geographic
          Location and Product Variations. ........................................ 32

      D.  Dr. Sunding's Pass-Through Model Ignores an Entire
          Link in the Distribution Chain of the Retail Channel. ........ 33

      E.  Dr. Sunding's Pass-Through Model Is Based on an
          Incomplete and Unrepresentative Data Set. ........................ 35

IV.   EPPS' PROPOSED CARTWRIGHT CLASS IS BARRED BY
      APPLICABLE CHOICE-OF-LAW RULES, AND SEPARATE
      SUBCLASSES CANNOT BE MAINTAINED UNDER RULE
      23. ............................................................................................ 37

      A.  California's Choice-of-Law Rules Preclude Certification
          of the Cartwright Class. ...................................................... 37

          1.  Applying California Law to the Multistate Class
              Claims Would Violate Due Process. ............................ 38

          2.  Applying California Law to the Multistate Class
              Claims Is Inconsistent with the Conflicts-of-Law
              Test. ............................................................................ 40

      B.  EPPs' Proposal to Certify 32 Separate State Classes
          Would Render Adjudication Unmanageable, and Would
          Cause Individualized Issues to Predominate. ...................... 48

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983) .......................................................................... 45, 49

*AT&T Mobility LLC v. AU Optronics Corp.,*
707 F.3d 1106 (9th Cir. 2013) ............................................................ 38, 39

*B.W.I. Custom Kitchen v. Owens–Illinois, Inc.,*
191 Cal. App. 3d 1341 (Cal. Ct. App. 1987) ............................................ 7

*Barber v. United Airlines, Inc.,*
17 F. App'x 433 (7th Cir. 2001) .......................................................... 19

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.,*
524 F. Supp. 2d 1166 (N.D. Cal. 2007) ................................................ 19

*Bickerstaff v. Vassar Coll.,*
196 F.3d 435 (2d Cir. 1999) ............................................................... 9

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA) L.L.C,*
752 F.3d 82 (1st Cir. 2014) ............................................................... 19

*In re Capacitors Antitrust Litig.,*
106 F. Supp. 3d 1051 (N.D. Cal. 2015) ................................................ 45

*California v. Infineon Techs. AG,*
No. C 06-4333 PJH, 2008 WL 4155665 (N.D. Cal. Sept. 5, 2008) .................. 32

*Castellow v. Chevron USA,*
97 F. Supp. 2d 780 (S.D. Tex. 2000) .................................................... 14

*In re Citric Acid Antitrust Litig.,*
No. 95-1092, 1996 U.S. Dist. LEXIS 16409 (N.D. Cal. Oct. 2, 1996) .............................................................................. 7

*City of Charleston v. Hotels.com, LP,*
487 F. Supp. 2d 676 (D.S.C. 2007) ..................................................... 44

- iii -

*City of Tuscaloosa v. Harcros Chem., Inc.*,
 158 F.3d 548 (11th Cir. 1998) ........................................................................ 19

*In re Class 8 Transmission Purchasers Antitrust Litig.*,
 140 F. Supp. 3d 339 (D. Del. Oct. 21, 2015), *aff'd in part, vacated
 in part*, 679 F. App'x 135 (3d Cir. 2017) ................................................ 36, 37

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013) .......................................................................................... 7

*Conde v. Sensa*,
 No. 14-cv-51 JLS WVG, 2018 WL 4297056 (S.D. Cal. Sept. 10,
 2018) ........................................................................................................ 44, 46

*Daubert v. Merrell Dow Pharm., Inc.*,
 509 U.S. 579 (1993) ........................................................................................ 2

*In re Digital Music Antitrust Litig.*,
 321 F.R.D. 64 (S.D.N.Y. 2017) ...................................................................... 50

*In re Domestic Drywall Antitrust Litig.*,
 No. 13-md-2437, 2017 WL 3700999 (D. Del. Aug. 24, 2017) ....................... 34

*Doyle v. Chrysler Grp., LLC*,
 663 F. App'x 576 (9th Cir. 2016) .................................................................... 10

*Ellis v. Costco*,
 657 F.3d 970 (9th Cir. 2011) ..................................................................... 8, 20

*Feitler v. Animation Celection, Inc.*,
 13 P.3d 1044 (Or. Ct. App. 2000) .................................................................. 44

*In re Fla. Cement & Concrete Antitrust Litig.*,
 278 F.R.D. 674 (S.D. Fla. 2012) .................................................................... 29

*In re Flash Memory Antitrust Litig.*,
 No. C-07-0086-SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ........... passim

*In re Flonase Antitrust Litig.*,
 815 F. Supp. 2d 867 (E.D. Pa. 2011) .............................................................. 46

*Freeland v. AT&T Corp.*,
 238 F.R.D. 130 (S.D.N.Y. 2006) .................................................................... 23

*Freeman Indus. LLC v. Eastman Chem. Co.*,
    172 S.W.3d 512 (Tenn. 2005) ............................................................................ 50

*Gen. Tel. Co. of the Sw. v. Falcon*,
    457 U.S. 147 (1982) ......................................................................................... 38

*Global Reins. Corp. v. Equitas Ltd.*,
    969 N.E.2d 187 (N.Y. 2012) ............................................................................ 50

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008) ............................................................... passim

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ........................................................... 47

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .......................................................................... 10

*In re Hyundai & Kia Fuel Economy Litig.*,
    881 F.3d 679 (9th Cir. 2018), *reh'g en banc granted*, 897 F.3d
    1003 (9th Cir. 2018) ......................................................................................... 40

*In re Initial Public Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ................................................................................. 7

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    No. 05-1717 (JJF), 2010 WL 8591815 (D. Del. July 28, 2010) ................. 29, 50

*J.P. Morgan & Co. v. Sup. Ct.*,
    113 Cal. App. 4th 195 (Cal. Ct. App. 2003) ................................................ 46, 47

*Jamsport Entm't, LLC v. Paradama Prods., Inc.*,
    No. 02 C 2298, 2005 WL 14917 (N.D. Ill. Jan. 3, 2005) .................................. 19

*Jimenez v. Allstate Ins. Co.*,
    765 F.3d 1161 (9th Cir. 2014) .......................................................................... 10

*Johnson v. Microsoft Corp.*,
    834 N.E.2d 791 (Ohio 2005) ............................................................................ 42

*Kanne* v. *Visa U.S.A., Inc.*,
    723 N.W.2d 293 (Neb. 2006) ........................................................................... 45

*Key v. Lewis Aquatech Pool Supply, Inc.*,
  58 Va. Cir. 344 (Va. Cir. Ct. 2002) .................................................... 44

*Laumann v. Nat'l Hockey League*,
  117 F. Supp. 3d 299 (S.D.N.Y. 2015) ................................................. 26

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
  No. 03 Civ. 7037(PKC), 2005 WL 4684238 (S.D.N.Y. Apr. 11,
  2005) ........................................................................................................ 14

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2017 WL 1391491 (N.D. Cal. Apr. 12,
  2017) ................................................................................................... passim

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2018 WL 1156797 (N.D. Cal. Mar. 5,
  2018) ........................................................................................................ 31

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................... 14, 18, 20

*Loeb Indus., Inc. v. Sumitomo Corp.*,
  306 F.3d 469 (7th Cir. 2002) ........................................................ 45, 49

*Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*,
  No. 13–cv–01180–BLF, 2015 WL 4755335 (N.D. Cal. Aug. 11,
  2015) ........................................................................................................ 45

*Mazza v. Am. Honda Motor Co., Inc.*,
  666 F.3d 581 (9th Cir. 2012) ............................................................ passim

*McCann v. Foster Wheeler LLC*,
  225 P.3d 516 (Cal. 2010) .............................................................. 43, 47

*MDG Int'l, Inc. v. Australian Gold, Inc.*,
  No. 1:07-CV-1096-SEB-TAB, 2009 WL 1916728 (S.D. Ind. June
  29, 2009) ................................................................................................. 14

*In re Methionine Antitrust Litig.*,
  204 F.R.D. 161 (N.D. Cal. 2001) ....................................................... 33

*Miller v. Jannsen Pharm. Prods., L.P.*,
  No. 05-cv-4076-DRH, 2007 WL 1295824 (S.D. Ill. May 1, 2007).................. 10

*In re Modafinil Antitrust Litig.*,
   837 F.3d 238 (3d Cir. 2016) ................................................................ 10

*Mullins v. Premier Nutrition Corp.*,
   No. 13-cv-01271-RS, 2016 WL 3440600 (N.D. Cal. June 20,
   2016) ......................................................................................................... 47

*Munguia v. Bekins Van Lines, LLC*,
   No. 1:11-cv-01134-LJO-SKO, 2012 WL 5198480 (E.D. Cal. Oct.
   19, 2012) .................................................................................................... 42

*Obrey v. Johnson*,
   400 F.3d 691 (9th Cir. 2005) ..................................................................... 9

*Ollier v. Sweetwater Union High Sch. Dist.*,
   768 F.3d 843 (9th Cir. 2014) ..................................................................... 8

*In re Optical Disk Drive Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014) ....................................................... passim

*In re Optical Disk Drive Antitrust Litig.*,
   No. 3:10-md-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ........... 42, 47

*In re Packaged Seafood Prods. Antitrust Litig.*,
   242 F. Supp. 3d 1033 (S.D. Cal. Mar. 14, 2017) ................................. 42, 45

*In re Packaged Seafood Prods. Antitrust Litig.*,
   277 F. Supp. 3d 1167 (S.D. Cal. Sept. 26, 2017) ..................... 38, 42, 46, 47

*In re Paxil Antitrust Litig.*,
   212 F.R.D. 539 (C.D. Cal. 2003) ............................................................. 49

*Peterson v. Visa U.S.A., Inc.*,
   No. Civ.A. 03-8080, 2005 WL 1403761 (D.C. Super. Ct. Apr. 22,
   2005) ......................................................................................................... 45

*In re Pharmacy Benefit Mgrs. Antitrust Litig.*,
   No. 06-1782, 2017 WL 275398 (E.D. Pa. Jan 18, 2017) ...................... 7, 23

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ................................................................................. 38

*Pierson v. Orlando Health*,
   No. 6:08-cv-466, 2010 WL 3447496 (M.D. Fla. Aug. 30, 2010) .............. 33

*In re Polyurethane Foam Antitrust Litig.*,
   799 F. Supp. 2d 777 (N.D. Ohio 2011) ............................................................ 50

*In re Prempro*,
   230 F.R.D. 555 (E.D. Ark. 2005) ........................................................... 48, 49

*In re Processed Egg Prods. Antitrust Litig.*,
   312 F.R.D. 124 (E.D. Pa. 2015) ................................................................. passim

*Racies v. Quincy Bioscience, LLC*,
   No. 15-cv-00292-HSG, 2017 WL 6418910 (N.D. Cal. Dec. 15,
   2017) ................................................................................................................. 40

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   292 F. Supp. 3d 14 (D.D.C. 2017) ............................................................ passim

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) ................................................................... 8, 9

*Reed Const. Data Inc. v. McGraw-Hill Cos.*,
   49 F. Supp. 3d 385 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d
   Cir. 2016) .......................................................................................................... 15

*In re Relafen Antitrust Litig.*,
   221 F.R.D. 260 (D. Mass. 2004) ............................................................. 46, 47

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) ............................................................ 9

*Romano v. Metro-N. Commuter R.R.*,
   No. 06 Civ. 4986(PAC), 2007 WL 5309190 (S.D.N.Y. Nov. 26,
   2007) ................................................................................................................. 14

*Sali v. Corona Reg'l Med. Ctr.*,
   889 F.3d 623 (9th Cir. 2018) ............................................................................ 8

*Samsung Elecs. Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ........................................................................ 45

*Sher v. Raytheon Co.*,
   419 F. App'x 887 (11th Cir. 2011) .................................................................... 9

*Siegel v. Shell Oil Co.*,
   256 F.R.D. 580 (N.D. Ill. 2008) ...................................................................... 50

- viii -

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009) ........................................................................ 11

*Stutzle v. RhonePoulenc S.A.*,
No. 062165, 2003 WL 22250424 (Pa. Ct. C.P. Sept. 26, 2003) ....................... 41

*Tesla Wall Sys. LLC v. Budd*,
No. 14 CIV. 8564 (LLS), 2017 WL 1498052 (S.D.N.Y. Apr. 26,
2017) ................................................................................................................... 14

*Tourgeman v. Collins Fin. Servs., Inc.*,
No. 08-CV-1392 JLS (NLS), 2011 WL 5025152 (S.D. Cal. Oct.
21, 2011) ............................................................................................................. 10

*Victorino v. FCA US LLC*,
No. 16cv1617-GPC(JLB), 2018 WL 2455432 (S.D. Cal. June 1,
2018) ................................................................................................................... 40

*Vista Healthplan, Inc.* v. *Cephalon, Inc.*,
No. 2:06-cv-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015) ..................... 50

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ................................................................................. 6, 27, 38

*Walsh v. Ford Motor Co.*,
807 F.2d 1000 (D.C. Cir. 1986) ........................................................................ 48

*Wang v. Chinese Daily News, Inc.*,
737 F.3d 538 (9th Cir. 2013) ............................................................................... 7

*Wash. Mut. Bank, FA v. Sup. Ct.*,
24 Cal. 4th 906 (Cal. 2001) ............................................................................... 46

**STATUTES**

Cal. Bus. & Prof. Code § 16700 et seq. ......................................................... passim

W. Va. Code R. § 46A-6-102 ............................................................................... 44

**OTHER AUTHORITIES**

Fed. Rule of Civ. P. 23 ................................................................................... passim

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 37

Fed. R. Evid. 702 .............................................................................. 2, 8, 9, 36

ABA SEC. ANTITRUST L., ECONOMETRICS: LEGAL, PRACTICAL, AND
    TECHNICAL ISSUES (2005)...................................................................... 9

ABA SEC. ANTITRUST L., INDIRECT PURCHASER LITIG. HANDBOOK
    (2d ed. 2016).................................................................................... 47

ABA SEC. ANTITRUST L., PROVING ANTITRUST DAMAGES (3d ed.
    2017)................................................................................................ 17

James D. Hess & Eitan Gerstner, *Loss Leader Pricing and Rain Check
    Policy*, 6(4) MARKETING SCIENCE 358 (1987) ...................................... 27

Daniel Levy et. al., *Price Points and Price Rigidity*,
    93(4) REV. ECON. & STAT. 1417 (2011)............................................... 30

Justin McCrary & Daniel L. Rubinfeld, *Measuring Benchmark
    Damages in Antitrust Litigation* .......................................................... 17

Daniel L. Rubinfeld, *Antitrust Damages*, *in* RESEARCH HANDBOOK ON
    THE ECONOMICS OF ANTITRUST LAW, 378 (Einer Elhauge, ed.,
    2012)................................................................................................ 17

## INTRODUCTION

End Payer Plaintiffs ("EPPs") seek certification of 32 classes suing under 32 separate state laws. EPPs must show that each element of their claims can be determined using common evidence: (1) whether there was an antitrust violation, (2) whether all or nearly all proposed class members were injured by the violation, and (3) how much each member was injured by the violation. Only if each of those questions can be answered by common evidence can a class be certified.

EPPs fail to make that showing. Their failure is not surprising, given the differences among members of the 32 proposed classes. EPPs have purchased:

- dozens of different types of tuna products, under different brands;
- from thousands of different stores (from big box retail to the convenience store on the corner);
- after hundreds of different direct purchasers individually negotiated prices, which changed regularly and frequently;
- at different times throughout a four-year period;
- in different towns, cities, states and territories.

EPPs seek to meet their burden by relying on an expert opinion from Dr. David Sunding, a professor in the College of Natural Resources at UC Berkeley. Dr. Sunding concluded that "common economic evidence" can demonstrate that there was a conspiracy to raise prices, that prices were raised for every single product sold to every single retailer, and that every single retailer passed those raised prices on to each of the purchasers in the 32 classes EPPs seek to certify here. In order to reach this conclusion, however, Dr. Sunding must stray so far afield from acceptable and *reliable* scientific methodologies that his opinions

- 1 -

should be disregarded. And, his conclusions are so flawed they cannot withstand the "rigorous analysis" that Federal Rule of Civil Procedure 23 requires.[1]

EPPs' motion should therefore be denied for at least four reasons:

*First*, Dr. Sunding's model—a before-and-after examination of prices and costs during the class period as compared to a supposed "benchmark" period— turns completely on which dates he chose to include and to exclude for purposes of his econometric analysis. ████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████ Defendants' testing shows that if Dr. Sunding had used the class period *as alleged in the Complaint*, his own model would show ***no overcharge at all***. ██████████ ████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████ Because there is no principled economic basis for the way in which Dr. Sunding defined the relevant time periods used in his model, and because his definition of those time periods is outcome-determinative, his entire analysis should be rejected.

*Second*, Dr. Sunding *ignored* crucial pricing differences from the many individualized price negotiations and rebates between manufacturers and direct purchasers, which defeat his conclusions. ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

---

[1]  Dr. Sunding's methodological flaws are so severe that much if not all of his analysis also fails to meet the admissibility standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

█████████████████████████████████████████████ If

direct purchasers did not sustain an overcharge, then neither could end payers.

*Third*, even assuming there *was* an overcharge, Dr. Sunding similarly ignored real-world retail pricing behaviors, including loss-leader strategies, focal-point pricing, and geography-specific pricing, that defeat his conclusion that common evidence shows all retailers *passed through* the alleged overcharge to all EPPs. When those omissions are corrected, his model shows that many end purchasers in the proposed class experienced no pass-through whatsoever. His pass-through analysis also relies on a fundamentally inadequate and incomplete dataset that excludes data from distributors as well as from retailers in key jurisdictions about which he purports to opine, and yet again ignores discounts.

*Fourth*, EPPs' proposed classes suffer from irreparable legal problems. The multistate Cartwright Act class EPPs seek to certify ("Cartwright Class") would violate due process and is impermissible under California's choice-of-law rules, (1) due to material differences between California law and the laws of the states in which EPPs reside, and (2) because the interests of the states in which EPPs bought packaged tuna far exceed California's interest as to non-California residents' claims. Further, the 32 state classes EPPs seek to certify in the alternative would render class-wide adjudication unmanageable because of differences among those states' laws: 32 states' laws to interpret and apply when making legal rulings in pre-trial motions practice; 32 sets of jury instructions; and 32 classes the jury will separately consider—which would also cause individualized issues to predominate.

## BACKGROUND

**EPP allegations.** EPPs claim that Defendants "conspired to raise, fix, stabilize or maintain prices" of packaged tuna. EPP Fifth Am. Compl. ("Compl.") ¶ 3, ECF No. 1208. They allege that the anticompetitive behavior began "[a]t least as early as July 1, 2004." *Id.* ¶ 184. Their Complaint therefore alleges a "Class

Period" "from, and including, at least July 1, 2004 through such time as the anticompetitive effects of Defendants' conduct ceases." *Id.* ¶ 1. EPPs now seek to certify damages classes for only a portion of that period, from 2011 to 2015, but still premise their claims on conduct that occurred prior to 2011. EPPs' Mem. P. &. A. ISO Mot. Class Certification ("EPP Br.") 3–5, ECF No. 1130-1.

