# EXHIBIT 23



# Proving Antitrust Damages

## Legal and Economic Issues

### Third Edition

SECTION OF
**ANTITRUST
LAW**
Promoting Competition
Protecting Consumers

**ABA**
AMERICAN BAR ASSOCIATION
**Defending Liberty
Pursuing Justice**

Cover design by ABA Design.

The materials contained herein represent the opinions of the authors and/or the editors, and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Antitrust Law unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2017 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission contact the ABA Copyrights & Contracts Department, copyright@americanbar.org, or complete the online form at http://www.americanbar.org/utility/reprint.html.

Printed in the United States of America.

21 20 19 18 17    5 4 3 2 1

ISBN: 978-1-63425-975-0

e-ISBN: 978-1-63425-976-7

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 N. Clark Street, Chicago, Illinois 60654-7598.

www.shopABA.org

as the principal measure of harm in price-fixing cases.[17] Several methods are commonly used to estimate the overcharge.[18]

## 1. Before-During-After Model

The most conceptually straightforward method for estimating the cartel overcharge is through a "before-during-after" model.[19] This model is premised on the assumption that prices before and after, but not during, the relevant period were set free of any illegal cartelization. Using data from both the before and after time periods as nonconspiracy benchmarks, a model is constructed to estimate the but-for prices during the relevant period.[20] Overcharges are then estimated as the difference between the actual prices charged and the prices the model predicts would have been charged during the relevant period.[21] As noted in Chapter 6, when sufficient data for the period after the anticompetitive behavior are not available, a variation of the before-during-after model—the before-during model—may be used, where the nonconspiracy benchmark is restricted to the period before the alleged conspiracy.[22]

The simplest form of the before-during-after model assumes that the weighted average prices from *outside* the relevant period are a reasonable approximation of the prices *during* the relevant period absent the conspiracy. Put differently, this approach assumes that the entire price difference between the conspiracy period and nonconspiracy period was

---

17.　*See* Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390, 396 (1906) (affirming an award of damages based on "the difference between the price paid and the market or fair price that the city would have had to pay under natural conditions had the combination been out of the way").

18.　Other methods have been proposed. For example, Douglas Zona proposes structural modeling to identify but-for prices and overcharges. See J. Douglas Zona, *Structural Approaches to Estimating Overcharges in Price-Fixing Cases*, 77(2) ANTITRUST L. J. (2009).

19.　*See also* Chapter 6 for a discussion of Before-During-After models.

20.　*See* Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768, 793 (6th Cir. 2002) (before-during-after and regression analyses are "generally accepted methods for proving antitrust damages").

21.　Unit charges may be lower than posted prices because customers are awarded credits or qualify for discounts.

22.　*See In re* Auction Houses Antitrust Litig., No. 00-cv-0648, 2001 U.S. Dist. LEXIS 1713 (S.D.N.Y. 2001) (price-fixing overcharges estimated using the period before the conspiracy as the nonconspiracy period). In theory, the reverse may also be possible: a during-after model where the nonconspiracy benchmark is restricted to the period after the conspiracy.

228            *Proving Antitrust Damages*

due to the alleged anticompetitive conduct. While this strong assumption could hold in some circumstances, it is rarely justified, especially for lengthy conspiracy periods. First, the before-during-after model assumes that prices from the benchmark period are a good approximation of long-run equilibrium prices. It is important, however, to examine the economic conditions in the before and after periods for entry or exit, surpluses or shortages, or factors that would indicate that the market had not reached long-run equilibrium. For example, if price wars give rise to a cartel, then preconspiracy prices would not reflect long-run equilibrium prices.[23] Second, the assumption that but-for prices would have been constant during the relevant period generally implies that there were also no changes in the economic factors that normally determine prices—for example, changes in demand, changes in costs,[24] entry or exit of firms, or capacity constraints.[25] Third, the use of aggregate average prices from the benchmark period would produce inaccurate overcharge estimates for individual customers if their prices would have differed, for example, due to individualized negotiations and variation in bargaining power.

These limitations may be addressed through more rigorous methods that apply econometric techniques to estimate the but-for prices—such as dummy variable models and prediction models—while controlling for other factors that may have affected prices. Econometric techniques can be used to evaluate data relating to competing theories of the relationship

---

23. In the lysine matter, the plaintiffs' model was challenged on the grounds that the but-for world would have reflected oligopoly pricing instead of perfectly competitive pricing, and the alleged conspiracy period may have reflected normal seasonal pricing. *See* Lawrence J. White, *Lysine Price Fixing: How Long? How Severe?*, 81 REV. INDUS. ORG. 23 (2001).

24. The cartel may affect the price of an input, and failure to recognize this effect may lead to biased results. *See* Halbert White, Pauline Kennedy, and Robert Marshall, *The Measurement of Economic Damages in Antitrust Civil Litigation*, ECONOMICS COMMITTEE NEWSLETTER, American Bar Association, Section of Antitrust Law, Spring, (2006), pp. 17-22.

25. *See In re* Live Concert Antitrust Litig., 863 F. Supp. 2d 966, 976-79 (C.D. Cal. 2012) (finding expert's before-and-after model was unreliable because it failed to control for "changes in concert quality during the relevant time period."); Stein v. Pac. Bell, No. 00-CV-2915, 2007 WL 831750, at *12 (N.D. Cal. Mar. 19, 2007) ("Courts have consistently rejected 'before-and-after' models when experts failed to perform regression analysis or otherwise account for variables in the marketplace."); Blue Dane Simmental Corp. v. Am. Simmental Ass'n, 178 F.3d 1035, 1040-41 (8th Cir. 1999) (finding expert's before-and-after model was unreliable due to a failure to identify or examine other independent variables).