Patrick J. Stueve (KS 13847)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: 816-714-7100
Facsimile: 816-714-7101
stueve@stuevesiegel.com

*Counsel for Direct Action Plaintiff Associated
Wholesale Grocers, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

ASSOCIATED WHOLESALE
GROCERS, INC.,

             Plaintiff,

      v.

BUMBLE BEE FOODS LLC, LION
CAPITAL LLP, LION CAPITAL
(AMERICAS) INC., BIG CATCH
CAYMAN L.P., CHRISTOPHER D.
LISCHEWSKI, STARKIST
COMPANY, DONGWON
INDUSTRIES CO. LTD., DEL
MONTE CORPORATION, TRI-
UNION SEAFOODS LLC d/b/a
CHICKEN OF THE SEA
INTERNATIONAL, INC., AND
THAI UNION GROUP PCL,

             Defendants.

Case No. 15-md-2670-JLS-MDD
Case No. 2:18-cv-02212 (D. Kan.)

**FILED UNDER SEAL**

## SECOND AMENDED COMPLAINT

AWG'S SECOND AMENDED COMPLAINT

# **TABLE OF CONTENTS**

NATURE OF ACTION ........................................................................................................... 1

BACKGROUND .................................................................................................................... 3

JURISDICTION AND VENUE ............................................................................................. 11

PLAINTIFF ........................................................................................................................... 16

DEFENDANTS ..................................................................................................................... 17

    The Bumble Bee Defendants ............................................................................................. 17

    Lion Entities ....................................................................................................................... 18

    Defendant Christopher Lischewski ................................................................................... 26

    The Tri-Union Defendants ................................................................................................. 28

    Del Monte .......................................................................................................................... 45

    Co-Conspirators and Agents ............................................................................................. 46

TRADE AND COMMERCE ................................................................................................. 46

THE PRODUCTION OF CANNED TUNA .......................................................................... 47

TUNA SUPPLY, DEMAND, AND PRICING ...................................................................... 49

    The Supply of Canning-Grade Tuna Increased Substantially ........................................... 49

    The Demand for Canned Tuna in the United States Decreased Substantially ................... 51

    Prices Paid for Canned Tuna Increased Substantially as a Result of Defendants'
    Conspiracy ......................................................................................................................... 52

    Defendants' Pricing of Canned Tuna to Plaintiff and Others Was Against Defendants'
    Self-Interest But For Their Collusion ............................................................................... 55

THE MARKET FOR THE PRODUCTION AND SALE OF CANNED TUNA WAS
CONDUCIVE TO CARTELIZATION .................................................................................. 56

    There Are No Close Substitutes for Canned Tuna ............................................................ 56

    The Market for the Processing and Sale of Canned Tuna Is/Was Concentrated ............... 56

    Barriers to Entry ................................................................................................................ 57

    Prevailing Supply and Demand Factors Incentivized Collusion ....................................... 58

    The Transfer of Executives Between Defendants Facilitated Collusion ............................ 59

    Select Trade Associations Facilitated Collusion ............................................................... 61

    Common Vendors and Co-Packing Arrangements Facilitated Collusions and
    Enforcement of the Cartel ................................................................................................. 61

ADDITIONAL OVERT ACTS IN DEFENDANTS' CANNED TUNA CONSPIRACY ........... 62

    Defendants' Collusive Price Increases Between 2004-2006 ............................................. 63

i

Defendants' Collusive Can Size Reduction and Price Increases in 2007-2008 ..........................71

Defendants Collude on Net Prices in 2010...................................................................................78

Defendants Colluded to Increase Canned Tuna Prices in 2011...................................................80

Defendants Colluded on a Canned Tuna Price Increase in 2012.................................................83

Defendants' Collusion Not to Sell "FAD-Free" Branded Tuna Products in 2011 and Thereafter.....................................................................................................................................84

Defendants Colluded on Promotional Activity and Pricing Terms in at Least 2011-2013 .........................................................................................................................................86

Defendants' Communications in Furtherance of the Conspiracy After 2013 ...........................87

Defendants' Conspiracy Was Effective .......................................................................................87

DISCOVERY IS NECESSARY TO DETERMINE THE FULL SCOPE OF THE CONSPIRACY ..............................................................................................................................95

TOLLING OF THE STATUTE OF LIMITATIONS .....................................................................96

LION ENTITIES .........................................................................................................................109

Lion Entities Directly Participated in the Conspiracy .............................................................109

Lischewski is Liable for his Role in the Conspiracy ...............................................................128

EFFECTS OF THE DEFENDANTS' ILLEGAL COURSE OF CONDUCT ............................128

CAUSES OF ACTION................................................................................................................129

COUNT I .....................................................................................................................................129

COUNT II....................................................................................................................................132

PRAYER FOR RELIEF .............................................................................................................134

JURY DEMAND.........................................................................................................................134

ii

Plaintiff Associated Wholesale Grocers, Inc., ("Plaintiff") sues Bumble Bee Foods LLC ("Bumble Bee"), StarKist Company ("StarKist"), Dongwon Industries Co. Ltd. ("Dongwon"), Del Monte Corporation ("Del Monte"), Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc. ("COSI"), Thai Union Group PCL (f/k/a Thai Union Frozen Products PCL) ("Thai Union" or "TUG"), Lion Capital LLP ("Lion Capital"), Lion Capital (Americas), Inc. ("Lion Americas"), and Big Catch Cayman LP aka Lion/Big Catch Cayman LP ("Big Catch"), and Christopher D. Lischewski (collectively the "Defendants"), and allege as follows:

## NATURE OF ACTION

1.     This antitrust action arises out of a long-running conspiracy between and among the three largest domestic producers of shelf-stable tuna (*e.g.*, canned or pouched tuna) ("canned tuna" or "shelf-stable tuna") to fix, raise, and/or maintain the prices of canned tuna in the United States.

2.     As shown below, Defendants facilitated the conspiracy by, among other things, secretly and collusively exchanging price information and business plans, coordinating price announcements, and collectively reducing quantity and restraining output.  These coordinated efforts by Defendants were designed to and did dramatically increase the prices of shelf-stable tuna.

3.     The conspiracy, which began no later than May of 2004 and continued through at least July of 2015[1] (the "Relevant Period"), directly impacted Plaintiff.  The conspiracy's effect on the price of shelf-stable tuna, on information and belief,

---

[1] Discovery continues on the full scope of the conspiracy, including the time frame and participants.  At least six senior tuna executives for the defendants have asserted their Fifth Amendment rights and refused to answer questions about the scope and timing.  Defendant Christopher Lischewski, CEO of Bumble Bee has not yet been deposed.  Mr. Lischewski's counsel has indicted he will assert his Fifth Amendment rights to all questions.

AWG'S SECOND AMENDED COMPLAINT

1  continues to the present.  Discovery is required to determine the full nature of the
2  period, participants, and packaged seafood products involved.

3      4.     Defendants include the largest domestic producers and sellers of
4  canned tuna – Bumble Bee, StarKist, and COSI – as well as the parent entities of
5  those companies.  Together, these Defendants produced upwards of 80% of all
6  canned tuna sold in the United States during the Relevant Period.

7      5.     Although it had started at least by 2004, the price-fixing conspiracy
8  remained hidden and was not uncovered until after Defendant Thai Union Group
9  PCL, Tri-Union's parent entity, announced its intent to acquire Defendant Bumble
10  Bee for $1.5 billion in late 2014.  The acquisition, had it been completed, would
11  have created the largest canned tuna producer in the United States, with
12  approximately 38% of the market share.

13      6.     However, in connection with its review of the proposed acquisition,
14  the Antitrust Division of the United States Department of Justice ("DOJ")
15  determined that the market for canned tuna in the United States was not
16  functioning competitively and, in fact, was subject to a price-fixing conspiracy
17  involving Defendants.  This prompted the DOJ to open a criminal investigation
18  into the conspiracy alleged herein.

19      7.     In December 2015, and as a direct result of the DOJ's investigation,
20  Thai Union and Bumble Bee announced that the acquisition was being abandoned.

21      8.     The DOJ's investigation is ongoing.  To date, Defendant Bumble Bee,
22  two Bumble Bee senior sales and marketing executives, and a StarKist senior sales
23  executive all have pleaded guilty to charges related to the price-fixing conspiracy
24  alleged herein. An on May 16, 2018, a federal grand jury indicted Bumble Bee's
25  CEO Chris Lischewski on charges arising from the conspiracy alleged herein. Mr.

26
27
28

2

Lischewski has since resigned from his role as Bumble Bee's CEO and has taken a leave of absence from the company.

9.     In addition, in September 2017, COSI's parent company Thai Union announced that Tri-Union has received "conditional leniency" under the DOJ's "Corporate Leniency Program" with respect to the DOJ's investigation into the price-fixing conspiracy alleged herein.  A recipient of conditional leniency must *admit* to a criminal violation of the antitrust laws as a prerequisite to receiving conditional leniency.

10.     Because of the conspiracy alleged herein, Plaintiff has paid supra-competitive prices for canned tuna and therefore has been injured by Defendants' illegal actions.

## **BACKGROUND**

11.     Owing to a series of mergers and acquisitions, by the early 2000s, the shelf-stable packaged seafood industry operated as an oligopoly dominated by its "Big 3" producers: Bumble Bee, StarKist and COSI. While the Defendants and co-conspirators attempted to market their products as though they were differentiated, consumers substitute between different brands of canned tuna in response to price changes.  Further, canned tuna possessed the economic characteristics of a commodity-like product with no close substitutes. Indeed, Defendants openly recognized that if any individual brand were priced above the competitors, then the high-priced company would quickly lose market share to the lower priced competitors.  As a result, no Defendant or its co-conspirator(s) could profit, or sustainably profit, by unilaterally increasing its prices in the U.S.

12.     Further adding to Defendants' economic challenges by 2004 was the fact that, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

AWG'S SECOND AMENDED COMPLAINT

Consumer demand for canned tuna was dropping, a decline that was showing no signs of abating. As a result of this decline, Defendants controlled production capacity that was substantially in excess of the demand for canned tuna in the United States.

13. All of the Defendants recognized the challenges to each of them presented by these market conditions. The solution, embraced by all of them in 2004, was to enter into an unlawful agreement to increase prices of canned tuna sold to Plaintiff and others in the United States by, among other conduct, coordinating price increase announcements or pricing terms, secretly and collusively exchanging pricing information and prospective pricing announcements and business plans, and collectively reducing quantity and restraining output.



15. Defendants and co-conspirators implemented this conspiracy over a number of years through a series of meetings and other communications.

AWG'S SECOND AMENDED COMPLAINT

16.     During the early years of the conspiracy, between 2004 and 2006, Defendants and co-conspirators developed a common agreement or understanding that they would follow the price increases that each issued. In furtherance of this common agreement or understanding, Defendants exchanged information on their future pricing plans via telephone and other channels.

As a result of these and other collusive price information exchanges, Defendants were able to and did collusively increase prices of canned tuna sold to Plaintiff and others in the United States at least twice in 2004 and again in 2006.

17.     By 2007, Defendants became more practiced and ambitious in their collusive designs. Del Monte – which operated StarKist – recognized that Defendants could dramatically increase profits if each reduced its tuna can sizes from six ounces to five.

5

AWG'S SECOND AMENDED COMPLAINT

18.    Consequently, in accordance with their unlawful agreement, Bumble Bee, COSI and StarKist collusively downsized their six ounce tuna cans to five ounces. This concerted action to reduce quantity itself constitutes price fixing. But it also constitutes a conspiratorial price increase, as Defendants also colluded to raise prices on the newly downsized cans.

19.    Other collusive canned tuna price increases by the Defendants followed. In furtherance of their continuing unlawful agreement or understanding not to compete on price, Defendants were able to and did implement collusive price increases on canned tuna in at least 2008, 2010, 2011, and 2012. Additionally, in at least 2011, 2012 and 2013, Defendants agreed to constrain discounting and promotional practices and terms of sale of canned tuna to customers, including Plaintiff.

20.    Further, in 2012, Defendants and their co-conspirators agreed not to sell under their own brands any canned tuna products containing tuna that were caught with the use of a Fish Aggregating Device. Upon information and belief, this agreement remained in effect at least until July 2015.

21.    As explained below, the conspiracy was facilitated in part by the fact that during it, a number of senior sales and marketing executives and other employees left the employ of one Defendant to go work for another. This familiarity helped to cultivate a culture of collusion in the packaged seafood industry and resulted in communications by telephone between these senior sales and marketing executives for competing companies. A select number of industry trade associations also facilitated the conspiracy by providing Defendants with cover to meet and conduct conspiracy business.

AWG'S SECOND AMENDED COMPLAINT

22.     Additionally, Defendants' use of a common vendor for their cans (Impress, a co-conspirator) and a co-packing arrangement between Bumble Bee and COSI also facilitated Defendants' collusion and enforcement of their cartel.

23.     As far back as 2004, Defendants and co-conspirators affirmatively and fraudulently concealed their unlawful conduct and coordinated their messaging to their customers in order to create pretextual justifications for their collusive price increases. These pretextual explanations by Defendants for their canned tuna price increases were intended by them at the time to create the illusion that the market for the pricing and sale of canned tuna in the United States was competitive when, in fact, it was not. However, Plaintiff did not know this at the time. As a result of their many affirmative and fraudulent acts of concealment, described with particularity below, Defendants prevented Plaintiff from learning about the existence of the conspiracy until July 2015, when Thai Union admitted publicly that the DOJ was investigating the packaged seafood industry in the United States.

24.     The conspiracy alleged in this Second Amended Complaint was continuing and overarching in character. During the time period relevant to Plaintiff's claims, Defendants and co-conspirators had one or more common objectives in the conspiracy, which they realized, including, without limitation, increasing, fixing, stabilizing or maintaining the price of canned tuna sold to Plaintiff and others. There was interdependence among the Defendants and co-conspirators regarding the overt acts alleged below to achieve the objective(s) over the course of the conspiracy period. In addition, there was substantial overlap in the participants in the overt acts in furtherance of the conspiracy.

25.     In the paragraphs below, Plaintiff alleges who communicated with whom, when, where (when they met in person) and what they agreed to or discussed in furtherance of the conspiracy alleged in this Second Amended

7

Complaint. These communications included in-person meetings, e-mails, and telephone calls, and they involved the senior-most executives from each Defendant.

26.   That the canned tuna conspiracy existed cannot credibly be doubted. This is because on November 7, 2016, December 21, 2016, and June 28, 2017, Bumble Bee executives Walter Scott Cameron and Kenneth Worsham ("K. Worsham"), and StarKist executive Stephen L. Hodge, respectively, pled guilty to the felony charge of violating the U.S. antitrust laws by participating in an unlawful "conspiracy to suppress and eliminate competition by reaching agreements to fix, raise and maintain the prices of packaged seafood sold in the United States from at least 2011 through at least 2013 in violation of the Sherman Antitrust Act, 15 U.S.C. §1." The Cameron, K. Worsham, and Hodge Plea Agreements all state that "[p]ackaged seafood includes shelf-stable tuna fish." They further state that during the relevant period, defined as between at least 2011 through at least 2013, each participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood, the primary purpose of which was to fix, raise and maintain the prices of packaged seafood sold in the United States. In furtherance of the conspiracy, [Cameron, K. Worsham, and Hodge each] engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms. During these conversations, discussions and meetings, agreements and mutual understandings were reached to fix, raise and maintain the prices of packaged seafood sold in the United States."

27.   Additionally, on May 8, 2017, DOJ announced that Bumble Bee had agreed to plead guilty to price-fixing shelf-stable tuna products in the United States between 2011 and 2013. Bumble Bee will pay a $25,000,000 criminal fine for its

AWG'S SECOND AMENDED COMPLAINT

criminal conduct. Acting Assistant Attorney General Andrew Finch commented that DOJ's antitrust division "along with our law enforcement colleagues, will continue to hold these companies and their executives accountable for conduct that targeted a staple in American households."

28.    The Cameron and Worsham guilty pleas and the Bumble Bee plea agreement establish that a conspiracy did exist. But by operation of law, a guilty plea merely establishes the minimum parameters of a conspiracy. *See, e.g.*, *In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1475705, at *11 (D.D.C. May 9, 2000) ("[T]he Court rejects the notion that the guilty pleas … foreclose a broader conspiracy. Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention."). Thus, the scope of the conspiracy actionable in a civil antitrust action – including the timing of, and products and participants in, the conspiracy – may be (and as alleged in this Second Amended Complaint is) broader than the criminal pleas to date. Discovery is necessary to determine the full scope of the conspiracy in terms of products, time period and participants.

29.

