# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No. 15-MD-2670 JLS (MDD) |
| | **FILED UNDER SEAL** |
| THIS FILING RELATES TO THE DIRECT ACTION PLAINTIFF TRACK. | **FIFTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| _____/ | |

Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holding, LLC ("Plaintiffs"), by and through their undersigned attorneys, complain and allege as follows.

## <u>NATURE OF THE ACTION</u>

1. This action arises out of a conspiracy by the three largest brand name producers of shelf-stable packaged tuna products (i.e., tuna in cans, pouches and ready-to-eat servings) ("Packaged Tuna") in the United States – Bumble Bee Foods LLC, Tri-Union Seafoods LLC, and StarKist Company – which began no later than January 1, 2004, and continued through approximately July 2015 (the "Relevant Period"), to fix, raise, maintain, and/or stabilize prices for Packaged Tuna within the United States in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3).

2.     This conspiracy was effectuated by Defendants' conduct, including, but not limited to: (a) agreeing to issue collusive list price and net price increases on canned tuna; (b) agreeing to decrease the sizes of cans in which canned tuna is sold; (c) agreeing not to compete by refraining from selling branded canned tuna with labels indicating it is "FAD Free" (a term that will be explained below); and (d) agreeing to limit promotional activity for Packaged Tuna.  As a result of Defendants' anticompetitive conduct, Plaintiffs have paid anticompetitive prices for Packaged Tuna.

3.     The United States Department of Justice ("DOJ") is conducting a criminal investigation of this conspiracy. On December 7, 2016, it filed a criminal information against Walter Scott Cameron, a Senior Vice-President of Sales for Bumble Bee, alleging a conspiracy to fix prices of packaged Tuna, including Packaged Tuna. *United States v. Cameron*, No. 3:16-cr-00501-EMC (N.D. Cal.) (ECF No. 1). Cameron, who goes by the name "Scott," has held senior sales positions at Bumble Bee since May 2000 and has served as Bumble Bee's Senior Vice President of Sales since May 2007. Cameron's collusion facilitated Bumble Bee's agreement with Chicken of the Sea and StarKist to increase prices. Cameron pled guilty on January 25, 2017.

4.     On December 21, 2016, the DOJ filed a criminal information against Kenneth Worsham, a Senior Vice President of Marketing for Bumble Bee, alleging his participation in a conspiracy to fix the prices of packaged seafood, including Packaged Tuna. *United States v. Worsham*, No. 3:16-cr-00535-EMC-1 (N.D. Cal.) (ECF NO. 1). Worsham has been a Bumble Bee Senior Vice President of Marketing since at least 2001. He frequently discussed future pricing and shared customer opportunities with his father, Bob Worsham, a StarKist pricing consultant since the 1980s, as well as with Mike White, Chicken of the Sea's Director of Marketing since the late 1980s. Kenneth Worsham entered into agreements to increase prices with the leadership of Bumble Bee and StarKist. He pled guilty on March 15, 2017.

5.     Both plea agreements for Scott Cameron and Kenneth Worsham state that:

> [T]he defendant participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged Tuna, the primary purpose of which was to fix, raise and maintain the prices of packaged seafood sold in the United States. In furtherance of the conspiracy, the defendant engaged in conversations and discussions and attended meetings with representatives of other major packaged-Tuna-producing firms. During these conversations, discussions and meetings, agreements and mutual understandings were reached to fix, raise

> and maintain the prices of packaged seafood sold in
> the United States.

Worsham Plea Agreement, ¶4(b); Cameron Plea Agreement, ¶4(b).

6.    Chicken of the Sea has confirmed that it is an amnesty applicant with respect to Packaged Tuna.  Under the DOJ's Leniency Guidelines, for Chicken of the Sea to receive conditional amnesty, the company must admit to its participation in a criminal antitrust violation, such as price fixing. *See* https://www.justice.gov/atr/page/file/926521/download.

7.    On May 8, 2017, the Antitrust Division of the United States Department of Justice issued a press release announcing that "Bumble Bee Foods LLC has agreed to plead guilty for its role in a conspiracy to fix the prices of shelf-stable tuna fish, such as canned and pouch tuna, sold in the United States."

## JURISDICTION AND VENUE

8.    This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages, equitable relief, and reasonable attorneys' fees and costs for violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).  The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to

28 U.S.C. §§ 1331 and 1337 and Section 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

9. Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391(b), (c) and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

10. This Court has personal jurisdiction over Defendants because, *inter alia*, each: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold and delivered Packaged Tuna in the United States, including in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PLAINTIFFS

11. Plaintiff Winn-Dixie Stores, Inc. is a corporation organized, existing, and doing business under the laws of Florida with its principal place of business at 5050 Edgewood Court, Jacksonville, Florida 32254. During the

Relevant Period, Plaintiff directly purchased Packaged Tuna from one or more of the Defendants and has suffered injury and damages as a result of the antitrust violation alleged herein.

12.     Plaintiff Bi-Lo Holding, LLC is a limited liability company organized under the laws of the State of Delaware.  Its principal place of business is 5050 Edgewood Court, Jacksonville, Florida 32254.  During the Relevant Period, Plaintiff directly purchased Packaged Tuna from one or more of the Defendants and has suffered injury and damages as a result of the antitrust violation alleged herein.

## DEFENDANTS

### BUMBLE BEE

13.     Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business located at 9855 Granite Ridge Drive, Suite 100, San Diego, California 92123.  Bumble Bee produces and sells Packaged Tuna throughout the United States (including this District).  Bumble Bee is privately owned by Lion Capital ("Lion"), based in the United Kingdom.

### Thai Union and Tri-Union

14.     Defendant Tri-Union Seafoods, LLC d/b/a Chicken of the Sea International ("Tri-Union") is a Delaware limited liability company with its

principal place of business at 9330 Scranton Road, Suite 500, San Diego, California 92121.

15.     Defendant Thai Union Group Public Company, Ltd. ("Thai Union"), a publicly held company headquartered in Thailand, is a global processor and exporter of frozen seafood and Packaged Tuna.

16.     Since 2000, Tri-Union has been a wholly-owned subsidiary of Thai Union North America, Inc. ("TUNAI"), a California corporation with its principal place of business at 9330 Scranton Road, Suite 500, San Diego, California 92121. TUNAI, in turn, is a wholly-owned subsidiary of Thai Union. All three vertically-integrated companies have been led by Thiraphong Chansiri, who serves as the CEO and President of Thai Union, the President of TUNAI, and a Director of Tri-Union, at which Chansiri has a day-to-day leadership role.

17.     Throughout the Relevant Period, Thai Union controlled and supervised the business, operations, and activities of Tri-Union, including the conduct alleged in this Complaint. Thai Union has been described in the media as "the world's biggest producer of canned tuna," and is reported to export approximately 55% of its tuna to the United States.

18.     ████████████████████████████████████████

[REDACTED]

19.     Since the acquisition, Thai Union has fully integrated Tri-Union into its global Packaged Tuna business. In 2007, Tri-Union's President, John Signorino, was replaced by Thai Union's former Executive Director and Chief Financial Officer, Shue Wing Chan, who is both a member of the Chansiri family and Thai Union's self-styled "Global Leadership Team." Prior to joining

Tri-Union, he served as the CFO of Thai Union.[1] ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

20.  ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

21.

22.

23. ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

24. ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

25.     Thai Union approved Tri-Union's participation in the 2008 collusive resizing of canned tuna described below. It was aware of and supported collusive price increases for Packaged Tuna. It supported the 2012

agreement among Bumble Bee, Tri-Union and StarKist Company to refrain from labeling their respective brands of canned tuna as "FAD-free," *i.e.*, caught in an environmentally friendly manner.

26. ███████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████

27.     Thus, Tri-Union has been and is the *alter ego* and agent of Thai Union. Moreover, Thai Union directly participated in the conspiracy described herein through personnel who had duties at Thai Union, such as Chan.

28.     Thai Union also profited from the conspiracy. ████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████

29. ███████████████████████████████████████

█████████████████████████████████████████

30. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

31.     Due to the unlawful conduct alleged in this Complaint, Tri-Union earned profits in excess of what it would have earned in a competitive market. Tri-Union transferred this ill-gotten gain to its parent, Thai Union, by paying out the unlawfully obtained profits to Thai Union in the form of dividends and other transfer payments. ████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

32.     Thai Union and Tri-Union pitched themselves to Chicken of the Sea customers as one company, *i.e.*, Thai Union, the world's largest canned

seafood company. Given the breadth and scope of the conspiracy, and the benefits received by Thai Union as a direct result of the collusion alleged herein, it would be inequitable to allow Thai Union to escape responsibility for the actions of the combined enterprise.

