Michael P. Lehmann (Cal. Bar No. 77152)
Bonny E. Sweeney (Cal. Bar No. 176174)
Christopher L. Lebsock (Cal. Bar No. 184546)
Samantha J. Stein (Cal. Bar No. 302034)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
E-mail:  mlehmann@hausfeld.com
E-mail:  bsweeney@hausfeld.com
E-mail:  clebsock@hausfeld.com
E-mail:  sstein@hausfeld.com

Michael D. Hausfeld
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
E-mail:  mhausfeld@hausfeld.com

*Counsel for Olean Wholesale Grocery Cooperative, Inc.*
*and Interim Lead Counsel for the Proposed Direct Purchaser Class*
[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No. 15-MD-2670 JLS (MDD) |
| | **FOURTH CONSOLIDATED DIRECT PURCHASER CLASS COMPLAINT [Redacted]** |
| This filing relates to the Direct Purchaser Plaintiff Class Action Track | JURY TRIAL DEMANDED |

# TABLES OF CONTENTS

I.      NATURE OF THE ACTION............................................................................1

II.     JURISDICTION AND VENUE....................................................................5

III.    PLAINTIFFS.........................................................................................6

IV.     DEFENDANTS........................................................................................8

        A.      Thai Union Group And Tri-Union.........................................8

        B.      Bumble Bee, Lion Capital, Lion Americas, and Big Catch Cayman....14

        C.      Dongwon And StarKist.......................................................38

V.      AGENTS. ..............................................................................................47

VI.     INTERSTATE TRADE AND COMMERCE..................................................47

VII.    FACTUAL ALLEGATIONS....................................................................48

        A.      The Nature Of, Concentration Of, And Consolidation In, The Domestic
                PSP Market. ........................................................................48

                1.      Nature of the Domestic PSP Market. ...................................48

                2.      Concentration In The Domestic PSP Market. ...................52

                3.      Consolidation In The Domestic PSP Market. ...................52

                4.      Barriers To Entry In The Domestic PSP Market...............53

        B.      Demand, Supply, And Pricing in the Domestic PSP Market. ...............53

                1.      The Oversupply of Tuna...................................................53

                2.      Price Declines In Raw Skipjack Due To Oversupply. .......55

                3.      Declining Domestic Consumption Of Canned Tuna..........56

                4.      Domestic Pricing Of Canned Tuna...................................57

        C.      DOJ's Criminal Investigation Reveals That The Pricing for PSPs
                Produced By Defendants Was The Result of Collusion......................59

        D.      Methods By Which Defendants Effectuated Their Collusive Scheme. 62

                1.      Collusion On 2011 Price Increases....................................63

                2.      Collusion On List Price Increases In 2011-12..................66

                3.      Collusion On Promotional Activity...................................68

                4.      Other Collusive Conduct. ................................................69

                5.      Other Opportunities To Collude.......................................70

        E.      Defendant Parent Companies Recognized the Benefits of the
                Conspiracy. ........................................................................72

VIII.   CLASS ACTION ALLEGATIONS .............................................................74

IX.    TOLLING OF THE STATUTE OF LIMITATIONS ....................................77
X.     CAUSE OF ACTION......................................................................................81
XI.    PRAYER FOR RELIEF.................................................................................82
XII.   JURY DEMAND .........................................................................................83

Plaintiffs, by and through their undersigned attorneys, complain and allege as follows. All allegations herein other than those relating directly to Plaintiffs are based on information and belief.

## I. NATURE OF THE ACTION.

1. This action arises out of an overarching, continuous conspiracy by the three largest domestic producers of packaged seafood products ("PSPs") — Bumble Bee Foods LLC ("Bumble Bee"), Tri-Union Seafoods LLC d/b/a Chicken of the Sea ("Tri-Union"), and StarKist Company ("StarKist") (along with certain other entities described herein)[1] — to fix, raise, maintain, and/or stabilize prices for PSPs within the United States, its territories, and the District of Columbia, in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3). The term "PSPs" as used herein is defined to mean shelf-stable packaged tuna products, typically sold in either cans or pouches.

2. The conspiracy began at least by November of 2010, and the effects of the conspiracy — in the form of higher prices for PSPs caused by Defendants' collusion — continued until at least mid-2015. The class period for purposes of this Fourth Amended Consolidated Complaint extends from June 1, 2011 until July 31, 2015 (the "Class Period").[2]

---

[1] The other Defendants include Dongwon Industries Co. Ltd., StarKist's parent company; Thai Union Group, Tri-Union's parent company; and Bumble Bee's parent companies: Lion Capital LLP, Lion Capital (Americas) Inc., and Big Catch Cayman LP.

[2] Plaintiffs' Third Amended Consolidated Complaint, filed on April 17, 2018, included a class period extending back to 2004. The Court permitted Plaintiffs to amend their complaints in a recent order on the Lion Capital Entities' Motion to Dismiss. *See* ECF No. 1358. This Fourth Amended Consolidated Complaint modifies the Class Period as well as certain related allegations from that prior pleading to conform with Plaintiffs' Motion for Class Certification and the Class Period referenced therein. *See* ECF No. 1140, *see also* ECF No. 1190.

3.      As described in greater detail herein, this conspiracy was effectuated by various means, including, but not limited to:  (a) agreeing to fix certain net and list prices for PSPs; (b) agreeing to limit promotional activity for PSPs; and (c) agreeing to exchange sensitive or confidential business information for the purpose of facilitating the object of the conspiracy.  As a result, Defendants' PSP prices and resultant revenues have consistently been higher than they would have been absent Defendants' conspiracy.

4.      Moreover, as confirmed in proceedings before this Court, the Antitrust Division of the United States Department of Justice ("DOJ") is currently conducting a criminal investigation of this conspiracy.

5.      On December 7, 2016, the DOJ filed a criminal Information against Walter Scott Cameron ("Cameron"), a Senior Vice-President of Sales for Bumble Bee, alleging a conspiracy to fix prices of PSPs.  *See* "Information" (Dec. 7, 2016) (ECF No. 1) in *United States v. Cameron*, No. 3:16-cr-00501-EMC (N.D. Cal.).  Cameron pled guilty to the offense charged at a hearing on January 25, 2017.  The DOJ sent a crime victims notification letter to the Direct Purchaser Class Plaintiffs' counsel as a result of this guilty plea.

6.      On December 21, 2016, the DOJ filed a criminal Information against Kenneth Worsham ("K. Worsham"), a Senior Vice-President of Trade Marketing for Bumble Bee, again alleging his participation in a conspiracy to fix the prices of PSPs.  *See* "Information" (Dec. 21, 2016) (ECF No. 1) in *United States v. Worsham*, No. 3:16-cr-00535-EMC-1 (N.D. Cal.).  K. Worsham pled guilty to the charge against him on March 15, 2017.

7.      Both plea agreements state that:

> **the defendant participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood**, the primary purpose of which was to fix, raise and maintain the prices of packaged seafood sold in the United States, In furtherance of the conspiracy, the defendant engaged in conversations and discussions and

attended meetings with representatives of other major packaged-seafood-producing firms. ***During these conversations, discussions and meetings, agreements and mutual understandings were reached to fix, raise and maintain the prices of packaged seafood sold in the United States.***

Worsham Plea Agreement, ¶4(b); Cameron Plea Agreement, ¶4(b) (emphases added).[3]

_____

[3] Both plea agreements refer to a "relevant period" for purposes of each agreement "from at least 2011 through at least 2013." That "relevant period" does not control the temporal scope of the conspiracy alleged herein. As explained in *In re Packaged Ice Antitrust Litigation*, 723 F. Supp. 2d 987, 1011-12 (E.D. Mich. 2010):

> [n]or can this civil litigation be circumscribed or defined by the boundaries of the criminal investigations or plea agreements. In *Starr* [*v. Sony BMG Music Entertainment*, 592 F.3d 314, 325 (2d Cir. 2010)], the Second Circuit rejected defendants' argument that inferring a conspiracy based upon the DOJ investigations was unreasonable because the DOJ allegedly had closed its inquiry and publicly announced that it had uncovered no evidence of competitive harm. . . . The Court noted that even if it could consider this evidence on a motion to dismiss, there was no case cited 'to support the proposition that a civil antitrust complaint must be dismissed because an investigation undertaken by the Department of Justice found no evidence of conspiracy.

*Id.*; *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-65 (7th Cir. 2002) (refusing to infer lack of a civil conspiracy from the government's decision not to move against certain defendants, acknowledging that the DOJ may decide to limit the scope of an investigation for numerous reasons, including differing standards of proof in a criminal case and the knowledge that the private bar "had both the desire and the resources to prosecute [the] suit"); *In re Vitamins Litig.*, No. 99-misc-197, 2000 WL 1475705 at *11 (D.D.C. May 9, 2000) (rejecting the "notion that the guilty pleas and cooperation agreements and the class settlement foreclose a broader conspiracy. Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention."); *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 620 (N.D. Ga. 1997) ("[T]he court is aware of no authority that requires a civil antitrust plaintiff to plead

8.      On May 8, 2017, the DOJ announced a third guilty plea, this time with Bumble Bee itself. *United States v. Bumble Bee Foods, LLC*, No. 17-cr-00249 (N.D. Cal.). The Information filed in that docket accuses Bumble Bee of conspiring to fix the prices of PSPs and notes that, inter alia, it (a) "***engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood producing firms***"; (b) "***agreed and reached mutual understandings during these conversations, discussions, and meetings, to fix, raise, and maintain the prices of packaged seafood sold in the United States***"; and (c) "***negotiated prices with customers and issued price announcements for packaged seafood in accordance with the agreements and mutual understandings reached.***" *See* "Information" ¶ 9 (May 8, 2017) (ECF No. 1) (Emphases added).

9.      At the same time that this Information was filed, the DOJ issued a press release, available at https://www.justice.gov/opa/pr/bumble-bee-agrees-plead-guilty-price-fixing. The press release stated (emphases added):

> *In addition to agreeing to plead guilty, Bumble Bee has agreed to pay a $25 million criminal fine, which will increase to a maximum criminal fine of $81.5 million, payable by a related entity, in the event of a sale of Bumble Bee subject to certain terms and conditions. Bumble Bee has also agreed to cooperate with the Antitrust Division's ongoing investigation. The plea agreement is subject to court approval.*

> *"Today's charge is the third to be filed – and the first to be filed against a corporate defendant – in the Antitrust Division's ongoing investigation into price fixing among some of the largest suppliers of packaged seafood," said Acting Assistant Attorney General Andrew Finch of the Justice Department's Antitrust Division. "The division, along with our law enforcement colleagues, will continue to hold these companies and their executives accountable for conduct that targeted a staple in American households."*

only the facts of a prior criminal indictment. To the contrary, several cases flatly reject that theory.").

10. On May 30, 2017, the DOJ filed an Information against Steve Hodge ("Hodge"), a former Senior Vice-President of Sales for StarKist from May of 2010 to December of 2013. *See United States v. Hodge*, No. 17-CR-0297-EMC (N.D. Cal.). Hodge pled guilty to the charge on June 28, 2017, admitting that "from at least 2011 through at least 2013" he "participated in a conspiracy . . . to fix, raise, and maintain the prices of packaged seafood sold in the United States" by, among other things, "engag[ing] in conversations and discussions and attend[ing] meetings with representatives of other major packaged-seafood-producing-firms." *Id.*, ECF No. 13 (plea agreement)

11. On May 15, 2018, the federal grand jury filed an Indictment against Bumble Bee's CEO Chris Lischewski ("Lischewski") in the U.S. District Court of the Northern District of California. The Indictment asserts that Lischewski participated in meetings and communications with competitors and, among other things, agreed during those meetings and communications to restrain competition and fix and maintain prices of packaged tuna. According to the Indictment, Lischewski knowingly joined in and participated in the conspiracy from at least November of 2010 to in or around December 2013.

