1
2

**FILED UNDER SEAL – HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER OF THE COURT**

3

BETSY C. MANIFOLD (182450)
manifold@whafh.com

4

RACHELE R. BYRD (190634)
byrd@whafh.com

5

**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**

6

750 B Street, Suite 2770
San Diego, CA 92101

7

Telephone:  619/239-4599
Facsimile:  619/234-4599

8

*Interim Lead Counsel for the End Payer Plaintiffs*

9

[Additional Counsel Listed on Signature Page]

10

11

### UNITED STATES DISTRICT COURT

12

### FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14
15

IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION

16

This Document Relates To:

17

The Indirect Purchaser End Payer Actions

Case No. 15-MD-2670 JLS (MDD)

**[REDACTED] SIXTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT OF THE INDIRECT PURCHASER END PAYER PLAINTIFFS**

18
19

**(FILED UNDER SEAL)**

20
21

22

DEMAND FOR JURY TRIAL

23
24

JUDGE:  Hon. Janis L. Sammartino
CTRM:   4D (4th Fl.—Schwartz)

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

<u>Page No.</u>

NATURE OF ACTION ................................................................. 1

PARTIES ................................................................................. 3

**Bumble Bee Defendants** ....................................................... 11

AGENTS AND CO-CONSPIRATORS ........................................ 39

JURISDICTION AND VENUE ................................................... 39

CLASS ACTION ALLEGATIONS ............................................. 40

RELEVANT MARKETS ........................................................... 48

INTERSTATE COMMERCE ..................................................... 49

**Dongwon And StarKist Act As A Single Entity** .................. 56

ADDITIONAL FACTUAL ALLEGATIONS ................................. 67

FRAUDULENT CONCEALMENT AND THE TOLLING OF THE STATUTE OF LIMITATIONS ...................................................... 113

TOLLING OF THE STATUTE OF LIMITATIONS ....................... 113

CAUSES OF ACTION ............................................................. 127

<u>VIOLATIONS OF STATE ANTITRUST LAW</u> ........................ 127

<u>VIOLATIONS OF STATE CONSUMER PROTECTION LAW</u> .... 161

PRAYER FOR RELIEF ........................................................... 222

JURY DEMAND ..................................................................... 223

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Plaintiffs Louise Adams, Nay Alidad, Jessica Bartling, Gay Birnbaum, Barbara Blumstein, Melissa Bowman, Sally Bredberg, Barbara Buenning, Michael Buff, Scott Caldwell, Jade Canterbury, Laura Childs, Casey Christensen, Jody Cooper, Kim Craig, Sundé Daniels, Elizabeth Davis-Berg, Brian Depperschmidt Vivek Dravid, Gloria Emery, Robert Etten, Ana Gabriela Felix Garcia, John Frick, Kathleen Garner, Stephanie Gipson, Kathy Durand (formerly Gore), Andrew Gorman, Tina Grant, Edgardo Gutierrez, Lisa Hall, Mary Hudson, Tya Hughes, Amy Jackson, Marissa Jacobus, Danielle Johnson, Zenda Johnston, Amy Joseph, Michael Juetten, Steven Kratky, Kathy Lingnofski, Carla Lown, Katherine McMahon, Diana Mey, Liza Milliner, Laura Montoya, Rick Musgrave, Jennifer A. Nelson, Corey Norris, Barbara Olson, Kirsten Peck, John Pels, Elizabeth Perron, Valerie Peters, John Peychal, Audra Rickman, Erica Rodriguez, Joelyna A. San Agustin, Amber Sartori, Rebecca Lee Simoens, Robert Skaff, Greg Stearns, Nancy Stiller, Christopher Todd, John Trent, Elizabeth Twitchell, Bonnie Vander Laan, Nigel Warren, Julie Wiese, Thomas E. Willoughby III, and Daniel Zwirlein (collectively "Plaintiffs"), for their consolidated complaint, allege upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel, as follows:

### NATURE OF ACTION

1.     This is a class action concerning anticompetitive activity by the Defendants Bumble Bee Foods LLC ("Bumble Bee"); Lion Capital LLP ("Lion Capital"); Lion Capital (Americas), Inc. ("Lion Americas"); Lion/Big Catch Cayman LP ("Big Catch"); Dongwon Industries Co., Ltd. ("Dongwon"); StarKist Company ("StarKist"); Del Monte Corporation ("Del Monte"); Thai Union Group Public Company Limited; and Tri-Union Seafoods LLC d/b/a Chicken of the Sea International ("Tri-Union" or "COSI"), collectively referred to herein as "Defendants." The claims alleged herein are brought pursuant to various state

- 1 -

**FILED UNDER SEAL**

antitrust, consumer protection, and equitable laws as alleged.  This action is brought by Plaintiffs, on behalf of themselves and Classes of persons and entities who indirectly purchased shelf-stable packaged tuna ("Packaged Tuna") produced by any Defendant or current or former subsidiary or affiliate of any Defendant, during the period from, and including, at least June 1, 2011 through such time as the anticompetitive effects of Defendants' conduct ceases.

2.     The exact date of the conspiracy is uncertain, but it began no later than November 2011 and continued in force through at least July 2015 (the "Relevant Period").  The class period for purposes of this Complaint extends from at least June 1, 2011 to July 31, 2015 (the "Class Period"). The effects of the conspiracy continue to the date of the filing of this Complaint, as evidenced by the Class Period.[1]

3.     Defendants have conspired to raise, fix, stabilize or maintain prices of and restrict capacity within the market for the sale of Packaged Tuna during the Class Period.

4.     With slowing and stagnating growth and margins in the United States Packaged Tuna industry,  Defendants directly coordinated the following business matters: (1) can and pouch sizes for tuna; (2) pricing of packaged tuna; (3) promotional activity for packaged tuna; and (4) the offering of "FAD" (or "Fish Aggregating Device") Free labeling for tuna under the major brands. Defendants' coordination, among other things, caused the prices for Packaged

---

[1]     Plaintiffs' Fifth Consolidated Indirect Purchaser End Payer Plaintiffs Class Action Complaint, filed on June 5, 2018, included a class period extending back until 2004. The Court permitted Plaintiffs to amend their complaints in a recent order on the Lion Capital Entities' Motion to Dismiss. *See* ECF No. 1358. This Sixth Amended Consolidated Complaint modifies the Class Period based on evidence collected in discovery and as reflected in Plaintiffs' Motion for Class Certification.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1  Tuna to be supracompetitive during the Class Period. As part of this

2  coordination, Defendants agreed and conspired to artificially increase prices for

3  Packaged Tuna to record highs in spite of reduced consumer interest and falling

4  demand.  The impacts of Defendants' unlawful and anticompetitive conduct are

5  ongoing and continue to this day.

6  **PARTIES**

7  <u>**Plaintiffs**</u>

8       5.     Plaintiff Louise Adams is domiciled in Chippewa County, Michigan,

9  and purchased Packaged Tuna indirectly from one or more Defendants in the State

10  of Michigan during the Class Period.

11       6.     Plaintiff Nay Alidad is domiciled in Clark County, Nevada, and

12  purchased Packaged Tuna indirectly from one or more Defendants in the State of

13  Nevada during the Class Period.

14       7.     Plaintiff Jessica Bartling is domiciled in Hillsborough County, New

15  Hampshire, and purchased Packaged Tuna indirectly from one or more Defendants

16  in the State of New Hampshire during the Class Period.

17       8.     Plaintiff Gay Birnbaum is domiciled in Beaufort County, South

18  Carolina, and purchased Packaged Tuna indirectly from one or more Defendants in

19  the State of South Carolina during the Class Period.

20       9.     Plaintiff Barbara Blumstein is domiciled in Palm Beach County,

21  Florida, and purchased Packaged Tuna indirectly from one or more Defendants in

22  the State of Florida during the Class Period.

23       10.    Plaintiff Melissa Bowman is domiciled in Douglas County, Nebraska,

24  and purchased Packaged Tuna indirectly from one or more Defendants in the State

25  of Nebraska during the Class Period.

26       11.    Plaintiff Sally Bredberg is domiciled in Cook County, Illinois, and

27  purchased Packaged Tuna indirectly from one or more Defendants in the State of

28

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Illinois during the Class Period.

12.     Plaintiff Barbara Buenning is domiciled in Dodge County, Nebraska, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Nebraska during the Class Period.

13.     Plaintiff Michael Buff is domiciled in Albany County, New York, and purchased Packaged Tuna indirectly from one or more Defendants in the State of New York during the Class Period.

14.     Plaintiff Scott Caldwell is domiciled in Essex County, Massachusetts, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Massachusetts during the Class Period.

15.     Plaintiff Jade Canterbury is domiciled in Monroe County, West Virginia, and purchased Packaged Tuna indirectly from one or more Defendants in the State of West Virginia during the Class Period.

16.     Plaintiff Laura Childs is domiciled in Washington County, Minnesota, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Minnesota during the Class Period.

17.     Plaintiff Casey Christensen is domiciled in Lincoln County, South Dakota, and purchased Packaged Tuna indirectly from one or more Defendants in the State of South Dakota during the Class Period.

18.     Plaintiff Jody Cooper is domiciled in Merrimack County, New Hampshire and purchased Packaged Tuna, indirectly from one or more Defendants in the State of New Hampshire.

19.     Plaintiff Kim Craig is domiciled in Garland County, Arkansas, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Arkansas during the Class Period.

20.     Plaintiff Sundé Daniels is domiciled in Norfolk County, Massachusetts and purchased Packaged Tuna indirectly from one or more

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1    Defendants in the State of Massachusetts during the Class Period.

2        21.    Plaintiff Elizabeth Davis-Berg is domiciled in Cook County, Illinois,

3    and purchased Packaged Tuna indirectly from one or more Defendants in the State

4    of Illinois during the Class Period.

5        22.    Plaintiff Brian Depperschmidt is domiciled in Sedgwick County, Kansas,

6    Kansas, and purchased Packaged Tuna indirectly from one or more Defendants in

7    the State of Kansas during the Class Period.

8        23.    Plaintiff Vivek Dravid is domiciled in Cuyahoga County, Ohio, and

9    purchased Packaged Tuna indirectly from one or more Defendants in the State of

10   Utah during the Class Period.  Vivek Dravid was formerly domiciled during the

11   Class Period in Salt Lake County, Utah, during which time he made all relevant

12   purchases in the State of Utah.

13       24.    Plaintiff Kathy Durand (formerly Gore) is domiciled in Portales

14   County, New Mexico, and purchased Packaged Tuna indirectly from one or more

15   Defendants in the State of New Mexico during the Class Period.

16       25.    Plaintiff Gloria Emery is domiciled in Hawaii County, Hawaii, and

17   purchased Packaged Tuna indirectly from one or more Defendants in the State of

18   Hawaii during the Class Period.

19       26.    Plaintiff Robert Etten is domiciled in Ramsey County, Minnesota, and

20   purchased Packaged Tuna indirectly from one or more Defendants in the State of

21   Minnesota during the Class Period.

22       27.    Plaintiff Ana Gabriela Felix Garcia is domiciled in the District of

23   Columbia and purchased Packaged Tuna indirectly from one or more Defendants

24   in the State of Arizona and the District of Columbia during the Class Period.

25       28.    Plaintiff John Frick is domiciled in Jackson County, Missouri, and

26   purchased Packaged Tuna indirectly from one or more Defendants in the State of

27   Missouri during the Class Period.

28

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

29.     Plaintiff Kathleen Garner is domiciled in Clark County, Arkansas, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Arkansas during the Class Period.

30.     Plaintiff Stephanie Gipson is domiciled in Chittenden County, Vermont, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Vermont during the Class Period.

31.     Plaintiff Andrew Gorman is domiciled in the District of Columbia, and purchased Packaged Tuna indirectly from one or more Defendants in the District of Columbia and the State of Virginia during the Class Period.

32.     Plaintiff Tina Grant is domiciled in Salt Lake County, Utah, and purchased Packaged Tuna indirectly from one or more Defendants in the States of Arizona and Utah during the Class Period.

33.     Plaintiff Edgardo Gutierrez is domiciled in Broward County, Florida, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Florida during the Class Period.

34.     Plaintiff Lisa Hall is domiciled in Saline County, Kansas, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Kansas during the Class Period.

35.     Plaintiff Mary Hudson is domiciled in San Diego County, California, and purchased Packaged Tuna indirectly from one or more Defendants in the State of California during the Class Period.

36.     Plaintiff Tya Hughes is domiciled in Ward County, North Dakota, and purchased Packaged Tuna indirectly from one or more Defendants in the States of Arizona, California, and North Dakota during the Class Period.

37.     Plaintiff Amy Jackson is domiciled in the Territory of Guam and purchased Packaged Tuna indirectly from one or more Defendants in the Territory of Guam and the State of California during the Class Period.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

38.     Plaintiff Marissa Jacobus is currently domiciled in Calaveras County, California, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Virginia during the Class Period. Marissa Jacobus was formerly domiciled during the Class Period in Arlington, Virginia, during which time she made all relevant purchases in the State of Virginia.

39.     Plaintiff Danielle Johnson is domiciled in Multnomah County, Oregon, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Oregon during the Class Period.

40.     Plaintiff Zenda Johnston is domiciled in Orange County, Florida, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Florida during the Class Period.

41.     Plaintiff Amy Joseph is domiciled in DuPage County, Illinois, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Illinois during the Class Period.

42.     Plaintiff Michael Juetten is domiciled in Los Angeles County, California, and purchased Packaged Tuna indirectly from one or more Defendants in the States of California and Wisconsin during the Class Period.

43.     Plaintiff Steven Kratky is domiciled in the independent city of St. Louis, Missouri, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Missouri during the Class Period.

44.     Plaintiff Kathy Lingnofski is domiciled in Outagamie County, Wisconsin, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Wisconsin during the Class Period.

45.     Plaintiff Carla Lown is domiciled in Blackhawk County, Iowa, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Iowa during the Class Period.

46.     Plaintiff Katherine McMahon is domiciled in Washington County,

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Rhode Island, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Rhode Island during the Class Period.

47.    Plaintiff Diana Mey is domiciled in Ohio County, West Virginia, and purchased Packaged Tuna indirectly from one or more Defendants in the State of West Virginia during the Class Period.

48.    Plaintiff Liza Milliner is domiciled in Washington County, Oregon, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Oregon during the Class Period.

49.    Plaintiff Laura Montoya is domiciled in Rio Arriba County, New Mexico, and purchased Packaged Tuna indirectly from one or more Defendants in the State of New Mexico during the Class Period.

50.    Plaintiff Rick Musgrave is domiciled in Contra Costa County, California, and purchased Packaged Tuna indirectly from one or more Defendants in the State of California during the Class Period.

51.    Plaintiff Jennifer A. Nelson domiciled in Bennington County, Vermont, and purchased Packaged Tuna indirectly from one or more Defendants in the States of Iowa, New York, and Vermont during the Class Period.

52.    Plaintiff Corey Norris is currently domiciled in the independent city of Alexandria, Virginia, and purchased Packaged Tuna indirectly from one or more Defendants in the State of North Carolina during the Class Period.  Corey Norris was formerly domiciled during the Class Period in Johnston County, North Carolina, during which time he made all relevant purchases in the State of North Carolina.

53.    Plaintiff Barbara Olson is domiciled in Washtenaw County, Michigan, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Michigan during the Class Period.

54.    Plaintiff Kirsten Peck is domiciled in Williamson County, Tennessee,

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

and purchased Packaged Tuna indirectly from one or more Defendants in the State of Tennessee during the Class Period.

55.   Plaintiff John Pels is domiciled in Sonoma County, California, and purchased Packaged Tuna indirectly from one or more Defendants in the States of Arizona and California during the Class Period.

56.   Plaintiff Elizabeth Perron is domiciled in Worcester County, Massachusetts and purchased Packaged Tuna, indirectly from one or more Defendants in the States of Massachusetts and Rhode Island during the Class Period.

57.   Plaintiff Valerie Peters is domiciled in Broward County, Florida, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Florida during the Class Period.

58.   Plaintiff John Peychal is domiciled in Sevier County, Tennessee, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Tennessee during the Class Period.

59.   Plaintiff Audra Rickman is domiciled in Brunswick County, North Carolina, and purchased Packaged Tuna indirectly from one or more Defendants in the State of North Carolina during the Class Period.

60.   Plaintiff Erica Rodriguez is domiciled in Maricopa County, Arizona, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Arizona during the Class Period.

61.   Plaintiff Joelyna A. San Agustin is domiciled in the Territory of Guam and purchased Packaged Tuna indirectly from one or more Defendants in the Territory of Guam during the Class Period.

62.   Plaintiff Amber Sartori is domiciled in Mecklenburg County, North Carolina, and purchased Packaged Tuna indirectly from one or more Defendants in the States of Missouri and North Carolina during the Class Period.

- 9 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

63.     Plaintiff Rebecca Lee Simoens is domiciled in St. Charles County, Missouri, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Missouri during the Class Period.

64.     Plaintiff Robert Skaff is domiciled in Rockingham County, New Hampshire, and purchased Packaged Tuna indirectly from one or more Defendants in the State of New Hampshire during the Class Period.

65.     Plaintiff Greg Stearns is domiciled in Waldo County, Maine, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Maine during the Class Period.

66.     Plaintiff Nancy Stiller is domiciled in Washoe County, Nevada, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Nevada during the Class Period.

67.     Plaintiff Christopher Todd is domiciled in New Orleans Parish, Louisiana, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Mississippi during the Class Period.

68.     Plaintiff John Trent is domiciled in Shelby County, Tennessee, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Tennessee during the Class Period.

69.     Plaintiff Elizabeth Twitchell is domiciled in the independent city of Alexandria, Virginia and purchased Packaged Tuna, indirectly from one or more Defendants in the State of Virginia during the Class Period.

70.     Plaintiff Bonnie Vander Laan is domiciled in Emmons County, North Dakota and purchased Packaged Tuna, indirectly from one or more Defendants in the State of North Dakota during the Class Period.

71.     Plaintiff Nigel Warren is currently domiciled in Hong Kong in the Special Administrative Region of China, though was previously domiciled in Kings County, New York, and purchased Packaged Tuna indirectly from one or

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

more Defendants in the State of New York during the Class Period.

72. Plaintiff Julie Wiese is domiciled in Milwaukee County, Wisconsin, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Wisconsin during the Class Period.

73. Plaintiff Thomas E. Willoughby III is domiciled in Cumberland County, Maine, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Maine during the Class Period.

74. Plaintiff Daniel Zwirlein is domiciled in Waukesha County, Wisconsin, and purchased Packaged Tuna indirectly from one or more Defendants in the State of Wisconsin during the Class Period.

**Defendants**

**Chicken of the Sea Defendants**

75. Defendant Tri-Union Seafoods, LLC d/b/a Chicken of the Sea International ("Tri-Union" or "COSI") is a Delaware corporation with its principal place of business at 9330 Scranton Rd. #500, San Diego, CA 92121

76. Defendant Tri-Union is a wholly-owned subsidiary of Defendant Thai Union Group Public Company Limited, a publicly held company headquartered in Thailand.

77. Defendant Thai Union Group Public Company Limited ("Thai Union" or "TUG") is a corporation organized and doing business under the laws of Thailand. Its head office is located at 72/1 Moo 7, Sethakit 1 Road, Tambon Tarsai, Mueang Samut Sakhon District, Amphur Muangsamutsakorn, Samutsakorn 74000, Thailand. TUG is the world's largest canned tuna producer, processing 18% of the world's production. It is the largest canned tuna producer in Thailand.

78. Unless otherwise stated, below, Tri-Union and TUG are collectively referred to as "Chicken of the Sea" or "COSI".

**Bumble Bee Defendants**

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

79.     Defendant Bumble Bee Foods LLC, f/k/a Bumble Bee Seafoods LLC ("Bumble Bee") is a domestic Delaware corporation with its principal place of business at 280 10th Avenue, San Diego, CA 92101.  Bumble Bee's annual revenue in 2014 exceeded $1 billion. Bumble Bee produces and sells Packaged Tuna throughout the United States (including in this District), its territories, and the District of Columbia. Christopher D. Lischewski ("Lischewski") was  Bumble Bee's CEO and President during the entirety of the relevant conspiracy period. As noted herein, Bumble Bee has pled guilty to its role in a conspiracy to fix prices of packaged seafood products in the United States.

80.     Defendant Lion Capital LLP ("Lion Capital") is a British private equity firm founded in June 2004 by Lyndon Lea ("Lea") and two others, which specializes in buying out and controlling investments in the consumer products sector. Lion Capital forms private equity funds, such as Lion Capital Fund I, which included capital commitments with investments in entities like Kettle Foods (potato chips) and Jimmy Choo (designer shoes and accessories). In 2010, Lion Capital formed its third private equity fund, Lion Capital Fund III, which included capital commitments of €1.5 billion with investments in Bumble Bee, among others.

81.     Lion Capital is based in the United Kingdom. According to Lion Capital's  website, it has operated offices in the United States during the relevant period, including in New York at 888 7th Ave #4302, New York, NY 10106 and Los Angeles at 100 Wilshire Blvd, Santa Monica, CA 90401.[3]  The Lion Capital executives who managed and were involved in decision-making for Bumble Bee

---

[3]     Lion Capital's website states that in October of 2012, it "[r]elocated [its] North American office from New York to Los Angeles." http://www.lioncapital.com/about/#!overview. Its current United States address is the Los Angeles address indicated above.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

were based in Los Angeles County, California, ████████████████ ███████████████████████████████████████████ During the relevant period and continuing to the present, Lion Capital purposefully directs its activities to the United States by operating offices in the United States and through its ownership and control of companies doing business in the United States, including Bumble Bee. North American institutions commit approximately 75% of the capital to the Lion Capital Funds.[4] As members of a limited liability partnership incorporated under the laws of the United Kingdom, the conduct of Lindberg, Chang, and Capps are imputed to Lion Capital as a matter of both U.S. and British law.

82.     Lion Capital is named as a Defendant in this case as a result of its direct participation in the conspiracy alleged herein and as the alter ego for Bumble Bee. Both Bumble Bee and Lion Capital are privately-held business entities, and Plaintiffs only learned about the details of their internal structure and ownership relationship, as well as the conspiratorial facts alleged herein, through document productions made in this litigation.[5] Defendant Lion Capital (Americas), Inc.

---

[4]     On April 24, 2017, Plaintiffs served Lion Capital with a subpoena at its Los Angeles address for information about its sale of Bumble Bee to TUG. Following Bumble Bee's guilty plea, Plaintiffs served another subpoena on Lion Capital on June 13, 2017, requesting information related to Bumble Bee's guilty plea. Lion Capital made two productions of documents totaling 1,333 documents (7,342 pages) on June 15 and August 4, 2017, and it recently made another production of documents (6,715 pages) on October 4, 2017. ██████████████████ ████████████████████████████████████████████ ██████████████████████████████████

[5]     Lion Capital was not previously named as a Defendant. Only after ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

("Lion Americas") is another parent company of Bumble Bee, according to Bumble Bee's plea agreement. Lion Americas is headquartered at Lion Capital's Los Angeles office referenced above; it is the subsidiary by which Lion Capital elects to operate in the United States. For example, Lion Capital once publicly represented that it is a "fully integrated business across two offices. One in London, one in New York." As Lion Capital also stated on its website, its "team is co-located in single offices in each of its core markets"—i.e., the United Kingdom (London) *and* the United States (Los Angeles). In a court filing, Lion Capital wrote that "Because Lion Capital is so U.S.-focused, in 2007, it formed its subsidiary Lion Capital (Americas), Inc. in New York City (which has since moved operations to Los Angeles, California)."[6] Lion Capital has also represented that its core business—the "management of investment activities"—took place from its U.S. office in addition to its London office.

83.     Lion Capital itself did not distinguish between it and Lion Americas during the relevant period – either publicly or in its internal activities.

> Lion's management of its investment activities from a single office in each of Europe (London) and North America (New York) is a critical component of the Firm's strategy. From a single office on each continent, Lion is better able to harness and share critical knowledge and learning across its team through real-time, informal communication on matters such as new investment ideas, industry developments, active transactions and portfolio company strategies.

███████████████████████████████████████████████████████

████████████████████████████, and both Lion Capital and Lion Americas use

---

[6]     *See Stone Lion Capital Partners, L.P. v. Lion Capital LLP*, No. 2013-1353, 2013 WL 6006296 (Fed. Cir. Nov. 1, 2013) ("Corrected Non-Confidential Brief of Appellee").

FILED UNDER SEAL

the same website without distinguishing between the two entities. Even in the biographies on the individual employees, Lion Capital makes no distinction between those who work for it or Lion Americas. Further, ███████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████. During the relevant period, Lion Capital and Lion Americas acted as one unit and shared work and responsibilities.

84.     Lion Americas was a mere instrumentality of Lion Capital. It would not exist but for Lion Capital; it exist solely to manage Lion Capital investment vehicles. In fact, during the relevant time period, Lion Capital was Lion Americas only "client." Lion Capital wholly owns Lion Americas and acts as a single enterprise; anything Lion Americas does to increase the profitability of Lion Capital's investment companies is designed to serve and increase the investments of Lion Capital. They thus have a complete unity to interests and common design to serve Lion Capital's business and increase the profitability and returns of Lion Capital's investment vehicles. Put another way, Lion Capital and Lion Americas have no distinct economic interests; they function as a single economic unit.

85.     At all times relevant to this Sixth Amended Complaint, Lion Americas acted as the agent of Lion Capital. In fact, in filing its Form ADV, the uniform form used by investment advisers to register with the SEC and state securities authorities, Lion Americas answered yes to the question "Do you control or are you controlled by the related person [Lion Capital LLP]?" (emphasis in original). Also, Lion Capital has asserted that Lion Americas exists to provide investment advice to Lion Capital about its U.S.-based portfolio companies (Bumble Bee included). Accordingly, but for Lion Americas' existence, Lion Capital would have performed this function itself.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

86.    During the relevant period, Lion Americas also had a substantial overlap in personnel with Lion Capital. For example, during the relevant period,

During the relevant period, there is no indication that Lindberg, Capps, and Chang ever made any attempt to distinguish their work for Lion Capital versus Lion Americas, such as by identifying that they were appearing at a Bumble Bee Board of Director Meeting as a Lion Capital partner checking on its investment as opposed to as a director of Lion Americas in its management capacity (or vice versa). During the relevant time period, Lindberg, Capps, and Chang never made any distinction between acts they took as Lion Capital partners or as Lion Americas executives.

87.    Although Lindberg, Chang, and Capps held titles at Lion America, each was unequivocally an employee of Lion Capital.

- 16 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Accordingly, although Lindberg, Chang, and Capps received financial compensation from both Lion Capital and Lion Americas, they had a contractual right to payment from Lion Capital.

88.

Accordingly, all the conduct detailed in this Sixth Amended Complaint undertaken by Lindberg, Chang, and Capps was performed at the direction and under the close supervision of Lea, as part of Lindberg's Chang's, and Capps' duties and responsibilities to Lion Capital.

89.    Lion Capital and Lion Americas participated in the conspiracy alleged in this Sixth Amended Complaint principally through Lindberg, Chang, and Capps (as well as Lea and other employees of both entities), and the actions taken by these individuals in furtherance of the conspiracy (as alleged below) were taken on behalf of both Lion Capital and Lion Americas in their official capacities as senior executives of both entities.

90.    Lion Americas also performed functions that Lion Capital would have had to perform, but for Lion Americas.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



91.    Due to Lea's ability to dictate the day-to-day responsibilities of Lion Capital's members, Lion Capital has complete control and discretion over the day-to-day operations of Lion Americas. For example, Capps—nominally the President of Lion Americas—was subject to the contractual provision that authorized Lea to determine Capps' duties and responsibilities. Lea had the same degree of control over Lindberg and Chang.

92.    [redacted] The primary individuals who provided those management and advisory services to Bumble Bee were Lindberg, Chang,

---
[7] [redacted].

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Capps, and Lea. This is another example of Lion Capital and Lion Americas employees not clearly distinguishing between their functions on behalf of Lion Capital versus Lion Americas.  Even though it was Lion Capital which had the agreement to provide "advisory services," Lindberg, Capps, Chang, and Lea all provided these advisory and management services, without distinguishing whether they were working for Lion Capital or Lion Americas as they did so.

93.    Furthermore, Lion Americas was wholly dependent on Lion Capital for funding. Upon information and belief, Lion Americas had no source of revenue independent of Lion Capital, nor did Lion Americas have any independent affiliation with Lion Capital's investment funds. Thus, Lion Americas acted entirely at the discretion of Lion Capital and was entirely dependent on Lion Capital for funding. When Plaintiffs refer in this Sixth Amended Complaint to acts done by Lion Americas by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish among the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy. Hereafter, "Lion" shall refer to both Lion Capital and Lion Americas.

94.    Defendant Lion/Big Catch Cayman LP ("Big Catch") is a holding

- 19 -

**FILED UNDER SEAL**

1   company that ███████ owns Bumble Bee. Big Catch ████████████████

2   ███████, and its principal place of business was formerly "c/o Lion Capital

3   (Americas) Inc., 888 7th Avenue, 43rd Floor, New York, NY 10019"—Lion's

4   former office address in New York. Big Catch is the entity referenced in Bumble

5   Bee's criminal plea agreement as the entity that would receive the proceeds from

6   the sale of Bumble Bee.  Based on this fact, the DOJ required that Big Catch must

7   pay up to $81.5 million in criminal fines in the event that Bumble Bee is sold, in

8   order to prevent Big Catch and its investors (including Lion Capital) from being

9   unjustly enriched from the unlawful conduct committed by Bumble Bee.

