REDACTED

Jonathan W. Cuneo
Joel Davidow
Blaine Finley
CUNEO, GILBERT & LADUCA, LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Tel: 202.789.3960
jonc@cuneolaw.com
joel@cuneolaw.com
bfinley@cuneolaw.com

Peter Gil-Montllor
Christian Hudson
CUNEO, GILBERT & LADUCA, LLP
16 Court Street, Suite 1012
Brooklyn, NY 11241
Tel: 202-789-3960
pgil-montllor@cuneolaw.com
christian@cuneolaw.com

*Interim Lead Counsel for Commercial Food Preparer Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | 3:15-md-02670-JLS-MDD **COMMERCIAL FOOD PREPARER PLAINTIFFS' FOURTH AMENDED COMPLAINT** **REDACTED** |
| This filing relates to the Commercial Food Preparer Class Action Track | **JURY TRIAL DEMANDED** |

Plaintiffs Capitol Hill Supermarket, Janet Machen, Thyme Café & Market, Simon-Hindi LLC, LesGo Personal Chef, Maquoketa Care Center, A-1 Diner, Francis T. Enterprises d/b/a Erbert & Gerbert's, Harvesters

1

REDACTED

Enterprises, LLC d/b/a Harvester's Seafood and Steakhouse, Dutch Village Restaurant,  Painted Plate Catering, GlowFisch Hospitality d/b/a Five Loaves Café,  Rushin Gold LLC d/b/a The Gold Rush, Erbert & Gerbert, Inc., Groucho's Deli of Raleigh, Sandee's Catering, Groucho's Deli of Five Points, and Confetti's Ice Cream Shoppe (collectively, "Plaintiffs"), by and through their undersigned attorneys, allege as follows. Other than those relating directly to Plaintiffs, all allegations herein are upon information and belief.

## NATURE OF THE ACTION

1.      Defendants Bumble Bee Foods LLC; Lion Capital LLP; Lion Capital (Americas), Inc.; Lion/Big Catch Cayman LP ("Big Catch"); Tri-Union Seafoods LLC; Thai Union Group Public Company Limited; Del Monte Corporation; StarKist Company ("StarKist"); and Dongwon Industries Co., Ltd. (collectively, "Defendants") include the largest producers of packaged seafood products in the United States. This action concerns a continuous conspiracy— which began at least by November of 2010 and the effects of which continued until at least December 31 of 2016—to fix prices for packaged tuna within the United States. The effects of the conspiracy—in the form of higher prices for packaged tuna caused by Defendants' collusion—continued until at least the end of 2016. The class period for the purposes of this Fourth Amended Complaint extends from June 1, 2011 until December 31, 2016 (the "Class Period").[1]

2.      During the conspiracy, Defendants agreed to various means of

---

[1] Plaintiffs' Third Amended Complaint, filed on April 18, 2018, included a class period extending back until 2004.  The Court permitted Plaintiffs to amend their complaints in a recent order on the Lion Capital Entities' Motion to Dismiss. *See* ECF No. 1358.  This Fourth Amended Complaint modifies the Class Period and other allegations herein to conform with the evidence collected in discovery and as reflected in Plaintiffs' Motion for Class Certification.

CFPs' FOURTH AMENDED COMPLAINT

REDACTED

eliminating competition, including, for example: ▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ As used

in this complaint, the term "packaged tuna" refers to shelf-stable skipjack,

albacore and yellowfin tuna products, typically in cans or pouches.

3.      The United States Department of Justice ("DOJ") is conducting a

criminal investigation of this conspiracy. In December 2016, the DOJ filed

criminal informations against Bumble Bee's Walter Scott Cameron and Kenneth

Worsham, charging them with a conspiracy to fix prices of packaged seafood,

including packaged tuna.

4.      Scott Cameron held senior sales positions at Bumble Bee since

May 2000 and facilitated Bumble Bee's agreement with Chicken of the Sea and

StarKist to increase prices. Cameron pleaded guilty on January 25, 2017.

5.      Kenneth Worsham ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Kenneth Worsham pleaded guilty on March 15, 2017.

6.      Finally, on May 8, 2017, hours before this complaint was filed, the

DOJ announced that Defendant Bumble Bee would plead guilty and pay a

criminal fine of at least $25,000,000 "in the first charges to be filed against a

corporation in the U.S. Department of Justice's ongoing antitrust investigation

into the seafood industry." The DOJ press release indicated that the fine would

**REDACTED**

rise to a maximum of $81,500,000 if Bumble Bee is sold to another entity under certain conditions.

7.      On May 30, 2017, the DOJ filed an Information against Steve Hodge ("Hodge"), a former Senior Vice-President of Sales for StarKist from May of 2010 to December of 2013. *See United States v. Hodge*, No. 17-CR-0297-EMC (N.D. Cal.). Hodge pled guilty to the charge on June 28, 2017, admitting that "from at least 2011 through at least 2013" he "participated in a conspiracy . . . to fix, raise, and maintain the prices of packaged seafood sold in the United States" by, among other things, "engag[ing] in conversations and discussions and attend[ing] meetings with representatives of other major packaged-seafood-producing-fims." *Id.*, ECF No. 13 (plea agreement).

8.      On May 15, 2018, the federal grand jury filed an Indictment against Bumble Bee's CEO Chris Lischewski ("Lischewski") in the U.S. District Court of the Northern District of California.  The Indictment asserts that Lischewski participated in meetings and communications with competitors and, among other things, agreed during those meetings and communications to restrain competition and fix and maintain prices of packaged tuna.  According to the Indictment, Lischewski knowingly joined in and participated in the conspiracy from at least November of 2010 to in or around December 2013.

9.      Plaintiffs, indirect purchasers of packaged tuna, have paid supracompetitive prices for packaged tuna as a direct result of Defendants' conspiracy. Plaintiffs bring this lawsuit as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of residents of jurisdictions which proscribe the Defendants' unlawful conduct, as described herein.  These jurisdictions include Arkansas, California, the District of Columbia, Florida,

REDACTED

Iowa, Maine, Minnesota, Mississippi, New York, North Carolina, South Carolina, Tennessee, and Wisconsin. Plaintiffs bring this lawsuit individually and on behalf of all persons and entities that indirectly purchased packaged tuna produced in packages of 40 ounces or more that were manufactured by any Defendant (or any current or former subsidiary or any affiliate thereof) and that were purchased directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco (other than inter-company purchases among these distributors) at any time between June 1, 2011 and December 31, 2016.

## JURISDICTION AND VENUE

10.     Plaintiffs seek damages, restitution, treble damages, disgorgement, other monetary relief, injunctive and other equitable relief under various state antitrust, consumer protection and unfair trade practices laws, and state unjust enrichment laws, as alleged specifically herein, as well as costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of Defendants' violations of those laws.

11.     This Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000, there are more than 100 members in the Class, and there are members of the Class who are citizens of different states than Defendants. This court also has supplemental subject matter jurisdiction under 28 U.S.C. § 1367 because of the federal claims raised by the Direct Action and Direct Purchaser class plaintiffs.

12.     Venue is proper in this Judicial District because (1) Defendants COSI and Bumble Bee each have their principal places of business within this District and (2) each Defendant transacts a substantial amount of business in this

REDACTED

District, and (3) each Defendant and the conduct alleged has affected, and continues to affect, a substantial amount of trade and commerce in this District.

## PARTIES

### Plaintiffs

13.     Plaintiff **Capitol Hill Supermarket** is a grocery and deli located in Washington, D.C. During the Class Period, Capitol Hill Supermarket indirectly purchased packaged tuna produced in packages of 40 ounces or more that were manufactured by one or more Defendant (or any current or former subsidiary or any affiliate thereof), and these purchases were made directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco. Capitol Hill Supermarket seeks to serve as class representative on behalf of the proposed class defined in the Fourth Amended Complaint.

