1

**FILED UNDER SEAL – HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER OF THE COURT**

2

BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. BYRD (190634)
byrd@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
BRITTANY N. DEJONG (258766)
dejong@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599

3

4

5

6

7

8

9

10

*Interim Lead Counsel for the End Payer Plaintiffs*

11

[Additional Counsel Listed on Signature Page]

12

UNITED STATES DISTRICT COURT

13

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14

15

| | |
|---|---|
| | Case No. 15-MD-2670 JLS (MDD) |
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | **[REDACTED] REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| This Document Relates To: | (**FILED UNDER SEAL**) |
| All End Payer Plaintiff Actions | DATE:   December 20, 2018<br>TIME:    9:00 a.m.<br>JUDGE:  Hon. Janis L. Sammartino<br>CTRM:   4D (4th Floor – Schwartz) |

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILED UNDER SEAL**

## TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ................................................................. 1

II.   DR. SUNDING'S CLASS AND BENCHMARK
      PERIODS ARE EVIDENCE-DRIVEN ................................. 3

      A.    EPPs' Narrowed Class Period Provides a Proper
            Basis for Determining the Propriety of Class Certification ................ 3

      B.    Dr. Sunding's "Held Out" Period is Properly
            Evidence-Driven ................................................. 5

      C.    Dr. Sunding's Regression Models Support His Analysis
            and Conclusions Regarding the Benchmark Period ........................... 6

      D.    Dr. Sunding's Documentary Analysis is Sound Economic
            Practice and Provides a Basis for His Statistical Calculations ............ 7

III.  DR. SUNDING's OVERCHARGE ANALYSIS IS SOUND AND
      CLEARLY SHOWS COMMON IMPACT .......................... 8

      A.    Defendants' Subregressions are a Statistical
            Sleight of Hand ................................................. 9

      B.    Dr. Sunding's Model Does Not Produce
            Absurd Results .................................................. 11

      C.    Individualized Price Negotiations Have No Bearing
            on the Validity of Dr. Sunding's Model, Which is
            Consistent with the Packaged Tuna Market ...................................... 13

      D.    Dr. Sunding's Model Shows Harm For All
            Defendants' Customers ........................................... 15

      E.    Defendants Rely on Cases That Do Not Support
            Their Position ................................................... 18

IV.   PREDOMINANTLY COMMON PROOF WILL BE USED TO
      SHOW PASS THROUGH AND IMPACT TO EPPS .......................... 20

      A.    Defendants' Meritless Arguments Regarding
            "Loss Leader" and Focal Point Pricing Do Not
            Defeat Predominance .............................................. 21

      B.    Dr. Sunding's Pass-Through Studies Account for
            Geographic and Product Variation ...................................... 24

      C.    Dr. Sunding Presents Predominantly Common Proof
            of Pass-Through Throughout the Distribution Chain ......................... 28

      D.    Dr. Sunding's Pass-Through Model is Both
            Representative and Extremely Robust ................................... 30

- i -

**FILED UNDER SEAL**

V.    CHOICE OF LAW SUPPORTS CERTIFICATION.....................................32

    A.    The Cartwright Class Should Be Certified .........................................32

    B.    The Individual State Classes Should Be Certified.............................33

VI.   CONCLUSION ........................................................................................35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FILED UNDER SEAL**

## TABLE OF AUTHORITIES

**Page No.**

### Cases

*Abdeljailil v. General Electric Capital Corp.*,
306 F.R.D. 303 (S.D. Cal. 2015) ........................................................................... 3

*Aicco, Inc. v. Ins. Co. of N. Am.*,
90 Cal. App. 4th 579 (2001) ................................................................................ 33

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013) ........................................................................................... 29

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*,
191 Cal. App. 3d 1341 (1987) ............................................................................. 24

*Briseno v. ConAgra Foods, Inc.*
844 F.3d 1121 (9th Cir.) ................................................................................ 27, 34

*Byrd v. Aaron's Inc.*,
784 F.3d 154 (3d Cir. 2015) ................................................................................ 27

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004); ............................................................................. 34

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013) ................................................................................ 27

*CDW LLC v. NETech Corp.*,
906 F. Supp. 2d 815 (S.D. Ind. 2012) ................................................................... 5

*Daubert v. Merrell Dow Pharm., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ............................................................................... 11

*Daubert v. Merrill Dow Pharm., Inc.*,
509 U.S. 579 (1993) ............................................................................................. 7

*Ellis v. Costco*,
657 F.3d 970 (9th Cir. 2011) ............................................................................... 16

*Gold v. Lumber Liquidators, Inc.*,
No. 14-cv-05373-TEH, 2017 U.S. Dist.
LEXIS 96724 (N.D. Cal. June 22, 2017) ................................................................ 3

*Gordon v. Microsoft Corp.*,
No. MC 00-5994, 2003 Minn.
Dist. LEXIS 9 (Dist. Minn. Dec. 15, 2003) .......................................................... 26

**FILED UNDER SEAL**

*Gordon v. Microsoft Corp.*,
   No. 00-5994, 2001 U.S. Dist.
   LEXIS 26360 (D. Minn. Mar. 30, 2001) ........................................................22

*Holt v. Noble House Hotels & Resort, Ltd.*,
   No. 17cv2246-MMA (BLM), 2018 U.S. Dist.
   LEXIS 177940 (S.D. Cal. Oct. 16, 2018) ..........................................................3

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
   276 F.R.D. 364 (C.D. Cal. 2011) ....................................................................13

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   MDL No. 1775, 2014 U.S. Dist.
   LEXIS 180914 (E.D.N.Y. Oct. 15, 2014)..........................................................9

*In re Capacitors Antitrust Litig. (No. III),*
   No. 17-md-02801-JD, 2018 U.S. Dist.
   LEXIS 195310 (N.D. Cal. Nov. 14, 2018) .................................................2, 9, 11

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. C-07-5944-SC, 2013 U.S. Dist.
   LEXIS 137944 (N.D. Cal. June 20, 2013) ........................................................22

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. C-07-5944-SC, 2013 U.S. Dist.
   LEXIS 137945 (N.D. Cal. June 20, 2013) ........................................................31

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. C-07-5944-SC, 2013 U.S. Dist.
   LEXIS 137946 (N.D. Cal. Sept. 24, 2013) ................................................. 22, 28

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   308 F.R.D. 606 (N.D. Cal. Oct. 2015) ...........................................................4, 7

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
   140 F. Supp. 3d 339 (D. Del. Oct. 21, 2015) ..................................................31

*In re Domestic Drywall Antitrust Litig.,*
   No. 13-MD-2437, 2017 U.S. Dist. LEXIS
   135758 (E.D. Pa. Aug. 24, 2017)....................................................................30

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   No. M 02-1486 PJH, 2006 U.S. Dist.
   LEXIS 39841 (N.D. Cal. June 5, 2006) .............................................................7

*In re Fla. Cement & Concrete Antitrust Litig.*,
   278 F.R.D. 674 (S.D. Fla. 2012) ....................................................................22

**FILED UNDER SEAL**

*In re Flash Memory Antitrust Litig.*,
No. C 07-0086, 2010 U.S. Dist.
LEXIS 59491 (N.D. Cal. June 9, 2010) ....................................................18, 23, 24

*In re Flonase Antitrust Litig.*,
284 F.R.D. 207 (E.D. Pa. 2012) .................................................................10, 19

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal.2008) .......................................................................18

*In re High-Tech Emp. Antitrust Litig.*,
289 F.R.D. 555 (N.D. Cal. 2013) ......................................................................11

*In re High-Tech Emp. Antitrust Litig.*,
985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...............................................................7

*In re High-Tech Emple. Antitrust Litig.*,
No. 11-CV-02509-LHK, 2014 U.S. Dist.
LEXIS 47181 (N.D. Cal. Apr. 4, 2014) .............................................................12

*In re Indus. Diamonds,*
167 F.R.D. 374 (S.D.N.Y. 1996) ......................................................................19

*In re Korean Ramen Antitrust Litig.*,
No. 13-cv-04115-WHO, 2017 U.S. Dist.
LEXIS 7756 (N.D. Cal. Jan. 19, 2017) ..........................................................28, 30

*In re Lidoderm Antitrust Litig.*,
No. 14-md-02521-WHO, 2017 U.S. Dist.
LEXIS 24097 (N.D. Cal. Feb. 21, 2017) .......................................................17, 34

*In re Lithium Ion Batteries Antitrust Litig.*,
No. 13-MD-240 YGR, 2017 U.S. Dist.
LEXIS 57340 (N.D. Cal. Apr. 12, 2017) .............................................................24

*In re Live Concert Antitrust Litigation*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................7, 17

*In re Methionine Antitrust Litig.*,
204 F.R.D. 161 (N.D. Cal. 2001) ......................................................................28

*In re Motorola Sec. Litig.*,
644 F.3d 511 (7th Cir. 2011).............................................................................5

*In re NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ......................................................................16

*In re Optical Disk Drive Antitrust Litig.*,
No. 3:10-MD-2143 RS, 2016 U.S. Dist.

**FILED UNDER SEAL**

LEXIS 15899 (N.D. Cal. Feb. 8, 2016) ............................................................22

*In re Optical Disk Drive Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014)...................................................19, 20, 24, 30

*In re OSB Antitrust Litig.*,
   No. 06-826, 2007 U.S. Dist.
   LEXIS 56617 (E.D. Pa. Aug. 3, 2007) .......................................................30

*In re Packaged Seafood Prods. Antitrust Litig.*,
   242 F. Supp. 3d 1033 (S.D. Cal. 2017) ......................................................32

*In re Packaged Seafood Prods. Antitrust Litig.*,
   277 F. Supp. 3d 1167 (S.D. Cal. 2017) ......................................................32

*In re Polyurethane Foam Antitrust Litig.*,
   314 F.R.D. 226 (N.D. Ohio 2014) .........................................................16, 31

*In re Processed Eggs Prods. Antitrust Litig.*,
   312 F.R.D. 171 (E.D. Pa. Nov. 12, 2015) ..............................................16, 27

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   292 F. Supp. 3d 14 (D.D.C. 2018) ...........................................................12

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) ......................................................26

*In re Static Random Access Memory Antitrust Litig.*,
   No. 07-md-01819 CW, 2010 U.S. Dist.
   LEXIS 141670 (N.D. Cal. Dec. 7, 2010) ......................................................4

*In re Static Random Access Memory Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal. 2009) .......................................................25, 33, 34

*In re Terazosin Hydrochloride Antitrust Litig.*,
   220 F.R.D. 672 (S.D. Fla. 2004) .............................................................35

*In re Urethane Antitrust Litig.*,
   166 F. Supp. 3d 501 (D.N.J. 2016) ............................................................8

*In re Wellbutrin XL Antitrust Litig.*,
   282 F.R.D. 126 (E.D. Pa. 2011) ..............................................................18

*In re: TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010).......................................................4, 24, 26, 34

*Kleen Products LLC v. Int'l Paper*,
   306 F.R.D. 585 (N.D. Ill. 2015) ..............................................................16

*Knutson v. Schwan's Home Serv., Inc.*,
   No. 3:12-cv-0964-GPC-DHB, 2013 U.S. Dist.

