Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Douglas H. Patton, Esquire
Kevin J. Murray, Esquire
Samuel J. Randall, Esquire
Brandon S. Floch, Esquire
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida  33131
Tel:  (305) 373-1000
Fax: (305) 372-1861

***Liaison Counsel for the Direct Action Plaintiffs
and Counsel for the "Kroger" Plaintiffs***

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No. 15-md-2670-JLS-MDD<br><br>MDL No. 2670 |
| This Document Relates to:<br><br>ALL ACTIONS | **Judge:  Hon. Janis Sammartino**<br>**Courtroom:  4D (4th Floor)**<br>**Date: TBD**<br>**Time: TDB** |

## PLAINTIFFS' NOTICE OF MOTION & MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BUMBLE BEE ON LIABILITY

## PUBLIC VERSION

## NOTICE OF MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE** that on a date and time to be determined by the Court, in Courtroom 4D of the Honorable Janis L. Sammartino, United States District Judge, Plaintiffs will and hereby do move for an Order from this Court entering partial Summary Judgment against Bumble Bee on the issue of liability.

This Motion is based upon this Notice of Motion and Motion, the Plaintiffs' Joint Statement of Facts, the Memorandum of Points and Authorities, and such argument which may be presented at the hearing on this motion.

Dated: September 19, 2019                    Respectfully submitted,

By: _____

William J. Blechman, Esquire
Kevin J. Murray, Esquire
Douglas H. Patton, Esquire
Samuel J. Randall, Esquire
Brandon S. Floch, Esquire
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida  33131
Tel:   (305) 373-1000
Fax:   (305) 371-1861
E-mail:  wblechman@knpa.com
            kmurray@knpa.com
            dpatton@knpa.com
            srandall@knpa.com
            bfloch@knpa.com

***Liaison Counsel for Direct Action Plaintiffs***

## MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES

Bumble Bee Foods, along with two of its senior executives, have been convicted for participating in a price-fixing conspiracy. Additionally, three witnesses from Chicken of the Sea ("COSI") directly implicate Bumble Bee in this conspiracy beginning in 2008. Substantial evidence in the record, including memoranda of meetings between Bumble Bee executives and executives at its competitors, overwhelmingly support the conclusion that Bumble Bee participated in the conspiracy during this time period.

Most pertinent to this motion, not a single witness with firsthand knowledge of the unlawful acts committed by Bumble Bee through its senior-most executives denies Bumble Bee's participation in the conspiracy. Rather than dispute the overwhelming evidence of their participation in the price-fixing conspiracy, each of the five primary conspirators at Bumble Bee[1] invoked their Fifth Amendment rights against self-incrimination during their depositions.

Thus, the evidence of Bumble Bee's participation in the conspiracy is unrebutted. Accordingly, based on these undisputed facts, Fed. R. Civ. P. 56 requires that the Court enter Summary Judgment against Bumble Bee on its participation in a price-fixing conspiracy between 2008 and 2015.

## I.   UNDISPUTED FACTS

As detailed in Plaintiffs' Joint Statement of Undisputed Facts, five Bumble Bee employees are directly implicated in the price-fixing conspiracy: (1) CEO Chris Lischewski; (2) ███████████; (3) Senior VP of Sales Scott Cameron; (4) Senior VP of Trade Marketing Ken Worsham; and (5) ███████.[2] Although all five of these Bumble Bee employees were deposed in this MDL, none has provided any testimony that rebuts the evidence of their involvement on behalf of Bumble Bee in

---

[1]   *See generally* Plaintiffs' Joint Statement of Facts ("PJSOF").

[2]   *See, e.g.,* PJSOF at ¶¶ 1–2, 8–13, 32–39, 48–55, 79, 83–85, 92.

the price-fixing conspiracy.  To the contrary, both Scott Cameron and Ken Worsham have admitted to their involvement in the conspiracy beginning no later than 2011,[3] and Bumble Bee has made the same admission in its corporate capacity.[4]  Moreover, each of these five Bumble Bee employees invoked his Fifth Amendment rights rather than respond to questions about his involvement in the conspiracy.[5]

Accordingly, the evidence of Bumble Bee's involvement in the conspiracy beginning in 2008 is not in dispute.

### A.    The Can Downsizing and List Price Increase in 2008

On March 13, 2008, while StarKist was seeking to downsize its six-ounce cans to five ounces (and persuade its competitors to follow this move),[6] the senior-most executives of Bumble Bee and Chicken of the Sea met over breakfast at Milton's in Del Mar, California.  The first and second in command of both Bumble Bee and COSI (CEO Shue Wing Chan and EVP John Sawyer for COSI, and CEO Chris Lischewski and ▮▮▮▮▮▮▮▮ for Bumble Bee) attended this meeting.[7]

Prior to this meeting, neither COSI nor Bumble Bee had decided whether to downsize its cans.[8]  But over breakfast, the executives agreed that both Bumble Bee and COSI would downsize their six-ounce cans to five ounces.[9]  Following this meeting, Bumble Bee and COSI continued to communicate about their downsizing plans, including by sharing details about their efforts to sell their customers on this change.[10]

---

[3]      PJSOF at 93–95.

[4]      PJSOF at 76–79.

[5]      PJSOF at 98.

[6]      PJSOF at ¶¶ 1, 7–8.

[7]      PJSOF at ¶ 2.

[8]      PJSOF at ¶¶ 3–6.

[9]      PJSOF at ¶¶ 9–13.

[10]     PJSOF at ¶¶ 14–16, 18.

