Michael P. Lehmann (Cal. Bar No. 77152)
Bonny E. Sweeney (Cal. Bar No. 176174)
Christopher L. Lebsock (Cal. Bar No. 184546)
Samantha Stein (Cal. Bar. No. 302034)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel:  (415) 633-1908
Fax:  (415) 358-4980
Email:  mlehmann@hausfeld.com
Email:  bsweeney@hausfeld.com
Email:  clebsock@hausfeld.com
Email:  sstein@hausfeld.com

*Lead Counsel for the Direct Purchaser Plaintiffs Class*

[Other counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No. 3:15-md-02670-JLS-MDD<br>MDL No. 2670<br><br>**PLAINTIFFS' JOINT OPPOSITION TO THE PARENT ENTITIES' SUMMARY JUDGMENT MOTIONS**<br><br>Re: ECF Nos. 1973, 1998, 2001 |
| This document relates to:<br><br>ALL ACTIONS | **[PUBLIC REDACTED VERSION]**<br><br>DATE:       February 12, 2019<br>TIME:        9:00 a.m.<br>JUDGE:     Janis L. Sammartino<br>CTRM:      4D |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

JOINING PARTIES ...................................................................................... xii

GLOSSARY OF ABBREVIATIONS AND CITATIONS ........................... xiii

I.    INTRODUCTION................................................................................. 1

II.    FACTUAL BACKGROUND ............................................................... 3

   A.    Dongwon and StarKist.................................................................. 5

   B.    TUG and COSI.............................................................................. 9

   C.    Lion Entities and Bumble Bee ................................................... 11

      1.  Procedural History ................................................................. 11

      2.  Factual Background................................................................ 12

   D.    The Conspiracy.......................................................................... 19

      1.  The Two Levels of the Conspiracy ....................................... 19

      2.  The Parent Entities' Involvement in the Conspiracy. .......... 21

         a.   The Origins of the 2010-2015 Conspiracy...................... 21

         b.   The "Owner-to-Owner" Tour .......................................... 22

         c.   Preparation for the 2011 Price Increase .......................... 27

      3.  The Conspiracy Continues.................................................... 29

III.   SUMMARY JUDGMENT STANDARDS ......................................... 43

IV.  ARGUMENT REGARDING CONSPIRACY PARTICIPATION ..... 44

   A.    Summary Judgment Standard in an Antitrust Case ............................ 45

   B.    Defendants Have Not Met Their Burden to Show There Are No
        Disputes of Material Fact. ................................................................ 51

      1.  Defendants' Arguments About What the Evidence Shows May Not Be
          Resolved By the Court. ..................................................................... 54

      2.  Jae Chul Kim, Ingu Park, and Other DWE Executives Are Plainly
          Connected to and in Control of DWI. .............................................. 62

      3.  TUG Has Not Shown That It Would Be Economically Implausible For
          It to Participate In The Conspiracy. ................................................. 65

      4.  Defendants' Admissions and the Guilty Pleas Are Not Dispositive on
          Whether Defendants Conspired ....................................................... 70

   C.    Plaintiffs have Shown that A Reasonable Fact Finder Could Find that
        The Parent Entities Conspired in This Case....................................... 74

Pls.' Opp'n to Defs.' Summ. J. Mots. (Parent Cos.)    Case No. 15-md-2670-JLS-MDD

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

V.    ARGUMENT REGARDING *ALTER EGO* AND AGENCY
      CLAIMS ............................................................................................ 81

   A.    Legal Standards. ................................................................................ 82

      1.   *Alter Ego* Standard......................................................................... 82

      2.   Agency Standard ............................................................................ 87

   B.    DWI and StarKist ............................................................................ 88

   C.    TUG and COSI................................................................................. 99

   D.    Lion Entities .................................................................................. 105

      1.   Lion Americas Acted as an Agent of Lion Capital............................ 106

      2.   Big Catch is the Alter Ego of Lion Capital....................................... 109

VI.   CONCLUSION ................................................................................ 111

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
   No. 15-CV-06314-YGR, 2018 WL 3707283 (N.D. Cal. Aug. 3,
   2018).................................................................................................88

*Alman v. Danin*,
   801 F.2d 1 (1st Cir. 1986) ..............................................................84

*Am. Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010).........................................................................64

*Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
   456 U.S. 556 (1982)................................................................... 64, 65

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).........................................................................43

*Arandell Corp. v. Centerpoint Energy Services, Inc.*,
   900 F.3d 623 (9th Cir. 2018) ........................................... 50, 73, 81

*Associated Vendors, Inc. v. Oakland Meat Co.*,
   210 Cal. App. 2d 825 (Cal. Ct. App. 1962).................................86

*Axon Solutions, Inc. v. San Diego Data Processing Corp.*,
   No. 09 CV 2543 JM RBB, 2010 WL 1797028 (S.D. Cal. May 4,
   2010).................................................................................................95

*In re Baby Food Antitrust Litigation*,
   166 F.3d 112 (3d Cir. 1999) .........................................................78

*Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*,
   417 U.S. 703 (1974).........................................................................84

*Barnes v. Arden Mayfair, Inc.*,
   759 F.2d 676 (9th Cir. 1985) .................................................. 70, 71

*Baxter v. Palmigiano*,
   425 U.S. 308 (1976)........................................................................ 4

*Bd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*,
210 F.3d 18 (1st Cir. 2000) ................................................................. 83, 84

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
620 F.2d 1360 (9th Cir. 1980) .................................................. 50, 73, 74

*Bowoto v. Chevron Texaco Corp.*,
312 F. Supp. 2d 1229 (N.D. Cal. 2004) ............................................ 87, 89

*British Marine PLC v. Aavanti Shipping & Chartering Ltd.*,
No. 13 CIV. 0839 BMC, 2013 WL 6092821 (E.D.N.Y. Nov. 19,
2013)...................................................................................................... 84, 85

*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*,
445 U.S. 97 (1980)........................................................................................83

*Cascade Steel Rolling Mills, Inc. v. C. Itoh & Co. (Am.) Inc.*,
499 F. Supp. 829 (D. Or. 1980)...................................................................85

*In re Cathode Ray Tube (CRT) Antitrust Litig. (CRTs)*,
No. C-07-5944 JST, 2017 WL 5957654 (N.D. Cal. Feb. 27,
2017)......................................................................................... 54, 61, 65

*Chartrand v. Barney's Club, Inc.*,
380 F.2d 97 (9th Cir. 1967) ........................................................................63

*In re ChinaCast Educ. Corp. Sec. Litig.*,
809 F.3d 471 (9th Cir. 2015) ......................................................................64

*In re Chocolate Confectionary Antitrust Litigation*,
801 F.3d 383 (3d Cir. 2015) .......................................................... 76, 77, 78

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ............................................................*passim*

*In re Citric Acid Litigation*,
996 F. Supp. 951 (N.D. Cal. 1998)..............................................................79

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)...................................................................................... 1

*Contract Assocs. Office Interiors, Inc. v. Ruiter*,
No. CIV.S0700334 WBS EFB, 2008 WL 2225702 (E.D. Cal.
May 29, 2008) .............................................................................................87

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984) ........................................................... 81, 83, 84

*Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, Inc.*,
   No. 11-CV-0252-CVE-PJC, 2015 WL 427807 (N.D. Okla. Feb.
   2, 2015) ............................................................................. 85, 86

*Daniels v. United States*,
   No. 3:16-CV-02077-BTM-DHB, 2017 WL 3478765 (S.D. Cal.
   Aug. 11, 2017) ......................................................................... 88

*Dearborn v. Mar Ship Operations, Inc.*,
   113 F.3d 995 (9th Cir. 1997) .................................................. 109

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
   8 F.3d 1217 (7th Cir. 1993) ...................................................... 45

*Donovan v. Schmoutey*,
   592 F. Supp. 1361 (D. Nev. 1984) ........................................ 63, 64

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
   No. M 02-1486 PJH, 2007 WL 9752971 (N.D. Cal. Feb. 20,
   2007) ...................................................................................... 70

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ...................................................... 43, 48, 53

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938) .................................................................. 84

*Esco Corp. v. United States*,
   340 F.2d 1000 ......................................................................... 57

*Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*,
   525 F.3d 822 (9th Cir. 2008) .................................................... 44

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350(3d Cir. 2004) ...................................................... 56

*In re G&L Packing Co., Inc.*,
   41 B.R. 903 (N.D.N.Y. 1984) ................................................... 83

*In re Grand Jury Subpoenas*,
   627 F.3d 1143 (9th Cir. 2010) .................................................. 72

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
  No. 5:11-CV-03613-EJD, 2015 WL 365491 (N.D. Cal. Jan. 27,
  2015)..................................................................................................46

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*,
  328 F.3d 1122 (9th Cir. 2003) .......................................................87

*Cal. ex rel. Harris v. Safeway, Inc.*,
  651 F.3d 1118 (9th Cir. 2011) .......................................................46

*Head v. Wilkie*,
  No. 17-55942, 2019 WL 4213764 (9th Cir. Sept. 5, 2019) ...........44

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ................................................46, 73, 78, 79

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) .........................................50

*In re High-Tech Emp. Antitrust Litig.*,
  No. 11-CV-02509-LHK, 2014 WL 1283086 (N.D. Cal. Mar. 28,
  2014).............................................................................................47, 80

*Home Depot, U.S.A., Inc. v. E.I. DuPont de Nemours & Co.*,
  No. 16-CV-04865-BLF, 2019 WL 3804667 (N.D. Cal. Aug. 13,
  2019).............................................................................................48, 78

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
  810 F. Supp. 2d 1100 (S.D. Cal. 2011) .........................................104

*Jacobson v. U.S. Dep't of Homeland Sec.*,
  882 F.3d 878 (9th Cir. 2018) .........................................................44

*Johnson v. VCG Holding Corporation*,
  845 F. Supp. 2d 353 (D. Me. 2012) ...............................................86

*Kleen Prods. LLC v. Georgia-Pac. LLC*,
  910 F.3d 927 (7th Cir. 2018) .........................................................60

*Maney v. Fischer*,
  No. 96 Civ. 0561 (KMW), 1998 WL 151023 (S.D.N.Y. Mar. 31,
  1998).............................................................................................82, 83

*Margolis v. Dial Corp.*,
No. 12-CV-288 JLS (WVG), 2013 WL 12069023 (S.D. Cal. Aug. 23, 2013)...........................................................................89

*Matsumoto v. Auto Page, Inc.*,
No. B216840, 2010 WL 5061932 (Cal. Ct. App. Dec. 13, 2010) ...............102

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)..........................................................46, 47, 48, 53

*McLaughlin v. Liu*,
849 F.2d 1205 (9th Cir. 1988) ......................................................51

*Mercury Time, Inc. v. Gruen Mktg. Corp.*,
No. 97-CV-0020 JG, 1999 WL 342299 (E.D.N.Y. May 26, 1999)...............86

*Meyer v. Kalanick*,
174 F. Supp. 3d 817 (S.D.N.Y. 2016)...........................................74

*In re Mid-Atl. Toyota Antitrust Litig.*,
560 F. Supp. 760 (D. Md. 1983).....................................................45

*Moviecolor Ltd. v. Eastman Kodak Co.*,
288 F.2d 80 (2d Cir. 1961) .............................................................83

*N.L.R.B. v. Deena Artware, Inc.*,
361 U.S. 398 (1960).......................................................................85

*NEC Elecs. Inc. v. Hurt*,
208 Cal. App. 3d 772 (Cal. Ct. App. 1989)..................................99

*New York State Elec. & Gas Corp. v. FirstEnergy Corp.*,
808 F. Supp. 2d 417 (N.D.N.Y. 2011)..........................................83

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*,
210 F.3d 1099 (9th Cir. 2000) ......................................................63

*In re Packaged Ice Antitrust Litig.*,
723 F. Supp. 2d 987 (E.D. Mich. 2010).........................................73

*Phoenix Canada Oil v. Texaco Inc.*,
842 F.2d 1466 (3d Cir. 1988) ........................................................88

*In re Platinum-Beechwood Litig.*,
   No. 18-CV-10936 (JSR), 2019 WL 2569653 (S.D.N.Y. June 21,
   2019)....................................................................................................63

*In re Plywood Antitrust Litig.*,
   655 F.2d 627 (5th Cir. 1981) .........................................................60

*Poller v. Columbia Broad. Sys., Inc.*,
   368 U.S. 464 (1962)........................................................................51

*In re Polypropylene Carpet Antitrust Litig.*,
   178 F.R.D. 603 (N.D. Ga. 1997)....................................................73

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   No. 08-CV-00042 JG VVP, 2012 WL 3307486 (E.D.N.Y. Aug.
   13, 2012) ........................................................................................49

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2012) ......................................................46, 54

*Rad Servs., Inc. v. Aetna Cas. & Sur. Co.*,
   808 F.2d 271 (3d Cir. 1986) ............................................................4

*Ramirez v. Chip Masters, Inc.*,
   No. 11-CV-5772 (WFK) (MDG), 2014 WL 1248043 (E.D.N.Y.
   Mar. 25, 2014)................................................................................97

*Rearden LLC v. Crystal Dynamics, Inc.*,
   No. 17-CV-04187-JST, 2018 WL 3023450 (N.D. Cal. June 18,
   2018)...............................................................................................44

*Riddle v. Leuschner*,
   51 Cal. 2d 574, 335 P.2d 107 (Cal. 1959)......................................99

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
   232 F.3d 1258 (9th Cir. 2000) .........................................................4

*S.E.C. v. Elmas Trading Co.*,
   620 F. Supp. 231 (D. Nev. 1985).....................................................84

*Sec. & Exch. Comm'n v. Colello*,
   139 F.3d 674 (9th Cir. 1998) ...........................................................4

*Sec. & Exch. Comm'n v. Strategic Global Invs., Inc.*,
   262 F. Supp. 3d 1007 (S.D. Cal. 2017) .......................................................... 4

*Seiko Epson Corp. v. Print-Rite Holdings, Ltd.*,
   No. CV 01-500-BR, 2002 WL 32513403 (D. Or. Apr. 30, 2002) .................85

*Siegel v. Warner Bros. Entm't Inc.*,
   581 F. Supp. 2d 1067 (C.D. Cal. 2008).........................................................81

*In re SK Foods, LP*,
   499 B.R. 809 (E.D. Cal. Bank. 2013) ...................................................... 86, 99

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   803 F.3d 1084 (9th Cir. 2015) .............................................................*passim*

*State Farm Mut. Auto Ins. Co. v. Abrams*,
   No. 96 C 6365, 2000 WL 574466 (N.D. Ill. May 11, 2000).......................... 4

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   No. 07-MD-01819 CW, 2010 WL 5138859 (N.D. Cal. Dec. 10,
   2010)....................................................................................61, 74, 75, 81

*Stevens v. Corelogic, Inc.*,
   899 F.3d 666 (9th Cir. 2018) .......................................................................44

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
   622 F. Supp. 2d 890 (N.D. Cal. 2009) .........................................................87

*In re Tableware Antitrust Litig.*,
   No. C 04 3514 VRW, 2007 WL 781960 (N.D. Cal. Mar. 13,
   2007)............................................................................................................ 4

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
   451 U.S. 630 (1981).....................................................................................84

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   599 F. Supp. 2d 1179 (N.D. Cal. 2009) .......................................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. M 07-1827 SI, 2011 WL 7724271 (N.D. Cal. Nov. 4, 2011).................54

*In re Titanium Dioxide Antitrust Litig.*,
   959 F. Supp. 2d 799 (D. Md. 2013)..............................................................79

Pls.' Opp'n to Defs.' Summ. J. Mots. (Parent Cos.)   Case No. 15-md-2670-JLS-MDD

ix

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ..................................................................46

*Trenz v. Sirius Xm Radio, Inc.*,
    No. 15CV0044 AJB (NLS), 2015 WL 11658715 (S.D. Cal. July
    13, 2015) ................................................................................................87

*U.S. v. Bestfoods*,
    524 U.S. 51 (1998) ..................................................................................65

*United States v. Dist. Council of N.Y. City & Vicinity of United Bhd. of
    Carpenters & Joiners of Am.*,
    832 F. Supp. 644 (S.D.N.Y. 1993) ............................................................ 4

*United States v. Gen. Motors Corp.*,
    384 U.S. 127 (1966) ................................................................................46

*United States v. Grasso*,
    724 F.3d 1077 (9th Cir. 2013) ................................................................49

*United States v. ITS Fin., LLC*,
    No. 3:12-cv-95, 2013 WL 5947222 (S.D. Ohio Nov. 6, 2013) ...................... 5

*United States v. Kimball Foods, Inc.*,
    440 U.S. 715 (1979) ................................................................................82

*United States v. MMR Corp. (LA)*,
    907 F.2d 489 (5th Cir. 1990) ..................................................................45

*United States v. Paramount Pictures*,
    334 U.S. 131 (1948) ................................................................................45

*United States v. Peters*,
    732 F.3d 93 (2d Cir. 2013) ......................................................................83

*United States v. Reed*,
    575 F.3d 900 (9th Cir. 2009) ..................................................................49

*United States v. Wallace*,
    759 F.3d 486 (5th Cir. 2014) ..........................................................50, 73

*In re Urethane Antitrust Litig.*,
    913 F. Supp. 2d 1145 (D. Kan. 2012) ......................................................62

*Visa Int'l Serv. Ass'n v. Bankcard Holders of Am.*,
    784 F.2d 1472 (9th Cir. 1986) ....................................................................44

*In re Vitamin C Antitrust Litig.*,
    No. 06-MD-1738 (BMC)(JO), 2012 WL 2930109 (E.D.N.Y.
    July 18, 2012)..........................................................................................101

*In re Vitamins Antitrust Litig.*,
    270 F. Supp. 2d 15 (D.D.C. 2003)...............................................................45

*In re Vitamins Antitrust Litig.*,
    No. 99-197 (TFH), 2000 WL 1475705 (D.D.C. May 9, 2000).....................73

*Wolfe v. United States*,
    806 F.2d 1410 (9th Cir. 1986) ....................................................................82

*In re Wolverton Assocs.*,
    909 F.2d 1286 (9th Cir. 1990) ....................................................................87

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*,
    402 F. Supp. 262 (E.D. Pa. 1975)...............................................................85

**Statutes**

Clayton Antitrust Act........................................................................... 82, 83, 84

Sherman Antitrust Act ...............................................................................*passim*

**Other Authorities**

Christine Varney & John F. Terzaken, *The Cartels and Leniency
    Review* (1st ed. 2013) ................................................................................72

Federal Rule of Civil Procedure 56(a)............................................................43

Federal Rule of Civil Procedure 56(d)...............................................1, 12, 43, 44

O'Malley, Grenig, & Lee, Federal Jury Practice & Instructions Civil
    Companion Handbook § 1:4........................................................................60

United States Attorneys' Manual § 9-11.140 ..................................................72

1

## JOINING PARTIES

2

| Party | Joining Brief as to [Defendant(s)] |
| --- | --- |
| DPPs | All Defendants |
| EPPs | Lion Entities and StarKist/DWI |
| CFPs | Lion Entities and StarKist/DWI |
| Affiliated Food Plaintiffs (DAPs) | Lion Entities |
| AWG Plaintiffs (DAPs) | All Defendants |
| Winn-Dixie Plaintiffs (DAPs) | All Defendants |
| Kroger Plaintiffs (DAPs) | Lion Entities |
| Publix Plaintiffs (DAPs) | Lion Entities |
| W. Lee Flowers (DAPs) | Lion Entities and StarKist/DWI |

# GLOSSARY OF ABBREVIATIONS AND CITATIONS

| Term | Definition | Citation |
|------|-----------|----------|
| Stein Decl. | Declaration of Samantha J. Stein (filed Nov. 7, 2019) | Accompanying this filing on Nov. 7, 2019 |
| Chang Decl. | Declaration of Jeff Chang | Accompanying Lion Entities' Motion for Summary Judgment |
| DeMario Opening Report | Expert Merits Report of Marianne DeMario (DPPs) | Stein Decl., Ex. 246 |
| DeMario Rebuttal Report | Expert Merits Rebuttal Report of Marianne DeMario (DPPs) | Stein Decl., Ex. 247 |
| Hamilton Reply | Expert Merits Rebuttal Report of Gary Hamilton Ph.D. (DPPs) | Stein Decl., Ex. 245 |
| Hamilton Report | Expert Merits Report of Gary Hamilton Ph.D. (DPPs) | Stein Decl., Ex. 244 |
| Heeb Report | Expert Report of Randal Heeb (COSI) | Stein Decl., Ex. 243 |
| Laby Report | Expert Report of Arthur Laby (TUG/COSI) | Stein Decl., Ex. 248 |
| Lindberg Decl. | Declaration of Eric Lindberg | Accompanying Lion Entities' Motion for Summary Judgment |
| MMR | Expert Merits Report of Russell Mangum, Ph.D. (DPPs) | Stein Decl., Ex. 241 |
| MMRR | Expert Merits Reply Report of Russell Mangum, Ph.D. (DPPs) | Stein Decl., Ex. 242 |
| Paris Decl. | Declaration of Adam Paris (Lion) | Accompanying Lion Entities' Motion for Summary Judgment |

1   The Direct Purchaser Plaintiffs ("DPPs"), End Payer Plaintiffs ("EPPs"),
2   Commercial Food Preparers ("CFPs"), and Direct Action Plaintiffs ("DAPs")
3   hereby oppose the Motions for Summary Judgment filed by the "Parent
4   Defendants" or "Parent Companies/Entities" in this case: Defendants Dongwon
5   Industries ("DWI"), Thai Union Group ("TUG"), and Lion Capital, Lion
6   (Americas), Inc., and Big Catch Cayman LP (together, the "Lion Entities").  *See*
7   ECF Nos. 1973 ("DWI Mot."), 1973-1 ("DWI MP&A"); 2001 ("TUG Mot.");
8   2001-1 ("TUG MP&A"); and 1998 ("Lion Mot."); 1998-1 ("Lion MP&A").
9   Conspiracies under the antitrust laws are to be judged "as a whole" (*Cont'l Ore Co.*
10  *v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)), and accordingly,
11  Plaintiffs file this joint response opposing the Parent Entities' Motions.  *See* ECF
12  Nos. 1973, 1998, 2001.

