# Exhibit 254

# (part 1)

# (Stein Decl.)



# Modern Industrial Organization

**Fourth Edition**

**Dennis W. Carlton**
*University of Chicago*

**Jeffrey M. Perloff**
*University of California, Berkeley*



PEARSON
Addison
Wesley

Boston  San Francisco  New York
London  Toronto  Sydney  Tokyo  Singapore  Madrid
Mexico City  Munich  Paris  Cape Town  Hong Kong  Montreal

*To Janie and Jackie*

Editor in Chief: Denise Clinton
Acquisitions Editor: Adrienne D'Ambrosio
Director of Development: Sylvia Mallory
Managing Editor: Jim Rigney
Senior Production Supervisor: Nancy Fenton
Senior Media Producer: Melissa Honig
Marketing Manager: Deborah Meredith
Design Supervisor: Regina Kolenda
Interior Designer: Leslie Haimes
Cover Designer: Leslie Haimes
Illustrator: Jim McLaughlin
Senior Prepress Supervisor: Caroline Fell
Senior Manufacturing Buyer: Hugh Crawford
Compositor: Nesbitt Graphics, Inc.
Cover Image: Stella, Frank (b. 1936) © Copyright ARS, NY. Agbatana II. 1968. Polymer and fluorescent polymer paint on canvas. 10' × 15'. © Copyright ARS, NY. Musee d'Art et d'Industrie, Saint-Etienne. Photo credit: Giraudon

Many of the designations used by manufacturers and sellers to distinguish their products are claimed as trademarks. Where those designations appear in this book and Addison-Wesley is aware of a trademark claim, the designations have been printed in initial caps or all caps.

Library of Congress Cataloging-in-Publication Data

Carlton, Dennis W.
  Modern industrial organization / Dennis W. Carlton, Jeffrey M. Perloff.—
4th ed.
    p. cm
  Includes bibliographical references and index.
  ISBN 0-321-18023-2
  1. Industrial organization (Economic theory) I. Perloff, Jeffrey M. II.
Title

HD2326.C376 2005
338.6—dc22
                              2004007014

Copyright © 2005 by Dennis W. Carlton and Jeffrey M. Perloff

All rights reserved. No part of this publication may be reproduced, stored in a database or retrieval system, distributed, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. Printed in the United States of America.

    3 4 5 6 7 8 9 10—CRW—08 07 06

Case 3:15-md-02670-JLS-MDD   Document 2143-12   Filed 11/07/19   PageID.171155   Page 4 of 20

To prevent cheating, successful cartels must do more than just set a price. Posner (1970, 400) finds that at least 14% of all Department of Justice antitrust cases involved explicit collusion on terms besides basic price (and this figure apparently does not include explicit rules on dividing the market, exchanging information, or sales quotas).[22]

Some cartels succeed in preventing cheating by assigning each firm certain buyers or geographic areas, which allows cheating to be detected easily. Fraas and Greer (1977) found that 26% of price-fixing cases involved market allocation schemes. Posner (1970) found that 7.8% of the antitrust cases involved an allocation of customers, 14.6% involved a division of territories, and 1.8% involved a division of product markets (or 24% overall). The two-country mercury cartel used a geographic division of markets: Spain supplied the United States, and Italy supplied Europe.

Another effective technique is for members of a cartel to agree to fix market shares (say, at their precartel levels). (See Example 5.5.) As long as market shares are easily observable, no firm has an incentive to cut its price. If it lowered its price, its share would increase, and other firms would retaliate. For example, cartel members who detect changes in the output levels of other firms could adjust their own output to maintain their proportionate shares of market output (Osborne 1976; Spence 1978a, 1978b). All firms expect this reaction, so no firm has an incentive to increase its own output only to earn lower profits after retaliation. As www.aw-bc.com/carlton_perloff "Conjectural Variations" discusses, fixing market shares can result in the cartel price.

A most-favored-nation clause in a sales contract guarantees the buyer that the seller is not selling at a lower price to another buyer (Salop 1986). A variant of such clauses was used in sales of large steam-turbine generators. The two major sellers, General Electric and Westinghouse (see Example 5.1), each used clauses in their contracts stating that the seller would not offer a lower price to any other buyer, current or future, without offering the same price decrease to the initial buyer. This rebate mechanism created a penalty for cheating on the cartel: If either company deviated from the agreement by cutting its price, it would have to cut prices to all previous buyers as well.

A meeting-competition clause in a long-term supply contract or in an advertisement guarantees the buyer that if another firm offers a lower price, the seller will match it or release the buyer from the contract (Salop 1986). Such a clause makes it difficult for a firm to cheat, because buyers will bring news of lower prices to the cartel. Thus, surprisingly, these clauses could be associated with high cartel prices rather than the low ones they seem to guarantee.

---

[22]Posner (2003, 51) notes, "The machinery [of cartelization] may include sales quotas, exclusive sales agencies, industry-wide price-fixing committees, the levying of penalties for infractions, provisions for the arbitration of disputes, the establishment of an investigative apparatus product standardization, allocation of customers, and the division of geographical markets."

**EXAMPLE 5.5** *Vitamins Cartel*

In the 1990s, there was a massive worldwide cartel involving many different vitamins, including biotin, folic acid, and vitamins A, B1, B2, B5, B6, C, and E, among others. Vitamins have a wide variety of uses as additives to human and animal diets and in skin and healthcare products. The various vitamins are not substitutes for each other.

Vitamin production is highly concentrated among a few firms. At the time of the cartel, the three largest producers were Hoffman-LaRoche (which since has sold its vitamins business), which produced 40 to 50 percent of all vitamins; BASF, with a 20 to 30 percent share; and Aventis (formerly Rhone-Poulenc), with a 5 to 15 percent share. These major manufacturers produced many of the same vitamins. Over half of all vitamin sales were for vitamins A and E, which were sold by all three major producers.

Allegedly beginning in 1989, Hoffman-LaRoche, BASF, and Rhone-Poulenc held meetings to discuss allocations of market sales around the world so as to reduce competition, and soon thereafter other firms became involved in a worldwide cartel.

The cartel fixed market shares for each vitamin by country, agreed on price increases, specified target prices and minimum prices, and shared information to ensure that each firm was abiding by its allocation. Sometimes the firms explicitly discussed large individual customers and agreed on those customers' prices and how much of the customers' needs each manufacturer would supply.

The firms met regularly. There were four levels of meetings: the highest level involving senior executives who determined overall strategy and adherence to the agreements; the next level involving marketing executives about two or three times a year; another meeting (usually quarterly) involving marketing managers of individual products to monitor the implementation of the allocations; and finally, quarterly meetings of regional marketing managers to discuss pricing, implement price increases, and adjust allocations. The "budget meetings" in August were used to outline allocations for the coming year, together with price increases.

All cartel members could agree that if the market price drops below a certain level (called a trigger price), each firm will expand its output to the precartel level (Friedman 1971); that is, all firms will abandon the cartel agreement. In this case, a firm that cuts its price might gain in the extremely short run, but would lose in the end due to the destruction of the cartel by this predetermined punishment mechanism.

