# Exhibit 254

## (part 2)

## (Stein Decl.)

a generation earlier (Genesove and Mullin, 1997). Rather, deviations were either *ignored* or *matched*.

Typically, when a specific incident of cheating was uncovered, fault was determined, and the refiner confessed or attempted to justify it[50]—or more likely, blamed the broker[51]—and then halted the practice. There the matter would end. One can conjecture that one refiner's cheating would encourage another's, but by the nature of such a process it is impossible to connect one incident to a particular predecessor.

Where the cheating continued over a longer period, or there was an open violation of the agreement, the response was typically to match the practice. This is most evident in transportation pricing. When one firm openly lowered its rate for rail shipments to the lower water-barge rate, other firms would respond by lowering their rail rates to the same level.[52] When the Pacific refiners gave a freight allowance on certain contracts, American announced that it would match it.[53] The punishment was indeed "tailored to fit the crime."

Matching was not only in degree but also in kind. In responding to a violation, rival firms have at their discretion not only the extent of retaliation, but the instrument as well. For example, in response to the invoicing of a rail shipment at the lower barge rate, in contradiction to the Institute rules, retaliation need not be restricted to transportation pricing, but in principle could include payment length, consignment policy, sugar grades, and even price. Indeed, just as B. Douglas Bernheim and Michael D. Whinston (1990) have shown that, where there is multimarket conduct, collusion can be enhanced when punishment encompasses all markets, so one would expect that collusion would be enhanced by punishing a deviator with all possible instruments at hand.

It is surprising, then, to observe that the response to a deviation was generally restricted to the instrument of violation. When, for example, Southern refiners failed to prevent the diversion of shipments from states in which price was guaranteed during shipment to where it was not, C&H introduced a guarantee for Texan shipments and threatened to extend it to other Western states.[54] Likewise, when McCahan concluded that some refiners were not uniformly enforcing the contract time limits, Placé first threatened not to enforce McCahan's terms either[55] and then, with others, carried out his threat. Likewise, Arbuckle Brothers threatened to "meet secret competition by openly accepting contracts for delivery...over an indefinite delayed period."[56] After several price moves over a period of months resulted in mixed success in contract enforcement, the Institute proposed that each refiner inform the trade that henceforth any sugar remaining on a contract would be shipped to customers in bulk bags on the contract's expiration date. Savannah, although agreeing to send out the letter, refused to enforce it, on the grounds that Hershey had in the past done the same. Colonial then conditioned its enforcement on that of Savannah and C&H.[57] In yet another case, when Arbuckle Brothers temporarily stopped adhering to the Institute's sugar standards, National and Penn stopped as well.[58]

This restricted pattern of retaliation is also present in the enforcement of the separation of brokerage and storage activities downstream. Arbuckle Brothers threatened that if there were any further shipments to brokers who doubled as warehouse operators, then it would begin supplying Edgar again.[59]

Matching was actually institutionalized in the enforcement of the 30-day delivery rule, which

[50] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, May 27, 1930.

[51] E.g., *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, August 29, 1929; September 26, 1929; December 19, 1929.

[52] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, March 28, 1929.

[53] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, May 22, 1930.

[54] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, March 8, 1929.

[55] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, letter filed with the memoranda, February 15, 1929.

[56] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, June 15, 1929.

[57] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, August 1, 1929.

[58] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, February 8, 1929.

[59] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, May 9, 1929.

firms continually broke by granting extensions on the grounds of production schedules and transport availability. To deal with this problem, the Institute required refiners to report their quantity of undelivered contracts for each price move.[60] These weekly reports were circulated to all members and discussed at a dedicated weekly meeting. A large balance of undelivered contracts revealed a firm as unlikely to meet the contract due date, either because of capacity constraints in production or transportation, or because the high balances signaled an unwillingness to pressure customers to take delivery. Other refiners could then match by adjusting, or threatening to adjust, their own contract enforcement. This matching was eventually further institutionalized by a short-lived understanding "that all refiners will be free to spread their own deliveries over the same number of days as the most delayed refiner will require," which agreement was "*not* to be announced to the trade."[61]

These reports both sped up retaliatory matching and made it more routine. In their absence, a firm would not know precisely how well others were forcing delivery until after the due date had passed. Retaliation could only then be through refusal to enforce future contracts, or, like C&H before joining the Institute, on other contractual terms.[62] The reports permitted quick, nearly contemporaneous responses, precisely tailored to the violation.

Where retaliation did take the form of a reversion, or threatened reversion, to competitive conditions or worse, it was only in response to large-scale cheating in several dimensions. This only occurred in the South, which was the periphery of the market. As early as June 1929, an Institute investigator reported the Code of Ethics as "dead in the water" in Texas. Compartmentalization broke down there. C&H would not discuss any single issue, but insisted that given the conditions, it would only discuss all of them together.[63] Arguing that Texan refiners "have been guilty of many different violations of the Code," C&H threatened to "request the entire suspension of the Code of Ethics in the Texas territory so that all refiners may be in position to fight fire with fire."[64]

Elsewhere in the South, Savannah was dissuaded from resigning from the Institute, so that it might deal with the "unethical" competition from the Cuban-refiner Hershey, by a resolution which authorized members "to 'meet the competition of Hershey,' provided that the specific competitor and the exact territorial limits are announced to the Institute."[65] Thus, the Institute agreed to suspend the collusive agreement, so long as prior notification was given.[66]

The last example illustrates again how Institute membership stymied firms from immediately responding to competition. Retaliation was to be at the discretion of the Institute as a whole only. When in November 1929, Godchaux withdrew its authorization for the Institute to audit its stocks until Colonial ceased from storing its sugar in buyer-affiliated warehouses, and withholding contract enforcement and other statistics,[67] the other refiners disapproved. According to them, Godchaux was "taking a very arbitrary position. Irrespective of Colonial's activities, Godchaux has no right to *secretly* indulge in unethical practices themselves....If Godchaux desires to meet Colonial competition it must be done openly, as Savannah did in Southeastern territory."[68]

[60] The willingness of refiners to supply these figures is striking given the failure to collect actual sales figures from members, as described in Genesove and Mullin (1999).

[61] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, November 17, 1929.

[62] See Section VII.

[63] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, July 18, 1929.

[64] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, November 21, 1929 p. 1.

[65] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings. The date is unclear in the original, but is probably July or August, 1929.

[66] Hershey was not a member of the Institute, but, like the beet-sugar association and C&H before joining, had adhered to some of the Institute's regulations and its requests for market statistics.

[67] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, August 22, 1929; September 19, 1929; October 3, 1929.

[68] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, Executive Committee, November 7, 1929.

Our comments in this and the previous section paint a very different picture of the response to a deviation than that imagined in the formal theory. Instead of meeting a single deviation with immediate massive retaliation, there may be an attempt to determine if it was indeed a conscious effort to break the agreement, or rather a misunderstanding, or the product of external factors. Threats may also precede any retaliation, in part to ensure it is not misconstrued as a deviation, in part to allow the deviator to back down. Retaliation when, and if, it comes is limited to the kind of violation, and is typically to match it.

Thus the refiners had chosen the opposite end of the trade-off between Type I and Type II errors to that of the Green and Porter (1984) equilibrium. There, firms accept that they will punish when cheating does not occur in order that cheating never occur; here, firms accept some cheating so as not to punish inappropriately. Collusion was nonetheless (imperfectly) sustained, because wholesale cheating was retaliated against massively.

One reason to desist from full-scale retaliation stems from the vertical contractual arrangements in the industry. Issues of internal firm organization apparently dictated that the most efficient contract between a firm and its sales agents entailed brokerage, with brokers often dealing exclusively with specific refiners.[69] Brokers faced high-powered incentives, with a fixed percentage commission earned on every sale.

This system was at odds with the collusive agreement in two respects. First, an exclusive broker had an incentive to "steal" a customer from another firm through secret concessions. Of course, because refiners made a positive profit on every sale, this would benefit the refiner as well. But being one of many, instead of one of 15, a broker's incentive to deviate much exceeded a refiner's. Viewed from the refiners' perspective, brokers' cheating added noise to demand, and so provided an opportunity for firms to cheat by hiding behind their brokers, much like demand shocks in Green and Porter (1984). Collectively through the Institute, the refiners sought brokers' adherence to the agreement through blacklisting deviators (although refiners tended to protect their own), and instilling a culture of adherence to the codes.

Not only did the system make deviations more prevalent, it made punishment more costly. It is easy to see that continual transitions between a "collusive" phase and a "punishment" phase would be difficult to enact in such an environment. One cannot easily ask selling agents to one day adhere to one set of rules, the next to another, and the day after to return to the first set of rules, especially when the first set of rules stands in the way of their (individual) profit opportunities.

Apparently, the tension between the desire of selling agents to increase sales and the firm's desire to abide by the agreement was felt inside the firm (as legally defined) as well. Arguing that "the matter of contract enforcement cannot be left in the hands of the Sales Department," one firm announced that it had established "an entirely separate department to handle contract enforcement and enforcement will be accomplished without allowing the prejudices and desires of the Sales department to interfere."

Finally, we ask: Why matching? Matching in price (where sales are made before rivals can respond) will not deter undercutting, of course, but the method can be effective for deviations in discrete choices, such as for rules. Robert Axelrod's (1984) demonstration of the robustness of a matching, or "tit for tat" strategy in computer simulations of the prisoner's dilemma is well known.[70] Less well known is subsequent work showing the robustness of the "generous tit for tat" strategy (Axelrod, 1997 p. 36–37) in which a percentage of deviations are assumed to be "mistakes," and so are forgiven—as seems to have occurred here. An additional appeal of matching must have been that it was consistent with the ethic of nondiscrimination and symmetry that underlay the Code of Ethics.

Could what we have labeled as deviation followed by retaliation by matching be better thought of as a move to a new equilibrium, in

[69] American's attempt to sell directly to buyers without intermediaries from 1918–1922 was apparently a complete failure.

[70] Levenstein (1997) documents a tit for tat clause in the collusive agreement between Dow Chemical and Deutsche Bromkonvention.

which one firm leads, and the others follow in an optimal response, however grudgingly? There is some appeal to this interpretation, at least when the violation was done openly. But the larger point remains. We do not see the use of massive retaliation to protect the original equilibrium, which the Folk Theorems of implicit collusion would suggest could be sustained by such response, and would be, when collusion is less than perfect.

## VII. What Firms Did Not Do: Inference from Market Shares and Market Allocation

Since in the Green and Porter (1984) model and its offshoots cheating is inferred from an increase in a firm's market share, it is natural to ask, as some readers of earlier drafts of this paper have, whether refiners used such information to police the accord. Market-share information was available to them, although at somewhat low frequency (Genesove and Mullin, 1999), but was rarely used in that fashion. The one such inference in the Placé memoranda is the observation that Arbuckle had not been obtaining its "proper quota of business," apparently because brokers regarded it as "too strict" in enforcing contracts. The possibility that American's advertising is at fault instead is dismissed, since other refiners' sales had not fallen. Half a year later, the Arbuckle representative blamed its low share on its not being "as liberal in meeting competition as McCahan" had been. Placé retorted that the "premise" was wrong.[71]

In Green and Porter (1984), a fall in market share, whatever the reason, leads to a price war. In the Placé memoranda, the reason for the decline is crucial. In a rather dramatic incident, the president of C&H, not yet a member of the Institute, threatened to "break the price" *if,* upon returning to San Francisco, he were to discover that its sales had been low *because* of the failure of Eastern refiners to enforce the 30-day limit.

