UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No.: 15-MD-2670 JLS (MDD)<br><br>**ORDER DENYING MOTION TO EXCLUDE DIRECT PURCHASER PLAINTIFFS' EXPERT WITNESS**<br><br>**(ECF No. 1967)** |

Before the Court are Defendants Dongwon Industries Co., Ltd. (DWI) and Tri-Union Seafoods LLC's Motion to Exclude Testimony of Dr. Gary Hamilton, (ECF No. 1967-1 (Mot.)), Direct Purchaser Plaintiffs' (DPP) Opposition to Defendants' Motion (ECF No. 2108 (Opp'n)), and Defendants' Reply (ECF No. 2215).[1]  Having reviewed the Parties' arguments and the law, the Court **DENIES** Defendants' Motion.

## BACKGROUND

The "DPPs retained Dr. Hamilton to investigate the groups in this case and to analyze the degree of control and cohesion within these two groups." Opp'n, at 2.  The two groups Dr. Hamilton offers his opinions on are: (1) Thai Union Group (TUG) and its subsidiary, Chicken of the Sea International (COSI); and (2) Dongwon Group (DWG) and its

---

[1] Unredacted versions of these documents were filed as ECF Nos. 1966, 2107 and 2214, respectively.

subsidiary, StarKist Company. *See* Hamilton Report (RCF No. 1966-2 (HR)) ¶ 10. He concluded that the groups "display weak and informal corporate governance and weak corporate barriers." *Id.* ¶ 12.C. Dr. Hamilton's conclusion is based on his evaluation of "relevant material in the scholarly literature, trade journals, newspapers, stock exchange listings, and searchable databases[,]" as well as numerous depositions and other discovery produced in the course of this litigation. *Id.* ¶ 11, 12.

Dr. Hamilton's expertise in sociology is undisputed. He received his Ph.D. in Sociology in 1975 and has been a professor of the subject at various higher education institutions, including various Asian universities, since 1974. HR Exhibit (Ex.) 1. Dr. Hamilton's current role is Professor Emeritus for The Jackson School of International Studies at the University of Washington. *Id.* His "primary research specialty is the organizational structure of Asian economies and, specifically, family-owned business groups." *Id.* ¶ 5. He has published dozens of articles, essays, and books on this topic. *See id.* Ex. 1.

Defendants request that the Court exclude Dr. Hamilton's testimony.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The trial judge acts as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow*

15-MD-2670 JLS (MDD)

*Pharm., Inc.*, 509 U.S. 579, 589 (1993). Following *Daubert*, the Supreme Court explained that *all* expert testimony (including non-scientific) must be both relevant and reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

Expert testimony is relevant if it "logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (*Daubert II*). Also, "[t]he requirement that the opinion testimony assist the trier of fact goes primarily to relevance." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

Expert testimony must also have a "reliable basis in the knowledge and experience of [the expert's] discipline." *Daubert*, 509 U.S. at 592. "[T]he test of reliability is flexible," and a district court is granted "broad latitude when it decides *how* to determine reliability" as well as "in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 141-42 (citations omitted) (emphasis in original). Where "experts are retained to offer non-scientific testimony, the reliability inquiry will 'depend[ ] heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'" *Bona Fide Conglomerate, Inc. v. SourceAmerica*, No. 14-CV-00751-GPC-AGS, 2019 WL 1369007, at *2 (S.D. Cal. Mar. 26, 2019) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004)).

"Disputes as to the strength of an expert's credentials, faults in his use of a particular methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (citation and brackets omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

## ANALYSIS

### I. Relevance

Defendants first argue that Dr. Hamilton's testimony fails the relevancy inquiry because he ignores the factors courts use in determining whether a parent corporation is

/ / /

3

vicariously liable for the actions of its subsidiary.[2]  *See* Mot. at 6.  To be relevant, Dr. Hamilton's opinions must "logically advance[] a material aspect" of at least one of DPPs' claims.  *Daubert II*, 43 F.3d at 1315.  Only a cursory view of DPPs' complaint is necessary to reveal the relevance of Dr. Hamilton's testimony.

