# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No.:  15-MD-2670 DMS (MDD) |
| | **CLASS ACTION** |
| This Document Relates To: | |
| *Associated Wholesale Grocers, Inc. v. Bumble Bee Foods LLC et al.,* case no. 18cv1014-JLS-MDD | **ORDER GRANTING IN PART AND DENYING IN PART DIRECT ACTION PLAINTIFFS AND END PURCHASER PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT AGAINST STARKIST COMPANY BASED ON GUILTY PLEAS AND ADMISSIONS IN PARALLEL CRIMINAL PROCEEDINGS** |
| *Winn-Dixie Stores, Inc. et al. v. Bumble Bee Foods LLC et al.*, case no. 16cv17-JLS-MDD | |
| End Payer Class Actions | |
| Commercial Food Preparer Class Actions | |
| Direct Purchaser Class Actions | **(ECF Nos. 1993, 2035)** |

Pending before the Court in this multidistrict litigation are partial motions for summary judgment against certain Defendants as to liability based on Defendants' criminal convictions and admissions in parallel criminal proceedings.  Specifically, Plaintiffs Winn-Dixie Stores, Inc. ("Winn-Dixie"), Associated Wholesale Grocers, Inc. ("AWG"), and W. Lee Flowers & Co. ("W. Lee Flowers") (collectively "Direct Action Plaintiffs" or

"DAPs"))[1] filed a motion for partial summary judgment against StarKist Company ("StarKist") (ECF No. 2035 ("DAP Mot.")); and End Payer Plaintiffs ("EPPs") filed a motion for partial summary judgment against StarKist and Bumble Bee Foods, LLC ("Bumble Bee") (ECF No. 1993 ("EPP Mot.")).[2]  A number of other Plaintiffs joined in the DAP and EPP Motions.[3]  StarKist filed a consolidated opposition to both motions. (ECF No. 2129.)  The Moving Parties filed reply briefs.  (ECF Nos. 2193, 2221.)  For the following reasons, the EPP and DAP Motions are granted in part and denied in part.

## I.

## BACKGROUND

Several plaintiffs initiated multiple civil actions in 2015, alleging an antitrust conspiracy by Defendants to fix and maintain packaged tuna prices above competitive levels in violation of state and federal antitrust laws.  On December 9, 2015, various parallel civil actions based on the same conspiracy were consolidated in a multidistrict litigation for pretrial proceedings before this Court.  The Court divided Plaintiffs into four tracks: (1) DAPs are direct purchasers proceeding individually against Defendants; (2) DPPs are direct purchasers who, unlike DAPs, are proceeding on behalf of a putative class; (3) CFPs are indirect purchasers proceeding on behalf of a putative class; and (4) EPPs are

---

[1]    W. Lee Flowers has since settled all its claims against StarKist.  (ECF No. 2463.) For brevity, Winn-Dixie and AWG are collectively referred to herein as DAPs, although they are not the only direct-action plaintiffs involved in this action.

[2]    On November 21, 2019, Bumble Bee filed for bankruptcy protection.  *See In re: Bumble Bee Parent, Inc. et al.,* Case No. 19-12502-LSS (Bankr. D. Del.).  Proceedings against Bumble Bee are currently stayed pursuant to 11 U.S.C. § 362, and all claims against Bumble Bee have been administratively closed.  (ECF No. 2591, 2286.)  Accordingly, this Order addresses claims against StarKist only.

[3]    Direct Purchaser Plaintiffs ("DPPs") and Commercial Food Preparer Plaintiffs ("CFPs") joined in both motions.  (ECF Nos. 2043, 2046.)  EPPs joined in the DAP Motion (ECF No. 2039) and AWG joined in the EPP Motion (ECF No. 1997).  All moving parties are sometimes collectively referred to as the "Moving Parties."

consumers proceeding on behalf of a putative class (collectively "Plaintiffs").  Defendants are the three largest domestic tuna brands and their parent companies: (1) Tri-Union Seafoods LLC d/b/a Chicken of the Sea International ("COSI") and Thai Union Group PCL ("TUG"); (2) Bumble Bee, Lion Capital LLP, Lion Capital (Americas), Inc. and Big Catch Cayman LP; and (3) StarKist and Dongwon Enterprises Co. Ltd. ("Dongwon").  AWG also filed claims against Bumble Bee's former President and CEO Christopher Lischewski.[4]

In July 2015, prior to the filing of these civil actions, the United States Department of Justice ("DOJ") announced its investigation into the packaged tuna industry.  Criminal charges were filed against COSI, Bumble Bee, and StarKist, as well as a number of their executives for violating the Sherman Act, 15 U.S.C. § 1, a felony.  In exchange for self-reporting its participation in the conspiracy and a pledge of full cooperation with the investigation, the DOJ Antitrust Division issued a conditional leniency letter to COSI pursuant to the Corporate Leniency Program and the Antitrust Criminal Penalty Enhancement and Reform Act, 15 U.S.C. § 1 *et seq.* ("ACPERA").[5]

In 2017, Walter Scott Cameron, Bumble Bee's Senior Vice President of Sales, Kenneth Worsham, Bumble Bee's Senior Vice President of Trade Marketing, and Stephen L. Hodge, StarKist's Senior Vice President of Sales, pleaded guilty to participating in the conspiracy with representatives of other major packaged-seafood-producing firms with the

---

[4]     Unless otherwise noted, individuals are referred to by full names only when first introduced.  Subsequently, they are referenced by last name only.

[5]     Pls' Joint Statm. of Undisputed Facts in Supp. of EPP Mot., ECF No. 2003, Ex. ("EPP Ex.") 76 (TUG press release) and 77 (Frequently Asked Questions About ACPERA, issued by the DOJ ("DOJ Q&A")).  Under ACPERA, Pub. L. No. 108-237, 118 Stat. 661 (codified at 15 U.S.C. § 1 *et seq.* and accompanying notes), a cartel participant who is first to voluntarily report its participation may avoid prosecution and obtain a reduction in civil damages, if it promptly terminates its involvement in the conspiracy, provides full, complete, and continuing cooperation with the investigation, criminal prosecution, and discovery in a related civil antitrust action, and if it provides adequate restitution to the victims, typically plaintiffs in a related civil antitrust action.  *See generally* DOJ Q&A.

purpose to fix, raise, and maintain the prices of shelf-stable tuna in violation of the Sherman Act.  (Pls' Statm. of Undisputed Facts in Supp. of DAP Mot., ECF No. 2033, Exs. ("DAP Ex.") 31-33; *see also United States v. Cameron,* U.S. Dist, Ct. N.D. Cal. Case No. 16cr501-EMC; *United States v. Worsham,* U.S. Dist. Ct. N.D. Cal. Case No. 16cr535-EMC; *United States v. Hodge,* U.S. Dist, Ct. N.D. Cal. Case No. 17cr297-EMC.)[6]

Bumble Bee pleaded guilty to the same conspiracy on August 4, 2017.  (EPP Ex. 74; *see also United States v. Bumble Bee Foods, LLC,* U.S. Dist, Ct. N.D. Cal. Case No. 17cr249-EMC.)  On May 16, 2018, Lischewski was indicted for his role in the same conspiracy.  (*United States v. Lischewski*, U.S. Dist, Ct. N.D. Cal. Case No. 18cr203-EMC, ECF No. 1 (Indictment).)  He was found guilty on December 3, 2019, after a jury trial.  (*Id.* ECF No. 640 (Verdict), ECF No. 697 (Judgment).)  His conviction was affirmed on appeal. *United States v. Lischewski*, __ Fed. Appx. __, 2021 WL 2826474 (9th Cir. Jul. 7, 2021.) The Court of Appeals found there was "overwhelming evidence that Lischewski participated in a scheme to fix prices in the canned tuna market." *Id.* at *2.  StarKist entered its guilty plea for the same conspiracy on November 14, 2018.  (Dec. of Belinda S. Lee in Supp. of Opp'n, ECF No. 2129, Ex. ("SK Ex.") 36 ("Plea Agreement"); *see also United States v. StarKist Co.,* U.S. Dist. Ct. N.D. Cal. Case No. 18cr513-EMC ("*StarKist*"); EPP Ex. 78 ("Tr.").

