1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Case No.:  15-MD-2670 DMS (MDD)<br><br>**CLASS ACTION**<br><br>**ORDER (1) GRANTING PLAINTIFFS' MOTION FOR RECONSIDERATION; (2) VACATING ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; (3) DENYING DEFENDANTS' MOTION TO DISMISS; AND (4) DENYING AS MOOT PLAINTIFFS' MOTION FOR CERTIFICATION OF RULE 54(b) JUDGMENT AND THE PARTIES' JOINT MOTION TO SEAL**<br><br>**(ECF Nos. 2281, 2285, 2471)** |

Pending before the Court are Plaintiffs' Motion for Certification of a Rule 54(b) Judgment ("Rule 54(b) Mot.," ECF No. 2281-1) and Direct Action Plaintiffs' ("DAP") Motion for Reconsideration of the Court's Order Granting Lion Capital's Motion to Dismiss or, in the Alternative, for Entry of Final Judgment Under Rule 54(b) ("Mot. for Reconsideration," ECF No. 2284.)  Plaintiff W. Lee Flowers & Co. separately joined in

the Rule 54(b) Motion.  (ECF No. 2282.)  Defendants Lion Capital LLP ("Lion Capital") and Big Catch Cayman LP ("Big Catch") opposed, ("54(b) Opp'n," ECF No. 2289; "Reconsideration Opp'n," ECF No. 2291), and Plaintiffs replied, ("54(b) Reply," ECF No. 2300; "Reconsideration Reply," ECF No. 2302.)[1]  The parties also jointly filed a motion to seal.  ("Mot. to Seal," ECF No. 2471.)  For the reasons set forth below, Plaintiffs' Motion for Reconsideration is granted, the Order Granting Defendants' Motion to Dismiss ("Second Lion Order," ECF No. 2270) is vacated, and Defendants' motion to dismiss (ECF No. 1631) is denied.  In light of those rulings, Plaintiffs' Rule 54(b) motion and the parties' Motion to Seal are denied as moot.

# I.

# BACKGROUND

The general background and history of this litigation is well documented and extensively discussed in prior orders.  (ECF Nos. 2454, 2654.)  For purposes of the present motions, the Court sets out only the relevant facts.

In July 2015, the Antitrust Division of the United States Department of Justice ("DOJ") announced its investigation into the packaged tuna industry.  Criminal charges for price fixing in violation of the Sherman Act, 15 U.S.C. § 1, were filed against the three largest domestic producers of packaged tuna products—Tri-Union Seafoods LLC d/b/a Chicken of the Sea International ("COSI"),  Bumble Bee Foods LLC ("Bumble Bee"), StarKist Company ("StarKist"), and their executives.  Bumble Bee's CEO Christopher Lischewski[2] was convicted after a jury trial.  *United States v. Lischewski*, 860 Fed. Appx. 512, 2021 WL 2826474 (9th Cir. Jul. 7, 2021) (affirming conviction).  He is serving a prison sentence for his "leadership role in the conspiracy."  *United States v. Lischewski*,

---

[1]  The Motion for Reconsideration briefing was filed under seal.  The public redacted briefs can be found at ECF Nos. 2285, 2295, and 2303.  This Order cites to the sealed briefs.
[2]   Unless otherwise noted, individuals are referred to by full names only when first introduced.  Subsequently, they are referenced by last name only.

2

U.S. Dist. Ct. N.D. Cal. Case No. 18cr203-EMC, Am. Crim. Minutes of Jun. 16, 2020, sentencing, ECF No. 692.  All other defendants pled guilty.

In the wake of the DOJ announcement of its investigation, dozens of plaintiffs initiated civil actions alleging price fixing against the three tuna producers and their parent companies: (1) COSI and its owner Thai Union Group PCL ("TUG"); (2) StarKist and its owner Dongwon Industries Co. Ltd. ("Dongwon"); and (3) Bumble Bee and its owners Lion Capital, Lion Capital (Americas), Inc. ("Lion Americas") and Big Catch (collectively the "Lion Entities").  The civil actions were consolidated in a multidistrict litigation ("MDL") for pretrial proceedings before this Court.

The Lion Entities moved to dismiss the claims alleged against them.  In the order disposing of the motion, the Court concluded it had personal jurisdiction over the Lion Entities, but that Plaintiffs stated a claim only against Lion Americas.  (Order Granting in Part and Denying in Part Defs.' Mots. to Dismiss ("First Lion Order") at 90, ECF No. 1362.)[3]  The complaint was sufficient to allege that Lion Americas directly participated in the price fixing conspiracy.  (*Id.* at 79-86.)  Plaintiffs were granted leave to amend the claims against Lion Capital and Big Catch.  (*Id.* at 90.)  When Plaintiffs filed their amended complaints,[4] Lion Capital and Big Catch again moved to dismiss, which motion was granted without leave to amend.

