Manton M. Grier (D.S.C. No. 2461)
HAYNSWORTH SINKLER BOYD, P.A.
1201 Main Street
Suite 2200
P.O. Box 11889 (29211)
Columbia, South Carolina
Telephone: (803) 779-3080
Facsimile: (803) 765-1243
mgrier@hsblawfirm.com
bknowlton@hsblawfirm.com
eblack@hsblawfirm.com
meldridge@hsblawfirm.com

*Counsel for Direct Action Plaintiff W. Lee Flowers & Co.*
*(additional counsel listed on signature page)*

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION

This document relates to:

- Direct Action Plaintiff Winn-Dixie Stores, Inc.
- Direct Action Plaintiff Bi-Lo Holding, LLC
- Direct Action Plaintiff Associated Wholesale Grocers, Inc.
- Direct Action Plaintiff Affiliated Foods Midwest Cooperative, Inc.
- Direct Action Plaintiff W. Lee Flowers & Co.

Case No. 3:15-md-02670-JLS-MDD
MDL No. 2670

**PLAINTIFFS' JOINT MEMORANDUM IN OPPOSITION TO DEL MONTE CORPORATION'S PARTIAL MOTION FOR SUMMARY JUDGMENT**

DATE: February 12, 2020
TIME: 9:00 a.m.
JUDGE: Janis L. Sammartino
COURT: 4D

# TABLE OF CONTENTS

I. INTRODUCTION .......... 4

II. ARGUMENT .......... 4

A. Summary Judgment Standards Applicable To This Motion .......... 4

B. Standard for Withdrawal from an Alleged Antitrust Conspiracy .......... 5

C. Del Monte Did Not Effectively Withdraw from the Conspiracy Until the Expiration of the OSA and TSA in 2010 .......... 7

D. Del Monte Waived the Affirmative Defense of Withdrawal as Against AWG's and Flowers' State Law Claims .......... 11

III. Conclusion .......... 12

CASES

*In re Adbox*, 488 F.3d 836, 841 (9th Cir. 2007) ---------------------------------------- 12

*Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 8669891, at *6 (N.D.Cal. Aug. 22, 2016) ---------------------------------------- 6

*Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-5944 SC, 2010 WL 9543295, at *12 (N.D. Cal. Feb. 5, 2010) ---------------------------------------- 6, 12

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ---------------------------------------- 4

*Meeker v. Belridge Water Storage Distr.*, 2008 WL 3155060, at *17 (E.D. Cal. 2008) ---------------------------------------- 12

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999) ---------------------------------------- 6, 7, 10, 11

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000) ---------------------------------------- 5

*Optical Disk Drive Antitrust Litig.*, 2017 WL 6503743 at *7 (N.D.Cal. Dec. 18, 2017) ---------------------------------------- 6

*Smith v. U.S.*, 568 U.S. 106, 112-13 (2013) ---------------------------------------- 5

*TFT-LCD (Flat Panel) Antitrust Litigation*, 820 F.Supp.2d 1055, 1060 (N.D.Cal. 2011) ---------------------------------------- 5

*U.S. v. Finestone*, 816 F.2d 583, 589 (11th Cir. 1987) ---------------------------------------- 6

*U.S. v. Gypsum Co.*, 438 U.S. 422, 464-65 (1978) ---------------------------------------- 5, 10, 11

*United States v. Inryco*, 642 F.2d 290, 293 (9th Cir. 1981) ---------------------------------------- 5

*United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) ---------------------------------------- 5

*United States v. Steele*, 685 F.2d 793 (3d Cir. 1982) ---------------------------------------- 7

## STATUTES

S.C. Code. § 39-3-10, *et seq.* ---------------------------------------------------------------- 12

S.C. Code. § 60-501, *et seq.* ---------------------------------------------------------------- 12

## OTHER AUTHORITIES

14 ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1278 (3d ed. 2019) 13

## REGULATIONS

Fed. R. Civ. P. 56(a) ---------------------------------------------------------------------- 4

Plaintiffs[1] hereby oppose Del Monte Corporation's ("Del Monte's") Motion for Partial Summary Judgment (the "Motion") (ECF No. 2025.).

