1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11   IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No.:  15-MD-2670 DMS (MDD) |
| 12   This Document Relates To: | **CLASS ACTION** |
| 13   End Payer Plaintiffs | |
| 14   Commercial Food Preparer Plaintiffs | **ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' GEAR-TYPE CLAIMS** |
| 15   *Affiliated Foods, Inc. v. TriUnion Seafoods LLC, et al.*, 3:15-cv-02787-JLS-MDD | |
| 16 | |
| 17   *Bashas' Inc., et al. v. Tri-Union Seafoods, LLC, et al.*, 3:17-cv02487 | **(ECF No. 1999)** |
| 18 | |
| 19   *Fareway Stores Inc. et al v. TriUnion Seafoods, LLC et al.*, 3:16- cv-02765 | |
| 20 | |
| 21   *Giant Eagle, Inc. v. Tri-Union Seafoods, LLC, et al.*, 3:16-cv00046 | |
| 22   *McLane Company, Inc. et al v. Tri-Union Seafoods, LLC et al.*, 3:16-cv-00047 | |
| 23 | |
| 24   *Western Family Foods, Inc. v. Tri-Union Seafoods, LLC et al.*, 3:16-cv-00025 | |
| 25 | |
| 26   *Winn-Dixie Stores, Inc. v. Bumble Bee Foods LLC, et al.*, 3:16-cv00017-JLS-MDD | |
| 27 | |
| 28 | |

1
2

*Associated Wholesale Grocers, Inc. v. Bumble Bee Foods LLC*, et al., 3:18-cv-01014-JLS-MDD

3
4

*CVS Pharmacy, Inc. v. Bumble Bee Foods LLC, et al.*, 3:17-cv02154-JLS-MDD

5
6

*SpartanNash Company v. TriUnion Seafoods, LLC, et al.*, 3:18-cv-02366-JLS-MDD

7

*Kroger Co., et al. v. Bumble Bee Foods LLC, et al.*, 3:16-cv00051-JLS-MDD

8
9

*Wegmans Food Markets, Inc. v. Bumble Bee Foods LLC, et al.*, 3:16-cv-00264-JLS-MDD

10
11

*Publix Super Markets, Inc. et al. v. Bumble Bee Foods LLC, et al.*, 3:16-cv-00247-JLS-MDD

12
13

*SuperValu Inc., et al. v. Bumble Bee Foods LLC, et al.*, 3:17-cv0951-JLS-MDD

14
15

*Krasdale Foods, Inc. v. Bumble Bee Foods LLC, et al.*, 3:17-cv1748-JLS-MDD

16
17

*Meijer, Inc. and Meijer Distribution, Inc. v. Bumble Bee Foods, et al.*, 3:16-cv-0398-JLSMDD

18
19

*Super Store Industries v. Bumble Bee Foods LLC et al.*, 3:17-cv0950-JLS-MDD

20
21

*Moran Foods, LLC v. Bumble Bee Foods LLC, et al.*, 3:17-cv1745-JLS-MDD

22
23

*Dollar General Corporation, et al. v. Bumble Bee Foods LLC et al.*, 3:17-cv-1744-JLS-MDD

24
25

*W. Lee Flowers & Co., Inc. v. Bumble Bee Foods, LLC; et al.*, 3:16-cv-01226 (JLS)

26

27
28

    Pending before the Court in this multidistrict litigation is a partial motion for summary judgment against the Direct Action Plaintiffs ("DAPs"), the Indirect Purchaser

End Payer Plaintiffs ("EPPs"), and Commercial Food Preparer Plaintiffs ("CFPs," collectively with DPPs and EPPs, the "Plaintiffs").  Specifically, Defendants StarKist Company ("StarKist") and its current owner Dongwon Industries Co., Ltd. ("DWI"), Tri-Union Seafoods, LLC d/b/a Chicken of the Sea International ("COSI") and its current owner Thai Union Group PCL ("Thai Union Group"), and Bumble Bee Foods LLC ("Bumble Bee," collectively with StarKist, DWI, COSI, and Thai Union Group, the "Defendants"), request partial summary judgment on the ground that Plaintiffs cannot show a "cognizable injury due to Defendants' decisions not to market branded products based on fishing gear type (the 'Gear-Type Marketing Decisions')."  (Defs.' Mot. for Partial Summ. J. at 2, ECF No. 2002).[1]  Plaintiffs filed an opposition (Pls.' Opp'n to Defs.' Mot., ECF No. 2105), and some but not all of the Defendants filed a reply.  (Reply Mem. of P. & A. in Further Supp. of Defs.' Mot., ECF No. 2192.)[2]

# I.

# BACKGROUND

The general background and history of this litigation is well documented and extensively discussed in prior orders.  (ECF Nos. 2454, 2654.)  For purposes of the present motion, the Court sets out the following facts:

In 2011, Greenpeace launched a campaign seeking to pressure tuna manufacturers to label their products according to the method (or gear) by which fish are caught.  (Pls.' Resp. to Defs.' Statement of Undisputed Material Facts in Supp. of Mot. ¶¶5-6, ECF No.

