1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>All Matters | Case No.:  15-MD-2670 DMS (MDD)<br><br>**CLASS ACTION**<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFFS' PRIVATE LABEL CLAIMS**<br><br>**(ECF Nos. 2015, 2212)** |

Pending before the Court in this multidistrict litigation is a motion for partial summary judgment filed by Defendants StarKist Co. ("StarKist") and Dongwon Industries Co., Ltd. ("DWI") on Plaintiffs' Private Label claims, *i.e.*, claims based on purchases of Defendants' Private Label, or non-branded, tuna.  (ECF No. 2014.[1])  The Direct Action Plaintiffs ("DAPs"), Direct Purchaser Plaintiffs ("DPPs"), End Payer Plaintiffs ("EPPs"), and Commercial Food Preparer Plaintiffs ("CFPs," collectively with DAPs, DPPs, and EPPs, the "Plaintiffs") filed a joint opposition to the motion (Pls.' Opp'n to Defs.' Mot.,

---

[1] The citation here is to Defendants' sealed brief.  Citations to other briefs are also to the sealed versions.

ECF No. 2109), and Defendants filed a reply brief.  (Reply Mem. of P. & A. in Further Supp. of Defs.' Mot., ECF No. 2208.)  For the reasons discussed below, the motion is denied.

# I.

# BACKGROUND

For purposes of the present motion, the Court sets out only the relevant facts.  On August 3, 2015, DPPs filed a complaint alleging an antitrust conspiracy by the three largest domestic tuna brands and their parent companies, including StarKist, Bumble Bee Foods LLC ("Bumble Bee"), and Tri-Union Seafoods, LLC d/b/a/ Chicken of the Sea International ("COSI"), to fix and maintain packaged tuna prices above competitive levels in violation of state and federal antitrust and consumer protection laws.  Shortly thereafter, on August 24, 2015, EPPs and CFPs filed a complaint alleging the same conspiracy.

Some of Plaintiffs' allegations proved to be true.  Defendants Bumble Bee and StarKist pleaded guilty to conspiracy to violate federal antitrust laws under the Sherman Act, 15 U.S.C. § 1, on August 4, 2017, and November 14, 2018, respectively.  COSI had earlier entered into a leniency agreement with the Department of Justice Antitrust Division and agreed to cooperate and debrief concerning its participation as a "cartel" member in the foregoing conspiracy.  A number of executives of Defendants StarKist and Bumble Bee pleaded guilty to participating in the conspiracy in 2017, and another executive of Bumble Bee (Christopher Lischewski) was tried and convicted by jury on December 3, 2019, for his role in the conspiracy.  (*See* Order Granting in Part and Denying in Part DAPs and EPPs' Mot. for Partial Summ. J. Against StarKist Co. Based on Guilty Pleas and Admis. In Parallel Criminal Proceedings, ECF No. 2654) (discussing guilty pleas, conviction and admissions of Defendants and their representatives and granting partial summary judgment).

Defendants sell over 80% of the packaged tuna in the United States.  Their Branded tuna products consist of Defendants' namesake brands, "StarKist," "Bumble Bee," and "Chicken of the Sea." Defendants non-branded, or Private Label, tuna products generally

use labels and brand names chosen by Defendants' customers, such as Walmart's Great Value, Target's Market Pantry, and Costco's Kirkland.  Defendants argue their Private Label tuna products comprise a "discrete segment" of their business (on average about 13% of their net sales).  (Defs.' Mot. for Partial Summ. J., at 4, ECF No. 2014.).  Defendants move for summary judgment on Plaintiffs' Private Label claims, asserting there is no evidence to support Plaintiffs' claims that Defendants' Private Label products are part of the packaged tuna price fixing conspiracy to which Defendants admitted liability and pleaded guilty.  Defendants argue the price fixing conspiracy to which they admitted liability includes Branded tuna only.  Plaintiffs oppose, arguing that Defendants' antitrust conspiracy included *all* of their packaged tuna products, including both Private Label and Branded products. (Pls.' Opp'n to Defs.' Mot., ECF No. 2109.)   After thoroughly considering the parties' briefs, the relevant case law, and the record, the Court finds there are triable issues of fact regarding the scope of Defendants' price-fixing conspiracy and whether it included Defendants' Private Label products.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses.  Summary judgment or adjudication of issues is appropriate if depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c)(1).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The burden on the party moving for summary judgment depends on whether it bears the burden of proof at trial.

