Adam S. Paris (SBN 190693)
parisa@sullcrom.com
Zachary A. Sarnoff (SBN 307762)
sarnoffz@sullcrom.com
Brandon T. Wallace (SBN 323471)
wallaceb@sullcrom.com
**SULLIVAN & CROMWELL LLP**
1888 Century Park East, Suite 2100
Los Angeles, California  90067
Telephone:   (310) 712-6600
Facsimile:    (310) 712-8800

*Attorneys for Defendant Lion Capital*
*(Americas), Inc. and Specially Appearing*
*Defendants Lion Capital LLP and*
*Big Catch Cayman LP*

**[ADDITIONAL COUNSEL ON SIGNATURE PAGE]**

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:  PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION<br><br>_____<br><br>This Document Relates to:<br><br>ALL ACTIONS<br><br>_____ | Case No. 3:15-md-2670-DMS-MDD<br><br>MDL No. 2670<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE LION COMPANIES' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     May 19, 2023<br>Time:     1:30 p.m.<br>Judge:    Hon. Dana M. Sabraw<br>Courtroom: 13A |

1

## **TABLE OF CONTENTS**

2

**Page**

3

4   INTRODUCTION .................................................................................................... 1

5   UNCONTESTED FACTS .......................................................................................... 5

6   I.   THE LION COMPANIES ................................................................................ 5
7        A.   Lion Capital LLP ................................................................................. 5
         B.   Lion Capital (Americas), Inc. ............................................................. 6
8        C.   Big Catch Cayman LP ......................................................................... 7

9   II.  FUND III INVESTMENT IN BUMBLE BEE ................................................ 8
10       A.   The Fund III-Bumble Bee Investment Thesis ..................................... 8
         B.   Due Diligence ...................................................................................... 9
11       C.   The Bumble Bee LBO ......................................................................... 11

12  III. MONITORING BY LION (AMERICAS) ....................................................... 12

13  IV.  THE PROPOSED TRANSACTION WITH TUG ........................................... 14

14  V.   BUMBLE BEE'S BANKRUPTCY ................................................................ 14

15  PROCEDURAL BACKGROUND .......................................................................... 15

16  I.   THE FIRST, SECOND, AND THIRD LION ORDERS ................................ 15

17  II.  PLAINTIFFS' CLAIMS AGAINST THE LION COMPANIES ................. 17

18       A.   Direct Participation Claims ................................................................ 17
19
         B.   Vicarious Liability Claims ................................................................. 18
20
    LEGAL STANDARD .............................................................................................. 19
21
    ARGUMENT ............................................................................................................ 19
22
23  I.   LION (AMERICAS) DID NOT FIX PRICES OR OTHERWISE
         PARTICIPATE IN THE ALLEGED PACKAGED TUNA
24       CONSPIRACY ............................................................................................... 21

25       A.   The Direct Evidence of Lion (Americas)' Conduct Consists
              of Legitimate Private Equity Investment Behavior ........................... 22
26
         B.   Plaintiffs' Circumstantial Claims Are Belied By the Direct
27            Evidence in the Record .................................................................... 24

28

II.   ALL OF PLAINTIFFS' CLAIMS AGAINST LION LLP  ALSO FAIL AS A MATTER OF LAW .............................................. 32

    A.   There Is No Direct or Circumstantial Evidence That Lion LLP Participated in the Alleged Conspiracy ........................ 32

    B.   Lion LLP May Not Be Held Liable for Alleged Conduct of "Dual Agent" Lion (Americas) Employees ......................... 35

    C.   Plaintiffs' "Coordinated Activity" Theory of Participation Against Lion LLP Fails as a Matter of Law ....................... 37

    D.   Plaintiffs' Remaining Vicarious Liability Theories Against Lion LLP Fail as a Matter of Law ...................................... 38

        1.   Lion LLP and Lion (Americas) Are Separate Companies ................................................................... 39

        2.   Lion LLP Does Not Exert Day-to-Day Control Over Lion (Americas) ............................................................ 40

III.   BIG CATCH CANNOT BE HELD LIABLE AS THE "ALTER EGO" OF LION LLP ................................................... 41

CONCLUSION ............................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbe* v. *City of San Diego*,
  2007 WL 4146696 (S.D. Cal. 2007) (Sabraw, C.J.) ..........................................19

*Anderson* v. *Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .........................................................................................19

*Arandell Corp.* v. *Centerpoint Energy Servs.*,
  900 F.3d 623 (9th Cir. 2018).............................................................5, 18, 37, 38

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999) ..................................................................20, 28, 29

*Breakdown Servs., Ltd.* v. *Now Casting, Inc.*,
  550 F. Supp. 2d 1123 (C.D. Cal. 2007) (California).........................................20

*In re Citric Acid Litig.*,
  191 F.3d 1090 (9th Cir. 1999)...................................................................*passim*

*In re Citric Acid Litig.*,
  996 F. Supp. 951 (N.D. Cal. 1998).........................................................21, 26, 35

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust
  Litig.*,
  906 F.2d 432 (9th Cir. 1990) ...........................................................................21

*Copperweld Corp.* v. *Independence Tube Corp.*,
  467 U.S. 752 (1984) .........................................................................................38

*Doe* v. *Unocal Corp.*,
  248 F.3d 915 (9th Cir. 2001) ......................................................................39, 40

*In re Dynamic Random Access Memory Antitrust Litig.*,
  2007 WL 9752971 (N.D. Cal. Feb. 20, 2007)....................................................40

*ING Bank* v. *Ahn*,
  758 F. Supp. 2d 936 (N.D. Cal. 2010) ...............................................................40

*Insulate SB, Inc.* v. *Advanced Finishing Sys., Inc.*,
  797 F.3d 538 (8th Cir. 2015) (Minnesota) .......................................................20

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................*passim*

*Monsanto Co.* v. *Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ........................................................................24, 32

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015)........................................................24, 25, 30

*Name.Space, Inc.* v. *Internet Corp. for Assigned Names & Numbers*,
   795 F.3d 1124 (9th Cir. 2015)............................................................... 16

*Oaktree Principal Fund V, LP* v. *Warburg Pincus LLC*,
   2016 WL 6782768 (C.D. Cal. Aug. 9, 2016) ...................................... 35

*In re: Old BBP, Inc.*,
   No. 19-12502-LSS, Dkt. No. 326 (Bankr. D. Del. Jan. 24, 2020) ..................... 15

*Orr* v. *Beamon*,
   77 F. Supp. 2d 1208 (D. Kan. 1999) (Kansas) .................................. 20

*Ranza* v. *Nike, Inc.*,
   793 F.3d 1059 (9th Cir. 2015).............................................................. 41

*Sun Microsystems Inc.* v. *Hynix Semiconductor Inc.*,
   622 F. Supp. 2d 890 (N.D. Cal. 2009) ............................................... 24

*T.W. Elec. Serv., Inc.* v. *Pacific Elec. Contractors Ass'n*,
   809 F.2d 626 (1987) .............................................................................. 19

*Toscano* v. *Prof'l Golfers Ass'n*,
   258 F.3d 978 (9th Cir. 2001) ...................................................... 3, 27, 32

*Trinity Indus., Inc.* v. *Greenlease Holding Co.*,
   2014 WL 1766083 (W.D. Pa. May 2, 2014) ...................................... 35

*Twombly. Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007) .............................................................................. 27

*United States* v. *Bestfoods*,
   524 U.S. 51 (1998) ........................................................................*passim*

*United States* v. *Bumble Bee Foods LLC*,
   17-cr-00249-EMC (N.D. Cal. Aug. 4, 2017) ...................................... 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*United States* v. *Lischewski*,
  18-cr-203-EMC (N.D. Cal. Dec. 2, 2019) ........................................................ 2

*United States* v. *Lischewski*,
  18-cr-203-EMC (N.D. Cal. Nov. 4, 2019) ........................................................ 2

*United States* v. *Lischewski*,
  Case No. 18-CR-00203-EMC (N.D. Cal.) ........................................................ 31

*Waggoner* v. *Denbury Onshore, LLC*,
  612 Fed. Appx. 734 (5th Cir. May 20, 2015) (Mississippi) .............................. 20

**Statutes**

15 U.S.C. §§ 80b-3, 80b-4 ..................................................................................... 39

28 U.S.C. § 1407 ..................................................................................................... 15

Fed. R. Civ. P. 56(a) .............................................................................................. 19

Sherman Act Section 1 ..................................................................................... 19, 20

**Other Authorities**

O'Malley, Grenig & Lee, 3A Fed. Jury Prac. & Instr. § 150:43 ............. 3, 20, 27, 33

American Bar Association Antitrust Section, Model Jury Instructions
  in Civil Antitrust Cases ............................................................................... 29, 33

1  **INTRODUCTION**

2      Plaintiffs seek to hold three innocent private equity companies

3  (together, the "Lion Companies" or "Lion") legally and financially liable for a

4  canned tuna price-fixing conspiracy that the undisputed evidence shows was

5  concealed from Lion.  In July 2015, the Antitrust Division of the U.S. Department

6  of Justice (the "DOJ") announced its investigation into the packaged tuna industry.

7  The DOJ determined that three packaged tuna companies, Bumble Bee Foods LLC

8  ("Bumble Bee"), Tri-Union Seafoods LLC d/b/a Chicken of the Sea ("COSI"), and

9  StarKist Co. ("StarKist"), had entered into a price-fixing conspiracy regarding the

10  prices of packaged tuna products in the United States. Bumble Bee pleaded guilty to

11  participating in an alleged conspiracy. In August 2017, Judge Chen adjusted

12  downwards Bumble Bee's criminal fine based on his finding that a larger fine would

13  have "huge adverse consequences" for Bumble Bee's business.  (*See* Transcript of

14  Proceedings at 15:14–19, *United States* v. *Bumble Bee Foods LLC*, 17-cr-00249-

15  EMC (N.D. Cal. Aug. 4, 2017), ECF No. 36.)

16      Without Bumble Bee to pay for its misconduct, Plaintiffs in this

17  multidistrict litigation have since sought to pin responsibility for the alleged

18  conspiracy on the three Lion Companies, none of which ever priced or sold a single

19  can of tuna:  Lion Capital LLP ("Lion LLP"), a British private equity firm that

20  manages funds with investments in the consumer sector; Lion Capital (Americas),

21  Inc. ("Lion (Americas)"), a subsidiary of Lion LLP that provides it with advice

22  concerning United States investments; and Big Catch Cayman LP ("Big Catch"), a

23  Cayman Islands-based holding company formed to hold the now-worthless Bumble

24  Bee shares that were acquired in 2010 by Lion Capital Fund III ("Fund III").

25      The DOJ investigated this matter for years.  This investigation included

26  the aid of an Antitrust Criminal Penalty Enhancement & Reform Act ("ACPERA")

27  cooperator, COSI; guilty pleas by StarKist, a StarKist executive (Stephen Hodge),

28  Bumble Bee, and two Bumble Bee executives (Scott Cameron and Ken Worsham);

and a guilty verdict against Bumble Bee's former CEO (Chris Lischewski).  Lion cooperated fully.  The record generated exonerates the Lion Companies:

- COSI, the ACPERA cooperator, disclosed the existence, participants, and substance of the conspiracy as part of its cooperation agreement—and did not identify any Lion Company or Lion Company employee (*see* Paris Decl. Ex. A, at 4);

- Not a single witness, including the tuna executives who pleaded guilty and cooperated with Plaintiffs, testified to conspiring with the Lion Companies or had knowledge of any misconduct by any Lion Company (*see* Paris Decl. Ex. B (Cameron), Ex. C (Worsham), Ex. D (Hodge));

- The Government called Lion (Americas) manager Jeff Chang as the first witness in support of its case against Mr. Lischewski (*see* Paris Decl. Ex. F, Crim. Minutes, *United States* v. *Lischewski*, 18-cr-203-EMC (N.D. Cal. Nov. 4, 2019); and

- During closing arguments in the Lischewski case, the Government stated to the jury that the participants "**concealed this conspiracy from Bumble Bee's owners, Lion Capital**." (Paris Decl. Ex. H, Trial Tr. at 3200:10–11, *United States* v. *Lischewski*, 18-cr-203-EMC (N.D. Cal. Dec. 2, 2019); *id.* at 3214:22–3215:1 ("[Lischewski] was cautious about what he reported to Lion Capital about the conspiracy when he talked about the conversation from Chicken of the Sea.  He wanted Lion Capital to know his results but he **didn't want them to know how he got them**.") (Emphases added).)