**The experts.** EPPs retained Dr. Sunding to determine whether EPPs could determine liability, overcharge, and pass-through of any overcharges on the basis of common evidence. He concluded that they can. Defendants retained Dr. Laila Haider to review Dr. Sunding's work. She concluded that his work has serious economic flaws that, when corrected, show that common evidence cannot be used to prove overcharge or pass-through to all—or even nearly all—class members.

**Dr. Sunding's treatment of time periods.** Dr. Sunding's overcharge model compares the relationship between pricing and costs inside and outside of the proposed class period from May 2011 to July 2015 (the "proposed Class Period"), to try to isolate how the alleged conspiracy affected pricing. This is known as a before-and-after, or "benchmark" approach. Ex. 2, Sunding Rep. ¶ 108.[2] Although their Complaint alleges a conspiracy beginning in 2004, ████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████

---

[2] "Ex." refers to exhibits to the Declaration of Craig A. Benson in Support of Defendants' Opposition to EPPs' Motion for Class Certification, filed concurrently herewith.

█████████████████████████████ It is only by defining the relevant periods in this way that his model shows any overcharges. When Dr. Haider ran Dr. Sunding's model using all of the time periods in which conspiratorial conduct is alleged to have taken place, it detected no positive and statistically significant overcharges. Ex. 1, Haider Rep. ¶ 45.

**Dr. Sunding's overcharge analysis.** For each Defendant, Dr. Sunding's overcharge model calculated a single average national overcharge for all direct purchasers, spanning the entire proposed Class Period—an assumption with no economic underpinning and one that flies in the face of common sense. ████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████ When Dr. Haider tested Dr. Sunding's model using actual data from retailers on actual prices they paid after negotiations, it showed that many large customers did not sustain a positive and statistically significant overcharge. *Id.* ¶¶ 33–40.

**Dr. Sunding's pass-through analyses.** Dr. Sunding relied on two categories of data to analyze pass-through. █████████████████████
█████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████████

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ██████████████████████████████████████████

7 ████████████████████████████████████████████

8 ██████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ██████████████████████████████████████████████

11 ████████████████████████████ When Dr. Haider corrected Dr.

12 Sunding's model to account for location and product attributes, his estimated pass-

13 through effects by Defendant disappeared for a large portion of the class. *Id.* ¶ 65.

14 **Dr. Sunding's document review.** In addition to his flawed regression

15 analysis, Dr. Sunding engaged in an extended—but highly selective—analysis of

16 the documentary record. ██████████████████████████

17 ██████████████████████████████████████████████

18 ████████████████████████

19 <u>**LEGAL STANDARD**</u>

20 "Certifying a class is not an easy endeavor, and must not be undertaken

21 casually." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 132 (E.D.

22 Pa. 2015). This is because "[t]he class action is 'an exception to the usual rule that

23 litigation is conducted by and on behalf of the individual named parties only.'"

24 *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v.

25 Yamasaki*, 442 U.S. 682, 700–01 (1979)). "Rule 23 does not set forth a mere

26 pleading standard." *Dukes*, 564 U.S. at 350. Rather, "[a] party seeking class

27 certification must affirmatively demonstrate his compliance with the Rule—that is,

28

he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.*

**Rule 23 and antitrust.** The Supreme Court has recognized that class actions can serve a valuable role in the enforcement of antitrust laws. But there is no relaxed standard for class certification in antitrust cases, and courts regularly decline to certify antitrust classes where plaintiffs fail to meet their burdens under Rule 23. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013).[3] In antitrust cases, like all others, the Court must engage in a "rigorous analysis," *id.* at 27, to "assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met." *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006). That necessarily entails resolving "factual disputes" relevant to Rule 23 requirements, an obligation that "is not lessened by overlap between a Rule 23 requirement and a merits issue." *Id.* at 41; *see also Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013).

EPPs would have this Court believe it can shortcut this inquiry. They rely on decades-old district court cases that predate both *Comcast* and *Dukes*, for the false premise that there is a "general rule" that alleged price fixing "presumptively impacts upon all purchasers." EPP Br. 14.[4] They are wrong. All recent cases

---

[3] *See also, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14 (D.D.C. 2017); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 WL 1391491 (N.D. Cal. Apr. 12, 2017); *Processed Egg*, 312 F.R.D. 124; *In re Pharmacy Benefit Mgrs. Antitrust Litig.*, No. 06-1782, 2017 WL 275398 (E.D. Pa. Jan 18, 2017); *In re Optical Disk Drive Antitrust Litig. ("ODD")*, 303 F.R.D. 311 (N.D. Cal. 2014); *In re Flash Memory Antitrust Litig.*, No. C-07-0086-SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010); *In re Graphics Processing Units ("GPU") Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008).

[4] Neither the 1996 *Citric Acid* decision that EPPs cite or *B.W.I. Custom Kitchen v. Owens–Illinois, Inc.*, 191 Cal. App. 3d 1341 (Cal. Ct. App. 1987), suggests otherwise. *Citric Acid* observed that only "[s]ome courts" allowed such a presumption, while others "carefully examine the facts of each case in order to determine whether common proof of impact is possible." *In re Citric Acid*

- 7 -

make clear there is "no uniform approach" and each case "involves a particularized analysis of the specific industry and chain of distribution." *See, e.g.*, *GPU*, 253 F.R.D. at 489; *cf. In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013) ("Before *Behrend*, the case law was far more accommodating to class certification" whereas after that decision, "[i]t is now clear . . . that Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it.").

**Rule 23 and expert work.** Expert opinions must be scrutinized at the class certification stage. To begin with, expert testimony is always subject to the Court's reliability inquiry under Rule 702 and *Daubert*, which focuses on methodologies, but not conclusions. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) (Under *Daubert*, it is "'not the correctness of the expert's conclusions' that matters, but 'the soundness of his methodology.'" (citation omitted)). But in undertaking its "rigorous analysis," a court must also go beyond *Daubert* and "rule upon the ***conclusions*** generated by the principles and methodology." *Rail Freight*, 292 F. Supp. 3d at 42–43 (emphasis added) (quoting *In re Processed Egg Prods.*, 81 F. Supp. 3d 412, 417 (E.D. Pa. 2015)); *see also Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 634 (9th Cir. 2018) (district courts should analyze "persuasiveness" at the Rule 23 stage, not just admissibility); *Ellis v. Costco*, 657 F.3d 970, 982 (9th Cir. 2011) (even admissible expert reports must also be judged for "persuasiveness" under Rule 23). The court therefore must resolve disputes between the parties' experts, if those disputes go to whether or not the injury can be shown on a class-wide basis. *See, e.g.*, *Ellis*, 657 F.3d at 982–83 (in evaluating expert declarations, "the district court was required to resolve any

*Antitrust Litig.*, No. 95-1092, 1996 U.S. Dist. LEXIS 16409, at *18 (N.D. Cal. Oct. 2, 1996). Nothing in the 30-year-old *B.W.I.* supplants the rigorous, fact-specific inquiry demanded by *Comcast* and *Dukes*; and, in any event, California law cannot be applied to the 32-state Cartwright Class EPPs seek here. *See infra* Part IV.A.

factual disputes necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*"); *Sher v. Raytheon Co.*, 419 F. App'x 887, 890 (11th Cir. 2011) ("district court erred . . . by not sufficiently evaluating and weighing conflicting expert testimony" at class certification stage).

**Rule 23 and regressions.** The Supreme Court's mandate that district courts perform a "rigorous analysis" requires close scrutiny of regression models proffered by economists. Courts have a duty to take a "hard look at the soundness of statistical models that purport to show predominance," and may not rubber stamp them. *Rail Freight*, 725 F.3d at 255 (quoting *Comcast*, 569 U.S. at 36); *see also GPU*, 253 F.R.D. at 491 (class certification is not "automatic every time counsel dazzle the courtroom with graphs and tables").[5] The "hard look" is required because while "regression analysis will always yield a result," "[w]hether a regression is useful for assessing classwide impact is a different question." Ex. 25, ABA Sec. Antitrust L., Econometrics: Legal, Practical, and Technical Issues 355–56 (2005) [hereinafter, "Econometrics"].

**Predominance.** Rule 23(b)(3)'s "'predominance' inquiry is a demanding one." *Processed Egg*, 312 F.R.D. at 142 (citing *Comcast*, 569 U.S. at 34). It focuses on the "relationship between the common and individual issues" and "tests

---

[5] *See e.g.*, *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999) (regression that "omitted the major variables" was "so incomplete as to be inadmissible" (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986))); *Batteries*, 2017 WL 1391491, at *12 (rejecting regression that did not "sufficiently capture[] the variety of different types of class members and product categories"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010) ("[W]here significant variables that are quantifiable are omitted from a regression analysis, the study may become so incomplete that it is inadmissible . . . ."); *GPU*, 253 F.R.D. at 501–02 (requiring that an expert's regression "be properly analyzed and scientifically reliable and that it demonstrate a question of fact common to the class"); *cf. Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005) ("[S]tatistical evidence may suffer from serious methodological flaws and can be excluded, consistent with the trial court's 'gatekeeping' power, under Rule 702.").

whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citation omitted).  The question is whether "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." *Tourgeman v. Collins Fin. Servs., Inc.*, No. 08-CV-1392 JLS (NLS), 2011 WL 5025152, *13 (S.D. Cal. Oct. 21, 2011) (Sammartino, J.) (citations omitted). "Where liability determinations are both individual and fact intensive, class certification under Rule 23(b)(3) is improper." *Miller v. Jannsen Pharm. Prods., L.P.*, No. 05-cv-4076-DRH, 2007 WL 1295824, at *7 (S.D. Ill. May 1, 2007).

Antitrust "impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 262 (3d Cir. 2016) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)).  But predominance also requires a valid "common methodology for calculating damages," because without one, there is "no way to determine" whether "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated." *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016) (citations and internal quotation marks omitted) (unpublished); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014) ("[A] methodology for calculation of damages that could not produce a class-wide result [i]s not sufficient to support certification.") (citing *Comcast*, 569 U.S. at 38).

## ARGUMENT

## I. DR. SUNDING'S OVERCHARGE MODEL FAILS TO SUPPORT COMMON IMPACT OR DAMAGES AND IS UNRELIABLE BECAUSE HIS SELECTION OF TIME PERIODS IS BASELESS AND OUTCOME-DRIVEN.

Out of the gate, Dr. Sunding's overcharge regression model is not reliable or persuasive in showing that impact and damages can be demonstrated through common evidence because it turns on the arbitrary inclusion and exclusion of time periods that are not supported by any economic analysis or rationale.[6]

### A. Dr. Sunding Has No Economic Basis To Support His Treatment of Time Periods.

Dr. Sunding made arbitrary choices regarding how to treat different time periods in his overcharge model, which were guided by no scientific methodologies. These render his analysis unreliable and unpersuasive. *First*, Dr. Sunding cherry-picked his proposed Class Period (which is different from the class period alleged in the complaint) in order to maximize the overcharge he purports to find applied to all direct purchasers whose tuna was sold to EPPs. Indeed, as Dr. Haider's testing showed, Dr. Sunding's cherry-picking is the difference between a model that shows overcharges and a model that shows *none*. ████████████

---

[6]    EPPs primarily rely on Dr. Sunding's regression analyses, but also at times point to Dr. Sunding's "anecdotal" and "qualitative evidence of the economic characteristics" as a purported means of proving common impact. EPP Br. 21; *see also id.* at 15. Such qualitative analyses are insufficient to prove impact without a valid quantitative model. *See, e.g.*, *ODD*, 303 F.R.D. at 320 ("[W]hile such industry characteristics may be preconditions for any colorable case of class-wide impact, they do not establish such impact."); *GPU*, 253 F.R.D. at 502 ("Plaintiffs must show not that 'market conditions are favorable for impact' . . . but that there is a common, formulaic method of proving . . . an overcharge."). In fact, the very case cited by EPPs indicates that it is was not the expert's qualitative theories, but rather his "quantitative" regression models, that was used "to demonstrate class-wide injury." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 613, 615 (N.D. Cal. 2009) (cited in EPP Br. 21 n.10).

By excluding this particular period, Dr. Sunding removed from his analysis a period capable of demonstrating whether rising costs—rather than any alleged conspiracy—are what was responsible for impacting price. Predictably, the result of gerrymandering the time periods in this way is an artificially inflated overcharge. *Third*, Dr. Sunding impermissibly utilized as a supposedly "clean" benchmark one of the very periods plaintiffs allege is tainted by the alleged price-fixing. These three flaws artificially pump up an alleged overcharge in a manner that is disconnected from standard scientific methodology. We address each point sequentially below.

### 1. Cherry-picking an overcharge



[7] If these periods are included in the class period, as EPPs alleged in their Complaint they should be, then Dr. Sunding's model actually *produces a negative overcharge*. Ex. 1, Haider Rep. ¶ 45. In other words, if Dr. Sunding had done as he claimed to have done—accepted EPPs' allegations in the Complaint as true[8]—and sought to identify the effect of the alleged conspiracy over the period in which EPPs allege Defendants were price-fixing, then he would have concluded that there was *no overcharge and no injury to the class*.

---

[7]  EPPs' Complaint claims the alleged conspiracy had "anticompetitive effects," beginning "at least as early as July 1, 2004" through July 2015. Compl. ¶¶ 1, 184.

[8]



1

2

3

4 [9]

5

6

7 Dr. Sunding's decisions as to

8 which periods to include and exclude (or "hold out") in his model thus had no

9 grounding in economic analysis. As Dr. Haider's testing shows (and as further

10 explained below) it was only by slicing and dicing the time periods that Dr.

11 Sunding was able to come up with a statistically significant, positive overcharge.[10]

12

_____

13 [9] An expert cannot blindly accept and "bolster[]" a plaintiff's allegations by

14 incorporating them as "assumptions" to his opinion—especially when, as here, such assumptions are dispositive of the results the expert purports to find. *Lava*

15 *Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037(PKC), 2005 WL 4684238, at *2 (S.D.N.Y. Apr. 11, 2005); *see also Tesla Wall Sys. LLC v. Budd*,

16 No. 14 CIV. 8564 (LLS), 2017 WL 1498052, at *1 (S.D.N.Y. Apr. 26, 2017) (an

17 expert who "[u]nquestioningly accept[s] the assumptions furnished to him by plaintiff's counsel . . . cannot be said to have 'reliably applied principles and

18 methods to the facts of the case'" (citation omitted)); *In re Live Concert Antitrust*

19 *Litig.*, 863 F. Supp. 2d 966, 978 (C.D. Cal. 2012) (excluding expert opinion that "impermissibly assume[d] . . . without meaningfully testing" facts about alleged

20 anticompetitive conduct); *MDG Int'l, Inc. v. Australian Gold, Inc.*, No. 1:07-CV-

21 1096-SEB-TAB, 2009 WL 1916728, at *4 (S.D. Ind. June 29, 2009) ("An expert must independently verify facts given to him, rather than 'accepting [them] at the

22 word of . . . counsel.'" (citation omitted)).

23 [10] For this reason, Dr. Sunding was not being "conservative" by using a shorter

24 conspiracy period than the one alleged in the Complaint, as EPPs may suggest. Just the opposite. His treatment of time periods—

25 —is *necessary* to finding

26 any positive overcharge at all using his model. This reveals his analysis to be not only economically baseless, but also impermissibly outcome-driven. *See, e.g.*,

27 *Romano v. Metro-N. Commuter R.R.*, No. 06 Civ. 4986(PAC), 2007 WL 5309190,

28 at *1 (S.D.N.Y. Nov. 26, 2007) (rejecting "result-driven and convenient" expert

- 14 -

Dr. Sunding's proposed methodology therefore fails as a matter of law.  As one district court explained: "When constructing a benchmark statistic, the regression analyst may not 'cherry-pick' the time-frame or data points so as to make her ultimate conclusion stronger.  Rather, some passably scientific analysis must undergird the selection of the frame of reference."  *Reed Const. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014) (citation omitted), *aff'd*, 638 F. App'x 43 (2d Cir. 2016).  The court went on to reject the expert's methodology, where his "choice of the end dates" for his "benchmark model" was admittedly "more or less, arbitrary," and the error had an "outcome-determinative effect" since it "yielded no damages" for different end dates.  *Id.* at 407.  Dr. Sunding's methodology should be rejected for the same reasons.

## 2. "Holding out" periods of rising input costs

Dr. Sunding's decisions as to which periods to include and exclude from his benchmark and class periods were not merely arbitrary; rather, they had the effect of systematically inflating the overcharge he purports to measure.  ███████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████  Not surprisingly, as discussed above, when Dr. Haider added this back into Dr. Sunding's overcharge analysis and ran the model using the full class period alleged in the Complaint, Dr. Sunding's claimed overcharge disappeared.  *Id.* ¶ 45.  ███████████████████

opinions); *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 797 (S.D. Tex. 2000) (explaining "result-driven procedures are anathema to both science and law and are properly excluded because they are too speculative to assist the triers of fact").

- 15 -



[REDACTED]

### 3. Relying on a tainted time period

Finally, Dr. Sunding's "benchmark" period contradicts the EPPs' allegations, rendering his model meaningless. The benchmark approach requires "using the periods before and/or after the alleged wrongful behavior as a benchmark." Ex. 22, Daniel L. Rubinfeld, *Antitrust Damages*, in RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW, 378, 381 (Einer Elhauge, ed., 2012). To reliably apply this approach, "it is essential that the non-impact period be as similar as possible to the impact period. . . . *but for the wrongful behavior*." *Id.* (emphasis added).[11] [REDACTED]

[REDACTED]

Other courts have rejected benchmark models for this very reason. *In re Live Concert Antitrust Litigation* is on point. There, the expert "simply excluded 1999 from his data set, and performed the 'Before–and–After' analyses as though

---

[11] *See also* Ex. 23, ABA SEC. ANTITRUST L., PROVING ANTITRUST DAMAGES 227 (3d ed. 2017) (the benchmark approach assumes that "prices before and after, but not during, the relevant period were set free of any illegal cartelization"); Ex. 24, Justin McCrary & Daniel L. Rubinfeld, *Measuring Benchmark Damages in Antitrust Litigation*, 3(1) J. ECONOMETRIC METHODS 63, 65 (2014) (In a "before-after" benchmark approach, the benchmark is a "control period in which the market was *unimpeded*" by the alleged conspiracy. (emphasis added)).

1999 had never occurred"—an act the court found rendered the expert's analysis "hopelessly flawed" because an expert "must *account for* major factors (such as allegedly anticompetitive conduct in 1999); he cannot simply *ignore* them and perform the analysis as if they did not exist." *Live Concert*, 863 F. Supp. 2d at 980–81. The court, accordingly, excluded the expert's testimony. *Id.* at 981. The same result is warranted here.