30.    Additionally, defendants such as Bumble Bee have admitted in civil discovery that its senior executives engaged in meetings and discussions in

9

violation of antitrust laws during the relevant period.  Specifically, Bumble Bee has admitted that "Senior Vice Presidents of the Sales and Marketing departments at Bumble Bee coordinated certain list price increases relating to certain canned tuna products through a series of bilateral communications with executives at the other companies (including, at various time, communications with Steve Hodge and Chuck Handford of StarKist," and "Senior Vice Presidents and Vice Presidents of the Sales and Trade Marketing departments at Bumble Bee coordinated certain promotional levels and changes to certain pricing guidance on certain canned tuna products through a series of bilateral communications with executives at the other companies (including, at various times, communications with Steve Hodge and Chuck Handford of StarKist and Mike White of Chicken of the Sea."

31. ███████████████████████████████████████

32.    The existence of the canned tuna conspiracy alleged in this Second Amended Complaint is further supported by additional evidence alleged below, including, without limitation, the following:

(a)    On December 3, 2015, Thai Union and Bumble Bee announced that they had abandoned their proposed merger in the face of DOJ's criminal investigation of them, prompting William Baer, then head of the DOJ's Antitrust Division, to state later that day that "[the DOJ's] investigation convinced us – and the parties knew or should have known from the get go – that the market is not functioning competitively today, and further consolidation would only make things worse."

AWG'S SECOND AMENDED COMPLAINT

(b)     During the time period relevant to Plaintiff's claims, Defendants and their co-conspirators' pricing of canned tuna to Plaintiff and others in the United States is explainable only through conspiratorial action.  During the conspiracy, there was a large increase in the supply of canning-grade tuna coupled with decreasing U.S. demand for canned tuna. These conditions should have caused canned tuna prices in the U.S. to decline precipitously. Instead, the price increased (significantly).  Additionally, the market for the production and sale of canned tuna was conducive to cartelization because: (i) as noted above, it is a commodity-like product for which there are no close substitutes; (ii) together, Defendants dominated the market for the processing of tuna and the production and sale of canned tuna in the United States; and (iii) there were barriers to entry into the market for the production and sale of canned tuna in the United States.

33.     The allegations in this Second Amended Complaint are pled in the alternative if necessary to avoid inconsistency.

## JURISDICTION AND VENUE

34.     This civil antitrust action arises under Sections 1 of the Sherman Act, 15 U.S.C. § 1 for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and for treble damages and permanent injunctive relief pursuant to the Kansas Restraint of Trade Act, K.S.A. 50-101, et seq.

35.     This Court has subject matter jurisdiction over each of the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1337.  This Court further has subject matter jurisdiction over each of the claims in this action pursuant to 28 U.S.C. § 1332, as, upon information and belief, this action is between citizens of different States and has an amount in controversy in excess of $75,000, exclusive of interest and costs.

11

36.     Venue is proper in this Court pursuant to 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) & (d), because:

(a)     a substantial part of the events giving rise to these claims occurred in this District, including the sales to Plaintiff of shelf-stable tuna at artificially high prices;

(b)     each Defendant is subject to personal jurisdiction in this District; and

(c)     Defendants transact business in this District.

37.     Defendants are subject to the personal jurisdiction of this Court because:

(a)     they are amenable to service of process because each transacts business in, has continuous or systematic contacts with, or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)     they are amenable to service of process because each transacts business in, has continuous or systematic contacts with, or has sufficient minimum contacts in this District, and Defendants headquartered outside this District are nevertheless engaged in the business of manufacturing, distributing, advertising and/or selling shelf-stable tuna throughout the United States, including in this District;

(c)     they are amenable to service of process because each Defendant belonged to the conspiracy alleged in this Complaint and one or more of them performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling shelf-stable tuna to Plaintiff and others in this District at artificially inflated prices;

AWG'S SECOND AMENDED COMPLAINT

1       (d)   they are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and/or the Kansas Long Arm Statute, K.S.A. 60-308, because each Defendant, either personally or through their co-conspirators in furtherance of the conspiracy, has sufficient minimum contacts with Kansas, including that each Defendant: transacted (and continues to transact) business in this state, committed tortious acts within Kansas; entered into contracts with a Kansas resident that were to be performed in whole or in part in Kansas; and caused injury in Kansas arising out of acts or omissions outside of Kansas while Defendants were engaged in solicitation or service activities within Kansas.  In addition, Defendants have submitted to the jurisdiction of the Court because of their continuous and systematic contacts with Kansas;

       (e)   they contracted to supply services or goods, including shelf-stable tuna, or have agents who contracted to supply materials or goods, including shelf-stable tuna, in this District; money flowed from Plaintiff in Kansas to pay Defendants for shelf-stable tuna and otherwise financially benefited; Defendants transact business in the District or have agents who transact business on their behalf in the District in furtherance of the conspiracy; Defendants committed unlawful acts or caused one or more unlawful acts to be done, or consequences to occur, in the District; and Defendants engaged in unlawful conduct described below outside of the District causing injury to Plaintiff in the District;

       (f)   they and one or more of their coconspirators contracted to supply services or goods, including canned tuna, in the State where this Federal Court sits; money flowed from Plaintiff or other purchasers in the State to pay Defendants and their co-conspirators for canned tuna; Defendants and one or more of their co-conspirators transact business in the State in furtherance of the conspiracy; Defendants and their co-conspirators did or caused one or more

13

AWG'S SECOND AMENDED COMPLAINT

unlawful acts alleged in this Second Amended Complaint to be done, or consequences to occur, in the State; Defendants and their co-conspirators engaged in unlawful conduct described in this Second Amended Complaint outside of the State causing injury to Plaintiff in the State, and because this Court's exercise of jurisdiction is not inconsistent with the Constitution of this State or the Constitution of the United States;

(g)    Dongwon and TUG are subject to the general and specific personal jurisdiction of this Court because they have purposefully directed their contacts and conspiratorial conduct at the United States (including the forum State and the District of Kansas) and have purposefully availed themselves of the laws of the United States. As alleged in this Second Amended Complaint, Dongwon and TUG, either directly, or indirectly through their subsidiaries (StarKist and COSI, respectively), engaged in price-fixing activities and anticompetitive conduct that were intended to have, and did have, direct, substantial and reasonably foreseeable effects on the commerce of the forum State and the United States;

(h)    In addition to the foregoing, or in the alternative, on information and belief, TUG[2] and Dongwon[3] have each consented to or waived objection to this Court's personal jurisdiction over each of them in this case.

---

[2]    TUG sponsors American Depository Receipts, which are traded on NASDAQ, which will allow U.S. investors to trade equities of TUG in the United States securities market.  In connection with those U.S. securities transactions, TUG regularly files and discloses required financial information with the U.S. Securities and Exchange Commission.

[3]    Moreover, Dongwon has availed itself of the personal jurisdiction of courts in the United States and U.S. territories, and maintained that it is the alter ego of its wholly-owned subsidiary (StarKist) doing business in U.S. territories. For example, and without limitation: (i) In *Dongwon Industries Co., Ltd., v. Ships Gear & Transit, Inc.*, 93-cv-01691 (S.D. Cal.), Dongwon submitted to the personal jurisdiction of *this* Court by commencing an action for breach of contract and tort claims against a ship manufacturer from which Dongwon purchased three purse-seining vessels for tuna fishing; (ii) In *Dongwon Industries Co., Ltd, v. Yoshida*,

AWG'S SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(i)     Lion Americas is subject to the general and specific personal jurisdiction of this Court because its principal place of business in in California;

(j)     Lion Capital is subject to the general and specific personal jurisdiction of this Court because they have purposefully directed their contacts and conspiratorial conduct at the United States (including the forum State and the District of Kansas) and have purposefully availed themselves of the laws of the United States. As alleged in this Second Amended Complaint, Lion Capital and Big Catch engaged in intentional acts such as monitoring Bumble Bee projects, corresponding with Bumble Bee executives, investors, and competitors, and exchanging confidential information. This conduct was and is intentionally directed at the United States and it was foreseeable that it would cause harm in the United States; and

(k)     Big Catch Cayman is subject to the general and specific jurisdiction of this Court because, as a mere shell company, it is the alter ego

90-cv-00282 (D. Alaska), Dongwon availed itself of the jurisdiction of the U.S. courts by commencing an action in the District of Alaska; (iii) In *Hill v. Majestic Blue Fisheries, LLC*, 10-cv-23886 (S.D. Fla.), and *In the Matter of Majestic Blue Fisheries, LLC*, 11-cv-00032 (D. Guam), Dongwon consented to the jurisdiction of the courts in actions arising out of the sinking of a U.S. flagged vessel operated and managed by Dongwon; (iv) In *Yu Sheng Fishery Co., Ltd., v. Dongwon Industries Co., Ltd.*, 1991 WL 126138 (D. Guam), the District Court found that Dongwon had satisfied the requirements of *in persona* jurisdiction based on Dongwon's assertions that it had sufficient minimum contacts with Guam and was the alter-ego of its cannery located in Guam; (v) In *Yang et al v. Majestic Blue Fisheries, LLC*, et al, 13-cv-00015 (D. Guam), Dongwon maintained that as the agent of a U.S.-flagged vessel, it (Dongwon) was the beneficiary of and had right to enforce an arbitration provision in a seaman's contract, and Dongwon was entitled to enforce the arbitration provision because its conduct was substantially interdependent and arose out of the same misconduct attributable to the U.S. vessel owner; and (vi) In *United States of America ex rel. Moore & Co. v. Majestic Blue Fisheries LLC, et al*, 12-cv-01562 (D. Del.), litigation arose from Dongwon's scheme (along with relatives of company insiders) to form U.S. corporations for the purpose of acquiring two fishing vessels flagged under U.S. law and certified as such under the South Pacific Tuna Treaty.

15

and/or agent of Lion Capital, Lion Americas, and/or Bumble Bee.

## PLAINTIFF

38.     Plaintiff Associated Wholesale Grocers, Inc. ("AWG"), is a Kansas corporation with its headquarters and principal place of business in Wyandotte County, Kansas, at 5000 Kansas Avenue, Kansas City, Kansas, 66106. Founded in 1924, AWG provides over 3,800 grocery stores and other retail outlets with a complete assortment of grocery, fresh meat, fresh produce, specialty foods, and general merchandise items. From its Kansas corporate headquarters, AWG purchased canned tuna sold by one or more of the Defendants, their subsidiaries, divisions, units, or affiliates. As a result, AWG has been injured by reason of the antitrust violations alleged herein.

39.     AWG is a direct purchaser of canned tuna.

40.     During the Relevant Period, AWG purchased canned tuna directly from Defendants, which it then re-sold to retailers. AWG directly purchased many millions of dollars' worth of shelf-stable tuna products during the Relevant Period.

## DEFENDANTS

41.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered or committed by duly authorized officers, managers, agents, employees or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

### The Bumble Bee Defendants

42.    Defendant Bumble Bee Foods LLC is a Delaware limited liability company, with its headquarters and principal place of business in San Diego, California. During the time period relevant to Plaintiff's claims, Bumble Bee manufactured canned tuna and shelf stable salmon, clams, crabs, sardines, mackerel, oysters, and shrimp. Bumble Bee is defined to include its managers, officers, employees, and agents acting on its behalf. Bumble Bee maintains canned tuna processing facilities in San Diego, California, and it maintained a plant in Puerto Rico that it closed in approximately June 2012. Bumble Bee's 2014 annual revenue exceeded $1 Billion. Bumble Bee is owned by Lion Capital LLP, a private equity firm based in the United Kingdom. Lion Capital purchased Bumble Bee in 2010 for approximately $980 Million from Centre Partners Management LLC, a U.S.-based private equity firm.  In 2014, Lion Capital agreed to sell Bumble Bee to Thai Union for $1.51 Billion. However, due to concerns about the antitrust violations alleged in this Second Amended Complaint, Lion Capital and Thai Union announced on December 3, 2015, that they were not proceeding with the merger. During the time period relevant to Plaintiff's claims: Bumble Bee directly participated in the conspiracy alleged in this Second Amended Complaint; Bumble Bee produced and sold canned tuna throughout the United States and its territories; Bumble Bee directly sold canned tuna to Plaintiff and others in the United States;

AWG'S SECOND AMENDED COMPLAINT

and Bumble Bee engaged in the unlawful conduct alleged in this Second Amended Complaint in violation of Section 1 of the Sherman Act.

### Lion Entities

43.   Defendant Lion Capital LLP ("Lion Capital") is a British private equity firm specializing in investments in the consumer sector.   Lyndon Lea ("Lea") co-founded the company in 2004.  Lion Capital purchased Bumble Bee in 2010 for approximately $980 Million from Centre Partners Management LLC ("Centre"), a United States-based private equity firm.   According to its website, Lion Capital maintained offices in New York and Los Angeles during a time period covered by the alleged conspiracy.  Lion Capital's Los Angeles office was responsible for overseeing the Bumble Bee investment.  The Lion Capital members in this office included Eric Lindberg ("Lindberg"), Jeff Chang ("Chang"), and Jacob Capps ("Capps").  As members of a limited liability partnership incorporated under the laws of the United Kingdom, the conduct of Lindberg, Chang, and Capps are imputed to Lion Capital as a matter of both U.S. and British law.

44.   Defendant Lion Capital (Americas), Inc. ("Lion Americas") is another parent company of Bumble Bee that is identified as such in Bumble Bee's plea agreement.  It is the subsidiary through which Lion Capital operates in the United States.   There is no meaningful distinction between Lion Capital and Lion Americas  (together, the "Lion Entities").  Lion Americas is headquartered in the same Los Angeles office as Lion Capital.  In terms of personnel, Lion Americas has significant overlap with Lion Capital.  For example, Lindberg was both a director of Lion Americas and a member at Lion Capital, while Capps was President of Lion Americas and a member at Lion Capital. In other words, the key executives involved on the Bumble Bee account during the relevant period were concurrently both Lion Americas and Lion Capital directors and officers.  During

AWG'S SECOND AMENDED COMPLAINT

the relevant period, there is no indication that Lindberg, Capps, and Chang ever made any attempt to distinguish their work for Lion Capital versus Lion Americas, such as by identifying that they were appearing at a Bumble Bee Board of Director Meeting as a Lion Capital partner checking on its investment as opposed to as a director of Lion Americas in its management capacity (or visa versa). During the relevant time period, Lindberg, Capps, and Chang never made any distinction between acts they took as Lion Capital members or as Lion Americas executives or directors. Additionally, Lion Americas and Lion Capital use the same website without distinguishing between the two entities.[4]

45.     Lion Capital and Lion Americas participated in the conspiracy alleged in this Second Amended Complaint through Lindberg, Chang, and Capps (as well as other employees of both entities), and the actions taken by these individuals in furtherance of the conspiracy (as alleged below) were taken on behalf of both Lion Capital and Lion Americas in their official capacities as senior executives of both entities and as members of Lion Capital.

46.     Although Lindberg, Chang, and Capps were members of Lion Capital and also held titles at Lion Americas, each was unequivocally an employee of Lion Capital.

---

[4]     https://www.bloomberg.com/profiles/companies/0058736D:US-lion-capital-americas-inc.

AWG'S SECOND AMENDED COMPLAINT



48.    Although Lea was actively involved in managing Lion Capital's investment in Bumble Bee and attended most Bumble Bee board meetings as a member of its board of directors, he assigned Mr. Lindberg to be principally responsible for managing Lion Capital's investment in Bumble Bee, and he assigned Capps and Chang to assist Lindberg.   Accordingly, all the conduct detailed in this Second Amended Complaint undertaken by Lindberg, Chang, and Capps was performed at the direction and under the close supervision of Lea, as part of Lindberg's, Chang's and Capps' duties and responsibilities to Lion Capital.

49.    At all times relevant to this Second Amended Complaint, Lion Americas acted as the agent of Lion Capital.  In fact, in filing its Form ADV, the uniform form used by investment advisers to register with the SEC and state securities authorities, Lion Americas answered yes to the question "Do you *control* or are you *controlled* by the related person [Lion Capital LLP]?" (emphasis in

AWG'S SECOND AMENDED COMPLAINT

original).  Also, Lion Capital has asserted that Lion Americas exists to provide investment advice to Lion Capital about its U.S.-based portfolio companies (Bumble Bee included).  Accordingly, but for Lion Americas' existence, Lion Capital would have performed this function itself.