33.     As used herein, "Chicken of the Sea" collectively refers to Defendants Tri-Union and Thai Union.

**Dongwon, Del Monte, And StarKist**

34.     Defendant StarKist Co. ("StarKist") is a Delaware corporation with its principal place of business at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania 15212. From December 2002 until October 2008, StarKist was an operating segment of Del Monte Corporation, at which time it was sold to three members of the family-owned and managed Korean conglomerate Dongwon Group. The purchasing companies were Dongwon Industries Co., Ltd. ("Dongwon Industries"), Dongwon Enterprise Co., Ltd. ("Dongwon Enterprise"), and Dongwon F&B Co. After the purchase, StarKist became a majority-owned subsidiary of Dongwon Industries, and since September 23, 2012, StarKist has been a wholly-owned subsidiary of Dongwon Industries. Each of the Dongwon Group affiliates is ultimately owned by Dongwon Enterprise, a family-owned holding company. Jae-chul Kim, who

founded the conglomerate in 1969, owns 24.5% of Dongwon Enterprise, while his son and successor, Nam-jung Kim, owns 68%.

35.     Defendant Del Monte Corporation ("Del Monte"), now known as Big Heart Pet Brands, Inc., is a Delaware corporation with its principal place of business at 1 Strawberry Lane, Orrville, Ohio, 44667. Del Monte acquired StarKist in 2002. Through StarKist, Del Monte produced and sold Packaged Tuna throughout the United States (including in this District), its territories and the District of Columbia. On June 6, 2008, Del Monte entered into a contract to sell StarKist to Dongwon; the sale was completed on October 6, 2008. According to a filing by Del Monte with the Securities & Exchange Commission, "[a]t the time of sale, Del Monte entered into a two-year Operating Services Agreement (which was completed in September 2010) pursuant to which [Del Monte] provided operational services to Starkist Co. such as warehousing, distribution, transportation, sales, information technology and administration."

36.     Del Monte managed the operations of StarKist Co. during the time it owned StarKist, from December 2002 until October 2008, and thereafter continued to manage StarKist under an operating agreement with Dongwon Industries until October 2010, at which time Dongwon Industries became the

operator of StarKist. Key StarKist executives also served as Del Monte executives during the time Del Monte owned and operated StarKist. For example, Don Binotto served as StarKist's CEO from the 1990s through December 2005 when StarKist was owned first by Heinz, then by Del Monte, and then was rehired by Dongwon Industries in July 2008. Joseph Tuza was a Del Monte marketing executive between May 2006 and August 2008, and then was a StarKist Sr. VP of Marketing, from August 2008 until November 2011.

37.     Defendant Dongwon Industries Co., Ltd. is a publicly traded company with its principal place of business at Dongwon Industries Building, 7th Floor, Mabang-ro 68 (Yangjae-dong), Seocho-gu, Seoul, South Korea. Dongwon Industries is part of the Dongwon Group, which has annual Packaged Tuna revenue of approximately $1.4 billion. StarKist regularly describes itself as a subsidiary of Dongwon Group and as a subsidiary of Dongwon Industries.

38.     Dongwon Group controls approximately 75% of the Korean canned tuna market. At the time of the StarKist acquisition, it was reported that "the transaction will help the Dongwon Group, whose affiliates include the world's biggest tuna fishing company, Dongwon Industries, and processed food maker Dongwon F&B, to create the world's biggest canned tuna business. 'We believe that the acquisition of StarKist seafood will help Dongwon establish a

strong foothold and penetration in the U.S. market,' said Park In-gu, vice chairman of Dongwon Enterprise, which is the holding company for the conglomerate." Park also stated that the deal was "a great opportunity for us to initiate operations in the United States."

39.     Dongwon Group's website describes its mission to become the "world's biggest tuna company," through StarKist, which it describes as follows:

> StarKist is the world's best tuna brand with 65 years of history, and holds the No.1 position in the US tuna market. Like Dongwon Group in Korea, StarKist is an iconic tuna brand in the United States, and has been controlled by Dongwon Group since 2008, accompanying Dongwon Group on its journey to globalization. Dongwon Group, which has already become the dominant player in Korea's tuna market, has focused on the steady growth of the world's tuna market and determined that tuna can be one of core resources that will lead future industries. Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna company, and will become de facto a globalized enterprise.

40.     Dongwon Group purchased StarKist with the goal of globalizing and integrating StarKist with its existing seafood businesses. According to former StarKist CEO, In-soo Cho, "StarKist used to own boats and catch its own tuna and process it and sell it" until the "business was sold and became part of larger parts of businesses." StarKist's purchase by Dongwon Group,

which owns one of the largest fishing fleets in the world, was done with the goal of returning StarKist to an integrated business model, "from the sea to the shelves." To do so, executives from other Dongwon Group companies were brought to StarKist to oversee the company; the media reported a contemporaneous "string of exits" by StarKist's U.S. executives.

41. ███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███

42.    █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

43.    In 2012, Dongwon Industries dismissed several StarKist executives and replaced them with executives from the Dongwon entities—a move intended to "better align and leverage Dongwon's expertise and streamline the organization." Among the Dongwon executives brought on to closely manage and control StarKist was Nam-jung Kim, who currently owns 68% of Dongwon

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████

Enterprise. Nam-jung Kim (the son of Dongwon Chair J.C. Kim) was appointed to the newly created position of chief operating officer to lead the "continued growth and expansion of Dongwon-StarKist global business." His biography, according to Bloomberg, demonstrates the seamless integration between the Dongwon affiliates, including StarKist:

> Nam-jung Kim served as Vice President of Dongwon F&B Co., Ltd. Mr. Kim served as the Chief Operating Officer of StarKist Co. since 2012 until October 2014. Mr. Kim's lasting relationship with the tuna industry took off in 1996 at the Dongwon F&B tuna plant in Changwon. He served as the Chief of Management Supporting Division at Dongwon Industry Co., Ltd. He served as a Director of Construction Division at Donwon Systems Corporation and Vice President of Dongwon Enterprise Co., Ltd. He became Product Manager of the sea laver category in 1999. Mr. Kim returned to Dongwon F&B in 2004 to work as Marketing Strategy Manager until 2006. He continued to diversify his business acumen by leading the Finance & Planning Department of Dongwon Industries Co. Since 2008, he served as the Head of the Finance and Planning Department at Dongwon Systems and served as its Vice President of its construction arm. Immediately before joining StarKist, he served as Executive Vice President at Dongwon Enterprise since 2011, the holding company of the Dongwon conglomerate.

According to Bloomberg, Nam-jung Kim currently serves on the Board of Dongwon F&B, and as Vice Chair of StarKist.

44.    Nam-jung Kim was to lead the growth of the combined Dongwon-

StarKist global business. At the same time, Dongwon Industry stated its commitment to supply StarKist directly with a steady stream of tuna, and purchased a dedicated vessel to operate for StarKist in American Somoa. Dongwon added Jae Hoon Choi to the StarKist procurement team to lead the effort.

45. Also in 2012, Hyung-joo Kim was transferred from Dongwon F&B, where he served as chief financial officer, to become StarKist's senior vice president, finance. Andrew Choe joined Dongwon Enterprise in 2010 and was sent to StarKist in 2012 to work as senior vice president of supply chain and operations, before being named StarKist president and CEO in 2014. In addition, Ingu Park, the vice chair of Dongwon Enterprise, became the board chair of StarKist and served as interim president after Don Binotto left in November 2010, reporting directly to the Chair of Dongwon. According to Bloomberg, Ingu Park currently serves as both the CEO of Dongwon Precision Machinery Co. Ltd. and as Chair of the StarKist board of directors. He had previously served as Vice Chair and Director of Dongwon F&B.

46. Dongwon micromanaged StarKist's affairs and disregarded principles of corporate separateness with respect to StarKist. ████████████
████████████████████████████████████████

47.

48.

49.

███████████████████

50.     Dongwon, including J.C. Kim and other senior Dongwon executives, not only established policy and direction for StarKist, but was the decision-maker concerning even routine matters at StarKist, and effectively took over the performance of StarKist's day-to-day operations in carrying out that policy and direction.   Further, because of the disregard of corporate separateness and the lack of any meaningful distinction between the two companies, StarKist employees that performed acts in furtherance of the conspiracy did so on behalf of both Dongwon and StarKist (and Dongwon employees similarly acted on behalf of both StarKist and Dongwon).

51.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

52.     StarKist Company is the agent, instrumentality and *alter ego* of Dongwon, which directly participated in, and profited from, the conspiracy described herein.