12. The existence of a conspiracy is confirmed by more than the guilty pleas of Bumble Bee, K. Worsham, Cameron, and Hodge, as well as the grand jury's Indictment of Lischewski. Tri-Union has also confirmed to counsel for Plaintiffs that it has sought leniency from the DOJ for the conspiracy alleged herein.

## II. JURISDICTION AND VENUE.

13. This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages, obtain equitable relief, and recover costs of suit and reasonable attorneys' fees for violations of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28

U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

14.     Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

15.     Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the long-arm statute of California (Cal. Civ. Proc. Code § 410) because each has transacted business in this state and because the California long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the state of California to satisfy due process.

16.     This Court has personal jurisdiction over Defendants because, *inter alia*, each Defendant: (a) transacted business in this District, the United States and its territories, and the District of Columbia; (b) directly or indirectly sold and delivered PSPs in this District, the United States and its territories, and the District of Columbia; (c) has substantial aggregate contacts with this District, the United States and its territories, and the District of Columbia; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District, the United States and its territories, and the District of Columbia.

## III.     PLAINTIFFS.

17.     Plaintiff Olean Wholesale Grocery Cooperative, Inc. ("Olean") is a resident of the State of New York.  Operating out of a 380,000 square foot distribution center in Olean, New York, Olean currently services retail members and a large number of non-member retailers in Western and Central New York, Western Pennsylvania and Northeastern Ohio.  During the Class Period, Olean

purchased PSPs directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint. Olean seeks to serve as a class representative on behalf of the proposed class defined in this Fourth Amended Consolidated Complaint.

18. Plaintiff Pacific Groservice Inc. d/b/a PITCO Foods ("PITCO") is a grocery wholesaler having its principal place of business in San Jose, California. During the Class Period, PITCO purchased PSPs directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

19. Plaintiff Piggly Wiggly Alabama Distributing Co., Inc. ("Piggly Wiggly") is an Alabama corporation with its principal place of business in Bessemer, Alabama. Piggly Wiggly distributes bakery/delicatessen items, groceries, meat, and produce to independent retailers in the Southeast. During the Class Period, Piggly Wiggly purchased PSPs directly from one or more Defendants, and has been injured in its business or property by reason of the antitrust violations alleged in this Complaint. Piggly Wiggly seeks to serve as a class representative on behalf of the proposed class defined in this Fourth Amended Consolidated Complaint.

20. Plaintiff Howard Samuels is Trustee in Bankruptcy for Central Grocers, Inc. ("CGI"), an Illinois corporation with its principal place of business in Joliet, Illinois. CGI is a member-owned grocery wholesaler supplying over 400 independent grocery retailers in the Chicago metropolitan area and Northwest Indiana. During the Class Period, CGI purchased PSPs directly from one or more Defendants, and has been injured in its business or property by reason of the antitrust violations alleged in this Complaint.

21. Plaintiff Trepco Imports and Distribution Ltd. ("Trepco") is a California corporation with its principal place of business in San Diego, California. Trepco is a wholesale grocery and convenience store supply company. During the

Class Period, Trepco purchased PSPs directly from one or more Defendants, and was injured in its business or property by reason of the antitrust violations alleged in this Complaint. Trepco seeks to serve as a class representative on behalf of the proposed class defined in this Fourth Amended Consolidated Complaint.

22.    Plaintiff Benjamin Foods LLC ("Benjamin Foods") is a broadline food distributor located in Hatboro, Pennsylvania. Benjamin Foods distributes groceries, frozen foods, meat, poultry, seafood, dairy and produce, among other products, to public and private foodservice clients and government agencies. During the Class Period, Benjamin Foods purchased PSPs directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint. Benjamin Foods seeks to serve as a class representative on behalf of the proposed class defined in this Fourth Amended Consolidated Complaint.

## IV.    DEFENDANTS.

### A.    Thai Union Group and Tri-Union.

23.    Defendant Tri-Union is a domestic corporation that operates under the name "Chicken of the Sea" (also referred to as "COSI"). Its principal place of business is located at 9330 Scranton Road, Sorrento South Corporate Center, Suite 500, San Diego, California 92121. Tri-Union produces and sells PSPs throughout the United States (including this District), its territories, and the District of Columbia. Its initial predecessor entity was the Van Camp Seafood Company, created in 1914. That entity eventually became wholly owned by Tri-Union's parent, Thai Union Frozen Products PCL ("TUF") (now known as Thai Union Group Public Company Limited ("TUG")) in 2000.[4]

---

[4] TUG is a publicly-traded company that was first listed on the Stock Exchange of Thailand in 1994 as "Thai Union Frozen Products PCL" and which changed its name to TUG in or about 2015. As used herein, the acronym "TUG" refers to both TUG and, with respect to the applicable time period, its predecessor entity, TUF.

24.     Defendant TUG is a corporation organized and doing business under the laws of Thailand. TUG is the world's largest canned tuna producer, processing 18% of the world's production. It is also the largest canned tuna producer in Thailand. In 2014, TUG earned gross profit of $547 million on worldwide revenue of $3.339 billion. Its head office is located at 72/1 Moo 7, Sethakit 1 Road, Tambon Tarsai, Mueang Samut Sakhon District, Amphur Muangsamutsakorn, Samutsakorn 74000, Thailand. TUG, through its wholly-owned subsidiary Tri-Union, produces and sells PSPs throughout the United States (including this District), its territories, and the District of Columbia. In recent years, 40% or more of its sales have originated in the United States, which is its largest market. TUG also purposefully directs its activities to the United States by exporting PSPs, including canned tuna and tuna loins, from Thailand to this country. TUG further purposefully directs its activities to the United States through its method of conducting business. It currently has three strategic business units, one of which is the "Ambient Seafood" unit, which includes its global packaged tuna business; Tri-Union is part of that business unit and is viewed by TUG as part of its footprint in the United States. Indeed, TUG has its own fishing fleet and is thus vertically integrated with Tri-Union. TUG also purposefully directs its activities into the United States by operating Thai Union North America, Inc. ("TUNAI") (a company formerly known as Thai Union International, Inc.), that was founded in 1996. TUNAI is a wholly-owned instrumentality of TUG and has its address at 9330 Scranton Road, Sorrento South Corporate Center, Suite 500, San Diego CA 92121 (the same address as Tri-Union). TUNAI's President is Thiraphong Chansiri ("T. Chansiri") (President and CEO of TUG). The Chansiri family is the largest single shareholder in TUG, owning approximately 20.4% of its stock.[5]

_____

[5] TUG sponsors the issuance of American Depository receipts traded on NASDAQ that allow United States investors to trade its equities in the domestic securities

25.     As set forth below, TUG directly participated in the conspiracy alleged herein and used its dominance and control over Tri-Union's PSP business to conspire with the other Defendants and their co-conspirators.  Among the members of the Board of Directors of Tri-Union are Kraisorn Chansiri (Chairman of TUG), Cheng Niruttinanon ("Niruttinanon") (Executive Chairman of TUG),[6] and the aforementioned T. Chansiri.  A former Director of Tri-Union was Chan Tin King, Executive Director and Chief Financial Officer ("CFO") of TUG.  Shue Wing Chan ("Chan"), the President and CEO of Tri-Union/COSI since 2007 to 2016, is a member of the Chansiri family, and is a member of TUG's self-styled "Global Leadership Team."  Prior to joining Tri-Union, he served as the CFO of TUG.[7] TUG exercises control and dominance over Tri-Union through these individuals. According to his own LinkedIn webpage, David Roszmann ("Roszmann"), the former Chief Operating Officer ("COO") of Tri-Union, who joined the company in March of 2013, "only direct[ly] reported to CEO [Chan] relative of majority owning family of this foreign public company [TUG] with all functions direct[ly] reporting to COO including sales, marketing, procurement, supply chain, operations, finance, HR. legal and IT."  Roszmann left Tri-Union in December of 2015, soon after Tri-Union's attempt to acquire Bumble Bee was assailed by the DOJ, as further described below.  Despite his close involvement in the conspiracy as described herein, TUG has not severed its ties with Chan.  Chan now serves as

---

market. In that connection, it regularly files reports with the United States Securities & Exchange Commission.

[6] The Niruttinanon family is the third largest shareholder in TUG, owning approximately 7.0% of its stock.

[7] According to one report, as CFO of TUG, Chan "managed the TUF overall business development and financial operations, including day-to-day matters related to financial administration and business performance.  He was responsible for managing the development and implementation of business plans and financial strategies for the expansion of TUF's business."

CEO and President of Thai Union's U.S. Ambient Operation; his position at Tri-Union was filled by Valentin Ramirez, who also reports directly to TUG.

26. TUG publicly acknowledges its dominance over Tri-Union. The following pertinent excerpt of an organizational chart that appears on TUG's website demonstrates that TUG views Tri-Union as part of its overall "Global Tuna Business" and "US Ambient Operations" that are controlled directly by TUG's Board of Directors and executives.



27. TUG controlled the day-to-day operations of Tri-Union's PSP business. There was such a unity of interest and ownership between TUG and Tri-Union that the individuality or separateness of the two companies ceased with respect to that business. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

28.     Some examples of this unity and TUG's control over the affairs of Tri-Union are as follows. █████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

29.     This control by TUG over the business affairs of Tri-Union's PSP business manifested itself in many ways. ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

30.     Tri-Union became TUG's instrument — its marketing conduit for TUG's tuna — under the control of TUG (and TUG's executives).  And, as discussed below, given TUG's control and the unity of interests between Tri-Union and its parent in carrying out the conspiracy alleged here, it would be unjust and lead to an inequitable result to allow TUG to escape liability for Tri-Union's acts.

Due to the unlawful conduct alleged herein, Tri-Union earned profits in excess of what it would have earned in a competitive market. ███████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████ Accordingly, TUG knowingly profited from Tri-Union's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ As a result of these facts, considered alone or in combination with one or more of the foregoing other facts, adherence to the fiction of the separate existence of TUG and Tri-Union would sanction a fraud or promote an injustice; and an inequitable result or an injustice would occur if the corporate form were elevated over substance.



[8] ████████████████████████████████████████████████████████

1    31.    As further described below, ████████████████████

2    ████████████████████████████████████████████████. It

3    would be inequitable for TUG to now hide behind the corporate veil for Tri-

4    Union's actions.  Thus, Tri-Union is the agent, instrumentality, and *alter ego* of

5    TUG.

6    32.    TUG and its executives (such as ████████████████)

7    also participated directly in the alleged conspiracy, as described below.  TUG was

8    aware of and supported collusive price increases for PSPs that occurred in 2011-

9    2012. ████████████████████████████████████

10   ███████

11   33.    Unless otherwise indicated, TUG and Tri-Union will now be

12   referred to collectively herein as "COSI".

13   **B.    Bumble Bee, Lion Capital, Lion Americas, and Big Catch Cayman**

14   34.    Defendant Bumble Bee is a domestic corporation with its

15   principal place of business located at 280 10th Avenue, San Diego, California

16   92101. Bumble Bee's annual revenue in 2014 exceeded $1 billion.  Bumble Bee

17   produces and sells PSPs throughout the United States (including in this District), its

18   territories, and the District of Columbia.  Lischewski was Bumble Bee's CEO and

19   President during the entirety of the relevant period.  As noted above, Bumble Bee

20   has pled guilty to its role in a conspiracy to fix prices of packaged seafood products

21   in the United States.