10          95.    Big Catch is a shell company and does not engage in any operations

11  separate from ████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████. Thus, Big Catch is controlled

21  _____

22  [8] Lischewski is and has been Bumble Bee's CEO and President during the entirety

23  of the relevant conspiracy period. The DOJ's sentencing memorandum for Bumble

    Bee and ████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████

28

                                        No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

entirely by Lion and Lion's executives who make any and all decisions for Big Catch. Big Catch's business is Lion Capital's business, and as a result, there is a unity of interest between Big Catch and Lion Capital.

96.     Additionally, the corporate veil between Big Catch and Lion must be pierced and disregarded in order to prevent fraud and injustice. Lion created Big Catch as a vehicle both to funnel conspiracy proceeds from Bumble Bee to the Lion funds, and also to attempt to insulate Lion from its involvement in the price-fixing conspiracy alleged in this Sixth Amended Complaint.

97.     Lion Capital also stripped Bumble Bee (the entity that Big Catch was designed to hold) of its assets in order to minimize the financial risk to Lion and its investors if the conspiracy alleged in this Sixth Amended Complaint were uncovered.

- 21 -

**FILED UNDER SEAL**

███████████████████████████████████ Lion took this step so that, if the conspiracy proved successful and Bumble Bee realized Lion's profit targets, Lion would result in a substantial windfall, but that if the conspiracy came to light, Lion's risk of loss would be further minimized.  Thus, Lion structured Big Catch to shift the risk of the conspiracy's detection to the victims of the price-fixing conspiracy, while seeking to guarantee Lion and its investors with the conspiracy's financial upside.

98.    Despite annual revenues of over $900 million—███████████████ ████████████—Bumble Bee carries over ████████ of debt. Following its guilty plea, and as a result of this debt, the DOJ allowed Bumble Bee to pay a reduced criminal fine of only $25 million, to be paid on an installment schedule over a five-year period, in connection with its involvement in the antitrust conspiracy alleged herein. Bumble Bee and the DOJ acknowledged that under the United States Sentencing Guidelines ("Guidelines") the appropriate fine range was between $136.2 million and $272.4 million—an amount predicated on a volume of impacted commerce for only 2011 to 2013. The ultimate fine of $25 million is therefore approximately 80% to 90% less than the Guidelines' recommended range. The primary explanation for this tremendous fine reduction is due to a downward departure under §8C3.3 of the Guidelines, which was applied for Bumble Bee's purported inability to pay a full criminal fine without substantially jeopardizing the continued viability of the organization. Bumble Bee's fine may increase up to $81.5 million, an amount to be paid by Big Catch if Bumble Bee is sold, subject to certain terms and conditions. Those terms and conditions, the plea agreement, and the declarations supporting Bumble Bee's poverty defense remain under seal. Even with Big Catch's potential payment of up to $81.5 million, that amount is still approximately 40% less than the minimum fine contemplated by the

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Guidelines and approximately 70% less than the maximum fine.[10]  Big Catch is the mechanism by which Lion Capital protected itself from Bumble Bee's liabilities. Big Catch is the mechanism by which Lion Capital protected itself from Bumble Bee's liabilities.

99.

100.   Accordingly, Big Catch is liable for its role in the conspiracy because it is the alter ego of Lion.

101.   Lion Capital, Lion Americas, and Big Catch are all defined as "parent companies" in Bumble Bee's Plea Agreement with the DOJ.  (Lion Capital, through its control of Bumble Bee's board of directors, expressly approved this agreement).  Additionally, Bumble Bee is a wholly-owned subsidiary of Big Catch, and Lion Capital maintains equitable ownership of both Bumble Bee and Big Catch.  For example, Lion Capital had the ability to award carried interest in the funds that it managed to both itself and to its members.  Thus, Lion Capital had the ability to transfer the ownership interest held by its funds in Bumble Bee from the fund to either Lion Capital itself, or to a separate company – Lion Capital Carry LP – that held carried interests for the benefit of Lion Capital's members.

102.   Lion Capital and Lion Americas directly participated in the conspiracy alleged in this Sixth Amended Complaint and purposefully directed this conduct at the United States (including California).   Lion was aware of the

---

[10]    The DOJ left restitution for Bumble Bee's criminal conduct to the civil cases filed before this Court.

**FILED UNDER SEAL**

1   conspiracy, took acts in furtherance of the conspiracy, and knowingly stand to

2   accept the proceeds of Bumble Bee's unlawful conduct. Due to the unlawful

3   conduct alleged herein—to part of which Bumble Bee has expressly pled guilty—

4   Lion Capital, Lion Americas, and Big Catch earned profits and other earnings in

5   excess of what they would have in a competitive market. Starting by November of

6   2010, Lion became involved in Bumble Bee's business. Lion's website states that

7   it "ensure[s] that [its] companies have the best management talent to execute the

8   vision that we develop in a collaborative partnership" while never forgetting "the

9   responsibility for successful outcomes in our companies rests with us."

10

11

12

13   103.

14

15

16

17

18

19

20

21

22   that a "key message is to ensure Dongwon that Lion will

23   support rationale [sic] market behavior by Bumble Bee."  There is no reasonable

24   explanation for Lion, which was going to buy Bumble Bee and become

25   Dongwon's competitor,

26

27

28

- 24 -

FILED UNDER SEAL



104. In arranging the meeting, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Lindberg attended this meeting, which occurred on November 15, 2010, in New York City, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ – amounting to fixing and maintaining prices – ultimately helped Lion Capital achieve increased profits for Bumble Bee, which in turn increased profits and earnings for Lion Capital and its funds.

105. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. For example, when Lion Capital announced a potential transaction with TUG in 2014, Lyndon Lea (founder

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

of Lion Capital and an officer of both Lion Capital and Lion Americas)[12] gave a statement about Lion's role in Bumble Bee's operations from 2010 to 2014: "We are proud to have played a significant role in the evolution of Bumble Bee over the last 4 years and would like to thank our partners, Chris [Lischewski] and the management team, for helping us achieve such a successful return on our investment."  Lion Capital's operation of Bumble Bee is consistent with how it advertises its business strategy.  As Lea said in an interview on the Lion Capital website: "If all they [companies Lion acquires] want is a check, there are plenty of private equity firms that are delighted to write you a check and let you get on with your business.  That's not us…We're not good at that.  What we're good at doing is being your partner."  Further, a video on the Lion website states that: "We [Lion Capital] built a team with an intimate knowledge of the way consumers and brands interact, allowing us to work with companies in a very different way to the average private equity firm…We work closely with management to see exactly what a brand is capable of achieving, and then take it to new heights….  We focus solely on retail and consumer businesses so our team is uniquely positioned to work with management to identify the right strategies for revitalizing operations."

106. █████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████

_____

[12]     Although Lea is an officer of Lion Americas, Lion Americas has taken the position in this litigation that Lea is exclusively a Lion Capital employee, and as such, Lion Americas does not have custody or control over Lea's custodial files.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL



110.

111. Upon information and belief, Lyndon Lea also learned of the conspiracy during his close supervision of Bumble Bee's business, and during his supervision of Lindberg, Chang, and Capps.

**FILED UNDER SEAL**

Accordingly, in directing the responsibilities and duties of his employees, Lea ratified their participation in the conspiracy by continuing to assign Lindberg, Chang, and Capps responsibilities related to Bumble Bee.

112. Similarly, Lea was actively involved in tracking Lion's valuations of Bumble Bee, so that he could provide investors with details about the value of his funds, and received briefings that reflected his knowledge of the conspiracy.

113.

thereof. First, as referenced above, the meetings Lindberg attended on behalf of Lion Capital and Bumble Bee

These ownership-level discussions

Following the meeting between

- 29 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



1    114. Following those meetings, the U.S. subsidiaries

2

3    To ensure adherence to

4    the conspiracy,

5

6

7

8

9

10   asking rhetorically,

11

12

13   115. Lion Capital and Lion Americas took an active role in ensuring that

14   the conspiracy agreements were enforced as well.   To help ensure that the

15   conspiracy pricing was followed,

16

17

18

19

20

21   Upon information and belief, the purpose of this meeting was

22   for Lindberg to convey, and he did convey,

23

24

25

26

27

28

- 30 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

116. Lischewski routinely kept Lion Capital and Lion Americas informed about conspiratorial activities.  For example, and without limitation, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Unbeknownst to Lischewski, StarKist ████████████████████████████  At the time, Lischewski was aware ████████████████████████████  Accordingly, Lischewski ████████████████████████████████████████ along with Bumble Bee's ████████████████████████

117. ████████████████████████████████████████████████████████████████████  One week later, on January 26, 2012, Lischewski ████████████████████████████████████████████████████████████████████████████████  In Lischewski's e-mail to Capps and Lindberg, he commented that ████████████████████████

13 ████████████████████████████████████████████████████████████████████████████████████████████████████████

No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL



1

2      Through the end of January 2012, Lischewski

3

4

5

6      118.

7

8

9           to help "improve" the industry. In essence, Chansiri was asking

10   Lindberg how their companies could collectively improve pricing of canned tuna.

11

12

13

14

15

16

17

18                                  Indeed, as reflected above, by the time of

19   Lindberg's e-mail to T. Chansiri, Lion Capital and Lion Americas were already

20   aware of and condoned the U.S. subsidiaries agreements to fix prices, and

21   Lindberg and others were actively policing the conspiracy to prevent "cheating"

22   and keep the companies adhering to their unlawful conspiracy.  Lindberg ended the

23   e-mail

24

25      119.  Lindberg

26

27

28

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



Lischewski told Lindberg that

For example, following his meeting with Chansiri in Boston on March 13, 2012, Lindberg , but also noted that he could only cover additional details verbally or individually (i.e., in person). By meeting in person, Lion Capital and Lion Americas employees could conceal their communications and knowledge of the price-fixing conspiracy.

121. Lion Capital and Lion Americas also pushed Lischewski to take steps intended to confirm to StarKist and Dongwon that Bumble Bee was committed to the conspiracy pricing. For example,

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1

2

3   Lindberg

4 nevertheless encouraged Lischewski to make a "symbolic" public statement:

5

6      I know we think that they understand that they have been crazy and

7      we have been entirely rational and fair but I bet it isn't quite that clear on their side.  Just a thought, <u>it occurred to me that it might be a good</u>

8      <u>opportunity to start banging a consistent public drum for everyone's</u>

9      <u>consumption that pricing needs to become reasonable</u>.  (Emphasis added.)

10

11 Lindberg's comments viewed in the context of other facts alleged in this pleading

12 reflect Lion's knowledge of and continued support for the conspiracy, including

13 the Lion Capital and Lion Americas' efforts to police the conspiracy pricing.

14      122.   Lion Capital, through Lindberg and other Lion Americas executives,

15 ensured that Bumble Bee kept prices up and did not cheat or undercut the

16 conspiracy through lower pricing, which people in the tuna industry referred to as

17 "irrational pricing".  It was considered "irrational" to lower prices, because once

18 one company dropped prices, the others would follow to avoid losing market share

19 (i.e., sales volume).  Lion Capital and its Lion Americas executives ensured that

20 Bumble Bee did not drop prices to steal market share, and through assurances at

21 the ownership level and otherwise, none of the other companies engaged in

22 "irrational pricing" either.  In mid-2010, before Lion Capital purchased Bumble

23 Bee,

24

25

26

27

28

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1   ████████████████" In purchasing Bumble Bee, Lion Capital decided to use

2   that strategy to its advantage.  It could generate additional profitability to meet its

3   investment-level profit expectations for itself and its funds was to ensure that when

4   prices of fish went up, ████████████████████████████████

5   ████████████████████████████████████████

6   ████████████████████████ Lion Capital, through its own executives,

7   including Lindberg, and Lion Americas executives, through Capps and Chang,

8   ensured that Bumble Bee and its competitors were in sync and aligned with the

9   foregoing strategy to not compete and increase prices and thus profitability.

10      123.   This goal was shared with competitors as well. ████████████

11  ████████████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████████

14  ████████████████████████████████████████

15  ████████████████████████████████████████

16  ████████████████████████████████████████

17  ████████████████████████████████ Lischewski, with Lion

18  Capital's support, continued to meet with Dongwon executives and StarKist Board

19  of Directors members throughout 2013 and 2014, and ████████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████████

24  ████████████████████████████████ During the same

25  industry meeting, Park also met with Lischewski to discuss ████████████

26  ████████████████████████████ Lischewski and Park

27

28

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

met again, ██████████████████████████████████████

██

124.   Based on the conspiracy, TUG reported in its 2014 annual report, issued in February 2015, that "[d]espite minimal sales growth in the U.S., competitive inventory cost and reasonable market conditions helped lift the margin of our US brand."   Similarly, in December 2014, Lion was able to report that Bumble Bee's EBITDA was a record-breaking $150 Million, on revenue of $1 Billion.  Lion's Kelly Mayer attributed Bumble Bee's record year to the growth of "gross margins through disciplined pricing actions."   These financial results were due to the conspiracy.  For its part, Lion Capital knowingly accepted the proceeds of the conspiracy.  For example, in at least some of the years between 2011 and 2014, Lion Capital received payments from Bumble Bee of 1.25% of targeted EBITDA.

125.   In summary, Lion Capital and Lion Americas knowingly entered a price-fixing conspiracy and affirmatively participated in the conspiracy through 2015 by facilitating coordination and communications with competitors to raise prices and to limit competition as well as by actively concealing the conspiracy.

126.   Additionally, Lion Capital continues to own its equity stake in Bumble Bee, which has appreciated substantially since it purchased the company for $980 million in 2010.  As alleged above, TUG had agreed to pay $1.51 billion for the company in a deal that was ultimately scuttled due to DOJ's investigation of Defendants.   Accordingly, Lion Capital's equity stake in Bumble Bee has increased by ██████████████████ as a result of the conspiracy and Lion Americas management of and involvement in Bumble Bee during the conspiracy, ████████████████████████████████████████████ ██████████████

- 36 -

**FILED UNDER SEAL**

127.   And although DOJ scuttled this merger, Lion Capital and Lion Americas have already profited from the conspiracy.   In March 2011, when Lion Capital borrowed an additional $150 million against Bumble Bee's assets and distributed the proceeds of this loan to its investors, this allowed Lion Capital to award carried interest in its funds to itself and to its members, including Lion Americas employees.   Furthermore, upon information and belief, Lion Capital has reported to its investors the inflated value of Bumble Bee based on the valuation given to it by TUG, which reflects a profit of more than $530 million, and a return on Lion's investment of more than 350%.   Profits from Bumble Bee since late 2010 are rolled up to Lion Capital, and Lion Capital is able to report and utilize those profits for its investment fund.

128.   Lion Capital and Lion Americas also encouraged Bumble Bee to engage in the conspiracy while (as alleged above) simultaneously loading it up with debt and siphoning off its profits, causing Bumble Bee to become severely overleveraged.

129.   As used hereafter, the term "Bumble Bee" will refer to Bumble Bee Foods LLC, Lion, and Big Catch for the time period after Lion's acquisition of Bumble Bee Foods LLC. Lion and Big Catch are only being sued for participation in the alleged conspiracy for the time period after Lion's acquisition of Bumble Bee Foods LLC.

130.   In light of the preceding allegations, as well as others contained in this Sixth Amended Complaint, Plaintiffs refer to the acts done in furtherance of the alleged conspiracy by Lion Americas, Lindberg, Chang, and/or Capps, those acts were undertaken on behalf of Lion Capital and Lea. When Lion Americas, Lindberg, Chang, and/or Capps acted in furtherance of the alleged conspiracy, they did so on behalf of Lion Capital and Lea.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

**StarKist Defendants**

131.  Defendant StarKist Company is a Delaware corporation with its principal place of business at 225 North Shore Drive, Suite 400, Pittsburgh, PA 15212.  StarKist Company is a wholly-owned subsidiary of Dongwon Industries Co. Ltd. ("Dongwon"), which is headquartered in the Republic of Korea.

132.  Defendant Dongwon is a corporation organized and doing business under the laws of South Korea, with its headquarters located at Dongwon Industries Building 7th floor, Mabang-ro 68 (Yangjae-dong), Seocho-gu, Seoul, Korea. Dongwon is a publicly traded company listed on the Korean Stock Exchange. It is the largest producer of canned tuna in South Korea.

**Del Monte Defendants**

133.  Defendant Del Monte Corporation ("Del Monte"), now known as Big Heart Pet Brands, Inc., is a Delaware corporation with its principal place of business at 1 Strawberry Lane, Orrville, Ohio, 44667.

134.  In 2014, Del Monte Pacific Limited acquired the canned and processed foods portfolio of the Del Monte Corporation.  As a result, the remainder of the Del Monte business not acquired in the transaction was renamed Big Heart Pet Brands, Inc., which now largely focuses on the remaining pet foods portfolio.

135.  Del Monte acquired StarKist Company in 2002. Through StarKist Company, Del Monte Produced and sold Packaged Tuna throughout the United States (including in this District), its territories and the District of Columbia.  On June 6, 2008, Del Monte sold StarKist Company to Dongwon; the divestiture was completed on October 6, 2008. According to a filing by Del Monte with the Securities & Exchange Commission ("SEC"), "[a]t the time of sale, Del Monte entered into a two-year Operating Services Agreement (which was completed in September 2010) pursuant to which the Company provided operational services to StarKist Company such as warehousing, distribution, transportation, sales,

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1    information technology and administration."

2                     **AGENTS AND CO-CONSPIRATORS**

3        136.   On information and belief, other corporations, partnerships, or business

4    entities, currently unknown to Plaintiffs, are co-conspirators with Defendants in

5    their unlawful restraints of trade.   Various persons that are not named as

6    Defendants have participated as co-conspirators in the violations alleged herein

7    and have performed acts and made statements in furtherance thereof.

8        137.  These other persons or entities have facilitated, adhered to,

9    participated in, and/or communicated with others regarding the alleged

10   conspiracy to raise and maintain prices of Packaged Tuna and restrict offerings

11   alleged.   Plaintiffs reserve the right to name some or all of these entities as

12   Defendants at a later date.

13                     **JURISDICTION AND VENUE**

14       138.  Plaintiffs seek consideration paid, damages, restitution, treble

15   damages or three times consideration paid  by consumers of Packaged Tuna,

16   disgorgement, other monetary relief, and other equitable relief under various state

17   antitrust, consumer protection and unfair trade practices laws, and state unjust

18   enrichment laws, as alleged specifically herein,  as well as costs of suit, including

19   reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly

20   situated sustained as a result of Defendants' violations of those laws.

21       139.   This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337. The Court

22   has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those

23   claims are so related to the federal claim brought by Plaintiffs at the time the

24   matter was originally brought that they form part of the same case or controversy,

25   and the Court may continue to exercise jurisdiction even if no federal claim

26   remains.  This Court also has subject matter jurisdiction over the state law claims

27   under 28 U.S.C. § 1332 because the amount in controversy for each of the Classes

28

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

exceeds $5,000,000, there are more than 100 members in each of the Classes, and there are members of some of the Classes who are citizens of different states than Defendants.

140.   Venue is proper in this Judicial District because (1) Defendants COSI and Bumble Bee each have their principal places of business within this District; (2) each Defendant transacts a substantial amount of business in this District, and (3) each Defendant and the conduct alleged has affected, and continues to affect, a substantial amount of trade and commerce in this District.

## CLASS ACTION ALLEGATIONS

141.   Plaintiffs as specifically identified herein also bring claims asserted in this action on behalf of themselves and as a class claims under Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), seeking damages pursuant to various the state antitrust, unfair competition, and consumer protection laws of the states listed below on behalf of the following classes (the Cartwright Act Class and the State Classes, each of which is individually described and further defined):

(a)   **Cartwright Act class**: All persons and entities who resided in one of the States described in paragraphs 110(b) to 110(gg), specifically Arizona, Arkansas, California, the District of Columbia, Florida, Guam, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin, who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(b)   **Arizona class**: All persons and entities who resided in the State of Arizona who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or

- 40 -

**FILED UNDER SEAL**

any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(c)   **Arkansas class**: All persons and entities who resided in the State of Arkansas who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(d)   **California class**: All persons and entities who resided in the State of California who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(e)   **District of Columbia class**: All persons and entities who resided in the District of Columbia who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(f)   **Florida class**: All persons and entities who resided in the State of Florida who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(g)   **Guam class**: All persons and entities who resided in the Territory of Guam who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(h)   **Hawaii class**: All persons and entities who resided in the State of Hawaii who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

- 41 -

**FILED UNDER SEAL**

(i) <u>**Iowa class**</u>: All persons and entities who resided in the State of Iowa who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period, or from August 25, 2011 to the present for antitrust claims.

(j) <u>**Kansas class**</u>: All persons and entities who resided in the State of Kansas who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, from August 25, 2012 to the present.

(k) <u>**Maine class**</u>: All persons and entities who resided in the State of Maine who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, from August 25, 2009 to the present for statutory claims.

(l) <u>**Massachusetts class**</u>: All persons and entities who resided in the State of Massachusetts who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(m) <u>**Michigan class**</u>: All persons and entities who resided in the State of Michigan who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by  any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(n) <u>**Minnesota class**</u>: All persons and entities who resided in the State of Minnesota who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

(o)   **Mississippi class**: All persons and entities who resided in the State of Mississippi who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(p)   **Missouri class**: All persons and entities who resided in the State of Missouri who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(q)   **Nebraska class**: All persons and entities who resided in the State of Nebraska who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(r)   **Nevada class**: All persons and entities who resided in the State of Nevada who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(s)   **New Hampshire class**: All persons and entities who resided in the State of New Hampshire who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(t)   **New Mexico class**: All persons and entities who resided in the State of New Mexico who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(u)   **New York class**: All persons and entities who resided in the State of New York who indirectly purchased Packaged Tuna for end

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, during the Class Period, or from August 25, 2012 to the present for consumer protection claims.

(v)  **North Carolina class**: All persons and entities who resided in the State of North Carolina who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(w)  **North Dakota class**: All persons and entities who resided in the State of North Dakota who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(x)  **Oregon class**: All persons and entities who resided in the State of Oregon who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(y)  **Rhode Island class**: All persons and entities who resided in the State of Rhode Island  who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, between July 15, 2013 and the present.

(z)  **South Carolina class**: All persons and entities who resided in the State of South Carolina  who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(aa)  **South Dakota class**: All persons and entities who resided in the State of South Dakota  who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(bb) **Tennessee class:** All persons and entities who resided in the State of Tennessee who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(cc) **Utah class**: All persons and entities who resided in the State of Utah who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(dd) **Vermont class**: All persons and entities who resided in the State of Vermont who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(ee) **Virginia class**: All persons and entities who resided in the State of Virginia who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(ff) **West Virginia class**: All persons and entities who resided in the State of West Virginia who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

(gg) **Wisconsin class**: All persons and entities who resided in the State of Wisconsin who indirectly purchased Packaged Tuna for end consumption and not for resale, produced by any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the Class Period.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

142. The Cartwright Act Class and the State Classes are collectively referred to herein as the "Classes" unless otherwise indicated.

143. Excluded from each of the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, all judges assigned to this matter, all jurors in this matter, and all persons and entities who only purchased Packaged Tuna directly or for resale.

144. Each of the Classes is so numerous that joinder of all members would be impracticable. While Plaintiffs do not know the exact number of members of each of the Classes, Plaintiffs believe there are at least hundreds of thousands of members in each of the Classes.

145. Common questions of law and fact exist as to all members of each of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all members of each of the Classes, thereby making appropriate relief with respect to each Class as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether the Defendants and their co-conspirators engaged in a combination and conspiracy to fix, raise, maintain or stabilize the prices of Packaged Tuna sold in the United States and in each of the States alleged herein;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether Defendants' alleged conduct violated various state antitrust and restraint of trade laws;

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

(e)     Whether Defendants' alleged conduct violated various state consumer protection and unfair competition laws;

(f)     Whether the conduct of Defendants and co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(g)     The effect of Defendants' alleged conduct on the prices of Packaged Tuna sold in the United States during the Class Period; and

(h)     The appropriate relief for the Classes, including injunctive and equitable relief.

146.   Each Plaintiff's claims are typical of the claims of the members of the respective Classes each Plaintiff seeks to represent, and each Plaintiff will fairly and adequately protect the interests of the respective classes such Plaintiff seeks to represent.  Each of the Plaintiffs and all members of the Classes that Plaintiffs seek to represent were similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Packaged Tuna purchased indirectly from the Defendants and/or their co-conspirators.

147.   Each Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of each of the Classes that each Plaintiff seeks to represent. Each Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the respective Classes that plaintiff seeks to represent.   Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

148.   The questions of law and fact common to the members of each of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

149.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

150.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## RELEVANT MARKETS

151.   The relevant geographic market is the United States. Defendants operate Packaged Tuna in the United States and, collectively, control the U.S. market of Packaged Tuna.  Collectively, Defendants account for approximately 80% of Packaged Tuna sales in the United States.  Unlike Packaged Tuna manufacturers and sellers located outside of the United States, Defendants have U.S. facilities, relationships and distribution assets in the United States that enable Defendants to avoid foreign product import tariffs and to effectively constrain prices for Packaged Tuna packaged and sold in the United States.

152.   The relevant product market is Packaged Tuna.

153.   The market in the United States for Packaged Tuna is approximately $1.8 billion annually.  As shelf-stable food products, Packaged Tuna may be transported across state lines in the final packaging and without cold-chain or further processing.

154.   Packaged Tuna is sold nationwide to consumers in a few standard

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

sizes and predominantly in standard grades.  Each brand's offerings compete with each other brand's comparable offerings.

155.    Packaged Tuna is sold as "white meat", which consists of Albacore, and "light meat", which is primarily Skipjack tuna. The market is dominated by a few common sizes of packages:  cans in 5oz and 12oz size, sold by all Defendants, and pouches, sold by StarKist and Bumble Bee.  The tuna in the cans or pouches falls into a few grades (chunk, solid, flake).  Accordingly, product offerings are readily described by these brief categories – for example "5oz chunk light."

## INTERSTATE COMMERCE

156.    Defendants manufactured and/or sold Packaged Tuna in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

157.    Defendants' business activities substantially affected interstate commerce in the United States and caused antitrust injury throughout the United States.

158.    Defendants' business activities also affected the intrastate (or intra-District, or intra-Territorial) commerce of every jurisdiction for which a claim is asserted herein, as further specifically alleged in Claims for Relief Two through Seventy-Seven herein where required.  Packaged Tuna is a staple food.  American consumers, on average, currently purchase more than two pounds of this product per capita annually, and thousands of consumers buy it each year in every single state, District and territory.

159.    Together, Defendants control approximately 80% of the United States Packaged Tuna market.  StarKist controls approximately 40-44% of the market, Bumble Bee approximately 24-25% and Tri-Union approximately 15-17%.

## PARENT ENTITY LIABILITY

- 49 -

**FILED UNDER SEAL**

**COSI And TUG Act As A Single Entity**

160.   TUG, through its wholly-owned subsidiary Tri-Union, produces and sells Packaged Tuna throughout the United States (including this District), its territories and the District of Columbia.  In recent years, 40% or more of its sales have originated in the United States, which is its largest market.

161.   TUG purposefully directs its activities to the United States by exporting Packaged Tuna, including canned tuna, from Thailand to this country. TUG further purposefully directs its activities to the United States through its method of conducting business. It currently has three strategic business units, one of which is the "Ambient Seafood" unit, which includes its global canned tuna business; Tri-Union is part of that business unit and is viewed by TUG as part of its footprint in the United States. Indeed, TUG has its own fishing fleet and is thus vertically integrated with Tri-Union. TUG also purposefully directs its activities into the United States by operating Thai Union North America, Inc. ("TUNAI") (a company formerly known as Thai Union International, Inc.), that was founded in 1996. TUNAI is a wholly-owned instrumentality of TUG and has its address at 9330 Scranton Road, Sorrento South Corporate Center, Suite 500, San Diego CA 92121 (the same address as Tri-Union). TUNAI's President is Thiraphong Chansiri (President and CEO of TUG). The Chansiri family is the largest single shareholder in TUG, owning 20.4% of its stock.[15]

162.   TUG directly participated in the conspiracy alleged herein and used its dominance and control over Tri-Union's Packaged Tuna business to conspire with the other Defendants and their co-conspirators. Among the members of the Board

---

[15]  TUG sponsors the issuance of American Depository receipts traded on NASDAQ that allow United States investors to trade its equities in the domestic securities market. In that connection, it regularly files reports with the United States Securities & Exchange Commission.

**FILED UNDER SEAL**

of Directors of Tri-Union are Kraisorn Chansiri (Chairman of TUG), Cheng Niruttinanon (Executive Chairman of TUG),[16] and the aforementioned Thiraphong Chansiri. Chan Tin King, a former Director of Tri-Union, now serves as Executive Director and Chief Financial Officer ("CFO") of TUG. Shue Wing Chan ("Chan"), the President and CEO of Tri-Union since 2007, is a member of the Chansiri family, and is a member of TUG's self-styled "Global Leadership Team." Prior to joining Tri-Union, he served as the CFO of TUG.[17] ███████████████████ ████████████████████████████████████████████████████████████. His dual role and his membership in the founding family made his participation inextricable from TUG.