14.     Plaintiff **Janet Machen** is a caterer located in Little Rock, Pulaski County, Arkansas. During the relevant period, Plaintiff Machen has purchased Defendants' packaged tuna from food distributors Sam's Club, Wal-Mart, and Kroger.

15.     Plaintiff **Thyme Café & Market** is a café and gourmet market located at 1630 Ocean Park Boulevard in Santa Monica, California. During the Class Period, Thyme Café & Market indirectly purchased packaged tuna produced in packages of 40 ounces or more that were manufactured by one or more Defendant (or any current or former subsidiary or any affiliate thereof), and these purchases were made directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco. Thyme Café seeks to serve as class representative on behalf of the proposed class defined in the Fourth Amended

REDACTED

Complaint.

16.     Plaintiff **Simon-Hindi LLC, d/b/a Simon's**, is a restaurant and catering company located at 501 1st Avenue, San Diego, California. During the Class Period, Simon-Hindi LLC indirectly purchased packaged tuna produced in packages of 40 ounces or more that were manufactured by one or more Defendant (or any current or former subsidiary or any affiliate thereof), and these purchases were made directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco. Simon-Hindi LLC seeks to serve as class representative on behalf of the proposed class defined in the Fourth Amended Complaint.

17.     Plaintiff **LesGo Personal Chef, LLC** is a caterer located in Mary Esther, Okaloosa County, Florida. The principal place of business is 1056 Bryn Mawr Boulevard, Mary Esther, Florida. During the relevant period, Plaintiff LesGo Personal Chef, LLC purchased Defendants' packaged tuna from food distributors Wal-Mart, Sysco and US Foods.

18.     Plaintiff **Maquoketa Care Center, Inc.**, is located at 1202 German Street in Maquoketa, Iowa. During the Class Period, Maquoketa Care Center, Inc. indirectly purchased packaged tuna produced in packages of 40 ounces or more that were manufactured by one or more Defendant (or any current or former subsidiary or any affiliate thereof), and these purchases were made directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco. Maquoketa Care Center, Inc. seeks to serve as class representative on behalf of the proposed class defined in the Fourth Amended Complaint.

19.     Plaintiff **A-1 Diner** is a restaurant located at 3 Bridge Street in Gardiner, Maine. During the Class Period, A-1 Diner indirectly purchased

REDACTED

packaged tuna produced in packages of 40 ounces or more that were manufactured by one or more Defendant (or any current or former subsidiary or any affiliate thereof), and these purchases were made directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco. A-1 Diner seeks to serve as class representative on behalf of the proposed class defined in the Fourth Amended Complaint.

20.    Plaintiff **Francis T. Enterprises** d/b/a Erbert & Gerbert's, operates sandwich shops in St. Cloud, Minnesota. During the Class Period, Francis T. Enterprises indirectly purchased packaged tuna produced in packages of 40 ounces or more that were manufactured by one or more Defendant (or any current or former subsidiary or any affiliate thereof), and these purchases were made directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco. Francis T. Enterprises seeks to serve as class representative on behalf of the proposed class defined in the Fourth Amended Complaint.

21.    Plaintiff **Harvesters Enterprises, LLC**, doing business as Harvester's Seafood and Steakhouse, is a restaurant located at 20735 Highway 12 in Lexington, Mississippi. During the relevant period, Plaintiff Harvesters Enterprises, LLC purchased Defendants' packaged tuna from food distributors..

22.    Plaintiff **Dutch Village Restaurant** is a restaurant located at 8729 East Main Street in Clymer, NY. During the relevant period, Plaintiff Dutch Village Restaurant purchased StarKist's packaged tuna from the food service distributor Maple Vale Farm, Inc. Plaintiff Dutch Village Restaurant purchased groceries, including StarKist's packaged tuna, on a weekly basis.

23.    Plaintiff **Painted Plate Catering** is a catering business located in Greensboro, North Carolina. During the relevant period, Painted Plate purchased

REDACTED

Defendants' packaged tuna products—specifically, Chicken of the Sea Chunk Light Tuna in 66.5 ounce cans—from food distributors including Sysco, Southern Foods, Pate Dawson, and Cheyney Brothers.

24. Plaintiff **GlowFisch Hospitality d/b/a Five Loaves Café** operates multiple cafés located in and around Charleston, South Carolina. During the relevant period, GlowFisch purchased Defendants' packaged tuna products from food distributors, including Costco, US Foods, PFG, and Sysco.

25. Plaintiff **Rushin Gold LLC d/b/a The Gold Rush** is a bar and restaurant located in Nashville, Tennessee. During the Class Period, Rushin Gold LLC indirectly purchased packaged tuna produced in packages of 40 ounces or more that were manufactured by one or more Defendant (or any current or former subsidiary or any affiliate thereof), and these purchases were made directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco. Rushin Gold seeks to serve as class representative on behalf of the proposed class defined in the Fourth Amended Complaint.

26. Plaintiff **Erbert & Gerbert's, Inc.** operates s sandwich shop in Eau Claire, Wisconsin. During the Class Period, Erbert & Gerbert's, Inc. indirectly purchased packaged tuna produced in packages of 40 ounces or more that were manufactured by one or more Defendant (or any current or former subsidiary or any affiliate thereof), and these purchases were made directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco. Erbert & Gerbert's Inc. seeks to serve as class representative on behalf of the proposed class defined in the Fourth Amended Complaint.

27. Plaintiff **Groucho's Deli of Raleigh** is a restaurant located in Raleigh, North Carolina. During the Class Period, Groucho's Deli of Raleigh

**REDACTED**

indirectly purchased packaged tuna produced in packages of 40 ounces or more that were manufactured by one or more Defendant (or any current or former subsidiary or any affiliate thereof), and these purchases were made directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco. Groucho's Deli of Raleigh seeks to serve as class representative on behalf of the proposed class defined in the Fourth Amended Complaint.

28.     Plaintiff **Sandee's Catering** is a bakery and deli that provides catering services and is located in Jamestown, New York. During the Class Period, Sandee's Catering indirectly purchased packaged tuna produced in packages of 40 ounces or more that were manufactured by one or more Defendant (or any current or former subsidiary or any affiliate thereof), and these purchases were made directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco. Sandee's Catering seeks to serve as class representative on behalf of the proposed class defined in the Fourth Amended Complaint.

29.     Plaintiff **Groucho's Deli of Five Points** is a restaurant located in Columbia, South Carolina. During the Class Period, Groucho's Deli of Five Points indirectly purchased packaged tuna produced in packages of 40 ounces or more that were manufactured by one or more Defendant (or any current or former subsidiary or any affiliate thereof), and these purchases were made directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco. Groucho's Deli of Five Points seeks to serve as class representative on behalf of the proposed class defined in the Fourth Amended Complaint.

30.     Plaintiff **Confetti's Ice Cream Shoppe** is a restaurant located in Jacksonville, Florida. During the Class Period, Confetti's Ice Cream Shoppe

**REDACTED**

indirectly purchased packaged tuna produced in packages of 40 ounces or more that were manufactured by one or more Defendant (or any current or former subsidiary or any affiliate thereof), and these purchases were made directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco. Confetti's Ice Cream Shoppe seeks to serve as class representative on behalf of the proposed class defined in the Fourth Amended Complaint.