**FILED UNDER SEAL**

LEXIS 127032 (S.D. Cal. Sept. 5, 2013) ........................................4

*Laumann v. Nat'l Hockey League*,
  117 F. Supp. 3d 299 (S.D.N.Y. 2015) .................................... 12

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
  No. 03 Civ. 7037 (PKC), 2005 U.S. Dist.
  LEXIS 44802 (S.D.N.Y. Apr. 11, 2005) ................................... 4

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ........................................... 34

*McCrary v. Elations Co. LLC*,
  No. EDCV 13-0242 JGB (SPx), 2014 U.S. Dist.
  LEXIS 200660 (C.D. Cal. Dec. 2, 2014) ................................. 17

*Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
   311 F.R.D. 590 (C.D. Cal. 2015) ...................................... 34

*Nitsch v. Dreamworks Animation SKG Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016) ........................................ 7

*Opperman v. Path, Inc.*,
  Case No. 13-cv-00453-JST, U.S. Dist.
  LEXIS 92403 (N.D. Cal. July 15, 2016) ................................. 34

*Paige v. California*,
  291 F.3d 1141 (9th Cir. 2002) (amended) .............................. 11

*Pierson v. Orlando Health*,
  No. 6:08–cv–466, 2010 U.S. Dist.
  LEXIS 96906 (M.D. Fla. Aug. 30, 2010) ................................ 28

*Reed Const. Data Inc. v. McGraw-Hill Cos.*,
  49 F. Supp. 3d 385 (S.D.N.Y. 2014) .................................... 27

*Rosack v. Volvo of Am. Corp.*,
  131 Cal. App. 3d 741 (1982) ........................................... 31

*S.M. v. J.K.*,
  262 F.3d 914 (9th Cir.2001),
  as amended by 315 F.3d 1058 (9th Cir.2003) ........................... 12

*Sullivan v. Costco Wholesale Corporation*,
  No. 1:17-cv-00959-LJO-EPG, 2018 U.S. Dist.
  LEXIS 143840 (E.D. Cal. Aug. 23, 2018) ............................... 11

*United States v. Cameron*,
  No. 3:16-cr-00501 (N.D. Cal. Dec. 7, 2016) ............................ 3

**FILED UNDER SEAL**

*United States v. Kenneth Worsham*,
  No. 3:16-cr-00535 (N.D. Cal. Dec. 21, 2016) ........................................3

*Van Patten v. Vertical Fitness Grp., LLC*,
  No. 12cv1614-LAB (MDD), 2013 U.S. Dist.
  LEXIS 189845 (S.D. Cal. Nov. 8, 2013) ..............................................4

*Yellowowl-Burdeau v. City of Tukwila*,
  No. 2:16-cv-01632-RAJ, 2017 U.S. Dist.
  LEXIS 67693 (W.D. Wash. May 3, 2017)............................................32

*Zaklit v. Nationstar Mortg., LLC*,
  No. 5:15-cv-2190-CAS(KKx), 2017 U.S. Dist.
  LEXIS 117341 (C.D. Cal. July 24, 2017) ..............................................3

**Statutes**

28 U.S.C.
  § 1322 (d) ...........................................................................................33

**Other Authorities**

*Data Availability Policy*, AMERICAN ECONOMIC ASS'N ...........................14

*Data Policy*, THE QUARTERLY JOURNAL OF ECONOMICS.........................14

DR. KENNETH FLAMM AND DR. MICHAEL NAAMAN,
  SUB-REGRESSIONS IN ANTITRUST CLASS CERTIFICATION
  CAN BE UNRELIABLE (December 17, 2014)........................................10

Kershell, Holly,
  *Comment: An Approach to Certification Issues in Multi-State
  Diversity Class Actions in Federal Court After the Class Action
  Fairness Act of 2005*,
  40 U.S.F. L. REV. 769 (2006) .......................................................33, 35

**Rules**

Fed. R. Civ. P.
  23(b)(3).............................................................................................34

No. 15-MD-2670 JLS (MDD)

**FILED UNDER SEAL**

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| 6AC | EPPs Sixth Amended Consolidated Class Action Complaint |
| Ardagh (formerly Impress) | Can maker in American Samoa used by both StarKist and COSI |
| ATUNA | Trade publication |
| BB Rog Resp. | Bumble Bee's Fifth Supplemental Objections and Responses to Plaintiffs' Second Set of Interrogatories |
| Benson Decl. | Declaration of Craig A. Benson in Support of Defendants' Opposition to EPPs' Motion for Class Certification |
| BKK | Bangkok spot price for skipjack |
| Burt Decl. | Declaration of Thomas H. Burt dated May 29, 2018 |
| CAFA | Class Action Fairness Act of 2005 |
| COSI | Chicken of the Sea |
| EPPs | End Payer Plaintiffs |
| Fed. R. Civ P. | Federal Rule of Civil Procedure |
| FCF | F.C.F. Fishery Co. Ltd. |
| FAD | Fish Aggregating Device |
| Haider Report | Ex. 1 to the Benson Decl. |
| Haider Tr. | November 9, 2018 Deposition Transcript of Dr. Laila Haider |
| IRI | Information Resources, Inc. |
| Mangum Decl. | Declaration of Russell W. Mangum, III, Ph.D., in Support of Direct Purchaser Plaintiffs' Motion for Class Certification at 83-100 (filed under seal May 29, 2018) |
| Manifold Decl. | Declaration of Betsy Manifold dated May 29, 2018 |
| Milton's | Restaurant in Del Mar, CA and meeting spot for Defendants |
| Mot. | EPPs Memorandum of Points and Authorities in Support of Motion for Class Certification |
| NFI | National Fisheries Institute |
| Opp. | Defendant's Opposition to End Payer Plaintiffs' Motion for Class Certification |
| Parsons Tr. | March 22, 2018 Deposition Transcript of Darren Parsons of COSI |
| POC price | "Pago Pago market price" or "Pacific Operating Committee" |
| Project Peach | Co-packing agreement between BumbleBee and COSI in Lyons, Georgia |
| SamPac | COSI plant in American Samoa |
| Sunding Tr. | Deposition of David Sunding, Ph.D., Sept. 7, 2018 |

**FILED UNDER SEAL**

| Sunding Reply | November 20, 2018 Reply Expert Report of David Sunding, Ph.D |
| Sunding Report | May 29, 2018 Expert Report of David Sunding, Ph.D Annexed to EPPs' Motion for Class Certification as Exhibit 90 to the Burt Decl. |
| Supp. Burt Decl. | Supplemental Declaration of Thomas H. Burt dated November 20, 2018 |
| Supp. Manifold Decl. | Supplemental Declaration of Betsy Manifold dated November 20, 2018 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

No. 15-MD-2670 JLS (MDD)

FILED UNDER SEAL

## I.   INTRODUCTION

End Payer Plaintiffs ("EPPs") submit this Memorandum in further support of their Motion for Class Certification (Dkt. No. 1130). In this case, criminal guilty pleas and admissions establish that the Defendant tuna companies coordinated increases in their national list and net prices for Packaged Tuna, and help establish the time period during which they did so. The price-fixed product traveled unaltered through a simple chain of commerce to the consumers. Dr. David Sunding, the chair of a prestigious economics department, has developed and presented economic analysis and econometric market models that help demonstrate the resulting market-wide overcharge for Packaged Tuna, and that impact on EPP class members. Sunding Report.[1] Against this backdrop, Defendants and their retained economist, Dr. Haider,[2] fire a blunderbuss, attacking the Class Period and benchmark period, the overcharge regression model, the nine pass-through studies, and (for the third time) the classes under state laws. Each of those attacks fails as follows:

- The Class Period and benchmark are not cherry-picked. The Plaintiffs begin the Class Period based on admissions of market-wide illegal conduct. The "benchmark" period allows a reasonable economic examination of how Defendants'

---

[1]    Expert Report of David Sunding in Support of Plaintiffs' Motion for Class Certification, May 29, 2018 ("Sunding Report"), attached as Ex. 1 to the Supplemental Declaration of Thomas H. Burt in further support of End Payer Plaintiffs' Motion for Class Certification ("Supp. Burt Decl.").

[2]    Dr. Haider has published only one paper in a peer-reviewed academic journal, and that work was based upon her dissertation and co-authored with her advisors. She has since published only in practitioner publications, and even these were done with her then-coworkers at various consulting firms. Haider Dep. Ex. 4 and Tr. 47:15-17, 55:11-16 (Supp. Burt Decl., Ex. 2). Dr. Haider has never held a faculty post (*id*. 57:10-16) and appears to specialize in attacking class actions. For example, while the press release issued upon her move to Edgeworth references class litigation six times (Haider Dep. Ex. 5), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Haider Tr. 78:17-79:9, 144:5-147:8.

▮▮▮▮▮▮▮▮▮  *Id*. 82:7-83:3.

- 1 -

**FILED UNDER SEAL**

1 conduct affected the market. Dr. Sunding did not include the period from 2008 to

2 2011 because based on his review of the facts, doing so produced a more effective

3 benchmark period with which to compare the Class Period.

4 • Dr. Haider attacks Dr. Sunding's overcharge regression largely using

5 statistical methods that fail a test of scientific falsifiability. ████████████████

6 ████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████

8 ████████████████████████████████████████████ Similar

9 methods by the same economics firm were rejected last week by Judge Donato in *In*

10 *re Capacitors Antitrust Litig. (No. III),* No. 17-md-02801-JD, 2018 U.S. Dist.

11 LEXIS 195310, at *64 n.4 (N.D. Cal. Nov. 14, 2018) ("*Capacitors*") (criticizing Dr.

12 John Johnson, Dr. Haider's employer and Defendants' expert against DPPs here).



13

14

15

16

17

18

19 • Dr. Sunding shows empirically

20

21

22

23 • The attacks on the state law classes are an attempt to relitigate an issue

24 fully briefed and decided on the pleading motions.

25 For these reasons, and those explained below and those explained in Dr.

26 Sunding's Reply Report ("Sunding Reply") (Supp. Burt Decl., Ex. 3), the Court

27 should disregard Defendants' attempts to obfuscate the simple truth: common

28 evidence will prove the case and the Court should certify the proposed Classes.