This agreement to downsize allowed the industry to move to five-ounce cans, a move that likely would not have happened otherwise.  During the period between StarKist's announcements of its intention to downsize and the confirmation by Bumble Bee and COSI that they would follow StarKist's move, the three largest purchasers of canned tuna in the country – Walmart, Costco, and Kroger – had each expressed their unwillingness to accept downsized cans.[11]   However, the three competitors shared information with each other regarding their messaging to retailers about the can downsizing, as well as their respective timeframes for implementing the change.[12]  Thus, with the three major domestic suppliers committed to the downsizing (and also committed to coordinating their business plans with each other), Defendants were able to successfully implement the change.  StarKist began shipping its five-ounce cans in July 2008, and COSI and Bumble Bee began selling their downsized cans two months later.[13]

Contemporaneous to their collusive downsizing initiative, the competitors also reached an agreement to implement an across-the-board price increase on all packaged tuna products.[14]

Beginning in late May 2008, COSI and Bumble Bee began to hear rumors about StarKist increasing prices ███████████████████████████████[15]  On June 11, a Bumble Bee employee reported to Bumble Bee's Ken Worsham and Scott Cameron that ████████████████████████████████████████████████████████ ████████████████████████████████████████[16]

---

[11]     PJSOF at ¶ 17.
[12]     PJSOF at ¶ 18.
[13]     PJSOF at ¶¶ 19–20.
[14]     PJSOF at ¶¶ 21–40.
[15]     PJSOF at ¶¶ 22–23.
[16]     PJSOF at ¶ 23.

1     These rumors proved accurate, as Del Monte held an internal meeting to discuss

2    the list price changes for its StarKist products.[17]  That same day, COSI's █████

3    reported to his boss, John Sawyer, details about what occurred during this internal

4    Del Monte sales meeting.  Despite the fact that Del Monte, the owner of StarKist at

5    this time,[18] had not yet announced any price increases, ██████ was able to provide

6    StarKist's unconfirmed list price on a case of chunk light tuna.  The price that Mr.

7    ██████ reported to Mr. Sawyer ($36.48) matched to the cent the price reflected on

8    StarKist's internal document prepared the same day.[19]

9     On June 16, 2008 (the Monday following the Del Monte conference call), both

10    ████████ of COSI and ████████████ of Bumble Bee received and reported to their

11    superiors the same exact pricing information about the same eight products on the

12    new StarKist price list, which was still not yet announced to any customers.[20]

---

[17]    PJSOF at ¶ 24.

[18]    Prior to its sale to Dongwon, StarKist was an unincorporated division of Del Monte.

[19]    PJSOF at ¶¶ 25–26.

[20]    PJSOF at ¶¶ 27–28.  The StarKist price list at issue contained pricing for approximately 40 different products.  Given that ████████████ both had precisely accurate information from a still unreleased StarKist price list, *see* PJSOF at ¶¶ 29–30, the only plausible inference is that this information came directly from Del Monte.  And given that both ████████████ had accurate information about the same eight products from this lengthy price list, the only two reasonable inferences are either that ████████████ shared this information with each other, or that they both had the same source within Del Monte.  *Id.*



Contemporaneous with ████████████████ collection of competitive intelligence from StarKist, COSI's Mike White admits that he was communicating with Ken Worsham of Bumble Bee about implementing list price increases.[22]  White further admitted that his communications with Worsham resulted in an agreement to increase list prices of packaged tuna products,[23] and COSI corroborated this admission in its corporate capacity.[24]

Once again, no witness rebuts this direct evidence of a collusive agreement between Bumble Bee and COSI.  Chris Lischewski, Ken Worsham, and Scott Cameron each invoked his Fifth Amendment rights in response to questions about the list price agreement reached in mid-2008.[25]

As a result of this agreement, Bumble Bee and COSI implemented list prices that were substantially higher than their prior list prices, and also demonstrably higher than the prices that would have existed without collusion.  ████████████████

---

[21]    In the packaged tuna industry, the smallest size can is sometimes called a quarter (or 1/4), the medium six ounce (and then five ounce) size can is sometimes called a half (or 1/2), and the larger 10 ounce can is called a one (or 1).  *See, e.g.,* Robert Worsham Dep. at 29:4–30:1 [Tab 33]. ████████████████████████

[22]    PJSOF at ¶¶ 32–34.

[23]    PJSOF at ¶ 33.

[24]    PJSOF at ¶ 35.

[25]    PJSOF at ¶ 36–39.

1 ███████████████████████████████████████████████████████
2 ███████████████████████████████████████████████████████
3 ███████████████████████████████████████████████████████
4 ██████████████████████████████.[26]

5     As a result of the simultaneous list price increase and can downsizing, packaged

6 tuna prices remained at substantially elevated levels throughout the remainder of 2008

7 and all of 2009.  ██████████████████████████████████████

8 ███████████████████████████████████████████████████████

9 ████████████████████████████████████████████████[27]

10     **B.     The 2010 Net Price Increase**

11     In early 2010, Bumble Bee and COSI reached another agreement to increase

12 prices.  As COSI admitted in its corporate capacity, as early as May 2010, there was

13 an "Agreement among Bumble Bee and COSI on timing of net price increase for

14 branded tuna products."[28]  COSI's Mike White also admitted that he participated in

15 collusive communications with Bumble Bee's ████████ and Ken Worsham that

16 resulted in this agreement to implement a net price increase, and he identified specific

17 phone calls with █████ and Worsham during which they "discuss[ed] coordinating

18 packaged tuna pricing."[29]

19     While White was coordinating pricing with George and Worsham, Bumble

20 Bee's Scott Cameron was communicating with █████████████████████████

21 ████████████.  On April 23, 2010, immediately following a phone call with

22 ████████,[30] ███████████████████████████████████

23 _____

24     [26]   PJSOF at ¶¶ 40–46.