13  Moreover, because the Court has neither ruled on Lion Capital LLP ("Lion
14  Capital") and Big Catch LP's ("Big Catch") pending motion to dismiss nor
15  authorized discovery to be opened against either defendant, their motion for
16  summary judgment is premature and should be denied pursuant to Federal Rule
17  of Civil Procedure 56(d).  *See* Supporting Decl. of Elana Katcher.

18  **I.    INTRODUCTION**

19  A jury should decide whether the Parent Companies in this case violated the
20  antitrust laws.  There is more than enough evidence establishing that these entities
21  participated in and supported the conspiracy in this case to go to the jury.

22  It is true that the U.S. subsidiary Defendants—which have all admitted to
23  participating in the conspiracy to varying degrees—have not admitted that their
24  Parent Entities participated in the conspiracy.  But that fact is not at all dispositive
25  in this case.  The record is replete with examples of conduct by the Parent Entities
26  that is plainly inconsistent with competition—including direct evidence of the
27  Parent Companies' knowledge and support for their subsidiaries' conspiracy.

28

1    TUG urges the Court to accept its innocent explanations for the surreptitious

2    communications between ███████████████████████

3    ███████████████████ and argues that although TUG itself sold private

4    label packaged tuna, it had nothing to gain from this conspiracy. Likewise, the

5    Lion Entities suggest that these meetings were for a legitimate business purpose and

6    further suggest interpretations for various evidence before the Court. These

7    arguments should be heard by a jury. The contemporaneous evidence reflects that

8    the Parent Companies communicated to one another their mutual desires to stop

9    price competition in the packaged tuna industry and increase profits for all. It

10    shows that the Parent Entities took steps to achieve those goals and were ultimately

11    successful. Looking at this conspiracy as a whole, as the controlling case law

12    requires, Plaintiffs have proffered sufficient facts for a jury to find the Parent

13    Defendants liable.

14    DWI's motion does not even attempt to discuss the conspiracy evidence

15    against it (in dereliction of its burden at summary judgment). Instead, the primary

16    thrust of its motion is the argument that not "a single DWI employee or board

17    member" participated in anticompetitive conduct. DWI MP&A at 1. This is

18    plainly false. Conspicuously absent from DWI's discussion is any reference to how

19    *the majority owners* of DWI—Jae Chul Kim and his son, Nam-jung Kim—directly

20    participated in and supported this conspiracy. Additionally, DWI completely

21    ignores that it authorized officials of Dongwon Enterprise Co. Ltd. ("DWE"), such

22    as Ingu Park, Moonsu Park, and Andrew Choe, to operate and act on its behalf for

23    the purposes of representing DWI's interests with StarKist. Indeed, there is

24    evidence that both Jae Chul Kim and Ingu Park met with competitors while

25    expressly asserting they represented DWI—facts DWI entirely ignores. Under

26    basic agency principles and policies underlying the antitrust laws, DWI must be

27    held accountable for its actions.

28

There is abundant evidence against the Parent Entities—this brief contains over 100 pages of evidence and discussion about their participation, including a timeline (above) laying out key facts and dates.  Critically, the Court should note: **(1)** the meetings between the Parent Entities, followed by meetings with their U.S. subsidiaries and price increases; **(2)** the evidence that each parent company knew about the conspiracy (*e.g.*, (a) that Lion Capital and Lion Americas' executives received a "whistleblower" letter about "anticompetitive" behavior in violation of the "Sherman Act"; (b) TUG's CEO knew that there was ███████████ in the U.S. packaged tuna market, which meant significant profits for COSI; and (c) Dongwon knew of the ████████████ between StarKist and Bumble Bee); and **(3)** the language and signaling used by the Parent Companies to describe and propose increased pricing, including how pricing should become ███████████ ████████████████████████████████████████████ problems. Based on such evidence, a jury absolutely could (and should) find the Parent Entities liable for violating the antitrust laws.

Finally, Plaintiffs respond to the arguments about their *alter ego* and agency allegations.  The evidence shows how the Parent Companies used their control to interfere with their respective U.S. subsidiaries' operations and directed them and their assets be used for the benefit of the Parents.  There is also evidence the Parents ratified the illicit conduct by their respective U.S. subsidiaries.  Given the fact-intensive inquiry that applies and the substantial evidence that supports these conclusions, neither can be resolved at summary judgment.

Summary judgment for the Parent Companies is not warranted.

## II.   FACTUAL BACKGROUND

In the following section, Plaintiffs first discuss each parent company and its relationships with its respective subsidiary (Parts A-C), and then Plaintiffs discuss the facts supporting the Parent Entities' involvement in the conspiracy (Part D).

1    Below, Plaintiffs reference testimony in which witnesses invoked Fifth

2  Amendment protections against self-incrimination.  Such invocations in a civil

3  setting give rise to an adverse inference when silence is corroborated by

4  independent evidence of the fact being questioned.  *See Baxter v. Palmigiano*, 425

5  U.S. 308, 318 (1976); *Sec. & Exch. Comm'n v. Strategic Global Invs., Inc.*, 262 F. Supp.

6  3d 1007, 1023 (S.D. Cal. 2017) (where "the Court finds that there is independent

7  corroborating evidence of Defendants' [liability] [] th[e] Court may properly draw

8  an adverse inference from [the] Fifth Amendment invocation and shift to

9  Defendants the burden of [proof]"); *Sec. & Exch. Comm'n v. Colello*, 139 F.3d 674,

10  677-78 (9th Cir. 1998) (approving same).

11    Moreover, "the refusal to testify by a proven co-conspirator may justify an

12  adverse inference against other conspirators."  *United States v. Dist. Council of N.Y.*

13  *City & Vicinity of United Bhd. of Carpenters & Joiners of Am.*, 832 F. Supp. 644, 652

14  (S.D.N.Y. 1993); *State Farm Mut. Auto Ins. Co. v. Abrams*, No. 96 C 6365, 2000 WL

15  574466, at *7 (N.D. Ill. May 11, 2000) ("[A]n adverse inference could be drawn

16  against a party from an alleged co-conspirator's invocation of the Fifth Amendment

17  privilege against self-incrimination. . . . As alleged co-conspirators, some degree of

18  loyalty and/or control may prevent one party from rendering damaging testimony

19  against another."); *see also Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264

20  (9th Cir. 2000) ("not allowing the negative inference to be drawn poses substantial

21  problems for an adverse party who is deprived of a source of information that might

22  conceivably be determinative in a search for the truth") (quotation omitted).[1]

23    _____

24  [1] Such invocations can be imputed to these witnesses' employers and former

25  employers as well.  *Rad Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 275-76

26  (3d Cir. 1986).  "[T]he Third Circuit analogized from FRE 801(d)(2)(D) to hold

27  that drawing a negative inference from a former employee's refusal to testify is

28  permissible so long as there are factors 'suggesting the retention of some loyalty

by the former employee to the party-employer.'"  *In re Tableware Antitrust Litig.*,

Accordingly, where Fifth Amendment testimony is discussed below, the Court should consider whether the jury could infer that the answer to the question asked could have been unfavorable to the witness or his co-conspirators.

### A. Dongwon and StarKist

StarKist is the wholly-owned subsidiary of DWI, a company established by Chairman Jae Chul Kim ("Chairman Kim").  It is undisputed that DWI is a publicly-traded company in South Korea, with 59.24% of its shares owned by DWE.  DWE is primarily owned by only two individuals—who collectively own over 92% of its shares: Chairman Kim (24.5%) and his son, Vice-Chairman Nam-jung Kim ("Nam-jung") (67.98%).[2]  By owning nearly 60% of DWI, DWE and its majority owners also benefit from DWI's ownership of StarKist.  *See also* Stein Decl., Ex. 210 (Choe Dep.) 49:12-16 (testifying that "███████████ ████████████████████████████████████████████████████ ████████████████").

Although Dongwon suggests that DWI played no role with StarKist or the conspiracy, it ignores the virtually complete authority DWI gave various DWE executives to act on its behalf.  One of the primary ways DWI did this was by making its equitable owners Chairman Kim and Nam-jung ████████████ ████████████████, along with DWE officials: (a) Ingu Park ("Ingu"), Chairman Kim's brother in law and the other Vice-Chairman of the Dongwon Group; (b) Moonsu Park ("Moonsu"), the current President and former CFO of DWE, as well

---

No. C 04 3514 VRW, 2007 WL 781960, at *5 (N.D. Cal. Mar. 13, 2007) (quoting *Rad Servs.*, 808 F.2d at 275); *see also United States v. ITS Fin., LLC*, No. 3:12-cv-95, 2013 WL 5947222, *92-93 (S.D. Ohio Nov. 6, 2013) (Black, J.) *aff'd in part, rev'd in part on other grounds*, No. 13-4341, 2014 WL 6610420 (6th Cir. Nov. 21, 2014) (drawing adverse inference when defendant's former vice president invoked the Fifth Amendment).

[2] *See* Hamilton Report ¶¶ 89, 96.  Stein Decl., Ex. 42; Stein Decl., Ex. 43.

as ▓▓▓▓▓▓▓▓▓ of DWI[3]; and (c) Andrew Choe ("Choe"), StarKist's current president and CEO, who was formerly a director of strategic planning at DWE and reported to Moonsu.[4] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓—instead, DWI delegated to DWE officials total authority to act on its behalf with respect to StarKist.

While Dongwon wants the Court to believe that each of the individuals above wore a particular hat and never blurred the lines about the entity on whose behalf they were acting, the record indicates that the opposite is true. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ingu's

_____

[3] Stein Decl., Ex. 211 (Park (Moonsu) Dep.) 12:7-12, 15:22-16:16, 17:25-19-5. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Stein Decl., Ex. 212 (DWI 30(b)(6) (Lee) Dep.) 204:14-206:12.

[4] Stein Decl., Ex. 14; Stein Decl., Ex. 210 (Choe Dep.) 10:14-11-22.

[5] Stein Decl., Ex. 15 (DWI's Am. Rule 26(a)(1) Initial Disclosures) (Sept. 29, 2017)).  DWI recently supplemented its initial disclosures to identify additional individuals, *after* Plaintiffs had already deposed those individuals.  *See id.* (attaching DWI's Second Am. Rule 26(a)(1) Initial Disclosures (Mar. 7, 2019)).

[6] Stein Decl., Ex. 213 (Shin Dep.) 13:5-7, 14:23-24, 134:11-13.

[7] Stein Decl., Ex. 201 (Tharp Dep.) 45:2-7.

[8] Stein Decl., Ex. 44.

representations reflect a recognition that StarKist, DWI, and DWE are all part of the Dongwon Group.  DWI considers Chairman Kim as the "Chairman of the Dongwon Group"—which it envisions as one company (as described on its website).[9]  And Moonsu, the former CFO of DWE (now the president of DWE), testified that he was "███████████████████████████████."[10]

Moonsu, along with Chairman Kim and Ingu, exerted authority and influence over DWI and its employees.  ████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████ ██████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████ ████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████

The concept of the "Dongwon Group" was also ███████████████ ████████████ ██████████████████████████ ████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████

_____

[9] Stein Decl., Ex. 43.

[10] Stein Decl., Ex. 211 (Park (Moonsu) Dep.) 16:4-16 (emphases added).

[11] Stein Decl., Ex. 213 (Shin Dep.) 56:4-19, 134:22-135:5.

[12] Stein Decl., Ex. 213 (Shin Dep.) 58:9-59:12 (emphasis added).

[13] *Id.* 256:14-258:21; Stein Decl., Ex. 45.

[14] Stein Decl., Ex. 232 (DWI 30(b)(6) (Choi) Dep.) 21:22-22:1; 133:6-10); Stein Decl., Ex. 211 (Park (Moonsu) Dep.) 37:1-8.

[15] There is no evidence StarKist or DWI ever paid DWE any consideration for guaranteeing its loans.  DeMario Opening Report ¶ 29.

1 ███████████████████████████████████████████████████

2 ████████████████████████████████████████████ The

3 DPPs' expert, Professor Gary Hamilton, Ph.D., who is an expert in organizational

4 structure of Asian economies and family-owned business groups, opined that

5 "DWI is a surrogate of the Dongwon Group, as is DWE. They both serve as

6 surrogates for the group itself."  Hamilton Reply ¶ 34.

7     DWE acted on DWI's behalf.  ████████████████████████

8 ███████████████████████████████████████████████████

9 ████████████████████████████

10
11
12
13          ████████████████████████████████████████
14
15
16

17 ███████████████████████████████████████████████████

18 ███████████████████████████████████████████████████

19 ███████████████████████████████████████████████████

20 ███████████████████████████████████████████████████

21 ██████████████████████████████

22     Another example of DWI's acquiescence to DWE is when ████████

23

24 _____

25 [16] Stein Decl., Exs. 46, 47 (emphases added to both).

26 [17] Stein Decl., Ex. 211 (Park (Moonsu) Dep.) at 51:21-52:13.

27 [18] Stein Decl., Ex. 211 (Park (Moonsu) Dep.) at 28:24-30:3, 31:5-15; Stein Decl.,
Ex. 48.

28

1 ████████████████████████████ ████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 Chairman Kim, Ingu, and other DWE officials all acted on DWI's behalf.

**B. TUG and COSI**

TUG—the "Thai Union Group"—is the 100% owner of Thai Union North America ("TUNA"), which in turn owns 100% of COSI.  DeMario Opening Report ¶¶ 12, 73-75.  Thiraphong Chansiri ("Chansiri") and Cheng Niruttinanon (aka "Han Seng") control TUG and its member companies, including COSI.[21]  Chansiri, the President and CEO of TUG, holds 34 additional executive positions in TUG and associated firms, including as the Chairman of COSI's Board of Managers and as the President of TUNA.  Hamilton Report ¶ 39.  TUG's Executive Chairman (and Chansiri's Uncle), Han Seng, also sits on COSI's Board and also holds 22 other executive positions within TUG.  *Id.* ¶ 40.

17 ████████████████████████████████████

18 ████████████████████████████████████████████

19 ██████████████████ ██████████████████████████

20 ████████████████████████████████████████████

---

[19] Stein Decl., Ex. 49.

[20] Stein Decl., Ex. 50.

[21] TUG criticizes Plaintiffs for not deposing Han Seng, but it fails to note that after Magistrate Judge Dembin ruled that Plaintiffs could not depose Dongwon's "apex" executive, Chairman Kim (ECF No. 1355), TUG's counsel told Plaintiffs that TUG would similarly file an "apex" letter if Plaintiffs sought to depose Han Seng.  Stein Decl. ¶ 2.  Plaintiffs reserve the right to call Han Seng at trial.

[22] Stein Decl., Ex. 214 (Blatt Dep.) 87:16-88:3.



1 ████████████████████████████ ████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████ ████████████

4 ████████████████████████████████████████

5 ████████████████████████

6          Chansiri and Han Seng would also dole out assignments to COSI personnel.

7 ████████████████████████████████████████

8 ████████████████████████████████████████

9 ████████████████████████████████████████

10 ████████████████████████ ████████████████

11 ████████████████████████████████████████

12 ████████████████████████████████████████

13 ████████████████████████████████████████

14 ████████████     These anecdotes show the sort of influence and control TUG had

15 over COSI.

16          COSI's CEO during the relevant period was Shue Wing Chan, Chansiri's

17 cousin and Han Seng's nephew.          ████████████████████

---

[23] Stein Decl., Ex. 51.

[24] Stein Decl., Ex. 52 (as one COSI employee wrote, "[w]e are still awaiting answer from Thiraphong through Kevin on whether he will allow us to bid on this business").

[25] Stein Decl., Ex. 53. The DPPs' expert, Marianne DeMario, estimates that TUG entities earned profits of at least $43 million on sales to COSI. DeMario Opening Report ¶ 85. There is also evidence that COSI could have saved money if its parent company had not forced it to buy from TUG entities. *See id.* ¶¶ 87-88; *see also* DeMario Rebuttal Report ¶¶ 46-64 (describing how during the relevant period, "COSI's transfer prices have shifted as much as $131.9 million of COSI's profit to its parent company and other related-parties in the TUG Entities.").

[26] Stein Decl., Ex. 54.

[27] Stein Decl., Exs. 55, 56.



**C. Lion Entities and Bumble Bee**

**1. Procedural History**

Plaintiffs first sought leave to name the Lion Entities as Defendants in late 2017, which the Court granted. *See, e.g.*, ECF No. 530. On September 5, 2018, the Court denied the Lion Entities' motion to dismiss with regard to Lion Americas' alleged direct participation in the conspiracy but granted it with regard to *alter ego* allegations against Lion Americas and all claims against Lion Capital and Big Catch (though the Court found that Plaintiffs had alleged that Big Catch was Lion Capital's *alter ego*). ECF No. 1358. The Court granted Plaintiffs leave to replead, and Plaintiffs filed their respective amended complaints on October 5, 2018. *See,*

---

[28] *See, e.g.*, Stein Decl., Ex. 57-59.