One reason to use trigger prices is that, in some markets, firms have difficulty distinguishing between cheating by other firms and random fluctuations in price due to fluctuations in demand or supply costs. It is possible, however, for cartels to modify their punishment methods to prevent cheating even when random shocks occur (Green and Porter 1984). If firms were to permanently revert to competitive behavior whenever they detected a fall in price, the cartel could be destroyed by a random fluctuation in

The price was usually raised in increments of 5 percent, and the effective date of a price increase was often April 1 of the next year. Hoffman-LaRoche typically initiated the price increases, with the other firms following suit. The detailed exchanges of sales information allowed the firms to monitor adherence to their sales allocation. If a firm had sold too much in a given year, it could be required to buy supplies from the other firms to restore the original sales allocation.

Although the exact amounts by which the cartel raised prices are subject to dispute, the increases during the cartel period were sizable. For example, the average price for vitamin A rose by 40 percent and that of vitamin E increased over 60 percent from 1990 to 1998. The price of vitamin C rose by about 30 percent during the identified cartel period and fell by 50 percent thereafter.

Starting in the late 1990s, Rhone-Poulenc participated in the U.S. Justice Department's corporate leniency program. The first cartel member to confess to the DOJ—if it is not a ringleader or enforcer in the conspiracy and if the DOJ is not aware of the illegal activity—is granted automatic amnesty. Rhone-Poulenc revealed the existence of the cartel and details about its operations so as to avoid antitrust fines. Subsequently other cartel members agreed to pay multimillion-dollar fines. These same firms had to pay fines to Canadian and European Union competition authorities as well.

The fines were substantially larger than had been collected in previous antitrust cases. The largest U.S. fines were $500 million for Hoffman-LaRoche, $225 million for BASF, and $72 million for the Japanese company Takeda. Two Hoffman-LaRoche executives went to jail. The biggest Canadian fines were the $48 million (Canadian) collected from Hoffman-LaRoche, the $18 million from BASF, and the $14 million from Rhone-Poulenc. The major European fines were €462 million for Hoffman-LaRoche, about €300 million for BASF, and €37 million for Takeda. Private antitrust settlements collected additional amounts from the cartel members.

Source: Official Journal of the European Communities, Commission Decision of 21 November 2001. (Case Comp/E-1/37.512—Vitamins.)

price (rather than price cutting by one firm). Instead, if the firms agreed to behave competitively only for a predetermined length of time and then to revert to the cartel behavior, a random fluctuation in price would not destroy the cartel permanently.[23]

One attraction of this scheme is that, even if the agreement temporarily breaks down, it can be reestablished without further meetings. In a market in which random

---

[23] If the firms revert to their precartel output level, the price falls to the precartel level as well. A more severe punishment, a price below the precartel level, may be used instead: With a lower price, it may be possible to shorten the punishment period. For an illustration of how cartel prices might be set to minimize cheating, see Davidson and Martin (1985). Where members of a cartel disagree on how to behave, some kind of voting mechanism may be used (Cave and Salant 1987).

price fluctuations can mask cheating on the cartel agreement by firms, such an agreement could lead to recurrent sharp declines in price and cartel profit levels. When a random drop in price occurs, cartel members punish themselves unnecessarily.

Nonetheless, this mechanism may be attractive to the cartel because, if the punishment period (when all firms produce large levels of output) is long enough, it is never in a firm's best long-run interest to cheat on the cartel. Thus, cartel members realize that the price only falls below the trigger price because of random fluctuations (because no firm ever engages in price cutting). The cartel must keep punishing itself, however; if it stopped, price cutting would occur.[24] Example 5.6 provides an example of the American rail-freight industry in the 1880s that may illustrate such behavior.

## Cartels and Price Wars

Many observers, seeing large price fluctuations in a market, argue that the firms in that market are trying to form a cartel that keeps breaking apart. They conclude that government intervention is not required because competitive forces keep destroying the cartel. Yet, these fluctuations could be part of a rational, long-run cartel policy involving trigger prices, as discussed in the preceding section. This trigger-price argument holds that price wars occur more often during unexpected business cycle downturns (recessions and depressions) when price is likely to decline in response to lowered demand (Green and Porter 1984; Staiger and Wolak 1992). We expect then that cartels are more likely to terminate during a price war. Other economists argue that price wars should occur in periods of high demand (Rotemberg and Saloner 1986). They reason that the benefit from undercutting the cartel price is greatest during booms.

To see whether either or both theories are realistic, Valerie Y. Suslow (1998) investigates the stability of cartels over the business cycle by examining 72 international cartel agreements covering 47 industries during the period 1920–39.

Because major European countries had no systematic antitrust legislation prior to World War II, these cartels were legal and had formal written contracts. As of 1927, cartels were legal in Switzerland, whereas Belgium, France, Spain, Italy, and the Netherlands did not explicitly prohibit them. Under German law, cartels were legal; however, Germany passed antitrust legislation in 1923 that was designed to guard against abuses of economic power. In 1930, Great Britain adopted a resolution recognizing cartels as a fact of economic life, but calling for the *principle of publicity*, which required compulsory notification, registration, and publication of the cartel agreements. Other European countries followed Great Britain's policy in the mid-1930s. It was not until after World War II that France passed legislation to control cartel activity.

---

[24]Bernheim and Ray (1989), Evans and Maskin (1989), Farrell and Maskin (1989), and others point out that instead of going into a punishment phase, cartel members may renegotiate their cartel agreement. These papers indicate, however, that it may be possible to form agreements that avoid this renegotiation problem.

# Rules, Communication, and Collusion: Narrative Evidence from the Sugar Institute Case

By DAVID GENESOVE AND WALLACE P. MULLIN*

*Detailed notes on weekly meetings of the sugar-refining cartel show how communication helps firms collude, and so highlight the deficiencies in the current formal theory of collusion. The Sugar Institute did not fix prices or output. Prices were increased by homogenizing business practices to make price cutting more transparent. Meetings were used to interpret and adapt the agreement, coordinate on jointly profitable actions, ensure unilateral actions were not misconstrued as cheating, and determine whether cheating had occurred. In contrast to established theories, cheating did occur, but sparked only limited retaliation, partly due to the contractual relations with selling agents. (JEL L13, L41)*

This paper reexamines the cartel problem by studying the private discussions within one cartel. While we find much that is in accord with George J. Stigler's (1964) basic insight that firms would structure an agreement conscious of their later incentive to cheat on it, we also uncover puzzles for established theory, and identify elements that a richer theory should encompass—especially regarding the role of communication in collusion.

Our window into the inner workings of a cartel is a remarkable series of notes on the weekly meetings of the Sugar Institute. This trade association was formed in December 1927, in the wake of several years of falling margins and excess capacity, by 14 firms comprising nearly all the cane sugar refining capacity in the United States. It operated until 1936, when the Supreme Court ruled its practices illegal.