In Dilip Abreu et al. (1990), Drew Fudenberg et al. (1994), and Athey and Bagwell (2000), a firm that registers a decrease in market share is compensated with additional market share in future periods. There are a couple of discussions along these lines in the memoranda. Colonial having stated that "it will consider itself at liberty 'to meet the competition' as it meets it. ... The consensus of opinion was that Colonial ha[d] suffered such a large decrease in distribution that some means must be found to allow them to catch up."[72] Because at this point the memoranda become quite spotty in covering the meetings, we do not know why Colonial's sales had declined, and do not know whether "some means" was found and acted upon (we suspect not). Elsewhere, Placé hears that American is forbidding secondhand sugars from being transferred to Boston, presumably to stop Revere, the local Boston refiner, from dropping its price.

Note, however, that as we pointed out in Section II, there was no easy mechanism for reallocating market shares.

There are thus imperfect echoes of these models of collusion under imperfect public information in the memoranda, but they are rare. These four incidents are the only such ones in nearly a hundred meetings over the 18-month period. Market share is a noisy indicator of cheating; and with direct evidence available, the refiners evidently preferred to rely on that instead.

Throughout the course of the Institute's life there were calls for a stronger agreement that would go beyond rules to exercise control over production. Indeed, that was the members' initial purpose in organizing, before their counsel told them they could not do so. Nonetheless, twice American proposed a market-sharing scheme. In April 1929, it suggested a "formula" holding each refiner's output to its capacity under "Wartime 'control' plus 50 percent of any subsequent increase in capacity." The issue "was discussed at great length but no decision was arrived at." Then on August 29 of that year, having waited for the official meeting to adjourn, the American representative proposed a specific market share for each firm (with a de-

[71] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, September 29, 1929; February 20, 1930.

[72] *W. J. McCahan Sugar Refining and Molasses Company,* Memoranda and Notes of Meetings, September 26, 1930.

crease in every share except American's). For neither proposal was any enforcement mechanism offered, and, in fact, nothing came of either, so that almost a year later, one participant complained "that, in spite of all the pretty speeches which have been made on [self-regulation], there is no evidence of this principle being put into practice." He was answered that "unfortunately, the Institute's attorney does not allow discussion of this subject on a basis which could bring actual results."[73]

A couple of refiners called for consolidating the industry. The C&H president spoke of removing two or three refiners.[74] Spreckels called for "three, or at most four, companies control[ling] all the refineries of the country."[75] But there were no mergers or acquisitions during this period.

Calls for coordinated market withdrawals were left unfulfilled as well. C&H prepared a map "to show that, if the Western territory is not invaded by Atlantic Coast and Gulf refiners, Western producers would be able to distribute these products without coming south or east."[76] But the Eastern refiners were hardly prepared to cede the important market of Chicago. Placé demanded a "deliberate plan for the curtailment of the operation of the [then nonmember] C&H," and in response the Institute decided to ask the Hawaiian planters to sell a larger part of their raw sugar to the Eastern refiners, rather than C&H. But there is no further mention of this, and C&H's production was not cut back.[77]

These are the only discussions of stronger collusive schemes in Placé. The Sugar Institute was at the edge of allowable behavior, "pioneers" at the "frontier" as its counsel was to say on the eve of the trial, "beyond anything" the courts had approved, although not necessarily yet forbidden.[78] Through its communicative organs it could do much better than simply inferring cheating from public information. To collude more explicitly, would clearly have been illegal. To merge was impossible, given the government's 1910 antitrust suit against American. Unfortunately for the refiners, the Court would decide that their practices were also illegal, and push back the "frontier."

## VIII. Conclusion

We have emphasized the Sugar Institute's role as a mechanism for governance and a forum for communication among the refiners. However, it fulfilled two additional functions. The more important of the two was its role as a neutral party among the firms. That allowed the Institute to audit them. It also collected information while protecting its confidentiality, aggregating self-reported firm-level statistics into industry totals that were then reported back to the firms. Genesove and Mullin (1999) considers this role, and so we have not pursued it here.

There was an additional, strategic value to the embodiment of the collusive agreement in an institution outside of the individual firms. In their bargaining with brokers or buyers, the refiners sometimes used the Institute as a scapegoat. More formally, firms could commit to policies by having them formalized as Institute rules. However, this manoeuver was limited by the Institute's counsel's warning that such claims would paint the Institute as a consolidation and thus risk antitrust prosecution.

It is useful to compare what we have learned here about communication with a number of recent theoretical papers that have explored the issue.

We have stressed the adaptation value of frequent meetings. It could be argued that such flexibility would come at the cost of less credible punishment schemes, for frequent meetings might allow firms to renegotiate their way out of punishments. The theoretical literature on

[73] *W. J. McCahan Sugar Refining and Molasses Company*, Memoranda and Notes of Meetings, April 11, 1929; August 29, 1929; February 6, 1930.

[74] *W. J. McCahan Sugar Refining and Molasses Company*, Memoranda and Notes of Meetings, March 8, 1929.

[75] *W. J. McCahan Sugar Refining and Molasses Company*, Memoranda and Notes of Meetings, February 13, 1930.

[76] *W. J. McCahan Sugar Refining and Molasses Company*, Memoranda and Notes of Meetings, March 8, 1929.

[77] *W. J. McCahan Sugar Refining and Molasses Company*, Memoranda and Notes of Meetings, April 11, 1929.

[78] *W. J. McCahan Sugar Refining and Molasses Company*, Memoranda and Notes of Meetings, March 8, 1929; January 17, 1930.

renegotiation is inconclusive, although Barbara McCutcheon (1997) has argued that the ability of colluding firms to meet once an initial agreement has been reached would constrain the agreement. Certainly, that would help explain why retaliation seems so weak in this market.

However, we think that renegotiation was not a serious impediment to collusion. Clearly, the refiners did not see it as so. In choosing to have weekly meetings, the refiners obviously valued the adaptation function higher than any risk of renegotiation of punishment. The meetings continued at that frequency, or higher, at least until mid–1930, when the Placé memos end. No one ever suggested less frequent meetings.

Also, we see no evidence of renegotiation out of punishment. The threats we document are never retracted. Nor do we see firms bargain out of any punishment. Of course, the possibility that a punishment might be renegotiated might nonetheless determine the structure of the agreement; in theoretical terms, one can always construct a nonrenegotiated equilibrium from the path of any renegotiation-proof equilibrium. But, (a) we have already noted that in meeting so frequently the refiners must have been either unaware or unconcerned with the possibility of renegotiation, and (b) that theoretical conclusion presupposes an environment in which all contingencies are foreseen. This nonrenegotiated equilibrium is more properly seen as an artifact of the models, in the same sense that the models predict that there will be no cheating in equilibrium. McCutcheon herself acknowledges that her model lacks "incomplete contracting, imperfect monitoring, and meetings in equilibrium"—all features of the Sugar Institute.

In their recent paper on price collusion with private information, Athey et al. (2000) touch on certain issues that we have emphasized here. Thus they note that in the pursuit of a workable collusive agreement, firms will often choose to give up cost efficiencies. We stressed the same point in Section II, but it is important to understand the difference between our paper and theirs. The foregone efficiencies in their model are privately observed; whereas those we document here—delivering sugar by water rather than rail, for example—are publicly known, and so, as the authors themselves note in their conclusion, their collusive scheme could easily and profitably accommodate them. Thus a different explanation for the foregone efficiencies is required. We have offered the explanation that exploitation of these efficiencies would threaten the homogeneity of business practices that made pricing transparent.

In their conclusion, Athey et al. (2000) argue that their model could rationalize a hypothetical situation in which one firm openly lowers its price drastically and yet evokes no response. They cite an earlier draft of this paper as providing support, in the nonprice domain, for such occurrences. We think this is a mistaken application of their model, for the cheating we describe in Section VI are clearly "off-equilibrium." They are taken secretly, and typically uncovered only by the Institute's costly investigation.

We have found the current theories of collusion to be inadequate for representing what transpired in the Sugar Institute. Existing theory has little to say about communication in collusion, and those models that exist do not capture the richness of the content of that communication. Furthermore, the nature of retaliation for cheating is much more restrained than that imagined by the existing theories. We have also argued that the internal organization of the firms—more specifically, the selling agents' high-powered incentives—help explain the limited retaliation. Nonetheless, one should not lose sight of the overall success of Stigler's (1964) original insight in capturing the essentials of collusion in this market. The Sugar Institute and its rules were constructed by firms in pursuit of the common goal of collusion, but each well aware of their individual *ex post* incentive to undermine the agreement once in place.

## REFERENCES

**Abreu, Dilip; Pearce, David and Stacchetti, Ennio.** "Optimal Cartel Equilibria with Imperfect Monitoring." *Journal of Economic Theory*, June 1986, *39*(1), pp. 251–69.

________. "Toward a Theory of Discounted Repeated Games with Imperfect Monitoring." *Econometrica*, September 1990, *58*(5), pp. 1041–63.

**Albert, Bill and Graves, Adrian,** eds. *The world*

*sugar economy in war and depression, 1914–1940*. London: Routledge, 1988.

***American Column and Lumber Co. et al. v. United States***. 257 U.S. 377, 1921.

**Athey, Susan and Bagwell, Kyle.** "Optimal Collusion with Private Information." Mimeo, Massachusetts Institute of Technology, 2000.

**Athey, Susan; Bagwell, Kyle and Sanchirico, Chris.** "Collusion and Price Rigidity." Mimeo, Massachusetts Institute of Technology, 2000.

**Axelrod, Robert.** *The evolution of cooperation*. New York: Basic Books, 1984.

______. *The complexity of cooperation*. Princeton, NJ: Princeton University Press, 1997.

**Babcock, Harry A.** Final Report, 1-5601, on *Application of Joannes Brothers Company, et al. for issuance of complaint vs. The Sugar Institute, Inc. et al.*, June 20, 1930, in Record Group 122, Records of the Federal Trade Commission, Docket Section, Applications for Issuance of Complaint, 1915–1926, Box No. 30, National Archives, College Park, Maryland.

**Bashkar, V.** "Quick Responses in Duopoly Ensure Monopoly Pricing." *Economics Letters*, 1989, *29*(2), pp. 103–07.

**Bernheim, B. Douglas and Whinston, Michael D.** "Multimarket Contact and Collusive Behavior." *Rand Journal of Economics*, Spring 1990, *21*(1), pp. 1–26.

**Blinder, Alan S.** "Why Are Prices Sticky? Preliminary Results from an Interview Study," in Eytan Sheshinski and Yoram Weiss, eds., *Optimal pricing, inflation, and the cost of price adjustment*. Cambridge, MA: MIT Press, 1993, pp. 409–21.

**Carlton, Dennis.** "A Reexamination of Delivered Pricing Systems." *Journal of Law and Economics*, April 1983, *26*(1), pp. 51–70.

***Cement Manufacturers' Protective Association et al. v. United States***. 268 U.S. 588, 1925.

**Christensen, Laurits Rolf and Caves, Richard E.** "Cheap Talk and Investment Rivalry in the Pulp and Paper Industry." *Journal of Industrial Economics*, March 1997, *45*(1), pp. 47–73.

**Compte, Olivier.** "Communication in Repeated Games with Imperfect Private Monitoring." *Econometrica*, May 1998, *66*(3), pp. 597–626.

**Dick, Andrew R.** "When Are Cartels Stable Contracts?" *Journal of Law and Economics*, April 1996, *39*(1), pp. 241–83.

**Doyle, Maura P. and Snyder, Christopher M.** "Information Sharing and Competition in the Motor Vehicle Industry." *Journal of Political Economy*, December 1999, *107*(6), pp. 1326–64.