One of DPPs' claims is an "alter ego" theory.  The first requirement of alter ego—and the only one this Court need evaluate for purposes of this motion—is "that there is such a unity of interest and ownership that the individuality, or separateness, of the said [defendant] and corporation has ceased."  *Firstmark Capital Corp. v. Hempel Fin. Corp.*, 859 F.2d 92, 94 (9th Cir. 1988) (citations and emphasis omitted).  In other words, there is a lack of distinction between the subsidiary and parent corporation. Factors used to support "unity of interest" include:

> [C]ommingling of funds, failure to maintain minutes or adequate corporate records, identification of the equitable owners with the domination and control of the two entities, the use of the same office or business locations, the identical equitable ownership of the two entities, the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual, and the failure to adequately capitalize a corporation.

*In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1060 (S.D. Cal. 2017) (citations omitted).

Dr. Hamilton's expert report "logically advances" a jury's potential consideration of a number of the "unity of interest" factors.  Dr. Hamilton's characterization of TUG's "clearly defined ownership pyramid, in which the greater Chansiri family owns the controlling shares in all the firms included in the pyramid" goes to the "identification of

---

[2] Defendants also raise the issue of Dr. Hamilton's "subjective characterization of Asian business practices based on cultural and racial stereotypes" in their relevancy argument, but it is better handled as a reliability question, and the Court will address it as such.

the equitable owners with the domination and control of the two entities," and to the "identical equitable ownership of the two entities." HR ¶78. Dr. Hamilton also discusses TUG's use of the same office or business location for both the parent and subsidiary. *See id.* ¶ 46. Dr. Hamilton provides similar analysis with regards to DWI and StarKist. *See id.* ¶ 85, ¶¶ 91-98, ¶¶ 106-07.

While Dr. Hamilton does not explicitly state that he is evaluating the factors relevant to the alter ego analysis, that is not required for expert testimony to be admissible. Dr. Hamilton is a sociologist, not a lawyer. As such, he should be expected to testify about "society, social institutions, and social relationships." Sociology, *The Merriam-Webster Dictionary*, at 681 (2016). It is an expert's job to "help the trier of fact to understand the evidence," not to unilaterally "offer[] legal conclusion testimony [that] invades the province of the [finder of fact]." Fed. R. Evid. 702; *Nationwide v. Kass Info. Sys., Inc.*, 523 F.3d 1051, 1059 (9th Cir. 2008). Dr. Hamilton's testimony satisfies Rule 702's relevancy requirement.

## II. Reliability

Defendants argue that Dr. Hamilton's testimony lacks reliability because: (1) Dr. Hamilton "fail[s] to offer any objective criteria of his own" "to evaluate the reliability of his conclusions," (2) "[Dr.] Hamilton's testimony goes beyond summary and passes into argument" in an "attempt to usurp the role of the jury," and (3) Dr. Hamilton impermissibly bases his testimony on "characterizations of Asian business practices based on cultural and racial stereotypes of Korean and first-generation Chinese owned-businesses and people." Mot. at 10, 14-15, 2.

### A. Methodology

At bottom, Defendants argue that Dr. Hamilton's conclusion that Defendant subsidiaries and parent corporations displayed "weak barriers" of corporate governance is based merely on subjective opinions without any basis in the factual record of this case; essentially, Dr. Hamilton doesn't bridge the gap between his expertise and the facts at hand.