The Moving Parties request summary adjudication that StarKist participated in a conspiracy to fix prices of packaged tuna until July 1, 2015.  EPPs also seek a finding that the conspiracy began as early as June 1, 2011, and DAPs request a finding that it started in December 2007.  (*See* EPP Mot. 1; Pls' Joint Reply Mem. of Law in Further Supp. of Their Mot. for Partial Summ. J. Against StarKist ("DAP Reply") 1 ECF. No. 2190.)  StarKist opposes, arguing that the scope and significance of its Plea Agreement and the conspiracy itself are much more limited.

---

[6]     The Court takes judicial notice of the filings in the criminal cases.  *See* Fed. R. Evid. 201.

## II.

## DISCUSSION

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses. Summary judgment or adjudication of issues is appropriate if depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[7] A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The burden on the party moving for summary judgment depends on whether it bears the burden of proof at trial.

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000); *see also Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) ("Where the moving party will have the burden of proof at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.").

On the other hand, if the moving party would *not* bear the burden at trial, it can meet its burden on summary judgment by "either of two methods:" it may

> produce affirmative evidence ... negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may ... meet its initial burden of production "by 'showing'—that is, pointing out to

---

[7]   Unless otherwise noted, internal quotation marks, ellipses, brackets, citations, and footnotes are omitted from citations.

1    the district court—that there is an absence of evidence to support the
2    nonmoving party's case."

3    *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1105-06 (9th
4    Cir. 2000) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

5        If the moving party carries its burden of production, the nonmoving party must "go
6    beyond the pleadings and by [its] own affidavits, or by the depositions, answers to
7    interrogatories, and admissions on file, designate specific facts showing that there is a
8    genuine issue for trial." *Celotex*, 477 U.S. at 324.  In this regard, the nonmoving party

9        must do more than simply show that there is some metaphysical doubt as to
10       the material facts[, and] must come forward with specific facts showing that
         there is a genuine dispute for trial.  Where the record taken as a whole could
11       not lead a rational trier of fact to find for the non-moving party, there is no
12       genuine issue for trial.

13   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

14       In ruling on a motion for summary judgment, "courts may not resolve genuine
15   disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572
16   U.S. 650, 656 (2014).  "[A] judge's function at summary judgment is not to weigh the
17   evidence and determine the truth of the matter but to determine whether there is a genuine
18   issue for trial." *Id.*  "[T]he evidence of the nonmovant is to be believed, and all justifiable
19   inferences are to be drawn in his favor." *Id.* at 651; *see also id.* at 657.  "Credibility
20   determinations, the weighing of the evidence, and the drawing of legitimate inferences
21   from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

22       "The district court may limit its review to the documents submitted for the purpose
23   of summary judgment and those parts of the record specifically referenced therein."
24   *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).  The
25   court is not obligated "to scour the record in search of a genuine issue of triable fact."
26   *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

27   / / /
28   / / /

6

## A.    Federal Antitrust Claims

"The antitrust laws of the United States aim to protect consumers by maintaining competitive markets." *In re Musical Instruments & Equip. Antitrust Litig.,* 798 F.3d 1186, 1191 (9th Cir. 2015).  To this end, the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1.  The Act "prohibits agreements that unreasonably restrain trade by restricting production, raising prices, or otherwise manipulating markets to the detriment of consumers." *Musical Instruments*, 798 F.3d at 1191.

The accepted standard under this provision is the rule of reason, which outlaws only "unreasonable restraints."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).

> In analyzing the reasonableness of an agreement under § 1, the Supreme Court has distinguished between agreements made up and down a supply chain, such as between a manufacturer and a retailer ("vertical agreements"), and agreements made among competitors ("horizontal agreements").    The Supreme Court has recognized that certain horizontal agreements always or almost always tend to restrict competition and decrease output.    Classic examples include agreements among competitors to fix prices ....    Such inherently anticompetitive horizontal agreements violate the Sherman Act per se.  Once the agreement's existence is established, no further inquiry into the practice's actual effect on the market or the parties' intentions is necessary to establish a § 1 violation.

*Musical Instruments*, 798 F.3d at 1191; *see also Leegin Creative Leather Prods.,* 551 U.S. at 886 (horizontal agreements among competitors to fix prices are *per se* unlawful).  COSI self-reported, StarKist, Bumble Bee, and some of their executives pleaded guilty to, and Lischewski was convicted of, participating in a horizontal price-fixing conspiracy.

Unlike the Sherman Act, which provides for criminal liability, the Clayton Act provides a private right of action by allowing "any person who shall be injured in his

/ / /

business or property by reason of anything forbidden in the antitrust laws [to] sue" in federal court for damages.  15 U.S.C. § 15(a).

1.    Plea Period: "Period Beginning at Least as Early as November 2011 and Continuing Through at Least as Late as December 2013"

The Moving Parties contend that StarKist's guilty plea collaterally estops it from relitigating in this proceeding its participation in a price-fixing conspiracy with its competitors for the time period admitted in the Plea Agreement.  (DAP Reply 2-3; *see also* Pls' Reply Mem. of P.&A. in Further Supp. of Mot. for Partial Summ. J. ("EPP Reply") 1, ECF No. 2218.)  StarKist opposes the DAP and EPP Motions to the extent the Moving Parties request summary adjudication of issues outside the scope of the Plea Agreement. (Def. StarKist's Omnibus Opp'n to Pls' Mot. for Partial Summ. J. Against StarKist (ECF No. 2035) and EPPs' Mot. for Partial Summ. J. (ECF No. 1993) 10-12, ECF No. 2128 ("Opp'n").)

StarKist pleaded guilty to a one-count information alleging it "knowingly entered into and engaged in a combination and conspiracy to fix, raise, and maintain the prices of packaged seafood."  (*StarKist*, ECF No. 1 (Information) 1-2; *see also* Plea Agreement 3-4; Tr. 14-15.)  Among other things, StarKist admitted the following facts:

(a)    For purposes of this Plea Agreement, the "relevant period" is that period beginning at least as early as November 2011 and continuing through at least as late as December 2013.  ...  During the relevant period, the defendant was a producer of packaged seafood, was engaged in the sale of packaged seafood in the United States, and employed 50 or more  individuals.  For purposes of this Plea Agreement, packaged seafood consists of canned tuna fish.  ...

(b)    During the relevant period, the defendant, through its officers and employees, including high-level personnel of the defendant, participated in a conspiracy among major packaged-seafood-producing firms, the primary purpose of which was to fix, raise, and maintain the prices of packaged seafood sold in the United States.  In furtherance of the conspiracy, the defendant, through its officers and employees, engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms.  During these conversations, discussions,

8

and meetings, agreements and mutual understandings were reached to fix, raise, and maintain the prices of packaged seafood sold in the United States. Defendant, through its officers and employees, negotiated prices with customers and issued price announcements for packaged seafood in accordance with the agreements and mutual understandings reached.

(Plea Agreement 3-4; *see also* Tr. 13-14.)

The judge presiding over the criminal cases found that "there is a factual basis for the plea [and] that the elements necessary to support a conviction under ... [the] sole count of the information have been satisfied." (Tr. 14.) StarKist agreed to a $100 million fine, the maximum penalty for the offense. (Plea Agreement 5-6; Tr. 10.) A Judgment was entered accordingly. (*StarKist*, ECF No. 181 (Judgment); *see also* ECF No. 179 (Sentencing Tr.) 42-48.)