DAPs filed a Motion for Reconsideration of the Second Lion Order or, alternatively, for entry of a final judgment against Lion Capital and Big Catch under Rule 54(b) of the Federal Rules of Civil Procedure.[5]   All Plaintiffs, including DAPs, also joined in a

---

[3]  The public redacted version of the First Lion Order can be found at ECF No. 1358.
[4]  The parties have stipulated, and the Court ordered, that the Fourth Amended Complaint filed by the Kroger Plaintiffs (Compl., ECF No. 1475), is "in all material respects representative" for purposes of the Lion Entities' motion to dismiss.  (ECF Nos. 1524, 1529, 2270.)  The public redacted version of the Complaint can be found at ECF No. 1423.
[5]  All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure.

separately filed Rule 54(b) Motion.[6]  Finally, the parties jointly filed a Motion to Seal requesting the sealing of eight documents filed in support of and in opposition to Plaintiffs' Motion for Reconsideration.

## II.

## MOTION FOR RECONSIDERATION

"Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. IJ, Multnomah County, Oregon v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).[7]  Here, Plaintiffs argue reconsideration is warranted based on newly discovered evidence and because the Court committed clear error in the Second Lion Order.[8]

In support of their argument of clear error, Plaintiffs raise the issue of the Court's application of *United States v. Bestfoods*, 524 U.S. 51, 69 (1998), in reaching the conclusion that Plaintiffs failed sufficiently to allege that Eric Lindberg, Jacob Capps, and Jeff Chang, dual agents of Lion Capital and Lion Americas, acted on behalf of Lion Capital when they participated in the conspiracy.  (*Cf.* Second Lion Order at 16-17 *with* Mot. for Reconsideration at 8-12.)  The Lion Entities counter that Plaintiffs should be precluded

---

[6]  The Rule 54(b) Motion, as well as the related opposition and reply, are incorporated by reference into the Motion for Reconsideration briefing, which does not add any substantive arguments regarding Rule 54(b) certification.  (*See* Mot. for Reconsideration at 12; Reconsideration Opp'n at 1 n.1; Reconsideration Reply at 10.)

[7]  Unless otherwise noted internal quotation marks, citations, ellipses, brackets, and footnotes are omitted from citations.

[8]  Although Plaintiffs' substantive arguments are clear, the procedural vehicle for their motion is less so.  Plaintiffs appear to be relying on Rule 59 as the basis for their motion, but that Rule governs motions to alter or amend a judgment, and no judgment has been entered here.  Regardless, the substantive standard for reconsideration is the same, whatever the procedural vehicle.  As stated above, that standard requires a showing of (1) newly discovered evidence, (2) clear error or manifest injustice, or (3) an intervening change in controlling law, and that is the standard that applies to the present Motion for Reconsideration.

from seeking reconsideration because they failed to address this issue in their opposition to the Second Lion 12(b)(6) Motion.  (Reconsideration Opp'n at 2, 4.)

The Court disagrees.  In their moving papers the Lion Entities quoted *Bestfoods* for the hornbook proposition that "a parent corporation ... is not liable for the acts of its subsidiaries."  (Mem. of P.&A. in Supp. of Lion Capital and Big Catch Renewed Consol. Mot. to Dismiss ("Second Lion 12(b)(6) Mot.") at 31, ECF No. 1630-1.)[9]  It was only in the reply that they argued for dismissal based on the "*Bestfoods* presumption," which they articulated as follows, "The Supreme Court has held that 'dual status' agents of a parent corporation and its subsidiary are presumed to be acting for the subsidiary if, as here, they are employed by that subsidiary."  (Reply in Supp. of Lion Capital and Big Catch Renewed Consol. Mot. to Dismiss ("Second Lion 12(b)(6) Reply") at 2 (*citing Bestfoods*, 524 U.S. at 69-70), ECF No. 1759.)[10]  Raising the "*Bestfoods* presumption" for the first time in the reply deprived Plaintiffs of an opportunity to respond.  Accordingly, Plaintiffs' request to reconsider the Second Lion Order on this basis is granted.  *See Dietz v. Bouldin*, 579 U.S. 40, 45-46 (2016).

The issue of Lion Capital's liability was raised in the context of a Rule 12(b)(6) motion to dismiss.  Plaintiffs' allegations must therefore meet the pleading standard of Rule 8(a)(2).  The Rule

> requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.  While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds for his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

---

[9]  The public redacted version can be found at ECF No. 1631-1.
[10]  The public redacted version can be found at ECF No. 1760.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court must accept as true all allegations of material fact in the complaint and construe them in the light most favorable to the party opposing dismissal.  *Id.*

On a Rule 12(b)(6) motion courts generally may not consider material outside the complaint.  *Khoja v. Orexigen Therapeutics, Inc.*, 988 F.3d 988, 998 (9th Cir. 2018).  "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201."  *Id.*  In determining whether Plaintiffs stated a claim, the Court considers neither the evidence offered by Plaintiffs nor affidavits offered by the Lion Entities insofar as they fall outside these exceptions.

As set out in the First Lion Order, Plaintiffs sufficiently alleged Lion Americas' direct participation in the conspiracy.  (First Lion Order at 86.)  The finding was based on detailed allegations that Lindberg, Capps, and Chang communicated with Lischewski and other Bumble Bee executives regarding pricing agreements with StarKist and COSI and cooperated in Bumble Bee's efforts to police and enforce them.  (*Id.* at 81-84.)  The principal issue on reconsideration is whether Plaintiffs also sufficiently alleged participation by Lion Americas' parent entity Lion Capital.