## I. INTRODUCTION

In its Motion, Del Monte argues that its sale of StarKist Co., Inc. on October 6, 2008 constitutes a withdrawal from the alleged conspiracy between its co-Defendants' alleged conspiracy to fix and maintain the price of packaged tuna products in contravention of U.S. antitrust laws. In support of this argument, Del Monte points to evidence in the record demonstrating that its alleged co-conspirators were aware of its sale of StarKist Co. to co-Defendant Dongwon Industries Co., Ltd. ("Dongwon"). Del Monte also attempts to downplay its continued post-sale involvement with StarKist by arguing that the Operating Services Agreement (the "OSA") and Transition Services Agreement (the "TSA") that the two entities entered into upon Del Monte's sale of StarKist constituted a "limited" provision of services, and thus did not prevent Del Monte from withdrawing from the conspiracy. In doing so, Del Monte essentially argues that its cessation of active participation in the conspiracy after October 6, 2008 constitutes an effective withdrawal from the conspiracy, therefore severing its liability for Plaintiffs' post-sale claims. Such a position is contrary to case law and the record, and this Court must deny Del Monte's Motion.

## II. ARGUMENT

### A. <u>Summary Judgment Standards Applicable To This Motion</u>

Summary judgment is only appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, a court finds no genuine disputed issues of material fact and concludes that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*,

---

[1] For the purposes of this Motion, Plaintiffs includes Associated Wholesale Grocers, Inc., Affiliated Foods Midwest Cooperative, Inc., W. Lee Flowers & Co., Inc., Winn-Dixie Stores, Inc., and Bi-Lo Holding, LLC.

477 U.S. 317, 322 (1986). The moving party on a motion for summary judgment must carry an initial "burden of production" before the opposing party is even required to respond on the merits. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). ("*Nissan Fire*"). If the moving party will bear the burden of proof at trial as to a claim or defense, on summary judgment it must present admissible evidence affirmatively showing there is no triable issue of fact as to that claim or defense to carry its "burden of production." *Id*. If the moving party will not bear the burden of proof, it may satisfy its initial burden of production in one of two ways: (1) by negating an essential element of the claim; or (2) a showing that the opposing party does not have enough evidence of an essential element of the claim. *Id*. A moving party may not simply assert that Plaintiffs lack essential evidence. *Id*. at 1105 ("[a] moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence").

**B. <u>Standard for Withdrawal from an Alleged Antitrust Conspiracy</u>**

A conspiracy is "presumed to continue until there is affirmative evidence of abandonment, withdrawal, [or] disavowal." *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003); *see also United States v. Inryco*, 642 F.2d 290, 293 (9th Cir. 1981) (a conspiracy "remains actionable until its purpose has been achieved or abandoned"). A party cannot point to "[p]assive nonparticipation in the continuing scheme" to "sever the meeting of the minds that constitutes the conspiracy." *Smith v. U.S.*, 568 U.S. 106, 112-13 (2013). Rather, to establish that a party withdrew from the conspiracy, the party must show, "[a]t a minimum," that it took "'[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators.'" *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 820 F.Supp.2d 1055, 1060 (N.D.Cal. 2011) (quoting *U.S. v. Gypsum Co.*, 438 U.S. 422, 464-65 (1978)). Specifically, "'the defendant must prove that he undertook affirmative steps . . . *to disavow or defeat the conspiratorial objectives*, and either communicated those

acts in a manner reasonably calculated to reach his co-conspirators or disclosed the illegal scheme to law enforcement authorities.'" *Id.* (quoting *U.S. v. Finestone*, 816 F.2d 583, 589 (11th Cir. 1987)). It is not necessary to demonstrate that a conspirator continued to take acts in further of the purported conspiracy to defeat a withdrawal defense. Indeed, "[t]he relevant question . . . is not whether [Del Monte] took affirmative acts in furtherance of the alleged conspiracy, but rather whether [Del Monte] took affirmative acts to show its complete disassociation from it *and the industry*." *Optical Disk*, at *8 (denying defendant's motion for partial summary judgment where the record evidence demonstrated that the defendant failed to exit the industry fully and to sever all ties) (emphasis added).

In the antitrust context, a "*full exit* from an industry suffices to establish a prima facie case of withdrawal." *In re Optical Disk Drive Antitrust Litig.*, 2017 WL 6503743 at *7 (N.D.Cal. Dec. 18, 2017) (emphasis added). However, the conspirator must "*sever completely all ties* to the industry." *Id.* (citing *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 8669891, at *6 (N.D.Cal. Aug. 22, 2016) (hereinafter "*CRT* II")) (emphasis added). Crucially, "the sale of an operating business does not automatically establish" the withdrawal defense. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-5944 SC, 2010 WL 9543295, at *12 (N.D. Cal. Feb. 5, 2010) (hereinafter *CRT* I). Rather, there must be "factual inquiries—again, with the burden of proof on the defendants—into such subjects as the defendants' continued financial interest in the business that was sold, some continued participation, or some continued benefit from the alleged conspiracy." *Id.*