---

[1] The public redacted version of this briefing can be found at ECF No. 1999.  The version cited here is the sealed brief.

[2] As previously noted in the Order Granting in Part and Denying in Part DAPs and EPPs' Mot. for Partial Summ. J. Against StarKist Co. Based on Guilty Pleas and Admis. in Parallel Criminal Proceedings (ECF No. 2654), Bumble Bee filed for bankruptcy protection.  *See In re: Bumble Bee Parent, Inc. et al.,* Case No. 19-12502-LSS (Bankr. D. Del.).  As a result, proceedings against Bumble Bee are currently stayed and all claims against it have been administratively closed.  (ECF No. 2286.)  Accordingly, this Order identifies Bumblebee only insofar as it was one of the original Moving Parties.

2105-1.)  The initiative was aimed at eliminating the use of a particular type of fishing gear known as fish aggregating devices ("FADs"), which are "manmade floating objects that create a gathering of fish similar to aggregations created by floating natural debris, such as logs." (Defs.' Mot. for Partial Summ. J. at 2, ECF No. 2002.)  Used in conjunction with "purse-seine" (large drawstring) nets, Greenpeace complained that the indiscriminate nature of this type of fishing is environmentally irresponsible because of its potential to capture large numbers of fish other than tuna, so-called "bycatch," and urged the tuna industry to stop using FADs and convert all tuna products to "FAD-free."  Defendants disagreed and mounted a campaign against Greenpeace, leading to their Gear-Type Marketing Decisions in which they agreed *not* to market their branded packaged tuna products as FAD-free.

Defendants StarKist, Bumble Bee, and COSI all participate in the National Fisheries Institute ("NFI"), a not-for-profit organization, which facilitates work in the seafood industry through legislative and regulatory policies.  (Pls.' Resp. to Defs.' Statement of Undisputed Material Facts in Supp. of Mot. ¶2, ECF No. 2105-1.)  Housed within the NFI is the Tuna Council, an entity which "speaks for the tuna industry on numerous issues including food safety, labeling, sustainability, nutrition education and product marketing." (*Id.* at ¶3.)  StarKist, Bumble Bee, and COSI are all represented by the Tuna Council.  In addition, these Defendants are founding members of, and participate in, the International Seafood Sustainability Foundation ("ISSF"), a not-for-profit organization formed in 2009, "[t]o undertake and facilitate science-based initiatives for the long-term conservation and sustainable use of global tuna stocks, reducing bycatch and promoting tuna ecosystem health."  (*Id.* at ¶4.)

The NFI, ISSF, and Tuna Council all disagreed with Greenpeace's proposition that FAD-free fishing was preferable for environmental or sustainability purposes and believed Greenpeace's position was unsupported by scientific evidence.  (Reply Separate Statement of Material Facts in Supp. of Defs.' Mot. ¶7, ECF No. 2192-1.) This disagreement came in the form of public statements from the NFI, which argued that doing away with FADs

would require "more engines burning more fuel for more time, enough bait to decimate stocks of bait fish, and a massive new carbon footprint." (*Id.* at ¶9.) NFI further argued, contrary to Greenpeace, that "tuna bycatch rates have never been lower" because of FAD-fishing. (*Id.* at ¶8.)

Despite growing vendor interest in FAD-free products, StarKist, Bumble Bee, and COSI communicated with each other and decided they would not label or market any of their branded products by making any reference to gear type or "FAD-free" tuna. (*Id.* at ¶14.) Because seine fishing vessels employed both FAD and FAD-free (*i.e.* free school) fishing methods on the same expedition, members of the Tuna Council stated that any marketing strategies aimed at identifying gear-type could potentially mislead and confuse consumers. (*Id.* at ¶11.) Thereafter, in early 2012, Defendants decided that none would label or market any of their branded tuna products by making any reference to FAD-free or gear-type. (Defs.' Statement of Undisputed Facts in Supp. of Mot. ("SOF") ¶14, ECF No. 2002-1.)