/ / /

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000); *see also Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) ("Where the moving party will have the burden of proof at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.").

On the other hand, if the moving party would *not* bear the burden at trial, as here, it can meet its burden on summary judgment by "either of two methods:"

> produce affirmative evidence . . . negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may . . . meet its initial burden of production by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1105-06 (9th Cir. 2000) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

If the moving party carries its burden of production, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.  In this regard, the nonmoving party:

> must do more than simply show that there is some metaphysical doubt as to the material facts[, and] must come forward with specific facts showing that there is a genuine dispute for trial.  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

In ruling on a motion for summary judgment, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).  "[A] judge's function at summary judgment is not to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 651; *see also id.* at 657. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

## III.

## DISCUSSION

As noted, Defendants argue there is no evidence that their Private Label products were part of (or within the scope) of the antitrust conspiracy to which they and their representatives admitted liability. (Defs.' Mot. for Partial Summ. J., ECF No. 2014.) Plaintiffs argue Defendants admitted to a price fixing agreement in their plea agreements that encompasses "shelf-stable tuna fish," which necessarily includes Private Label products. Plaintiffs further contend Defendants "understood that prices for their Branded products were linked to the prices of their Private Label products, such that explicit price-fixing covering one aspect of their 'shelf-stable tuna fish' business would infect other aspects of it, including … Defendants' Private Label business." (Pls.' Opp'n to Defs.' Mot. at 18-19, ECF No. 2109.) In addition to these arguments on the merits of Plaintiffs' claim, the parties dispute whether Plaintiffs have both Article III and antitrust standing to pursue claims based on purchases of Private Label products. The Court addresses these issues below.

## A.   Sherman Act Section 1

Section 1 of the Sherman Act dictates that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To prevail on a claim under section 1 of the Sherman Act, Plaintiffs must show: (1) the existence of an agreement, conspiracy, or combination between two or more entities; (2) the arrangement resulted in an unreasonable restraint of trade under either a *per se* rule of illegality or rule of reason analysis; and (3) that the restraint affected interstate commerce. *Am. Ad Mgmt.,*

5

*Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir. 1996); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F.Supp.2d 1166, 1191 (N.D. Cal. 2009).  In the present motion, Defendants' central argument is that Plaintiffs do not have evidence of the first element of their antitrust claim—the existence of a price fixing agreement concerning Private Label tuna products.  In response, Plaintiffs point to admissions by Defendants in their discovery responses, Defendants' guilty pleas, and other documents and testimony, and argue that evidence raises a triable issue of fact on whether there is a link between Branded and Private Label tuna pricing, and thus, whether Defendants conspired to increase prices for all of their packaged tuna, including Branded and Private Label.

Turning first to the Defendants' admissions, Defendants assert the discovery responses admit to a conspiracy on Branded tuna only.  On their face, COSI's admissions are specifically limited to Branded tuna, (*see* Decl. of Belinda Lee in Supp. of Mot. ("Lee Decl."), Ex. 28, ECF No. 2014-9), and StarKist and Bumble Bee's admissions appear to be limited to National Price lists, which they assert govern Branded tuna only.  (Lee Decl., Ex. 27, ECF No. 2014-9.)  Plaintiffs assert there is some ambiguity in Bumble Bee's responses, and they could be construed to include Private Label products, but that ambiguity is not evidence of an agreement on Private Label products.