Likewise, years of discovery in this civil litigation has confirmed that the Lion Companies engaged in the normal investment activities one would expect of a private equity firm and its affiliates: investing money from investors into a portfolio company and monitoring that investment.  This is all legitimate behavior.

Nevertheless, Plaintiffs in this civil litigation insist on pressing their false claims against the Lion Companies using snippets of emails out of context, drawing implausible inferences from lawful meetings, and subverting settled doctrines of corporate separateness.

At summary judgment, Plaintiffs may not rely on guilt-by-association to create triable issues as to the Lion Companies. Well-settled law requires Plaintiffs to come forward with "specific evidence"—as to **each** Lion Company—that "tends

to exclude the possibility" of lawful behavior, and shows that each Lion Company had "a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999); *Toscano* v. *Prof'l Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001) (citations omitted); O'Malley, Grenig & Lee, 3A Fed. Jury Prac. & Instr. § 150:43 ("In determining whether or not a defendant, or any other person, was a member of a conspiracy, do not consider what others may have said or done.") (emphasis added). A careful review of the record demonstrates that Plaintiffs fail to meet their burden.

*First*, Plaintiffs' claims against Lion (Americas) fail because all of Plaintiffs' evidence against it is "consistent with proper business practice," *In re Citric Acid Litig.*, 191 F.3d at 1094, and none "tends to exclude the possibility" of lawful behavior. *Matsushita*, 475 U.S. at 588. To place Plaintiffs' contrary position in stark relief, here are some of the implausible allegations the Court would have to embrace for Plaintiffs' claims against Lion (Americas) to survive summary judgment:

1. In late 2010, Lion (Americas) employees discovered the existence of a secret, criminal price-fixing conspiracy at Bumble Bee while doing routine due diligence in advance of a possible investment, a conspiracy unknown to then-owner Centre Partners;

2. Upon learning of the price-fixing conspiracy, Lion (Americas) employees—who have unblemished track records and sterling reputations—recommended to Lion LLP's Investment Committee that the Lion Companies commit hundreds of millions of dollars from Fund III investors to acquire a company facing crippling legal exposure, not to mention operational disruption and reputational damage;

3. The Lion Companies invested Fund III investors' money in Bumble Bee knowing that the most probable exit opportunity—a future sale of

the company to a seafood industry participant—would be subject to rigorous DOJ scrutiny;

4.    Lion (Americas) structured the LBO of Bumble Bee so as to undercapitalize the company to insulate the Lion Companies from liability—even though purposeful undercapitalization of a supposed criminal enterprise would have the opposite effect;

5.    While the Lion Companies managed this Fund III investment very carefully for years, at the same time they tolerated illegal misconduct that would have catastrophic business consequences;

6.    In mid-2012, when an anonymous whistleblower raised to Lion (Americas) concerns about alleged malfeasances—never shared with Lion LLP—Lion (Americas) staged a discussion with Bumble Bee's CEO; and

7.    In 2014, despite being aware of the price-fixing conspiracy, the Lion Companies agreed to a $1.5 billion sale of Bumble Bee to a competitor—knowing that the transaction would be scrutinized by the DOJ, yet hoping the alleged conspiracy would escape detection.

***Second***, Lion LLP is independently entitled to summary judgment on Plaintiffs' legal theories because they fail under settled principles of corporate law. Recognizing the absence of any legitimate evidence against Lion LLP proper, it is no surprise that Plaintiffs attempt to impute various alleged Lion (Americas) conduct to Lion LLP.  But the record establishes that Lion LLP, a British private equity firm, is separate and distinct from its U.S.-based investment advisor, Lion (Americas), and that Lion LLP did not exert day-to-day control over Lion (Americas).  And the mere act of delegating oversight responsibility to Lion (Americas) cannot be sufficient to survive summary judgment against Lion LLP because even under a "coordinated activity" theory, Plaintiffs "must come forward with evidence that **each defendant independently** participated."  *Arandell Corp.* v. *Centerpoint Energy Servs.*, 900

F.3d 623, 633 (9th Cir. 2018).  Although some Lion (Americas) employees held "membership" titles at Lion LLP, the undisputed evidence shows that these persons were acting in their capacity as Lion (Americas) employees when carrying out the business of Lion (Americas) overseeing Fund III's investment in Bumble Bee.  At no point did these individuals act in the interests of Lion LLP **but not** Lion (Americas)—a finding that is required, under settled Supreme Court precedent, to impute liability to Lion LLP.  *United States* v. *Bestfoods*, 524 U.S. 51 (1998).

*Finally*, Plaintiffs' "alter ego" claim against Big Catch, a now-worthless holding company, lacks any evidentiary support. Even if Plaintiffs could show a total "identity of interest" between Lion LLP and Big Catch (which they cannot, because Lion LLP has no ownership interest at all in Big Catch), there is no possibility of an inequitable result because Big Catch's only notable holding is stock in the old, bankrupt Bumble Bee entity.

## UNCONTESTED FACTS

### I.     THE LION COMPANIES

#### A.     Lion Capital LLP

Lion LLP is a private equity firm organized as a limited liability partnership under the laws of the United Kingdom.  (Declaration of Graham Tester ("Tester Decl."), ¶ 5.)  Like other private equity firms, Lion LLP is in the business of managing investment Funds for outside investors.  (*Id.* ¶ 7.)  For each Fund, this involves creating the Fund itself; raising money for the Fund from outside investors; selecting various potential investments for the Fund; managing the Fund partnerships; and providing overhead services (*e.g.*, payroll, accounting, and legal) to support those activities.  (*Id.* ¶¶ 7, 28.)

Lion LLP does not have any ownership interest in any of the Funds themselves, nor does Lion LLP have any equity interest—directly or indirectly—in any of the Funds' portfolio companies.  (*Id.* ¶¶ 8, 11.)  Lion LLP is compensated **solely** from pre-set management fees that are paid by the Fund in exchange for the

management services that Lion LLP provides. (*Id.* ¶ 9.)[1]  The amount of such management fees is calculated as a percentage of the amount of capital committed in, or invested by, the Fund at a given time. (*Id.*)  Thus, Lion LLP's compensation is not dependent on the performance of any individual portfolio company (like Bumble Bee), nor is it dependent on the performance of the Fund's investments as a whole. (*Id.*)  Lion LLP is not entitled to any profits or "carried interest" from any of the Funds. (*Id.* ¶¶ 10, 11.)

As an investment manager, Lion LLP's strategy is focused on consumer brands, a broad sector that encompasses a majority of the modern economy. (*Id.* ¶ 12.)  Once a Fund is formed and investments are placed, Lion LLP does not manage the operations of individual portfolio companies. (*Id.* ¶ 13.) While Lion LLP exercises voting rights on behalf of the Funds; places individuals on the portfolio company's board of directors; and stays apprised of high-level developments, Lion LLP does not have any day-to-day involvement. (*Id.*.)

With respect to investments in North America, such as Fund III's investment in Bumble Bee, Lion LLP's role is even further reduced: Lion LLP delegates to its subsidiary, Lion (Americas), the role of vetting potential investments, monitoring such investments once made, and providing investment advice. (*Id.* ¶ 14.)  While one member of Lion LLP's Investment Committee typically serves on the board of directors at each portfolio company, for North American portfolio companies the "deal team" (*i.e.*, the individuals tasked with vetting and monitoring the investment) comprises solely Lion (Americas) employees. (*Id.* ¶ 14.)

## B.   Lion Capital (Americas), Inc.

Lion (Americas) is a Delaware corporation that provides advice to Lion LLP regarding potential and ongoing investments in North America. (*Id.* ¶ 16; Declaration of I-Wen Jeff Chang (the "Chang Decl.") ¶¶ 6–7.)  In its role as

---

[1]   Some private equity firms collect annual "monitoring fees" from portfolio companies.  It is undisputed that Lion LLP never collected any monitoring fees from Bumble Bee.

investment advisor, Lion (Americas) performs due diligence reviews of potential North American portfolio companies and reports its findings to the Lion LLP Investment Committee.   (Chang Decl. ¶¶ 11–13; *see also* Declaration of Eric Lindberg (the "Lindberg Decl.") at ¶ 12.)  After the Fund makes an investment, the Lion (Americas) deal team participates in the high-level strategic governance of a portfolio company, often by having Lion (Americas) employees on the company's board of directors, and sends periodic reports to Lion LLP.  Lion (Americas) does not manage the day-to-day operations of any portfolio company.  (Tester Decl. ¶ 17.)

Like Lion LLP, Lion (Americas)' compensation is not tied to the performance of the Fund or to the performance of any individual portfolio company.  (*Id.* ¶¶ 9, 18.)  Lion (Americas) earns its revenue from Lion LLP in exchange for investment advice; it does not charge a fee to any of the Funds, nor does it hold any direct or indirect equity interest in the Funds, or in any of the Funds' portfolio companies.  (*Id.* ¶ 18.)  Lion (Americas) is not entitled to any profits or "carried interest" from any of the Funds.  (*Id.* ¶ 19.)

The three Lion (Americas) employees involved in the Bumble Bee investment were Jeff Chang, Jacob Capps, and Eric Lindberg.  While Messrs. Chang, Capps and Lindberg held "membership" titles at Lion LLP for some period of time, it is undisputed that Messrs. Chang, Capps and Lindberg were at all times **Lion (Americas) employees**, working on investments assigned to Lion (Americas), with their compensation paid 100% by Lion (Americas) and 0% by Lion LLP.  (*Id.* ¶ 20.)

## C.    Big Catch Cayman LP

Big Catch is a holding company organized as a limited partnership under the laws of the Cayman Islands, where it was formed in 2010 as an investment vehicle for Fund III's acquisition of Bumble Bee.  Big Catch has no employees and conducts no business beyond the holding of assets.  (Tester Decl. ¶¶ 22, 23, 26.)  The only assets held by Big Catch are a small amount of working capital; an indirect stock interest in Menon Renewable Products Inc. (a venture-stage sustainable food

business that is small, loss-making, and valued at $0), and the now-worthless shares of the old, bankrupt Bumble Bee.  (*Id.* ¶ 26.)

## II.     FUND III INVESTMENT IN BUMBLE BEE

In the Fall of 2010, an employee of J.P. Morgan informed Lion (Americas) that a private equity fund managed by Centre Partners was interested in selling its stake in Bumble Bee.  Lion (Americas) began to research Bumble Bee as a possible investment for the recently created Fund III.

### A.     The Fund III-Bumble Bee Investment Thesis

Lion (Americas) identified Bumble Bee as a strong company with "a loyal consumer that buys based on perceived brand differences and historical resonance with the brand."  (Paris Decl. Ex. I, Sept. 26, 2010 Investment Committee Memo ("Sept. 26 IC Memo"), at 2.)  Bumble Bee's business appeared quite stable: "[c]anned seafood is a resilient, stable, basic food item and low-cost protein source." (Paris Decl. Ex. E, Sept. 27, 2010 Investment Committee Memo ("Sept. 27 IC Memo"), at 4.)  These characteristics fit Bumble Bee within Lion LLP's philosophy of pursuing well-recognized consumer brands, (*id.*; *see also* Paris Decl. Ex. J, 2012 Form ADV, at 3–4), and with Lion LLP's high-level business strategy of using a strong brand to drive incremental growth and value.  (*See* Chang Decl. ¶ 19; Strebulaev Decl. ¶ 22.)  For example, Lion (Americas) identified Bumble Bee's historical "underinvestment into marketing" (Strebulaev Decl. ¶ 15), and believed that with "tactical marketing support over an extended period of time to reposition [its] brand," Bumble Bee "could generate incremental top-line volume growth." (Paris Decl. Ex. I, Sept. 26 IC Memo, at 5.)  Lion (Americas) thought Bumble Bee could "increase margin by making better use of Bumble Bee's brand, by . . . developing more innovative and more consumer resonant products," including "convenience products."  (Paris Decl. Ex. K, Deposition Transcript of Eric Lindberg ("Lindberg Dep. Tr.") 63:23–64:8.)