**B.** **Dr. Sunding's Purported Documentary Analysis of Time Periods Is Not Based on Any Expertise, Employs No Methodology, and Is Unscientific and Arbitrary.**

███████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████ This is not sufficient and is not the work of an economic scientist. Rather, this is the province of the finder of fact. ██████████████
████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████
███████
                        ██████████████████████████████████
                        ██████████████████████████████████
                        ██████████████████████
                        ████████████████████████████



Courts routinely hold that opinions that merely repeat and characterize fact documents are inappropriate because they offer nothing beyond what any juror could do, and because they lack any discernable scientific methodology. *See, e.g.*, *Jamsport Entm't, LLC v. Paradama Prods., Inc.*, No. 02 C 2298, 2005 WL 14917, at *10 (N.D. Ill. Jan. 3, 2005) (excluding testimony that "certain conduct was anticompetitive" where expert's analysis "consist[ed], in large part, of his interpretation of correspondence and other evidence," since nothing in expert's economic expertise "suggests that he is any more competent than the average juror in interpreting these communications"); *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 565 (11th Cir. 1998) (excluding "characterizations of documentary evidence as reflective of collusion," because "the trier of fact is entirely capable of determining whether or not to draw such conclusions"); *Rail Freight*, 292 F. Supp. 3d at 53 ("'The cases are clear that an economist's testimony is not admissible where he or she simply reads and interprets evidence of collusion as any juror might . . . .'" (alteration omitted) (quoting *Processed Egg*, 81 F. Supp. 3d at 421)). Any opinions based on this document review, *see* Ex. 2, Sunding Rep. ¶¶ 64–90, should be rejected for that reason alone.[12]

---

[12] Courts routinely reject opinions that "cherry-pick" facts and data. *See, e.g.*, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA) L.L.C*, 752 F.3d 82, 92 (1st Cir. 2014); *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176–78 (N.D. Cal. 2007).

As such, Dr. Sunding's documentary analysis fails to provide the economic analysis needed to validate EPPs' chosen proposed Class Period because he has no expertise, did not use any type of valid methodology, and cherry-picked the data.

## II. EVEN IF HIS TIME PERIOD SELECTIONS WERE VALID, DR. SUNDING'S OVERCHARGE MODEL IS UNRELIABLE AND INCAPABLE OF SHOWING COMMON IMPACT.

Dr. Sunding's analysis should be rejected for another, independent reason. His model assigned a *single* overcharge to all purchases, by all direct purchasers, for every point in time.[13] Ex. 3, Sunding Tr. 174:17–176:18. It therefore is neither reliable nor persuasive because it failed to account for major variables that reflect the market realities of Defendants' individual pricing negotiations with direct purchasers, instead relying on a blanket overcharge that obscures the absence of impact to large segments of the class. Courts regularly reject economic models based on unsupported assumptions. *See Live Concert*, 863 F. Supp. 2d at 977–82 (excluding expert's regression model that did not "meaningfully test[] [his] assumption" and "fail[ed] to account for at least two major variables"). And even if the model could be admissible, those significant omissions render it unpersuasive. *See Ellis*, 657 F.3d at 982 (at class certification, beyond determining admissibility, court should have gone on to judge its "persuasiveness"); *ODD*, 303 F.R.D. at 325 (expert opinions unpersuasive even though admissible where "plaintiffs fail[ed] to show the expert reports answer the critical questions").

---

[13] This means that someone purchasing a 5oz can of tuna in Tupelo, Mississippi in July 2011 is assumed to pay precisely the same overcharge as someone purchasing a 12oz pouch of tuna in Los Angeles during Lent (a period of high demand) in 2015. *See* Ex. 3, Sunding Tr. 117:20–119:8; 174:19–175:10. Dr. Sunding offers no defensible theory or any economic justification for this conclusion.

**A. Dr. Sunding's Overcharge Model Ignores Individualized Price Negotiations and Improperly Assumes Common Impact by Using Averages Even Though Many Large Customers Did Not Sustain a Positive and Statistically Significant Overcharge.**

Dr. Sunding's model guarantees the conclusion of common impact by ignoring critical information on the individualized nature of customer negotiations and unduly relying on averages.

Although Defendants issue national price lists, the actual price that any direct purchaser pays for a purchase of packaged tuna from any Defendant (i.e., the first step of the distribution chain that leads to EPPs) is determined through individual, customer-specific negotiations that result in significant price differentiation across direct purchasers.[14]  Dr. Sunding's model, however, simply ignored these individualized negotiations.[15] ████████████████████

_____

14 ████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

15 ████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████

█████████████████████████████████████████████████. He instead estimated a single average overcharge paid by direct purchasers to each Defendant that masks considerable price variation among direct purchasers. *Id.* ¶ 41.

*First*, "[a]s a general matter, antitrust claims predicated on negotiated transactions, as opposed to purchases based on list prices, often entail consideration of individualized proof of impact." *Flash Memory*, 2010 WL 2332081, at *8; *see also GPU*, 253 F.R.D. at 504 ("[I]ndividualized negotiations between defendants and direct purchasers often require courts to scrutinize each transaction to ascertain whether the purchaser paid a supra competitive price." (quoting *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 384 (S.D.N.Y. 1996))). At a minimum, when faced with evidence of individualized negotiations, a plaintiffs' expert must demonstrate *why* his model is nonetheless capable of demonstrating impact on a class-wide basis. *See GPU*, 253 F.R.D. at 494 ("[I]t was [the expert's] burden to show that individual differences between products and purchasers *could* be accounted for, *not* that individual differences could be ignored"). Dr. Sunding did not even try.

*Second*, an average overcharge cannot prove, by itself, that all or nearly all direct purchasers were affected. A four-cent average overcharge, for example, could mean that 50 percent of direct purchasers paid an eight-cent overcharge and half paid no overcharge at all. Courts have roundly rejected this logically and

---

████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████ The court in Flash Memory specifically rejected an argument that "Defendants' alleged reliance on price lists constitutes common proof of antitrust impact" because that argument "ignore[d] the realities of the market." 2010 WL 2332081, at *9. Even though those lists existed, the court found that "[i]n actuality, direct purchasers had significant negotiating power" and "the bulk of Defendants' sales to direct purchasers were made pursuant to negotiated transactions which resulted in substantial variations in the prices paid by direct purchasers." *Id.* at *8–9. The same is true here.

methodologically flawed approach when it obscures differences in impact to direct purchasers, yet that is exactly what Dr. Sunding did. Courts have thus discredited approaches like Dr. Sunding's that rely on averages to assume common impact instead of demonstrating it with results. The court in *Flash Memory*, for example, was "unpersuaded by Plaintiffs' reliance on [an expert] regression analysis to explain the variations in individual transaction prices" because the model looked only at "*average price*" data that obscured "individual variances in price trends" and "individual variations over time among the prices that different customers pay." 2010 WL 2332081, at *9–10. In *Optical Disk Drive*, the court similarly denied class certification where the expert's report relied on average "overcharge coefficients [that] reflect aggregate estimates for all purchasers." 303 F.R.D. at 324. The court explained that such a model "cannot serve to establish that all (or nearly all) members of the class suffered damage as a result of defendants' alleged anti-competitive conduct" because by producing a uniform overcharge across purchasers, "class-wide impact is still being *assumed* by the models, rather than demonstrated by the results" and thus the analysis "assumes the very proposition that the [plaintiffs] are now offering it, in part, to show." *Id.* at 321, 324.[16]

The same conclusion is appropriate here. Dr. Sunding's use of averages conceals substantial variation and the fact that many direct purchasers did not pay an alleged overcharge at all, leaving EPPs unable to show impact on a class-wide basis. █████████████████████████████████████████

---

[16] *See also Pharmacy Benefit*, 2017 WL 275398, at *21 (rejecting analysis under *Daubert*'s fit test where "Plaintiffs' experts provide no basis on which one can conclude that the average [overcharge] . . . is shared by virtually every class member"); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 151 (S.D.N.Y. 2006) ("Using averages that include prices for different products 'can lead to serious analytical problems.'" (quoting Ex. 25, ECONOMETRICS, at 220)).

**B.      Dr. Sunding's Overcharge Model Is Structurally Unsound Because It Generates Absurd Results.**

Testing reveals that Dr. Sunding's explanatory variables are untrustworthy and inconsistent with real-world conditions and econometric effects.

---

[17]  EPPs argue that the existence of "a few" individual class members for whom injury cannot be shown will not defeat class certification. EPP Br. 19 & n.9.  But as shown above, the lack of impact to many prominent direct purchasers would affect large segments of the class.  And the same is true for pass-through, where, as discussed *infra* Part III, testing reveals substantial populations with no or negative pass-through.  Courts have ruled that class models are insufficient where they include more than a *de minimis* number of uninjured members—the "outer limits" of which are 5-6%.  *Rail Freight*, 292 F. Supp. 3d at 137.

DEFENDANTS' OPPOSITION TO END PAYER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
15-MD-2670-JLS-MDD



None of this makes any sense, either separately or taken together.[18]

This all makes absolutely no sense. *See id.* ¶ 30 n.36 (explaining Dr. Sunding's "counter-intuitive" effects are problematic because they mean his model cannot distinguish between price effects from normal demand and supply factors and the alleged anticompetitive conduct).[19]

[18]

These economically incoherent and fundamentally implausible results illustrate that Dr. Sunding's model and conclusions are not reliable. As one court explained, "an inexplicable or unexpected coefficient can act as a canary in the coal mine that indicates that a regression model—although perhaps facially reliable—is producing counterintuitive results inconsistent with real-world behavior." *Rail Freight*, 292 F. Supp. 3d at 73.[20] Regression models are not persuasive where they produce "absurd and counterintuitive" and "seemingly nonsensical results" that are contrary to common sense expectations about what the "actual" real-world facts would be. *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 310, 318 (S.D.N.Y. 2015) (rejecting model under *Daubert*).

## III. DR. SUNDING'S PASS-THROUGH MODEL IS UNRELIABLE AND INCAPABLE OF SHOWING COMMON IMPACT.

Because EPPs are indirect purchasers, the predominance analysis has two steps. "First, Plaintiffs must show that *direct purchasers* paid an artificially inflated price for [packaged tuna]. And second, Plaintiffs must establish that the direct purchasers, in turn, *passed through* some or all of the inflated cost to *indirect purchasers*." *Flash Memory*, 2010 WL 2332081, at *7. "Without a reliable method for proving common impact on all purchasers of defendants' products *throughout the chain of distribution*, indirect-purchaser plaintiffs cannot proceed as a class." *GPU*, 253 F.R.D. at 507 (emphasis added).

Like his overcharge model, Dr. Sunding's pass-through model is methodologically unsound and cannot withstand the "rigorous analysis" required under Rule 23(b)(3).[21] Dr. Sunding failed to account for critical aspects of the

---

[20] The *Rail Freight* court admitted the expert model under *Daubert* only after finding that, unlike Dr. Sunding, the expert provided "a plausible explanation" for the counterintuitive results, but ultimately did not certify the class based on the court's Rule 23 analysis of the expert's model. *See* 292 F. Supp. 3d at 14.

[21] EPPs' reliance on *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.* to suggest some lesser burden is misplaced. EPP Br. 19–20. That decision was on a

distribution chain affecting pass-through to end purchasers; he ignored important real-world behavior including loss-leader and focal-point pricing, as well as geographic location, and entire states and links in the distribution chain. This renders his analysis unreliable and masks considerable variation in impact to EPPs.

**A.      Dr. Sunding's Pass-Through Model Ignores Loss-Leader Pricing.**

Loss-leader pricing results in the exact opposite of a retailer passing all costs along to consumers. It:

> is a pricing strategy in which retailers set very low prices, sometimes below cost, for some products to lure customers into stores. The idea is that while customers are in the store to get this good (the leader product), they buy other goods that generate higher profits.

Ex. 27, James D. Hess & Eitan Gerstner, *Loss Leader Pricing and Rain Check Policy*, 6(4) MARKETING SCIENCE 358, 358 (1987).

Dr. Sunding simply dismissed the possibility of loss-leader pricing,

_____

motion to dismiss and only looked at a pleading standard. *See* No. 09-cv- 00852, 2012 U.S. Dist. LEXIS 125677, at *11 (E.D. Wis. Sept. 5, 2012). "Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350.

[22]

Accounting for those class members who purchased packaged tuna at loss-leader pricing would have required an individualized—rather than common—analysis as to each of the resellers' loss-leader pricing practices over time. *See GPU*, 253 F.R.D. at 505 ("Class certification is problematic where a plaintiff's method of proving pass-through requires a reseller-by-reseller analysis").

Courts have rejected approaches that attempt to demonstrate common impact by conveniently ignoring adverse facts, as Dr. Sunding did here. For instance, in *Processed Egg*, the court concluded that retailers' different "marketing schemes are evidence that the anticompetitive overcharge, if any, cannot be determined on a



classwide basis," including that "[e]ggs are often sold as 'loss leaders' whereby retailers sell eggs below cost in order to attract customers to the store." 312 F.R.D. at 158. Another court denied class certification where "direct purchasers did not consistently pass on increases in [product] prices to indirect purchasers" and instead "often absorbed" those price increases due to market conditions, and where the expert "offer[ed] no opinion to rebut this evidence." *In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 685 (S.D. Fla. 2012). The court thus denied certification because "the Court would need to conduct an individualized inquiry to determine whether the alleged overcharge was in fact passed on to each putative class member." *Id.* Similarly, the court in *Flash Memory* recognized that "different retailers respond to cost changes in different ways, with some *choosing not to pass-through cost changes* in the form of higher prices for the end-user"— just as the groceries here may choose not to pass on costs in order to pursue a loss leader strategy. 2010 WL 2332081, at *11 (emphasis added). The court observed that the expert's "one-size-fits-all" analysis "account[ed] for none of these anomalies," and denied class certification for failure to demonstrate that pass-through could be shown with common evidence. *Id.* at *11–13.[24]

_____

[24]

**B.  Dr. Sunding's Pass-Through Model Ignores Focal-Point Pricing.**

Focal-point pricing refers to the practice by which retailers set shelf prices to achieve specific visual price points.  A common example is a price ending in "9"— *e.g.*, $0.99, $1.99.  Ex. 1, Haider Rep. ¶ 107.  ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████[25]  This is important because a retailer's use of focal-point pricing frequently limits that retailer's ability to pass through a particular price increase.[26]

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ █████████████████████████████

─────────────────────

████████████████████████████████████████████████████████████

███

[25] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

[26]  Studies have shown that products at focal-point prices are less likely to change in comparison to prices ending in non-focal-point digits.  *See* Ex. 26, Daniel Levy et al., *Price Points and Price Rigidity*, 93(4) Rᴇᴠ. Eᴄᴏɴ. & Sᴛᴀᴛ. 1417–31 (2011).

[27] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

It is not "reasonable to assume a uniform pass through rate" when there is evidence of "price points—i.e., the common practice in the industry of selling products" just below the next pricing point. *ODD*, 303 F.R.D. at 324–25. "[F]or example, if the overcharge paid by the direct purchaser . . . was only four dollars, it seems implausible that the retailer would then raise the price of [an end product] that otherwise would sell for $999 to $1003." *Id.* at 325. The same logic applies here: it is implausible that a retailer would raise the price of a can of tuna that otherwise would sell for $0.99 to $1.03. ███████████████████████ ████████████████████████████████████████

More recently, the court in *Batteries* denied a renewed motion for class certification because the plaintiffs' expert "failed to provide an explanation for the effect of focal-point pricing on the pass-through analysis," and thus, "the Court [could not] find that the antitrust injury to the class [could] be determined on a common basis as to the putative class." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2018 WL 1156797, at *5 (N.D. Cal. Mar. 5, 2018). Although that expert—unlike Dr. Sunding—offered "various kinds of statistical data analysis" in support of his "theory" that focal-point pricing did not preclude a finding of common impact, that analysis showed only "that product cost changes correspond to product price changes" generally, and did not reflect the "*actual* changes" to prices from focal-point pricing. *Id.* at *4 (emphasis added). Dr. Sunding's analysis is even more deficient because he failed to consider focal-point

pricing at all.  Ex. 1, Haider Rep. ¶¶ 105, 109.  His analysis thus does not "fit" the facts under *Daubert* and is unpersuasive under Rule 23's rigorous analysis.

**C.    Dr. Sunding's Pass-Through Model Ignores Geographic Location and Product Variations.**

Dr. Sunding's pass-through regression models are also insufficient because they incorrectly assume that prices paid by EPPs were constant across geographic locations. ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████  Importantly, when Dr. Sunding's proposed regression models are corrected to allow for these differences, his pass-through effects decline significantly.  When his models are corrected for both geographic location and product attributes,[28] his estimated pass-through effects by Defendant *disappear* for a significant portion of the class.  *See id.* ¶¶ 61–65.

████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████  Additionally, the IRI data on which Dr. Sunding relies masks differences in prices paid by EPPs across different retailers and different

---

[28]  *See Flash Memory*, 2010 WL 2332081, at *10 (denying class certification due in part to expert's failure to account for variability across "different types of products"); *California v. Infineon Techs. AG*, No. C 06-4333 PJH, 2008 WL 4155665, at *11 (N.D. Cal. Sept. 5, 2008) (listing variations in "product" as one "divergent factor . . . that increases the likelihood that proof of pass-through can only be shown with resort to individualized proof").

stores within a state. *Id.* ¶ 79. Thus, Dr. Sunding's proposed methodology obscures wide variation in prices paid by different end consumers *for the same product, in the same state* at any given point in time. *Id.*

Courts have found uniform pass-through rates are inappropriate under similar circumstances, where "the evidence demonstrates that resellers do not act uniformly and that they operate in *different markets with different competitive pressures*; that is, that there is not a single pass-through rate for all . . . resellers." *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 165 (N.D. Cal. 2001) (emphasis added). The court in *Processed Egg* denied class certification where the expert's pass-through model, using IRI data (like Dr. Sunding's model), "fail[ed] to analyze what appear[ed] to be significant individualized differences in pricing across *different retailers and regions*" and so risked "mask[ing] stores with no pass-through rate at all." 312 F.R.D. at 124, 160–61; *see also Pierson v. Orlando Health*, No. 6:08-cv-466, 2010 WL 3447496, at *5 (M.D. Fla. Aug. 30, 2010) (excluding expert opinions that were "based on unsupported assumptions that, *inter alia*, geographic markets and practice environments are comparable").

### D. Dr. Sunding's Pass-Through Model Ignores an Entire Link in the Distribution Chain of the Retail Channel.

Dr. Sunding's analysis is also inadequate because it omits key segments of the retail channel. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████ This channel often contains multiple levels where Defendants sell directly to distributors, who then sell to retailers, who sell to consumers. *Id.* ¶ 71.