50.    Lion Americas would not exist but for Lion Capital.  Lion Americas exists solely to manage Lion Capital investment vehicles.  Lion Capital wholly owns Lion Americas, and they act as a single enterprise: anything Lion Americas does to increase the profitability of Lion Capital's investment companies is designed to serve and increase the investments of Lion Capital.  They thus have a complete unity to interests and common design to serve Lion Capital's business and increase the profitability and returns of Lion Capital's investment vehicles.  Put another way, Lion Capital and Lion Americas have no distinct economic interests; they function as a single economic unit.

51.    Lion Americas also performed additional functions that Lion Capital would have had to perform, but for Lion Americas.

AWG'S SECOND AMENDED COMPLAINT

52.     Additionally, due to Lea's ability to dictate the day-to-day responsibilities of Lion Capital's members, Lion Capital has complete control and discretion over the day-to-day operations of Lion Americas.

53.     Further, Lion Americas was wholly dependent on Lion Capital for funding.  Upon information and belief, Lion Americas had no source of revenue independent of Lion Capital, nor did Lion Americas have any direct, independent affiliation with Lion Capital's investment funds.  Thus, Lion Americas acted entirely at the direction of Lion Capital and was entirely dependent on Lion Capital for funding.

54.     Defendant Big Catch Cayman LP aka Lion/Big Catch Cayman LP ("Big Catch") is a holding company that wholly owns Bumble Bee.  Big Catch was established in November 2010, and its principal place of business is c/o Lion Capital (Americas) Inc., 888 7th Avenue, 43rd Floor, New York, N.Y. 10019.  Big Catch is the entity referenced in Bumble Bee's criminal plea agreement as the entity that would receive the proceeds from the sale of Bumble Bee.  Based on this fact, the DOJ required that Big Catch must pay up to $81.5 million in criminal fines in the event that Bumble Bee is sold, in order to prevent Big Catch and its investors (including Lion Capital) from being unjustly enriched from the unlawful conduct committed by Bumble Bee.

22

55.     Big Catch is a shell company and does not engage in any operations separate from those of Lion Capital and Bumble Bee.  Big Catch has no day-to-day activities, does not hold board meetings, has no offices, and has no employees. Lion Capital's funds are the ultimate owner of Big Catch, and s███████████████ ██████████████████████████████████████████████████████████████ ████████   Thus, Big Catch is controlled entirely by Lion Capital and Lion Capital's executives make any and all decisions for Big Catch.  Big Catch's business is Lion Capital's business, and as a result, there is a unity of interest between Big Catch and Lion Capital.

56.     Additionally, the corporate veil between Big Catch and Lion Capital must be pierced and disregarded in order to prevent fraud and injustice. Big Catch was created by Lion Capital in bad faith, and it exists only to serve as a vehicle both to funnel conspiracy proceeds from Bumble Bee to Lion, and to attempt to insulate Lion from its involvement in the price-fixing conspiracy alleged in this Second Amended Complaint. ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████   Lion knew that these targets could not be reached but for Bumble Bee's continued participation in the conspiracy, and deliberately set these targets to incentivize and induce the unlawful actions undertaken by these individuals in furtherance of the conspiracy alleged in this Second Amended Complaint.

57.     ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

AWG'S SECOND AMENDED COMPLAINT

Thus, Lion Capital structured Big Catch to shift the risk of the conspiracy's detection to the victim's of the price-fixing conspiracy, while seeking to guarantee Lion Capital and its investors the conspiracy's financial upside.

58.     Accordingly, Big Catch is liable for its role in the conspiracy because it is the alter ego of Lion Capital.

59.     Lion Capital, Lion Americas, and Big Catch are all defined as "parent companies" in Bumble Bee's Plea Agreement with the DOJ.  (Lion Capital, through its control of Bumble Bee's board of directors, expressly approved this agreement).  Additionally, Bumble Bee is a wholly-owned subsidiary of Big Catch, and Lion Capital maintains equitable ownership of both Bumble Bee and Big Catch.

AWG'S SECOND AMENDED COMPLAINT

1   ███████████████████████████████████████████████ Further,

2   Lion Capital held itself out as Bumble Bee's owner during conspiracy meetings,

3   and leveraged its control of Bumble Bee to meet with Dongwon and TUG for the

4   purpose of policing the conspiracy and ensuring its effectiveness.

5          60.   As described below, Lion Capital and Lion Americas directly

6   participated in the conspiracy through Lea, Lindberg, Chang, and Capps (as well as

7   other Lion Capital employees).  The conduct of Lindberg, Chang, and Capps is

8   legally imputed to Lion Capital because: (1) as members of a Limited Liability

9   Partnership formed under British law, the actions of Lindberg, Chang, and Capps

10  bind the company as a matter of law; (2) Lindberg, Chang, and Capps are

11  employees of Lion Capital and, because all acts that each committed, as alleged in

12  this Second Amended Complaint, were within the scope of Lindberg's, Chang's,

13  and Capps' employment for Lion Capital, Lion Capital is vicariously liable for

14  their conduct under the principle of *respondeat superior*; and (3) Lindberg, Chang,

15  and Capps are agents of Lion Capital because their conduct described in this

16  Second Amended Complaint was committed with the knowledge and at the

17  direction of Lea (Lion Capital's managing partner).  As further detailed below,

18  Lion Capital and Lion America directly participated in the conspiracy by: (1)

19  attending meetings with the owners of COSI (TUG) and StarKist (Dongwon) at

20  which Lion Capital and Lion Americas agreed to direct Bumble Bee to continue to

21  fully support the conspiracy's various pricing agreements; and (2) using Lion

22  Capital's control of Bumble Bee to ensure that its promises to TUG and Dongwon

23  were met.   Big Catch participated in the conspiracy as the alter ego of Lion

24  Capital.

25

26

27

28
AWG'S SECOND AMENDED COMPLAINT

**Defendant Christopher Lischewski**

61.     Plaintiff incorporates all the references to Christopher D. Lischewski described throughout this Second Amended Complaint in support of its claims against defendant Lischewski.  Exercise of jurisdiction over defendant Lischewski is consistent with Kansas law, the Kansas long arm statute, and the Due Process Clause of the Fourteenth Amendment. Defendant Lischewski's price fixing conduct as alleged throughout the Second Amended Complaint that affected the price of shelf-stable tuna purchased by plaintiff makes it entirely foreseeable that he would be subject to jurisdiction in the forum state.

62.     Lischewski's individual conduct directly affected shelf-stable tuna prices and produced Plaintiff economic injury when it purchased tuna products from Lischewski's company.  Further, Lischewski's illegal price fixing activities constituted a tortious act under K.S.A. § 60-308. Plaintiff suffered financial loss and harm at the point of sale in Kansas where it paid the artificially stabilized and higher prices that were imposed as a result of Defendant Lischewski's price fixing conduct.  And his participation in the conspiracy with Defendants who are subject to jurisdiction in Kansas supports the exercise of personal jurisdiction over him.

63.     Defendant Christopher D. Lischewski was Bumble Bee's CEO and President during the entirety of the Relevant Period. He has taken a leave of absence from the company the details of which, including whether he is continuing to be paid or whether he is participating in the Bumble Bee operations are unclear, in part because Bumble Bee witnesses have asserted their Fifth Amendment rights and refused to testify. He is a resident of San Diego County, California. Plaintiff sues Lischewski in both his individual and official capacity for his participation in the conspiracy between at least 2004 and 2015.

AWG'S SECOND AMENDED COMPLAINT

64.     Upon information and belief, Lischewski, Bumble Bee's CEO since 1999, ensured that customers paid more for canned tuna by personally directing and engaging in the illegal price-fixing conspiracy alleged herein.  Defendant Lischewski directed and supervised the sales of the price-fixed shelf-stable tuna to Bumble Bee's customers, including Plaintiff.  Defendant Lischewski directed and supervised the sales, manufacturing, marketing, advertising, and distribution of Bumble Bee's price-fixed shelf-stable tuna products that Plaintiff purchased in Kansas.  Defendant Lischewski was a primary participant in the price-fixing allegations in this Second Amended Complaint.  He had control of, and direct participation in the illegal activities, and was one of the moving forces behind the price fixing conspiracy alleged herein.

65.     On numerous occasions, Lischewski has publicly encouraged Defendants to maintain the illegal conspiracy alleged herein.  For example, at an Infofish industry conference in late May 2008, Defendant Lischewski gave a keynote address in which he urged fellow "global industry leaders" to undertake the challenge to drive the development of "sustainable tuna management practices."  Thereafter, beginning in or about August of 2008, Defendants all collusively shrunk the size of their cans of tuna from 6 oz. to 5 oz.

66.     Lischewski has been charged by the DOJ for conduct in violation of the US antitrust laws for actions beginning no later than November of 2010.

67.     In 2011, Defendant Lischewski complained that tuna was "too cheap" and that it was "important to persuade customers to pay more for canned tuna."

68.     In October 2011, Lischewski briefed Lion Capital's Lindberg on the "current competitive situation" before Lindberg met with Dongwon executives.  On information and belief, this was code Lischewski used when discussing the

27

AWG'S SECOND AMENDED COMPLAINT

conspiracy.   The DOJ's indictment charged that Lischewski "us[ed] code" to conceal the conspiracy.

69.   In January of 2012, Lischewski sent emails regarding the conspiracy to Lion's Jerry Capps and Lindberg, some forwarded directly from Bumble Bee's senior tuna sales and marketing executives Ken Worsham and Scott Cameron—both of whom have pleaded guilty to violating the antitrust laws.  Lischewski emailed Lion's Capps and Lindberg that Bumble Bee's competitors COSI and StarKist were "cheating" on pricing, a solid indication that these competitors had already agreed on collusive pricing.

70.   Upon information and belief, Defendant Lischewski played an active role in helping Lion Capital to undercapitalize Bumble Bee and reaped substantial personal profits from the price-fixing conspiracy alleged herein.

### The Tri-Union Defendants

71.   Defendant Tri-Union Seafoods LLC, doing business as Chicken of the Sea International, Inc., is a limited liability company organized, existing and doing business under the laws of the State of California, with its headquarters and principal place of business in San Diego, California. COSI is defined to include its managers, officers, employees and agents acting on its behalf. COSI operates its tuna processing facility in Lyons, Georgia. In 1997, Tri-Union Seafoods LLC acquired COSI (which was then called Van Camp Seafood Company), with Thai Union Group PCL (f/k/a Thai Union Frozen Products PCL) owning a 50% ownership interest in the limited liability company. In 2000, TUG acquired the remaining 50% share of Tri-Union Seafoods LLC, and COSI became a wholly-owned subsidiary of TUG (and has remained a TUG subsidiary ever since). In 2014, TUG earned gross profit of $547 Million on worldwide revenue of $3.339 Billion. During the time period relevant to Plaintiff's claims, COSI directly, or on

AWG'S SECOND AMENDED COMPLAINT

1  behalf of TUG: participated in the conspiracy alleged in this Second Amended
2  Complaint; produced and sold canned tuna throughout the United States and its
3  territories; sold canned tuna to Plaintiff and others in the United States; and
4  engaged in the unlawful conduct alleged in this Second Amended Complaint in
5  violation of Section 1 of the Sherman Act.

6       72.    Defendant Thai Union Group PCL is a corporation organized, existing
7  and doing business in Thailand, with its headquarters located in Amphar Muang,
8  Thailand. After its acquisition, COSI became a wholly-owned subsidiary of TUG.

9       73.    During the time period relevant to Plaintiff's claims, and as alleged in
10 this Second Amended Complaint, TUG directly participated in the conspiracy and
11 purposefully directed this conduct at the United States (including the forum State);
12 produced and sold canned tuna in the United States and its territories; sold canned
13 tuna to Plaintiff and others in the United States; used its dominance or control of
14 COSI's raw material purchasing and tuna business to conspire with the other
15 Defendants and their co-conspirators; and engaged in the unlawful conduct alleged
16 in this Second Amended Complaint in violation of Section 1 of the Sherman Act.

Cheng is Kraisorn Chansiri's brother and the second largest
shareholder of Thai Union.

24      74.    Alternatively, during the time period relevant to Plaintiff's claims, and
25 as more fully alleged throughout this Second Amended Complaint, Thai Union
26 participated in the conspiracy by and through COSI, which acted as and was Thai

28                                           29
AWG'S SECOND AMENDED COMPLAINT

Union's alter ego or agent. Thai Union dominated or controlled COSI's canned tuna business as reflected by, among other actions, Thai Union's domination or control of COSI's production, pricing, hiring, budgeting, capitalization and/or marketing of canned tuna. During this time period, Thai Union effectively controlled and took over performance of the day-to-day operations of COSI's canned tuna business, and there was such unity of interest and ownership between Thai Union and COSI that the individuality or separateness of the two companies ceased with respect to COSI's canned tuna business. COSI's status as the alter ego or agent of Thai Union is evidenced by, among other facts, one or more of the facts alleged below that occurred during the time period relevant to Plaintiff's claims:

(a)     Thai Union used COSI as a mere shell, instrumentality or conduit for a single venture involving the sale of price-fixed canned tuna in the United States caught, processed and canned or pouched by Thai Union in Thailand for the ultimate benefit of Thai Union. COSI enabled Thai Union to be vertically integrated with respect to the U.S. operations. As a result of this structure, Thai Union and COSI effectively functioned as a single entity for purposes of the conspiracy. In the words of Thai Union, COSI and Thai Union were not just "family," but "Thai Union + COSI = One Company." With respect to the canned tuna produced by Thai Union in Thailand and sold in the United States, COSI merely acted as Thai Union's marketing conduit to sell Thai Union's canned tuna under the Thai Union-owned COSI label.  This comes as no surprise, because TUG's website demonstrates that TUG views COSI as part of TUG's overall "Global Tuna Business" and "US Ambient Operations" controlled directly by TUG's Board of Directors and executives.

AWG'S SECOND AMENDED COMPLAINT



(b)     Thai Union dominated or controlled COSI's marketing of canned tuna in the United States. For example, and without limitation, TUG presented (and does present) a common global marketing image with COSI. TUG's 2015 Annual Report lists COSI as "our strong brand in North America." TUG's 2001 Annual report states: "The principal activities of the overseas subsidiaries such as the subsidiaries in United States are the manufacture and distribution of canned seafood, and the import of shrimp and other frozen seafood products for sale to restaurant chains, retailing, wholesaling and food processing."

(c)     Thai Union and COSI used the same offices or locations in the United States. TUG's 2015 Annual Report, identifying "Thai Union's footprint," lists itself as having corporate offices in Portsmouth, New Hampshire; New York, New York; El Segundo, California; San Diego, California; and Lyons, Georgia. Each of these offices is an office or plant of COSI.

AWG'S SECOND AMENDED COMPLAINT

1            (d)    Thai Union and COSI had overlapping Board Members and key

2 executives who dominated or controlled COSI. For example, and without

3 limitation, according to a corporate organizational chart on its website, TUG

4 represents that it treats COSI as part of its overall "Global Tuna Business" and "US

5 Ambient Operations" that are controlled directly by TUG's Board of Directors and

6 executives. Kraisorn Chansiri, the Chairman of TUG, is a member of the Board of

7 Directors of COSI; Cheng Niruttinanon ("C. Niruttinanon"), Executive Chairman

8 of TUG, is a member of COSI's Board of Directors; and Thiraphong Chansiri ("T.

9 Chansiri"), President and CEO of TUG, is a member of COSI's Board of Directors

10 and President of Thai Union North America, Inc., a wholly-owned subsidiary of

11 TUG and the holding company through which TUG owns COSI and does business

12 in the United States. Additionally, Shue Wing Chan ("Chan"), a member of the

13 family that controls TUG, and a member of TUG's self-styled "Global Leadership

14 Team," is President and CEO of COSI. David Roszmann, the former Chief

15 Operating Officer of COSI, joined COSI in March 2013 and directly reported to

16 CEO Chan on matters including sales, marketing, procurement, supply chain,

17 operations, finance, HR, legal and IT. Mr. Roszmann left COSI in December 2015,

18 soon after the DOJ questioned TUG's attempt to acquire Bumble Bee. Upon

19 information and belief, Chan now holds executive positions at COSI and other

20 subsidiaries controlled by TUG. Further, Chang Tim King served as Executive

21 Director and CFO of TUG and a member of the COSI Board of Directors.

22            (e)    Thai Union appointed people who were involved in the day-to-

23 day operations of COSI, including people who participated in the conspiracy as

24 Thai Union intended.

25

26

27

28                                        32



(f)     Thai Union micromanaged COSI's affairs and disregarded principles of corporate separateness with respect to COSI.

AWG'S SECOND AMENDED COMPLAINT

(g)     Thai Union, as the parent, owned COSI, the wholly-owned subsidiary of Thai Union.