53.     ████████████████████████████████████████

54. ██████████████████████████████████

55.     As set forth below, Del Monte participated directly in various acts in furtherance of the conspiracy during the time it owned and operated StarKist. During the Del Monte years, StarKist functioned as an operating segment of Del Monte and was not an independent company. Multiple Del Monte

employees served dual roles in both StarKist and Del Monte, including in their direct participation in the improper exchange of competitive information and illegal agreements. ██████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

56.     As used herein, "StarKist" collectively refers to Defendants StarKist, Del Monte (December 2002 until October 2010), and Dongwon (from October 2008 through the present).

## UNNAMED CO-CONSPIRATORS

57.     On information and belief, at all relevant times, other producers of Packaged Tuna willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

## AGENTS

58.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees,

or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

59. Throughout the Relevant Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of Packaged Tuna in interstate commerce between and among offices of Defendants and their customers located throughout the United States.

60. Throughout the Relevant Period, Defendants transported substantial amounts of Packaged Tuna in a continuous and uninterrupted flow of interstate commerce throughout the United States.

61. Throughout the Relevant Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States.

## FACTUAL ALLEGATIONS

62. Packaged Tuna are sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others. According to a May 2012 presentation by Bumble Bee, it estimated that total

United States retail sales of shelf-stable tuna were $1.719 billion in 2011 and were estimated to be $1.750 billion in 2012.

63.     Defendants are the three largest domestic manufacturers of Packaged Tuna. The industry is highly concentrated. According to the aforementioned presentation by Bumble Bee, it had 29% of the domestic shelf-stable Tuna market, CoS had 18.4% and StarKist had 25.3%. The remaining market share was comprised of smaller companies and private label brands. With respect to shelf-stable tuna, StarKist had 34.6% of the market, Bumble Bee had 27.8% and CoS had 19.4%. In December of 2014, the Wall Street Journal reported that the Defendants' respective shares of the domestic market for canned tuna were 13% for CoS, 25% for Bumble Bee, and 36% for StarKist. Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28% and CoS at 20%.

64.     This oligopolistic structure within the industry is the result of recent mergers and acquisitions. For example, in 1997, Van Camp Tuna Company ("Van Camp") was acquired by the investment group Tri-Union Tunas LLC, of which TUF was a member. Thereafter, TUF bought out the other investors to acquire Van Camp completely, which it renamed Chicken of the Sea International, an entity that was later merged into Tri-Union Tunas

LLC.  In 2008, Dongwon acquired StarKist from Del Monte Foods for $363 million.  Similarly, in 2014, TUF bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the United States.  And in December of 2014, TUF announced the acquisition from Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion.  The combination of CoS and Bumble Bee would have created a virtual duopoly, with the combined entity substantially exceeding the market share of StarKist.  TUF had planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million.

65.    There are economic indications that support the conclusion that there was collusive pricing within the domestic PSP industry.

66.    Consumption of Packaged Tuna, particularly canned tuna, has declined over the last ten years in the United States.  The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. in 2013.  This trend has been widely reported.

67.    An article in the *Washington Post* graphically represented this decline by measuring United States annual *per capita* consumption from 1930 to 2010:



The same article presented this graph, showing that while Americans are buying less canned Tuna, they are paying more for what they do buy:



68.     Given the decline in consumption of the signature Packaged Tuna, one would expect rational businesses to reduce the prices for Packaged Tuna, but that did not happen.

69.     In a competitive environment, a decline in demand for a product will normally lead to a decline in the price of that product. However, because

Defendants controlled the market and agreed with each other to fix the prices of Packaged Tuna, such prices were intentionally and collaboratively set at artificially high levels throughout the Relevant Period.

70. The price increases since August 2004 were a direct result of Defendants' conspiracy to fix the prices of Packaged Tuna in the United States. As a result, Plaintiffs paid artificially inflated prices for Packaged Tuna purchased from the Defendants.

**Defendants Had Many Opportunities to Meet and Collude.**

71. Defendants had ample opportunities to meet and collude. Senior executives from Del Monte, StarKist, Bumble Bee, Chicken of the Sea, Dongwon, and Thai Union routinely attended trade shows and conferences during which they discussed Packaged Tuna pricing and other aspects of their anticompetitive conspiracy. Defendants regularly attended the multi-day biannual Infofish "tuna conference" — typically held in Bangkok, but never held in the United States (where there is more active antitrust enforcement) — as well as regular meetings of the International Tuna Sustainability Foundation ("ISSF") and its governing body, the International Tuna Sustainability Association. Defendants also collaborated on many projects during the Relevant Period, including their joint "Tuna the Wonderfish" advertising campaign, the

National Fisheries Institute's ("NFI") Tuna Council (formerly known as the U.S. Tuna Foundation), and the collective efforts of the ISSF.

72.     Frequent international trade meetings provided opportunities for fostering warm relationships with competitors and ultimately facilitated high-level collusion. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

73.     Meetings hosted by the NFI and ISSF were typically limited to Defendants' high-level executives, and perhaps one organizer from the trade associations. The organizers often had roots in the defendant companies. ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

74.     For example, the NFI's "Tuna the Wonderfish" advertising campaign, which ran from early 2011 through early 2012, was designed to stem the tide of declining sales of Packaged Tuna in the United States. The "Tuna the Wonderfish" campaign gave Defendants ample opportunities to conspire to raise and fix Packaged Tuna prices. Although the campaign was unsuccessful in boosting consumption, Defendants nonetheless jointly implemented price increases at least three times in 2011 and 2012 in the face of falling demand.

75.     There also were numerous interlocking relationships between Chicken of the Sea, Bumble Bee, and StarKist, which fostered frequent high-level discussions among the leadership of these companies. For example, between the late 1990s and 2009, StarKist and Chicken of the Sea had a co-packing agreement concerning their facilities in American Samoa.

76.     During the Relevant Period, Bumble Bee and Chicken of the Sea also co-operated on Tuna processing and packaging. Bumble Bee co-packed for Chicken of the Sea on the west coast at Bumble Bee's Santa Fe Springs,

California plant, while Chicken of the Sea co-packed for Bumble Bee on the east coast at its Georgia plant.

77.     During the Relevant Period, it was commonplace for former executives of one Defendant to later become executives at their former competitors. Within the past 20 years, numerous individuals have held executive or senior sales/marketing positions for more than one Defendant (while maintaining close interlocking relations with former colleagues), including, but not limited to: Chris Lischewski (VP of Procurement at StarKist from 1991 to 1998, and then President and CEO of Bumble Bee, from 1999 to present); Jan Tharp (Sr. VP of Supply Chain at StarKist, from December 2008 to July 2010, Sr. VP, Operations at Bumble Bee, from July 2010 to September 2012, and then Executive VP/COO at Bumble Bee, from September 2012 to present); J. Douglas Hines (Sr. VP, Sales & Marketing at Chicken of the Sea in the 1990s, joining Bumble Bee in 1997, where he served as Bumble Bee's Executive VP and COO from September 2008 to September 2012); Joseph Clancy (VP Sales/Marketing at StarKist, from 1985 to 2002, and then VP Retail Sales at Chicken of the Sea, from November 2002 to December 2010); Kevin McClain (VP of Supply Chain at Chicken of the Sea, from 1979 to 2009, and then VP Resourcing at Bumble Bee, from 2009 to present); David Burt

(General Manager – Marketing at StarKist from 2000 to 2004, and then VP Sales Specialty Markets at Bumble Bee, from March 2004 to present); Hubert Tucker (Sales Manager at Chicken of the Sea, from December 1997 to July 2012 and then Starkist's Director of Sales Eastern Zone, from July 2012 to present); Donald Stanton (General Manager Inventory Control at StarKist, from 1985 to 2001 and then VP Supply Chain at Bumble Bee, from October 2005 to January 2009); and Dennis Hixson (VP Sales Specialty Markets at Chicken of the Sea, from 2005 to 2013, and then Sr. Retail Operations Manager at StarKist, from 2014 to present).

## Defendants' Executives Communicated Frequently.

78.     Scott Cameron, who recently pled guilty to price-fixing Packaged Tuna, has held senior sales positions at Bumble Bee since May 2000 and has served as Bumble Bee's Sr. VP of Sales since May 2007. ███████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████

79.     During the Relevant Period, Cameron held frequent internal sales

conference calls at Bumble Bee attended by numerous account managers.

████████████████████████████████████████████████████

████████████████████████████████████████

80.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

81.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███

82.     ████████████████████████████████████████

████████████████████████████████████████████████████

83.

84.

85. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

## Defendants' Overarching Conspiracy.

86.    Defendants' overarching and continuous scheme to fix domestic prices for Packaged Tuna began at least as early as 2004, as demonstrated by the following specific examples:

### 2004 and 2006 Price Increases

87.    In late 2003 and early 2004, the prevailing prices for canned tuna were below the level needed to deliver the profits expected by Thai Union. Defendants were cutting the price of Packaged Tuna to gain market share. Indeed, for example, six-ounce chunk light tuna which had sold for 63 cents a can in May 2003 had declined to 54 cents a can by late 2003 and early 2004 a decline of 14.3 percent. ██████████████████████████████

██████████████████████████████████████

88. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

89. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Chicken of the Sea had also recently entered into a co-packing agreement with Del Monte's StarKist, which was signed by Mussell and StarKist CEO, Don Binotto (who used a Del Monte email address during all relevant times).