22   35.    Defendant Lion Capital LLP ("Lion Capital") is a British private

23   equity firm founded in June 2004 by Lyndon Lea ("Lea") and two others, which

24   specializes in buying out and controlling investments in the consumer products

25   _____

26   9 ████████████████████████████████████████

27   ████████████████████████████████████████████

28   ████████████████████████████████

sector. Lion Capital forms private equity funds, such as Lion Capital Fund I, which included capital commitments with investments in entities like Kettle Foods (potato chips) and Jimmy Choo (designer shoes and accessories). In 2010, Lion Capital formed its third private equity fund, Lion Capital Fund III, which included capital commitments of €1.5 billion with investments in Bumble Bee, among others.

36. Lion Capital is based in the United Kingdom, however, it also operated offices in the United States during the relevant period. During the relevant period and continuing to the present, Lion Capital purposefully directed its activities to the United States by operating offices in the United States and through its ownership and control of companies doing business in the United States, including Bumble Bee. North American institutions commit approximately 75% of the capital to the Lion Capital Funds.[10] According to Lion Capital's website, it has operated offices in the United States in New York (at 888 7th Ave #4302, New York, NY 10106) and Los Angeles (at 100 Wilshire Blvd, Santa Monica, CA 90401).[11] The Lion Capital members in the U.S. offices during the relevant period included █████████████████████████████████████████████████
████████████  ███████████████████████████████████████

---

[10] On April 24, 2017, Plaintiffs served Lion Capital with a subpoena at its Los Angeles address for information about its sale of Bumble Bee to TUG. Following Bumble Bee's guilty plea, Plaintiffs served another subpoena on Lion Capital on June 13, 2017, requesting information related to Bumble Bee's guilty plea. Lion Capital made two productions of documents totaling 1,333 documents (7,342 pages) on June 15 and August 4, 2017, and it recently made another production of documents (6,715 pages) on October 4, 2017. From reviewing only the two initial productions, Plaintiffs uncovered evidence that Lion Capital took affirmative acts in furtherance of the conspiracy.

[11] Lion Capital's website states that in October of 2012, it "[r]elocated [its] North American office from New York to Los Angeles." http://www.lioncapital.com/about/#!overview. Its current United States address is the Los Angeles address indicated above.

1  ██████████████████, █████████████████████████████

2  ████████████████████████████████████████.

3      37.      Defendant Lion Capital (Americas), Inc. ("Lion Americas") is

4  another parent company of Bumble Bee, as reflected in paragraph 13 of Bumble

5  Bee's amended plea agreement.  Lion Americas is headquartered at Lion Capital's

6  Los Angeles office referenced above; and it is the subsidiary through which Lion

7  Capital operates in the United States.  ██████████████████████████

8  ████████████████████████████████████████████████████████████

9  ██████████████      As Lion Capital also stated on its website, its "team is co-

10 located in single offices in each of its core markets"—*i.e.*, the United Kingdom

11 (London) *and* the United States (Los Angeles).  In a court filing, Lion Capital wrote

12 that "[b]ecause Lion Capital is so U.S.-focused, in 2007, it formed its subsidiary

13 Lion Capital (Americas), Inc. in New York City (which has since moved operations

14 to Los Angeles, California)."[12]  Lion Capital has also represented that its core

15 business — the "management of investment activities" — took place from its U.S.

16 office in addition to its London office, and that having a single office in each of

17 these locations was "a critical component of the Firm's Strategy."  It explained that

18 "[f]rom a single office on each continent, Lion is better able to harness and share

19 critical knowledge and learning across its team through real-time, informal

20 communication on matters such as new investment ideas, industry developments,

21 active transactions, and portfolio company strategies."

22      38.      Lion Capital itself did not distinguish between it and Lion

23 Americas during the relevant period—either publicly or in its internal activities.

24 For example, all Lion Americas and Lion Capital employees use the same

25 "@lioncapital.com" email extension, and both Lion Capital and Lion Americans

26

27 [12] *See Stone Lion Capital Partners, L.P. v. Lion Capital LLP*, No. 2013-1353, 2013
   WL 6006296 (Fed. Cir. Nov. 1, 2013) ("Corrected Non-Confidential Brief of

28 Appellee").

use the same website without distinguishing between the two entities. Even in the website's biographies on the individual employees, Lion Capital makes no distinction between those who work for it versus Lion Americas. █████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████. During the relevant period, Lion Capital and Lion Americas acted as one unit and shared work and responsibilities.

39. Lion Americas was a mere instrumentality of Lion Capital. █ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████, and they act as a single enterprise: everything Lion Americas does to increase the profitability of Lion Capital's investment companies is designed to serve and increase the profitability of Lion Capital's investments. They thus have a complete unity of interests and a common design to serve Lion Capital's business and increase the profitability and returns of Lion Capital's investment vehicles. Put another way, Lion Capital and Lion Americas have no distinct economic interests; they function as a single economic unit.

40. At all times relevant to this Fourth Amended Consolidated Complaint, Lion Americas acted as the agent of Lion Capital. In fact, in filing its Form ADV, the uniform form used by investment advisers to register with the Securities Exchange Commission and state securities authorities, Lion Americas answered "yes" to the question "Do you control or are you controlled by the related person [Lion Capital LLP]?" (emphasis in original). Also, Lion Capital has asserted that Lion Americas exists to provide investment advice to Lion Capital about its U.S.-based portfolio companies (Bumble Bee included). Accordingly, but for Lion Americas' existence, Lion Capital would have performed this function itself.

41. During the relevant period, Lion Americas also had a substantial overlap in personnel with Lion Capital. For example, during the relevant period,

42.



43.

44.     Lion Capital and Lion Americas participated in the conspiracy alleged in this Fourth Amended Complaint ███████████████ ███████████████ and the actions taken by these individuals in furtherance of the conspiracy (as alleged below) were taken on behalf of both Lion Capital and Lion Americas in their official capacities as senior executives of both entities.

45.     Lion Americas also performed additional functions that Lion Capital would have had to perform, but for Lion Americas.  For example, ████



46.

47.

[13] This fee appears to have been waived during at least some of these periods.

FOURTH CONSOLIDATED DIRECT
PURCHASER CLASS ACTION COMPLAINT

20

CASE NO. 15-MD-2670-JLS (MDD)

48.

49.      In light of the foregoing, when Plaintiffs refer in this Fourth Amended Consolidated Complaint to acts done by either of the Lion Entities (Lion Capital or Lion Americas) in their allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish among the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

50.      Defendant Big Catch Cayman LP aka Lion/Big Catch Cayman LP ("Big Catch") is a holding company that wholly owns Bumble Bee. Big Catch was established in November of 2010, and its principal place of business was formerly "c/o Lion Capital (Americas) Inc., 888 7th Avenue, 43rd Floor, New York, NY 10019" — Lion Americas' and Lion Capital's former office address in New York.

Big Catch is the entity referenced in Bumble Bee's criminal plea agreement as the entity that would receive the proceeds from the sale of Bumble Bee. Based on this fact, the DOJ required that Big Catch must pay up to $81.5 million in criminal fines in the event that Bumble Bee is sold, in order to prevent Big Catch and its investors (including Lion Capital) from being unjustly enriched from the unlawful conduct committed by Bumble Bee.

51. Big Catch is a shell company and does not engage in any operations separate from Lion Capital or Bumble Bee. Big Catch has no day-to-day activities, does not hold board meetings, has no offices, and has no employees. Lion Capital's funds are the ultimate owner of Big Catch, and ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████ Big Catch's business is Lion Capital's business, and as a result, there is a unity of interest between Big Catch and Lion Capital.

52. Additionally, the corporate veil between Big Catch and Lion Capital must be pierced and disregarded in order to prevent fraud and injustice. Lion Capital created Big Catch as a vehicle both to funnel conspiracy proceeds from Bumble Bee to the Lion Capital funds, and also to attempt to insulate Lion from its involvement in the price-fixing conspiracy alleged in this Fourth Amended Consolidated Complaint. ████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████



53.

54.     Despite annual revenues of over $900 million — ███████
███████████████ — Bumble Bee carries over $843 million of debt.
Following its guilty plea, and as a result of this debt, the DOJ allowed Bumble Bee
to pay a reduced criminal fine of only $25 million, to be paid on an installment
schedule over a five-year period, in connection with its involvement in the antitrust
conspiracy alleged herein.  Bumble Bee and the DOJ acknowledged that under the
United States Sentencing Guidelines ("Guidelines") the appropriate fine range was

between $136.2 million and $272.4 million — an amount predicated on a volume of impacted commerce for only 2011 to 2013. The ultimate fine of $25 million is therefore approximately 80% to 90% less than the Guidelines' recommended range. The primary explanation for this tremendous fine reduction is due to a downward departure under §8C3.3 of the Guidelines, which was applied for Bumble Bee's purported inability to pay a full criminal fine without substantially jeopardizing the continued viability of the organization. Bumble Bee's fine may increase up to $81.5 million, an amount to be paid by Big Catch if Bumble Bee is sold, subject to certain terms and conditions (which were filed under seal). Even with Big Catch's potential payment of up to $81.5 million, that amount is still approximately 40% less than the minimum fine contemplated by the Guidelines and approximately 70% less than the maximum fine.[14] Big Catch is the mechanism by which Lion Capital protected itself, successfully, from Bumble Bee's liabilities.

55. Accordingly, Big Catch is liable for the allegations alleged in this Fourth Amended Consolidated Complaint because it is the alter ego of Lion Capital.

56. Lion Capital, Lion Americas, and Big Catch are all defined as "parent companies" in Bumble Bee's Amended Plea Agreement with the DOJ. (Lion Capital, through its control of Bumble Bee's board of directors, expressly approved this agreement). Bumble Bee is a wholly-owned subsidiary of Big Catch, and Lion Capital maintains equitable ownership of both Bumble Bee and Big Catch. For example, ████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

---

[14] The DOJ left restitution for Bumble Bee's criminal conduct to the civil cases filed before this Court.

57. Lion Capital and Lion Americas directly participated in the conspiracy alleged in this Fourth Amended Complaint and purposefully directed this conduct at the United States (including California). Lion Capital and Lion Americas were aware of the conspiracy, took acts in furtherance of the conspiracy, and knowingly accepted and stand to accept the proceeds of Bumble Bee's unlawful conduct. Due to the unlawful conduct alleged herein — to part of which Bumble Bee has expressly pled guilty — Lion Capital, Lion Americas, and Big Catch earned profits and other earnings in excess of what they would have in a competitive market.

58. Starting by November of 2010, Lion Capital and Lion Americas became actively involved in Bumble Bee's business, and as some of his first acts in working with Bumble Bee,

59.

ultimately helped Lion Capital and Lion Americas achieve increased profits for Bumble Bee, which in turn increased profits and earnings for Lion Capital and its funds.