163. TUG exercises control and dominance over Tri-Union through these individuals. And, according to his own LinkedIn webpage, David Roszmann ("Roszmann"), the former Chief Operating Officer ("COO") of Tri-Union, who joined the company in March of 2013, served as the "only direct report to CEO [Chan] (relative of majority owning family of this foreign public company [TUG]) with all functions direct-reporting to COO including sales, marketing, procurement, supply chain, operations, finance, HR. legal and IT." Roszmann left Tri-Union in December of 2015, soon after Tri-Union's attempt to acquire Bumble Bee was assailed by the DOJ, as further described below.

---

[16] The Niruttinanon family is the third largest shareholder in TUG, owning 7.0% of its stock.

[17] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- 51 -

**FILED UNDER SEAL**

164. TUG publicly acknowledges its dominance over Tri-Union. The following pertinent excerpt of an organizational chart that appears on TUG's website demonstrates that TUG views Tri-Union as part of its overall "Global Tuna Business" and "US Ambient Operations" that are controlled directly by TUG's Board of Directors and executives:



165. TUG and Tri-Union Seafoods LLC d/b/a Chicken of the Sea International ("Tri-Union" or "COSI") acted as a single business enterprise and TUG's control and dominance over COSI and the integration of their collective human and capital resources and operations were intended to and did achieve a common business purpose. Ultimately, COSI is but a mere shell and conduit for

**FILED UNDER SEAL**

the affairs of TUG, which stripped it of assets.  For the reasons that follow, it would be an unjust and inequitable result to permit TUG to escape liability for the conduct alleged herein.

166.  COSI earned profits in excess of what it would have earned in a competitive market.  It transferred this ill-gotten gain to TUG by paying out the unlawfully-obtained profits and other conspiracy proceeds to TUG in the form of dividends and other transfer payments.

Accordingly, TUG knowingly profited from COSI's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched.

As a result of these facts, considered alone or in combination with one or more of the foregoing other facts,

---

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1  adherence to the fiction of the separate existence of TUG and COSI would sanction
2  a fraud or promote an injustice, and an inequitable result or an injustice would
3  occur if the corporate form were elevated over substance.

4  167. ████████████████████████████████████
5  ████████████████████████████████████████
6  ████████████████████████████████████████
7  ████████████████████████████████████████
8  ████████████████████████████████████████
9  ████████████████████████████████████████

10  168.  COSI and TUG also engaged in joint marketing and branding of
11  COSI. ███████████████████████████████████
12  ████████████████████████████████████████
13  ████████████████████████████████████████
14  ████████████████████████████████

15  169. ████████████████████████████████████
16  ████████████████████████████████████████
17  ████████████████████████████████████████
18  ████████████████████████████████████████
19  ████████████████████████████████████████
20  ████████████████████████████████████████
21  ████████████████████████████████████

22  170.  In further recognition of the fact that TUG and COSI were at all
23  relevant times a single business enterprise, █████████████████████████
24  ████████████████████████████████████████
25  ████████████████████████████████████████
26  ████████████████████████████████████████
27  ████████████████████████████████████████
28

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



171.   Further COSI, which has its corporate headquarters in San Diego, California,

172.

173.

174.   Thus, TUG and Tri-Union operated as a single business enterprise and Tri-Union is the *alter ego* and agent of TUG. Moreover, TUG directly participated in the conspiracy described herein through personnel who had duties at TUG, such as Chan and Wipada Termlertmanuswong, both of whom were stationed in San

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Diego.   In addition, TUG, by its own acknowledgement, profited from the conspiracy.

175.   TUG withdrew the substantial profits from the conspiracy, from COSI. ████████████████████████████████████████████████ ████████████████████████████████████

176.   As a result of COSI's transfers to TUG, TUG left COSI unable to satisfy a substantial judgment.   For example, COSI's stated equity as of December 31, 2012 was just $62 million.   Approximately $22 million of the equity was COSI's plant facilities and equipment.   In addition, in 2012 COSI had over $63 million in "related party" payables.   Given the breadth and scope of the alleged conspiracy, an award of damages even before statutory trebling cannot reasonably be met by COSI alone.   Because TUG reaped the rewards and COSI alone cannot make the victims whole, it would be inequitable to exclude the single business enterprise composed of TUG and COSI from joint and several liability.

**Dongwon And StarKist Act As A Single Entity**

177.   Dongwon itself has repeatedly availed itself of the jurisdiction of United States federal courts.[19]

---

[19]   *Dongwon Indus. Co., Ltd. v. Yoshida*, No. 90-cv-00282 (D. Alaska); *Yu Sheng Fishery Co. v. Dongwon Indus. Co., Ltd.*, No. 91-00018, 1991 WL 126138, at *1 (D. Guam May 20, 1991) (denial of motion by Dongwon for *vacatur* of writ of maritime attachment, dismissal of *in rem* claims and release of security; court noted that "[t]here is no dispute of the fact that Dongwon has sufficient minimum contacts with Guam to subject it to general *in personam* jurisdiction and suit in this district".); *Matter of Yu Sheng Fishery Co., Ltd.*, 1993 A.M.C. 116 (D. Guam July 12, 1991); *Dongwon Indus. Co., Ltd. v. Ships Gear & Transit, Inc.*, No. 93-cv-01691 (S.D. Cal.) (suit alleging contract and tort claims against seller of a purse seine skiff); *Perez v. Dongwon Indus. Co.*, No. 1:02-cv-00025 (D. Guam Aug. 9, 2002) (admiralty suit against Dongwon that was settled); *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 69 F.Supp. 3d 416 (D. Del. 2014), *rev'd*, 812 F.3d 294 (3d Cir. 2016) ("*Moore*") (proceedings involving (continued...)

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

_____

(…continued)

defendants' (including Dongwon) motion to dismiss claims under the False Claims Act relating to the sinking a United States-flagged vessel operated by Dongwon); *Hill v. Majestic Blue Fisheries, LLC*, Civ. No. 11-00034, 2013 WL 1499155 (D. Guam April 12, 2013) ("*Hill*") (denying Dongwon's motion to dismiss for failure to state a claim) and 2015 WL 3961421 (D. Guam June 30, 2015) (involving various motions dealing with pretrial settlement by Dongwon); *Yang v. Majestic Blue Fisheries, LLC*, Civ. No. 13-00015, 2015 WL 5001190 (D. Guam Jan. 14, 2015), *adopted in part and rejected in part*, 2015 WL 5003606 (D. Guam Aug. 24, 2015), *recon. denied*, 2016 WL 1411335 (D. Guam April 11, 2016) (all dealing with Dongwon's participation in a scheme with relatives of corporate insiders to acquire two United States flagged vessels). The *Hill, Yang* and *Moore* cases are of significance here. The underlying facts are laid out in *Majestic Blue*, 2014 WL 3728556, at *10-35 and the *qui tam* complaint filed in the *Moore* case in November of 2012. Dongwon owned the F/V *Majestic Blue*, a tuna fishing vessel. Jae-woong Kim, the brother of Dongwon Chairman Jae-chul Kim, was the General Manager of Dongwon's office in Guam and had two daughters who were American citizens born on Guam. In 2008, those women became the figureheads for Majestic Blue Fisheries LLC ("MBFLLC"), a United States limited liability company. The F/V *Majestic Blue* was sold to that entity for $10. MBFLLC thereupon entered into maintenance and ship manning contracts with Dongwon whereby the latter essentially ran the vessel, which, because it was owned by American citizens, could fly the American flag. A series of American captains was hired to lead the vessel, but they were figureheads; largely Korean personnel selected by Dongwon really held the reins of control. The crew on the vessel engaged in repeated violations of, *inter alia*, MARPOL (the International Convention on the Prevention of Pollution from Ships) and certain laws relating to fishing practices. In June of 2010, the vessel sank after a series of poor repairs by Dongwon. MBFLLC sued for a limitation of its liability. Chief Engineer Chang Cheol Yang and Captain David Hill both died in the incident and their next of kin sued both MBFLLC and Dongwon. Dismissal of the *Moore* case was recently reversed, and the findings of fact made by the Magistrate Judge in *Majestic Blue* are being appealed to the Ninth Circuit. Adam Baske, a tuna expert formerly with the Pew Charitable Trusts, has, in an article on the F/V *Majestic Blue*, called Dongwon "one of the international bad boys in terms of illegal fishing activity." https://medium.com/matter/mutiny-on-the-majestic-blue-80e3d2fbb345#.4wrwj94gy.

**FILED UNDER SEAL**

178.  According to StarKist Company's website:

> Founded in 1969, Dongwon Group began as a fisheries business and branched out into various sectors including a strong food & beverage manufacturing arm, Dongwon F&B. Dongwon F&B now owns 75% of the canned tuna market share in Korea. Dongwon Industries is one of the world's largest tuna catching companies with a fleet of 36 boats. Dongwon's world class fish procurement and processing capacity builds on StarKist's national brand recognition and distribution networks in the United States to bring world-class seafood to consumers worldwide.[20]

179.  Dongwon's own website has this to say about its control over StarKist Company:

> StarKist is the world's best tuna brand with 65 years of history, and holds the No.1 position in the US tuna market. Like Dongwon Group in Korea, StarKist is an iconic tuna brand in the United States, and has been controlled by Dongwon Group since 2008, accompanying Dongwon Group on its journey to globalization. Dongwon Group, which has already become the dominant player in Korea's tuna market, has focused on the steady growth of the world's tuna market and determined that tuna can be one of core resources that will lead future industries. Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna company, and will become de facto a globalized enterprise. (Emphases added).[21]

180.  For the reasons that follow, it would be an unjust and inequitable result to permit Dongwon to escape liability for the conduct alleged herein.

---

[20]    http://starkist.com/about-starkist

[21]    http://www.dongwon.com/eng/content/subsidiary/04020113.

- 58 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

181.   Before describing the interrelationship between StarKist Company and Dongwon Industries, it is first necessary to explain briefly the concept of the Korean *chaebol*, which is a recognized concept in the academic business literature focused on South Korean companies. *See, e,g*., the general discussions in David Hundt, *Korea's Developmental Alliance: State, Capital and the Politics of Rapid Development* (2009); *R. M.* Steers, K.S. Yoo, & G. Ungson, *The Chaebol: Korea's New Industrial Might* (1989).

182.   The term "*chaebol*" is made up of the words "*chae*" (wealth or property and "*bol*" (clan or group). Chaebols are closely-knit business groups in South Korea under the control of a single family or extended family, with key flagship firms which are used as the instruments of control of other firms within the group . They have four key features: (1) the governance structure of the group involves family or extended family control; (2) the formal organizational structure of the group involves a group headquarters, located in an actual or *de facto* holding company, sometimes known as a "flagship" company, which controls a network of subsidiaries, which fall under the control of the family, the group as a whole, and of flagship firms within the group; (3) the business structure of the firm encompasses a number of discrete products and services, some of which are wholly unrelated and others that are effectively vertically integrated; and (4) these groups are characterized by strong internal cultures of hierarchy, familism and loyalty, with family members of the founder or his cohorts also occupying key managerial positions within the group.

183.   The Dongwon family of companies fits this definition. The company started in 1969 and is dominated by Chairman Jae-chul Kim ("J.C. Kim") and members of his family or extended family, as described in more detail below. The group headquarters is in Seoul, South Korea, where its holding company, Dongwon Enterprise, is located. Through its subsidiaries, it operates in a number

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

of business sectors including, *inter alia*, marine products, other food products, feed products and pet food, packing materials, and aluminum foil products. As explained below, the Dongwon family of companies has an internal culture of hierarchy, familism and loyalty. Defendants Dongwon Industries and StarKist Company exhibit that culture with members of J.C. Kim's family being put in key positions in both companies and executives at Dongwon Enterprise, Dongwon Industries and various other Dongwon subsidiaries being routinely seconded to StarKist Company to fill managerial roles. Dongwon Industries, run by J.C. Kim, is the parent entity for StarKist Company. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

184. Dongwon purposefully directs its activities in the United States through its controlled and wholly-owned subsidiary StarKist Company, through which it produces and sells Packaged Tuna throughout the United States (including in this District), its territories and the District of Columbia. Dongwon also has an ownership interest in other United States businesses. It has a 12.5% stake in Silver Bay Seafoods, LLC (a fishery located in Sitka, Alaska) and a 50% majority interest in D.W. Global, Inc. (a shipping and import/export company located in Commerce, California). According to its quarterly and annual reports, Dongwon typically derives more than 50% of its global revenue from the United States. Indeed, Dongwon has its own fishing fleet and is vertically integrated with StarKist. Dongwon also purposefully directs its activities to the United States by exporting Packaged Tuna to this country. Dongwon directly participated in the conspiracy alleged herein, as described herein, as well as using its control over StarKist's

**FILED UNDER SEAL**

Packaged Tuna business to conspire with the other Defendants and their co-conspirators.

185.  Dongwon dominates StarKist, and has done so since June 6, 2008 when it contracted to purchase StarKist from Del Monte (a sale completed in October 2008).

186.  Once it acquired StarKist in June of 2008, Dongwon participated directly in the alleged conspiracy. For example, it permitted the collusive can resizing initiated by its predecessor to go forward and it supported and benefitted from the succession of collusive price increases that commenced in 2008 that are described herein.

187.  Ingu Park ("Park"), the Chairman of the Board of StarKist, served as its Acting President from November of 2010 to March of 2011, and also serves as CEO of Dongwon Precision Machinery Company.  During the Class Period, including in 2008, Park also served as Vice-Chairman of Dongwon Enterprise Co., Ltd.



188.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



189. Choe first took a title at StarKist in March of 2012, but formalities notwithstanding, he was closely involved in the management of StarKist. For example,

190.

191. Choe maintained a Dongwon employee status with a Dongwon title and a Dongwon email address until March 26, 2012. StarKist's own website, however, describes the reality: that Choe (StarKist's current CEO and President) joined StarKist in 2010. This is for practical purposes true, and it demonstrates the absence of meaningful distinction between StarKist and Dongwon management after Dongwon's purchase of StarKist.

192. Nam-Jung Kim (son of Dongwon Chairman Jae-chul Kim), who served as the COO of StarKist from 2012 until October of 2014, was Vice-President of Dongwon F&B and of Dongwon Enterprise Co. He now serves as a

No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL



1    Director of both StarKist and Dongwon.[22]

9    193.  Similarly, Hyung-Joo Kim, Chief Financial Officer ("CFO") of
10   Dongwon F&B, became the CFO of the StarKist in 2012. Likewise, Park serves as
11   CEO of Dongwon Precision Machinery Company. Nam-Jung Kim, Hyung-Joo
12   Kim, and Ingu Park all served as officers of StarKist during the period of the
13   conspiratorial activities described herein, would have known of those activities,
14   and would have relayed that information to executives at Dongwon, as reflected in
15   Dongwon's own statements described below.

16   194.  After the acquisition, American executives at StarKist began to
17   leave—voluntarily and involuntarily.

22   According to one article, "Kim Nam-Jung is the younger son of Dongwon
     chairman Kim Jae-Chul, who founded the business in 1969 to fish for tuna and
     established his first overseas base in the Republic of Ghana in 1973…. In
     preparation for succession, the founder has been transferring ownership of the
     private family holding company, Dongwon Enterprise Co., which owns stakes in
     various listed affiliates, to Nam-Jung. Jae-Chul holds a 24.5% stake and Nam-
     Jung, 68%. https://www.forbes.com/profile/kim-nam-jung/.

**FILED UNDER SEAL**



195.

---

[23]   Dongwon is no stranger to antitrust violations in the food industry. In June of 2011, one of its subsidiaries, Dongwon Dairy Foods, was fined 1.31 billion Korean won by the Korean Fair Trade Commission ("KFTC") for conspiring with three other firms to rig prices in the South Korean cheese market. According to the KFTC, employees of the Dongwon subsidiary were found to have participated in "a covert organization established for the purpose of such price-fixing"; they had multiple meetings with competitors in 2007-08, in which they agreed to raise cheese prices by 15-20%. http://www.koreaherald.com/view.php?ud=20110626000297.

No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL

196.   Dongwon also participated directly in managing other facets of StarKist's operations, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ StarKist became Dongwon's instrument—its marketing conduit for Dongwon's tuna—under the control of Dongwon (and Dongwon executives).  And, as discussed below, given Dongwon's control and the unity of interests between StarKist and its parent in carrying out the conspiracy alleged here, it would be unjust and lead to an inequitable result to allow Dongwon to escape liability for StarKist's acts. Dongwon purchased and controlled StarKist to its benefit in becoming a "*de facto* globalized enterprise" and extending its operations to the United States using an already well-known national brand.

197.   Due to the unlawful conduct alleged herein, StarKist earned profits in excess of what it would have earned in a competitive market.  StarKist transferred its ill-gotten gain obtained through the alleged conspiracy to Dongwon, by paying out the unlawfully obtained profits and other conspiracy proceeds to Dongwon in the form of dividends and other transfer payments. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Accordingly,  Dongwon

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

knowingly profited from StarKist's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched. As a result of these facts, considered alone or in combination with one or more of the foregoing other facts, adherence to the fiction of the separate existence of Dongwon and StarKist would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over substance.

198.   From July 2008 when Dongwon took the reins of StarKist, to October of 2014, StarKist had a total of five CEOs: Donald Binotto ("Binotto"), Ingu Park, In-Soo Cho, interim CEO Sam Hwi Lee, and current CEO Choe.

199.   As set forth herein, Dongwon participated in the conduct as alleged; in addition to its complete control and domination of StarKist, its disregard of corporate forms ███████████████████████████████████████████████████████████ ████████████████████████████████████████████, and its descriptions of Dongwon personnel as working for Starkist, which was true in fact even when not acknowledged in titles, demonstrates that StarKist is the agent, instrumentality and *alter ego* of Dongwon.

**Del Monte And StarKist Acted As Single Entities**

200.   In its 2008 Form 10-K filed with the Securities and Exchange Commission ("SEC") and in preceding Form 10-Ks, Del Monte referred to the "StarKist Seafood operating segment," which indicates that StarKist did not function as an autonomous entity during the period of its ownership by Del Monte.

201.   Del Monte owned StarKist until October 2008, and remained involved in the operations by contract until September 2010. As set forth below, Del Monte participated directly in various acts in furtherance of the continuing conspiracy alleged herein. Certain individuals acting on behalf of Starkist that are mentioned herein came to StarKist from Del Monte. Examples are Melissa Murphy

FILED UNDER SEAL

("Murphy"), StarKist's Senior Vice-President of Corporate Affairs and Human Resources, who served as Del Monte's Vice-President of Corporate Communications from 2003 to 2008; Steve Hodge ("Hodge"), a former Senior Vice-President of Sales for StarKist from May of 2010 to December of 2013 who was employed by Del Monte as a Director of Field Sales for StarKist from 2008-10, and who pled guilty to price-fixing in this case; and Joe Tuza ("Tuza"), who served as the Vice-President of Marketing for Del Monte before joining StarKist.



204.   Defendants and their co-conspirators directly and through their affiliates sold Packaged Tuna in the United States and in this district at artificially inflated prices during the Class Period.   Defendants are direct, horizontal competitors in the United States Packaged Tuna market.

## ADDITIONAL FACTUAL ALLEGATIONS

### A.   Overview of the Packaged Tuna Industry.

205.   In addition to the facts alleged above, which are incorporated by reference, the following facts are also alleged:

206.   Packaged Tuna starts as raw fish that is processed, cooked and canned for flavor, safety, and to increase shelf life. Because the tuna are generally caught far out at sea, raw tuna is usually delivered to canneries or processing facilities in a frozen or refrigerated state. Upon delivery to a processing plant, an initial quality

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

control inspection is performed.

207. Tuna of acceptable quality is transferred to large ovens for "precooking." Following pre-cooking and cleaning, tuna is transmitted into a filling machine which processes the tuna into cans or pouches in pre-set amounts. The containers are then closed and sealed in sealing machines.

208. Each package has a code that identifies the plant, product, date, batch, and other identifying information. Filled and sealed packages are then cooked under pressure to make the products commercially sterile and so that they will have a long shelf life.

209. Packaged Tuna is largely sold, in the original packaging, directly to wholesale distributors, who, in turn, re-sell, also in their original packaging, to grocery stores, restaurants, school districts and other outlets. Additionally, Packaged Tuna is sold both directly and indirectly, in their original packaging, to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others, who resell Packaged Tuna to end-user consumers in their original packaging.

210. Defendants all currently sell or during the class period sold Packaged Tuna in the United States. Defendants collectively dominate the United States' highly-concentrated Packaged Tuna industry and have done so for decades. StarKist, Bumble Bee, and COSI for about 80% of the tuna market, and the remaining share is divided among private label brands, typically associated with and distributed by a single retailer. Beginning in or about 2000, national demand for Packaged Tuna, began to decline for numerous reasons. Between 2000 and 2014, the average per person annual tuna consumption decreased by more than 31% from approximately 3.5 pounds per person per year to 2.4 pounds per person per year

211. In a competitive environment, a decline in demand for a given

- 68 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

commodity product should (other factors being equal) lead to a decline in that product's price. However, as Defendants control the market and have agreed to restrict capacity, allocate customers, and fix prices for Packaged Tuna, the prices were set at artificially high levels beginning not later than July 21, 2008.  Further, while the raw material is the largest cost input, the price of canned tuna since 2007 has outpaced the price of the major component fish, namely skipjack tuna, and significant oversupply and falling raw material prices during periods since the conspiracy began have not resulted in price reductions as would be expected in a competitive industry.  Growth of prices that outstrips rises in raw product costs and/or persists when material costs fall, and in markets where demand is softening, suggests suspension of ordinary market functions. Prices for Packaged Tuna since at least June 1, 2011, were a direct result of Defendants' conspiracy to diminish can size and collusively set and raise prices, to police discounts and refrain from offering products labeled to indicate sustainability features.  As a result, Plaintiffs and the Classes paid artificially-inflated prices for Packaged Tuna purchased indirectly from Defendants.

## B.  Defendants Engaged in an Anticompetitive Conspiracy

212.    At least as early as June 1, 2011 Defendants COSI, Bumble Bee and StarKist participated in an anticompetitive horizontal cartel, perpetuated through organizations the Defendants themselves created, and which conspiracy included communications in person and by telephone and email, and in in-person meetings at senior levels of the Defendant brands, and sharing sensitive business information directly and through intermediaries.  Defendants (1) coordinated a reduction in tuna can sizes; (2) coordinated increases to list and net prices of Packaged Tuna; (3) shared information about and policed discounting on Packaged Tuna; and (4) collectively agreed to forbear from introducing products under brand names that were labeled FAD Free, indicating forbearance from a fishing method that has

- 69 -

**FILED UNDER SEAL**

been criticized for its impact on the sustainability of global fisheries. The Defendants' horizontal collusion was intended to, and did, fix, raise, stabilize, and/or maintain the prices of Packaged Tuna sold to customers in the United States.

213. The Defendants among others, in their present or past parent corporate forms, were founding members of the U.S. Tuna Foundation, which became The Tuna Council. In 2007, the Tuna Council merged with the National Fisheries Institute ("NFI"). The NFI was founded at least as early as 1945, and serves as the seafood industry's primary trade group and lobby.

214. The NFI includes several subgroups, including the Tuna Council, which consists of the Defendant brands. Additionally, in 2007 NFI members created the Better Seafood Board ("BSB"), an organization which, while "governed separately from NFI," "provides the mechanism for [the] industry's partners in the supply chain. . .to report suppliers committing economic fraud."[24] BSB's code of conduct includes requirements of "never mislabeling a fish" or "short-weighting product".[25] During the Class Period NFI and the BSB have served as loci for collusive communication between Defendants and as a source of anticompetitive agreement.

215. NFI had frequent meetings during the Relevant Period, including meetings during the times that the collusive agreement on FAD-free tuna was discussed. In fact, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[24]   *See*   http://www.aboutseafood.com/about/better-seafood-board-3/, last accessed May 6, 2016.

**FILED UNDER SEAL**

216.

Defendants formed another organization, the International Sustainable Seafood Foundation ("ISSF"), in 2009.  The ISSF and/or its affiliated trade group ISSA also serve as an additional forum for in-person and telephonic meetings between the Defendants, who are direct horizontal competitors.

**C.    Defendants' Collusive Price Increases During 2004-2006**

217.    From 2001 and 2003, canned tuna prices declined, as did profit margins.

218.    Accordingly,

- 71 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



1 

2     219.  During

3 

4 

5 

6 

7                                          These communications offered

8 the three CEOs an opportunity to discuss increasing prices of Packaged Tuna in the

9 United States.

10     220.  As a result of the discussions among the COSI, Bumble Bee and Del

11 Monte/StarKist executives and employees

12 Defendants made, a conscious commitment to an unlawful common scheme to

13 increase prices of Packaged Tuna in the U.S. by coordinating price increases,

14 secretly and collusively exchanging advanced pricing intentions and pricing

15 announcements and explanations, and policing discounting.

16     221.

17 

18 

19 

20 

21 

22 

23 

24 

25 

26 

27     222.  The following day, on June 1, 2004, in accordance with their unlawful

28 

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1  agreement, Del Monte announced a price increase of 10% on StarKist's Packaged
2  Tuna,

3      223.   To confirm its conformance with the price increase and so the other
4  brands could conform their pricing accordingly,



No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1    225. ████████████████████████████████████

2    ████████████████████████████████████████

3    ████████████████████████████████████████

4    ██████████████████████

5    226.   On June 11, 2004, COSI put out a net price increase on multiple

6    Packaged Tuna on June 11, 2004, effective in July 2004. Within days thereafter,

7    Bumble Bee increased Packaged Tuna prices as well, also effective in July 2004.

8    All three brands immediately followed the net increase with a list price increase in

9    late August or early September of 2004. By September 2, 2004, Bumble Bee,

10   StarKist, and Chicken of the Sea had announced new, higher, collusive list prices

11   on their chunk light products, $2.00 per case higher than previous pricing. ████

12   ████████████████████████████████████████

13   ██████████████████████████████ These price increases

14   together established uniform pricing on both light meat and white meat tuna, ███

15   ████████████████████████████████████████

16   ██████████████████████████

17   227. ██████████████████████████████████████

18   ████████████████████████████████████████

19   By July 2004, COSI, Bumble Bee and Del Monte/StarKist had executed the first

20   collusive price increase. In September, they executed the second.

21   228.   Between August 20, 2004 and August 30, 2004, Bumble Bee,

22   StarKist, and COSI collusively raised prices on light meat tuna by an additional

23   $2.00 per case.

24   229.   Defendants' 2004 collusive price increases were intended to and did

25   increase U.S. Packaged Tuna prices, and these prices remained at supracompetitive

26   levels throughout the Class Period.

27   230.   In or about January 2006, Defendants decided to execute another

28

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1  round of collusive price increases when rising albacore costs threatened to erode
2  their supracompetitive profit margins.  StarKist moved first,  notifying the trade
3  (that is, brokers and purchasers) on or about January 30, 2006 that it would
4  increase prices on white meat (albacore) tuna products by about 6% effective May
5  1, 2006.  However, StarKist needed Bumble Bee and COSI to go along with the
6  price increase for it to hold.



No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1

2      235.

3

4

5

6

7

8

9

10

11

12

13      236.

14

15

16

17      237.

18

19

20                                                                    onte.[27]

21      238.

22

23

24

25      _____
       27

26

27

28

**FILED UNDER SEAL**

239. Consequently, on March 6, 2006 COSI announced a price increase of approximately 6% on white meat tuna products, which followed the prices announced by StarKist. For example, COSI raised prices on cases of solid white tuna in water to $58.08 and on 24-packs of solid white tuna in oil to $29.04, which exactly matched the prices announced by StarKist.

240. Thereafter, Bumble Bee announced a price increase on white meat tuna products that matched the conspiratorial prices. Bumble Bee made its announcement on April 17, 2006. Both the Bumble Bee and the COSI price increases went into effect in the first week of July 2006.

241. As a result of the conspiracy, six ounce chunk light tuna (one of the most popular Packaged Tuna products, which had gone as low as $0.54 per can in the beginning of 2004, rose to $0.58 by late 2004 and $0.62 by August 2005. The 2004 and 2006 increases set a template for exchange on non-public information and collusive, coordinated increases.

**D.    Defendants' Collusive Package Size Reduction and Price Increases in 2007-2008**

242. The conspiracy among Defendants and co-conspirators continued in 2007 and 2008.

243.

No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL



### Collusive Alignment of Can Sizes in 2008

244.   Between roughly 2000 and 2007, leading tuna companies, including Defendants, followed each other in a series of gradual moves to change the size of the standard tuna can, first from seven ounces to six and a half ounces, then to six and one-eighth ounces, and then to six ounces.  These changes occurred gradually over at least an eight-year period.

245.   In 2007, StarKist and its can maker, Impress, decided to abruptly change the size of its standard six-ounce tuna can to five ounces, marking a major departure from the gradual changes of the previous decade.

246.   Rather than keep this competitive information to itself,



No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

247. Further, the downsizing necessarily involved a price change, and therefore virtually required cooperation on pricing to be adopted by all three competitors. A size reduction with a proportional cost reduction would present consumers a lower out-of-pocket price for a smaller package at the same net price, likely effectively operating as a discount and undercutting the competitors for market share. If the three brands made the same size adjustment without also making the same pricing decision (an effective increase),

248. Months later, in August of 2008 when the move had been implemented, StarKist stated that it did this primarily for environmental reasons, including the purpose of "sav[ing] two million gallons of water a year, while only taking out two teaspoons of tuna from each can."[28] This was not actually StarKist's motive.

249.