**Defendants**

**Bumble Bee, Lion Capital, Lion Americas, and Lion/Big Catch Cayman**

11

**REDACTED**

1  ████████████

2  ██  ████████████████████████████

3  ██████████████████████████████████

4  ████████████████████████████████████

5  ███████████████████████████████████

6  ███████████████████████████████████

7  ████████████████████████████

8  █████████████████████████████████████

9  ███████████████████████████████████

10 ████████████████████████████████████

11 █████████████████████████████████████

12 ██████████████████████████████████

13 █████████████████████████████████

14 ████████████████████████████████████

15 █████████████████████████████████████

16 ████████████

17 ██  ████████████████████████████

18 _____

19  [2] On April 24, 2017, Plaintiffs served Lion Capital with a subpoena at its Los
Angeles address for information about its sale of Bumble Bee to TUG.
Following Bumble Bee's guilty plea, Plaintiffs served another subpoena on Lion
Capital on June 13, 2017, requesting information related to Bumble Bee's guilty
plea. Lion Capital made two productions of documents totaling 1,333 documents
(7,342 pages) on June 15 and August 4, 2017, and it recently made another
production of documents (6,715 pages) on October 4, 2017. From reviewing
only the two initial productions, Plaintiffs uncovered evidence that Lion Capital
took affirmative acts in furtherance of the conspiracy.

[3] Lion Capital's website states that in October of 2012, it "[r]elocated [its] North
American office from New York to Los Angeles."
http://www.lioncapital.com/about/#!overview.  Its current United States address
is the Los Angeles address indicated above.

CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

[4] *See Stone Lion Capital Partners, L.P. v. Lion Capital LLP*, No. 2013-1353, 2013 WL 6006296 (Fed. Cir. Nov. 1, 2013) ("Corrected Non-Confidential Brief of Appellee").

**REDACTED**

CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

15

**REDACTED**

16

**REDACTED**

17

REDACTED

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    46.    In light of the foregoing, when Plaintiffs refer in this Fourth

25

26    [5] This fee appears to have been waived during at least some of these periods.

27

28

**REDACTED**

Amended Complaint to acts done by either of the Lion Entities (Lion Capital or Lion Americas) in their allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish among the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them.  Thus, all Defendant entities within the corporate families were active, knowing participants in the alleged conspiracy.

CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

20

**REDACTED**

21

**REDACTED**

6 The DOJ left restitution for Bumble Bee's criminal conduct to the civil cases filed before this Court.

**REDACTED**

CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

24

**REDACTED**

[7] Although Lea is an officer of Lion Americas, Lion Americas has taken the position in this litigation that Lea is exclusively a Lion Capital employee, and as such, Lion Americas does not have custody or control over Lea's custodial files.

25

**REDACTED**

CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

27

**REDACTED**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

28

**REDACTED**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CFPs' FOURTH AMENDED COMPLAINT

28

**REDACTED**

**REDACTED**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[8] Lischewski e-mailed Cameron on January 17, 2012 to confirm that StarKist had announced its increase that day.  Cameron informed Lischewski that StarKist had already announced the price increase days earlier, and that Bumble Bee had already announced its own price increase following the StarKist pricing. Cameron already had a copy of StarKist's conspiracy price increase letter and forwarded the letter to Lischewski.

**REDACTED**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

33

**REDACTED**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CFPs' FOURTH AMENDED COMPLAINT

27

28

**REDACTED**

35

**REDACTED**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REDACTED

1

2

3

4

5

6        Furthermore, in light of the preceding

7 allegations, as well as others contained in this Fourth Amended Complaint,

8 Plaintiffs refer to acts done in furtherance of the alleged conspiracy by Lion

9 Americas, Lindberg, Chang, and/or Capps, those acts were undertaken on behalf

10 of Lion Capital and Lea.  When Lion Americas, Lindberg, Chang, and/or Capps

11 acted in furtherance of the alleged conspiracy, they did so on behalf of Lion

12 Capital and Lea.

13         **Chicken of the Sea Defendants: Tri-Union & Thai Union Group**

14      82.      Defendant Tri-Union Seafoods LLC **("Tri-Union")** is a Delaware

15 corporation with its principal place of business located at 9330 Scranton Road,

16 Suite 500, San Diego, California 92121.  Tri-Union sells the tuna brand

17 "Chicken of the Sea" and absorbed a former entity known as "Chicken of the

18 Sea International," and is therefore often referred to as "COSI." Tri-Union

19 produces and sells packaged tuna throughout the United States (including this

20 District).

21      83.      Defendant Thai Union Group **("TUG")** is a corporation organized

22 and doing business under the laws of Thailand. TUG is the world's largest

23 canned tuna producer, processing 18% of the world's production. It is also the

24 largest canned tuna producer in Thailand. Its head office is located at 72/1 Moo

25 7, Sethakit 1 Road, Tambon Tarsai, Mueang Samut Sakhon District.

26

27                             CFPs' FOURTH AMENDED COMPLAINT

28

REDACTED

84.     Since 2000, Tri-Union has been a wholly-owned subsidiary of Thai Union North America, Inc. ("TUNAI"), a California corporation with its principal place of business at 9330 Scranton Road, Suite 500, San Diego, California 92121. TUNAI, in turn, is a wholly-owned subsidiary of TUG. All three vertically-integrated companies have been led by Thiraphong Chansiri, who serves as the CEO and President of TUG, the President of TUNAI, and a Director of Tri-Union, at which Chansiri has a day-to-day leadership role. The Chansiri family is the largest single shareholder in TUG, owning approximate 25% of its stock during the relevant time period.

85.     TUG, through its wholly-owned subsidiary Tri-Union produces and sells packaged tuna throughout the United States (including this District). In recent years, 40% or more of its sales have originated in the United States, which is its largest market. TUG also purposefully directs its activities to the United States by exporting packaged tuna, including canned tuna, from Thailand to this country. Tri-Union is viewed by TUG as TUG's presence in the United States.

86.     TUG publicly acknowledges its dominance over Tri-Union. An organizational chart that appears on TUG's website depicts Tri-Union as part of TUG's overall "Global Tuna Business" and "US Ambient Operations," both of which fall directly under the control of TUG's Board of Directors and executives.  As set forth below, TUG directly participated in the conspiracy alleged herein and used its dominance and control over Tri-Union's packaged tuna business to conspire with the other Defendants and their co-conspirators.

87.     TUG has fully integrated Tri-Union into its global packaged tuna business. In 2007, Tri-Union's President, John Signorino, was replaced by

REDACTED

TUG's former Executive Director and Chief Financial Officer, Shue Wing Chan, who is both a member of the Chansiri family and of TUG's "Global Leadership Team." Prior to joining Tri-Union, Chan served as the CFO of TUG.[9] During Chicken of the Sea "Meetings of Managers," Chan was identified as present both as the President of COSI (in which role he presided over the meetings) and as a Director of TUG. Chan, as alleged throughout this Complaint, actively participated in the collusive activities described on behalf of both Tri-Union and TUG. On June 28, 2016, it was reported that Chan would leave Tri-Union and take up the role of the head of business development for TUNAI; his position at Tri-Union was filled by Valentin Ramirez, who also reports directly to TUG.

88.     Tri-Union's Board of Directors includes Kraisorn Chansiri (Chairman of TUG) and his son Thiraphong Chansiri (President and CEO of TUG) as well as Cheng Niruttinanon ("Niruttinanon") (Executive Chairman of TUG).  The Niruttinanon family is the third largest shareholder in TUG, owning 7.0% of its stock. A former Director of Tri-Union was Chan Tin King, the Executive Director and Chief Financial Officer of TUG.