FILED UNDER SEAL

## II.    DR. SUNDING'S CLASS AND BENCHMARK PERIODS ARE EVIDENCE-DRIVEN

The Class Period begins when Bumble Bee admits it began colluding. Amended Plea Agreement, *United States v. Bumble Bee Foods, LLC*, No. 3:17-cr-00249 (N.D. Cal. Aug. 2, 2017), ECF No. 32 ("Bumble Bee Plea Agreement"). This accords with admissions from others involved in the conspiracy.[3] Defendants cannot argue that this is arbitrary or unfounded, and so they complain instead that the Class Period has been narrowed to correspond to evidence. EPPs filed a Sixth Amended Consolidated Class Action Complaint on October 5, 2018, ECF No. 1461 ("6AC"), defining the Class Period as presented in this motion. *Id.* at ¶ 2.[4]

### A.    EPPs' Narrowed Class Period Provides a Proper Basis for Determining the Propriety of Class Certification

Plaintiffs may suggest a class period narrower (and thus contained in) a class period specified in a previously filed complaint. *See Abdeljailil v. General Electric Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015) (new definition "simply a narrower version"); *see Holt v. Noble House Hotels & Resort, Ltd.*, No. 17cv2246-MMA (BLM), 2018 U.S. Dist. LEXIS 177940, at *6, 32 (S.D. Cal. Oct. 16, 2018) (allowing the plaintiffs to narrow a class definition at the time they sought certification; granting motion to certify the narrowed class)[5]; *Knutson v. Schwan's*

---

[3]    Information, ¶ 2, *United States v. Kenneth Worsham*, No. 3:16-cr-00535 (N.D. Cal. Dec. 21, 2016), ECF No. 1; Information, ¶ 2, *United States v. Cameron*, No. 3:16-cr-00501 (N.D. Cal. Dec. 7, 2016), ECF No. 1. ████████████████████████████████████████████████████████████

DPPs and CFPs use the same start date for their class period. ECF No. 1460, ¶ 2; ECF No. 1470, ¶ 1.

[5]    Modification of a proposed class period – with or without an accompanying amendment to the complaint, is particularly appropriate when plaintiffs narrow a class definition and thus defendants are not prejudiced. *See Zaklit v. Nationstar Mortg., LLC*, No. 5:15-cv-2190-CAS(KKx), 2017 U.S. Dist. LEXIS 117341, at *21 (C.D. Cal. July 24, 2017) ("courts routinely permit plaintiffs to narrow the scope of their class at the certification stage.") (citing cases); *Gold v. Lumber Liquidators, Inc.*, No. 14-cv-05373-TEH, 2017 U.S. Dist. LEXIS 96724, at *14 (N.D. Cal. June

**FILED UNDER SEAL**

1  *Home Serv., Inc.*, No. 3:12-cv-0964-GPC-DHB, 2013 U.S. Dist. LEXIS 127032, at

2  *13 (S.D. Cal. Sept. 5, 2013).

3      After analyzing the record evidence, Dr. Sunding confirmed that ████████

4  ████████████████████████████████████████████████████████

5  ████████████████ Sunding Report, ¶ 90. ████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████ Sunding Tr. 131:6-131:15, 134:8-11, 135:13-136:7.[6] Dr.

8  Sunding's thorough analysis of the relevant facts and the legal parameters of this

9  case make clear the appropriateness of the 2011 to 2015 class period. *Compare*

10 Sunding Tr. 219:19-220:9 █████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ██████████████████████████████████████████ *with* Sunding

13 Tr. 66:20-67:20 ██████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████████████████████████ *See In re*

16 *Static Random Access Memory Antitrust Litig.*, No. 07-md-01819 CW, 2010 U.S.

17 Dist. LEXIS 141670, at *46 (N.D. Cal. Dec. 7, 2010) (time period sufficient because

18 it was "tailored to the facts of the case").[7] Moreover, as Dr. Sunding noted,

19

20 _____

21 22, 2017); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 620

22 (N.D. Cal. 2015) (amendments to complaint to conform evidence could be "made prior to judgment but after the class is certified"); *Van Patten v. Vertical Fitness*

23 *Grp., LLC*, No. 12cv1614-LAB (MDD), 2013 U.S. Dist. LEXIS 189845, at *7-11

24 (S.D. Cal. Nov. 8, 2013); *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 591 (N.D. Cal. 2010) ("*LCD*") ("Here, the proposed modifications are minor,

25 require no additional discovery, and cause no prejudice to defendants.").

26 [6]    Deposition of David Sunding, Ph.D., Sept. 7, 2018 ("Sunding Tr.") (annexed to the Supp. Burt Decl. as Ex. 5).

27 [7]    *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037 (PKC), 2005

28 U.S. Dist. LEXIS 44802 (S.D.N.Y. Apr. 11, 2005), is an irrelevant case where the expert took pro forma rather than actual data as the basis for his opinion providing business loses projections resulting from a fire. The court described the failure to

- 4 -

FILED UNDER SEAL

1  " ███████████████████████████████████████████ "  are

2  " █████████████████████████████████████████████████

3  ████████████████████████████. Sunding Tr. 130:24-131:5;

4  *see In re Motorola Sec. Litig.*, 644 F.3d 511, 516 (7th Cir. 2011) ("The interpretation

5  of a class definition is a question of law").[8]

**B.  Dr. Sunding's "Held Out" Period is Properly Evidence-Driven**

Dr. Sunding removed ████████████████████████

████████████████████████████ Sunding Report, ¶ 94-5. *See id*. ¶ 72

(collusion), *compare with* ¶ 74 ("Operation Bloody Nose"). Dr. Sunding observed

██████████████████████████████████████████████████

███████. Sunding Tr. 218:6-221:1. Ultimately Dr. Sunding concluded that ████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ Sunding Tr. 129:17-21.  *See* Sunding Report, ¶ 95 (████

████████████).[9]  Dr. Sunding has explained ████████████████

██████████████████████████████████████████. *See* Sunding

Report, ¶¶ 94-95; Sunding Tr. 220:21-25 ("███████████████████████

_____

ground analysis in the actual facts of the case as using "projections and wishful thinking." *Id.* at *8.

[8]     Defendants cite cases that they claim suggest that experts must verify a class period.  But these cases suggest merely that experts should do what Dr. Sunding did here: examine the record facts for himself in reaching his opinions. *E.g.*, *CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815, 822-23 (S.D. Ind. 2012) (finding expert "did not simply accept 'off-the-cuff' figures supplied by the client" but instead "determined the type of . . . data he required to make a proper analysis."). The cases do not and cannot require that an economic expert "verify" legal questions such as a class period.

[9]     Similarly, Dr. Sunding ██████████████████████████████████████ Sunding Tr. 116:11-117:19. But contrary to Defendants' suggestion, ██████████████████████████████████████████████████ *Id.* 189:13-191:7.

**FILED UNDER SEAL**

[REDACTED]

[REDACTED] ). Dr. Sunding's observations in this regard are confirmed by COSI's Second Supplemental Responses and Objections to Second Interrogatories, [REDACTED]. Supp. Burt Decl., Ex. 4 at 4.[10]

Because his empirical economic analysis indicated that certain earlier periods did not belong in the Class Period, Dr. Sunding "[REDACTED]

[REDACTED] Sunding Tr. 129:16-24. However, helpful explanatory data from the [REDACTED] as Defendants imply. *Id.* 128:23-129:24.[11] Rather, Dr. Sunding included relevant data in performing his econometric analysis of tuna market pricing. *Id.*

**C.  Dr. Sunding's Regression Models Support His Analysis and Conclusions Regarding the Benchmark Period**

Dr. Sunding testified [REDACTED]

[REDACTED]

[REDACTED] Sunding Tr. 127:6-128:22, [REDACTED] Sunding Report, ¶ 104. Dr. Sunding [REDACTED]

[REDACTED] Sunding Tr. 127:6-128:22 (emphasis added). This analysis shows, and Defendants admit, that there is no impact in earlier years. *See* Defendants'

---

[10]  Dr. Haider's testimony shows [REDACTED] (*see* Haider Tr. 131:9-132:8, 135:12-137:18), meaning that her critique of Dr. Sunding's [REDACTED]

[11]  Dr. Sunding accounted for [REDACTED] Sunding Report, ¶ 104 & Table 1 [REDACTED].

- 6 -

**FILED UNDER SEAL**

Opposition to End Payer Plaintiffs' Motion for Class Certification ("Opp.") at 2.[12] Despite this, Defendants and Dr. Haider ███████████████████ ███████████████████ But, as Dr. Sunding notes, ███████████ ███████████████ Sunding Tr. 218:12-17.

### D. Dr. Sunding's Documentary Analysis is Sound Economic Practice and Provides a Basis for His Statistical Calculations

Dr. Sunding's economic analysis of the market, including documentary analysis, which Defendants criticize as non-economic, Opp. at 18-20, is based on standard economic practice and consistent with evidence law. *See Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 297 (N.D. Cal. 2016) (expert's analysis based on "economic theory, documentary evidence, and statistical analyses"); *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1209 (N.D. Cal. 2013) (expert "relied on the documentary evidence"). Admissible expert evidence must "fit," or relate to, the facts of the case. *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993); *see In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 U.S. Dist. LEXIS 39841, at *43 (N.D. Cal. June 5, 2006) (expert analysis based on, *inter alia*, data and documents produced in discovery); *CRT Antitrust Litig.*, 308 F.R.D. at 629 ("factual review of evidence produced"). As Dr. Sunding explained: ███████████████████ ███████████████████████████████████ ███████████████████████████████████████ Sunding

---

[12] *In re Live Concert Antitrust Litigation*, is inapposite. There, an expert changed his benchmark period after testifying the proposed benchmark would enable him to determine damages and thus contradicted his prior testimony. 863 F. Supp. 2d 966, 980 (C.D. Cal. 2012). Dr. Sunding has done no such thing. In addition, Dr. Sunding's multiple regression analysis accounts for the relevant major variables affecting the market, unlike the regressions the *Live Concert* court disapproved. *Id.* at 978-79.

FILED UNDER SEAL

Tr. 82:22-83:23. ███████████████████████████████████████

██████████████████████████████████████ *Id.*[13]

## III.   DR. SUNDING'S OVERCHARGE ANALYSIS IS SOUND AND CLEARLY SHOWS COMMON IMPACT

EPPs previously explained the legal presumption that market-wide conduct designed to increase prices creates a presumption of market-wide impact. *See* EPPs' Memorandum of Points and Authorities in Support of Motion for Class Certification, ECF No. 1130-1 ("Mot."), at 13-14 (and cases cited therein). Further, because the Packaged Tuna market is a national market for an easily transportable commodity good, opportunities for arbitrage mean that prices and overcharges among customers and areas should not vary substantially. *See* Sunding Report, ¶¶ 41-5; Sunding Tr. 116:13-19, 117:17-118:9. Moreover, it is abundantly clear that Defendants coordinated their prices, shared pricing information, and used the conspiratorially inflated prices for their pricing discussions and negotiations with customers. *See, e.g.*, Bumble Bee Plea Agreement, ¶ 4(b); Transcript of Proceedings at 12:20-13:10, *United States v. Bumble Bee Foods, LLC*, No. 3:17-cv-00249 (N.D. Cal. Aug. 4, 2017), ECF No. 36; Information, ¶ 9(a-c), *United States v. Starkist, Co.*, No. 3:18-cv-00513 (N.D. Cal. Oct. 18, 2018), ECF No. 1 (annexed as Ex. 1 to the Supplemental Declaration of Betsy C. Manifold in support of End Payer Plaintiffs' Motion for Class Certification ("Supp. Manifold Decl.")).