25     [27]   PJSOF at ¶ 47.

26     [28]   PJSOF at ¶ 48.

27     [29]   PJSOF at ¶¶ 49–50.

28     [30]   A chart setting forth the relevant calls is attached to the PJSOF at Tab 41.



1  ████████████████████████████████████████

2  █████████████ █████████████████████████████

3  ████████████████████████████████████████████

4  ███████████████████[33]

5         ████████████████████████████████████

6  ████████████████████████████████████████████

7  ████████████████████████████████"[34]████████

8  ████████████████████████████████████████████

9  ███████████████████████[35]█████████████████

10 █████████████████.[36]

11        ██████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 █████████████████████████[37]

15        Based on these collusive communications, Bumble Bee was able to implement

16 a price increase in coordination with its competitors. █████████████████

17 ████████████████████████████████████████████

18 ████████████████████████████████████████████

19 █████████████████████████.[38]

20

21
   _____

22   [31]       PJSOF at ¶ 52.

23   [32]       PJSOF at ¶ 53.

24   [33]       PJSOF at ¶ 53.

25   [34]       PJSOF at ¶ 54.

26   [35]       PJSOF at ¶ 55.

27   [36]       PJSOF at ¶ 52, Tab 40.

28   [37]       PJSOF at ¶ 56.

     [38]       PJSOF at ¶ 58.

## C.   Collusion Between 2011 and 2013

In a plea agreement with the United States and in an interrogatory response to Plaintiffs in this MDL, Bumble Bee admitted that it reached agreements with COSI and StarKist between, at least, the first quarter of 2011 and the fourth quarter of 2013.[39] Bumble Bee's plea agreement provides that:

- During the relevant period [defined as 2011 to 2013], the defendant, through its officers and employees, including high-level personnel of the defendant, participated in a conspiracy among major packaged-seafood-producing firms, the primary purpose of which was to fix, raise, and maintain the prices of packaged seafood sold in the United States.[40]

- In furtherance of the conspiracy, the defendant, through its officers and employees, engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms.[41]

- During these conversations, discussions, and meetings, agreements and mutual understandings were reached to fix, raise, and maintain the prices of packaged seafood sold in the United States.[42]

- Defendant, through its officers and employees, negotiated prices with customers and issued price announcements for packaged seafood in accordance with the agreements and mutual understandings reached.[43]

- The business activities of the defendant and its coconspirators in connection with the production and sale of packaged seafood that were

---

[39]   PJSOF at ¶¶ 76–79.

[40]   PJSOF at ¶ 77.

[41]   PJSOF at ¶ 77.

[42]   PJSOF at ¶ 77.

[43]   PJSOF at ¶ 77.

the subject of this conspiracy were within the flow of, and substantially affected, interstate trade and commerce.[44]

Bumble Bee's plea agreement, and the criminal judgment entered by the Court based on that guilty plea, both provide that Bumble Bee violated the Sherman Act, 15 U.S.C. § 1, by conspiring to fix prices.[45]

Bumble Bee's interrogatory response also elaborated on three agreements that it admitted to as part of its guilty plea:

1)   "First, Senior Vice Presidents of the Sales and Trade Marketing departments at Bumble Bee coordinated certain list price increases relating to certain canned tuna products through a series of bilateral communications with executives at the other companies (including, at various times, communications with Steve Hodge and Chuck Handford of StarKist) that occurred between the first quarter of 2011 and the fourth quarter of 2013....   Bumble Bee announced three list price increases during the relevant period (on March 10, 2011, January 17, 2012, and March 30, 2012) that were the result of such coordination."[46]

2)   "Second, Senior Vice Presidents and Vice Presidents of the Sales and Trade Marketing departments at Bumble Bee coordinated certain promotional levels and changes to certain pricing guidance on certain canned tuna products through a series of bilateral communications with executives at the other companies (including, at various times, communications with Steve Hodge and Chuck Handford of StarKist and Mike White of Chicken of the Sea).   These communications occurred

---

[44]     PJSOF at ¶ 77.

[45]     PJSOF at ¶ 78.

[46]     PJSOF at ¶ 79.

episodically between the first quarter of 2011 and the fourth quarter of 2013."[47]

3) "Third, as an additional basis for the Company's guilty plea, the Company acknowledged that certain documents and information suggest that the CEOs of Bumble Bee and Chicken of Sea coordinated with respect to certain promotional pricing on certain canned tuna products during 2013."[48]

Bumble Bee's admissions are further corroborated by the admissions of COSI and StarKist. COSI (in its corporate capacity), Mike White, John Sawyer, and Shue Wing Chan each admit to reaching multiple agreements with Bumble Bee related to pricing of packaged tuna products between 2008 and 2013.[49]

StarKist also pled guilty to conspiring with Bumble Bee and COSI, and further admitted that it coordinated two list price increases with Bumble Bee between November 2011 and May 2012.[50] In an interrogatory response, StarKist further confirmed that it conspired with Bumble Bee (and COSI) between November 2011 and December 2013 through Steve Hodge, ██████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████[51]

---

[47] PJSOF at ¶ 79.

[48] PJSOF at ¶ 79.

[49] PJSOF at ¶¶ 80–85.

[50] PJSOF at ¶¶ 86–92.