[29] *See, e.g.*, Stein Decl., Ex. 60; Hamilton Report ¶¶ 74-75.

[30] Stein Decl., Ex. 215 (Chan Dep.) 49:10-15, 50:3-51:20). Thus, when TUG suggests it had no "authority over their subsidiaries' packaged tuna pricing" this is clearly not the case. TUG MP&A at 14-15.

[31] Stein Decl., Ex. 61. *See also* Laby Report ¶¶ 40-42.

*e.g.*, ECF No. 1423.  On January 4, 2019, the briefing related to the Lion Entities' subsequent renewed motion to dismiss was completed and that motion remains pending.  ECF No. 1760.  As a result, Magistrate Judge Dembin has denied discovery with respect to Lion Capital and Big Catch, as described in the Declaration of Elana Katcher.

Because Plaintiffs have not had complete discovery for Lion Capital and Big Catch, it would be premature to rule on summary judgment as to these two entities. While Plaintiffs have been able to proceed with discovery from Lion Americas and have taken the depositions of Lion Capital partners Eric Lindberg, Jacob Capps, and Jeff Chang, all other discovery against Lion Capital itself remains stayed.  For example, the only documents produced from the custody of Lyndon Lea are a limited number of documents that were produced in response to Plaintiffs' subpoena of Lion Capital as a non-party, and his deposition has not yet been taken. Without an opportunity to obtain discovery from Lion Capital, Plaintiffs have been deprived of essential facts to make their case against the Lion Entities.  Accordingly, although Plaintiffs believe that the summary judgment in favor of Lion Capital is inappropriate based on the current limited factual record, Lion Capital's Motion is also premature under Rule 56(d).

## 2.  Factual Background

Lion Capital is a private equity firm, and Lion Capital's U.S.-based office is named Lion Americas, which is primarily involved in managing Lion Capital's investments in the United States.  *See* Paris Decl., Ex. C.  Bumble Bee was part Lion Capital's Fund III (formed in 2010).  Chang Decl. ¶ 21.

The following key executives from these two Lion Entities were involved in Bumble Bee's operations and served *concurrently* as both Lion Americas *and* Lion Capital directors and officers during the relevant time period:  Eric Lindberg (Partner, Lion Capital and Director, Lion Americas), Jacob Capps (Partner, Lion

1   Capital and President, Lion Americas), Jeff Chang (Partner, Lion Capital, and

2   Principal, Lion Americas).

3       The other key players are Lyndon Lea (Founding Partner/Managing

4   Partner, Lion Capital), Ken Smialek (Partner, Lion Capital), Janet Dunlop (COO,

5   Lion Capital) and Todd Bondy (Associate, Lion Americas).

6       Plaintiffs refer to Lion Americas and Lion Capital together as "Lion" unless

7   otherwise noted.  They do so because there is no indication that Lindberg, Capps,

8   or Chang ever made any attempt to distinguish their work for Lion Capital versus

9   Lion Americas.[32]  As noted, they held positions at *both* firms during the relevant

10  period.

---

[32] *See, e.g.*, Stein Decl., Ex. 216 (Lindberg Dep.) 50:16-54:14; *see also id.* 54:18-20

[33] Stein Decl., Ex. 61.

---

1    Lion Capital assigned Lindberg, Capps, and Chang—the so-called "deal

2  team"—to oversee the Bumble Bee investment, but they were also relatively new

3  to Lion Capital. ████████████████████████████████████████

4  ███████████████████████████████████████████████████████

5  ██████  ███████████████████████████████████████████████

6  ██████████████████████████  ████████████████████████████

7  ███████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████

9  ███████████████████████████████████████████

10    While Lion argues without citation that Lindberg, Capps, and Chang had

11  "unblemished track records and sterling reputations" (Lion MP&A at 3), and thus

12  supposedly were left on their own to oversee Lion Capital's investment of

13  "hundreds of millions of dollars" (id.), the "deal team" assigned to the Bumble Bee

14  transaction was comprised of individuals who had a relatively short track record

15  with Lion. ████████████████████████████████████████████

16  ███████████████████████████████████████

17    Lion Capital portrays itself as a faraway parent that left its U.S. investments

18  in the hands of its U.S. subsidiary—but that is far from the truth. ████████████

19  ███████████████████████████████████████████████████████

---

[34] *See, id.*; Stein Decl., Ex. 216 (Lindberg Dep.) 24:24-25:4, 25:16-26:22.

[35] Stein Decl., Ex. 217 (Chang Dep.) 35:20-37:20.

[36] Stein Decl., Ex. 218 (Capps Dep.) 19:2-4; 25:10-27:23; 29:11-30:11, 152:14-21.

[37] Stein Decl., Exs. 63-64.

[38] *See, e.g.*, Stein Decl., Ex. 216 (Lindberg Dep.) 26:23-27:7; 48:16-49:9; Stein Decl., Ex. 218 (Capps Dep.) 43:11-46:14 ████████████████████████████
████████████████████████████████████████████

[39] Stein Decl., Ex. 216 (Lindberg Dep.) 58:16-20; Stein Decl., Ex. 218 (Capps Dep.) 88:19-89:18.



40 Stein Decl., Ex. 216 (Lindberg Dep.) 58:3-14.

41 Stein Decl., Ex. 217 (Chang Dep.) 42:17-43:5.

42 Stein Decl., Ex. 65 at 3; Stein Decl., Ex. 217 (Chang Dep.) 48:17-57:9; Stein Decl., Ex. 218 (Capps Dep.) 114:7-22, 155:10-156:19).

43 Stein Decl., Ex. 218 (Capps Dep.) 90:4-90:24; 107:11-109:13; 117:4-133:24; Stein Decl., Ex. (Exhibit 1642.pdf).

44 Stein Decl., Ex. 218 (Capps Dep.) 133:25-138:18; Stein Decl., Ex. 66.

45 Stein Decl., Ex. 191 (emphases added).

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4    Immediately after the Bumble Bee acquisition, Lion Capital took steps to

5 ensure that it was intimately involved in Bumble Bee's day-to-day operations,

6 management, and finances. ██████████████████████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ███████████████████████  ██████████████████████████

11 ████████████████████████████████████████████████████

12 █████████████████████████████████████████  █████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████  ██████████

17 ████████████████████████████████████████████████████

18 █████████████████████████████████████

19    After the Bumble Bee purchase transaction closed, Lindberg, Capps, and

20 Chang joined the Bumble Bee Board of Directors, along with Lea and Lion

21

22 _____

23 ██████████████████████████████████████████ Stein Decl., Ex. 218 (Capps Dep.) 165:5-12).

24 [46] Stein Decl., Ex. 191 (emphases added).

25 [47] Stein Decl., Ex. 68.

26 [48] Stein Decl., Ex. 219 (Lischewski Dep.) 123:16-124:11.

27 [49] Stein Decl., Ex. 220 (Cameron Dep.) 444:16-19, 444:25-445:4 448:13-17.

28 [50] *See, e.g.,* Stein Decl., Ex. 69.

1    Capital's COO Janet Dunlop.[51] ████████████████████████████████

2    ████████████████████████████████████████████████████████████████

3    ██████████████████████████████    ███████████████████████████████

4    ████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████

8    █████████████████████████████████████████████████████████████████

9        There are countless examples of Lion's involvement. ████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████

13   ███████████████████████████████████████████████    ██████████████

14   ████████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████    █████████████████

16   ████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████

19

20   _____

21   [51] Stein Decl., Ex. 217 (Chang Dep.) 99:21-100:14; Stein Decl., Ex. 218 (Capps Dep.) 199:1-199:12).  Lea was not a nominal Board member—he attended several

22   meetings.  Stein Decl., Exs. 70-74.  When Lea could not make a Board meeting,

23   he would be updated by Lindberg, Chang, and Capps about key points, either verbally or in writing. Stein Decl., Ex. 218 (Capps Dep.) 317:5-317:20.

24   [52] Stein Decl., Ex. 216 (Lindberg Dep.) 287:18-288:16).

25   [53] Stein Decl., Ex. 75; Stein Decl., Ex. 255.

26   [54] *See, e.g.*, Stein Decl., Ex. 216 (Lindberg Dep.) 212:24-214:8; Stein Decl., Ex. 217 (Chang Dep.) 102:24-104:17.  Stein Decl., Exs. 76, 77.

27   [55] Stein Decl., Ex. 217 (Chang Dep.) 101:5-101:23

28

1  ████████████████    ████████████████████████████████████

2  ██████████████████████████████████

3      Big Catch Cayman LP aka Lion/Big Catch Cayman LP ("Big Catch") is a

4  holding company established in November of 2010 that wholly owns Bumble Bee.[58]

5  ████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████

10  ████████████████████████████

11  ████████████████████████████████████████████████████

12  ████████    ████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████    ██████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████

18

19

20  [56] Stein Decl., Ex. 216 (Lindberg Dep.) 419:5-15, 426:11-427:7.

21  [57] *See* Stein Decl., Ex. 220 (Cameron Dep.) 448:13-449:6-10.

22  [58] Stein Decl., Ex. 216 (Lindberg Dep.) 407:20-408:8, 410:8-13.

23  [59] Stein Decl., Ex. 78.

24  [60] Stein Decl., Ex. 216 (Lindberg Dep.) 37:3-38:5, 408:1-6, 409:4-8; Stein Decl., Ex _ 217 (Chang Dep.) 72:15-25, 131:12-132:3; Stein Decl., Ex. 79.

25  [61] Stein Decl., Ex. 217 (Chang Dep.) 95:22-96:4.

26  [62] Stein Decl., Ex. 67.

27  [63] Stein Decl., Ex. 78; 220 Lischewski Dep. 236:12-238:4; Stein Decl., Ex. 218 (Capps Dep.) 362:3-24; Stein Decl., Ex. 216 (Lindberg Dep.) 408:9-14.

28

**D. The Conspiracy**

**1. The Two Levels of the Conspiracy**

There are two levels to the conspiracy involved in this case.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) (describing how complex price-fixing conspiracies are often carried out "by both executives and subordinate employees," and "implemented by subsidiaries and distributors within a corporate family.").

The first level involves the Defendants' U.S. subsidiaries.  There is no dispute that Bumble Bee, StarKist, and COSI each conspired to fix, raise, and maintain the prices of packaged tuna.  The salient facts about this level of the conspiracy are contained in Plaintiffs' Summary Judgment Motions (*see* ECF Nos. 1976, 1993, 2009, 2035).  It is important to note, however, that Bumble Bee pleaded guilty to violations of the Sherman Act, for the period of "████████████████████ ████████████████████████████████████"[64]

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[64] Stein Decl., Ex. 1.

[65] Stein Decl., Ex. 10.



15   COSI's employees have leniency with the Department of Justice.

16   Lischewski has been criminally indicted and currently on trial.

17   The second level of the conspiracy involves the Parent Entities—each of

18   which played a pivotal role in carrying out the first level of the conspiracy.   As

19   discussed below, the Parent Entities ensured that the U.S. subsidiaries kept prices

20   elevated and prevented their subsidiaries from dropping prices ▮▮▮▮▮▮

21   ▮▮▮▮▮▮.   The Class Plaintiffs contend that the second level of the

22   conspiracy commenced by at least November of 2010; the DAPs allege that it began

23   in 2008.  In the following section, Plaintiffs first discuss the core-allegations about

24   the Parent Entities' involvement and participation in the conspiracy, then the DAPs

25   describe the facts supporting that the conspiracy commenced even earlier.

26

27   [66] Stein Decl., Ex. 11.

28

2. **The Parent Entities' Involvement in the Conspiracy.**

   a. *The Origins of the 2010-2015 Conspiracy*

[REDACTED]

Additionally, in late 2010, Defendants were committed to their $20 million joint category growth campaign: Tuna the Wonderfish, which they launched at a time when "[t]una was losing relevance" as per-capita consumption of canned tuna had plummeted.[71] [REDACTED]

_____

[67] *See* Stein Decl., Ex. 216 (Lindberg Dep.) 65:11-18, 418:18-419:23.

[68] Stein Decl., Ex. 80.  A 2010 presentation explained: "[h]istorically [the company is] able to generate profit during times of fish price volatility," noting that "[i]n periods of rising fish costs, the Company attempts to raise prices prior to the receipt and processing of higher-priced raw materials" while "[i]n periods of declining fish costs, the Company seeks to delay its price reductions to market, generating additional profitability."  Stein Decl., Ex. 81 at 19.

[69] Stein Decl., Ex. 201 (Tharp Dep.) 38:22-39:6; 41:8-13; 95:22-96:7; Stein Decl., Ex. 221 (Park (Ingu) Dep.) 43:3-18; Stein Decl., Ex. 211 (Park (Moonsu) Dep.) 28:24-29:6, 29:25-30:3; 315:15; Stein Decl., Ex. 210 (Choe Dep.) 25:16-34:10.

[70] Stein Decl., Ex. 199 (Binotto Dep.) 304:9-305:19; Stein Decl., Ex. 221 (Park (Ingu) Dep.) 72:15-23; Stein Decl., Ex. 82.

[71] Stein Decl., Ex. 256, Stuart Elliott, *Time to Eat Tuna? 'Wonder' No More*, N.Y. TIMES (Mar. 3, 2011)



72 ███

73 Stein Decl., Ex. 16.

74 *Id.*

75 Stein Decl., Ex. 216 (Lindberg Dep.) 98:11-17.



76 Stein Decl., Ex. 84 (emphases added). *See* Ex. 219 (Lischewski Dep.) 110:5-21.

77 *Id.* (emphases added). Ex. 219 (Lischewski Dep.)

78 Stein Decl., Ex. 218 (Capps Dep.) 176:10-178:23.

79 Stein Decl., Exs. 85, 86.

acting on behalf of Lion Capital – the equitable owner of Bumble Bee – rather than Lion Americas, which had no direct ownership over Bumble Bee.



[80] Stein Decl., Ex. 87 (emphases added)

[81] Stein Decl., Ex.  216 (Lindberg Dep.) 88:18-88:23).

[82] Stein Decl., Ex. 217 (Chang Dep.) 159:19-160:4; 161:12-162:3; 169:1-172:18; Stein Decl., Ex. 218 (Capps Dep.) 185:19-187:16.

[83] Stein Decl., Ex. 88.

[84] Stein Decl., Ex. 89.

[85] *Id.;* Stein Decl., Ex. 221 (Park (Ingu) Dep.) 110:6-25; Stein Decl., Ex. 216 (Lindberg Dep.) 120:15-18.



86 Stein Decl., Ex. 89.

87 Stein Decl., Ex. 216 Lindberg Dep. 144:1-13.

88 Stein Decl., Ex. 90.

89 Ex. 219 (Lischewski Dep.)

90 Stein Decl., Ex. 6 (Lischewski indictment)

91 Stein Decl., Ex. 91.

92 See Stein Decl., Ex. 199 (Binotto Dep.) 302:4-304:14.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19  [93] Stein Decl., Ex. 91.

20  [94]

21

22

23

24  [95] Stein Decl., Ex. 92; Stein Decl., Ex. 216 (Lindberg Dep.) 126:17-127:15.  Stein

25  Decl., Ex. 222 (Chansiri Dep). 209:1-211:9, 215:5-7, 216:22-217:22).

26  [96] Stein Decl., Ex. 216 (Lindberg Dep.) 127:12-25.

27  [97] Stein Decl., Ex. 219 (Lischewski Dep.) 119:25-123:4

28  [98] Stein Decl., Ex. 218 (Capps Dep.) 187:18-20.

These parent-level meetings were crucial to the conspiracy, since the owners of these companies expressly or implicitly agreed to reduce competition in the packaged tuna industry.

### c. Preparation for the 2011 Price Increase

---

[99] Stein Decl., Ex. 93.

[100] *Id.*; *see also* Stein Decl., Ex. 211 Park (Moonsu) Dep. 113:9-114:5 ▮

[101] Stein Decl., Ex. 94; Stein Decl., Ex. 222 Chansiri Dep. 226:18-23, 230:19-21, 231:3-18.

[102] Stein Decl., Ex. 54.

[103] Stein Decl., Ex. 95.

---



104 Stein Decl., Ex 96.

105 Stein Decl., Ex. 97.

106 Stein Decl., Ex. 220 (Cameron Dep.) 446:23-448:7

107 Stein Decl., Ex. 223 (Worsham Dep.) 105:6-21; 106:3-24.

108 Stein Decl., Ex. 98; Stein Decl., Ex. 219 (Lischewski Dep.) 139:3-140:1

109 Stein Decl., Ex. 99.



### d.  The Conspiracy Continues

---

[110] Stein Decl., Ex. 100.

[111] Stein Decl., Ex. 26 (StarKist Price Increase); Stein Decl., Ex. 101 (Bumble Bee Price Increase).

[112] Stein Decl., Ex. 102.

[113] As Bumble Bee's 30(b)(6) witness explained,



114 Stein Decl., Ex. 103.

115 *See* Stein Decl., Ex. 219 (Lischewski Dep.) 147:19-150:15

116 Stein Decl., Ex. 221 (Park (Ingu) Dep.) 137:2-8.

117 Stein Decl., Ex. 221 (Park (Ingu) Dep.) 137:23-138:9.

118 Stein Decl., Ex. 104.



_Stein Decl., Ex. 105._ [119]

_Stein Decl., Ex. 106._ [120]

_Stein Decl., Ex. 107._ [121]

_Stein Decl., Ex. 205 (Hodge Dep. 147:7-148:10.)_ [122]

_Stein Decl., Ex. 108._ [123]



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

[124] Stein Decl., Ex. 216 (Lindberg Dep.) 186:17-187:3.

[125]

[126] *See* Stein Decl., Ex. 109.

[127] Stein Decl., Ex. 110.

[128] Stein Decl., Ex. 216 (Lindberg Dep.) 164:7-24.

[129] Stein Decl., Ex.



---

130 Stein Decl., Ex. 111.

131 Stein Decl., Ex. 112; *see also* Stein Decl., Ex. 18.

132 Stein Decl., Ex. 113.

133 Stein Decl., Ex. 114.

134 Stein Decl., Ex. 218 (Capps Dep.) 256:10-18, 257:18-259:25.



135 Stein Decl., Ex. 115.

136 Stein Decl., Ex. 116.

137 Stein Decl., Ex. 117.

138 Stein Decl., Ex. 118.



139 Stein Decl., Ex. 119-21.

140 Stein Decl., Ex. 122.

141 Stein Decl., Ex. 123.

142 Stein Decl., Ex. 219  (Lischewski Dep.) 170:3-5-171:21

143



---

[144] Stein Decl., Ex. 124.  The Department of Justice identified the whistleblower as Charles Simmons.

[145] Stein Decl., Ex. 125; Stein Decl., Ex. 257 (Declaration of Bumble Bee's General Counsel); *see also* Stein Decl., Ex. 196.

[146] Stein Decl., Ex. 216 (Lindberg Dep.216 216 (Lindberg Dep.) 351:3-352:2; Stein Decl., Ex. 218 (Capps Dep.) 293:7-25.

[147] Stein Decl., Ex. 193; Stein Decl., Ex. 217 (Chang Dep.) (177:3-192:6).

[148] Stein Decl., Ex. 218 (Capps Dep.) 210:18-215:25.

[149] Stein Decl., Ex. 194.