Among the top executives in regular attendance at the meetings was Louis V. Placé, Vice President of McCahan, a midsize refinery in Philadelphia. Placé, who was "in charge of all activities of the company except production and raw sugar purchases,"[1] wrote over 500 pages of single-spaced detailed notes on the Board of Directors, Executive Committee, and Enforcement Committee meetings from January 1929 through mid-1930. He also reported on the informal gatherings that followed them, and private conversations with other refiner representatives and Institute personnel.[2] Since the memos circulated among only some six McCahan executives, they are extremely candid. Under cross-examination at the trial, Placé claimed to have regularly destroyed them upon receiving the much less revealing *official* minutes.[3] Placé's own notes catch the

* Genesove: Department of Economics, Hebrew University of Jerusalem, Mt. Scopus, Jerusalem 91905, Israel; Mullin: Department of Economics, Michigan State University, 101 Marshall Hall, East Lansing, MI 48824. Mullin's research was supported by an MSU AURIG grant, which is gratefully acknowledged. David Burnstein provided excellent research assistance. We thank Phil Haile, Tom Hubbard, Fiona Scott Morton, two anonymous referees, and lunch and workshop participants at the University of Chicago, CEPR, the Hebrew University of Jerusalem, Indiana University, MIT, Michigan State University, and the NBER for helpful comments. Special thanks are due to Carl Van Ness, archivist at the University of Florida, Gainesville, for his assistance in using the Braga Brothers collection. We also thank Fred Romanski and Gregory Plunges of the National Archives and Records Administration.

[1] Testimony of Louis Placé, Transcript of Record, Volume II p. 827 (*United States v. Sugar Institute,* Records of the District Court of the United States).

[2] The Placé memoranda are deposited in the Rionda Family Archives at the University of Florida, Gainesville (see Carl Van Ness, 1995). We supplement them with the voluminous trial record. Both sources are described in Genesove and Mullin (1999).

[3] *United States v. Sugar Institute* (1934), paragraph 7712, Volume VI, Supplemental Transcript of the Record.

President of American in an act of perjury,[4] and reveal both the refiners' legal strategy, and their political machinations.[5]

For economists, Placé's notes are a unique information trove on cartel behavior. Participants in a modern cartel are unlikely to create such detailed and contemporaneous documents of decision-making, due to legal concerns. Moreover, although antitrust agencies can subpoena firm records and interview market participants, strict confidentiality rules keep what they learn from academic research, except by way of the rare trial.

Placé's memos serve us in two ways. First, they are a record of the *communication* among the refiners. Here are announcements of impending actions that firms did not wish misconstrued as market stealing, charges of cheating, threats of retaliation, and deliberations over cooperative actions that were jointly profitable but singly unprofitable.

Second, the memos reveal the *reasoning* behind firms' actions. This is a type of evidence that economists have tended to shy away from. Milton Friedman (1953) would judge a theory solely by its predicted outcomes. But we agree with Alan S. Blinder (1993) that a firm's explanation of its conduct is also proof, since a theory describes the "chain of reasoning" which motivates the firm. Indeed, participants' beliefs are an integral part of many game-theoretic models. Furthermore, because like Ariel Rubinstein (1992) we view "a model [as] an approximation of [the players'] perception and not an approximation of an objective description of reality," we think it valuable to document how colluding firms viewed their environment.

The Sugar Institute never directly fixed prices nor allocated market shares. There is no indication or legal finding of either.[6] Instead, it fixed rules. These rules, the main principles of which were stated in its Code of Ethics[7] and the details of which were promulgated in successive Code Interpretations, covered every conceivable aspect of the distribution and marketing of sugar other than the basis price itself. In this way, the refiners eliminated the differential treatment of customers and harmonized contractual practices, thus facilitating the detection of secret price cuts.

In his seminal work on collusion, Stigler (1964) identified the ability both to *detect* price cutting and to *retaliate* against it as the primary requirements of successful collusion. However, he emphasized detection. In contrast, more recent work, from Edward J. Green and Robert H. Porter (1984) on, has concentrated on the nature of optimal retaliation, and taken the detection probability as parametric. Studying the Sugar Institute refocuses our attention on detection, in revealing how firms may enhance it by altering their environment through both specific rules and institutional structure, including communication. The costs of such a strategy in foregone profits from price discrimination and cost efficiencies are made clear as well.

We find the current formal theory of collusion wanting in three respects. First, the theory ignores the inevitable incompleteness of collusive agreements. Conclusions about the role of renegotiations are especially misleading because of this neglect. In contrast, we show that the meetings embodied a governance structure for the agreement, ensuring its adaptation to (typically endogenous) changing circumstances. Second, the theory provides no role for rich communication within the agreement. We show the crucial role provided by *ex ante* notification and *ex post* determination of fault at the weekly meetings.[8]

---

[4] He actively participated at a meeting in which the move to delivered pricing was coordinated (W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, April 18, 1929), but denied that the refiners ever discussed it (*United States v. Sugar Institute*, Defendants Fact Brief, p. 212). The memos also show Arbuckle Brothers shipping to a bootlegger (W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, February 20, 1930).

[5] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, January 29, 1929; February 15, 1929; May 11, 1929. In the last case, the refiners discuss asking the beet-sugar refiners association to petition the government to regulate transportation pricing in the sugar-cane refining industry.

[6] The antitrust authorities realized this early on (Harry A. Babcock, 1930 p. 14).

[7] This is reproduced in the Appendix of Genesove and Mullin (1999).

[8] Recent work that uses communication as a technical device to form public histories to solve for the equilibrium does not demonstrate the need for communication (Olivier Compte, 1998; Michihiro Kandori and Hitoshi Matsushima, 1998). Also, the messages in these models are simply retrospective reports of the private information—i.e., firm out-

Finally, as Margaret C. Levenstein (1997) has shown, the theory incorrectly predicts that cheating (which should not even occur in equilibrium!) will always be met by competitive, or subcompetitive, conditions. We see such harsh punishments only in response to massive cheating. Occasional incidents of cheating were typically not retaliated against. Open violations, or consistent patterns of cheating in a single dimension were matched in degree and kind. We argue that the contractual arrangements for sales agents help explain the limited retaliation.

Section I presents evidence that the Institute raised margins and profits. This establishes that the collusive efforts were at least partially successful, and so merit further investigation. Section II details the collusive mechanism, rule fixing, and the benefits and costs it entailed. Section III interprets the Institute as an incomplete collusive agreement. Sections IV and V explore how *ex ante* notification and *ex post* determination of fault supported the agreement, while Section VI documents firms' response to its violation. Section VII shows that the firms did not transfer market shares or infer cheating from variations in them, as existing theories predict. Section VIII concludes.

### I. Performance

How successful was the Sugar Institute? Table 1 lists some relevant yearly statistics. As Genesove and Mullin (1997, 1998) showed, the simple production technology of cane sugar refining affords direct measures of marginal cost and so of the price-cost margin as well. To produce a pound of refined sugar, one needs 1.075 pounds of raw sugar, the price of which constitutes most of the cost of refining. Column (2) presents the "proper margin," the difference between the price of refined and 1.075 times the price of raw. Column (3) subtracts an additional 60 cents per *hundred* pounds, which represents all non-raw-sugar variable costs of refining.[9]

The establishment of the Sugar Institute in December 1927 is coincident with an increase of the margin of about 20 to 25 cents per hundred pounds over the preceding three years. As column (4) shows, this increase is a more than doubling of the Lerner Index. Of course, the use of list prices runs into the obvious difficulty that the Institute was established in response to the pervasiveness of secret price cuts. However, any bias only strengthens our conclusion: so long as the Sugar Institute eliminated or at the very least did not exacerbate the secret concessions, the increase in the list price provides a lower bound for the increase in the actual price.