***E. I. DuPont de Nemours Co. et al. vs. FTC***. 729 F. 2d 128, 1984.

**Eddy, Arthur Jerome.** *The new competition*. New York: D. Appleton and Co., 1912.

**Friedman, Milton.** *Essays in positive economics*. Chicago: University of Chicago Press, 1953.

**Fudenberg, Drew; Levine, David I. and Maskin, Eric.** "The Folk Theorem with Imperfect Public Information." *Econometrica*, September 1994, *62*(5), pp. 997–1039.

**Genesove, David and Mullin, Wallace, P.** "Predation and Its Rate of Return: The Sugar Industry, 1887–1914." National Bureau of Economic Research (Cambridge, MA) Working Paper No. 6032, May 1997.

______. "Testing Static Oligopoly Models: Conduct and Cost in the Sugar Industry, 1890–1914." *Rand Journal of Economics*, Summer 1998, *29*(2), pp. 355–77.

______. "The Sugar Institute Learns to Organize Information Exchange," in Naomi R. Lamoreaux, Daniel M. G. Raff, and Peter Temin, eds., *Learning by doing in markets, firms, and countries*. Chicago: University of Chicago Press, 1999, pp. 103–38.

**Gertner, Robert H.** "Tacit Collusion with Immediate Responses: The Role of Asymmetries." Mimeo, University of Chicago, 1994.

**Green, Edward J. and Porter, Robert H.** "Noncooperative Collusion under Imperfect Price Information." *Econometrica*, January 1984, *52*(1), pp. 87–100.

**Kandori, Michihiro and Matsushima, Hitoshi.** "Private Observation, Communication and Collusion." *Econometrica*, May 1998, *66*(3), pp. 627–52.

**Katz, Michael L.** "The Welfare Effects of Third Degree Price Discrimination in Intermediate Goods Markets." *American Economic Review*, March 1987, *77*(1), pp. 154–67.

**Kreps, David M.** *A course in microeconomic theory*. Princeton, NJ: Princeton University Press, 1990.

**Levenstein, Margaret C.** "Price Wars and the Stability of Collusion: A Study of the Pre-

Case 3:15-md-02670-DMS-MSB Doc 2143-13 Filed 11/07/19 PgID.171180 Pg 9 of 45



World War I Bromine Industry." *Journal of Industrial Economics*, June 1997, *45*(2), pp. 117–37.

***Maple Flooring Manufacturers' Association et al. v. United States***. 268 U.S. 563, 1925.

**McCutcheon, Barbara.** "Do Meetings in Smoke-Filled Rooms Facilitate Collusion?" *Journal of Political Economy*, April 1997, *105*(2), pp. 330–50.

**Pearce, David G.** "Repeated Games: Cooperation and Reality," in Jean-Jacques Laffont, ed., *Advances in economic theory*, Sixth World Congress, Vol. 1. New York: Cambridge University Press, 1992, pp. 132–74.

**Romer, Christina D.** "The Great Crash and the Onset of the Great Depression." *Quarterly Journal of Economics*, August 1990, *105*(3), pp. 597–624.

**Rubinstein, Ariel.** "Comments on the Interpretation of Repeated Games Theory," in Jean-Jacques Laffont, ed., *Advances in economic theory*, Sixth World Congress, Vol. 1. New York: Cambridge University Press, 1992, pp. 175–81.

**Scherer, F. M. and Ross, David.** *Industrial market structure and economic performance*, 3rd Ed. Boston: Houghton Mifflin, 1990.

**Slade, Margaret E.** "Vancouver's Gasoline-Price Wars: An Empirical Exercise in Uncovering Supergame Strategies." *Review of Economic Studies*, April 1992, *59*(2), pp. 257–76.

**Stigler, George J.** "A Theory of Oligopoly." *Journal of Political Economy*, February 1964, *72*(1), pp. 44–61.

**Thisse, Jacques-François and Vives, Xavier.** "On the Strategic Choice of Spatial Price Policy." *American Economic Review*, March 1988, *78*(1), pp. 122–37.

**Ulen, T. S.** "Cartels and Regulation: Late Nineteenth Century Railroad Collusion and the Creation of the Interstate Commerce Commission." Ph.D. dissertation, Stanford University, 1979.

***United States v. American Linseed Oil Co. et al.*** 262 U.S. 371, 1923.

***United States v. Sugar Institute.*** 15 Fed. Supp. 817, 1934; 297 U.S. 553, 1936.

***United States v. Sugar Institute***, Answer of the Defendants. District Court of the United States for the Southern District of New York, filed August 1, 1931.

***United States v. Sugar Institute***, Mail and Files Division, Case File 60–104–13. General Records of the Department of Justice, Record Group 60, National Archives, College Park, Maryland. [Cited as DOJ Correspondence.]

***United States v. Sugar Institute***, Records of the District Courts of the United States. (Record Group 21), Southern District of New York, Equity File No. 59–103, National Archives, New York City. [Cited as District Court Record.]

**Van Ness, Carl.** "A Guide to the Records in the Braga Brothers Collection." Mimeo, George A. Smathers Libraries, Department of Special Collections, University of Florida, May 1995.

**W. J. McCahan Sugar Refining and Molasses Company.** Records (Correspondence) of Vice President Louis V. Placé, Jr., University of Florida, George A. Smathers Libraries, Braga Brothers Collection, Record Group IV, Series 151, Box 1, M. E. Rionda Correspondence. Boxes 2–3, General Correspondence, 1928–1945.

______. Records (Memoranda and Notes of Meetings) of Vice President Louis V. Placé, Jr., University of Florida, George A. Smathers Libraries, Braga Brothers Collection, Record Group IV, Series 151, Box 11, Sugar Institute, 1928–1945.

**Whitney, Simon.** "Competition Under Secret and Open Prices." *Econometrica*, January 1935, *3*(1), pp. 40–65.

***Willett and Gray Weekly Statistical Sugar Trade Journal.*** Various issues, 1914–1941.

**Williamson, Oliver E.** *The mechanisms of governance*. New York: Oxford University Press, 1996.

*Journal of Industrial Organization Education*

*Volume* 1, *Issue* 1 | 2006 | *Article* 6

# Cartels

**Jeffrey M. Perloff,** *University of California, Berkeley*

**Recommended Citation:**
Perloff, Jeffrey M. (2006) "Cartels," *Journal of Industrial Organization Education*: Vol. 1: Iss. 1, Article 6.
**DOI:** 10.2202/1935-5041.1005

Unauthenticated
Download Date | [illegible]

# Cartels

Jeffrey M. Perloff


**Abstract**

This lecture, PowerPoint slides, and movie provide a relatively non-technical introduction to cartels. After describing the characteristics of cartels predicted by economic theory, the instructor shows a movie of the "secret" meetings of the lysine cartel. This movie demonstrates that an actual cartel behaves as economic theories predict. Although the lecture is designed for undergraduates, graduate students normally enjoy this introduction as a break from more technical material. The lecture and the accompanying PowerPoint slides take up the first hour of a 90 minute class, and the movie (roughly 24 minutes) takes up the rest of the time. The lecture can be reduced to an hour by skipping the game theory section and going lightly over a few other areas.



**KEYWORDS:** cartels, oligopoly, antitrust, game theory

**Author Notes:** I am grateful to Dennis Carlton, John Connor, and Jim Dearden (who edited this submission).


Unauthenticated
Download Date | 12/15/14 10:54 PM

## Introduction

Today's lecture concerns cartels.[1] (Slide 1) Cartels are groups of firms that explicitly coordinate their pricing or output activities. Cartels are particularly common in oligopolistic markets where there are only a few firms.

We are going to cover six main topics. (Slide 2) First, cartels are harmful and common. Second, there are a number of conditions that usually must be met for a cartel to form. Third, cartels often fail because cartel members cheat on their agreement. Fourth, there are additional conditions that usually hold for cartels to prosper and last. Fifth, one of these conditions is that a cartel is more likely to succeed in markets that last for multiple periods. Sixth, many countries use anti-trust laws to try to prevent cartels. Seventh, a major recent cartel, the lysine cartel, illustrates most of these points. We will conclude the lecture by showing a tape, filmed secretly by the FBI, of actual meetings of the lysine cartel. This film demonstrates that economic theories about cartels are consistent with real-world events.

## Cartels: Bad and Ubiquitous

As Adam Smith stated, whenever people in the same industry meet, they have a tendency to hatch plans to raise prices or take other actions that will increase their profits. (Slide 3) A truly successful cartel (from the firms' standpoint) achieves the same level of profit that a monopoly would—or, at least higher profits than the firms would make without coordinating activities.

The resulting higher prices harm consumers and society as a whole. Just as you learned in your introductory economics course, the extra profit for firms is less than the loss to consumers.

We know that cartels form frequently from a variety of pieces of evidence. Where cartels are not forbidden by law they have been common, as in the United States in the eighteenth century or Europe until recently. Where the laws of a single nation cannot affect international cartels involving countries, such as OPEC (the Organization of Petroleum Exporting Countries), cartels operate freely. We also know that even when cartels are prohibited by law, they frequently occur. The U.S. Department of Justice and the Federal Trade Commission frequently take legal actions against firms who they allege have colluded. We'll provide examples later in this lecture.

---

[1] This lecture draws heavily on material in Carlton and Perloff (2005) and Perloff (2007), for obvious reasons.



Unauthenticated
Download Date | 12/15/14 10:54 PM

*Journal of Industrial Organization Education, Vol. 1 [2006], Iss. 1, Art. 6*

## Why Cartels Form and Firms Cheat

Cartels form because a firm can make a higher profit by coordinating its actions with other firms than by acting independently. (Slide 4) Although firms that act independently try to maximize their profits, in doing so, they ignore the effects their actions have on other firms. For example, a firm will increase its output if it believes that its own profit will rise even though it knows that by so doing, it will lower the profit of other firms in the market. (Slide 5) The cartel will take these externalities into account in setting the optimal cartel output or price.

Luckily for consumers, many cartels fail even without government intervention. The reason is that members of the cartel cheat on their agreement by producing extra output or undercutting the cartel's price. (Slide 6)

Although most cartels are formed by oligopolistic firms, we can illustrate the basic reason why forming a cartel raises collective profits and why firms want to cheat by using a competitive market example. (Slide 7) Suppose that there are a large, fixed number of identical, price-taking firms in a market with cost curves as shown in panel a (the figure on the left). The competitive supply curve is the horizontal aggregation of the representative individual firm's supply curve: the marginal cost (*MC*) curve above the minimum of the average cost (*AC*) curve. In panel b, the supply curve (sum of the individual *MC* curves) is labeled *S*. It intersects the market demand curve at $p_c$, the competitive price, and $Q_c$, the competitive quantity. At that price, each of price-taking firm produces $q_c$, as panel a shows.

If the firms were to coordinate their actions, they would operate like a monopoly (thereby maximizing aggregate profit). If the monopoly's marginal cost curve is *S* (panel b), its profit is maximized where *S* intersects the aggregate quantity $Q_m$ where *S* intersects its marginal revenue (*MR*) curve. That is, each of the individual firms would have to reduce their quantity from $q_c$ to $q_m$ (panel a) so that aggregate quantity falls from $Q_c$ to $Q_m$ (panel b). Question to the class: How do we know that firm and collective profits rise? [Point out that the cartel free to pick any output levels it wants including the original, pre-cartel ones. If it changes from the noncollusive level, it must believe that it is increasing its profit. One can also use the marginal revenue and marginal cost curves to present a more formal argument.]