5

Dr. Hamilton states that his opinions are based on "relevant material in the scholarly literature, trade journals, newspapers, stock exchange listings, and searchable databases" in addition to the non-public information that was turned over to DPPs as part of discovery. HR ¶¶ 11, 12.  His testimony is filled with references to objective criteria he analyzes to reach his conclusions. For example, in discussing TUG and DWI's pyramidal ownership structures, Dr. Hamilton considers the percentage ownership that the parent corporation had in the lower tiered subsidiaries, as well as the ownership percentage that members of the respective controlling families had in the groups. *See id.* ¶¶ 34-37, ¶ 89 n. 133, ¶¶ 92-96, Ex. 3.  Dr. Hamilton goes on to evaluate and discuss the duplicating hierarchies he believes these firms employ.  He backs up this assertion with organizational flow charts and discussions of facts on the record regarding the dynamics of TUG and DWI's shifting high-ranking personnel between parent and subsidiary corporations.  *See id.* ¶¶ 39-44, ¶ 49, ¶ 141, Ex. 4-5.[3]

Beyond the objective evidence set forth by Dr. Hamilton to support his analysis, his expertise in the subject matter cannot be, and is not, seriously challenged.  As is the case here, where "experts are retained to offer non-scientific testimony, the reliability inquiry will 'depend[ ] heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'" *Bona Fide Conglomerate, Inc.*, 2019 WL 1369007, at *2.  Also, "[d]isputes as to . . . faults in his use of a particular methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy*, 161 F.3d at 1231.

The Court is not deciding the strength of Dr. Hamilton's opinion; that will be resolved at trial.  Dr. Hamilton has met Rule 702's requirements to base his testimony on sufficient facts and data, and he has applied reliable principles and methods to the facts of this case.

---

[3] This is not an exhaustive list of the objective criteria Dr. Hamilton analyzed in his report.

### B. *Improper Analysis of the Record*

Defendants argue that Dr. Hamilton's analysis of the factual record is impermissible because he "relies almost entirely on a handful of documents cherry-picked" from the record and impermissibly evaluates the credibility of witnesses. *See* Mot. at 12-14.

Defendants' "cherry-picking" argument is unpersuasive. There is no rule that an expert must consider and discuss all of the evidence on the record in order to proffer admissible testimony. "That [an expert] did not address (or review) deposition testimony where defendants' employees testified to matters that purportedly undermine some of his opinions or assumptions does not make his testimony excludable. Those are grounds for cross-examination." *In re Korean Ramen Antitrust Litig.*, 281 F.Supp.3d 892, 931 (N.D. Cal. 2017).

Defendants next argue that Dr. Hamilton's "plan[] to tell the jury not to credit the testimony of [a defense witness]" is improper. Mot. at 13. "An expert witness is not permitted to testify specifically to a witness' credibility." *Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017) (quoting *United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989)). Dr. Hamilton's testimony so far was directly responsive to defense counsel's deposition question. Thus, defense counsel "opened the door" to Dr. Hamilton's opinion on the matter. Should Dr. Hamilton opine on the credibility of defense witnesses unprompted by defense counsel at trial, the issue will be addressed at that time.

### C. *Cultural and Racial Stereotypes*

Lastly, Defendants argue that Dr. Hamilton's testimony is based on cultural and racial stereotypes. Specifically, Defendants take issue with Dr. Hamilton's characterization of the "Chineseness" of TUG and DWI's having "acted like Koreans." Mot. at 8.

Defendants rely on *Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993 (9th Cir. 2001). In *Jinro*, the defendants relied on a purported expert "to testify about Korean law and the business practices of Korean companies—particularly their alleged propensity to engage in fraudulent activity." *Id.* at 1001. The purported expert in *Jinro* was a general

manager of a detective agency in Korea who "claimed to have familiarized himself with Korean business practices as part of his job duties and as 'a hobby of his.'" *Id.* The Ninth Circuit determined that the purported expert's testimony should not have been admitted at trial because he was lacking qualifications to opine on the issues at hand, and his testimony erroneously led the jury to believe that because his job focused on corrupt Korean businesses, so this must be representative of most Korean businesses, and thus most Korean businesses must be corrupt. *Id.* at 1006. The Court also determined that the testimony should have been excluded under Rule 403 because "it was so tinged with ethnic bias and stereotyping." *Id.*

Dr. Hamilton's testimony is distinguishable from the testimony in *Jinro* on a number of grounds. First, contrary to the witness in *Jinro*, there is extensive evidence in the record to support Dr. Hamilton's testimony as a "cultural expert by education, profession[, and] experience." *Id.* at 1009. He has spent nearly half a century studying the cultural dynamics of businesses in Asia, so it is well within his purview to liken certain behaviors to those that are common in cultures he has studied.