Under Section 5 of the Clayton Act, a final judgment in a criminal proceeding finding the defendant violated federal antitrust laws,

shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto.

15 U.S.C. § 16(a). The purpose of this provision is "to minimize the burdens of litigation for injured private suitors by making available to them all matters previously established by the Government in antitrust actions" and "confer ... as large an advantage as the estoppel doctrine would afford ...." *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568 (1951); *see also* 15 U.S.C. § 16(a) ("Nothing contained in this section shall be construed to impose any limitation on the application of collateral estoppel").

The criteria for application of collateral estoppel in a case involving a criminal judgment are:

(1) the prior conviction must have been for a serious offense so that the defendant was motivated to fully litigate the charges; (2) there must have been a full and fair trial to prevent convictions of doubtful validity from being used; (3) the issue on which the prior conviction is offered must of necessity have been decided at the criminal trial; and (4) the party against whom the collateral estoppel is asserted was a party or in privity with a party to the prior trial.

9

*United States v. Real Prop. Located at Section 18, Twp. 23, Range 9, Sunnyview Plat, Lots 4 & 5, Block 4, Lakeview Dr., Quinault Lake, Olympic Nat. Park, Grays Harbor Cty., WA.*, 976 F.2d 515, 518 (9th Cir. 1992) ("*Real Property*").  Although the standard references a "trial," "a guilty plea may be used to establish issue preclusion in a subsequent civil suit." *Id*. at 519.

StarKist concedes that the first, second, and fourth criteria are met.  (Opp'n 10 n.9.)  As to the third criterion, StarKist argues the only issues necessarily decided are the elements of the Sherman Act charge, thus excluding four issues from collateral estoppel: (1) the injury element required for civil liability, *see* 15 U.S.C. § 15(a); (2) any products other than 5 oz. tuna cans; (3) whether the agreement was to raise tuna prices; and (4) any conduct occurring before November 2011 or after December 2013.  (Opp'n 11.)

Collateral estoppel "has only been allowed where an element of the crime to which the defendant pled guilty or of which he was convicted was at issue in the second suit." *Real Property,* 976 F.2d at 519.  The elements of the Sherman Act violation to which StarKist pleaded guilty are:

(a)   the conspiracy described in the Information existed at or about the time alleged;
(b)   the defendant knowingly became a member of the conspiracy; and
(c)   the conspiracy described in the Information either substantially affected interstate commerce in goods or services or occurred within the flow of interstate commerce in goods and services.

(Plea Agreement 4; *see also* Tr. 12-13, 14.)  The factual basis for these elements was also necessarily decided, *see Emich*, 340 U.S. at 569, including that the conspiracy was among competitors "to fix, raise, and maintain the prices of packaged seafood," that it existed from "at least as early as November 2011 and continuing through at least as late as December 2013," and that it encompassed "canned tuna fish."  The guilty plea precludes StarKist from relitigating these issues.

/ / /

/ / /

### a.   *Injury*

StarKist argues the guilty plea does not have collateral estoppel effect to establish the injury element of the civil antitrust claims.  (Opp'n 1 & n.2, 12-13.)  In a parallel civil antitrust case, where the plaintiffs can avail themselves of the preclusive effect of a criminal judgment, they must show the "impact of the conspiracy on them ... and evidence of resulting damages."   *Emich*, 340 U.S. at 570-71.   DAPs concede this in their motion, stating that their focus is the conspiracy element.  (DAP Mot. 16.)[8]  EPPs do not address the injury element until their reply.  They contend that the report of StarKist's economist Andres Lerner (SK Ex. 3, "Lerner Rept.") concedes the fact of injury.[9]  (EPP Reply 1, 11.) It is inappropriate to raise new arguments in a reply brief because it deprives the opposing party of an opportunity to respond.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.")  Accordingly, EPPs' late-raised injury argument is not considered for purposes of this Order.  Although actual effect on the market is presumed in a horizontal conspiracy such as this, *see Musical Instruments,* 798 F.3d at 1191, to the extent EPPs seek summary adjudication regarding the impact of the conspiracy on them, their motion is denied, *see Emich*, 340 U.S. at 570.

### b.   *Products Covered by the Plea Agreement*

StarKist seeks to further narrow the effect of the guilty plea to 5 oz. tuna cans. (Opp'n 3, 12 n.10, 14.)  The argument is based on StarKist's admission in an interrogatory response:

---

[8]   Because the DAP Motion does not include page numbers, cites are to the page numbers generated by the CM/ECF System.

[9]   The argument is not as solid as EPPs suggest.  Lerner did not adopt EPP economist David Sunding's opinions, not even after Lerner had made what he deemed necessary adjustments.   Instead, Lerner expressly distanced himself from the outcome of his adjustment analysis: "These are *not* my estimated overcharges and alleged damages but estimates derived from Dr. Sunding's own regression model and calculation after correcting for some key flaws."  (Lerner Rept. 133 (emphasis added).)

> StarKist participated in two separate agreements with Bumble Bee and Chicken of the Sea during the time period between November 2011 and December 2013.  StarKist's present-day knowledge of these agreements is summarized as follows:  First, acting on his own, Stephen L. Hodge[10] coordinated the timing of two 2012 StarKist list price announcements relating to *certain canned tuna products* ....

(SK Ex. 19 (emphasis added).)[11]  StarKist relies on the phrase "certain canned tuna products" to narrow the preclusive effect of the Plea Agreement to 5 oz. tuna cans.  This is contrary to the Plea Agreement which broadly defines "packaged seafood" as "canned tuna fish" and not merely 5 oz. cans of tuna fish.  (Plea Agreement 3.)

StarKist General Counsel Scott Meece entered the guilty plea on behalf of StarKist and confirmed the accuracy of the Plea Agreement.[12]  (SK Ex. 6, Meece Dep. 68.)  When deposed in this case, he testified that the reference to "certain canned tuna products" in the interrogatory responses is limited to 5 oz. cans.  (*Id.* 71-72.)  After further questioning, he explained that the 5 oz. limitation was constructed in hindsight after the guilty plea:

> Q.  ... I want to focus on that word "certain" in line 9, "certain tuna products."  [¶]  The word "certain" was not in the guilty plea ...; is that true?  [¶]
> THE WITNESS:  I honestly don't recall.
> MR. LEBSOCK:  What does StarKist mean when it says "certain canned tuna products" ...?

---

[10]  Contrary to the interrogatory response, in its guilty plea StarKist admitted it participated in the conspiracy "through its officers and employees, including high-level personnel of the defendant[.]"  (Plea Agreement 3.)

[11]  On several occasions the same exhibit was filed by more than one party.  For example, the foregoing interrogatory response was filed as StarKist's Exhibit 19, DAPs' Exhibit 32, and EPPs' Exhibit 79.  In this and all other similar instances, the court refers to the exhibit by only one of its designations.

[12]  At the hearing, Meece responded to plea colloquy questions, including questions about the scope of the Plea Agreement.  (*See, e.g.,* Tr. 14-15.)  As in this proceeding, StarKist was represented in the criminal case by Latham & Watkins LLP as its outside counsel.

15-MD-2670 DMS (MDD)

A.  My recollection is that our belief is that it was the 5-ounce cans. We have much larger cans that are much more for commercial food preparers, and we had – we have some different sized cans.  I think that was our belief, was 5-ounce cans were the subject, but I just don't recall the detail in the plea agreement.

Q. [T]he StarKist interrogatory answer is dated January 30, 2019 right?

A. ... Yes.

Q. And the plea agreement that was signed by you on behalf of StarKist was dated October 1st, 2018?

A. ... Yes, that's when I dated it.

Q. Is StarKist attempting to narrow the scope of what it pled to when it uses the words "certain canned tuna products" in the interrogatory answer?