**A.    Plaintiffs' Allegations**

At all relevant times, Lion Capital was a British private equity firm specializing in investments in the consumer sector.  (Compl. ¶ 189; *see also* Am. and Restated Limited Liability Partnership Deed Relating to Lion Capital LLP ("LLP Agreement"), ECF No. 1630-3; *see also* ECF No. 1721-1.)[11]  Its founder and Managing Partner was Lydon Lea.  (Compl. ¶ 189; LLP Agreement §§ 1.1, 9.1.)  Lindberg, Capps, and Chang were among its

─────────────────

[11]  The Court considers the LLP Agreement because it is referenced in the Complaint.  (Compl. ¶¶ 192-93.)  *See Khoja*, 988 F.3d at 1002.

Members.  (Compl. ¶¶ 189, 192; *see also* LLP Agreement, Schedule 1.)  Lea, Lindberg, and Capps were also among its Executive Officers.[12]

Lion Americas was a Delaware corporation and Lion Capital's wholly owned subsidiary.  (Compl. ¶ 190; *see also* Lion Americas Form ADV ("Form ADV"), ECF No. 2291-2, pages 97-117, Items 2, 3 & Schedule A.)[13]  Lion Americas was an SEC-registered investment advisor with one client—Lion Capital.  (Form ADV, Items 2, 5, 7.)  Capps served as Lion Americas' President, Lindberg was one of its directors, and Chang was an employee.  (Compl. ¶¶ 189-97.)  Plaintiffs adopted the Lion Entities' position that although Lea was an officer of Lion Americas, he was not a Lion Americas employee but was exclusively a Lion Capital employee.  (*Id.* ¶ 215 & n.13.)

Lion Capital's business model was to acquire companies, increase their market value, and sell them at a profit.  (First Lion Order at 78.)  Lion Capital held itself out to potential investors as "focus[sed] solely on retail and consumer businesses" and possessing "a team with an intimate knowledge of the way consumers and brands interact[.]"  (Compl. ¶ 216.)  It distinguished itself from "average" private equity firms by its philosophy of getting "down to the very granular knowledge" of the businesses it owned.  (*Id.* ¶¶ 215, 216.)

---

[12]  To the extent they provide background and undisputed facts, the Court takes judicial notice of the SEC Form D, Stock/Securities Offering, filed Oct. 21, 2010, and Form D as amended, filed October 17, 2011, by the Lion Capital Fund III, L.P. (the "Fund") (collectively "Form D"), found at https://sec.report/Document/0001498249-10-000001 and https://sec.report/Document/0001498249-11-000001, respectively.  *See Khoja*, 899 F.3d at 999; Fed. R. Evid. 201.  According to Form D, the persons related to the Fund were Lea, Capps, and Lindberg, among others, each identified as "Executive Officer ... of Lion Capital LLP – manager of Issuer[.]"  Form D defines "Issuer" as the Fund.

[13]  The Court takes judicial notice of Lion Americas' Form ADV dated March 30, 2018, which was filed with the Securities and Exchange Commission ("SEC").  *See Khoja*, 899 F.3d at 999; Fed. R. Evid. 201.  By virtue of his majority stake in Lion Capital, Lea indirectly owned nearly all of Lion Americas' shares.  (Form ADV, Schedule B.)  Because Form ADV itself does not contain page numbers, page references are to the numbers generated by the CM/ECF System.

Lion Capital acquired Bumble Bee in December 2010 (Compl. ¶¶ 189, 210, 240; *see also* First Lion Order at 4) and became Bumble Bee's equitable owner. (First Lion Order at 33.) The equitable ownership finding encapsulates the convoluted ownership structure of the Bumble Bee investment (*see id.* at 31-33 & n.21; *see also* Compl. ¶¶ 200-05) and is based on the facts that Lion Capital exercised control over the investment fund, Lion Capital Fund III, L.P. (the "Fund"), which invested in Bumble Bee, and that Lion Capital was the Fund's "managing agent."[14] (First Lion Order at 33; Form D (identifying Lion Capital as the Fund's "manager").)

Plaintiffs contend that Lion Capital learned of Bumble Bee's participation in the conspiracy before the acquisition. (Compl. ¶¶ 208-09.) During the due diligence process, Lion Capital had access to Bumble Bee's financial records and executives who are now known to have participated in the conspiracy. (*Id.* ¶ 208.) Specifically, Lion Capital inquired about the increase in Bumble Bee's per-can profit margins since 2006, and learned it was the result of a price increase and the can downsize in 2008. (*Id.*) It can reasonably be inferred that, as a "sophisticated investment firm" (First Lion Order at 81) and in keeping with its claims of expertise in the consumer sector and "granular knowledge" of the companies it acquired, Lion Capital knew of the contemporaneous industry-wide downward pressure on product pricing due to the falling price of raw tuna and decreasing market demand for canned tuna. (Compl. ¶¶ 208, 55-60; *see also* First Lion Order at 77-79, 81.) In a competitive market canned tuna prices would have decreased. Bumble Bee prices increased.

Just weeks before completing the acquisition, Lion Capital separately met with Dongwon and TUG executives. (Compl. ¶¶ 210, 211.) In arranging the meeting with Dongwon Chairman Jae-chul Kim on November 15, 2010, Lindberg explained he wanted

---

[14] Like Lion Capital, the Fund was established in the United Kingdom. Its address was "c/o Lion Capital LLP." It was registered with the SEC in the United States. (*See* https://sec.report/CIK0001498249.)