Generally, the party asserting a withdrawal defense must sever all ties with "the business through which it participated in the conspiracy." *CRT* II, at *8; *see also Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999) ("The conspirator's break with the other conspirators, however, *must be both clean and permanent*.") (emphasis added). Where the conspiracy involves a business conspiracy,

meaning that the conspiracy "is carried out through the regular activities of an otherwise legitimate business enterprise," the law will only find a conspirator's abandonment of the conspiracy effective "where the conspirator can demonstrate that he retired from the business, *severed all ties to the business*, and deprived the remaining conspirator group of the services which he provided to the conspiracy." *Morton's Market* at 839. Courts have found that, for instance, an employee of a corporation involved in a bribery conspiracy effectively withdrew from the conspiracy when the employee resigned *and permanently severed* his employment relationship with the corporation. *Id.* (citing *United States v. Steele*, 685 F.2d 793 (3d Cir. 1982)).

**C. Del Monte Did Not Effectively Withdraw from the Conspiracy Until the Expiration of the OSA and TSA in 2010.**

Del Monte contends that it effectively withdrew from the alleged conspiracy when it sold StarKist to Dongwon on October 6, 2008. However, Del Monte has failed to point to any evidence in the record demonstrating that it affirmatively severed ties and completely disassociated with the packaged tuna industry upon the sale of its packaged tuna assets. Indeed, Del Monte cannot make such a showing, as the OSA and TSA contractually obligated it to continue its business relationship with StarKist Co., and, thus, the packaged tuna industry, until October 2010. Seemingly recognizing that it cannot affirmatively demonstrate that there is no genuine issue of material fact regarding its purported withdrawal from the conspiracy, Del Monte instead argues that it is entitled to summary judgment because its co-Conspirators were aware of the sale of StarKist to Dongwon, because neither the OSA nor TSA endowed Del Monte with any pricing power, and because Plaintiffs did not allege any affirmative conspiratorial acts taken by Del Monte or its employees beyond October 6, 2008. Del Monte's contentions are unavailing in light of the case law, and this Court should deny its Motion.

As Del Monte concedes, under the OSA and TSA, "Del Monte agreed to provide

various services to StarKist Co. from October 2008 through October 2010." (MPA, p. 12.) The TSA specifically notes that Del Monte and StarKist entered into the OSA "[i]n order to support the *continued and uninterrupted* operation of" the business of "manufacturing, marketing, selling and distributing" StarKist brand products and private label seafood products. (SOF ¶ 1.) The OSA requires that Del Monte and StarKist appoint Operating Service Representatives to meet "on a monthly basis to facilitate ongoing cooperation between the parties in connection with their performance of" the OSA. (SOF ¶ 2.) At the monthly meetings, the Operating Service Representatives were required to take certain actions, including: (1) review and analyze performance regarding Service Level "Targets" and Penalty Triggers; (2) discuss potential improvements ("generally"); (3) review current improvement activities; (4) review actual problems; (5) update regarding complaints by customers, suppliers or consumers; (5) make recommendations with respect to costs; and (6) review fish supply and procurement. (*Id.*) Thus, Del Monte did not "sever completely all ties" to the packaged seafood industry. On the contrary, it remained an active and integral participant in StarKist's ongoing operations.

Pursuant to the OSA, Del Monte agreed to provide certain long-term services to StarKist, including "[c]omplete Sales support across all exiting Sales channels utilized by the Business," including "management of Broker relationships, use of dedicated retail brokerage support, shelf resets, payment of brokerage fees, and use of [Del Monte's] dedicated customer teams." (SOF ¶ 3.) Likewise, in the category of Warehousing/Transportation/Distribution, Del Monte provided customer service and customer financial service services for StarKist that required it to communication with StarKist's customers, process sample requests, initiate customer billings for product shipments, manage trade accounts receivable, validate and clear trade promotion deductions, and seek recovery of invalid customer deductions. (SOF ¶ 4.) While Del Monte received fixed-value fees for certain services it provided to StarKist—such as

fees incurred for sales platform costs—it also received a variable fee based on a percentage of the "NSV" for services rendered in connection with brokerage/variable selling. (SOF ¶ 5.)