Defendants argue their FAD-free agreement was made in good faith and supported by NFI, ISSF and the Tuna Council. As noted, Defendants argue Plaintiffs have not shown a cognizable injury due to their FAD-free agreement and therefore they are entitled to summary judgment regarding "whether Defendants violated the antitrust laws in deciding not to market branded products referring to gear type." (Defs.' Mot. for Partial Summ. J. at 5, ECF No. 2002.)[3] Plaintiffs assign ill motives to Defendants' FAD-free agreement and argue that it was another orchestrated step by Defendants to stifle competition and fix prices. They argue that Defendants attempt impermissibly to parse their price fixing conspiracy into discrete components and that there are numerous triable issues of fact

---

[3] Defendants state that their motion "does not depend upon whether the alleged restraint of trade is evaluated under the *per se* rule or the rule of reason." (*Id.* at 2, n.3., ECF No. 2002.) Accordingly, the Court declines to address in the present motion whether the *per se* or rule of reason standard applies.

"whether Defendants' joint refusal to offer branded FAD-free tuna effectuated the purpose of their price-fixing conspiracy and assisted Defendants in maintaining their conspiracy." (Pls.' Opp'n to Defs.' Mot. at 1, ECF No. 2105.)  The Court agrees with Plaintiffs, and for the reasons set forth below, denies the motion.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses.  Summary judgment or adjudication of issues is appropriate if depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c)(1).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.

The burden on the party moving for summary judgment depends on whether it bears the burden of proof at trial.

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000); *see also Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) ("Where the moving party will have the burden of proof at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.").

On the other hand, if the moving party would *not* bear the burden at trial, it can meet its burden on summary judgment by "either of two methods:"

produce affirmative evidence . . . negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may ... meet its initial burden of production by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1105-06 (9th Cir. 2000) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

If the moving party carries its burden of production, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.  In this regard, the nonmoving party:

must do more than simply show that there is some metaphysical doubt as to the material facts[, and] must come forward with specific facts showing that there is a genuine dispute for trial.  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

In ruling on a motion for summary judgment, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).  "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.*  "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 651; *see also id.* at 657.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson*, 477 U.S. at 255.

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein."  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).  The court is not obligated "to scour the record in search of a genuine issue of triable fact."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

15-MD-2670 DMS (MDD)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.

### DISCUSSION

The crux of Defendants' argument is that Plaintiffs' "damages models cannot demonstrate any injury attributable to Defendants' decisions to refrain from … labeling packaged tuna products based on fishing gear type." (Defs.' Mot. for Partial Summ. J. at 1, ECF No. 2002.) Plaintiffs argue that if a price fixing conspiracy is based on a number of overt acts, as is the case here, it is improper to focus on one aspect of the conspiracy and require an injury (or damages) solely attributable to the isolated conspiratorial act—here, Defendants' Gear-Type Marketing Decisions. The Court agrees with Plaintiffs.

The Supreme Court has instructed that it is incumbent upon trial courts to provide plaintiffs "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). The Supreme Court has further instructed that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *United States v. Patten*, 226 U.S. 525, 544 (1913). *See also In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-MD-01819 CW, 2010 WL 5138859, at *6 (N.D. Cal. Dec. 10, 2010) ("[A] court should examine the evidence as a whole to determine whether it reasonably supports an inference that the defendant engaged in a price fixing conspiracy.") These principles dictate the result here.

Plaintiffs allege Defendants conspired to "fix, maintain, and raise the prices of packaged tuna products through a series of overt acts, including collusion on list and net prices, promotional activities, *and the agreement not to sell 'FAD-free' labeled branded products*." (Pls.' Opp'n to Defs.' Mot. at 10, ECF No. 2105) (emphasis added); *see also* Sixth Amended Consolidated Class Action Complaint of the End Payer Plaintiffs ¶¶ 269-330, ECF No. 1458.) Plaintiffs do not allege a separate conspiracy against Defendants for their role in preventing the availability of branded FAD-free tuna products. (*Id.*) Rather, the conspiracy alleged against Defendants is based on wide-ranging anticompetitive

conduct with a goal of price fixing, through a series of overt acts, including collusion on list and net prices, promotional activities and marketing strategies. (*Id.*)  One vehicle by which Plaintiffs allege the price fixing conspiracy was accomplished was Defendants' collaborative decision to refrain from labeling branded packaged tuna products based on fishing gear type. (*See id.*)

> Plaintiffs argue that Defendants' motive in forming the FAD-free agreement is clear:

> [T]o avoid competing on a new product offering that could potentially cannibalize sales of their national brands, and thereby maintain collusive price levels.  The FAD-free agreement enabled Defendants to maintain their price-fixing conspiracy, and to further effectuate their agreement not to compete on the basis of price or distinguishing product choice, such as FAD-free tuna.