The guilty pleas are similarly ambiguous.  Although the plea agreements speak in broad terms about "shelf-stable tuna fish," (Lee Decl., Ex. 77 ¶4(a) (Bumble Bee Plea Agreement), ECF No. 2015-4; Lee Decl., Ex. 78 ¶4(a) (Stephen Hodge Plea Agreement), ECF No. 2015-5; Lee Decl., Ex. 79 ¶4(a) (Kenneth Worsham Plea Agreement), ECF No. 2015-6; Lee Decl., Ex. 81 ¶4(a) (Walter Scott Cameron Plea Agreement), ECF No. 2015-8), and "canned tuna fish," (Lee Decl., Ex. 80 ¶4(a) (StarKist Plea Agreement), ECF No. 2015-7), they are silent on whether the conspiracy included Branded tuna, Private Label tuna, or a combination of the two.  As Defendants correctly note, the guilty pleas established only the necessary elements of a Sherman Act violation, namely, the existence of an agreement and that the agreement was in unreasonable restraint of trade.  The plea agreements do not speak to the scope of the agreement or the scope of the conspiracy.

Because the plea agreements reference tuna products in general terms, do not specify any particular product and do not speak to the scope of the conspiracy, the Court declines to find that Defendants admitted in their plea agreements to a price fixing conspiracy that included Private Label.[2]

Aside from the discovery responses and the guilty pleas, Plaintiffs also rely on other evidence to withstand Defendants' motion. Specifically, Plaintiffs rely on emails, deposition testimony, and documents to show, at a minimum, that there is a linkage between the pricing of Branded tuna and Private Label tuna.[3]

In cases involving two product markets, courts have found that evidence of a "linkage" between those markets is sufficient to withstand a motion for summary judgment. *See In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 403 (3d Cir. 2015) (stating it may be reasonable to use evidence of a foreign conspiracy to support an inference of domestic conspiracy "if two markets are sufficiently similar or adjacent and the relevant activities therein are sufficiently linked or tied in some way."); *In re Korean Ramen Antitrust Litig.*, 281 F.Supp.3d 892, 919 (N.D. Cal. 2017) (stating evidence of a conspiracy overseas does not evidence a domestic conspiracy absent "'some linkage' between the conduct overseas and sales (or other injury) in the United States.") Here, Defendants assert there are two separate markets for Branded and Private Label tuna based on a number of factors. Specifically, Defendants claim Private Label is manufactured according to the

---

[2] This decision does not mean the plea agreements are inadmissible on the issue of the scope of the agreement or conspiracy. At trial, Plaintiffs may use the plea agreements as evidence that pricing for Private Label products was part of Defendants' conspiracy to fix prices for all of their "shelf-stable tuna fish," while Defendants may argue the plea agreements were silent, and thus the conspiracy did not involve Private Label tuna. Ultimately, the trier of fact will determine the scope of the conspiracy in light of all the evidence, including the plea agreements.

[3] Plaintiffs also rely on expert testimony, but the Court finds consideration of that evidence is unnecessary to decide the present motion. Defendants' motion to strike the Declaration of Russell W. Mangum, III, (ECF No. 2212), is therefore denied as moot.