Another reason Bumble Bee was attractive for Fund III was that there

1   seemed to be a natural exit opportunity in place: Thai Union Group ("TUG," or "Thai

2   Union").   As reflected in Chang's contemporaneous memos to the Investment

3   Committee, Lion (Americas) identified TUG as a potential future acquirer of

4   Bumble Bee early on.  (Paris Decl. Ex. G, at 6; *see also* Chang Decl. ¶ 44.)

5        This is a critical fact because Lion (Americas) recognized **from the**

6   **outset** that any potential sale of Bumble Bee to TUG, a strategic seafood

7   manufacturer, would entail DOJ antitrust clearance.  (Lindberg Decl. ¶ 44.)  The

8   Lion (Americas) team believed "that a combination would be permissible if

9   [COSI's] [a]lbacore[] businesses were divested."  (Paris Decl. Ex. L.)  Nowhere in

10  any of these investment memos is there any evidence that either Centre Partners, the

11  current owner, or Lion (Americas) had any inkling that any executives at Bumble

12  Bee might be conspiring with competitors to fix tuna prices.

13       **B.      Due Diligence**

14       Before recommending to Lion LLP that Fund III acquire Bumble Bee,

15  Lion (Americas) conducted a due diligence review and communicated its findings

16  to Lion LLP.   (Chang Decl. ¶¶ 11, 21.) Given the size of the contemplated

17  investment—expected to be the largest single North American investment made by

18  a Lion fund up until that time—Lion (Americas) hired reputable third-party advisors

19  to vet Bumble Bee and its management team.  (Paris Decl. Ex. G, Oct. 10 IC Memo,

20  at 4.)  KPMG, a large and well-established Big Four accounting firm, verified the

21  accuracy of Bumble Bee's audited financial information and met with senior Bumble

22  Bee executives as part of its accounting due diligence assessment.  Simpson Thacher,

23  AlixPartners, SmartRevenue, and Marsh assisted with the legal, operational,

24  commercial, and consumer aspects of Bumble Bee due diligence.  (*Id.*)

25       In addition to reviewing the detailed work of its third-party advisors,

26  the Lion (Americas) deal team conducted its own due diligence.  After interviewing

27  the senior executives at Bumble Bee, Lion (Americas) concluded that management

28  was experienced, professional, and competent.  (*Id.* at 2.)  Lion (Americas) also

1  performed financial modeling, based on Bumble Bee's financial data, to analyze

2  potential rates of return for Fund III investors under a variety of scenarios.

3        Nothing in these models suggested that Bumble Bee could or did earn

4  supra-competitive rates of return because it was engaged in a price-fixing

5  conspiracy, nor did Lion (Americas)' projected rates of return for Fund III investors

6  rely upon that assumption.  In fact, while Bumble Bee management and its financial

7  advisors at J.P. Morgan estimated to potential acquirers that Bumble Bee would

8  achieve $143 million EBITDA for 2011 and a compound annual growth rate

9  ("CAGR") of approximately 8.5% over a six-year period (*see* Paris Decl. Ex. M,

10  Summer 2010 J.P. Morgan presentation, at 4; Ex. N, Bumble Bee management

11  presentation, at 19), the Lion (Americas) deal team took a more conservative

12  approach in its modeling.  In its Investment Committee Memo, the Lion (Americas)

13  deal team projected that Bumble Bee would achieve $134.7 million EBTIDA in

14  2011 and 3.3% CAGR over the 2010–2015 period.  (Paris Decl. Ex. G, Oct. 10 IC

15  Memo, at LION_00040105.)  Lion (Americas) further assumed that Bumble Bee

16  would not implement a price increase to offset the cost of the tuna industry's joint

17  marketing campaign ("Tuna the Wonderfish").  (*Id.* at n.1.)  And Lion (Americas)

18  anticipated that Bumble Bee's profitability in the Lightmeat segment would decline,

19  in line with broader market trends.  (*Id.* at 7.)  This modeling gave Lion (Americas)

20  confidence that Bumble Bee did not have to achieve outsized upside opportunities

21  in order for Fund III investors to experience a healthy return on their investment.

22  (*Id.* at 11.)

23        Plaintiffs identify **no evidence** that due diligence raised any "red flags"

24  that would lead a private equity investor—or any of its seasoned advisors—to

25  believe Bumble Bee was neck-deep in a criminal conspiracy. The results of this four-

26  month process suggested to the Lion (Americas) deal team that Bumble Bee had a

27  strong consumer brand with opportunities for growth and an experienced, competent

28  management team capable of executing on its strategy.  Conservative financial

1  modeling assured Lion (Americas) that even if upside opportunities were not

2  achieved, Fund III would be able to earn a modest return.   Lion (Americas)

3  recommended that Fund III acquire Bumble Bee via a "leveraged buyout," or

4  "LBO"—a typical structure for private equity acquisitions.

5        ### C.   The Bumble Bee LBO

6              In December 2010, Fund III acquired Bumble Bee from its then-owner,

7  a Centre Partners fund, in an LBO that was financed with $605 million of senior

8  secured debt (Paris Decl. Ex. O, Dec. 20, 2010 "Project Big Catch" KPMG Report,

9  at 6), a roughly $210 million equity investment by Fund III investors, and nearly

10 $100 million of rollover equity from Bumble Bee's management and FCF Co., Ltd.

11 ("FCF"), a major supplier.   (Strebulaev Decl. ¶ 30; *see also id.*)   The transaction

12 closed on December 15, 2010, with Big Catch holding Bumble Bee's shares, which

13 was, in turn, owned by Fund III (68.58%), Bumble Bee management (8.58%), and

14 FCF (22.84%).   (Lindberg Decl. ¶ 13; Brown Decl. ¶ 20.)

15             In the first quarter of 2011, shortly after the Bumble Bee acquisition

16 closed, the loan market was favorable and J.P. Morgan reached out to Bumble Bee's

17 Director of Tax with a proposal for Bumble Bee to recapitalize, which would involve

18 replacing approximately half of Fund III's equity with covenant-free, "pay-in-kind

19 (PIK) toggle" debt.   (Paris Decl. Ex. P.)   The lack of covenants and repayment

20 optionality gave Bumble Bee operational flexibility, in addition to the tax advantages

21 identified by KPMG.   (*Id.*; Ex. Q, at 12; Ex. R, at LION_00070131 (noting that

22 interest can be paid in kind with additional notes, but Bumble Bee "has sufficient

23 cash flow under our projections" to pay the interest in cash "if we wanted to do

24 that"); Lea Dep. Tr. 87:11-22, 342:5-24.)   And from the Fund III investor's

25 perspective, the recapitalization allowed Fund III to redeploy capital it had recently

26 invested in Bumble Bee to go towards other investments, further diversifying the

27 Fund III portfolio while maintaining a still-sizeable $108 million Bumble Bee

28

1    investment.  (Paris Decl. Ex. R.)  None of the capital returned to Fund III went into

2    the pockets of Lion LLP or Lion (Americas).  (Tester Decl. ¶ 30.)

3           To be clear: neither the 2010 LBO, nor the 2011 recapitalization, nor

4    any other transaction ever gave Lion LLP or Lion (Americas) any profit or

5    ownership interest—directly or indirectly—in Bumble Bee.  (*Id.* at ¶¶ 8, 10, 18, 19.)

6    **III.   MONITORING BY LION (AMERICAS)**

7           After the LBO, Lion (Americas) monitored Fund III's investment in

8    Bumble Bee, as it does with other North American investments by Lion Funds.

9    (Chang Decl. ¶ 33.)  Capps, Chang and Lindberg joined the Bumble Bee board of

10   directors, attending quarterly board meetings.  (*Id.* ¶ 34.)  One or more of them

11   participated in monthly calls regarding Bumble Bee's financial performance.  (*Id.*)

12   Lion (Americas) did not direct day-to-day business decisions made by Bumble Bee,

13   such as individual price change announcements on particular types of tuna.  (*Id.*

14   ¶ 35.)  Instead, Lion (Americas) only weighed in on significant business issues.  For

15   instance, Lion (Americas) advised on the development of a new frozen food line,

16   including reviewing marketing materials and taste-testing the product (*see id.*), and

17   mediated an environmental dispute between Bumble Bee and Greenpeace (*see*

18   Lindberg Decl. ¶ 15).  Lion (Americas) sometimes received email updates from

19   Bumble Bee management on a variety of topics, occasionally including competitors'

20   pricing, which the Lion (Americas) employees thought were based on publicly

21   available information, or market intelligence gleaned from other industry

22   participants like distributors or customers.  (Chang Decl. ¶ 35; Lindberg Decl. ¶ 16.)

23          Lion LLP relied on Lion (Americas) to monitor the Bumble Bee

24   investment, so Lion LLP's oversight of the investment was very high-level.  (Chang

25   Decl. ¶¶ 35–37.)  Some Lion LLP personnel (including Lyndon Lea, Lion LLP's co-

26   founder and Managing Partner) served on the Bumble Bee board, but only

27   sometimes attended board meetings.  (Chang Decl. ¶¶ 36–37.)  The Lion (Americas)

28   deal team would sometimes, but not always, update Lea regarding monthly calls

SULLIVAN & CROMWELL LLP

1   with management and board meetings that Lea did not attend.  (*Id.* ¶ 37.)  Lea and

2   Lion LLP focused on Bumble Bee's overall performance; when and how Bumble

3   Bee might be sold; and significant strategic initiatives that could impact the

4   company's financial performance and value.  (*Id.* ¶¶ 36–43.)  Lion LLP was not

5   focused on day-to-day developments, such as list price changes by Bumble Bee or

6   its competitors.  (*Id.* ¶ 35.)

7           As the leader of the Lion (Americas) deal team, Lindberg met with

8   owners of other worldwide seafood companies including TUG, Dongwon Enterprise

9   Co., Ltd. ("DWE"), and FCF, to discuss potential co-packing arrangements and the

10  industry's joint "Tuna the Wonderfish" marketing campaign to increase overall U.S.

11  tuna consumption.  (Lindberg Decl. ¶ 17.)  Lindberg met once with FCF; twice with

12  J.C. Kim of DWE; and, on several occasions, with Thiraphong Chansiri of TUG.

13  (*Id.* ¶¶ 18–24.)  Since Lion (Americas) advises Lion LLP on many investments

14  besides Bumble Bee, Lindberg used these meetings as opportunities to explore

15  possible ways to benefit other global seafood investments made by Lion funds, such

16  as exploring potential M&A transactions or supply relationships. (*Id.*) With Chansiri

17  (TUG), Lindberg discussed potential acquisitions of Contessa and Calvo, and

18  potential supply for the Lion Fund-owned European company Findus.  One time,

19  when Lindberg sought to discuss with Chansiri other seafood businesses owned by

20  Lion Funds, the two met in Lion LLP's London office. (*Id.* ¶ 25.)   Lindberg

21  introduced Chansiri to the CEO of another company, Young's Seafood.  (*Id.*; *see*

22  *also* Paris Decl. Ex. S, Deposition Transcript of Thiraphong Chansiri ("Chansiri Dep

23  Tr."), 230:6–11.)  None of this activity was at all untoward or had any relationship

24  to the alleged price-fixing conspiracy at issue in this case.[2]

25

26

27  ─────────────────
    [2]      With respect to Lion (Americas)' alleged contacts with TUG, the Lion Companies
28  incorporate by reference paragraphs 23-49 of Thai Union Group PCL's Statement of Undisputed
    Material Facts In Support of Motion For Summary Judgment (ECF No. 2001), and evidence cited
    therein.