Dr. Sunding's pass-through analysis for these multi-outlet stores in the retail channel ignores all of the transactions in the middle of the distribution chain between intermediaries—i.e., distributors that purchase tuna directly from manufacturers for resale to retailers before the retailers sell to end consumers. *Id.*

- 33 -

¶¶ 70–75. ███████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

This does not pass muster under Rule 23. Dr. Sunding's model improperly assumes pass-through at the distributor level for the entire multi-outlet retail channel, which is a fact that EPPs are required to affirmatively prove.[29] For this reason, the court in *Batteries* held the expert's regression analysis failed to "demonstrate[] th[at] antitrust impact is 'passed on' to each level of the indirect purchasers in the distribution chain," and also granted a motion to strike on *Daubert* grounds based on the "lack of representativeness in the data used to conduct the analyses." *See* 2017 WL 1391491, at *12. Specifically, the expert offered "no methodology to account for" the effects of "bundling, rebates, and discounts" throughout the distribution chain, and he also did not obtain data for an entire group of class members. *Id.* Likewise, Dr. Sunding has not analyzed any data for the distributors that sold to multi-outlet stores in the retail channel, nor any of their pricing practices, and so his model ignores an entire link of the distribution chain for a large percentage of Defendants' sales in that channel. Ex. 1, Haider Rep. ¶ 70. As the court in *Batteries* held, such an analysis is simply "too abbreviated" and thus "insufficient to show that pass-through and damages can be established by expert analysis on a class-wide basis." 2017 WL 1391491, at *12.

---

[29] *See, e.g.*, *In re Domestic Drywall Antitrust Litig.*, No. 13-md-2437, 2017 WL 3700999, at *14 (D. Del. Aug. 24, 2017) (denying certification where "model assume[d] a 100% pass-through rate, which is something that [plaintiffs] must prove"); *ODD*, 303 F.R.D. at 321 (refusing to credit expert opinion that "ma[de] no attempt to establish, but instead simply assume[d], class-wide impact").

### E. Dr. Sunding's Pass-Through Model Is Based on an Incomplete and Unrepresentative Data Set.

Dr. Sunding's pass-through model also fails as a means of class-wide proof, and is unreliable, because it omits data from entire states covered by the proposed class. ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████ He has not explained this omission, nor has he claimed that the data upon which he actually relied are representative of the data relevant to the proposed class.

The IRI data also necessarily reflect higher prices than those actually paid by end purchasers because IRI data does not account for discounts at the point of sale, such as manufacturer's coupons used by end purchasers. █████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████ Had he done so, he would have learned that, as multiple EPP witnesses have testified, they frequently used coupons at the point of sale.[30] Thus, not only are the data sets relied on incomplete

---

[30] *See* Ex. 6, Childs Tr. 43:17–19 ("Q. The coupons you use for tuna, do they work at every grocery store you shop at? A. I think so. I'm not really sure on that

and unrepresentative, they also fail to capture actual prices paid. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

Expert testimony must be "based on sufficient facts or data." Fed. R. Evid. 702. Accordingly, the court in *Batteries* struck expert opinions in part and denied class certification because of "lack of representativeness in the data used to conduct the analyses," where plaintiffs' pass-through analysis did not cover a sufficient variety of class members and products to make it reliable and applicable to the class. 2017 WL 1391491, at *12. And courts have routinely concluded that, to withstand the "rigorous scrutiny" Rule 23 requires, the data relied upon in an expert analysis must be representative of the broader universe of relevant data. *See, e.g.*, *In re Class 8 Transmission Purchasers Antitrust Litig.*, 140 F. Supp. 3d 339, 353 (D. Del. Oct. 21, 2015) (rejecting an expert model that relied on "a small slice of data" that was not fully representative of sales made during the class period), *aff'd in part, vacated in part on other grounds*, 679 F. App'x 135 (3d Cir. 2017); *ODD*, 303 F.R.D. at 324 (noting that "the selectivity of the pricing data examined in the analysis substantially limits the conclusions that can be drawn"); *see also Processed Egg*, 312 F.R.D. at 159–60 (declining to credit expert analysis because underlying IRI data was geographically limited and too aggregated).

In *Class 8 Transmission*, for example, the court found an expert's analysis incapable of demonstrating class-wide injury where it "utilize[d] assumptions" drawn from limited data that were not representative of sales during the class

---

one"); Ex. 7, Hall Tr. 19:14–19 ("Q. Do you ever use coupons when you shop for groceries? A. Yes. Q. And what are your sources for coupons? A. Online. Newspaper. And then mailings."); Ex. 8, Hudson Tr. 42:15–22 ("Q. Do you use coupons with your grocery purchases? . . . A. Generally, yes, ma'am.").

period.  140 F. Supp. 3d at 353.  The court found that "rebates, among other beneficial terms" can "present a significant problem for plaintiffs trying to prove, through common evidence, that the alleged overcharges were passed on." *Id.* at 354.  The court denied certification because the "real-world facts" meant that plaintiffs' claims could not be proven using common evidence. *Id.* at 356.

Because there is no basis on which to conclude that the data are sufficiently representative, EPPs have failed to carry their burden under Rule 23.

## IV.  EPPS' PROPOSED CARTWRIGHT CLASS IS BARRED BY APPLICABLE CHOICE-OF-LAW RULES, AND SEPARATE SUBCLASSES CANNOT BE MAINTAINED UNDER RULE 23.

EPPs' class certification motion should also be denied for the independent reason that neither of their proposed state-law class models is permissible under Rule 23 and the applicable choice-of-law doctrine.  EPPs' proposed Cartwright Class cannot be certified under the substantive law of California, and the state-specific subclass model that EPPs propose in the alternative would give rise to innumerable individual issues that would overwhelm the issues common to the class and thereby defeat predominance.  The individual inquiries that would arise under the state-specific model would also present enormous practical problems at trial, rendering class-wide adjudication unmanageable under Rule 23.

### A.  California's Choice-of-Law Rules Preclude Certification of the Cartwright Class.

EPPs request that the Court certify a single class of plaintiffs from 30 states, the District of Columbia and Guam, and apply California's Cartwright Act to each and every one of the claims (the "Cartwright Class").  EPP Br. 4, 35.  It is well settled that a multistate class cannot proceed under California law unless the extraterritorial application of the state statute (1) satisfies constitutional requirements, including due process, and (2) comports with California's conflicts-of-law doctrine.  For the reasons below, the Cartwright Class fails at both steps.

- 37 -

EPPs misleadingly claim that in a prior decision, "this Court 'in large part agreed with Plaintiffs' to uphold the application of California law to the narrowly drawn Cartwright class." EPP Br. 35 (citation and alteration omitted). But, in that order, "the question presently before the Court regarding this issue [wa]s not the propriety of class certification, but instead only whether Plaintiffs have stated a plausible Cartwright Class" under Rule 12(b). *See In re Packaged Seafood Prods. Antitrust Litig.*, 277 F. Supp. 3d 1167, 1183 (S.D. Cal. Sept. 26, 2017). The fact that EPPs' claims survived a motion to dismiss does not matter for purposes of class certification.[31] When evaluated with the degree of scrutiny required by Rule 23(b)(3), the Cartwright Class cannot be certified.

### 1. Applying California Law to the Multistate Class Claims Would Violate Due Process.

A multistate class cannot be certified under California law unless the law's application to each and every one of the class members' claims would comport with due process. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589–90 (9th Cir. 2012); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22 (1985). That means that for each claim included in the Cartwright Class, California must have "significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Shutts*, 472 U.S. at 818 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312 (1981)). EPPs bear the burden of proving the proposed class satisfies this test. *Mazza*, 666 F.3d at 589–90. In the single page of their brief that addresses this issue, EPPs rely on *AT&T Mobility LLC v. AU Optronics Corp.*, 707

---

[31] "Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. At the motion to dismiss phase, the facts in plaintiffs' complaint are assumed to be true. At class certification, "actual, not presumed, conformance" must be shown as to each and every requirement of Rule 23. *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160–61 (1982).

1  F.3d 1106 (9th Cir. 2013) to argue that due process is satisfied because certain

2  Defendants' alleged collusive conduct took place in California.  EPP Br. 35–36.

3       EPPs are mistaken.  They suggest *AT&T Mobility* held that the Cartwright

4  Act can constitutionally be applied in an antitrust conspiracy case so long as some

5  amount of collusive conduct is alleged to have taken place in California.  *See id.*

6  Not so.  The court held only that the Cartwright Act *could* lawfully be applied

7  upon a sufficient factual showing of in-state conduct *by each defendant*.  *See*

8  *AT&T Mobility*, 707 F.3d at 1113 & n.15.  The court directed the district court to

9  "make an individual determination" on remand as to whether there had been

10  sufficient in-state conduct alleged "with respect to each Defendant," making clear

11  that one defendant's in-state conspiratorial conduct cannot automatically be

12  imputed to another for purposes of due process.  *Id.* at 1114.

13       EPPs ignore this and merely lump all Defendants together to argue that

14  California law can be applied based on the locations of Bumble Bee and COSI

15  headquarters and manufacturing facilities, a single meeting between executives of

16  Bumble Bee and COSI, and two employees' statements in connection with plea

17  agreements, neither of which identifies any acts by StarKist or Del Monte in

18  California.  EPP Br. 36.  These facts have no bearing on the application of the

19  Cartwright Act as to StarKist or Del Monte.  *See AT&T Mobility*, 707 F.3d at 1113

20  n.15.  StarKist has its headquarters and principal place of business in Pittsburgh,

21  Pennsylvania, and is incorporated in Delaware.  StarKist Answer to Kroger 3d Am.

22  Compl. ¶ 32, ECF No. 1069.  At no point during the proposed Class Period did

23  StarKist have a principal place of business or headquarters in California, nor is

24  StarKist incorporated in California.  Similarly, Del Monte has headquarters and a

25  principal place of business in Orrville, Ohio, and is incorporated in Delaware.  Del

26  Monte Answer to Kroger 3d Am. Compl. ¶ 38, ECF No. 1058.  The guilty pleas do

27  not specifically address where StarKist's or Del Monte's conduct took place, and

28

- 39 -

EPPs' brief does not identify any conspiratorial acts in California by StarKist or Del Monte. *See* EPP Br. 35–36.

At least with respect to EPPs who are not residents of California—who make up the majority of the putative multistate class—the Cartwright Class would require the Court to apply California law to claims by non-resident EPPs, against non-resident defendants, based on purchases made outside of California, without showing that any of StarKist or Del Monte's conduct in the proposed Class Period occurred in California. Courts have rejected motions for multistate class certification on analogous factual records, and EPPs' motion should be denied as well. *See Racies v. Quincy Bioscience, LLC*, No. 15-cv-00292-HSG, 2017 WL 6418910, at *5 (N.D. Cal. Dec. 15, 2017) ("[T]he Court finds no evidence in the record to support a finding of sufficient contacts [with California] where Defendant is based in Wisconsin, and consumers purchased the product across the country." (citation omitted)); *Victorino v. FCA US LLC*, No. 16cv1617-GPC(JLB), 2018 WL 2455432, at *11 (S.D. Cal. June 1, 2018) (no California-law multistate class where plaintiffs fail to show significant contacts between California and parties).

### 2. Applying California Law to the Multistate Class Claims Is Inconsistent with the Conflicts-of-Law Test.

Due process is only half of the choice-of-law inquiry. Even if a proposed multistate class model would be constitutional, the class cannot be certified under California law if there are other states with laws that conflict with California's and that have superior interests in having their laws applied to the claims of class members.[32] *See Mazza*, 666 F.3d at 590. To make this determination, courts apply

---

[32] EPPs claim that the recent decision in *In re Hyundai & Kia Fuel Economy Litigation*, 881 F.3d 679 (9th Cir. 2018), *reh'g en banc granted*, 897 F.3d 1003 (9th Cir. 2018) "supports this Court's holding that California law applies to the Cartwright Class." EPP Br. 37–38. EPPs are wrong. *First*, as discussed *supra* p. 38, this Court has never held "that California law applies to the Cartwright Class." *Second*, *Hyundai* actually supports Defendants' position, not EPPs',

- 40 -

California's choice-of-law test, which sets forth a three-part "governmental interest" inquiry. *See id.* At the ***first step***, the court must decide whether there are material differences between California and other states' laws that could "spell the difference between the success and failure of a claim." *Id.* at 591. If so, the court proceeds to the ***second step***, where it must determine whether there is a true conflict by looking to see if each state has an interest in having its own law applied. *Id.* at 590, 592. If so, then there is a "true conflict" and the court proceeds to the ***third step***, where it decides "which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Id.* at 590. The court then applies the law of that state. *See id.* The analysis applies to "each of the potentially affected jurisdictions" as to each claim, *id.* at 590, and includes both plaintiffs' and defendants' home states. *See Batteries*, 2017 WL 1391491, at *14.

> (a) California Does Not Have a Superior Interest in Applying Its Laws to Non-Residents' Claims Relative to the States in which StarKist and Del Monte Reside.

Pennsylvania and Ohio are "potentially affected jurisdictions" relevant to the conflicts-of-law inquiry because StarKist and Del Monte reside there. *See id.* at *13–14 (finding that the interests of New Jersey, in which a minority of defendants resided, were superior to California's interests even though other defendants resided in California and much of the alleged collusion occurred in California).

***Step one: material difference.*** California law materially differs from Pennsylvania and Ohio law on indirect purchaser antitrust claims. Pennsylvania and Ohio follow *Illinois Brick*; California does not. *Compare* Cal. Bus. & Prof. Code § 16750(a) (permitting recovery "regardless of whether [the] injured person dealt directly or indirectly with the defendant"), *with Stutzle v. RhonePoulenc S.A.*,

---

because it emphasizes that California law generally cannot appropriately be applied to claims brought under multiple other states' consumer protection laws. *See id.* 881 F.3d at 691–93, 702–03.

No. 062165, 2003 WL 22250424, at *2 (Pa. Ct. C.P. Sept. 26, 2003) (Pennsylvania does not permit indirect purchaser damages recovery), and *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 798–99 (Ohio 2005) (no indirect purchaser recovery in Ohio).  Because this would "spell the difference between . . . success and failure" for EPPs' claims, it is material.  *Mazza*, 666 F.3d at 591; *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1067–68 (S.D. Cal. Mar. 14, 2017).

  **Step two: true conflict**.  This Court has recognized that there is a true conflict between *Illinois Brick* states and repealer states under *Mazza*.  *Packaged Seafood*, 242 F. Supp. 3d at 1067–68.  Other federal courts are in accord.  *See In re ODD Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 WL 467444, at *13 (N.D. Cal. Feb. 8, 2016); *Batteries*, 2017 WL 1391491, at *14.

  **Step three: comparative impairment**.  This Court has previously held that choices of states either to permit indirect purchaser actions or not "evince a policy judgment by those states that should not be cast aside."  *Packaged Seafood*, 242 F. Supp. 3d at 1068.  California has only "attenuated" interests, if any, in allowing nonresident plaintiffs to seek indirect purchaser damages under the laws of California.  *See id.*  Pennsylvania and Ohio, in contrast, have significant interests in protecting resident businesses from liability they consider to be excessive.  *See Mazza*, 666 F.3d at 592–93 (states have an interest in "calibrat[ing] liability to foster commerce"); *Munguia v. Bekins Van Lines, LLC*, No. 1:11-cv-01134-LJO-SKO, 2012 WL 5198480, at *10 (E.D. Cal. Oct. 19, 2012) (state has an interest in "having its damages limitation rules applied is to protect its resident defendants").  As explained above, this interest is superior to California's interest, if any, in imposing indirect purchaser liability for purchases made by nonresidents of California outside of California.  *See Batteries*, 2017 WL 1391491, at *14.

  California Supreme Court precedent supports this conclusion.  The court has emphasized that applying California law can "significantly undermine" the

interests of another state in affording businesses reliable protection from legal liability for conduct that occurred in that state. *McCann v. Foster Wheeler LLC*, 225 P.3d 516, 534–35 (Cal. 2010). California's interests would not be impaired were its laws subordinated to another state's where, as here, the claims are by nonresident plaintiffs, against nonresident defendants, based on injuries occurring outside of California. *See id.* at 534–37.

The same issue arose in *Batteries*. Like here, in *Batteries*, some of the defendants were from an *Illinois Brick* repealer state (New Jersey), even though other defendants were headquartered in California. *Batteries*, 2017 WL 1391491, at *13. The court concluded New Jersey's interest in having its own law applied was superior to California's interest in the application of its own law to claims by non-residents. *Id.* at *14. As in that case, here it would be "too much of a stretch to employ California law as an end run around the limitations" that the foreign states (here, Pennsylvania and Ohio) had "elected to impose." *Id.* (quoting *ODD*, 2016 WL 467444, at *13). The Court should come to the same conclusion here.

> (b) <u>The Conflicts Between the Cartwright Act and the Laws of Plaintiffs' Home States Preclude Certification of the Cartwright Class.</u>

The Cartwright Class would also be inappropriate under conflict-of-laws principles because of differences between the Cartwright Act and the laws of the states where EPPs reside and where the transactions involved in this case occurred.

***Step one: material difference***. EPPs assert claims under 50 separate antitrust and consumer protection statutes, which together cover 32 jurisdictions. They seek to apply a single statute—the Cartwright Act—to each and every one of these claims. These laws, however, differ in numerous respects that are potentially outcome-determinative as to certain class members or groups of class members,

- 43 -

and that therefore are material.[33]  *See Mazza*, 666 F.3d at 590–91.  In this context, courts "cannot adopt and act upon" an "assumption" that differences in the laws could be managed at trial.  *Processed Egg*, 312 F.R.D. at 164.  Instead, they must analyze the points at which the laws *could* diverge in material ways at trial.

To begin with, the consumer protection statutes under which EPPs seek relief are materially different from the Cartwright Act.  For example, the Cartwright Act contains no reliance requirement, but other states' consumer protection laws do.[34]  The Ninth Circuit has held that this is a material difference.  *Mazza*, 666 F.3d at 591.  Other states' consumer protection laws also require plaintiffs to make additional showings not required under California law.  *See, e.g.*, *City of Charleston v. Hotels.com, LP*, 487 F. Supp. 2d 676, 680 (D.S.C. 2007) (defendant's conduct must have "had an adverse impact on the public interest").  This Court recently recognized these and other variations as material differences among state consumer protection laws.  *See Conde v. Sensa*, No. 14-cv-51 JLS WVG, 2018 WL 4297056, at *12–13 (S.D. Cal. Sept. 10, 2018) (Sammartino, J.).

EPPs' state-law antitrust claims also present material differences from the Cartwright Act.  For example, the states vary in their treatment of indirect purchaser standing.  Although all 24 state antitrust statutes permit indirect purchasers to recover for antitrust violations *under some circumstances*, the states diverge in the limitations that they place on indirect purchaser standing, and particularly in their treatment of damages.  To illustrate, the limitations on antitrust

---

[33]  This discussion addresses certain salient points on which the laws diverge.  These and additional differences are laid out in detail in Appendices A and B.

[34]  *See, e.g.*, W. Va. Code R. § 46A-6-102(7)(M) (plaintiffs must show that defendants intended others rely on deceptive conduct); *Feitler v. Animation Celection, Inc.*, 13 P.3d 1044, 1047 (Or. Ct. App. 2000) (reliance sometimes required under Oregon statute); *Key v. Lewis Aquatech Pool Supply, Inc.*, 58 Va. Cir. 344, 347 (Va. Cir. Ct. 2002) (reliance required under Virginia law); *see also* Appendix B.