(h)     Due to the unlawful conduct alleged in this Second Amended Complaint, COSI earned profits in excess of what it would have earned in a competitive market. COSI transferred this ill-gotten gain to its parent, Thai Union, by paying out the unlawfully obtained profits and other conspiracy proceeds to Thai Union in the form of dividends and other transfer payments

Accordingly, Thai Union knowingly profited from COSI's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched. Further, TUG charged COSI prices for tuna that were higher than COSI would have paid had COSI been free to acquire tuna at market rates. As a result of these facts,

AWG'S SECOND AMENDED COMPLAINT

considered alone or in combination with one or more of the foregoing other facts, adherence to the fiction of the separate existence of Thai Union and COSI would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over substance.

75.     Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc., and Thai Union Group PCL, are collectively referred to in this Second Amended Complaint as the "COSI Defendants."

The StarKist Defendants

76.     Defendant StarKist Company is a corporation organized, existing, and doing business under the laws of the State of Pennsylvania, with its headquarters and principal place of business in Pittsburgh, Pennsylvania. During the time period relevant to Plaintiff's claims, StarKist manufactured canned tuna and shelf stable salmon. StarKist is defined to include its officers, employees, and agents acting on its behalf. StarKist operates its tuna processing facility in Pago Pago, American Samoa.   Although StarKist's annual revenue is not publicly reported, the Pittsburgh Post-Gazette reported in early 2010 that StarKist's annual revenue was between $650 and $670 million. That figure likely grew to approximately $1 Billion in 2014. In 2008, Dongwon Industries Co. Ltd. ("Dongwon") purchased StarKist for approximately $363 Million and thereafter, including during the time period relevant to these allegations, StarKist operated as a wholly-owned subsidiary of Dongwon. During the time period relevant to Plaintiff's claims, StarKist directly or on behalf of Dongwon: participated in the conspiracy alleged in this Second Amended Complaint; produced and sold canned tuna throughout the United States and its territories; sold canned tuna to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Second Amended Complaint in violation of Section 1 of the Sherman Act.

AWG'S SECOND AMENDED COMPLAINT

77.     Defendant Dongwon Industries Co. Ltd. is a corporation organized, existing, and doing business in South Korea, with its headquarters located in Seoul, South Korea. Dongwon is a vertically integrated fishing conglomerate that owns the world's largest fishing fleet. Dongwon has an ownership stake in U.S. businesses besides StarKist, including a 12.5% stake in Silver Bay Seafoods, LLC (a fishery in Sitka, Alaska) and a 50% majority interest in DW Global, Inc. (a shipping and import/export company located in Commerce, California). As noted above, in 2008, Dongwon bought StarKist, and Dongwon is StarKist's parent. Dongwon sells a substantial volume of canned tuna (and other shelf-stable packaged seafood products) in the United States, and according to its quarterly and annual reports, it typically derives more than 50% of its global revenue from the United States.

78.     Before describing the interrelationship between StarKist and Dongwon Industries, we explain briefly the concept of the Korean chaebol, which is a recognized concept in the academic business literature focused on South Korean companies. *See generally* David Hundt, Korea's Developmental Alliance: State, Capital and the Politics of Rapid Development (2009); R. M. Steers, K.S. Yoo, & G. Ungson, The Chaebol: Korea's New Industrial Might (1989). The term "chaebol" is made up of the words "chae" (wealth or property) and "bol" (clan or group). Chaebols are closely-knit business groups in South Korea under the control of a single family or extended family, with key flagship firms that are used as the instruments of control of other firms within the group. They have four key features: (1) the governance structure of the group involves family or extended family control; (2) the formal organizational structure of the group involves a group headquarters, located in an actual or de facto holding company, sometimes known as a "flagship" company, which controls a network of subsidiaries, which

AWG'S SECOND AMENDED COMPLAINT

fall under the control of the family, the group as a whole, and of flagship firms within the group; (3) the business structure of the firm encompasses a number of discrete products and services, some of which are wholly unrelated and others that are effectively vertically integrated; and (4) these groups are characterized by strong internal cultures of hierarchy, familyism and loyalty, with family members of the founder or his cohorts also occupying key managerial positions within the group.

79.    The Dongwon family of companies fits this definition. The company started in 1969 and is dominated by Chairman Jae-chul Kim ("Chairman Kim") and members of his family or extended family, as described in more detail below. The group headquarters is in Seoul, South Korea, where its holding company, Dongwon Enterprises, is located. Through its subsidiaries, it operates in a number of business sectors including, inter alia, marine products, other food products, feed products and pet food, packing materials, and aluminum foil products. As explained below, the Dongwon family of companies has an internal culture of hierarchy, familyism and loyalty. Defendants Dongwon and StarKist exhibit that culture with members of J.C. Kim's family being put in key positions in both companies and executives at Dongwon, Dongwon Enterprises and various other Dongwon subsidiaries being routinely seconded to StarKist to fill managerial roles. Dongwon, run by Chairman Kim, is the parent entity for StarKist, but his control over the Dongwon family of companies was such that, with the stroke of a pen, he could (and in fact did) command executives of the holding company or from sister subsidiary companies to either oversee the business of StarKist from Korea or relocate in the United States and help run StarKist. This was done without regard for which Dongwon subsidiary the individual worked for, and for the purposes of involvement in StarKist's management, all Dongwon personnel were functionally

AWG'S SECOND AMENDED COMPLAINT

Dongwon Industries personnel subject to the direct control of Chairman Kim. In other words, as a chaebol, Dongwon does not follow the principles of corporate separateness that are expected of companies incorporated in the United States and instead acts as a single integrated enterprise.   Accordingly, acts taken by employees of Dongwon's corporate affiliates in furtherance of the conspiracy, as alleged in detail below, were taken on behalf of the interests of the chaebol and under the control of Dongwon (and Chairman Kim) as the chaebol's flagship.

80.   Dongwon directly participated in the conspiracy alleged in this Second Amended Complaint and purposefully directed this conduct at the United States (including the forum State); produced and sold canned tuna in the United States and its territories; intentionally sold price-fixed canned tuna to Plaintiff and others in the United States; used its dominance or control of StarKist's raw material purchasing and tuna business to conspire with the other Defendants and their co-conspirators; and engaged in the unlawful conduct alleged in this Second Amended Complaint in violation of Section 1 of the Sherman Act.

81.   Alternatively, during the time period relevant to Plaintiff's claims, and as more fully alleged throughout this Second Amended Complaint, Dongwon participated in the conspiracy by and through StarKist, which acted as Dongwon's alter ego or agent. Dongwon dominated or controlled StarKist's canned tuna business as reflected by, among other actions, Dongwon's domination or control of StarKist's production, pricing, hiring, budgeting, capitalization and/or marketing of canned tuna. During this time period, Dongwon effectively controlled and took over performance of the day-to-day operations of StarKist's canned tuna business, and there was such unity of interest and ownership between Dongwon and StarKist that the individuality or separateness of the two companies ceased with respect to StarKist's canned tuna business. StarKist's status as the alter ego or agent of

AWG'S SECOND AMENDED COMPLAINT

Dongwon is evidenced by, among other facts, one or more of the facts alleged below that occurred during the time period relevant to Plaintiff's claims:

(a)     Dongwon used StarKist as a mere shell, instrumentality or conduit for a single venture involving the sale of price-fixed canned tuna in the United States caught, processed, and/or packaged by Dongwon in South Korea and Thailand for the ultimate benefit of Dongwon and the Kim family.

Dongwon used StarKist to market Dongwon's product. StarKist enabled Dongwon to be vertically integrated with respect to the U.S. operations. As a result of this vertical integration, Dongwon and StarKist effectively functioned as a single entity for purposes of the conspiracy. With respect to the canned tuna produced by Dongwon in South Korea and Thailand and sold in the United States, StarKist merely acted as Dongwon's marketing conduit to sell Dongwon's canned tuna under the Dongwon-owned StarKist label.

(b)     Dongwon dominated or controlled StarKist's marketing of canned tuna in the United States. For example, and without limitation, Dongwon's website states: "StarKist is an iconic tuna brand in the United States, *and has been controlled by Dongwon Group since 2008*, accompanying Dongwon Group on its journey to globalization.... Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna company, and will become de facto a globalized enterprise." (Emphasis added). Dongwon has presented a common global marketing image with StarKist. As Dongwon stated in 2008, it acquired StarKist to "establish a strong foothold in penetrating the U.S. market," and the purpose of Dongwon's acquisition was "to add a stable buyer of its tuna and to place other products in the U.S. through StarKist's distribution

AWG'S SECOND AMENDED COMPLAINT

network." Dongwon and StarKist presented themselves to Plaintiff as a single, vertically integrated entity. StarKist's website states that "Dongwon Industries is one of the world's largest tuna catching companies with a fleet of 36 boats. Dongwon's world class fish procurement and processing capacity builds on StarKist's national brand recognition and distribution networks in the United States to bring world-class seafood to consumers worldwide."

(c)     Dongwon and StarKist used the same offices or locations in the United States. Dongwon's website lists StarKist's U.S. office as one of its global branch offices.

(d)     Dongwon and StarKist had overlapping Board Members and key executives who dominated or controlled StarKist. For example, and without limitation, in about September 2014, Andrew Choe ("A. Choe") became the President and CEO of StarKist. A. Choe was seconded to StarKist in April 2012 as the Senior Vice-President of its supply chain. Previously, Mr. Choe had held an executive position at Dongwon as Director of Strategic Planning. Nam-Jung Kim ("NJ Kim"), son of Chairman Kim, served as the COO of StarKist from about 2012 until October 2014, when he was promoted to Vice Chairman of StarKist. He currently serves on the board of directors for StarKist and Dongwon. Prior to his being sent to join StarKist, NJ Kim was Vice-President of Dongwon F&B (a Dongwon subsidiary) and Dongwon Enterprise Co. (the Kim family's holding company that owns Dongwon Industries). Since 2008, NJ Kim has served as the Head of the Finance and Planning Department at Dongwon Systems and served as Vice President of its construction unit. Additionally, according to Forbes, in preparation for Chairman Kim's succession, "the founder has been transferring ownership of the private family holding company, Dongwon Enterprise Co., which owns stakes in [Dongwon and other affiliates], to Nam-Jung. Jae-Chul holds a

AWG'S SECOND AMENDED COMPLAINT

24.5% stake and Nam-Jung, 68%." Accordingly, NJ Kim owned a controlling interest in Dongwon while serving as StarKist's COO and Vice Chairman. The position of COO was created specifically for him, so that he could lead the "continued growth and expansion of Dongwon-StarKist global business." Also, Hyung-Joo Kim, Chief Financial Officer ("CFO") of Dongwon F&B, was seconded to StarKist in 2012 to serve as CFO. In-Gu Park ("IG Park"), the Chairman of the Board of StarKist, also served as its Acting President from November 2010 to March 2011. IG Park serves as CEO of Dongwon Precision Machinery Company, and has also served as CEO and Vice Chairman at Dongwon F&B and Dongwon Enterprise. During the time period relevant to these allegations, IG Park chaired StarKist's board of directors while simultaneously sitting on the board or serving as an officer (or both) of other Dongwon companies. Additionally, StarKist's board meetings were often held in South Korea so that Dongwon executives could easily attend them.

(e)     Dongwon appointed people who were involved in the day-to-day operations of StarKist, including people who participated in the conspiracy as Dongwon intended. For instance, and without limitation, Dongwon appointed senior executives at StarKist – including at least In-Soo Cho (IS Cho), A. Choe and Sam Lee. Additionally, Dongwon dismissed several StarKist executives in 2012 and replaced them with employees from within the Dongwon corporate family, including Hyung-Joo Kim as CFO. After Dongwon's acquisition of StarKist, American executives at StarKist Company began to leave – voluntarily and involuntarily. One report indicated that a "plethora of executives from Dongwon Industries' Seoul headquarters – complete with translators" had "descend[ed] on Pittsburgh to sort out the 'challenges' the company is going through;" one source

AWG'S SECOND AMENDED COMPLAINT

stated that "there is so much American management leaving and probably even more so after this announcement…."

      (f)    Dongwon micromanaged StarKist's affairs and disregarded principles of corporate separateness with respect to StarKist. For example, and without limitation:



AWG'S SECOND AMENDED COMPLAINT

(g)



AWG'S SECOND AMENDED COMPLAINT

(h)    Dongwon, as the parent, owned StarKist, the wholly-owned subsidiary of Dongwon. Dongwon purchased 100% of StarKist in 2008.

(i)    Due to the unlawful conduct alleged in this Second Amended Complaint, StarKist earned profits in excess of what it would have earned in a competitive market. Accordingly, Dongwon knowingly profited from StarKist's participation in the conspiracy and knowingly

44

accepted the proceeds of the conspiracy and has been unjustly enriched. As a result of these facts, considered alone or in combination with one or more of the foregoing other facts, adherence to the fiction of the separate existence of Dongwon and StarKist would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over substance.

### Del Monte

82.     Del Monte Corporation ("Del Monte"), now known as Big Heart Pet Brands, Inc., is a privately held corporation organized under the laws of Delaware with its headquarters and principal place of business in Orrville, Ohio. Prior to October 2008, Del Monte owned and operated StarKist. Although Del Monte sold StarKist to Dongwon in 2008, it continued to operate StarKist on behalf of Dongwon until approximately September 2010, under an Operating Services Agreement entered into between Del Monte and Dongwon pursuant to which Del Monte provided the sales force that sold StarKist products in the United States. In a filing with the Securities & Exchange Commission, Del Monte explained that under the Operating Services Agreement with Dongwon, Del Monte provided operational services to StarKist such as "warehousing, distribution, transportation, sales, information technology and administration."

83.     During the time period relevant to Plaintiff's claims, Del Monte participated directly in the conspiracy.  As alleged in this Second Amended Complaint, Del Monte employees including, and without limitation, ███████████ ████████████████████████████████████████████████ attended meetings and engaged in other overt acts in furtherance of the conspiracy on behalf of StarKist and Del Monte. Additionally, during periods relevant to Plaintiff's claims, Del Monte sold StarKist-branded canned tuna at prices affected

AWG'S SECOND AMENDED COMPLAINT

by the conspiracy directly to Plaintiff and others in the United States, in violation of Section 1 the Sherman Act.

84.     From the period prior to October 2008, the term "StarKist Defendants" refers to StarKist and Del Monte, collectively. From October 2008 until October 2010, the term "StarKist Defendants" refers to StarKist, Del Monte and Dongwon, collectively. From November 2010 until the July 2015, the term "StarKist Defendants" refers to StarKist and Dongwon, collectively.

### Co-Conspirators and Agents

85.     Other entities and individuals not named as Defendants combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Second Amended Complaint. Conspirators currently known to Plaintiff include Impress USA, Inc. ("Impress") and its employees.

86.     The individuals employed by Defendants and co-conspirators who participated in the conspiracy did so on behalf of their respective employer Defendant or co-conspirator, and their conduct in furtherance of the conspiracy was undertaken by each of them during the course and scope of their employment by their Defendant employer or co-conspirator.

### TRADE AND COMMERCE

87.     During the time period relevant to Plaintiff's claims, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial. In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that:

46

(a) Defendants and their co-conspirators sold and shipped substantial quantities of canned tuna in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the canned tuna;

(b) Data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States;

(c) Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States; and/or

(d) Defendants and their co-conspirators imported substantial quantities of raw materials for canned tuna from outside the United States.

88. The effect of Defendants and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiff's claims.

## THE PRODUCTION OF CANNED TUNA

89. There are several levels in the production of canned tuna. Initially, the tuna is caught by fishing vessels, which operate in the Pacific, Atlantic and Indian Oceans (although the majority of tuna comes from the Pacific Ocean). After it is caught, the fish is frozen or refrigerated. Both Dongwon and TUG control extensive tuna fishing fleets used, at least in part, to supply fish to StarKist and COSI, respectively.

90. In addition to the fleets controlled by Dongwon and TUG, tuna trading companies buy the fish from fishing vessels and coordinate transshipment of catches to processors, including Defendants. During the time period relevant to Plaintiff's claims, the major trading companies were: the Tri-Marine Group, a foreign organization that does business in the United States through Tri-Marine

47

International, Inc., Tri-Marine Management Company, LLC, Tri Marine Fishing Management LLC, Tri Marine Fish Company, and The Tuna Store, LLC; Itochu Corporation, a Japanese company in the fishing business through its Food Company, which it owns and controls; and Fong Cherng Fishery Company Ltd. ("FCF"), a privately-held Taiwanese company.