90. On or around March 18, 2004, a Chicken of the Sea board meeting was held to discuss Chicken of the Sea and Thai Union's brand strategy. █

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

91. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

92. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

93.     During May 2004, Mussell was in close contact with Chris

Lischewski, President and CEO of Bumble Bee and Don Binotto, President and CEO of Del Monte's StarKist, as they worked together on their presentations for the industry's major trade event (the InfoFish World Tuna Conference), which was to be held in Bangkok, Thailand in early June. The theme of the presentations was the state of the U.S. tuna market. During late May 2004, these executives also communicated regularly about their planned reactions to new country-of-origin regulations that were soon to go into effect. █████████

███████████████████████████████████████

███████████████████████████████████

94.    █████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████



95. ██████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████

96. ██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

97.     During early June 2004, Mussell, Lischewski, Binotto and their key executives were in Bangkok for the InfoFish World Tuna Conference and other conferences where they gave their presentations about the state of the U.S. tuna market. Mussell's InfoFish presentation about the U.S. tuna market noted that the U.S. average tuna price per pound had dropped by 25% since 1980.

98. ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

99. ██████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████

100. █████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

██████████████████████████████████

101.    On June 9, 2004, Chicken of the Sea began notifying its customers that it would increase net prices on chunk light and solid white (albacore) tuna, effective July 1, 2004. The price increases were blamed on steel, fuel, and freight cost increases, as well as poor fishing. ████████████████████

████████████████████████████████████

████████████████████████████████████

███████████

102.    ██████████████████████████████

████████████████████████████████████

███████████████████████ Del Monte CEO Rick Wolford confirmed on a September 2, 2004 earnings call that all three companies, StarKist, Chicken of the Sea, and Bumble Bee had raised prices on their chunk light (skipjack) and solid white (albacore) tuna products in the June-August 2004 time period.

103.    ██████████████████████████████

█████████████████████████████████ In late August and early September 2004, Defendants announced a second round of list price increases, all effective in October 2004.

104.    ██████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

105. By May 2005, Chicken of the Sea's market share for both chunk light tuna specifically, and all Packaged Tuna generally, had increased back to 2002. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

106. Defendants successfully implemented their price increase in 2004, and were able to keep prices at supracompetitive levels into 2006, when rising albacore costs threatened to erode their supracompetitive profit margins. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

107. [REDACTED]

[REDACTED]

[REDACTED]

108. Between January 30, 2006 and February 23, 2006, StarKist notified its brokers that it would increase prices by approximately 6% on white meat (albacore) tuna products, effective May 1, 2006. ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

109. ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



110.

111.

112.    On March 6, 2006,

Chicken of the Sea announced a price increase of approximately 6% on white meat tuna products, which followed the prices announced by StarKist. For example, Chicken of the Sea raised prices on cases of solid white tuna in water to $58.08 and on 24-packs of solid white tuna in oil to $29.04, which exactly

matched the prices announced by StarKist.

113.      ████████████████████████████████ Bumble Bee announced

a price increase on white meat tuna products that matched the conspiratorial

prices. Bumble Bee made its announcement on April 17, 2006. Both the

Bumble Bee and the Chicken of the Sea price increases went into effect in the

first week of July 2006.

### 2007-2008 Agreement to Downsize Can Size

114.      ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

115.    However, Del Monte needed to bring its competitors along,

otherwise its smaller package at the same price would be too noticeable on the

shelves, and its customers would balk. ████████████████████████



116.

Absent an agreement among all three Defendants to reduce packaging size, it would have been against the individual interest of any one of

the Defendants to make the shift for fear of losing market share as major customers were opposed to downsizing and threatened to drop any brand that made the switch in favor of a brand that did not make the switch. Thus, all Defendants had to agree to downsize their tuna packages. Indeed, although StarKist announced its intention to downsize in January 2008, it did not begin the process of converting its cans until late April 2008, ████████████

████████████████████████████████

117.  ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

118.  ████████████████████████████████

████████████████████████████████

████████████████████████████████



119.

120. The package-reduction agreement was facilitated by Impress USA,

Inc., a canner with facilities in American Samoa.  In 2007-08, Impress had a strong commercial relationship with StarKist, Bumble Bee and Chicken of the Sea. ███████████████████████████████████████████████

███████████████████████████████████████

121. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████

122. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

123.

124.

125.

126.

127. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

128. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

129. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

130.

131. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

132. Thereafter, beginning in or about July 21, 2008, Bumble Bee, Chicken of the Sea and Del Monte/StarKist began distributing five ounce cans of tuna to replace their six ounce cans, as well as downsized pouched tuna. The size change increased the price per ounce of packaged tuna sold to Plaintiffs by 20 percent. ████████████████████████████████████

████████████████████████████████████████

133. ████████████████████████████████████████████████

134.

135.

136.

137. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

138. ███████████████████████████████████████████████

██████████████████████████████████████████

**2008 Price Increase**

139.     Not content with making customers pay the same amount for a smaller package of tuna, Defendants also colluded to raise list prices for Packaged Tuna in 2008.

140. ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████

141. ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

142. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

143. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

144. ████████████████████████████████████████

145.

146.

147.     StarKist, Chicken of the Sea, and Bumble Bee did issue list price increases in the third quarter of 2008, many of which were nearly identical for various types of Packaged Tuna. Bumble Bee's list was issued on or around June 27, 2008, and was effective September 29, 2008. Chicken of the Sea advised its customers of its list price increase on or around July 3, 2008 with a stated effective date of September 1, 2008. On or around June 17, 2008, Del Monte's StarKist, issued a list price increase effective July 21, 2008.

148.

**2010 Price Increase**

149.     The Defendants conspired again in 2010 to raise net prices on

various Packaged Tuna, particularly chunk light tuna. Announcing an increase in net prices is unusual in the Packaged Tuna industry because net prices are usually only given to the Defendants' sales brokers and not broadly announced to the trade. Further, net prices are often given orally and not in a letter. It is also unusual to announce mid-quarter increases. Here, the price increases were announced mid-quarter and the net prices were disclosed in a letter. The increases were all announced in or around May 2010 and took effect in the third quarter of that year. The increases were nearly identical on a per unit basis.

150. ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████

151. ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

persuade Bumble Bee to join Chicken of the Sea and StarKist in an agreement to raise net prices.

152.     On or around April 26-27, 2010, StarKist's Joe Tuza and Melissa Murphy-Brown, Bumble Bee's Dave Melbourne, and Chicken of the Sea's John Sawyer were all in Washington D.C. for an NFI meeting and all stayed at the Washington Marriott in Georgetown. The NFI venue provided an opportunity for high-level talks between executives ████████████████████████████████████████

153.     ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████

154.     ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

155. ██████████████████████████████████████████

██████████████████████████████████████████████

███████████

156. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

157. ██████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████

158. ██████████████████████████████████████████

██████████████████████████████████████████████

159.

160.

161.

162. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

163.     On May 19, 2010, a meeting of the NFI's Tuna Council was held and was attended by StarKist's Don Binotto, Melissa Murphy-Brown, and Joe Tuza; Bumble Bee's Chris Lischewski and Dave Melbourne, and Chicken of the Sea's John Sawyer, Shue Wing Chan, and Kevin Bixler.

164. ████████████████████████████████████████████████

████████████████████

165.     On or about May 21, 2010, Bumble Bee issued its net increase letter, which was effective in or around August 2010. All of the net price increase announcements were set at nearly identical levels. Like StarKist and Chicken of the Sea, Bumble Bee pretextually blamed fishing restrictions for its increases.

**2011-2012 Price Increases**

166. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

167. ████████████████████████████████████████████████████

████████████████████████████████████████████ At the same time,

StarKist's Joe Tuza and Melissa Murphy-Brown; Bumble Bee's Chris Lischewski and Dave Melbourne; and Chicken of the Sea's John Sawyer were all collaborating closely on various NFI matters, including the companies' joint Tuna the Wonderfish campaign. On or around January 26-27, 2011, the executives met in San Diego for ISSF and NFI meetings. Chicken of the Sea's Shue Wing Chan attended the San Diego meetings, as well.

168. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

169.

170.

171.

172.

173.

174.

175.

176.

███████

177.    On or around March 10, 2011, Bumble Bee announced to its brokers "broad scale list price increases" across many of its Packaged Tuna products, effective May 29, 2011, also citing cost increases "with no signs of relief in the near future."