60.　　Since Lion Capital's purchase of Bumble Bee, and it and Lion Americas have become intimately involved in Bumble Bee's business and tracking adherence to the conspiracy.  Throughout the conspiracy, Lion Capital and Lion Americas were involved in the day-to-day operations of Bumble Bee.  For example, when Lion Capital announced a potential transaction with TUG in 2014, Lyndon Lea (founder of Lion Capital and an officer of both Lion Capital and Lion

Americas)[15] gave a statement about Lion's role in Bumble Bee's operations from 2010 to 2014: "We are proud to have played a significant role in the evolution of Bumble Bee over the last 4 years and would like to thank our partners, Chris [Lischewski] and the management team, for helping us achieve such a successful return on our investment." Lion Capital's operation of Bumble Bee is consistent with how it advertises its business strategy. As Lea said in an interview on the Lion Capital website: "If all they [companies Lion acquires] want is a check, there are plenty of private equity firms that are delighted to write you a check and let you get on with your business. That's not us…We're not good at that. What we're good at doing is being your partner." Further, a video on the Lion website states that: "We [Lion Capital] built a team with an intimate knowledge of the way consumers and brands interact, allowing us to work with companies in a very different way to the average private equity firm…We work closely with management to see exactly what a brand is capable of achieving, and then take it to new heights…. We focus solely on retail and consumer businesses so our team is uniquely positioned to work with management to identify the right strategies for revitalizing operations." Lion Capital's website also states that it "ensure[s] that [its] companies have the best management talent to execute the vision that we develop in a collaborative partnership" while never forgetting "the responsibility for successful outcomes in our companies rests with us." ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

61.     Consistent with the Lion Entities' business philosophy and other representations, when Lion Capital first acquired Bumble Bee, Lion Capital and Lion Americas took various actions to ensure that they could monitor and control Bumble

---

[15] Although Lea is an officer of Lion Americas, Lion Americas has taken the position in this litigation that Lea is exclusively a Lion Capital employee, and as such, Lion Americas does not have custody or control over Lea's custodial files.

Bee's business.

62.

63.

64.

65.

66.

FOURTH CONSOLIDATED DIRECT
PURCHASER CLASS ACTION COMPLAINT

CASE NO. 15-MD-2670-JLS (MDD)

67. ███████████████████████████

68. Lion Capital and Lion Americas executives knew of the conspiracy and took acts in furtherance thereof. ███████████████████████████

69. Following those meetings, the ████████████████████

70.

71.



72.

73.



74.

75.



76.

77.

78.



79.

80.

81.



82.

83.

84.     The term "Bumble Bee" will refer to Bumble Bee Foods LLC, Lion

Capital, Lion Americas, and Big Catch for the time period after Lion's acquisition of

Bumble Bee Foods LLC.  Furthermore, in light of the preceding allegations, as well

as others contained in this Fourth Amended Consolidated Complaint, Plaintiffs refer

to acts done in furtherance of the alleged conspiracy by Lion Americas, Lindberg,

Chang, and/or Capps, those acts were undertaken on behalf of Lion Capital and Lea.

1 When Lion Americas, Lindberg, Chang, and/or Capps acted in furtherance of the
2 alleged conspiracy, they did so on behalf of Lion Capital and Lea.

3       **C.    Dongwon and StarKist.**

4       85.       Defendant StarKist Company is a domestic corporation with its
5 headquarters located at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania
6 15212.  StarKist Company produces and sells PSPs throughout the United States
7 (including in this District), its territories and the District of Columbia.  The
8 predecessor to StarKist Company was the French Sardine Company, created by a
9 group of fishermen in 1918.  In 1942, it adopted the brand name "StarKist."  It was
10 acquired by the H.J. Heinz Co. in 1963 and, by the 1980s, was considered by many
11 to be the leading brand of canned tuna in the United States.  In 2002, Del Monte
12 Foods Company bought StarKist Company.  Defendant Dongwon Industries Co.,
13 Ltd. ("Dongwon") acquired the company from Del Monte in June of 2008 for $363
14 million.  Although StarKist Company's annual revenue is not publicly reported, the
15 *Pittsburgh Post-Gazette* stated in early 2010 that StarKist Company's annual
16 revenue was between $650 and $670 million.[17]  It is expected that its current annual
17 revenue well exceeds $1 billion.

18       86.       Defendant Dongwon is a corporation organized and doing
19 business under the laws of South Korea, with its headquarters located at Dongwon
20 Industries Building 7th floor, Mabang-ro 68 (Yangjae-dong), Seocho-gu, Seoul,
21 Korea.  Dongwon is a publicly traded company listed on the Korean Stock
22 Exchange.  It is the largest producer of canned tuna in South Korea.  Dongwon

23
24
25
26 _____
[17] http://www.post-gazette.com/business/businessnews/2010/02/19/North-Shore-
27 based-tuna-giant-StarKist-faces-an-increasingly-competitive-
industry/stories/201002190160.
28

itself has repeatedly availed itself of the jurisdiction of United States federal courts.[18]

---

[18] *Dongwon Indus. Co., Ltd. v. Yoshida*, No. 90-cv-00282 (D. Alaska); *Yu Sheng Fishery Co. v. Dongwon Indus. Co., Ltd.*, No. 91-00018, 1991 WL 126138, at *1 (D. Guam May 20, 1991) (denial of motion by Dongwon for *vacatur* of writ of maritime attachment, dismissal of *in rem* claims and release of security; court noted that "[t]here is no dispute of the fact that Dongwon has sufficient minimum contacts with Guam to subject it to general *in personam* jurisdiction and suit in this district"); *Matter of Yu Sheng Fishery Co., Ltd.*, 1993 A.M.C. 116 (D. Guam July 12, 1991); *Dongwon Indus. Co., Ltd. v. Ships Gear & Transit, Inc.*, No. 93-cv-01691 (S.D. Cal.) (suit alleging contract and tort claims against seller of a purse seine skiff); *Perez v. Dongwon Indus. Co.*, No. 02-cv-00025 (D. Guam Aug. 9, 2002) (admiralty suit against Dongwon that was settled); *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 69 F. Supp. 3d 416 (D. Del. 2014), *rev'd*, 812 F.3d 294 (3d Cir. 2016) ("*Moore*") (proceedings involving defendants' (including Dongwon) motion to dismiss claims under the False Claims Act relating to the sinking of a United States-flagged vessel operated by Dongwon); *Hill v. Majestic Blue Fisheries, LLC*, Civ. No. 11-00034, 2013 WL 1499155 (D. Guam Apr. 12, 2013) ("*Hill*") (denying Dongwon's motion to dismiss for failure to state a claim) and 2015 WL 3961421 (D. Guam June 30, 2015) (involving various motions dealing with pretrial settlement by Dongwon); *Yang v. Majestic Blue Fisheries, LLC*, Civ. No. 13-00015, 2015 WL 5001190 (D. Guam Jan. 14, 2015), *adopted in part and rejected in part*, 2015 WL 5003606 (D. Guam Aug. 24, 2015), *recon. denied*, 2016 WL 1411335 (D. Guam Apr. 11, 2016) (all dealing with Dongwon's participation in a scheme with relatives of corporate insiders to acquire two United States flagged vessels). The *Hill, Yang* and *Moore* cases are of significance here. The underlying facts are laid out in *Majestic Blue*, 2014 WL 3728556, at *10-35, and the *qui tam* complaint filed in the *Moore* case in November of 2012. Dongwon owned the F/V Majestic Blue, a tuna fishing vessel. Jae-woong Kim, the brother of Dongwon Chairman J.C. Kim, was the General Manager of Dongwon's office in Guam and had two daughters who were American citizens born on Guam. In 2008, those women became the figureheads for Majestic Blue Fisheries LLC ("MBFLLC"), a United States limited liability company. The F/V *Majestic Blue* was sold to that entity for $10. MBFLLC thereupon entered into maintenance and ship manning contracts with Dongwon whereby the latter essentially ran the vessel, which, because it was owned by American citizens, could fly the American flag. A series of American captains was hired to lead the vessel, but they were figureheads; largely Korean personnel selected by Dongwon really held the reins of control. The crew on the vessel engaged in repeated violations of, *inter alia*, MARPOL (the International Convention on the Prevention of Pollution

87.     According to StarKist Company's website:

> Founded in 1969, Dongwon Group began as a fisheries business and branched out into various sectors including a strong food & beverage manufacturing arm, Dongwon F&B. Dongwon F&B now owns 75% of the canned tuna market share in Korea. Dongwon Industries is one of the world's largest tuna catching companies with a fleet of 36 boats. Dongwon's world class fish procurement and processing capacity builds on StarKist's national brand recognition and distribution networks in the United States to bring world-class seafood to consumers worldwide.[19]

Dongwon's own website has this to say about its control over StarKist Company:

> StarKist is the world's best tuna brand with 65 years of history, and holds the No.1 position in the US tuna market. Like Dongwon Group in Korea, ***StarKist is an iconic tuna brand in the United States, and has been controlled by Dongwon Group since 2008***, accompanying Dongwon Group on its journey to globalization. Dongwon Group, which has already become the dominant player in Korea's tuna market, has focused on the steady growth of the world's tuna market and determined that tuna can be one of core resources that will lead future industries. ***Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna company, and will become de facto a globalized enterprise***. (Emphases added).[20]

---

from Ships) and certain laws relating to fishing practices. In June of 2010, the vessel sank after a series of poor repairs by Dongwon. MBFLLC sued for a limitation of its liability. Chief Engineer Chang Cheol Yang and Captain David Hill both died in the incident and their next of kin sued both MBFLLC and Dongwon. Dismissal of the *Moore* case was reversed, and the findings of fact made by the Magistrate Judge in *Majestic Blue* are being appealed to the Ninth Circuit. Adam Baske, a tuna expert formerly with the Pew Charitable Trusts, has, in an article on the F/V *Majestic Blue*, called Dongwon "one of the international bad boys in terms of illegal fishing activity." <https://medium.com/matter/mutiny-on-the-majestic-blue-80e3d2fbb345#.4wrwj94gy>.

[19] http://starkist.com/about-starkist.

[20] http://www.dongwon.com/eng/content/subsidiary/04020113.

88.     Dongwon purposefully directs its activities to the United States through its "controlled" and wholly-owned subsidiary StarKist Company, through which it produces and sells PSPs throughout the United States (including in this District), its territories, and the District of Columbia.  Indeed, Dongwon has its own fishing fleet and is vertically integrated with StarKist Company.  Dongwon also purposefully directs its activities to the United States by exporting PSPs, including canned tuna, to this country for sale.  It sells canned tuna in the United States that is canned in Korea and branded under its own name and is sold at price levels inflated because of the claimed conspiracy.

89.     Dongwon also has an ownership interest in other United States businesses.  It has a 12.5% stake in Silver Bay Seafoods, LLC (a fishery located in Sitka, Alaska) and a 50% majority interest in D.W. Global, Inc. (a shipping and import/export company located in Commerce, California).

90.     According to its quarterly and annual reports, Dongwon typically derives more than 50% of its global revenue from the United States.

91.     Before describing the interrelationship between StarKist Company and Dongwon, it is first necessary to explain briefly the concept of the Korean *chaebol*, which is a recognized concept in the academic business literature focused on South Korean companies.  The Dongwon family of companies is recognized as being a *chaebol*.[21]

92.     The term "*chaebol*" is made up of the words "*chae*" (wealth or property) and "*bol*" (clan or group).  *Chaebols* are closely-knit business groups in South Korea under the control of a single family or extended family, with key flagship firms which are used as the instruments of control of other firms within the

---

[21] *See* Jae Jean Suh, <u>The Social and Political Networks of the Korean Capitalist Class</u>, *Asian Perspective*, Vol. 13 No. 2 (Fall-Winter 1989) at 116. *See also* http://www.newworldencyclopedia.org/entry/Chaebol.

group. They have four key features: (1) the governance structure of the group involves family or extended family control; (2) the formal organizational structure of the group involves a group headquarters, located in an actual or *de facto* holding company, sometimes known as a "flagship" company, which controls a network of subsidiaries, which fall under the control of the family, the group as a whole, and of flagship firms within the group; (3) the business structure of the firm encompasses a number of discrete products and services, some of which are wholly unrelated and others that are effectively vertically integrated; and (4) these groups are characterized by strong internal cultures of hierarchy, familism, and loyalty, with family members of the founder or his cohorts also occupying key managerial positions within the group.