---

[28] *See* http://www.mouseprint.org/2008/08/11/holy-mackerel-starkist-downsizes-tuna/, last accessed May 13, 2016.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



252. Thai Union participated directly in, and approved of, the collusive decision to resize cans.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL



No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

268.   The new five ounce can was implemented in or about July 21, 2008, and StarKist made public statements about the new can size in August 2008.  The pricing for all three brands reflected a 20% increase in the per-ounce price.

***Collusive List Price Increase in 2008***

269.   After the can downsizing had been decided but before it had been fully implemented,



- 84 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



277.

278.

279.

280. StarKist announced its price increase on June 17, 2008, effective July

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

21, 2008.  COSI and Bumble Bee announced their price increases between June 27, 2008, and June 30, 2008, both effective October 2008.



281.

282.

283.

**E.**    **Collusive Conduct 2010 And Later**

*Collusive Q3 2010 Net Price Increase*

284.

- 87 -

**FILED UNDER SEAL**



285.

286.

287. Defendants' executives responsible for the May 2010 net price increases were well-acquainted with each other, because at least some had been employed by each other's companies.  For example, COSI's, Clancy had been Vice President of Sales and Marketing at StarKist until 2002.  Bumble Bee's George was COSI's Senior Vice President of Trade Marketing and Innovation at Chicken of the Sea from June 1979 until May 2006, when he became Vice President of Trade Marketing at Bumble Bee.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



289.  Net price increases were unusual in the industry.  The net price is not the list price, but is a price provided to brokers, and not typically released directly to customers.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



**FILED UNDER SEAL**



No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



302. ▮▮▮▮▮▮▮▮▮▮▮▮ each of the Defendants announced net price increases on chunk lite tuna products in May 2010, with the same effective date, August 1, 2010. Their price increases were essentially identical on a per unit basis.

***Collusive Q2 and Q3 2011 Price Increase***

303.

304.

305.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



***Collusive Price Increase of 2012***

311. In late 2011 and early 2012, Defendants began considering and discussing another coordinated list price increase for Q2 2012.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

312. As a result of their collective decision, the three brands each announced new price lists to their customers within just a few days of one another. StarKist announced its price increases on January 13, effective March 26, 2012. Bumble Bee announced its increases on 17, 2012, effective on April 1, 2012. COSI announced its increases on January 18, 2012, effective on April 1, 2012. The price increases were substantially identical for the cartel participants' corresponding products.

313. Defendants' contemporaneous announcements of list price increases for Packaged Tuna occurred at a time when consumer demand continued to weaken in the U.S., a practice lacking any legitimate independent business reasons in an otherwise competitive market. In order to conceal their price agreement, Defendants gave pretextual justifications in their price announcement letters to customers, pointing to the rising input costs for fish, packaging, and transportation.

314. The series of price increases planned, executed and collusively set a benchmark which caused the prices to consumers to be artificially high long after the last overt acts of conspiracy.

*Collusive Monitoring of Promotions*

315. To preserve the prices that they had decided and implemented together, the Defendants engaged in monitoring of discounts and promotions.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1 ███████████████████████████████████████

2 ███████████████████████████████████████

3 ██████████████████

### *Collusive Refusal to Offer FAD-Free Products*

318.   During 2011, the industry experienced increasing pressure to provide consumers the option to purchase more sustainably fished product in their product lines.  A particular focus was the use of FADs in conjunction with the purse-seine method of fishing. A FAD is a man-made device that floats on the ocean (typically using a buoy tethered to the ocean floor) used to attract schools of fish that orbit around the FAD.

319.   Much of the world's tuna is caught by purse-seine netting, in which a large net is deployed under an entire school of fish and hoisted upwards.  This technique is distinct from methods involving towed nets, or pole-and-line fishing, where fish are hooked.  The most cost-effective method of catching skipjack tuna is to use a FAD to draw schools of tuna into a small area, and a purse-seine net to capture them.  The practice has drawn criticism on environmental sustainability grounds.

320.   In the latter half of 2011, partially in response to efforts by environmental sustainability advocates, the Defendants began receiving inquiries about providing light tuna (largely skipjack) caught without the use of a FAD. Rather than respond to these inquiries as an opportunity for competitive differentiation, the Defendants decided to formulate a coordinated response.



- 97 -

**FILED UNDER SEAL**



323.

324.    On February 10, 2012, Safeway announced its decision to eliminate FAD-caught tuna in favor of tuna caught using "free-school purse-seine methods."

325.

326.

327.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



328.  Each brand had an individual interest in offering consumers FAD-Free tuna,

329.  When Bumble Bee introduced an entirely separate label that was FAD-Free (under the name Wild Selections) on or about April 26, 2013, (more than a year after the agreement),

330.  The FAD-free agreement assisted Defendants in maintaining their price-fixing conspiracy, and in staving off inter-brand competition in offering FAD-free tuna to consumers as a more environmentally sustainable and desirable alternative.

***Defendants Have Additional Opportunities to Collude***

331.  Defendants BumbleBee, StarKist, and COSI or their precedent corporate parents all helped found NFI's Tuna Council and BSB, which became loci of a conspiracy among these competitors not to compete, and to share

**FILED UNDER SEAL**

competitive information and coordinated business strategies.  As explained on that organization's website:

> "The National Fisheries Institute's Tuna Council
> represents the largest processors and household names
> for canned and pouch tuna in the U.S. including *Bumble Bee*®,
> *Chicken of the Sea*® and *StarKist*®. The Tuna Council s
> peaks for the tuna industry on numerous issues including food
> safety, labeling, sustainability, nutrition education and product
> marketing."

NFI and specifically Tuna Council meetings were typically attended by the CEOs, and/or by other members of the senior management team.  They met or spoke at least quarterly, providing a regular opportunity for the exchange of competitive information.

332.  The industry provides other opportunities for the Defendants to collude and exchange sensitive business information necessary to forming and monitoring a cartel.

333.  For example, all three Defendants participate in regional fisheries management organizations.  These include the Mid-Atlantic Fisheries Council; and the Fishery Counsel of Canada. All three Defendants regularly send representatives to major trade conferences including the Infofish World Tuna Trade Conference and Exchange, an Asia-Pacific region conference sponsored each year by an intergovernmental arm of the United Nations and drawing key players in the industry.  The conference is in its fourteenth year.

334.  The ISSF was founded in 2009. The ISSF states that its mission is to "to undertake science-based initiatives for the long-term conservation and sustainable use of tuna stocks, reducing by and promoting ecosystem health."

335.  The ISSF Board of Directors includes individuals associated with the

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

tuna industry, many of whom work or have worked for Defendants. For example, the current President of the ISSF is Susan Jackson ("Jackson"). Prior to joining ISSF, Jackson was the vice president for government/industry relations and seafood sourcing for Defendant Del Monte Foods, former parent of StarKist. The Board of Directors of the ISSF also currently includes John Connelly, who is the President of the NFI.

336.   The ISSA is a tuna industry trade association.  Full membership in the ISSA is limited to "processors," "traders" and "marketers" in the tuna industry.

337.   All three Brand Defendants are founding members of the ISSF. Each of the three Brand Defendants has played, and/or continues to play an active role in the ISSF and the ISSA. Chris Lischewski, President and CEO of Bumble Bee, In-Soo Cho, former president and CEO of Starkist and Shue Wing Chan, of Thai Union, parent of COSI, have served as ISSA Board Members.

338.   The ISSF and the ISSA provided the three Brand Defendants numerous and ongoing opportunities to interact at meetings, conferences, and to participate in conference calls. ISSF bylaws provide for meetings of the ISSF Board of Directors be held three times each year.

339. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

340.   Defendants also collaborated on projects at trade and other not-for-profit associations during the relevant period, such as the "Tuna the Wonderfish"

No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL

campaign of 2011-2012.

341. The "Tuna the Wonderfish" campaign was designed to combat declining sales of Packaged Tuna from early 2011 to early 2012. It was unsuccessful, but it gave Defendants ample opportunity to collude to raise and fix Packaged Tuna prices. This campaign was bankrolled by the Defendants and carried out under the auspices of the Tuna Council with the support of Thai processors. In it, the Defendants teamed up for marketing purposes. ███████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

342. Defendants Bumble Bee and COSI also cooperate on seafood processing and packaging through bilateral co-packing agreements. Bumble Bee co-packs for the West Coast of the United States for COSI in Bumble Bee's Santa Fe Springs, California plant while COSI does the same for the East Coast in Lyons, Georgia. TUG approved this arrangement. Thus, even before the proposed merger, described below, of these two companies, they were cooperating closely. These interlocking relationships provided an excellent opportunity to collude on pricing. Collaborating at their U.S. processing facilities allowed each of these two Defendants an organic and in-house opportunity to monitor production, a key component of information exchange necessary to sustaining a long-term cartel.

**F.    The Packaged Tuna Market Is Conducive to Collusion**

343. The Packaged Tuna market is structured and characterized in such a way as to be highly conducive to conspiracy.

344. Packaged Tuna is sold to wholesale and retail stores which in turn sell to customers such as the Plaintiffs. A very small percentage of sales are made directly to consumers. There are numerous barriers to entry into the Packaged Tuna

- 102 -

**FILED UNDER SEAL**

market. Start-up costs are very high.  Dongwon and TUG each are to some degree vertically integrated, Dongwon claiming at times to have the world's largest fishing fleet. The cost of processing plants is high.  Merely modernizing the processing plant in American Samoa (owned by COSI at the start of the Class Period, purchased and refitted by a nonparty and reopened in 2015) cost $70 million.  Access to manufacturing materials, distribution channels and raw materials are all highly restricted. Defendants are able to raise prices without fear of being undercut by new entrants into the market.

345.   Additionally, StarKist, COSI and Bumble Bee, as brands, have all existed for a very long time.  StarKist was founded in 1917.  COSI was founded in 1914 as the Van Camp Seafood Company, and was once a part of Ralston Purina. Bumble Bee actually predates the First World War and was previously part of Pillsbury and later ConAgra.  StarKist, the most recent of the brand names to appear on American store shelves, began using that name in 1942, though the company itself predates even that.  These three brands have had not decades but generations to build brand identities and relationships.  They are known by virtually every American consumer.  Any company seeking to start anew faces difficulties in lack of background, industry ties, and brand awareness.

346.   Even an industry player with decades of experience faces formidable obstacles in establishing a consumer brand.  Tri-Marine, a company that has sold fish to each brand for decades, now cans the Kirkland Signature brand for Costco, one of the more successful private labels.  It now owns the packing plant in American Samoa previously operated by COSI.  However, even with this massive investment and experience, Tri-Marine's entry has been limited to private label production, where one of the largest retail outlets lends its muscle to bring the product to market.  Tri-Marine has a brand of its own, Ocean Naturals, but Ocean Naturals has struggled to find shelf space and exists as a niche environmental

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

sustainability product with small areas of shelf space at Walmart, and is otherwise dependent upon Amazon as a retail conduit.

347.   Purchasers routinely source their Packaged Tuna from one of the Defendants.   As a result, Defendants dominate the United States Packaged Tuna market.

348.   As stated above, Defendants control roughly 80% of the tuna market share for the United States, so almost all wholesale or retail purchasers do business with Defendants.  Defendants possess significant market power to raise prices for Packaged Tuna to supra-competitive price levels in the United States.

349.   Packaged Tuna has a number of characteristics that combine to reduce customers' willingness to purchase substitute products in the face of rising prices.  Packaged Tuna are convenient high protein, low fat, shelf-stable food that has a particular taste and historical usage.  Because of these characteristics, there are no reasonable substitutes for Packaged Tuna.  Therefore, control of the Relevant Markets by a theoretical a hypothetical monopolist would allow that monopolist to profitably increase the prices to supra-competitive or monopoly levels.

350.   There are economic indications that support the conclusion that there was collusive pricing within the domestic Packaged Tuna industry.   As noted above, consumption of Packaged Tuna, has declined over the past ten years in the United States.  The annual consumption per person of canned tuna was 3.1 lbs. in 2005, but fell to 2.3 lbs. in 2013. An article in the Washington Post graphically represented this decline by measuring United States annual per capita consumption from 1930 to 2010:

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



351.   But while Americans are buying less Packaged Tuna, they are paying more for what they do buy.  The same article presented this graph, illustrating the increased prices paid for lower quantities of canned seafood (expanding the analysis beyond tuna) by American purchasers:



352.   Given this decline in consumption of Packaged Tuna and other packaged seafood products, one would expect rational businesses to reduce the prices for packaged seafood products, but that did not happen. The following chart, taken from data available at the Bureau of Labor Statistics, depicts seasonally

**FILED UNDER SEAL**

adjusted U.S. city average prices for shelf stable fish and seafood from January 2005 through the first part of 2015, with the period 1982-84 used as a baseline.

353.   As shown below, the average U.S. price for Packaged Tuna increased dramatically from 2008 to the early part of 2015 – and did so even though annual consumer demand for the products in the United States was falling.



354.   Changes in overall tuna catch do not explain the price increase. Supply of tuna has expanded steadily worldwide since the early 1960s.  The use of purse-seine netting, in which a net is extended under an entire school and hauled upwards, as described above, has increased the availability of skipjack tuna since the 1970s, so that Skipjack has come to represent more than 70% of the Defendants' tuna products on U.S. store shelves.  The global tuna catch, which was less than a million metric tons per year in 1961, is now over 4.5 million tons annually.  Catch per vessel has roughly doubled since the mid-1980s, and the global tuna fishing fleet is larger today than it was in the mid-1980s.   No constriction in global tuna catch explains the rising prices charged by Defendants.

355.   Nor do raw material costs adequately explain these price increases. While the cost per metric ton of skipjack tuna rose in 2012 and early 2013, it declined precipitously thereafter. According to the April 19, 2015 issue of Tuna

**FILED UNDER SEAL**

Market Intelligence, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year." Tuna exporters in Ecuador noted in January of 2015 that the price per metric ton had declined from $1,400 to $800. And the United Nations Food & Agriculture Organization noted in its May 2015 "Food Outlook" biannual report that tuna prices had dropped considerably in 2014: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low." Despite these drastically declining raw material costs, Defendants did not decrease prices and try to obtain more market share.

356. In fact, while there have been periodic increases in fish cost, from 2000 to 2015, fish cost as a proportion of retail price of canned tuna has actually decreased. In 2000, the price of tuna accounted for 37% of the retail price of the canned product. By 2015, tuna price was only 31% of the canned tuna price.

357. TUG's Frozen Products' Annual Report discusses this situation. In its 2013 Annual Report, TUG Frozen Products stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and more rational market competition in the US." It stated in the same report that its future profit margins would depend upon "[r]easonable US canned tuna competition without unnecessary price."

358. In 2014, TUG attributed its own US profits to reduced price competition and competitors eschewing the quest for market share through discounting. It would have been against the individual self-interest of each Defendant to eschew increasing market share during this period by lowering prices.

**G.     The Department of Justice Investigates Defendants**

359. The San Francisco office of the Antitrust Division of the United States

No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL

Department of Justice ("DOJ") is currently investigating anticompetitive practices in the PSP industry. A grand jury has been convened, two individuals previously employed by Bumble Bee, and one previously employed by StarKist, have entered guilty pleas, and on May 8, 2017, the investigation further resulted in the first corporate guilty plea. It was publicly reported that Bumble Bee would plead guilty to conspiring to restrain trade in connection with Packaged Tuna, and pay a fine.

360. The criminal investigation first surfaced on July 23, 2015, when TUG confirmed that "Tri-Union Seafoods LLC, operating in the United States under the brand Chicken of the Sea ha[d] received a subpoena requiring the production of relevant information to the DOJ" and that "Chicken of the Sea is cooperating fully with the investigation."

361. On July 17, 2015, TUG announced it suspended a planned public stock offering that it had planned to use to finance acquisition of Bumble Bee. TUG stated that it wanted "additional clarity" on the investigation before proceeding with the offering. Thai Union has notified the United States Securities and Exchange Commission ("SEC") of the suspension. Thai Union has since also announced that the planned acquisition of Bumble Bee will not proceed given the merger investigation that is part of the DOJ investigation of anticompetitive practices in the PSP industry.

362. The publication Global Competition Review has reported that it "is highly likely that something produced in the [Tri-Union and Bumble Bee] merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal," and "early information indicates the demand for information came from a separate section of the antitrust division, not one tasked

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

with analyzing deals."

363.   On July 23, 2015, Bumble Bee acknowledged receipt of a grand jury subpoena. Bumble Bee stated, "The Company did receive a grand jury subpoena relating to a US Department of Justice investigation into potential antitrust violations in the packaged seafood industry. The Company is cooperating fully with the investigation."

364.   StarKist received a subpoena as well, but did not say so publicly.

365.   The fact that these companies received subpoenas from a federal grand jury is alone significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at lll-82.

366.   Early in this litigation, the DOJ made a formal motion for intervention in this action, and the Government negotiated and filed a partial stay agreement that expressly provides for certain discovery while preventing discovery that would infringe upon the Grand Jury's investigation; which was later modified to accommodate the timeline of the investigation.  That investigation has now borne demonstrable fruit.

367.  On December 7, 2016, it filed a criminal information against Cameron, a Senior Vice-President of Sales for Bumble Bee, alleging a conspiracy to fix prices of PSPs. "Information" (Dec. 7, 2016) (ECF No. 1) in *United States v. Cameron*, No. 3:16-cr-00501-EMC (N.D. Cal.). Cameron pled guilty to the offense charged at a hearing on January 25, 2017.

368.   On December 21, 2016, the DOJ filed a criminal information against Ken Worsham, a Senior Vice-President of Trade Marketing for Bumble Bee, again

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

alleging his participation in a conspiracy to fix the prices of PSPs. "Information" (Dec. 21, 2016) (ECF No. 1) in *United States v. Worsham*, No. 3:16-cr-00535-EMC-1 (N.D. Cal.). Ken Worsham pled guilty to the charge against him on March 15, 2017.

369. Both plea agreements state that:

the defendant participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood, the primary purpose of which was to fix, raise and maintain the prices of packaged seafood sold in the United States, In furtherance of the conspiracy, the defendant engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms. ***During these conversations, discussions and meetings, agreements and mutual understandings were reached to fix, raise and maintain the prices of packaged seafood sold in the United States.***

Worsham Plea Agreement, ¶ 4(b); Cameron Plea Agreement, ¶ 4(b).

370. Pursuant to his guilty plea, Ken Worsham admitted to collusive discussions with competitors about Defendants' price increases. Ken Worsham also stated that during his conversations, discussions, and meetings, "agreements and mutual understandings were reached to fix, raise, and maintain the prices of packaged seafood sold in the United States."[30] Ken Worsham and the government agreed on his sentencing guidelines calculations "based on a total amount of volume of commerce attributable to the defendant of over $300 million."[31] A

---

[30] Plea Agreement ¶ 4 (b) *United States v. Kenneth Worsham*, No. 16 CR 535 (N.D. Cal. Dec. 21, 2016) (ECF No. 14).

[31] *Id*. ¶ 9. (emphasis added). Worsham admitted his employer's sales of packaged seafood affecting U.S. customers totaled *at least* $300 million. *Id.* ¶ 4(a).

**FILED UNDER SEAL**

reasonable inference from this admission is that Ken Worsham, Bumble Bee, StarKist and COSI reached and implemented illegal collusive agreements affecting over $300 million worth of Bumble Bee's sales of packaged seafood in U.S. interstate commerce, in addition to the packaged seafood sales of StarKist and COSI that the agreement affected.

371.   The DOJ's May 8, 2017 announcement of Bumble Bee's guilty plea and information filed in that docket accuses Bumble Bee of conspiring to fix the prices of PSPs and notes that, inter alia,  it (a) "engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood producing firms"; (b) "agreed and reached mutual understandings during these conversation, discussions and meetings, to fix, raise and maintain the prices of packaged seafood sold in the United States"; and (c) "negotiated prices with customers and issued price announcements for packaged seafood in accordance with the agreements and mutual understandings reached." *United States v. Bumble Bee Foods, LLC*, No. 17 -CR-249 (N.D. Cal.) "Information" ¶ 9 (May 8, 2017) (ECF No. 1) (emphases added).

372.   With the filing of that Information, the DOJ issued a press release, available  at  https://www.justice.gov/opa/pr/bumble-bee-agrees-plead-guilty-price-fixing. The press release stated (emphases added):

> In addition to agreeing to plead guilty, Bumble Bee has agreed to pay a $25 million criminal fine, which will increase to a maximum criminal fine of $81.5 million, payable by a related entity, in the event of a sale of Bumble Bee subject to certain terms and conditions. Bumble Bee has also agreed to cooperate with the Antitrust Division's ongoing investigation. The plea agreement is subject to court approval.
>
> "Today's charge is the third to be filed – and the first to be filed against a corporate defendant – in the Antitrust Division's ongoing investigation into price fixing among some of the largest suppliers of

No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL

packaged seafood," said Acting Assistant Attorney General Andrew Finch of the Justice Department's Antitrust Division. "The division, along with our law enforcement colleagues, will continue to hold these companies and their executives accountable for conduct that targeted a staple in American households."

373.   On May 30, 2017, the DOJ filed an Information against Steve Hodge ("Hodge"), a former Senior Vice-President of Sales for StarKist from May of 2010 to December of 2013, who was employed by Del Monte as a Director of Field Sales for StarKist from 2008-10. *See United States v. Hodge*, No. 17-CR-0297-EMC (N.D. Cal.). Hodge pled guilty to the charge on June 28, 2017, admitting that "from at least 2011 through at least 2013" he "participated in a conspiracy . . . to fix, raise, and maintain the prices of packaged seafood sold in the United States" by, among other things, "engag[ing] in conversations and discussions and attend[ing] meetings with representatives of other major packaged-seafood-producing-fims." *Id.*, ECF No. 13 (plea agreement).

374.   On May 15, 2018, the federal grand jury filed an Indictment against Bumble Bee's CEO Chris Lischewski in the U.S. District Court of the Northern District of California. The Indictment asserts that Lischewski participated in meetings and communications with competitors and, among other things, agreed during those meetings and communications to restrain competition and fix and maintain prices of packaged tuna. According to the Indictment, Lischewski knowingly joined in and participated in the conspiracy from at least November of 2010 to in or around December 2013.

375.   It has been publicly reported that another Defendant has applied for and been accepted into the DOJ's corporate leniency program under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, §213(b), 118 Stat. 665, 666 (codified as amended at 15 U.S.C. § 1 note) ("ACPERA"). ██████████   ██████████████   the ACPERA

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

leniency program is specifically related to Defendants' price-fixing activities and other anticompetitive conduct in violation of Section 1 of The Sherman Act in the United States Packaged Tuna market.   ACPERA protection requires that the amnesty applicant admit the commission of a criminal act.  Therefore, ███████ ██ Bumble Bee personnel admit committing a crime in connection with the antitrust investigation.

### H.    Plaintiffs Suffered Antitrust Injury

376.   Defendants' anticompetitive conduct had the following effects, among others:

    a.  Price competition has been restrained or eliminated with respect to Packaged Tuna sold in the United States;

    b.  The prices of Packaged Tuna sold in the United States have been fixed, raised, maintained, or stabilized at artificially inflated levels;

    c.  Indirect purchasers of Packaged Tuna have been deprived of free and open competition; and

    d.  Indirect purchasers of Packaged Tuna paid artificially inflated prices.

377.   By reason of the alleged violations of the antitrust laws and other laws alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Packaged Tuna than they would have paid in the absence of Defendants' illegal conduct, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## FRAUDULENT CONCEALMENT AND THE TOLLING OF THE STATUTE OF LIMITATIONS

### I.    TOLLING OF THE STATUTE OF LIMITATIONS

378.   Plaintiffs had neither actual nor constructive knowledge of the facts

- 113 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

constituting its claim for relief.

379.   Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least July of 2015. Indeed, the conspiracy was apparently only uncovered by DOJ in the process of reviewing internal company documents relating to the proposed merger between COSI and Bumble Bee.

380.   Defendants engaged in a secret conspiracy and did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was an agreement to fix prices for Packaged Tuna.  By their very nature, price-fixing conspiracies are inherently self-concealing. Plaintiffs allege that Defendants agreed among themselves to conceal their unlawful conspiracy, including by agreeing not to discuss the conspiracy publicly and by other means of avoiding detection and maintaining secrecy, such as the use of nonpublic e-mails and private telephone calls, as described above. Accordingly, Plaintiffs could not have had either actual or constructive knowledge of the price fixing scheme until the public disclosure of the DOJ's criminal investigation on July 23, 2015.

**2004-2006 Price Increases**

381.   Defendants fraudulently concealed the 2004 and 2006 increases.

- 114 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

(i)



**2008 Package Downsizing**

382.   Defendants fraudulently concealed their 2007-08 package size reduction and list price increase agreements by several means.

**FILED UNDER SEAL**



383.   Defendants also sometimes concealed their package downsizing conduct by using coded references to describe their co-conspirators.  For example,

384.

385.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1 ████████████████████████████████████████████████████

2 █████████████ █████████████████████████████

3 ████████████████████████████

4     386. The guilty plea of Ken Worsham of Bumble Bee further raises the

5 inference that the conspiracy was affirmatively concealed. Ken Worsham is the son

6 of Bob Worsham, who was a consultant for StarK2ist and, as alleged above, ████

7 ████████████████████████████████████████ The

8 involvement of both father and son in the collusive activity allowed Defendants an

9 avenue to pass competitive information in private with no need to present an

10 explanation for why they should be meeting and communicating. █████████

11 ████████████████████████████████████████████████████

12 ████████████████

13     387. Defendants gave pretextual reasons for the package downsizing and

14 price increase to conceal their unlawful conduct.

15     388. ████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 █████████████████████████

24     389. Similarly, a published article at the time of the announcement of the

25 can resizing and price increase stated that "a customer service representative for

26 StarKist . . . explained that tuna prices have reached an all-time high." And in

27 August 2008, StarKist added an environmental sustainability justification, by

28

- 117 -

**FILED UNDER SEAL**

1    touting the can downsizing as "saving two million gallons of water."

2    390. When instituting the 2008 list price increase, StarKist stated in August

3    that it was raising prices effective November 3, 2008 because of the "continued

4    escalation of global Tuna fish prices." ███████████████████████

5    ████████████████████████████████████████

6    ████████████████████████████████████████

7    ████████████████████████████████████████

8    ████████████████████ Internally, Bumble Bee stated that the

9    environmental reasons for the can downsizing were pretextual and designed to

10    mask what was in effect a disguised price increase.

11    **Later Coordinated Price Increases**

12    391. Defendants again used multiple means to conceal their 2008, 2010,

13    2011, and 2012 agreements to increase prices, ████████████████

14    ████████████████████████████████████████

15    ████████████████████████████████████████

16    ████████████████████████████████.

17    392. Defendants sought to limit inculpatory written communications with

18    one another. Thus, for example, ██████████████████████████

19    ████████████████████████████████████████

20    ████████████████████████████████████████

21    ████████████████████████████████████████

22    ████████████████████████

23    393. Similarly, in connection with the 2011-12 price increases, COSI,

24    StarKist, and Bumble Bee interacted mostly through telephonic communications or

25    face-to-face meetings. ████████████████████████████████

26    ████████████████████████████████████████

27    ████████████████████████████████████████

28

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1    ███. By communicating with customers individually rather than releasing a
2    public price announcement, Defendants sought to minimize any public discussion
3    of the fact that multiple Packaged Tuna producers were increasing prices at the
4    same time.

5    394. ████████████████████████████████

6    ████████████████████████████████████████

7    ████████████████████████████████████████

8    ████████████████████████████████████████

9    ████████████████████████████████████████

10   ████████████████████████████████████████

11   ████████████████████████████████████████

12   ████████████████████████████████████████

13   ████████████████████████████████████████

14   ████████████████████████████████████████

15   ████████████████████████████████████████

16   ████████████████████████████████████████

17   ██████████████████!"

18   395. When Defendants met in person, they took steps to ensure that their
19   meetings were secret. ████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████"

22   396. Further, all three Defendants attended NFI Tuna Council meetings
23   several times a year in various locations around the world. These conferences
24   provided Defendants with regular opportunities to arrange off-agenda meetings
25   without raising suspicions. ████████████████████

26   ████████████████████████████████████████

27   ████████████████████████████████████████

28

- 119 -

**FILED UNDER SEAL**

1 ████████████████████████████████████████████

2 ████████████████████████████████████. By

3 arranging their meetings to coincide with industry shows and conferences,

4 Defendants attempted to reduce the chance that their presence in the same location

5 would betray their illegal enterprise.

6     397. As explained above, familial connections sometimes provided

7 Defendants with seemingly innocuous channels for passing confidential

8 information. ████████████████████████████████

9 ████████████████████. Additionally, Laurel Cameron

10 neé Edwards, the wife of Bumble Bee Senior Vice President Scott Cameron, began

11 working at ISSF in early 2012. Prior to her employment at ISSF, she had worked

12 as a Vice President of Sales with Scott Cameron at Bumble Bee. ████████

13 ████████████████████████████████████████████

14 ████████████. Given her role at ISSF, she was ideally positioned to facilitate

15 communications between Defendants.

16     398. Further, Defendants consistently gave pretextual public justifications

17 to support their price increases.

18     399. With respect to the 2010 net price increase, ████████

19 ████████████████████████████████████████████

20 ████████████████████████████████████████████

21 ████████████████████████████████████████████

22 ██████████████████████████████████.