89.     TUG exercises control and dominance over Tri-Union. Some examples are as follows. TUG held weekly "interdepartmental meetings" that Shue Wing Chan often attended telephonically, where it closely managed the packaged seafood business of Tri-Union.  Although based in San Diego, Tri-Union conducted Board Meetings and Manager Meetings at TUG's executive

---

[9] According to one report, as CFO of Thai Union, Shue Wing Chan "managed the [Thai Union] overall business development and financial operations, including day-to-day matters related to financial administration and business performance. He was responsible for managing the development and implementation of business plans and financial strategies for the expansion of [Thai Union's] business."

CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

offices in Thailand, requiring travel for TUG's convenience. In addition, TUG executives regularly attended meetings of the "Managers of Tri-Union Seafoods, LLC" in San Diego. In March 2006, these "Managers" included TUG's Cheng Niruttinanon (TUG Executive Director), Thiraphong Chansiri (President of TUG), and Shue Wing Chan (then-Director of TUG), all of whom attended a Manager's Meeting in San Diego.

90.     TUG's Thiraphong Chansiri ███████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████

91.     Internally, TUG and Tri-Union / COSI ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████

92.     TUG and its executives also participated directly in the alleged conspiracy. TUG████████████████████████████████

CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

93.     Due to the unlawful conduct alleged herein, Tri-Union earned in excess of what it would have earned in a competitive market.

As a result of these facts, considered alone or in combination, adherence to the fiction of the separate existence of TUG and Tri-Union / COSI would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over substance.

94.     Hereinafter, Tri-Union Seafoods LLC and Thai Union Group Public Company Limited are collectively referred to as Chicken of the Sea

CFPs' FOURTH AMENDED COMPLAINT

REDACTED

International, (**"COSI"**).

## StarKist Defendants: Starkist, Dongwon, & Del Monte

95.     Defendant StarKist Co. is a Delaware corporation with its principal place of business at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania 15212. From December 2002 until October 2008, StarKist was an operating segment of Del Monte Corporation, at which time it was sold to three members of the family-owned and managed Korean conglomerate Dongwon Group. After the purchase, StarKist became a majority-owned subsidiary of Dongwon Industries, and since September 23, 2012, StarKist has been a wholly-owned subsidiary of Dongwon Industries Co. Ltd. **("Dongwon")**.

96.     Defendant Del Monte Corporation **("Del Monte")**, now known as Big Heart Pet Brands, Inc., is a Delaware corporation with its principal place of business at 1 Strawberry Lane, Orrville, Ohio, 44667. Del Monte acquired StarKist in 2002. Through StarKist, Del Monte produced and sold packaged tuna throughout the United States (including in this District), its territories and the District of Columbia. On June 6, 2008, Del Monte entered into a contract to sell StarKist to Dongwon; the sale was completed on October 6, 2008. According to a filing by Del Monte with the Securities & Exchange Commission, "[a]t the time of sale, Del Monte entered into a two-year Operating Services Agreement (which was completed in September 2010) pursuant to which [Del Monte] provided operational services to Starkist Co. such as warehousing, distribution, transportation, sales, information technology and administration."

97.     Key StarKist executives also served as Del Monte executives during the time Del Monte owned and operated StarKist.

98.     As set forth below, Del Monte participated directly in various acts

43

**REDACTED**

in furtherance of the conspiracy during the time it owned and operated StarKist. During the Del Monte years, StarKist functioned as an operating segment of Del Monte and was not an independent company. Multiple Del Monte employees served dual roles in both StarKist and Del Monte, including in their direct participation in the improper exchange of competitive information and illegal agreements. For example,

99.     During Del Monte's ownership,

For example,

Dongwon & StarKist

100.    Before describing the interrelationship between StarKist Compny and Dongwon Industries, it is first necessary to explain briefly the concept of the Korean *chaebol*, which is a recognized concept in the academic business literature. *See, e,g*., the general discussions in David Hundt, *Korea's Developmental Alliance: State, Capital and the Politics of Rapid Development* (2009); R. M. Steers, K.S. Yoo, & G. Ungson, *The Chaebol: Korea's New Industrial Might* (1989); Jae Jean Suh, The Social and Political Networks of the

44

REDACTED

<u>Korean Capitalist Class</u>, *Asian Perspective*, Vol. 13 No. 2 (Fall-Winter 1989) at 116.

101.    The term "*chaebol*" is made up of the words "*chae*" (wealth or property and "*bol*" (clan or group). Chaebols are closely-knit business groups in South Korea under the control of a single family or extended family, with key flagship firms used as instruments of control over other firms within the group. Chaebols have four key features: (1) the governance structure of the group involves family or extended family control; (2) the formal organizational structure of the group involves a group headquarters, located in an actual or *de facto* holding company, sometimes known as a "flagship" company, which controls a network of subsidiaries, which fall under the control of the family, the group as a whole, and of flagship firms within the group; (3) the business of the firm encompasses a number of discrete products and services, some of which are wholly unrelated and others that are effectively vertically integrated; and (4) the group is characterized by strong internal cultures of familism and loyalty, with family members of the founder or his cohorts also occupying key managerial positions within the group.

102.    The Dongwon family of companies fits this definition. The company was created in 1969 by Chairman Jae-chul Kim ("J.C. Kim"), himself a fisherman, and is dominated by members of his family or extended family, as described in more detail below. The group headquarters is in Seoul, South Korea, where its holding company, Dongwon Enterprises, is located. Through its subsidiaries, it operates in a number of business sectors including, *inter alia*, marine products, other food products, feed products and pet food, packing materials, and aluminum foil products. ███████████████████

45

**REDACTED**

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████ In other words, as a *chaebol*, Dongwon does not follow the principles of corporate separateness that are expected of companies incorporated in the United States – it acts as a single integrated enterprise.

103.    With that in mind, Defendant Dongwon Industries Co., Ltd. (**"Dongwon"**) is a publicly traded company with its principal place of business at Dongwon Industries Building, 7th Floor, Mabang-ro 68 (Yangjae-dong), Seocho-gu, Seoul, South Korea. Dongwon Industries has annual packaged tuna revenue of approximately $1.4 billion. Dongwon has repeatedly availed itself of the jurisdiction of United States District Courts in filings as a plaintiff.

104.    Dongwon Group controls approximately 75% of the Korean canned tuna market. At the time of the StarKist acquisition, In-Gu Park, vice chairman of the Dongwon conglomerate's holding company, said "We believe that the acquisition of StarKist seafood will help Dongwon establish a strong foothold and penetration in the U.S. market." Park also stated that the deal was "a great

46

opportunity for us to initiate operations in the United States."

105.    StarKist regularly describes itself as a subsidiary of Dongwon Group and as a subsidiary of Dongwon Industries. Dongwon and StarKist used the same offices or locations in the United States.  Dongwon's website lists StarKist's U.S. office as one of its global branch offices

106.    Dongwon Industries controlled and supervised the business, operations, and activities of StarKist, including the conduct alleged in this Complaint, from at least October 2008 to the present.



107.    In 2012, Dongwon dismissed several StarKist executives and replaced them with executives from the Dongwon entities—

CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

108. Dongwon micromanaged StarKist's affairs and disregarded principles of corporate separateness with respect to StarKist.  Due to the unlawful conduct alleged in this complaint, StarKist charged supracompetitive prices, to the benefit of Dongwon. Due to the unlawful conduct alleged herein, StarKist Company earned profits in excess of what it would have earned in a competitive market. StarKist Company transferred its ill-gotten gain obtained through the alleged conspiracy to Dongwon, by paying out the unlawfully obtained profits and other conspiracy proceeds to Dongwon in the form of dividends and other transfer payments. For example, for each year between at least 2009 and 2015,

48

**REDACTED**

Dongwon directed StarKist Company to disburse a large portion of the conspiracy proceeds that the subsidiary received to Dongwon in South Korea. Between 2009 and 2015, Dongwon received more than $100,000,000 in conspiracy proceeds from StarKist Company. Accordingly, Dongwon knowingly profited from StarKist Company's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched. As a result of these facts, considered alone or in combination with one or more of the foregoing other facts, adherence to the fiction of the separate existence of Dongwon and StarKist Company would sanction a fraud or promote an injustice; and an inequitable result or an injustice would occur if the corporate form were elevated over substance. It would be inequitable for Dongwon to now hide behind the corporate veil for StarKist Company's actions under Dongwon's watch. Thus, StarKist Company is the agent, instrumentality, and *alter ego* of Dongwon.