████████████████████████████████████████████
████████████████████████████████████████████
██████████████ Sunding Tr. 141:15-142:7; Sunding Report, ¶¶ 93, 102-112. This is the common approach in antitrust cases. *See, e.g., In re Urethane Antitrust Litig.*, 166 F. Supp. 3d 501, 504–05, 509 (D.N.J. 2016) (citations omitted) (there "are an

---

[13]     As Dr. Sunding points out, ████████████████████████████. Sunding Reply, ¶ 33. Dr. Haider's cursory approach, on the other hand led to obvious errors. She accused ████████████████████████████████████████████
███████████████████████ Sunding Reply, ¶ 59.

- 8 -

FILED UNDER SEAL

1   abundance of judicial decisions supporting" the use of regression models). Neither

2   Defendants nor Dr. Haider dispute that reduced form models are generally accepted.

    **A.    Defendants' Subregressions are a Statistical Sleight of Hand**

4           Defendants attack Dr. Sunding's overcharge model by purporting to show that

5   many large purchasers did not see a statistically significant overcharge.[14] Dr.

6   Haider's analysis is mere gimmickry and not sound economics.  She shrinks the

7   sample sizes to produce spurious results.

8           Breaking down the data to the level of the individual purchaser and then

9   running a regression on each and every purchaser, as Dr. Haider did, virtually

10   ensures misleading results. *See* Sunding Tr. 168:25-169:11. The technique Dr.

11   Haider uses is similar to that used in *In re Air Cargo Shipping Servs. Antitrust Litig.*,

12   MDL No. 1775, 2014 U.S. Dist. LEXIS 180914 (E.D.N.Y. Oct. 15, 2014). There,

13   Magistrate Judge Pohorelsky examined what he called "sub-regression" techniques

14   similar to those performed here (Dr. Haider's CV includes an article in a legal

15   newsletter in apparent direct response to *Air Cargo*, Haider Dep. Ex. 1). After an

16   extensive analysis, the court found such sub-regressions "fundamentally mis-

17   specified" and unpersuasive, and certified the class. *Id.* at *141-173, 266.

18           Dr. Johnson, who owns Edgeworth Economics, was just criticized in

19   *Capacitors* for the infirmity of this technique. *Capacitors*, 2018 U.S. Dist. LEXIS

20   195310, at *64 n.4. He and Dr. Haider, who worked with him at NERA and

21   Edgeworth, have developed this technique not in academic journals, but in and for

22   litigation, specifically opposing class certification. *See* Haider Exs. 1, 5. "At best,

23   such a slicing and dicing approach reflects ignorance of statistical properties; at

24   worst it is statistical trickery passed off as 'rigor.' Regardless, it must be called out

25   as invalid and unscientific."  DR. KENNETH FLAMM AND DR. MICHAEL NAAMAN,

---

[14] ███████████████████████████████████████████ Sunding Tr. 166:24-167:6, 231:12-22, 240:5-9.

No. 15-MD-2670 JLS (MDD)

**FILED UNDER SEAL**

Sᴜʙ-Rᴇɢʀᴇssɪᴏɴs ɪɴ Aɴᴛɪᴛʀᴜsᴛ Cʟᴀss Cᴇʀᴛɪғɪᴄᴀᴛɪᴏɴ Cᴀɴ Bᴇ Uɴʀᴇʟɪᴀʙʟᴇ (December 17, 2014), https://www.lrca.com/wp-content/uploads/2014/12/naaman_flamm_subregression_misuse.pdf (last visited Nov. 19, 2018); *see also*, Sunding Tr. 173:16-174:1, 187:12-18, 189:16-190:3, 191:3-6. *See* Sunding Reply, ¶ 15 n.1.

Dr. Haider's sub-regressions do not establish and cannot establish what she claims. For example, Dr. Sunding points out ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████ *See* Sunding Reply, ¶¶ 26-9.

Further, as Dr. Sunding explains, ██████████████████████████████ ████████████████████████████████████████████████████████████ ██████████ Rather, Dr. Haider's sub-regressions show ██████████████ ████████████████████████████████████████████████████████. *See* Sunding Reply, ¶¶ 16-20. But as Dr. Sunding explains, ████████████████ ██████████████████████████████████ *Id.* ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ *Id.*, ¶¶ 26-29.

Dr. Sunding's robust analysis examines the market as it actually exists. *See, e.g., In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 229 (E.D. Pa. 2012) (because expert analyzed a single market, averaged data and analysis was appropriate). He controls for relevant economic factors such as purchaser size and distribution channel (Sunding Tr. 166:24-167:6, 231:12-22, 240:5-9). Courts regularly reject attempts to use insufficient sample sizes and misleading data mining to discredit legitimate statistical studies. The Ninth Circuit recognizes that aggregate data in regression analysis is appropriate "where [a] small sample size may distort the statistical analysis and may render any findings not statistically probative." *Paige v.*

FILED UNDER SEAL

*California*, 291 F.3d 1141, 1148 (9th Cir. 2002) (amended). *See also Capacitors*, 2018 U.S. Dist. LEXIS 195310, at *64 n.4; *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 580 (N.D. Cal. 2013).

### B. Dr. Sunding's Model Does Not Produce Absurd Results

Defendants next turn to an argument that is rooted in neither the law nor sound econometrics. Essentially, Defendants argue that even if they can't successfully identify flaws with Dr. Sunding's model, it must be wrong because it produces "absurd" results. Defendants' argument is both wrong and highlights Dr. Haider's own computational mistakes.

For example, Dr. Haider claims ███████████████████████████ ████████████████████████████████████████████████████████. Dr. Haider made a mistake in her computations. Dr. Haider's interpretation of the marginal effect of pouches on Tuna is fundamentally flawed as she does not take into account the fact that Dr. Sunding's model allows fish prices and input prices to affect prices of can and pouch products differently, thus dramatically overstating the statistical calculation of the difference between pouch prices and can prices. When this mistake is corrected, ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ Sunding Reply, ¶ 32.[15]

───────────────────

[15] Defendants also argue essentially, that mere variation in prices over time and/or among purchasers defeats class certification. Opp. at 32. This is wrong. It is the *relationship* between price and fundamentals which allows an economist to estimate a but-for world and a calculation of overcharge. The expert must point to "'some objective, independent validation of the expert's methodology'" to be admissible. *See Sullivan v. Costco Wholesale Corporation*, No. 1:17-cv-00959-LJO-EPG, 2018 U.S. Dist. LEXIS 143840, at *7 (E.D. Cal. Aug. 23, 2018) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995)). *See* Sunding Tr. 205:12-206:6, 207:20-23. This means that one looks not to a scatterplot of prices, but rather connects the dots to examine market-wide price trends over time.

FILED UNDER SEAL

1    In addition, Dr. Sunding's approach is corroborated by the model used by

2    another expert in this case.  Dr. Russell W. Mangum, a Direct Purchaser class

3    economic expert and Senior Vice President at Nathan Associates Inc., employed

4    slightly different data and variables but reached similar results and conclusions.  Dr.

5    Mangum, for example, reached effectively the same conclusions after: ███████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ██████████████████████████ Declaration of Russell W. Mangum, III,

10   Ph.D., in Support of Direct Purchaser Plaintiffs' Motion for Class Certification (ECF

11   No. 1140) (filed under seal May 29, 2018) ("Mangum Decl.") at 83-100. He found

12   an overcharge for all Defendants across the market. *Id.* at 103-106.

13       *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14 (D.D.C.

14   2018), does not support Defendants' contentions. The court ultimately accepted the

15   model that supposedly produced the "counterintuitive" result. *Id.* at 71. The reason

16   for that is simple: much more than conclusory statements are needed to undercut the

17   possible probative value of expert testimony. *See In re High-Tech Emp. Antitrust*

18   *Litig.*, No. 11-CV-02509-LHK, 2014 U.S. Dist. LEXIS 47181, at *93 (N.D. Cal.

19   Apr. 4, 2014) (Courts should not disregard results within a range where reasonable

20   experts differ) (citing *S.M. v. J.K.*, 262 F.3d 914, 921 (9th Cir. 2001), as amended by

21   315 F.3d 1058 (9th Cir. 2003) (citation omitted)).[16] *Id. See*, *e.g., In re Aftermarket*

22   *Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 373–74 (C.D. Cal. 2011)

23   ("where a court is confronted with two opposing expert analyses or econometric

24

25   [16]    *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299 (S.D.N.Y. 2015), is
     not to the contrary, as the model there failed for lack of sufficient data. *Id.* at 318.

26   That expert made conclusions about consumer preferences and reactions without any

27   data on those preferences. Moreover, the court noted that the expert's analysis, like
     Dr. Haider's, was not based on "independent research or study, but have instead

28   been developed for the sole purpose of bolstering [a party's] position in this
     litigation." *Id.*

**FILED UNDER SEAL**

models of what the 'but for' world would look like, the Court is not supposed to decide at the certification stage which expert analysis or model is better.").

**C.      Individualized Price Negotiations Have No Bearing on the Validity of Dr. Sunding's Model, Which is Consistent with the Packaged Tuna Market**

Dr. Haider's conclusions ███████████████████████████████████ ████████████████████████ fly in the face of the plain, record evidence. Defendants issue national price lists, and then seek to minimize the lists' import by claiming the prices are merely suggestions followed by individual negotiations, but what Defendants hide is the limited extent of those negotiations and the minimal impact they have on purchase price. The reason for that is simple: ██████████████████ ██████████████████████████████. Parsons Tr. 120:22-121:10, *see generally id.* 171-177.[17] More importantly, Defendants have admitted that █████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Sunding Report, ¶¶ 140-44. Indeed, Defendants fail to provide any facts to support their claim that the price lists are mere starting points.