[51] PJSOF at ¶¶ 90–92. Although StarKist does not expressly admit that it participated in the collusive price increase that took place in May 2011, there is no evidence in the record that StarKist contradicting Bumble Bee's admission that StarKist was a party to this collusive agreement. ████████████████

███████████████████████████████████████

Additionally, Scott Cameron (Bumble Bee's Senior VP of Sales), Ken Worsham (Bumble Bee's Senior VP of Trade Marketing), and Steve Hodge (StarKist's Senior VP of Sales) have each corroborated Bumble Bee's admissions through their own guilty pleas and the resulting criminal convictions.[52]

Finally, no witness in this MDL implicated by these admissions has disputed Bumble Bee's account of these agreements.  Although Chris Lischewski apparently intends to proceed to tria on the criminal charges against him related to his involvement in the conspiracy alleged by Plaintiffs, he invoked his Fifth Amendment rights rather than answer questions about his conduct.[53]  Similarly, Scott Cameron, Ken Worsham, ███████████████, and ██████████ of Bumble Bee and Steve Hodge and ██████████████ of StarKist each invoked his Fifth Amendment rights in response to all questions about their involvement in the conspiracy.[54]

### D.  Collusion Continued Until July 2015

Based on the collusive pricing agreements that occurred between 2008 and 2013, Bumble Bee and its competitors were able to charge supra-competitive prices to Plaintiffs by continuing to monitor and enforce those agreements in 2014 and 2015. █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████[55]

And just as this market allocation agreement between StarKist and Bumble Bee endured after 2013, the price lists that had been implemented through collusion

---

██████████████████████████████████████████████
███████████  *See* PJSOF at ¶ 99.

[52]    PJSOF at ¶¶ 93–96.

[53]    PJSOF at ¶ 98.

[54]    PJSOF at ¶ 98.

[55]    PJSOF at ¶ 102.

1   also remained in effect. ████████████████████████████████

2   ████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████

4   ████[56]   StarKist was similarly unable to identify any decrease to its list prices

5   between 2010 and 2015.[57]   Thus, there is no evidence that Bumble Bee, StarKist, or

6   COSI ever retracted the list price increases that were implemented through their

7   collusive agreements.[58]

8         Moreover, a number of the same individuals who colluded on pricing between

9   2008 and 2013 continued to communicate with each other between January 2014 and

10   July 2015.  For example, ██████████████ of StarKist ████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████████████████ continued to communicate with

13   Scott Cameron about pricing of StarKist and Bumble Bee products in 2014.[59]

14   Similarly, between January 2014 and July 2015, Bumble Bee's ████████ continued

15   to speak frequently with COSI's Mike White, and Bumble Bee's Chris Lischewski

16   continued to speak with COSI's Shue Wing Chan.[60]

17   **II.     <u>STANDARD</u>**

18         A party may move for summary judgment under Fed. R. Civ. P. 56(a) as to a

19   claim or part of a claim. Rule 56 provides that summary judgment is appropriate when

20   there is "no genuine dispute as to any material fact and the movant is entitled to

21   judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

22   Material facts are those that may affect the outcome of the case. *Anderson v. Liberty

23   Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists only

---

[56]     PJSOF at ¶¶ 103–104.

[57]     PJSOF at ¶ 105.

[58]     PJSOF at ¶ 106.

[59]     PJSOF at ¶ 108.

[60]     PJSOF at ¶ 109.

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "When a plaintiff seeks summary judgment as to an element for which it bears the burden of proof, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Daimler AG v. A-Z Wheels LLC*, 334 F. Supp. 3d 1087, 1094 (S.D. Cal. 2018) (quoting *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)).

"On summary judgment, an adverse inference alone is not enough to support the absence of a genuine dispute of material fact. Such an inference may be drawn only when there is independent evidence of the fact to which the party refuses to answer." *Sec. & Exch. Comm'n v. Strategic Glob. Investments, Inc.*, 262 F. Supp. 3d 1007, 1023 (S.D. Cal. 2017) (citing *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977)).

## III.   Plaintiffs Are Entitled to Partial Summary Judgment on Liability

To prevail on their claim for price-fixing in violation of the Sherman Act, Plaintiffs must prevail on four elements:

1) that an agreement to fix the prices of packaged tuna existed;

2) that Bumble Bee knowingly – that is, voluntarily and intentionally – became a party to that agreement;

3) that such agreement occurred in or affected interstate commerce; and

4) that the agreement caused Plaintiffs to suffer an injury to their business or property.[61]

---

[61]   *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, 2013 WL 6174683, at *5 (N.D. Cal. Nov. 20, 2013), *aff'd*, 637 F. App'x 981 (9th Cir. 2016).

Given the overwhelming and undisputed evidence of Bumble Bee's participation in a price-fixing conspiracy, Plaintiffs are entitled to judgment as a matter of law on the first three of these elements.   Additionally, the evidence demonstrates that, as a matter of law, Bumble Bee conspired with COSI between 2008 and 2015,[62] and with StarKist between at least 2011 and 2015.  Finally, because the conspiracy involved price-fixing agreements between horizontal competitors, there is no dispute that the *per se* analysis applies in this case.

### A.   The Evidence of Bumble Bee's Participation in the Conspiracy Between 2008 and 2010 Is Undisputed

As detailed above, uncontroverted evidence establishes that Bumble Bee participated in a price-fixing conspiracy beginning no later than March 2008, when its CEO and COO met with its competitor and agreed to reduce the sizes of its six-ounce cans to five ounces.  Plaintiffs need only prove than Bumble Bee entered into a single agreement with a single competitor in order to establish its liability prior to January 2011 (the time period covered by Bumble Bee's guilty plea).  Plaintiffs exceed this requirement three-fold, by establishing – without rebuttal– that Bumble Bee entered into at least the following three agreements between 2008 and 2010:

1)     An agreement between at least Bumble Bee and COSI[63] to downsize their six-ounce packaged tuna cans to five ounces in mid-2008;

2)     An agreement between at least Bumble Bee and COSI to increase list prices for packaged tuna products simultaneous with the can downsizing in mid-2008;

---

[62]     The Class Plaintiffs only seek partial summary judgment for the time period between 2011–2015.