150 Stein Decl., Ex. 126; Stein Decl., Ex. 205 (Hodge Dep.) 171:2-172:16

151 Stein Decl., Ex. 127 at 30 (LION_00025982); Stein Decl., Ex. 217 (Chang Dep.) 195:1-23.

152 *Id.*; Stein Decl., Ex. 217 (Chang Dep.) 196:12-23.

153 Stein Decl., Ex. 127 at 37 (LION_00025989); Chang Dep. 150:6-25. Stein Decl. 128.

154 Stein Decl., Ex. 129; *see also* Stein Decl., Ex. 195.



155 *See, e.g.*, Stein Decl., Ex. 219 (Lischewski Dep.) 179:6-184:6

156 Stein Decl., Ex. 130.

157 Stein Decl., Ex. 132.

158 Stein Decl., Ex. 222 (Chansiri Dep.) 243:3-6; 264:5-8, 265:15-17; Stein Decl., Ex. 216 (Lindberg Dep.) 150:2-18; 261:13-262:7, 262:21-24, 317:13-25; Stein Decl., Ex. 133 (Lindberg also



159 Stein Decl., Ex. 216 (Lindberg Dep.) 256:19-272:5.

160 Stein Decl., Ex. 134.

161 Stein Decl., Ex. 135.

162 Stein Decl., Ex. 225 (Cho Dep.) 313:16-317:13; Stein Decl., Ex. 29.

163 Stein Decl., Ex. 136.

164 Stein Decl., Ex. 137.

165 Stein Decl., Ex. 138.



166 Stein Decl., Ex. 139.

167 Stein Decl., Ex. 216 (Lindberg Dep.) 322:1-326:3.

168 Stein Decl., Ex. 140.

169 Stein Decl., Ex. 141.

170 Stein Decl., Ex. 213 (Shin Dep.) 116:16-127:17; Stein Decl., Ex. 142.



171 *Id.*; *see also* Stein Decl., Ex. 213 (Shin Dep.) 176:19-177:1.

172 Stein Decl., Ex. 221 (Park (Ingu) Dep.) 78:4-79:22.

173 *See, e.g.*, Stein Decl. Ex. 219 (Lischewski Dep.) 187:25-189:2 ████████

174 Stein Decl., Ex. 143 at 10.

175 Stein Decl., Ex. 144 (emphases added).

176 *Id.* (emphases added); *see also* Stein Decl., Ex. 222 (Chansiri Dep.) 175:14-186:21; Stein Decl., Ex. 209 (TUG 30(b)(6) (Ayrle) Dep.) 272:2-275:10-19.

177 Stein Decl., Ex. 145.  Thus, contrary to TUG's argument that Plaintiffs are only relying on communications between the Parent Entities to establish their price-fixing claims (TUG MP&A at 18), there is also evidence that Chansiri and Lischewski met in person during the relevant period.

178 *See, e.g.,* Stein Decl., Ex. 219 (Lischewski Dep.) 190:20-192:6-8 (████

1 ██████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ██████████████████████████████████████████████████

4 ██████████████████████████████████████████████████

5 ██████████████████████████████████████████████████

6 ██████████████████████████████████████████████████

7 ████████████████

8       ***e. Pre-Nov. 2010***

9      Prior to Lion Capital's purchase of Bumble Bee, there is evidence that TUG

10 and Dongwon were already conspiring. ██████████████████

11 ██████████████████████████████████████████████████

12 ██████████████████████████████████████████████████

13 ██████████████████████████████████████████████

14 ████████████████████████████ ███████████████████

15 ██████████████████████████████████████████████

16   ████████████████████████████████████████████

17 ██████████████████████████████████████████████████

18 ██████████████████████████████████ █

19 ██████████████████████████████████████████████████

20 ██████████████████████████████████████████████████

21 █████████████████████████

22   ███████████████████████████████████████████

23 ██████████████████████████████████████████████████

24 _____

25 [179] Stein Decl., Ex. 146 (emphases added).

26 [180] Stein Decl., Ex. 147.

27 [181] Stein Decl., Ex. 148.

[182] Stein Decl., Ex. 149.

28



### III.   SUMMARY JUDGMENT STANDARDS

There is no heightened standard for antitrust plaintiffs at summary judgment. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468 (1992).  Summary judgment is only appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  And the Court must "view the facts and draw factual inferences in favor of [] the non-moving party."  *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1088 (9th Cir. 2015).  At summary judgment, "the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The specific standards for the Sherman Act Claims (and related state law claims) as well as *alter ego* and agency are set forth below.

Additionally, Plaintiffs have submitted the Katcher Declaration in support of their contention that the Court should deny summary judgment to Lion Capital and Big Catch pursuant to Federal Rule of Civil Procedure 56(d).  Under Rule 56(d), the Court may defer or deny a motion for summary judgment where the

---

[183] Stein Decl., Ex. 150.

[184] Stein Decl., Ex. 151.

"nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." "Courts generously grant Rule 56(d) motions, 'unless the non-moving party has not diligently pursued discovery of the evidence.'" *Rearden LLC v. Crystal Dynamics, Inc.*, No. 17-CV-04187-JST, 2018 WL 3023450, at *1 (N.D. Cal. June 18, 2018) (citations omitted). The Ninth Circuit has emphasized that summary judgment ***must*** be denied where the nonmovant was not provided with an opportunity to gather discovery. *Head v. Wilkie*, No. 17-55942, 2019 WL 4213764, at *2 (9th Cir. Sept. 5, 2019); *Jacobson v. U.S. Dep't of Homeland Sec.*, 882 F.3d 878, 883 (9th Cir. 2018). A premature summary judgment is also inappropriate in cases that are heavily fact dependent (*Head*, 2019 WL 4213764, at *2), or where plaintiffs intend to rely on material that is the subject of outstanding discovery requests (*Visa Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986)).

To gain relief under the Rule, "[t]he requesting party must show [that]: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008). This does not require that the nonmovant "predict with accuracy precisely what further discovery will reveal; the whole point of discovery is to learn what a party does not know or, without further information, cannot prove." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1222 (2019). Ms. Katcher's supporting declaration addresses these criteria and describes why summary judgment is premature given the state of discovery against Lion Capital and Big Catch.

## IV.   ARGUMENT REGARDING CONSPIRACY PARTICIPATION

Defendants do not dispute that: (1) there was a price-fixing conspiracy in this case; (2) parent companies can participate in a conspiracy even when it is their

subsidiaries that actually compete in the relevant market (*see In re Vitamins Antitrust Litig.*, 270 F. Supp. 2d 15, 24, 28 (D.D.C. 2003) (finding holding company that did not itself sell the relevant product was nevertheless a co-conspirator))[185]; or (3) the Parent Defendants stood to directly benefit from their subsidiaries' participation in the conspiracy, giving them a plausible economic reason to conspire.  Nonetheless, the Parent Defendants ask the Court to step into the role of fact finder and make the conclusive determination that they did not knowingly participate in or acquiesce to that conspiracy, despite the economic benefits that they reaped from it.  *See United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948) ("acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one.").

Defendants have not met their initial burden to show plausible and justifiable reasons for their conduct or that their participation in the conspiracy is "economically implausible."  And, furthermore, there is abundant evidence that the Parent Entities knew about their subsidiaries' conspiracy and joined it.  The Parent Entities cannot show that summary judgment is appropriate.

## A. Summary Judgment Standard in an Antitrust Case

In the antitrust context, "[a]n agreement to restrain trade may be established by direct or by circumstantial evidence." *Stanislaus*, 803 F.3d at 1088 (citation omitted).  "Direct" evidence "is evidence tantamount to an acknowledgment of guilt" whereas circumstantial evidence "is everything else including ambiguous statements. These are not to be disregarded because of their ambiguity; most cases are constructed out of a tissue of such statements and other circumstantial

---

[185] A defendant can participate in an antitrust conspiracy even if it does not compete in the sale of the relevant product.  *See, e.g., Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993); *United States v. MMR Corp. (LA)*, 907 F.2d 489, 498 (5th Cir. 1990); *In re Mid-Atl. Toyota Antitrust Litig.*, 560 F. Supp. 760, 777-78 (D. Md. 1983).

evidence." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) ("*High Fructose*").  However, "[a]ll evidence, including direct evidence, can sometimes require a factfinder to draw inferences to reach a particular conclusion, though '[p]erhaps on average circumstantial evidence requires a longer chain of inferences.'" *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 64 (2d Cir. 2012) (quoting *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900 (7th Cir. 2006) (Posner, J.)) (alterations in original).  Where there is "direct evidence that [a defendant] entered into illegal price-fixing agreements . . . summary judgment would, of course, be inappropriate[.]" *In re Citric Acid Litig.*, 191 F.3d 1090, 1093 (9th Cir. 1999) (citations omitted) ("*Citric Acid II*").

However, an explicit agreement is "not a necessary part of a Sherman Act conspiracy." *United States v. Gen. Motors Corp.*, 384 U.S. 127, 142-43 (1966); *Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1132-33 (9th Cir. 2011) (the Sherman Act proscribes agreements to restrain trade, "whether express or implicit [or] whether by formal agreement or otherwise.").

When relying on circumstantial evidence, plaintiffs need only provide enough evidence that "*tends to exclude* the possibility that [defendants] acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (emphases added).  The "tends to exclude" standard does not require plaintiffs to "exclude all possibility that the manufacturers acted independently[.]" *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 934-35 (7th Cir. 2000); *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, No. 5:11-CV-03613-EJD, 2015 WL 365491, at *5 (N.D. Cal. Jan. 27, 2015) (denying summary judgment because though "none of the evidence necessarily excludes the possibility that Cypress arrived at decisions on its own . . . . , all that is necessary to avoid summary judgment is evidence that reasonably tends to exclude that possibility.").

The facts of *Matsushita* are key to understanding the Supreme Court's

holding.  *Matsushita* involved a group of American corporations that made or sold consumer electronic products and claimed that their Japanese counterparts were engaging in a 20-year conspiracy to price *below cost* in the United States in the hope of expanding their market share sometime in the future.  *Matsushita*, 475 U.S. at 577-82.  In reviewing a grant of summary judgment, the Supreme Court highlighted the difficulty with the plaintiffs' theory, namely, that defendants had every incentive *not* to engage in the alleged conduct, which required them to sustain *losses for decades with no foreseeable profits*—and thus, because the plaintiffs could offer no "rational motive to conspire" (*id.* at 597), the Court held that a reasonable jury could not return a verdict for the plaintiffs and that summary judgment was appropriate.  *Id.* at 587-88.  The Court, however, ultimately remanded to give the plaintiffs the opportunity to come forward evidence to support their theory of predatory pricing. *Id.*

Following *Matsushita*, the Ninth Circuit has developed a two-part test to consider whether circumstantial evidence "tends to exclude" lawful behavior. First, the defendant can "rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice.' . . . [Second] The burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior."  *Citric Acid II*, 191 F.3d at 1094 (internal citation omitted). In other words, "[t]he Ninth Circuit has interpreted *Matsushita* to mean that where a defendant has demonstrated a plausible business reason for its conduct, 'a plaintiff who relies solely on circumstantial evidence of conspiracy . . . must produce evidence tending to exclude the possibility that defendants acted independently.'" *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1283086, at *1 (N.D. Cal. Mar. 28, 2014) ("*High Tech*") (citing *Citric Acid II*, 191 F.3d at 1096). Defendants continue to bear the initial burden to show that they had plausible and

1   justifiable reasons for their conduct.

2   Although Defendants emphasize the 1999 *Citric Acid II* case, they noticeably

3   ignore more recent 2015 precedent: *Stanislaus Food Products Co. v. USS-POSCO*

4   *Industries*, 803 F.3d 1084 (9th Cir. 2015) (authored by Judge M. Margaret

5   McKeown, who sat on the *Citric Acid* panel). *Stanislaus* explains that a defendant

6   may satisfy its initial burden by "demonstrat[ing] that the potential benefit of the

7   scheme 'is just not apparent,' such that the defendant's 'participation in the alleged

8   conspiracy is economically implausible.'" *Home Depot, U.S.A., Inc. v. E.I. DuPont de*

9   *Nemours & Co.*, No. 16-CV-04865-BLF, 2019 WL 3804667, at *4 (N.D. Cal. Aug.

10  13, 2019) (quoting *Stanislaus*, 803 F.3d at 1091). *Stanislaus* makes clear that in

11  determining whether the evidence "tends to exclude" independent (as opposed to

12  conspiratorial) conduct, the Ninth Circuit (like the Supreme Court in *Matsushita*)

13  allows for broader inferences in the non-moving party's favor when the plaintiff's

14  claim makes economic sense. *See Stanislaus*, 803 F.3d at 1089. Indeed, *Stanislaus*

15  highlighted the *Matsushita* Court's statement that "'if the factual context renders

16  [plaintiffs'] claim implausible—if the claim is one that simply makes no economic

17  sense—[plaintiffs] must come forward with more persuasive evidence to support

18  [their] claim than would otherwise be necessary.'" *Id.* (quoting *Matsushita*, 475 U.S.

19  at 587); *see also Home Depot*, 2019 WL 3804667, at *7 ("The factual context . . . and

20  the economic plausibility of a defendant's motivation to conspire play an explicit,

21  central role in the standards set forth in *Matsushita*."; "[i]mplausible claims require

22  a 'more persuasive' showing 'that tends to exclude the possibility' of independent

23  action.") (citations omitted).[186]

---

[186] But the Supreme Court has "not h[e]ld that if the moving party enunciates any economic theory supporting its behavior" it is entitled to summary judgment. *Eastman Kodak*, 504 U.S. at 468-69. Only if "the plaintiff's theory is economically senseless" and "no reasonable jury could find in its favor" should "summary judgment [] be granted." *Id.*

1    Courts in the Ninth Circuit have also recognized that once the existence of a
2    conspiracy has been established (as the guilty pleas and Defendants' interrogatory
3    responses establish here), only a "slight connection" to the conspiracy is necessary
4    to find the defendant liable.  *United States v. Grasso*, 724 F.3d 1077, 1086 (9th Cir.
5    2013) *cert. denied Grasso v. United States*, 134 S. Ct. 484 (2013) ("Once the existence
6    of the conspiracy is shown, evidence establishing . . . a knowing connection of the
7    defendant with the conspiracy, even though the connection is slight, is sufficient to
8    convict him of knowing participation in the conspiracy."); *United States v. Reed*, 575
9    F.3d 900, 924 (9th Cir. 2009) (same); *see also Precision Assocs., Inc. v. Panalpina World
10   Transp. (Holding) Ltd.*, No. 08-CV-00042 JG VVP, 2012 WL 3307486, at *2
11   (E.D.N.Y. Aug. 13, 2012) (with respect to liability of parent corporations, where
12   "only 'slight evidence' is necessary to connect a defendant to an antitrust conspiracy
13   once the conspiracy is established, it follows that the pleading burden may be more
14   easily satisfied where, . . . there have been guilty pleas to criminal charges arising
15   out of the same events.") (quotations omitted).

16   For example, in *Grasso*, the defendant argued that his involvement was
17   limited to the legitimate aspects of certain real estate transactions, and he was
18   unaware of any fraudulent conduct to inflate the value of the property at issue.  724
19   F.3d at 1087.  The Court, however, cited evidence showing that Grasso knew the
20   objectives of the fraudulent scheme, including evidence showing how he helped his
21   co-conspirators convince lenders that various properties were sold for more than
22   their actual sales prices and was an expert in his field and therefore would
23   understand that alleged co-conspirators were not innocently carrying out illegal
24   activities.  *Id.*  The Court found that this evidence provided the "slight connection"
25   to the pre-established conspiracy to convict Grasso.  *See also id.* at 1096-97 (Berzon,
26   J., concurring in part, dissenting in part) (explaining that the slight evidence rule
27   "is ultimately best understood to mean that if someone joins the conspiracy, 'slight'

28

1    activity to accomplish its objectives is enough").

2         Relatedly, it has long been held that in antitrust cases, "plaintiffs should be

3    given the full benefit of their proof without tightly compartmentalizing the various

4    factual components and wiping the slate clean after scrutiny of each . . . [T]he

5    character and effect of a conspiracy are not to be judged by dismembering it and

6    viewing its separate parts, but only by looking at it as a whole."  *In re High-Tech*

7    *Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) (quoting *Cont'l*

8    *Ore Co.*, 370 U.S. at 699).   Indeed, "[i]t is well established that, for purposes of

9    coconspirator culpability, members of a conspiracy need not be aware of the

10   existence or activities of other members." *United States v. Wallace*, 759 F.3d 486, 492

11   (5th Cir. 2014) (citing *United States v. Booker*, 334 F.3d 406, 411 (5th Cir. 2003)); *see*

12   *also Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir.

13   1980) ("Participation by each conspirator in every detail in the execution of the

14   conspiracy is unnecessary to establish liability, for each conspirator may be

15   performing different tasks to bring about the desired result.").  As recently explained

16   by the Ninth Circuit in *Arandell Corp. v. Centerpoint Energy Services, Inc.,* 900 F.3d

17   623, 628 (9th Cir. 2018) in reversing a grant of summary judgment:

18
19          "While particularly true of price-fixing conspiracies, it is well
             recognized law that any conspiracy can ordinarily only be proved by
20           inferences drawn from relevant and competent circumstantial
             evidence, including the conduct of the defendants charged." [*Esco*
21           *Corp. v. United States*, 340 F.2d 1000] at 1007 [(9th Cir. 1965)]. Thus,
             even in the criminal context, the government "need show neither
22           direct contact nor explicit agreement among all of the alleged
             conspirators." *United States v. Reese*, 775 F.2d 1066, 1071 (9th Cir.
23           1985). Nor must the government show "that each defendant or all
             defendants must have participated in each act or transaction." *Esco*,
24           340 F.2d at 1006. Involvement "in but two of ten allegedly
             conspirational [*sic*] situations does not absolve [a defendant] from
25           participation in the entire conspiracy if its involvement in the two was
26           unlawful and knowingly and purposely performed." *Id.* at 1008. Nor
27

28

can a single defendant "join a continuing conspiracy long after others have commenced it, or partially carried it out, and thereby claim immunity either for his actions, or for those of others taking place before or after his active participation, *as long as he remains an active participant*." *Id.* at 1006 (emphasis added and citation omitted).

Finally, the Supreme Court has admonished that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962). "It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice." *Id.* "The Supreme Court has not . . . approved summary judgments that rest on credibility determinations." *McLaughlin v. Liu*, 849 F.2d 1205, 1209 (9th Cir. 1988).

**B. Defendants Have Not Met Their Burden to Show There Are No Disputes of Material Fact.**

The U.S. Defendants have already admitted to a price-fixing conspiracy in this case, from which the Parent Entities unquestionably stood to gain—and as the record reflects, the evidence undoubtedly provides enough of a basis for a reasonable jury to conclude they in fact did join the conspiracy.

As to StarKist, Plaintiffs' experts have determined that from 2011 to 2015,

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

_____

25  [187] Stein Decl., Ex. 144; Stein Decl., Ex. 209 (TUG 30(b)(6) (Ayrle) Dep.) 274:3-
275:19.

26  [188] Stein Decl., Ex. 216 (Lindberg Dep.) 35:10-15; 36:1-5.

27  [189] Stein Decl., Ex. 216 (Lindberg Dep.) 37:3-38:5.