An increase in the price-cost margin indicates only that collusion was enhanced. How close that is to fully collusive pricing depends on the elasticity of the relevant demand curve. In our earlier work, we show that the elasticity of demand for cane sugar during the 1890–1914 period was about 1.75. That would indicate a monopoly Lerner Index of 57 percent, far above the margins under the Sugar Institute. This discrepancy is explained in part by the post-War growth of beet sugar, which would have increased the demand elasticity for cane, and in part by the desire to deter both foreign and domestic entrants. A more realistic benchmark for monopoly pricing would be 11 percent. This was the margin in 1892, when both the margin and American's market share reached their greatest level (the latter at 92 percent of the market). By that measure, the refiners managed to raise the Lerner Index to about three-quarters of its monopoly level.

The quantity series, though less dramatic, is also consistent with an increase in market power. Column (5) shows that the output of the Atlantic refiners fell with the establishment of the Sugar Institute. The decrease in output is small, as sugar demand is relatively inelastic. Output continued to fall in the latter part of the Sugar Institute period.

---

puts—and miss the richness that we will describe later on. Laurits Rolf Christensen and Richard E. Caves (1997) and Maura P. Doyle and Christopher M. Snyder (1999) show how firms coordinate through public announcements of intended capacities and production, respectively.

[9] This is 26 cents (per hundred pounds) in 1898 dollars, the value used in the earlier studies. These costs remained remarkably stable as well. McCahan's internal documents indicate these costs amounted to 63.6 cents per hundred pounds in 1927 (*W. J. McCahan Sugar Refining and Molasses Company,* Correspondence, December 12, 1932 Placé letter to Manuel E. Rionda.) The corresponding industry average in 1927 was 55.3 cents. (*United States v. Sugar Institute,* brief for the Defendants on the Facts, p. 455, in District Court Record). The economic significance of these differences across firms or time is slight.

382                                    THE AMERICAN ECONOMIC REVIEW                                    JUNE 2001

TABLE 1—EFFECT OF THE SUGAR INSTITUTE ON PERFORMANCE MEASURES

| (1) Year | (2) Proper margin | (3) Proper margin −0.60 | (4) Lerner index | (5) Output | (6) Profits | (7) Beet share | (8) Foreign refined share |
|---|---|---|---|---|---|---|---|
| 1914 | 0.99 | 0.39 | 0.047 | 106 | 3.7 | | |
| 1915 | 0.95 | 0.35 | 0.036 | 114 | 3.9 | | |
| 1916 | 1.04 | 0.44 | 0.041 | 118 | 4.3 | | |
| 1917 | 1.31 | 0.70 | 0.068 | 103 | 7.4 | | |
| 1918 | 1.04 | 0.44 | 0.048 | 93 | 3.9 | | |
| 1919 | 0.88 | 0.27 | 0.029 | 121 | 4.2 | | |
| 1920 | 1.94 | 1.34 | 0.129 | 113 | 12.2 | | |
| 1921 | 1.06 | 0.46 | 0.073 | 128 | 6.0 | | |
| 1922 | 0.97 | 0.36 | 0.060 | 157 | 5.9 | | |
| 1923 | 0.88 | 0.28 | 0.033 | 123 | 3.3 | | |
| 1924 | 1.06 | 0.45 | 0.061 | 128 | 5.4 | 15.3 | 0.5 |
| 1925 | 0.80 | 0.19 | 0.035 | 143 | 2.6 | 16.1 | 0.5 |
| 1926 | 0.79 | 0.18 | 0.034 | 142 | 2.7 | 15.4 | 0.5 |
| 1927 | 0.74 | 0.14 | 0.023 | 130 | 2.0 | 14.7 | 2.5 |
| 1928 | 1.00 | 0.40 | 0.071 | 122 | 4.9 | 18.7 | 6.2 |
| 1929 | 1.00 | 0.39 | 0.077 | 128 | 5.1 | 14.7 | 8.3 |
| 1930 | 1.04 | 0.44 | 0.091 | 126 | 5.6 | 17.0 | 8.0 |
| 1931 | 0.96 | 0.36 | 0.071 | 107 | 3.8 | 20.5 | 9.6 |
| 1932 | 1.07 | 0.47 | 0.093 | 103 | 4.7 | 21.0 | 12.8 |
| 1933 | 1.14 | 0.54 | 0.093 | 99 | 5.3 | 21.6 | 14.7 |
| 1934 | 1.17 | 0.56 | 0.104 | 94 | 5.3 | 25.1 | 11.0 |
| 1935 | 1.07 | 0.47 | 0.083 | 96 | 4.4 | 22.1 | 11.1 |
| 1936 | 1.03 | 0.42 | 0.072 | 98 | 4.2 | | |
| 1937 | 1.03 | 0.43 | 0.077 | 108 | 4.9 | | |
| 1938 | 0.98 | 0.37 | 0.077 | 100 | 3.7 | | |
| 1939 | 1.01 | 0.41 | 0.079 | 99 | 3.9 | | |
| 1940 | 1.01 | 0.41 | 0.086 | 100 | 3.9 | | |
| 1941 | 0.85 | 0.25 | 0.048 | 116 | 3.0 | | |

*Notes:* Columns (2) through (6) are weekly averages. Column (2) shows the difference between the price of refined sugar and 1.075 times the price of raw sugar, in cents per pound. Column (3) shows the difference between column (2) and 0.60, the non-raw-sugar component of variable cost per pound. Column (4) presents the ratio of that margin to the price of refined sugar. Column (5) shows the output of the Atlantic refiners, in millions of pounds. Column (6) shows the sum of the variable profits of the Atlantic refiners, in millions of dollars. Columns (7) and (8) present the annual shares of domestic beet-sugar production and imported refined sugar in total U.S. sugar consumption. All prices are in December 1927 dollars. The Sugar Institute was established in December 1927.
*Sources:* Prices of refined (standard granulated) and raw (96 centrifugal) and output are taken from the weekly reports of *Willett and Gray's Weekly Statistical Sugar Trade Journal*. The shares of domestic beet-sugar production and imported refined sugar are taken from the January issues of *Willett and Gray's Weekly Statistical Sugar Trade Journal*.

The decline is undoubtedly due to the Great Depression, although it is much less than the 24-percent fall in total industrial output. The relative stability of sugar production is consistent with Christina D. Romer's (1990) finding that the onset of the Great Depression was associated with much sharper cutbacks in purchases of durables than of nondurables. It is also due to low prices for raw sugar, itself a consequence of rising subsidies in producer nations and the 1934 reduction in the tariff on Cuban raw sugars (Bill Albert and Adrian Graves, 1988 p. 9).

As one would expect, rivals outside of the collusive agreement responded to the price increase by increasing their own output. Column (8) shows an increase in imports of refined sugar, which originated almost entirely in Cuba. Coca-Cola, the largest purchaser of refined sugar, was among those firms that shifted entirely to foreign suppliers.[10] Previously a negli-

---

[10] James Fly to O'Brien, February 26, 1932, *United States v. Sugar Institute,* DOJ Correspondence, Case File

gible flow of less than half a percent of total U.S. consumption, foreign refined sugar increased to 6 percent in the first year of the Sugar Institute and continued to increase until it reached almost 15 percent in 1933, after which it was reduced by legislative fiat in the Sugar Act of 1934 to 11 percent. The share of beet sugar production [column (7)], whose producers lay outside of the Sugar Institute as well, also rose—from an average share of 15.4 percent in the four years before the Sugar Institute, to an average of 17.7 percent in the first four years of the Institute before the Sugar Act, although the year-to-year variability here is such that one can not clearly attribute the rise to the Institute's formation.