Notice that, to raise the price, each firm has to restrict its output to $q_m$. {*Segment 5 of the lysine movie shows the cartel members allocating output by firm.*} As shown in the figure on the left, at that quantity, the typical firm is receiving a price that is above its marginal cost. Thus, a firm could increase its profit by cheating on the agreement and raising its output level. Assuming that the other firms do not change their behavior, one firm could cheat without greatly affecting the cartel price. (The most profitable outcome for any one firm is for all other firms to run a cartel and for it to act independently.) To maximize its profit,

DOI: 10.2202/1935-5041.1005 

Unauthenticated
Download Date | 12/15/14 10:54 PM

it would increase its output to $q*$. Of course, if it pays for one firm to cheat, then all have an incentive to cheat.

## Conditions for Cartel Success

Economists have identified many conditions for cartels to form, last, and be profitable. (Slide 8) Here, we review some of the major ones. First, the cartel can significantly raise prices. Second, the cartel controls most of the market (makes most of the sales). Third, the organizational costs of forming and running a cartel are low. Fourth, buyers do not have monopsony power—they are at the mercy of the cartel. Fifth, the cartel the cartel can be maintained. The cartel has mechanisms that allow it to detect and prevent cheating, and it can avoid prosecution and punishment by the government.

It only pays to set up a cartel and risk government prosecution if the potential rewards are great. (Slide 9) That is, the cartel has to expect that it can raise prices substantially. It can do that if the demand facing the cartel is not very elastic. If it were, then even a monopoly cannot raise profit. Question to class: Why? [Remind them that monopoly price is $p_m = MC/(1 + 1/\varepsilon)$, where $MC$ is the marginal cost and $\varepsilon$ is the market demand elasticity.] {*Segment 4 of the lysine movie shows cartel members setting prices globally.*}

The cartel cannot raise prices substantial unless the cartel makes most of the market sales. (Slide 10) Ideally for the cartel, all firms belong to the cartel, or, at least, all the big firms in the market. Moreover, recycling is not feasible. For example, a copper cartel sells "new" copper that competes with recycled copper (old copper products are melted down and the copper is reused). When the cartel raises its price and profit increases, other firms will want to enter.

For the cartel to succeed, there must be barriers to prevent such entry. (Slide 11) Limits to entry are important for cartel success because entrants cannot dissipate cartel profits.

Evidence to support this claim is that most cartels occur in markets with relatively few firms. (Slide 12) (One important exception is that cartels sometimes form in professional associations, often because they get help from governments through licensing laws or other means.)

According to a study of Department of Justice price-fixing cases (Hay and Kelley 1974) from 1963 to 1972, almost half of the cartels (48%) involved six or fewer firms. Only 6.5% consisted of 50 or more conspirators.

Of the global cartels from 1990 to 2003 studied by Connor (2003), over three-quarters (77%) involved six or fewer firms. The median number of corporations involved was five. Only 13% had 10 or more participants—and most of those were organized by quasi-official European trade associations.

Many cartels fail when entry occurs. When a third firm (country) entered the mercury market, that cartel failed.



Unauthenticated
Download Date | 12/15/14 10:54 PM

Cartels are more likely to form and persist if organizational costs are low. (Slide 13) If there are few firms in the industry, secretly meeting is relatively easy. (Remember Adam Smith's comment. *Segment 3 of the lysine movie shows cartel members discussing using the trade association as a front for their secret meetings.*) If a few firms make most of the sales in the industry, then those few large firms may be able to collude among themselves. If output is identical across firms, then it is easier for firms to agree as to how to limit output or set prices. In contrast, if each firm produces many, differentiated products, agreeing how to run the cartel is relatively difficult. Industry organizations' legal meetings provide a cover for illicit meetings. These organizations may have data collecting or information sharing functions that help cartels enforce their agreements.

Obviously detecting and preventing cheating by cartel members is crucial for cartel longevity. (Slide 14) If there are relatively few firms in the cartel, it is relatively easier to determine which one cheated by producing too much output or selling at too low a price. If all firms produce identical, homogeneous products, then it is much easier to see if other cartel members have deviated from the agreement. Monitoring is easier if purchases are infrequent and large. Some cartels make monitoring easier by dividing customers between firms (other firms agree not to try to steal those customers) or by dividing the market geographically. In recent sophisticate cartels (lysine, vitamins), agreements require that firms adjust output at the end of the year if one firm sells more than it was allocated. {*In segment 7 of the lysine movie, a conspirator explains how this reallocation scheme works.*}

Many other monitoring techniques have been developed to enforce cartel agreements. (Slide 15) Some bold cartels have agreed to let other firms review their books. Some use most-favored national clauses in customer contracts in which they promise to adjust their prices if they later give a better deal to other customers, thus giving customers an incentive to monitor. Many government contracts are put out to bid, and government agencies report the winning bid and company.

Have you ever gone to an electronics or bed retailer and been offered a "low price" guarantee? For example, if you find a lower price within a month of purchasing there, they'll give you double the difference. That probably made you feel like you were getting a good deal. However, it might have been part of a cartel scheme. Such a guarantee gives consumers an incentive to monitor for the firm.

Cartels are likely to avoid government prosecution under antitrust laws if their actions are undetected (e.g., they meet in secret). (Slide 16) Cartels do not care substantially if they are caught if the punishments are small (which used to be the case in the United States).

DOI: 10.2202/1935-5041.1005 

Unauthenticated
Download Date | 12/15/14 10:54 PM

Under most antitrust laws, the crime is not raising prices by meeting to do so. Thus, firms can avoid prosecution if they can agree tacitly (sometimes called conscious parallelism) but not explicitly. Before the Department of Justice objected, an airline might announce that it was raising fares in two weeks. If the other firms made similar announcements, it went ahead and raised fares. Otherwise it rescinded its announced increase.

Many international, government-run cartels such as OPEC are effectively immune to prosecution by authorities in any one country. In the past, the United States participated in such international agreements (e.g., concerning the price of international airline tickets).

## Cartels over Time

*{Optional Section}* According to game theory, collusion is extremely difficult in a one-period game (a market that lasts only briefly). (Slide 17) It is easier in a multiperiod game.

We illustrate game theory and determine the Nash equilibrium for a real-world, single-period game involving a duopoly: an oligopoly with two (*duo*-) firms. (Slide 18) We examine how American Airlines and United Airlines actually compete for customers on flights between Chicago and Los Angeles.[2] (Slide 19)

The total number of passengers flown by these two firms, $Q$, is the sum of the number of passengers flown on American, $q_A$, and those flown on United, $q_U$. The airlines can set the number of flights and the number of seats per flight. However for simplicity, we assume that the airlines can pick only a relatively large quantity, 64 units (one unit being 1000 passengers) per quarter, or a relatively small quantity, 48 units per quarter.

The profit matrix or payoff matrix (Slide 20) shows the profits given the strategies that the firms choose. For example, if American chooses a large quantity, $q_A$ = 64 units per quarter, and United chooses a small quantity, $q_U$ = 48 units per quarter, the firms' profits are in the cell in the lower left-hand corner of the matrix. In that cell, American's profit (upper-right number) is \$5.1 million per quarter, and United's profit (bottom-left number) is \$3.8 million per quarter.

Because the firms choose their strategies simultaneously, each firm selects a strategy that maximizes its profit given what it believes the other firm will do. That is, the firms are playing a noncooperative game of imperfect information in which each firm must choose an action before observing the simultaneous action by its rival.

[2]This example is based on Brander and Zhang (1990). They reported data for economy and discount passengers taking direct flights between the two cities in the third quarter of 1985. In calculating the profits, we assume that Brander and Zhang's estimate of the firms' constant marginal cost is the same as the firms' relevant long-run average cost.



Unauthenticated
Download Date | 12/15/14 10:54 PM

The firm must choose its best response to the other firm's strategy given that it doesn't know what the other firm will do. The firm rejects any strategy that is strictly dominated by another strategy. (Slide 21) Strategy 1 strictly dominates Strategy 2 if Strategy 1 produces at least a profit as high as Strategy 2 does regardless of the action taken by the rival firm. If one strategy strictly dominates all other strategies, regardless of the actions chosen by rival firms, the firm should choose this dominant strategy. Where a firm has a dominant strategy, its belief about its rival's behavior is irrelevant.

Although firms do not always have dominant strategies, they do have them in this game. To determine American's dominant strategy, American's managers can use the following reasoning: (return to Slide 20)

- *If United chooses the high-output strategy* ($q_U$ = 64), *American's high-output strategy maximizes its profit*: Given United's strategy, American's profit is $4.1 million (top-right number in the upper-left cell) with its high-output strategy ($q_A$ = 64) and only $3.8 million (top-right number in the upper-right cell) with its low-output strategy ($q_A$ = 48). Thus American is better off using a high-output strategy if United chooses its high-output strategy.
- *If United chooses the low-output strategy* ($q_U$ = 48), *American's high-output strategy maximizes its profit*: Given United's strategy, American's profit is $5.1 million with its high-output strategy and only $4.6 million with its low-output strategy.
- *Thus the high-output strategy is American's dominant strategy*: Whichever strategy United uses, American's profit is higher if it uses its high-output strategy.

By the same type of reasoning, United's high-output strategy is also a dominant strategy. (Slide 22) Because the high-output strategy is a dominant strategy for both firms, the pair of high-output strategies, $q_A = q_U = 64$, is a Nash equilibrium.[3] In this Cournot-Nash equilibrium, each firm earns $4.1 million. If the firms colluded, they would choose the "cartel" equilibrium ($q_A = q_U = 48$), where each firm would earn $4.6 million. Thus the sum of the firms' profits is not maximized in this simultaneous-choice, one-period game.

Why don't the firms cooperate and use the individually and jointly more profitable low-output strategies, by which each earns a profit of $4.6 million,

---

[3] We can use the profit matrix to confirm that this pair of strategies is a Nash equilibrium by showing that neither firm wants to change its strategy if it is certain that the other firm will use its high-output strategy. If American knew that United would use its high-output strategy, it still would not switch to its low-output strategy because its profit would fall from $4.1 million to $3.8 million. Similarly, United would not switch if it knew American would use its high-output strategy. Because neither firm wants to change its strategy given that the other firm is playing its Nash equilibrium strategy, this pair of strategies ($q_A = q_U = 64$) is a Nash equilibrium.



Unauthenticated
Download Date | 12/15/14 10:54 PM

instead of the $4.1 million in the Nash equilibrium? (Slide 23) They don't cooperate due to a lack of trust: Each firm uses the low-output strategy only if the firms have an enforceable, binding agreement.

Suppose that the two firms meet in advance and agree to restrict their outputs to the lower quantity. If the firms are going to engage in this game only once, each has an incentive to cheat on their agreement. If American believes that United will stick to the agreement and produce $q_U = 48$, American can increase its profit from $4.6 million to $5.1 million by violating the agreement and producing $q_A = 64$. Moreover, if American thinks that United will also cheat on the agreement by producing $q_U = 64$, American wants to produce the high output (so that it will earn $4.1 million rather than $3.8 million). By this reasoning, each firm has a substantial profit incentive to cheat on the agreement. In this type of game—called a prisoners' dilemma game—all players have dominant strategies that lead to a profit (or other payoff) that is inferior to what they could achieve if they cooperated and pursued alternative strategies.

Collusion is more feasible in a repeated, multiperiod game. (Slide 24) In a single-period game, one firm cannot punish the other firm for cheating on a cartel agreement. But if the firms meet period after period, a wayward firm can be punished by the other.