Second, Dr. Hamilton does not attempt to suggest that these characteristics mean that Chinese, Thai, or Korean businesses are more likely to engage in illegal activity or wrong-doing, as was the case in *Jinro*. Dr. Hamilton's ultimate conclusion that the defendants displayed "weak corporate barriers" is far from asserting that they were engaged in illegal activity.

Finally, the opinions at issue here have a basis in fact. As discussed above, Dr. Hamilton relies on numerous sources of objective data, as well as "depositions from key personnel in the two business groups." HR ¶ 12. Dr. Hamilton's testimony is not tantamount to an inadmissible syllogism because he sufficiently bridges the gap between his expertise and his conclusions with facts and evidence relating to the case.

Dr. Hamilton's testimony is much closer to the challenged testimony in *In re Korean Ramen Antitrust Litigation*. Expert testimony was offered "on the corporate structure and organizational features of Korean business groups . . . , the corporate governance setting in

which they operate, and to provide expert analysis and opinions with respect to whether and to what extent these factors are germane to understanding the organization and operations of [the defendants—Korean business groups.]" *Id.* at 930 (citations omitted). Despite the defendants' contentions that the expert's testimony was based on "impermissible national-origin based stereotypes," the testimony was deemed admissible because of the expert's "academic qualifications and reliance on extensive literature." *Id.* at 931-32. The court contrasted the challenged testimony with the excluded testimony in *Jinro* where the purported expert "offered his impressionistic generalizations about Korean businesses based on his personal investigative experiences, his 'hobby' of studying Korean business practices, unspecified input from his office staff and his marriage to a Korean woman." *Jinro*, 266 F.3d at 1006.

Dr. Hamilton has significant "academic qualifications" and his testimony "reli[es] on extensive literature." *Korean Ramen*, 281 F.Supp.3d at 931-32*; see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2017 WL 2616916, at *1 (N.D. Cal. Apr. 5, 2017) (admitting expert testimony regarding "the ability of [Korean family-controlled business groups] to exercise effective control" "of other firms within the group" based, in part, on "cultural factors such as rigidly hierarchical forms of corporate organization and strong deference to superiors, including the group patriarch.").

Dr. Hamilton's testimony satisfies Rule 702's reliability requirement.[4]

---

[4] Defendants also ask the Court to exclude Dr. Hamilton's testimony under Rule 403 because "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The request is denied at this stage of the proceedings.

Dr. Hamilton's "Chineseness" remark was intended to add "cultural and sociological" context to his findings . *See* Hamilton Rebuttal Report ¶ 78; *see also Korean Ramen*, 281 F.Supp.3d at 932 (denying a Rule 403 challenge where an expert "relies on the 'cultural dimension' of Korean culture and corporate culture to support his conclusions.") (citations omitted). The same can be said for Dr. Hamilton's "acted like Koreans" comment. Further, the latter comment was a direct answer to defense counsel's question. *See* Hamilton Dep. 289:21-34 ("Q. (By Mr. Yates) Answer my question, sir. Do you believe that the Koreans in this case acted like Koreans?") Defense counsel "opened

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Exclude Expert Testimony of Dr. Gary Hamilton (ECF No. 1966).

**IT IS SO ORDERED.**

Dated: September 24, 2020

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

---

the door" to Dr. Hamilton's opinion on the matter. Dr. Hamilton did not suggest that Korean or Chinese corporate culture tolerates or encourages illegal activity. *Cf. Korean Ramen Litig.*, 281 F.Supp.3d at 932. He testified that the defendants displayed "weak corporate barriers." Accordingly, his opinion is not excluded under Rule 403 at this point. HR ¶ 12.C.