[¶]

THE WITNESS:  I don't think StarKist was intending to do anything with regard to the plea agreement.  It is what it is.  I believe that this reflects our belief that the issue is relating to certain sizes, and I believe it's 5-ounce.  But I honestly don't recall the detail off the top of my head.

MR. LEBSOCK:  How did StarKist come to the conclusion that the collusive conduct relates only to the 5-ounce cans?

A.  Again, through thorough analysis by our outside counsel of all the discovery ....

(*Id.* 70-72)[13]

StarKist's argument that the preclusive effect of its Plea Agreement is limited to 5 oz. tuna cans is rejected for two reasons.  First, Meece testified he did not recall either the terms of the Plea Agreement or what StarKist meant by "certain canned tuna products" in its interrogatory response.  He admitted that the limitation to 5 oz. cans was created after the guilty plea.  Accordingly, his testimony does not assist in interpreting the interrogatory response and is insufficient to contradict the terms of the Plea Agreement.

Second, StarKist's contention is contrary to the express terms of the Plea Agreement, which broadly defines the products and is not limited to any particular size of canned tuna fish.  StarKist argues that "ambiguities in the plea agreement must be construed in favor of

---

[13]        No objection or motion to strike was made in relation to the last answer.

15-MD-2670 DMS (MDD)

the defendant." (Opp'n 20, citing *United States v. Transfiguracion*, 442 F.3d 1222, 1228 (9th Cir. 2006).) *Transfiguracion* is unavailing because it addresses the interpretation of a plea agreement between the government and defendant in a criminal proceeding and not between the defendant and third parties in a related civil case. Furthermore, *Transfiguracion* applies "ordinary rules of contract interpretation;" specifically "the principle that ambiguities in contracts are to be construed unfavorably to the drafter." *Id.* None of the Plaintiffs in this case drafted StarKist's Plea Agreement. Moreover, the agreement is not ambiguous. It applies to "canned tuna products[,]" without limitation. Accordingly, StarKist has failed to raise a genuine dispute on the issue whether the Plea Agreement was limited to 5 oz. tuna cans.

<u>c.</u>   *Agreement to Increase Prices*

Next, StarKist argues that there was no "overarching conspiracy," but merely "discrete and limited agreements" regarding the *timing* of two price increases in 2012, which did not include an agreement to increase prices. (Opp'n 3, 12 n.10, 13-14.) The argument is again based on StarKist's interrogatory response that "Hodge coordinated the timing of two 2012 StarKist list price announcements[,]" (SK Ex. 19), and is again rejected as contrary to the express terms of the Plea Agreement. StarKist pled guilty to "participat[ing] in a conspiracy ... the primary purpose of which was to *fix, raise and maintain the prices* of packaged seafood ...." (Plea Agreement 3 (emphasis added).) In furtherance of the conspiracy, it reached "agreements and mutual understandings [with its competitors] to *fix, raise and maintain prices* ...." (*Id*. 4.) StarKist also admitted that it "negotiated prices with customers and issued price announcements for packaged seafood *in accordance with the agreements* and mutual understandings reached." (*Id.*; *see also* Tr. 8, 13-15 (emphasis added).) The scope of collusive conduct was confirmed in the plea colloquy. (*See*, *e.g.,* Tr. 9.) Accordingly, the plea encompasses collusive price increases and not just collusive timing of price announcements.

/ / /

/ / /

14

### d.  Time Period

Finally, StarKist suggests that its guilty plea has a reverse collateral estoppel effect of sorts in that it precludes finding a price fixing conspiracy before or after the time period stated in the Plea Agreement or for any product other than canned tuna.  (*See, e.g.,* Opp'n 1, 11, 25.)   To the contrary, aside from its preclusive effect, the existence of a plea agreement itself may constitute relevant evidence for either party's case.  *Emich,* 340 U.S. 571 n.8 ("we do not intend to preclude ... admission [of the criminal judgment] for such other purposes ... as the general law of evidence may permit.").

### e.  Conclusion

StarKist's guilty plea establishes knowing participation in a price-fixing conspiracy with its competitors for the purpose of fixing, raising, and maintaining prices of canned tuna products for the period at least as early as November 2011 and continuing through at least as late as December 2013.  Preclusive effect of the guilty plea is not limited to 5 oz. tuna cans or isolated collusive actions admitted in StarKist's responses to interrogatories. The Plea Agreement does not preclude Plaintiffs from introducing evidence and arguing for a greater scope of conspiracy.  Although actual effect on the market is presumed in a price-fixing conspiracy such as the conspiracy admitted by StarKist, *see Musical Instruments,* 798 F.3d at 1191, to the extent the Moving Parties seek summary adjudication of the impact of the conspiracy on them, their motion is denied, *see Emich*, 340 U.S. at 570-71.

### 2.   Period Starting June 1, 2011

The Moving Parties request a finding that the price-fixing conspiracy started before November 2011.  DAPs contend StarKist should be found liable for the conspiracy starting December 2007 (DAP Reply 1), while EPPs argue for liability starting June 1, 2011 (EPP Mot. 1).  Another pending summary judgment motion addresses liability for any damages

/ / /

/ / /

/ / /

arising from purchases of StarKist products prior to May 30, 2011.[14]  (StarKist, Del Monte Corporation, and Dongwon's Mot. for Partial Summ. J. Dismissing All Claims for Purchases Made Prior to May 30, 2011, ECF no. 2023 ("Pre-2011 Mot.").)  Two other motions raise statute of limitations defenses.  (StarKist and Bumble Bee's Mot. for Partial Summ. J. on Statute of Limitations Grounds (Class Pls), ECF no. 2007; and Defs' Mot. for Partial Summ. J. on Statute of Limitations Grounds, ECF no. 2010 (together, "Statute of Lim. Mot.'s").)  Accordingly, neither StarKist's liability arising from purchases prior to May 30, 2011, nor statute of limitations defenses raised by Defendants are addressed here. This Order addresses StarKist's participation in the conspiracy from June 1, 2011.

The Moving Parties, seeking summary adjudication of an issue on which they would bear the burden of proof at trial, carry a heavy burden to prevail at summary judgment. They "must come forward with evidence which would entitle [them] to a directed verdict if the evidence went uncontroverted at trial."  *C.A.R. Transp. Brokerage*, 213 F.3d at 480. Moreover, in the antitrust context, they must present evidence of an anti-competitive agreement, *i.e.*, they must show more than merely parallel anticompetitive conduct stemming from each competitor's independent decision.  *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 553 (2007).  Conduct which is "as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  *Matsushita Elec. Indus. Co.,* 475 U.S. at 588.

Among other things, the Moving Parties point to the Plea Agreement entered by Hodge, StarKist's executive, who admitted participating in the conspiracy "from at least 2011."   (DAP Ex. 33, Hodge Plea Agreement 3.)   StarKist argues the Hodge Plea Agreement is ambiguous because it does not specify a month when the conspiracy started.

/ / /

/ / /

_____

[14]     StarKist acknowledges that its "May 30, 2011, list price increase ... was not raised in StarKist's Pre-2011 Motion."  (Opp'n 19.)

(Opp'n 19-20.)  However, reading the Plea Agreement in context,[15] it is apparent that it encompasses a time period starting at the beginning of 2011 and perhaps earlier.  Although Hodge's Plea Agreement does not specify the date when the conspiracy started, it unambiguously indicates StarKist was participating in the conspiracy as of June 1, 2011.