15-MD-2670 DMS (MDD)

to meet on an "owner to owner" basis.  (*Id.* ¶ 211.)  Accordingly, Lindberg held himself out as a representative of Lion Capital, soon-to-be owner of Bumble Bee.

In preparing Lindberg for the meeting, Lischewski told him that a "key message is to ensure Dongwon that Lion will support rational[] market behavior by Bumble Bee." (Compl. ¶¶ 210, 223.)  Defendants have argued that "rational" meant just that and nothing more.  However, after the guilty pleas and Lischewski's conviction, in the context of the pre-acquisition meetings with competitors, and in light of other allegations in the Complaint which shed additional light on the issue (*see, e.g., id.* ¶¶ 210, 221, 234), it can reasonably be inferred that "rational market behavior" was a euphemism for collusive pricing agreements among Bumble Bee, StarKist, and COSI.  (*See also* First Lion Order at 49.)  Prior to the meeting, Lindberg reviewed the "talking points" with Lea and others at Lion Capital.  (Compl. ¶ 211.)

Plaintiffs alleged sufficient material facts to support a reasonable inference that Lion Capital learned prior to completing the acquisition that Bumble Bee's profits were the product of pricing actions which would be untenable in a competitive market and were in fact the product of anticompetitive agreements.  Lion Capital proceeded to acquire Bumble Bee anyway.

The "primary purpose" of Lion Capital was "to carry on, directly or indirectly through its Associates, the business of the provision of investment management (and/or advisory) services to the Funds[,]" including the Fund which invested in Bumble Bee. (LLP Agreement ¶ 3.3.)  Lion Americas was a Lion Capital "Associate." (LLP Agreement § 1.1.)

Lion Capital used Lion Americas to carry out some of its management duties and paid Lion Americas on a "cost plus fee" basis.  (*See* Form ADV, Item 5; Compl. ¶¶ 195, 196.)  Lion Capital was Lion Americas' only client, Lion Americas was not involved in any other business other than advising Lion Capital, and it had no direct or indirect affiliation with the Fund.  (*See* Form ADV, Items 5-7; Compl. ¶ 199.)  Lion Americas had no other source of income and was entirely dependent on Lion Capital for funding.

(Compl. ¶ 199; Form ADV, Item 5.)  Based on the foregoing, the allegations support a reasonable inference that Lion Americas had no direct ability to manage Bumble Bee, and that Lion Capital, as Bumble Bee's equitable owner and managing agent of the Fund, had the ability to manage Bumble Bee.

The Lion Entities' website stated that Lion Capital "closely managed the business affairs of the companies in which it invests."  (Compl. ¶ 216.)  Specifically, it claimed, "*We work closely with management* to see exactly what a brand is capable of achieving, and then take it to new heights," and, based on the consumer brand focus, "our team is uniquely positioned to *work with management* to identify the right strategies for revitalizing operations.  (*Id.*) (emphases added).  Lion Capital "ensure[s] that [its] companies have the best management talent to execute the vision that we develop in a *collaborative partnership*" while never forgetting "the responsibility for successful outcomes in our companies rests with us [Lion Capital]."  (*Id.*) (emphasis added).  At the time of the acquisition, Lischewski disseminated an internal memorandum to Bumble Bee employees stating that "the Lion Entities team planned to be 'actively involved' in the business."  (*Id.* ¶ 217.)  Lion Capital installed Lea, Lindberg, and Capps on Bumble Bee's board of directors, thus controlling three of its four seats.  (*Id.* ¶¶ 217, 205.)

 Lion Capital oversaw the Bumble Bee investment from its office in Los Angeles, California, near Bumble Bee's headquarters and principal place of business in San Diego.  (Compl. ¶¶ 189, 31.)  Lion Americas operated out of the same office.  (*Id.* ¶ 190.)  Dual agents Lindberg, Capps, and Chang also worked out of the Los Angeles office.   (*Id.* ¶¶ 189, 190.)

As the sole Managing Partner of Lion Capital, Lea had the discretion and authority to admit new Members, determine their duties and compensation, and expel them from Lion Capital.  (LLP Agreement ¶¶ 11, 12.1(b), 14.1, 1.1.)  Further, the LLP Agreement sets out the "Members' Obligations[,]" as follows:

> Each Member shall, unless the Managing Partner otherwise agrees, devote the whole of his time and attention to the performance of his obligations on behalf

of the LLP and its Associates, as required by the Managing Partner and shall not engage in other business activities without the consent of the Managing Partner. The Managing Partner may determine the duties, role and obligations of each of the Members from time to time.

(LLP Agreement ¶¶ 14 & 14.1.) The Lion Entities have argued that this provision does not mean that Lindberg, Capps, or Chang had to devote their entire time to duties as assigned by Lea. (Second Lion 12(b)(6) Reply at 6.) They point to the language that the Members had to devote their time to obligations on behalf of Lion Capital *and its Associates*, Lion Americas included, and that Lea would determine their duties merely *from time to time* and not necessarily all of the time. (Second Lion 12(b)(6) Reply at 6) (second emphasis added).