The OSA also set certain "Targets" for Del Monte to maintain and provides for penalties to be assessed against Del Monte in the event that Del Monte failed to meet a "Service Level" as set forth in the OSA. (SOF ¶ 6.) Specifically, the OSA sets forth certain Sales Service Levels that Del Monte was required to meet. (*Id.*) While the OSA did not set forth a penalty for Del Monte's failure to meet an average price per item, the OSA noted that Del Monte meeting an average price per item goal "is important to StarKist Co." (SOF ¶ 7.) Likewise, while Del Monte did not set prices, the OSA clarifies that Del Monte *did* set "promotional objectives and maximum spend guidelines," and that it "can certainly track average price." (SOF ¶ 8.) Based on the clear terms of the OSA, Del Monte cannot contend that it did not assist StarKist with the operation of its business and that it severed ties with StarKist—and the packaged tuna industry—after the October 6, 2008 sale. Indeed, both the OSA and TSA require Del Monte to provide significant support to StarKist with both the sales and customer services functions of its business, which Del Monte concedes includes StarKist's packaged tuna business—which is the subject to the alleged conspiracy—as well as StarKist's general packaged seafood business. (*See* MPA, p.3, fn.5.)

Testimony and evidence from StarKist's employees further demonstrate that Del Monte actively continued to assist StarKist with the operation of its packaged tuna business during the OSA period. In one e-mail to Steve Rayburn, Del Monte's then-VP of Finance and Assistant Controller, StarKist's then-CEO Don Binotto confirmed that "delmonte will assist [StarKist]" during the OSA period. (SOF ¶ 9.) Indeed, in the same e-mail Rayburn confirmed to Binotto that "Del Monte is providing full sales support under the terms of the OSA . . . Del Monte Sales will still call on customers." (*Id.*) Binotto later testified that Del Monte "still provided . . . direct communication

with the customer" and "feedback and recommendations" during the OSA period. (SOF ¶ 10.)

Notably, Binotto testified that StarKist "ended up bringing Steve Hodge over . . . from Del Monte to be our counterpoint to communicate to the Del Monte folks." (*Id.*) Indeed, Binotto acknowledged that the division between Del Monte employees versus StarKist employees was "a little more complicated" under the OSA, and that Del Monte "had teams on key accounts . . . that Del Monte Serviced. And so when they went in, we . . . StarKist Co., whoever the salespeople were at that time . . . also went in with them to make the presentation." (*Id.*)

Finally, an email dated October 9, 2008—subsequent to the OSA's effective date—also demonstrates that Binotto and Steve Hodge, who was still employed by Del Monte at the time, exchanged information about Bumble Bee and Chicken of the Sea matching albacore prices. (SOF ¶ 11) Hodge wrote: "By the way, another source confirmed what we discussed about BB matching on the albacore shortly, but doesn't look like COS is going to move at all." (*Id.*) This is precisely the type of competitive intelligence that was used to facilitate and carry out the ongoing price-fixing. Hodge is a particularly critical figure – he moved from Del Monte to StarKist at some point after October 2008, and later pleaded guilty to the tuna price fixing conspiracy beginning at least as early as 2011. (SOF ¶ 12.) And StarKist has identified Steve Hodge as its key player in the tuna price fixing conspiracy. (*Id.*) This email shows that Del Monte was continuing to work in furtherance of the conspiracy after the sale, which alone requires denying summary judgment.

Del Monte relies on two cases—*U.S. Gypsum* and *Morton's Market*—to argue that it effectively withdrew from the conspiracy when it sold its StarKist business because it did not take any affirmative acts in furtherance of the conspiracy and because its sale of StarKist was communicated to, and acknowledged by, its co-conspirators. However, as set forth above the record is replete with evidence sufficient to show that

Del Monte did not fully sever ties with StarKist, the "business through which it participated in the conspiracy," upon the sale of StarKist on October 6, 2008, but instead continued to assist StarKist with the operation of its packaged tuna business pursuant to the OSA and TSA agreements between the parties. Indeed, and unlike the defendant in *Morton's Market*, it cannot be said that there is no genuine issues of material fact as to whether Del Monte "retired" and "permanently severed" its relationship with StarKist, the company involved in the conspiracy to fix packaged tuna prices, when it sold its StarKist business on October 6, 2008. *See Morton's Market*, 198 F.3d at 839.

Likewise, Del Monte's reliance on *U.S. Gypsum* is misplaced. *U.S. Gypsum* merely stands for the proposition that "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *U.S. Gypsum*, 438 U.S. at 464-65. Plaintiffs do not dispute that Del Monte's competitors were aware of the change in ownership following the October 6, 2008 sale of StarKist; however it cannot be said that the sale constituted an "affirmative act" sufficient to sever Del Monte's connection to the conspiracy. As set forth above, Del Monte continued to provide services to StarKist that greatly benefitted StarKist's business—the very business that continued to engage in the price-fixing conspiracy with its co-Defendants. Del Monte's contention that its co-conspirators were aware of the sale and that it did not take any affirmative acts in furtherance of the conspiracy does not change the fact that Del Monte did not completely sever ties with and exit the packaged seafood industry, but continued to provide crucial services to StarKist's packaged tuna business pursuant to the OSA and TSA. Accordingly, Del Monte did not effectively withdraw from the conspiracy until the OSA and TSA expired in 2010.