(*Id.*)  Plaintiffs further argue that "[r]estricting output and fixing prices are two sides[s] of the same coin, both are naked restraints of trade with no purpose except furthering Defendants' common scheme to eliminate competition in the U.S. market for Packaged Tuna." (*Id.* at 10-11.)  Plaintiffs argue that the three brands collectively control most of the Packaged Tuna output in the United States and by "agreeing not to compete on the perceived eco-friendliness of their products, Defendants were able to prevent erosion of their control of the price for mainstream tuna products—the target of their conspiracy." (*Id.* at 11.)

Defendants argue in their reply that Plaintiffs assume, "without any proof—a conspiracy on both marketing [FAD-free] *and* also unrelated pricing and package-size decisions." (Reply Br. at 1, ECF No. 2192.)  Defendants argue that Plaintiffs have therefore failed to raise a triable question of fact "as to the existence and scope of the alleged agreement[.]" (*Id.*)  However, Plaintiffs have provided evidence in support of the overall price fixing conspiracy, which includes marketing and promotional decisions in addition to pricing and package-size decisions.

Specifically, Plaintiffs provide evidence of the initial coordination among Defendants COSI, StarKist, and Bumble Bee to refrain from entering the FAD-free market and labeling their branded products accordingly in order to control both competition and

pricing of their packaged tuna products.  For example, on August 25, 2011, Bumble Bee's Director of Sustainability, Mike Kraft, emailed colleagues about the growing demand for FAD-free tuna products.  *Id.*  Specifically, Kraft said:

> To state the obvious, I think we need to get internal consensus with Chris [Lischewski, CEO of Bumble Bee] and then even discuss with other ISSF American brands a consistent approach[.]

(Pls.' Opp'n to Defs.' Mot., Ex. 3, ECF No. 2105-5.)  The next day, Kraft affirmed the gravity of the situation to Lischewski.  When asked whether Bumble Bee should assume a consistent position with other American ISSF brands on FAD-free products, Kraft wrote:

> On the regular Greenpeace call the other day, [StarKist] mentioned getting the same request and expressed a concern if one of the companies sees supplying FAD free S[kip]J[ack] [tuna] as a business opportunity and takes advantage of it to sell 'more sustainable tuna' than the others.

(Pls.' Opp'n to Defs.' Mot., Ex. 9, ECF No. 2105-11.)  Lischewski, indicating his openness to an agreement among Bumble Bee, COSI, and StarKist to refrain from offering FAD-free products, stated:

> I think it [sic] important that all three brands agree to stay away from FAD free for our brands. I am open to committing not to sell any FAD free into private label as well but does this open up door for other importers???

(*Id.*)  On September 8, 2011, StarKist's Senior Vice President of Corporate Affairs and Human Resources, Melissa Murphy, shared with her COSI colleagues Bumble Bee's talking points regarding a FAD-free agreement.  Murphy contributed to the email thread, as follows:

> [StarKist is] working on our letter now, I'll send when its [sic]done. Hope this helps. I agree we need to stay aligned on this.

(Pls.' Opp'n to Defs.' Mot., Ex. 10, ECF No. 2105-12.)

Plaintiffs also provide evidence of the consummation of an agreement not to offer FAD-free products, which was reached by the CEOs of StarKist, Bumble Bee and COSI on or about February 6, 2012, and the anticompetitive purposes of the agreement.  (Pls.'

Opp'n to Defs.' Mot., Ex. 1, ECF No. 2105-3.)  For example, according to Shue Wing Chan, CEO of COSI, the agreement that was reached by the CEOs and senior officials of the three Defendants was that "they would not market and promote FAD-free product under their StarKist, Bumble Bee and Chicken of the Sea brands." (*Id.*)  Chan understood the purpose of "the agreement was to prevent one company from getting a potential competitive advantage over the other companies if they marketed FAD-free under their national brand." (*Id.*)

Further, to underscore the significance of the FAD-free agreement and Defendants' commitment to its anticompetitive purposes, Plaintiffs point to Bumble Bee's launch of FAD-free products on April 23, 2013, under a separate (non-brand) label called, "Wild Selections." (Pls.' Opp'n to Defs.' Mot. at 7, ECF No. 2105.)  COSI was unhappy with Bumble Bee breaking rank and entering the FAD-free market, albeit under a private label. John Sawyer, COSI Senior VP, spoke out and wrote Frank Pogue, StarKist VP of Marketing and Innovation, expressing frustration with Bumble Bee, as follows:

> This flies in the face of what we as an industry agreed to as well as that conversation we had in February. If you have a chance lets discuss.