particular product specifications each customer sets when it solicits bids.  In addition, many retailers have separate procurement departments for sourcing Private Label, and negotiate Private Label prices separately from Branded tuna.  Defendants contend the market dynamics are also quite different for Private Label, which is illustrated by the lower prices for Private Label compared to Branded tuna.  Defendants argue Private Label products "resemble a true commodity: large customers (such as Walmart) … with bargaining power purchase Private Label based primarily on price (as opposed to brand or other attributes)." (Defs.' Mot. for Partial Summ. J. at 6, ECF No. 2014.)  Defendants therefore sell Private Label products at relatively low margins.  Defendants' Branded tuna, on the other hand, "enjoys significant brand equity and includes premium products such as branded pouches that have much higher margins."  (*Id.* at 6-7, ECF No. 2014.)  Defendants also note that Private Label products comprise a "discrete segment" of their business, where "prices are typically set through discrete customer bids that Defendants submit in response to a customer's invitation or RFQ procurement process." (*Id.* at 4, ECF No. 2015.).  Defendants argue that Private Label prices are "almost entirely a function of current and projected costs[,]" and that the dozens of suppliers in the "Private Label segment, most of which do not supply Branded Tuna, would swiftly undercut any other approach to pricing."  (*Id.* at 7, ECF No. 2014; Stein Decl., Ex. 202 at 198:18 (Lischewski stating "there's 40 or 50 private label packers, predominately southeast Asia[.]")  However, Defendants concede these allegedly separate markets are subject to at least one common denominator, namely, "the cost of raw fish[.]"  (*Id.* at 16, ECF No. 2014.)  And ultimately, the end product, *i.e.*, canned tuna, is the same, regardless of whether it is marketed as a branded product or with a private label.  Thus, on the present record, the Court disagrees with Defendants that there are two separate markets at issue in this case.

But even assuming Defendants' premise was correct and there were two markets, Plaintiffs have presented evidence of a linkage between those markets sufficient to withstand Defendants' motion.  Specifically, Bumble Bee's Lischewski testified to an acceptable "gap" between pricing of Branded tuna and Private Label tuna.  (*See* Decl. of

Samantha Stein in Supp. of Pls.' Opp'ns to Various Summ. J. Motions and Motions to Exclude ("Stein Decl."), Ex. 202 at 200, ECF No. 2152-26 ("In the U.S. we've tried to protect our brand shares by saying we may have to take a lower margin, but we have to maintain a gap versus private label to manage private label share at the current level.") Internal StarKist emails also reflect that Private Label pricing was based off Branded pricing.  (*See* Stein Decl., Ex. 22, ECF No. 2145-13 ("I would think that we need to determine branded nets first then base [Private Label] pricing off of that.")  COSI's pricing of Branded and Private Label tuna was also linked.  (*See* Stein Decl., Ex. 207, ECF No. 2153-5 (COSI's Bruce Reynolds admitting "the price of private label would have some impact on branded price[.]")

Plaintiffs also present evidence that two StarKist executives involved in the price fixing conspiracy, Chuck Handford and Hodge, were involved with Private Label pricing in addition to Branded pricing.  (*See* Stein Decl., Ex. 25, ECF No. 2145-16 (indicating Handford was involved in creation of spreadsheet laying out Private Label and branded pricing); Stein Decl., Ex. 28, ECF No. 2145-19 (indicating "Steve" Hodge would have to approve "any adjustments to the targeted new price and/or changes in the effective date[.]") Similar evidence exists for Bumble Bee.  (*See* Lee Decl., Ex. 1 at 127, ECF No. 2014-2 (Bumble Bee's Donald Gallagher stating trade marketing personnel were responsible for setting prices "on brand, and they also give me private label direction.")  This evidence also supports an inference that the conspiracy involved not just Branded tuna, but Private Label tuna, as well.  *See Choc. Confectionary*, 801 F.3d at 403 (stating if "the people involved in the conspiracies are the same or overlapping, it may be reasonable to use evidence of a foreign conspiracy to support an inference of a domestic conspiracy.")

Defendants dispute whether this evidence is sufficient to raise a genuine issue of material fact on Plaintiffs' Private Label claims, and argue Plaintiffs must meet a higher standard because a conspiracy in the "Private Label market" is implausible given the large number of suppliers involved with Private Label products.  Defendants are correct that "[i]mplausible claims require a 'more persuasive' showing 'that tends to exclude the

possibility' of independent action." *Stanislaus Food Products Co. v. USS-POSCO Industries*, 803 F.3d 1084, 1089 (9th Cir. 2015) (quoting *Matsushita*, 475 U.S. at 587-88). However, Defendants have failed to show that there are two distinct and separate markets for Branded and Private Label tuna.  Rather, Plaintiffs pleaded only one market in the case, namely the "canned tuna" market, (FAC ¶¶72-73), 85% of which was controlled by Defendants during the alleged conspiracy.  On the record presently before the Court, Plaintiffs' Private Label claims are not implausible, and Plaintiffs need not make a "more persuasive" showing to withstand Defendants' motion.