1    A key part of Lion (Americas)' role in monitoring the Bumble Bee

2    investment was to develop profitable exit opportunities.  (Chang Decl. ¶¶ 25–26.)

3    Given TUG's expressed interest as a potential buyer, Lindberg recognized the

4    importance of cultivating a relationship with TUG.  (Lindberg Decl. ¶¶ 19, 24.)

5    Lindberg met with Chansiri of TUG on several occasions to discuss such a potential

6    acquisition. (Lindberg Decl. ¶¶ 23–28; *see, e.g.*, Paris Decl. Ex. T, at 1 ("Thai Union

7    has made clear that we are their top M&A priority. . . . [This] is the outcome of

8    approaching two years of dialog with their CEO.").)

9    ### IV.    THE PROPOSED TRANSACTION WITH TUG

10    After receiving multiple bids for Bumble Bee over the course of 2014

11    from TUG and other companies, the Lion Companies announced an agreement to

12    sell Bumble Bee to TUG in December 2014.  (Paris Decl. Ex. U.)  They knew at the

13    time—as they had expected since due diligence—that the DOJ would review the

14    proposed transaction closely.  (Lindberg Decl. ¶ 44.)  They were surprised to learn

15    that the DOJ did not approve the transaction, and they were shocked to learn why:

16    certain executives at Bumble Bee, COSI and StarKist were accused of participating

17    in a price-fixing conspiracy.  (*Id.* at ¶ 45; Chang Decl. ¶ 47.)

18    ### V.    BUMBLE BEE'S BANKRUPTCY

19    Bumble Bee pleaded guilty and struggled to pay its defense costs from

20    the ensuing litigation, particularly this MDL.  In November 2019, faced with an

21    unquantified, potentially enormous civil liability and no lenders willing to refinance

22    under that scenario, Bumble Bee filed for bankruptcy.  In January 2020, the

23    Bankruptcy Court approved the sale of substantially all of Bumble Bee's assets to

24    FCF, free and clear of all antitrust and other liabilities pursuant to Court order.  *In*

25    *re: Old BBP, Inc.*, No. 19-12502-LSS, Dkt. No. 326  (Bankr. D. Del. Jan. 24, 2020).

26    As a result, Fund III lost its entire remaining investment of over $108 million.

27    (Tester Decl. ¶ 31.)

28

# PROCEDURAL BACKGROUND

On December 9, 2015, the United States Judicial Panel on Multidistrict Litigation opened this MDL and centralized pretrial proceedings in this Court pursuant to 28 U.S.C. § 1407.  (ECF No. 1.)  Plaintiffs did not name any Lion Companies as defendants until October 16, 2017—more than three months after the deadline to add new parties without leave, and shortly after Judge Chen reduced Bumble Bee's criminal fine in the criminal proceeding.  (*See* ECF No. 530.)

## I.    THE FIRST, SECOND, AND THIRD LION ORDERS

In September 2018, in a 90-page opinion that carefully analyzed all of Plaintiffs' claims and supporting allegations, the Court dismissed all claims against Lion LLP and Big Catch on the grounds that Plaintiffs failed to state a claim against either company.  (*See* ECF No. 1358 (the "First Lion Order").)  As to Lion (Americas), the Court held that "there is no direct evidence of an agreement between Lion Americas' executives and the other members of the alleged conspiracy" and that "[s]everal of Plaintiffs' allegations fail to state a claim for direct participation," but that certain of Plaintiffs' circumstantial allegations were sufficient, at the pleadings stage, to survive a motion to dismiss.  (*Id.* at 80–84.)  With respect to vicarious liability, the Court rejected each of Plaintiffs' attempts to make the Lion Companies legally responsible for conduct of Bumble Bee executives, holding that there is "no alter ego liability between Bumble Bee and any Lion entity." (*Id.* at 70.) Plaintiffs filed amended complaints in October 2018, abandoning their Bumble Bee alter ego theory while re-packaging their claims against Lion LLP and Big Catch.

In January 2020, "[a]fter years of litigation and discovery," the Court analyzed Plaintiffs' allegations and arguments for a second time, dismissing Plaintiffs' claims against Lion LLP and Big Catch with prejudice because "leave to amend would be futile and not warranted."  (*See* ECF No. 2270 (the "Second Lion Order").)  The Court considered each legal theory that Plaintiffs advanced based on the facts alleged in the Complaints, and rejected all of them:

1     •     As to Plaintiffs' theory that Lion LLP joined and directly participated in the alleged packaged tuna conspiracy through the actions of Lyndon Lea, the Court held that controlling Ninth Circuit precedent does not permit the Court to "infer an anticompetitive agreement when factual allegations 'just as easily suggest rational, legal business behavior.'"  (ECF No. 2270, at 15 (quoting *Name.Space, Inc.* v. *Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1130 (9th Cir. 2015)).)

•     As to Plaintiffs' theory that actions of Eric Lindberg, Jeff Chang, and Jacob Capps should be imputed to Lion LLP, the Court held that the U.S. Supreme Court's holding in *United States* v. *Bestfoods*, 524 U.S. 51 (1998) "requires Plaintiffs to plead with specificity how Messrs. Lindberg's, Chang's, and Capps' actions were taken in the interests of Lion Capital <u>and not Lion Americas</u>," which Plaintiffs failed to do.[3]  (ECF No. 2270, at 16 (emphasis added).)

•     As to Plaintiffs' myriad other attempts to hold Lion LLP liable for the acts of others, each of Plaintiffs' vicarious liability theories was either abandoned by Plaintiffs during the briefing process or rejected by the Court, including Plaintiffs' latest unconstitutional and "novel theory of liability under the representative service doctrine."  (ECF No. 2270, at 17–18.)

On March 21, 2022, the Court issued an Order that reconsidered the Court's initial two decisions and resuscitated Plaintiffs' claims against Lion LLP and Big Catch.  (ECF No. 2781 (the "Third Lion Order").)  This represented a stark reversal: not only because it exposed Lion LLP and Big Catch to an outsized risk of joint and several liability and treble damages as to a multi-year price-fixing conspiracy, but also because, as to several controlling questions of law, the Third Lion Order took a very different view of the law on Plaintiffs' theories of liability. Following the Third Lion Order, the parties conducted seven months of additional fact and expert discovery.  As part of this discovery, the Lion Companies produced

---

[3]     The Court's Orders use the term "Lion Capital" to refer to Lion Capital LLP.

thousands of additional documents in response to Plaintiffs' requests; stipulated to Plaintiffs' request for a third-party subpoena to collect even more documents pertaining to Korn Ferry's 2012 review of Bumble Bee management; and produced Lyndon Lea, Lion LLP's managing partner, for deposition for more than eight hours.  The parties took third-party depositions of Scott Cameron, Kenneth Worsham and Stephen Hodge, former executives at Bumble Bee and StarKist who had previously invoked their Fifth Amendment rights in the civil litigation but agreed to testify after the conclusion of their criminal proceedings.

## II.     PLAINTIFFS' CLAIMS AGAINST THE LION COMPANIES[4]

### A.     Direct Participation Claims

Plaintiffs have no evidence that any Lion Company ever set the prices of packaged tuna at Bumble Bee, or that anyone from any Lion Company met—or even communicated—with anyone from StarKist or COSI.  Rather, Plaintiffs' circuitous theory of Lion's "direct participation" posits that the Lion Companies became aware of the alleged conspiracy while performing due diligence in connection with Fund III's potential acquisition of Bumble Bee; proceeded to invest hundreds of millions of dollars of Fund III investors' money in a criminal enterprise, despite knowing that Bumble Bee faced crippling legal exposure that would have catastrophic consequences for Bumble Bee, Fund III investors, and the Lion Companies themselves; and participated in the conspiracy before attempting to sell Bumble Bee to TUG.  (*See, e.g.*, Kroger Compl. ¶¶ 207–242.)[5]

As to Lion (Americas), Plaintiffs allege that Messrs. Lindberg, Capps, and Chang participated in the conspiracy by remaining "in the loop and informed about conspiratorial activities" through, for example, emails sent from Lischewski

---

[4]     By this recitation, the Lion Companies in no way concede the truth or materiality of any of Plaintiffs' allegations.

[5]     This brief cites the Fourth Amended Complaint filed by the Kroger Plaintiffs ("Kroger Compl.", ECF No. 1475) because it is in all material respects representative of all Plaintiffs' complaints, as the parties and this Court have recognized.  (ECF No. 2781 at 3 n.4.)

1   to Chang containing information about a competitor's "non-public price increase."

2   (*Id.* ¶ 228.)  Plaintiffs further allege that Lindberg discussed the conspiracy at "owner

3   to owner" meetings with TUG and DWE—even though the contemporaneous

4   meeting notes, emails, and sworn testimony reflect that Lindberg's meetings were

5   about unrelated and legitimate business topics, not U.S. packaged tuna pricing.

6       With respect to Lion LLP, Plaintiffs allege, "[u]pon information and

7   belief, Lea learned of the conspiracy."  (Kroger Compl. ¶ 220; EPP Compl. ¶ 111;

8   *see* DPP Compl. ¶ 66 (omitting "[u]pon information and belief"); CFP Compl. ¶ 63

9   (same).) That allegation is baseless: Plaintiffs provide no "information" that supports

10  a "belief" that Lea had knowledge of the conspiracy; no evidence of any affirmative

11  action Lea took in furtherance of the conspiracy; and no communication between

12  Lea and any individual employed by Lion (Americas), Bumble Bee, its competitors,

13  or its competitors' owners that refers in any way to the alleged conspiracy.[6]

14      **B.    Vicarious Liability Claims**

15      The majority of Plaintiffs' allegations regarding Lion LLP, and all of

16  Plaintiffs' allegations regarding Big Catch, assert vicarious liability.  Plaintiffs'

17  claims have shifted throughout the litigation, as theories were rejected by the Court

18  and/or abandoned.  Plaintiffs currently assert three remaining theories of vicarious

19  liability against Lion LLP: (1) that Lion LLP is liable for the conduct of Lion

20  (Americas) because the two companies are a "single economic unit" (*e.g.*, Kroger

21  Compl. ¶ 196); (2) that Lion (Americas) was the "agent" of Lion LLP (*e.g.*, *id.*

22  ¶ 195); and (3) that conduct of Lion (Americas) employees Lindberg, Chang, and

23  Capps should be "imputed" to Lion LLP because they were acting "on behalf of"

24  Lion LLP and/or "under the close supervision of Lea" (*e.g.*, *id.* ¶ 194).  Plaintiffs'

25  sole claim against Big Catch is that it is liable as Lion LLP's "alter ego," in the event

26

27  [6]    The theory that Lion LLP's delegation of oversight to Lion (Americas) qualifies as
28  "coordinated activity . . . sufficient under *Arandell* to raise a reasonable inference of Lion Capital's
    own participation in the conspiracy" (*see* Third Lion Order, ECF No. 2781 at 19) is not a viable
    theory of direct participation and fails as a matter of law, as discussed *infra*.  *See infra* § II(C).

1  that Lion LLP is held liable in the first instance.  (*E.g.*, *id.* ¶ 204.)

2  ## LEGAL STANDARD

3  All of Plaintiffs' claims against the Lion Companies fail as a matter of

4  law on summary judgment.  On summary judgment, the Court "pierce[s] the

5  pleadings . . . to assess the proof in order to see whether there is a genuine need for

6  trial."  *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

7  (citation omitted); Fed. R. Civ. P. 56(a).  In an antitrust case, to survive a defendant's

8  summary judgment motion, plaintiffs "must establish that there is a genuine issue of

9  material fact as to whether [the defendant] entered into an illegal conspiracy that

10  caused [plaintiffs] to suffer a cognizable injury."  *Matsushita*, 475 U.S. at 576.