- 44 -

standing set forth in *Associated General Contractors of California, Inc. v. California State Council of Carpenters ("AGC")*, 459 U.S. 519 (1983), apply to indirect purchaser claims brought under ten of the relevant states' antitrust laws.[35] These limitations on indirect purchaser standing and recovery have been applied by different states in inconsistent ways, and therefore may "spell the difference between . . . success and failure" for EPPs' claims.[36] *Mazza*, 666 F.3d at 591.

Other states' laws also include various time-based restrictions that conflict with the Cartwright Act. For instance, Rhode Island prohibits indirect purchaser recovery based on pre-2013 conduct. *See Packaged Seafood*, 242 F. Supp. 3d at 1072. The proposed Class Period covers 2011-2015, and therefore accounts for two years for which Rhode Island EPPs could not recover under their state law. Taken together in light of these variations, the state antitrust laws cannot be said to be materially identical. As one court noted:

> [T]he second element of the end payor plaintiffs' antitrust claims—demonstration of injury—warrants special

---

[35] *See, e.g.*, *Kanne* v. *Visa U.S.A., Inc.*, 723 N.W.2d 293, 300 (Neb. 2006); *Peterson v. Visa U.S.A., Inc.*, No. Civ.A. 03-8080, 2005 WL 1403761, at *4–5 (D.C. Super. Ct. Apr. 22, 2005); *see also* Appendix A. Courts have indicated that *AGC* does not apply to indirect purchaser claims brought under California law. *See Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1072–73 (N.D. Cal. 2015). Under *AGC*, courts look to the directness of a plaintiff's injury relative to other plaintiffs, which may raise individualized issues relating to the chain of distribution, and also look to whether damages would be duplicative. *See AGC*, 459 U.S. at 543–45; *see also, e.g.*, *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 485 (7th Cir. 2002) (considering the existence of intermediaries in the chain of distribution to determine whether an indirect purchaser could recover).

[36] For example, one court concluded that plaintiffs' state-law antitrust claims were barred in four jurisdictions that adopted *AGC*, and therefore dismissed those claims on antitrust standing grounds while allowing twelve other state-law antitrust claims to proceed. *Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, No. 13–cv–01180–BLF, 2015 WL 4755335, at *19–20 (N.D. Cal. Aug. 11, 2015).

- 45 -

> scrutiny.  State courts have differed significantly in their consideration of this element, prompting one commentator to observe: "The most important determinant of class certification of indirect purchaser suits appears to be where the suit is filed."

*In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 280 (D. Mass. 2004) (quoting William H. Page, *The Limits of State Indirect Purchaser Suits: Class Certification in the Shadow of Illinois Brick*, 67 ANTITRUST L.J. 1, 21 (1999)).

*Step two: true conflict*.  The material differences between these state laws give rise to true conflicts because states have independent interests in having their own restrictions applied to claims by resident members.  *See Packaged Seafood*, 242 F. Supp. 3d at 1067–68; *Mazza*, 666 F.3d at 592–93 ("[E]ach state has an interest in setting the appropriate level of liability for companies conducting business within its territory."); *Conde*, 2018 WL 4297056, at *12–13.

*Step three: comparative impairment*.  Under California's choice-of-law test, the laws of EPPs' home states should apply to their claims.  California state courts look to whether California's contacts "g[i]ve rise to a significant interest on the part of California in applying its laws to these classwide claims."  *J.P. Morgan & Co. v. Sup. Ct.*, 113 Cal. App. 4th 195, 233–34 (Cal. Ct. App. 2003).  The California Supreme Court has also instructed trial courts to "consider . . . the function and purpose of th[e] laws" at issue when weighing state interests.  *Wash. Mut. Bank, FA v. Sup. Ct.*, 24 Cal. 4th 906, 920 (Cal. 2001) (quoting *Offshore Rental Co. v. Continental Oil Co.*, 22 Cal. 3d 157, 166 (Cal. 1978)).  The function and purpose of state antitrust laws is "to prevent consumers purchasing goods from being overcharged, and to allow *the market within the state* to function efficiently." *In re Flonase Antitrust Litig.*, 815 F. Supp. 2d 867, 883 (E.D. Pa. 2011) (emphasis added).  The states in which consumers purchased products therefore have "a serious interest in applying their law to allow consumers . . . to recover the money that they were overcharged in a transaction occurring in their states."  *Id.*

- 46 -

Applying these principles in *Mazza*, the Ninth Circuit emphasized the "strong interest" that other states have "in the application of their laws to transactions between their citizens and corporations doing business within their state," while highlighting the weakness of California's interest in the same transactions. *Mazza*, 666 F.3d at 594; *see also McCann*, 48 Cal. 4th at 97–102 (California's interests are substantially limited for out-of-state parties and out-of-state injuries); *J.P. Morgan & Co.*, 113 Cal. App. 4th at 222 ("Neither our busy trial courts nor our citizens who fund them can afford the luxury of volunteering to handle the nation's class actions." (quoting *Osborne v. Subaru of Am., Inc.*, 198 Cal. App. 3d 646, 664 (Cal. Ct. App. 1988))). And where "doubts remain," "one of the guiding principles of federalism breaks the tie: 'each State may make its own reasoned judgement about what conduct is permitted or proscribed within its borders.'" *Mullins v. Premier Nutrition Corp.*, No. 13-cv-01271-RS, 2016 WL 3440600, at *5 (N.D. Cal. June 20, 2016) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003)). California law should not be used "as an end run around" other states' antitrust and consumer protection laws. *See ODD*, 2016 WL 467444, at *13; *Packaged Seafood*, 242 F. Supp. 3d at 1067–68 & n.11.[37] EPPs' motion to certify the Cartwright Class should thus be denied.

---

[37] *See also Relafen*, 221 F.R.D. at 277 (law applicable to each antitrust claim is the law of the state where the transaction occurred); *In re GPU Antitrust Litig.*, 527 F. Supp. 2d 1011, 1028 (N.D. Cal. 2007) ("It is hard to see why the laws of other states should be tossed overboard and their residents remitted to California law for transactions that, for individual consumers, are local in nature."); Ex. 28, ABA Sec. Antitrust L., Indirect Purchaser Litig. Handbook 109–10 (2d ed. 2016) (noting courts find foreign purchases fall outside the aims of state antitrust laws).

### B. EPPs' Proposal to Certify 32 Separate State Classes Would Render Adjudication Unmanageable, and Would Cause Individualized Issues to Predominate.

EPPs separately request that the Court certify 32 separate subclasses under the laws of each of 30 states, the District of Columbia, and Guam.  Because "a multitude of subgroups . . . would lead to monumental case management problems," *In re Prempro*, 230 F.R.D. 555, 565 (E.D. Ark. 2005), Rule 23 requires EPPs to show that this model would be manageable.  *See Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (plaintiffs "must creditably demonstrate, through an 'extensive analysis' of state law variances, that 'class certification does not present insuperable obstacles'") (citation omitted); *Processed Egg*, 312 F.R.D. at 163 n.31 (Rule 23 requires plaintiffs to "provide a detailed accounting of the state [law] variations" to satisfy manageability).  EPPs, however, make no attempt to show how the claims of thousands of members across 32 jurisdictions would *not* create insurmountable obstacles.  This omission alone should be fatal to their motion for class certification.  *See Processed Egg*, 312 F.R.D. at 165.

Setting aside the burden of proof, a review of the state laws reveals that EPPs' proposed model would be utterly unmanageable.  EPPs advance claims under the *antitrust* laws of 25 different jurisdictions.  They also seek relief under the *consumer protectio*n statutes of 23 jurisdictions (many of which overlap with the 25 antitrust-law states).  They also assert claims for unjust enrichment under 26 of the same state laws.  These laws differ in a multitude of ways that would create practical difficulties and individualized problems at trial.[38]  *See Processed Egg*, 312 F.R.D. at 143 (rejecting a similar class model where plaintiffs "attempt[ed] to place 21 square pegs into a single round hole, asking the Court to envision 21 statewide classes under the antitrust laws of 21 states, the consumer protection

---

[38]  The laws are compared in greater detail in Appendices A and B.

laws of seven states, and the unjust enrichment laws of 17 states, all tried in a single proceeding as if it were a nationwide class under federal antitrust law").

As discussed above, states vary considerably in their limitations on indirect purchaser standing. *See supra* pp. 44–45; *see also* Appendix A. This difference is significant because the *AGC* factors that are applied in ten of the applicable states require courts to consider the directness of the plaintiff's injury relative to other plaintiffs, the risk of duplicative damages, and the complexity of apportioning relief. *See AGC*, 459 U.S. at 535. This is a highly individualized and fact-specific inquiry that is unlikely to be susceptible to class-wide proof, but that may be dispositive as to the claims of some or all EPPs from a particular state.[39] This inquiry alone would render class treatment unmanageable in light of the number of proposed classes. *See Prempro*, 230 F.R.D. 565. Moreover, were the proposed classes certified, the Court would need to analyze the contours of each state's limitations on indirect purchaser standing in order to apply the correct substantive law to EPPs' claims, and thereby undertake a host of separate and complex inquiries that would only be relevant to a small subset of EPPs.[40] *See Processed Egg*, 312 F.R.D. at 149 (noting "the 'back-breaking labor involved in deciphering the state of antitrust standing in each of [the relevant] states'" (quoting *Flash Memory*, 643 F. Supp. 2d at 1153)). This defeats the very purpose of the class

---

[39] For example, to show that damages would not be duplicative, a plaintiff would be required to address the role of intermediaries in the supply chain, which would require case-specific inquiries. *See, e.g.*, *Loeb Indus.*, 306 F.3d at 484 (indirect purchasers' claims failed under *AGC* because there were "more immediate victims . . . in a better position to maintain a treble damages action").

[40] EPPs argue that any state-law variations "relate to remedies" and so can be addressed via "bifurcated proceedings" rather than by denying class certification. EPP Br. 32. But the state statutes diverge on important liability issues as well. *See* Appendices A and B. And, because the individualized issues here cannot be disentangled from common issues, "the benefits of bifurcation . . . will prove to be ephemeral." *In re Paxil Antitrust Litig.*, 212 F.R.D. 539, 547 (C.D. Cal. 2003).

action device. *See Intel*, 2010 WL 8591815, at *61 (concluding that "there is no benefit to the utilization of the national class action device" where plaintiffs had proposed 26 classes under various states' antitrust and consumer protection laws).

The various statutes differ in numerous other important respects, which give rise to further manageability problems and render class treatment not superior as a method of adjudicating plaintiffs' claims. For instance, the consumer protection laws impose different reliance and scienter requirements, and also vary substantially as to proof of injury and proximate cause. *See* Appendix B. As another example, the antitrust laws vary in terms of geographic scope, which would require the Court to undertake in-depth inquiries for each jurisdiction to determine whether each state's law could validly be applied on the facts of their residents' case.[41] *See* Appendix A. And multi-class unjust enrichment claims have been rejected by a multitude of courts on the grounds that the laws differ in too many ways to be manageable under Rule 23(b)(3).[42]

Taken as a whole, the "numerous differences" between the statutes simply do not support class treatment in a case involving as many state laws as this litigation. *See In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 99 (S.D.N.Y. 2017).

---

[41] *See, e.g.*, *Global Reins. Corp. v. Equitas Ltd.*, 969 N.E.2d 187, 195 (N.Y. 2012) (recognizing an "established presumption . . . against the extraterritorial operation of New York law"); *Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 523–24 (Tenn. 2005) (Tennessee law applies only to conduct that has "substantial effects" on in-state trade or commerce).

[42] *See, e.g.*, *Processed Egg*, 312 F.R.D. at 149; *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1833, 2015 WL 3623005, at *27–28 (E.D. Pa. June 10, 2015); *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 584 (N.D. Ill. 2008); *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 786 (N.D. Ohio 2011).

Dated:  October 2, 2018

By:  /s/  Kenneth A. Gallo

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kenneth A. Gallo (NY 4484457)
Craig A. Benson (DC 473285)
Joseph J. Bial (NY 4151528)
2001 K Street, NW
Washington, DC  20006-1047
Telephone: 202-223-7356
Facsimile:  202-204-7356
Email:  kgallo@paulweiss.com
Email: cbenson@paulweiss.com
Email: jbial@paulweiss.com

William B. Michael (NY 4296356)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3648
Facsimile:  212-492-0648
Email:  wmichael@paulweiss.com

*Counsel for Defendant Bumble Bee Foods, LLC*

- 51 -

| | |
|---|---|
| Dated: October 2, 2018 | By: s/ John Roberti |
| | **ALLEN & OVERY LLP** |
| | John Roberti (DC 495718) |
| | Kelse Moen (DC 1035164) |
| | Jana Steenholdt (DC 1034459) |
| | 1101 New York Avenue N.W. |
| | Washington, D.C. 20005 |
| | Telephone: (202) 683-3800 |
| | Facsimile: (202) 683-3999 |
| | john.roberti@allenovery.com |
| | kelse.moen@allenovery.com |
| | jana.steenholdt@allenovery.com |
| | |
| | Brian Fitzpatrick (NY 4853040) |
| | Joshua L. Shapiro (NY 4499695) |
| | 1221 Avenue of the Americas |
| | New York, NY 10020 |
| | Telephone: (212) 610-6300 |
| | Facsimile: (212) 610-6399 |
| | brian.fitpatrick@allenovery.com |
| | joshua.shapiro@allenovery.com |
| | |
| | *Counsel for Defendant Tri-Union Seafoods LLC d/b/a Chicken of the Sea International and Thai Union Group PCL* |
| | |
| Dated: October 2, 2018 | By: s/ Barbara T. Sicalides |
| | **PEPPER HAMILTON LLP** |
| | Barbara T. Sicalides (PA 57535) |
| | Barak A. Bassman (PA 85626) |
| | Megan Morley (PA 321706) |
| | Benjamin J. Eichel (PA 307078) |
| | Alexander L. Harris (PA 311382) |
| | 3000 Two Logan Square |
| | Eighteenth and Arch Streets |
| | Philadelphia, PA 19103-2799 |
| | Telephone: (215) 981-4000 |
| | Facsimile: (215) 981-4750 |

- 52 -

sicalidesb@pepperlaw.com
bassmanb@pepperlaw.com
morleym@pepperlaw.com
eichelb@pepperlaw.com
harrisa@pepperlaw.com

*Counsel for Defendant Del Monte
Corporation*

Dated: October 2, 2018                    By: s/ Belinda S. Lee

**LATHAM & WATKINS LLP**
Alfred C. Pfeiffer (Cal. Bar No. 120965)
Christopher S. Yates (Cal. Bar No. 161273)
Belinda S. Lee (Cal. Bar No. 199635)
Niall E. Lynch (Cal Bar No. 157959)
Ashley M. Bauer (Cal. Bar No. 231626)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Al.Pfeiffer@lw.com
Chris.Yates@lw.com
Belinda.Lee@lw.com
Niall.Lynch@lw.com
Ashley.Bauer@lw.com

*Counsel for Defendants StarKist Co. and*
*Dongwon Industries Co., Ltd.*

- 54 -

# SIGNATURE ATTESTATION

Under Section 2.f.4 of the Court's CM/ECF Administrative Policies, I hereby certify that authorization for filing this document has been obtained from each of the other signatories shown above, and that all signatories have authorized placement of their electronic signature on this document.

/s/  Kenneth A. Gallo

Kenneth A. Gallo

October 2, 2018

*Counsel for Defendant Bumble Bee Foods, LLC*

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2018, I electronically filed the foregoing Defendants' Opposition to End Payer Plaintiffs' Motion for Class Certification with the Clerk of Court for the United States District Court, Southern District of California by using the Court's CM/ECF system, which will serve electronic notification of this filing to all counsel of record.

/s/ Kenneth A. Gallo
Kenneth A. Gallo

October 2, 2018

*Counsel for Defendant Bumble Bee Foods, LLC*

**Appendix A**

| State | Associated General Contractors ("AGC") Restrictions on Indirect Purchaser Standing? | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| Arizona<br><br>*Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, et seq.* | No<br><br>Few state courts have addressed the issue; but those that have, have indicated that *AGC* does not apply to Arizona antitrust claims. *See Consiglio-Tseffos v. Visa U.S.A., Inc.*, No. CV 2003-020170, 2004 WL 3030043, at *1 (Ariz. Sup. Ct. Dec. 8, 2004).[1] | Yes<br><br>There must be a geographic nexus between Arizona and the alleged antitrust violation. Ariz. Rev. Stat. § 44-1402. | No<br><br>Plaintiffs need not necessarily show that the antitrust violation caused harm; it may be sufficient to show that plaintiffs are *threatened* by an antitrust violation. Ariz. Rev. Stat. § 44-1408. | Yes<br><br>Plaintiffs can only recover treble damages if the court finds that the violation was "flagrant." Ariz. Rev. Stat. § 44-1408(B).[2] | Plaintiffs bear the burden of showing injury by "admissible and convincing proof." *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 108 (Ariz. 2003) (en banc).<br><br>The remedies permitted under the Arizona statute are cumulative. Ariz. Rev. Stat. § 44-1411.<br><br>Plaintiffs must notify the state attorney general upon filing suit, whether in state or federal court, and must provide proof of such notification.[3] Ariz. Rev. Stat. § 44-1415(A). |
| California<br><br>*Cartwright Act, Cal. Bus. & Prof. Code § 16720* | No<br><br>*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000) ("California law | None known | Yes<br><br>Cal. Bus. & Prof. Code § 16750(a). | Yes<br><br>Courts are permitted in some circumstances to take steps to avoid duplicative recovery.[4] | Plaintiffs must prove that they sustained injury in fact. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000).<br><br>Plaintiffs who file suit are required to provide written notice of the litigation to the state attorney |

---

[1] Federal courts have also predicted that, if presented with the question, the Arizona Supreme Court would hold that *AGC* does not apply to claims under the state antitrust statute. *See In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 38 (D.D.C. 2008).

[2] "Flagrant," as defined by the Arizona Supreme Court, "means conduct which is shocking or outrageous and connotes behavior which is open, notorious or willful in nature." *W. Waste Serv. Sys., Inc. v. Superior Court*, 584 P.2d 554, 556 (Ariz. 1978) (en banc).

[3] Because the notice requirement applies in both state and federal court, federal courts have dismissed Arizona antitrust claims where plaintiffs failed to prove that they had satisfied this requirement. *In re Effexor Antitrust Litig.*, No. 3:11-cv-5661(PGS)(LHG), 2018 WL 4466050, at *13 (D.N.J. Sept. 18, 2018).