91. After fish trading companies buy the fish or Dongwon- or TUG-controlled vessels catch the tuna, they arrange its delivery to a processing plant where it is cooked (usually by steaming), cleaned, filleted, and prepared for canning or packaging. For example, Bumble Bee describes the process for tuna as follows:

> Upon arrival to the local processing plant, the whole frozen tuna rounds are put into cold storage. The rounds are first inspected for quality, then grouped by size and weight for the most accurate thawing and cooking times. The processing begins when the tuna is removed from the plant freezer, thawed in water and prepared for cleaning. The tuna is then loaded into metal racks, which are wheeled into large steam pre-cookers.   Tuna is cooked for a prescribed time and temperature depending upon the size of the fish. Once the tuna is cooled, the tuna meat is removed from the bones. The tuna loins are placed in bags, blast frozen to lock in moisture and placed on pallets for shipment to canneries in the United States. The frozen loins are shipped directly to the cannery where the canning process is entirely automated. The tuna move in a single line from the filling machine to the packaging sealer. The sealed product is then cooked, cooled, and labeled. Once they pass Quality Assurance approval, the cans are prepared for shipment to your local market.

92. After processing, the tuna is canned or packaged. Chunk-style tuna is conveyed through a chopper, while solid-style tuna is packed directly into the can.

AWG'S SECOND AMENDED COMPLAINT

Along with the tuna, the can is filled with varying types of liquid (usually vegetable oil or water) before it is sealed. After the can is sealed, it is cooked under pressure to allow for sterility and a long shelf life. The tuna can are then sold to retailers and wholesalers, including Plaintiff.   Prices paid by retailers and wholesalers for canned tuna may vary depending upon several factors, including the type of tuna (*e.g.*, light or white meat), packaging (can or pouch), water or oil, flavoring, brand, and package size.

93.     The StarKist Defendants maintain facilities in South Korea, Thailand, Ecuador, and American Samoa. The COSI Defendants maintain facilities in Thailand and Lyons, Georgia. Bumble Bee conducts the majority of its canning operations in the United States, at its production facility near San Diego. Bumble Bee also buys light meat loins from traders in the Western/Central Pacific Ocean (*e.g.*, Papua New Guinea), the Indian Ocean (*e.g.*, Thailand) and the Eastern Pacific Ocean (*e.g.*, Ecuador), and the product is shipped to its California cannery for canning and sale in the United States.

## **TUNA SUPPLY, DEMAND, AND PRICING**

### **The Supply of Canning-Grade Tuna Increased Substantially**

94.     The higher prices witnessed during the conspiracy did not stem from global reductions in the supply of harvested tuna or other fish. To the contrary, technological advances in fishing over the last 40 years, due mostly to the advent of the purse seine for tuna fishing (a method of fishing involving the use of large nets that capture entire schools of fish), and the use of Fishing Aggregation Devices ("FADs") (man-made objects such as floats or buoys that are used to attract certain fish), have increased the volume of skipjack and albacore caught annually. Compared to 1975, when purse seining accounted for a negligible share

49

of the global tuna fish catch, this method is now responsible for 66% percent of all tuna caught globally.

95.     The following chart demonstrates the proliferation of purse seining in the Western and Central Pacific Ocean (which sources approximately 60% of the world's tuna) relative to other methods of tuna fishing, such as longline and pole fishing methods:



96.     The advances in fishing technology have increased the efficiency of fishing and substantially lowered the cost necessary to fish for tuna on a commercial scale. According to the Pacific Islands Forum Fisheries Agency ("FFA"), between 1986 and 2007, the average catch per tuna fishing vessel roughly doubled, from 3,750 metric tons to 7,100 metric tons per year. This, in turn, has spurred substantial recent investment in fishing vessels. Between approximately 2007 and 2011, the number of tuna fishing vessels increased by more than 25%.

AWG'S SECOND AMENDED COMPLAINT

97.     The combination of increased investment in fishing vessels and improved efficiency of those vessels has resulted in a dramatic increase in the volume of canning-grade tuna caught annually. As the following chart depicts, between 1984 and 2014, the volume of skipjack caught annually increased roughly three-fold:



**The Demand for Canned Tuna in the United States Decreased Substantially**

98.     The higher prices for canned tuna during the conspiracy did not result from increasing demand for the product. To the contrary, there has been a substantial decline in both the demand for and consumption of canned tuna in the United States over the last 25 years. As publicly available information reflects, consumption of canned tuna in the United States peaked at nearly four pounds per person in the early 1990s, and then began to fall, to 3.4 pounds per capita in 2003 and to approximately 2.5 pounds per capita in 2009, with consumption and demand continuing to decline thereafter. The following chart, based on publicly available information, depicts the declining per capita consumption of canned tuna in the U.S

51



99.   Demand for canned tuna in other developed countries has also declined per capita. In Japan, consumption of canned tuna declined by approximately 20% from 1995 to 2007, while overall consumption in Western Europe remained stagnant between 2000 and 2010. Notwithstanding this trend of declining demand, the United States, Western Europe and Japan accounted for more than 50% of all global canned tuna consumption in 2008 according to the FFA. Further, the United States remained the largest consumer of canned tuna in the world, accounting for approximately 28% of global consumption in 2010.

**Prices Paid for Canned Tuna Increased Substantially as a Result of Defendants' Conspiracy**

100.   In the face of declining U.S. demand for canned tuna and the increasing supply of canning-grade tuna and other species of fish, market forces should have put substantial pressure on Defendants to attain greater market share and increase production so as to garner economies of scale that would reduce the price of canned tuna sold to Plaintiff and others in the United States. Instead, because of the conspiracy, the opposite occurred.

52

101.   As discussed above, the higher prices paid by Plaintiff were due to the conspiracy and not other supply and demand factors. During the conspiracy (and because of it), canned tuna prices sold to U.S. retailers, including Plaintiff, increased (or were otherwise above competitive levels) while the tuna catch increased and U.S. demand for canned tuna declined. This incongruity is also reflected in the chart below, which shows that although per capita U.S. canned tuna consumption continued to decline after approximately 2004, the dollar amount spent on canned tuna and other packaged seafood in the United States actually increased (canned tuna accounts for approximately 75% of all canned seafood spending):



102.   Defendants and their co-conspirators' pricing of canned tuna sold to Plaintiff and others in the United States is not consistent with expected pricing given the excess supply and production capacity coupled with declining U.S. demand. To the contrary, during the conspiracy, the prevailing market conditions in the U.S. canned tuna industry would predict *decreasing* prices. However, as

AWG'S SECOND AMENDED COMPLAINT

alleged in this Second Amended Complaint, canned tuna prices – including the prices Defendants and their co-conspirators charged Plaintiff – are explained by the conspiracy.

103. The higher canned tuna prices resulted in substantial profits for Defendants. TUG saw its net profit increase from $61 million in 2008 to $140 million in 2014. The following year, in its 2014 Annual Report issued in February 2015, TUG explained that "[d]espite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand."

104. A substantial portion of TUG's profits were the result of the conspiratorial agreements alleged in this Second Amended Complaint.

105. Bumble Bee has been similarly profitable due to the conspiracy. As alleged earlier, Lion Capital purchased Bumble Bee for $980 million in 2010, and reached an agreement to sell it to TUG in 2014 for $1.51 billion. In announcing the sale, Lion Capital noted that Bumble Bee's EBITDA in 2014 was a record-breaking $150 Million, on revenue of $1 Billion. Kelly Mayer, in a memo to her partners at Lion Capital, attributed Bumble Bee's record year to the growth of "gross margins through disciplined pricing actions." Discovery is necessary to determine whether Lion Capital was aware of and participated, if at all, in the conspiracy alleged in this Second Amended Complaint.

106. StarKist, who has the largest U.S. market share,

AWG'S SECOND AMENDED COMPLAINT

1    ████████████████████████ Accordingly, Dongwon registered substantial
2    additional income in the period following the collusion alleged in this Second
3    Amended Complaint, and received the proceeds of the conspiracy from StarKist
4    knowing the ill-gotten nature of these funds. ████████████████████████
5    ████████████████████████████████████████████

6    107.   In a Korean-language publication, Dongwon stated that "[t]he canned
7    tuna market in the U.S. is approximately a $1,700,000,000 USD market, but it is a
8    mature market where growth has stopped, and it maintains an oligopolistic system
9    with StarKist (40%), Bumble Bee (25%), and COSI (15%), and represents a
10   structure in which the price of tuna cannot be efficiently reflected in the sales price
11   of products."  Instead, during the time period relevant to these allegations, the price
12   of canned tuna reflected the conspiracy price.

### Defendants' Pricing of Canned Tuna to Plaintiff and Others Was Against Defendants' Self-Interest But For Their Collusion

15   108.   As alleged above, during the conspiracy, the market for the production
16   and sale of canned tuna in the United States was concentrated in a relatively few
17   firms, *i.e.*, Bumble Bee, the COSI Defendants and the StarKist Defendants.
18   However, none of these companies had the power, unilaterally, to profitably
19   increase the price of canned tuna sold in the United States, and instead needed to
20   maintain a unified front in order to increase prices to the highly profitable levels
21   that existed during the conspiracy. Because Defendants' canned tuna products were
22   close substitutes, unilateral attempts by any one of them to manipulate canned tuna
23   price or supply posed substantial commercial risks. A unilateral increase in price
24   not followed by others would simply lead to lost sales.  A unilateral reduction in
25   production would be costly because market share would be lost and revenue would
26   likely fall while fixed costs (*e.g.*, labor, distribution, overhead, facility operation,

AWG'S SECOND AMENDED COMPLAINT

facility maintenance, etc.) would remain relatively the same. Under the circumstances, Defendants and their co-conspirators' canned tuna pricing actions during the conspiracy would have been against their self-interest unless they were colluding.

### THE MARKET FOR THE PRODUCTION AND SALE OF CANNED TUNA WAS CONDUCIVE TO CARTELIZATION

#### There Are No Close Substitutes for Canned Tuna

109. Canned tuna includes both "white" tuna fish, which consists of albacore tuna, and "light" tuna fish, which consists primarily of skipjack tuna. Both varieties of canned tuna are typically packed in either water or vegetable oil. Light tuna accounts for approximately two thirds of total sales in the United States by volume.

110. Canned tuna possess commodity-like characteristics in that the product of one seller is interchangeable with the product of another. As such, all things equal, it would not be profitable for Defendants and co-conspirators to unilaterally increase canned tuna prices in the U.S., because a unilateral price by any Defendant would allow another Defendant to steal substantial market share by simply holding its price.

#### The Market for the Processing and Sale of Canned Tuna Is/Was Concentrated

111. Over the past two decades, the canned tuna industry has undergone a high degree of consolidation. As a result of this consolidation, and during the conspiracy, the U.S. canned tuna industry had become highly concentrated.

112. During the conspiracy, the market for the production of canned tuna was dominated by Defendants and their co-conspirators. But for the conspiracy alleged in this Second Amended Complaint, Defendants and their co-conspirators

56

AWG'S SECOND AMENDED COMPLAINT

would have had to compete on price. Although estimates of their respective market shares vary somewhat, StarKist, Bumble Bee and COSI's branded products account for approximately 80% of the canned tuna market in the United States. Also, COSI, which has the smallest domestic market share of the three Defendants for branded canned tuna, is the largest supplier of private-label canned tuna in the United States. During the conspiracy, Defendants processed at least 85% of all canned tuna sold in the United States.

### Barriers to Entry

113.   During the time period relevant to Plaintiff's claims, there were barriers to entry into the market for the production and sale of canned tuna in the United States, including, without limitation:

(a)   New entrants were faced with substantial start-up costs, including the need to gain access to distribution channels and retail outlets. Additionally, substantial manufacturing expertise was required to enter the U.S. market.  These startup costs reduced the opportunity or ability for rivals to enter the U.S. market and undercut Defendants and their conspirators' supracompetitive pricing.

(b)   New entrants and existing market participants faced substantial upfront, industry-specific costs to build a plant to process tuna loins into canned tuna.  For example, the cost for Tri-Marine simply to modernize the plant it acquired from COSI in Pago Pago, American Samoa, in 2010, was approximately $70 million. (The plant did not reopen until approximately 2015.)

(c)   The method used for processing canned tuna in the United States was capital intensive. Given the cost to Tri-Marine of modernizing COSI's Pago Pago plant, the purchase of real estate and the construction of a new canned

AWG'S SECOND AMENDED COMPLAINT

tuna processing facility in the mainland United States would likely cost in excess of $70 million, and require substantial industry expertise to build and operate.

(d)     Restrictive tariffs of between approximately 6% and 35% on the importation of canned tuna into the United States impaired the ability of foreign suppliers from capitalizing on supracompetitive domestic pricing of canned tuna.

### Prevailing Supply and Demand Factors Incentivized Collusion

114.  As discussed above, during the conspiracy, Defendants and co-conspirators faced supply and demand factors that should have led to declining prices for canned tuna in the United States. The declining consumption of canned tuna in the United States resulted in excess production capacity for canned tuna. Defendants and co-conspirators had sufficient production capacity in the United States to supply consumers with 3.4 pounds of canned tuna per capita in 2003. However, by 2009, when annual per capita consumption had fallen to 2.5 pounds, a large portion of Defendants and their co-conspirators' capacity went unused.

115.  On top of the excess production capacity standing idle as a result of declining demand, Defendants also took steps prior to 2009 to increase their own efficiency and production capacity of canned tuna. For example, COSI's Lyons, Georgia plant – which opened in 2009 – had a production capacity that was approximately 50% higher than the production capacity of the Pago Pago plant that it displaced (and that was reopened by Tri-Marine in 2015). And when Dongwon purchased StarKist in 2008, it transferred equipment and technology that increased the manufacturing capacity of the StarKist Defendants' plant in Pago Pago.

116.  Accordingly, the expanding global supply of canning-grade tuna and other fish coupled with declining demand for shelf-stable seafood and the excess

AWG'S SECOND AMENDED COMPLAINT

domestic production capacity controlled by Defendants left the canned tuna industry ripe for collusion.

### The Transfer of Executives Between Defendants Facilitated Collusion

117.  During the conspiracy alleged in this Second Amended Complaint, executives left one conspirator to take a position at another.

118.  For example, Don George, Bruce Bollmer, and Herbert Tucker all worked at COSI when the conspiracy began in 2004, and later took positions at Bumble Bee (George) and StarKist (Tucker and Bollmer). Joe Clancy was a former StarKist employee who joined COSI in 2002 and, as alleged below, continued to exchange confidential information with former colleagues after joining COSI. Similarly, Jan Tharp left StarKist and joined Bumble Bee in a senior role, and maintained a close relationship with several StarKist executives after joining Bumble Bee.

119.  In these and other instances, the executives exchanged confidential and sensitive pricing information with colleagues at their former employer after joining the new conspirator.

120.  Additionally, there were a number of close personal relationships between key members of the conspiracy.



121.

AWG'S SECOND AMENDED COMPLAINT



122.   Phone communications like these during the Relevant Period were often followed by price increases.

## Select Trade Associations Facilitated Collusion

123.   The culture of collusion that existed in the packaged seafood industry during the time period relevant to Plaintiff's claim was also facilitated and enhanced by certain trade associations that counted Defendants among their major, or *only*, members.

124.   For example, one such trade association was the National Fisheries Institute ("NFI"), which existed as early as 2004. Defendants Bumble Bee, COSI and Del Monte/StarKist were among its members. In 2007, NFI created the Tuna Council, whose *only* members were Bumble Bee, COS and Del Monte/StarKist. As soon as the Tuna Council was created, Defendants used it to facilitate their collusion. For example, in January 2008, as Defendants were discussing their collusive can-size reduction, As Plaintiff allege in further detail below, Defendants discussed and exchanged confidential information about canned tuna pricing in furtherance of the conspiracy under the cover of NFI and the Tuna Council.

125.   On information and belief, Bumble Bee's CEO Lischewski used the trade association meetings to provide cover for one on one meetings with the senior leaders of Bumble Bee's competitors to re-inforce the collusive price increases.

## Common Vendors and Co-Packing Arrangements Facilitated Collusions and Enforcement of the Cartel

126.   During the time period relevant to Plaintiff's claims, but particularly between approximately 2004 and 2010, Defendants shared a common canner in

61

AWG'S SECOND AMENDED COMPLAINT

American Samoa, Impress. Bumble Bee, Del Monte/StarKist and COSI each knew at the time that Impress was sharing production and other information about each of them with the others, and Defendants used Impress as a conduit to facilitate the exchange of information regarding the conspiracy. As alleged in this Second Amended Complaint, Impress is a co-conspirator, and its role in this regard is illustrated in connection with the collusive can size reduction that occurred in 2007 and 2008.