178.    ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████

179.    On March 16, 2011, there was an NFI conference call attended by Chicken of the Sea's John Sawyer, StarKist's Joe Tuza and Melissa Murphy-Brown, and Bumble Bee's Dave Melbourne.

180.    The next day, Chicken of the Sea announced to its brokers that it would increase its tuna net prices, effective June 1, 2011, citing cost increases.

Chicken of the Sea's increase, based on a comparison of net to list prices, was proportional to the list price increases of StarKist and Bumble Bee.

181. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████

**2011-2012 Price Increases**

182. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



183.

184. the Defendants announced

price increases as follows: StarKist on or about January 13, 2012; Bumble Bee on or about January 17, 2012; and Chicken of the Sea on or about January 18, 2012. Each price increase announced identical (or virtually identical) increases on a light and white tuna products. For example, a 48 pack of five ounce cans

of chunk light tuna in water increased from $40.80 to $43.68. Other products also increased by identical percentages. The increases for Bumble Bee and Chicken of the Sea were effective April 1, 2012, while StarKist's increase went into effect on March 26, 2012.

185. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████

186. The 2008-12 list price increases set benchmarks that affected all subsequent list prices of Packaged Tuna. However, the Defendants collusion on prices did not stop after the March 2012 price increase.

187. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

The Bumble Bee increase was not announced until March 30, 2012. On or around April 26, 2012, StarKist announced a substantially similar increase.

188.    Defendants continued to share sensitive information about pricing and market share in order to police each other's adherence to the collusive agreements. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████  By monitoring market share, the companies could identify sudden spikes that would reveal whether one competitor was cheating on their agreement and therefore make such cheating (*i.e.* true price competition) less likely to occur.

189.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  Private dinners and other social events

continued to be venues for high-level executives at Chicken of the Sea, Bumble Bee, and StarKist to collude. All the usual channels of collusion remained open and prices remained inflated.

**Defendant Conspired to Not Offer "FAD Free" Tuna Products.**

190.    Defendants also conspired not to compete by collectively agreeing not to offer branded tuna products labeled as being "FAD free." FAD-free tuna is tuna caught without the use of fish aggregation devices. Because FADs are considered unsustainable and destructive to ocean ecosystems, there is a growing demand among consumers for FAD-free tuna. However, FAD-free methods of catching tuna are costly. Defendants saw FAD-free tuna as a threat to their selling margins. However, if any one Defendant put out such a product, the others would have to follow or risk losing sales.

191.    By early November 2011, Chris Lischewski of Bumble Bee, Shue Wing Chan of Chicken of the Sea, and In-Soo Cho of StarKist had collaborated on an article attacking Greenpeace and other environmental groups for criticizing the way tuna is harvested. The sustainability issue came up in late 2011 in debates within the NFI.

192.    In February 2012, StarKist, Bumble Bee and Chicken of the Sea entered into an agreement not to compete on the sale of FAD-free canned tuna.

Each company agreed that it would not sell any FAD-free product under its own label, despite strong and growing demand by consumers for FAD-free products.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████

193.  ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

194. ██████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████

195.    Defendants' agreement not to compete by producing branded tuna labeled "FAD Free" ensured that FAD-free tuna, which would be more costly to produce and have a lower profit margin, did not cannibalize sales of their non-FAD-free tuna products that were the subject of their price-fixing conspiracy.

**Defendants Agreed to Limit Competition Relating to Promotions.**

196.    To ensure that their collusive tuna price increases would not erode, Defendants also agreed to limit promotions on such products. ████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

**The Packaged Tuna Market Is Conducive to Collusion.**

197.　The structure and characteristics of the Packaged Tuna market in the United States are conducive to a price-fixing agreement.

198.　Packaged Tuna is a commodity product sold directly to retail grocery chains, grocery wholesalers, and food distributors. Packaged Tuna varieties contain similar amounts of seafood, and are marketed in packages, including, but not limited to, cans, pouches, and cups. Purchasers of Packaged Tuna are more likely to be influenced by price than anything else when making a purchasing decision.

199.　There are substantial barriers precluding, or reducing, entry into the Packaged Tuna market, including high start-up costs (processing plants can cost tens of millions of dollars to build and maintain), manufacturing expertise, access to raw materials, and access to distribution channels. Therefore, Defendants could collectively raise prices, and, in fact, raised prices, without fear of being undercut by new entrants.

200.　Purchasers routinely source virtually all their Packaged Tuna from

Defendants. Retailers and distributors must carry Defendants' product lines in order to stay competitive in the markets in which they do business. As a result, Defendants dominated the United States Packaged Tuna market during the Relevant Period, and continue to do so.

201.    Defendants possessed significant market power to raise prices for Packaged Tuna above competitive levels in the United States with a combined market share of 80-85% during 2004-2015. Upon information and belief, they conspired to ensure the stabilization and maintenance of their respective market shares in the Packaged Tuna market despite declining demand.

202.    There are no economically reasonable substitutes for Packaged Tuna. Alternative forms of seafood, such as frozen seafood or fresh seafood, require refrigeration and preparation, such as cooking, before they can be consumed, and lack the convenience, consistent portion size, and ease of use of Packaged Tuna.

## **PLAINTIFFS SUFFERED ANTITRUST INJURY**

203.    During the Relevant Period, Defendants' conspiracy had the following effects, among others:

a.      Price competition was restrained or eliminated with respect to Packaged Tuna; and

b.      The prices of Packaged Tuna were fixed, raised, maintained, or stabilized at artificially inflated levels.

204.    During the Relevant Period, Defendants charged supra-competitive prices for Packaged Tuna sold to Plaintiffs. By reason of Defendants' alleged violations of the antitrust laws, Plaintiffs sustained damages, injury, and harm to their businesses or property in an amount to be determined, having paid higher prices for Packaged Tuna than they otherwise would have paid absent Defendants' alleged illegal contract, combination, or conspiracy. This is an antitrust injury of the type the antitrust laws were meant to punish and prevent.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

205.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claims for relief.

206.    Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the alleged conspiracy

until at least July of 2015, when the DOJ's investigation first became public.

207.    Indeed, the conspiracy was so organized and effective that it was only accidentally discovered by the DOJ in the process of reviewing internal company documents relating to the proposed merger between Chicken of the Sea and Bumble Bee.

208.    Defendants engaged in a secret conspiracy and did not reveal facts that would put Plaintiffs on inquiry notice that there was an agreement to fix prices for Packaged Tuna. ███████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████ Defendants' communications with customers also offered plausible pretextual reasons for their similar price movements.

209.    ███████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████

210.    Thus, the conspiracy was actively concealed through secret communications among Defendants and pretextual communications to

customers until July 23, 2015. Plaintiffs were unaware of Defendants' and their co-conspirators' unlawful conduct, and did not know they were paying artificially high prices for Packaged Tuna.

211. Defendants and their co-conspirators met and communicated secretly concerning the pricing and marketing of Packaged Tuna to avoid detection.

212. Throughout the Relevant Period, Defendants secretly agreed to implement very similar or identical price increases on Packaged Tuna at similar times. To avoid detection by their customers, including Plaintiffs, Defendants issued announcements and made other communications to the market that were intended to mislead their customers, including Plaintiffs, into believing that the pricing actions were taken independently by each Defendant because of cost increases that Defendants falsely claimed were unavoidable and industry-wide.

213. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

214. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

215.     In the summer of 2004, Defendants each collusively increased their packaged tuna prices by similar amounts. Chicken of the Sea, Del Monte on behalf of StarKist, and Bumble Bee announced increases in the price of six oz. packages of "chunk light" tuna, falsely attributing the increases to increased raw material costs due to, among other things, a dwindling supply of light tuna. In an August 30, 2004 communication to its sales agents, Chicken of the Sea falsely advised that the price increase was due to increased raw material costs, including natural gas, steel, freight and fuel, as well as "poor catch rates and tight supply." It instructed its agents: "It is critical that this information be shared with all customers **immediately**." (emphasis in original). On September 2, 2004, Chicken of the Sea announced to all of its customers that it would increase prices by approximately 8% on six oz. packages of light tuna, effective

on orders placed after October 18, 2004. According to the announcement, the increase was attributable to, among other things, "poor fishing conditions."

216.    On September 2, 2004, Del Monte (at the time the owner of StarKist and the issuer of all StarKist price increases) held an earnings conference call on which its Chair, Rick Wolford, falsely attributed the joint price increases not to collusion, but to a "similar experience that we all have with tight Skipjack as well as tight albacore supplies."

217.    These pretextual statements masked the truth: ████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████ None of these activities could feasibly be detected by outsiders.