93.     The Dongwon family of companies readily fits this definition. The company started in 1969 and is dominated by its founder and Chairman Jae-chul Kim ("J.C. Kim") and members of his family or extended family, as described in more detail below. The group headquarters is in Seoul, South Korea, where its holding company, Dongwon Enterprise Company ("Dongwon Enterprise"), is located. Through its subsidiaries, it operates in a number of business sectors including, *inter alia*, marine products, other food products, feed products and pet food, packing materials, and aluminum foil products. As detailed below, the Dongwon family of companies has an internal culture of hierarchy, familism, and loyalty. Defendants Dongwon and Starkist Company exhibit that culture, with members of J.C. Kim's family being put in key positions in both companies and various other executives at Dongwon Enterprise, Dongwon, and other subsidiaries in the Dongwon family of companies being routinely seconded to StarKist Company to fill managerial roles. Dongwon, run by J.C. Kim, is the parent entity for StarKist Company. However, the relationship of personnel from Dongwon Enterprises (also run by J.C. Kim), and its subsidiaries to StarKist is such that the flagship company could, and in fact did, cause personnel under its direction to

manage StarKist Company's affairs with complete disregard to what subsidiary in the Dongwon family of companies they formally worked for, and for purposes of involvement in StarKist Company's management, all personnel in the Dongwon family of companies were functionally personnel that J.C. Kim could assign and direct. Thus, the Dongwon family of companies is run as an integrated enterprise.

94.     Since its acquisition of StarKist Company, Dongwon has dominated it. Executive positions within StarKist Company have been and are being held by many people who worked or work at Dongwon itself or at the many satellite companies owned and controlled by Dongwon. The current President and CEO of StarKist Company is Andrew Choe ("Choe"), who took that position in September of 2014. Choe joined Dongwon Enterprise in 2010 and was sent to Starkist Company in March of 2012 to serve as its as Senior Vice-President of its supply chain and Director of Strategic Planning and Development.[22] Likewise, Nam-Jung Kim (son of Dongwon Chairman J.C. Kim), who served as the COO of StarKist Company from 2012 until October of 2014, was a Vice-President of both Dongwon F&B and Dongwon Enterprise; before joining StarKist Company, he also served as the head of the Finance & Planning Department of Dongwon. He now serves as a Director of both StarKist Company and Dongwon.[23] Similarly, Hyung-

---

[22] Choe remained a Dongwon Enterprise employee, with a Dongwon Enterprise title and a ███████████████████, until March 26, 2012, at which time he became a StarKist Company employee. Choe nonetheless was so deeply involved in StarKist Company's management and strategy that as of the date of this Complaint, StarKist Company's own website describes Choe as having joined StarKist Company in 2010. This demonstrates how blurred the distinction between StarKist Company and Dongwon management had become after Dongwon's purchase of StarKist Company.

[23] His full background and many posts within the Dongwon family of companies is presented in more detail at http://www.bloomberg.com/research/stocks/people/person.asp?personId=201359887&privcapId=6461466. According to one article, "Kim Nam-Jung is the younger son of Dongwon chairman Kim Jae-Chul, who founded the business in 1969 to fish

Joo Kim, Chief Financial Officer ("CFO") of Dongwon F&B, became the CFO of StarKist Company in 2012.  Likewise, Ingu Park ("Park"), the Chairman of the Board of StarKist Company, who also served as its Acting President from November of 2010 to March of 2011, serves as CEO of Dongwon Precision Machinery Company and was Vice-Chairman of Dongwon Enterprises.  Nam-Jung Kim, Hyung-Joo Kim, and Park all served as officers of StarKist Company during the period of the conspiratorial activities described herein, would have known of those activities, and would have relayed that information to executives at Dongwon, as reflected in Dongwon's own statements described below.  All of this constant movement of executives between entities in the Dongwon family of companies reflect its status as a highly integrated *chaebol*.

95.     After the acquisition of StarKist Company by Dongwon, American executives at StarKist Company began to leave — voluntarily and involuntarily.  ███████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████

_____

for tuna and established his first overseas base in the Republic of Ghana in 1973…. In preparation for succession, the founder has been transferring ownership of the private family holding company, Dongwon Enterprise Co., which owns stakes in various listed affiliates, to Nam-Jung. Jae-Chul holds a 24.5% stake and Nam-Jung, 68%."  https://www.forbes.com/profile/kim-nam-jung/.

[24] Dongwon is no stranger to antitrust violations in the food industry.  In June of 2011, one of its subsidiaries, Dongwon Dairy Foods, was fined 1.31 billion Korean won by the Korean Fair Trade Commission ("KFTC") for conspiring with three other firms to rig prices in the South Korean cheese market.  According to the KFTC, employees of the Dongwon subsidiary were found to have participated in "a covert organization established for the purpose of such price-fixing"; they had multiple meetings with competitors in 2007-08, in which they agreed to raise

96. Dongwon closely managed the business affairs of StarKist Company, thereby ignoring principles of corporate separateness. ████

97. ████

_____

cheese prices by 15-20%.
http://www.koreaherald.com/view.php?ud=20110626000297.

1 █████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 █████████████████████████████████████████████████████

4 ██████████████████████████████████████ And, as discussed below, given

5 Dongwon's control and the unity of interests between StarKist Company and its

6 parent in carrying out the conspiracy alleged here, it would be unjust and lead to an

7 inequitable result to allow Dongwon to escape liability for StarKist Company's

8 acts. Dongwon purchased and controlled StarKist Company to its benefit in

9 becoming a "*de facto* globalized enterprise" and extending its operations to the

10 United States using an already well-known national brand.

11      98.      Due to the unlawful conduct alleged herein, StarKist Company

12 earned profits in excess of what it would have earned in a competitive market.

13 StarKist Company transferred its ill-gotten gain obtained through the alleged

14 conspiracy to Dongwon, ████████████████████████████████████

15 █████████████████████████████████████████████████

16 ██████████████████████████████████████████████████████

17 █████████████████████████████████████████████████████

18 ███████████████████████████████████████████████████████

19 █████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 Accordingly, Dongwon knowingly profited from StarKist Company's participation

22 in the conspiracy and knowingly accepted the proceeds of the conspiracy and has

23 been unjustly enriched. As a result of these facts, considered alone or in

24 combination with one or more of the foregoing other facts, adherence to the fiction

25 of the separate existence of Dongwon and StarKist Company would sanction a

26 fraud or promote an injustice; and an inequitable result or an injustice would occur

27 if the corporate form were elevated over substance.

28

99.     Dongwon participated directly in the alleged conspiracy. ███

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████

100.     Unless otherwise indicated, during the period of Dongwon's ownership of StarKist Company, Dongwon and StarKist Company will be referred to collectively herein as "StarKist."

### V.     AGENTS.

101.     The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

### VI.     INTERSTATE TRADE AND COMMERCE.

102.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of PSPs in interstate commerce between and among offices of

1  Defendants and their customers located throughout the United States, its territories,

2  and the District of Columbia.

3      103.    Throughout the Class Period, Defendants transported substantial

4  amounts of PSPs in a continuous and uninterrupted flow of interstate commerce

5  throughout the United States, its territories, and the District of Columbia.

6      104.    Throughout the Class Period, Defendants' unlawful activities, as

7  described herein, took place within and substantially affected the flow of interstate

8  commerce and had a direct, substantial, and reasonably foreseeable effect upon

9  commerce in the United States, its territories, and the District of Columbia.

10              **VII.    FACTUAL ALLEGATIONS.**

11      **A.    The Nature Of, Concentration Of, And Consolidation In, The Domestic**

12          **PSP Market.**

13      105.    In addition to the facts alleged above, which are incorporated by

14  reference, the following facts are also alleged.

15  **1. Nature of the Domestic PSP Market.**

16      106.    PSPs are sold directly by Defendants to club warehouses,

17  wholesale grocery suppliers, grocery cooperatives, mass merchandisers, retailers,

18  and drug stores, among others. ████████████████████████████████

19  ██████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████████████

24      107.    Canned or pouched tuna is a commodity product.  The United

25  States Department of Labor ("DoL") has referred to canned tuna as a "relatively

26  undifferentiated commodity…with widespread consumer indifference to its country

27  of origin or brand name."  COSI observed that tuna may be commodity-oriented,

28

that consumer decisions are often made primarily on price and that price changes significantly affect sales volumes.

108.     COSI's website describes the processing procedures for canned tuna made from frozen or refrigerated tuna loins:

Sourcing

Tuna is highly migratory and found in all the major oceans around the globe. Once our wild-caught tuna is caught, it is flash frozen and delivered to one of our processing facilities.

Fish Receiving

Fish are delivered to canneries frozen or refrigerated. Quality evaluations are performed during unloading, which include monitoring the temperature and condition of the fish and collecting samples for histamine and salt analysis. Lots found unacceptable are rejected.

Cold Storage

Fish are maintained at temperatures near 0° until processing

Pre-Processing Evaluation

Prior to being scheduled for processing, representative samples from each lot are test-packed and samples are evaluated before and after canning to assess quality. Test-pack results are used to determine acceptability and process requirements of fish remaining in each lot.

Thawing

When lots are scheduled for processing in our canneries, fish are brought out of cold storage and thawed to backbone temperatures sufficient to facilitate evisceration and sensory evaluation.

Evisceration & Evaluation

Viscera are removed and each fish is evaluated by trained staff for physical characteristics associated with decomposition or contamination. Any fish exhibiting unacceptable characteristics is rejected.

Pre-Cooking

Acceptable fish are placed on racks and transferred to large ovens, where they are cooked sufficiently to facilitate cleaning of the fish.

Cleaning

Each fish is manually cleaned and inspected for quality attributes. The cleaning operation consists of removing the head, tail, skin, bones and dark flesh known as red meat.

Can Filling

Cleaned tuna loins are fed into filling machines where prescribed amounts of fish are placed into cans. Via a separate system, empty cans are conveyed to filling machines after having been inverted and flushed with air jets and/or water sprays.

Ingredient Addition

Cans leaving the filling machine are conveyed past points where prescribed amounts of spring water or canola oil and other ingredients are added.

Can Sealing

Filled cans are conveyed to sealing machines where lids are put in place and the cans hermetically sealed. Each can or lid is affixed with a permanent production code that identifies plant, product, date packed, batch and other pertinent information. The integrity of the hermetic

seal is evaluated at frequent intervals during processing to ensure product safety.

Thermal Processing

Sealed cans are retorted (cooked) under pressure utilizing process time and temperature schedules designed by processing experts to render the product commercially sterile. All aspects of thermal processing are strictly monitored and controlled.

Finished Product Evaluation

Samples of each finished production code receive qualitative (e.g., color, odor, flavor, texture and cleaning) and quantitative evaluations prior to being released for labeling.

Labeling & Casing

Product lots meeting finished product evaluation criteria are delivered to labeling lines where they are labeled and cased. Cased products are appropriately marked with information necessary to facilitate product tracing.

Warehousing & Shipping

Cased products are shipped or are staged in warehouses for later shipment.