23     400. With regard to the 2011 price increase, ████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████████████

26 ████████████████████████████████████████████

27 ████████████████████████████████████████████

28

- 120 -

No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL



401. Other examples of pretextual statements regarding price increases include:

402. A June 2011 letter from COSI attributing price increases to "persistent global inflationary trends" and "increased raw material costs and a weak U.S. dollar."

403. A July 2011 StarKist letter announcing prices increases for canned tuna that were attributed to "continuously rising fish costs."

404. A January 2012 COSI letter saying that "[h]igh fish prices have made it necessary to increase the list price of both light and white [tuna]. All indicators are that these higher raw material costs will not return to levels that were seen as recently as a year ago."

405. A January 17, 2012 list price announcement from Bumble Bee attributing increases to general inflationary trends in fish, transportation and packaging costs.

406. A January 17, 2012 letter from Cameron of Bumble Bee to customers saying that "[o]ver the recent past, global inflation, economic uncertainty, transportation consolidation, fuel prices, and record high resource (fish) costs, have compounded to create unprecedented pricing volatility in our industry. As we

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

forecast these factors moving into the first half of 2012, we see no relenting on these cost pressures. The factors that were outlined above will increase, which has led Bumble Bee Foods to announce list pricing actions on a number of canned and pouch tuna items (ranging from +4% to +9%), beginning in April, 2012."

407.   A March 2012 letter from Cameron of Bumble Bee telling customers that "unforecasted elements," some of which would occur in the latter part of 2012, necessitated canned tuna price increases.

408.   An August 2012 Intrafish article in which Senior Vice President David Melbourne of Bumble Bee says that "[t]he leading brands took pricing action due to escalating fish costs."

409.   None of these communications ever mentioned Defendants' collusion or the fact that, as DOJ's Baer has stated, their industry was "not functioning competitively."

410.   Defendants actively sought to mislead their customers about the price-fixing scheme. Their various justifications for price increases did not disclose that they had agreed among themselves to fix, raise and/or stabilize the price of Packaged Tuna.   Defendants' justifications for their price increases were also misleading, to the extent they were true even in part, because of their failure to disclose that the price increases in fact resulted from their illegal agreement and conspiracy.

411.   Defendants' fraudulent concealment was even more effective against Plaintiffs because they were and are consumers.  Indirect purchases, at retail prices, interposed an additional layer of opacity as to the prices charged by the Defendants and the timing of changes.

412.   Because Defendants' agreement, understanding and conspiracy was kept secret, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

high prices for Packaged Tuna during the Class Period.

413.   The guilty plea of Ken Worsham of Bumble Bee further raises the inference of using means of communication that affirmatively concealed the conspiracy from detection.   Ken Worsham, as alleged *supra*, is the son of Bob Worsham, a longtime Del Monte employee and StarKist consultant. ████ ████████████████████████████████████████  The involvement of both father and son in the collusion allowed Defendants an avenue to pass competitive information where personnel from competing companies could meet as frequently as necessary with no need to present an explanation.

414.   None of these communications ever mentioned Defendants' collusion or the fact that, as DOJ's Baer has stated, their industry was "not functioning competitively."

415.   Defendants thus actively misled their customers about the price-fixing scheme.   Their various justifications for price increases did not disclose that they had agreed among themselves to fix, raise and/or stabilize the price of Packaged Tuna.   Defendants' justifications for their price increases were also misleading, to the extent they were true even in part, because of their failure to disclose that the price increases in fact resulted from their illegal agreement and conspiracy.

416.   Because Defendants' agreement, understanding and conspiracy was kept secret, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for Packaged Tuna during the Class Period.

**Defendants' Conspiratorial Acts Overwhelmingly Took Place in California**

417.   Defendants' acts in furtherance of their conspiracy to raise the prices of Packaged Tuna overwhelmingly occurred in the State of California.

418.   As alleged above, Defendants COSI and Bumble Bee each maintain their principal places of business in San Diego, California.   Defendants used and

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

availed themselves of these and other California-based locales to engage in and implement their conspiracy.



No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



422. Defendants' acts of collusion in the State of California continued.

As a result of these efforts, all three Defendants issued May 2010 price increase announcements for Packaged Tuna and other PSP products. Defendants' proposed Q3 2010 net price increases were all similar in magnitude, and had the same effective date of August 1, 2010.

423. COSI executives in San Diego, California played a core role in coordinating subsequent price increases for Packaged Tuna and other PSPs, as well.

424.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**



425. Defendants' actions to collude on limiting promotional activity also had a California focus.

426. In sum, all aspects of Defendants' collusive and conspiratorial acts, as herein alleged, involved executive and management-level personnel employed by, among others, Defendants COSI and Bumble Bee at their principle places of business in San Diego, California. Additionally, Defendants' actions in furtherance of the alleged Packaged Tuna price-fixing conspiracy overwhelming occurred in California. Indeed, in allocutions made at the time they entered guilty pleas to criminal antitrust charges for engaging in conspiratorial conduct with other companies to fix the prices of PSPs in the United States, Bumble Bee executives Ken Worsham and Cameron quite candidly admitted that their wrongful and collusive actions in violation of the nation's antitrust laws occurred largely, if not

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

entirely, in California.[32]

427.   Because the conspiratorial conduct overwhelmingly took place in California, and the massive economic harm visited on consumers throughout the United States emanated from California through the conduct of predominantly California actors acting in California, therefore California has a superior interest in having its laws applied to all injured consumers which exceeds the interests of those states which while allowing recovery by their consumers have chosen a different or more limited procedural mechanism with respect to cases brought in their respective jurisdictions under their respective laws.

**CAUSES OF ACTION**

<u>VIOLATIONS OF STATE ANTITRUST LAW</u>

428.   The following First through Twenty-Seventh Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of the indicated Class.

**<u>FIRST CLAIM FOR RELIEF</u>**

**Violation of Section 16720 of the
California Business and Professions Code ("The Cartwright Act")
(By All Plaintiffs On Behalf of
The Cartwright Act Class)[33]**

429.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

430.   The violations of federal antitrust law set forth above also constitute

---

[32] *See, e.g.*, Rprt's Transc. Of Proceedings, January 25, 2017, *U.S. v. Cameron*, 3:16-cr-00501-EMC, at pp.13-15; Rptr's Transc. Of Proceedings, March 15, 2016, *U.S. v. Worsham*, 3:16-cr-00535-EMC, at page 13, lines 15-17.

[33] Plaintiffs reserve the right to seek amendment to apply the Cartwright Act to consumers in all US States and territories.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1   violations of section 16720 of California Business and Professions Code.

2      431.   The states and jurisdictions included in the Cartwright Class (as

3   defined in ¶ 110(a), supra) each allow indirect purchasers to recover on a similar

4   theory applicable to the facts alleged in this Complaint, which overwhelmingly

5   took place within the State of California.

6      432.   Because the conspiratorial conduct overwhelmingly took place in

7   California, and the massive economic harm visited on consumers throughout the

8   United States emanated from California through the conduct of predominantly

9   California actors acting in California, therefore California has a superior interest in

10  having its laws applied to all injured consumers which exceeds the interests of

11  those states which while allowing recovery by their consumers have chosen a

12  different or more limited procedural mechanism with respect to cases brought in

13  their respective jurisdictions under their respective laws.

14     433.   During the Class Period, Defendants and their co-conspirators

15  engaged in a continuing contract, combination or conspiracy in unreasonable

16  restraint of trade and commerce and other anticompetitive conduct alleged above in

17  violation of California Business and Professions Code section 16700, *et seq.*

18     434.   Defendants' anticompetitive acts described above were knowing and

19  willful and constitute violations or flagrant violations of California Business and

20  Professions Code section 16700, *et seq.*

21     435.   As a direct and proximate result of Defendants' unlawful conduct,

22  Plaintiffs and members of the Cartwright Act Class have been injured in their

23  business and property in that they paid more for Packaged Tuna than they

24  otherwise would have paid in the absence of Defendants' unlawful conduct.  As a

25  result of Defendants' violation of section 16720 of California Business and

26  Professions Code, Plaintiffs and members of the Cartwright Act Class seek treble

27  damages and their cost of suit, including reasonable attorneys' fees, pursuant to

28

**FILED UNDER SEAL**

section 16750(a) of California Business and Professions Code.

## SECOND CLAIM FOR RELIEF
### Violation of Arizona's Uniform State Antitrust Act,
### Ariz. Rev. Stat. § 44-1401, *et seq.*
### (By Plaintiffs Ana Gabriela Felix Garcia, Tina Grant, Tya Hughes,
### John Pels, and Erica Rodriguez On Behalf of the Arizona Class)

436.   Plaintiffs Ana Gabriela Felix Garcia, Tina Grant, Tya Hughes, John Pels, and Erica Rodriguez, on behalf of themselves and the Arizona Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

437.   By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. § 44-1401, *et seq.*

438.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna market, a substantial part of which occurred within Arizona.

439.   Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Packaged Tuna Market.

440.   Defendants' violations of Arizona law were flagrant.

441.   Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

442.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and members of the Arizona Class have been injured in their business or property and are threatened with further injury.

443.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct preventing Arizona plaintiffs from reasonably

FILED UNDER SEAL

discovering the claim during the limitations period.  This cause of action did not accrue until July 23, 2015 when the plaintiffs knew or in the exercise of reasonable diligence should have known about the Defendants' unlawful conduct.

444.   By reason of the foregoing, Plaintiffs and members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Stat. § 44-1401, *et seq.*

### THIRD CLAIM FOR RELIEF
**Violation of California's Cartwright Act,**
**Cal. Bus. & Prof. Code § 16700,** *et seq.*
**(By Plaintiffs Mary Hudson, Tya Hughes, Amy Jackson, Michael Juetten, Rick Musgrave, and John Pels On Behalf of the California Class)**

445.   Plaintiffs Mary Hudson, Tya Hughes, Amy Jackson, Michael Juetten, Rick Musgrave, and John Pels, for themselves and on behalf of the California Class, repeat and reallege each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

446.   The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

447.   California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

448.   Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

449.   A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus.

- 130 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

& Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id*. at § 16726.

450.   Plaintiffs Mary Hudson, Tya Hughes, Amy Jackson, Michael Juetten, John Pels, and Rick Musgrave purchased Packaged Tuna within the State of California during the Class Period.  But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

451.   Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

452.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct preventing California plaintiffs in the exercise of due diligence from uncovering the unlawful conduct.   The applicable statute of limitations is tolled until July 23, 2015 until the plaintiffs by the exercise of reasonable diligence should have discovered it.

453.   Plaintiffs and members of the Class were injured in their business or property, with respect to purchases of Packaged Tuna in California and are entitled to all forms of relief, including recovery of treble dages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF
**Violation of the District of Columbia Antitrust Act,**
**D.C. Code § 28-4501, *et seq.***
**(By Plaintiffs Ana Gabriela Felix Garcia,**
**and Andrew Gorman On Behalf of the District of Columbia Class)**

454.   Plaintiffs Ana Gabriela Felix Garcia, and Andrew Gorman on behalf of themselves and on behalf of the District of Columbia Class, repeat and reallege each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

455.   The policy of District of Columbia Code, Title 28, Chapter 45

- 131 -

**FILED UNDER SEAL**

(Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

456. Plaintiffs Ana Gabriela Felix Garcia, and Andrew Gorman purchased Packaged Tuna within the District of Columbia during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

457. Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods…shall be deemed to be injured within the meaning of this chapter." D.C. Code 28-4509(a).

458. Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the market for Packaged Tuna within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq.*

459. Defendants wrongfully concealed the facts alleged herein giving rise to the unlawful conduct by the affirmative actions described herein which were designed to prevent the discovery of such unlawful conduct and the Plaintiffs in the District of Columbia did not discover and could not discover the unlawful conduct prior to July 23, 2015.

460. Plaintiff and members of the Class were injured with respect to purchases of Packaged Tuna in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

### FIFTH CLAIM FOR RELIEF
**Violation of the Guam Antitrust Law,**
**Guam Code Ann. tit. 9 § 69.10,** *et seq.*

- 132 -

**FILED UNDER SEAL**

**(By Plaintiffs Amy Jackson and Joelyna A. San Agustin**
**On Behalf of the Guam Class)**

461.  Plaintiffs Amy Jackson and Joelyna San Agustin, on behalf of themselves and the Guam Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

462.  By reason of the conduct alleged herein, Defendants have violated Guam Code Ann. tit. 9 § 69.10, *et seq.*

463.  Plaintiffs Amy Jackson and Joelyna San Agustin purchased Packaged Tuna within the Territory of Guam during the Class Period.  But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

464.  Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna market, a substantial part of which occurred within Guam.

465.  Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Guam, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Packaged Tuna Market.

466.  Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Territory of Guam.

467.  Defendants' unlawful conduct substantially affected Guam's trade and commerce.

468.  As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Guam Class have been injured in their business or property and are threatened with further injury.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

469.   Defendants wrongfully concealed the facts alleged herein giving rise to the unlawful conduct.  Having acted in secret, the statute of limitation for the Guam Plaintiffs' claim did not begin running until July 23, 2015, when the Plaintiffs acting reasonably could have discovered Defendants' unlawful conduct. Plaintiffs could not and should not have suspected Defendants' wrongful conduct until July 23, 2015.

470.   By reason of the foregoing, the Plaintiffs and members of the Guam Class is entitled to seek all forms of relief, including treble damages and reasonable attorney's fees and costs under Guam.

## SIXTH CLAIM FOR RELIEF
### Violation of the Hawaii Antitrust Statute,
### Haw. Rev. Stat. § 480-1, *et seq.*
### (By Plaintiff Gloria Emery on Behalf of the Hawaii Class)

471.   Plaintiff Gloria Emery, for herself and on behalf of the Hawaii Class, repeats and realleges each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

472.   The Hawaii Antitrust Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State," including acts to (i) "fix, control, or maintain, the price of any commodity;" (ii) "limit, control, or discontinue, the production, manufacture, or sale of any commodity for the purpose or with the result of fixing, controlling or maintaining its price"; and (iii) "fix, control, or maintain, any standard of quality of any commodity for the purpose or with the result of fixing, controlling, or maintaining its price." Haw. Rev. Stat. § 480-4(a) and 4(b).

473.   Plaintiff Gloria Emery purchased Packaged Tuna within the State of Hawaii during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

474.   Defendants contracted, combined, or conspired to restrain the trade or commerce in the market for Packaged Tuna and their conduct substantially affected Hawaii commerce, in violation of Haw. Rev. Stat. §§ 480-1, *et seq.*

475.   Plaintiff and members of the Class were injured with respect to purchases of Packaged Tuna in that at least thousands of sales of Defendants' Packaged Tuna took place in Hawaii, purchased by Hawaii consumers at supra-competitive prices caused by Defendants' conduct.

476.   Under Hawaii law, an indirect purchaser may bring an action under the Hawaii Antitrust Act based on the facts alleged in this Complaint.[34]

477.   Defendants' continued violations of the law comprise a repeated pattern and course of conduct that provide an exception to the applicable statute of limitations.   Defendants also affirmatively misled Plaintiff and members of the Hawaii class by wrongfully concealing the facts alleged herein giving rise to the unlawful conduct.   Plaintiff had neither actual nor constructive knowledge of the facts giving rise to her claims until July 23, 2015, and exercised due diligence in attempting to discover such facts.

478.   By reason of the foregoing, Plaintiff and members of the Hawaii Class are entitled to all forms of relief available under Haw. Rev. Stat. §§ 480, *et seq.*, including treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations thereof.

479.   Concurrent with the filing of this complaint, Plaintiff and her counsel have served required materials upon the Hawaii Attorney General pursuant to Haw. Rev. Stat. § 480-13.3.

### SEVENTH CLAIM FOR RELIEF

---

[34]   In compliance with Haw. Rev. Stat. § 480-13.3, Plaintiff has contemporaneously served a copy of this Complaint on the Hawaii Attorney General.

**FILED UNDER SEAL**

### Violation of the Illinois Antitrust Act,
### 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*
### (By Plaintiffs Sally Bredberg, Elizabeth Davis-Berg, and Amy Joseph)

480.   Plaintiffs Sally Bredberg, Elizabeth Davis-Berg, and Amy Joseph repeat each of the  allegations contained in paragraphs 1 to 401 as if fully set forth herein.

481.   The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 Ill. Comp. Stat. 10/2.

482.   Plaintiffs Sally Bredberg and Elizabeth Davis-Berg, and Amy Joseph purchased Packaged Tuna within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

483.   Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. 10/7(2).

484.   Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for Packaged Tuna sold, and/or for allocating customers or markets for Packaged Tuna within the intrastate commerce of Illinois.

485.   Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for Packaged Tuna in Illinois for the purpose of excluding competition, in violation of 740 Ill. Comp. Stat. 10/1, *et seq.*

486.   Defendants wrongfully concealed the facts alleged herein giving rise

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

to the unlawful conduct by the affirmative acts described herein with the intent to deceive the Plaintiffs.  Plaintiffs did not know and could not have known about Defendants' unlawful conduct until July 23, 2015.

487.   Plaintiffs were injured with respect to purchases of Packaged Tuna in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

**EIGHTH CLAIM FOR RELIEF**
**Violation of the Iowa Competition Law**
**Iowa Code § 553.1, *et seq.***
**(By Plaintiffs Carla Lown and Jennifer A. Nelson**
**On Behalf of the Iowa Class)**

488.   Plaintiffs Carla Lown and Jennifer A. Nelson, on behalf of themselves and the Iowa Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

489.   The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

490.   Plaintiffs Carla Lown and Jennifer A. Nelson purchased Packaged Tuna within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

491.   Defendants contracted, combined or conspired to restrain or monopolize trade in the market for Packaged Tuna, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for Packaged Tuna, in violation of Iowa Code § 553.1, *et seq.*

492.   Defendants wrongfully concealed the facts alleged herein giving rise

- 137 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1  to the unlawful conduct.   Defendants' unlawful conduct was not reasonably

2  discovered until July 23, 2015.

3      493.   Plaintiffs and members of the Iowa Class were injured with respect to

4  purchases of Packaged Tuna in Iowa, and are entitled to all forms of relief,

5  including actual damages, exemplary damages for willful conduct, reasonable

6  attorneys' fees and costs, and injunctive relief.

### NINTH CLAIM FOR RELIEF
**Violation of the Kansas Restraint of Trade Act**
**Kan. Stat. Ann. § 50-101, *et seq.***
**(By Plaintiffs Brian Depperschmidt and Lisa Hall**
**On Behalf of the Kansas Class)**

13      494.   Plaintiffs Brian Depperschmidt and Lisa Hall, on behalf of themselves

14  and the Kansas Class, repeat and reassert each of the allegations contained in

15  paragraphs 1 to 401 as if fully set forth herein.

16      495.   The Kansas Restraint of Trade Act aims to prohibit practices which,

17  inter alia, "tend to prevent full and free competition in the importation,

18  transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

19      496.   Plaintiffs Brian Depperschmidt and Lisa Hall purchased Packaged

20  Tuna within the State of Kansas during the Class Period. But for Defendants'

21  conduct set forth herein, the price per unit of Packaged Tuna would have been

22  lower, in an amount to be determined at trial.

23      497.   Under the Kansas Restraint of Trade Act, indirect purchasers have

24  standing to maintain an action based on the facts alleged in this Complaint. Kan.

25  Stat. Ann § 50-161(b).

26      498.   Defendants combined capital, skill or acts for the purposes of creating

27  restrictions in trade or commerce of Packaged Tuna, increasing the price of

28

FILED UNDER SEAL

Packaged Tuna, preventing competition in the sale of Packaged Tuna, or binding themselves not to sell Packaged Tuna, in a manner that established the price of Packaged Tuna and precluded free and unrestricted competition among themselves in the sale of Packaged Tuna, in violation of Kan. Stat. Ann. § 50-101, *et seq.*

499. Plaintiffs and members of the Class were injured with respect to purchases of Packaged Tuna in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**TENTH CLAIM FOR RELIEF**
**Violation of the Maine's Antitrust Statute,**
**Me. Rev. Stat. Ann. tit. 10 § 1101, *et seq.***
**(By Plaintiffs Greg Stearns and Thomas E. Willoughby III**
**On Behalf of the Maine Class)**

500. Plaintiffs Greg Stearns and Thomas E. Willoughby III, on behalf of themselves and the Maine Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

501. Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

502. Plaintiffs Greg Stearns and Thomas E. Willoughby III purchased Packaged Tuna within the State of Maine during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

503. Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

504. Defendants contracted, combined or conspired in restraint of trade or

- 139 -

**FILED UNDER SEAL**

commerce of Packaged Tuna within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of Packaged Tuna within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

505.   Plaintiffs and members of the Class were injured with respect to purchases of Packaged Tuna in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

## ELEVENTH CLAIM FOR RELIEF
**Violation of the Michigan Antitrust Reform Act**
**Mich. Comp. Laws § 445.771, *et seq.***
**(By Plaintiffs Louise Adams, and Barbara Olson**
**On Behalf of the Michigan Class)**

506.   Plaintiffs Louise Adams, and Barbara Olson, on behalf of themselves and the Michigan Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

507.   The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce…to prohibit monopolies and attempts to monopolize trade or commerce…[and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

508.   Plaintiffs Louise Adams, and Barbara Olson purchased Packaged Tuna within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

509.   Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

510.   Defendants contracted, combined or conspired to restrain or

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

monopolize trade or commerce in the market for Packaged Tuna, in violation of Mich. Comp. Laws § 445.772, *et seq.*

511.   Defendants wrongfully concealed the facts alleged herein giving rise to the unlawful conduct and through their affirmative arrangements and contrivances preventing discovery of such unlawful conduct until July 23, 2015.

512.   Plaintiffs and members of the Class were injured with respect to purchases of Packaged Tuna in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## TWELFTH CLAIM FOR RELIEF
### Violation of the Minnesota Antitrust Law,
### Minn. Stat. § 325D.49, *et seq.*
### (By Plaintiffs Laura Childs and Robert Etten On Behalf of the Minnesota Class)

513.   Plaintiffs Laura Childs and Robert Etten, on behalf of themselves and the Minnesota Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

514.   The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

515.   Plaintiffs Laura Childs and Robert Etten purchased Packaged Tuna within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

516.   Under the Minnesota Antitrust Act of 1971, indirect purchasers have

- 141 -

**FILED UNDER SEAL**

standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

517.   Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for Packaged Tuna within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for Packaged Tuna within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for Packaged Tuna within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq.*

518.   Defendants wrongfully concealed the facts alleged herein giving rise to the unlawful conduct through the fraudulent and intentional acts described herein and Minnesota Plaintiffs could not have reasonable discovered the concealment of Defendants' unlawful conduct until July 23, 2015.

519.   Plaintiffs and members of the Class were injured with respect to purchases of Packaged Tuna in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

## THIRTEENTH CLAIM FOR RELIEF
### Violation of the Mississippi Antitrust Statute,
### Miss. Code Ann. § 75-21-1, *et seq.*
### (By Plaintiff Christopher Todd On Behalf of the Mississippi Class)

520.   Plaintiff Christopher Todd, on behalf of himself and the Mississippi Class, repeats and reasserts each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

521.   Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint

- 142 -

**FILED UNDER SEAL**

or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

522.  Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

523.  Plaintiff Christopher Todd purchased Packaged Tuna within the State of Mississippi during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

524.  Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

525.  Defendants combined, contracted, understood and agreed in the market for Packaged Tuna, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of Packaged Tuna and hindering competition in the sale of Packaged Tuna, in violation of Miss. Code Ann. § 75-21-1(a), *et seq.*

526.  Defendants monopolized or attempted to monopolize the production, control or sale of Packaged Tuna, in violation of Miss. Code Ann. § 75-21-3, *et seq.*

527.  Defendants' Packaged Tuna products are sold in hundreds of grocery stores, markets, and warehouse clubs throughout the State of Mississippi.  During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

528.  Defendants wrongfully concealed the facts alleged herein giving rise

No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL

to their unlawful conduct.  As alleged herein, the Defendants actively concealed their unlawful conduct which prevented Mississippi Plaintiffs from reasonably discovering the claim during the limitations period.   This cause of action did not accrue until July 23, 2015 when the Plaintiffs knew, or in the exercise of reasonable diligence, should have known about the Defendants' unlawful conduct.

529.   Plaintiff and members of the Class were injured with respect to purchases of Packaged Tuna in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

## FOURTEENTH CLAIM FOR RELIEF
### Violation of the Nebraska Junkin Act,
### Neb. Rev. Stat. § 59-801, *et seq.*,
### (By Plaintiffs Melissa Bowman and Barbara Buenning On Behalf of the Nebraska Class)

530.   Plaintiff Melissa Bowman and Barbara Buenning, on behalf of themselves and the Nebraska Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

531.   Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

532.   Plaintiffs Melissa Bowman and Barbara Buenning purchased Packaged Tuna within the State of Nebraska during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

533.   Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

534.   Defendants contracted, combined or conspired in restraint of trade or

- 144 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

commerce of Packaged Tuna within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for Packaged Tuna within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

535.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.   As alleged herein, the Defendants affirmatively concealed their unlawful conduct which prevented Nebraska Plaintiffs from reasonably discovering the claim before the statute of limitations expired.   As a result, Defendants" unlawful conduct was neither obvious nor discoverable during the limitations period.   This cause of action did not accrue until July 23, 2015 when the Plaintiffs knew, or in the exercise of reasonable diligence, should have known about the Defendants' unlawful conduct.

536.   Plaintiff and members of the Class were injured with respect to purchases of Packaged Tuna in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## FIFTEENTH CLAIM FOR RELIEF
### Violation of the Nevada Unfair Trade Practices Act,
### Nev. Rev. Stat. § 598A.010, *et seq.*
### (By Plaintiffs Nay Alidad and Nancy Stiller
### On Behalf of the Nevada Class)

537.   Plaintiffs Nay Alidad and Nancy Stiller, on behalf of themselves and the Nevada Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

538.   The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities…is necessary to the

- 145 -

**FILED UNDER SEAL**

economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

539.   The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, inter alia, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

540.   Plaintiffs Nay Alidad and Nancy Stiller purchased Packaged Tuna within the State of Nevada during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

541.   Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

542.   Defendants fixed prices by agreeing to establish prices for Packaged Tuna in Nevada, divided Nevada markets, allocated Nevada customers, and monopolized or attempted monopolize trade or commerce of Packaged Tuna within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq.*

543.   Plaintiffs and members of the Class were injured with respect to purchases of Packaged Tuna in Nevada in that at least thousands of sales of Defendants' Packaged Tuna took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendants' conduct.

544.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, the Nevada Plaintiffs did not discover and could not have discovered by the exercise of reasonable diligence

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Defendants' unlawful conduct.   Accordingly, Plaintiffs and members of the Nevada Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

545.   In accordance with the requirements of § 598A.210(3), simultaneous notice of this action was mailed to the Nevada Attorney General by Plaintiffs Nay Alidad and Nancy Stiller.

**SIXTEENTH CLAIM FOR RELIEF**
**Violation of New Hampshire's Antitrust Statute,**
**N.H. Rev. Stat. Ann. tit. XXXI, § 356, *et seq.***
**(By Plaintiffs Jessica Bartling, Jody Cooper, and Rob Skaff,**
**On Behalf of the New Hampshire Class)**

546.   Plaintiffs Jessica Bartling, Jody Cooper, and Rob Skaff, on behalf of themselves and the New Hampshire Class, repeats and reasserts each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein

547.   Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

548.   Plaintiffs Jessica Bartling, Jody Cooper, and Rob Skaff purchased Packaged Tuna within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

549.   Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

550.   Defendants fixed, controlled or maintained prices for Packaged Tuna, allocated customers or markets for Packaged Tuna, and established, maintained or

- 147 -

**FILED UNDER SEAL**

1  used monopoly power, or attempted to, constituting a contract, combination or
2  conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

3      551.  Defendants fraudulently concealed the essential facts alleged here
4  giving rise to their unlawful conduct.  Until July 23, 2015, New Hampshire
5  Plaintiffs did not discover and could not have discovered in the exercise of
6  reasonable diligence either Defendants' unlawful conduct or the facts giving rise to
7  such conduct.

8      552.  Plaintiffs and members of the Class were injured with respect to
9  purchases of Packaged Tuna in New Hampshire and are entitled to all forms of
10  relief, including actual damages sustained, treble damages for willful or flagrant
11  violations, reasonable attorneys' fees, costs, and injunctive relief.

**SEVENTEENTH CLAIM FOR RELIEF**
**Violation of the New Mexico Antitrust Act,**
**N.M. Stat. Ann. §§ 57-1-1, *et seq.***
**(By Plaintiffs Kathy Durand (formerly Gore) and Laura Montoya On Behalf**
**of the New Mexico Class)**

16      553.  Plaintiffs Kathy Durand (formerly Gore) and Laura Montoya, on
17  behalf of themselves and the New Mexico Class, repeat and reassert each of the
18  allegations contained in paragraphs 1 to 401 as if fully set forth herein.

19      554.  The New Mexico Antitrust Act aims to prohibit restraints of trade and
20  monopolistic practices. N.M. Stat. Ann. 57-1-15.

21      555.  Plaintiffs Kathy Durand (formerly Gore) and Laura Montoya
22  purchased Packaged Tuna within the State of New Mexico during the Class Period.
23  But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna
24  would have been lower, in an amount to be determined at trial.

25      556.  Under New Mexico law, indirect purchasers have standing to maintain
26  an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

27      557.  Defendants contracted, agreed, combined or conspired, and

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

monopolized or attempted to monopolize trade for Packaged Tuna within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

558.   Defendants knew that their conduct was unlawful and wrongfully concealed the facts alleged here giving rise to their unlawful conduct.  Until July 23, 2015, New Mexico Plaintiffs did not know and could not have known in the exercise of reasonable diligence either Defendants' unlawful conduct or the facts giving rise to such conduct.