109.    Once it acquired StarKist Company in June of 2008, Dongwon participated <u>directly</u> in the alleged conspiracy. █████████████████ As set forth below, Bumble Bee and StarKist continued to work together after Dongwon's purchase to keep prices in the

<div align="center">49</div>

**REDACTED**

1  packaged tuna market at collusive levels.

2      110.    Dongwon's ███████████████████████████

3  ████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  ████████████████████████████████████████████

7  ███████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ██████████████████████████████████████████████

10  ██████████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  ██████████

13      111.    Dongwon, including J.C. Kim and other senior Dongwon

14  executives, not only established policy and direction for StarKist, but was the

15  decision-maker concerning even routine matters at StarKist, and effectively took

16  over the performance of StarKist's day-to-day operations in carrying out that

17  policy and direction.  Further, because of the disregard of corporate separateness

18  and the lack of any meaningful distinction between the two companies, StarKist

19  employees that performed acts in furtherance of the conspiracy did so on behalf

20  of both Dongwon and StarKist (and Dongwon employees similarly acted on

21  behalf of both StarKist and Dongwon).

22

23  ──────────────
[10] Choe remained a Dongwon Enterprise employee, with a Dongwon title and a

24  Dongwon email address, until March 26, 2012, at which time he became a
StarKist employee. Choe nonetheless was so deeply involved in StarKist

25  management and strategy that as of the date of this Complaint, StarKist's own
website describes Choe (StarKist's current CEO and President) as having joined

26  StarKist in 2010.

27                                    CFPs' FOURTH AMENDED COMPLAINT

28

REDACTED

112.     Accordingly, Dongwon knowingly profited from StarKist's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched.  As a result of these facts, considered alone or in combination, adherence to the fiction of the separate existence of Dongwon and StarKist would promote an injustice, and an inequitable result would occur if the corporate form were elevated over substance.

113.     As used herein, "**StarKist**" collectively refers to Defendants StarKist, Del Monte (December 2002 until October 2010), and Dongwon (from October 2008 through the present).

## INTERSTATE TRADE AND COMMERCE

114.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payments and other documents essential to the sale of packaged tuna products in interstate commerce between and among offices of Defendants and their customers located throughout the United States, its territories, and the District of Columbia.

115.     Throughout the Class Period, Defendants transported substantial amounts of packaged tuna in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories, and the District of Columbia.

116.     Throughout the Class Period, Defendants' unlawful activities took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States, its territories, and the District of Columbia.

REDACTED

# RELEVANT MARKETS

117.     The relevant geographic market is the United States. The relevant product market is packaged tuna.  Defendants collectively control the U.S. market for packaged tuna and together account for nearly 80% of packaged tuna sales in the United States.  Unlike packaged tuna manufacturers and sellers located outside of the United States, Defendants have U.S. facilities, relationships and distribution assets in the United States that enable Defendants to avoid foreign product import tariffs and to effectively constrain prices for packaged tuna packed and sold in the United States.

118.     The market in the United States for packaged tuna is approximately $1.7 billion annually. Packaged tuna is sold nationwide to consumers in a few standard sizes and predominantly in standard grades.  Each brand's offerings compete with each other brand's comparable offerings.

119.     Canned tuna is regulated by the United States Department of Agriculture, at 21 C.F.R. § 161.190 (2016).  The regulations govern the species, parts, packaging, packing media, additives and flavoring, and labeling of canned tuna.

# FACTUAL ALLEGATIONS

## The packaged tuna industry

120.     Defendants are the three largest domestic manufacturers of packaged tuna, which is pre-cooked tuna sold in a can or pouch. StarKist, Bumble Bee, and COSI together account for about 80% of the tuna market, and the remaining share is divided among private label brands, typically associated with and distributed by a single retailer.  In December

**REDACTED**

of 2014, the *Wall Street Journal* reported that the Defendants' respective shares of the domestic market for canned tuna were 36% for StarKist, 25% for Bumble Bee, and 13% for COSI.  Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28%, and COSI at 20%.

121.    Packaged tuna is a commodity product. Although there are some exceptions to the rule, the albacore and yellowfin species of tuna are sold as such, and the product known simply as "tuna" is the skipjack species of tuna, which is not as threatened by overfishing and other stressors on marine life.

122.    Beginning in or about 2000, national demand for packaged tuna began to decline for numerous reasons.  Between 2000 and 2014, the U.S. average annual tuna consumption decreased from approximately 3.5 pounds per person per year to 2.4 pounds per person per year.

123.    In a competitive environment, a decline in demand will normally lead to a decline in price. However, because Defendants controlled the market and agreed with each other to fix the prices of packaged tuna, such prices were intentionally and collaboratively set at artificially high levels throughout the Class Period, and prices did not decline. Instead, while volume sales decreased, annual dollar sales of packaged seafood, around 70% of which is packaged tuna, increased. U.S. consumers on the whole were paying more for less. The following chart shows observed data through 2014 with projections thereafter.

CFPs' FOURTH AMENDED COMPLAINT

REDACTED



124.    Raw material costs do not explain the rising prices: the rising price of packaged tuna since 2007 has outpaced the price of its major component, skipjack tuna. Global catches of skipjack have been increasing since the early 90s and the debut of fish-aggregating devices ("FADs") together with purse-seining methods has caused skipjack oversupply and falling prices.

125.    The packaged seafood industry is tightly knit by family connections, employee swaps, and co-packing agreements. Within the past 20 years, numerous individuals have held executive or senior sales/marketing positions for more than one Defendant (while maintaining close relations with former colleagues), including, but not limited to:



CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**



126. Co-packing also brought Defendants together. Between the late 1990s and 2009, StarKist and COSI had a co-packing agreement concerning their facilities in American Samoa. During the class period, Bumble Bee and COSI also cooperated on seafood processing and packaging. Bumble Bee co-packed for COSI on the west coast in Bumble Bee's Santa Fe Springs, California plant, while COSI co-packed for Bumble Bee on the east coast at its Lyons, Georgia plant. These connections between Defendants facilitated trust and cooperation and made the conspiracy possible.

**Overview: the packaged tuna conspiracy**

127. At least as early as late 2010, Defendants COSI (including TUG),

CFPs' FOURTH AMENDED COMPLAINT

REDACTED

Bumble Bee and StarKist (at that time owned by Del Monte) participated in an anticompetitive horizontal cartel, perpetuated through organizations the Defendants themselves created, including the International Seafood Sustainability Foundation ("ISSF") and National Fisheries Institute ("NFI"). The conspiracy included communications by telephone and by email, in-person meetings of senior officials from each Defendant, and the sharing of sensitive pricing and sales information directly and through intermediaries.  For example, Defendants (a) agreements to raise list and/or net prices in 2011 and 2012; (b) an agreement to limit promotional or discount activity, which commenced in 2011 and continued for years; (c) other collusive conduct in the form of sharing confidential information by surreptitious means and having clandestine meetings of the top executives of the Defendants.  Defendants' horizontal collusion was intended to, and did, fix, raise, stabilize, and/or maintain the prices of packaged tuna sold to customers in the United States. The overarching scheme to fix prices began at least as early as late 2010. The following sections describe specific instances of collusion that illustrate the conspiracy.