Though Dr. Haider denied recalling any such evidence (Haider Tr. 24:10-4), ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████ *See* Parson Tr. 120:2-7 ████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████ Dr. Sunding tested ████████████████████████████████ ███████████████████████████████████████████ (even by Dr. Haider's criteria, Haider Tr. 166:5-167:2), and for which, fortunately, there was sufficient data. █████████████████████████████████████████████████

---

[17]      Deposition of Darren Parsons of COSI ("Parsons Tr.") (Supp. Burt Decl., Ex. 6).

No. 15-MD-2670 JLS (MDD)

FILED UNDER SEAL

[18]

.

Finally, Dr. Haider's assertions concerning individualized pricing should be disregarded because she relied on unverifiable, unscientific factual assertions. Dr. Haider conducted

Haider Ex. 1.

(Haider Tr. 19:9-23:13, 26:15-30:12),

*Id.* 23:15-24:9.

Dr. Haider does not specify the portions of her opinions

.[20]

---

[18]   Sales in most industries involve some negotiation, but a regression model like Dr. Sunding's, measuring real-world prices over long periods, fully captures the overall effect of those negotiations in the relationship between prices and cost.

[19]   *See*, *e.g.*, *Data Availability Policy*, AMERICAN ECONOMIC ASS'N, https://www.aeaweb.org/journals/policies/data-availability-policy (last visited Nov. 20, 2018) ("It is the policy of the American Economic Association to publish papers only if the data used in the analysis are clearly and precisely documented and are readily available to any researcher for purposes of replication."); *Data Policy*, THE QUARTERLY JOURNAL OF ECONOMICS, https://academic.oup.com/qje/pages/Data_Policy (last visited Nov. 20, 2018) ("It is the policy of the *Quarterly Journal of Economics* to publish papers only if the data used in the analysis are clearly and precisely documented and are readily available to any researcher for purposes of replication.").

[20]   This may form the basis of a *Daubert* challenge at the merits stage; at this stage, primarily in order to expedite consideration of the Class Certification motion and avoid burdening the Court with more paper, EPPs ask instead that the Court simply

- 14 -

FILED UNDER SEAL

### D.    Dr. Sunding's Model Shows Harm For All Defendants' Customers

Defendants attack Dr. Sunding's use of averages, which they assert conceals individual differences in impact and improperly conflates two issues: injury, or what common evidence is sufficient to allow a jury to find common, market-wide effects; and damages, or the use of a single average overcharge to estimate those effects. As to the first issue, whether there was impact on all Defendants' customers, which should be the focus at class certification, Dr. Sunding's model easily meets the test.

Dr. Sunding determined—and the Defendants do not dispute ███████████ ███████████████████████████████. Defendants can point to no evidence that they limited their coordination to certain customers or market segments. In fact, all the evidence (common to all plaintiffs) regarding the market indicates that both in intent and in practice, Defendants' collusion was designed to affect the market as a whole. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Sunding Reply, ¶ 24. After a thorough analysis of the market and the evidence in the case, Dr. Sunding concluded that ███████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████. *Id.*, ¶ 21.

In reaching this conclusion, Dr. Sunding did not rely purely on a structural analysis. Dr. Sunding was able to test empirically whether all or substantially all of Defendants' customers would be impacted by the conspiracy. ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

disregard Dr. Haider's assertions ███████████████████████████████████ ███████████████████████

No. 15-MD-2670 JLS (MDD)

FILED UNDER SEAL

1       ██████ *Id., ¶ 22.* ███████████████████████████

2       ████.[21]

3         As stated above, the fact that each direct purchaser negotiated each purchase

4 does not require an individual analysis of each direct purchaser. Where a variety of

5 customers purchase commodity products over time, different nominal prices among

6 customers are inevitable. But as courts have repeatedly recognized, because

7 plaintiffs seek to establish the difference between actual price levels and necessarily

8 hypothetical but-for price levels, some averaging of data to examine market-wide

9 impact on price levels over time is appropriate, which is why courts routinely allow

10 the use of a single overcharge in antitrust cases. *See, e.g., In re NASDAQ Market-*

11 *Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("Neither a variety of

12 prices nor negotiated prices is an impediment to class certification if it appears that

13 plaintiffs may be able to prove at trial that, as here, the price range was affected

14 generally."); *In re Processed Eggs Prods. Antitrust Litig.*, 312 F.R.D. 171, 198-99

15 (E.D. Pa. Nov. 12, 2015); *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226,

16 283 (N.D. Ohio 2014) (allowing single overcharge regression model even when

17 statistically significant impact was only found for 20% of customers); *Kleen*

18 *Products LLC v. Int'l Paper*, 306 F.R.D. 585, 600 (N.D. Ill. 2015) (citation omitted).

19         Yet, Defendants attack Dr. Sunding's use of a single overcharge for each

20 Defendant as not being sufficiently granular. Even the cases Defendants cite do not

21 support the broad proposition that relying on a single overcharge is problematic.

22 Defendants' reliance on *Live Concert* is misplaced for a number of reasons,

23 including because plaintiffs in that case made no distinction between the artists

24 regardless of their popularity, an omission so critical that it destroyed the model's

25

26 [21]     Dr. Sunding also notes ████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████████████ Mangum Decl., ¶

144.

FILED UNDER SEAL

1  usefulness. *Live Concert*, 863 F. Supp. 2d at 978. [22] Unlike purchasers of Packaged

2  Tuna, it is safe to assume potential concertgoers do not view tickets of minor acts as

3  interchangeable with major stars, especially across genres.

4        Defendants further cite to *Live Concert* in quibbling that Dr. Sunding might

5  have included additional or different inputs in his model. But Dr. Sunding has

6  provided sound reasons for selecting his inputs and his analysis: ███████████

7  ██████████████████████████████████████████████████████████████

8  ████████████████████████ *See* Sunding Report, ¶¶ 102-08, 111.[23] In fact, the *Live*

9  *Concert* court notes that where, as here, the model accounts for the "major factors"

10  in the market, the model has sufficient validity for admissibility. *Live Concert*, 863

11  F. Supp. 2d at 978. *See also McCrary v. Elations Co. LLC*, No. EDCV 13-0242 JGB

12  (SPx), 2014 U.S. Dist. LEXIS 200660, at *21 (C.D. Cal. Dec. 2, 2014) ("a court

13  'cannot simply assume that variables omitted from the analysis are, in fact, major

14  factors . . . . There must be some indication that the excluded variables would have

15  impacted the results.'") (internal citations omitted). In any event, Defendants do not

16  suggest that additional or different inputs would materially change Dr. Sunding's

17  results.  *See, e.g., In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017

18  U.S. Dist. LEXIS 24097, at *67 (N.D. Cal. Feb. 21, 2017) ("that the experts dispute

19  what the appropriate inputs should be does not undermine the approach or the

---

[22]     Defendants also cite *Ellis v. Costco*, 657 F.3d 970 (9th Cir. 2011), but that Title VII case merely stands for the unremarkable proposition that courts have to weigh expert evidence on class requirements. *Id.* at 982.

[23]     Dr. Haider insists that ███████████████ ██████ Haider Report, ¶ 9 (Ex. 1 to the Declaration of Craig A. Benson in Support of Defendants' Opposition to EPPs' Motion for Class Certification (ECF No. 1411-1) ("Benson Decl.")), Haider Tr. 195:20-197:10. He recognizes no such thing. Rather, he ████████████████ ███████████████████████████████████████████████ █████████████████████ Mangum Decl., ¶¶ 192-95.

- 17 -

No. 15-MD-2670 JLS (MDD)

FILED UNDER SEAL

reliability of . . . [Plaintiffs' expert's damages] model"). Defendants have not demonstrated anything close to a fatal oversight in Dr. Sunding's analysis.

E.     **Defendants Rely on Cases That Do Not Support Their Position**

The shortcomings of Defendants' argument become even clearer when looking at the cases they rely on. These cases are easily distinguished from this one for at least three significant reasons: (1) they involve components of finished products, sometimes customized by the buyer; (2) they involve more complex distribution, with four to six steps, not one to three; and/or (3) they involve massively concentrated purchasers, with OEMs buying 50-90%, which means individual end users may not be typical and individual negotiation is a bigger factor. Defendants rely on *In re Flash Memory Antitrust Litig.*, No. C 07-0086, 2010 U.S. Dist. LEXIS 59491 (N.D. Cal. June 9, 2010) and *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ("*GPU*"), both of which are components cases that "involve much more complicated questions about the effect that a supracompetitively priced component had on the final purchase price for an end user." *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 142 (E.D. Pa. 2011).

*In Flash Memory*, the model averaged prices for an array of different products with very different attributes that were sold to different categories of buyers as part of a five-step chain. *Flash Memory*, 2010 U.S. Dist. LEXIS 59491, at *28, 59-60. Very few buyers accounted for more than 80% of the market, giving them unique market power, and the power to demand customization, not present here.[24] *Id.* at *48. *See also GPU*, 253 F.R.D. at 480 (nearly half the purchases by just six buyers). Perhaps most importantly, there were absolutely no uniform practices concerning price lists. *Flash Memory*, 2010 U.S. Dist. LEXIS 59491, at *46-47. *See also GPU*, 253 F.R.D. at 502 ("it is unclear as to what degree if any defendants kept list prices

---

[24]     Dr. Sunding tested ██████████████████████████████████████ Sunding Report, ¶¶ 41, 112.

- 18 -

**FILED UNDER SEAL**

1   for their products."). Here, ███████████████████████

2   ████████████████████████████████████████

3   ████████████. *See also* 6AC ¶¶ 114, 274; Burt

4   Decl., ¶¶ 41, 45, 51.

In *GPU*, the complexity of both products and market structure – hundreds of product types, going to market by six different paths – led the court to determine "defendants' chain of distribution and the particularized sales transactions associated with each sale of a GPU product present a significant barrier to certification." *GPU,* 253 F.R.D. at 483. Price lists were a minor factor. *Id.* at 491.[25]

Unlike in *GPU* and *Flash Memory*, purchasers in this market have smaller market shares and less market power and the products come from the Defendants in standardized content, sizes and packing. *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 324 (N.D. Cal. 2014) ("*ODD*") ("ODDs typically make up a relatively small portion of the cost of the products into which they are incorporated"), also suffers from the same issue of involving a market and class so easily distinguishable from the facts here that it provides no guidance on the question of the validity of Dr. Sunding's use of averages. In *ODD*, "more than 80% of sales were to a few large customers, two of which (accounting for nearly half of sales) utilized a bidding process and ordered customized products." *Id.* at 317. Plaintiffs there could show a conspiracy involving just those large OEMs, which may not have affected list prices and prices to smaller purchasers. *Id.* at 318. In other words, the issue was not simply that there were individual negotiations, but

---

[25]   The one class the *GPU* court certified is instructive here; it included those who, like here, bought directly and at the same point in distribution. *Id.* at 497-98. *See also In re Indus. Diamonds,* 167 F.R.D. 374, 383 (S.D.N.Y. 1996) (certifying a class for products for which there were price lists, excluding only custom products). Here, Defendants acknowledge ███████████████████████████

████████████████████████████ Mot. at 5; Sunding Report, ¶ 103 n.169.