[63]     Although there is substantial evidence that StarKist also participated in the first three agreements, Plaintiffs concede that this evidence is disputed and therefore cannot be resolved as a matter of law.  However, because Plaintiffs need only prove that Bumble Bee conspired with one competitor, the question of fact as to whether StarKist conspired with Bumble Bee and COSI prior to 2011 does not preclude a finding that, as a matter of law, Bumble Bee conspired with COSI.

3)    An agreement between at least Bumble Bee and COSI to increase net prices for packaged tuna products in May 2010;

Accordingly, Plaintiffs are entitled to summary judgment on Bumble Bee's liability for the period between March 2008 and December 2010.

"A plaintiff's motion for [judgment as a matter of law] requires the trial court to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect." *United California Bank v. THC Fin. Corp.*, 557 F.2d 1351, 1356 (9th Cir. 1977).

Plaintiffs meet this standard here based on overwhelming and uncontradicted evidence. Two of the witnesses who attended this meeting – John Sawyer and Shue Wing Chan – acknowledge that they reached an agreement with Bumble Bee at this meeting (through ███████ and Chris Lischewski). COSI – the corporate party to the agreement – confirmed these admissions. Further, Chris Lischewski and ███████ ███████ invoked their Fifth Amendment rights rather than answer questions about this meeting.

Accordingly, there is no evidence in the case that contradicts the admissions of Sawyer, Chan, and COSI. Thus, as to the Bumble Bee's participation in the can downsizing, "there was no conflicting evidence. Quite simply, one scale pan was empty while the other was not." *Belcon Inc. v. D.C. Water & Sewer Auth.*, 826 A.2d 380, 386 (D.C. 2003) (holding that directed verdict was properly entered in favor of party with the burden of proof). *See also Chicago, Rock Island & Pac. Ry. Co. v. Howell*, 401 F.2d 752, 754 (10th Cir. 1968) ("The fundamental rule which makes the jury the sole judge of the weight and credibility of testimony is subject to the caveat that testimony concerning a simple fact, capable of contradiction, not incredible, and standing uncontradicted, unimpeached, or in no way discredited by cross-examination, must be permitted to stand."); *Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 75 (1st Cir. 2002) (affirming directed verdict in favor of party with the

1   burden of proof because "a reading of [the testimony] discloses no lack of candor on

2   [the witness's] part.  It was not shaken by cross-examination....  Its accuracy was not

3   controverted by proof or circumstances, directly or inferentially; and it is difficult to

4   see why, if inaccurate, it readily could not have been shown to be so.  The witness

5   was not impeached; and there is nothing in the record which reflects unfavorably upon

6   his credibility."); *Hurd v. Am. Hoist & Derrick Co.*, 734 F.2d 495, 501 (10th Cir.

7   1984) (directing verdict in favor of plaintiff based on uncontradicted evidence from

8   plaintiffs' retained expert).[64]

9          Bumble Bee has presented no evidence providing any basis to disbelieve the

10  unequivocal testimony of COSI, Sawyer, and Chan, and for this reason, there is no

11  disputed material fact on the issue of whether Bumble Bee reached an agreement with

12  at least one of its competitors by March 2008.  Accordingly, because Plaintiffs need

13  only prove that Bumble Bee participated in a single conspiratorial act in furtherance

14  of the price-fixing conspiracy, Plaintiffs are entitled to judgment as a matter of law

15  regarding Bumble Bee's liability for the period between 2008 and 2010.  *See Arandell*

16  *Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 634 (9th Cir. 2018) (quoting

17  *Esco Corp. v. United States*, 340 F.2d 1000, 1006, 1008 (9th Cir. 1965)) (recognizing

18  that a plaintiff need not "show "that each defendant or all defendants must have

19  participated in each act or transaction.  Involvement 'in but two of ten allegedly

20  conspirational [conspiratorial] situations does not absolve [a defendant] from

21  participation in the entire conspiracy if its involvement in the two was unlawful and

22  knowingly and purposely performed.'").

23         But although Plaintiffs meet their burden on the issue of Bumble Bee's

24  liability prior to 2011 with evidence of its participation in the can downsizing alone,

25  Plaintiffs also demonstrate two additional agreements that Bumble Bee reached with

26  _____

27  [64]   As noted in § II, *infra*, the standard for summary judgment in favor of
    the party with the burden of proof is the same as the standard for granting a directed

28  verdict after trial.

COSI in furtherance of the conspiracy. Thus, this same analysis applies to agreements between Bumble Bee and COSI to increase list prices in 2008 and to increase net prices in 2010.

COSI's Mike White clearly testified that he reached agreements with Bumble Bee – through Ken Worsham – in both instances. As detailed above, phone records and contemporaneous documents corroborate this testimony. COSI's John Sawyer, and Shue Wing Chan, along with COSI itself (in its corporate capacity), further corroborate White's testimony. And once again, in the face of this overwhelming evidence, each of the central Bumble Bee witnesses – Worsham, Cameron, Lischewski, ███████████ – invoked his Fifth Amendment rights rather than refute the accusations levied against him.

Thus, Plaintiffs are entitled to judgment as a matter of law on the issue of liability for Bumble Bee's participation in the price-fixing conspiracy prior beginning in 2008.