28

_____

1 ███████████████████████████████████████████

2 ███████████████████████████████████████████

3 ████████████████ Thus, Lion Capital was also motivated to maximize Bumble

4 Bee's profits and did so through its employees' acts to further the conspiracy for

5 Lion and their own personal benefit.

6      Under such circumstances, where Defendants obviously stood to gain from

7 higher prices produced by the alleged conspiracy, Defendants "bear[] a substantial

8 burden in showing that [they are] entitled to summary judgment." *Eastman Kodak*,

9 504 U.S. at 469; *see also id.* at 478 (noting that the "alleged conduct—higher service

10 prices and market foreclosure—is facially anticompetitive and exactly the harm that

11 antitrust laws aim to prevent. In this situation, *Matsushita* does not create any

12 presumption in favor of summary judgment for the defendant."); *Stanislaus*, 803

13 F.3d at 1089-90 (emphasizing the importance of "whether the alleged conspirators

14 would have had a rational motivation to conspire.").  Thus, unlike in *Matsushita* or

15 *Citric Acid*, the Defendants cannot rebut conspiracy allegations by arguing the price

16 increases were against Defendants' interests and didn't make economic sense. *Id.*

17 at 1090 (recognizing a key motive of conspiracy is "being able to charge higher

18 prices in the absence of meaningful competition" and that "POSCO, a joint owner

19 of UPI . . . similarly stood to gain by reaping the benefit of those increased prices.").

20 The record evidence disproves Defendants' contentions.

21      Moreover, because the U.S. subsidiaries admit they reached agreements in

22 violation of the antitrust laws and thus were not engaging in independent conduct,

23 there is no issue about whether the ultimate economic conduct in this case (the

24 increased pricing) was independent or interdependent.  The only outstanding

25

26 [190] Stein Decl., Ex. 216 (Lindberg Dep.) 387:4-388:10; 130:2-11 (████████████

27 ███████████████████████████████████████████

28

question is whether the Parent Entities knowingly joined the conspiracy.  The arguments the Parent Entities put forth to respond to that inquiry are inappropriate for resolution at summary judgment and their other arguments are similarly untenable.  Plaintiffs discuss each of those arguments below.

**1. Defendants' Arguments About What the Evidence Shows May Not Be Resolved By the Court.**

Lion and TUG in particular attempt to justify the documents reflecting their knowledge of the conspiracy and their communications with competitors by disputing which inferences a fact-finder *should* draw from the evidence.[191]  But such arguments only prove that there is a genuine dispute about what the evidence shows and, thus, are plainly inappropriate for summary judgment.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 7724271, at *1 (N.D. Cal. Nov. 4, 2011) (denying summary judgment where "Defendants dispute plaintiffs' characterization of [] evidence" and holding that "[s]uch disputes regarding the interpretation of evidence are not appropriate for resolution on summary judgment."); *see also In re Cathode Ray Tube (CRT) Antitrust Litig. (CRTs)*, No. C-07-5944 JST, 2017 WL 5957654, at *4 (N.D. Cal. Feb. 27, 2017) (same); *Publ'n Paper*, 690 F.3d at 61 ("when the evidence admits of competing permissible inferences . . . 'the question of what weight should be assigned to [the] inferences remains within the province of the fact-finder at a trial.'") (quotation omitted).

For example, Lion and TUG suggest that each of their communications with competitors were done for legitimate business purposes and that—despite contemporaneous evidence suggesting otherwise—they did not discuss any unlawful topics.  Lion MP&A at 27-28; *see also, e.g.,* TUG MP&A at 2 (███████████

██████████████████████████████████████████████████████████

---

[191] As discussed below, DWI did not discuss such evidence or offer any plausible and justifiable reasons for its conduct.



Instead, Lion emphasizes how Lindberg carefully added little negations to his otherwise questionable communications with competitors, arguing that "Plaintiffs ask the Court . . . to give them a meaning that is the literal opposite of

[192] Stein Decl., Ex. 125; Bumble Bee did not produce this letter to Plaintiffs until February 11, 2019—which it blamed on "an isolated coding error."  Stein Decl., Ex. 258.

[193] *See, e.g.*,  Ex. 220 (Cameron Dep.) 449:20-22

450:10-12

[194] Stein Decl., Ex. 144.

what they say."  Lion MP&A at 27-28.  But an equally plausible reading of these disclaimers is that Lindberg knew what they were doing was wrong, and he was trying to keep it a secret.  If Lion is correct that injecting little notes about purported compliance with the laws is sufficient to overcome other inferences of conspiracy at the summary judgment stage, then cartelists could avoid all liability simply by adding little disclaimers and negations to their conspiratorial communications.  This cannot be the result.

It particularly cannot be the result in light of the facts here, ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████  This evidence shows that Lindberg, a Harvard Business School graduate, knew he needed to be careful about what he said to competitors[196]—but that does not mean that he and the other Parent Entities did not implicitly discuss and agree about these matters.  The Court should consider the evidence about the savviness of Lindberg and the other players in assessing the evidence.  As the Ninth Circuit has recognized in another price-fixing conspiracy, "[a] knowing wink can mean more than words."

---

[195] It is almost as if Lindberg knew that the term "rational" has been used by courts in the antitrust context.  *See, e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362(3d Cir. 2004) (discussing "rational, interdependent decision-making" as opposed to unlawful concerted action).  The Court should be wary of these savvy executives' use of the exact words that Courts have used to describe lawful competitive behavior in antitrust cases.

[196] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████

*Esco*, 340 F.2d at 1007.   While Lindberg may have been careful not to discuss specific pricing *in written communications*, the documents and overall context provide other circumstantial evidence from which a "reasonable factfinder could conclude . . . that [Defendants] w[ere] part of the conspiracy." *Citric Acid II*, 191 F.3d at 1101 (citation omitted).

Thus, although there is not explicit evidence that Lindberg directly set pricing with competitors, there is abundant evidence that Lindberg was aware of the importance of "signaling" competitors about pricing. █████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[197] Stein Decl., Ex. 108.

[198] Stein Decl., Ex. 129.



And around the same time in March of 2012, Chairman Kim, Nam-jung, and Choe met with Chansiri and Han Seng of TUG and discussed how to avoid a price war, suggested that "[t]here is only price war if [the companies] do not 'respect'. . . fish price".[202]   Later, in July of 2012, Lindberg reported that after "Starkist's dysfunctional management team [] was fired by Dongwon, [] they are now in lockstep with us in setting pricing rationally."[203]   In fact, during an October 2012 conversation with Lischewski and Ingu and Shin, who were "representing

---

[199] Stein Decl., Ex. 130.
[200] Stein Decl., Ex. 216 (Lindberg Dep.) 303:6-307:22.
[201] Stein Decl., Ex. 129.
[202] Stein Decl., Ex. 132.
[203] Stein Decl., Ex. 141.

1   Dongwon Industries", they discussed how "StarKist had raised its prices, helping

2   Bumble Bee with raising its prices[.]"[204]   Additionally, an internal TUG document

3   that Chansiri received, stated that "US canned tuna should improve due to *less price*

4   *competition*" and that that "[t]he market competition has become *more rational* since

5   4Q '12."[205]

6       Also of significance is the timing of these exchanges between the Parent

7   Entities.   It is undisputed that, in the 18-month period between November 2010

8   (when Bumble Bee sought a truce from StarKist and Lindberg met with Chairman

9   Kim and Chansiri) and May 2012, StarKist, Bumble Bee, and COSI conspired to

10   increase prices three times and colluded throughout this period on promotional

11   pricing.[206] As the Court previously commented: "the period from January to March

12   2012 is particularly salient."  ECF No. 1358 at 81.  During this period, Lischewski

13   informed Lindberg and Chang about "cheating" in the industry, and also about a

14   price increase that would correct the problem.[207]   Viewing the evidence of the

15   frequent meetings between the Parent Entities during this time period in

16   conjunction with the evidence that the Parent Entities were "on notice that some

17   mischief [wa]s afoot" (ECF No. 1358 at 82) is more than sufficient to support the

18   "reasonable inference" (*id.*) that the meetings helped support the agreements to

19   increase price.

20       In the face of these contemporaneously-created documents and the other

21   evidence above, a jury could reasonably find that the Parent Entities knew about

22   the conspiracy and took steps to support the object of the conspiracy in violation of

23   ---

[204] Stein Decl., Ex. 142.

24   [205] Stein Decl., Ex. 144 (emphases added); *see also* Stein Decl., Ex. 222 (Chansiri

25   Dep.) 175:14-186:21; Stein Decl., Ex. 209 (TUG 30(b)(6) (Ayrle) Dep.) 272:2-275:10-19.

26   [206] Stein Decl., Exs. 10-12.

27   [207] Stein Decl., Ex. 123.

28

1    the antitrust laws.  The present denials of Lindberg, Chansiri, and others cannot be

2    dispositive in the face of such contemporaneous evidence to the contrary. ■

3    ████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ███████████████████████████████████████    ████████████

11   ████████████████████████████████████████████████████████

12   ██████████████████████████████████████████████

13        Although the Parent Defendants argue their witnesses denied the existence

14   an agreement with competitors regarding packaged tuna pricing, an illegal

15   agreement under the antitrust laws can be reached without formal agreements.

16   Indeed, "solemnized covenants to conspire are difficult to come by in any price

17   fixing case."  *In re Plywood Antitrust Litig.,* 655 F.2d 627, 633 (5th Cir. 1981); *see also*

18   *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018) ("The task

19   before any plaintiff is thus to find and produce evidence that reveals coordination

20   or agreement (even a wink and a nod-formal agreements have never been required

21   for purposes of Sherman Act section 1).") (citations omitted).[210]

---

[208] Stein Decl., Ex. 209 (TUG 30(b)(6) (Ayrle) Dep.) 14:22-15:1.

[209] *Id.* 263:11-24, 271:4-275:19.

[210] A commonly used jury instruction manual for Sherman Act claims explains that "[t]o establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement; that they met together; or that they directly stated what their object or purpose was, or the details of it, or the means by which they would accomplish their purpose. The agreement itself may have been entirely unspoken." O'Malley, Grenig, & Lee, Fed. Jury. Prac. &

1    While the Parent Entities also discussed other non-conspiratorial topics, such

2    as the merger between COSI and TUG or purchasing raw tuna, this does not refute

3    the evidence that they also knew about and supported the conspiracy.   In this

4    context, where the Parent Companies obviously stood to gain from the conspiracy,

5    Defendants cannot use their alternative arguments about the meaning of the

6    evidence to show that there is no genuine dispute of material fact that the parent

7    entities participated in the conspiracy.   *CRTs*, 2017 WL 5957654, at *4 (same) ("At

8    bottom, there is conflicting evidence about the purpose of the bilateral meetings. A

9    jury, not the Court, should determine whose characterization of those meetings is

10   most credible.").[211]

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ██████████████████████████        ██████████████████████

14   ████████████████████████████████████████████████████

15   ██████████████████████████████████   *See In*

16   *re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-MD-01819 CW, 2010

17   WL 5138859, at *6 (N.D. Cal. Dec. 10, 2010) (where there was "evidence that []

18   executives and other managers with influence or ultimate authority over pricing

19   had knowledge of competitive price and production information . . . . a reasonable

20   factfinder could infer that the information impacted pricing").

_____

Instr. Civil Comp HB § 1:4 ("What the evidence must show to prove that the conspiracy existed is that the alleged members of the conspiracy in some way came to an agreement to accomplish a common purpose.")

[211] Even if the Court finds that "[c]onsidering the defendants' explanation, . . . the defendants had 'met their burden of proffering a plausible justification for their conduct consistent with proper business practice,'" they cannot show that "the factual context renders [Plaintiffs'] claim implausible." *Citric Acid II*, 191 F.3d at 1095.

## 2. Jae Chul Kim, Ingu Park, and Other DWE Executives Are Plainly Connected to and in Control of DWI.

DWI does not even attempt to address the evidence in the record about its conduct.  For example, DWI completely ignores the admission ███████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████ █ █
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████[212]

Perhaps the decision to ignore this evidence is strategic to reserve all

---

[212] Stein Decl., Ex. 146 (emphases added); *see also* Ex. 89 ████████████
█████████████████████████

[213] DWI argues that Plaintiffs "did not seek to take a single Rule 30(b)(1) deposition of a DWI employee. If there were any basis to believe that anyone at DWI had participated in a conspiracy, at a minimum one would expect Plaintiffs to have deposed him or her." DWI MP&A at 11.  This plainly misrepresents the record.  First, Plaintiffs indeed took the deposition of Phil Shin—DWI's only witness listed in its Initial Disclosures for years.  *See* Stein Decl., Ex. 15.  Second, as discussed herein, the owners of DWI were the real decision-makers.

[214] Stein Decl., Ex. 142. ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████ Stein Decl., Ex. 126.
*See In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1153-54 (D. Kan. 2012) (direct evidence of a conspiracy where, among other things, executive stated he could "make price increases stick").

1   arguments on this evidence for reply, but in doing so, DWI has failed to meet its

2   initial burden of justifying its conduct such that a reasonable fact finder could not

3   find plausible Plaintiffs' allegations of conspiracy.  Nor has DWI addressed the

4   economic context surrounding its alleged participation in the conspiracy, by, for

5   example, showing that Plaintiffs' allegations make no economic sense.  DWI's

6   motion is entirely devoid of any substantive arguments justifying summary

7   judgment in the antitrust context.  On those grounds alone, the Court could and

8   should deny summary judgment for DWI.  *See also Nissan Fire & Marine Ins. Co. v.*

9   *Fritz Cos., Inc.*, 210 F.3d 1099, 1105 (9th Cir. 2000) ("A moving party may not

10  require the nonmoving party to produce evidence supporting its claim or defense

11  simply by saying that the nonmoving party has no such evidence.").

12       Instead, DWI focuses all of its efforts arguing that the evidence Plaintiffs have

13  adduced relates to DWE, arguing that Chairman Kim, Nam-jung, Moonsu, Ingu

14  and others are "not connected to DWI."  DWI MP&A at 12.  This is blatantly

15  untrue—Chairman Kim and his son Nam-jung are the majority owners of DWI,

16  and ███████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ██████████████████████████████

19       The law is clear that "[t]he knowledge of a director, officer, sole shareholder

20  or controlling person of a corporation is imputable to that corporation."  *In re*

21  *Platinum-Beechwood Litig.*, No. 18-CV-10936 (JSR), 2019 WL 2569653, at *17

22  (S.D.N.Y. June 21, 2019) (quoting *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246,

23  255 (2d Cir. 1995)); *Donovan v. Schmoutey*, 592 F. Supp. 1361, 1399 (D. Nev. 1984);

24  *cf. Chartrand v. Barney's Club, Inc.*, 380 F.2d 97, 100-01 (9th Cir. 1967).  As the

25  majority owners of DWI, Chairman Kim and Nam-jung's knowledge of the

26  conspiracy is imputed to DWI.  Likewise, Ingu and Moonsu were controlling

27  persons of DWE, which owns DWI, and their knowledge should be inputted to

28

1   DWI. And as ████████████████████ of DWI, Moonsu's knowledge is

2   imputable to DWI. *See Donovan*, 592 F. Supp. at 1399 (director was "chargeable

3   with knowledge respecting their activities which he had the means of knowing").

4       Similarly, the fact that DWI appointed each of these individuals to the

5   StarKist Board of Directors and entrusted them with overseeing StarKist's activities

6   justifies imputation here. As the Ninth Circuit explained in

> the "underlying purpose of imputation" is "fair risk-allocation,
> including the affordance of appropriate protection to those who
> transact business with corporations." [] Hence, when a corporate
> officer commits wrongdoing, the "principal who has placed the agent
> in the position of trust and confidence should suffer, rather than an
> innocent stranger."

12  *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 477 (9th Cir. 2015) (quotation

13  omitted). Indeed, "[o]ne who selects an agent and delegates authority to him

14  should incur the risks of the agent's infidelity or want of diligence rather than

15  innocent third persons." *Id.* at 478 (quotation omitted). Although that Ninth

16  Circuit opinion was in the context of enforcing the securities laws, similar policy

17  aims for imputing liability exist in the antitrust context as well. *See also Am. Needle,*

18  *Inc. v. Nat'l Football League*, 560 U.S. 183, 192 (2010) (in antitrust cases it is "moved

19  by the identity of the persons who act, rather than the label of their hats.")

20  (quotation omitted).

21      The Supreme Court has confirmed that "under general rules of agency law,

22  principals are liable when their agents act with apparent authority and commit torts

23  analogous to the antitrust violation presented by this case." *Am. Soc. of Mech. Eng'rs,*

24  *Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565–66 (1982) (citations omitted). In *American*

25  *Society*, the Supreme Court recognized the importance of imputing knowledge to

26  prevent a defendant from "avoid[ing] liability by ensuring that it remained ignorant

27  of its agents' conduct," or of "do[ing] as little as possible to oversee its agents." *Id.*

28

at 573.  This is particularly true where a principal has a motive to increase profits, such as here, where Chairman Kim and Nam-jung stood to gain directly from supracompetitive profits.  *See id.* at 571-72.

As discussed, Chairman Kim, Nam-jung, Ingu, Moonsu, and Choe among others, acted with apparent authority from DWI.  Sometimes they directly represented that they were representing DWI and DWI's interests[215], and other times they were more generally representing the Dongwon Group.  Where the evidence is not clear which entity is acting, that issue should be a question for the jury.  *See CRTs*, 2017 WL 5957654, at *4 (denying summary judgment where the evidence generally referred to "MEC," "Matsushita," or Panasonic's "headquarters" without specifying which entity they mean, but which could all refer to the same defendant, Panasonic Corp.—and noting that "[p]articularly given Panasonic Corp.'s position at the top of the Panasonic organizational chart, . . . these facts lead the Court to reject Panasonic Corp.'s efforts to distance itself from Plaintiffs' evidence.").

The same is true here.  The individuals who participated on behalf of DWI often held themselves out as representing Dongwon generally, and as discussed above, the Dongwon entities considered themselves all part of the Dongwon Group, with its Chairman Kim and Vice-Chairmen Nam-Jung and Ingu.  Thus, those individuals' knowledge and acts in furtherance of the conspiracy (carried out by DWI's wholly-owned subsidiary, StarKist) should be imputed to DWI.

### 3. TUG Has Not Shown That It Would Be Economically Implausible For It to Participate In The Conspiracy.

As noted above, TUG stood to gain from the conspiracy through COSI's participation and supracompetitive sales, but also through its own participation and

---

[215] *U.S. v. Bestfoods,* 524 U.S. 51, 70 n.13 (1998) (identifying the issue as whether "an act is taken on behalf of the corporation for whom the officer claims to act")

1  supracompetitive sales.  Similar to its Private Label Summary Judgment Motion,

2  TUG attempts to argue that it "is not a direct competitor with its alleged co-

3  conspirators in the market for packaged tuna in the U.S." and that "TUG has no

4  incentive to join a downstream packaged tuna conspiracy; the two markets provide

5  fundamentally different products to different customers."  TUG MP&A at 16.  Both

6  statements are unsupported.

[216] Stein Decl., Ex. 152.

[217] *Id.*

[218] Stein Decl., Ex. 52 ( 

*see also* Ex. 226 (TUG (30(b)(6) (Wongpiya) Dep.) 110:10-113:13;

[219] Stein Decl., Ex. 38-39.



220 *See* Laby Report ¶ 42

221 Stein Decl., Ex. 208 (COSI 30(b)(6) (Parsons) Dep.) 238:8-10.

222 Stein Decl., Ex. 209 (TUG 30(b)(6) (Ayrle) Dep.) 207:8-208:14.

223 Stein Decl., Ex. 143 at 10.

These facts reflect that TUG in fact faced similar incentives as other Defendants (and indeed shared strategies with TUG's management), as Plaintiffs' economist experts have concluded.  *See* MMRR ¶¶ 236-39.