Prices, profit margins, and the like are all measures of market power. They tell us the degree to which collusion is successful. They say nothing about how it is achieved. For that, we must consider the actual mechanism of collusion—that is, the Sugar Institute—its rules, its meetings, and the means by which it ensured compliance with those rules.

## II. Collusion by Rules

The Sugar Institute system combined implicit collusion on price with explicit collusion on business practices. The latter complemented the former—the ultimate goal—by making price cuts more transparent. In this section, we outline the agreement on business practices. In the next three sections, we explore how, through communication, explicit collusion sustained the agreement.

Rule number one of the Sugar Institute was the requirement of "open prices and publicly announced terms," and so nondiscriminatory pricing. The attendant provisions that prices be posted on the refiners' bulletin boards, that the Institute be notified of all changes both in price and methods of pricing, and that price changes be announced no later than 3:00 p.m. merely continued existing industry practice.

No. 60–104–13. Foreign refiners attributed their increased exports to the higher U.S. margins brought by the Sugar Institute (Walter L. Rice to James Fly, May 16, 1932, *United States v. Sugar Institute*, DOJ Correspondence, Case File No. 60–104–13).

The remaining rules primarily consisted of restrictions on contractual practices between the refiners and downstream firms—brokers, wholesalers, and retailers—and among downstream firms themselves. The breadth and detail of the restrictions were remarkable. For example, the Institute disallowed quantity discounts, allowances for the return of sugar bags, long-term contracts, and certain types of credit arrangements. It required refiners to report it all sales of damaged sugar. It drew up a list of permissible consignment points (cities where refiners stored sugar on their own account). The Institute went so far as to forbid certain downstream activities, namely brokerage and storage, being combined within the same firm! Enforcement of this last rule engaged the Institute in private investigation and auditing.

The stated aim of these rules was to eliminate discriminatory pricing. This claim was repeated as part of the refiners' legal defense, but why it would have been in their interest to do so was never explained. The defendants noted that this ensured compliance with the Clayton Act's prohibition on price discrimination, but were silent on why compliance required collective action.

To the economist, the Institute's rules smack of *facilitating practices*. Collusive agreements are constantly in danger of being undermined by secret price cuts. Since a collusive agreement results in a price above any firm's individually optimal price, participant firms have an individual incentive to undercut this price slightly and receive a larger share of industry demand and profits. A firm that cheats will want to undercut secretly in order to avoid retaliation from other producers. Anything that makes detection of a secret price cut more likely enhances collusion. At least if they are adhered to, the requirements of "open prices and publicly announced terms" clearly make cheating more evident. Complex, differentiated contractual terms may hide price cuts under other names, and so restrictions on contracting practices would serve a similar role to the open-pricing requirement. Thus, the Sugar Institute was primarily a mechanism to increase the probability of detection of secret price cuts, thereby facilitating collusion.

The refiners worked to enhance detection and not reduce reaction time, because the industry's

long standing "moves" system, in effect even before the establishment of the Sugar Institute, already made the effective reaction lag nearly zero. Under this system, announced price decreases took effect immediately, while price increases took effect only after a day had passed. That gave buyers, who purchased a month's worth of sugar at a time, the incentive to refrain from purchasing immediately after a price decrease until other, perhaps preferred, firms matched it (which they always did) and perhaps to benefit from a further fall in price. In practice, firms' reactions often came in minutes, and a day proved long enough for all reactions to be registered and for the price to settle. So price competition preceded trade. Thus by decreasing its publicly announced price a firm could not hope to "steal the market." Only secret discounts could steal customers away from other firms.

The Sugar Institute rules were so wide ranging and detailed, because virtually every contractual term could mask a price cut. We consider five of these rules.

*Water-Damaged or Frozen Sugar.*—It seems reasonable that such sugar sell at a discount. But a refiner could ship undamaged sugar to a favored customer, invoice it for damaged sugar, and claim, if questioned later, that the sugar was damaged. So for each such sale, the rules required "full details of amount, location, reason and price to be circulated by the Institute."[11]

*Favorable Credit Terms.*—Likewise, favorable credit terms secretly extended to buyers could substitute for a price cut. A long-standing industry practice granted a 2-percent discount for cash payment. But refiners would vary the length of the grace period necessary to qualify for the discount. The Institute forbade this.

*Storage Rates.*—Prior to the Institute's ban, many brokers also operated warehouses that stored sugar for customers. Acting on behalf of a refiner with whom they had a long-term relationship, the broker could substitute a discount on the storage payment for a cut in the price of refined sugar itself. The refiner would then compensate the broker by routing an unintermediated purchase offer through the broker, for example.[12]

*Delivery Time (Contract Enforcement).*—Customers did not have to take delivery immediately, but could spread out deliveries against a contract over 30 or more days. Allowing favored buyers to take delivery beyond the contracted date not only saved them storage and interest payments, it also constituted a preferred price if the basis price rose in the meanwhile. So the Institute insisted that delivery dates be enforced.

*Freight rates.*—This was yet another way of giving a price cut, although only on rates not regulated by the Interstate Commerce Commission (ICC). For that reason, the Sugar Institute discouraged use of private water charters by requiring every such shipment to be registered. It also asked the charters to quote uniform rates for all customers, and even demanded a written commitment from shippers not to rebate freight to customers.[13] When the lower water rates proved too tempting to both refiners and their brokers, the refiners moved to delivered pricing, as described in Section III.

Colluding in this manner was not costless. By adopting these restrictions, the firms forwent additional profits from the differential treatment of customers.[14] These lost profits, which a monopolist would have earned, derived not only from price discrimination, but also efficiencies of various kinds, especially in shipping. When large buyers in Buffalo

---

[11] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, January 17, 1930.

[12] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, August 2, 1929.

[13] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, April 4, 1929; April 11, 1929; February 20, 1930; February 27, 1930. For similar reasons, trucking posed continual problems for the Institute.

[14] In his ruling, the District Court Judge stated the matter succinctly: "The refiners preferred to have all sugar sold in any given trade areas at precisely the same prices and terms rather than to effect economies in its sale and distribution." Andrew R. Dick (1996) notes that in colluding via a common sale agency, some U.S. export cartels must forego marketing specialized to the needs of individual firms' products.

asked to receive delivery by water barge (technically more convenient for the buyers), even if charged at the much higher railroad rate, the Institute refused for fear of creating the opportunity for granting discounts.[15] On a larger scale, the move to delivered pricing led to refiners replacing brokers in the transportation of sugar by water barge.[16] Presumably, the original integration configuration was the more efficient one. The refiners also ran the risk of backward integration by their large customers thus denied quantity discounts, as A&P threatened to do.[17]

The prohibition of long-term contracts, and tolling contracts, where the buyer financed the raw-sugar purchase, clearly also meant lost efficiencies.[18] The requirement that all purchased sugar be delivered within 30 days led to a secondary market, where "secondhand sugar," offered by customers who had overbought, sold at a discount ranging between 5 and 20 cents. Any transaction costs in buying and selling would make that development a social loss.