In the single-period game, each firm takes its rival's strategy as given and assumes that it cannot affect its rival's strategy. However, if the same game is played repeatedly, firms engage in a supergame in which players may devise strategies for this period that depend on rivals' actions in previous periods.

In a repeated game, a firm can influence its rival's behavior by *signaling* and *threatening to punish*. One airline could use a low-quantity strategy for a couple of periods to signal to the other firm its desire that the two firms cooperate and produce that low quantity in the future. If the other firm does not respond by lowering its output in future periods, the first firm suffers lower profits for only a couple of periods. However, if the other firm responds to this signal and lowers its quantity, both firms can profitably produce at the low quantity thereafter.

In addition to or instead of signaling, a firm can punish a rival for not restricting output. We can illustrate how firms punish rivals to ensure collusion. (Slide 25) Suppose that American announces or somehow indicates to United that it will use the following two-part strategy:

- American will produce the smaller quantity each period as long as United does the same.
- If United produces the larger quantity in period *t*, American will produce the larger quantity in period *t* + 1 and all subsequent periods.

If United believes that American will follow this strategy, United knows that it will make $4.6 million each period if it produces the lower quantity. Although United can make a higher profit, $5.1 million, in period *t* by producing



Unauthenticated
Download Date | 12/15/14 10:54 PM

the larger quantity, by doing so it lowers its potential profit to $4.1 million in each following period. Thus United's best policy is to produce the lower quantity in each period unless it cares greatly about current profit and little about future profits. If United values future profits nearly as much as current ones, the one-period gain from deviating from the collusive output level does not compensate for the losses from reduced profits in future periods, which is the punishment American will impose. United may take this threat by American seriously because American's best response is to produce the larger quantity if it believes it cannot trust United to produce the smaller quantity.[4] Thus if firms play the same game *indefinitely*, they should find it easier to collude.

Playing the same game many times, however, does not necessarily help the firms collude. (Slide 26) Suppose that the firms know that they are going to play the game for $T$ periods. In the last period, they know that they are not going to play again, so they know they can cheat—produce a lot of output—without fear of punishment. As a result, the last period is like a single-period game, and all firms cheat. That makes the $T - 1$ period the last interesting period. By the same reasoning, they'll cheat in $T - 1$. Continuing this type of argument, we conclude that maintaining a cartel will be difficult if the game has a known stopping point. If the players know that the game will end but aren't sure when, cheating is less likely to occur. Collusion is therefore more likely in a game that will continue forever or that will end at an uncertain time.

## Reasons for Antitrust Laws

Before cartels and price fixing were made illegal, cartels thrived. (Slide 27) Cartels (or "trusts" as they were called in the nineteenth century) existed in oil, steel, sugar, and many other markets. Eventually Congress acted and passed laws establishing the first antitrust law, the Sherman Act, in 1890. In 1914, it also passed the Federal Trade Commission Act, which also contained antitrust provisions.

These laws prohibit firms from explicitly agreeing to take actions that reduce competition, such as meeting to jointly setting price. (Slide 28) These anti-cartel laws are called "antitrust laws" in the United States and "competition policies" in most other countries.

At first, the antitrust laws were not enforced and appeared to be very weak. (Slide 29) However, starting in 1902, under pressure from President Teddy Roosevelt, the Department of Justice (DOJ) brought suits that eventually ended up

[4] American does not have to punish United forever to induce it to cooperate. All it has to do is punish it for a long enough period that it does not pay for United to deviate from the low-quantity strategy in any period.

DOI: 10.2202/1935-5041.1005 

Unauthenticated
Download Date | 12/15/14 10:54 PM

in the Supreme Court. (Slide 30) The resulting decisions established that the laws were potent and could be enforced.

Again, one of the most features of the U.S. antitrust law is that most people finding surprising is that it requires explicit agreement between firms. One interesting example comes from the airlines industry. (Slide 31) {*At this point, have two students read the exchange on* (Slides 32 and 33). *You can get some cheap laughs by having them substitute "horsefeathers" or some other antiquated phrase for the symbols used to indicate obscenities.*} No antitrust prosecution resulted in this case because there was a lack of a formal agreement. (Slide 34)

Until recently, Europe and other areas of the world had much weaker antitrust laws than did the United States. {Segment 2 of the lysine movie is a telephone conversation in which an Asian co-conspirator is hesitant to meet in the United States because of the U.S. antitrust laws.} Now their laws are much closer to those of the United States. (Slide 35)

Both the United States and Europe now use Corporate Leniency Programs to induce some cartel members to squeal on the others. (Slide 36)

## Lysine

An important recent case that illustrates most of the properties of successful cartels that we have just addressed and involved the Corporate Leniency Program involved the international lysine industry (see Connor, 2003, and Eichenwald, 2001). (Slide 37) Lysine is an amino acid that is used as a nutritional supplement, in animal feed to promote growth, and for other purposes. At the time it was prosecuted, this cartel received the largest penalties to date. In 1996, Archer Daniels Midland and other firms pleaded guilty to price fixing in this industry.

The lysine and its market have many of the properties that lead to a successful cartel. (Slide 38) Lysine is a homogenous product. The lysine market is highly concentrated: the four largest firms control most of the U.S. and world markets. The four largest buyers purchase less than 30 percent of the total market. Buyers make infrequent, large purchases. Entry is difficult because new plants are expensive, take years to build, and require people with unusual skills to run them.

We know a lot about this conspiracy because one of the leading participants helped the FBI tape the colluders' "secret" meetings. Their agreement was a typical one. (Slide 39) The cartel firms felt that they needed all the major firms to participate. {*Segment 1 of the lysine movie shows the conspirators discussing the various firms involved.*} They fixed prices and allocated quantities that could be sold to each firm. {*The cartel members discuss fixing prices in segment 4 and allocating output in segment 5.*} They used their industry organization to collect data and provide cover for their illicit meeting. {*See segment 3.*} They shared



Unauthenticated
Download Date | 12/15/14 10:54 PM

sales data. {*See segment 8. Segment 6 shows the largest firm threatening other smaller firms if they do not agree to the cartel and its allocation terms.*} They had a punishment scheme in place to prevent firms from exceeding their quotas. {*See segments 7 and 8.*}

Prior to this case, government fines tended to be small relative to the benefits from the conspiracy. That changed with the lysine case. (Slide 40) Moreover, fairly serious individual penalties were assessed. (Slide 41) (Although, notice that the heads of the firms avoid jail time.) In the private cases that followed the government cases, consumers recouped some of their losses. (Slide 42)

## Movie

Now show the movie. You can request a free copy of the VHS tape, a booklet containing transcripts of the tape segments, via mail or fax (202-616-4529) from the United States Department of Justice, Antitrust Division, Freedom of Information Act Unit, 325 Seventh Street, N.W., Suite 200, Washington, D.C., 20530. The electronic version posted here is of lower quality than the original film (to keep its size down).

It is a good idea to preview the movie first so that you can make comments before and during running the movie. It helps to explain what is about to happen in each segment and how that segment connects to the points in the lecture. Details on the various segments of the movie are available in a speech by James M. Griffin, Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, http://www.usdoj.gov/atr/public/speeches/4489.htm, provides. If you are familiar with the background (e.g., read Eichenwald's *The Informant*), you can tell your students about the bizarre behavior of Mark Whitacre and his role. You might want to skip the last segment, which is difficult to follow, and the first section, which mainly introduces the players and shows their contempt for customers and antitrust authorities. I've shown this film to both undergraduates and graduate students. It is a big hit with both groups. Students are happy to sit through the entire movie without squirming.

DOI: 10.2202/1935-5041.1005


Unauthenticated
Download Date | 12/15/14 10:54 PM

*To make downloading easier and to allow you to show just a subset of the movie easily, the movie has been divided into sections:*

| Segment | Title, length |
|---|---|
| 1 | The DOJ title (28 seconds); "January 18, 1995, Cartel Meeting in Atlanta, Georgia, Cartel members show disdain for customers and antitrust enforcement" (2 minutes, 54 seconds) |
| 2 | "July 13, 1993, Telephone Call from ADM Headquarters, foreign co-conspirator expresses reluctance to meet in the United States" (1 minute, 54 seconds) [Taped phone conversation with text appearing on the screen.] |
| 3 | "March 10, 1994, Cartel Meeting in Maui, Hawaii, Cartel members use trade association as a cover for conspiracy meetings" (1 minute, 47 seconds) |
| 4 | "March 10, 1994, Cartel Meeting in Maui, Hawaii, Cartel members fix price on a global basis" (2 minute, 41 seconds) |
| 5 | "October 25, 1993, Cartel Meeting in Irvine, California, Cartel members allocate worldwide sales volumes" (3 minutes, 28 seconds) |
| 6 | "October 25, 1993, Cartel Meeting in Irvine, California, Co-conspirator threatens retaliation if others don't agree to proposed market allocation scheme" (2 minutes, 48 seconds) |
| 7 | "March 10, 1994, Cartel Meeting in Maui, Hawaii, Co-conspirator explains how end-of-year compensation scheme eliminates the incentive to cheat on the cartel" (2 minutes, 31 seconds) [High point of the movie: One of ADM's executives tells other firms that the customers are their enemies and that only the various firms are their friends.] |
| 8 | "January 18, 1995, Cartel Meeting in Atlanta, Georgia, Cartel members report end-of-year sales figures and find that sales volumes 'were right on target'" (4 minutes, 49 seconds) |



Unauthenticated
Download Date | 12/15/14 10:54 PM

## References

Carlton, Dennis W., and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th ed., 2005, Boston: Addison Wesley.

Connor, John M., "Private International Cartels: Effectiveness, Welfare, and Anticartel Enforcement," 2003, Purdue University working paper, http://agecon.lib.umn.edu/cgi-bin/pdf_view.pl?paperid=11506&ftype=.pdf

Eichenwald, Kurt, *The Informant*, 2001, Broadway Books.

Hay, George A., and Daniel Kelley, "An Empirical Survey of Price-Fixing Conspiracies." *Journal of Law and Economics*, 1974, 17, 13-38.

Perloff, Jeffrey M., *Microeconomics*, 4th ed., 2007, Boston: Addison Wesley.

DOI: 10.2202/1935-5041.1005 

Unauthenticated
Download Date | 12/15/14 10:54 PM

# Industrial Organization

## Contemporary Theory and Empirical Applications

Fourth Edition

Lynne Pepall

Dan Richards

George Norman

Blackwell Publishing

© 2008 by Lynne Pepall, Dan Richards, and George Norman

BLACKWELL PUBLISHING
350 Main Street, Malden, MA 02148-5020, USA
9600 Garsington Road, Oxford OX4 2DQ, UK
550 Swanston Street, Carlton, Victoria 3053, Australia

The right of Lynne Pepall, Dan Richards, and George Norman to be identified as the authors of this work has been asserted in accordance with the UK Copyright, Designs, and Patents Act 1988.

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, except as permitted by the UK Copyright, Designs, and Patents Act 1988, without the prior permission of the publisher.

Designations used by companies to distinguish their products are often claimed as trademarks. All brand names and product names used in this book are trade names, service marks, trademarks, or registered trademarks of their respective owners. The publisher is not associated with any product or vendor mentioned in this book.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold on the understanding that the publisher is not engaged in rendering professional services. If professional advice or other expert assistance is required, the services of a competent professional should be sought.

This fourth edition first published 2008 by Blackwell Publishing Ltd

9 10 11 12 - 2012

*Library of Congress Cataloging-in-Publication Data*

Pepall, Lynne, 1952–
Industrial organization : contemporary theory and empirical applications / Lynne Pepall, Dan Richards, George Norman. – 4th ed.
p. cm.
Includes bibliographical references and index.
ISBN 978-1-4051-7632-3 (hardcover : alk. paper) 1. Industrial organization.
I. Richards, Daniel Jay. II. Norman, George, 1946– III. Title.