Next, in its responses to interrogatories, Bumble Bee admitted to a conspiracy with StarKist and COSI starting in the first quarter of 2011, including coordination of price increases.  (DAP Ex. 26 5-6.)  Cameron and Worsham at Bumble Bee

> coordinated certain list price increases relating to certain canned tuna products through a series of bilateral communications with executives at the other companies (including, at various times, communications with Steve Hodge and Chuck Handford of StarKist) that occurred between the first quarter of 2011 and the fourth quarter of 2013.  [They also] coordinated certain promotional levels and changes to certain pricing guidance on certain canned tuna products through a series of bilateral communications with executives at the other companies (including, at various times, communications with Steve Hodge and Chuck Handford of StarKist and Mike White of Chicken of the Sea).  These communications occurred episodically between the first quarter of 2011 and the fourth quarter of 2013.

(*Id.* at 6.)  White was deposed about the conspiracy:

> Q      Did you agree on behalf of COSI with employees of StarKist to increase the list or net price of packaged tuna products around February 2011?
>       [¶]
> THE WITNESS:   Yes.
> Q      Did you agree on behalf of [COSI] with employees of Bumble Bee to increase the list or net price of packaged tuna products around February 2011?
>       [¶]
> THE WITNESS:   Yes.
> Q      And what else can you tell me about the agreement among StarKist, Bumble Bee and [COSI] that started as early as February 2011 regarding a list and/or net price increase for branded tuna products?
>       [¶]

---

[15]      The relevant language reads: "For purposes of this Plea Agreement, the 'relevant period' is that period from at least 2011 through at least 2013."

THE WITNESS:   As I recall, it was StarKist and Bumble Bee took a list price increase and we chose to take a net price increase ....

(EPP Ex. 34, White Dep. 119-20.)

In March 2011, StarKist and Bumble Bee announced list price increases and matched prices on certain items.  In a memorandum distributed on March 3, 2011, Hodge informed StarKist customers of new list prices effective "on any purchase order with a delivery date of May 30, 2011."  (DAP Ex. 23 at SKC000447308.)  For example, the new price for solid white halves was $65.28 per unit for a full truckload, and $65.93 per unit for a smaller order.  (*Id.* at SKC000447317.)  Just a few days before, on February 28, Handford had emailed Hodge and others at StarKist regarding "BB List – SW[16] 5 oz," stating

BB new price list will be $65.28, ours is currently set to go to $69.12.  I propose we match theirs.  ...  I will try to secure their size info.

(DAP Ex. 22.)  Bumble Bee did not announce its list price increase until March 11.  (*See* EPP Exs. 54, 55.)  Accordingly, Bumble Bee's pricing revealed in Handford's email was confidential competitor information.   Moreover, StarKist matched Bumble Bee's anticipated price.

On March 11, 2011, Bumble Bee distributed to its brokers a list price increase announcement effective May 29, 2011.  (EPP Exs. 54, 55.)  On the same day, COSI informed its Broker Team, "As you know both Bee and Star are ... taking price increases. ... At this point we are not taking a list price increase [but are] mov[ing] to higher nets ...."  (EPP Ex. 56; *see also* White Dep. 120.)

The simultaneous matching price increases, especially between StarKist and Bumble Bee, were the product of several months of negotiations and sharing of competitive information.  For example, on January 12, 2011, executives at Bumble Bee exchanged emails with "rumors" about StarKist's expected price increase.  (DAP Ex. 16.)  In response,

---

[16]   "BB" stands for Bumble Bee and "SW" stands for solid white tuna.

Cameron provided specifics about StarKist's pricing plans. (*Id.*) Earlier in the day Cameron spoke with Handford at StarKist for 21 minutes. (*See* DAP Ex. 17; EPP Ex. 40, Phone Call Chart 82.)[17]

Handford was deposed about his calls with Cameron on January 12. (EPP Ex. 88, Handford Dep. 163-70.) In response to each question, Hanford invoked his Fifth Amendment privilege against self-incrimination. (*Id.*) He did so again with questions about other communications he had with Bumble Bee and COSI executives reflected in his phone records. (*See passim* Handford Dep. 181-225.)[18]

When Cameron was shown the same phone records at Lischewski's trial, he admitted that he spoke with Handford for 21 minutes on January 12, 2011, before updating his colleagues at Bumble Bee about StarKist's pricing plans. (Trial Tr. 581-82.)[19] Cameron had been tasked by Lischewski to negotiate a price increase with StarKist by

_____

[17]     Cites to the Phone Call Chart are to the page numbers generated by the CM/ECF system.

[18]     The Moving Parties request that the Court draw negative inferences from these and other Fifth Amendment invocations.

"When a party asserts the privilege against self-incrimination in a civil case, the district court has discretion to draw an adverse inference from such assertion." *Nationwide Life Ins. Co. v. Richards,* 541 F.3d 903, 911 (9th Cir. 2008). This includes drawing an adverse inference against the opposing party on summary judgment. *See SEC v. Colello*, 139 F.3d 674, 678 (9th Cir. 1998). However, "[t]he inference may not be drawn unless there is a substantial need for the information and there is not another less burdensome way of obtaining that information." *Nationwide Life Ins.*, 541 F.3d at 912.

The Court declines to draw adverse inferences because the Moving Parties subsequently submitted transcripts from Lischewski's trial which had become available between the motion and reply filing dates. The transcripts include testimony on the issues which were deflected in deposition by invoking the Fifth Amendment. StarKist has not objected to this evidence and has itself relied on trial transcripts as they became available. (*See* Opp'n 14 n.12; SK Ex. 20.) Accordingly, there is no substantial need to draw adverse inferences.

[19]     Excerpts from the Lischewski trial transcript are attached to Dec. of Betsy C. Manifold in Further Supp. of EPP Mot., ECF No. 2221-1, as Exs. 1-6, 12, and 13 (collectively "Trial Tr.").

"mak[ing] a direct contact" with Handford.  (*Id.* at 531-32.)  Handford was chosen because he was a former Bumble Bee employee and Cameron's co-worker for a number of years before transferring to StarKist.  (*Id*.)  In January 2011, Cameron and Handford talked "specifically about a list price increase."  (*Id.*)

Handford's phone records reflect many other phone calls with Cameron, Worsham, and White before and after the list price increase announcements.  (DAP Exs. 17, 18, 24 (phone bills); Phone Call Chart 82-118.)  In its answer to Kroger Company Plaintiffs' Fourth Amended Complaint, StarKist admitted some of the communications:

> StarKist admits that there were telephone calls between Mr. White and Messrs. K. Worsham and/or Handford on February 22, 23, 28 and March 2, 3, 4, 14, and 15.  StarKist admits that there were text messages between Messrs. White and Handford on February 24 and 26.

(ECF No. 1664, StarKist Ans. to the Kroger Co. Pls.' Fourth Am. Compl. ¶144.)  Similar admissions were made in the answer to EPPs' Sixth Amended Complaint:

> StarKist admits that there was a telephone call between Mr. White and Mr. Handford on February 23; one text message each on February 24 and 26; a call of eight minutes on February 28; a call of seven minutes on March 2 and two calls on March 15.

(ECF No. 1690, SK Ans. to EPPs' Sixth Am. Consol. Class Action Compl. ¶305.) StarKist's admissions that the communications took place are binding at summary judgment. *See Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030, 1033 n.1 (9th Cir. 2020).

Further, Cameron and Handford had a 22-minute call on February 21, just two days before an email communication among Bumble Bee executives about StarKist pricing plans.  (DAP Ex. 18; Phone Call Chart 86; DAP Ex. 19 (email).)  When they were deposed about it, they both invoked the Fifth Amendment. (DAP Ex. 20, Cameron Dep. 146-49; Handford Dep. 188-89.)  Handford also invoked the Fifth when asked about the source for his February 25 email to Hodge and Joe Tuza, StarKist Senior VP of Marketing, about

Bumble Bee pricing plans, which was preceded the same day by a 13-minute call with Cameron.  (DAP Ex. 21 (email); DAP Ex. 24; Phone Call Chart 86; Handford Dep. 189-93.)