The Court does not consider the LLP Agreement in the abstract but in the context of other factual allegations. Plaintiffs alleged that Lea assigned Lindberg to be principally responsible for managing the Bumble Bee investment and that he assigned Capps and Chang to assist Lindberg. (Compl. ¶ 194; *see also id.* ¶ 191.) These assignments were consistent with the LLP Agreement. No facts have been alleged or are discernible from judicially noticed documents to suggest that Lindberg, Capps, or Chang engaged in any business activities other than as assigned by Lea. In context, it is apparent that Lea directed Lindberg, Capps, and Chang's actions with regard to Bumble Bee to meet Lion Capital's objectives as the managing agent of the Bumble Bee investment.

Lion Capital closely monitored Bumble Bee's performance as well as competitors' compliance with the pricing agreements and set ambitious goals for Bumble Bee (Compl. ¶¶ 213, 221, 232), as it wanted to ensure Bumble Bee's continued "supra-competitive" profits and "investment grade returns" to the Fund. (*Id.* ¶¶ 202, 213.) Lion Capital

15-MD-2670 DMS (MDD)

"incentivized and rewarded" Bumble Bee executives[15] with Big Catch shares[16] to meet the goals it set for the benefit of its investors.  (*Id*. ¶ 202.)

Lea attended most Bumble Bee board meetings, which were often followed by off-the-record "executive sessions." (Compl. ¶¶ 218, 220, 194; *see also id*. ¶ 217.)  When Lea was unable to attend, he received detailed private briefings.  (*Id*. ¶ 220.)  Lea's briefing included competitor information and developments which revealed collusive dealings with Bumble Bee's competitors.  (*Id*. ¶¶ 217, 228.)  To the extent Lea did not himself directly communicate with Bumble Bee executives, Lindberg, Capps, and Chang provided reports. (*Id*. ¶ 220.)  For example, on March 28, 2012, Chang reported to Lea about a board meeting the day before.  His report included non-public information about StarKist and COSI profitability and plans for Bumble Bee to closely align its list pricing with them as of April 1, 2012.  (*Id*.)

Plaintiffs cite another example from July 2012, when Lea "complained" to Lindberg that Bumble Bee had missed earnings projections for the first half of 2012 and asked for some "good news" to report to the investors.  (Compl. ¶ 221.)  Lindberg responded that the failure to meet the goal would not repeat itself because it was the result of pricing issues "caused by StarKist's dysfunctional management team which was fired by Dongwon," and that StarKist was "now in lockstep with us in setting pricing rationally."  (*Id*.)  These specific allegations support Plaintiffs' assertion that Lion Capital knew of and encouraged Bumble Bee's collusive activities.

The allegations of Lion Capital's involvement in the conspiracy are underscored by Bumble Bee's Plea Agreement, which suggests that Lion Capital was not merely passively involved but had meaningful information to contribute to the then-ongoing investigation.

---

[15]  The executives included Lischewski, Kenneth Worsham, and Walter Scott Cameron, all of whom have either pleaded guilty to, or were found guilty of, participating in the conspiracy.

[16]  Big Catch was the Lion Entity whose purpose was to hold Bumble Bee stock.  (Compl. ¶ 200.)

The Plea Agreement required Bumble Bee's "parent companies," including Lion Capital, to provide full cooperation with the government investigation and potentially pay additional fines on behalf of Bumble Bee.  (*U.S. v. Bumble Bee*, N.C. Cal. Case No. 17cr00249, Am. Plea Agreement ¶¶ 9, 13, 14, ECF No. 32; *see also id.* Tr. of Proceedings ("Tr.") at 10-11, ECF No. 36; *see also* Compl. ¶ 205.)  The Lion Entities were represented at Bumble Bee's change of plea hearing and sentencing by the firm representing them in this MDL.  (*See* Tr. at 3.)  Moreover, in this MDL, it was Lion Capital that produced "crucial" email communications between Lischewski and the Lion Entities.  (Compl. ¶ 181.)

Consistent with its objective to achieve maximum investor returns for its Fund, Lion Capital was involved in policing compliance and enforcing collusive pricing agreements. For example, in early 2012, TUG President and CEO Thiraphong Chansiri contacted Lindberg asking how they could "work together on the owner level" to help "improve" the industry.  (Compl. ¶ 230.)  Lindberg heartily agreed with Chansiri's "sentiments about the negative industry atmosphere."  (*Id.*)  This exchange was followed by a meeting between them to discuss the issues.  (*Id.* ¶ 231.)

The Court has already determined that the alleged email exchange supports a reasonable inference that TUG and Lion Capital sought to clamp down on what they perceived as "cheating" on the pricing agreements.  (First Lion Order at 82-83.)  In this instance, the Court focuses on the fact that Chansiri reached out to Lindberg "on the owner level."  Lindberg had previously held himself out as a representative of Bumble Bee's owner (*Cf.* Compl. ¶ 211), and in fact was a Lion Capital Executive Officer (Form D).  It is therefore not surprising that he was contacted in that capacity.  These specific allegations support a reasonable inference that Lindberg acted on behalf of Lion Capital when he engaged in the policing and enforcement of the collusive agreements.