### D. Del Monte Waived the Affirmative Defense of Withdrawal as Against AWG's and Flowers' State Law Claims.

"It is clear that withdrawal from a conspiracy is an affirmative defense, with the

burden of proof being on the claimed withdrawing party." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-5944 SC, 2010 WL 9543295, at *12 (N.D. Cal. Feb. 5, 2010). And "[i]t is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its exclusion from the case…" 14 ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1278 (3d ed. 2019); *see In re Adbox*, 488 F.3d 836, 841 (9th Cir. 2007) (same).

In their respective Complaints, AWG and Flowers assert claims for violations of Section 1 of the Sherman Act. In its Answers to both AWG's and Flowers' Complaints, Del Monte pleaded the affirmative defense of withdrawal as to their Section 1 Sherman Act claims. (*See* Dkt. 1570 at 71; Dkt. 1579 at 58.)

However, AWG and Flowers *also* assert claims under state antitrust laws: the Kansas Restraint of Trade Act, K.S.A. 60-501, *et seq.* ("KRTA"), and the South Carolina Antitrust Act, S.C. Code. § 39-3-10, *et seq.* ("SCAA"), respectively. Del Monte did not plead the affirmative defense of withdrawal as against *AWG's and Flowers' state law claims*. It is black letter law that such failure, at this late stage of the litigation, constitutes a waiver of the defense. *See, e.g.*, *Meeker v. Belridge Water Storage Distr.*, 2008 WL 3155060, at *17 (E.D. Cal. 2008) (rejecting affirmative defenses because they were not pleaded in answer and were therefore waived). As a result, even if the Court determines that Del Monte has satisfied its burden of showing withdrawal from the conspiracy prior to October 2010 with respect to Plaintiffs' Sherman Act claims, it must deny Del Monte's Motion with respect to AWG's and Flowers' state law claims.

**III. Conclusion.**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion.

Date: November 7, 2019

Respectfully Submitted,

HAYNSWORTH SINKLER BOYD, P.A.

By: s/ *Mary Cothonneau Eldridge*

Manton M. Grier (D.S.C. No. 2461)
Robert Y. Knowlton (D.S.C. No. 2380)
Elizabeth H. Black (D.S.C. No. 10088)
Mary C. Eldridge (D.S.C. No. 12540)
1201 Main Street
Suite 2200
P.O. Box 11889 (29211)
Columbia, South Carolina
Telephone: (803) 779-3080
Facsimile: (803) 765-1243
mgrier@hsblawfirm.com
bknowlton@hsblawfirm.com
eblack@hsblawfirm.com
meldridge@hsblawfirm.com

*Counsel for W. Lee Flowers & Co., Inc.*

*s/ Patrick J. Stueve*

Patrick J. Stueve (KS 13847)
Steve N. Six (KS 16151)
C. Curtis Shank (KS 26306)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: 816-714-7100
Facsimile: 816-714-7101
stueve@stuevesiegel.com
six@stuevesiegel.com
shank@stuevesiegel.com

*Counsel for Direct Action Plaintiff Associated Wholesale Grocers, Inc. and Affiliated Foods Midwest Cooperative*

By: *s/ Patrick J. Ahern*
Patrick J. Ahern
Theodore B. Bell
AHERN AND ASSOCIATES, P.C.
Willoughby Tower
8 South Michigan Avenue Suite 3600
Chicago, Illinois 60603
(312) 404-3760
patrick.ahern@ahernandassociatespc.com
theo.bell@ahernandassociatespc.com

*Counsel for Direct Action Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC*

**SIGNATURE ATTESTATION**

Under Section 2.F.4 of the Court's CM/ECF Administrative Policies, I hereby certify that authorization for filing this document has been obtained from each of the other signatories shown above, and that all signatories have authorized placement of their electronic signature on this document.

Dated: November 7, 2019                    By: s/ *Mary Cothonneau Eldridge*

**CERTIFICATE OF SERVICE**

I certify that on November 7, 2019, I filed the foregoing document and supporting papers with the Clerk of the Court for the United States District Court, Southern District of California, by using the Court's CM/ECF system. I also served counsel of record via this Court's CM/ECF system.

Dated: November 7, 2019              By: s/ *Mary Cothonneau Eldridge*