(Pls.' Opp'n to Defs.' Mot., Ex. 18, ECF No. 2105-20.)  Pogue had a similar reaction to Sawyer and questioned Bumble Bee's commitment to the FAD-free agreement, writing, "So much for solidarity[,]" and confirming he would call Sawyer later to discuss. (*Id.*)

Finally, Plaintiffs provide expert witness testimony in support of their argument that the FAD-free agreement was part and parcel of Defendants' overarching price fixing conspiracy.  Dr. Colin Carter, an expert retained by the Associated Wholesale Grocers ("AWG") and Affiliated Foods Midwest Cooperative, Inc. ("AFMC") plaintiffs, stated:

> Indeed, the relevance of this [FAD-free] agreement to my opinions is that it is direct evidence of one of the means of carrying out the price-fixing conspiracy, namely, through the use of trade organizations, like NFI. Industry-wide trade organizations are widely understood in economics literature to provide opportunities for regular communications among competitors and cover for such conversations to occur. The FAD-free agreement conclusively shows that in this case the Defendants were in fact

1  using trade organizations—along with emails, phone calls, and other secret
2  meetings—to carry out their price-fixing conspiracy.

3  (Defs.' Mot. for Partial Summ. J., Ex. 21 (Rebuttal Report), ECF No. 2002-23.)[4]

4  Based on the foregoing evidence and expert testimony, Plaintiffs have raised triable
5  questions of fact "as to the existence and scope" of Defendants' alleged agreement to fix
6  and maintain packaged tuna prices in the American market, to include Defendants' alleged
7  agreement on Gear-Type Marketing Decisions.  The evidence of Defendants' FAD-free
8  agreement is inextricably intertwined with and bound up in the alleged multifaceted price
9  fixing conspiracy.  Although Defendants have pleaded guilty to a price-fixing conspiracy,
10 the trier of fact is entitled to evaluate all of its alleged component parts to determine the
11 scope of the conspiracy—collusion on list and net prices, can downsizing, promotional
12 activities and marketing—and the injury to the marketplace caused by that conspiracy.

13 Defendants argue that "Plaintiffs' various experts admit that their injury and
14 damages analyses do not purport to account for any alleged harm flowing from Defendants'
15 decisions not to label their branded products based on gear-type."  (Defs.' Mot. for Partial
16 Summ. J., ECF No. 2002.)  Because the price fixing conspiracy is viewed in its entirety
17 and must not be "dismembered," *Patten*, 226 U.S. at 544, Plaintiffs need not show injury
18 or damages solely attributable to Defendants' FAD-free agreement.

19
20
21
22
_____

23 [4] Dr. David Sunding, an expert retained by End Payer Class Plaintiffs, had similar opinions
24 to Dr. Carter: "I note this [FAD-free agreement] as another example of what I would
   characterize as collusive conduct among the defendants or consistent with what they were
25 doing with respect to price."  (Defs.' Mot. for Partial Summ. J., Ex. 18, ECF No. 2002-20.)
   While not expressly objecting to Dr. Sunding's testimony, Defendants note that EPPs
26 represented they will call Dr. Sunding as a damages expert only and not as a "merits" expert
27 to establish the fact of conspiracy or its duration, either at trial or at the summary judgment
   stage."  (Defs.' Reply Br. at 6 n.9, ECF No. 2192.)  Accordingly, the Court reserves ruling
28 on the scope of Dr. Sunding's testimony for later proceedings.

15-MD-2670 DMS (MDD)

# III.

## CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment on Plaintiffs' Gear-Type Claims is denied.  Plaintiffs and Defendants will file unredacted versions of their briefs (ECF Nos. 1999, 2103 and 2194), and identify these documents on the docket as "unredacted" versions of their prior filings, and in each instance reference the docket number of the previous "redacted" version.

**IT IS SO ORDERED**.

Dated:  April 15, 2022

Hon. Dana M. Sabraw, Chief Judge
United States District Court

15-MD-2670 DMS (MDD)