In sum, Plaintiffs have raised a genuine issue of material fact on the scope of the price fixing conspiracy, and whether it included Private Label tuna in addition to Branded tuna.  Accordingly, Defendants' motion on the merits of Plaintiffs' Section 1 claim for purchases of Private Label products is denied.

**B.    Standing**

Defendants' other arguments concern both Article III and antitrust standing.  To have Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, ___ U.S. ___, 141 S.Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  The requirements for antitrust standing are similar:  "(1) 'injury of the type the antitrust laws were intended to prevent' that also (2) 'flows from that which makes defendants' acts unlawful.'" *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 922 (9th Cir. 2015) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

1.    Article III Standing

Although Defendants make one reference to injury, (*see* Defs.' Mot. for Partial Summ. J. at 19:14-16, ECF No. 2014), the focus of their Article III argument is causation. First, Defendants argue, as a matter of law, that any correlation between prices of Branded tuna and Private Label tuna is insufficient to show causation.  In support of this argument,

10

Defendants cite *Mesa v. Zymo Genetics, Inc.*, No. C10-1486JLR, 2011 WL 13124668, at *3 (W.D. Wash. June 6, 2011), and *Kauai Kunana Dairy Inc. v. United States*, No. 09-00473 DAE-LEK, 2009 WL 4668744, at *4 (D. Hawai'i Dec. 8, 2009).  Neither of those cases is applicable here.  *Mesa* addressed the issue of causation in the context of a motion for attorneys fees under Delaware law.  *Kauai Kunana* did address causation under Article III, but that case is by no means the only or final word on the issue of causation vis-à-vis correlation.  Indeed, other courts have stated that "[t]emporal correlation does not prove causation, but it is probative." *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 213 (4th Cir. 2020).  *See also United States v. Undetermined Quantities of All Articles of Finished and In-Process Foods*, 936 F.3d 1341, 1349 (11th Cir. 2019) ("Correlation is not causation, but neither must correlation be ignored.")  Therefore, Defendants' correlation argument does not show Plaintiffs lack Article III standing.[4]

Defendants also rely on the Court's January 3, 2017 Order dismissing Plaintiffs' claims based on non-tuna products to support their causation argument.  However, that reliance is misplaced.  That Order was in response to a motion to dismiss, not a motion for summary judgment, and it involved two entirely different types of products (tuna and non-tuna), as opposed to the one product at issue here (canned tuna).

At its core, Defendants' Article III standing argument is that Plaintiffs have failed to put forth any evidence "to support the notion that collusion in Branded Tuna caused an increase in Private Label prices." (Defs.' Mot. for Partial Summ. J. at 15, ECF No. 2014.)  However, the Court's discussion above on the merits of Plaintiffs' claim refutes that argument.  Accordingly, Defendants are not entitled to summary judgment on the basis of lack of Article III standing.

---

[4] Defendants' critique of Plaintiffs' substitutability theory, *i.e.*, the theory that Private Label tuna is a substitute for Branded tuna, also fails to show there is no genuine issue of material fact on causation such that Defendants are entitled to summary judgment based on lack of Article III standing.

15-MD-2670 DMS (MDD)

2.      Antitrust Standing

The final issue here is whether Plaintiffs have antitrust standing for their Private Label claims.  In making this determination, courts consider: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damage."  *Am. Ad Mgmt.*, 190 F.3d at 1054-55 (quoting *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996).  Here, Defendants argue the first three factors weigh against a finding that Plaintiffs have antitrust standing for their Private Label claims.