11  "Material" facts must be outcome-determinative, *Anderson* v. *Liberty Lobby, Inc.*,

12  477 U.S. 242, 248 (1986), and a "genuine dispute" exists only if the trier of fact must

13  resolve that dispute to determine the rights of the parties under the governing

14  substantive law.  *T.W. Elec. Serv., Inc.* v. *Pacific Elec. Contractors Ass'n*, 809 F.2d

15  626, 630 (1987) ("Disputes over irrelevant or unnecessary facts will not preclude a

16  grant of summary judgment.").  Plaintiffs are obligated to identify the material facts

17  that require a trial.  *See, e.g.*, *Abbe* v. *City of San Diego*, 2007 WL 4146696, at *2

18  (S.D. Cal. 2007) (Sabraw, C.J.) ("Notably, the court is not obligated to scour the

19  record in search of a genuine issue of triable fact," but "may limit its review to the

20  documents submitted for the purposes of summary judgment and those parts of the

21  record specifically referenced therein.") (internal quotation marks omitted).

22  ## ARGUMENT

23  Plaintiffs bring claims under Section 1 of the Sherman Act and various

24  state law analogues.[6]  The essential elements of a Section 1 Sherman Act claim are:

---

25
26  [6]  This brief addresses all of Plaintiffs' claims against the Lion Companies.  The same standards apply to Plaintiffs' state and federal claims, which all rely on Plaintiffs' theory that the Lion Companies participated in the alleged conspiracy. *See* Phillip E. Areeda & Herbert
27  Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 2400
28  (2019) ("[T]he great majority of state antitrust rules are either identical to federal rules or else track

"(1) an agreement among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition." ECF No. 283 at 8 (citation omitted).

Under Ninth Circuit law, to survive summary judgment Plaintiffs must proffer competent evidence of a defendant's "'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Toscano*, 258 F.3d at 983. This evidence may be direct or circumstantial. "Direct evidence in a Section 1 conspiracy must be evidence that is **explicit** and **requires no inferences** to establish the proposition or conclusion being asserted." *See In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) (emphasis added)). Plaintiffs lack any direct evidence of a "conscious commitment" by any Lion Company to join any price-fixing conspiracy, as explained *infra*. Lindberg's meetings with other owners for legitimate business reasons, or his receipt from Bumble Bee managers of already public pricing information—none of which disclosed the existence of price-fixing—does not comprise "direct" evidence of price-fixing. *See* O'Malley, Grenig & Lee, 3A Fed. Jury Prac. & Instr. § 150:43 ("In determining whether or not a defendant, or any other person, was a member of a conspiracy, <u>do not consider what others may have said or done</u>.") (emphasis added). There is not a hint of evidence in the record that Lea or Lion LLP had anything that could even arguably amount to "direct evidence" of conspiracy participation.

Evidence of conspiracy may also be circumstantial. To avoid deterring legal, procompetitive behavior that could be confused with price-fixing, courts apply "[a] special rule. . . to the use of circumstantial evidence in antitrust cases. '[W]here

---

them very closely."); *see, e.g.*, *Breakdown Servs., Ltd.* v. *Now Casting, Inc.*, 550 F. Supp. 2d 1123, 1141 (C.D. Cal. 2007) (California); *Orr* v. *Beamon*, 77 F. Supp. 2d 1208, 1211 (D. Kan. 1999) (Kansas); *Insulate SB, Inc.* v. *Advanced Finishing Sys., Inc.*, 797 F.3d 538, 547 (8th Cir. 2015) (Minnesota); *Waggoner* v. *Denbury Onshore, LLC*, 612 Fed. Appx. 734, 736 n.2 (5th Cir. May 20, 2015) (Mississippi).

an antitrust plaintiff relies entirely upon circumstantial evidence of conspiracy, a defendant will be entitled to summary judgment if it can be shown that (1) the defendant's conduct is consistent with other plausible explanations, and (2) permitting an inference of conspiracy would pose a significant deterrent to beneficial procompetitive behavior.'" *In re Citric Acid Litig.*, 996 F. Supp. 951, 954 (N.D. Cal. 1998), *aff'd*, 191 F.3d 1090 (9th Cir. 1999) (quoting *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 440 (9th Cir. 1990)) (second alteration in original).

Here, again as discussed *infra*, the record shows plausible and justifiable reasons for the Lion Companies' conduct that is consistent with proper and typical private equity business practices, and thus merits summary judgment for Lion. The Lion Companies engaged in the ordinary and legitimate business practices of a private equity fund manager, investment advisor, and holding company by evaluating and approving an investment; monitoring that investment in order to increase its value; and attempting to exit the investment at a profit by selling it to a strategic purchaser. No reasonable jury could find on this record that Lion (Americas), much less Lion LLP, knowingly participated in a packaged tuna price-fixing conspiracy that the DOJ concluded was "**concealed**" from the Lion Companies. Allowing Plaintiffs' counterfactual claims to proceed to trial would undermine well-established legal standards for civil antitrust claims, and would chill legitimate investment behavior.

## I.  LION (AMERICAS) DID NOT FIX PRICES OR OTHERWISE PARTICIPATE IN THE ALLEGED PACKAGED TUNA CONSPIRACY

Plaintiffs' claims against the Lion Companies begin with the theory that Lion (Americas) was a direct participant in the alleged conspiracy through its employees Eric Lindberg, Jacob Capps, and Jeff Chang, who monitored Fund III's investment in Bumble Bee. (*E.g.*, Kroger Compl. ¶ 207.) There is no triable evidence of unlawful conduct to support such a claim.

### A. The Direct Evidence of Lion (Americas)' Conduct Consists of Legitimate Private Equity Investment Behavior

***Due diligence.*** In 2010, Lion (Americas) evaluated Bumble Bee as a potential Fund III investment, overseeing the four-month due diligence process that included research on Bumble Bee and its competitors; a review of Bumble Bee's accounting records; meeting with Bumble Bee's senior management team; and the use of financial models to project the potential return on Fund III's investment. (Chang Decl. ¶¶ 16–20; Paris Decl. Ex. E, Sept. 27 IC Memo; Paris Decl. Ex. G, Oct. 10 IC Memo.) Lion (Americas) hired highly regarded third-party advisors— including KPMG, Simpson Thacher, AlixPartners and Marsh—to provide their expertise concerning the accounting, legal, operational, commercial and consumer aspects of the due diligence. (*Id.*) Neither their analyses nor Lion (Americas)' independent analysis revealed that Bumble Bee was participating in any unlawful activity. (Paris Decl. Ex. V, Oct. 5, 2010 Final Report of AlixPartners; Paris Decl. Ex. W, KPMG Report.) To argue otherwise is implausible on this record.

***Investment thesis.*** The direct, undisputed evidence shows that Lion (Americas) recommended Bumble Bee as an attractive investment for Fund III because Lion (Americas) believed Bumble Bee fit well with Lion (Americas) and Lion LLP's overall investment philosophy, not because Lion (Americas) had a devious plan to exploit unlawful Bumble Bee activity. (Chang Decl. ¶¶ 18–23; Lindberg Decl. ¶ 12; Paris Decl. Ex. G, Oct. 10 IC Memo.) Consistent with Lion LLP's focus on strong consumer brands, Lion (Americas) reported to the Lion LLP Investment Committee that Bumble Bee was an "iconic" brand with a long heritage and "resonance with consumers." (Paris Decl. Ex. I, Sept. 26 IC Memo.) Consistent with its approach of streamlining operations of portfolio companies, Lion (Americas) identified cost-saving initiatives and operational improvements at Bumble Bee that were projected to enhance the value of Fund III's investment. (Paris Decl. Ex. G, Oct. 10 IC Memo.) Lion (Americas) thought Bumble Bee could capitalize on its strong brand recognition and command better margins by

introducing innovative "value add" products, moving merchandise outside of the canned tuna section, and supporting such new initiatives through improved marketing. (Paris Decl. Ex. G, Oct. 10 IC Memo.)  Among several possible cost-saving initiatives, Lion (Americas) reported to the Investment Committee that Bumble Bee could achieve significant savings by entering into a co-packing relationship with StarKist. (*Id.*)  Lion (Americas) believed Bumble Bee's management team was the best and most experienced in the industry, and had confidence they could execute on the high-level plan. (*Id.*)

Like any private equity advisor, Lion (Americas) analyzed potential exit strategies. (*Id.*)  Lion (Americas) reported to the Investment Committee that, "Thai Union have been fairly direct in their desire to own Bumble Bee," and therefore "represent a logical acquirer." (*Id.*)  Lion (Americas) reported that "a strategic combination of Bumble Bee and Chicken of the Sea has been explored and would yield $20m+ in synergies," and recognized that such a transaction would be subject to antitrust review by the DOJ. (*Id.*; Chang Decl. ¶ 26.)

***Monitoring.***  After the acquisition of Bumble Bee by Fund III, the Lion (Americas) deal team engaged in routine monitoring of Fund III's investment in Bumble Bee.  Messrs. Capps, Chang and Lindberg became members of Bumble Bee's board of directors.  In that capacity, they attended quarterly board meetings and voted on budgets proposed by Bumble Bee management. (Chang Decl. ¶ 34.)  They also from time to time participated in calls regarding Bumble Bee's financial performance, received email updates from Bumble Bee management on various topics, and discussed high-level strategic issues with Bumble Bee management. (Chang Decl. ¶ 35.)  Bumble Bee pursued initiatives outlined by Lion (Americas), including "an aggressive new product development program to drive long term organic growth under [Bumble Bee's] leading brands." (Paris Decl. Ex. X, November 2011 Bumble Bee Parent, Inc. Board of Directors Meeting ("Nov. 2011 Board Presentation").)  Lion (Americas) believed Bumble Bee management was

operating lawfully, and had confidence in Bumble Bee management's ability to achieve its objectives. (Chang Decl. ¶ 43; Lindberg Decl. ¶ 39.)

### B. Plaintiffs' Circumstantial Claims Are Belied By the Direct Evidence in the Record

Circumstantial evidence may only withstand a motion for summary judgment if that evidence "tends to exclude the possibility" of lawful behavior. *Matsushita*, 475 U.S. at 588 (quoting *Monsanto Co.* v. *Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). The bar is high: "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* In the Ninth Circuit, courts analyze circumstantial evidence in two steps. *First*, a defendant may "rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice." *In re Citric Acid Litig.*, 191 F.3d at 1094. *Second*, "[t]he burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *Id.*

The record here shows plausible and justifiable reasons for Lion (Americas)' conduct. Accordingly, Plaintiffs bear the burden "to provide specific evidence tending to show that [each Lion Company] was **not** engaging in permissible competitive behavior." *Id.* (emphasis added); *see also Sun Microsystems Inc.* v. *Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 896 (N.D. Cal. 2009).

Plaintiffs have no such evidence. Rather, they distort emails and meetings that, both on their face and taken in context, are "as consistent with [legal behavior] as with conspiracy." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). Plaintiffs' claims against Lion (Americas) are predicated on sinister speculation about a few meetings between Lindberg and officials from TUG or DWE; a handful of emails reporting market intelligence on tuna pricing; and an anonymous letter alleging, among many other things, drunken frolicking and antitrust violations by Bumble Bee executives. Lion (Americas)'

1   response to events, both on the face of the documents and taken in context, is

2   "consistent with proper business practice." *Id.*

3       ***Lindberg's meetings with TUG and DWE.***   Plaintiffs claim that,

4   "[u]pon information and belief, Lindberg's meetings with J.C. Kim and T. Chansiri

5   and Han Seng Cheng resulted in the exchange of assurances among each of the

6   owners that their respective U.S. subsidiaries would continue to adhere to the

7   conspiracy pricing agreements." (*E.g.*, Kroger Compl. ¶ 224.)