[4] Where an alleged antitrust violation involves a distribution chain in which multiple levels of purchasers have sued, the parties and the court "may employ joinder, interpleader, consolidation, and like procedural devices to bring all claimants before the court," and may allocate damages "among the various levels of injured purchasers." *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1086 (Cal. 2010).

| State | *Associated General Contractors ("AGC")* Restrictions on Indirect Purchaser Standing? | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| | affords [antitrust] standing more liberally than does federal law."). | | | | general. Cal. Bus. & Prof. Code § 16750.2. Failure to file proof of such notice will bar recovery. *Id.*<br><br>The statute provides that the state attorney general can estimate and prove damages in the aggregate in *parens patriae* actions under the antitrust law. Cal. Bus. & Prof. Code § 16760(d). The statute does not specifically authorize the use of such proof in suits by private plaintiffs. |
| District of Columbia<br><br>*D.C. Antitrust Act, D.C. Code § 28-4501, et seq.* | Yes<br><br>*Peterson v. Visa U.S.A.*, No. Civ.A. 03-8080, 2005 WL 1403761, at *2–6 (D.C. Super. Ct. Apr. 22, 2005). | Yes<br><br>There must be some nexus between the alleged antitrust violation and the District of Columbia. D.C. Code § 28-4502. | Yes<br><br>D.C. Code Ann. § 28-4508. | Yes<br><br>Courts may take steps as necessary to avoid duplicative recovery. D.C. Code § 28-4509(c).<br><br>Interest is only to be awarded if the court deems that the award would be just in light of three specific statutory considerations (and no other considerations). D.C. Code § 28-4508(b). | No individualized proof of damages is required in class actions.[5] D.C. Code § 28-4508(c). |

---

[5] "The percentage of total damages attributable to a member of such class shall be the same as the ratio of such member's purchases or sales to the purchases or sales of the class as a whole." D.C. Code § 28-4508(c).

| State | *Associated General Contractors* ("*AGC*") **Restrictions on Indirect Purchaser Standing?** | **Temporal and/or Geographic Requirements?** | **Causation Requirements?** | **Restrictions on Damages?** | **Notes & Other Features** |
|---|---|---|---|---|---|
| | | | | No special showing required to obtain treble damages. D.C. Code § 28-4508(a). | |
| Guam<br><br>*Guam Antitrust Law, Guam Code Ann. tit. 9 § 69.10, et seq.* | No court appears to have addressed whether the *AGC* factors apply to actions brought under Guam's antitrust law. | Yes<br><br>The market affected by the alleged antitrust violation must include Guam, in whole or in part. Guam Code Ann. tit. 9 § 69.10(b). | No<br><br>Plaintiffs need not necessarily show that the antitrust violation caused harm; it may be sufficient to show that plaintiffs are *threatened* by an antitrust violation. Guam Code Ann. tit. 9 § 69.30(a). | Yes<br><br>Plaintiffs can only recover treble damages if the court concludes that the defendant's violation was willful. Guam Code Ann. tit. 9 § 69.30(b). | |
| Hawaii<br><br>*Hawaii Antitrust Statute, Haw. Rev. Stat. § 480-1, et seq.* | The state supreme court has not ruled on whether the *AGC* factors apply under the state statute. *See Davis v. Four Seasons Hotel Ltd.*, 228 P.3d 303, 324 n.33 (Haw. 2010). | Yes<br><br>Plaintiffs must show that defendants' conduct was "in restraint of trade or commerce in the State." Haw. Rev. Stat. § 480-4(a). | Yes<br><br>Haw. Rev. Stat. § 480-13(a). | Yes<br><br>Statutory damages minimums do not apply in the class action context. Haw. Rev. Stat. § 480-13(c). Courts are directed to take specific steps to avoid duplicative recovery in cases with direct and indirect purchasers. *Id.* | Plaintiffs must notify the state attorney general of the litigation. Haw. Rev. Stat. § 480-13.3. |
| Iowa | Yes | Yes | Yes | Yes | |

| State | *Associated General Contractors ("AGC")* Restrictions on Indirect Purchaser Standing? | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| *Iowa Competition Law Iowa Code § 553.1, et seq.* | *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 199 (Iowa 2007). | The geographic or product market implicated by the alleged conspiracy must exist in Iowa, in whole or in part. Iowa Code § 553.3(6). | Plaintiffs must be able to establish causation in order to recover damages. Iowa Code § 553.12(2). They need not show causation in order to obtain injunctive relief. Iowa Code § 553.12(1). | Private plaintiffs can recover exemplary damages, which are not to exceed double the plaintiff's compensatory damages, and which are only available if the defendant's violation was willful or flagrant. Iowa Code § 553.12(3). | |
| Kansas<br><br>*Kansas Restraint of Trade Act Kan. Stat. Ann. § 50-101, et seq.* | The Supreme Court of Kansas has not addressed this issue. Lower state courts and federal courts have applied the *AGC* factors to claims arising under the state antitrust statute. *See Wrobel v. Avery Dennison Corp.*, No. 05-cv-1296, 2006 WL 7130617, at *3 (Kan. Dist. Ct. Feb. 1, 2006); *Orr v. Beamon*, 77 F. Supp. 2d 1208, 1211 (D. Kan. 1999). | None known | Yes<br><br>Kan. Stat. Ann. § 50-161(b). | None known | A plaintiff bringing suit under the Kansas statute "need not show a relationship rising to the level of an agreement," and "does not have to show that the [defendants'] combination actually succeed[ed] in increasing prices." *O'Brien v. Leegin Creative Leather Prods., Inc.*, 277 P.3d 1062, 1075 (Kan. 2012).<br><br>To obtain damages, plaintiffs must prove that they sustained injury as a result of the unlawful conduct. *O'Brien v. Leegin Creative Leather Prods., Inc.*, 277 P.3d 1062, 1076 (Kan. 2012). The Supreme Court of Kansas has suggested that state and federal standards may differ as to what proof of injury will suffice. *Id.* at 1079. |
| Maine<br><br>*Maine Antitrust* | Yes<br><br>*Knowles v. Visa U.S.A., Inc.*, No. CV-03-707, | Yes<br><br>The Maine antitrust law prohibits | Yes<br><br>Me. Rev. Stat. Ann. tit. 10 § 1104(1). | None known | Maine courts <u>do not apply the "continuing violation" doctrine</u> to toll the statute of limitations for state antitrust claims. *See, e.g., McKinnon v.* |

| State | *Associated General Contractors ("AGC")* Restrictions on Indirect Purchaser Standing? | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| *Statute, Me. Rev. Stat. Ann. tit. 10 § 1101, et seq.* | 2004 WL 2475284, at *5 (Me. Sup. Ct. Oct. 20, 2004); *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1039 & n.5 (N.D. Ill. 2017). | contracts, combinations, or conspiracies "in restraint of trade or commerce in this State." Me. Rev. Stat. Ann. tit. 10 § 1101. | | | *Honeywell Int'l, Inc*., 977 A.2d 420, 425 (Me. 2009).<br><br>Plaintiffs must show "proof of real injury," i.e., evidence that they actually paid higher prices as a result of the defendants' antitrust violation. *McKinnon v. Honeywell Intern., Inc*., 977 A.2d 420, 426–27 (Me. 2009). The state high court has strongly suggested that econometric evidence alone will not suffice.[6] *Id.* |
| Michigan<br><br>*Michigan Antitrust Reform Act Mich. Comp. Laws § 445.771, et seq.* | Yes<br><br>*Stark v. Visa*, No. 03-055030-CZ, 2004 WL 1879003, at *2 (Mich. Cir. Ct. July 23, 2004). | Yes<br><br>Statutory language requires geographic nexus with the state. Mich. Comp. Laws § 445.771.[7] | No<br><br>Plaintiffs need not necessarily show that the antitrust violation caused harm; it may be sufficient to show that plaintiffs are *threatened* by an antitrust violation. Mich. Comp. Laws § 445.778(2). | Yes<br><br>Treble damages are only available if the antitrust violation was "flagrant." Mich. Comp. Laws § 445.778(2). | Plaintiffs must show antitrust injury; and in the class action context, this requires that plaintiffs provide meaningful details as to how damages would be calculated in cases in which there may be meaningful variations between class members. *A&M Supply v. Microsoft Corp.*, 654 N.W.2d 572, 574–75 (Mich. Ct. App. 2002). |
| Minnesota<br><br>*Minnesota Antitrust Law, Minn. Stat.* | No<br><br>*Lorix v. Crompton Corp.*, 736 N.W.2d 619, 629 (Minn. 2007). | Yes<br><br>The Minnesota statute applies to contracts, | Yes<br><br>Minn. Stat. § 325D.57. | Yes<br><br>Courts are authorized to "take any steps necessary to avoid | The statute requires that a plaintiff provide notice to the state attorney general upon filing suit. Minn. Stat. § 325D.63. |

[6] Consistent with *McKinnon*, federal courts have observed that the Maine antitrust statute "require[s] a somewhat stronger and more precise showing of individual impact" than do many other state statutes. *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 282 (D. Mass. 2004).

[7] Specifically, Mich. Comp. Laws § 445.772 prohibits contracts, combinations, or conspiracies to restrain trade "in a relevant market," which is defined in § 445.771 as "the geographical area of actual or potential competition in a line of trade or commerce, all or any part of which is within this state." § 445.771(b).

| State | Associated General Contractors ("AGC") Restrictions on Indirect Purchaser Standing? | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| § 325D.49, et seq. | | combinations, or conspiracies "when any part thereof was created, formed, or entered into in this state," or "whenever [the prohibited conduct] affects the trade or commerce of this state." Minn. Stat. § 325D.54. | | duplicative recovery against a defendant." Minn. Stat. § 325D.57.<br><br>There are no special mental state requirements or additional showings necessary to recover treble damages. *See id.* | |
| Mississippi<br><br>*Mississippi Antitrust Statute, Miss. Code Ann. § 75-21-1, et seq.* | Mississippi courts have not ruled as to whether *AGC* applies to private actions under the state antitrust statute. | Yes<br><br>"Mississippi law requires that the majority of an antitrust conspiracy occur within the state." *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1099 (N.D. Cal. 2007) (citing *Std. Oil Co. of Ky. v. State*, 65 So. 468, 471 (1914), *overruled in part on other grounds sub nom. Mladinich v.* | Yes<br><br>Miss. Code Ann. § 75-21-9. | Yes<br><br>Prevailing plaintiffs are entitled to recover only actual damages plus $500 per instance of injury. Miss. Code Ann. § 75-21-9. | |

| State | *Associated General Contractors ("AGC") Restrictions on Indirect Purchaser Standing?* | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| | | *Kohn*, 164 So.2d 785 (1964)). | | | |
| Nebraska  *Nebraska Junkin Act, Neb. Rev. Stat. § 59-801, et seq.* | Yes  *Kanne v. Visa U.S.A., Inc.*, 723 N.W.2d 293, 297–301 (Neb. 2006) | Yes  There must be a geographic nexus between the state and the alleged antitrust conduct. Neb. Rev. Stat. Ann. § 59-801 ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, <u>within this state</u>, is hereby declared to be illegal." (emphasis added)). | Yes  Neb. Rev. Stat. Ann. § 59-821. | Yes  Private plaintiffs can recover actual damages or, if such actual damages are not "susceptible of measurement by ordinary pecuniary standards," can obtain "liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained." Neb. Rev. Stat. Ann. § 59-821. | |
| Nevada  *Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, et seq.* | Yes  *Nev. Recycling & Salvage, Ltd. v. Reno Disposal Co., Inc.*, 423 P.3d 605, 607 (Nev. 2018). | Yes  There must be a geographic nexus between Nevada and the antitrust violation. Nev. Rev. Stat. § 598A.060(1). | Varies  Plaintiffs need not show causation to obtain injunctive relief, but are required to establish causation in order to recover money | No  Note that statutory language provides that prevailing plaintiffs "<u>shall recover</u> treble damages," indicating that such damages may be awarded to a | Plaintiffs must prove injury. *Nev. Recycling & Salvage, Ltd. v. Reno Disposal Co., Inc.*, 423 P.3d 605, 606 (Nev. 2018).  Plaintiffs must provide notice to the state attorney general upon filing suit. Nev. Rev. Stat. § 598A.210(3). |

| State | *Associated General Contractors ("AGC")* Restrictions on Indirect Purchaser Standing? | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| | | | damages. Nev. Rev. Stat. § 598A.210. | successful plaintiff as a presumptive matter. Nev. Rev. Stat. § 598A.210(2). | |
| New Hampshire<br><br>*New Hampshire Antitrust Statute, N.H. Rev. Stat. Ann. tit. XXXI, § 356, et seq.* | No New Hampshire court appears to have addressed the applicability of the *AGC* factors. | Yes<br><br>Indirect purchasers cannot recover under New Hampshire antitrust law for conduct that occurred prior to 2008.[8] | Varies<br><br>Plaintiffs need not show causation to obtain injunctive relief, but are required to establish causation in order to recover money damages. N.H. Rev. Stat. § 356:11. | Yes<br><br>Prevailing plaintiffs are generally entitled to compensatory damages. N.H. Rev. Stat. § 356:11. Plaintiffs can only recover treble damages if the court concludes that the violation was willful or flagrant. *Id.* | |
| New Mexico<br><br>*New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1, et seq.* | Yes<br><br>*Nass-Romero v. Visa*, 279 P.3d 772, 778–81 (N.M. Ct. App. 2012). | Yes<br><br>There must be a nexus between the antitrust violation and New Mexico. N.M. Stat. Ann. § 57-1-1. However, the conduct at issue need not be purely intrastate. § 57-1-13. | No<br><br>Plaintiffs need only show threat of injury to obtain injunctive relief or damages. N.M. Stat. Ann. § 57-1-3(A). | No<br><br>Courts are permitted to award a prevailing plaintiff less than he requested, but must award at least plaintiff's actual damages. N.M. Stat. Ann. § 57-1-3(A). | |

---

[8] *See In re Auto Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1004 (E.D. Mich. 2014).

| State | Associated General Contractors ("AGC") Restrictions on Indirect Purchaser Standing? | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| New York<br><br>*New York General Business Law, N.Y. Gen. Bus. Law § 340* | Yes<br><br>State courts have not explicitly adopted *AGC*, but have held that indirect purchaser actions cannot proceed where standing is lacking due to remoteness. *See Ho v. Visa U.S.A., Inc.*, 793 N.Y.S.2d 8, 8–9 (N.Y. App. Div. 2005).[9] | Yes<br><br>There is an "established presumption . . . against the extraterritorial operation of New York law." *Global Reinsurance Corp. v. Equitas Ltd.*, 969 N.E.2d 187, 195 (N.Y. 2012). | Yes<br><br>N.Y. Gen. Bus. Law § 340(5). | Yes<br><br>In antitrust cases involving both direct and indirect purchaser plaintiffs, the court is <u>required</u> to take steps to avoid duplicative liability. N.Y. Gen. Bus. Law § 340(6).<br><br>Treble damages are not available in the class action context. *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007). | |
| North Carolina<br><br>*N.C. Gen. Stat. § 75-1, et seq.* | State courts have not ruled consistently on the applicability of the *AGC* factors. *Compare Crouch v. Crompton Corp.*, No. 02 CV 4375, 2004 WL 2414027, at *10 (N.C. Super. Ct. | Yes<br><br>There must be a geographic nexus between the state of North Carolina and the antitrust | Yes<br><br>N.C. Gen. Stat. § 75-16. | No<br><br>Prevailing plaintiffs can recover treble damages. N.C. Gen. Stat. § 75-16. | In cases involving continuous courses of conduct that violate the statute, each week that the violation continued counts as a separate violation. N.C. Gen. Stat. § 75-8. |

[9] Federal courts considering this question have concluded in light of the case law that *AGC* should be applied to antitrust claims arising under New York law. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9 CV 3690, 2015 WL 3988488, at *14 (N.D. Ill. June 29, 2015) ("New York's lower- and mid-level courts have consistently endorsed the application of the *AGC* factors in assessing antitrust standing, in accordance with the state's harmonization provision. The Court has no reason to believe that New York's highest court would not do the same. Accordingly, the Court will apply the *AGC* factors in determining whether Indirect Plaintiffs have standing under New York's Donnelly Act.").

| State | Associated General Contractors ("AGC") Restrictions on Indirect Purchaser Standing? | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| | Oct. 28, 2004), *with Teague v. Bayer AG*, 671 S.E.2d 550, 555–56 (N.C. Ct. App. 2009).[10] | violation. N.C. Gen. Stat. § 75-1.[11] | | | |
| North Dakota<br><br>*North Dakota Uniform State Antitrust Act*, N.D. Cent. Code § 51-08.1, *et seq.* | Yes<br><br>*Beckler v. Visa U.S.A., Inc.*, No. Civ. 09-04-C-00030, 2004 WL 2475100, at *4 (D.N.D. Sept. 21, 2004). | Yes<br><br>The state antitrust statute only applies if North Dakota made up all or part of the market affected by the antitrust violation. N.D. Cent. Code § 51-08.1-01. | Varies<br><br>Plaintiffs need not necessarily show that the antitrust violation caused harm; it may be sufficient to show that plaintiffs are *threatened* by an antitrust violation. N.D. Cent. Code § 51-08.1-08. | Yes<br><br>Prevailing plaintiffs ordinarily may recover actual damages under N.D. Cent. Code § 51-08.1-08. If the trier of fact concludes that the defendant's antitrust violation was flagrant, plaintiff can recover up to treble damages. *Id.* | |
| Oregon<br><br>*Oregon Antitrust Law*, Or. Rev. Stat. § 646.705, *et seq.* | No Oregon court appears to have addressed the applicability of the *AGC* factors. | Yes<br><br>Indirect purchasers cannot recover under Oregon antitrust law for conduct that | Yes<br><br>Or. Rev. Stat. § 646.780(1)(a). | Yes<br><br>Note that statutory language provides that prevailing plaintiffs "shall recover treble damages," indicating | Plaintiffs bringing suit under the antitrust law must notify the state attorney general of the litigation. Or. Rev. Stat. § 646.780(5)(b). |

---

[10] Federal courts have noted this uncertainty, and several have held that the *AGC* factors are properly applied in indirect purchaser cases under the North Carolina antitrust law. *See In re Dairy Farmers*, 2015 WL 3988488, at *15; *see also Contant v. Bank of Am. Corp.*, No. 17 Civ. 3139 (LGS), 2018 WL 1353290, at *5 (S.D.N.Y. Mar. 15, 2018) (discussing cases holding that *AGC* applies to such claims, but dismissing plaintiffs' North Carolina claims on other grounds).