127.   In addition to economic and other conditions that facilitated the conspiracy, in 2011, Bumble Bee and the COSI Defendants entered into co-packing agreements in which Bumble Bee's factory in Santa Fe Springs, California, packed and canned the tuna for COSI's west coast operations, and COSI's plant in Lyons, Georgia, packed the canned tuna for Bumble Bee's east coast operations. This copacking arrangement enabled Bumble Bee and the COSI Defendants to monitor each other's output and pricing.

## ADDITIONAL OVERT ACTS IN DEFENDANTS' CANNED TUNA CONSPIRACY

128.   Defendants and their co-conspirators carried out their continuing conspiracy regarding canned tuna through in-person meetings and communications, including e-mails and telephone calls. During these meetings and communications, they agreed on conspiracy terms as alleged in this Second Amended Complaint, and coordinated price increase announcements or pricing terms, secretly and collusively exchanged pricing information and prospective pricing announcements and business plans, and collectively reduced quantity and restrained output of canned tuna sold to Plaintiff and others in the United States.

AWG'S SECOND AMENDED COMPLAINT

## Defendants' Collusive Price Increases Between 2004-2006

129.   In the first half of 2004, the prevailing prices for canned tuna in the U.S. were below the level needed to deliver the profits expected by TUG. Between 2001 and 2003, canned tuna prices had declined, as had profit margins.



COSI needed a new strategy.

TUG favored this strategy because higher canned tuna prices accommodated higher prices for processed tuna sold by TUG to COSI and its rivals. (Processed tuna is the main cost input to produce canned tuna).

130.

AWG'S SECOND AMENDED COMPLAINT



131.

132.

64



133.

134.

135.

AWG'S SECOND AMENDED COMPLAINT



136.

137.

138.

AWG'S SECOND AMENDED COMPLAINT



139.

140.

141.

AWG'S SECOND AMENDED COMPLAINT

142. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████

143. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

144. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

145. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

146. ████████████████████████████████████████
███████████████████████████████████

68

147. 

148.

149.

5

AWG'S SECOND AMENDED COMPLAINT



150.

151.

AWG'S SECOND AMENDED COMPLAINT



152.

153.

154.

**Defendants' Collusive Can Size Reduction and Price Increases in 2007-2008**

155.   The conspiracy among Defendants and co-conspirators continued in 2007 and 2008.

156.

71



157.

158.

AWG'S SECOND AMENDED COMPLAINT



159.

160. The collusive can-size reduction was facilitated by co-conspirator Impress, a canner with facilities in American Samoa. In 2007-08, Impress had a commercial relationship with Del Monte/StarKist, Bumble Bee and COSI.



161.

162.

AWG'S SECOND AMENDED COMPLAINT



163.

164.

166.   Defendants also agreed to coordinate their messaging regarding their plans to downsize cans, so that customers would not learn that the decision was not driven by necessity, but was instead the result of collusion.

AWG'S SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7    167.
8
9
10
11
12
13
14
15
16
17    168.
18
19
20
21
22
23
24
25
26
27
28



75



169.

170.

171.

AWG'S SECOND AMENDED COMPLAINT



172.   The conspiracy among Defendants and co-conspirators continued after the agreement to reduce the tuna can size.

173.

174.

175.

176.

AWG'S SECOND AMENDED COMPLAINT

177.



178.

**Defendants Collude on Net Prices in 2010**

179.   The conspiracy among Defendants and co-conspirators continued into 2010, when they once again collusively raised net prices on canned tuna. Net prices are the prices disseminated to brokers of shelf stable seafood products, and represent the list price, less promotional allowances offered by Defendants to reduce the list price. (Brokers present these prices to retailers like Plaintiff, who pay Defendants directly for the product).

AWG'S SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

180.

181.

182.

183.

184.



79

1
2
3
4    185.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19    186.
20
21
22    187.
23



24

**Defendants Colluded to Increase Canned Tuna Prices in 2011**

25
26      188.   Even with the alteration in can size for processed tuna and the prior
27 collusive price increases, Defendants and co-conspirators were still unhappy with

28

AWG'S SECOND AMENDED COMPLAINT

the prices they obtained. Lischewski of Bumble Bee complained in April 2011 that canned tuna was "too cheap." He said that it was important to persuade customers to pay more for canned tuna. Unable to achieve this through lawful measures, Defendants continued to meet, communicate and conspire not to compete on canned tuna sold in the United States.

189. 

190.

191.

81



AWG'S SECOND AMENDED COMPLAINT



194.

**Defendants Colluded on a Canned Tuna Price Increase in 2012**

195.   The conspiracy among Defendants and their co-conspirators continued after 2011 and into 2012.



196.   In December 2011 and January 2012, telephone conversations occurred between senior executives and sales personnel of Bumble Bee, the COSI Defendants and the StarKist Defendants about coordinating and announcing a price increase for a number of products in the second quarter of 2012.

197.

83

198.   These competitor discussions led to an agreement or understanding that the Defendants would increase prices by nearly identical amounts.  Pursuant to this agreement or understanding, the Defendants announced collusive price increases as follows: the StarKist Defendants on or about January 13, 2012, effective on March 26, 2012; Bumble Bee on or about January 17, 2012, effective on April 1, 2012; and the COSI Defendants on or about January 18, 2012, effective on April 1, 2012. Each price increase announced identical (or virtually identical) increases on a number of packaged seafood products. For example, a 48 pack of five ounce cans of chunk light tuna in water increased from $40.80 to $43.68. Other products also increased by identical percentages.

199.

## Defendants' Collusion Not to Sell "FAD-Free" Branded Tuna Products in 2011 and Thereafter

200.   In 2011, employees and representatives of the StarKist Defendants, Bumble Bee, and the COSI Defendants discussed whether any of them would launch a "FAD-Free" product (*i.e.*, a canned tuna product containing only tuna that were caught without the use of a FAD device). These discussions included e-mails that occurred throughout 2011 and into 2012.

201.

AWG'S SECOND AMENDED COMPLAINT

1

2

3    202.

4

5

6

7

8   203.   Defendants came to believe that if any of them launched a FAD-Free

9   product under one of their own branded labels, then it would work to the detriment

10  of each of their companies.

11

12

13

14  204.   On a teleconference during the week of February 10, 2012, the

15  StarKist Defendants, Bumble Bee and the COSI Defendants agreed that none of

16  them would launch a branded FAD-free canned tuna product in the United States.

17  This agreement was later confirmed in writing during the week of February 17,

18  2012. Defendants agreed not to sell FAD-free canned tuna products in the United

19  States under their own brand names to avoid competition in the sale of canned tuna

20  in the United States.

21

22

23  205.

24

25

26

27

28

AWG'S SECOND AMENDED COMPLAINT



206.

**Defendants Colluded on Promotional Activity and Pricing Terms in at Least 2011-2013**

207.   Between at least November 2011 and June 2013, senior executives and sales personnel of the StarKist Defendants, Bumble Bee and the COSI Defendants exchanged e-mails and had telephone conversations about discounting and promotional practices and terms for the sale of canned tuna to customers. As part of these e-mails and telephone conversations, these senior executives and sales personnel of Defendants assured each other that they would not compete regarding the pricing and sale of canned tuna sold to customers.

208.



86

209. 

## Defendants' Communications in Furtherance of the Conspiracy After 2013

210.   Defendants and co-conspirators collusive activities regarding canned tuna continued after 2013.

## Defendants' Conspiracy Was Effective

211.   Defendants' and co-conspirators' conspiracy alleged in this Second Amended Complaint was effective. For example, and without limitation, Bumble Bee's Lischewski observed in 2012 that canned tuna prices had increased more than 40% in eighteen months during 2011 and 2012.

87

212.   As a proximate result of this conspiracy, and during the time period relevant to Plaintiff's claims, Defendants and co-conspirators charged Plaintiff and others in the United States supracompetitive prices (*i.e.*, prices above a competitive level) for canned tuna.

213.   Defendants and co-conspirators' conspiracy alleged in this Second Amended Complaint overcharged Plaintiff on canned tuna that Plaintiff directly purchased from one or more Defendants and co-conspirators regardless of whether the conspiracy price increase was on Defendants' list or net price of canned tuna. This is because Plaintiff directly purchased canned tuna from Defendants and co-conspirators, and Defendants and co-conspirators' collusive manipulation of canned tuna list and net prices had an adverse effect on the price each Plaintiff paid for canned tuna.

214.   As alleged in this Second Amended Complaint, during the conspiracy, Defendants and co-conspirators agreed on the timing and amount of canned tuna price increases as reflected in price announcements. They were successful in achieving these price increases, which enabled them to impose supracompetitive prices on Plaintiff and others. This was because Defendants knew during the conspiracy that all of them were increasing canned tuna prices (or offering the same or similar prices); and the announced canned tuna price increases were higher than would have occurred if, in the absence of the conspiracy, each Defendant had competed and independently and unilaterally crafted its own price increase announcements. Defendants' coordinated canned tuna price increase announcements provided them with a higher, unified starting point for imposing canned tuna prices on Plaintiff and others than would have resulted if each Defendant had independently and unilaterally set its own price increases (if at all).

DOJ INVESTIGATION AND AMNESTY APPLICATION

AWG'S SECOND AMENDED COMPLAINT

215. A criminal antitrust investigation into Defendants' price-fixing conspiracy appears to have begun in July 2015, following Thai Union's announcement of its intention to acquire Bumble Bee for $1.5 billion.

216. On December 3, 2015, Thai Union and Bumble Bee notified the DOJ that the proposed acquisition was being abandoned. The decision to cancel the transaction was due directly to the DOJ's antitrust investigation and the companies' potential liability for anticompetitive behavior.

217. The DOJ's criminal investigation of Defendants has resulted in guilty pleas for violations of federal antitrust laws. At the date of filing, the following high-placed sales executives involved in canned tuna pricing have pleaded guilty to criminal violations of 15 U.S.C. § 1:

(a) Walter Scott Cameron, Senior Vice President of Sales for Bumble Bee (pleaded guilty on November 7, 2016);

(b) Kenneth Worsham, Senior Vice President of Trade Marketing for Bumble Bee (pleaded guilty on December 21, 2016); and

(c) Stephen L. Hodge, Senior Vice President of Sales for StarKist (pleaded guilty on June 28, 2017).

218. The criminal Informations for all three executives state that beginning as early 2011 and continuing until or about 2013, the individuals and their coconspirators "knowingly entered into and engaged in a combination and conspiracy to fix, raise, and maintain the prices of packaged seafood sold in the United States."

219. The Informations state that the exact dates of the conspiracy remain "unknown" to the DOJ. They further provide that each defendant's conduct was an unreasonable restraint of interstate commerce in violation of Section 1 of the Sherman Act, and specify that the "substantial terms" of the unlawful conduct

89

"were to fix, raise, and maintain prices of packaged seafood." The Informations further specify that "[p]ackaged seafood includes shelf-stable tuna."

220.    The Informations for all three executives further state that the "means and methods" of the conspiracy included (a) engaging in conversations and discussions and attending meetings with representatives of "other major packaged-seafood-producing firms," (b) agreeing and reaching "mutual understandings" during these conversations, discussions and meetings to fix, raise and maintain the prices of packaged seafood sold in the United States, and (c) "negotiat[ing] prices and issu[ing] price announcements for packaged seafood in accordance with the agreements and mutual understandings reached."

221.    The Informations note, however, that "various business organizations" not made defendants in the Informations "participated as coconspirators in the offense charged in this Information."

222.    In ¶ 4(b) of each of Mr. Cameron's, Mr. Worsham's, and Mr. Hodge's Plea Agreements, each admits that:

> During the relevant period, the defendant participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood, the primary purpose of which was to fix, raise, and maintain the prices of packaged seafood sold in the United States. In furtherance of the conspiracy, the defendant engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms. During these conversations, discussions, and meetings, agreements and mutual understandings were reached to fix, raise, and maintain the prices of packaged seafood sold in the United States.

223.    The maximum penalties for each of the executives' crimes include imprisonment for 10 years and fines of up to the greater of $1 million or twice the

90

gross pecuniary gain to the conspirators, or loss caused to the victims, derived from the illegal price-fixing conspiracy.

224.   However, the Plea Agreements for all three executives recommend a significant downward departure from those maximums.   The Plea Agreement for Walter Scott Cameron recommends a reduced penalty "because of the defendant's substantial assistance in the government's investigation and prosecutions of violations of federal criminal law in the packaged-seafood industry."   It specifically recommends a greatly reduced prison term and a $25,000 fine.

225.   Worsham's and Hodge's Plea Agreements recommend downward departures based on their agreement to "cooperate fully and truthfully with the United States in the prosecution of this case, the current federal investigation of violations of federal antitrust and related criminal laws involving the production or sale of packaged seafood in the United States," and other related investigations. As with Cameron's, those Plea Agreements recommend a reduced prison term and a $25,000 fine.

226.   Worsham will be sentenced on September 28, 2018.   Upon information and belief, Cameron and Hodge do not yet have Sentencing Hearings scheduled.

227.   On May 8, 2017, the DOJ announced that Bumble Bee itself had agreed to plead guilty to price-fixing shelf-stable tuna products in the United States between 2011 and 2013.

228.   In addition to agreeing to plead guilty, Bumble Bee agreed to pay a criminal fine of $25 million for its criminal conduct. The fine will increase to a maximum of $81.5 million, to be paid by Defendant Big Catch Cayman, if Bumble Bee is sold.

AWG'S SECOND AMENDED COMPLAINT

229. Both fines are below the DOJ's guideline fine range of $113.5 million. According to the DOJ's Sentencing Memorandum, the downward departure was justified both because Bumble Bee has provided and will continue to provide substantial assistance and cooperation to the DOJ in its ongoing investigation into the conspiracy and because any higher fine would have "substantially jeopardize[ed] the continued viability of the organization." Indeed, the Sentencing Memorandum explicitly noted the ongoing related multidistrict litigation pending before The Honorable Janis Sammartino, United States District Judge for the Southern District of California, stating that "a fine reduction is required to the extent a guidelines fine would impair the defendant's ability to make restitution to victims in the civil lawsuits."

230. The Honorable Edward M. Chen, United States District Judge for the Northern District of California, accepted Bumble Bee's guilty plea and entered judgment against it under the terms recommended by the DOJ on August 7, 2017.

231. Bumble Bee's cooperation will very likely provide additional evidence in support of the allegations in this Complaint, evidence that will be uncovered through the course of discovery.

232. On September 11, 2017, in a letter to The Stock Exchange of Thailand, Thai-Union announced that Tri-Union has received "conditional leniency" under the DOJ's "Corporate Leniency Program" with respect to the DOJ's investigation into the price-fixing conspiracy alleged herein. The letter states: "Provided Tri-Union continues to fully cooperate with the DOJ, Tri-Union's conditional leniency status means that neither Tri-Union nor any cooperating executives or employees within the scope of the [conspiracy alleged herein] will face criminal fines, jail time or prosecution."

AWG'S SECOND AMENDED COMPLAINT

233.   First implemented in 1978, the DOJ's Corporate Leniency Program "allows corporations…involved in antitrust crimes to self-report and avoid criminal convictions and resulting fines and incarceration," provided that the corporation is the first corporate conspirator to confess, it fully cooperates with the DOJ's investigation, and meets certain other conditions.

234.   The Corporate Leniency Program includes two types of leniency: Type A and Type B.   Type A Leniency is available only before the DOJ has received any information about the alleged illegal conduct, while Type B Leniency is available when the DOJ uncovers wrongdoing and then uses a company's cooperation to build its case.   Because the DOJ first uncovered evidence of the conspiracy alleged herein as part of its review of the Tri-Union and Bumble Bee consolidation, it is likely that Tri-Union is proceeding under Type B Leniency.

235.   In order to qualify for Type B Leniency, a company must, among other things, be "the first one to come forward and qualify for leniency with respect to the illegal activity being reported," "report[] the wrongdoing with candor and completeness[,] and provide[] full, continuing and complete cooperation that advances the [DOJ] in its investigation."   In addition, a company may qualify for leniency only if the "confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

236.   Critically, an applicant for leniency must *admit* to a criminal violation of the antitrust laws *before* receiving a conditional leniency letter.   "Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will not qualify for leniency through the Leniency Program."

237.   The DOJ "may also insist on interviews with key executives of the applicant who were involved in the violation before issuing the conditional

AWG'S SECOND AMENDED COMPLAINT

less

leniency letter. A company that argues that an agreement to fix prices, rig bids, restrict capacity, or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement generally has no made a sufficient admission of a criminal antitrust violation to be eligible for leniency."