218.    Plaintiffs accepted and relied on the proffered reasons for the price increases, in some cases incorporating the explanation into their contemporaneous internal communications about why all three suppliers were

increasing their prices in very similar amounts.

219.   In 2006, Defendants continued their conspiracy █████████ ██████████████████████████████████████████████████ ████████████████████████████████ These executives had built a relationship of trust with each other because of their long histories together in the industry. ██████████████████████████████████████ ██████████████████████████████████

220.   ████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████

221.   For example, on March 6, 2006, Chicken of the Sea's Anthony Montoya sent out a price increase announcement that pretextually blamed the albacore increases on raw material, fuel, steel and freight costs, and did not

mention that the decision to increase was made only after reaching agreement with Chicken of the Sea's competitors. On April 17, 2006, a Bumble Bee price announcement sent out by Scott Cameron pretextually blamed the increase on increases in fuel, steel, and albacore costs, but failed to mention his own collusive conduct. Similarly, Del Monte blamed its increases on rising packaging and energy cost without revealing the collusion.

222. With respect to the package downsizing conduct in 2007-08, Defendants fraudulently concealed their agreement to reduce the net weight of their tuna cans and pouches by several means. As pled herein in greater detail, Defendants used a third party--Impress-- █████████████████████ ████████████ in an effort to conceal their conspiracy from Plaintiffs. Using a third-party canner with no ties to Plaintiffs to facilitate communications reduced the number of direct, conspirator-to-conspirator communications, thus reducing the likelihood of detection.

223. ███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████    ████████████████████████

██████████████████████████████████████████

224. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

225. Indeed, in or around May 2008, Bumble Bee began to give presentations to its customers that flatly misled them about the reason for Bumble Bee's decision to downsize its cans. Although Bumble Bee's executives, including its CEO and President, Chris Lischewski, had been colluding with competitors directly and indirectly on this issue since at least

January 2008, the presentation stated that Bumble Bee had decided to downsize in <u>March 2008</u> after confirming "from other customers the long alluded-to rumor that the Light Meat tuna brand leader Del Monte /Star-Kist will be downsizing all 6oz net weight sizes to 5oz." ██████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████

226.    In addition, in the Summer of 2008, StarKist, Bumble Bee, and Chicken of the Sea each announced they would increase tuna prices by an average of approximately 8.5% across the board. To mask their lockstep pricing as independent action, Defendants again falsely cited increases in industry costs. For example, in its June 27, 2008 announcement, Bumble Bee attributed the joint move to increases in the "[c]osts of protein, packaging, steel, aluminum, transportation and fuel."

227.    On or around June 6, 2008, Chicken of the Sea sent a letter to its brokers giving the following rationale for price increases that occurred at the same time as the downsizing (prices were increased for remaining 6 oz. cans, and the price for 5 oz. cans was set at the same level as the price for the 6 oz.

cans):

> [l]ight meat tuna raw material prices have gone up over $1,000 MT over the last two years. Prices are not expected to retreat due to the strong worldwide demand and a weak Dollar. Combine this fact with increases in production and supply chain costs Chicken of the Sea is announcing a list price increase on all chunk light tuna items.. . .

The letter also cited the following "increases unrelated to fish price: 15% increase in packaging; 29.5% increase in land and ocean freight; 30.0% increase in cannery utility; 33.3% increase in labor."

228.    Similarly, a published article at the time of the announcement of the can resizing stated that "a customer service representative for StarKist that explained that tuna prices have reached an all-time high, and coupled with the increased costs of transportation and other ingredients, they had to make a change." And another article said "in August of 2008 when the move had been implemented, StarKist stated that it did this primarily for environmental reasons, including the purpose of "sav[ing] two million gallons of water a year, while only taking out two teaspoons of tuna from each can." The existence of a price-fixing conspiracy as a reason for the price increase was not disclosed.

229.    On August 27, 2008, Del Monte issued a price announcement to all of its "Valued Customers," advising of a StarKist price increase, effective

November 3, 2008, due to "continued escalation of global Tuna fish prices," and stating that "[o]ver the next several days our sales agency and/or local sales management will be in contact with you to provide additional details and review plans that will continue the growth of our mutual business." In accordance with its announcement, Del Monte's agents and representatives contacted its customers over the next several months to provide detailed, but misleading, explanations for both recent and forthcoming StarKist price increases.

230. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████

231. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ The close ties and trust among executives, many of whom had previously worked together before moving to competing firms, made discovery of the conspiracy by their customers almost impossible.

232.    With respect to the 2010 net price increase, Bumble Bee's Lischewski circulated a trade announcement on May 21, 2010, stating that "skipjack pricing volatility" led to "cost increases" that drove tuna wholesale prices upward. He listed as "compounding factors" a three-month ban on FAD fishing imposed in the Western Pacific region and sharp increases in the cost of diesel fuel. Likewise, in its May 10, 2010 list price increase announcement, StarKist attributed the increase to low catch rates, fishery closures, and fuel price escalation.  Again, the existence of a price-fixing conspiracy as a reason for the price increases was not disclosed.

233.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

234.    In its March 2011 announcement of a price increase effective in May 2011, StarKist cited increases in "Crude index," "Packaging costs," and "Fish costs." In its January 2012 announcement of a price increase effective March 2012, StarKist cited increases in the costs of crude oil, metal, and transportation, as well as "Record high fish costs." Chicken of the Sea, in its January 2012 announcement of a price increase effective March 2012, placed

the blame on "High fish prices" and "higher raw material costs." Again in its March 30, 2012 announcement to "Our Valued Customers" of another price increase effective July 2012, Bumble Bee cited "global inflation, transportation cost increases stemming from global demand on fossil fuel, and resource materials (most notably on fish)." And StarKist, in its April 2012 announcement to "Our Valued Customers" of a price increase, effective in July 2012, cited "numerous costs increases" and escalating "fish costs" as the reasons for the price increase. These statements were misleading because they failed to disclose the true reason for the increase was Defendants' illegal agreement.

235. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Defendants ensured that a written record of their interactions with each other concerning this price increase was not created. There was no way Plaintiffs could have discovered the existence of these communications any earlier than they did.

236.     None of these communications ever mentioned Defendants' collusion or the fact that, as DOJ's Bill Baer stated in December 2015, their industry was "not functioning competitively."

237.     The guilty plea of Kenneth Worsham of Bumble Bee further raises the inference that the conspiracy was affirmatively concealed. Kenneth Worsham is the son of Robert Worsham, who was a consultant for StarKist and, as alleged above, participated in the 2008 agreement to increase list prices for Packaged Tuna. The involvement of both father and son in the collusive activity provided Defendants with an avenue to pass competitive information in private with no need to present an explanation for why they were meeting and communicating.

238.     ████████████████████████████████████████████

████████████████████████████████████████████████  ██████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Defendants' conspiracy indicted Lischewski for his role in that conspiracy and the indictment expressly alleged that he deleted emails to conceal his unlawful conduct.

239.    None of the facts or information available to Plaintiffs prior to July 23, 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy prior to July 23, 2015.

240.    Defendants thus actively misled their customers about the price-fixing scheme. Their various justifications for price increases did not disclose that they had agreed among themselves to fix, raise or stabilize the price of Packaged Tuna. Defendants' justifications for their price increases were also misleading, to the extent they were true even in part, because they failed to disclose that the price increases in fact resulted from their illegal agreement and conspiracy.

241.    As a result of Defendants' and their co-conspirators' fraudulent concealment of the price-fixing conspiracy, the running of any statute of limitations is tolled with respect to Plaintiffs' claims of anticompetitive conduct alleged in this complaint.

## ADDITIONAL GUILTY PLEAS

241.   Bumble Bee recently pled guilty to its role in a conspiracy to fix prices of packaged seafood products in the United States.  The Department of Justice issued a press release on May 8, 2017 detailing the nature of the plea: "In addition to agreeing to plead guilty, Bumble Bee has agreed to pay a $25 million criminal fine, which will increase to a maximum criminal fine of $81.5 million, payable by a related entity [Big Catch Cayman LP], in the event of a sale of Bumble Bee subject to certain terms and conditions.  Bumble Bee has also agreed to cooperate with the Antitrust Division's ongoing investigation."[3]

242.   Steve Hodge recently pled guilty to his role in the price-fixing conspiracy during his tenure at StarKist.  Hodge admitted to (and has been convicted of) price-fixing canned tuna (and other packaged seafood products) in violation of the Sherman Act for the period between at least 2011 until 2013.

## LION CAPITAL ENTITIES

243.   Defendant Lion Capital LLP ("Lion Capital") is a British private equity firm specializing in investments in the consumer sector.  Lyndon Lea ("Lea") co-founded the company in 2004.  Lion Capital purchased Bumble Bee in 2010 for approximately $980 Million from Centre Partners Management

---

[3] https://www.justice.gov/opa/pr/bumble-bee-agrees-plead-guilty-price-fixing.