Bumble Bee's website has a similar description of processing of tuna loins for use in canned tuna. ███████████████████████████████████████████

███████████

109.    StarKist's processing and canning of tuna is slightly different, as explained at its FAQ webpage.  At its facility in American Samoa, it receives frozen tuna from fishing vessels; thaws and cleans it; processes it into loins, which are cut into sizes suitable for canning; and packs the processed fish into cans that are then sealed at the facility.

**2. Concentration In The Domestic PSP Market.**

110.    Defendants StarKist, Bumble Bee, and COSI are the three largest domestic manufacturers of PSPs.  The industry is highly concentrated. ████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

111.    In December of 2014, the *Wall Street Journal* reported that the Defendants' respective shares of the domestic market for canned tuna were 13% for COSI, 25% for Bumble Bee, and 36% for StarKist.  Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28%, and COSI at 20% — nearly 80% of the market.

**3. Consolidation In The Domestic PSP Market.**

112.    This oligopolistic structure of the domestic PSP market is the result of recent mergers and acquisitions.[25]  For example, in 1997, Van Camp Seafood Company ("Van Camp") was acquired by the investment group Tri-Union, of which TUG was a member.  Thereafter, in 2000, TUG bought out the other investors to acquire Van Camp completely, which it renamed Chicken of the Sea International, an entity that was later merged into Defendant Tri-Union.

113.    In 2008, Dongwon acquired StarKist Company from Del Monte for $363 million.

114.    And in December of 2014, TUG announced the acquisition of Bumble Bee from Lion Capital (subject to regulatory approval) for $1.51 billion. The combination of COSI and Bumble Bee would have created a virtual duopoly,

---

[25] An oligopoly is a market or industry dominated by a small number of sellers.

1  with the combined entity substantially exceeding the market share of StarKist.

2  TUG had planned to finance the acquisition partly through a preferential public

3  offering to existing shareholders that would have raised approximately $380

4  million.  As explained below, that acquisition did not take place.

5  **4.  Barriers To Entry In The Domestic PSP Market.**

6  115.     The oligopolistic structure of the domestic PSP industry is further

7  reinforced by barriers to entry formed by high initial capital investment for

8  processing and canning facilities and domestic tariffs that limit foreign competition.

9  116.     As is clear from the foregoing, there are significant capital outlays

10  associated with production of PSPs. ████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████

17  117.     In addition to capital outlays forming a barrier to entry, United

18  States tariffs on imported canned tuna deter significant domestic sales by foreign

19  producers.  The DoL has noted that tariff rates are six percent *ad valorem* on

20  canned tuna not packed in oil weighing seven kilograms or less and 12.5 percent *ad*

21  *valorem* for the same product weighing over seven kilograms.

22  **B.     Demand, Supply, And Pricing in the Domestic PSP Market.**

23  **1.  The Oversupply of Tuna.**

24  118.     The primary types of tuna used in canned tuna sold in the United

25  States are skipjack and albacore.  Skipjack accounts for the vast majority of canned

26  tuna sold and is often described on labels as "light tuna."

27  119.     There is currently and has been in recent years an oversupply of

28  skipjack being caught, due, *inter alia*, to the use of purse seining as a method of

capture.  As Lischewski of Bumble Bee described purse seining in a recent article, "[w]ith a purse seiner, they can set a net, encircle a school of tuna, then we pull a rope through the bottom of the net to close it and that's our purse. And then we can bring that net into the boat, and we can actually scoop the tuna--generally still alive, right out of the nets, and into refrigerated sea water until we ultimately freeze them on board."[26]  In 2011, the Pacific Islands Forum Fisheries Agency reported that in the Western Centric Pacific Ocean, the total purse seine catch increased from 113,000 metric tons in 1980 to 1.8 million metric tons in 2009; the catch per vessel climbed from 3,750 metric tons in 1986 to 7,100 metric tons in 2007.

120.	The issues of excessive capture have been aggravated in recent years by the extensive use of fish aggregating devices ("FADs") — man-made objects such as floats or buoys that are used to attract certain ocean-going fish.  As stated in a February 2016 article in *Undercurrent News*:

> A tuna industry veteran believes that there is a "major shakeout" coming if vessel owners don't act fast to address issues leading to the sector's current oversupply.

> Henk Brus, of the firm Sustunable, told attendees at the Americas Tuna Conference on Jan 29 that he believes the explosion in the use of fish aggregating devices (FADs) in the Eastern Pacific Ocean is the main cause of the oversupply and the recent plunge that skipjack tuna prices have experienced in recent years.

> "With the software that is available now today, we're increasingly going to select FADs and we're not even going to catch it anymore. We're basically going to harvest it. If the FAD is ripe we're going to pick the FAD," he said.

Various organizations like Greenpeace have been vocal advocates of "sustainability" in fish harvesting: fishing practices that do not result in undue depletion of fisheries.

---

[26] http://www.sandiego6.com/todays-tuna-industry-ocean-to-table/.

1   121.    The following chart, taken from the Western & Central Pacific

2   Fisheries Commission's 2014 "Tuna Fishery Yearbook" published in 2015 shows

3   how annual global catches of skipjack increased between 1990 and 2014.



**2. Price Declines In Raw Skipjack Due To Oversupply.**

122.    The increasing catches of skipjack have led to decreases in the

price of raw skipjack.  The most recent example is what happened in 2013-15.

Between May of 2013 and January of 2014, the price per ton of skipjack in

Bangkok fell from $2350 to $1250.  The price rebounded briefly, but then fell again

even further.  According to the April 19, 2015 issue of *Tuna Market Intelligence*,

"[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But

the price has plummeted to US$1,000 in early 2015, with industry officials

anticipating further reductions in price this year."  The United Nations Food &

Agriculture Organization ("FAO") noted in its May 2015 "Food Outlook" biannual

report that raw tuna prices had dropped considerably in 2014: "tuna prices declined

significantly due to excess supply, with frozen skipjack prices hitting a 6-year low."

Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton

had declined from $1400 to $800.  By December of 2015, prices out of Ecuador had

dropped to $950 per ton and Thai prices were expected to be between $950 and $980 per ton.

**3. Declining Domestic Consumption Of Canned Tuna.**

123.    In the United States, this increase in the amount of tuna caught was not matched by increases in demand for canned tuna. Consumption of PSPs, particularly canned tuna, has declined over the last ten years in the United States due in large part to changing consumer tastes and concerns over how tuna is fished and the effect on other species, such as dolphins. The annual consumption per person was 3.1 lbs. in 2005, but had fallen to 2.3 lbs. by 2013. This trend was widely reported.

124.    An article in the *Washington Post* graphically represented this decline by measuring United States annual *per capita* consumption from 1930 to 2010:



125.    Similarly, the National Marine Fisheries Service reported that consumers consistently and gradually consumed less of tuna during the Class Period, and a full pound (or 30%) less per capita in 2013 versus 2004:

**U.S. ANNUAL PER CAPITA CONSUMPTION OF CANNED FISHERY PRODUCTS, 1985-2013**

| Year | Salmon | Sardines | Tuna | Shellfish | Other | Total |
|------|--------|----------|------|-----------|-------|-------|
|      |        |          | - - - - - - Pounds - - - - - - - - - - - - - - - - - - - - - - - - - |        |       |       |
| 1985 | 0.5 | 0.3 | 3.3 | 0.5 | 0.4 | 5.0 |
| 1986 | 0.5 | 0.3 | 3.6 | 0.5 | 0.5 | 5.4 |
| 1987 | 0.4 | 0.3 | 3.5 | 0.5 | 0.5 | 5.2 |
| 1988 | 0.3 | 0.3 | 3.6 | 0.4 | 0.3 | 4.9 |

| 1989 | 0.3 | 0.3 | 3.9 | 0.4 | 0.2 | 5.1 |
|------|-----|-----|-----|-----|-----|-----|
| **1990** | **0.4** | **0.3** | **3.7** | **0.3** | **0.4** | **5.1** |
| 1991 | 0.5 | 0.2 | 3.6 | 0.4 | 0.2 | 4.9 |
| 1992 | 0.5 | 0.2 | 3.5 | 0.3 | 0.1 | 4.6 |
| 1993 | 0.4 | 0.2 | 3.5 | 0.3 | 0.1 | 4.5 |
| 1994 | 0.4 | 0.2 | 3.3 | 0.3 | 0.3 | 4.5 |
| 1995 | 0.5 | 0.2 | 3.4 | 0.3 | 0.3 | 4.7 |
| 1996 | 0.5 | 0.2 | 3.2 | 0.3 | 0.3 | 4.5 |
| 1997 | 0.4 | 0.2 | 3.1 | 0.3 | 0.4 | 4.4 |
| 1998 | 0.3 | 0.2 | 3.4 | 0.3 | 0.2 | 4.4 |
| 1999 | 0.3 | 0.2 | 3.5 | 0.4 | 0.3 | 4.7 |
| **2000** | **0.3** | **0.2** | **3.5** | **0.3** | **0.4** | **4.7** |
| 2001 | 0.4 | 0.2 | 2.9 | 0.3 | 0.4 | 4.2 |
| 2002 | 0.5 | 0.1 | 3.1 | 0.3 | 0.3 | 4.3 |
| 2003 | 0.4 | 0.1 | 3.4 | 0.4 | 0.3 | 4.6 |
| 2004 | 0.3 | 0.1 | 3.3 | 0.4 | 0.4 | 4.5 |
| 2005 | 0.4 | 0.1 | 3.1 | 0.4 | 0.3 | 4.3 |
| 2006 | 0.2 | 0.2 | 2.9 | 0.4 | 0.2 | 3.9 |
| 2007 | 0.3 | 0.2 | 2.7 | 0.4 | 0.3 | 3.9 |
| 2008 | 0.1 | 0.2 | 2.8 | 0.4 | 0.4 | 3.9 |
| 2009 | 0.2 | 0.2 | 2.5 | 0.4 | 0.4 | 3.7 |
| **2010** | **0.2** | **0.2** | **2.7** | **0.4** | **0.4** | **3.9** |
| 2011 | 0.2 | 0.2 | 2.6 | 0.4 | 0.4 | 3.8 |
| 2012 | 0.2 | 0.2 | 2.4 | 0.4 | 0.4 | 3.6 |
| **2013** | **0.4** | **0.2** | **2.3** | **0.4** | **0.4** | **3.7** |

### 4. Domestic Pricing Of Canned Tuna.

126. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

127.        In a competitive market, increased supply of raw materials, with expected lower input costs, combined with stagnant demand, should have resulted in significantly lower list prices and extensive promotions for canned tuna. The domestic canned tuna industry used to be that type of market. In the past, as Lischewski of Bumble Bee had noted at the 2000 Infofish conference held in Bangkok, Thailand, the canned tuna industry was highly competitive. Fiercely competing for market share, producers sacrificed profit margins for greater sales volume. In 1985-99, 54.5% of the canned tuna sold in the United States was sold with some sort of promotion, with average price discounting of "a staggering 31 percent." Over this period, retail prices of chunk light half-pound canned tuna had

declined from $43.19 per case to $20.35, a 53% decline in constant dollars. As Lischewski explained:

> The fault for this poor performance falls squarely on the shoulders of the tuna industry. Rather than focus on innovation and growth, the three major brands have fought an "unwinnable" war to steal shares from one another in a flat to declining category. Nowhere is this more evident than in profit margins.... Our results estimate that compared to 1980-84, profit margins have eroded by approximately US $6.75 per case. Multiplying this loss by the 35 million case retail market represents an annual profit loss of more than $200 million to the tuna industry.[27]

128.    In other words, prior to the anticompetitive conspiracy described herein, the domestic canned tuna industry used to engage in real competition involving cut-throat pricing and substantial discounting, which led to lower prices for purchasers during that time period. Since at least 2011, however, the industry has abandoned that competition. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally adjusted United States average prices for shelf stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 (before the period of intense competition identified by Lischewski) identified as a baseline.