559.   Plaintiffs and members of the Class were injured with respect to purchases of Packaged Tuna in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## EIGHTEENTH CLAIM FOR RELIEF
### Violation of Section 340 of the New York General Business Law
### (By Plaintiffs Michael Buff, Jennifer A. Nelson, and
### Nigel Warren On Behalf of the New York Class)

560.   Plaintiffs Michael Buff, Jennifer A. Nelson, and Nigel Warren, on behalf of themselves and the New York Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein

561.   Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

562.   Plaintiffs Michael Buff, Jennifer A. Nelson, and Nigel Warren purchased Packaged Tuna within the State of New York during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

563.   Under New York law, indirect purchasers have standing to maintain

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

564.   Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of Packaged Tuna and restrained competition in the free exercise of the conduct of the business of Packaged Tuna within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

565.   Defendants wrongfully concealed the facts alleged here giving rise to their unlawful conduct and the New York Plaintiffs remained ignorant of such unlawful conduct until July 23, 2015.   Until July 23, 2015, the New York Plaintiffs did not know, and could not have known, in the exercise of reasonable diligence about Defendants' wrongful conduct.

566.   Plaintiffs and members of the Class were injured with respect to purchases of Packaged Tuna in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

**NINETEENTH CLAIM FOR RELIEF**
**Violation of the North Carolina General Statutes,**
**N.C. Gen. Stat. § 75-1, *et seq.***
**(By Plaintiffs Corey Norris, Audra Rickman, and Amber Sartori**
**On Behalf of the North Carolina Class)**

567.   Plaintiffs Corey Norris, Audra Rickman, and Amber Sartori, on behalf of themselves and the North Carolina Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

568.   Defendants entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within North Carolina.

569.   Defendants established, maintained, or used a monopoly, or attempted

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

to establish a monopoly, of trade or commerce in the Packaged Tuna Market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

570.   Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

571.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

572.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, the North Carolina Plaintiffs did not know and could not have learned or discovered by the exercise of due care about Defendants' unlawful conduct.

573.   By reason of the foregoing, Plaintiffs and members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq.*

### TWENTIETH CLAIM FOR RELIEF
**Violation of the North Dakota Uniform State Antitrust Act,**
**N.D. Cent. Code § 51-08.1, *et seq.***
**(By Plaintiffs Tya Hughes and Bonnie Vander Laan**
**On Behalf of the North Dakota Class)**

574.   Plaintiffs Tya Hughes and Bonnie Vander Laan, on behalf of themselves and the North Dakota Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

575.   The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code § 51-08.1, *et seq.*

576.   Plaintiffs Tya Hughes and Bonnie Vander Laan purchased Packaged Tuna within the State of North Dakota during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would

- 151 -

**FILED UNDER SEAL**

1    have been lower, in an amount to be determined at trial.

2          577.   Under the North Dakota Uniform State Antitrust Act, indirect

3    purchasers have standing to maintain an action based on the facts alleged in this

4    Complaint. N.D. Cent. Code § 51-08.1-08.

5          578.   Defendants contracted, combined or conspired in restraint of, or to

6    monopolize trade or commerce in the market for Packaged Tuna, and established,

7    maintained, or used a monopoly, or attempted to do so, for the purposes of

8    excluding competition or controlling, fixing or maintaining prices for Packaged

9    Tuna, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

10          579.   Defendants wrongfully concealed the facts alleged herein giving rise

11    to their unlawful conduct.  Until July 23, 2015, North Dakota Plaintiffs did not

12    discover and could not have discovered by exercise of reasonable diligence

13    Defendants' unlawful conduct.  Until July 23, 2015, North Dakota Plaintiffs had

14    neither actual nor constructive notice of the facts alleged herein giving rise to

15    Defendants' unlawful conduct.

16          580.   Plaintiffs and members of the Class were injured with respect to

17    purchases in North Dakota and are entitled to all forms of relief, including actual

18    damages, treble damages for flagrant violations, costs, reasonable attorneys' fees,

19    and injunctive or other equitable relief.

20                      **TWENTY-FIRST CLAIM FOR RELIEF**

21                      **Violation of the Oregon Antitrust Law,**

22                      **Or. Rev. Stat. § 646.705,** *et seq.*

23                 **(By Plaintiffs Danielle Johnson and Liza Milliner**

24                       **On Behalf of the Oregon Class)**

24          581.   Plaintiffs Danielle Johnson and Liza Milliner, on behalf of themselves

25    and the Oregon Class, repeat and reassert each of the allegations contained in

26    paragraphs 1 to 401 as if fully set forth herein.

27          582.   Chapter 646 of the Oregon Revised Statutes generally governs

28

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715.

583. Plaintiffs Danielle Johnson and Liza Milliner purchased Packaged Tuna within the State of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

584. Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

585. Defendants contracted, combined, or conspired in restraint of trade or commerce of Packaged Tuna, and monopolized or attempted to monopolize the trade or commerce of Packaged Tuna, in violation of Or. Rev. Stat. § 646.705, *et seq.*

586. Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct. Until July 23, 2015, Oregon Plaintiffs did not discover and could not have discovered with reasonable diligence either the facts alleged or Defendants' unlawful conduct.

587. Plaintiffs and members of the Class were injured with respect to purchases of Packaged Tuna within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**TWENTY-SECOND CLAIM FOR RELIEF**
**Violation of the Rhode Island Antitrust Act**
**R.I. Gen. Laws § 6-36-1, *et seq.***

No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL

**(By Plaintiff Katherine McMahon and Elizabeth Perron On Behalf of the Rhode Island Class)**

588.   Plaintiffs Katherine McMahon and Elizabeth Perron, on behalf of themselves and the Rhode Island Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

589.   The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws § 6-36-2(a)(2).

590.   Plaintiffs Katherine McMahon and Elizabeth Perron purchased Packaged Tuna within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

591.   Under the Rhode Island Antitrust Act, as of July 15, 2013, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a). In Rhode Island, the claims of the Plaintiff and the Class alleged herein run from July 15, 2013, through the date that the effects of Defendants' anticompetitive conduct cease.

592.   Defendants contracted, combined and conspired in restraint of trade of Packaged Tuna within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of Packaged Tuna for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

593.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, Rhode Island Plaintiffs could not, in the exercise of reasonable diligence, have discovered the alleged facts or

- 154 -

**FILED UNDER SEAL**

1 Defendants' wrongful conduct.

2     594.   Plaintiff and members of the Class were injured with respect to

3 purchases of Packaged Tuna in Rhode Island and are entitled to all forms of relief,

4 including actual damages, treble damages, reasonable costs, reasonable attorneys'

5 fees, and injunctive relief.

6

7

8

9                **TWENTY-THIRD CLAIM FOR RELIEF**

10       **Violation of the South Dakota Antitrust Statute,**

11       **S.D. Codified Laws § 37-1-3.1, *et seq.***

12   **(By Plaintiff Casey Christensen On Behalf of the South Dakota Class)**

13     595.   Plaintiff Casey Christensen, on behalf of herself and the South Dakota

14 Class, repeats and reasserts each of the allegations contained in paragraphs 1 to

15 401 as if fully set forth herein.

16     596.   Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of

17 trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1-

18 3.1, 3.2.

19     597.   Plaintiff Casey Christensen purchased Packaged Tuna within the State

20 of South Dakota during the Class Period. But for Defendants' conduct set forth

21 herein, the price per unit of Packaged Tuna would have been lower, in an amount

22 to be determined at trial.

23     598.   Under South Dakota law, indirect purchasers have standing under the

24 antitrust provisions of the South Dakota Codified Laws to maintain an action based

25 on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

26     599.   Defendants contracted, combined or conspired in restraint of trade or

27 commerce of Packaged Tuna within the intrastate commerce of South Dakota, and

28

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

monopolized or attempted to monopolize trade or commerce of Packaged Tuna within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1, *et seq.*

600.   Defendants acted affirmatively to wrongfully conceal facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, South Dakota Plaintiffs had no actual or constructive notice of these concealed facts and did not discover and could not have discovered with reasonable diligence Defendants' unlawful conduct.

601.   Plaintiff and members of the Class were injured with respect to purchases of Packaged Tuna in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

### TWENTY-FOURTH CLAIM FOR RELIEF
**Violation of the Tennessee Trade Practices Act,
Tenn. Code Ann. § 47-25-101, *et seq.*
(By Plaintiffs Kirsten Peck, John Peychal, and John Trent
On Behalf of the Tennessee Class)**

602.   Plaintiffs  Kirsten Peck, John Peychal, and John Trent, for themselves and on behalf of the Tennessee Class, repeat and realleged each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

603.   The Tennessee Trade Practices Act ("TTPA") prohibits all arrangements, contracts, agreements, trusts, or combinations that tend to advance, reduce, or control the price or the cost of products to producers or consumers.  The TTPA prohibits arrangements that decrease competition or affect the prices of goods even if those goods arrived in Tennessee through interstate commerce.

604.   Plaintiffs Kirsten Peck, John Peychal, and John Trent purchased Packaged Tuna within the State of Tennessee during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

have been lower, in an amount to be determined at trial.

605. Defendants contracted, combined, or conspired to retrain the trade or commerce in the market for Packaged Tuna and their conduct substantially affected commerce within the State of Tennessee, in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

606. Plaintiffs and members of the Class were injured with respect to purchases of Packaged Tuna in that at least thousands of sales of Defendants' Packaged Tuna took place in Tennessee, purchased by Tennessee consumers at supra-competitive prices caused by Defendants' conduct.

607. Under Tennessee law, indirect purchaser may bring an action under the TTPA based on the facts alleged in this Complaint.

608. Defendants wrongfully and affirmatively concealed the facts alleged herein giving rise to their unlawful conduct. Despite exercising due diligence, Plaintiffs did not have information sufficient to alert a reasonable person of the need to investigate the injury, and were not able to discover evidence of their claims of Defendants' unlawful conduct until July 23, 2015.

609. By reason of the foregoing, Plaintiffs and members of the Class are entitled to all forms of relief available under Tenn. Code Ann. §§ 47-25-101, *et seq*, including the full consideration or sum paid for the Packaged Tuna, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations thereof.

<u>**TWENTY-FIFTH CLAIM FOR RELIEF**</u>
**Violation of the Utah Antitrust Act,**
**Utah Code Ann. §§ 76-10-911, *et seq.***
**(By Plaintiffs Vivek Dravid and Tina Grant On Behalf of the Utah Class)**

610. Plaintiffs Vivek Dravid and Tina Grant, on behalf of themselves and the Utah Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

611.   The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

612.   Plaintiffs Vivek Dravid and Tina Grant purchased Packaged Tuna within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

613.   Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

614.   Defendants contracted, combined or conspired in restraint of trade or commerce of Packaged Tuna, and monopolized or attempted to monopolize trade or commerce of Packaged Tuna, in violation of Utah Code Ann. § 76-10-3101, *et seq.*

615.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, Utah Plaintiffs did not discover and could not have reasonably discovered their claim.

616.   Plaintiffs and members of the Class who are either Utah residents or Utah citizens were injured with respect to purchases of Packaged Tuna in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

## TWENTY-SIXTH CLAIM FOR RELIEF
### Violation of the West Virginia Antitrust Act,
### W. Va. Code § 47-18-1, *et seq.*
### (By Plaintiffs Diana Mey and Jade Canterbury
### On Behalf of the West Virginia Class)

617.   Plaintiffs Diana Mey and Jade Canterbury, on behalf of themselves

- 158 -

**FILED UNDER SEAL**

and the West Virginia Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

618.   The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

619.   During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W. Va. Code § 47-18-1, *et seq.*

620.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

621.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, West Virginia Plaintiffs did not discover and could not in the exercise of reasonable diligence have discovered the alleged concealed facts or Defendants' wrongful conduct.

622.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the West Virginia Class have been injured in their business and property in that they paid more for Packaged Tuna than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiff and members of the West Virginia Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

**TWENTY-SEVENTH CLAIM FOR RELIEF**
**Violation of the Wisconsin Antitrust Act,**
**Wis. Stat. Ann. § 133.01(1), *et seq.***
**(By Plaintiffs Michael Juetten, Kathy Lingnofski, Julie Wiese,**
**and Daniel Zwirlein On Behalf of the Wisconsin Class)**

- 159 -

**FILED UNDER SEAL**

623.   Plaintiffs Michael Juetten, Kathy Lingnofski, Julie Wiese, and Daniel Zwirlein, on behalf of themselves and the Wisconsin Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

624.   Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

625.   Plaintiffs Michael Juetten, Kathy Lingnofski, Julie Wiese, and Daniel Zwirlein purchased Packaged Tuna within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

626.   Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

627.   Defendants contracted, combined or conspired in restraint of trade or commerce of Packaged Tuna, and monopolized or attempted to monopolize the trade or commerce of Packaged Tuna, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq.*

628.   Plaintiffs and members of the Class were injured with respect to purchases of Packaged Tuna in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for Defendants' Packaged Tuna in Wisconsin.

629.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct. Until July 23, 2015, Wisconsin Plaintiffs did not discover and could not in the exercise of reasonable diligence have discovered

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

their injury or that Defendants' unlawful conduct likely caused such injury.

630. Accordingly, Plaintiffs and members of the Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

631. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced Packaged Tuna from Defendants, and (2) paying higher prices for Defendants' Packaged Tuna than they would have in the absence of Defendants' conduct. These injuries are of the type of the laws of the above States were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

632. Defendants are jointly and severally liable for all damages suffered by Plaintiffs and Class members.

## <u>VIOLATIONS OF STATE CONSUMER PROTECTION LAW</u>
### (Against All Defendants)

633. The following Twenty-eighth through Fifty-first Claims for Relief are pleaded under the consumer protection or similar laws of each State or jurisdiction identified below, on behalf of the indicated Class.

### <u>TWENTY-EIGHTH CLAIM FOR RELIEF</u>
**Violation of the Arkansas Deceptive Trade Practices Act,**
**Ark. Code Ann. § 4-88-101, *et seq.***
**(By Plaintiffs Kim Craig, and Kathleen Garner**
**On Behalf of the Arkansas Class)**

634. Plaintiffs Kim Craig, and Kathleen Garner, on behalf of themselves and the Arkansas Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

635. By reason of the conduct alleged herein, Defendants have violated

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Ark. Code Ann. § 4-88-101, *et seq.*

636.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna market, a substantial part of which occurred within Arkansas.

637.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Arkansas, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Packaged Tuna Market.

638.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Arkansas.

639.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of the Class.

640.   Defendants' unlawful conduct substantially affected Arkansas's trade and commerce.

641.   Defendants' conduct was willful.

642.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Arkansas Class have been injured in their business or property and are threatened with further injury.

643.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.   Until July 23, 2015, Arkansas Plaintiffs did not discover, and could not in the exercise of reasonable diligence have discovered, their injury or that Defendants' unlawful conduct likely caused such injury.

644.   By reason of the foregoing, Plaintiffs and members of the Arkansas Class are entitled to seek all forms of relief, including actual damages plus reasonable attorney's fees under Ark. Code Ann. § 4-88-113.

**FILED UNDER SEAL**

## TWENTY-NINTH CLAIM FOR RELIEF
**Violations of California's Unfair Competition Law**
**Cal.  Bus. & Prof. Code § 17200, *et seq.* (the "UCL")**
**(By Plaintiffs Mary Hudson, Tya Hughes, Amy Jackson, Michael Juetten,**
**Rick Musgrave, and John Pels On Behalf of the California Class)**

645.   Plaintiffs Mary Hudson, Tya Hughes, Amy Jackson, Michael Juetten, Rick Musgrave, and John Pels, for themselves and on behalf of the California Class, repeat and reallege each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

646.   The violations of federal antitrust law set forth above also constitute violations of section 17200, *et seq.* of California Business and Professions Code.

647.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

648.   This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

649.   The Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; and (2) the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

650.   Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or

- 163 -

**FILED UNDER SEAL**

independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

651.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct preventing California Plaintiffs in the exercise of due diligence from uncovering the unlawful conduct.   The applicable statute of limitations is tolled until July 23, 2015 until the Plaintiffs, by the exercise of reasonable diligence, should have discovered it.

652.   Plaintiffs and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

653.   The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

654.   The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the California Class to pay supra-competitive and artificially-inflated prices for Packaged Tuna sold in the State of California. Plaintiffs and the members of the California Class suffered injury in fact and lost money or property as a result of such unfair competition.

655.   As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the California Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

## THIRTIETH CLAIM FOR RELIEF
**Violation of the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.***

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

**(By Plaintiffs Ana Gabriela Felix Garcia,
and Andrew Gorman On Behalf of the District of Columbia Class)**

656.    Plaintiffs Ana Gabriela Felix Garcia, and Andrew Gorman, on behalf of themselves and the District of Columbia Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

657.    Plaintiffs Ana Gabriela Felix Garcia, and Andrew Gorman and members of the District of Columbia Class purchased Packaged Tuna for personal, family, or household purposes.

658.    By reason of the conduct alleged herein, Defendants have violated D.C. Code § 28-3901, *et seq.*

659.    Defendants are "merchants" within the meaning of D.C. Code § 28-3901(a)(3).

660.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna market, a substantial part of which occurred within the District of Columbia.

661.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Packaged Tuna Market.

662.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

663.    Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

664.    As a direct and proximate cause of Defendants' unlawful conduct, the

**FILED UNDER SEAL**

Plaintiffs and members of the District of Columbia Class have been injured in their business or property and are threatened with further injury.

665.   Defendants wrongfully concealed the facts alleged herein giving rise to the unlawful conduct by the affirmative actions described herein which were designed to prevent the discovery of such unlawful conduct and the Plaintiffs in the District of Columbia did not discover and could not discover the unlawful conduct prior to July 23, 2015.

666.   By reason of the foregoing, the Plaintiffs and members of the District of Columbia Class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code § 28-3901, *et seq.*

## THIRTY-FIRST CLAIM FOR RELIEF
### Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201(2)*, et seq.*
### (By Plaintiffs Barbara Blumstein, Edgardo Gutierrez, Zenda Johnston, and Valerie Peters On Behalf of the Florida Class)

667.   Plaintiffs Barbara Blumstein, Edgardo Gutierrez, Zenda Johnston, and Valerie Peters, for themselves and on behalf of the Florida Class, repeat and reallege each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

668.   The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

669.   The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in

- 166 -

**FILED UNDER SEAL**

the conduct of any trade or commerce." Florida Stat. § 501.202(2).

670. A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

671. Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("…anyone aggrieved by a violation of this [statute] may bring an action…").

672. Plaintiffs Barbara Blumstein, Edgardo Gutierrez, Zenda Johnston, and Valerie Peters purchased Packaged Tuna within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

673. Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna market, a substantial part of which occurred within Florida.

674. Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Packaged Tuna, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2000 and continuing through the date of this filing.

675. Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

676. Defendants' unlawful conduct substantially affected Florida's trade and commerce.

677. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for Packaged Tuna and are threatened with

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1  further injury.

2  678.  Defendants wrongfully concealed the facts alleged herein giving rise

3  to their unlawful conduct.  As alleged herein, until July 23, 2015, Defendants were

4  both successful in the concealment of their unlawful conduct and used fraudulent

5  means to achieve such concealment such that the Florida Plaintiffs could not

6  reasonably discover the claim under the circumstances to protect their interests

7  during the limitations period.   As a result, this cause of action did not accrue until

8  July 23, 2015.

9  679.  By reason of the foregoing, Plaintiffs and the members of the Florida

10  Class are entitled to seek all forms of relief, including injunctive relief pursuant to

11  Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable

12  attorneys' fees and costs pursuant to Florida Stat. § 501.211.

13

14  **THIRTY-SECOND CLAIM FOR RELIEF**
**Violation of Hawaii Unfair and Deceptive Trade Practices Act**

15  **Haw. Rev. Stat. § 480-2**
**(By Plaintiff Gloria Emery On Behalf of the Hawaii Class)**

16

17  680.  Plaintiff Gloria Emery, for herself and on behalf of the Hawaii Class,

18  repeats and realleges each of the allegations contained in paragraphs 1 to 401 as if

19  fully set forth herein.

20  681.  Plaintiff Gloria Emery and members of the Hawaii Class purchased

21  Packaged Tuna for personal, family, or household purposes.

22  682.  By reason of the conduct alleged herein, Defendants have violated in

23  violation of Haw. Rev. Stat. § 480-2.

24  683.  Defendants have engaged in "unfair competition or unfair or

25  deceptive acts or practices" within the meaning of Haw. Rev. Stat. § 480-2, with

26  the intent to injure competitors and consumers through supra-competitive profits.

27  684.  During the Class Period, Defendants' unlawful conduct substantially

28

- 168 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

affected Hawaii commerce and consumers.

685.   Defendants fraudulently concealed their price-fixing conspiracy and withheld material facts regarding the true cause of price increases. Defendants' conduct had the capacity to deceive consumers and misled consumers into believing that increased prices were caused by non-conspiratorial circumstances.

686.   Defendants' unlawful conduct substantially affected Hawaii's trade and commerce.

687.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and members of the Hawaii Class have been injured and are threatened with further injury.

688.   Defendants' continued violations of the law comprise a repeated pattern and course of conduct that provide an exception to the applicable statute of limitations.   Defendants also affirmatively misled Plaintiff by wrongfully concealing the facts alleged herein giving rise to the unlawful conduct.   Plaintiff had neither actual nor constructive knowledge of the facts giving rise to her claims until July 23, 2015, and exercised due diligence in attempting to discover such facts.

689.   By reason of the foregoing, Plaintiff and members of the Hawaii Class are entitled to seek all forms of relief available under Haw. Rev. Stat. §§ 480, *et seq.*

690.   Concurrent with the filing of this complaint, Plaintiff and her counsel have served required materials upon the Hawaii Attorney General pursuant to H.R.S. § 480-13.3.

## THIRTY-THIRD CLAIM FOR RELIEF

**Violation of the Massachusetts Consumer Protection Act,**
**Mass. Gen. Laws ch. 93A § 1, *et seq.***
**(By Plaintiffs Scott Caldwell, Sundé Daniels, and Elizabeth Perron**
**On Behalf of the Massachusetts Class)**

- 169 -

**FILED UNDER SEAL**

691.   Plaintiffs Scott Caldwell, Sundé Daniels, and Elizabeth Perron, on behalf of themselves and the Massachusetts Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

692.   By reason of the conduct alleged herein, Defendants have violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A § 2, *et seq.*

693.   Plaintiffs Scott Caldwell, Sundé Daniels, and Elizabeth Perron purchased Packaged Tuna within the State of Massachusetts during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

694.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna market, a substantial part of which occurred within Massachusetts.

695.   Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Packaged Tuna, a substantial part of which occurred within Massachusetts, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Packaged Tuna market.

696.   Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Massachusetts.

697.   Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

698.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Massachusetts Class have been injured in their business or property and are threatened with further injury.

699.   By reason of the foregoing, the Plaintiffs and the Massachusetts Class

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under Mass. Gen. Laws ch. 93A § 9.

700.   Pursuant to Mass. Gen. Laws ch. 93A § 9, Plaintiff Caldwell mailed to all Defendants on August 31, 2015, via certified mail, return receipt requested, Demand for Payment Letters which explained the unfair acts, the injury suffered, and requested relief from the Defendants. Plaintiff Caldwell has received a response to these letters from Defendant StarKist, but was unable to come to any agreement with StarKist.  Plaintiff Caldwell has received no response from the other Defendants.

701.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, Defendants concealed the existence of their unlawful conduct through the affirmative actions alleged herein with an intent to deceive the Massachusetts Plaintiffs and Class as to the nature of their actions.  Plaintiffs did not know and reasonably could not have known the facts alleged giving rise to Defendants' unlawful conduct.   As a result, this cause of action did not accrue until July 23, 2015.

702.   Pursuant to Mass. Gen. Laws ch. 93A § 9, Plaintiff Daniels mailed to all Defendants on September 3, 2015, and again on October 2, 2015, via certified mail, return receipt requested, Demand for Payment Letters which explained the unfair acts, the injury suffered, and requested relief from the Defendants. Plaintiff Daniels has received a response to these letters from Defendant StarKist, but was unable to come to any agreement with StarKist.  Plaintiff Daniels has received no response from the other Defendants.

## THIRTY-FOURTH CLAIM FOR RELIEF
**Violation of the Michigan Consumer Protection Act**
**Mich. Comp. Laws Ann. § 445.901, *et seq*.**
**(By Plaintiffs Louise Adams, and Barbara Olson**
**On Behalf of the Michigan Class)**

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

703.   Plaintiffs Louise Adams, and Barbara Olson, on behalf of themselves and the Michigan Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

704.   By reason of the conduct alleged herein, Defendants have violated Mich. Comp. Laws Ann. § 445.901, *et seq.*

705.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within Michigan.

706.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Packaged Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Michigan.

707.   Defendants' conduct was conducted with the intent to deceive Michigan consumers regarding the nature of Defendants' actions within the stream of Michigan commerce.

708.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Michigan.

709.   Defendants' conduct misled consumers, withheld material facts, and took advantage of Plaintiffs and Class members' inability to protect themselves.

710.   Defendants' unlawful conduct substantially affected Michigan's trade and commerce.

711.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and members of the Michigan Class have been injured in their business or property and are threatened with further injury.

712.   Defendants wrongfully concealed the facts alleged herein giving rise to the unlawful conduct and through their affirmative arrangements and

- 172 -

**FILED UNDER SEAL**

contrivances preventing discovery of such unlawful conduct until July 23, 2015.

713.   By reason of the foregoing, the Plaintiffs and the Michigan Class are entitled to seek all forms of relief available under Mich. Comp. Laws Ann. § 445.911.

### THIRTY-FIFTH CLAIM FOR RELIEF
**Violation of the Minnesota Consumer Fraud Act,**
**Minn. Stat. § 325F.68, *et seq.***
**(By Plaintiffs Laura Childs and Robert Etten**
**On Behalf of the Minnesota Class)**

714.   Plaintiffs Laura Childs and Robert Etten, on behalf of themselves and the Minnesota Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

715.   By reason of the conduct alleged herein, Defendants have violated Minn. Stat. § 325F.68, *et seq.*

716.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

717.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the Packaged Seafood Market.

718.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

719.   Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

720.   Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL

721.   Defendants' conduct was willful.

722.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

723.   Defendants wrongfully concealed the facts alleged herein giving rise to the unlawful conduct through the fraudulent and intentional acts described herein and Minnesota Plaintiffs could not have reasonable discovered the concealment of Defendants' unlawful conduct until July 23, 2015.

724.   By reason of the foregoing, the Plaintiffs and the members of the Minnesota Class are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, *et seq.* and applicable case law.

**THIRTY-SIXTH CLAIM FOR RELIEF**
**Violation of the Missouri Merchandising Practices Act,**
**Mo. Ann. Stat. § 407.010, *et seq.***
**(By Plaintiffs John Frick, Steven Kratky, Amber Sartori, and**
**Rebecca Lee Simoens On Behalf of the Missouri Class)**

725.   Plaintiffs John Frick, Steven Kratky, Amber Sartori, and Rebecca Lee Simoens on behalf of themselves and the Missouri Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

726.   Plaintiffs and members of the Missouri Class purchased Packaged Tuna during the Class Period for personal, family, or household purposes.

727.   By reason of the conduct alleged herein, Defendants have violated Missouri's Merchandising Practices Act (the "MMPA"), specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . ."

**FILED UNDER SEAL**

728.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna Market, a part of which occurred within Missouri.

729.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Packaged Tuna Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a part of which occurred within Missouri.

730.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

731.   Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff and the members of the Missouri Class concerning Defendants' unlawful activities.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and the members of the Missouri Class as they relate to the cost of Packaged Tuna they purchased.

732.   Defendants misrepresented the real cause of prices increases and/or the absence of price reductions in Packaged Tuna by making public statements that were not in accord with the facts.

733.   Defendants' statements and conduct concerning the price of Packaged Tuna were deceptive as they had the tendency or capacity to mislead Plaintiff and the members of the Missouri Class to believe that they were purchasing Packaged Tuna at prices established by a free and fair market.

734.   Defendants' unlawful conduct substantially affected Missouri commerce.

735.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Missouri Class suffered ascertainable loss of money or property.

736.   Defendants wrongfully concealed the facts alleged herein giving rise

- 175 -

**FILED UNDER SEAL**

to their unlawful conduct.  As alleged herein, until July 23, 2015, Defendants affirmatively and successfully concealed their unlawful conduct which prevented the Missouri Plaintiffs and the Class from discovering Defendants' unlawful conduct.   As a result of this fraudulent concealment, this cause of action did not accrue until July 23, 2015.

737.   Accordingly, Plaintiffs and members of the Missouri Class seek all relief available under the MMPA, specifically Mo. Rev. Stat. § 407.020, as further interpreted by Title 15 of the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025 which provides for the relief sought in this count.

## THIRTY-SEVENTH CLAIM FOR RELIEF
### Violation of the Nebraska Consumer Protection Act,
### Neb. Rev. Stat. § 59-1602, *et seq.*
### (By Plaintiffs Melissa Bowman and Barbara Buenning
### On Behalf of the Nebraska Class)

738.   Plaintiffs Melissa Bowman and Barbara Buenning, on behalf of themselves and the Nebraska Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

739.   By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. § 59-1602, *et seq.*

740.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within Nebraska.

741.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Packaged Tuna Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

742.   Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendants' actions within the stream of Nebraska commerce.