**Collusion prior to 2011**

128.    Collusion regarding packaged tuna began or increased beginning in early 2008. The time period of 2008 though late 2010 included intermittent periods of collusion along with intermittent periods of competition.

**Collusion to increase prices in 2011**

129.    By late 2010, around the time that Lion Capital was acquiring Bumble Bee, the Defendants were regularly communicating with one another about the industry, including ways to improve the industry and combat negative trends.  In preparation for one such meeting, Bumble Bee's █████████

56

**REDACTED**

1

2

3

4

5       130.     Defendants colluded on price increases for packaged seafood

6   products, including tuna,

7

8

9

10

11       131.     Discussions about the forthcoming price increase occurred among

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CFPs' FOURTH AMENDED COMPLAINT

REDACTED



135.    StarKist announced its list price increases on March 2, 2011, with an effective date of May 30, 2011.

136.    Bumble Bee announced its list price increases on March 10, to take effect on May 29, 2011. COSI then announced a net price increase on May 17, 2011, effective June 1, 2011. COSI's increase,

137.    Dongwon's

**Collusion to increase prices in 2011 and 2012**

138.    In December 2011 and January 2012,

**REDACTED**

These competitor discussions led to an agreement or understanding that the Defendants would increase packaged tuna prices by nearly identical amounts,

139.   Plans for the increase were hatched between

140.   Pursuant to the plan, the Defendants announced collusive price increases as follows:

59

**REDACTED**

142.    The 2008-12 list price increases set benchmarks that affected all subsequent list prices of packaged tuna. However, the Defendants' collusion on prices did not stop after the March 2012 price increase.

**Collusion on reducing promotions**

144.    To ensure that their collusive tuna price increases would not erode, Defendants also agreed to limit promotions on such products. Commencing in at

REDACTED

least ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

145.    To preserve the prices that they had decided and implemented together, Defendants engaged in monitoring of discounts and promotions and policed one another. ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

**REDACTED**

By exchanging such information among high-level executives, the competitors were able to police whether each remained faithful to their overarching conspiracy.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

146.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claim for relief.

147.    Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least July of 2015. Indeed, the conspiracy was apparently only uncovered by the DOJ in the process of reviewing internal company documents relating to the proposed merger between COSI and Bumble Bee.

148.    Defendants engaged in a secret conspiracy and did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was an agreement to fix prices for packaged tuna.  By their very nature, price-fixing conspiracies are inherently self-concealing. Defendants agreed among themselves to conceal their unlawful conspiracy, including by agreeing not to discuss the conspiracy publicly and by other means of avoiding detection and maintaining secrecy, such as the use of personal e-mails and private telephone

REDACTED

calls, as described above. Accordingly, Plaintiffs could not have had either actual or constructive knowledge of the price fixing scheme until the public disclosure of the DOJ's criminal investigation.

149. Defendants avoided confirming or referencing their illegal agreement in writing, instead conducting most of their conspiratorial communications via direct conspirator-to-conspirator telephone calls, in-person meetings among the conspirators, and in-person and telephonic communications through Impress, the third-party facilitator.  These communications include the telephone conversations referenced in this complaint.

150. The guilty plea of Ken Worsham of Bumble Bee further raises the inference that the conspiracy was affirmatively concealed. Ken Worsham is the son of Robert "Bob" Worsham, who was a consultant for StarKist. ███

███

151. In connection with the 2011-12 price increases discussed above, COSI, StarKist, and Bumble Bee interacted mostly through telephonic communications or face-to-face meetings, as described above. As alleged above,

CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

152.    With respect to these various conspiratorial acts,

153.    While implementing the various collusive price increases, Defendants consistently gave pretextual public reasons for them, such as rising costs, a weakening United States dollar, or other factors. Examples of these pretextual statements include:

64

**REDACTED**



CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

154.     Defendants thus actively misled their customers about the price-fixing scheme. Their various justifications for price increases did not disclose that they had agreed among themselves to fix, raise and/or stabilize the price of packaged tuna.  Defendants' justifications for their price increases were also misleading, to the extent they were true even in part, because of their failure to disclose that the price increases in fact resulted from their illegal agreement and conspiracy.

155.     Additionally, as noted above, Defendants surreptitiously shared confidential information among themselves in furtherance of the conspiracy through surreptitious means, such ███████████████████ ████████████████████████████████████████ ████████████  Defendants' representatives also had meetings with each other at locations outside of their respective offices for the purpose of concealing their conspiracy.

156.     Finally, Lischewski took steps to conceal his own involvement (as well as Lion Capital's and Lion Americas' involvement) in the conspiracy. Although Bumble Bee produced millions of pages of documents to Plaintiffs in this case, crucial e-mails between Lischewski and Lion team members were not produced by Bumble Bee, and Plaintiffs did not obtain these documents until they executed a subpoena on Lion Capital.  Upon information and belief, Lischewski deleted these incriminating e-mails in an attempt to thwart Plaintiffs' (and DOJ's) investigation of his unlawful conduct.  Indeed, the Grand Jury investigating Defendants' conspiracy indicted Lischewski for his role in that conspiracy and the indictment expressly alleged that he deleted emails to conceal

REDACTED

his unlawful conduct.

157.     Because Defendants' communications, agreements, understanding and overall conspiracy were kept secret and camouflaged through fraudulent, pretextual statements, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for packaged tuna during the Class Period.

## CLASS ACTION ALLEGATIONS

158.     Plaintiffs bring claims asserted in this action on behalf of themselves and as class claims under Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), seeking damages pursuant to California's Cartwright Act on behalf of the following Class (or "Damages Class"):

> Food Service Product Class: All persons and entities in 27 named states and D.C., that indirectly purchased packaged tuna products produced in packages of 40 ounces or more that were manufactured by any Defendant (or any current or former subsidiary or any affiliate thereof) and that were purchased directly from DOT Foods, Sysco, US Foods, Sam's Club, Wal-Mart, or Costco (other than inter-company purchases among these distributors) from June, 2011 through December, 2016 (the "Class Period").[11]

159.     Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, all judges assigned to this matter, and all jurors

---

[11] In the alternative, Plaintiffs seek certification of a class of purchasers from 10 states and the District of Columbia. These jurisdictions include California, District of Columbia, Florida, Iowa, Maine, Minnesota, New York, North Carolina, South Carolina, Tennessee and Wisconsin.

CFPs' FOURTH AMENDED COMPLAINT

**REDACTED**

in this matter.

160.    The Class is so numerous that joinder of all members is impracticable.  While Plaintiffs do not know the exact number members of the Class, Plaintiffs believe there are at least thousands of members in the Class.

161.    Common questions of law and fact exist as to all members of the Class.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all members of the Class, thereby making appropriate relief with respect to each Class as a whole.  Such questions of law and fact common to the Class includes, but are not limited to:

(a)    Whether the Defendants and their co-conspirators engaged in a combination and conspiracy to fix, raise, maintain or stabilize the prices of packaged tuna sold in the United States and in each of the States alleged herein;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether Defendants' alleged conduct violated various state antitrust and restraint of trade laws;

(e)    Whether Defendants' alleged conduct violated various state consumer protection and unfair competition laws;

(f)    Whether the conduct of Defendants and co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Class;

(g)    The effect of Defendants' alleged conduct on the prices of packaged tuna sold in the United States during the Class Period; and

68

(h)     The appropriate relief for the Class, including injunctive and equitable relief.