- 19 -

FILED UNDER SEAL

1   that the scheme may not have even been intended to affect all prices, just certain big

2   purchasers whose purchases were decoupled from list. Here, where two companies,

3   Bumble Bee and StarKist, and three executives have already pleaded guilty to price-

4   fixing,[26] where everyone got the exact same price lists, and where every end user

5   bought essentially the same simple product, there is simply no disconnect of the kind

6   seen in *ODD*. Dr. Sunding did not assume the ███████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ██████████████████████████████████████████. Sunding Report,

10  ¶¶ 109-110. This is an approach that both the *GPU* and *ODD* courts embraced.

11  *ODD*, 303 F.R.D. at 320-321 (quoting *GPU*, 253 F.R.D. at 491).

## IV.   PREDOMINANTLY COMMON PROOF WILL BE USED TO SHOW PASS THROUGH AND IMPACT TO EPPS

14      Given the straightforward product and distribution chain at issue here, a

15  presumption of impact to EPPs is warranted. *See* Mot. at 16-18. But EPPs do not rest

16  on that presumption. EPPs also demonstrated that common qualitative, quantitative

17  and anecdotal proof of pass-through predominates and that a reasonable method for

18  showing class-wide impact exists. *See* Mot. at 18-29. Defendants fail to rebut these

19  showings because they, *inter alia*, ignore their own admissions that pass-through

20  occurs, repeatedly and grossly mischaracterize Dr. Sunding's opinions and analyses,

21  and attempt to graft indirect purchaser "component" case complexities onto a

22  conspiracy to fix the price of a commodity "finished product."

23      Defendants fail to recognize or rebut the evidence from their own documents.

24  Each Defendant recognized ███████████████████████████████████████

25  ███████████████████████████. Mot. at 28-29; Sunding Report, ¶¶ 140-

26  44. This evidence would be presented at a trial on behalf of one class member or all

---

27  [26]    *See* Supp. Manifold Decl., Ex. 2 (StarKist); Burt Decl., Ex. 74 at 12:14-14:10,
28  Ex. 57 at 13:10-15:2, Ex. 72 at 11:21-13:18 (Worsham, Cameron and Hodge guilty pleas).

- 20 -

**FILED UNDER SEAL**

class members. As further demonstrated below, EPPs have easily demonstrated that pass-through can be shown through common proof.

### A.    Defendants' Meritless Arguments Regarding "Loss Leader" and Focal Point Pricing Do Not Defeat Predominance

Defendants falsely claim "Dr. Sunding did not refer or cite to a single document produced by any of the direct purchasers in this case regarding their pricing or marketing strategies." Opp. at 28 (emphasis omitted). Dr. Sunding reviewed and cited ███████████████████████████████████ ██████████████████████ (Sunding Report, ¶ 128 n.193) ████████████ █████████████████████████████████████████████████████████ ███████████ *Id.*, ¶ 129 n.194. Dr. Sunding was ██████████████ ████████████████████████████████████████ However, to lay this issue to rest, Dr. Sunding conducted ████████████████████████████████ █████████████████████████████████████████████████████████ ██████████████████████████ Sunding Reply, ¶ 53-55. ███████████ █████████████████████████████████████████████████████████ ███████████████████████ *Id.* These findings further support Dr. Sunding's conclusion that █████████████████████████████████████████████ ████████████.

This conclusion is consistent with Defendants' documents, which show that so-called "loss leaders" are ███████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████████████████. *See* Benson Decl., Ex. 15 (█████████████████████████); Ex. 18 (████████████ ███████████████████████). Finally, even assuming, arguendo, that retail prices at times dropped below wholesale prices, EPPs are still injured because the same retailer pricing strategies would have occurred in the but-for world, and "[t]he overcharge is passed through to the [EPPs] without regard to whether the

- 21 -

**FILED UNDER SEAL**

retailer sells above or below cost." *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-2143 RS, 2016 U.S. Dist. LEXIS 15899, at *70-71 (N.D. Cal. Feb. 8, 2016) (describing same and certifying class); *Gordon v. Microsoft Corp.*, No. 00-5994, 2001 U.S. Dist. LEXIS 26360, at *29 (D. Minn. Mar. 30, 2001).

Thus, Defendants' claims that Dr. Sunding ignores loss-leader pricing and "never looked at real-world evidence" (Opp. at 27, 28) are simply false. Dr. Sunding performed the sort of "real world" analysis courts rely on and found that retail discounts are often supported by manufacturer promotional discounts. *See, e.g., In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 U.S. Dist. LEXIS 137944, at *75 (N.D. Cal. June 20, 2013) report and recommendation adopted, 2013 U.S. Dist. LEXIS 137946, at *70-80 (N.D. Cal. Sept. 24, 2013); Sunding Report, ¶¶ 129-30, Figure 13. Dr. Sunding's study ███████████ █████████ far exceeded the cursory review in *Processed Eggs*. Sunding Report, ¶¶ 163-69 (███████████████████████████████████████████ ███████████████████████████████████████████ ██████████; Sunding Reply, ¶¶ 56-58.[27]

Similarly, Defendants' assertion that Dr. Sunding "ignored" focal point pricing, and that he "conducted no economic analysis" of its impact on pass-through, Opp. at 30-32, is demonstrably false. Dr. Sunding analyzed ████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████████" Sunding Report, ¶¶ 131-34. His conclusions were not based on a "single document" as Defendants claim (Opp. at 30 n.27), but on the combination of his review of Defendants' documents, cited academic articles and *his quantitative analyses* of

---

[27]   *In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 685 (S.D. Fla. 2012) is similarly inapposite because loss leaders were not at issue, and the expert "offer[ed] no methodology for determining whether pass-through actually occurred."

- 22 -

**FILED UNDER SEAL**

1  Walmart, Sam's Club, Trader Joe's and Kroger data. *Id.*, ¶¶ 131-34. Thus, while

2  Defendants purport to criticize Dr. Sunding



5  *Id.*, ¶ 169. As Dr. Sunding found, for example,

10      Defendants' cases on this topic do not address either the quantitative proof

11  presented by Dr. Sunding showing pass-through regardless of price promotion and

12  retailer (*id.*, ¶¶ 145-73), or the qualitative proof of pass through reflected in

13  Defendants' own documents (*id.*, ¶¶ 140-44). As such, Defendants' reliance on

14  *Flash Memory*,[28] *ODD* and *Lithium Ion Batteries* – all cases where the price-fixed

15  product was largely or entirely incorporated in other products before resale – is

16  misplaced.

17      In *Flash Memory*, this meant that not only were there a variety of categories

18  and types of flash memory chips and finished products incorporating such chips, the

19  chips were sold to some indirect purchasers on a stand-alone basis and as a

20  component of another product to others, creating a highly complex distribution

21  system. *Id.*, 2010 U.S. Dist. LEXIS 59491, at *28-30. Importantly, the court in *Flash*

22  *Memory* expressly distinguished the facts before it — which involved a component

23  part incorporated into a larger finished product in a highly complex manufacturing

24  and distribution system — from "situations in which the product received by an

25  indirect purchaser from the distributor was in the same form that it was originally

---

27  [28]    It should be noted that the *Flash Memory* court expressly relied upon the fact

28  that "the [U.S. DOJ] investigated claims of price fixing in the flash memory industry
and made **no findings of wrongdoing**." 2010 U.S. Dist. LEXIS 59491, at *41
(emphasis added).

FILED UNDER SEAL

sold by the defendant manufacturer." *Id.* at *63. The *Flash Memory* court noted that in the latter "situations . . . the effects of the price-fixing [are] not obscured by substantially altering or adding to the item received from the manufacturer," and hence, it is permissible in that instance to presume that the overcharge was passed-through in a manner that impacted the class in a "generalized" manner. *Id.* (quoting *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 1352 (1987)). Thus, *Flash Memory* supports applying a presumption of impact to price-fixed commodities—like Packaged Tuna—that remain unchanged from Defendant manufacturer to end purchaser.

In both *ODD* and *Lithium Ion Batteries*, the component parts "typically make up a relatively small portion of the cost of the products into which they are incorporated . . . ." *ODD*, 303 F.R.D. at 324. *See also In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-240 YGR, 2017 U.S. Dist. LEXIS 57340, at *90 (N.D. Cal. Apr. 12, 2017). In contrast, the price-fixed item here is the complete product that the retailers sold to class members. Thus, the wholesale price largely determined the price at which the retailer would sell. The grocery retailers simply did not have the ability to absorb even a small cost change in the face of thin margins in a highly competitive grocery retail industry.[29]

### B. Dr. Sunding's Pass-Through Studies Account for Geographic and Product Variation

Defendants assert that Dr. Sunding's pass-through models "incorrectly assume that prices paid by EPPs were constant across geographic locations" (Opp. at 32), and that the aggregation of certain data obscures price variations (*id.* at 33). Defendants mischaracterize Dr. Sunding's work. In addition to estimating pass-through at the state-level, Dr. Sunding's analyses ███████████████

---

[29]   Defendants do not dispute that the grocery retail industry is characterized by high level of competition. Defendants' own documents acknowledge █████████ ████████████████████████████████████████████ *See, e.g.,* Supp. Burt Decl., Exs. 7-9 (BB_Civil_000270216; SKC000096682; SKC000611965).

**FILED UNDER SEAL**

1 ████████████████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████████████████

3 ██████████████████ *See* Sunding Reply, ¶ 37 ██████████████████████████████

4 ████████████████████████████. Thus, any assertion that Dr. Sunding "assumed"

5 that prices were the same across or within states is false.

6        Defendants' criticism of Dr. Sunding's use of IRI data is particularly curious

7 in light of the fact that Defendants themselves regularly use IRI data to keep track of

8 their own and competitors' retail sales, to evaluate consumer demand in response to

9 price changes, and to make important business decisions.[30] Indeed, IRI data is well-

10 accepted and widely used in market studies by government agencies, academia, and

11 market participants. Sunding Report, ¶ 147, n.211.