## B.   **Plaintiffs Are Entitled to Judgment as a Matter of Law for the time Period Covered by Bumble Bee's Guilty Plea**

The record from Bumble Bee's criminal proceedings – including its interrogatory response that provides further detail regarding the conduct for which the company was convicted – establishes that, between January 2011 and December 2013, Bumble Bee entered into at least the following four price-fixing agreements with its competitors:

1)   An agreement between at least Bumble Bee, COSI, and StarKist to increase prices of packaged tuna products in March 2011;

2)   An agreement between at least Bumble Bee, COSI, and StarKist to increase list prices of packaged tuna products in January 2012;

3)   An agreement between at least Bumble Bee and StarKist to increase list prices of packaged tuna products in April 2012; and

4)   An agreement between Bumble Bee, COSI, and StarKist to limit aggressive promotional offers to customers on packaged tuna products between at least November 2011 and December 2013.

Under Ninth Circuit law, Bumble Bee is collaterally estopped for relitigating its liability for the conduct covered by its guilty plea.  Alternatively, even if collateral estoppel did not apply, partial summary judgment on Bumble Bee's liability for participating in a price-fixing conspiracy is appropriate because Bumble Bee cannot demonstrate that there is a material question of fact as to whether it violated the Sherman Act between 2011 and 2013.

1.   Bumble Bee is Collaterally Estopped From Contesting its Liability Between January 2011 and December 2013

Section 5 of the Clayton Act, 15 U.S.C. § 16(a), provides that any final judgment resulting from a criminal proceeding brought by the United States under the antitrust laws establishing that:

> a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto.

And although the Clayton Act expressly provides for the prima facie evidence standard, the Ninth Circuit has noted that this provision "does not bar the application of collateral estoppel" stemming from a criminal judgment under the antitrust laws. *Pool Water Prod. v. Olin Corp.*, 258 F.3d 1024, 1030 (9th Cir. 2001).  Accordingly, the application of offensive non-mutual collateral estoppel is appropriate here because each of the elements required by Ninth Circuit is satisfied.  Thus, collateral estoppel forecloses civil defendants from relitigating issues decided in earlier criminal proceedings when: (1) the prior conviction must have been for a serious offense so that the defendant was motivated to fully litigate the charges; (2) there must have been

a full and fair trial to prevent convictions of doubtful validity from being used; (3) the issue on which the prior conviction is offered must of necessity have been decided at the criminal trial; and (4) the party against whom the collateral estoppel is asserted was a party or in privity with a party to the prior trial. *United States v. Real Property Located at Section 18*, 976 F.2d 515, 518 (9th Cir. 1992) (further confirming that these elements can be satisfied when a guilty plea is entered in lieu of trial because "it is settled law in this circuit that a guilty plea may be used to establish issue preclusion in a subsequent civil suit").

Plaintiffs satisfy each of these elements here.

First, Bumble Bee was convicted of a felony and required to pay a minimum fine of $25,000,000.[65]  Based on these circumstances, Ninth Circuit law provides that Bumble Bee was motivated to fully litigate those charges as a matter of law.  *See Ayers v. City of Richmond*, 895 F.2d 1267, 1272 (9th Cir. 1990) (holding that the "serious offense" element was satisfied in a case where the party subject to collateral estoppel was charged with six misdemeanors); *Real Property*, 976 F.2d at 518 (holding that there was "no dispute" concerning the severity of the offense when the offense at issue was a felony).

Second, the "validity of the conviction" element is clearly met based on Bumble Bee's guilty plea in a proceeding where it was represented by competent counsel.   In both *Ayers* and *Real Property*, the Ninth Circuit recognized that collaterally estoppel properly applied in cases where a criminal defendant pled guilty in lieu of trial.  *See Ayers*, 895 F.2d at 1271–72; *Real Property*, 972 F.2d at 518 (party's "guilty plea admitted the truth of all the elements charged in the offense, and thus established the validity of those facts for purposes of collateral estoppel").

---

[65]     *See* PJSOF ¶ 78.

Third, there can be no dispute that Bumble Bee was the same entity that pled guilty to the Sherman Act violation. *See* Judgment (identifying Bumble Bee Foods, LLC as the Defendant).

Fourth, Bumble Bee's conviction establishes estoppel on the precise issues resolved by the criminal proceeding. Whether Bumble Bee conspired to fix prices in violation of the Sherman Act, 15 U.S.C. § 1, was the central issue litigated in the criminal case. Based on certain specific admissions, the District Court accepted Bumble Bee's guilty plea and adjudicated the company guilty of criminal violations of the Sherman Act. Those admissions included that:

- Bumble Bee participated in "a conspiracy among major packaged-seafood-producing firms, the primary purpose of which was to fix, raise, and maintain the prices of packaged seafood sold in the United States";

- Bumble Bee communicated with its competitors "in furtherance of the conspiracy" and reached "agreements and mutual understandings ... to fix, raise, and maintain the prices of packaged seafood sold in the United States"

- Defendant, through its officers and employees, negotiated prices with customers and issued price announcements for packaged seafood in accordance with the agreements and mutual understandings reached.

- "The business activities of the defendant ... that were the subject of this conspiracy were within the flow of, and substantially affected, interstate trade and commerce."[66]

Additionally, in its interrogatory response, Bumble Bee further admitted that the price-fixing agreements that were covered by its guilty plea included: (1) the March 2011 price increase; (2) the January 2012 price increase; (3) the April 2012

---

[66]    *See* PJSOF ¶ 77.