---

[224] Stein Decl., Ex.  209 (TUG 30(b)(6) (Ayrle) Dep.) 264:7-24.

[225] Stein Decl., Ex. 227 (Moore Dep.) 91:5-8.



Thus, the only econometric analysis analyzing the supply and demand factors influencing pricing in the packaged tuna market in the record is that of Dr. Mangum.  TUG has no rebutting model to or analyses.  Dr. Mangum's analysis, in combination with the other evidence in the record, should at least create a genuine dispute of material fact as to whether TUG did in fact directly benefit from the conspiracy.

In sum, it was economically plausible for TUG to join the conspiracy and benefit from the conspiracy.

### 4. Defendants' Admissions and the Guilty Pleas Are Not Dispositive on Whether Defendants Conspired

The Parent Companies argue that because their U.S. subsidiaries do not identify them as co-conspirators in their admissions in the case or their guilty pleas in the criminal investigation that therefore this "should be dispositive" of their involvement. *See, e.g.*, DWI MP&A at 10-11. But nothing about these admissions should be "dispositive" or create some sort of presumption as Defendants suggest.

First, no court has held what Defendants argue—and Defendants leave out important context for the cases they cite in support. DWI, for instance, cites *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, No. M 02-1486 PJH, 2007 WL 9752971, at *13 (N.D. Cal. Feb. 20, 2007) ("*DRAM*") as holding that "it is improper for the court [to] accept evidence of the co-defendants' guilty pleas as evidence tending to support an inference of [defendant's] collusive activity when none of those guilty pleas implicated [defendant] in their criminal activity." DWI MP&A at 11. But the court there did not find the evidence was dispositive or even that it weighed in favor of the defendant there who disputed it participation. Rather, the court merely declined to find the guilty pleas weighed in the plaintiffs' favor: "Given that NTC was not implicated, the court declines to consider these pleas as evidence bearing on NTC's participation in the alleged unlawful activity." *DRAM*, 2007 WL 9752971, at *13.

TUG also overreaches on this issue. For example, TUG is correct that in *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 684 (9th Cir. 1985), the Ninth Circuit affirmed summary judgment where "the dairies [] admitted their participation in a conspiracy, while simultaneously exonerating [the moving defendant]" but in *Barnes* the dairies there had "nothing to gain for their exculpatory statements." The

situation in *Barnes* was fundamentally different, involving a conspiracy between dairy competitors, but the plaintiffs sought to bring in a "tangential defendant" who was not a dairy competitor but whom they alleged the dairies coerced into supporting their conspiracy.  *Id.* at 683.  Defendants here are not "tangential" but are core to the conspiracy.  Unlike the dairies, who had "nothing to gain" from exculpating the "tangential" defendant, here the U.S. subsidiaries have every interest in protecting their Parent Companies from the reputational harm associated with a finding of participation in the conspiracy and the economic harm if Plaintiffs are successful in proving their claims.

The same is true for *Citric Acid II*, which "note[d] that all four major citric acid manufacturers admitted to conspiring to fix prices but none identified [defendant] as a co-conspirator."  191 F.3d at 1106.  But again, the Ninth Circuit did not find that dispositive, and furthermore, the moving defendant there, (Cargill) had no affiliation to the other defendants and was also their direct competitor in the United States.  *Citric Acid II* does not suggest that Defendants can meet their burden of rebutting the alleged conspiracy or cast doubt on Plaintiffs' evidence in this context just because their U.S. subsidiaries have not implicated them in the conspiracy.  Instead, as *Stanislaus* explained, the context matters, and here, there is a plausible argument that the United States subsidiaries are protecting their Parent Companies from liability.  It is also worth noting that DWI and TUG are public companies.  Both have expressed concerns about worrying stockholders.  There could also be liability in the countries where they are traded if they are found to have conspired.  And Lion, too, has investors, and a finding of anticompetitive conduct could significantly damage its business too.

*Second*, the fact that the Department of Justice has not made the Parent Entities the target of its investigation is not surprising.  The grand jury's jurisdiction is limited, and the Department of Justice generally does not subpoena documents

outside of the United States.   *See* United States Attorneys' Manual § 9-11.140 ("[t]here are special considerations" when seeking evidence outside of the United States and that the Criminal Division should be contacted before any such requests are made)[227]; *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, United States' Objections to Special Master's Report & Recommendation RE: Toshiba Entities Motion for Modifications to the Discovery Schedule and Plan at 6, No. M 07-1827 SI, ECF No. 1258 (N.D. Cal. Sept. 14, 2009) (noting that "in the interest of international comity" the Department of Justice does not generally subpoena "foreign-located documents"); *In re Grand Jury Subpoenas*, 627 F.3d 1143, 1144 (9th Cir. 2010) (allowing the DOJ to subpoena civil plaintiffs' counsel to obtain discovery they received about a foreign defendant, and discussing that the government should not be denied discovery where, "[b]y a chance of litigation, the documents have been moved from outside the grasp of the grand jury to within its grasp.").

Indeed, TUG and COSI's own counsel has acknowledged that:

> The Antitrust Division also seeks to use treaties and other bilateral agreements to extradite foreign nationals whose criminal conduct has a substantial impact on US commerce, although thus far it has had limited success in doing so. Proceedings against foreign defendants still depend largely upon their voluntary submission to the jurisdiction of the US courts or their being arrested opportunistically during a visit to the United States.[228]

The Court should not read anything significant into the fact that "DOJ never took

---

[227] Available at http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/11mcrm.htm.

[228] Christine Varney & John F. Terzaken, *The Cartels and Leniency Review* 318, 358-59 (1st ed. 2013), available at http://www.allenovery.com/publications/en-gb/globalcartelenforcement/Documents/AO_the-cartels-and-leniency-review.pdf

1  any action against TUG" and COSI never reported TUG.  TUG MP&A at 1.

2  Courts indeed have rejected similar arguments.  *See, e.g.*, *High Fructose*, 295

3  F.3d at 664-65 (refusing to infer lack of a civil conspiracy from the government's

4  decision not to move against certain defendants, acknowledging that the DOJ may

5  decide to limit the scope of an investigation for numerous reasons, including

6  differing standards of proof in a criminal case and the knowledge that the private

7  bar "had both the desire and the resources to prosecute [the] suit"); *In re Packaged*

8  *Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1011-12 (E.D. Mich. 2010) ("Nor can this

9  civil litigation be circumscribed or defined by the boundaries of the criminal

10  investigations or plea agreements."); *In re Vitamins Antitrust Litig.*, No. 99-197

11  (TFH), 2000 WL 1475705 at *11 (D.D.C. May 9, 2000) (rejecting the "notion that

12  the guilty pleas and cooperation agreements and the class settlement foreclose a

13  broader conspiracy. Guilty pleas are negotiated instruments which take into

14  account not only the culpability of the accused but the Justice Department's

15  resources and other cases requiring the government's attention."); *In re*

16  *Polypropylene Carpet Antitrust Litig.,* 178 F.R.D. 603, 620 (N.D. Ga. 1997) ("[T]he

17  court is aware of no authority that requires a civil antitrust plaintiff to plead only

18  the facts of a prior criminal indictment. To the contrary, several cases flatly reject

19  that theory.").

20  *Third*, "[i]t is well established that, for purposes of coconspirator culpability,

21  members of a conspiracy need not be aware of the existence or activities of other

22  members."  *Wallace*, 759 F.3d at 492 (citing *Booker*, 334 F.3d at 411); *see also Beltz*

23  *Travel Serv*, 620 F.2d at 1367; *Arandell,* 900 F.3d at 628.  If the Court is all inclined

24  to weigh this evidence (though, it should not), then it needs to consider that certain

25  conspirators may only have some limited knowledge about the conspiracy.  For

26  example, COSI (the only party making admissions directly to the DOJ) may not

27  know the full dimensions of the discussions and understandings between Lion and

28

Dongwon, and therefore, it would be inappropriate to attribute its lack of identification of these companies as co-conspirators as establishing definitively that they did not participate in the cartel.

In sum, there is no basis for the Court to rely on Defendants' admissions and the guilty pleas as the basis for summary judgment in their favor.

**C. Plaintiffs have Shown that A Reasonable Fact Finder Could Find that The Parent Entities Conspired in This Case.**

As set forth above, there is substantial evidence that the Parent Entities knew about and supported the first level of the conspiracy between the U.S. subsidiaries and carried out the second level of the conspiracy by assuring would-be competitors that they would promote peace and "rational" competitive behavior (*i.e.*, higher prices). One thing that the parties agree on is that context matters. "It is fundamental to the law of conspiracy that the agreements that form the essence of the misconduct are not to be judged by technical niceties but by practical realities." *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825 (S.D.N.Y. 2016). "Sophisticated conspirators often reach their agreements as much by the wink and the nod as by explicit agreement, and the implicit agreement may be far more potent, and sinister, just by virtue of being implicit." *Id.*

Here, the record is replete with ██████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████ *See Beltz*, 620 F.2d at 1367; *SRAM*, 2010 WL 5138859, at *9 ("Plaintiffs need not produce evidence that Cypress communicated with many or all Defendant competitors to show that it engaged in a conspiracy").

1    The same is true for Lion Capital (from which Plaintiffs have not received

2    full discovery). 

18    Thus, while Plaintiffs

19    should be allowed to take discovery of Lion Capital, there is already significant

20    evidence that Lea—Lion Capital's CEO—knew about and supported the

21    conspiracy.

22    In these circumstances, where each of the Parent Companies had much to

23    gain from the conspiracy and provided so much value in policing the conspiracy

24    and ensuring their U.S. subsidiaries stuck to higher prices, it is reasonable for a trier

25    _____

26    [229] Stein Decl., Ex. 216 (Lindberg Dep.) 351:3-352:2; Stein Decl., Ex. 218 (Capps Dep.) 292:5-293:25.

27    [230] Stein Decl., Ex. 141.

1   of fact to believe that the Parent Companies reached an understanding to stop
2   competing and start raising profits.  A jury could (and should) find on Plaintiffs
3   behalf against the Parent Companies.

4   None of the out-of-circuit cases on which Defendants rely on suggest a
5   contrary result.  *First*, *In re Chocolate Confectionary Antitrust Litigation*, 801 F.3d 383
6   (3d Cir. 2015) ("*Chocolate*") involved direct evidence of price-fixing conspiracy on
7   chocolate products in Canada, which the plaintiffs argued extended to the U.S.
8   chocolate manufacturers.  The problem was that the plaintiffs had virtually no
9   evidence connecting the U.S. manufacturers to the Canadian conspiracy.  The
10  Court pointed out that the plaintiffs "c[ould] point to hardly any communications,
11  let alone pricing communications, among the Chocolate Manufacturers' U.S.
12  executives." *Id.* at 404.  Given the lack of conspiratorial allegations between the
13  U.S. executives, the court questioned whether the plaintiffs could ever "show that
14  the unlawful Canadian *conduct* actuated, facilitated, or informed the U.S. *conduct.*"
15  *Id.* at 405 (emphases in original).  The Third Circuit could find no evidence
16  sufficiently connecting the conduct of the U.S. Manufacturers to their Canadian
17  counterparts' conspiracy.  *Id.* at 403-06.

18  The exact opposite is the case here.  ██████████████████
19  ████████████████████████████████████████████
20  ████████████████████████████████████████████
21  ████████████████████████████████████████████
22  ████████████████████████████████████ ████████████
23  ████████████████████████████████████████████
24  ████████████████████████████████ ██████████████
25  ████████████████████████████████████████████

[231] Stein Decl., Ex. 93.
[232] Stein Decl., Ex. 99.



15    This evidence distinguishes this case from *Chocolate.*  Here, if anything, the

16  Parent Entities' mutual understandings ████████████████████ facilitated the

17  U.S. manufacturers' conspiracy.  ████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████, the Parent Entities

20  gave the U.S. subsidiaries the ability to stop focusing on short term market-share

21  grabs by dropping prices.  Thus, unlike in *Chocolate,* there is "a sufficient factual

---

[233] Stein Decl., Ex. 97, 108.

[234] Stein Decl., Ex. 89.

[235] Stein Decl., Ex. 192.

[236] Stein Decl., Ex. 215 (Chan Dep.) 49:10-15, 50:3-51:20.

[237] Stein Decl., Ex. 54.

[238] Stein Decl., Ex. 95.

1   basis for the [parent] conspiracy to be relevant to or facilitative of the purported

2   U.S. conspiracy."  801 F.3d at 407.

3      The other Third Circuit case Defendants rely on is *In re Baby Food Antitrust*

4   *Litigation*, 166 F.3d 112 (3d Cir. 1999).  There, plaintiffs contended there was a

5   conspiracy to fix prices of baby food but produced evidence that merely showed

6   that there were "sporadic exchanges of shop talk among field sales representatives

7   who lack pricing authority."  *Id.* at 125.   Additionally, the court discounted

8   testimony from one defendant's sales manager about how he would provide pricing

9   to persons with more pricing authority because that information related to an

10  entirely different product, vinegar—not baby food. *Id.* at 126. Plaintiffs also showed

11  that the defendants had information about their competitors, but the court declined

12  to find that "the mere possession of competitive memoranda is evidence of

13  concerted action to fix prices."  *Id.*  The plaintiffs there also relied on a document

14  where one of the defendants appeared to describe a "truce" with its competitors,

15  but the court declined to infer a price-fixing conspiracy existed through "the single

16  use of the term" in a case where otherwise there was insufficient evidence of

17  conspiracy.  *Id.* at 127.

18     The facts are, again, very different here.  Here, the U.S. Defendants admit to

19  the conspiracy, and there is certainly more than a "single" exchange between the

20  Parent Entities ████████████████████████████

21  ████████████████.  The evidence, combined with the record in this case

22  as a whole, could lead a jury to find a conspiracy existed between the Parent

23  Entities.  *See Home Depot*, 2019 WL 3804667, at *10 (communications between

24  competitors was "the kind of circumstantial evidence that, when viewed in

25  conjunction with the massive record in this case, could lead a jury to reasonably

26  infer a conspiracy in restraint of trade") (citation omitted); *see also High Fructose*, 295

27  F.3d at 662 (reversing grant of summary judgment where the district court

28

discounted several statements by the defendants referring to "an understanding within the industry not to undercut each other's prices" and "support" for efforts to limit pricing, as well as a statement that there was an "understanding between the companies that . . . causes us not to . . . make irrational decisions."); *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 829 (D. Md. 2013) (denying summary judgment where "the Plaintiffs have marshaled substantial evidence of just th[e] sort [as described in *High Fructose*,]" including "competitor statements regarding industry 'discipline' and the sharing of industry information . . . to support the Defendants' 'collective needs.'").

Defendants also rely on, *In re Citric Acid Litigation*, 996 F. Supp. 951, 956-57 (N.D. Cal. 1998) ("*Citric Acid I*"); *Citric Acid II*, 191 F.3d at 1097-98. But again, *Citric Acid* is inapposite. There, Cargill, a late comer to the citric acid market, was claimed to have participated in a conspiracy that four other horizontal competitors admitted to. None of those horizontal competitors had implicated Cargill in the conspiracy, but the plaintiffs argued that Cargill was using the industry trade association for illegal activities because the admitted conspirators participated in that association as well. *Id.* at 1097. However, there was no evidence that illegal activities took place at those trade meetings—rather all of the price-fixing happened at other meetings surrounding the association meetings. *Id.* The other "ominous" evidence the plaintiffs presented (a) did not involve Cargill, and (b) suggested a potential that the trade association correspond with Chinese citric acid producers to "stabilize and regulate Chinese production and exports"—but the alleged conspiracy was not between Chinese citric acid producers, and in any event, the minutes of that meeting noted that the suggestion should be discarded and ignored. *Id.* at 1098. The Court refused to find that Cargill's joining of this trade association was a sufficient basis to infer its participation in the conspiracy, particularly where Cargill showed "that it did explicitly weigh the costs and benefits of joining [the

1  association] and did take steps to assure that its data would be kept as confidential

2  as possible." *Id.* at 1100.

3  None of the dispositive facts from *Citric Acid* exist here.   The meetings

4  between the Defendants were not merely through trade association events which

5  Defendants otherwise had good reasons to attend, but rather were surreptitious,

6  one-on-one meetings.

7  Furthermore, there is no suggestion in the record that the Parent Entities

8  made any effort to keep their private business information confidential. ████

9  ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████   These are not the acts of companies that are trying to protect their

17 commercially sensitive information from a competitor. *See High Tech*, 2014 WL

18 1283086, at *3 ("A reasonable jury could infer that this confidential information

19 could be shared safely by competitors only because the anti-solicitation agreements

20 squelched true competition.").

21 Finally, the defendants in *Citric Acid* had no reason to conceal who their co-

22 conspirators were, whereas here all the U.S. subsidiary Defendants have an interest

23 in protecting their parent companies.  In antitrust cases, Defendants are jointly and

24 severally liable for misconduct, and by keeping the Parent Entities out of the case,

25 the U.S. subsidiaries have a better chance of preventing Plaintiffs from recovering

27 [239] Stein Decl., Ex. 153.

their damages.   Additionally, Defendants notably ignore recent Ninth Circuit precedent on this issue: *Arandell,* 900 F.3d at 629-31, which established that since a parent company and its subsidiary "always have a 'unity of purpose' and act as a 'single enterprise' whenever they engage in 'coordinated activity,'" the subsidiaries were "deemed to have shared the intent of" their parent company for purposes of a Section 1 violation of the Sherman Act. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771 (1984) ("The coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1"). Each of the Parent Companies and their subsidiaries here engaged in coordinated activities—including through sharing in proceeds from the conspiracy.   They had mutual and inter-locking interests with their subsidiaries and stood to collect significant profits from the conspiracy.

There is an abundance of evidence against the Parent Companies, and a jury could properly find that evidence sufficient to find in favor of Plaintiffs.   As such, the Court should deny Defendants' motions seeking summary judgment for their participation in the conspiracy.   *See SRAM*, 2010 WL 5138859, at *7.

## V.   ARGUMENT REGARDING *ALTER EGO* AND AGENCY CLAIMS

In addition to their allegations about the Parent Entities' direct participation in the conspiracy, Plaintiffs also allege vicarious liability under the doctrines of *alter ego* and agency.   Unlike Plaintiffs' conspiracy claims, the *alter ego* and agency claims are equitable in nature, and thus it is expected that they will be tried to the Court at some point.   *Siegel v. Warner Bros. Entm't Inc.*, 581 F. Supp. 2d 1067, 1076 (C.D. Cal. 2008); *see also* DWI MP&A at n.23 ("provid[ing] notice that [DWI] plans to move to bifurcate the alter-ego and agency issues from the underlying conspiracy allegations for the purposes of trial") (citation omitted).

In the following section, Plaintiffs discuss the legal standards that should be applied to the *alter ego* and agency analysis, and then apply those standards

separately to each of the parent groups. It is significant to think of these entities as "groups"—as opposed to a single parent and single subsidiary—because that is how they in fact acted and carried out their business. The relationships within TUG and the Dongwon Group are extensively summarized in the Report and Rebuttal Reports of the DPPs' sociologist expert, Dr. Gary Hamilton, as well as the DPPs' forensic accounting expert, Marianne DeMario. The facts cited in those Reports are adopted and incorporated by reference. However, Plaintiffs reproduce many of the salient facts for *alter ego* and agency liability below.