Placé, in particular, was prepared to forgo certain efficiencies from the allocation of production according to cost. He so feared different prices, that he did not want local differences in loading or shipping costs to lead to differential rates. "Those enjoying more economical loading conditions can pocket the profits," he wrote in a letter to the Institute.[19]

Coordinated action via a trade association was not obviously illegal. Indeed, there were numerous "open price" associations at the time,[20] many inspired by Arthur Jerome Eddy's (1912) book *The New Competition* and promoted by the Federal Trade Commission. But a series of Supreme Court decisions in the early 1920's had left the legal status of trade association activities unclear. Also, the Sugar Institute's activities were clearly on the edge of the permissible.[21] Indeed, its members were extremely conscious of the legal consequences of their deliberations.[22] They had the initial Code of Ethics vetted by the Department of Justice, which nonetheless later prosecuted the refiners, obtaining a 1936 Supreme Court decision outlawing most of the Institute's practices.

### A. *An Alternative Hypothesis: Quality Suppression*

There is an alternative, yet still collusive, explanation for the contractual restrictions.

---

[15] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, June 13, 1929.

[16] Between 1928 and 1931, barge shipments by refiners increased by 400 percent, while those by customers fell by two-thirds. *"Denies Sugar Group Enforcement Rule,"* Journal of Commerce, May 6, 1932, clipping in *United States v. Sugar Institute*, DOJ Correspondence, Case File 60–104–13, Box 422.

[17] *United States v. Sugar Institute*, DOJ Correspondence, Case File 60–104–13, Box 421, Lamb memo to Colonel Donovan, June 15, 1928 p. 1. Michael L. Katz (1987) shows how price discrimination can deter backward integration by large downstream buyers (indeed chain stores in his example). The successful backward integration of Arbuckle Brothers from sugar packaging to refining in 1898 after American refused it a quantity discount would have lent some credibility to A&P's threat (Genesove and Mullin, 1997).

[18] DOJ Correspondence (Box 422), *United States v. Sugar Institute*, Case File 60–104–13, July 11, 1931 interview with Edgar.

[19] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, April 3, 4, 1929.

[20] There were 150 such associations in 1921 (Federal Trade Commission Survey, cited by Simon Whitney, 1935 p. 40). Ironically, over 400 open-price associations were operating under the National Recovery Administration at the time of the Supreme Court decision (F. M. Scherer and David Ross, p. 348).

[21] See *American Column and Lumber Co. et al. v. United States*, 257 U.S. 377 (1921); *United States v. American Linseed Oil et al.*, 262 U.S. 371 (1923); *Cement Manufacturers' Protective Association et al. v. United States*, 268 U.S. 588 (1925); *Maple Flooring Manufacturers' Association et al. v. United States*, 268 U.S. 563 (1925).

[22] American, the largest firm, was particularly wary of any discussions of prices. Upon the reading of a broker's letter complaining about nonuniformity in the previous week's price announcement, its representative complained that "such a letter should never have been read at a meeting of the Institute and should never have been placed on the agenda." (W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, December 19, 1929). See also W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, July 18, 1929 and March 13, 1930. The initial Department of Justice report on the Institute noted that "If we may deduce anything from the invitation issued by the Institute to the Department of Justice to send a representative to attend its meetings, no discussion of price takes place at them" (DOJ Correspondence, *United States v. Sugar Institute*, Case File 60–104–13, Box 421, Contents of Bundle, December 1, 1928 p. 20). The refiners did discuss fixing brokerage rates (W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, December 12, 1929; January 30, 1930).

Many of these rules can be understood as limitations on either quality or within-firm variety, for contractual harmonization typically involved choosing the lower "quality" level. The grace period for payment was set at 7 days, and not at 14 days, the number of consignment points were cut by half,[23] etc. In this interpretation, the rules were meant to shut down nonprice competition and so were directly collusive, instead of merely facilitating collusion.

There was undoubtedly some suppression of nonprice competition involved, but at best this explanation is incomplete. First, it fails to account for many of the rules. These include the prohibition on quantity discounts, the refusal to deal with warehouse-affiliated brokers or shippers that did not openly announce their rates, as well as other transportation policies. The rules on prior notification discussed in Section IV are particularly difficult to interpret in this manner. Second, the number of different sugar grades itself was not restricted. This was so even though the proliferation of grades was costly to the smaller refineries through lost economies of scale in packaging.[24] Third, and most persuasively, the alternative argument does not capture the intermediate goal of eliminating discriminatory pricing. The Institute's Code of Ethics has as its first principle that "all discrimination between customers should be abolished." This goal is a central theme not only throughout the published Code but also in the notes on the private meetings.

Nonetheless, we do not reject this argument completely. Rather, we view the suppression of nonprice competition as complementary to contractual harmonization. Both quality and variety are often overprovided from the industry's point of view. If one is already choosing, and enforcing, one single contractual standard among many, one might as well limit nonprice competition along the way.

### III. Incomplete Collusive Agreements

*"Although [oligopoly] is often thought of as a market-structure problem, it becomes a contracting problem when it is phrased in terms of the comparative efficacy of cartel agreements"* (Oliver E. Williamson, 1996 p. 8).

The unavoidable conclusion from reading the Placé memoranda is that the initial agreement was *incomplete,* in the sense used in the theory of the firm. Collusive agreements are incomplete for the usual reason that it is impossible to anticipate, enumerate and work through all contingencies. Indeed, the need to "fill in gaps" in the initial agreement was explicitly recognized by the refiners in writing to the Court that the Code of Ethics was not and "could not be, self-operative. ... [I]t required interpretation and administration and consultation and the collection of information, [which] the Institute was set up to provide."[25]

The weekly meetings allowed the refiners to "complete the contract" in several different ways. Least important was the opportunity to adapt to changing external circumstances, for the technology and demand of refined sugar barely changed over the period of the Institute. Aside from the rare mention of a new demand substitute, such as liquid sugar, or a small-scale innovation like bagging refined sugar in paper-lined raw-sugar bags, such issues do not arise in the Placé memoranda.[26]

The meetings also allowed the refiners to perfect the agreement under unchanging external conditions. This included addressing minor questions left unclear by the Code and subsequent amendments. Can damaged sugar be sold under a price guarantee? No. Is it "permissible to store in the warehouse of a broker who does not handle sugar?" Yes. May one entertain a broker? Yes. Do 30-day contracts end on the 30th day after the start of the contract, or on the

---

[23] Whitney, December 1, 1928. *United States v. Sugar Institute,* DOJ Correspondence, Case File 60–104–13.

[24] This is evident from a series of letters between Placé, who was in charge of marketing, and the production manager, e.g., letter from Kavanagh to Placé, July 24, 1930, *W. J. McCahan Sugar Refining and Molasses Company,* Correspondence—Costs and Melts, Record Group IV—S. G. 3, Series 151, Box 1. The Institute's Standardization Committee concerned itself only with defining a few of the widely available commercial grades, and monitoring the refiners' accurate labeling of their own sugars for sale (a logical complement to the "open-prices" rule). It was not particularly successful.

[25] Answer of the Defendants, *United States of America, Petitioner, v. The Sugar Institute, et al., Defendants,* in the District Court of the United States for the Southern District of New York, Filed August 1, 1931 p. 59.