HD31.P377 2008
658.1–dc22

2007039115

A catalogue record for this title is available from the British Library.

Set in 10/12pt Times
by Graphicraft Limited, Hong Kong
Printed and bound by Courier Kendallville

For further information on
Blackwell Publishing, visit our website at
www.blackwellpublishing.com

**Table 15.2** Payoff matrix for a 2 × 2 pricing game

| | | Strategy for firm 2 | |
|---|---|---|---|
| | | Price high | Price low |
| Strategy for firm 1 | Price high | (12, 12) | (5, 14) |
| | Price low | (14, 5) | (6, 6) |

Meet the competition clauses can also strengthen the trigger strategies that support collusive behavior among firms. To get some idea as to just how powerful this effect can be, consider a simple one-period pricing game between two firms. The payoff matrix shown in Table 15.2 describes this prisoners' dilemma game. The one-shot nature of the game leads the firms to the only Nash equilibrium in which both firms price low. Now consider what happens when we permit both firms to publish meet-the-competition guarantees that are legally and instantaneously binding.[10] These guarantees render the off-diagonal price pairs in Table 15.2 unattainable. There is no opportunity to undercut one's cartel partner when each firm has announced a meet-the-competition policy that goes into effect immediately. Because the combinations of one firm pricing low and the other firm pricing high are unattainable, neither firm has any incentive to deviate from the price high policy. The cartel works even in this simple one-period setting.

*Stable market conditions* also facilitate the detection and punishment of cheating on the cooperative agreement. When demand or production costs are uncertain and subject to random shocks it is easy to make mistakes and punish rivals wrongly suspected of cheating on the cartel. For this reason, the simple trigger strategy of punishing suspected cheating with a permanent reversion to noncooperative play is too harsh. But a modified trigger strategy that punishes the defector only for a number of periods is not as potent a deterrent as a trigger strategy that retaliates forever. Moreover, with uncertain demand, the kinds of strategies that work to sustain collusion often do so only by establishing a market price well below that of a pure monopoly.

One way for a cartel in an unstable market to reinforce the trigger strategy is to establish a *centralized sales agency*, as in the De Beers diamond cartel, or a trade association. Either institutional arrangement can monitor and report upon both market conditions and individual firm performance. Monitoring may be further facilitated by agreements to divide the market explicitly, say by percentage of total sales or by geographic territory.

To summarize, cooperative price-fixing agreements are facilitated when an industry exhibits characteristics that make the detection and the deterrence of cheating easier. Such factors include the presence of only a few firms, selling homogeneous products on a reasonably frequent basis and relatively stable market conditions. All of these factors have been found to be present in the prosecution of numerous recent international cartels.[11] Agreements on market division, whether by geography or sales, also make it easier to

[10] This is perfectly legal since the price-matching guarantees are offered to buyers rather than communicated to other sellers.

[11] See Connor (2001) for a detailed and very readable analysis of these cartels.

monitor the behavior of cartel members. The potential for punishment, in some cases, violence, is greatly enhanced by such features and should never be understated.[12]

## 15.3 AN ILLUSTRATION: COLLUSION ON THE NASDAQ EXCHANGE

Empirical evidence suggests that price-fixing arrangements are not unusual and that their impact can be large. Experience clearly shows that not all of the characteristics listed above need to be present for collusion to occur. It can occur even in conditions that seem on the surface to be quite competitive. We illustrate this point with the well-known case of collusion in the National Association of Securities Dealers Automated Quotations (NASDAQ) market.

Started in 1971, the NASDAQ was the world's first electronic stock market. Since that date it has grown rapidly and now vies with the New York Stock Exchange for position as the largest stock market in the United States. In March 2007 alone more than 33 billion shares were traded with a dollar volume of more than $822 billion.[13] NASDAQ trading is made online and for any given stock there are multiple traders.

The traders post two quotes for each stock in which they deal—an "ask" price at which they will sell the stock and a "bid" price at which they will buy the stock. By convention ask and bid prices used to be quoted in increments of eighths of a dollar. Traders make profits by quoting ask prices that are greater than bid prices but compete with each other through the ask and bid prices they quote. Market prices are determined by the lowest ask price and the highest bid price—called the *inside prices*—the difference between the lowest ask and highest bid being referred to as the *inside spread*.

Because the number of dealers trading a particular stock on the NASDAQ market can be large (sometimes as many as 60) and because entry is relatively easy, this market would seem to be pretty close to satisfying the competitive market ideal. However, other conditions favorable to cooperation are present. Play is repeated frequently and on a regular basis. The traded items (shares) are basically homogeneous. Firms have very similar costs and technical abilities. Are these conditions enough to overcome the procompetitive effects of low concentration and relatively easy entry?

The work of two economists, Christie and Schultz, suggests that the answer to that question is, yes. They found that in the 1990s NASDAQ was not the competitive market it seemed.[14] The evidence came to light when Christie and Schultz constructed a matched sample of securities on the NASDAQ and on the NYSE/AMEX exchanges and compared the distribution of inside spreads. Figure 15.2 reports their results. They concluded that a much higher proportion of NASDAQ stocks had inside spreads of even eighths—2/8 or 4/8—than did similar stocks on NYSE/AMEX.

You might wonder why this should matter. After all, what is an eighth of a dollar between friends? However, given a share volume of around 1.5 billion shares per day, an additional spread of 1/8 is equivalent to additional profits of $187.5 million *per day*, a gift that most friends would be delighted to receive. Christie and Schultz suggested that collusion among NASDAQ dealers could explain the higher proportion of even eighths. The argument goes

[12] A number of cartels in New York City have used violence to enforce their market power.

[13] For further details visit the NASDAQ website at http://www.nasdaq.com.

[14] "Why do NASDAQ market makers avoid odd-eighth quotes?," *Journal of Finance*, December, 1994, pp. 1813–49.




**Figure 15.2** The distribution of inside spreads on NYSE/AMEX and NASDAQ
Source: W. G. Christie and P. Schultz, "Why Do NASDAQ Market Makers Avoid Odd Eighth Quotes?," *Journal of Finance*, 49 (December, 1994): 1813–49

## Reality Checkpoint

### "I Am the Broker, You Are the Brokee!"

Once upon a time, two economists named Paul Schultz (of Ohio State) and William Christie (of Vanderbilt) were talking about stock prices for trades in the over-the-counter market quoted by the National Association of Securities Dealers Automated Quotation (NASDAQ) system. As described in the text, this is a computerized market in which dealers list the prices at which they will buy (the "bid" price) and sell (the "ask" price) various stocks. The difference between the bid and ask prices is the "spread," and it is a major source of dealer profits. Over time, the two economists noticed something odd. The spread was rarely less than 75 cents and always expressed as a multiplier of 25 cents, even though stocks themselves are priced in odd eighths (e.g., 20 and 3/8, or 24 and 5/8). The two economists subsequently published a research paper suggesting that NASDAQ prices could only come about as a result of a price-fixing agreement.

The paper caused an immediate stir and, ultimately, led to an investigation by the antitrust division of the Justice Department. Some time later, the Justice Department filed a civil complaint against two dozen securities dealers. The complaint documented the earlier findings of Schultz and Christie. It also showed that cheating was a potential problem that the dealers dealt with by harassment and verbal assault of the culprit. For example, consider this recorded conversation of one dealer complaining to a second dealer that the latter employed a trader who was not maintaining a spread divisible by 25.

> *First trader*: "He's trading it at one-eighths and embarrassing your firm."
> *Second trader*: "I understand."
> *First trader*: "You know, I would tell him to straighten up his act, stop being a (expletive deleted) moron!"

The agreement did not require the two dozen dealers involved to admit guilt or pay a fine. But it did require the dealers to cease and desist the practice and to tape randomly 3.5 percent of all trader conversations to ensure compliance.

Source: D. Lohse and A. Raghavan, "Will NASDAQ Accord Lead to Better Prices," *Wall Street Journal*, July 18, 1996, p. C1.

as follows. Essentially the NASDAQ dealers are engaged in an infinitely repeated game. When the dealers collude in their bid and ask prices then under certain conditions a dealer will earn more profit by sticking to the collusive agreement than she would earn if she defected from the agreement and undercut the other traders' inside spreads.

Let's investigate under what conditions collusion is possible. Suppose that there are $N$ dealers in a particular stock?[15] Dealer $i$ quotes an ask price of $a_i$ and a bid price of $b_i$, both measured by convention in eighths of a dollar. The inside ask is defined as $a = \min_i a_i$, the lowest ask price, and the inside bid is defined as $b = \max_i b_i$, the highest bid price. The inside spread is, of course, $a - b$. The demand for shares of this stock by members of the public who wish to purchase at price $a$ is denoted $D(a)$, while the supply of shares by members of the public who wish to sell at price $b$ is denoted $S(b)$. To be specific, we will assume that:

$$D(a) = 200 - 10a \tag{15.7}$$

$$S(b) = -120 + 10b \tag{15.8}$$

where, again by convention, quantities are measured in blocks of 10,000 shares.

We make two further simplifying assumptions. First, we assume that dealers set their bid and ask prices to equate expected demand with expected supply. That is, they do not buy for inventory. What this means is that dealer $i$ quotes ask price $a_i$ and bid price $b_i$ such that $200 - 10a_i = -120 + 10b_i$ which implies that $b_i = 32 - a_i$. As Figure 15.3 shows, this assumption means that the only combinations of ask and bid prices that we need consider are {(20, 12), (19, 13), (18, 14), (17, 15), (16, 16)}. Second, we assume that any dealer who does not quote the inside spread gets no business while all market makers who quote the inside spread share the orders equally.

We define the value of this stock, $v$, as the price that equates public demand with public supply. You can easily confirm that, given our demand and supply functions, $v = 16$. In other words, the value of this stock is 16 (or in dollar terms \$2.00) and at that price a quantity of 400,000 shares would be traded. Aggregate profit from trading in this stock is made up of




**Figure 15.3** Demand and supply for a stock
The stock is traded in units of 10,000 shares and priced in increments of one-eighth of a dollar. Ask (demand) and bid (supply) prices are quoted to equate demand and supply.

[15] For a more complete, but complex, analysis see Dhutta (1999) and Dhutta and Madhavan, (1997).

**Table 15.3** Profits in the NASDAQ example

| *Ask price* a | *Bid price* b = 32 − a | *Volume of shares (10,000)* | *Aggregate profit ($000)* |
|---|---|---|---|
| 20 | 12 | 0 | 0 |
| 19 | 13 | 10 | 75 |
| 18 | 14 | 20 | 100 |
| 17 | 15 | 30 | 75 |
| 16 | 16 | 40 | 0 |

**Table 15.4** Payoff matrix for the NASDAQ cartel game (U.S. dollars, thousands)

| | | *Strategy for Millennial Securities (ask, bid) quotes* | | |
|---|---|---|---|---|
| | | *(18, 14)* | *(17, 15)* | *(16, 16)* |
| *Strategy for all other market makers (ask, bid) quotes* | *(18, 14)* | $\left(\frac{100(N-1)}{N}, \frac{100}{N}\right)$ | (0, 75) | (0, 0) |
| | *(17, 15)* | (75, 0) | $\left(\frac{75(N-1)}{N}, \frac{75}{N}\right)$ | (0, 0) |
| | *(16, 16)* | (0, 0) | (0, 0) | (0, 0) |

two components: revenues from selling at greater than $v$ and revenues from buying at less than $v$. In other words,

$$\pi(a, b) = (a - v)D(a) + (v - b)S(b) \qquad (15.9)$$

Given our specific demand and supply functions and the "no inventory" assumption, so that $b = 32 - a$ and $D(a) = S(b)$, this simplifies to:

$$\pi(a) = (a - b)(200 - 10a) = (2a - 32)(200 - 10a) = 20(a - 16)(20 - a) \qquad (15.10)$$

Table 15.3 gives these profits at the five possible combinations of bid and ask prices.