Cameron and Handford also had two six-minute phone calls shortly before Handford's February 28 email to Hodge, Tuza, and others at StarKist.  (DAP Ex. 24; Phone Call Chart 86; DAP Ex. 22 (email).)  When asked if Bumble Bee's planned list price for solid white tuna in that email came from Cameron earlier that day, Handford asserted his Fifth Amendment privilege.  (Handford Dep. 194-99.)

On March 10, after StarKist announced its list price increase but before Bumble Bee announced its own increase, Handford exchanged calls with Cameron, Worsham, and others at Bumble Bee.  (DAP Ex. 24; Phone Call Chart 88-89.)  When asked about the calls and whether they had to do with Bumble Bee's impending announcement, Handford again invoked the Fifth Amendment.  (Handford Dep. 207-10.)

Handford was also asked about his other calls with Cameron and Worsham during the same time frame and whether they were to coordinate list price increases.   He consistently pleaded the Fifth.  (*See generally* Handford Dep. 181-225.)

At Lischewski's trial, Hodge, Handford's superior, admitted that Handford was "talking to his competitors" about the 2011 list price increase.  (Trial Tr. 1368.)  Cameron testified he was in contact with Handford in January and February and communicated with him by phone and text message about a dozen of times.  (*Id.* at 582, 584.)  They spoke "specifically about a list price increase."  (*Id.* at 534.)  In early March or February, they ultimately agreed "on a list price increase on a number of important items ... specifically, solid white and chunk light."  (*Id.* at 583; *see also* at 571.)  In addition to the publication date and effective date for the list price increase, they also "discussed the *amount* of the list price increase."  (*Id.* at 583-84 (emphasis added); *see also id.* at 595.)  Cameron testified that "[t]hrough all of these phone conversations with Chuck, we worked out an agreement which covered StarKist's "cease-fire" against Bumble Bee on solid white and Bumble Bee's "cease-fire" against StarKist on pouch and chunk light tuna.  (*Id.* at 535.)

The result was a coordinated price increase announcement. StarKist's announcement was distributed on March 3 with list prices effective May 30, 2011. (DAP Ex. 23.)  Bumble Bee's announcement was distributed just after midnight on March 11, effective May 29, 2011.  (EPP Exs. 54, 55.)  At trial Hodge confirmed that Bumble Bee's and StarKist's new list prices for solid white halves were "identical."  (Trial Tr. 1367-68.)

Frequent phone calls among Handford, Cameron, Worsham, other Bumble Bee executives, and White continued after the price increase announcements.  (*See* DAP Exs. 24, 25 (phone bills); Phone Call Chart 89-118.)  When Handford was deposed about the calls, he asserted his Fifth Amendment privilege.  (Handford Dep. 210-14.)  Cameron testified at trial that after the list price agreement with StarKist was formalized, he continued to talk with Handford "about what the next step was on guidance, on where pricing was going to be in the marketplace."  (Trial Tr. 584.)  It was "obvious" to talk with Handford about "guidance" following the list price increase:

> A    Because we had taken list prices up, net prices would come up with them.  And these new net prices were important to understand what the future pricing in the marketplace was going to be.
> Q    Why was it important to understand?
> A    We would be ... moving out of specific price points that customers were merchandising in; so we would be raising our promoted price points.

(*Id.* at 606-07.)  They discussed guidance primarily for "light meat, chunk light, and solid white" products with regard to pricing for the second half of 2011.  (*Id.* at 607.)  As a result, they agreed "that there wasn't going to be, specifically on solid white, 10-for-10 pricing[20] in the marketplace; that pricing would be higher than that."  (*Id.* at 607; *see also id.* at 607-08.)  Although the information about a "company's guidance [is] supposed to be

---

[20]    "10-for-10 pricing" means "[b]uy ten, pay $10.  That was an attractive price point for retailers" because it "moved a lot of volume" and for consumers because "[a] dollar a can is a great value."  (Trial Tr. 607.)

15-MD-2670 DMS (MDD)

confidential" (*id.* at 581), Cameron and Handford continued sharing this information and negotiating for the rest of the first half of 2011 (*id.* at 607).

Simultaneously, Worsham, Cameron's colleague at Bumble Bee, was also talking to Handford about pricing in furtherance of the same agreements:

> Q     So to summarize, what agreements did you reach with Mr. Handford in March 2011?
>
> A     To take a list price increase that would be effective at the end of May on both white meat and light meat.  We talked about promotional price points, and we ultimately talked about increasing further beyond the list price increase with our Q3 guidance documents and the ... promotional price points that would have been associated with that in Q3.

(Trial Tr. 1586-87.)

Handford's February 28 email conveying Bumble Bee's planned price increase with a suggestion to match Bumble Bee's price, his offer to obtain Bumble Bee's can size information, the subsequent matching of certain list prices reflected in Bumble Bee's and Star Kist's list price announcements which were distributed simultaneously with essentially the same effective date, and Hodge's admission that Handford was in fact communicating with StarKist competitors about the 2011 price increases, all directly implicate StarKist in the conspiracy through the statements of StarKist's own employees. Other documents filed in support of the DAP and EPP Motions and testimony of other witnesses at Lischewski's trial provide further direct evidence of StarKist's active involvement in the conspiracy as of and from June 1, 2011.  Accordingly, the Moving Parties have presented sufficient direct evidence of conspiracy in progress as of June 1, 2011, to meet their burden on summary judgment and shift the burden to StarKist to produce evidence and raise a genuine issue of fact.  *See Nissan Fire & Marine Ins.*, 210 F.3d at 1103.

StarKist counters that its decision to raise prices was not collusive but unilateral and based on the rising expenses, including fish costs.  (Opp'n 5, 19 & n.17.)  It is undisputed that StarKist and its competitors were under severe pressure to raise prices due to rising

costs, including fuel and fish costs.  That rising costs could lead competitors unilaterally to raise prices does not mitigate direct evidence of actual negotiations and agreements on the timing and amount of price increases.

StarKist also points to the deposition of its then-Director of Trade Marketing Andras Mecs:

> Q     Did collusion between StarKist on the one hand and Bumble Bee or Chicken of the Sea on the other hand play any role in the reason why StarKist raised list prices in March of 2011?
>         [¶]
> A     I would say, no, not at all.

(SK Ex. 37, Mecs Dep. 34.)  However, Mecs also admitted that he had not discussed the subject with Handford or any other of StarKist personnel who would be familiar with the matter.  (*Id.* at 35-36; *see also id.* at 29-33.)

When, as here, the moving party carries its burden, the nonmoving party:

> must do more than simply show that there is some metaphysical doubt as to material facts. ... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.  [¶]  It follows from these settled principles that if the factual context renders [a] claim implausible[, the nonmoving party] must come forward with more persuasive evidence to support their claim than would otherwise be necessary.

*Matsushita Elec. Indus. Co.,* 475 U.S. at 586-87 (1986) (emphasis in original); *see also Scott v. Harris,* 550 U.S. 372, 380 (2007).

Viewing the facts in the light most favorable to StarKist and drawing all reasonable inferences in its favor, *see Tolan*, 572 U.S. at 651, 657, StarKist has presented insufficient evidence to raise a genuine issue of fact.  The Moving Parties provided more than merely evidence of neutral conduct which could be consistent with permissible competition.  *See id.* at 588.  They provided specific and direct evidence of StarKist's active participation in price fixing agreements.  Accordingly, Mecs' conclusory denial is insufficient to create a genuine issue of fact, particularly when coupled with the admission that he had not

conferred with any StarKist personnel involved in the matter.  *See Villarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir. 2002) ("this court has refused to find a genuine issue where the only evidence presented is uncorroborated and self-serving testimony"); *see also Kennedy v. Applause, Inc.,* 90 F.3d 1477, 1481 (9th Cir. 1996) ("uncorroborated and self-serving" testimony contradicted by specific facts found insufficient); *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 928 (9th Cir. 1980) (evidence provided without personal knowledge found insufficient); *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 953 (9th Cir. 1978) (conclusory, self-serving deposition testimony where the witness was not informed of the relevant facts found insufficient).