Continuing to secure Bumble Bee's high profit margins, achievable only through collusion, by perpetuating and enforcing pricing agreements was to Lion Capital's benefit. (First Lion Order at 78.)  This strategy was poised to pay off when Lion Capital announced

plans to sell Bumble Bee to TUG in 2014.  Lion Capital acquired Bumble Bee for $980 million in December 2010 and had entered into an agreement to sell it to TUG in late 2014 for $1.51 billion—an increase of approximately $530 million in just four years.  (Compl. ¶¶ 189, 209, 213, 240.)  Upon announcing the transaction, Lea issued a statement:

> We are proud to have played a significant role in the evolution of Bumble Bee over the last 4 years and would like to thank our partners, Chris [Lischewski] and the management team, for helping us achieve such a successful return on our investment.

(*Id.* ¶ 215.)  The deal fell apart after the DOJ "informed the companies it had serious concerns that the proposed transaction would harm competition."  (DOJ Press Release dated Dec. 3, 2015, cited in Compl. ¶ 209 n.12.)

## B.   Legal Arguments and Authorities

In their opposition to the Second Lion 12(b)(6) Motion Plaintiffs argued that Lindberg, Capps, and Chang acted as agents of Lion Capital.  (Pls' Resp. to Lion Capital and Big Catch Renewed Consol. Mot. to Dismiss ("Second Lion 12(b)(6) Opp'n,") at 6-15, ECF No. 1721.)[17]  The parties agree that the federal common law of agency, as stated in the Restatement (Third) of Agency, applies to the question whether Lion Americas agents were also agents of Lion Capital.  (*Cf. id.* at 12 *with* Second Lion 12(b)(6) Reply at 3-4.)  The Lion Entities do not dispute that Plaintiffs sufficiently alleged facts to meet the agency elements under federal common law.  (*See* Second Lion 12(b)(6) Reply at 4.)  They argue, however, that more is required for dual agents like Lindberg, Capps, and Chang.  They point to *Bestfoods* for the proposition that in the absence of additional facts, the law presumes dual agents acted on behalf of the subsidiary rather than the parent corporation.  (*Id.* at 2.)  Plaintiffs counter that their Complaint overcomes the presumption.  (Mot. for Reconsideration at 8 n.16.)

---

[17]  The public redacted version can be found at ECF No. 1721.

Plaintiffs rely on *Arandell v. CenterPoint Energy Services*, 900 F.3d 623 (9th Cir. 2018), for the proposition that Lion Capital and Lion Americas were a single enterprise for purposes of the price-fixing conspiracy so that "the knowledge of ... dual officers and directors is imputed to Lion Capital, which is in turn liable for its own conduct in furtherance of the conspiracy."[18] (Mot. for Reconsideration at 7.) *Arandell* addressed the issue of a subsidiary's direct liability for collusion based on participation in coordinated activity with its parent and affiliate entities. 900 F.3d at 625. The case was part of an MDL alleging an industry-wide conspiracy. *See Arandell,* 900 F.3d at 627-28. At the time of the relevant motions, the existence of the conspiracy had already been established because the parent and affiliate entities had admitted to their participation. *See id.* at 627-28, 629, 634 n.11. Here, Bumble Bee and its executives have been convicted of collusion with competitors. Further, the Court has found that Plaintiffs sufficiently alleged Lion Americas' collusion with Bumble Bee.

In *Arandell* the plaintiffs' theory against the subsidiary was that it had played a vital part in the scheme orchestrated by its parent. 900 F.3d at 628. There was a substantial overlap between the directors and managers of the subsidiary, affiliate, and parent entities. *Id.* at 629, 632. The parent and affiliates colluded with other natural gas conglomerates to manipulate prices. *Id.* at 630. In furtherance of the conspiracy, the parent entity's officers and directors instructed the affiliate to manipulate retail prices and directed the subsidiary, which purchased gas from the affiliate, to sell it to consumers and return profits to the parent. *Id.* at 628.

In support of its summary judgment motion, the subsidiary argued plaintiffs failed to raise a genuine issue whether the subsidiary engaged in any anticompetitive activity. *Id.* The subsidiary argued its liability could not rest solely on the facts that its affiliate and parent entities were involved in the conspiracy and that the subsidiary sold natural gas to

---

[18]  The Court in this Order expresses no opinion whether Plaintiffs have stated a claim against Lion Capital on indirect liability theories such as veil-piercing or alter ego.

15-MD-2670 DMS (MDD)

consumers. *Id.* The district court agreed and granted summary judgment reasoning that the plaintiffs failed to present evidence that the subsidiary knowingly engaged in price manipulation or knew that its parent and affiliate were engaged in such behavior. *Id.* The Court of Appeals reversed. *Id.* at 629.

> As to anticompetitive intent, the court ruled,

> A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single "economic unit" of which it is a part.

*Id.* at 632; *see also* discussion at 630-32. The plaintiffs' evidence that the activities of the commonly owned entities were coordinated and furthered the conspiracy, *i.e.,* the subsidiary's claimed unwitting distribution to consumers at artificially inflated prices, obviated the need for a separate showing of the subsidiary's knowledge. *Id.* at 632. The commonly owned enterprise's illegal purpose was imputed to the subsidiary. *Id.*

The "unity of *purpose* ... does not supply a theory of unbounded vicarious liability for the *acts* of legally distinct entities." *Id.* at 633. "A defendant may be held liable under § 1 of the Sherman Act if that person *acted* either with the knowledge that the action would have unreasonable anticompetitive effects or with the purpose of producing those effects." *Id.* at 629 (emphasis added). To hold any defendant directly liable as part of a common scheme, a plaintiff "must come forward with evidence that each defendant independently participated." *Id.* at 633. The plaintiffs' showing in *Arandell* that the subsidiary sold gas at inflated prices and distributed the profits to its parent was adequate circumstantial evidence to raise a genuine issue regarding the subsidiary's own participation in the scheme. *Id.* at 634-35.