On the first factor, Defendants argue there was no price fixing in the Private Label market, therefore Plaintiffs have not suffered an injury of "the type the antitrust laws were intended to forestall."  In support of this argument, Defendants rely on the different market forces at play for Branded tuna and Private Label tuna, *i.e.*, "supply and demand dynamics, competitors, and pricing," (Defs.' Mot. for Summ. J. at 21, ECF No. 2014), and then leap to the conclusion that Private Label tuna was not restrained.  As discussed above, however, the different market forces do not show there were two distinct markets for Branded and Private Label tuna.  On the contrary, the end-products are the same, and as Defendants themselves acknowledge, there are some common denominators for both products, such as "the cost of raw fish[.]"  (*Id.* at 16, ECF No. 2014.)

Even if there were two separate and distinct markets for Branded and Private Label tuna, that would not preclude Plaintiffs from having standing to pursue their Private Label claims.  Although Defendants assert "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained[,]" (Defs.' Mot. for Partial Summ. J. at 21, ECF No. 2014) (quoting *Am. Ad Mgmt.*, 191 F.3d at 1057), there is an exception to this market participant requirement "for parties whose injuries are 'inextricably intertwined' with the injuries of market participants."  *Am. Ad Mgmt.*, 191 F.3d at 1057 n.21.  The evidence in this case, at a minimum, raises a genuine issue of material fact on that exception.

12

1    Evidence that Branded and Private Label tuna pricing was "inextricably
2    intertwined," as well as the linkages discussed above, distinguish this case from *In re*
3    *Digital Music Antitrust Litig.*, 812 F.Supp.2d 390 (S.D.N.Y. 2011), which Defendants rely
4    on to support their antitrust injury argument. That decision, like this Court's January 3,
5    2017 decision on the tuna versus non-tuna products, was in response to a motion to dismiss,
6    and thus that court did not have the benefit of a complete record. Here, Plaintiffs have
7    come forward with not just allegations but evidence of "linkages" between Branded and
8    Private Label tuna, and as the *Digital Music* court suggested, evidence "of th[ese] type[s]
9    of linkage[s] are important." *Id.* at 402. In light of the evidence presented in this case, the
10   first factor in the antitrust standing analysis supports, rather than detracts from, a finding
11   that Plaintiffs have antitrust standing to pursue their Private Label claims.[5]

12    Defendants' final argument on antitrust standing is that no Plaintiff has calculated
13   damages as to Private Label specifically, therefore any harm suffered as the result of
14   purchasing Private Label tuna is speculative. However, a failure to apportion damages
15   between sales of Private Label and Branded tuna does not mean Plaintiffs' damages are
16   speculative. On the contrary, there appears to be no dispute that Plaintiffs suffered
17   damages here as a result of Defendants' price fixing conspiracy. Apportioning damages in
18   this context is not so complex as to defeat a finding that Plaintiffs lack antitrust standing.
19   Accordingly, Defendants are not entitled to summary judgment on that basis.

20                                     **V.**

21                              **CONCLUSION**

22    For the reasons stated above, Defendants' Motion for Partial Summary Judgment is
23   denied. Plaintiffs and Defendants shall file unredacted versions of their briefs (ECF Nos.
24   2015, 2110) and related statements of undisputed facts, oppositions, exhibits, as well as the

---

27   [5] The evidence of linkage discussed above also refutes Defendants' argument that any
28   alleged injuries Plaintiffs suffered as a result of purchasing Private Label tuna were too
     remote to confer antitrust standing.

15-MD-2670 DMS (MDD)

response thereto (ECF No. 2209); and they shall identify these documents on the docket as "unredacted" versions of their prior filings and in each instance reference the docket number of the previous "redacted" version.  The parties shall refile without redactions all the aforementioned documents no later than July 26, 2022.

**IT IS SO ORDERED**.

Dated:  July 19, 2022

Hon. Dana M. Sabraw
United States District Judge

15-MD-2670 DMS (MDD)