8       The record shows that Lindberg's meetings with DWE and TUG

9   executives were for unrelated and wholly legitimate business reasons: to explore

10  mutually beneficial transactions involving not only Bumble Bee, but also other

11  portfolio companies owned by Lion Funds.  Among the items on Lindberg's agenda

12  during these meetings were business development opportunities for Findus, another

13  Lion fund-owned food company.  (Paris Decl. Ex. Y (planning "potential TU, FCF,

14  and Dongwon meetings with Findus et al." in January 2011); *see also id.* Ex. K,

15  Lindberg Dep. Tr. 148:20–153:5 (describing four-hour meeting with Findus and

16  Chansiri and subsequent lunch meeting between Lindberg and Chansiri); Ex. S,

17  Chansiri Dep Tr. at 230:6–232:23 (Chansiri's testimony that he met with one

18  executive from Young's Seafood, a subsidiary of Findus, during his only, very short

19  trip to the Lion LLP office in London); Ex. Z (Lindberg writing that, for his first

20  meeting with "FCF (and maybe the others for that matter) the subject of Findus

21  supply relationship should absolutely be on the agenda").))  Lindberg also explored

22  possible M&A transactions.  (*See, e.g.*, *id.* Ex. S, Chansiri Dep. Tr. 243:21–24

23  (possible M&A cooperation with Contessa), 255:11–18 (Calvo).)

24      Lindberg's meetings with TUG had a further legitimate purpose: Lion

25  (Americas) viewed TUG as a likely purchaser of Bumble Bee upon Fund III's exit.

26  (Paris Decl. Ex. G, Oct. 10 IC Memo.) Meetings with TUG were crucial to

27  maintaining a relationship that could ultimately provide a profitable exit from Fund

28  III's investment in Bumble Bee.  (Lindberg Decl. ¶¶ 19, 23–26; Paris Decl. Ex. T

1  ("Thai Union has made clear that we are their top M&A priority[, . . . ] the outcome

2  of approaching two years of dialog with their CEO.").)  Lindberg made clear that he

3  did not discuss U.S. tuna pricing at any of these meetings.  (Lindberg Decl. ¶¶ 23–

4  28.)   Lindberg's legitimate business reasons to meet with TUG and DWE are

5  undisputed, and Plaintiffs cannot rely on the mere fact of the meetings to survive

6  summary judgment.  *See In re Citric Acid Litig.*, 996 F. Supp. at 959 ("Where

7  cooperation is necessary for a legitimate business purpose, the mere opportunity to

8  conspire at business meetings is insufficient to support an inference of conspiracy.").

9        Plaintiffs cite emails concerning these meetings and ask the Court to

10  ascribe an implausible meaning that is the literal opposite of what the emails say.

11  For instance, before meeting with owners of other seafood companies, Lindberg

12  consulted with antitrust counsel for Lion (Americas).   (Lindberg Decl. ¶ 20.)

13  Lindberg was careful to ensure these meetings did not stray into areas that would

14  raise antitrust concerns, and he explained to a DWE executive before their first

15  meeting the following:

16        Please be aware that we will NOT need an anti-trust attorney present.
      I would like our agenda to include a general introduction of Dongwon
17        Group and Lion Capital; general industry topics such as increasing
      overall canned seafood consumption; ways in which Bumble Bee and
18        StarKist can cooperate to mutually reduce operating costs; and ways in
      which Dongwon may be able to cooperate and supply other Lion
19        Capital European consumer seafood companies.  Prohibited topics
      under US competition laws are quite narrow, such as sharing of detailed
20        cost information and discussing of pricing strategy and collusion, and
      **we certainly will not discuss those topics**.
21

22  (Paris Decl. Ex. AA; *see also id*. Ex. BB (providing a similar comment before the

23  second and final meeting with DWE); Ex. CC (Lindberg says to Chansiri that he is

24  "anxious to work with you to improve the sector," but only "in the strictest

25  compliance with US law").)

26        DWE's internal meeting minutes summarizing J.C. Kim's meeting with

27  Lindberg confirm that they did not discuss any unlawful topic.  These minutes report

28  one of Lindberg's first statements:

First, as the industry's two most-leading companies come together, there may be a concern that this violates the Anti–Trust Law. This meeting is a going to be an exchange of opinions regarding general industry information and a plan for developing the entire industry in the future, so there should be no problems. As a major shareholder, I will preface this meeting by saying we will not discuss the management and business direction, and there will be no mention of pricing or strategies.

Paris Decl. Ex. DD.

Using these emails as evidence that the meetings were actually conducted in furtherance of the alleged conspiracy violates *Twombly*. *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 557 (2007) ("[W]ithout that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.").

**Emails containing competitive intelligence.**  Over the course of five years, from late 2010 through 2015, Lion (Americas) employees received a few emails from Bumble Bee management that mentioned Bumble Bee's expectations for its competitors' pricing strategies. There is no evidence that Lion (Americas) employees saw these emails as anything other than ordinary competitive intelligence, "consistent with proper business practice." *In re Citric Acid Litig.*, 191 F.3d at 1094. And there is certainly no evidence that they viewed these emails as evidence of a criminal price-fixing conspiracy.

Emails not authored by any Lion (Americas) personnel cannot as a matter of law demonstrate that **Lion (Americas)** had "a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Toscano* v. *Prof'l Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001) (citation omitted); O'Malley, Grenig & Lee, 3A Fed. Jury Prac. & Instr. § 150:43 ("In determining whether or not a defendant, or any other person, was a member of a conspiracy, **do not consider what others may have said or done**.") (emphasis added). Indeed, some of the emails Plaintiffs rely upon suggest that Bumble Bee's competitors were **decreasing** their prices in order to grab market share from Bumble Bee, which is inconsistent with the allegation that Lion (Americas) was made aware of a conspiracy to maintain prices at artificially **high** levels. For example, on July 28, 2011, Lischewski wrote

1   to Lindberg that Chicken of the Sea's prices were so low "they are losing money and

2   the attacks are not rationale [sic]."   (Paris Decl. Ex. EE; Ex. FF (Lischewski

3   reporting that StarKist's "level of pricing is at breakeven and doesn't   make

4   sense.").)   Emails like this are consistent with Lion (Americas)' understanding that

5   a big threat to Bumble Bee was competitors who priced below their costs, which the

6   Lion (Americas) deal team viewed as "irrational"—illogical— for their long-term

7   business prospects.   (*See id.* Ex. G, Oct. 10 IC Memo; Chang Decl. ¶ 40; Lindberg

8   Decl. ¶ 26.)   There is no evidence that the Lion (Americas) employees knew any of

9   this information was coming from Bumble Bee's competitors, as opposed to

10  ordinary market intelligence from customers, distributors or industry rumor.   (Chang

11  Decl. ¶ 43; Lindberg Decl. ¶ 30.)

12         A few times, Lischewski reported to Lion (Americas) that a competitor

13  increased prices.   (*E.g.*, Paris Decl. Ex. GG (Lischewski reporting a StarKist list

14  price increase was "not as much as we had hoped," and Bumble Bee "followed with

15  our list price increase earlier today"); Ex. HH (Lischewski reporting that Bumble

16  Bee increased lightmeat and pouch prices "following SK action on 8/1 to follow us

17  up on albacore and lead lightmeat and pouch.  No word from COSI yet.").)   Given

18  that all three companies made public statements about list price changes, it is

19  unremarkable that Lion (Americas) was sometimes told by Bumble Bee

20  management about price changes and Bumble Bee's planned response.   (Chang

21  Decl. ¶ 43; Lindberg Decl. ¶¶ 29, 30.)   Being informed of market price movements

22  falls far short of evidence showing the requisite "conscious commitment to a

23  common scheme" by anyone at Lion (Americas).   *See In re Baby Food Antitrust

24  Litig.*, 166 F.3d 112, 117, 121 (3rd Cir. 1999) (citation omitted) (evidence that

25  defendants knew of competitors' price increases before they were publicly

26  announced "evinces only an exchange of information among the defendants,"

27  insufficient to support inference of conspiracy).

28

1    To try to show that Lion (Americas) should have recognized these

2    emails as more than routine competitive intelligence, Plaintiffs rely on Lischewski's

3    use of the word "cheating" in a single email authored by Lischewski.  In January

4    2012, StarKist publicly announced a list price increase effective April 1.  Two weeks

5    later, StarKist undercut Bumble Bee's offer in a Lent grocery store advertisement,

6    and Scott Cameron wrote to Lischewski that StarKist was "signal[ing] one thing,

7    and do[ing] another."  (Paris Decl. Ex. II.)  Lischewski forwarded the email to

8    Lindberg and Capps, writing, "[n]ot getting any prettier out there for Q1 with

9    rampant cheating continuing.  All three companies have announced a list price

10   increase April 1 so hopefully it gets better."  (*Id.*)

11   As a matter of law, whatever Lischewski may or may not have meant

12   by the word "cheating," it is not evidence that **Lion (Americas)** had a "conscious

13   commitment" to an unlawful scheme.  *See* American Bar Association Antitrust

14   Section, Model Jury Instructions in Civil Antitrust Cases (A.B.A., Chicago 2016),

15   A-21, Instruction 4: Participation and Intent ("In determining whether a defendant

16   was a member of the alleged conspiracy, **you should consider only the evidence**

17   **about that particular defendant's statements and conduct** . . .") (emphasis

18   added).  "To cheat" means "to practice fraud or trickery." *Cheat*, Merriam-Webster,

19   https://www.merriam-webster.com/dictionary/cheat.  From the Lion (Americas)

20   perspective, this was literally true: Bumble Bee's competitors were engaged in

21   "trickery"—publicly announcing list price increases, while at the same time

22   providing lowball bids to customers. *See In re Baby Food Antitrust Litig.*, 166 F.3d

23   at 127 (holding that a defendant's "single use of the term [truce] in a highly

24   competitive business environment and in the face of continuing fierce competition

25   is as consistent with independent behavior as it is with price-fixing").

26   At bottom, Plaintiffs cite only a few emails actually authored by any

27   Lion (Americas) personnel.  None even comes close to sufficient evidence to support

28   Plaintiffs' claims.  In one, Chang reports that three branded competitors would be

"closely aligned on tuna list pricing" starting on April 1 (Paris Decl. Ex. JJ), a phrase copied verbatim from the **Bumble Bee Board meeting slide deck**. (Chang Decl. ¶ 39.)  In another, Lindberg wrote that Bumble Bee performance issues in early 2012 were attributable to StarKist's dysfunctional management and its irrational pricing, but that "they are now in lockstep with us in setting pricing rationally." (Paris Decl. Ex. T.)  In a third email, Lindberg forwarded to Capps an email in which Lischewski suggests "attacking" StarKist by cutting prices on pouch tuna and wrote, "under no circumstances do we want any negative price signaling." (Paris Decl. Ex. EE.)

These emails are circumstantial evidence reflecting Lion (Americas)' plausible belief that Bumble Bee and its competitors were maintaining prices for independent, lawful business reasons, just like gas stations or airlines do.  Phrases like "closely aligned" and "in lockstep with us" are common and as consistent with legitimate competition as they are with an anticompetitive agreement, and they do not "tend to exclude the possibility" that Lion (Americas) thought Bumble Bee was engaged in lawful behavior. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) ("In an interdependent market, companies base their actions in part on the anticipated reactions of their competitors.  Because of this mutual awareness, two firms may arrive at identical decisions independently, as they are cognizant of—and reacting to—similar market pressures.").  The concern Lindberg expressed in his email to Capps that a public price change by Bumble Bee would be an important "negative price signal[]" to StarKist creates a reasonable inference that Lindberg was **unaware** of any private pricing agreements between the companies.