[11] *See id.* ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal." (emphasis added)); *see also In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1083 (S.D. Cal. 2017) (discussing the limited extraterritorial reach of the North Carolina statute).

| State | Associated General Contractors ("AGC") Restrictions on Indirect Purchaser Standing? | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| | | occurred prior to 2010.[12]<br><br>The Oregon antitrust law applies to "trade and commerce" within Oregon or between Oregon and another jurisdiction. Or. Rev. Stat. § 646.705. | | that such damages may be awarded to a successful plaintiff as a presumptive matter. Or. Rev. Stat. § 646.780(1)(a) (emphasis added).<br><br>In the class action context, attorney fees, expert witness fees, and investigative costs may not be awarded to a prevailing defendant. Or. Rev. Stat. § 646.780(4). | |
| Rhode Island<br><br>*Rhode Island Antitrust Act R.I. Gen. Laws § 6-36-1, et seq.* | No Rhode Island court has directly decided whether *AGC* applies to indirect purchaser claims brought under the Rhode Island antitrust statute. | Yes<br><br>Indirect purchasers cannot recover under Rhode Island antitrust law for conduct that occurred prior to July 15, 2013.[13]<br><br>Additionally, the Rhode Island antitrust statute does | Yes<br><br>R.I. Gen. Laws Ann. § 6-36-11(a). | Yes<br><br>Courts are directed to take steps to avoid duplicative recovery. R.I. Gen. Laws Ann. § 6-36-11(a). However, the statute does not suggest that there is any special showing that a plaintiff must make in order to recover treble | The statute specifically permits the state attorney general to recover on behalf of those in the state, and that he may establish aggregate damages using, *e.g.*, statistical sampling methods and "any other reasonable system of estimating aggregate damages that the court in its discretion may permit." R.I. Gen. Laws Ann. § 6-36-13. However, the statute does not explicitly authorize this means of proof in suits by private plaintiffs.<br><br>Plaintiffs must notify the state attorney general of the suit; and the litigation cannot proceed until |

[12] *See In re Packaged Seafood Prods.*, 242 F. Supp. 3d at 1070–72.
[13] *See In re Packaged Seafood Prods.*, 242 F. Supp. 3d at 1072.

| State | *Associated General Contractors ("AGC") Restrictions on Indirect Purchaser Standing?* | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| | | not apply unless the antitrust violation "has an impact on trade or commerce of this state sufficient to invoke the jurisdiction of the superior court." R.I. Gen. Laws Ann. § 6-36-7(a). | | (as opposed to actual) damages. *See id.* | plaintiff files proof of such notice with the court. R.I. Gen. Laws Ann. § 6-36-21. |
| South Dakota<br><br>*South Dakota Antitrust Statute, S.D. Codified Laws § 37-1-3.1, et seq.* | No South Dakota court appears to have addressed the applicability of the *AGC* factors. | Yes<br><br>The statute applies if "any part of" the trade or commerce affected by the antitrust violation is within South Dakota. S.D. Codified Laws § 37-1-3.1. | Yes<br><br>S.D. Codified Laws § 37-1-14.3. | Yes<br><br>Courts are permitted to take steps to avoid duplicative recovery in subsequent cases based on the same antitrust violation. S.D. Codified Laws §§ 37-1-33, 37-1-25.<br><br>The statute states that the courts "shall increase recovery under this section to three times the damages sustained," indicating that such | The statute suggests that only the attorney general may use systems that estimate aggregate damages in order to prove injury or impact, and that private plaintiffs must instead rely on individualized proof.[14]  S.D. Codified Laws § 37-1-26. |

---

[14] The statute provides that aggregate damages may be estimated and proven by way of statistical methods, so as to avoid the need for individualized proof, in actions brought under certain subsections, specifically, § 37-1-23 to § 37-1-32, inclusive.  *See* § 37-1-26.  Plaintiffs' right of action is codified at § 37-1-14.3.  It therefore appears from the face of the statute that statistical proof of aggregate damages cannot be used by private plaintiffs to establish injury or impact.

| State | Associated General Contractors ("AGC") Restrictions on Indirect Purchaser Standing? | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| | | | | damages may be awarded to a successful plaintiff as a presumptive matter. S.D. Codified Laws § 37-1-14.3. | |
| Tennessee<br><br>*Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101, et seq.* | Yes<br><br>The Supreme Court of Tennessee has not directly addressed the issue, but one lower state court has applied *AGC* to determine whether plaintiffs suing under the state statute have antitrust standing. *Tenn. Med. Ass'n v. BlueCross BlueShield of Tenn., Inc.*, 229 S.W.3d 304, 308 (Tenn. Ct. App. 2007). | Yes<br><br>The Tennessee statute applies only to conduct that has "substantial effects" on trade or commerce in Tennessee. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 523–24 (Tenn. 2005). | Yes<br><br>Tenn. Code Ann. § 47-25-106. | Yes<br><br>Prevailing plaintiffs who were overcharged for price-fixed goods can recover only the amounts that they paid for the goods. Tenn. Code Ann. § 47-25-106. | |
| Utah<br><br>*Utah Antitrust Act, Utah Code Ann. § 76-10-911, et seq.* | No Utah court appears to have addressed the applicability of the *AGC* factors. | Yes<br><br>Indirect purchasers cannot recover under Utah antitrust law for conduct that occurred prior to May 2006.[15] | Varies<br><br>Plaintiffs need not necessarily show that the antitrust violation caused harm; it may be sufficient to show that plaintiffs are | Yes<br><br>Plaintiffs cannot recover treble damages if, when combined with other items of recovery (*e.g.*, attorneys' fees), | "In an action by indirect purchasers, any damages or settlement amounts paid to direct purchasers for the same alleged antitrust violations shall constitute a defense in the amount paid on a claim by indirect purchasers under this chapter so as to avoid duplication of recovery of damages." Utah Code Ann. § 76-10-3109(6). |

---

[15] *See, e.g.*, *California v. Infineon Techs. AG*, No. C 06-4333 PJH, 2008 WL 1766775, at *4–5 (N.D. Cal. Apr. 15, 2008).

| State | *Associated General Contractors ("AGC") Restrictions on Indirect Purchaser Standing?* | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| | | | *threatened* by an antitrust violation. Utah Code Ann. § 76-10-3109(1)(a). | such an award would cause a defendant to become insolvent. Utah Code Ann. § 76-10-3109(2)(a). | The statute sets forth a presumptive framework for dividing damages between direct purchasers, indirect purchasers, and other parties. Utah Code Ann. § 76-10-3109(7).<br><br>The Utah statute sets forth a <u>presumption of pass-through</u>. Utah Code Ann. § 76-10-3109(8). Therefore, plaintiffs need not necessarily show pass-through as part of their prima facie case.<br><br>Plaintiffs are required to notify the state attorney general of the litigation, and must serve the state attorney general with a copy of each filing. Utah Code Ann. § 76-10-3109(9).<br><br>In the class action context, unpaid damages or settlement funds must be distributed by way of a *cy pres* arrangement or paid into Utah's Attorney General Litigation Fund. Utah Code Ann. § 76-10-3109(10). |
| West Virginia<br><br>*West Virginia Antitrust Act, W. Va. Code § 47-18-1, et seq.* | State courts have not addressed the applicability of the *AGC* factors in any antitrust cases.[16] | Yes<br><br>There must be a nexus between West Virginia and the alleged antitrust violation. W. Va. Code § 47-18-3(a).[17] | Yes<br><br>W. Va. Code § 47-18-9. | No<br><br>The statute does not appear to specify any particular showing that must be made for a prevailing plaintiff to | |

---

[16] However, the state high court has cited to *AGC* and applied its principles in the tort context. *Aikens v. Debow*, 541 S.E.2d 576, 582 (W. Va. 2000).

[17] *See id.* ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce <u>in this State</u> shall be unlawful." (emphasis added)). State and federal courts have noted that the West Virginia antitrust statute "'is directed towards *intrastate* commerce.'" *State ex rel. Palumbo*

| State | Associated General Contractors ("AGC") Restrictions on Indirect Purchaser Standing? | Temporal and/or Geographic Requirements? | Causation Requirements? | Restrictions on Damages? | Notes & Other Features |
|---|---|---|---|---|---|
| | | | | obtain treble damages. *See* W. Va. § 47-18-9. | |
| Wisconsin<br><br>*Wisconsin Antitrust Act, Wis. Stat. Ann. § 133.01(1), et seq.* | Yes<br><br>*Strang v. Visa U.S.A., Inc.*, No. 03 CV 011323, 2005 WL 1403769, at *3 (Wis. Cir. Ct. Feb. 8, 2005). | Yes<br><br>The Wisconsin antitrust statute reaches interstate conduct only in limited circumstances, specifically, where "(1) actionable conduct, such as the formation of a combination or conspiracy, occurred within this state . . . or (2) the conduct complained of 'substantially affects' the people of Wisconsin and has impacts in this state." *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 141 (Wis. 2005) (citation omitted). | Yes<br><br>Wis. Stat. Ann. § 133.18(1)(a). | No<br><br>The statute does not appear to specify any particular showing that must be made for a prevailing plaintiff to obtain treble damages. *See* Wis. Stat. Ann. § 133.18(1)(a). | |

---

*v. Graley's Body Shop, Inc*., 425 S.E.2d 177, 183 n.11 (W. Va. 1992) (emphasis in original) (quoting *Anziulewicz v. Bluefield Cmty. Hosp., Inc.*, 531 F. Supp. 49, 53 (S.D. W. Va. 1981)).

**Appendix B**

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| Arkansas<br><br>*Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, et seq.* | Actual damages attorney fees | No<br><br>Class actions are prohibited unless the asserted claim is a violation of Amendment 89 of the Arkansas Constitution. Ark. Code Ann. § 4-88-113(f)(1)(B). | Yes<br><br>The statute contains a demanding proximate cause requirement; and courts have rejected indirect purchaser claims for failure to show proximate cause. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9 CV 3690, 2015 WL 3988488, at *17 (N.D. Ill. June 29, 2015). | Yes<br><br>Plaintiffs must prove reliance. Ark. Code Ann. § 4-88-113(f)(2). | No | Yes<br><br>Prevailing plaintiffs can recover only actual damages. Ark. Code Ann. § 4-88-113(f)(1)(A). | Plaintiffs must <u>individually</u> show <u>actual</u> financial harm <u>proximately caused by</u> his or her reliance on conduct that is unlawful under the state statute. Ark. Code Ann. § 4-88-113(f)(2). |
| California<br><br>*Cal. Bus. & Prof. Code § 17200, et seq.* | Equitable relief, including restitution | Yes | Yes<br><br>Cal. Bus. & Prof. Code § 17204. | Yes, but only for named plaintiffs.<br><br>*Prescott v. Rady Children's Hosp.*, 265 F. Supp. 3d 1090, 1103 (S.D. Cal. 2017). | No | Yes<br><br>Injunctive relief and restitution only. Cal. Bus. & Prof. Code § 17204. | Plaintiffs must show <u>actual economic injury</u> that was <u>caused by</u> the conduct prohibited by the statute. Cal. Bus. & Prof. Code § 17204. |
| District of Columbia<br><br>*D.C. Consumer Protection Procedures Act,* | Treble damages or $1500 per violation (whichever is greater), punitive damages, | Yes | No<br><br>*Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 8 (D.D.C. 2002). | Varies by provision<br><br>*Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438 (D.C. 2013). | No<br><br>*Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013). | Yes<br><br>To recover, plaintiffs must prove "outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's | Defendants must be "merchants" within meaning of D.C. Code § 28-3901(a)(3).<br><br>Proof of actual injury is not required. *Wells v. Allstate* |

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| *D.C. Code § 28-3901, et seq.* | attorney fees and costs | | | | | rights." *Djourabchi v. Self*, 571 F. Supp. 2d 41, 52 (D.D.C. 2008).[1] | *Ins. Co.*, 210 F.R.D. 1, 8 (D.D.C. 2002). |
| Florida<br><br>*Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204(1), et seq.* | Injunctive relief, declaratory judgment, actual damages, attorney fees and costs | Yes, but with restrictions.<br><br>*See Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Ct. App. 2006). | Yes<br><br>The Florida statute contains a demanding causation requirement. *Lombardo v. Johnson & Johnson Consumer Cos.*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015).[2] | Florida's state appellate courts are split as to whether reliance is an element of a FDUTPA claim. *Compare Philip Morris USA Inc. v. Hines*, 883 So. 2d 292, 294 (Fla. Dist. Ct. App. 2003), *with Egwuatu v. South Lubes, Inc.*, 976 So. 2d 50, 52 (Fla. Dist. Ct. App. 2008). | No<br><br>There is no intent requirement in the statute, nor do courts appear to have read in such a requirement. | Yes<br><br>Actual damages, attorney fees and court costs are recoverable. Fla. Stat. § 501.211. | Proof of actual harm is required. *Soper v. Tire Kingdom, Inc.*, 124 So. 3d 804, 806 (Fla. 2013).<br><br>State courts have suggested that individualized showings of harm are required, and that "there is no class-wide proof of damages available" under the FDUTPA. *Rollins v. Butland*, 951 So. 2d 860, 873 (Fla. Dist. Ct. App. 2006). |
| Hawaii<br><br>*Hawaii Unfair and Deceptive Trade Practices* | All forms of relief available under § 480 *et seq.* | Yes<br><br>Haw. Rev. Stat. § 480-13.3. | Yes<br><br>Plaintiffs must show causation. Haw. Rev. Stat. § 480-13(b). | No<br><br>*Hungate v. Law Office of David B. Rosen*, 391 P.3d 1, 18 (Haw. 2017). | No<br><br>There is no intent requirement in the statute, nor do courts appear to | Yes<br><br>Statutory damages minimums do not apply in the class action context. Haw. Rev. Stat. § 480-13(c). | Proof of injury is required. Haw. Rev. Stat. § 480-13(a). |

---

[1] Plaintiffs must make this showing by clear and convincing evidence. *Id.*

[2] Florida district courts have suggested that an indirect purchaser claim is too remote and speculative to satisfy the FDUTPA's causation requirement where the defendant manufacturer did not itself set prices, but rather suggested prices to retailers that were ultimately responsible for product pricing. *Lombardo v. Johnson & Johnson Consumer Cos.*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015).

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| *Act, Haw. Rev. Stat. § 480-2* | | | | | have read in such a requirement. | Additionally, the statute directs courts to take specific steps to avoid duplication of recovery in cases involving direct and indirect purchasers. *Id.* | |
| Massachusetts<br><br>*Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A § 2* | Treble damages, attorney fees and costs | Yes<br><br>*Heller Fin. v. INA*, 573 N.E.2d 8, 13 (Mass. 1991). | Yes<br><br>Plaintiffs must establish proximate causation to prevail. *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 24 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017). | No<br><br>There is no reliance requirement, but reliance may be used to show causation, which is required. *Heller Fin. v. INA*, 573 N.E.2d 8, 13 (Mass. 1991). | Yes<br><br>The statutory text does not include a scienter requirement, but courts have held that to be unfair, an act or practice must be "immoral, unethical, oppressive, or unscrupulous." *Walsh v. Teltech Sys., Inc*., 821 F.3d 155, 160 (1st Cir. 2016). | Yes<br><br>Double or treble damages are permitted only where the defendant acted willfully or knowingly, that is, with a subjectively culpable mental state. *Anthony's Pier Four, Inc*. *v. HBC Assocs*., 583 N.E.2d 806, 821–22 (Mass. 1991).[3] | To prevail under the Massachusetts statute, plaintiffs must prove at trial that they sent a demand letter to provide defendants with notice of their claims. *Hugenberger v. Alpha Mgmt. Corp*., 990 N.E.2d 104, 106 (Mass. App. Ct. 2013). |
| Michigan | All relief available under Mich. Comp. Laws | Yes, but limited.<br><br>The statute permits class | Yes | Varies by provision<br><br>*Evans v. Ameriquest Mortg. Co*., No. | Varies by provision | Yes<br><br>In the class action context, only actual | Michigan district courts have noted that the basic elements and applicable defenses vary by statutory |

[3] A defendant "acts knowingly with respect to a result if he is aware that it is practically certain that his conduct will cause such a result." *Gore v. Arbella Mut. Ins. Co*., 932 N.E.2d 837, 850 (Mass. App. Ct. 2010) (citation and internal quotation marks omitted).

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| *Michigan Consumer Protection Act Mich. Comp. Laws Ann. § 445.901, et seq.* | Ann. § 445.911 | actions only for certain categories of violations, and only on behalf of those residing or injured in the state. Mich. Comp. Laws § 445.911(3). | Plaintiffs must show causation. Mich. Comp. Laws § 445.911(2). | 233115, 2003 WL 734169, at *3 (Mich. Ct. App. Mar. 4, 2003). | Mich. Comp. Laws § 445.903(1). | damages are recoverable. Mich. Comp. Laws § 445.911(3). | provision, and have emphasized that plaintiffs attempting to show predominance must be precise and thorough in their treatment of state-law requirements.[4] |
| Minnesota<br><br>*Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68, et seq.* | Damages, attorney fees and costs | Yes | Yes<br><br>Plaintiffs must show causation to prevail under the statute *See Grp. Health Plan, Inc. v. Philip Morris Inc*., 621 N.W.2d 2, 11 (Minn. 2001). If a plaintiff would have purchased a particular product regardless of an unlawful overcharge, there is no causation and the plaintiff's claim fails. | Yes, but limited<br><br>Plaintiffs must establish that there is a "causal nexus" between the statutory violation and their claimed injuries, which generally entails some showing of reliance. *See Grp. Health Plan, Inc. v. Philip Morris Inc*., | Yes<br><br>Plaintiffs must show that defendants acted with the knowledge or intent that others would rely on the misrepresentation. Minn. Stat. § 325F.69(1). | Not addressed in statute and not specifically addressed in cases. | To prevail in an action under the Minnesota CFA, plaintiffs must plead and prove that the action would provide a <u>public benefit</u>. *Ly v. Nystrom*, 615 N.W.2d 302, 313 (Minn. 2000).[6] Courts typically do not find a public benefit where a plaintiff seeks only damages. *See Podpeskar v. Makita U.S.A. Inc.*, 247 F. |

---

[4] *See Robinson v. Gen. Elec. Co*., No. 09-cv-11912, 2016 WL 1464983, at *10 (E.D. Mich. Apr. 14, 2016) ("Plaintiffs' cursory references to state statutes – which are pivotal to a predominance analysis that is ancillary to class certification – lack the specificity required for the Court to properly parse whether or not the elements, claims, and applicable substantive state laws predominate as to the entire class. This is a problem.").

[6] To determine whether there is a public benefit, courts consider "the degree to which the defendants' alleged misrepresentations affected the public; the form of the alleged representation; the kind of relief sought; and whether the alleged misrepresentations are ongoing." *Khoday v. Symantec Corp*., 858 F. Supp. 2d 1004, 1017 (D. Minn. 2012).