238.   Thus, Thai Union's public announcement that Tri-Union has received "conditional leniency" from the DOJ confirms that Tri-Union has *admitted* to a criminal antitrust violation arising out of its pricing of canned tuna and likely means that the DOJ has conducted interviews with high-level Thai Union and/or Tri-Union executives involved in the conspiracy who also have admitted to the conspiracy and have provided information and evidence about it. And because only the first member of conspiracy to come forward is entitled to conditional leniency, Thai Union's announcement indicates that Tri-Union was the initial whistleblower regarding the conspiracy.

239.   On May 16, 2018, Defendant Christopher Lischewski, Bumble Bee's longtime CEO and President, was indicted by a federal grand jury.

240.   Paragraph 7 of the Indictment states:

Beginning in or about November 2010 and continuing until in or about December 2013, the exact dates being unknown to the Grand Jury...the defendant and coconspirators knowingly entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing the prices for packaged seafood sold in the United States. The combination and conspiracy engaged in by the defendant and coconspirators was an unreasonable restraint of interstate commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

AWG'S SECOND AMENDED COMPLAINT

241. Paragraph 10 of the Indictment describes the "Means and Methods of the Conspiracy," which include that Lischewski and coconspirators: participated in meetings, conversations, and communications concerning prices of packaged seafood to be sold in the United States during which he agreed on prices and to limit product categories; collected, exchanged, monitored, and discussed information on prices; issued price announcements and pricing guidance for packaged seafood in accordance with the agreements reached; sold packaged seafood in the United States at collusive and noncompetitive prices; and employed measures to conceal their conduct, including, but not limited to, using code when referring to coconspirators, meeting at offsite locations to avoid detection, limiting distribution and discouraging retention of documents reflecting conspiratorial contacts, and providing misleading justifications for prices.

242. On May 25, 2018, Lischewski resigned from his position as CEO of Bumble Bee and took a leave of absence from the company.

## DISCOVERY IS NECESSARY TO DETERMINE THE FULL SCOPE OF THE CONSPIRACY

243. Discovery is necessary to determine the full scope of the conspiracy, including the time frame, products and participants. Plaintiff reserve the right to amend or supplement this Second Amended Complaint to add other Defendants, claims, time period, products or other allegations based upon discovery and further investigation. For example, discovery is necessary to determine whether and the extent to which, if at all, Defendants and co-conspirators conspired on other packaged seafood products – including salmon, shrimp, crab, clams, oysters, sardines and/or mackerel. While StarKist did not produce or sell many of these other packaged seafood products, Bumble Bee and COSI did, and their packaged

AWG'S SECOND AMENDED COMPLAINT

seafood price increases in 2008, 2011 and 2012 (among others) warrant further scrutiny in discovery.

## TOLLING OF THE STATUTE OF LIMITATIONS

244.   The statutes of limitation as to Defendants and their co-conspirators' continuing antitrust violations alleged in this Second Amended Complaint were tolled because of one or more of the following events:

(a)   The pendency of one or more Class Action Complaints, and any Amendments, against Defendants and their co-conspirators for conspiring to fix prices of packaged seafood products (including canned tuna) tolled the running of the statute of limitations on Plaintiff's claims; and/or

(b)   On December 7, 2016, the DOJ filed a Criminal Complaint (or Information) charging Cameron with the criminal offense of violating the U.S. antitrust laws by participating in a conspiracy to fix, raise and maintain the prices of packaged seafood sold in the United States. The Cameron criminal proceedings, and others to follow regarding the packaged seafood (including canned tuna) conspiracy, tolls the running of the statutes of limitation on Plaintiff's claims during the criminal proceedings and for one year thereafter by operation of federal statute, under 15 U.S.C. § 16(i).

(c)   Defendants' affirmative acts of fraudulent concealment of the conspiracy prevented Plaintiff from having notice of their claims more than four years before filing their initial Complaint, and tolled the statute of limitations on Plaintiff's claims.

245.   Each of the overt acts in furtherance of the conspiracy alleged in this Second Amended Complaint was done with the purpose of concealing the conspiracy and preventing Plaintiff and other purchasers of canned tuna (and other

AWG'S SECOND AMENDED COMPLAINT

packaged seafood products) from learning about the conspiracy's existence. Accordingly, Plaintiff did not know or reasonably suspect the existence of their claims more than four years before filing their initial Complaint, nor were they aware of any facts more than four years before filing their initial Complaint that would have put them on reasonable notice of their claims. More than four years before Plaintiff filed their initial Complaint, Defendants and their co-conspirators fraudulently concealed the existence of each Plaintiff's antitrust claim so that each Plaintiff, acting as a reasonable person, did not know of the existence of its claim at the time.

246. During the time period relevant to Plaintiff's claims, including the time period more than four years before Plaintiff filed their initial Complaint, Defendants and their co-conspirators concealed the existence of Plaintiff's antitrust claims from Plaintiff as a result of the self-concealing nature of the conspiracy; and/or because Defendants and their co-conspirators engaged in affirmative and deceptive acts of concealment as described below. As a result, Plaintiff did not know, and through the exercise of due diligence (which they exercised) could not have known, about the existence of their antitrust claims more than four years before filing their initial Complaint.

247. Notwithstanding the self-concealing nature of their conspiracy, during the time period relevant to Plaintiff's claims, including more than four years before Plaintiff filed their initial Complaint, Defendants and their co-conspirators affirmatively misled Plaintiff by wrongfully and affirmatively concealing the existence of Plaintiff's antitrust claims from Plaintiff. In addition to the overt acts alleged above that were undertaken with the purpose of concealing the conspiracy, Defendants took additional steps to conceal their illegal conduct from Plaintiff and others. For example, and without limitation:

AWG'S SECOND AMENDED COMPLAINT

(a)   During the conspiracy alleged in this Second Amended Complaint, and as alleged above, Defendants and co-conspirators met in secret to affirmatively conceal the existence of the conspiracy from those not involved in it.

(b)   During the conspiracy alleged in this Second Amended Complaint, Defendants and co-conspirators used personal e-mail for conspiracy communications in order to avoid detection of the conspiracy by those not involved in it. (Defendants did not typically use private e-mail accounts for any other business purposes and instead used their corporate e-mail accounts).

AWG'S SECOND AMENDED COMPLAINT

(c)     During the conspiracy alleged in this Second Amended Complaint, Defendants and co-conspirators used misleading subject lines on e-mails to affirmatively conceal the conspiratorial nature of their communications from those not involved in the conspiracy.

(d)     During the conspiracy alleged in this Second Amended Complaint, Defendants and co-conspirators met in places outside their offices to communicate about the conspiracy in order to affirmatively conceal the fact of their meeting and the existence of the conspiracy from those not involved in it.

99

AWG'S SECOND AMENDED COMPLAINT



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

23     (e)  During the conspiracy alleged in this Second Amended

24 Complaint, Defendants and co-conspirators applied warnings on documents not to

25 disclose to others or instructions about transmission in order to affirmatively

26 conceal the existence of the conspiracy from those not directly involved in it.

27

28

AWG'S SECOND AMENDED COMPLAINT



    (g)  During the conspiracy alleged in this Second Amended Complaint, Defendants and co-conspirators affirmatively concealed the existence

AWG'S SECOND AMENDED COMPLAINT

of the conspiracy from Plaintiff and others by providing pretextual explanations for Defendants and co-conspirators' collusive canned tuna can size reduction, price increases and other conspiracy activities. These explanations, while seemingly true on their face at the time, were actually intended by Defendants and co-conspirators to deflect attention from and conceal their conspiracy and to create the illusion of competition when, in fact, price competition was being systematically suppressed and eliminated. As such, these explanations were false and pretextual. For example, and without limitation:



AWG'S SECOND AMENDED COMPLAINT



iv.

AWG'S SECOND AMENDED COMPLAINT

v.

vi.      Defendants and their co-conspirators cited their own predictions about where the tuna market was heading as the basis for a price increase. Because these future predictions were unverifiable by Plaintiff, they provided Defendants with pretexts that allowed for the implementation of collusive price increases. For example, on January 18, 2012, the COSI Defendants wrote to their customers, including Plaintiff, that "[h]igh fish prices have made it necessary to increase the list price of both light and white [tuna]. All indicators are that these higher raw material costs will not return to levels that were seen as recently as a year ago." Upon information and belief, this pretextual explanation was discussed between or among Defendants through e-mail and telephone

AWG'S SECOND AMENDED COMPLAINT

communications in the weeks and months that preceded COSI's announcement.

vii.    In a letter to customers (including Plaintiff) dated March 30, 2012, Bumble Bee's Cameron predicted that a number of "unforecasted elements," some of which would occur "in the second half of 2012," combined to require Bumble Bee to increase its own pricing.

viii.    In a March 30, 2012 interview, IS Cho explained the justification the StarKist Defendants were giving to retailers in pretextual support of the collusive price increases: "We had a tough year last year and we have taken a lot of price increases ... We are fixing it and retailers do understand.... The tuna industry is not going to offer a low-priced and quality product and lose money on it."

ix.    In a presentation to Kroger on April 19, 2013, Bumble Bee justified its canned tuna price increase by forecasting that the prices of skipjack and albacore would rise approximately $120 and $200 per metric ton, respectively, over the next six months.

x.    Between 2011 and 2013, Defendants repeatedly gave pretextual justifications to Plaintiff about their supposed inability to offer certain discounting on promotional terms. For example, and without limitation, in a presentation to Ahold in July 2013, the StarKist Defendants stated:  "we will aggressively manage costs and improve productivity to maintain competitive pricing aligned with market conditions."

AWG'S SECOND AMENDED COMPLAINT

xi.   Each of the foregoing examples of Defendants' explanations for canned tuna price increases was pretextual and false or misleading, as each price increase was the result of the conspiracy. The foregoing examples are representative of the pretextual and false or misleading explanations that Defendants and their co-conspirators provided Plaintiff during the conspiracy, including more than four years before Plaintiff filed its initial Complaint, in order to affirmatively conceal the conspiracy from Plaintiff and others.

(h)   During the conspiracy alleged in this Second Amended Complaint, Defendants and co-conspirators affirmatively concealed the existence of the conspiracy from Plaintiff and others by using trade association meetings, which they attended, to create the illusion that they were meeting for legitimate purposes when, in fact, they were using these meetings as a cover to conceal the conspiracy from others not involved in it. These trade associations include the Tuna Council and the ISSF.  For example, and without limitation, in 2010, 2011 and 2012, Defendants, through the Tuna Council, partnered with the Thai Food Processors Association – of which TUG was a member – to plan and then launch a U.S. advertising campaign called "Tuna the Wonderfish," ostensibly to stimulate demand for canned tuna in the United States. ▮▮▮▮▮▮▮ (The campaign was unsuccessful.) ▮▮▮▮▮▮▮

106

AWG'S SECOND AMENDED COMPLAINT

(i)     During the conspiracy alleged in this Second Amended Complaint, Defendants and co-conspirators affirmatively concealed the existence of the conspiracy from those not involved in it by confining knowledge and communication in furtherance of the conspiracy to a limited number of high ranking and/or key employees of each Defendant and co-conspirator, and limiting the creation of documents reflecting the existence of the conspiracy.

248.

documents

AWG'S SECOND AMENDED COMPLAINT

Indeed, the Grand Jury investigating Defendants' conspiracy indicted Lischewski for his role in that conspiracy and the indictment expressly alleged that he deleted emails to conceal his unlawful conduct.

249.   During the conspiracy, including more than four years before Plaintiff filed their initial Complaint: Defendants and their co-conspirators' affirmative acts of concealment were intended by them to conceal the existence of their unlawful actions from Plaintiff; and Plaintiff were unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of concealment.

250.   As a direct result of Defendants' and their co-conspirators' affirmative and fraudulent acts of concealment alleged above, each Plaintiff did not have actual or constructive knowledge of its antitrust claim, or the facts that might reasonably have led any Plaintiff (or a reasonable purchaser in Plaintiff's position) to discover or suspect that it had the antitrust claim against Defendants and their co-conspirators alleged in this Second Amended Complaint, more than four years before Plaintiff filed their initial Complaint. Before then, no Plaintiff was aware of the facts that would have alerted it (or would have alerted a reasonably diligent purchaser in each Plaintiff's position) of the need to investigate whether it had the antitrust claim alleged in Plaintiff's initial Complaint or their Second Amended Complaint.

251.   Further, throughout the conspiracy, each Plaintiff engaged in due diligence in seeking to ensure that it was receiving competitive pricing for canned tuna. For example and without limitation, each Plaintiff used a method of purchasing canned tuna – including, for example and without limitation, seeking price quotes and bids from their suppliers and/or investigating reasonably available public information – that caused it to believe in good faith at the time that it was receiving competitive prices for the canned tuna that it purchased from Defendants

AWG'S SECOND AMENDED COMPLAINT

and their co-conspirators.  Upon learning of DOJ's investigation into Defendants' potential antitrust violations, Plaintiff diligently investigated Defendants' conduct and ultimately concluded that each of them had a claim. Unfortunately, as alleged in this Second Amended Complaint, as a proximate result of the conspiracy, Defendants and their co-conspirators overcharged each Plaintiff for canned tuna during the time period relevant to each Plaintiff's claim despite each Plaintiff's due diligence during the alleged conspiracy, including the time period more than four years before Plaintiff filed their initial Complaint.

252.   Defendants and their co-conspirators' fraudulent concealment of their unlawful conduct tolled the statute of limitations for each Plaintiff's claim.

253.   Plaintiff's claims have been brought within the applicable statute of limitations period.

## LION ENTITIES

### Lion Entities Directly Participated in the Conspiracy

254.   The Lion Entities directly participated in the conspiracy alleged in this Second Amended Complaint and purposefully directed this conduct at the United States (including the forum State).  Lion Capital and Lion Americas were aware of the conspiracy, took acts in furtherance of the conspiracy, and knowingly accepted the proceeds of Bumble Bee's unlawful conduct.

255.   Lion Capital and Lion Americas are sophisticated companies, and during their 2010 due diligence of Bumble Bee in preparation for the acquisition, the Lion Entities had access to both Bumble Bee senior executives and others who were key members of the conspiracy, as well as Bumble Bee financial and other records that revealed the existence of the conspiracy.  Upon information and belief, Lion Capital and Lion Americas learned of the ongoing conspiracy from these Bumble Bee individuals or records, or both, prior to Lion Capital's acquisition of

109

Bumble Bee.

█████████████████████████████████████████████████████████████████████

██████████████████████████████, and because Lion Capital's due diligence surely also revealed the dire structural economic conditions facing the packaged tuna industry in the United States alleged in this Second Amended Complaint (such as declining demand), it is implausible that Lion Capital – a highly sophisticated investment entity – would not have connected the dots and determined that these successful pricing actions were the result of anything other than collusion. (This inference is further compelled based on Lion Capital and Lion America openly discussing the conspiracy with Bumble Bee and taking acts in furtherance of the conspiracy even before the acquisition was completed, as described below).

256.   It bears noting that later, when the DOJ conducted its due diligence review of TUG's announced plan in late 2014 to purchase Bumble Bee from Lion Capital, DOJ discovered by late 2015 that "the parties knew or should have known from the get go – that the [packaged seafood] market is not functioning competitively today…"[7] (At the time, TUG and Bumble Bee called off their deal.) In other words, a sophisticated entity with non-public access to Bumble Bee's executives (if they were truthful) and records regarding the company's packaged

----

[7]     https://www.justice.gov/opa/pr/chicken-sea-and-bumble-bee-abandon-tuna-merger-after-justice-department-expresses-serious.

110

AWG'S SECOND AMENDED COMPLAINT

seafood business, pricing and communications with competitors would have discovered reasonably soon, i.e., "from the get go," the existence of the conspiracy. DOJ's statement further supports the reasonable inference that Lion Capital and Lion Americas learned about the ongoing conspiracy during their due diligence of Bumble Bee before the 2010 acquisition.

257. The fact that Lion Capital and Lion Americas learned about the conspiracy and what had gone on before each entity joined the conspiracy in 2010 is further supported by the Lion Entities' conduct even before the acquisition of Bumble Bee closed. For example, before Lion Capital announced its purchase of Bumble Bee in late 2010, Lion executives began interacting with the owners of COSI and StarKist.



AWG'S SECOND AMENDED COMPLAINT

1
2
3
4
5   258.
6
7
8
9
10
11
12
13
14
15
16
17   259.
18
19
20
21



– it is apparent that the Lion Entities joined the conspiracy in November 2010 with knowledge of the conspiracy and the price-fixing activities that had gone on before November 2010. Further, it is apparent from Lion Capital and Lion America's subsequent conduct in furtherance of the conspiracy that, when they joined the conspiracy in November 2010, they did so with the intent to pursue the same anticompetitive objectives as

112

AWG'S SECOND AMENDED COMPLAINT

their co-conspirators.  In any event, Lion Capital and Lion Americas subsequently participated in the conspiracy after acquiring Bumble Bee.