LLC ("Centre"), a United States-based private equity firm. According to its website, Lion Capital maintained offices in New York and Los Angeles during a time period covered by the alleged conspiracy. Lion Capital's Los Angeles office was responsible for overseeing the Bumble Bee investment. The Lion Capital members in this office included Eric Lindberg ("Lindberg"), Jeff Chang ("Chang"), and Jacob Capps ("Capps"). As members of a limited liability partnership incorporated under the laws of the United Kingdom, the conduct of Lindberg, Chang, and Capps are imputed to Lion Capital as a matter of both U.S. and British law.

244. Defendant Lion Capital (Americas), Inc. ("Lion Americas") is another parent company of Bumble Bee that is identified as such in Bumble Bee's plea agreement. It is the subsidiary through which Lion Capital operates in the United States. There is no meaningful distinction between Lion Capital and Lion Americas (together, the "Lion Entities"). Lion Americas is headquartered in the same Los Angeles office as Lion Capital. In terms of personnel, Lion Americas has significant overlap with Lion Capital. For example, Lindberg was both a director of Lion Americas and a member at Lion Capital, while Capps was President of Lion Americas and a member at Lion Capital. In other words, the key executives involved on the Bumble Bee

account during the relevant period were concurrently both Lion Americas and Lion Capital directors and officers. During the relevant period, there is no indication that Lindberg, Capps, and Chang ever made any attempt to distinguish their work for Lion Capital versus Lion Americas, such as by identifying that they were appearing at a Bumble Bee Board of Director Meeting as a Lion Capital partner checking on its investment as opposed to as a director of Lion Americas in its management capacity (or visa versa). During the relevant time period, Lindberg, Capps, and Chang never made any distinction between acts they took as Lion Capital members or as Lion Americas executives or directors. Additionally, Lion Americas and Lion Capital use the same website without distinguishing between the two entities.[4]

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

245. Lion Capital and Lion Americas participated in the conspiracy alleged in this Fourth Amended Complaint through Lindberg, Chang, and Capps (as well as other employees of both entities), and the actions taken by these individuals in furtherance of the conspiracy (as alleged below) were taken

---

[4] https://www.bloomberg.com/profiles/companies/0058736D:US-lion-capital-americas-inc.

on behalf of both Lion Capital and Lion Americas in their official capacities as senior executives of both entities and as members of Lion Capital.

246.    Although Lindberg, Chang, and Capps were members of Lion Capital and also held titles at Lion Americas, each was unequivocally an employee of Lion Capital. ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

247.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

248. Although Lea was actively involved in managing Lion Capital's investment in Bumble Bee and attended most Bumble Bee board meetings as a member of its board of directors, he assigned Mr. Lindberg to be principally responsible for managing Lion Capital's investment in Bumble Bee, and he assigned Capps and Chang to assist Lindberg. Accordingly, all the conduct detailed in this Fourth Amended Complaint undertaken by Lindberg, Chang, and Capps was performed at the direction and under the close supervision of Lea, as part of Lindberg's, Chang's and Capps' duties and responsibilities to Lion Capital.

249. At all times relevant to this Fourth Amended Complaint, Lion Americas acted as the agent of Lion Capital. In fact, in filing its Form ADV, the uniform form used by investment advisers to register with the SEC and state securities authorities, Lion Americas answered yes to the question "Do you *control* or are you *controlled* by the related person [Lion Capital LLP]?" (emphasis in original). Also, Lion Capital has asserted that Lion Americas exists to provide investment advice to Lion Capital about its U.S.-based

portfolio companies (Bumble Bee included). Accordingly, but for Lion Americas' existence, Lion Capital would have performed this function itself.

250. Lion Americas would not exist but for Lion Capital. Lion Americas exists solely to manage Lion Capital investment vehicles. Lion Capital wholly owns Lion Americas, and they act as a single enterprise: anything Lion Americas does to increase the profitability of Lion Capital's investment companies is designed to serve and increase the investments of Lion Capital. They thus have a complete unity to interests and common design to serve Lion Capital's business and increase the profitability and returns of Lion Capital's investment vehicles. Put another way, Lion Capital and Lion Americas have no distinct economic interests; they function as a single economic unit.

251. Lion Americas also performed additional functions that Lion Capital would have had to perform, but for Lion Americas. ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████      ████████████████████

███████████████████████████████████████████

252. Additionally, due to Lea's ability to dictate the day-to-day responsibilities of Lion Capital's members, Lion Capital has complete control and discretion over the day-to-day operations of Lion Americas. █████████

253. Further, Lion Americas was wholly dependent on Lion Capital for funding. Upon information and belief, Lion Americas had no source of revenue independent of Lion Capital, nor did Lion Americas have any direct, independent affiliation with Lion Capital's investment funds. Thus, Lion

Americas acted entirely at the direction of Lion Capital and was entirely dependent on Lion Capital for funding.

254. Defendant Big Catch Cayman LP aka Lion/Big Catch Cayman LP ("Big Catch") is a holding company that wholly owns Bumble Bee. Big Catch was established in November 2010, and its principal place of business is c/o Lion Capital (Americas) Inc., 888 7th Avenue, 43rd Floor, New York, N.Y. 10019. Big Catch is the entity referenced in Bumble Bee's criminal plea agreement as the entity that would receive the proceeds from the sale of Bumble Bee. Based on this fact, the DOJ required that Big Catch must pay up to $81.5 million in criminal fines in the event that Bumble Bee is sold, in order to prevent Big Catch and its investors (including Lion Capital) from being unjustly enriched from the unlawful conduct committed by Bumble Bee.

255. Big Catch is a shell company and does not engage in any operations separate from those of Lion Capital and Bumble Bee. ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████    ████████████████████

████████████████████████████████████████████

[REDACTED]

[REDACTED]

256.    Additionally, the corporate veil between Big Catch and Lion Capital must be pierced and disregarded in order to prevent fraud and injustice. Big Catch was created by Lion Capital in bad faith, and it exists only to serve as a vehicle both to funnel conspiracy proceeds from Bumble Bee to Lion, and to attempt to insulate Lion from its involvement in the price-fixing conspiracy alleged in this Fourth Amended Complaint. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Lion knew that these targets could not be reached but for Bumble Bee's continued participation in the conspiracy, and deliberately set these targets to incentivize and induce the unlawful actions undertaken by these individuals in furtherance of the conspiracy alleged in this Fourth Amended Complaint.

257.    [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████ Thus, Lion Capital structured Big Catch to shift the risk of the conspiracy's detection to the victim's of the price-fixing conspiracy, while seeking to guarantee Lion Capital and its investors the conspiracy's financial upside.

258. Accordingly, Big Catch is liable for its role in the conspiracy because it is the alter ego of Lion Capital.

259.   Lion Capital, Lion Americas, and Big Catch are all defined as "parent companies" in Bumble Bee's Plea Agreement with the DOJ.   (Lion Capital, through its control of Bumble Bee's board of directors, expressly approved this agreement).   Additionally, Bumble Bee is a wholly-owned subsidiary of Big Catch, and Lion Capital maintains equitable ownership of both Bumble Bee and Big Catch. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████ Further, Lion Capital held itself out as Bumble Bee's owner during conspiracy meetings, and leveraged its control of Bumble Bee to meet with Dongwon and TUG for the purpose of policing the conspiracy and ensuring its effectiveness.

260.   As described below, Lion Capital and Lion Americas directly participated in the conspiracy through Lea, Lindberg, Chang, and Capps (as well as other Lion Capital employees).   The conduct of Lindberg, Chang, and Capps is legally imputed to Lion Capital because: (1) as members of a Limited Liability Partnership formed under British law, the actions of Lindberg, Chang,

and Capps bind the company as a matter of law; (2) Lindberg, Chang, and Capps are employees of Lion Capital and, because all acts that each committed, as alleged in this Fourth Amended Complaint, were within the scope of Lindberg's, Chang's, and Capps' employment for Lion Capital, Lion Capital is vicariously liable for their conduct under the principle of *respondeat superior*; and (3) Lindberg, Chang, and Capps are agents of Lion Capital because their conduct described in this Fourth Amended Complaint was committed with the knowledge and at the direction of Lea (Lion Capital's managing partner). As further detailed below, Lion Capital and Lion America directly participated in the conspiracy by: (1) attending meetings with the owners of COSI (TUG) and StarKist (Dongwon) at which Lion Capital and Lion Americas agreed to direct Bumble Bee to continue to fully support the conspiracy's various pricing agreements; and (2) using Lion Capital's control of Bumble Bee to ensure that its promises to TUG and Dongwon were met. Big Catch participated in the conspiracy as the alter ego of Lion Capital.