---

[27] https://www.dol.gov/whd/as/sec7.htm.

129.     Indeed, the same *Washington Post* article cited above presented the following graph, which showed that while Americans were are buying less canned seafood, they are paying more for what they do buy, as explained further below.



Americans are buying less, but more expensive canned seafood

C.     **DOJ's Criminal Investigation Reveals That The Pricing for PSPs Produced By Defendants Was The Result of Collusion.**

130.     The regulatory proceedings concerning the proposed merger between COSI and Bumble Bee revealed that Defendants collusively agreed to fix the domestic prices of PSPs.  The DOJ's investigation of conduct in violation of the antitrust laws is continuing.

131.     On July 23, 2015, TUG suspended the preferential public offering in connection with its proposed acquisition of Bumble Bee in light of a grand jury investigation commenced by the DOJ.  TUG disclosed on that day that both Bumble Bee and COSI had received grand jury subpoenas relating to an antitrust investigation of PSPs.  The publication *Undercurrent News* further reported in an article dated that same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US

seafood producers have also received a subpoena requiring the production of relevant information to the DOJ."

132.    The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.
>
> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

The article goes on to state:

> An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analysing deals.
>
> It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.
>
> ****
>
> The source said others in the industry are now anticipating that they too will be subpoenaed….

133.    TUG held an Extraordinary General Meeting of Shareholders on September 16, 2015. The minutes of that meeting state:

> Khun Thiraphong Chansiri [Chairman of TUG's Board of Directors] clarified: on the capital increase issue, the Company had a resolution from the Board of Directors and had the approval from the Office of Securities and Exchange Commission to delay the capital increase process for 6 months. The main reason for the delay request was that the

week prior to the due date of the capital increase payment, ***Tri-Union Seafood or Chicken of the Sea International in the United States of America was notified by the Department of Justice of the USA that the investigation on illegal actions regarding Anti-Trust of the whole packaged seafood industry in USA was being carried out, not limited to only on the Company***. Hence the Company had consulted with the Board of Directors and the legal consultants who shared their viewpoints that ***the Company should delay its capital increase due to a high degree of uncertainty in such serious matter*** and to provide time to the shareholders to thoroughly and completely study the facts. The Company had no urgent need to use the fund from the capital increase whatsoever. The Company thus returned the fund to the shareholders. On the lawsuit issues, the Company has been keeping an eye on but still retains no clear facts and data because ***the investigation was on the whole industry***. Also the Company has been informed that the investigation process takes 2-3 years. (Emphases added)

134.    The fact that these companies received subpoenas from a federal grand jury is significant because it indicates that the DOJ is pursuing a criminal prosecution.

135.    As noted above, counsel for COSI has confirmed to Plaintiffs that COSI has applied to the DOJ for leniency in connection with the alleged conspiracy.

136.    The significance of a company seeking Type B leniency cannot be understated. According to the DOJ's "Frequently Asked questions" about the Antitrust Division's Leniency Program (as updated on January 26, 2017), an applicant for Type B leniency must admit to participating in a *criminal violation* of the antitrust laws (https://www.justice.gov/atr/page/file/926521/download):

**5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**

Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. ***Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation***

*of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.* Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program. (Emphases added).

As indicated on the same DOJ webpage, the leniency applicant must also establish "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

137.    On December 3, 2015, it was announced that the planned merger of COSI and Bumble Bee was being abandoned. According to a press release on the DOJ's website:

> "Consumers are better off without this deal," said Assistant Attorney General Bill Baer [("Baer")] of the department's Antitrust Division. "*Our investigation convinced us – and the parties knew or should have known from the get go – that the market is not functioning competitively today, and further consolidation would only make things worse*." (Emphases added).[28]

138.    As noted above, Bumble Bee, K. Worsham, and Cameron have all pled guilty to criminal violations of the price-fixing proscription contained in the Sherman Act.

**D.    Methods By Which Defendants Effectuated Their Collusive Scheme.**

139.    Since at least late 2010, Defendants — entities that should be competing against one another — have been engaged in an overarching collusive scheme to fix prices for PSPs. As reflected by these improper communications,

---

[28] Lischewski of Bumble Bee was unrepentant about the collapse of the deal. He was quoted as saying that "[d]uring the last year, Bumble Bee has conducted business as usual and now has a renewed focus to execute its vision for the company well into the future."
http://www.oregonlive.com/business/index.ssf/2015/12/canned_tuna_giants_blocked_by.html.

there are several mechanisms by which Defendants effectuated this scheme: ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ As reflected in allegations throughout this Fourth Amended

Consolidated Complaint, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Each of these categories of

conduct is described below.

**1. Collusion On 2011 Price Increases.**

140. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

141. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮



142.

143.

144.

145.

146.     StarKist announced its list price increases on March 2, 2011, with an effective date of May 30, 2011.

147.     Bumble Bee announced its list price increases on March 10, 2011, to take effect on May 29, 2011.



COSI then announced a net price increase on May 17, 2011, effective June 1, 2011. COSI's increase, based on a comparison of net to list prices, was proportional to the list price increases of StarKist and Bumble Bee.

148.

149.

**2. Collusion On List Price Increases In 2011-12.**

150.

151.

152.



153.

154.

155.     The FAO reported that canned tuna wholesale and retail prices in the United States increased by 10.9% and 6.6%, respectively, between 2010 and 2012.  At the same time, canned tuna consumption continued to decline across the United States, falling by 7.7% between 2011 and 2012.  One FAO newsletter noted in December of 2012 that "[s]luggish demand for canned tuna continues in the US market.  Under the current economic conditions consumers are reluctant to accept higher canned tuna prices, while supermarkets are unable to promote the product as a low-priced item as they could in the past."  Under such conditions of decreasing demand, one would expect Defendants would have *decreased* prices to generate business.  By coordinating price increases, Defendants' pricing conduct was contrary to the individual self-interest of each of them, and would have been impossible to maintain absent the conspiratorial agreements between them.

156.    These price increases in 2011-12 achieved Lischewski of Bumble Bee's goal of ensuring that the industrywide prices for canned tuna were no longer "too cheap."  Lischewski himself noted in a July 2012 interview that "we believe the market will adjust to the new price levels over the next year as tuna remains a healthy and affordable protein."  He went on to add that "[u]nfortunately, higher prices—*up more than 40 percent over the last 18 months*—are negatively impacting overall consumption and promotional sales volume is down as retailers are not able to achieve the 'hot' price points that historically enabled them to drive tuna volume."  (Emphases added).  Thus, Lischewski was conceding that the previous 18 months of price increases were driving down consumer demand and promotional volume—again something contrary to the individual self-interest of COSI, Bumble Bee, and StarKist.  Likewise, in a March 2012 interview, Cho, former President and CEO of StarKist, stated that the company was taking action to increase prices.  He said that "[i]n America, all they have done is say: 'two cans for a dollar, three cans for a dollar'–but that has to change."

157.    ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**3.  Collusion On Promotional Activity.**

158.    ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



4.    **Other Collusive Conduct.**

159.

160.

161. In short, ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
███████████

162. ████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

### 5. Other Opportunities To Collude.

163. In addition to the secret e-mails and telephone calls described above, the Defendants had numerous other opportunities to meet and collude.

164. Additional opportunities to collude were provided by the annual Infofish conventions held in Bangkok, Thailand during the Class Period.

165. Another opportunity was provided by the Tuna Council of the National Fisheries Institute ("NFI"). As explained on the NFI's website:

> The National Fisheries Institute's Tuna Council represents the largest processors and household names for canned and pouch tuna in the U.S. including *Bumble Bee®, Chicken of the Sea® and StarKist®*. The Tuna Council speaks for the tuna industry on numerous issues

including food safety, labeling, sustainability, nutrition education and product marketing.

166.    Bumble Bee, COSI, and StarKist jointly sponsored the "Tuna the Wonderfish" advertising campaign of 2011-12 under the auspices of the Tuna Council to remedy the perception that canned tuna was a "cheap" product. This campaign was bankrolled by the three companies, who teamed up for collective marketing purposes. Tuza of StarKist reportedly said that "[w]e worked together surprisingly well." He said further that the campaign, intended to increase consumption of tuna, was based on the hope that "as the water level rises…all boats rise with the tide", referring to the three aforementioned companies. The same philosophy was applied in Defendants' subsequent collusive activities with respect to list price increases and promotions.

167.    Yet another opportunity to collude was provided through meetings of the ISSF (International Seafood Sustainability Foundation). Lischewski is the chair of that organization.

168.    A███████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████████
███████████

169.    The interlocking relationships among Defendants are also demonstrated by the movement of executives among the companies. There are numerous examples of this. ████████████████████████████

Such movement of executives and the common friendships that were formed fostered collusion among all three companies; a former executive of one Defendant who now served at another Defendant would deem it permissible to share his current employer's confidential information with his ex-colleagues.

**E. Defendant Parent Companies Recognized the Benefits of the Conspiracy.**

170.    Defendant parent companies benefitted from participation in the conspiracy, as reflected in statements made by their respective parent entities.

171.    In its 2013 Annual Report, TUG stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US*." (Emphases added).  It said in the same report that its future profit margins would depend upon "[r]easonable US canned tuna competition *without unnecessary price* [*sic*]." (Emphases added).  In its 2014 Annual Report, TUG explicitly noted that this goal had been achieved. It stated:

> *Thanks to reduced price competition (absence of cut throat pricing) and generally lower fish costs, our own tuna brands marked a great year of increased profitability.* Despite minimal sales growth in the US, competitive inventory cost and *reasonable market conditions* helped lift the margin of our US brand. (Emphases added).

172.    The same report went on to note that "*sensible market competition*, supported by lower raw material costs made it possible for our own tuna brands to expand their margins through the year despite limited volume growth." (Emphases added).  It indicated that future revenue growth would again be dependent upon "*[r]easonable US canned tuna market competition that focuses more on consumption creation than market share alone*." (Emphases added).

173.    Similarly, Kelly Mayer, a partner in Lion (the owner of Bumble Bee) released a memorandum in December of 2014 to limited partners that stated:

> With respect to earnings development under our ownership, Bumble Bee maintained and grew gross margins *through disciplined pricing actions*, leading to adjusted EBITDA climbing to over $150 million this year, the highest level of EBITDA in the company's history.

(Emphases added).

174.    And Dongwon has stated that "[t]he canned tuna market in the U.S. is approximately a $1,700,000,000 USD market, but it is a *mature market where growth has stopped, and it maintains an oligopolistic system* with Starkist Co. (40%), Bumble Bee (25%), and Chicken of the Sea (15%), and *represents a*

*structure in which the price of tuna cannot be efficiently reflected in the sales price of products*." (Emphases added).[30]

175.    The "reasonable market conditions", "more rational market competition", "sensible market competition", avoidance of battles for market share, "absence of cut throat pricing", pricing structure that fails to efficiently reflect input costs, and pricing "discipline" that the various Defendants' reports and statements note came about through collusion.  In a truly competitive market, it would have been in the individual self-interest of each Defendant to increase market share during this period of declining costs and declining demand by lowering prices and offering more promotions.

176.    TUG, Dongwon, and Lion Capital all directly profited as a result of the conspiracy.

177.    As noted above, Lion Capital saw substantial increases of Bumble Bee's gross margins in recent years and structured the ownership of Bumble Bee to take the full advantage of profits earned from the conspiracy.