743.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

744.   Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs and Class members' ability to protect themselves.

745.   Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

746.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiff and the members of the Nebraska Class have been injured in their business or property and are threatened with further injury.

747.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.   As alleged herein, the Defendants affirmatively concealed their unlawful conduct which prevented Nebraska Plaintiffs from reasonably discovering the claim before the statute of limitations expired.   As a result, Defendants" unlawful conduct was neither obvious nor discoverable during the limitations period.   This cause of action did not accrue until July 23, 2015 when the Plaintiffs knew, or in the exercise of reasonable diligence, should have known about the Defendants' unlawful conduct.

748.   By reason of the foregoing, Plaintiff and members of the Nebraska Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1614.

### THIRTY-EIGHTH CLAIM FOR RELIEF
**Violation of the Nevada Deceptive Trade Practices Act,**
**Nev. Rev. Stat. § 598.0903, *et seq.***
**(By Plaintiffs Nay Alidad and Nancy Stiller**

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

**On Behalf of the Nevada Class)**

749.   Plaintiffs Nay Alidad and Nancy Stiller, on behalf of themselves and the Nevada Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

750.   By reason of the conduct alleged herein, Defendants have violated Nev. Rev. Stat. § 598.0903, *et seq.*

751.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

752.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Packaged Tuna Market.

753.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

754.   Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

755.   Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

756.   Defendants' conduct was willful.

757.   As a direct and proximate cause of Defendants' unlawful conduct, the members of the Nevada Class have been injured in their business or property and are threatened with further injury.

758.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, the Nevada Plaintiffs did not discover and could not have discovered by the exercise of reasonable diligence Defendants' unlawful conduct.

**FILED UNDER SEAL**

759.   By reason of the foregoing, the Nevada Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

## THIRTY-NINTH CLAIM FOR RELIEF
**Violation of the New Hampshire Consumer Protection Act,
N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, *et seq.*,
(By Plaintiffs Jessica Bartling, Jody Cooper, and Rob Skaff
On Behalf of the New Hampshire Class)**

760.   Plaintiffs Jessica Bartling, Jody Cooper, and Rob Skaff, on behalf of themselves and the New Hampshire Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

761.   By reason of the conduct alleged herein, Defendants have violated N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, *et seq.*

762.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within New Hampshire.

763.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Packaged Tuna Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

764.   Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of Defendants' actions within the stream of New Hampshire commerce.

765.   Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

766.   Defendants' conduct was willful and knowing.

767.   Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiff and Class members' ability to protect themselves.

768.   Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

769.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the New Hampshire Class have been injured in their business or property and are threatened with further injury.

770.   Defendants fraudulently concealed the essential facts alleged here giving rise to their unlawful conduct.   Until July 23, 2015, New Hampshire Plaintiffs did not discover and could not have discovered in the exercise of reasonable diligence either Defendants' unlawful conduct or the facts giving rise to such conduct.

771.   By reason of the foregoing, the Plaintiffs and the members of the New Hampshire Class are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

## FORTIETH CLAIM FOR RELIEF
### Violation of the New Mexico Unfair Practices Act,
### N.M. Stat. Ann. §§ 57-12-3, *et seq.*
### (By Plaintiffs Kathy Durand (formerly Gore) and Laura Montoya
### On Behalf of the New Mexico Class)

772.   Plaintiffs Kathy Durand (formerly Gore) and Laura Montoya, by themselves and on behalf of the New Mexico Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

773.   By reason of the conduct alleged herein, Defendants have violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

774.   Defendants entered into a contract, combination, or conspiracy

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna market, a substantial part of which occurred within New Mexico.

775.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Packaged Tuna Market.

776.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

777.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of the Class.

778.   Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

779.   Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico class members and the price paid by them for Packaged Tuna as set forth in N.M. Stat. Ann. § 57-12-2E.

780.   Defendants' conduct was willful.

781.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the New Mexico Class have been injured in their business or property and are threatened with further injury.

782.   Defendants knew that their conduct was unlawful and wrongfully concealed the facts alleged here giving rise to their unlawful conduct.  Until July 23, 2015, New Mexico Plaintiffs did not know and could not have known in the exercise of reasonable diligence either Defendants' unlawful conduct or the facts giving rise to such conduct.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

783.   By reason of the foregoing, Plaintiffs and members of the New Mexico Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

## FORTY-FIRST CLAIM FOR RELIEF
### Violation of the North Carolina Unfair Trade and Business Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.*
### (By Plaintiffs Corey Norris, Audra Rickman, and Amber Sartori On Behalf of the North Carolina Class)

784.   Plaintiffs Corey Norris, Audra Rickman, and Amber Sartori, on behalf of themselves and the North Carolina Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

785.   By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat. § 75-1.1, *et seq.*

786.   Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within North Carolina.

787.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

788.   Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

789.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of the Class.

790.   Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

791.   Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer

- 182 -

**FILED UNDER SEAL**

injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

792.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

793.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, the North Carolina Plaintiffs did not know and could not have learned or discovered by the exercise of due care about Defendants' unlawful conduct.

794.   By reason of the foregoing, the Plaintiffs and the members of the North Carolina Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 75-16.

### FORTY-SECOND CLAIM FOR RELIEF
**Violation of the North Dakota Unfair Trade Practices Law,**
**N.D. Cent. Code § 51-10, *et seq.***
**(By Plaintiffs Tya Hughes and Bonnie Vander Laan**
**On Behalf of the North Dakota Class)**

795.   Plaintiffs Tya Hughes and Bonnie Vander Laan, on behalf of themselves and the North Dakota Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

796.   By reason of the conduct alleged herein, Defendants have violated N.D. Cent. Code § 51-10-01, *et seq.*

797.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

798.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within North Dakota, for the purpose of

- 183 -

**FILED UNDER SEAL**

1   controlling, fixing, or maintaining prices in the Packaged Tuna Market.

2   799.   Defendants' conduct was unfair, unconscionable, or deceptive within

3   the conduct of commerce within the State of North Dakota.

4   800.   Defendants' conduct amounted to a fraudulent or deceptive act or

5   practice committed by a supplier in connection with a consumer transaction.

6   801.   Defendants' unlawful conduct substantially affected North Dakota's

7   trade and commerce.

8   802.   Defendants' conduct was willful.

9   803.   Defendants wrongfully concealed the facts alleged herein giving rise

10   to their unlawful conduct.  Until July 23, 2015, North Dakota Plaintiffs did not

11   discover and could not have discovered by exercise of reasonable diligence

12   Defendants' unlawful conduct.  Until July 23, 2015, North Dakota Plaintiffs had

13   neither actual nor constructive notice of the facts alleged herein giving rise to

14   Defendants' unlawful conduct.

15   804.   As a direct and proximate cause of Defendants' unlawful conduct, the

16   Plaintiff and the members of the North Dakota Class have been injured in their

17   business or property and are threatened with further injury.

18   805.   By reason of the foregoing, the Plaintiffs and the members of the

19   North Dakota Class are entitled to seek all forms of relief, including damages and

20   injunctive relief under N.D. Cent. Code § 51-10-06.

21   **FORTY-THIRD CLAIM FOR RELIEF**
**Violation of the Oregon Unlawful Trade Practices Act,**
22   **Or. Rev. Stat. § 646.605,** *et seq.*
23   **(By Plaintiffs Danielle Johnson and Liza Milliner**
24   **On Behalf of the Oregon Class)**

25   806.   Plaintiffs Danielle Johnson and Liza Milliner, on behalf of themselves

26   and the Oregon Class, repeat and reassert each of the allegations contained in

27   paragraphs 1 to 401 as if fully set forth herein.

28

**FILED UNDER SEAL**

807.   By reason of the conduct alleged herein, Defendants have violated Or. Rev. Stat. § 646.608, *et seq.*

808.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within Oregon.

809.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Packaged Tuna Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

810.   Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendants' actions within the stream of Oregon commerce.

811.   Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

812.   Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiff and class members' ability to protect themselves.

813.   Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

814.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Oregon Class have been injured in their business or property and are threatened with further injury.

815.   By reason of the foregoing, the Plaintiffs and the members of the Oregon Class are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.

816.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, Oregon Plaintiffs did not discover

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

and could not have discovered with reasonable diligence either the facts alleged or Defendants' unlawful conduct.

817.   Pursuant to section 646.638 of the Oregon Unlawful Trade Practices Act, contemporaneously with the filing of this action, a copy of this Complaint is being served upon the Attorney General of Oregon.

## FORTY-FOURTH CLAIM FOR RELIEF
### Violation of Rhode Island Deceptive Trade Practices Act,
### R.I. Gen Laws § 6-13.1-1, *et seq.*
### (By Plaintiffs Katherine McMahon and Elizabeth Perron
### On Behalf of the Rhode Island Class)

818.   Plaintiffs Katherine McMahon and Elizabeth Perron, on behalf of themselves and the Rhode Island Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

819.   By reason of the conduct alleged herein, Defendants have violated R.I. Gen Laws § 6-13.1-1, *et seq.*

820.   Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

821.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within Rhode Island, for the purpose of controlling, fixing, or maintaining prices in the Packaged Tuna Market.

822.   Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

823.   Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

824.   Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

825.   Defendants' conduct was willful.

- 186 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

826.   Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Rhode Island Class concerning Defendants' unlawful activities, including the horizontal conspiracy and artificially-inflated prices for Packaged Tuna.

827.   Defendants' deception, including its affirmative misrepresentations and/or omissions concerning the price of Packaged Tuna, constitutes information necessary to Plaintiffs and members of the Rhode Island Class relating to the cost of Packaged Tuna purchased.

828.   Plaintiffs and members of the Rhode Island class purchased goods, namely Packaged Tuna, primarily for personal, family, or household purposes.

829.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Rhode Island Class have been injured in their business or property and are threatened with further injury.

830.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, Rhode Island Plaintiffs could not, in the exercise of reasonable diligence, have discovered the alleged facts or Defendants' wrongful conduct.

831.   By reason of the foregoing, Plaintiffs and the members of the Rhode Island Class are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. Gen Laws § 6-13.1-5.2.

## FORTY-FIFTH CLAIM FOR RELIEF
### Violation of the South Carolina Unfair Trade Practices Act,
### S.C. Code Ann. § 39-5-10 *et seq.*
### (By Plaintiff Gay Birnbaum on Behalf of the South Carolina Class)

832.   Plaintiff Gay Birnbaum, on behalf of herself and the South Carolina Class, repeats and reasserts each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

833.    Section 39-5-10 of the South Caroline Code prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

834.    Plaintiff Gay Birnbaum purchased Packaged Tuna from Defendants within the State of South Carolina during the Class Period.

835.    Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

836.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within South Carolina, for the purpose of controlling, fixing, or maintaining prices in the Packaged Tuna Market.

837.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

838.    Defendants' unlawful conduct substantially affected South Carolina's trade and commerce.

839.    Defendants' conduct was willful.

840.    Defendants deliberately failed to disclose material facts to Plaintiff and members of the South Carolina Class concerning Defendants' unlawful activities, including the horizontal conspiracy and artificially-inflated prices for Packaged Tuna.  Defendants' wrongful concealment of the facts alleged herein giving rise to the unlawful conduct meant that such facts were not and could not have been reasonably discovered by the diligence of Plaintiffs until July 23, 2015.

841.    Defendants' deception, including its affirmative misrepresentations and/or omissions concerning the price of Packaged Tuna, constitutes information necessary to Plaintiff and members of the South Carolina Class relating to the cost of Packaged Tuna purchased.

842.    As a direct and proximate cause of Defendants' unlawful conduct, the

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Plaintiffs and the members of the South Carolina Class have been ascertainably injured in their business or property and are threatened with further injury.

843.   By reason of the foregoing, Plaintiff and the members of the South Carolina Class are entitled to seek all forms of relief, including treble damages or and reasonable attorneys' fees and costs under S.C. Code Ann. § 39-5-140

844.   Pursuant to S.C. Code Ann. § 39-5-140(b), a copy of this complaint is being mailed to the South Carolina Attorney General in conjunction with its filing.

## FORTY-SIXTH CLAIM FOR RELIEF
**Violation of the South Dakota Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws § 37-24, *et seq.***
**(By Plaintiff Casey Christensen On Behalf of the South Dakota Class)**

845.   Plaintiff Casey Christensen, on behalf of herself and the South Dakota Class, repeats and reasserts each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

846.   By reason of the conduct alleged herein, Defendants have violated S.D. Codified Laws § 37-24-6.

847.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

848.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within South Dakota, for the purpose of controlling, fixing, or maintaining prices in the Packaged Tuna Market.

849.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Dakota.

850.   Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

851.   Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

- 189 -

**FILED UNDER SEAL**

852.   Defendants' conduct was willful.

853.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiff and the members of the South Dakota Class have been injured in their business or property and are threatened with further injury.

854.   Defendants acted affirmatively to wrongfully conceal facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, South Dakota Plaintiffs had no actual or constructive notice of these concealed facts and did not discover and could not have discovered with reasonable diligence Defendants' unlawful conduct.

855.   By reason of the foregoing, Plaintiff and the members of the South Dakota Class are entitled to seek all forms of relief, including actual damages and injunctive relief under S.D. Codified Laws § 37-24-31.

**FORTY-SEVENTH CLAIM FOR RELIEF**
**Violation of the Utah Consumer Sales Practices Act,**
**Utah Code Ann. §§ 13-11-1, *et seq.***
**(By Plaintiffs Vivek Dravid and Tina Grant On Behalf of the Utah Class)**

856.   Plaintiffs Vivek Dravid and Tina Grant, on behalf of themselves and the Utah Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

857.   By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-11-1, *et seq.*

858.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna market, a substantial part of which occurred within Utah.

859.   Defendants are suppliers within the meaning of Utah Code Ann. §§ 13-11-3.

860.   Defendants established, maintained, or used a monopoly, or attempted

- 190 -

**FILED UNDER SEAL**

1   to establish a monopoly, of trade or commerce in the Relevant Markets, a

2   substantial part of which occurred within Utah, for the purpose of excluding

3   competition or controlling, fixing, or maintaining prices in the Packaged Tuna

4   Market.

5       861.   Defendants' conduct was unfair, unconscionable, or deceptive within

6   the conduct of commerce within the State of Utah.

7       862.   Defendants' conduct and/or practices were unconscionable and were

8   undertaken in connection with consumer transactions.

9       863.   Defendants knew or had reason to know that their conduct was

10  unconscionable.

11      864.   Defendants' conduct misled consumers, withheld material facts, and

12  resulted in material misrepresentations to Plaintiff and members of the Class.

13      865.   Defendants' unlawful conduct substantially affected Utah's trade and

14  commerce.

15      866.   As a direct and proximate cause of Defendants' unlawful conduct, the

16  Plaintiffs and the members of the Utah Class have been injured in their business or

17  property and are threatened with further injury.

18      867.   Defendants wrongfully concealed the facts alleged herein giving rise

19  to the their unlawful conduct.  Until July 23, 2015, Utah Plaintiffs did not discover

20  and could not have reasonably discovered their claim.

21      868.   By reason of the foregoing, the Plaintiffs and the members of the Utah

22  Class is entitled to seek all forms of relief, including declaratory judgment,

23  injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5)

24  and 13-11-20.

### FORTY-EIGHTH CLAIM FOR RELIEF
**Violation of the Utah Unfair Practices Act,**
**Utah Code All. §§ 13-5-1, *et seq.***
**(By Plaintiffs Vivek Dravid and Tina Grant On Behalf of the Utah Class)**

- 191 -

**FILED UNDER SEAL**

869.   Plaintiffs Vivek Dravid and Tina Grant, on behalf of themselves and the Utah Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

870.   By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-5-1, *et seq.*

871.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna market, a substantial part of which occurred within Utah.

872.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Packaged Tuna Market.

873.   Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

874.   Defendants' unlawful conduct substantially affected Utah's trade and commerce.

875.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

876.   Defendants wrongfully concealed the facts alleged herein giving rise to the their unlawful conduct.  Until July 23, 2015, Utah Plaintiffs did not discover and could not have reasonably discovered their claim.

877.   By reason of the foregoing, the Plaintiffs and the members of the Utah Class is entitled to seek all forms of relief, including actual damages or $2000 per Utah Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5-14, *et seq.*

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

### FORTY-NINTH CLAIM FOR RELIEF
**Violation of the Vermont Consumer Fraud Act,**
**Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.***
**(By Plaintiffs Stephanie Gipson and Jennifer A. Nelson**
**On Behalf of the Vermont Class)**

878. Plaintiffs Stephanie Gipson and Jennifer A. Nelson, on behalf of themselves and the Vermont Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

879. Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, inter alia, unfair methods competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. Vt. Stat. Ann. Tit. 9 § 2453(a).

880. One such unfair method of competition is through collusion, defined as agreeing, contracting, combining or conspiring to engage in price fixing, market division and/or allocation of goods, constituting unfair competition in the commerce of Packaged Tuna. Vt. Stat. Ann. Tit. 9, § 2451a(h).

881. Plaintiffs Stephanie Gipson and Jennifer A. Nelson purchased Packaged Tuna within the State of Vermont during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

882. Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this Complaint. Vt. Stat. Ann. Tit. 9, § 2465(b).

883. Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Vt. Stat. Ann. Tit. 9, § 2453, *et seq.*

884. Defendants wrongfully concealed the facts alleged herein giving rise

- 193 -

**FILED UNDER SEAL**

to their unlawful conduct.  As a result, the objective facts necessary to put the Vermont Plaintiffs and the Class on notice of such facts was not available until July 23, 2015.  As a result, the period prior to the discovery of this unlawful conduct should be excluded in determining the time limited for the commencement of this action.

885.  Plaintiffs and members of the Class were injured with respect to purchases of Packaged Tuna in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

**FIFTIETH CLAIM FOR RELIEF**
**Violation of the Virginia Consumer Protection Act,**
**Va. Code Ann. § 59.1-196, *et seq.***
**(By Plaintiffs Andrew Gorman, Marissa Jacobus, and Elizabeth Twitchell**
**On Behalf of the Virginia Class)**

886.  Plaintiff Andrew Gorman, Marissa Jacobus, and Elizabeth Twitchell, on behalf of themselves and the Virginia Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

887.  By reason of the conduct alleged herein, Defendants have violated Va. Code Ann. § 59.1-196, *et seq.*

888.  Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Packaged Tuna market, a substantial part of which occurred within Virginia.

889.  Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Packaged Tuna Market, a substantial part of which occurred within Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Packaged Tuna Market.

890.  Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Virginia.

**FILED UNDER SEAL**

891.   Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

892.   Defendants' unlawful conduct substantially affected Virginia's trade and commerce.

893.   Defendants' conduct was willful.

894.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Virginia Class have been injured in their business or property and are threatened with further injury.

895.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, Defendants concealed the existence of their unlawful conduct through their affirmative acts of misrepresentation with the intent to debar and deter the Virginia Plaintiffs and Class from discovering the facts alleged giving rise to Defendants' unlawful conduct.  The unlawful nature of Defendants' conduct is of character which involved moral turpitude.   As a result, the time of Defendants' obstruction should not be counted as any part of the period within which the action must brought.

896.   By reason of the foregoing, the Plaintiff and the members of the Virginia Class is entitled to seek all forms of relief, including treble damages or $1000 per violation, whichever is greater, plus reasonable attorneys' fees and costs under Va. Code Ann. § 59.1-204(A), *et seq.*

<u>**FIFTY-FIRST CLAIM FOR RELIEF**</u>
**Violation of the West Virginia Consumer Credit and Protection Act,**
**W. Va. Code § 46A-6-101, *et seq.***
**(By Plaintiffs Diana Mey and Jade Canterbury**
**On Behalf of the West Virginia Class)**

897.   Plaintiffs Diana Mey and Jade Canterbury, on behalf of themselves and the West Virginia Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

898.   The violations of federal antitrust law set forth above also constitute violations of Sections 46A-6-101, *et seq.* of the West Virginia Code.

899.   During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of  W. Va. Code § 46A-6-101, *et seq.*

900.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act and the West Virginia Consumer Credit and Protection Act.

901.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the West Virginia Class have been injured in their business and property in that they paid more for Packaged Tuna than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Sections 46A-6-104 of the West Virginia Consumer Credit and Protection Act, Plaintiffs and members of the West Virginia Class seek actual damages or $200 per violation, whichever is greater, pursuant to Section 46A-6-106 of the West Virginia Code.

902.   Pursuant to Section 46A-6-106(c) of the West Virginia Code, Plaintiff Jade Canterbury provided notice to Defendants in the manner specified under the Code on September 25, 2015, which was twenty (20) days or more prior to the addition of this claim.  Plaintiff has not received an offer to cure as of the date of this filing.

903.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, West Virginia Plaintiffs did not discover and could not in the exercise of reasonable diligence have discovered the alleged concealed facts or Defendants' wrongful conduct.

## <u>UNJUST ENRICHMENT</u>

No. 15-MD-2670 JLS (MMD)

FILED UNDER SEAL

904. The following Fifty-second through Seventy-seventh Claims for Relief are pleaded in the alternative to each of the other claims in this Complaint save the Sherman Act claim and the Cartwright Act claim.

## FIFTY-SECOND CLAIM FOR RELIEF
### (By Plaintiffs Ana Gabriela Felix Garcia, Tina Grant, Tya Hughes, John Pels, and Erica Rodriguez On Behalf of the Arizona Class)

905. Plaintiffs Ana Gabriela Felix Garcia, Tina Grant, Tya Hughes, John Pels, and Erica Rodriguez, on behalf of themselves and the Arizona Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

906. Plaintiffs Ana Gabriela Felix Garcia, Tina Grant, Tya Hughes, John Pels, and Erica Rodriguez purchased Packaged Tuna within the State of Arizona during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

907. Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Arizona at prices that were more than they would have been but for Defendants' actions.

908. Defendants have been enriched by revenue resulting from unlawful overcharges for Defendants' Packaged Tuna.

909. Plaintiffs and Class members have been impoverished by the overcharges for Defendants' Packaged Tuna resulting from Defendants' unlawful conduct.

910. Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct preventing Arizona plaintiffs from reasonably

- 197 -

**FILED UNDER SEAL**

discovering the claim during the limitations period.  This cause of action did not accrue until July 23, 2015 when the plaintiffs knew or in the exercise of reasonable diligence should have known about the Defendants' unlawful conduct.

911.   Defendants' enrichment and Plaintiffs' impoverishment are connected.  Defendants have paid no consideration to any other person for any benefits they received from Plaintiffs and Class Members.

912.   There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and Class members' impoverishment, because Plaintiffs and Class members paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

913.   Plaintiffs and Class members have no remedy at law.

## FIFTY-THIRD CLAIM FOR RELIEF

**(In the Alternative, By Plaintiffs Mary Hudson, Tya Hughes, Amy Jackson, Michael Juetten, Rick Musgrave, and John Pels
On Behalf of the California Class)**

914.   Plaintiffs Mary Hudson, Tya Hughes, Amy Jackson, Michael Juetten, Rick Musgrave, and John Pels for themselves and on behalf of the California Class, repeat and reallege each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

915.   Plaintiffs Mary Hudson, Tya Hughes, Amy Jackson, Michael Juetten, Rick Musgrave, and John Pels purchased Packaged Tuna within the State of California during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

916.   Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in California at prices that were more than they would have been but for Defendants' actions.

- 198 -

**FILED UNDER SEAL**

917.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct preventing California Plaintiffs in the exercise of due diligence from uncovering the unlawful conduct.   The applicable statute of limitations is tolled until July 23, 2015 until the Plaintiffs, by the exercise of reasonable diligence, should have discovered it.

918.   Plaintiffs and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class members.

## FIFTY-FOURTH CLAIM FOR RELIEF
### (By Plaintiffs Ana Gabriela Felix Garcia, and Andrew Gorman On Behalf of the District of Columbia Class)

919.   Plaintiffs Ana Gabriela Felix Garcia, and Andrew Gorman for themselves and on behalf of the District of Columbia Class, repeat and reallege each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

920.   Plaintiffs Ana Gabriela Felix Garcia, and Andrew Gorman purchased Packaged Tuna within the District of Columbia during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

921.   Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Class Members.

922.   Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in the District of Columbia at prices that were more than they would have been but for Defendants' actions.

923.   Plaintiffs and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class members.

- 199 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

924.   Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and Class Members.

925.   Defendants wrongfully concealed the facts alleged herein giving rise to the unlawful conduct by the affirmative actions described herein which were designed to prevent the discovery of such unlawful conduct and the Plaintiffs in the District of Columbia did not discover and could not discover the unlawful conduct prior to July 23, 2015.

926.   Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

## FIFTY-FIFTH CLAIM FOR RELIEF

**(In the Alternative, By Plaintiff Gloria Emery on Behalf of the Hawaii Class)**

927.   Plaintiff Gloria Emery for herself and on behalf of the Hawaii Class, repeats and realleges each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

928.   Plaintiff Gloria Emery purchased Packaged Tuna within the State of Hawaii during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

929.   Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff and Class Members.

930.   Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in the State of Hawaii at prices that were more than they would have been but for Defendants' actions.

931.   Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

economic detriment of Plaintiffs and Class members.

932.  Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiff and Class Members.

933.  Defendants wrongfully and continually concealed the facts alleged herein giving rise to their unlawful conduct with the intent to deceive Plaintiff. Plaintiff did not know and could not have known about Defendants' unlawful conduct until July 23, 2015.

934.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

935.  In the absence of other applicable claims for relief, Plaintiff Gloria Emery and the Hawaii Class have no adequate remedy at law against Defendants.

**FIFTY-SIXTH CLAIM FOR RELIEF**
**(By Plaintiffs Carla Lown and Jennifer A. Nelson**
**On Behalf of the Iowa Class)**

936.  Plaintiffs Carla Lown and Jennifer A. Nelson, on behalf of themselves and the Iowa Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

937.  Plaintiffs Carla Lown and Jennifer A. Nelson purchased Packaged Tuna within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

938.  Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Iowa at prices that were more than they would have been but for Defendants' actions.

939.  Defendants have been enriched by revenue resulting from unlawful overcharges for Defendants' Packaged Tuna, which revenue resulted from

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit.

940. Defendants' enrichment has occurred at the expense of Plaintiffs and Class members.

941. Defendants wrongfully concealed the facts alleged herein giving rise to the unlawful conduct. Defendants' unlawful conduct was not reasonably discovered until July 23, 2015.

942. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

<u>**FIFTY-SEVENTH CLAIM FOR RELIEF**</u>
**(By Plaintiffs Brian Depperschmidt and Lisa Hall**
**On Behalf of the Kansas Class)**

943. Plaintiffs Brian Depperschmidt and Lisa Hall, on behalf of themselves and the Kansas Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

944. Plaintiffs Brian Depperschmidt and Lisa Hall purchased Packaged Tuna within the State of Kansas during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

945. Defendants unlawfully overcharged end payers, who made of Defendants' Packaged Tuna in Kansas at prices that were more than they would have been but for Defendants' actions.

946. Plaintiffs and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class members.

947. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and Class Members.

948. Defendants were unjustly enriched at the expense of Plaintiffs and

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Class members.

### FIFTY-EIGHTH CLAIM FOR RELIEF
**(By Plaintiffs Scott Caldwell, Sundé Daniels, and Elizabeth Perron
On Behalf of the Massachusetts Class)**

949.   Plaintiffs Scott Caldwell, Sundé Daniels, and Elizabeth Perron, on behalf of themselves and the Massachusetts Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

950.   Plaintiffs Scott Caldwell, Sundé Daniels, and Elizabeth Perron purchased Packaged Tuna within the State of Massachusetts during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

951.   Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Massachusetts at prices that were more than they would have been but for Defendants' actions.

952.   Plaintiffs and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class members.

953.   Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and Class members.

954.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, Defendants concealed the existence of their unlawful conduct through the affirmative actions alleged herein with an intent to deceive the Massachusetts Plaintiffs and Class as to the nature of their actions.  Plaintiffs did not know and reasonably could not have known the facts alleged giving rise to Defendants' unlawful conduct.   As a result, this cause of action did not accrue until July 23, 2015.

955.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class members. Fairness

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

and good conscience require that Defendants not be permitted to retain the revenue resulting from their unlawful overcharges at the expense of Plaintiffs and Class members.

### FIFTY-NINTH CLAIM FOR RELIEF
**(By Plaintiffs Louise Adams, and Barbara Olson
On Behalf of the Michigan Class)**

956.   Plaintiffs Louise Adams, and Barbara Olson, on behalf of themselves and the Michigan Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

957.   Plaintiffs Louise Adams, and Barbara Olson purchased Packaged Tuna within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

958.   Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Michigan at prices that were more than they would have been but for Defendants' actions.

959.   Plaintiffs and Class members have conferred a direct economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges paid by Plaintiffs and the Class members and accepted and retained by Defendants, to the economic detriment of Plaintiffs and Class members.

960.   Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and Class members.

961.   Defendants wrongfully concealed the facts alleged herein giving rise to the unlawful conduct and through their affirmative arrangements and contrivances preventing discovery of such unlawful conduct until July 23, 2015.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

962.   Defendants were unjustly enriched at the expense of Plaintiffs and Class members.

### SIXTIETH CLAIM FOR RELIEF
### (By Plaintiffs Laura Childs and Robert Etten
### On Behalf of the Minnesota Class)

963.   Plaintiffs Laura Childs and Robert Etten, on behalf of themselves and the Minnesota Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

964.   Plaintiffs Laura Childs and Robert Etten purchased Packaged Tuna within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

965.   Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Minnesota at prices that were more than they would have been but for Defendants' actions.

966.   Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiff and Class members. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and Class members.