162.     Each Plaintiff's claims are typical of the claims of the members of the Class each Plaintiff seeks to represent, and each Plaintiff will fairly and adequately protect the interests of the respective class such plaintiff seeks to represent.  Each of the Plaintiffs and all members of the Class that Plaintiffs seek to represent were similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices, for packaged tuna purchased indirectly from the Defendants and/or their co-conspirators, plus an additional cost imposed by distributors.

163.     Each Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of each of the Class that each Plaintiff seeks to represent. Each Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the respective Class that plaintiff seeks to represent.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

164.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

165.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without

REDACTED

the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

166.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## CAUSES OF ACTION

## (1)

## Violation of Section 16720 of the California Business and Professions Code (Cartwright Act)

*(on behalf of Plaintiffs and the* Illinois Brick *Repealer Cartwright Act Class)*

167.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 to 193 as if fully set forth herein.

168.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of California Business and Professions Code section 16700, *et seq.*

169.    The states and jurisdictions included in the *Illinois Brick* Repealer Cartwright Class (as defined in ¶ 204, *supra*) each allow indirect purchasers to recover on a similar theory applicable to the facts alleged in this Complaint,

70

REDACTED

which overwhelmingly took place within the State of California.

170.     Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of California Business and Professions Code section 16700, *et seq.* As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the *Illinois Brick* Repealer Cartwright Act Class have been injured in their business and property in that they paid more for packaged tuna than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of section 16720 of California Business and Professions Code, Plaintiffs and members of the *Illinois Brick* Repealer Cartwright Act Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 16750(a) of California Business and Professions Code.

### (2)

### Violations of State Antitrust Statutes

*(on behalf of Plaintiffs and the Damages Class)*

171.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

172.     Defendants entered into a continuing conspiracy in restraint of trade to fix, raise, maintain, and/or stabilize at artificial and non-competitive levels the prices of packaged tuna. The conspiracy began at least as early as July 1, 2004 and continued in force or effect to the present (May 8, 2017), the exact dates being unknown to Plaintiffs.

173.     In formulating and effectuating this conspiracy, Defendants performed acts in furtherance of the combination and conspiracy, including participating in meetings and conversations among themselves during which

**REDACTED**

they agreed to price packaged tuna at certain levels and otherwise to fix, increase, inflate, maintain, and/or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to packaged tuna sold in the United States.

174.    Defendants' anticompetitive, unfair acts described above were knowing and willful, and constituted violations of the below-listed state antitrust statutes. Defendants caused Plaintiffs injury-in-fact through their unlawful conspiracy, in the form of overcharges for the packaged tuna purchased indirectly by Plaintiffs.

175.    Each of the following state law claims is asserted by the named plaintiff(s) from the corresponding state, on behalf of all Damages Class members in that state.

176.    **California**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.* During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and/or maintain packaged tuna prices at supracompetitive levels. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants, the substantial terms of which were to fix, raise, maintain, and/or stabilize the prices of packaged tuna. For the purpose of forming and effectuating the unlawful trust, the Defendants have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above. The

REDACTED

combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of packaged tuna has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for packaged tuna sold by Defendants have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased packaged tuna from entities who purchased packaged tuna directly from Defendants have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for packaged tuna than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of § 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to § 16750(a) of the California Business and Professions Code.

177.   **District of Columbia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code §§ 28-4501, et seq. Defendants' combinations or conspiracies had the following effects: (1) Packaged tuna price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class who resided in the District of Columbia and/or purchased packaged tuna in the District of Columbia were deprived of free and open competition in the District

REDACTED

of Columbia; and (4) Plaintiffs and members of the Damages Class who resided in the District of Columbia and/or purchased packaged tuna in the District of Columbia paid supracompetitive, artificially inflated prices for packaged tuna in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

178.     **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout Iowa; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in

74

**REDACTED**

restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

179. **Maine**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Title 10, §§ 1101, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout Maine; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. 10, §§ 1101, *et seq.*

180. **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the

REDACTED

Damages Class who resided in Minnesota and/or purchased packaged tuna in Minnesota were deprived of free and open competition in Minnesota; and (4) Plaintiffs and members of the Damages Class who resided in Minnesota and/or purchased packaged tuna in Minnesota paid supracompetitive, artificially inflated prices in Minnesota for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minn. Stat. §325D.49, *et seq.*

181.    **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, et seq. Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class who resided in Mississippi and/or purchased packaged tuna in Mississippi were deprived of free and open competition in Mississippi; and (4) Plaintiffs and members of the Damages Class who resided in Mississippi and/or purchased packaged tuna in Mississippi paid supracompetitive, artificially inflated prices in Mississippi for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful

REDACTED

conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

182.     **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout New York; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class who resided in New York and/or purchased packaged tuna in New York were deprived of free and open competition in New York; and (4) Plaintiffs and members of the Damages Class who resided in New York paid supracompetitive, artificially inflated prices for packaged tuna when they purchased packaged tuna in New York, or purchased in New York packaged tuna that were otherwise of lower quality than would have been absent the conspirators' illegal acts, or were unable to purchase packaged tuna that they would have otherwise purchased absent the illegal conduct. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York

REDACTED

Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

183.    **North Carolina**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class who resided in North Carolina and/or purchased packaged tuna in North Carolina were deprived of free and open competition in North Carolina; and (4) Plaintiffs and members of the Damages Class who resided in North Carolina and/or purchased packaged tuna in North Carolina paid supracompetitive, artificially inflated prices in North Carolina for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the North Carolina Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the North Carolina Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

184.    **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101 *et seq.*

REDACTED

Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed and eliminated throughout Tennessee; (2) packaged tuna prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) plaintiffs and members of the Tennessee Class were deprived of free and open competition; and (4) plaintiffs and members of the Tennessee Class paid more for packaged tuna products than they otherwise would have in the absence of defendants' unlawful conduct.  During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Tennessee Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §47-25-101 *et seq*. Accordingly, plaintiffs and members of the Tennessee Class seek all relief available under Tenn. Code Ann. §47-25-101 *et seq*.

185.     **Wisconsin**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Wisconsin Class were deprived of free and open competition; and (4) Plaintiffs and members of the Wisconsin Class paid supracompetitive, artificially inflated prices for packaged tuna. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin

79

REDACTED

commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Wisconsin Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

186.    Plaintiffs' injuries are of the type the antitrust laws of the above states were designed to prevent and flowed from Defendants' unlawful conduct.

187.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

188.    Accordingly, Plaintiffs and the members of the Damages Class seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### (3)

### Violation of State Consumer Protection Statutes

*(on behalf of Plaintiffs and the Damages Class)*

189.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

190.    Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of

REDACTED

the state consumer protection and unfair competition statutes listed below.

191.    Defendants caused Plaintiffs and those similarly situated an injury-in-fact through their unlawful conspiracy, in the form of overcharges for the packaged tuna purchased indirectly by Plaintiffs.