12        The use of aggregated or average data in antitrust economics, including pass-

13 through, is well-accepted. *See, e.g., LCD*, 267 F.R.D. at 605 ("a number of courts

14 have held that averaged and aggregated data may be used to demonstrate pass-

15 through"); *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264

16 F.R.D. 603, 614 (N.D. Cal. 2009) ("*SRAM*") (rejecting the defendants' criticism that

17 the indirect-purchaser plaintiffs' use of average and aggregated data in their

18 structural model could yield "false-positive pass-through").  Indeed, in rejecting

19 arguments similar to those made by Defendants here, the *LCD* court found the

20 following analysis of the *Gordon v. Microsoft* court applicable: that the issue was

21 not tracking a specific increase, but "how a series of Microsoft price increases,

22 and/or a series of Microsoft failures to reduce prices, impacted the price each

23

24 ───────────────
[30]      Sunding Report, ¶ 147; *see also* Supp. Burt Decl., Ex. 10 (ASMPKSF-

25 010015811, at slide 3 ███████████████████████████████████████████████████

26 ██████████████████████████████████████████████████████████████ Ex. 11

27 (BB_Civil_000011560-63 at 11561 ███████████████████████████████████████████

28 ████████████████████████████████████████████████████

No. 15-MD-2670 JLS (MDD)

**FILED UNDER SEAL**

consumer paid" must often be answered by "general principles about what generally tends to happen. Thus, average pass through rates appear reasonable and even necessary to prove damages here." *LCD*, 267 F.R.D. at 605 (quoting *Gordon v. Microsoft Corp.*, No. MC 00-5994, 2003 Minn. Dist. LEXIS 9, at *8 (Dist. Minn. Dec. 15, 2003). The same reasoning applies here.

Defendants also argue that Dr. Sunding's pass-through analyses omit certain variables needed to account for the effect of geographic location and product differences, and that when Dr. Haider changes Dr. Sunding's methodology, the estimated pass-through effects decline or disappear. Opp. at 32. Defendants' criticism is meritless. First, even using Dr. Haider's revised specification, the vast ████████████████████████████████████████████████████████████. Sunding Reply, ¶ 38.

Second, and fatally derailing Dr. Haider's critique, her method introduces two impermissible flaws. Dr. Haider's revisions to Dr. Sunding's methodology are inappropriate because they: █████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████ *Id.,* ¶ 39. ███████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████.[31] Indeed, the reduced sample size and

---

[31]    Sunding Reply, ¶ 39. █████████████████████████████
████████████████████████████████████████████████████████ *Id.*

Multicollinearity exists when independent variables in a regression model are moderately or highly correlated and it prevents the model from isolating which variable is causing observed effects. Courts have recognized that multicollinearity can lead to unreliable estimates. *See, e.g., In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1274-1275 (S.D. Cal. 2010) (noting the presence of multicollinearity as one of the reasons for finding expert opinion does not satisfy Rule 702's relevance and

**FILED UNDER SEAL**

1   multicollinearity problems created by Dr. Haider's revisions to Dr. Sunding's

2   methodology infect virtually all of Dr. Haider's results. *See id.*, ¶¶ 39-43. ███

3   ████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████

6   ████████████████████████████████████. *See* Sunding Reply, ¶¶ 48-54 & Figure 1.

7   These updated results show that ███████████████████████████████

8   ████████████████████████████████████████████████████████████████

9   ████████████████████████████.

10        *Processed Eggs*, cited by Defendants, is inapplicable here. *Processed Eggs*

11   did not involve price-fixing or guilty pleas. 312 F.R.D. at 129. The court denied

12   class certification for myriad reasons, including the Third Circuit's ascertainability

13   requirement,[32] which the Ninth Circuit has ***expressly rejected***. *Briseno v. ConAgra*

14   *Foods, Inc.*, 844 F.3d 1121, 1126-33 (9th Cir. 2017). After holding that the class

15   could not be certified for lack of ascertainability, the *Processed Egg* court noted, for

16   example, that plaintiffs lacked a method for distinguishing eggs sold by defendants

17   from eggs sold by non-conspirators, necessitating individualized inquiries.

18   *Processed Eggs*, 312 F.R.D. at 149. Further, the *Processed Egg* expert relied on only

19   one retailer study (*i.e.*, Kroger) and geographically estimated pass-through for that

20   retailer as whole. *Id.* at 158. Dr. Sunding, in contrast, relied ████████████

21   ████████████████████████████████. Moreover, Dr. Sunding's analysis here mirrors

22   the defense expert's approach in *Processed Egg* which that court found persuasive.

23

24

        ————————————————

25   reliability requirements); *Reed Const. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp.

26   3d 385, 404-05 (S.D.N.Y. 2014) (finding a "a severe multicollinearity problem" in

27   expert's method that "contribute[d] to the Court's conclusion that [the method was] inadmissible under Rule 702").

28   [32]   *See Processed Eggs*, 312 F.R.D. at 137-142 (class not certifiable for lack of ascertainability as defined in *Byrd v. Aaron's Inc*., 784 F.3d 154, 162–63 (3d Cir. 2015) and *Carrera v. Bayer Corp*., 727 F.3d 300, 306–08 (3d Cir. 2013)).

**FILED UNDER SEAL**

1    Dr. Sunding also estimated ████████████████████████████

2    ███████████████████████████████████████████████████████

3    ██████████████    *See* Sunding Report, ¶ 166.  With respect to use of IRI data,

4    unlike the plaintiffs' expert in *Processed Egg*, Dr. Sunding's IRI data ███████

5    ███████████████████████████████████████████████████████

6    ████████████████████████. *Id.*, Table 3; Sunding Reply, ¶ 36.

7    Given the similarities between Dr. Sunding's method and the one embraced in

8    *Processed Egg* as well as the critical factual differences, *Processed Egg* actually

9    supports certification here.[33] *See In re Korean Ramen Antitrust Litig.*, No. 13-cv-

10   04115-WHO, 2017 U.S. Dist. LEXIS 7756, *59 n.38 (N.D. Cal. Jan. 19, 2017)

11   (distinguishing the complex market and meager empirical analysis in *Processed Egg*

12   and certifying a class of indirect purchasers of Korean ramen noodles).

13   **C.    Dr. Sunding Presents Predominantly Common Proof of Pass-Through Throughout the Distribution Chain**

14

15        Defendants argue that Dr. Sunding's quantitative analysis of the canned tuna

16   distribution channel omitted sales from distributors to retailers such as grocery

17   stores, and that therefore he cannot show pass-through on a class-wide basis. Opp. at

18   33-34. This argument is wrong on both facts and law.

19        Legally speaking, at the class certification stage, EPPs need not prove injury

20   to all class members. The proper question is whether "there is a reasonable method

21   for determining, on a classwide basis, the antitrust impact's effects on the class

22   members. . . . This is a question of methodology, not merit." *CRT*, 2013 U.S. Dist.

23   LEXIS 137946, at *78-79. Thus, while EPPs have presented evidence, common to

24   all class members, that pass-through occurs at all links in the distribution chain, they

25   _____

26   [33]    The two other cases relied upon by Defendants are entirely inapplicable. Opp.

27   at 33. The plaintiffs in *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 165 (N.D.
     Cal. 2001), failed to show how they intended to show that the indirect purchaser
28   ***resellers*** did not pass on the overcharge; there are no resellers in the EPP class here.
     *Pierson v. Orlando Health*, No. 6:08–cv–466, 2010 U.S. Dist. LEXIS 96906 (M.D.
     Fla. Aug. 30, 2010) involved a suit for breach of contract, not antitrust claims.

- 28 -

**FILED UNDER SEAL**

1  need not do so here. "Defendants [effort] to push . . . the Court toward a full-blown

2  merits analysis . . . is forbidden and unnecessary at this point." *Id.* (citing *Amgen Inc.*

3  *v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 464-65 (2013)).

4       For example, EPPs have presented common evidence showing pass-through

5  throughout the distribution chain, ███████████████████████████████

6  ████████████████████████████████████████ (*see* Sunding

7  Report, ¶¶ 140-144, nn.202-210). Additionally, Dr. Sunding's analysis ██████

8  ████████████████████████████████████████████████████

9  (Sunding Reply, ¶ 62)—███████████████████████████

10  ████████████████████. *See* Sunding Report, ¶¶ 170-73. There is no

11  principled economic reason—and Defendants present none—████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████████████████ *See id.*, ¶¶ 119-20.

16       Consistent with Dr. Sunding's analysis, several wholesale distributors testified

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  *See* Supp. Burt Decl., Ex. 12 (Piggly Wiggly Alabama Distribution Co. 30(b)(6)

20  Dep. Tr. (Patterson) at 134:5-138:2 ██████████████), 120:10-21 (███████

21  ████████████████)); Ex. 13 (Olean Wholesale Cooperative, Inc.

22  30(b)(6) Dep. Tr. (McCann) at 65:9-20 (████████)); *see also id.*, Ex. 14 (Trepco

23  Imports & Distribution, Ltd. 30(b)(6) Dep. Tr. (Audo) at 88:2-17 ████████

24  ████████████████████████████████████); Ex. 15 (Benjamin

25  Foods 30(b)(6) Dep. Tr. (Klayman) at 114:15-115:21 (████████████████

26  ████████████████████████)). This direct proof of pass-through

27  from distributors to retailers, in conjunction with Dr. Sunding's empirical and

28

FILED UNDER SEAL

economic analysis, satisfies EPPs' burden.[34] *See Korean Ramen*, 2017 U.S. Dist. LEXIS 7756, at *42 (certifying a class of indirect purchasers where the expert's pass-through opinion was bolstered by direct purchaser deposition testimony that price increases were passed through to customers).

> **D.    Dr. Sunding's Pass-Through Model is Both Representative and Extremely Robust**

Defendants simply misstate the scope of data Dr. Sunding examined. Dr. Sunding's analyses ███████████████████████████████████████ ███████████████████.[35] The data also covers the time period well-before, during and after the Class Period. Sunding Report, Table 4. The studies include █████████ ████████████████████████████████████████████████████████████████. Sunding Reply, Table 3. The studies include data from each level of the chain of distribution, and analyses of mass merchandisers, club stores, food and grocery stores, drug stores, dollar stores, convenience stores and others. Sunding Report, ¶¶ 146-48 & Table 4. Dr. Sunding's data sets are sufficiently complete and representative. *Cf. Korean Ramen*, 2017 U.S. Dist. LEXIS 7756, at *59 (monthly averages from two retailers and two wholesalers); *In re OSB Antitrust Litig.*, No. 06-826, 2007 U.S. Dist. LEXIS 56617, at *30-31 (E.D. Pa. Aug. 3, 2007) (data from

---

[34]    Defendants' cited authorities are clearly distinguishable. *In re Domestic Drywall Antitrust Litig.,* No. 13-MD-2437, 2017 U.S. Dist. LEXIS 135758 (E.D. Pa. Aug. 24, 2017) involved a complex distribution scheme where the IPP putative class members "var[ied] widely in the manner in which they purchased drywall." *Id.,* at *41. Defendants also cite to an early *ODD* decision, where the expert failed to "present[] a persuasive explanation as to why it would be reasonable to assume a uniform pass through rate given that ODDs typically make up a relatively small portion of the cost of the products into which they are incorporated . . . ." *ODD*, 303 F.R.D. at 324–25. The present case involves neither a complex distribution chain nor a built-in component of a larger product.