1   price increase; and (4) agreements to limit aggressive promotional offers to customers
2   on packaged tuna products.[67]

3       Based on these admissions, Bumble Bee cannot escape its liability to Plaintiffs
4   for the period covered by its plea agreement.  For example, in *SEC v. Reyes*, No. 06-
5   04435, 2008 WL 3916247, at *1-3 (N.D. Cal. Aug. 25, 2008), the Court granted
6   summary judgment to the plaintiff in a securities fraud action based on the defendant's
7   prior criminal conviction for securities violations.  Indeed, in *Reyes*, the defendant
8   attempted to come forward with new evidence that he claimed was unavailable to him
9   during his criminal trial.  Applying the doctrine of collateral estoppel, the Court held
10  that, notwithstanding the supposedly new evidence, the defendant could not re-litigate
11  his guilt for the conduct that was established to be part of his criminal conviction,
12  because, that the evidence "was not presented to the jury rests, at least in some part,
13  on Reyes' shoulders....  In short, the criminal trial was not so 'unfair' as to preclude
14  application of collateral estoppel."

15      Similarly, in *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 86 (2d
16  Cir. 2000), the Second Circuit affirmed the application of collateral estoppel against
17  civil antitrust defendants who had been convicted of criminal RICO violations.  "We
18  affirm the district court's ruling as to collateral estoppel....  [A]lthough the charges
19  involved mail fraud as predicate acts under RICO, the verdicts involved necessary
20  findings regarding the defendants' participation in bid-rigging activities."

21      And in contrast to *Nasso*, the record in this MDL does not require a detailed
22  investigation in order to determine the conduct giving rise to Bumble Bee's
23  conviction.  Bumble Bee's plea agreement, the judgment, and its interrogatory
24  response all spell out this information in detail.

25

26

27      [67]    *See* PJSOF ¶ 79.

28

Accordingly, each of the four elements necessary to estop Bumble Bee from relitigating what was already established in the criminal proceedings is established here.

2.      Plaintiffs Are Entitled to Summary Judgment for Bumble Bee's Conduct During the Guilty Plea Period Even if the Admissions from the Criminal Proceedings Are Only Given Prima Facie Weight

Even if the Court were to determine that collateral estoppel does not apply, Plaintiffs are still entitled to partial summary judgment on Bumble Bee's liability for the guilty plea period.

As detailed in § III(B)(ii) above, at a minimum, the admissions and findings from the criminal proceeding are subject to prima facie weight. *See* 15 U.S.C. § 16(a). In light of Bumble Bee's admissions in these civil proceedings, as well as the uncontroverted evidence detailed in § I corroborating these admissions, Plaintiffs have established a prima facie case against Bumble Bee regarding its participation in the conspiracy, which Bumble Bee cannot rebut.   As the Supreme Court explained almost 70 years ago:

> We are, therefore, of opinion that the criminal judgment was prima facie evidence of the general conspiracy for the purpose of monopolizing the financing of General Motors cars, and also of its effectuation by coercing General Motors dealers to use GMAC.  **To establish their prima facie case it therefore was necessary for petitioners only to introduce, in addition to the criminal judgment, evidence of the impact of the conspiracy on them, such as the cancellation of their franchises and the purpose of General Motors in cancelling them, and evidence of any resulting damages.**

*Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 570–71 (1951).

The same principle applies here.  Although Bumble Bee's criminal conviction does not, by itself, establish impact from the conspiracy, it does establish that Bumble Bee knowingly conspired to fix prices of packaged tuna sold in the United States with,

at least, StarKist and COSI.  The conviction also establishes that this conduct occurred in interstate commerce.  Because Bumble Bee cannot point to any evidence that creates a question of fact on these issues, the Court should enter partial summary judgment against Bumble Bee for the period covered by its guilty plea.

## C.   Bumble Bee Has Not Produced Any Evidence Demonstrating that the Conspiracy Ended in 2013

Because Bumble Bee's participation in the price-fixing conspiracy is established through at least December 2013, it is Bumble Bee's burden to demonstrate that the conspiracy ended prior to July 2015, when the DOJ investigation began (and when COSI confessed its involvement in the conspiracy to the competition authority). The Supreme Court has held that an antitrust "conspiracy continues up to the time of abandonment or success." *United States v. Kissel*, 218 U.S. 601, 608 (1910); *accord United States v. Inryco*, 642 F.2d 290, 293 (9th Cir. 1981) (conspiracy "remains actionable until its purpose has been achieved or abandoned").  Thus, "[o]nce a conspiracy is established, it is presumed to continue until there is an affirmative showing that it has been abandoned." *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, 2015 WL 5166014, at *10 (E.D. Tenn. June 24, 2015).[68]   To establish withdrawal from a conspiracy, a defendant must affirmatively show that it "either made a clean breast to authorities or communicated the abandonment in a manner reasonably calculated to reach coconspirators." *Precision Associates, Inc. v. Panalpina World Transport*, 2015 WL 4987751, at *4 (E.D.N.Y. Aug. 19, 2015).

Because Bumble Bee cannot meet this standard, Plaintiffs are entitled to judgment as a matter of law against Bumble Bee through July 2015.

---

[68]   *See also United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) (conspiracy "is presumed to continue until there is affirmative evidence of abandonment, withdrawal, [or] disavowal"); *McDonald v. United States*, 89 F.2d 128, 133 (8th Cir. 1937) ("[A] criminal conspiracy once formed continues until the object of it has been accomplished unless abandoned short of an overt act, or broken up by the arrest of the participants.").