**A. Legal Standards.**

**1. *Alter Ego* Standard**

Defendants acknowledge that there is an ambiguity on whether federal or state law applies in assessing *alter ego* liability. *See, e.g.*, DWI MP&A at 15-16 n.8.[240] Because Plaintiffs bring claims that derive from federal common law under the Sherman Act and Clayton Act, in order to maintain uniform legal doctrine on corporate entity antitrust recognition or liability, federal common law should apply. *See Wolfe v. United States*, 806 F.2d 1410, 1411 (9th Cir. 1986) ("The determination of whether to apply state or federal alter ego doctrine depends on the degree to which the subject matter of the case implicates federal interests.") (citations omitted); *United States v. Kimball Foods, Inc.*, 440 U.S. 715, 728-29 (1979) (citations omitted) (federal issues must be nationally uniform and state law should not apply if it "would frustrate specific objectives of the federal programs"); *Maney v. Fischer*, No. 96 Civ. 0561 (KMW), 1998 WL 151023, at *1 (S.D.N.Y. Mar. 31, 1998) ("Where a cause of action is based on a federal question, federal common law

---

[240] The Court and parties to this case previously cited California state law to assess alter ego and agency arguments. *See, e.g.*, ECF No. 295 at 11. Although state law and federal law on alter ego and agency issues overlap (as described in various cited cases), federal law is in fact appropriate for evaluating Plaintiffs' alter ego and agency claims, as discussed.

determines the parameters of the alter ego doctrine."); *see also United States v. Peters*, 732 F.3d 93, 103 n.4 (2d Cir. 2013) ("[B]ecause this case arises under federal question jurisdiction and involves a federal statute that 'demands national uniformity,' federal common law . . . presumably controls the question of whether the corporate veil should be pierced.") (citation omitted).[241]

In antitrust enforcement, "federal interests transcend those of the states." *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 84 (2d Cir. 1961). This is because "the federal interest in enforcing the national policy in favor of competition is both familiar and substantial." *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110 (1980). Thus, the federal antitrust laws are akin to other remedial statutes where federal common law, rather than state law, applies to veil-piercing questions. *See Bd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 26-27 (1st Cir. 2000) (Railway Labor Act case applying federal common law given "the purpose of the federal statute" and listing the Clayton Act among the statutes where veil piercing was necessary to further federal policies); *In re G&L Packing Co., Inc.*, 41 B.R. 903, 911 (N.D.N.Y. 1984) (case applying federal common law after noting that in *Copperweld*, the Supreme Court "considered the policy and purpose of § 1 of the Sherman Act, found that such policy would be disserved by treating corporations that are separate under state law as independent entities, and therefore rejected the application of state corporate law to this issue"); *Maney*, 1998 WL 151023, at *1 ("In federal question cases involving remedial statutes such as

---

[241] As one other district court noted, "[i]n *Bestfoods* the Supreme Court side-stepped the issue, specifically noting '[s]ignificant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law of veil-piercing.'" *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 495 (N.D.N.Y. 2011), *aff'd in part, vacated in part on other grounds, remanded*, 766 F.3d 212 (2d Cir. 2014) (quoting *Bestfoods*, 524 U.S. at 63, n.9).

ERISA, courts generally accord less respect to the corporate form than when applying the common law alter ego doctrine."). Indeed, the "sweeping language" of the Sherman Act's substantive provisions, showed Congress expected courts "to give shape to the statute's broad mandate". *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 643 & 644-45 (1981); *cf. Copperweld Corp.*, 467 U.S. 752 (analyzing federal cases to define corporate entities for § 1 purposes).[242]

"Under federal law, a corporate entity may be disregarded in the interests of public convenience, fairness, and equity[.]" *S.E.C. v. Elmas Trading Co.*, 620 F. Supp. 231, 234 (D. Nev. 1985) (citing *Town of Brookline v. Gorsuch*, 667 F.2d 215, 220 (1st Cir. 1981)); *Springfield Terminal*, 210 F.3d at 26. The "established law is" that "[a]lthough a corporation and its shareholders are deemed separate entities for most purposes, the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy." *Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*, 417 U.S. 703, 713 (1974). "In such cases, courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form." *Id.*; *Alman v. Danin*, 801 F.2d 1, 3 (1st Cir. 1986) ("corporate form may not defeat overriding federal legislative policies."). "Federal analysis gives less respect to the corporate form than does the strict common-law alter ego doctrine." *Elmas,* 620 F. Supp. at 234; *see also Bangor Punta Operations*, 417 U.S. at 713 (disregarding corporateness in Clayton Act antitrust case).

Federal common law allows piercing of the corporate veil where: "(1) a corporation uses its alter ego status to perpetrate a fraud or (2) where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own." *British Marine PLC v.*

---

[242] *Texas Industries* and *Copperweld* were decided after *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), so *Erie* does not overrule them.

Pls.' Opp'n to Defs.' Summ. J. Mots. (Parent Cos.)     Case No. 15-md-2670-JLS-MDD

84

*Aavanti Shipping & Chartering Ltd.*, No. 13 CIV. 0839 BMC, 2013 WL 6092821, at *5 (E.D.N.Y. Nov. 19, 2013) (citation omitted). Courts consider a number of factors in making this determination. These include:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms' length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Id.* at *5 (quotation omitted) ("[T]he general principle guiding courts in determining whether to pierce the corporate veil has been that liability is imposed when doing so **would achieve an equitable result**." (*quoting Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d Cir. 2008))) (emphases added).

Another significant inquiry is "whether in fact the economic enterprise is one, the corporate forms being largely paper arrangements that do not reflect the business realities." *N.L.R.B. v. Deena Artware, Inc.,* 361 U.S. 398, 403 (1960). Affiliated companies that "hold themselves out to the public as a single entity that is conveniently departmentalized" may be the *alter egos* of one another. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 402 F. Supp. 262, 328 (E.D. Pa. 1975); *see also Cascade Steel Rolling Mills, Inc. v. C. Itoh & Co. (Am.) Inc.*, 499 F. Supp. 829, 839 (D. Or. 1980) (piercing the corporate veil based on parent companies' efforts to create an image of a single entity around the world); *Seiko Epson Corp. v. Print-Rite Holdings, Ltd.*, No. CV 01-500-BR, 2002 WL 32513403, at *14 (D. Or. Apr. 30, 2002); *Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, Inc.*, No. 11-CV-0252-CVE-PJC, 2015 WL 427807, at *14 (N.D. Okla. Feb. 2, 2015) (finding the evidence sufficient to rebut the *Bestfoods* presumption when the parent "considered its

1   subsidiaries to be part [of] a single entity that functioned without regard to the

2   corporate separateness of its subsidiaries" and there was "no evidence suggesting

3   that those [dual] officers considered the corporate separateness of [the subsidiary]

4   as significant").

5     The *Bestfoods* presumption that executives are wearing the "hat" of the entity

6   they work for on paper is "a rebuttable presumption that can be overcome with

7   evidence that officers and directors were taking action on behalf of [the parent]

8   instead of [the subsidiary]." *Cyprus Amax Minerals*, 2015 WL 427807, at *13; *see also*

9   *Mercury Time, Inc. v. Gruen Mktg. Corp.*, No. 97-CV-0020 JG, 1999 WL 342299, at

10   *14 (E.D.N.Y. May 26, 1999) ("Mayer had so many roles in those companies that

11   Galle, his partner in the Mercury Time negotiations, did not even know which

12   company Mayer was representing."); *Johnson v. VCG Holding Corporation*, 845 F.

13   Supp. 2d 353, 355-56, 373-74 (D. Me. 2012) ("genuine issues of material fact" as to

14   whether employees paid by a subsidiary were employed by the subsidiary or its

15   parent, where the parent exhibited "a substantial overlap in personnel, policies, and

16   control" with the subsidiary, dual officers who "wore several hats," and other

17   services were provided by the parent).

18     An inequitable result can be found in several different ways.

19   Undercapitalization is not dispositive; "[e]vidence of inadequate capitalization is,

20   at best, merely a factor to be considered by the trial court in deciding whether or

21   not to pierce the corporate veil." *Associated Vendors, Inc. v. Oakland Meat Co.*, 210

22   Cal. App. 2d 825, 840 (Cal. Ct. App. 1962). "[D]iversion of assets from a

23   corporation by or to a stockholder or other person or entity, to the detriment of

24   creditors, or the manipulation of assets and liabilities between entities so as to

25   concentrate the assets in one and the liabilities in another" is one of the ways an

26   inequitable result can be found. *In re SK Foods, LP*, 499 B.R. 809, 841 (E.D. Cal.

27   Bank. 2013).

28

## 2. Agency Standard

Under applicable federal common law, agency liability is established by: "(1) a manifestation by the principal that the agent shall act for him; (2) that the agent has accepted the undertaking; and (3) that there is an understanding between the parties that the principal is to be in control of the undertaking." *See Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 899 (N.D. Cal. 2009). Similarly, under the representative services doctrine, a plaintiff proves agency liability by showing that "the subsidiary represents the parent corporation by performing services 'sufficiently important to the [parent] corporation that if it did not have a representative to perform them, the [parent] corporation . . . would undertake to perform substantially similar services.'" *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003) (quotation omitted).

"Agency can be established expressly, via a showing of actual authority, or it can be inferred, by finding apparent authority or ratification." *Trenz v. Sirius Xm Radio, Inc.*, No. 15CV0044 AJB (NLS), 2015 WL 11658715, at *2 (S.D. Cal. July 13, 2015) (citing RESTATEMENT (THIRD) OF AGENCY §§ 2.01, 2.03, 4.01). "Ratification is demonstrated through knowing acceptance after the fact by the principal of an agent's actions." *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1247 (N.D. Cal. 2004). For example, if a principal learns of the agent's illicit actions and fails to act to disavow those acts, then a reasonable jury could find the principal ratified the agent's unlawful conduct. *Id.* at 1248 ("Where the acts by the agent were not within the scope of the agency relationship, if they are not disavowed by the principal, failure to disavow may constitute ratification."); *Contract Assocs. Office Interiors, Inc. v. Ruiter*, No. CIV.S0700334 WBS EFB, 2008 WL 2225702, at *2 (E.D. Cal. May 29, 2008) ("a reasonable jury could readily infer that [the principal] had acquired the requisite knowledge of [its agent's] illicit conduct, effectively triggering its duty to disaffirm her acts"); *see also In re Wolverton*

*Assocs.*, 909 F.2d 1286, 1298 (9th Cir. 1990) (where company "retained the benefits of [its employee's] conduct even after confronted with evidence of foul play . . . [this] conduct on [company's] part supported the court's finding of ratification")); *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-CV-06314-YGR, 2018 WL 3707283, at *5 (N.D. Cal. Aug. 3, 2018) (discussing ratification in similar circumstances at summary judgment).

Agency need not be established for all purposes. "The parents and subsidiaries may fully maintain their separate corporate existences; yet, as any two unrelated companies, they might have entered into a limited agency relationship for a specific transaction. Whether this occurred here is a question of fact [.]" *Phoenix Canada Oil v. Texaco Inc.*, 842 F.2d 1466, 1478 (3d Cir. 1988). "Whenever the evidence conflicts regarding the existence of agency, the question must be submitted to the jury unless *only one* inference can reasonably drawn from the evidence, and then it becomes a question of law for the court." *Daniels v. United States*, No. 3:16-CV-02077-BTM-DHB, 2017 WL 3478765, at *5 (S.D. Cal. Aug. 11, 2017) (emphases added; quotations and internal marks omitted).

**B. DWI and StarKist**

StarKist and DWI share the same ultimate equitable owners, through DWE: Chairman Kim and his son Nam-jung. These two ultimate owners of DWI and StarKist ran the Dongwon Group and ran StarKist to ensure that its profits would be passed along to them through their ownership of DWI. These individuals and others who worked for them carried out their activities without distinguishing which entities they were working for—instead working on behalf of the Dongwon Group more generally. Indeed, Dongwon's website states that "StarKist is an iconic tuna brand in the United States, and has been ***controlled by Dongwon Group***

since 2008"[243]—a fact the Court previously found significant. *See* ECF No. 295 at 16; *see also Bowoto*, 312 F. Supp. 2d at 1245 ("[T]he fact that a parent holds out to the public that a subsidiary is a department of its own business increases the likelihood that the parent will be held liable for the subsidiary's acts.") (quotation omitted).

The equitable owners of StarKist and DWI incorporated them into what functioned as effectively one Dongwon company.[244] ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

---

[243] Stein Decl., Ex. 154 (emphases added). DWI claims Dongwon's statements about its control of StarKist are "puffery." DWI MP&A at 19 n.10. But as this Court explained, puffery is "exaggerated advertising, blustering, and boasting" that "has been described by most courts as involving outrageous generalized statements, not making specific claims[.]" *Margolis v. Dial Corp.*, No. 12-CV-288 JLS (WVG), 2013 WL 12069023, at *4 (S.D. Cal. Aug. 23, 2013) (quotations omitted). Puffery is not a specific, quantifiable representation (to DWI investors/customers) about whether a parent entity controls a subsidiary.

[244] ████████████████████████████████████████████████ Stein Decl., Ex. 155.

[245] Stein Decl., Ex. 115.

[246] Stein Decl., Ex. 156.

[247] Stein Decl., Ex. 157.



---

[248] Stein Decl., Ex. 156.

[249] Stein Decl., Ex. 158 (emphases added). "BOD" refers to Board of Directors.



---

[250] Stein Decl., Ex. 159 (emphases added).

[251] Stein Decl., Ex. 160.

[252] Stein Decl., Ex. 161.

[253] Stein Decl., Ex. 162.



[254] Stein Decl., Ex. 163; Ex. 229 (Kim Dep.) 46:14-21.

[255] Stein Decl., Ex. 230 (Roberts Dep.) 84:16-25; 88:22-89:1

[256] *See, e.g.*, Stein Decl., Ex. 225 (Cho Dep.) 54:13-55:13.

[257] Stein Decl., Ex. 164.

[258] Stein Decl., Ex. 165.

[259] Stein Decl., Ex. 166.

[260] Stein Decl., Ex. 167.



---

261 Stein Decl., Ex. 168.

262 Stein Decl., Ex. 169.

263 Stein Decl., Exs. 170-71.

264 Stein Decl., Ex. 172.

265 Stein Decl., Ex. 171.



266 Stein Decl., Ex. 172.

267 Stein Decl., Ex. 173 (emphases added).

268 Stein Decl., Ex. 174.

269 Stein Decl., Ex. 230 (Roberts Dep.) 60:23-61:15.

270 *Id.* 62:4-25.

1 ███████████████████████████████████████████████

2 ███████████████████████████████████████████████

3 ███████████████████████████████████████████████

4 ███████████████████████████████████████████████

5 ███████████████████████████████████████████████

6 ███████████████████████████████████████████████

7 ███████████████████████████████████████████████

8 ████████████  ██████████████████████████████████

9 █████████  █████████████████████████████████████

10 ███████████████████████████████████████████████

11 ███████████████████████████████████████████████

12 ███████████████████████████████████████████████

13 ███████████████

14    ████████████████████████████████████████████

15 ███████████████████████████████████████████████

16 ███████████████████████████████████████████████

17 ███████████████████████████████████████████████

18 ███████████████████████████████████████████████

19 ██████████████████████████████████ *Axon Sols., Inc. v.*

20 *San Diego Data Processing Corp.*, No. 09 CV 2543 JM RBB, 2010 WL 1797028, at *2

21 (S.D. Cal. May 4, 2010) ("The City, and its elected leaders, were the decision-

22 makers; SDDPC merely followed the City's directions."). █████████████

23 ███████████████████████████████████████████████

24 _____

25 [271] Stein Decl., Ex. 174.

26 [272] Stein Decl., Ex. 175.

[273] Stein Decl., Ex. 230 (Roberts Dep.) 82:2-13.

27 [274] Stein Decl., Ex. 99.

28

████████████████████████

The foregoing facts reflect the regular and constant involvement of Dongwon personnel in StarKist's business on behalf of their mutual equitable owners, Chairman Kim and his family.  These facts and others, show overlapping officers and employees (*see also* Hamilton Report ¶¶ 98-103, 134-37, 140-44), domination and control by the same equitable owners (*see also* Hamilton Report ¶¶ 78-97), involvement in day-to-day activities (*see also* Hamilton Report ¶¶ 122-33), and a disregard for corporate formalities between StarKist and Dongwon (*see also* Hamilton Report ¶¶ 138-39); and failure to carry-out arm's length transactions and maintain appropriate company records (DeMario Opening Report ¶¶ 53-62

████████████████████████████████████████

████████████ DeMario Rebuttal Report ¶ 36 n.41 ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

There is also evidence of commingling of funds, reducing capitalization, and other transfers of money from StarKist to DWI and other Dongwon Group entities to the detriment of StarKist and its creditors, but to the benefit of DWI and its equitable owners. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[275] Stein Decl., Ex. 140.

1 ████████████████████ █ ████████████████████████

2 ██████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ███████████████████ ████████████████████████

5 ██████████████████████████████████████████████

6 ███████████ ████████████████████████████████

7 ██████████████████████████████████████████████

8 ██████████████████████████████████████████████

9 ██████████████████████████████████████████████

10 ██████████████████████████████████████████████

11 ███████████

12    Additionally, there are facts showing that after Plaintiffs' had sued DWI and

13 StarKist, ████████████████████████████████████████████

14 ██████████████████████████████████████████████

15 ███████████ █ █████████████████████████████████

16 █████ █████ ████████ ██████ █████████ █████████ ██████ ███████   It   is

17 unquestionable that at that time, StarKist and DWI knew about the alleged

18 conspiracy and litigation, but they decided to remove that money out of StarKist's

19 possession in any event.  *See Ramirez v. Chip Masters, Inc.*, No. 11-CV-5772 (WFK)

20 (MDG), 2014 WL 1248043 at *5 (E.D.N.Y. Mar. 25, 2014) (applying California

21 law) ("It may be reasonably inferred that the Cejas, without regard to the interests

22 of Chip Masters or its creditors, and at a time when Chip Masters faced a potential

23 lawsuit, transferred its assets to . . . avoid[] the potential liability of this litigation.

24 Such conduct is sufficient to establish that the Cejas acted in bad faith and that an

25 inequitable result would occur if this Court does not pierce the corporate veil and

26 ───────────────

[276] Stein Decl., Ex. 176.

27 [277] Stein Decl., Ex. 177.

28

1  hold the Cejas personally liable.").

2      StarKist has indeed recently pleaded poverty before both the Northern

3  District of California and Ninth Circuit, and the former found one fact particularly

4  important with respect to StarKist's suggestion, which was its investment between

5  2014 and 2017 in Techpack Solutions Co.[278]  Techpack was South Korea's leading

6  manufacturer of glass bottles, PET bottles, and metal packaging.[279]  ██████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  ████████████████████████████████████████████████ █

13  ███████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ███████████████████████████████████████████ ████████

16  ███████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ██████████████████████████████████████████████

20    ██████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  _____

25  [278] Stein Decl., Ex. 9.

26  [279] Stein Decl., Ex. 259.

   [280] Stein Decl., Ex. 178.

27  [281] Stein Decl., Ex. 146 (emphases added).