[26] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, February 25, 1929; February 13, 1930.

same day of the next month? The former. Are contracts to be considered filled by telephone or telegraphic order, or only if invoiced? The latter.[27]

More importantly, certain rules were found to be unworkable, and had to be modified. The original Institute policy required refiners to charge the ICC-regulated all-rail rate, regardless of the actual transportation mode used. Removing the discretion from refiners to set their own tariffs meant that refiners' greater market power in their hinterlands were leveraged to more competitive markets, such as the Great Lakes, where all refiners marketed their sugars.[28] However, the availability of cheaper, albeit slower, water, or combined rail and water, routes offered too great an arbitrage opportunity to others. So the rules were changed to permit differential rates under a limited set of circumstances, for "inconsiderable" quantities. This new regime proved unworkable, in part because refiners themselves were tempted by these routes, which facilitated secret price concessions both on and off the routes. So the refiners switched to a system of delivered prices coupled with a refusal to sell f.o.b. refinery. This move to delivered pricing, delayed for over a year out of fear of the antitrust authorities, was *ostensibly* accomplished by the independent actions of the refiners, given the dubious legality of the Institute taking such a step. But the Placé memos show the move to be a coordinated act that required several meetings over a single week, in which suitable rates were discussed and a leader emerged among the firms.[29]

Perhaps the most important adaptation function lay in closing unintended loopholes. The Institute was constantly regulating some new practice, as the elimination of one method of secret price concession would give rise to a new, albeit less effective, one—much in the same way as taxpayers' or firms' response to tax or government regulations will give rise to new rules. Thus initially, only storage in a warehouse owned by a customer was prohibited. But as Institute regulations foreclosed that and other avenues for giving secret concessions, refiners began storing in broker-affiliated warehouses, and the rule had to be changed to prohibit storage there as well.

These decisions were formalized by issuing a series of Code Interpretations, which possessed a quasi-judicial character, an analogy not lost on Institute members. When C&H questioned the legality of enforcing adherence to the Interpretations, since only the Code itself had been approved by the Department of Justice, the Institute counsel deemed the former "absolutely indispensable. Even national laws must be 'interpreted' by the Courts because it is impossible to foresee, at the time of writing the law, all the circumstances to which it will apply. In the same way the Code must be interpreted in the light of particular circumstances."[30]

Legal imagery permeates the Placé memoranda. The participants spoke of evidence, as we shall see, and precedent. A decision on rates to cities served by the New York Canal was later taken as applicable, "[o]n the same principle," to rates throughout the Great Lakes region.[31] Inquiries about the operation of a public warehouse for sugar were deemed "covered by the decision in the Bridgeman Russell case."[32]

Given the centrality of rules in this collusive mechanism, one should perhaps not be surprised by the imagery. But the legality also had real effects. Legal principles help "complete the contract" by extending one decision to cover many subsequent incidents, as well as minimizing disputes. They also allow participants to anticipate others' response. One might also argue that the legal approach delayed, and perhaps restricted, retaliation against violations of the agreement, as we shall see.

---

[27] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, February 28, 1929; September 19, 1929; September 26, 1929; January 17, 1930; September 25, 1930.

[28] Dennis Carlton (1983) and Jacques-François Thisse and Xavier Vives (1988) show that while spatial price discrimination is a dominant strategy for a duopolist, the firms are better off when prior agreement forbids it.

[29] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, Several Meetings in April 1929.

[30] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, July 24, 1930.

[31] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, April 4, 1929.

[32] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, July 19, 1929 and February 20, 1930. In his study of nineteenth-century railroad pools, T. S. Ulen (1979 p. 82) found parallels in their institutions to an executive, legislature, and judiciary, though he makes no mention of legal imagery in their discussions.

## IV. Prior Notification

Prior notification of impending actions was an integral part of the Sugar Institute mechanism. Institute rules required a firm to notify other members before selling damaged sugar, introducing new private brands, and changing any terms of trade. While in practice the reports on damaged-sugar sales took place shortly afterwards,[33] the rule on private brands—sugar marketed through a grocery chain with the latter's label, often at a discount—was clearly followed.[34]

We see numerous examples of notification of future changes in shipping tariffs or policies more generally in the Placé memos. For example, when Revere, a Boston refiner, considered reducing its rail shipment rates from the rail rate to the water rate, it first told the Institute. Arbuckle preceded its public announcement of its decrease in freight rates by a private announcement to Institute members. And C&H informed the Institute of its probable intention to spread the price guarantee to other states.[35]

But notification was used even when it was not explicitly required by the agreement. Arbuckle Brothers anticipated (preempted?) opposition by announcing that some grocers had advertised its brand and that it wanted "to go on record as stating that such ads are at the expense of the grocers."[36]

Prior notification served two purposes. First, it was an attempt to eliminate the *retaliatory lag* in the nonprice domain. As such, it was complementary to the rule of "open announcement" of prices and other terms of trade to buyers, which was directed at shortening the *detection lag*. It is well known theoretically that full collusion is possible when firms can respond to others' deviations before consumers act,[37] and the combination of frequent meetings and prior notification allowed firms to do so.

The notification rule operated on the higher level of a two-level agreement. At the lower level was a precise agreement comprised of codes, amendments, and resolutions that detailed permissible actions, such as described in Section II. At the higher level was an understanding of adherence to these lower-level rules. This meta-understanding permitted refiners to remove themselves from the lower-level rules. But they were expected to notify the other members of their intention to do so beforehand.

Of course, notification must be timely to be effective. In its brief to the Supreme Court, the Department of Justice cited an Institute rule that notification be given at least 15 days before taking any action that violated a Board of Directors' decision. However, we have no independent verification of that claim.

Notification can also be in the individual interest of a firm. Consider an action which is privately profitable once other firms have responded to it, but which will take market share away from other firms if unanticipated by them. Taking market share away from rivals risks retaliation. In the price domain, for example, a decrease from *above* the monopoly price, if anticipated and matched, will leave the price cutter (and its rival) better off than before; but if unanticipated and thus unmatched, the decrease will give the initiating firm the whole of the market, and though temporarily more profitable, thus risk a retaliatory price war.[38]

The Placé memos contain an explicit recognition of this function. The Godchaux representative

---

[33] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, February 20, 1930 p. 6.

[34] For example, Federal announced to its fellow refiners that it might consider packing "private brands" but would take no action without notifying the Institute. Later, Imperial objected to the large number of private brands offered by Texas City, and threatened to "meet the competition." Three months after this threat, Imperial announced to the Institute that it would indeed pack private brands, at which time Texas City complained that it had discontinued two of its private brands. (W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, August 2, 1929; February 13, 1930; May 15, 1930).

[35] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, March 8, 1929; March 31, 1929.

[36] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, August 15, 1929; March 27, 1930.

[37] See, e.g., V. Bashkar (1989).