Aggregate profit is maximized at an ask price of 18 (or $2.25) and a bid price of 14 (or $1.75) with a spread of 4 (or 50 cents) and a volume of 200,000 shares. The question is: can dealers sustain an agreement to quote these prices, or will one dealer defect and quote a lower ask and a higher bid price? Consider a particular dealer, Millennial Securities Inc. Table 15.4 gives her payoff matrix given that she quotes prices ($a_m$, $b_m$) while all other dealers quote prices ($a_j$, $b_j$).[16]

It would appear that there are two Nash equilibria to this game—(17, 15) and (16, 16). But this ignores one of the beauties of a convention to set prices in increments of eighths

[16] We can confine ourselves to the three sets of prices (18, 14), (17, 15), and (16, 16) since no trader would wish to charge (19, 13) given an agreement to charge (18, 14).

of a dollar. The strategy (16, 16) is (weakly) dominated for Millennial Securities. She never does any worse and usually does better by quoting (17, 15). So we will eliminate the (16, 16) strategy. As a result, we are left with yet another prisoners' dilemma game. If this game were to be played between these market makers only once, the collusive agreement (18, 14) could not be sustained. It is not a Nash equilibrium. Millennial Securities, among others, has the incentive to undercut the agreed prices by quoting (17, 15).

What happens if this game is repeated indefinitely? Does Millennial Securities now have the incentive to stick with the collusive prices or will she still wish to undercut them? Let $p$ be the probability that Millennial Securities will be competing with these dealers in the next period and $R$ be the discount factor. Millennial's discounted profit from sticking to the collusive agreement is:

$$PV_{\infty}^{M} = \frac{100}{N} + \frac{100}{N}pR + \frac{100}{N}p^2R^2 + \frac{100}{N}p^3R^3 + \ldots = \frac{100}{N(1-pR)} \tag{15.11}$$

If instead, Millennial undercuts the agreed spread she can expect rapid reaction. After all, as Christie and Schultz noted, all asks and bids are public knowledge with screen trading. So let us assume that the other dealers react to Millennial's undercutting in one period and that the collusive agreement breaks down forever. Then Millennial Securities' expected profit from cheating on the agreement is:

$$PV_{\infty}^{D} = 75 + \frac{75}{N}pR + \frac{75}{N}p^2R^2 + \frac{75}{N}p^3R^3 + \ldots = 75 + \frac{75pR}{N(1-pR)}. \tag{15.12}$$

Cheating on the collusive agreement does not pay if $PV_{\infty}^{M} > PV_{\infty}^{D}$. Simple manipulation shows that for this to be the case the probability-adjusted discount factor must satisfy:

$$pR = \rho > \frac{3N-4}{3N-3} \tag{15.13}$$

At the time Christie and Schultz were doing their research, NASDAQ indicated that while there were sometimes as many as 60 dealers, there were, on average, only about 11 dealers for each stock. If $N = 11$ then the necessary value of $pR$ in equation (15.13) is $pR > 0.966$. If $N = 15$, then $pR$ must be as high as 0.976. Since $pR = \frac{p}{1+r}$ collusion requires both a very high probability $p$ of continued play and a very low interest rate. This, however, is where the frequency issue comes into play. The relevant time period between trades is probably not much more than an hour in any given trading day and market makers' memories carry over from day to day, if they ever go to sleep and stop trading! So the probability in any given period that a particular market maker will continue making a market in this specific stock one hour later is near unity, or $p \approx 1$. Moreover, since the relevant period is only an hour long, the interest rate that we use should also be measured on a per hour basis. A rate of 10 percent per year, for instance, implies a very small value for $r$ per hour—less than 0.01 percent in fact. Hence, values for $pR$ on the order of 0.99 are not at all unreasonable.

In short, the Christie and Schultz suggestion of NASDAQ dealer collusion is consistent with the conditions that economic theory predicts are necessary for such behavior. Moreover, NASDAQ's Preference Trade Rule acted very much like a "no price undercutting"

guarantee. It specified that a dealer who did not post the inside spread could nevertheless receive preferenced orders provided he or she matched the best intermarket prices. Thus, not only did NASDAQ meet the basic conditions for successful collusion but also the dealers appeared to have implemented an effective enforcement mechanism. A firm like our Millennial Securities knew that deviating from the cartel price (18, 14) and pricing at (17, 15) would not win the market even for one period since all the other brokers were committed to match her.

Of course, the proof of any pudding is in the eating. The paper by Christie and Schultz served as a catalyst to an investigation of NASDAQ pricing by the Department of Justice and the Securities and Exchange Commission (SEC). The eventual outcome shows that academic research can, in fact, directly lead to the detection of a cartel.[17] The investigation produced convincing evidence of collusion and the case was settled with an agreement by NASDAQ to change its practices. Dealers were required to record at least 3.5 percent of their traders' telephone conversations with other traders and to report any violations. In addition, NASDAQ introduced a *limit order display*. This allows investors to compete directly with dealers by specifying a price and quantity at which they are willing to buy or sell a stock. If the current inside bid on a particular stock is $\$20^7/_8$ and a private investor specifies a limit order, for example, to buy 10,000 shares of this stock at $21, then the market makers must raise their bids to $21. The result appears to have been a considerable narrowing in spreads.

Finally, for a variety of reasons including the above analysis, the SEC required NASDAQ and other markets to change their pricing practices by moving to decimal quotations in dollars (SEC order, June 2000) beginning "on or before September 5, 2000."[18] Interestingly enough, NASDAQ accompanied this move by a press release on the NASDAQ website citing the "increased savings potential for investors if decimal pricing leads to smaller price increments and narrower bid-ask spreads."

## 15.4 DETECTING COLLUSION AMONG FIRMS

In the preceding sections we have offered some guiding principles on where the authorities should watch most closely for collusive arrangements. Just watching, however, can never be enough. Even if the authorities are looking in the right place they may not detect price-fixing behavior. Some idea as to how difficult it is for the government to detect collusive behavior may be inferred from the fact that the majority of cartels that have been uncovered have only been disclosed through "finking." Sometimes the disclosure has been made by firms in the industry who have been unhappy either with the shares that they have been allocated in the cartel or because they have been excluded altogether. Sometimes it has been former employees of cartel members who have blown the whistle after losing their jobs.[19]

17 For details see the Department of Justice press release at http://www.usdoj.gov/atr/public/press_releases/1996/343.html.

18 To view this order go to http://www.sec.gov/rules/othern/34-42914.htm.

19 A classic example of this is the garbage-hauling business in New York, which was controlled by a trade association between firms who carved up the city between them. If a firm in the cartel took business away from another member, then the association forced the offending company to pay compensation amounting to "up to forty times the monthly pickup charge." Any firm attempting to enter the industry was met by arson and physical violence. Ex-mobsters who had been the victims of the financial penalties and violence provided some of the evidence necessary to break the cartel. (S. Raab, "To Prosecutors, Breakthrough after 5 Years of Scrutiny," *New York Times*, June 23, 1995, p. 3.)

# INDUSTRIAL ORGANIZATION

## Theory and Practice

Second Edition

**Don E. Waldman**
*Colgate University*

**Elizabeth J. Jensen**
*Hamilton College*

Addison Wesley

Boston San Francisco New York
London Toronto Sydney Tokyo Singapore Madrid
Mexico City Munich Paris Cape Town Hong Kong Montreal

*To our families,*
*Lynn, Abigail, and Gregory*
*Bob, Ben, and Annie*

Sponsoring Editor: *Denise Clinton*
Editorial Assistant: *Jennifer Jefferson*
Senior Production Supervisor: *Juliet Silveri*
Marketing Manager: *Jennifer Mednis*
Production Services: *Kathy Smith*
Manufacturing Manager: *Hugh Crawford*
Design Supervisor: *Regina Hagen*
Text Designer: *Ellen Pettengell*
Cover Designer: *Linda Wade*
Compositor: *G&S Typesetters, Inc.*
Illustrator: *George Nichols*
Printer: *Maple-Vail*
Cover Photos: *©2001 PhotoDisc, Inc.*

Copyright © 2001 by Addison Wesley Longman, Inc.
All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. Printed in the United States of America.

For permission to use copyrighted material, grateful acknowledgment is made to the copyright holders on p. 726, which is hereby made part of this copyright page.

**Library of Congress Cataloging-in-Publication Data**

Waldman, Don E.
Industrial organization : theory and practice / Don E. Waldman, Elizabeth J. Jensen.—2nd ed.
p. cm.
Includes bibliographical references and index.
ISBN 0-321-07735-0
1. Industrial organization (Economic theory) 2. Industrial organization. 3. Industrial policy. I. Jensen, Elizabeth Jane. II. Title.

HD2326.W349 2000
338.9—dc21 00-063932

1 2 3 4 5 6 7 8 9 10-MA-03 02 01 00

fifteen companies established a *quadrants* system to divide the United States. Four companies were assigned to each quadrant. These companies would meet and decide how to divide the market in their region. After the meetings, companies that were not present would be contacted for approval of the agreement.

By the time the government completed its investigation of the electrical equipment industry, twenty indictments covering twenty-two product groups had been handed down. Every indictment resulted in a plea of either guilty or *nolo contendere.** Eventually seven executives spent thirty days each in jail, another two dozen received thirty-day or one-month suspended sentences, and fines totaling approximately $2,000,000 were imposed on firms and individuals.[54]

**Lysine and Citric Acid—1992–1995** Two recent important conspiracies concerned schemes to divide world markets and resulted in huge antitrust fines. In 1996, the Archer Daniels Midland Company (ADM) had to pay a $100 million criminal fine. ADM had conspired with Ajinomoto Co., Kyowa Kakko Kogyo Co. Ltd., Sewon America, Inc., and others to restrain trade in Lysine, an amino acid used by farmers as a feed additive to help ensure proper growth of swine and poultry, and citric acid, an organic acid that is used in many food products and beverages, cosmetics, medicine, detergents, chemicals, and textiles.[55] ADM and its co-conspirators held meetings and conversations in which they discussed the price and volume of sales of lysine and citric acid.[56] During these meetings and conversations the companies agreed not only to fix prices, but to allocate the volume of sales for each company in both the United States and throughout the world. The conspirators also agreed to issue price announcements and price quotations for the purpose of monitoring and enforcing the agreed-upon prices and sales volumes.[57]

**Vitamins—1990–1999** On May 20, 1999 Hoffmann-La Roche of Switzerland and BASF AG of Germany pleaded guilty to fixing vitamin prices and were fined $725 million. From 1990 until February 1999, Hoffmann-La Roche, BASF, and their co-conspirators participated in a conspiracy to restrain the world trade in vitamins.[58] Through executives, officers, and employees, the two firms conspired with other vitamin manufacturers to allocate the volume of certain vitamins in the United States and the world, and to allocate customers to specific companies in the United States. This was accomplished through a series of conversations and meetings. At these meetings agreements were reached regarding the prices at which each conspirator would sell certain vitamins and also with regard to the timing of price increases and the volume of sales for each firm.[59] Additionally the conspirators agreed to rig bids so that specific companies would be awarded contracts to supply vitamin premixes to particular U.S. customers.