To the extent the Moving Parties request summary adjudication that StarKist was participating in the conspiracy as of and from June 1, 2011, their motions are granted.  The Court need not address the alternative issue raised in the DAP Motion that StarKist can be held liable for participation in the conspiracy prior to November 2011 based on co-conspirator liability theory.  (*See* DAP Mot. 22.)

### 3.   Period After December 2013

The Moving Parties argue that in the absence of StarKist's showing that it withdrew from the conspiracy or that the conspiracy ended, StarKist remains liable beyond the time frame it admitted in its Plea Agreement.  (DAP Mot. 18-21; EPP Mot. 13-14.)  They request summary adjudication of StarKist's participation in the conspiracy from January 2014 through July 2015, when the media first reported the DOJ investigation.

"Upon joining a criminal conspiracy, a defendant's membership in the ongoing unlawful scheme continues until he withdraws."  *Smith v. United States*, 568 U.S. 106, 107 (2013).  "[A] defendant's membership in the conspiracy ... endures even if he is entirely *inactive* after joining it."  *Id.* at 114 (emphasis in original).

> Passive nonparticipation in the continuing scheme is not enough to sever the meeting of minds that constitutes the conspiracy.  To avert a continuing criminality there must be affirmative action to disavow or defeat the purpose of the conspiracy.

*Id.* at 112-13.  "Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment."  *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 464-65 (1978).  "[T]he burden of establishing ... withdrawal rests upon the defendant."  *Smith,* 568 U.S. at 113.

StarKist argues it should not have to show withdrawal because it participated only in discrete agreements it admitted in its interrogatory responses and did not participate in an "overarching conspiracy."  (Opp'n 24-25.)  The contention that StarKist conspired only as to the timing of two price increases in 2012 was rejected in Section 1 above.  The contention is also contradicted by the evidence discussed in Section 2 above, showing that StarKist was already involved in the price-fixing conspiracy as of June 1, 2011.  Based on the Plea Agreement, there is no genuine dispute that StarKist was still involved in the conspiracy at the end of December 2013.  Accordingly, StarKist bears the burden to show withdrawal.  The Moving Parties can meet their initial burden on summary judgment by producing evidence tending to negate StarKist's withdrawal before July 2015 or showing that there is an absence of evidence to support that fact.  *See Nissan Fire & Marine Ins.,* 210 F.3d at 1105-06.

The Moving Parties argue that several pieces of evidence preclude StarKist from showing withdrawal.  First, it is undisputed that the collusive list price increases made before December 2013 were not reversed thereafter.   (*See* EPP Ex. 94 (StarKist interrogatory responses 5-6).)  Second, Worsham had an agreement with Hodge in late 2013 for first quarter 2014 pricing guidance.  (Trial Tr. 2122-23.)  Third, some of the same individuals who participated in the conspiracy before December 2013 continued to communicate frequently through July 2015, including, for example, calls between

/ / /

/ / /

/ / /

/ / /

Cameron and Hubert Tucker, StarKist Director of Sales.[21]   (*See* Phone Call Chart 167-227.)   Finally, the Moving Parties point to StarKist's August 2014 Board of Directors meeting minutes ("Minutes") stating that:

> StarKist and Bumble Bee had an implicit understanding that they wouldn't attack each other's pouch and [white meat] segments.   However, from Starkist's current position, due to the fact that the pouch market is increasing and Starkist's market share is 80%, growth through competition is advisable as well.

(DAP Ex. 35 at DWI_000066649.)   This evidence is sufficient to meet the Moving Parties' initial burden on summary judgment and shift the burden on StarKist to produce evidence in support of withdrawal.   *See Nissan Fire & Marine Ins.*, 210 F.3d at 1103.

StarKist opposes the Moving Parties' reliance on the Minutes, which were originally written in Korean.   (Opp'n 26 & n.27.)   It claims that the reference to "implicit understanding" is a translation error.   This contention is based entirely on Meece's deposition testimony that the reference is "probably a translation error" and that he sees "problems" with "translation from English to Korean and back ... from time to time." (Meece Dep. 101-03.)   Meece did not explain the nature of the error he alluded to, nor is there any evidence of his knowledge of the Korean language.   Moreover, Dongwon Group's Vice Chairman Nam-jung Kim, who attended the board meeting, testified about the reference to "implicit understanding."   (Dec. of Betsy C. Manifold in Further Supp. of EPP Mot., ECF No. 2221-1, Ex. ("EPP Reply Ex.") 9, Kim Dep.[22] 129-31, 134, 136-37.)

Kim is fluent in English and Korean.   In his deposition, he corrected and clarified certain translation issues with the exhibits.   (*See, e.g.,* Kim Dep. 21, 26, 132; *see also* Kim-

/ / /

---

[21]   Tucker testified about sharing COSI and Bumble Bee pricing information; however, he did not testify about communications in 2014 or 2015.   (*See* EPP Ex. 95, Tucker Dep. 132-35.)

[22]   Additional excerpts are found at ECF No. 2218-1, Dec. of Shinae Kim-Helms in Further Supp. of EPP Mot. ("Kim-Helms Dec.") Ex. A & B.

Helms Dec. 1.)[23]   Kim did not raise any issues regarding the translation of "implicit understanding." When he confirmed that the Minutes refer to an implicit understanding, Kim consulted both the original version of the Minutes in Korean and the certified English translation. (Kim-Helms Dec. 1-2; Kim Dep. 129, 136-37.) Two interpreters assisted in the deposition – a "main interpreter" and StarKist's own "check interpreter." (Kim-Helms Dec. 1-2.) Although StarKist's interpreter repeatedly interjected corrections and clarifications during the deposition, he raised no corrections or objections relative to the translation of "implicit understanding" or the translation of Kim's testimony about it. (*See* Kim Dep. 129-31, 136-37; Kim-Helms Dec. 2.) Finally, Kim's deposition was followed by copious corrections, including "Translator error" corrections. (*See* Kim-Helms Dec. Ex. B (Errata Sheet).) No corrections were noted in relation to the "implicit understanding" reference in the Minutes or Kim's substantive testimony about it. (*See id.*)

StarKist's contention that the reference in the Minutes to "implicit understanding " with Bumble Bee was a "translation error" is rejected as wholly unsupported. Further, the reference in the Minutes to "growth through competition is advisable as well," is ambiguous on the issue of StarKist's withdrawal.

StarKist also points to its firing of Hodge in December 2013 as evidence that it withdrew from the conspiracy.[24] (Opp'n 5.) The news of Hodge's replacement reached Bumble Bee. (SK Ex. 21 (email exchanges among Worsham, Lischewski, Cameron and others).) Bumble Bee's executives perceived Hodge's replacement Bob Roberts as less "reasonable" (*Id.*) Finally, StarKist argues that although it kept its list prices the same, it lowered its net prices, *i.e.,* guidance, competitively in 2014 in accordance with lower fish

/ / /

---

[23]   EPP's counsel Shinae Kim-Helms, fluent in English and a native speaker of Korean, attended Kim's videotaped deposition which took place in Seoul, South Korea. (Kim-Helms Dec. 1.)

[24]   Although Hodge was terminated, the reason was not based on his participation in the conspiracy. (Meece Dep. 22.)