Accordingly, to state a claim against Lion Capital, Plaintiffs must allege Lion Capital's knowledge or anticompetitive purpose. The state of mind can be either imputed from allegations of coordinated activity in furtherance of the conspiracy or alleged separately. In addition, Plaintiffs must allege Lion Capital's participation in any part of

the scheme.[19]  Defendants rely on *Bestfoods* to argue that Plaintiffs' allegations were insufficient.

*Bestfoods* addressed the issue of "the extent to which parent corporations may be held liable under CERCLA [the Comprehensive Environmental Response, Compensation, and Liability Act] for operating facilities ostensibly under the control of their subsidiaries." 524 U.S. at 60; *see also* at 69-70.  There, as here, the parent entities placed their own high-level officials on the subsidiary's board and in key management positions.  *Id.* at 68; *see also id.* at 59.  Those individuals made major policy decisions and conducted relevant day-to-day operations.  *Id.* at 68-69.  Furthermore, a parent entity official who was not an employee, officer, or director of the subsidiary "played a significant role in shaping [the subsidiary's] environmental compliance policy."  *Id.* at 59; *see also id.* at 72.

After a bench trial, the district court found the parent entities directly liable for CERCLA violations as operators at the facilities operated by the subsidiary.  *Id.* at 59, 67.  The Court of Appeals reversed.  *Id.* at 59-60.  The Supreme Court vacated and remanded for further fact finding on the issue of the parent entities' direct liability.  *Id.* at 72-73.

Generally, "a parent corporation ... is not liable for the acts of its subsidiaries."  *Id.* at 61.  However, "the parent corporation is itself responsible for the wrongs committed by its agents in the course of its business."  *Id.* at 65; *see also id.* at 64.  This occurs when

> the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management and the parent is directly a participant in the wrong complained of.  In such instances, the parent is directly liable for its own actions.

*Id.* at 64-65.  Nevertheless, when parent entity personnel are also acting at the management or directorial levels of the subsidiary, this does not automatically expose the parent to direct liability for the subsidiary's actions.  *Id.* at 69-70.  It is not inappropriate for parent entity

---

[19]  None of the conspirators need participate in every act or transaction of the conspiracy to be liable.  *Id.* at 634.

personnel to hold important positions with the subsidiary and "change hats to represent the two corporations separately, despite their common ownership." *Id.* at 69. The "courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Id.*

To overcome the presumption, a party must show that the dual agents were acting on behalf of the parent. *Id.* at 70. The focus of the inquiry is on the parent company's role in the alleged wrongdoing. *See id.* at 67-68. This is a fact-specific analysis "call[ing] for line-drawing," as the acts "that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary." *Id.* at 71. For example,

> [a]ctivities that ... are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures should not give rise to direct liability.

*Id.* at 72. On the other hand, participation in the subsidiary's wrongdoing supports a finding of the parent company's liability. *See id.* at 67-68, 70-71.

In *Bestfoods*, evidence that a parent entity agent was actively involved in dealing with the toxic risks emanating from the operation of the subsidiary's facility, and evidence suggesting that the subsidiary's actions in operating the facility were "dictated by, and thus taken on behalf of," a parent entity was sufficient to overcome reversal of a plaintiffs' judgment and warranted remand for further fact finding. *Id.* at 72-73 & n.14. Accordingly, Plaintiffs can allege Lion Capital's participation by alleging that Lion Capital participated in the conspiracy through its agents who were not also agents of Lion Americas, or alternatively, that dual agents Lindberg, Capps, and Chang acted on behalf of Lion Capital.

## C.   Antitrust Claim Against Lion Capital

Plaintiffs have sufficiently alleged that Lion Capital knew prior to the acquisition that Bumble Bee participated in an ongoing industry-wide price-fixing conspiracy. It can reasonably be inferred from the allegations that Lion Capital knew that Bumble Bee's

profits were untenable in a competitive market and were in fact the product of collusive price agreements.  Lion Capital proceeded to acquire Bumble Bee with this knowledge.

Plaintiffs have also sufficiently alleged that Lion Capital and Lion Americas engaged in coordinated activity as a single enterprise.  Lion Capital, with knowledge of Bumble Bee's ongoing participation in the conspiracy and as the managing agent of the Bumble Bee investment, used Lion Americas to assist in managing Bumble Bee with the objective of maintaining supra-competitive profits.  The coordinated activity furthered the conspiracy by encouraging Bumble Bee's continued participation and perpetuating the collusive agreements by policing and enforcing them.