Plaintiffs also cite an email exchange between Lindberg and Lischewski concerning an IntraFish article that contains statements by In-Soo Cho, then-CEO of StarKist.  (Paris Decl. Ex. KK; *see id.* Ex. LL (article).)  Cho said to the trade press that, "American consumers are paying too little [for tuna], so are getting poor quality products in return."  (*Id.* Ex. LL.)  In his email, Lindberg said

that "pricing needs to become reasonable and that we need to reposition [tuna] as a value-add product," so he floated to Lischewski the idea of doing a follow-on article with the trade press to reinforce this message.  (*Id.*; Paris Decl. Ex. KK.)  Lindberg characterized this as "banging a consistent public drum for everyone's consumption."  Plaintiffs suggest this is nefarious when it is, in fact, a tried-and-true public relations strategy. The fact that Lindberg thought it would be useful to convey messages through the trade press is additional evidence that he was unaware of any conspiracy.  If there was a secret agreement regarding prices already in place, then there would be no need to "bang" a "public drum" about prices.  None of these emails meets the requirements for circumstantial evidence set forth in *Citric Acid*.

   ***Anonymous letter.***  Finally, Plaintiffs cite an anonymous letter that Lindberg received in 2012 as evidence of Lion (Americas) wrongdoing. (Paris Decl. Ex. MM.)  That letter disparaged Lischewski and accused Bumble Bee management of various transgressions.  Lindberg read the letter and immediately knew some of the allegations in it were false. (Lindberg Decl. ¶ 39.)  Lindberg still circulated the letter to other Lion (Americas) employees, and forwarded the letter to Lischewski himself for a response.  (*Id*. ¶ 40.)  Lischewski rebutted the letter and when he and Lindberg spoke by phone, explained that the allegations in the letter were not credible.  (*Id.* ¶ 41; Paris Decl. Ex. NN.)  At Mr. Lischewski's criminal trial, Judge Chen excluded the letter from evidence, finding that it "certainly can't be admitted for the truth of the matter asserted, that there was a conspiracy," and held that "its probative value as to knowledge seems very weak."  (Paris Decl. Ex. OO, *United States* v. *Lischewski*, Case No. 18-CR-00203-EMC (N.D. Cal.), Aug. 27, 2019 Hr'g Tr. at 139:6–9.)

   Plaintiffs may certainly fault Lion (Americas) in retrospect for not having a more rigorous policy in 2012 for handling such accusations.  While such judgments are always susceptible to second-guessing with the benefit of hindsight, there is no contemporaneous evidence to "exclude the possibility" that Lion

(Americas) believed the allegation about anticompetitive conduct to be anything but false. *Matsushita*, 475 U.S. at 588 (quoting *Monsanto*, 465 U.S. at 764). Plaintiffs' burden on summary judgment is **not** to show that Lion (Americas) had a flawed process for handling complaints, or could have done a better job dealing with a whistleblower; Plaintiffs' burden is to provide evidence that Lion (Americas) had a "conscious commitment" to an unlawful price-fixing conspiracy. *Toscano*, 258 F.3d at 983 (citation omitted). That they cannot do on this record.

## II. ALL OF PLAINTIFFS' CLAIMS AGAINST LION LLP ALSO FAIL AS A MATTER OF LAW

Since Judge Chen's decision to adopt a downward departure from the criminal sentencing guidelines for Bumble Bee in April 2017, Plaintiffs have used various theories to put Lion LLP on the hook for the alleged conduct of others. Some were rejected and/or abandoned. (*See, e.g.*, First Lion Order, ECF No. 1358, at 70 ("The Court finds no alter ego liability between Bumble Bee and any Lion entity.").) This Court held, in two separate opinions, that Plaintiffs' allegations were not sufficient to state a claim. Disagreeing with Judge Sammartino, the Court in its Third Lion Order articulated three potential paths for a claim against Lion LLP, **if** Plaintiffs could discover plausible, admissible evidence in support. Specifically, the Court held that Lion LLP may be held liable (1) if Lion LLP learned of the alleged conspiracy during due diligence of Bumble Bee and "participated through Lea," Lion LLP's managing partner; (2) if Eric Lindberg acted "on behalf of" Lion LLP, rather than Lion (Americas), such that Lion LLP "participated through Lindberg"; and (3) if Lion LLP and Lion (Americas) "engaged in coordinated activity as a single enterprise." (*See* Third Lion Order, ECF No. 2781, at 18–20.) Summary judgment is appropriate because the record evidence does not create any triable issue of material fact against Lion LLP under any of the three theories, nor any of the other theories of vicarious liability that Plaintiffs have asserted in the past.

### A. There Is No Direct or Circumstantial Evidence That Lion LLP Participated in the Alleged Conspiracy

To survive summary judgment on their claim that Lion LLP knowingly joined the alleged conspiracy, Plaintiffs must come forward with Lion LLP-specific evidence. As a matter of law, they cannot do this by relying on statements or conduct by Lion (Americas) or anyone else.  For example, the Ninth Circuit's model jury instructions explain:

> "In determining whether or not a defendant, or any other person, was a member of a conspiracy, **do not consider what others may have said or done**.  The membership of a defendant, or any other person, in a conspiracy must be established by evidence as to the conduct of defendant _____, that is by what defendant _____ knowingly said or did."

O'Malley, Grenig & Lee, 3A Fed. Jury Prac. & Instr. § 150:43 (emphasis added); *see also* American Bar Association Antitrust Section, Model Jury Instructions in Civil Antitrust Cases (A.B.A., Chicago 2016), A-21, Instruction 4: Participation and Intent ("In determining whether a defendant was a member of the alleged conspiracy, **you should consider only the evidence about that particular defendant's statements and conduct** . . .") (emphasis added). When stripped of extraneous speculation about "what others may have said or done," Plaintiffs' evidence against Lion LLP is so weak as to border on the non-existent.

Plaintiffs allege that Lion LLP learned of the conspiracy during due diligence of Bumble Bee in 2010, and claim that because Lion is "sophisticated" it must have gleaned from financial data and "access" to Bumble Bee executives that these executives were involved in a clandestine, industry-wide price-fixing conspiracy that had escaped the detection of **everyone else** including its then-owner, Centre Partners, another "sophisticated" private equity firm; its customers and other industry participants; and regulators.

The direct evidence in the record at summary judgment—*e.g.*, the diligence memos sent by Lion (Americas) to the Lion LLP Investment Committee—debunks Plaintiffs' theory.  It is undisputed that Lion LLP was told due diligence

raised "no major red flags," and it is undisputed that Lion LLP was told Fund III should invest in Bumble Bee for various, legitimate reasons—not because of ongoing illegal activity by Bumble Bee management. (Paris Decl. Ex. G, Oct. 10 IC Memo, at 2.) Also undisputed: Lion LLP was told to assume that Bumble Bee's profitability in the Lightmeat segment would **decline** in line with market trends, and that Bumble Bee **would not be able to implement a price increase** to offset the cost of the industry-wide "Tuna the Wonderfish" marketing campaign. (*Id.* at 7, 9 n.1.) Far from trying to push Bumble Bee's profitability beyond legal limits, the Lion (Americas) modeling presented to Lion LLP projected that Bumble Bee would achieve modest growth over a five-year period, driven by growth in value-added ("VA") tuna products—which are not a part of this litigation—and cost-savings initiatives. (*Id.* at 7.)

Plaintiffs allege that, after Fund III's investment, Mr. Lea was a member of Bumble Bee's board of directors; attended Bumble Bee board meetings, which sometimes involved approving budgets and providing other similar board-level input; and received occasional reports pertaining to the state of Fund III's investment in the Bumble Bee business.

There was nothing nefarious about any of this: even one of Plaintiffs' own experts, Adoria Lim, conceded under oath that "it was **entirely proper** for Bumble Bee's board members to have done these various activities." (Paris Decl. Ex. PP, Lim Dep. Tr. 128:6–129:15 (emphasis added).) Subjecting Lion LLP to the threat of a jury trial and billions of dollars in joint and several liability for an alleged multi-year tuna price-fixing conspiracy on this record—which amounts to the ordinary business behavior one would expect (and, outside investors demand) of a private equity firm managing a fund's investment in a portfolio company—is not warranted, and "would pose a significant deterrent to beneficial procompetitive behavior." *In re Citric Acid Litig.*, 996 F. Supp. at 954. Plaintiffs fail to meet their burden "to provide specific evidence" against Lion LLP that "tends to exclude the

possibility" of lawful behavior.   *In re Citric Acid Litig.*, 191 F.3d at 1094; *Matsushita*, 475 U.S. at 588.

### B. Lion LLP May Not Be Held Liable for Alleged Conduct of "Dual Agent" Lion (Americas) Employees

Plaintiffs allege that the conduct of Lion (Americas) employees Chang, Capps and Lindberg should be "legally imputed" to Lion LLP because they each were a "Member" of Lion LLP.   (*E.g.*, Kroger Compl. ¶ 206.)   However, the Supreme Court has made clear that "dual agents," like Chang, Capps and Lindberg, are presumed to be wearing their "subsidiary hats" (in this case, Lion (Americas)) and not their "parent hats" (*i.e.*, Lion LLP) when acting for the subsidiary.   *U.S.* v. *Bestfoods*, 524 U.S. 51, 69 (1998).

To overcome the *Bestfoods* presumption, Plaintiffs must provide specific evidence showing how the actions of Messrs. Capps, Chang, and Lindberg were taken in the interests of Lion LLP **but not** Lion (Americas).   *Bestfoods*, 524 U.S. at 69–70 & n.13; *Oaktree Principal Fund V, LP* v. *Warburg Pincus LLC*, 2016 WL 6782768, at *11 (C.D. Cal. Aug. 9, 2016) (plaintiffs failed to overcome the presumption that certain conduct of dual status individual was performed on behalf of portfolio company Rural/Metro, rather than private equity fund sponsor Warburg, because plaintiffs "fail[ed] to include sufficient allegations regarding Warburg and Rural/Metro's differing interests"); *Trinity Indus., Inc.* v. *Greenlease Holding Co.*, 2014 WL 1766083, at *11 (W.D. Pa. May 2, 2014) (Plaintiff "failed to rebut the presumption that the dual officers and directors acted in their capacity as Greenlease board members and to show they acted **solely** as officers or directors of Ampco.") (emphasis added), *aff'd in relevant part*, 903 F.3d 333 (3d Cir. 2018).   In other words, if the evidence suggests they were acting for **both** companies with aligned interests, this is ordinary course corporate behavior and their conduct is only attributable as a matter of law to Lion (Americas), not to Lion LLP.

Plaintiffs' evidence is consistent with Lion (Americas)' role as advisor to Lion LLP on Fund III's Bumble Bee investment.   In the Third Lion Order, the

1  Court took judicial notice of two SEC Form D filings by Fund III for the proposition
2  that the Lion Americas employees were "Executive Officers" of Lion LLP.  (*See*
3  ECF No. 2781, at 7 n.12.)  In the context of SEC Form D, "[e]xecutive officers of
4  subsidiaries may be deemed executive officers of the issuer if they perform such
5  policy making functions for the issuer."  (*See* Paris Decl. Ex. QQ, Guide to
6  Definitions of Terms Used in Form D (last mod. Sept. 12, 2008),
7  https://www.sec.gov/info/smallbus/formddefinitions.htm.) The alleged "dual agent"
8  status of individuals like Eric Lindberg only begs the question posed under
9  *Bestfoods*, it does not answer it.

10         The Court held in the Third Lion Order that Plaintiffs' allegations were
11  sufficient to survive a motion to dismiss because Eric Lindberg referred to himself
12  in a single email as representing the "owner" of Bumble Bee, which the Court
13  deemed plausible to suggest "Lindberg's ostensible capacity was that of an agent of
14  Lion Capital." (ECF No. 2781, at 19.)  The Third Lion Order relied upon the Court's
15  previous determination—when the Court rejected Plaintiffs' "alter ego" claim—that
16  Lion LLP and Lion (Americas) were "equitable owners" of Bumble Bee, such that
17  it would be fair to proceed with the alter ego analysis even though neither Lion LLP
18  nor Lion (Americas) is a parent corporation of Bumble Bee.  (*See id.* at 8 (citing
19  ECF No. 1362, at 33).)  This does not establish whether Mr. Lindberg was acting on
20  behalf of Lion LLP or Lion (Americas) because the Court's equitable ownership
21  determination applied equally to both Lion LLP and Lion (Americas).  (*See* ECF No.
22  1362, at 33 ("Lion Americas believed that they, *i.e.*, the Lion entities, 'owned'
23  Bumble Bee in some respect.").)  The Court then rejected Plaintiffs' alter ego theory
24  in the First Lion Order.  (*See id.*, at 70 ("The Court finds no alter ego liability
25  between Bumble Bee and any Lion entity.").)