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| | | | *See Bykov v. Radisson Hotels Int'l, Inc.*, 221 F. App'x 490, 491–92 (8th Cir. 2007). | 621 N.W.2d 2, 11 (Minn. 2001).[5] | | | Supp. 3d 1001, 1012 (D. Minn. 2017). |
| Missouri<br><br>*Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020* | Available relief under the statute, as interpreted by Title 15 of the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. Rev. Stat. § 407.025 | Yes<br><br>Mo. Rev. Stat. § 407.025(2). At trial, plaintiffs must show that the class representatives "have been fairly chosen and adequately and fairly represent the whole class, to recover damages" under the statute. *Id.* | Yes<br><br>Mo. Rev. Stat. § 407.025.1. | No<br><br>*Edmonds v. Hough*, 344 S.W.3d 219, 223 (Mo. Ct. App. 2011). | No<br><br>*Edmonds v. Hough*, 344 S.W.3d 219, 223 (Mo. Ct. App. 2011). | Yes<br><br>Punitive damages are available under the statute, but to recover such damages, "the plaintiff must present substantial evidence establishing that the defendant's conduct was 'outrageous because of [the] defendant's evil motive or reckless indifference to the rights of others.'" *Walsh v. Al West Chrysler, Inc.*, 211 S.W.3d 673, 676 (Mo. Ct. App. 2007) (citation omitted). | Plaintiffs must show that their purchases were "primarily for personal, family or household purposes," and also must show that their losses are ascertainable. Mo. Rev. Stat. § 407.025(1).<br><br>Actual injury is required; only those who actually purchased the product can prevail under the statute. *Amburgy v. Express Scripts, Inc.*, 671 F. Supp. 2d 1046, 1057 (E.D. Mo. 2009). |
| Nebraska<br><br>*Nebraska Consumer Protection Act,* | All forms of relief available under Neb. | Yes | No<br><br>The statute contains no strict causation requirement. Plaintiffs | The statute contains no explicit reliance requirement. *See* Neb. Rev. Stat. § 59-1609. Federal courts | No<br><br>There is no intent requirement in the statute, nor do | Yes<br><br>A private plaintiff can recover actual damages only, except that the | Plaintiffs seek relief under Neb. Rev. Stat. § 59-1614, but that provision does not |

---

[5] In the class action context, individualized proof is not required. *Id.* at 14–15.

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| *Neb. Rev. Stat. § 59-1602, et seq.* | Rev. Stat. § 59-1614 | | need only "prove that the [challenged] practice possessed the tendency or capacity to mislead, or created the likelihood of deception." *State ex rel. Stenberg v. Consumer's Choice Foods, Inc.*, 755 N.W.2d 583, 591 (Neb. 2008) (citation and internal quotation marks omitted). | interpreting the statute have concluded that the law "probably do[es] not require" individualized showings of reliance by all plaintiffs. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 98–99 (D. Mass. 2008). | courts appear to have read in such a requirement. | court may increase the award "to an amount which bears a reasonable relation to the actual damages which have been sustained and which damages are not susceptible of measurement by ordinary pecuniary standards." Neb. Rev. Stat. § 59-1609. In certain cases, this increased amount is $1000. *Id.*<br><br>In cases involving both direct and indirect purchaser claims, "[t]he court may transfer and consolidate such claims, apportion damages, and delay disbursement of damages to avoid multiplicity of suits and duplication of recovery of damages and to obtain substantial fairness." § 59-1609(2). | authorize recovery for private plaintiffs.<br><br>To maintain a private action under the statute, a plaintiff must show that the challenged act or practice has an impact on the public interest. *Nelson v. Lusterstone Surfacing Co.*, 605 N.W.2d 136, 142 (Neb. 2000). |

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| Nevada<br><br>*Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, et seq.* | Damages and civil penalty of up to $5,000 per violation | Yes | Not addressed in statute and not specifically addressed in cases.<br><br>*See Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 657 (D. Nev. 2009). | Not addressed in statute and not specifically addressed in cases.<br><br>*See Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 657 (D. Nev. 2009). | Varies by provision<br><br>*See* Nev. Rev. Stat. § 598.0915. | Yes<br><br>Plaintiffs can obtain only actual damages. Nev. Rev. Stat. § 41.600(3). | |
| New Hampshire<br><br>*New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, et seq.* | All relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 & :10-a | Yes, but limited<br><br>N.H. Rev. Stat. § 358-A:10-a.[7] | Yes<br><br>A private plaintiff must "establish a causal link between the conduct at issue and his or her injury." *Mulligan v. Choice Mortg. Corp. USA*, No. CIV. 96-596-B, 1998 WL 544431, at *11 (D.N.H. Aug. 11, 1998). | No<br><br>*Mulligan v. Choice Mortgage Corp. USA*, No. CIV. 96-596-B, 1998 WL 544431 (D. N.H. 1998). | No<br><br>There is no intent requirement in the text of the statute; but violations must be knowing or willful for plaintiffs to recover double or treble damages. N.H. Rev. Stat. § 358-A:10. | Yes<br><br>In the class action context, plaintiffs can recover only actual damages. N.H. Rev. Stat. § 358-A:10-a. | |
| New Mexico<br><br>*New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-3,* | Actual damages or up to $300 per violation, | Yes<br><br>N.M. Stat. Ann. § 57-12-10(E). | Varies<br><br>Plaintiffs need not show actual injury to obtain injunctive relief, but must show such injury to | No<br><br>*Lohman v. Daimler-Chrysler Corp.*, 166 | No<br><br>N.M. Stat. Ann. § 57-12-10(A) ("Proof of monetary damage, | Yes<br><br>In a class action, plaintiffs can recover only actual damages. N.M. Stat. Ann. § 57- | |

---

[7] Plaintiffs may only maintain a class action as to other residents of the state or individuals whose causes of action arose within the state. Plaintiffs must show that the class representatives "have been fairly chosen and adequately and fairly represent the whole class, to recover actual damages" under the statute. *Id.*

7

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| *et seq.; § 57-12-2E* | whichever is greater | | recover damages. N.M. Stat. Ann. § 57-12-10(A). Plaintiffs seeking money damages are required to establish causation. N.M. Stat. § 57-12-10(B). | P.3d 1091, 1098 (N.M. Ct. App. 2007). | loss of profits or intent to deceive or take unfair advantage of any person is not required."). | 12-10(E). Where defendant's act or practice was willful, the named plaintiffs may each recover the greater of their actual damages, trebled, or $300. *Id.* | |
| North Carolina<br><br>*North Carolina Unfair Trade and Business Practices Act, N.C. Gen. Stat. § 75-1.1, et seq.* | All forms of relief, including treble damages under N.C. Gen. Stat. § 75-16 | Yes | Yes<br><br>Plaintiffs must show proximate cause. *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226 (N.C. 2013). | Yes<br><br>Plaintiffs must show (1) that they actually relied on defendants' misrepresentations, and (2) that such reliance was reasonable. *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 227 (N.C. 2013). | Yes<br><br>To prevail on a claim under the NCUTBPA, plaintiffs must show that defendants' conduct was "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Champion Pro Consulting Grp., Inc. v. Impact Sports Football*, LLC, 845 F.3d | No<br><br>A prevailing plaintiff can recover treble damages. *See* N.C. Gen. Stat. § 75-16. Note, however, that the statute does not provide for an award of punitive damages. *See id.* | In cases involving continuous courses of conduct that violate the statute, each week in which the violation continued counts as a separate violation. N.C. Gen. Stat. § 75-8.<br><br>The statute has limited extraterritorial reach; there must be some nexus between the challenged conduct and North Carolina for the law to apply. *See In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1082 (S.D. Cal. 2017). |

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| | | | | | 104, 109 (4th Cir. 2016).[8] | | |
| North Dakota<br><br>*North Dakota Unfair Trade Practices Law, N.D. Cent. Code § 51-10-01, et seq.* | Damages and injunctive relief | Unclear | No<br><br>There is no causation requirement in the statute. | No<br><br>There is no reliance requirement in the statute, nor do any state courts appear to have read a reliance requirement into the law. | No<br><br>Intent is not required under the statute. | Yes<br><br>The statutory provision under which plaintiffs seek relief provides for only injunctive relief, and does not permit damages. N.D. Cent. Code § 51-10-06. | This is a false advertising statute that prohibits the advertising or sale of goods at below cost. As such, plaintiffs would be required to show that defendants advertised, sold, or offered to sell their products at below cost, and that such conduct "has the intent or the effect of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor or otherwise injuring a competitor, impairs and prevents fair competition, injures public welfare, and is unfair competition and contrary to public policy and the policy of this chapter, if the result of such advertising, offer, or sale is to tend to deceive any purchaser or prospective purchaser, or substantially to lessen competition, or |

---

[8] The law has been construed narrowly, and courts have emphasized that plaintiffs must show "some type of egregious or aggravating circumstances" to recover. *Id.*

9

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| | | | | | | | unreasonably to restrain trade, or to tend to create a monopoly in any line of commerce." N.D. Cent. Code Ann. § 51-10-03. |
| Oregon<br><br>*Oregon Unlawful Trade Practices Act,*<br>*Or. Rev. Stat. § 646.608, et seq.* | All forms of relief available under Or. Rev. Stat. § 646.638 | Yes<br><br>Or. Rev. Stat. § 646.638(8) | Yes<br><br>Plaintiffs must show causation. *See Feitler v. Animation Celection, Inc.*, 13 P.3d 1044, 1047 (Or. Ct. App. 2000). | Yes<br><br>Reliance is required in order to establish causation. *Pearson v. Philip Morris, Inc.*, 361 P.3d 3, 28 (Or. 2015).[9] | No<br><br>*Goschie v. JP Morgan Chase Bank, N.A.*, No. 6:10-cv-062420AA, 2014 WL 6064783, at *8 (D. Or. Nov. 7, 2014). | Yes<br><br>Private plaintiffs can recover the greater of their actual damages or $200. Or. Rev. Stat. § 646.638(1). In the class action context, recovery can be awarded for harm to class members "only if the plaintiffs in the action establish that the members have sustained an ascertainable loss of money or property as a result of a reckless or knowing use or employment by the defendant of a method, act or practice" prohibited by the | Plaintiffs suing for damages under the Oregon UTPA must file suit within a year of the date the statutory violation was discovered, or be covered by a class action filed within a year. Or. Rev. Stat. § 646.638(6).<br><br>Plaintiffs must notify the state attorney general of their action, and must prove that they satisfied this requirement in order to prevail. Or. Rev. Stat. § 646.638(2). |

[9] Plaintiffs can show reliance on a classwide basis through circumstantial evidence—as opposed to direct, individualized proof—where (1) "the same misrepresentation" was made "without material variation to the members of the class," and (2) the misrepresentation was "of a nature that the class members logically would have had a common understanding of the misrepresentation, and naturally would have relied on it to the same degree and in the same way." *Strawn v. Farmers Ins. Co. of Oregon*, 258 P.3d 1199, 1213 (Or. 2011).

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| | | | | | | statute. *Id.* § 646.638(8). In either context, the court can award punitive damages. *Id.* § 646.638(1), (8). | |
| Rhode Island<br><br>*Rhode Island Deceptive Trade Practices Act, R.I. Gen Laws § 6-13.1-1, et seq.* | Injunctive relief, greater of actual damages or $200 per violation, punitive damages | Yes<br><br>R.I. Gen. Laws § 6-13.1-5.2(b). | Yes<br><br>Plaintiffs are required to establish causation. R.I. Gen. Laws § 6-13.1-5.2(a). | Not addressed in statute and not specifically addressed in cases. | Not addressed in statute and not specifically addressed in cases. | Yes<br><br>Plaintiffs can recover the greater of their actual damages or $200 per violation. R.I. Gen. Laws § 6-13.1-5.2. Courts also are permitted to award punitive damages in individual actions. *Id.* | To prevail under the Rhode Island DTPA, plaintiffs must show that they purchased the goods in question "primarily for personal, family, or household purposes," and that they sustained an "ascertainable loss" as a result of the statutory violation. R.I. Gen. Laws § 6-13.1-5.2. |
| South Carolina<br><br>*South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 et seq.* | Treble damages; attorney fees and costs | No<br><br>*Dema v. Tenet Physician Servs.*, 678 S.E.2d 430, 434 (S.C. 2009); *see also In re TD Bank NA*, 150 F. Supp. 3d 593, 634 (D.S.C. 2015). | Yes<br><br>Plaintiffs must establish causation. S.C. Code § 39-5-140(a). | Not addressed in statute and not specifically addressed in cases. | Not addressed in statute and not specifically addressed in cases. | Yes<br><br>Prevailing plaintiffs can recover only actual damages unless they establish that the violation was willful or knowing, in which case the court may award treble damages. S.C. Code § 39-5-140(a). | Plaintiffs are required to notify the state attorney general of private actions brought under the South Carolina UTPA. S.C. Code § 39-5-140(b). |

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| South Dakota<br><br>*S.D. Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws § 37-24-6* | Actual damages, injunctive relief | Yes | Yes<br><br>Plaintiffs must show causation. *Nygaard v. Sioux Valley Hosp. & Health Sys.*, 731 N.W.2d 184, 196–97 (S.D. 2007). | Yes<br><br>*Nygaard v. Sioux Valley Hosp. & Health Sys.*, 731 N.W.2d 184, 197 n.13 (S.D. 2007). | Varies by provision<br><br>S.D. Codified Laws § 37-24-6. | Yes<br><br>Prevailing plaintiffs can recover only actual damages. S.D. Codified Laws § 37-24-31. | |
| Utah<br><br>*Utah Consumer Sales Practices Act,* Utah Code Ann. §§ 13-11-1, et seq.<br><br>*Utah Unfair Practices Act,* Utah Code Ann. §§ 13-5-1, et seq. | Declaratory relief, ancillary relief, injunctive relief (Utah CSPA)<br><br>Greater of actual damages or $2000 per Utah class member (Utah UPA) | Yes, but limited.<br><br>Class actions are permitted, but only under certain circumstances. Utah Code Ann. § 13-11-20. | Yes<br><br>Causation is required under the Utah Consumer Sales Practices Act. Utah Code Ann. § 13-11-19. | Not addressed in statute and not specifically addressed in cases. | Varies by provision<br><br>*Compare* Utah Code Ann. § 13-11-4, *with* Utah Code Ann. § 13-11-5. | Yes<br><br>Consumers in class actions are not permitted to recover damages under the Utah Consumer Sales Practices Act. *See* Utah Code Ann. § 13-11-19.<br><br>Under the Utah Unfair Practices Act, prevailing plaintiffs may recover the greater of $2000 or three times their actual damages. Utah Code Ann. § 13-5-14. | To prevail under the Utah Consumer Sales Protection Act, plaintiffs must show that defendants are "suppliers" within the meaning of the statute. *See* Utah Code Ann. § 13-11-3.<br><br>Plaintiffs need not show actual damages under the Utah UPA. Utah Code Ann. § 13-5-14.<br><br>The Utah UPA prohibits price discrimination as between consumers, advertisement of goods that a seller is not prepared to supply, and other conduct that tends to harm competitors rather than consumers directly. *See* Utah Code Ann. § 13-5-1, *et seq.* |

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| Vermont<br><br>*Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2453, et seq.* | Actual damages, treble damages, attorney fees | Yes | Yes, but limited.<br><br>The Vermont CFA requires <u>either</u> reliance <u>or</u> a showing of causation. Vt. Stat. Ann. tit. 9, § 2461(b). | Yes, but limited.<br><br>The Vermont CFA requires <u>either</u> reliance <u>or</u> a showing of causation. Vt. Stat. Ann. tit. 9, § 2461(b). | Not addressed in statute and not specifically addressed in cases. | Yes<br><br>Prevailing plaintiffs can recover exemplary damages in the amount of three times their actual damages. §§ 2461(b), 2465(a). To do so, plaintiffs must show malice, that is, "conduct manifesting personal ill will, evidencing insult or oppression, or showing a reckless or wanton disregard of plaintiff[s'] rights." *L'Esperance v. Benware*, 830 A.2d 675, 682 (Vt. 2003).<br><br>Courts may take steps to avoid duplicative recovery in antitrust actions, including by consolidating indirect and direct purchaser actions. Vt. Stat. Ann. tit. 9, § 2465(b). | To prevail under the Vermont CFA, consumers must show "that (1) defendants misrepresented or omitted information in a manner <u>likely to mislead</u> consumers; (2) the consumers interpreted the message <u>reasonably under the circumstances</u>; and (3) the misleading representation was <u>material</u> in that it affected the consumers' purchasing decision." *Bergman v. Spruce Peak Realty, LLC*, 847 F. Supp. 2d 653, 671 (D. Vt. 2012) (emphasis added) (citing *Jordan v. Nissan N. Am.*, 853 A.2d 40, 43 (Vt. 2004)). |
| Virginia | Greater of treble damages or $1000 per | No<br><br>The Virginia CPA does not | Yes | Yes<br><br>*In re Lumber Liquidators Chinese-* | No<br><br>*In re Lumber Liquidators* | Yes<br><br>Prevailing plaintiffs generally can recover | Plaintiffs must show that defendants made misrepresentations of fact. *Lambert v. Downtown* |

| State | Relief Claimed | Class Actions Permitted? | Causation Requirements? | Reliance Requirements? | Intent / Scienter Requirements? | Restrictions on Damages | Notes & Other Features |
|---|---|---|---|---|---|---|---|
| *Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196, et seq.* | violation, attorney fees and costs | authorize class actions.[10] | Va. Code Ann. § 59.1-204(A). | *Manufactured Flooring Durability Mktg. & Sales Practice Litig.*, No. 1:16-md-2743 (AJT/TBJ), 2017 WL 2911681, at *12 (E.D. Va. July 7, 2017). | *Chinese-Manufactured Flooring Durability Mktg. & Sales Practice Litig.*, No. 1:16-md-2743 (AJT/TBJ), 2017 WL 2911681, at *12 (E.D. Va. July 7, 2017). | the greater of actual damages or $500. Va. Code Ann. § 59.1-204(A). If the statutory violation was willful, however, plaintiffs can recover the greater of $1000 or three times their actual damages per violation. *Id.* | *Garage, Inc.*, 553 S.E.2d 714, 716 (Va. 2001). |
| West Virginia<br><br>*West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-6-104* | Greater of actual damages or $200 per violation | Yes | Yes<br><br>Plaintiffs must show proximate causation, *i.e.*, that the deceptive act or practice had an outcome determinative effect on his or her purchasing decision. W. Va. Code § 46A-6-106(b). | Not addressed in statute and not specifically addressed in cases.[11] | Not addressed in statute and not specifically addressed in cases. | Yes<br><br>Prevailing plaintiffs can recover the greater of their actual damages or $200 per violation. W. Va. Code § 46A-6-106(a). | The statute contains pre-filing notice requirements that plaintiffs must satisfy in order to prevail. W. Va. Code § 46A-6-106.<br><br>Plaintiffs must establish ascertainable loss. *White v. Wyeth*, 705 S.E.2d 828, 837 (W. Va. 2010). |

---

[10] The Supreme Court of Virginia has held that class actions may only be maintained under Virginia law if there is express statutory authorization. *W.S. Carnes, Inc. v. Bd. of Superiors*, 478 S.E.2d 295, 300 (Va. 1996). The Virginia CPA contains no such authorization. *See* Va. Code Ann. § 59.1-204(A); *see also Pearsall v. Va. Racing Comm'n*, 494 S.E.2d 879, 883 (Va. Ct. App. 1998).

[11] However, plaintiffs must prove reliance in cases involving affirmative misrepresentations. *White v. Wyeth*, 705 S.E.2d 828, 837 (W. Va. 2010).