260.   The Lion Entities and Bumble Bee were well matched for purposes of the conspiracy.  After buying Bumble Bee, Lion Capital sought investment grade returns for its investors.  Bumble Bee's ongoing participation in the conspiracy at the time that Lion Capital acquired Bumble Bee provided Lion Capital with the opportunity to realize supra-competitive profits from Bumble Bee's business, which in turn would increase Bumble Bee's apparent market value and eventual sale price.  This is just what occurred, as the supra-competitive prices and revenue that the conspiracy delivered to Bumble Bee (before Lion siphoned the money) raised Bumble Bee's apparent market value such that, in late 2014, TUG was going to pay $1.51 billion for Bumble Bee after Lion Capital had bought Bumble Bee for $980 million four years earlier.

261.

262.   Throughout the conspiracy, Lion Capital and Lion Americas were involved in the day-to-day operations of Bumble Bee.  For example, when Lion Capital announced a potential transaction with TUG in 2014, Lea (founder of Lion

113

AWG'S SECOND AMENDED COMPLAINT

Capital and an officer of both Lion Capital and Lion Americas)[8] gave a statement about the Lion Entities's role in Bumble Bee's operations from 2010 to 2014: "We are proud to have played a significant role in the evolution of Bumble Bee over the last 4 years and would like to thank our partners, Chris [Lischewski] and the management team, for helping us achieve such a successful return on our investment."   (Emphasis added.)   Lion Americas' and Lion Capital's heavy involvement in the daily operations of Bumble Bee was consistent with the Lion Entities' business philosophy of getting "down to a very granular knowledge" of the businesses that Lion owned.

263.   In fact, the Lion Entities' website advertises Lion Capital as a private equity firm that closely manages the business affairs of the companies in which it invests.  The website states that Lion Capital "ensure[s] that [its] companies have the best management talent to execute the vision that we develop in a collaborative partnership" while never forgetting "the responsibility for successful outcomes in our companies rests with us [Lion Capital]."   Lea echoed this sentiment in an interview on the website: "If all they [companies Lion Capital acquires] want is a check, there are plenty of private equity firms that are delighted to write you a check and let you get on with your business.  That's not us…We're not good at that.  What we're good at doing is being your partner."  Further, a video on the Lion Entities' website states that: "We [Lion Capital] built a team with an intimate knowledge of the way consumers and brands interact, allowing us to work with

---

[8] Although Lea is an officer of Lion Americas, Lion Americas has taken the position in this litigation that Lea is exclusively a Lion Capital employee, and as such, Lion Americas does not have custody or control over Lea's custodial files. Lion Americas has not taken this position with respect to Lindberg, who was also a director of Lion Americas (without holding any other title).

AWG'S SECOND AMENDED COMPLAINT

companies in a very different way to the average private equity firm…We work closely with management to see exactly what a brand is capable of achieving, and then take it to new heights…. We focus solely on retail and consumer businesses so our team is uniquely positioned to work with management to identify the right strategies for revitalizing operations."

264.   Consistent with the Lion Entities' business philosophy and website, when Lion Capital first acquired Bumble Bee, Lion Capital and Lion Americas took various actions to ensure that they could monitor and control Bumble Bee's business.  As Lischewski told his employees in an internal memorandum at the time of the acquisition of Bumble Bee, the Lion Entities team planned to be "actively involved" with the business.  Lion Capital implemented this strategy of active involvement when it acquired Bumble Bee and thereafter during the conspiracy.  For example: First, Lion Capital placed its own executives on Bumble Bee's board and throughout its parent companies.  Lion Capital executives Lea, Lindberg, and Capps, sat on Bumble Bee's board.  Currently, three of the four board members of Bumble Bee are Lion Capital executives.

AWG'S SECOND AMENDED COMPLAINT

1    265.    

2

3

4

5

6

7

8

9

10

11

12

13    266.    Not only were the Lion Entities regularly receiving information about

14    Bumble Bee during the conspiracy, but the Lion Entities executives took an active

15    role in making decisions about Bumble Bee's operations.

16    

17

18

19

20

21

22    267.

23

24

25

26

27

28                                         116



268.

269.    Not only were Lion Capital and Lion Americas team members aware of the conspiracy, but they also took affirmative acts to further the conspiracy and pursue its anticompetitive objectives.

270.

117



271.

272.

273.

AWG'S SECOND AMENDED COMPLAINT



274.

275.

AWG'S SECOND AMENDED COMPLAINT



276.

277.

9

AWG'S SECOND AMENDED COMPLAINT



278.

121



279.

280.

AWG'S SECOND AMENDED COMPLAINT



[10]      Steve Hodge departed StarKist at the end of 2013, and thus this is the last telephone conversation with his co-conspirators in which he was known to participate before leaving the industry.

AWG'S SECOND AMENDED COMPLAINT



281.

AWG'S SECOND AMENDED COMPLAINT



282.

283.

AWG'S SECOND AMENDED COMPLAINT

284.   In addition to what the Lion Entities team learned in their involvement in Bumble Bee's business, Lischewski served as the Lion Entities' eyes and ears at Bumble Bee, updating Lion Capital and Lion Americas with confidential information about other Defendants and the status of collusive agreements with and information from Defendants.

285.   Based on the conspiracy, TUG reported in its 2014 annual report, issued in February 2015, that "[d]espite minimal sales growth in the U.S., competitive inventory cost and reasonable market conditions helped lift the margin of our US brand."   Similarly, in December 2014, Lion Capital reported that Bumble Bee's EBITDA was a record-breaking $150 Million, on revenue of $1 Billion.   Lion Capital's Kelly Mayer attributed Bumble Bee's record year to the growth of "gross margins through disciplined pricing actions."   These financial results were due to the conspiracy.

286.   In summary, at the time of its acquisition of Bumble Bee, Lion Capital and Lion Americas knowingly entered the ongoing price-fixing conspiracy with knowledge of its operation and of the collusive conduct that occurred prior to

---

[11]   This fee appears to have been waived during at least some of those periods.

AWG'S SECOND AMENDED COMPLAINT

2010.   Following its acquisition in 2010, both Lion Entities affirmatively participated in the conspiracy through 2015 by facilitating coordination and communications with competitors to raise prices and to limit competition.

287.   Additionally, Lion Capital continues to maintain equitable ownership of Bumble Bee, which has appreciated substantially since Lion Capital purchased the company for $980 million in 2010.   As alleged in ¶ 31, TUG had agreed to pay $1.51 billion for Bumble Bee in a deal that was ultimately scuttled due to DOJ's investigation of Defendants.   Accordingly, Lion Capital's equity stake in Bumble Bee has increased by more than $500 million as a result of the conspiracy, even before accounting for the conspiracy profits that have been used to pay down Bumble Bee's debt.

288.   Although DOJ scuttled this merger, Lion Capital has already profited from the conspiracy.   In

289.   Further, Lion Capital and Lion Americas encouraged Bumble Bee to engage in the conspiracy while (as alleged above) simultaneously loading it up with debt and siphoning off its profits, causing Bumble Bee to become severely overleveraged.

AWG'S SECOND AMENDED COMPLAINT

## Lischewski is Liable for his Role in the Conspiracy

290.    Lischewski knowingly participated in, facilitated, and coordinated the conspiracy as shown by the facts alleged throughout this Second Amended Complaint. Lischewski profited substantially from the conspiracy in numerous ways. He used his role to reap unlawful profits by selling Bumble Bee numerous times throughout the conspiracy period. He used Bumble Bee as his personal private banker, authorizing loans to himself from Bumble Bee even while Bumble Bee was woefully undercapitalized.

291.    For this conduct, and as alleged above, Lischewski has been criminally indicted by a federal grand jury.

## EFFECTS OF THE DEFENDANTS' ILLEGAL COURSE OF CONDUCT

292.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition among the Defendants in the sale of shelf-stable tuna was restrained and suppressed;

(b)    Prices of shelf-stable tuna manufactured and sold in the United States by the Defendants were fixed, raised, maintained and/or stabilized at supra-competitive levels; and

(c)    Direct purchasers of shelf-stable tuna, including Plaintiff, were deprived of the benefits of free and open competition in the purchase of shelf-stable tuna.

AWG'S SECOND AMENDED COMPLAINT

293.   Defendants' contract, combination, and conspiracy described herein consists of a continuing agreement, understanding and concert of action among the Defendants, the substantial terms of which were to artificially fix, raise, maintain, and/or stabilize prices paid by Plaintiff and other purchasers for shelf-stable tuna in the United States.

294.   In formulating and effectuating the contract, combination, or conspiracy, Defendants in fact did those things that they unlawfully combined and conspired to do, including, among other things:  agreeing to artificially fix, raise, maintain and/or stabilize prices for shelf-stable tuna in the United States, and implementing and monitoring the conspiracy among the cartel members.

295.   The activities described above have been engaged in by Defendants for the purpose of effectuating the unlawful agreement to fix, raise, maintain and/or stabilize the prices for shelf-stable tuna sold in the United States.

296.   As a direct and proximate result of the contract, combination, or conspiracy alleged herein, Plaintiff was, and continues to be, damaged in its business or property in that it paid supra-competitive prices for shelf-stable tuna, higher than that which it would have paid in the absence of the contract, combination, or conspiracy.

## CAUSES OF ACTION

## COUNT I

**Conspiracy to Fix Prices in Violation of the Sherman Act**
**15 U.S.C. § 1**
**(Against All Defendants)**

297.   Plaintiff incorporates by reference the allegations above, as if fully set forth herein.

129

AWG'S SECOND AMENDED COMPLAINT

298.   Beginning at least as early as May 2004 and continuing through at least July 2015, Defendants engaged in a continuing agreement, understanding and conspiracy to manipulate the price of shelf-stable tuna in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

299.   Defendants each gave their assent to, and acted in furtherance of, activities prohibited by the Sherman Act.  Each Defendant is fully and jointly liable for all acts in furtherance of the conspiracy committed by each other co-conspirator, and by each co-conspirator's agents, employees, representatives, trade groups and other associates, whether named or unnamed in this Complaint.

300.   The  contract,  combination,  and  conspiracy  among  Defendants consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, and sale of shelf-stable tuna,  the substantial terms and purpose of which were:

(a)     To fix, stabilize, maintain and/or raise prices of shelf-stable tuna in the United States and elsewhere; and/or

(b)     To control or reduce the output of shelf-stable tuna in the United States and elsewhere.

301.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in one or more of the following overt acts:

(a)     They agreed to exchange and did exchange current and future price information and private and proprietary business information about shelf-stable tuna sold in the United States and elsewhere;

(b)     They agreed to coordinate and did coordinate price levels and price movements of shelf-stable tuna sold in the United States and elsewhere;

AWG'S SECOND AMENDED COMPLAINT

(c)     They agreed on prices and price levels of shelf-stable tuna sold in the United States and elsewhere;

(d)     They agreed to control or reduce, and did control or reduce, the output of shelf-stable tuna in the United States and elsewhere; and

(e)     They agreed to limit and or reduce the marketing of their products, including by agreeing not to advertise their products as "FAD free."

302.   Defendants entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including without limitation, participating in conversations and meetings in the United States and/or elsewhere to discuss the prices of shelf-stable tuna to be sold and/or the volume of shelf-stable tuna to be produced in the United States and elsewhere; participating in conversations and attending meetings in the United States and/or elsewhere concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in the United States and elsewhere in accordance with the conspiracy; and/or exchanging information about the sale of shelf-stable tuna in the United States and elsewhere.

303.   As a result of Defendants' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. §, and during the Relevant Period:

(a)     Price competition in the sale of shelf-stable tuna among Defendants to Plaintiff and others has been restrained, suppressed and eliminated;

(b)     Prices for shelf-stable tuna sold by Defendants have been raised, fixed, maintained, and/or stabilized at artificially high and noncompetitive levels throughout the United States and elsewhere; and

(c)     Plaintiff has been deprived of the benefit of free and open competition.

AWG'S SECOND AMENDED COMPLAINT

304.   Plaintiff has been injured in its business or property by reason of Defendants' antitrust violations in amounts not yet determined.  Plaintiff's injuries as a direct purchaser of shelf-stable tuna are injuries of the type that the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

305.   Because Defendants controlled approximately 70-80% of the Relevant Market during the Relevant Period, their collective price increases provided sufficient cover, or a "price umbrella," for non-cartel companies who sold shelf-stable tuna without fear of losing sales or market share.

## COUNT II

### Violation of the Kansas Restraint of Trade Act
### K.S.A. 50-101 et seq.
### (Against All Defendants)

306.   Plaintiff incorporates by reference the allegations above, as if fully set forth herein.

307.   Beginning at least as early as May 2004 and continuing through at least July 2015, Defendants engaged in a continuing agreement, understanding, arrangement, contract, trust, combination and conspiracy to manipulate the price of shelf-stable tuna in the United States, in violation of the Kansas Restraint of Trade Act K.S.A. 50-101 *et seq.*

308.   Defendants each gave their assent to, and acted in furtherance of, activities prohibited by the Kansas Restraint of Trade Act.  Each Defendant is fully and jointly liable for all acts in furtherance of the conspiracy committed by each other co-conspirator, and by each co-conspirator's agents, employees, representatives, trade groups and other associates, whether named or unnamed in this Complaint.

AWG'S SECOND AMENDED COMPLAINT

309.  Defendants' actions in violation of the Kansas Restraint of Trade Act include, but are not limited to, participating in a collusive agreement to artificially raise and maintain pricing on shelf-stable tuna through the implementation of coordinated price increases and/or supply manipulation.

310.  Defendants affirmatively concealed from Plaintiff and the general public the existence of their illegal understandings and agreements through misrepresentations and omissions regarding this conspiracy.

311.  As a direct and proximate result of Defendants' conduct, Plaintiff directly purchased shelf-stable tuna at prices higher than it would have paid and on terms that are less favorable than would have been available in a competitive market.

312.  The anticompetitive effect of Defendants' illegal arrangements, contracts, agreements, combination, and conspiracy was to distort and/or artificially inflate the prices that Plaintiff paid for shelf-stable tuna.  Defendants' actions further restrained and controlled full and free competition in the market for shelf-stable tuna.

313.  Defendants' actions deprived Plaintiff of the right to make budgeting, accounting, resource allocations, and other financial and business decisions in a full and free competitive market for canned tuna.

314.   As a result of its purchases, Plaintiff thereby suffered loss, injury, and damage in an amount greater than $75,000.

315.  Plaintiff is entitled to recover in its capacity as a direct purchaser of canned tuna.

316.  Plaintiff seeks to recover treble the damages it sustained as a result of Defendants' conduct, as well as attorneys' fees, costs, and any additional remedies provided by law.

133

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1.     Declaring that the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants, were in violation of Sections 1 of the Sherman Act, 15 U.S.C. § 1 and the Kansas Restraint of Trade Act, K.S.A. 50-101, et seq.;

2.     A jury verdict against Defendants, jointly and severally, in treble the amount of Plaintiff's damages;

3.     Awarding to Plaintiff its attorneys' fees, costs, and interest as allowable by law; and

4.     Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

AWG'S SECOND AMENDED COMPLAINT

1

Dated: October 5, 2018                    Respectfully Submitted,

2

3                                         **STUEVE SIEGEL HANSON LLP**

4                                         /s/ Patrick J. Stueve

5                                         Patrick J. Stueve (KS 13847)
                                          Steve N. Six (KS 16151)
6                                         C. Curtis Shank (KS 26306)
                                          460 Nichols Road, Suite 200
7                                         Kansas City, Missouri 64112
8                                         Telephone:  816-714-7100
                                          Facsimile:  816-714-7101
9                                         stueve@stuevesiegel.com
10                                        six@stuevesiegel.com
                                          shank@stuevesiegel.com
11

12                                        *Counsel for Plaintiff Associated Wholesale*
                                          *Grocers, Inc.*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                             135

AWG'S SECOND AMENDED COMPLAINT

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 5, 2018, I filed a redacted version of the foregoing document with the Clerk of the Court for the United States District Court, Southern District of California, by using the Court's CM/ECF system.  I further certify that I served by e-mail an unredacted version of the foregoing document in its entirety on counsel of record for all Defendants and on interim lead counsel for the Class Plaintiffs.

/s/ Patrick J. Stueve
Patrick J. Stueve
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:  816-714-7100
Facsimile:  816-714-7101
stueve@stuevesiegel.com

136