261. The Lion Entities directly participated in the conspiracy alleged in this Fourth Amended Complaint and purposefully directed this conduct at the United States (including the forum State). Lion Capital and Lion Americas

were aware of the conspiracy, took acts in furtherance of the conspiracy, and knowingly accepted the proceeds of Bumble Bee's unlawful conduct.

262.    Lion Capital and Lion Americas are sophisticated companies, and during their 2010 due diligence of Bumble Bee in preparation for the acquisition, the Lion Entities had access to both Bumble Bee senior executives and others who were key members of the conspiracy, as well as Bumble Bee financial and other records that revealed the existence of the conspiracy.  Upon information and belief, Lion Capital and Lion Americas learned of the ongoing conspiracy from these Bumble Bee individuals or records, or both, prior to Lion Capital's acquisition of Bumble Bee. ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████ and because Lion Capital's due diligence surely also revealed the dire structural economic conditions facing the packaged tuna industry in the United States alleged █

██████████████████ of this Fourth Amended Complaint (such as declining demand), it is implausible that Lion Capital – a highly sophisticated investment entity – would not have connected the dots and determined that these successful pricing actions were the result of anything other than collusion. (This inference is further compelled based on Lion Capital and Lion America openly discussing the conspiracy with Bumble Bee and taking acts in furtherance of the conspiracy even before the acquisition was completed, as described below).

263.    It bears noting that later, when the DOJ conducted its due diligence review of TUG's announced plan in late 2014 to purchase Bumble Bee from Lion Capital, DOJ discovered by late 2015 that "the parties knew or should have known from the get go – that the [packaged seafood] market is not functioning competitively today…"[5] (At the time, TUG and Bumble Bee called off their deal.) In other words, a sophisticated entity with non-public access to Bumble Bee's executives (if they were truthful) and records regarding the company's packaged seafood business, pricing and communications with competitors would have discovered reasonably soon, i.e., "from the get go," the existence of the conspiracy. █████████████████████████████

████████████████████████████████████████████████

---

[5]    https://www.justice.gov/opa/pr/chicken-sea-and-bumble-bee-abandon-tuna-merger-after-justice-department-expresses-serious.

264.

265.

██████████████████████████████████████████████████

████████████████████████████████████

266. ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████ – it

is apparent that the Lion Entities joined the conspiracy in November 2010 with knowledge of the conspiracy and the price-fixing activities that had gone on before November 2010. Further, it is apparent from Lion Capital and Lion America's subsequent conduct in furtherance of the conspiracy that, when they joined the conspiracy in November 2010, they did so with the intent to pursue the same anticompetitive objectives as their co-conspirators. In any event, Lion Capital and Lion Americas subsequently participated in the conspiracy after acquiring Bumble Bee.

267. ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]    [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

268.    [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

269.    Throughout the conspiracy, Lion Capital and Lion Americas were involved in the day-to-day operations of Bumble Bee.  For example, when Lion Capital announced a potential transaction with TUG in 2014, Lea (founder of

Lion Capital and an officer of both Lion Capital and Lion Americas)[6] gave a statement about the Lion Entities's role in Bumble Bee's operations from 2010 to 2014: "We are proud to have played a significant role in the evolution of Bumble Bee over the last 4 years and would like to thank our partners, Chris [Lischewski] and the management team, for helping us achieve such a successful return on our investment." (Emphasis added.) Lion Americas' and Lion Capital's heavy involvement in the daily operations of Bumble Bee was consistent with the Lion Entities' business philosophy of getting "down to a very granular knowledge" of the businesses that Lion owned.

270. In fact, the Lion Entities' website advertises Lion Capital as a private equity firm that closely manages the business affairs of the companies in which it invests. The website states that Lion Capital "ensure[s] that [its] companies have the best management talent to execute the vision that we develop in a collaborative partnership" while never forgetting "the responsibility for successful outcomes in our companies rests with us [Lion

---

[6] Although Lea is an officer of Lion Americas, Lion Americas has taken the position in this litigation that Lea is exclusively a Lion Capital employee, and as such, Lion Americas does not have custody or control over Lea's custodial files. Lion Americas has not taken this position with respect to Lindberg, who was also a director of Lion Americas (without holding any other title).

Capital]." Lea echoed this sentiment in an interview on the website: "If all they [companies Lion Capital acquires] want is a check, there are plenty of private equity firms that are delighted to write you a check and let you get on with your business. That's not us…We're not good at that. What we're good at doing is being your partner." Further, a video on the Lion Entities' website states that: "We [Lion Capital] built a team with an intimate knowledge of the way consumers and brands interact, allowing us to work with companies in a very different way to the average private equity firm…We work closely with management to see exactly what a brand is capable of achieving, and then take it to new heights…. We focus solely on retail and consumer businesses so our team is uniquely positioned to work with management to identify the right strategies for revitalizing operations."

271. Consistent with the Lion Entities' business philosophy and website, when Lion Capital first acquired Bumble Bee, Lion Capital and Lion Americas took various actions to ensure that they could monitor and control Bumble Bee's business. As Lischewski told his employees in an internal memorandum at the time of the acquisition of Bumble Bee, the Lion Entities team planned to be "actively involved" with the business. Lion Capital implemented this strategy of active involvement when it acquired Bumble Bee

and thereafter during the conspiracy. For example: First, Lion Capital placed its own executives on Bumble Bee's board and throughout its parent companies. Lion Capital executives Lea, Lindberg, and Capps, sat on Bumble Bee's board. Currently, three of the four board members of Bumble Bee are Lion Capital executives. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████ █████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

272.    █████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

273. Not only were the Lion Entities regularly receiving information about Bumble Bee during the conspiracy, but the Lion Entities executives took an active role in making decisions about Bumble Bee's operations. ▮

274.

275.

276.

277.

278.

279.

280.

281.

██████████████████████████████████████████████████████

████████████

282. ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████

---

[8] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

283. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

284. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



285.

286.

███████████████████████████████████████████████████

███████████████████████████

287.   ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████





| | | | |
|---|---|---|---|
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |

| ████ | ████ | ████ | ████ |
|---|---|---|---|
| ████ | ████ | ████ | ██ |
| ████ | ████ | ████ | ██ |
| ██ | ██████ | ██████ | ██ |
| ██ | ██████ | ██████ | ██ |
| ██ | ████ | ████ | ██ |
| ████ | ██████ | ██████ | ██ |
| ████ | ██████ | ████ | ██ |
| ████ | ████ | ████ | ██ |
| ████ | ████ | ██████ | ██ |
| ██ | ████ | ████ | █ |

288. 



289.

290.

291. 

292.

293.

294. 

295.

296.

**COUNT I**

**Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**

297. Plaintiffs incorporate by reference the preceding paragraphs as if

fully set forth herein.

298. Throughout the Relevant Period, Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of Packaged Tuna within the United States, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

299. Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of such Packaged Tuna.

300. In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of Packaged Tuna.

301. The illegal combination and conspiracy alleged herein had the following effects, among others:

a.     The prices charged by Defendants to, and paid by, Plaintiffs for Packaged Tuna were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.     Plaintiffs have been deprived of free and open competition

in the purchase of Packaged Tuna;

c.     Plaintiffs have been required to pay more for Packaged Tuna that they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy; and

d.     Competition in the sale of Packaged Tuna has been restrained, suppressed or eliminated.

302.   As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured and damaged in their business and property in an amount to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.     That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

B.     That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs;

C.     That the Court award Plaintiffs attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law; and

D.     That the Court award Plaintiffs such other and further relief as may

be deemed necessary and appropriate.

**JURY DEMAND**

Plaintiffs request a jury trial on any and all claims so triable.


Dated:  October 5, 2018                            _____/s/ Patrick J. Ahern_____
                                                   Patrick J. Ahern
                                                   Carl Poli
                                                   Liana Alston
                                                   Ahern and Associates, P.C.
                                                   Willoughby Tower
                                                   8 South Michigan Avenue
                                                   Suite 3600
                                                   Chicago, Illinois 60603
                                                   Ph: (312) 404-3760
                                                   patrick.ahern@ahernandassociatespc.com

                                                   *Attorneys for Plaintiffs Winn-Dixie*
                                                   *Stores, Inc., and Bi-Lo Holding, LLC*

## CERTIFICATE OF SERVICE

I certify that on October 5, 2018, I filed a redacted version of the foregoing document with the Clerk of the Court for the United States District Court, Southern District of California, by using the Court's CM/ECF system. I further certify that I served by e-mail an unredacted version of the foregoing document in its entirety on counsel of record for all Defendants and on interim lead counsel for the Class Plaintiffs.


*/s/    Patrick J. Ahern*

Attorney for the Winn-Dixie Plaintiffs