178.    Similarly, Dongwon registered substantial additional income in the period following the series of list price increases described above.

179.    Likewise, TUG stated in its 2014 Annual Report stated that "[t]he overall gross margin of tuna in 2014 improved to 17.0 percent (from 12.5 percent in 2013) mainly due to gross margin expansion of branded business from lower fish costs, price adjustments of EU operation in early 2014 as well as *rational market competition in the US*." (Emphases added).

## VIII.    CLASS ACTION ALLEGATIONS

180.    Plaintiffs Olean, Piggly Wiggly, Benjamin Foods, and Trepco bring this action on behalf of themselves and as a class action pursuant to Rule

---

[30] The foregoing quotation is a translation from the Korean language.

23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class"):

> All persons and entities that directly purchased packaged seafood products within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between June 1, 2011 to July 31, 2015. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families, as well as any federal judges or their staffs.

Plaintiffs reserve the right to amend the Class definition as additional facts become known through discovery.

181. Plaintiffs do not know the exact number of members of the Class because such information is in the exclusive control of Defendants. Due to the nature of the trade and commerce involved, however, Plaintiffs believe that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories, and the District of Columbia so that joinder of all Class members is impracticable.

182. There are questions of law and fact which are common to the claims of Plaintiffs and the Class, including, but not limited to:

a. Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for PSPs;

c. Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for PSPs;

d. The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for PSPs;

e. Whether Defendants violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

f.      Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests; and

g.      Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and members of the Class, and, if so, the appropriate measure of damages.

183.      Plaintiffs' claims are typical of the claims of the members of the Class.

184.      Plaintiffs will fairly and adequately assert and protect the interests of the Class.

185.      Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

186.      Plaintiffs are represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

187.      The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

188.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b.      The Class is readily definable and one for which records should exist in the files of Defendants.

c.      Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.      Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.      Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

189.     This class action presents no difficulties of management that would preclude its maintenance as a class action.

## IX.    TOLLING OF THE STATUTE OF LIMITATIONS

190.     Plaintiffs had neither actual nor constructive knowledge of the facts constituting its claim for relief.

191.     Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least July of 2015.  Indeed, the conspiracy was apparently only uncovered by DOJ in the process of reviewing internal company documents relating to the proposed merger between COSI and Bumble Bee.

192.     Defendants engaged in a secret conspiracy and did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was an agreement to fix prices for PSPs.  By their very nature, price-fixing conspiracies are inherently self-concealing. Defendants agreed among themselves to conceal their unlawful conspiracy, including by agreeing not to discuss the conspiracy publicly and by other means of avoiding detection and maintaining secrecy, such as the use of nonpublic e-mails and private telephone calls, as described above.  Accordingly, Plaintiffs could not have had either actual or constructive knowledge of the price fixing scheme until the public disclosure of the DOJ's criminal investigation.

193.     Defendants avoided confirming or referencing their illegal agreement in writing, instead conducting most of their conspiratorial

communications via direct conspirator-to-conspirator telephone calls and in-person meetings among the conspirators. These communications include the telephone conversations referenced in this complaint. The absence of direct written communications among the co-conspirators confirming their agreement made detection more difficult.

194. The guilty plea of K. Worsham of Bumble Bee further raises the inference that the conspiracy was affirmatively concealed. K. Worsham is the son of R. Worsham, who was a consultant for StarKist. The involvement of both father and son in the collusive activity allowed Defendants an avenue to pass competitive information in private with no need to present an explanation for why they should be meeting and communicating. ███████████████████████████████ ██████████████████████████████████

195. In connection with the 2011-12 price increases discussed above, COSI, StarKist, and Bumble Bee interacted mostly through telephonic communications, text messages, or face-to-face meetings, as described above. As alleged above, ████████████████████████████████████ ██████████████████████████████████████████████ ███████. By these means, Defendants ensured that a written record of their interactions with each other concerning this price increase was not created. There was no way Plaintiffs could have discovered the existence of these communications any earlier than they have.

196. With respect to these various conspiratorial acts, confidential documents of one Defendant were often received by another Defendant with instructions not to share or distribute. Examples have been given above.

197. While implementing the various collusive price increases, Defendants consistently gave pretextual public reasons for them, such as rising costs, a weakening United States dollar, or other factors. Examples of these pretextual statements include:



(k) David Melbourne of Bumble Bee saying in an August 2012 *Intrafish* article that "[t]he leading brands took pricing action due to escalating fish costs".

198.    None of these communications ever mentioned Defendants' collusion or the fact that, as DOJ's Baer has stated, their industry was "not functioning competitively." In fact, the communications serve to reassure the public that markets were indeed functioning competitively.

199.    Defendants thus actively misled their customers about the price-fixing scheme. Their various justifications for price increases did not disclose that they had agreed among themselves to fix, raise and/or stabilize the price of PSPs. Defendants' justifications for their price increases were also misleading, to the extent they were true even in part, because of their failure to disclose that the price increases in fact resulted from their illegal agreement and conspiracy.

200.     Additionally, as noted above, Defendants shared confidential information among themselves in furtherance of the conspiracy through surreptitious means, such as the use of personal or spousal e-mail of addresses and the concealment of the true contents of those e-mails through the use of innocuous titles.  Defendants' representatives also had meetings with each other at locations outside of their respective offices for the purpose of concealing their conspiracy.

201.     Finally, Lischewski took steps to conceal his own involvement (as well as Lion Capital's and Lion Americas' involvement) in the conspiracy. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, the Grand Jury investigating Defendants' conspiracy indicted Lischewski for his role in that conspiracy and the indictment expressly alleged that he deleted emails to conceal his unlawful conduct.

202.     Because Defendants' communications, agreement, understanding and overall conspiracy was kept secret, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for PSPs during the Class Period.

## X.     CAUSE OF ACTION.

### Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

203.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

204.     Defendants and their co-conspirators engaged in a contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of PSPs within the United States, its territories, and the District of Columbia in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

205.     Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of PSPs.

206.     In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of PSPs.

207.     The illegal combination and conspiracy alleged herein had the following effects, among others:

a.     The prices charged by Defendants to, and paid by, Plaintiffs and members of the Class for PSPs were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.     Plaintiffs and members of the Class have been deprived of free and open competition in the purchase of PSPs;

c.     Plaintiffs and members of the Class have been required to pay more for PSPs than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy;

d.     Competition in the sale of PSPs has been restrained, suppressed or eliminated.

208.     As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.    That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act;

C.    That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Class;

D.    That the Court award Plaintiffs and the Class treble damages;

E.    That the Court award Plaintiffs and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law; and

F.    That the Court award Plaintiffs and the Class such other and further relief as may be deemed necessary and appropriate.

## XII.    JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(c), Plaintiffs demand a trial by jury on all matters so triable.


Dated: October 5, 2018                    Respectfully submitted,


By: *s/  Bonny E. Sweeney*
    Michael P. Lehmann
    Bonny E. Sweeney
    Christopher L. Lebsock
    Samantha J. Stein
    HAUSFELD LLP
    600 Montgomery Street, Suite 3200
    San Francisco, CA 94111
    Tel:  (415) 633-1908
    Fax: (415) 358-4980
    E-mail:  mlehmann@hausfeld.com
    E-mail:  bsweeney@hausfeld.com
    E-mail:  clebsock@hausfeld.com
    E-mail:  sstein@hausfeld.com

    Michael D. Hausfeld
    James J. Pizzirusso

HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
E-mail:   mhausfeld@hausfeld.com
E-mail:   jpizzirusso@hausfeld.com

*Counsel for Plaintiff Olean Wholesale
Grocery Cooperative, Inc. and Interim Lead
Counsel for the Direct Purchaser Class*

Arthur N. Bailey
Marco Cercone
RUPP BASE PFALZGRAF
CUNNINGHAM LLC
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
Telephone: (716) 664-2967
Facsimile: (716) 664-2983
E-mail: bailey@ruppbaase.com
E-mail: cercone@ruppbaase.com

Lesley Weaver
BLEICHMAR FONTI & AULD LLP
1999 Harrison Street, Suite 670
Oakland, CA 94612
Tel: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Additional Counsel for Plaintiff Olean
Wholesale Grocery Cooperative, Inc.*

Barbara Hart
Grace Lee
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, New York 10601
(O) 914-997-0500
(F) 914-997-0035

E-Mail: bhart@lowey.com
E-Mail: glee@lowey.com

*Counsel for Plaintiff Pacific Groservice Inc.*
*d/b/a PITCO Foods and Member of Direct*
*Purchaser Plaintiffs' Steering Committee*

Solomon B. Cera (Cal. Bar No. 99467)
Thomas C. Bright (Cal. Bar No. 169713)
Louis A. Kessler (Cal. Bar No. 243703)
CERA LLP
595 Market Street, Suite 2300
San Francisco, California 94105
Tel: (415) 777-2230
Fax: (415) 777-5189

C. Andrew Dirksen (Cal. Bar No. 130064)
CERA LLP
800 Boylston St., 16th Floor
Boston, MA 02199
Tel: (857) 453-6555
Fax: (415) 777-5189

*Counsel for Plaintiffs Howard Samuels as*
*Trustee in Bankruptcy for Central Grocers,*
*Inc. and Piggly Wiggly Alabama Distributing*
*Co., Inc. and Member of Direct Purchaser*
*Plaintiffs' Steering Committee*

Jason S. Hartley (CA Bar No. 192514)
Jason M. Lindner (CA Bar No. 211451)
HARTLEY LLP
550 West C Street, Suite 1750
San Diego, CA 92101
Phone: (619) 400-5822
Fax: (619) 400-5832
E-mail: hartley@hartleyllp.com
E-mail: lindner@hartleyllp.com

*Counsel for Plaintiff Trepco Imports &*
*Distribution, Ltd.*

Stephen R. Neuwirth
Sami H. Rashid
Joseph N. Kiefer
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
E-mail:
stephenneuwirth@quinnemanuel.com
E-mail: samirashid@quinnemanuel.com
E-mail: josephkiefer@quinnemanuel.com

Stanley Bernstein
Joseph Seidman
BERNSTEIN LIEBHARD LLP
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
E-mail: bernstein@bernlieb.com
E-mail: seidman@bernlieb.com

*Counsel for Plaintiff Benjamin Foods LLC
And Members of Direct Purchaser Plaintiffs'
Steering Committee*

Whitney E. Street (Cal. Bar No. 223870)
BLOCK & LEVITON LLP
520 Third Street, Suite 108
Oakland, CA 94607
Telephone: (415) 968-8999
Facsimile: (617) 507-6020
E-mail: whitney@blockesq.com

*Member of Direct Purchaser Plaintiffs'
Steering Committee*

Allan Steyer (Cal. Bar No. 100318)
D. Scott Macrae (Cal. Bar No. 104663)

Jill M. Manning (Cal. Bar No. 178849)
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Suite 300
San Francisco, CA 94111
Telephone: (415) 421-3400
Facsimile: (415) 421-2234
E-mail: asteyer@steyerlaw.com
E-mail: smacrae@steyerlaw.com
E-mail: jmanning@steyerlaw.com

*Additional Counsel for the Direct Purchaser
Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on October 5, 2018, I filed the foregoing document with the Clerk of the Court for the United States District Court, Southern District of California, by using the Court's CM/ECF System, which sends notifications of such filings to all counsel of record.

By: s/ *Bonny E. Sweeney*
Bonny E. Sweeney
*Interim Lead Counsel for the Direct Purchaser Class Plaintiffs Track*
HAUSFELD LLP
bsweeney@hausfeld.com