967.   Defendants wrongfully concealed the facts alleged herein giving rise to the unlawful conduct through the fraudulent and intentional acts described herein and Minnesota Plaintiffs could not have reasonable discovered the concealment of Defendants' unlawful conduct until July 23, 2015.

968.   It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiff and Class members.

### SIXTY-FIRST CLAIM FOR RELIEF
### (By Plaintiff Christopher Todd On Behalf of the Mississippi Class)

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

969.   Plaintiff Christopher Todd, on behalf of himself and the Mississippi Class, repeats and reasserts each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

970.   Plaintiff Christopher Todd purchased Packaged Tuna within the State of Mississippi during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

971.   Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Mississippi at prices that were more than they would have been but for Defendants' actions.

972.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  As alleged herein, the Defendants actively concealed their unlawful conduct which prevented Mississippi plaintiffs from reasonably discovering the claim during the limitations period.   This cause of action did not accrue until July 23, 2015 when the Plaintiffs knew, or in the exercise of reasonable diligence, should have known about the Defendants' unlawful conduct.

973.   Defendants retained the benefit of overcharges received on the sales of Defendants' Packaged Tuna, which in equity and good conscience belong to Plaintiffs and Class members on account of Defendants' anticompetitive conduct.

## SIXTY-SECOND CLAIM FOR RELIEF
### (By Plaintiffs John Frick, Steven Kratky, Amber Sartori, and Rebecca Lee Simoens On Behalf of the Missouri Class)

974.   Plaintiffs John Frick, Steven Kratky, Amber Sartori, and Rebecca Lee Simoens, on behalf of themselves and the Missouri Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

975.   Plaintiffs John Frick, Steven Kratky, Amber Sartori, and Rebecca Lee Simoens purchased Packaged Tuna within the State of Missouri during the Class Period.   But for Defendants' conduct set forth herein, the price per unit of

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Packaged Tuna would have been lower, in an amount to be determined at trial.

976.   Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Missouri at prices that were more than they would have been but for Defendants' actions.

977.   Plaintiffs and Missouri Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Missouri Class Members.

978.   Defendants appreciated the benefit bestowed upon them by Plaintiff and Missouri Class members.

979.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  As alleged herein, until July 23, 2015, Defendants affirmatively and successfully concealed their unlawful conduct which prevented the Missouri Plaintiffs and the Class from discovering Defendants' unlawful conduct.   As a result of this fraudulent concealment, this cause of action did not accrue until July 23, 2015.

980.   Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and Missouri Class members.

### SIXTY-THIRD CLAIM FOR RELIEF
**(By Plaintiffs Melissa Bowman and Barbara Buenning**
**On Behalf of the Nebraska Class)**

981.   Plaintiffs Melissa Bowman and Barbara Buenning, on behalf of themselves and the Nebraska Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

982.   Plaintiff Melissa Bowman and Barbara Buenning purchased Packaged Tuna within the State of Nebraska during the Class Period.  But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been

- 207 -

**FILED UNDER SEAL**

lower, in an amount to be determined at trial.

983.   Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Nebraska at prices that were more than they would have been but for Defendants' actions.

984.   Defendants received money from Plaintiffs and Class members as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.

985.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.   As alleged herein, the Defendants affirmatively concealed their unlawful conduct which prevented Nebraska Plaintiffs from reasonably discovering the claim before the statute of limitations expired.   As a result, Defendants" unlawful conduct was neither obvious nor discoverable during the limitations period.  This cause of action did not accrue until July 23, 2015 when the Plaintiffs knew, or in the exercise of reasonable diligence, should have known about the Defendants' unlawful conduct.

986.   In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and Class members.

## SIXTY-FOURTH CLAIM FOR RELIEF
### (By Plaintiffs Nay Alidad and Nancy Stiller
### On Behalf of the Nevada Class)

987.   Plaintiffs Nay Alidad and Nancy Stiller, on behalf of themselves and the Nevada Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

988.   Plaintiffs Nay Alidad and Nancy Stiller purchased Packaged Tuna within the State of Nevada during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

amount to be determined at trial.

989.   Defendants unlawfully overcharged end payers, who made purchases Defendants' Packaged Tuna in Nevada at prices that were more than they would have been but for Defendants' actions.

990.   Plaintiffs and Class members have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Defendants' Packaged Tuna.

991.   Defendants appreciated the benefits bestowed upon them by Plaintiffs and Class members, for which they have paid no consideration to any other person.

992.   Defendants have knowingly accepted and retained the benefits bestowed upon them by Plaintiffs and Class members.

993.   Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.   Until July 23, 2015, the Nevada Plaintiffs did not discover and could not have discovered by the exercise of reasonable diligence Defendants' unlawful conduct.

994.   The circumstances under which Defendants have accepted and retained the benefits bestowed upon them by Plaintiffs and Class members are inequitable in that they result from Defendants' unlawful overcharges for Defendants' Packaged Tuna.

## SIXTY-FIFTH CLAIM FOR RELIEF
### (By Plaintiffs Jessica Bartling, Jody Cooper, and Rob Skaff
### On Behalf of the New Hampshire Class)

995.   Plaintiffs Jessica Bartling, Jody Cooper, and Rob Skaff, on behalf of themselves and the New Hampshire Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein

996.   Plaintiffs Jessica Bartling, Jody Cooper, and Rob Skaff purchased Packaged Tuna within the State of New Hampshire during the Class Period. But

- 209 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

997.   Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in New Hampshire at prices that were more than they would have been but for Defendants' actions.

998.   Defendants have received a benefit from Plaintiffs and Class members in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.

999.   Defendants fraudulently concealed the essential facts alleged here giving rise to their unlawful conduct.   Until July 23, 2015, New Hampshire Plaintiffs did not discover and could not have discovered in the exercise of reasonable diligence either Defendants' unlawful conduct or the facts giving rise to such conduct.

1000. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

## SIXTY-SIXTH CLAIM FOR RELIEF

**(By Plaintiffs Kathy** Durand (formerly Gore) **and Laura Montoya On Behalf of the New Mexico Class)**

1001. Plaintiffs Kathy Durand (formerly Gore) and Laura Montoya, on behalf of themselves and the New Mexico Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

1002. Plaintiffs Kathy Durand (formerly Gore) and Laura Montoya purchased Packaged Tuna within the State of New Mexico during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

1003. Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in New Mexico at prices that were more than they

- 210 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

would have been but for Defendants' actions.

1004. Defendants have knowingly benefitted at the expense of Plaintiffs and Class members from revenue resulting from unlawful overcharges for Defendants' Packaged Tuna.

1005. Defendants knew that their conduct was unlawful and wrongfully concealed the facts alleged here giving rise to their unlawful conduct.  Until July 23, 2015, New Mexico Plaintiffs did not know and could not have known in the exercise of reasonable diligence either Defendants' unlawful conduct or the facts giving rise to such conduct.

1006. To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

## SIXTY-SEVENTH CLAIM FOR RELIEF
**(By Plaintiffs Corey Norris, Audra Rickman, and Amber Sartori**
**On Behalf of the North Carolina Class)**

1007. Plaintiffs Corey Norris, Audra Rickman, and Amber Sartori, on behalf of themselves and the North Carolina Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

1008. Plaintiffs Corey Norris, Audra Rickman, and Amber Sartori purchased Packaged Tuna within the State of North Carolina during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

1009. Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in North Carolina at prices that were more than they would have been but for Defendants' actions.

1010. Plaintiffs and Class members have conferred an economic benefit

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class members.

1011. Plaintiffs and Class members did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

1012. Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, the North Carolina Plaintiffs did not know and could not have learned or discovered by the exercise of due care about Defendants' unlawful conduct.

1013. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from Defendants' actions to fix, maintain and stabilize artificially high prices for Packaged Tuna on the market.

1014. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales and other business records.

1015. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

### SIXTY-EIGHTH CLAIM FOR RELIEF
**(By Plaintiffs Tya Hughes and Bonnie Vander Laan**
**On Behalf of the North Dakota Class)**

1016. Plaintiffs Tya Hughes and Bonnie Vander Laan, on behalf of themselves and the North Dakota Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

1017. Plaintiffs Tya Hughes and Bonnie Vander Laan purchased Packaged Tuna within the State of North Dakota during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1018. Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in North Dakota at prices that were more than they would have been but for Defendants' actions.

1019. Defendants, without justification, have been enriched at the direct impoverishment of Plaintiffs and Class members, in that Defendants have been enriched by revenue resulting from unlawful overcharges for Defendants' Packaged Tuna.

1020. Plaintiffs and Class members have been impoverished by the overcharges for Defendants' Packaged Tuna resulting from Defendants' unlawful conduct, and they have no legal means of retrieving the value of their impoverishment.

1021. Defendants' enrichment and Plaintiffs' and Class members' impoverishment are connected. Defendants have paid no consideration to any other person for any benefits they received directly or indirectly from Plaintiffs and Class Members.

1022. There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and Class members paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

1023. Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct. Until July 23, 2015, North Dakota Plaintiffs did not discover and could not have discovered by exercise of reasonable diligence Defendants' unlawful conduct. Until July 23, 2015, North Dakota Plaintiffs had neither actual nor constructive notice of the facts alleged herein giving rise to Defendants' unlawful conduct.

1024. Plaintiffs and Class members have no remedy at law.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

### SIXTY-NINTH CLAIM FOR RELIEF
**(By Plaintiffs Danielle Johnson and Liza Milliner**
**On Behalf of the Oregon Class)**

1025. Plaintiffs Danielle Johnson and Liza Milliner, on behalf of themselves and the Oregon Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

1026. Plaintiffs Danielle Johnson and Liza Milliner purchased Packaged Tuna within the State of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

1027. Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Oregon at prices that were more than they would have been but for Defendants' actions.

1028. Plaintiffs and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class members.

1029. Defendants were aware of the benefit bestowed upon them by Plaintiffs and Class members.

1030. Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct. Until July 23, 2015, Oregon Plaintiffs did not discover and could not discovered with reasonable diligence either the facts alleged or Defendants' unlawful conduct.

1031. It would be inequitable and unjust for Defendants to retain any of the overcharges for Packaged Tuna derived from Defendants' unfair conduct without compensating Plaintiffs and Class members.

### SEVENTIETH CLAIM FOR RELIEF
**(By Plaintiffs Katherine McMahon and Elizabeth Perron**

- 214 -

**FILED UNDER SEAL**

**On Behalf of the Rhode Island Class)**

1032. Plaintiffs Katherine McMahon and Elizabeth Perron, on behalf of themselves and the Rhode Island Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

1033. Plaintiffs Katherine McMahon and Elizabeth Perron purchased Packaged Tuna within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

1034. Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Rhode Island at prices that were more than they would have been but for Defendants' actions.

1035. Plaintiffs and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

1036. Defendants were aware of and/or recognized the benefit bestowed upon them by Plaintiffs and the Class members.

1037. Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, Rhode Island Plaintiffs could not, in the exercise of reasonable diligence, have discovered the alleged facts or Defendants' wrongful conduct.

1038. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class members.

## SEVENTY-FIRST CLAIM FOR RELIEF

### (By Plaintiff Gay Birnbaum on Behalf of the South Carolina Class)

1039. Plaintiff Gay Birnbaum for herself and on behalf of the South Carolina Class, repeats and realleges each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1040. Plaintiff Gay Birnbaum purchased Packaged Tuna with the State of South Carolina during the Class Period.  But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

1041. Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in the State of South Carolina at prices that were more than they would have been but for Defendants' actions.

1042. Plaintiff and Class members have conferred a non-gratuitous, economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class members.

1043. Defendants appreciated the benefits bestowed upon them by Plaintiff and Class Members, for which they have paid no consideration to any other person.

1044. Defendants deliberately failed to disclose material facts to Plaintiff and members of the South Carolina Class concerning Defendants' unlawful activities, including the horizontal conspiracy and artificially-inflated prices for Packaged Tuna.  Defendants' wrongful concealment of the facts alleged herein giving rise to the unlawful conduct meant that such facts were not and could not have been reasonably discovered by the diligence of Plaintiffs until July 23, 2015.

1045. It is inequitable for Defendants to accept and retain such benefits without compensating Plaintiff and Class Members.

### SEVENTY-SECOND CLAIM FOR RELIEF
**(By Plaintiff Casey Christensen On Behalf of the South Dakota Class)**

1046. Plaintiff Casey Christensen, on behalf of herself and the South Dakota Class, repeats and reasserts each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

1047. Plaintiff Casey Christensen purchased Packaged Tuna within the State of South Dakota during the Class Period. But for Defendants' conduct set forth

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

1048. Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in South Dakota at prices that were more than they would have been but for Defendants' actions.

1049. Plaintiff and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members.

1050. Defendants were aware of the benefit bestowed upon them by Plaintiff and Class members.

1051. Defendants acted affirmatively to wrongfully conceal facts alleged herein giving rise to their unlawful conduct.  Until July 23, 2015, South Dakota Plaintiffs had no actual or constructive notice of these concealed facts and did not discover and could not have discovered with reasonable diligence Defendants' unlawful conduct.

1052. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and Class members.

<u>**SEVENTY-THIRD CLAIM FOR RELIEF**</u>
**(By Plaintiffs Kirsten Peck, John Peychal, and John Trent
On Behalf of the Tennessee Class)**

1053. Plaintiffs Kirsten Peck, John Peychal, and John Trent, on behalf of himself and the Tennessee Class, repeats and reasserts each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

1054. Plaintiffs Kirsten Peck, John Peychal, and John Trent purchased Packaged Tuna within the State of Tennessee during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1   have been lower, in an amount to be determined at trial.

2       1055. Defendants unlawfully overcharged end payers, who purchased

3   Defendants' Packaged Tuna in Tennessee at prices that were more than they would

4   have been but for Defendants' actions.

5       1056. Plaintiffs and Class members have conferred an economic benefit

6   upon Defendants, in the nature of revenue resulting from unlawful overcharges to

7   the economic detriment of Plaintiff and Class Members.

8       1057. Defendants appreciated the benefits bestowed upon them by Plaintiffs

9   and Class Members, for which they have paid no consideration to any other person.

10       1058. It is inequitable for Defendants to accept and retain such benefits

11   without compensating Plaintiffs and Class Members.

12       1059. Defendants wrongfully and affirmatively concealed the facts alleged

13   herein giving rise to their unlawful conduct.   Despite exercising due diligence,

14   Plaintiffs did not have information sufficient to alert a reasonable person of the

15   need to investigate the injury, and were not able to discover evidence of their

16   claims of Defendants' unlawful conduct until July 23, 2015.

17       1060. The resellers from whom Plaintiffs and Class Members purchased

18   Defendants' Packaged Tuna were not involved in the conspiracy.   Plaintiff and

19   Class Members have no remedy against the innocent resellers under the theory of

20   unjust enrichment.

21   

**SEVENTY-FOURTH CLAIM FOR RELIEF**
**(By Plaintiffs Vivek Dravid and Tina Grant**
**On Behalf of the Utah Class)**

24       1061. Plaintiffs Vivek Dravid and Tina Grant, on behalf of themselves and

25   the Utah Class, repeat and reassert each of the allegations contained in paragraphs

26   1 to 401 as if fully set forth herein.

27       1062. Plaintiffs Vivek Dravid and Tina Grant purchased Packaged Tuna

28

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

1063. Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Utah at prices that were more than they would have been but for Defendants' actions.

1064. Plaintiffs and Class members have conferred a direct economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges paid by Plaintiffs and the Class members and accepted and retained by Defendants, to the economic detriment of Plaintiffs and Class members.

1065. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class members.

1066. Defendants wrongfully concealed the facts alleged herein giving rise to the their unlawful conduct.  Until July 23, 2015, Utah Plaintiffs did not discover and could not have reasonably discovered their claim.

1067. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members.

## SEVENTY-FIFTH CLAIM FOR RELIEF
### (By Plaintiffs Stephanie Gipson and Jennifer A. Nelson
### On Behalf of the Vermont Class)

1068. Plaintiffs Stephanie Gipson and Jennifer A. Nelson, on behalf of themselves and the Vermont Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

1069. Plaintiffs Stephanie Gipson and Jennifer A. Nelson purchased Packaged Tuna within the State of Vermont during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

1070. Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Vermont at prices that were more than they would have been but for Defendants' actions.

1071. Plaintiffs and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class Members.

1072. Defendants accepted the benefit bestowed upon them by Plaintiffs and Class members.

1073. Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct. As a result, the objective facts necessary to put the Vermont Plaintiffs and the Class on notice of such facts was not available until July 23, 2015. As a result, the period prior to the discovery of this unlawful conduct should be excluded in determining the time limited for the commencement of this action.

1074. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class members.

### SEVENTY-SIXTH CLAIM FOR RELIEF
**(By Plaintiffs Diana Mey and Jade Canterbury**
**On Behalf of the West Virginia Class)**

1075. Plaintiffs Diana Mey and Jade Canterbury, on behalf of themselves and the West Virginia Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

1076. Plaintiffs Diana Mey and Jade Canterbury purchased Packaged Tuna within the State of West Virginia during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

1077. Defendants unlawfully overcharged end payers, who made purchases

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

of Defendants' Packaged Tuna in West Virginia at prices that were more than they would have been but for Defendants' actions.

1078. Plaintiffs and Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class members.

1079. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Class members.

1080. Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct. Until July 23, 2015, West Virginia Plaintiffs did not discover and could not in the exercise of reasonable diligence have discovered the alleged concealed facts or Defendants' wrongful conduct.

1081. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class members.

## SEVENTY-SEVENTH CLAIM FOR RELIEF
### (By Plaintiffs Michael Juetten, Kathy Lingnofski, Julie Wiese, and Daniel Zwirlein On Behalf of the Wisconsin Class)

1082. Plaintiffs Michael Juetten, Kathy Lingnofski, Julie Wiese, and Daniel Zwirlein, on behalf of themselves and the Wisconsin Class, repeat and reassert each of the allegations contained in paragraphs 1 to 401 as if fully set forth herein.

1083. Plaintiffs Michael Juetten, Kathy Lingnofski, Julie Wiese, and Daniel Zwirlein purchased Packaged Tuna within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

1084. Defendants unlawfully overcharged end payers, who made purchases of Defendants' Packaged Tuna in Wisconsin at prices that were more than they would have been but for Defendants' actions.

1085. Plaintiffs and Class members have conferred an economic benefit

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class members.

1086. Defendants appreciated the benefit bestowed upon them by Plaintiffs and Class Members.

1087. Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct. Until July 23, 2015, Wisconsin Plaintiffs did not discover and could not in the exercise of reasonable diligence have discovered their injury or that Defendants' unlawful conduct likely caused such injury.

1088. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class members.

**PRAYER FOR RELIEF**

Accordingly, Plaintiffs, on behalf of themselves and the Classes of all others so similarly situated, respectfully requests that:

a)       The Court determine that each of the claims alleged in this Complaint may be maintained as a class action claims under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes once certified;

b)       The unlawful conduct alleged herein be adjudged and decreed in violation of the listed state antitrust laws, state consumer protection laws, and common law;

c)       Plaintiffs and the members of the Classes recover damages, to the maximum extent allowed under applicable state law, and that a joint and several judgment in favor of Plaintiffs and the members of such Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

d)     Plaintiffs and the members of the Classes recover damages, to the maximum extent allowed by applicable state law , in the form of restitution and/or disgorgement of profits unlawfully gained from them;

e)     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

f)     Plaintiffs and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

g)     Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law;

h)     Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs, on behalf of themselves and the Classes of all others similarly situated, hereby demand a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED: October 5, 2018                    **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:     _____*s/ Betsy C. Manifold*_____
                    BETSY C. MANIFOLD

BETSY C. MANIFOLD
RACHELE R. BYRD
750 B Street, Suite 2770

- 223 -

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

San Diego, CA 92101
Telephone:   619/239-4599
Facsimile:   619/234-4599
manifold@whafh.com
byrd@whafh.com

**WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLP**
FRED TAYLOR ISQUITH
THOMAS H. BURT
RANDALL S. NEWMAN
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:   212/545-4653
isquith@whafh.com
burt@whafh.com
newman@whafh.com

**WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLC**
CARL MALMSTROM
One South Dearborn St., Suite 2122
Chicago, IL 60603
Telephone: 312/984-0000
Facsimile:   312/212-4401
malmstrom@whafh.com

*Interim Lead Counsel for the End Payer
Plaintiffs*

**LOCKRIDGE GRINDAL NAUEN PLLP**
HEIDI M. SILTON
KAREN H. RIEBEL
100 Washington Ave. South
Minneapolis, MN 55401
Telephone: 612/339-6900
Facsimile:  612/339-0981
hmsilton@locklaw.com
khriebel@locklaw.com

**SHEPHERD FINKELMAN MILLER &
    SHAH LLP**
JAYNE GOLDSTEIN
1625 N, Commerce Pkwy, Suite 320
Telephone: 866/849-7545
Facsimile: 866/300-7367
jgoldstein@sfmslaw.com

- 224 -

**FILED UNDER SEAL**

**CASEY GERRY**
 **SCHENK FRANCAVILLA**
 **BLATT & PENFIELD LLP**
DAVID S. CASEY, JR.
GAYLE M. BLATT
JEREMY ROBINSON
CAMILLE GUERRA
110 Laurel Street
San Diego, CA 92101
Telephone: 619/238-1811
Facsimile:   619/544-9232
dcasey@cglaw.com
gmb@cglaw.com
jrobinson@cglaw.com
camille@cglaw.com

**PRITZKER LEVINE LLP**
ELIZABETH PRITZKER
BETHANY CARACUZZO
180 Grand Ave., Suite 1390
Oakland, CA 94612
Telephone: 415/692-0772
Facsimile: 415/366-6110
ecp@pritzkerlevine.com
sy@pritzkerlevine.com

**LEVI & KORSINSKY LLP**
NANCY KULESA
30 Broad St., 24th Floor
New York, NY 1004
Telephone: 212/363-7500
Facsimile: 212/363-7171
nkulesa@zlk.com

**ZOLL & KRANZ LLC**
MICHELLE KRANZ
6620 West Central Ave.
Suite 100
Toledo, OH 43617
Telephone: 419/841-9623
Facsimile: 419/841-9719
michelle@toledolaw.com

**GAINEY, McKENNA & EGLESTON**
THOMAS J. McKENNA
440 Park Avenue South
New York, NY 10016
Telephone: 212/983-1300
Facsimile: 212/983-0383
tjmckenna@gme-law.com

**THE OLIVER LAW GROUP PC**

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

ALYSON OLIVER
363 W. Big Beaver Rd., Suite 200
Troy, MI 48084
Telephone: 248/327-6556
Facsimile: 248/436-3385
aoliver@oliverlg.com

**BOTTINI & BOTTINI, INC.**
FRANCIS A. BOTTINI, JR.
7817 Ivanhoe Ave., Suite 102
La Jolla, CA 92037
Telephone: 858/914.2001
Facsimile: 858/914.2002
fbottini@bottinilaw.com

**ZIMMERMAN LAW OFFICES PC**
THOMAS A. ZIMMERMAN, JR.
MATTHEW C. DE RE
77 West Washington Street, Suite 1220
Chicago, IL 60602
Telephone: 312/440-0020
Facsimile: 312/440-4180
tom@attorneyzim.com
matt@attorneyzim.com

**LAURENCE D. PASKOWITZ, ESQ.**
208 East 51st St., Suite 380
New York, NY 10022
Telephone: 212/685.0969
Facsimile: 212/685.2306
lpaskowitz@pasklaw.com

**SUSAN A. BERNSTEIN**
200 Highland Avenue, Suite 306
Needham, MA 02494-3035
Telephone: 781/290-5858
Facsimile: 781/247-4266
susan@sabernlaw.com

**BAILEY GLASSER LLP**
ERIC B. SNYDER
KATHERINE E. CHARONKO
209 Capitol St.
Charleston, WV 25301
Telephone: 304/345-6555
Facsimile: 304/342-1110
esnyder@baileyglasser.com
kcharonko@baileyglasser.com

**STRAUS & BOIES, LLP**
TIMOTHY D. BATTIN
NATHAN M. CIHLAR

- 226 -

**FILED UNDER SEAL**

CHRISTOPHER V. LE
CARLA M. VOIGT
4041 Fairfax Drive, Fifth Floor
Fairfax, VA 22201
Telephone: 703/764-8700
Facsimile: 703/764-8704
tbattin@straus-boies.com
ncihlar@straus-boies.com
cle@straus-boies.com
cvoigt@straus-boies.com

**TRUMP, ALIOTO, TRUMP &
     PRESCOTT, LLP**
MARIO N. ALIOTO
LAUREN C. CAPURRO
2280 Union Street
San Francisco, CA 94123
Telephone: 415/563-7200
Facsimile: 415/346-0679
laurenrussell@tatp.com

**SANDIA CASCADE LEGAL GROUP,
     PLLC**
ROBERT TAYLOR-MANNING
1107 N. 60th Ave.
West Richland, WA  99353
Telephone:  206/310-3333
Facsimile:  206/206-299-4010
rtm@sandiacascadelaw.com

**STOLL BERNE LOKTING
     & SHLACHTER P.C.**
KEITH S. DUBANEVICH
STEVE D. LARSON
MARK A. FRIEL
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: 503/227-1600
Facsimile:  503/227-6840
kdubanevich@stollberne.com
slarson@stollberne.com
mfriel@stollberne.com

**LAW OFFICE OF JERALD M. STEIN**
JERALD M. STEIN
PO Box 1011
835 Main Street
Margaretville, NY 12455-1011
Telephone: 845/586-6111
Facsimile:  845/586-2815
jmsteinlaw@gmail.com

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

**SULLIVAN HILL**
DONALD G. REZ
550 West C Street, 15th Floor
San Diego, CA 92101
Telephone: 619/233-4100
Facsimile: 619/231-4372
rez@sullivanhill.com

**ZELLE LLP**
CHRISTOPHER T. MICHELETTI
JUDITH A. ZAHID
QIANWEI FU
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: 415/693-0700
Facsimile: 415/693-0770
cmicheletti@zelle.com
jzahid@zelle.com
qfu@zelle.com

**THE KRALOWEC LAW GROUP**
KIMBERLY A. KRALOWEC
KATHLEEN STYLES ROGERS
CHAD A. SAUNDERS
44 Montgomery Street, Suite 1210
San Francisco, CA 94104
Telephone: 415/546-6800
Facsimile: 415/546-6801
kkralowec@kraloweclaw.com
krogers@kraloweclaw.com
csaunders@kraloweclaw.com

**HULETT HARPER STEWART LLP**
KIRK B. HULETT
DENNIS STEWART
550 West C St., Suite 1500
San Diego, CA
Telephone: 619/338-1133
Facsimile: 619/338-1139
kbh@hulettharper.com
dstewart@hulettharper.com

**KIRBY MCINERNEY LLP**
ROBERT J. GRALEWSKI , JR.
600 B Street, Suite 1900
San Diego, CA  92101
Telephone:  619/398-6255
bgralewski@kmllp.com

**NICHOLAS AND TOMASEVIC**
CRAIG MCKENZIE NICHOLAS
ALEX M. TOMASEVIC

- 228 -

**FILED UNDER SEAL**

225 Broadway Suite 1900
San Diego , CA  92101
Telephon: 619/325-0492
Facsimile:  619/325-0496
cnicholas@nicholaslaw.org
atomasevic@nicholaslaw.org

**ADEMI & O'REILLY, LLP**
SHPETIM ADEMI
MARK ELDRIDGE
3620 East Layton Avenue
Cudahy , WI  53110
Telephone:  414/482-8000
sademi@ademilaw.com
meldridge@ademilaw.com

**FINKELSTEIN THOMPSON, LLP**
DOUGLAS G. THOMPSON, JR.
MICHAEL G. McLELLAN
James Place
1077 30th St, NW, Suite 150
Washington, DC 20007
Telephone:  202/337-8000
Facsimile:  202/337-8090
dthompson@finkelsteinthompson.com
mmclellan@finkelsteinthompson.com

**WILSON TURNER KOSMO LLP**
FREDERICK WILLIAM KOSMO, JR.
550 West C Street Suite 1050
San Diego , CA  92101-3532
Telephone:  619/236-9600
Facsimile:  619/236-9669
fkosmo@wilsonturnerkosmo.com

**BLOOD HURST & O'REARDON LLP**
TIMOTHY GORDON BLOOD
PAULA R. BROWN
THOMAS J. O'REARDON
701 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/338-1100
Facsimile:  619/338-1101
tblood@bholaw.com
pbrown@bholaw.com
toreardon@bholaw.com

**GUSTAFSON GLUEK PLLC**
DANIEL E. GUSTAFSON
DANIEL C. HEDLUND
Canadian Pacific Plaza
120 So. 6th St., Ste. 2600

No. 15-MD-2670 JLS (MMD)

**FILED UNDER SEAL**

Minneapolis , MN  55402
Telephone:  612/333-8844
Facsimile:  612/339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

**GROSS & KLEIN, LLP**
STUART GEORGE GROSS
The Embarcadero Pier 9, Suite 100
San Francisco , CA  94111
Telephone:  415/671-4628
Facsimile:  415/480-6688
sgross@grosskleinlaw.com

**SAFIRSTEIN METCALF LLP**
PETER G. SAFIRSTEIN
1250 Broadway, 27th Floor
New York, NY  10001
Telephone:  212/201-2855
psafirstein@safirsteinmetcalf.com

*Additional  Counsel  for  the  End  Payer
Plaintiffs*

SHELF.STABLE.SEAFOOD: 25070

- 230 -

No. 15-MD-2670 JLS (MMD)