192.    **Arkansas**: Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code § 4-88-101 *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels the prices at which packaged tuna products were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from plaintiffs and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

REDACTED

violation of Arkansas Code Annotated § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

193.    **California**: Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.* During the Class Period, Defendants committed acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above. During the Class Period, Defendants illegal conduct substantially affected California commerce and consumers. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged in this Class Action Complaint, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. The Defendants' conduct as alleged in this Class Action Complaint violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the violations of Section 16720, *et seq.*, of the California Business and Professions Code, as set forth above; Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent

REDACTED

acts, are otherwise unfair, unconscionable, unlawful, or fraudulent; Defendants'
acts or practices are unfair to purchasers of packaged tuna in the State of
California within the meaning of Section 17200, California Business and
Professions Code; and Defendants' unlawful conduct had the following effects:
(1) packaged tuna price competition was restrained, suppressed, and eliminated
throughout California; (2) packaged tuna prices were raised, fixed, maintained,
and/or stabilized at artificially high levels throughout California; (3) Plaintiffs
and members of the class who resided in California and/or purchased packaged
tuna in California were deprived of free and open competition in California; and
(4) Plaintiffs and members of the class who resided in California and/or
purchased packaged tuna in California paid supracompetitive, artificially inflated
prices in California for packaged tuna. Defendants' acts and practices are
unlawful, fraudulent, or deceptive within the meaning of Section 17200 of the
California Business and Professions Code. Plaintiffs and members of the class
are entitled to full restitution and/or disgorgement of all revenues, earnings,
profits, compensation, and benefits that may have been obtained by Defendants
as a result of such business acts or practices. The unlawful, fraudulent,
deceptive, and unfair business practices of Defendants, and each of them, as
described above, have caused and continue to cause Plaintiffs and the members
of the class to pay supracompetitive and artificially inflated prices for packaged
tuna. Plaintiffs and the members of the class suffered injury in fact and lost
money or property as a result of such unfair competition. The conduct of
Defendants as alleged in this Class Action Complaint violates Section 17200 of
the California Business and Professions Code. As alleged in this Class Action
Complaint, Defendants have been unjustly enriched as a result of their wrongful

REDACTED

conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

194.    **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq*. Defendants' unlawful conduct had the following effects: (1) packaged tuna price competition was restrained, suppressed and eliminated throughout Florida; (2) packaged tuna prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) plaintiffs and members of the Damages Class were deprived of free and open competition in the market for packaged tuna; and (4) plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for packaged tuna.  During the Class Period, defendants' illegal conduct substantially affected Florida commerce and consumers.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201 *et seq*., and, accordingly, plaintiffs and members of the Damages Class seek all relief available under that statute.

195.    **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North

**REDACTED**

Carolina Gen. Stat. § 75-1.1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the price at which packaged tuna were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and the members of the Damages Class. The conduct of the Defendants described in this Class Action Complaint constituted consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects upon purchasers in North Carolina: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and the members of the Damages Class who reside in North Carolina and/or purchased packaged tuna in North Carolina were deprived of free and open competition in North Carolina; and (4) Plaintiffs and the members of the Damages Class who resided in North Carolina and/or purchased packaged tuna in North Carolina paid supracompetitive, artificially inflated prices in North Carolina for packaged tuna. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named in this Class Action Complaint, directly, or indirectly and through affiliated they dominated and controlled, manufactured, sold, and/or distributed packaged tuna in North Carolina. Plaintiffs and the members of the

REDACTED

Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

196.     **South Carolina**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code §§ 39-5-10, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) packaged tuna price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) packaged tuna prices were raised, fixed, maintained, and/or stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for packaged tuna. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**(4)**

**REDACTED**

<div align="center">

**Unjust Enrichment**

**(on behalf of Plaintiffs and the Damages Class)**

</div>

197.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

198.    Plaintiffs from each of the following states in the Damages Class (Arkansas, California, the District of Columbia, Iowa, Minnesota, Mississippi, New York, North Carolina, South Carolina, Tennessee, Wisconsin) assert this cause of action on behalf of themselves and as representatives for all other class members of the same State, under the respective equity precedents and common law of each of the above-listed states. Plaintiffs plead this claim in the alternative to the aforementioned statutory remedies at law.

199.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, as a minimum, unlawfully inflated prices and unlawful profits of packaged tuna.

200.    Defendants have benefitted from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayment made by Plaintiffs and the members of the Damages Class for packaged tuna.

201.    Pursuit of any remedies against the entities from which Plaintiffs and the members of the Damages Class purchased packaged tuna subject to Defendants' conspiracy would have been futile, given that those entities did not take part in Defendants' conspiracy.

202.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and

<div align="center">87</div>

REDACTED

inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

C.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

     1.     An unreasonable restraint of trade or commerce in violation of the Cartwright Act;

     2.     A *per se* violation of the Cartwright Act;

     3.     An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition, unjust enrichment, and consumer protection laws as set forth herein;

D.     That Plaintiffs and the members of the Class recover damages to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

E.     That Plaintiffs and the members of the Class recover damages to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

88

REDACTED

F.      That Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

G.      That Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      That Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      That Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

CFPs' FOURTH AMENDED COMPLAINT

REDACTED

## **Demand For Jury Trial**

Plaintiffs, on behalf of themselves and the Class of all others similarly situated, hereby demand a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.


Dated: October 5, 2018

John H. Donboli (Cal. Bar No. 196266)
DEL MAR LAW GROUP, LLP
12250 El Camino Real, Suite 120
San Diego, CA 92130
Telephone: 858.793.6244
Facsimile: 858.793.6005
jdonboli@delmarlawgroup.com

Don Barrett
David McMullan
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Thomas P. Thrash
THRASH LAW FIRM, P.A.
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058

Respectfully submitted,

By /s/ Jonathan W. Cuneo

Jonathan W. Cuneo
Joel Davidow
Blaine Finley
CUNEO, GILBERT & LADUCA, LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Tel: 202.789.3960
jonc@cuneolaw.com
joel@cuneolaw.com
bfinley@cuneolaw.com

Peter Gil-Montllor
Christian Hudson
CUNEO, GILBERT & LADUCA, LLP
16 Court Street, Suite 1012
Brooklyn, NY 11241
Tel: 202-789-3960
pgil-montllor@cuneolaw.com
christian@cuneolaw.com

Armand Derfner
DERFNER & ALTMAN
575 King Street, Suite B
Charleston, SC 29403
Telephone: (843) 723-9804
aderfner@derfneraltman.com

90

REDACTED

Dewitt Lovelace
LOVELACE & ASSOCIATES, P.A.
12870 US Hwy 98 West Suite 200
Miramar Beach, FL  32550
Telephone: (850) 837-6020
dml@lovelacelaw.com

Shawn M. Raiter
LARSON KING LLP
30 East Seventh Street, Suite 2800
St. Paul, MN 55101
Telephone: (651) 312-6518
sraiter@larsonking.com

Arthur Bailey
ARTHUR N. BAILEY &
ASSOCIATES
111 West 2nd Street, Suite 1100
Jamestown, NY 14701
Telephone: (716) 664.2967
artlaw@windstream.net

Charles Barrett
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: (615) 238-3647
cbarrett@nealharwell.com

Joseph J. DePalma
Steven J. Greenfogel
LITE DEPALMA GREENBERG,
LLC
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Telephone: (267) 519-8306
sgreenfogel@litedepalma.com

J. Barton Goplerud
SHINDLER, ANDERSON,
GOPLERUD & WEESE PC
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Telephone: (515) 223-4567
goplerud@sagwlaw.com

Joseph R. Saveri (SBN 130064)
Steven N. Williams
Joshua P. Davis
Ryan J. McEwan
V Prentice
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Phone: (415) 500-6800
Fax: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
jdavis@saverilawfirm.com
rmcewan@saverilawfirm.com
vprentice@saverilawfirm.com

*Counsel for Plaintiffs and
Commercial Food Preparer Class*

CFPs' FOURTH AMENDED COMPLAINT

REDACTED

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 5, 2018 I filed the foregoing document with the

Clerk of the Court for the United States District Court, Southern District of

California, by using the Court's CM/ECF System, and also served counsel of

record via this Court's CM/ECF System.

By: /s/ *A. Blaine Finley*
CUNEO GILBERT & LADUCA,
LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Telephone: 202.789.3960
Facsimile: 202.589.1813
bfinley@cuneolaw.com

CFP FOURTH AMENDED COMPLAINT