[35]    Dr. Sunding's data covers 29 of 30 states and the District of Columbia. The only geographic areas that are not covered by at least one study are Hawaii and Guam, the populations of which amount to less than 1% of the total state populations at issue. Sunding Reply, ¶ 36.

**FILED UNDER SEAL**

1    seven sellers); *Polyurethane Foam*, 314 F.R.D. at 280-281 (pass-through analysis
2    had 35,000 usable observations of retail price).

3         Defendants also assert, with no support, that the IRI data does not include
4    discounts at the point of sale such as coupons, and that it therefore reflects higher
5    prices. Opp. at 35. Even if true, it is irrelevant because the consumer still pays the
6    overcharge embedded in the tuna's inflated sticker price. For example, if a $2 can of
7    tuna priced at $2.00 includes 20 cent overcharge, a consumer using a ten cent
8    coupon pays $1.90. In the but-for world, however, the consumer would have saved
9    the same ten cents, but would have paid 20 cents less – $1.70. Thus, the overcharge
10   is passed-through regardless of the coupon. *See, e.g., CRT*, 2013 U.S. Dist. LEXIS
11   137945, at *132 (N.D. Cal. June 20, 2013) ("CRT manufacturers would have offered
12   special price concessions to those buyers in the but-for as well as the actual world.");
13   *Rosack v. Volvo of Am. Corp.*, 131 Cal. App. 3d 741, 755 (1982) ("[Contentions] of
14   infinite diversity of product, marketing practices, and pricing have been made in
15   numerous cases and rejected." (citation omitted)). In any event, Dr. Sunding did not
16   rely ███████████████████████████████████████████████
17   ████████████████████████████████████████████████████
18   ███████████████████████.[36]

21   [36]   *In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 140 F. Supp.
22   3d 339 (D. Del. Oct. 21, 2015), *aff'd in part, vacated in part*, 679 F. App'x 135 (3d
23   Cir. 2017), another component case Defendants rely upon, is misplaced. The product
24   at issue—transmissions—was a component in the Class 8 trucks sold to end
         purchasers which are "unique and highly customized for use in different
25   applications" that were delivered through a "complex distribution chain [that]
26   frustrates [measurement] of pass-though." *Id.* at 354. Those complexities simply do
     not exist in this case. Notably, the expert's pass-through studies in *Transmissions*
27   accounted for about 2% of the transmissions sales at issue. *Id.* at 356. In contrast, Dr.
28   Haider concedes that ████████████████████████████████████████
     ███████████████████████████
     ███████████████████  Haider Report at 35 n.81.

- 31 -

FILED UNDER SEAL

## V.  CHOICE OF LAW SUPPORTS CERTIFICATION

### A.  The Cartwright Class Should Be Certified

The Court's prior holding that the Cartwright Class does not "create material differences between California and the relevant states' laws" *In re Packaged Seafood Prods. Antitrust Litig.*, 277 F. Supp. 3d 1167, 1183 (S.D. Cal. 2017) remains valid, and the Court's prediction that "discovery will likely not affect the legal analysis implicated by the circumstances of this particular case" (*In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1066 (S.D. Cal. 2017)) has proven sound. Having successfully pushed for and received an examination of the choice of law issue at the motion to dismiss stage,[37] Defendants show no basis to revisit it.[38] *See, e.g., Yellowowl-Burdeau v. City of Tukwila*, No. 2:16-cv-01632-RAJ, 2017 U.S. Dist. LEXIS 67693, at *2, 8 (W.D. Wash. May 3, 2017).

EPPs' allegations of the Defendants' intertwined collusive conduct occurring in California and its impact on California are sufficient. 6AC ¶¶ 417-427; *see also* ¶¶ 171, 174 (COSI and TUG business in California), 184 (Dongwon's ownership of a shipping company in Commerce, CA), and 342 (BB and COSI's joint packing plant in Santa Fe Springs, CA). Moreover, former StarKist executive Steve Hodge admitted ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████." Burt Decl., ¶ 52, Ex. 72 at 11:23-12:5, 12:8-13, 12:23-13:2 (Hodge allocation transcript). *See also* 6AC ¶¶ 52, 57 (███████████████████████████████████████████████ ██████████████████████████████████████████). This defeats StarKist's belated argument that its Pennsylvania offices exempt it from application

---

[37]  Defendants previously argued that examining choice of law "on a motion to dismiss is appropriate, especially when discovery will not substantially inform the choice-of-law analysis." *In re Packaged Seafood Prods.*, 242 F. Supp. 3d at 1065.

[38]  Defendants employ nearly the identical argument and case law as in their motion to dismiss (*see* ECF No. 207-6), which still fail.  *See* EPPs' Appendix A, attached hereto.

- 32 -

FILED UNDER SEAL

of California law. Opp. at 39.[39]

Moreover, StarKist admittedly conspired in California with other defendants (California corporations) which establishes an incontrovertible and material connection between StarKist and California and a reasonable expectation by StarKist that it would be held accountable under California laws for such conduct. Manifold Supp. Decl., Exs. 1-2.

**B. The Individual State Classes Should Be Certified**

Defendants' argument that variations among the state laws cause "individual issues to predominate" is fundamentally ill-conceived. No one state (and Defendants do not contend otherwise) poses manageability issues; nor could they, as each state presents one to three state law claims. 6AC ¶¶ 429–1088. Declining to adjudicate the valid and jurisdictionally proper class action claim of Plaintiff A simply because the Court also has before it the valid and jurisdictionally proper separate state law class claims of Plaintiffs B and C in a consolidated case would constitute an effective abdication of fair process and adjudication on the merits in all the cases.[40]

---

[39] StarKist's sudden claims that the Cartwright Class would violate its due process rights have been waived by its failure to raise the point in the Court's prior examination of the issue. *See, e.g., Aicco, Inc. v. Ins. Co. of N. Am.*, 90 Cal. App. 4th 579, 595 (2001) (rejecting claims by defendant located in Pennsylvania that Pennsylvania law rather than California should govern as waived where it had not previously "made a serious attempt to support its argument.").

[40] The convergence of large national antitrust conspiracies, state *Illinois Brick* repealer statutes, and the passage of the Class Action Fairness Act of 2005 ("CAFA") (28 U.S.C. § 1322 (d)) made it inevitable that sizable class claims involving the laws of multiple states would find their way into consolidated proceedings in Federal Court. Kershell, Holly, *Comment: An Approach to Certification Issues in Multi-State Diversity Class Actions in Federal Court After the Class Action Fairness Act of 2005*, 40 U.S.F. L. REV. 769, 770 (2006). It is thus unremarkable that in such a case a federal court will be called upon to coordinate varying state classes involving the laws of multiple states. As noted by the *SRAM* court, "[T]here is no qualitative difference between a federal district court considering class certification of state claims under that state law and a federal court serving as a multi-district litigation forum performing the same task for many federal courts." *SRAM*, 264 F.R.D. at 615.

**FILED UNDER SEAL**

As to "manageability," Defendants ignore the fact that "manageability" is just one part of the larger question under Rule 23(b)(3) of whether class treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). *See Moore v. Ulta Salon, Cosmetics & Fragrance, Inc*., 311 F.R.D. 590, 608 (C.D. Cal. 2015) (citing superiority factors); *Leyva v. Medline Indus. Inc*., 716 F.3d 510, 514 (9th Cir. 2013) (certification erroneously denied because all four criteria must be considered). And there is a "'well settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns.'" *Briseno v. ConAgra Foods, Inc.* 844 F.3d 1121, 1128 (9th Cir.) *cert denied*, 138 S. Ct. 813 (2017).

Defendants ignore the other factors. The identically situated consumers in each proposed class have exceedingly modest losses compared to the resources necessary to prosecute these actions. They must proceed in classes or not at all.[41]

Finally, Defendants ignore this Court's progress in the case to date. The pre-trial stage of this case has been managed through motion practice and discovery, which is nearly at a close. The same will necessarily be true of any summary adjudication motions.

While there may be some complexity at the jury instruction stage on some individual claims, that complexity is greatly overblown in the Defendants' zeal to avoid all accountability for their admitted criminal conduct. Courts recognize that while some differences in claims will exist, such differences pale in comparison with the common elements and can be handled by federal courts committed to the resolution of disputes, including in complex cases, on the merits. *Lidoderm*, 2017 U.S. Dist. LEXIS 24097, at *43, 111-12 (class of EPPs in 17 states certified;

---

[41]    *SRAM*, 264 F.R.D. at 615 (27 state law classes); *LCD*, 267 F.R.D. at 608 (23 state law classes). Denial of class certification sounds the death knell to modest consumer claims such as these. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); *Opperman v. Path, Inc.*, Case No. 13-cv-00453-JST, U.S. Dist. LEXIS 92403, at *56 (N.D. Cal. July 15, 2016).

FILED UNDER SEAL

differences in state laws could be accommodated on a special verdict form or through other mechanisms); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 701 (S.D. Fla. 2004).[42]

All of the Rule 23 elements, including superiority, have been satisfied for each individual state class Plaintiffs seek to certify, and they should be certified.

## VI.    CONCLUSION

EPPs' Motion for Class Certification should be granted.

DATED: November 20, 2018

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**

BETSY C. MANIFOLD
RACHELE R. BYRD
MARISA C. LIVESAY
BRITTANY N. DEJONG

By:        *s/ Betsy C. Manifold*
          BETSY C. MANIFOLD

750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:  619/234-4599
manifold@whafh.com
byrd@whafh.com
livesay@whafh.com
dejong@whafh.com

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
FRED TAYLOR ISQUITH
THOMAS H. BURT
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600

---

[42]    Defendants' reliance on pre-CAFA cases and cases which either rely on pre-CAFA authority or fail to give due consideration to the federalizing effect CAFA had on national interest multi-state cases such as this one, is out of step with jurisdictional realities. Better reasoned cases take account of the fact that "federal courts are the primary forum in which multi-state class actions may now be brought." These courts realize that "[m]ulti-state class actions can be made manageable if federal courts are willing to undertake the proper, albeit complex analysis of the laws of multiple states; and in this post-CAFA era it is imperative that they do so." *Kershell*, 40 U.S.F. L. Rev. at 770.

- 35 -

**FILED UNDER SEAL**

Facsimile:   212/545-4653
isquith@whafh.com
burt@whafh.com

**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP**

CARL MALMSTROM
111 West Jackson, Suite 1700
Chicago, IL 60604
Telephone: 312/984-0000
Facsimile:   312/212-4401
malmstrom@whafh.com

*Interim Lead Counsel for the
Indirect Purchaser End Payer Plaintiffs*

TUNA:25202

- 36 -