As explained above in § I, substantial evidence demonstrates that the conspiracy continued until July 2015.  Bumble Bee admits that the price lists that Defendants issued through collusion remained in effect through July 2015.[69]  Minutes from a StarKist board of directors meeting provides direct evidence that a market allocation "understanding" between StarKist and Bumble Bee (and Dongwon) continued in force through at least October 2014.  And the same "bilateral communications" between Bumble Bee executives and their competitors about the pricing and sale of packaged tuna products (that gave rise to Bumble Bee's guilty plea) continued after December 2013.[70]

Thus, although Bumble Bee's guilty plea does not have preclusive effect after December 2013, it "is still extremely probative" of its continued participation in the conspiracy, such that summary judgment is appropriate.  *See S.E.C. v. Hilsenrath,* No. 03-cv-03252, 2008 WL 2225709, at \*4–\*5 (N.D. Cal. May 29, 2008), *aff'd*, 406 F. App'x 197 (9th Cir. 2010) (granting summary judgment for conduct committed after period covered by guilty plea).

In *Hilsenrath*, the civil defendant previously pled guilty to a number of securities fraud violations for the period between August 1997 and March 1998.  However, the record in the civil proceedings demonstrated that the conduct underlying the criminal conviction continued through January 2000.  Based on this, the Court determined that the plaintiff met its initial burdens of production and persuasion under Rule 56, which shifted the burden to the defendant to demonstrate that there were material facts in dispute.  Because the defendant could not meet this burden, the Court entered summary judgment in favor of the plaintiff for the entire time period from August 1997 through January 2020.  As the Court explained:

---

[69]     *See* PJSOF at ¶¶ 103–106.

[70]     PJSOF at ¶¶ 107–109.

> The plea agreement constituted admissions that Hilsenrath acted with scienter when he made the earlier misleading statements of material fact from August 1997 through March 1998. Considering that Hilsenrath possessed the requisite scienter at least through March 1998 and he engaged in the same conduct through January 2000, this order finds that the SEC has met its initial burden in showing that he committed these acts with scienter through January 2000.   The burden now shifts to Hilsenrath to provide evidence that there is a genuine issue for trial.   He has not done so. Summary judgment is therefore granted on this claim.

*Hilsenrath*, 2008 WL 2225709, at \*5.

Accordingly, like in *Hilsenrath,* Bumble Bee cannot rebut the presumption that the conspiracy (that it admits to joining) ended in 2013.

## IV.    BUMBLE BEE'S AGREEMENTS WERE *PER SE* UNLAWFUL

Plaintiffs are also entitled to judgment as a matter of law that the *per se* mode of analysis applies to Bumble Bee's conduct. Whether to apply *per se* or rule of reason analysis in determining the reasonableness of a restraint of trade is a question of law for the Court. *See, e.g., In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 682, 694 (E.D. Mich. 2000).

As the Court has already recognized at least twice, Bumble Bee, StarKist, and COSI are horizontal competitors, and as such, agreements between the three companies on price are *per se* unlawful.  *In re Packaged Seafood Prod. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1183 (S.D. Cal. 2018); *In re Packaged Seafood Prod. Antitrust Litig.*, No. 15-MD-2670-JLS, 2017 WL 35571, at \*11 (S.D. Cal. Jan. 3, 2017).

This conclusion is fully consistent with both Ninth Circuit and Supreme Court precedent.  "In analyzing the reasonableness of an agreement under § 1, the Supreme Court has distinguished between agreements made up and down a supply chain, such as between a manufacturer and a retailer ('vertical agreements'), and agreements made among competitors ('horizontal agreements')."  *In re Musical Instruments &*

*Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).   Horizontal anticompetitive agreements are *per se* Sherman Act violations and "[o]nce the agreement's existence is established, no further inquiry into the practice's actual effect on the market or the parties' intentions is necessary to establish a § 1 violation." *Id.* "One example of a per se violation is an agreement among competitors to fix prices." *Id.* (citing *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397–98 (1927)).

## V.   **CONCLUSION**

As detailed in this Motion and the accompanying PJSOF, the record of Bumble Bee's participation in the conspiracy is overwhelming and uncontroverted.   It is supported not only by Bumble Bee's criminal conviction for price-fixing, but also by substantial direct evidence from witnesses at COSI, and also through documentary evidence that provides contemporaneous circumstantial corroboration of Plaintiffs' allegations.   Most importantly, this evidence is not rebutted by any witness in the case. Instead, each of the witnesses employed by Bumble Bee that is directly implicated in the conspiracy through the admissions of others invoked his Fifth Amendment rights in response to deposition questions about his involvement in the conspiracy.

Accordingly, as to the first three elements of Plaintiffs' price-fixing claims, there is no material issue of fact to submit to the jury.   Plaintiffs are entitled to summary judgment on the following issues:

1)   that an agreement to fix the prices of packaged tuna existed;

2)   that Bumble Bee knowingly – that is, voluntarily and intentionally – became a party to that agreement;

3)   that such agreement occurred in or affected interstate commerce;

4)   Bumble Bee reached price-fixing agreements with COSI beginning no later than March 2008, and continuing through July 2015;

5)      Bumble Bee reached price-fixing agreements with StarKist beginning no later than January 2011 and continuing through July 2015;

6)      the agreements between Bumble Bee, StarKist, and COSI are *per se* unlawful.


Dated: September 19, 2019                    Respectfully submitted,


By: _____

William J. Blechman, Esquire
Kevin J. Murray, Esquire
Douglas H. Patton, Esquire
Samuel J. Randall, Esquire
Brandon S. Floch, Esquire
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida  33131
Tel:  (305) 373-1000
Fax:  (305) 371-1861
E-mail: rarnold@knpa.com
         wblechman@knpa.com
         kmurray@knpa.com
         dpatton@knpa.com
         srandall@knpa.com
         bfloch@knpa.com

***Liaison Counsel for Direct Action Plaintiffs***