28

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

These facts show how Dongwon used StarKist's assets to further the interests of DWI and other Dongwon Group companies and to transfer those assets out of StarKist after litigation about the antitrust conspiracy commenced.  It would be inequitable for the owners of DWI and StarKist to use their positions with StarKist to transfer money out of the United States subsidiary to entities that are not reachable by Plaintiffs.  *See, e.g.*, *Riddle v. Leuschner*, 51 Cal. 2d 574, 335 P.2d 107, 112 (Cal. 1959) (inequitable result where Yosemite's assets were transferred and intermingled with Kadota's, disadvantaging Yosemite and its creditors); *SK Foods*, 499 B.R. at 841 ("when owners of an entity use their control to siphon off corporate assets to benefit owners or related entities and nothing is given in return, that conduct is deemed to be inequitable because it harms the interests of the corporation and its creditors."); *NEC Elecs. Inc. v. Hurt*, 208 Cal. App. 3d 772, 777-78 (Cal. Ct. App. 1989) ("Hurt manipulated the assets of Ph to the detriment of Ph's creditors. As a consequence, there is substantial evidence to support the trial court's conclusion that Hurt's manipulation of the assets of Ph produced an inequity to NEC and that Hurt was indeed Ph's alter ego.").

## C. TUG and COSI

As described above, COSI's Board of directors is comprised of only members of the Chansiri-Niruttinanon family since TUG acquired 100% of COSI.  TUG views COSI as merely a brand within its company.  During his transition to becoming CEO, Shue Wing was quoted as saying that "[t]he strength and quality of the Chicken of the Sea ***brand*** and its sales, marketing and management teams, coupled with the infrastructure of Thai Union, poise our company for continued

growth, and I look forward to building upon these factors[.]"  (Emphasis added.)[282]

The concept of COSI as a mere brand of TUG continues today, with COSI stating

in numerous public forums that it is the "North American brand" of TUG.[283]

_____

[282] *See* Stein Decl., Ex. 260.

[283]*See* Stein Decl., Ex. 261 and https://www.linkedin.com/company/chicken-of-the-sea/about/.

[284] Stein Decl., Ex. 215 (Chan Dep.) 45:1-5.

[285] Stein Decl., Ex. 179. The Court previously found significant to the alter ego inquiry the following facts: "TUG catches and cans the tuna that it sells through CotS . . . there is some overlap between TUG's and CotS's corporate governance . . .TUG presents a common global marketing image with CotS[.]"  ECF No. 295 at 13-14.

[286] Stein Decl., Ex. 180.



As these materials reflect, TUG and COSI held themselves out as one to customers, with TUG providing the raw materials and COSI providing some packaging and distribution for TUG products. ████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████ ███████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████ ██████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████ *See In re Vitamin C Antitrust Litig.,* No. 06-MD-1738 (BMC)(JO), 2012 WL 2930109, at *6 (E.D.N.Y. July 18, 2012) ("[T]he borders between CPG and Weisheng are as permeable as CPG's promotional materials depict. . . . Viewing the facts in a light most favorable to plaintiffs, the practical

---

[287] Stein Decl., Ex. 181.

[288] Stein Decl., Ex. 200 (Bixler Dep.) 175:12-19; 172:1-20.

[289] *Id.* 194:11-15.

1   reality of CPG and Weisheng seems to be that CPG, as advertised on its website,

2   manufactures and sells vitamin C through Weisheng, which acts like a sales

3   department of CPG.").



12   These are just a few examples

13   of such conduct.  *See Matsumoto v. Auto Page, Inc.*, No. B216840, 2010 WL 5061932,

14   at *6 (Cal. Ct. App. Dec. 13, 2010) (*alter ego* found when parent company "rendered

15   performance evaluations and made salary, bonus, promotion, demotion and other

16   personnel decisions" for subsidiary).

[290] Stein Decl., Ex. 182.

[291] Stein Decl., Exs. 183-84.

[292] Stein Decl., Exs. 185.

[293] Stein Decl., Ex. 51.



294 Stein Decl., Ex. 215 (Chan Dep.) 57:10-23.

295 Stein Decl., Ex. 215 (Chan Dep.) 67:16-68:12.

296 Stein Decl., Ex. 215 (Chan Dep.) 75:18-79:10.

297 Stein Decl., Ex. 222 (Chansiri Dep.) 30:13-23.

298 Stein Decl., Ex. 222 (Chansiri Dep.) 37:17-21.

299 Stein Decl., Ex. 222 (Chansiri Dep.) 44:2-8.

300 Stein Decl., Ex. 222 (Chansiri Dep.) 47:14-19.

301 Stein Decl., Ex. 222 (Chansiri Dep.) 35:10-14.

302 Stein Decl., Ex. 222 (Chansiri Dep.) 57:15-21.

1    These are just some of the examples of how COSI and TUG's same,

2  overlapping equitable owners exercised domination and control (*see also* Hamilton

3  Report ¶¶ 27-45, 48-51), were involved in day-to-day activities (*see also* Hamilton

4  Report ¶¶ 52-53, 62-75), and showed a disregard for corporate formalities between

5  TUG and COSI (*see also* Hamilton Report ¶¶ 55-59, 76-78; DeMario Opening

6  Report ¶¶ 99-106).  *In re Hydroxycut Mktg. & Sales Practices Litig.*, 810 F. Supp. 2d

7  1100, 1122-23 (S.D. Cal. 2011) (domination found, despite regard for corporate

8  formalities and adequate capitalization, when parent company's owner was

9  involved in "day-to-day operations" of the subsidiary).

---

[303] Stein Decl., Ex. 186.  *See also* Stein Decl., Ex. 53.



**D. Lion Entities**

Although Plaintiffs have been deprived of important discovery from Lion Capital and Big Catch, they submit that there is sufficient information to establish that Lion Americas was acting as an agent of Lion Capital and that Big Catch is

---

[304] Stein Decl., Ex. 262.

the *alter ego* of Lion Capital.  Moreover, Lion Capital is not entitled to summary judgment because one of two results must apply: either (1) the relevant Lion Capital partners who also held titles at Lion Americas acted on behalf of Lion Capital during the conspiracy; or (2) Lion Americas was an agent of Lion Capital.  Given the fact-intensive inquiry that applies and the substantial evidence that supports both these conclusions, neither can be resolved at summary judgment.

### 1. Lion Americas Acted as an Agent of Lion Capital

Lion Americas is not in the seafood business, but it used Bumble Bee to drive profits to Lion Capital's private equity fund and owner-partners in Big Catch. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████

████████████████     ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████     ████████████████████

████████████████████████████████████████████████████████

████████████████████████     ████████████████

---

[305] Stein Decl., Ex. 216 (Lindberg Dep.) 35:10-15; 36:1-5.

[306] The Court, in analyzing specific jurisdiction, has already found that Lindberg, Chang, and Capps "were [Lion Capital] partners and that their intentional acts impute to Lion Capital."  ECF No. 1358 at 44.

[307] Stein Decl., Ex. 62.

[308] Stein Decl., Ex. 13.



---

309 Stein Decl., Ex. 75.

310 Stein Decl., Ex. 62

311 *See, e.g.,* Stein Decl., Ex. 69; *see also* Stein Decl., Ex. 187 (noting that the "Manager" of Lion Capital Fund III is Lion Capital, not Lion Americas, and describing Manager's responsibilities)

312 Stein Decl., Ex. 217 (Chang Dep.) 160:16-161:11.

313 Stein Decl., Ex. 262 (SEC form, Section 7.A(6)), Ex. 263 (emphasis omitted).

314 Stein Decl., Ex. 262.



315 *Id.* Section 1.L (noting "Management Accounts and Similar Financial Records" are kept with Lion Capital LLP).

316 Stein Decl., Ex. 63.

317 *See, e.g.,* Stein Decl., Ex. 128.

318 Stein Decl., Ex. 188 (emphases added).

1 ███████████████████████████████████████████████████████

2 █████████████████

3    The Ninth Circuit has called a similar situation a "classic agency

4 relationship." *See, e.g.*, *Dearborn v. Mar Ship Operations, Inc.*, 113 F.3d 995, 999 (9th

5 Cir. 1997) (considering the common law definition of agency and finding an agency

6 relationship to exist where an entity operated a vessel on the government's behalf

7 and subject to its "overall direction and control over the operation of the vessel").

8 Here too, Lion Capital used Lion Americas to provide management and

9 monitoring for Bumble Bee while maintaining overall direction and control over

10 Bumble Bee as the ultimate owner and with the right to control its actions.

11    **2. Big Catch is the Alter Ego of Lion Capital**

12 ███████████████████████████████████████████████████████

13 ███████████████████████████████ █████████████████████

14 ██████████████ ███████████████████████████████████████

15 █████████████████████████████████████████ █████████████

16 ███████████████████████████████████████████████████████

17 ███████████████████████████████████ ███████████████████

18 ███████████████████████████████████████████████████████

---

[319] Stein Decl., Ex. 216 (Lindberg Dep.) 407:20-408:8, 409:4-8.

[320] Stein Decl., Ex. 231 (BB (30(b)(6) (Hughes) Dep.) 23:22-23; Stein Decl., Ex. 216 (Lindberg Dep.) 410:8-13.

[321] Stein Decl., Ex. 264.

[322] Stein Decl., Ex. 78 at 4 (LION_00014795).

1 ████████████ ███████████████████████████

2 ████████████████████████████████████

3

4

5

6

7

8

9

10

11

12

13

14

15

16 ██████████████████████████████████████

17 ████████████████████████████████████████

18 █████████████████████████████████

19    On the motion to dismiss, the Court found that an inequitable result could

20 exist here, noting that Big Catch is the vehicle by which the DOJ is preventing an

21 injustice from occurring with respect to Bumble Bee's criminal violations.  ECF

22 No. 1358 at 60-61.  Indeed, the DOJ and Northern District of California agreed

23

24 [323] *Id.* at 13 (LION_00014804).

25 [324] Stein Decl., Ex. 189.

26 [325] Stein Decl., Ex. 74.

27 [326]  Stein  Decl.,  Ex.  78  at  3  and  Signature  Page  (LION_00014794  and LION_00014843).

28

that Big Catch could guarantee a fine of up to $81.5 million if Bumble Bee is sold to ensure there was not a windfall to the owners of Big Catch – Lion Capital's fund investors.[327]   The same is true in the civil case if Big Catch is not held vicariously liable.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ Those debts have put Bumble Bee in a position where it is now considering restructuring the company, which could mean bankruptcy.[330]

Under these circumstances, Big Catch and Lion Capital should be held to be *alter egos*.

## VI. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny the Parent Entities' Motions in full.

---

[327] Stein Decl., Ex. 8 at 14-17.
[328] *See* Stein Decl., Ex. 231 (BB (30(b)(6) (Hughes) Dep.) 19:14-24, 22:12-23:11. Stein Decl., Ex. 190 at LION_00002942.
[329] Stein Decl., Ex. 190 at LION_00002947.
[330] https://www.undercurrentnews.com/2019/08/07/bumble-bee-mulls-bankruptcy-filing-with-sales-dropping-debt-covenant-breached/.

1

2 Date: November 7, 2019                    Respectfully Submitted,

3

4                                 By: _s/  Christopher L. Lebsock_
                                  Michael P. Lehmann
5                                 Bonny E. Sweeney
                                  Christopher L. Lebsock
6                                 Samantha J. Stein
7                                 HAUSFELD LLP
                                  600 Montgomery Street, Suite 3200
8                                 San Francisco, CA 94111
9                                 Tel:  (415) 633-1908
                                  Fax:  (415) 358-4980
10                                E-mail:  mlehmann@hausfeld.com
11                                E-mail:  bsweeney@hausfeld.com
                                  E-mail:  clebsock@hausfeld.com
12                                E-mail:  sstein@hausfeld.com

13

14                                Michael D. Hausfeld
                                  James J. Pizzirusso
15                                HAUSFELD LLP
16                                1700 K Street NW, Suite 650
                                  Washington, DC 20006
17                                Tel: (202) 540-7200
18                                Fax: (202) 540-7201
                                  E-mail:  mhausfeld@hausfeld.com
19                                E-mail:  jpizzirusso@hausfeld.com

20

21                                *Lead Counsel for the Direct Purchaser Plaintiff*
                                  *Class*

22

23                                By: _s/ Betsy C. Manifold_
24                                BETSY C. MANIFOLD
                                  RACHELE R. BYRD
25                                MARISA C. LIVESAY
26                                BRITTANY N. DEJONG
                                  WOLF HALDENSTEIN ADLER
27                                   FREEMAN & HERZ LLP

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

750 B Street, Suite 1820
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:   619/234-4599
manifold@whafh.com
byrd@whafh.com
livesay@whafh.com
dejong@whafh.com

FRED TAYLOR ISQUITH
THOMAS H. BURT
WOLF HALDENSTEIN ADLER
        FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:   212/545-4653
isquith@whafh.com
burt@whafh.com

CARL MALMSTROM
WOLF HALDENSTEIN ADLER
        FREEMAN & HERZ LLP
111 West Jackson, Suite 1700
Chicago, IL 60604
Telephone: 312/984-0000
Facsimile:   312/212-4401
malmstrom@whafh.com

*Lead Counsel for the*
*Indirect Purchaser End Payer Plaintiffs Class*


By: *s/ Jonathan W. Cuneo*
Jonathan W. Cuneo
Joel Davidow
Blaine Finley
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Tel.:  202-789-3960
Fax:  202-789-1813
Email:  jonc@cuneolaw.com
Email:  joel@cuneolaw.com
Email:  bfinley@cuneolaw.com

*Lead Counsel for the Commercial Food Preparer
Plaintiff Class*


By: s*/ William J. Blechman*
Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Kevin J. Murray, Esquire
Douglas H. Patton, Esquire
Samuel J. Randall, Esquire
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel:   (305) 373-1000
Fax:   (305) 372-1861
E-mail:      rarnold@knpa.com
              wblechman@knpa.com
              kmurray@knpa.com
              dpatton@knpa.com
              srandall@knpa.com

*Liaison Counsel for Direct Action Plaintiffs and
Counsel for the Kroger Plaintiffs*


By: *s/ Patrick J. Stueve*
Patrick J. Stueve (KS 13847)
Steve N. Six (KS 16151)
C. Curtis Shank (KS 26306)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112

Telephone:  816-714-7100
Facsimile:  816-714-7101
stueve@stuevesiegel.com
six@stuevesiegel.com
shank@stuevesiegel.com

*Counsel for Direct Action Plaintiff Associated
Wholesale Grocers, Inc.*


By: *s/ Manton M. Grier*
Manton M. Grier (D.S.C. No. 2461)
Robert Y. Knowlton (D.S.C. No. 2380)
Elizabeth H. Black (D.S.C. No. 10088)
Mary C. Eldridge (D.S.C. No. 12540)
HAYNSWORTH SINKLER BOYD, P.A.
1201 Main Street
Suite 2200
P.O. Box 11889 (29211)
Columbia, South Carolina
Telephone: (803) 779-3080
Facsimile: (803) 765-1243
mgrier@hsblawfirm.com
bknowlton@hsblawfirm.com
eblack@hsblawfirm.com
meldridge@hsblawfirm.com

*Counsel for Direct Action Plaintiff W. Lee
Flowers & Co.*


By: *s/ Patrick J. Ahern*
Patrick J. Ahern
Theodore B. Bell
AHERN AND ASSOCIATES, P.C.
Willoughby Tower
8 South Michigan Avenue Suite 3600
Chicago, Illinois 60603
(312) 404-3760
patrick.ahern@ahernandassociatespc.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

theo.bell@ahernandassociatespc.com

*Counsel for Direct Action Plaintiffs*
*Winn-Dixie Stores, Inc. and Bi-Lo Holdings,*
*LLC*


By: *s/David P. Germaine*
Paul E. Slater
Joseph M. Vanek
David P. Germaine
Alberto Rodriguez
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
pes@sperling-law.com
jvanek@sperling-law.com
dermaine@sperling-law.com
arodriguez@sperling-law.com

*Counsel for the "Publix Plaintiffs"*
*Direct Action Plaintiffs Dollar General*
*Corporation, Dolgencorp, LLC, Moran Foods,*
*LLC, Publix Super Markets, Inc., Meijer, Inc.,*
*Meijer Distribution, Inc., Wakefern Food Corp.,*
*Super Store Industries, SuperValu Inc.,*
*Associated Grocers of Florida, Inc., and Unified*
*Grocers, Inc.*


By: *s/ Laurence D. King*
Laurence D. King
KAPLAN FOX & KILSHEIMER LLP
Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone:  415-772-4700

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Facsimile:   415-772-4707
Email: lking@kaplanfox.com
Email: mchoi@kaplanfox.com

Robert N. Kaplan
Gregory K. Arenson
Elana Katcher
Matthew P. McCahill
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: rkaplan@kaplanfox.com
Email: garenson@kaplanfox.com
Email: ekatcher@kaplanfox.com
Email: mmccahill@kaplanfox.com

ALSTON & BIRD LLP
Valarie C. Williams
B. Parker Miller
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: valarie.williams@alston.com
Email: parker.miller@alston.com

THE COFFMAN LAW FIRM
Richard L. Coffman
Edison Plaza
350 Pine St., Suite 700
Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com

MARCUS & SHAPIRA LLP
Bernard D. Marcus
Moira C. Cain-Mannix
Erin Gibson Allen

One Oxford Center, 35th Floor
Pittsburgh, PA 15219
Telephone: (412) 471-3490
Facsimile: (412) 391-8758
Email: marcus@marcus-shapira.com
Email: cain-mannix@marcus-shapira.com
Email: allen@marcus-shapira.com

LOWIS & GELLEN LLP
Eric R. Lifvendahl
175 W. Jackson Blvd., Suite 950
Chicago, IL 60604
Telephone: (312) 364-2500
Facsimile: (312) 364-1003
Email: elifvendahl@lowis-gellen.com

MAURIELLO LAW FIRM, APC
Thomas D. Mauriello
1230 Columbia Street #1140
San Diego, CA 92101
Telephone: (619) 940-1606
Facsimile: (949) 606-9690
Email:  tomm@maurlaw.com

*Attorneys for "Affiliated Foods Plaintiffs"*
*Affiliated Foods Inc., Alex Lee, Inc., Associated*
*Foods Stores, Inc., Associated Grocers of New*
*England, Inc., Associated Grocers, Inc., Bashas'*
*Inc., Big Y Foods, Inc., Brookshire Brothers,*
*Inc., Brookshire Grocery Company, Certco, Inc.,*
*CVS Pharmacy, Inc., Dollar Tree Distribution.*
*Inc., Greenbrier International, Inc., Family*
*Dollar Stores, Inc., Family Dollar Services,*
*LLC., Fareway Stores, Inc., The Golub*
*Corporation, Giant Eagle, Inc., Kmart*
*Corporation, K-VA-T Food Stores, Inc., Mark*
*Glassman, Inc., McLane Company, Inc.,*
*Meadowbrook Meat Company, Inc., Merchants*
*Distributors, LLC., Schnuck Markets, Inc.,*
*SpartanNash Company, URM Stores, Inc.,*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Western Family Foods, Inc., Woodman's Food Market, Inc., and 99 Cents Only Stores LLC*

1

## **CERTIFICATE OF SERVICE**

I certify that on November 7, 2019, I filed the foregoing document and supporting papers with the Clerk of the Court for the United States District Court, Southern District of California, by using the Court's CM/ECF system. I also served counsel of record via this Court's CM/ECF system.


By: *s/ Christopher L. Lebsock*
       Christopher L. Lebsock
       HAUSFELD LLP
       clebsock@hausfeld.com
       *Lead Counsel for the Direct Purchaser*
       *Plaintiff Class*