[38] Notification is desirable even when the rival firms are left worse off after they match the price cutter, as when a low-cost firm undercuts an initial price that is equal to a high-cost firm's monopoly price (Robert H. Gertner, 1994). Also, compare Margaret E. Slade (1992), in which price wars are seen as transitions to the new equilibrium when privately observable costs change.

praised the attitude of Savannah who, when faced with the necessity of changing their method of doing business in order to meet competition last Fall, did *not* rush through an announcement [to the public]. Instead, they waited for a Board meeting at which they explained conditions as they found them and discussed with other refiners the necessity for action on their part. Their subsequent announcements, because understood, did not cause any upheavals. Other refiners recently have not followed this policy with the result that, when revolutionary announcements are made, retaliatory announcement are made by other refiners thereby plunging the industry into deplorable and expensive practices.[39]

As we shall see, notification also preceded retaliatory action. Deferring action until notification was possible carried a cost of retaliatory delay, at the benefit of reduced misunderstandings. Notice that all the cases considered here concern an easing of the terms of trade. In the usual example of notification—the *Ethyl* case[40]—prior announcement was made of an intended toughening of sale conditions: a nominal price increase in an inflationary environment. That gave firms an opportunity to see if other firms would follow them, or not. In that case, notification served as a coordinating mechanism for an action that, when taken by all firms, would benefit them, but if taken by one firm alone, would harm it.

## V. *Ex Post* Determination

The Sugar Institute meetings also provided a forum for accusation and rebuttal. For example, in March of 1929, American charged Federal with secretly cutting prices by loading barges without charge. American argued that

[F.O.B.] meant that the sugar must be placed within reach of the tackle of either the ship or the barge. Several people testified...that this had been the interpretation in the past and that all loading and unloading charges had always been construed as being for account of the vessel. [Federal] took the position that F.O.B. means literally "free on board" and the condition visualized by [American] could be correctly described as "F.A.S." meaning free alongside."[41]

Reading this, one is led to ask why the firms bother arguing at all. If one firm thinks that the other has cheated, why not just retaliate? Why the need to prove the point?

There are two reasons to first investigate. First, there may have been no intention to break the agreement. Perhaps Federal did not mean to capture additional market share by loading the barges, and thought that other firms were acting as it did. As in the Green and Porter model (1984), the evidence for *cheating* is never unambiguous, although here it is a misunderstanding—an "honest mistake" by rivals concerning the nature of the "agreement" (David M. Kreps, 1990 p. 529)—not a drop in industry demand, that confounds. A similar difference of opinion arose about the deadline for payment of sugar shipped by barge from New Orleans.[42]

Other times, the confounding factor was indeed a change in external factors. Thus, the failure to force delivery on customers at the end of 30 days was variously determined to be due not to cheating, but to the difficulty of obtaining barges, vacuum pans, and other unforeseen events. The accusation could be factually wrong: a concession on one barrel of caked sugar was wrongly reported as a concession on a much larger amount of powdered sugar by a Sugar Institute investigator.[43] Or a firm employee or direct broker may simply have made an error in invoicing or shipping.[44]

Unlike in Green and Porter (1984), there is a mechanism here—the Sugar Institute's meetings—by which firms can first judge whether cheating has in fact occurred before taking action. The Sugar Institute served as a court in which an accused firm might prove its innocence, in some cases on factual, in others on logical, grounds. In doing so, the Institute

---

[39] *W. J. McCahan Sugar Refining and Molasses Company*, Memoranda and Notes of Meetings, March 13, 1930 p. 3.

[40] *E. I. DuPont de Nemours Co. et al. vs. FTC* (1984).

[41] *W. J. McCahan Sugar Refining and Molasses Company*, Memoranda and Notes of Meetings, March 14, 1929.

[42] *W. J. McCahan Sugar Refining and Molasses Company*, Memoranda and Notes of Meetings, March 13, 1930. Placé notes to his readers that he "recognized the truth of Mr. Moog's reasoning."

[43] *W. J. McCahan Sugar Refining and Molasses Company*, Memoranda and Notes of Meetings, January 30, 1930.

[44] *W. J. McCahan Sugar Refining and Molasses Company*, Memoranda and Notes of Meetings, September 26, 1929; January 27, 1930; May 29, 1930.

raised the signal-to-noise ratio of indicators of cheating, to use a more prosaic metaphor.

A second reason not to retaliate immediately is the need to first garner support among the other firms. If the accusing firm acts alone, it may stand accused of cheating itself, and be subject to retaliation. Such was the case for Godchaux in retaliating against Savannah, as described in Section VI.

As a result, accusing firms could not rely on their own beliefs alone, but required evidence. Evidence had to be not only observable, but legally verifiable as well—to use the language of contract theory. Placé informs his readers (fellow McCahan executives) of an accusation that Godchaux was selling sugars to Edgar. This was a violation of Institute regulations because Edgar—a large, prominent, and aggressive Detroit brokerage firm—was engaged in storage as well. An invoice uncovered by an Institute investigator that appeared to document a sale was offered as evidence. Placé examined the invoice after the meeting.

> I am afraid that [the investigators] are off on the wrong track....[T]his invoice is merely part of Godchaux's bookkeeping method...I do not doubt that the 20 cars are eventually to be merchandised by Edgar but...[Godchaux] is too clever to commit a faux pas such as [the investigator] thought he had uncovered.[45]

With the invoice no longer probative, all the refiners were notified of the "the error which apparently had been made."[46]

### VI. Cheating and Retaliation

In the theory of implicit collusion, the response to a deviation is

> simple in the extreme. A deviation by player $i$ is always treated the same way regardless of the nature of the deviation, the period in which it occurred, the particular path in progress, or the point on the path at which the defection occurred. There is no need to "tailor the punishment to fit the crime" (David G. Pearce, 1992 p. 140).[47]

What we observe is quite different. Firms did cheat. A Detroit chain store received a secret price concession when it switched from National to Spreckels. Spreckels overpaid truckers who then worked a few hours "free" for certain customers. Arbuckle knowingly sold to a dummy corporation that fronted for Edgar.[48] All this was done secretly, then uncovered by the Institute.

Cheating was particularly bad in the South. Godchaux broke Institute regulations twice over in accepting a contract with a price guarantee for delivery by water barge, whose movements it agreed not to trace. Texas City accepted a 42-day contract—an offense serious enough that the owner offered to fire his top three executives over it. That same refiner later absorbed storage charges through a dummy corporation. Colonial offered a 6-cent rebate to large buyers. And in Tampa, postdated checks were used to give credit.[49]

Yet, outside of the South, neither in prices nor in rules were these individual violations met by reversion to competitive conditions à la Green and Porter (1984), let alone subcompetitive conditions, à la Dilip Abreu et al. (1986). This is especially noteworthy as the industry did experience subcompetitive prices

---

[45] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, March 20, 1930.

[46] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, March 27, 1930.

[47] Pearce is referring to public-information models only. But Susan Athey et al. (2000) show that in a private-information model, all "off-schedule" deviations are also treated the same.

[48] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, May 16, 1929; March 13, 1930. The Arbuckle representative volunteered the information to prove a point. Upon hearing it, one of the National representatives "jumped to his feet and in an excited tone of voice asked the Institute to elect another chairman as he refuses to be a member of an organization whose members brazenly admit the violation of its regulations. I caught an exchange of glances between [him and the other National representative] and the former immediately calmed down. It was evident that the National had [done the same]."

[49] W. J. McCahan Sugar Refining and Molasses Company, Memoranda and Notes of Meetings, August 22, 1929; October 3, 1929; December 19, 1929; February 14, 1930; March 27, 1930.