### 7. *Patent Cartels*

**Glass Containers—1924–1945**[60] Patents sometimes provide a wonderful opportunity to create effective cartels that last well beyond the life of the patents. This is precisely what occurred in the glass container industry from 1924 to 1945.

*A plea of *nolo contendere* means that while the indicted party does not admit to quilt, it chooses not to contest the charges. It is a very common plea in antitrust cases.

Case 3:15-md-02670-DMS-MSB Doc 2143-13 Filed 11/07/19 PgID.171210 Pg 39 of 45



A bit of history is useful. At the turn of the century, glass making was still done primarily by hand. However, in 1904 Owens-Illinois developed the first fully automated suction process machine for producing glass containers. When Owens refused to license its revolutionary machine, many glass container manufacturers were threatened with extinction. Unfortunately for Owens, a competing machine was developed that used the suspended gob feeding process. Hartford-Fairmont (the predecessor of Hartford-Empire) acquired the basic gob process patents and improved on them. At the same time, The Empire Machine Company, which was controlled by Corning Glass, owned certain gob process patent applications that interfered with Hartford-Fairmont's patents. In 1916 Hartford-Fairmont and Empire granted each other exclusive cross-licenses on their gob patents. Further negotiations led to the consolidation of the two firms as the Hartford-Empire Company on October 6, 1922.

Throughout this period Owens-Illinois also held gob process patents that were in conflict with Hartford's patent claims. On April 9, 1924, Owens and Hartford-Empire settled their conflicting patent claims. Under the agreement: (1) Owens granted Hartford an exclusive license on its patents, and Hartford granted Owens a nonexclusive license to make machines under Hartford's patents; (2) Owens received half of all Hartford's royalties over $600,000 per year; and (3) Owens received a veto over any attempt by Hartford to grant a license to any company that used any of Owens' patents. The agreement also prevented Owens from entering the pressed and blown glass field, which was reserved for Corning Glass, and left Owens in complete control of its original suction process patents.

After reaching this settlement with Owens, Hartford-Empire attempted to purchase all of the existing patents on gob feeder equipment. By 1938, Hartford had acquired over 600 glass manufacturing patents.[61] Once its patent control was complete, Hartford allocated each glass manufacturer a strict production quota on each specific type of glass container.

In 1931 Hartford's control was enhanced by the establishment of the "statistical committee" of the Glass Container Association. In consultation with the major glass manufacturers, the statistical committee assigned quotas to the Association's members and through the use of patent infringement suits was aggressive in its efforts to enforce the quotas.[62] As a result of these complex agreements, in 1938, 94 percent of all glass containers were produced on machines using one or more of Hartford-Empire's patents.[63]

The use of *patent pooling* by Hartford enabled the glass container manufacturers to solve the prisoner's dilemma by simply having Hartford negotiate and set quotas. Cheating was easily detected, and the threat of punishment in the form of a lower quota on one or more glass container items was always present.

**Gypsum Board 1929–1948**[64] Another classic example of patent pooling is found in the gypsum board industry. Since its organization in 1901 United States Gypsum has been the dominant firm in the gypsum products market. In 1939, US Gypsum controlled 55 percent of the wallboard market, and the eight-firm concentration ratio was over 90.[65] US Gypsum's control was built primarily on one patent, the Utzman patent, for producing wallboard with closed edges. Until 1912,

wallboard had been produced by sandwiching a gypsum core between two pieces of paper. Utzman's idea was to enclose the edges of the gypsum core with a paper cover so that the edges would be much less likely to crumble. Essentially, Utzman received a patent for the idea of covering the entire gypsum core (including the edges) with paper instead of enclosing just the two sides. It's hard to believe that such a minor technological advance could result in US Gypsum's domination of an industry for a quarter century, but it did.

When the Utzman patent expired in 1929, US Gypsum met with each of its licensees to work out a new set of patent agreements based on a new US Gypsum patent for producing *bubble board*, a new type of wallboard produced by introducing a soap foam into the wallboard mixture. On June 6, 1929, two months before the Utzman patent expired, US Gypsum and its licensees met in Chicago to discuss a new licensing agreement. What emerged was an agreement signed on August 6, 1929, the exact day the Utzman patent expired, that expanded US Gypsum's patent control into a full-blown cartel. Each licensee agreed to pay a royalty on "all plaster board and gypsum wallboard of every kind" whether or not made by patented processes. The agreement covered fifty patents and seven patent applications, and was to run until the most junior patent expired. Through these agreements US Gypsum was able to fix the minimum price on all wallboard products.

To prevent cheating, US Gypsum set up a subsidiary, Board Survey, Inc., to check complaints that a licensee had violated the agreement. It was common practice for Board Survey to send letters to licensees requesting explanations for alleged violations and to audit a licensee's books to check that price concessions were not being made on non–gypsum board products as a cover for negotiated secret price concessions. Frequent meetings were also held to explain provisions of the bulletins that were unclear.

Evidence suggests that the agreements resulted in increased gypsum board prices after 1929, and letters written by the licensees to US Gypsum indicated that the major objective of the agreement was to raise and stabilize wallboard prices.

An analysis of the glass container and gypsum board industries suggests that patents can be used not only as a spur for technological advance, but also as a spur for collusion. Patent cartels have proved to be effective methods of solving the prisoner's dilemma. Cheating is easily detected, and punishment in the form of patent infringement suits may be swift and effective.

## HOW SUCCESSFUL ARE THE SOLUTIONS?

### Excess Capacity Problems

One of the ironies of a successful solution to the prisoner's dilemma is that it almost invariably sows the seeds for the future demise of effective collusion.[66] Suppose an industry engages in a form of effective explicit or tacit collusion, and prices and profits rise. The increase in profits encourages the entry of new firms and the

expansion of capacity by existing firms. Often, this entry and capacity expansion results in serious excess capacity problems that put great strains on any attempt to maintain discipline. It makes little difference whether the capacity expansion is by firms that join the collusive agreements or not.

Considerable evidence indicates that excess capacity has been a recurring theme in many cartels, especially during recessions.[67] In recent years, for example, OPEC has been plagued by such problems. OPEC's success in the 1970s and early 1980s resulted in capacity expansion both within and outside of OPEC. Because the smaller producers had a great incentive to expand output, world capacity increased dramatically. Between 1973 and 1986, crude oil production in Western Europe (North Sea oil) increased from 139 million to 1395 million barrels per year, an increase of *1256 percent*.[68] During the same period output increased by 1800 percent in communist nations, and by 360 percent in Asia.[69] To maintain prices, Middle Eastern members of OPEC were forced to reduce their output from 7745 million barrels in 1973 to just 4639 million barrels in 1986.[70] In an attempt to stabilize prices, by the mid-1980s the Saudis were producing only 2.5 million barrels a day, well below their OPEC quota of over 4 million barrels per day.[71] This implied that the more successful Saudi Arabia was in stabilizing price, the greater was the development of excess capacity and the greater were the cartel's future problems.

The basing point system in the cement industry also provides evidence of the effect of collusion on capacity. The first apparent use of a basing point system in cement occurred in 1901. In 1902 the American Portland Cement Association was established as the industry's trade association, and by 1908 the Association's "Trade Relations Committee" had established a policy that "all prices quoted for portland cement shall be the prices for delivery at the point required by the purchaser."[72] By 1915 the basing point system was firmly entrenched on a national basis.

As indicated in Table 9.2, the cement industry experienced chronic excess capacity before the Supreme Court struck down the basing point system in 1948 and much less excess capacity thereafter. Table 9.2 indicates that capacity utilization rates fell below 80 percent for thirteen consecutive years between 1929 and 1941, and then again from 1943 until 1946. Declining demand during the Great Depression certainly was the major cause of the excess capacity problem. However, more than demand factors appears to have been involved. According to Loescher, "On top of the capacity idled by the depression there existed an estimated 60,000,000 barrels of practical capacity idled by excessive building—or about 25 percent of the average practical capacity of the period 1931 to 1935."[73]

Evidence indicates that during the height of explicit collusion in the electric turbine market GE, Westinghouse, and Allis-Chalmers were all expanding capacity at a rate that exceeded any possible demand increases.[74] Capacity expansion was encouraged because the turbine producers often used the existence of large amounts of excess capacity as a bargaining chip at meetings designed to divide the market.

ASPEN PUBLISHERS

**Phillip E. Areeda**
*Late Langdell Professor of Law*
Harvard University

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa

**Volume II**
**Third Edition**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application

Wolters Kluwer
Law & Business

AUSTIN BOSTON CHICAGO NEW YORK THE NETHERLANDS

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

—From a *Declaration of Principles* jointly adopted
by a Committee of the American Bar Association
and a Committee of Publishers and Associations

© 2007 President and Fellows of Harvard College
Published by Aspen Publishers. All Rights Reserved.

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording or any information storage and retrieval system, without permission in writing from the publisher. Requests for permission to reproduce content should be directed to the Aspen Publishers website at *www.aspenpublishers.com*, or a letter of intent should be faxed to the permissions department at 212-771-0803.

Printed in the United States of America

1 2 3 4 5 6 7 8 9 0

Library of Congress Control Number: 2006930321

ISBN 978-0-7355-6428-2 (Set)
978-0-7355-6767-2 (Volume II)

In any event, the critique of economics as being less empirical than the other social sciences may carry little weight in antitrust economics as it is used in litigation — for several reasons. *First*, the branch of economics most frequently employed in antitrust analysis is industrial organization, where the volume of empirical analysis is significant although much of it is subject to the criticism that the testing really amounts to rather minimal consistency verification rather than rigorous attempts to falsify. *Second*, it clearly was not *Daubert*'s purpose to change the way that any discipline goes about its own business. To be sure, the empirical content of economics may be less than the empirical content of, say, psychology; but nothing in *Daubert* suggests that economists as a group must behave more the way psychologists behave if they want their testimony to be admissible. Rather, the standards for empirical testing, peer review, and acceptance must be standards that are generally regarded as acceptable within the discipline in question — a proposition that the Supreme Court's subsequent *Kumho* decision made clear.[51] *Daubert*'s purpose is not to question or undermine economics' domain as the study of how rational economic actors make choices any more than it is to undermine psychology's domain as consisting in part of the study of why some actors fail to make choices that seem rational to the rest of us. For this reason it would be an inappropriate use of *Daubert* to exclude the testimony of an economist who was using methodologies and assumptions that are acceptable within the discipline of economics — even though these same methodologies or assumptions might not satisfy the practitioner of a different expert discipline.

Several antitrust decisions have applied *Daubert* to testimony offered by an economist, statistician, or other expert.[52] In

economic, statistical or econometric methodologies and reasoning that can properly be applied to the facts of this case.

Id. at 1252.

51. *Kumho*, note 10, 526 U.S. at 151.

52. In addition to the decisions discussed in the text, see the following:

On the use of regression analysis in particular, see *Polypropylene Antitrust Litig.*, 93 F. Supp. 2d 1348 (N.D. Ga. 2000), which noted that the Supreme Court's pre-*Daubert* decision in *Bazemore v. Friday*, 478 U.S. 385 (1986), held that an economist's statistical analysis could be admissible even if it did not incorporate every conceivable relevant variable. Id. at 393 n.4. However, the Supreme Court acknowledged that regression models omitting salient variables could be so "incomplete as to be inadmissible." Id. at 400 n.10. See also *People Who Care v. Rockford Board of Educ.*, 111 F.3d 528, 537-538 (7th Cir. 1997) (non-antitrust decision; "study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court"); *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir.), cert.