28

costs to increase its market share against Bumble Bee and COSI.  (*See, e.g.,* SK Exs. 57, 60, 63 (including emails from Mecs to the "Sales Team").)

Drawing all reasonable inferences in StarKist's favor, as the court must, *see Tolan*, 572 U.S. at 651, 657, StarKist's evidence is sufficient to raise a genuine dispute regarding its withdrawal from the conspiracy after December 2013.  The Moving Parties' motions are therefore denied as to this issue.

**B.    State Law Claims**

EPPs' operative consolidated class action complaint alleges claims under the antitrust, consumer protection, and unjust enrichment laws of 32 states.  (ECF no. 1461 ¶ 141.)  EPPs argue that all of the state laws alleged in their complaint prohibit price fixing, and that this justifies summary adjudication of each of them.  (EPP Mot. 14-15.)  With the exception of the Cartwright Act, Cal. Bus. & Prof. Code §16700 et seq., EPPs do not provide any analysis but attach an appendix listing the elements of each of the state law claims.  (ECF No. 1993-2, Appendix.)  AWG filed a notice of joinder in the EPP Motion arguing that to the extent the Court grants the Moving Parties' motions with regard to the federal antitrust claim, AWG is entitled to summary judgment on its claim alleging violation of the Kansas Restraint of Trade Act, K.S.A. 50-101.  (ECF No. 1997, AWG Joinder 2.)

EPPs argue that to the extent StarKist violated the Sherman Act, it also violated section 16720(a), (b) and (e) of the Cartwright Act.  The Cartwright Act is "California's equivalent to the Sherman Act."  *William O. Gilley Enter., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 661 (9th Cir. 2009).  It "provides a private cause of action for indirect purchasers of price-fixed goods."[25]  *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1108 (9th Cir. 2013).  "[T]he analysis under the Cartwright Act is identical to that under the

/ / /

---

[25]    This is not the case with the antitrust laws of some other states.  *Id.*

Sherman Act," *Name.Space, Inc. v. Internet Corp. of Assigned Names and Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015).

Like the Clayton Act, which provides for a private right of action based on Sherman Act violations, the Cartwright Act requires proof of injury: "Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor in any court having jurisdiction ...." Cal. Bus. & Prof. Code § 16750(a); *cf.* 15 U.S.C. § 15(a). As discussed in Section A.1.a. above, EPPs have not made a sufficient showing on the injury element to warrant summary adjudication of that issue. Accordingly, the EPP Motion relative to the Cartwright Act claim is granted only to the extent their motion is granted with respect to the Sherman Act claim.

EPPs and AWG also filed a notice of supplemental authority (ECF No. 2539, 2540), citing the order of the Superior Court of the State of Washington for King County granting the State of Washington's summary judgment motion against StarKist for violating Washington's antitrust statute, RCW § 19.86.030, and the underlying briefing. The order does not include any legal analysis. This Court, however, has considered the state court order in light of the briefing filed in that case and finds that order does not consider the injury element.

Neither EPPs nor AWG provide any explanation or analysis connecting the evidence with the elements of each of the other state law claims. Further, the state law claims are the subject of Defendants' Motion for Partial Summary Judgment on Certain State Law Claims (ECF no. 1992), among others. Given the dearth of legal analysis regarding the state law claims, and given other pending motions directly addressing these claims, the EPP Motion is denied without prejudice on the state law claims. However, to the extent the findings made in this Order correspond to any elements of the state law claims, they shall apply to those claims as well.

**C.     Motions to Seal**

Pending before the Court are four renewed motions to seal which partly relate to the EPP and DAP Motions addressed in this Order. (ECF Nos. 2425, 2429, 2431, 2434

30

("Motions to Seal").)  The original versions of these motions to seal were filed concurrently with the summary judgment motions and were denied without prejudice.  This Order addresses the Motions to Seal only insofar as they cover any filings associated with the briefing on the EPP and DAP Motions.

Initially the briefing of the EPP and DAP Motions was subject to heavy redacting and related requests to seal.  This includes the moving, opposition, and reply briefs (ECF nos. 1993-1, 2035, 2129, 2193, 2221), and the related statements of undisputed facts, oppositions, and responses thereto (ECF nos. 2008, 2036, 2129-1, 2129-2, 2193-1).  The pending Motions to Seal do not request the sealing of any of these filings.

Initially the parties also requested to seal nearly all of the exhibits filed in relation to the EPP and DAP Motions.  However, upon consideration of the EPP and DAP Motions only the quoted portion of the Minutes is the subject of the pending Motions to Seal.  The legal standard for sealing and its application to the facts of the MDL are discussed in the Order Denying Renewed Motions to File Documents Under Seal (ECF No. 2411) and are incorporated herein by reference.

StarKist requests to seal all 46 pages of the Minutes.  In its motion to seal it argues for the secrecy of non-public financial information, information about its relationship and transactions with Dongwon, as well as information about customer and supplier relationships and strategic plans.  (ECF No. 2425, Defs' StarKist and Dongwon's Second Renewed Mot. to Seal 4-8.)  The quoted paragraph does not disclose this kind of information.  It discusses StarKist's intentions regarding its collusion and/or competition with Bumble Bee as of August 2014.  This information does not fall within any category of the information StarKist addresses in its pending motion to seal.  This information is now seven years old, and the fact of collusion between StarKist and Bumble Bee has been the subject of extensive testimony in Lischewski's trial.  StarKist has not provided a compelling reason to seal the quoted portion of the Minutes.  Accordingly, StarKist's motion to seal the subject paragraph is denied.

///

## III.

## CONCLUSION

1.      The DAP and EPP Motions against StarKist are granted in part and denied in part.  To the extent the EPP Motion is asserted against Bumble Bee, it is denied without prejudice.

2.      For the reasons stated above, the Court finds as follows:

        a.      StarKist's guilty plea establishes knowing participation in a price-fixing conspiracy with its competitors.  As a participant in the conspiracy, StarKist engaged in the fixing, raising, and maintaining of prices of canned tuna products for the period from at least as early as November 2011 and continuing through at least as late as December 2013.  Preclusive effect of the guilty plea is not limited to 5 oz. tuna cans or isolated collusive actions admitted in StarKist's responses to interrogatories.  The Plea Agreement does not preclude Plaintiffs from introducing evidence and arguing for a greater scope of conspiracy.  The guilty plea establishes as a matter of law that the conspiracy had an actual effect on the market.  The guilty plea on its own does not establish injury to any particular Plaintiff.

        b.      StarKist was participating in the conspiracy as of and from June 1, 2011.  The time before June 1, 2011, is not addressed in this Order because other pending motions specifically cover that time frame.  This Order does not dispose of any statute of limitations defenses asserted in other pending motions.

        c.      There is a genuine dispute regarding StarKist's withdrawal from the conspiracy after December 2013.

        d.      The EPP Motion is denied to the extent it seeks summary judgment on any state law claims.  To the extent the findings made in this Order with regard to the federal antitrust claims correspond to the elements of any state law claim, they shall apply to the state law claims as well.

3.      The foregoing findings apply to all parties who joined in the DAP and EPP Motions.

15-MD-2670 DMS (MDD)

1       4.    StarKist and the Moving Parties shall file unredacted versions of their briefs

2   (ECF nos. 1993-1, 2035, 2129, 2193, 2221) and related statements of undisputed facts,

3   oppositions, as well as the response thereto (ECF nos. 2008, 2036, 2129-1, 2129-2, 2193-

4   1).  They shall identify these documents on the docket as "unreadacted" versions of their

5   prior filings and in each instance reference the docket number of the previous "redacted"

6   version.

7       **IT IS SO ORDERED**.

8   Dated:  November 16, 2021

9

10      Hon. Dana M. Sabraw, Chief Judge

    United States District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15-MD-2670 DMS (MDD)