The allegations of Lion Capital's knowledge and the coordinated activity with Lion Americas in furtherance of the conspiracy are sufficient under *Arandell* to raise a reasonable inference of Lion Capital's own participation in the conspiracy.  *Cf. Arandell*, 900 F.3d at 634-35.  As equitable owner with knowledge of Bumble Bee's participation, Lion Capital could have directed Bumble Bee to disassociate itself from the conspiracy.  Lion Capital's role in knowingly encouraging Bumble Bee's collusion was crucial to the continued viability of the conspiracy.

Alternatively, Plaintiffs have sufficiently alleged Lion Capital's own acts in furtherance of the conspiracy.  Plaintiffs alleged that Lion Capital directly participated through Lindberg, its Member and Executive Officer.  Lindberg held himself out as acting on behalf of Lion Capital when he assured, on an "owner to owner" basis, to Dongwon and TUG executives that Lion Capital would support and enforce the collusive pricing agreements.  In this regard, Lindberg's ostensible capacity was that of an agent of Lion Capital.  *Cf. Bestfoods,* 524 U.S. at 71-72.  Lion Americas had no ownership, equitable or otherwise, of Bumble Bee.  Accordingly, Plaintiffs' allegations support a reasonable inference that Lindberg acted on behalf of Lion Capital.  The allegations regarding Lindberg's actions on behalf of Lion Capital are sufficient to state a claim against Lion Capital.

Finally, Plaintiffs alleged sufficient facts to raise a reasonable inference that Lion Capital participated through Lea, its General Manager who was not employed by Lion Americas, as well as through the dual agents he directed. Lea assigned Lindberg, Capps, and Chang to manage the Bumble Bee investment. After the acquisition, their reports to Lea indicated that Bumble Bee continued to collude with its competitors. Contrary to discouraging continued support of Bumble Bee's collusion, Lea ratified and encouraged it by knowingly setting Bumble Bee's financial goals at levels which were untenable in the absence of collusion. In this regard, Plaintiffs sufficiently alleged that Lion Capital participated in the conspiracy by directing dual agents Lindberg, Capps, and Chang, and that the dual agents furthered the conspiracy at Lea's direction. *Id.* at 72-73 & n.14.

Based on the foregoing, Plaintiffs have alleged adequate facts to state an antitrust claim under 15 U.S.C. §1 against Lion Capital.

**D.    Antitrust Claim Against Big Catch**

The Court has previously found Plaintiffs sufficiently alleged that Big Catch was Lion Capital's alter ego. (First Lion Order at 62, 87; *see also* Second Lion Order at 18.) Accordingly, Plaintiffs have stated an antitrust claim under 15 U.S.C. § 1 against Big Catch on the alter ego theory.[20]

**III.**

**MOTION TO SEAL**

The parties jointly filed a Motion to Seal portions of eight documents filed in support of and in opposition to Plaintiffs' Motion for Reconsideration. (Mot. to Seal Exs. A-H, lodged at ECF No. 2472.) The documents consist of Kroger Plaintiffs' proposed fifth amended complaint, charts of new allegations in the proposed fifth amended complaint, including the Lion Entities' arguments in opposition and Plaintiffs' reply, a report on Lion

---

[20] In light of these rulings, the Court denies as moot Plaintiffs' alternative request and the separate motion for entry of judgment against Lion Capital and Big Catch pursuant to Rule 54(b).

20

Companies' and Lion Americas' annual performance, tax liabilities, and payroll, excerpts from three depositions, and an internal whistleblower communication.

The Motion for Reconsideration was decided based on the allegations in the operative Complaint. Further, because the Motion for Reconsideration is granted and the Second Lion 12(b)(6) Motion is denied, Plaintiffs' request for leave to amend is moot. Accordingly, none of the documents sought to be sealed is relevant to the decision on Plaintiffs' Motion for Reconsideration. The Joint Motion to Seal is therefore denied as moot.

The parties do not request the sealing of any portion of the parties' briefs in support of and in opposition to the Motion for Reconsideration. (*See* ECF No. 2472 (listing documents for sealing).) Accordingly, the parties will refile without redactions their briefs filed at ECF Nos. 2285, 2295, and 2303.

## IV.

## CONCLUSION

For the reasons stated above, it is hereby ORDERED as follows:

1. Plaintiffs' Motion for Reconsideration (ECF No. 2285) is granted. The Order Granting Defendants' Motion to Dismiss (ECF No. 2270) is vacated. Lion Capital and Big Catch's Renewed Consolidated Motion to Dismiss the Complaints of the Indirect Purchaser End Payer Plaintiffs, Commercial Food Preparer Plaintiffs, Direct Purchaser Plaintiffs, Direct Purchaser Class Plaintiffs, and Direct Action Plaintiffs and the Cherokee Nation (ECF No. 1631) is denied.

2. No later than the time set forth in Federal Rule of Civil Procedure 12(a)(4)(A) Defendants Lion Capital and Big Catch shall file their respective answers, if any.

3. Plaintiffs' Rule 54(b) Motion (ECF No. 2281) is denied as moot.

15-MD-2670 DMS (MDD)

4.   The parties' Joint Renewed Motion to File Documents Under Seal (ECF No. 2471) is denied as moot.  The parties shall forthwith refile without redactions their briefs filed at ECF Nos. 2285, 2295, and 2303.

**IT IS SO ORDERED**.

Dated:  March 21, 2022

Hon. Dana M. Sabraw, Chief Judge
United States District Court

15-MD-2670 DMS (MDD)