26         At the summary judgment stage, Mr. Lindberg's colloquial use of the
27  word "owner" does not overcome the *Bestfoods* presumption, because the
28  undisputed evidence shows that neither Lion LLP nor Lion (Americas) was ever an

"owner" of Bumble Bee. (Tester Decl. ¶¶ 8, 18.) The underlying email was sent in furtherance of the due diligence work being conducted by Lion (Americas)—the investment management subsidiary tasked with vetting Fund III's potential investment in Bumble Bee. (Lindberg Decl. ¶¶ 8, 10–13; Tester Decl. ¶¶ 14, 20.) Where there is no evidence of some different, divergent interest between Lion (Americas) and Lion LLP, Mr. Lindberg's conduct may not be imputed to Lion LLP as a matter of law.

### C.   Plaintiffs' "Coordinated Activity" Theory of Participation Against Lion LLP Fails as a Matter of Law

Relying on Plaintiffs' allegations that Lion LLP "used Lion Americas to assist in managing Bumble Bee," the Third Lion Order held that Plaintiffs "sufficiently alleged that Lion Capital and Lion Americas engaged in coordinated activity as a single enterprise," and deemed Lion LLP to share with Lion (Americas) "the objective of maintaining supra-competitive profits." (ECF No. 2781, at 19.) The Court concluded that "allegations of Lion Capital's knowledge and the coordinated activity with Lion Americas in furtherance of the conspiracy are sufficient under *Arandell* to raise a reasonable inference of Lion Capital's own participation in the conspiracy," and described Plaintiffs' allegations of "Lion Capital's own acts in furtherance of the conspiracy" as an "[a]lternative[]" basis of liability. (*Id.*)

On summary judgment, Plaintiffs' claims fail as a matter of law for two separate reasons. *First*, in *Arandell*, the Ninth Circuit made it clear that "knowledge" and "coordinated activity" are not sufficient on their own to establish liability, even where a parent and subsidiary are deemed to be part of the same "economic unit," because a defendant may only be held liable "**for its own acts** in purposeful and knowing furtherance of the alleged inter-enterprise price-fixing conspiracy, if proven." 900 F.3d at 634 (emphasis added); *see id.* at 633 ("As with any antitrust defendant, Plaintiffs must put forth evidence that CES engaged in anticompetitive conduct."). Specific action by Lion LLP to further the conspiracy is still required.

*Second*, Lion LLP's decision to delegate the task of monitoring the Bumble Bee investment to Lion (Americas) is not the type of "coordinated activity" required to sustain a direct participation claim against Lion LLP because this delegation **detached** Lion LLP from the tuna pricing decisions that gave rise to this litigation.  Stretching *Arandell* (and the Supreme Court's decision in *Copperweld*, upon which *Arandell* is based) beyond their reasonable limits to cover any coordinated activity between a parent and subsidiary, regardless of whether that coordinated activity had anything to do with the alleged anticompetitive conduct that gave rise to Plaintiffs' injuries, would undermine settled doctrines of corporate separateness and chill private equity investing. *Cf. Copperweld Corp.* v. *Independence Tube Corp.,* 467 U.S. 752, 771 (1984) ("[A] rule that punished coordinated conduct simply because a corporation delegated certain responsibilities to autonomous units might well discourage corporations from creating divisions with their presumed benefits. This would serve no useful antitrust purpose but could well deprive consumers of the efficiencies that decentralized management may bring.").

### D.    Plaintiffs' Remaining Vicarious Liability Theories Against Lion LLP Fail as a Matter of Law

Despite Plaintiffs' purposeful refusal to distinguish between Lion (Americas) and Lion LLP in their complaints—making it impossible to ascertain which allegations apply to Lion LLP, and which to Lion (Americas)—the two companies are separate corporate entities with wholly different functions.  Lion LLP is a United Kingdom limited liability partnership that raises money from outside investors to create and manage private equity Funds.  (Tester Decl. ¶¶ 5, 7.)  Lion (Americas), on the other hand, is a Delaware corporation that serves a specific, distinct purpose: providing investment advice to Lion LLP regarding investments in North America, such as Bumble Bee.  (Brown Decl. ¶¶ 26, 29.)

Because Lion LLP and Lion (Americas) are distinct companies with different roles, Lion LLP may not be held liable for Lion (Americas)' activities on any vicarious liability theory: "It is a general principle of corporate law deeply

1    'ingrained in our economic and legal systems' that a parent corporation (so-called

2    because of control through ownership of another corporation's stock) is not liable

3    for the acts of its subsidiaries." *U.S.* v. *Bestfoods*, 524 U.S. 51, 61 (1998) (citation

4    omitted).  Plaintiffs would have to show Lion LLP exercises a degree of control over

5    Lion (Americas) that does not exist, and for which there is no evidence—that Lion

6    (Americas) is a "mere agency or instrumentality" of Lion LLP.  *Id.* at 63.

7                    1.    Lion LLP and Lion (Americas) Are Separate Companies

8                    Plaintiffs cite Lion LLP's and Lion (Americas)' common interest in

9    successfully managing the Fund III investments as evidence that they are a "single

10   economic unit," with "complete unity to [sic] interests and common design."  (*E.g.*,

11   Kroger Compl. ¶ 196.)  To impose vicarious liability under this theory requires

12   Plaintiffs to prove that there is "such unity of interest and ownership that the separate

13   personalities [of the two entities] no longer exist."  *Doe* v. *Unocal Corp.*, 248 F.3d

14   915, 926 (9th Cir. 2001), *abrogated on unrelated grounds by Williams* v. *Yamaha

15   Motor Co.*, 851 F.3d 1015, 1021 (9th Cir. 2017).

16                   Plaintiffs cannot meet this burden, and fail to demonstrate that Lion

17   LLP and Lion (Americas) lack separate corporate personalities.  The record is replete

18   with documents that delineate the functions of the two companies' employees and

19   the adherence of employees of Lion LLP and Lion (Americas) to these policies.

20   (*See, e.g.*, Paris Decl. Ex. RR.)  For example, Lion (Americas) is required to file a

21   Form ADV with the SEC explaining its investment strategy.  15 U.S.C. §§ 80b-3,

22   80b-4.  This form explains that "Lion Capital LLP's executives formulate the high

23   level plan that will be implemented [(by Lion (Americas))] post-acquisition either

24   in partnership with the existing management team, or with a new team put in place

25   by Lion Capital LLP."  (Paris Decl. Ex. J, 2012 Form ADV.)

26                   Deposition testimony from Lion (Americas) employees confirms that

27   their due diligence reviews of potential portfolio companies served to facilitate Lion

28   LLP's investment decision-making (*see, e.g.*, Paris Decl. Ex. UU, Capps Dep. Tr.

88:16–89:6, 150:15–151:19; *id.* Ex. VV, Chang Dep. Tr. 43:1–5; *id.* Ex. K, Lindberg Dep. Tr. 26:11–27:4), and testimony from Mr. Lea establishes that he (on behalf of Lion LLP) was serving a separate role from those Lion (Americas) employees in connection with Fund III's Bumble Bee investment (*see* Paris Decl. Ex. WW, Lea Dep. Tr. 191:12–192:8, 322:21–323:18).

That some Lion (Americas) employees were members of Lion LLP—a common and unremarkable circumstance in private equity investing—does not change the fact that the two companies are separate. *See In re Dynamic Random Access Memory Antitrust Litig.*, 2007 WL 9752971, at *4 (N.D. Cal. Feb. 20, 2007); *see also Bestfoods*, 524 U.S. at 69 (it is a "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership").

### 2. Lion LLP Does Not Exert Day-to-Day Control Over Lion (Americas)

Plaintiffs allege that Lion (Americas) "acted as the agent of Lion Capital" (*E.g.*, Kroger Compl. ¶ 195), but have only ever defended this theory by citing the invalid "representative services" doctrine. The Court rejected this theory in the Second Lion Order (*see* ECF No. 2270 at 17–18), and that ruling stands even after the Third Lion Order because Plaintiffs abandoned this theory during their Motion for Reconsideration briefing.

Regardless, Plaintiffs cannot show that Lion LLP exerts the extreme level of control necessary to render it vicariously liable for Lion (Americas)' alleged acts. To impute conduct to Lion LLP, Plaintiffs must offer evidence of "facts that demonstrate 'parental control of the subsidiary's internal affairs or daily operations.'" *In re Dynamic Random Access Memory Antitrust Litig.*, 2007 WL 9752971 at *4 (citing *Unocal Corp.*, 248 F.3d at 927). Such control "that gives rise to agency is comprehensive, immediate, and day-to-day, while control that is supervisory and even prescriptive may not indicate agency." *ING Bank* v. *Ahn*, 758

1   F. Supp. 2d 936, 941–42 (N.D. Cal. 2010).  Plaintiffs cannot meet this standard

2   because the record shows a clear pattern of Mr. Lea delegating to Lion (Americas)

3   personnel, remaining informed of major developments rather than day-to-day

4   details.  (*See* Paris Decl. Ex. WW, Lea Dep. Tr. 191:12–192:8, 322:21–323:18.)

## III.   BIG CATCH CANNOT BE HELD LIABLE AS THE "ALTER EGO" OF LION LLP

Plaintiffs claim that, "Big Catch participated in the conspiracy as the alter ego of Lion Capital."  (*E.g.*, Kroger Compl. ¶ 206; DPP Compl. ¶ 55; EPP Compl. ¶ 100; CFP Compl. ¶ 52.)  *First*, even if Big Catch were the "alter ego" of Lion LLP, summary judgment would be appropriate as to Big Catch for all of the reasons discussed above as to Lion LLP.  *Second*, Plaintiffs have not offered any evidence that Big Catch is the "alter ego" of Lion LLP.  The undisputed evidence in the record shows that Lion LLP has <u>no</u> ownership interest in Big Catch.  (Tester Decl. ¶¶ 8, 11.)  Plaintiffs have no evidence to support the contention that Lion LLP exercises "pervasive control" over "routine matters of day-to-day operation" for Big Catch, such that their separate personalities no longer exist.  *Ranza* v. *Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015).  *Finally*, Plaintiffs cannot prove that respecting the corporate form as to Big Catch leads to an inequitable result.  Big Catch has no meaningful assets—it was formed to hold Fund III's equity interest in Bumble Bee, which is now worthless due to Bumble Bee's bankruptcy.  (Tester Decl. ¶ 26.)

## <u>CONCLUSION</u>

For all the foregoing reasons, the Lion Companies respectfully request that the Court grant their Motion for Summary Judgment.

Dated:  March 24, 2023

Respectfully submitted,

Of Counsel:

/s/  Adam S. Paris

Brian D. Glueckstein
gluecksteinb@sullcrom.com
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, New York  10004

Adam S. Paris (SBN 190693)
parisa@sullcrom.com
Zachary A. Sarnoff (SBN 307762)
sarnoffz@sullcrom.com
Brandon T. Wallace (SBN 323471)
wallaceb@sullcrom.com
**SULLIVAN & CROMWELL LLP**
1888 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 712-6600
Facsimile:   (310) 712-8800

*Attorneys for Defendant Lion Capital
(Americas), Inc. and Specially
Appearing Defendants Lion Capital
LLP and Big Catch Cayman LP*

## CERTIFICATE OF SERVICE

I certify that on March 24, 2023 I filed the foregoing document with the Clerk of the Court for the United States District Court, Southern District of California, by using the Court's CM/ECF system.

/s/  Adam S. Paris
Adam S. Paris