Adam S. Paris (SBN 190693)
parisa@sullcrom.com
Zachary A. Sarnoff (SBN 307762)
sarnoffz@sullcrom.com
Brandon T. Wallace (SBN 323471)
wallaceb@sullcrom.com
**SULLIVAN & CROMWELL LLP**
1888 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 712-6600
Facsimile:   (310) 712-8800

*Attorneys for Defendant Lion Capital (Americas), Inc. and Specially Appearing Defendants Lion Capital LLP and Big Catch Cayman LP*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 3:15-md-2670-DMS-MDD<br><br>MDL No. 2670<br><br>**DECLARATION OF ILYA A. STREBULAEV IN SUPPORT OF LION CAPITAL (AMERICAS), INC., LION CAPITAL LLP AND BIG CATCH CAYMAN LP'S RENEWED MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:   Hon. Dana M. Sabraw<br>Courtroom:   13A |

I, Ilya A. Strebulaev, declare under penalty of perjury under the laws of the United States of America, as follows:

1. My name is Ilya A. Strebulaev and I am the David S. Lobel Professor of Private Equity and Professor of Finance at the Graduate School of Business, Stanford University, where I have been a faculty member since 2004. I am also a

Research Associate at the National Bureau of Economic Research, and I serve as the faculty director of the Stanford GSB Venture Capital Initiative. I graduated from the London Business School with a doctorate in Finance, and I also hold degrees from Lomonosov Moscow State University (B.Sc. Economics) and the New Economic School, Moscow (M.A. Economics).

2.  By virtue of my research activities, I am an expert in venture capital and private equity, innovation, investment and financial decision-making, strategic financial decisions, corporate finance, and valuation. My research work has been widely published in leading academic journals, including the Journal of Finance and the Journal of Financial Economics, and it has won a number of prestigious academic awards, including the First Paper Prize of the Brattle Award for the best corporate paper published in the Journal of Finance, the Fama-DFA Prize for the best asset pricing paper published in the Journal of Financial Economics, and the Trefftzs Award by the Western Finance Association. My research has also been featured in a variety of public media, including The New York Times and The Wall Street Journal.

3.  In addition to my research activities in private equity and venture capital investments, I have taught graduate level courses on corporate finance and venture capital at Stanford GSB for 18 years. I have received several awards for my teaching, including the Stanford MBA Distinguished Teaching Award, the Sloan Teaching Excellence Award, as well as the inaugural Masters in Management Best Teacher Award at the London Business School. I have also conducted multiple workshops and executive sessions on new innovation trends, venture capital, the ecosystem of Silicon Valley, corporate innovation, and strategic decision making for senior business and government leaders around the world. I am also engaged in consulting domestic and international companies and investors on valuation of venture capital-backed companies, selection of venture

capital and private equity investments and fund managers, and portfolio allocation. I also serve as an expert witness in litigation matters.

4.  By virtue of my academic research, teaching, and involvement with the private equity industry, I am well familiar with all aspects of investment process by private equity funds, including pre-acquisition due diligence practices, degree of pre- and post-acquisition strategic and operational control by the acquirers over target companies, and financing structures and debt leverage commonly employed by private equity funds. A true and correct copy of my current curriculum vitae is attached as Appendix 1 to my Declaration.

5.  I previously submitted a declaration in support of Lion Capital (Americas), Inc., Lion Capital LLP and Big Catch Cayman LP's Motion for Summary Judgment filed on September 19, 2019. This declaration serves to update that prior declaration, including to reflect the updated expert reports I submitted on December 9, 2022 and January 6, 2023.

**Background**

6.  From my review of the record evidence in this matter, I understand that this case concerns an alleged conspiracy by three American seafood companies, StarKist Company ("StarKist"), Bumble Bee Foods, LLC ("Bumble Bee") and Tri-Union Seafoods, LLC ("Chicken of the Sea" or "COSI"), to fix the prices of shelf-stable packaged tuna sold in the United States. Plaintiffs seek to assert claims against Lion Capital LLP ("Lion Capital"), a private equity firm based in the United Kingdom that manages private equity funds (the "Funds") which invest capital committed by outside investors; Lion Capital (Americas), Inc. ("Lion (Americas)"), a subsidiary of Lion Capital that provides investment advice to Lion Capital in respect to investments in North America by the Funds; and Big Catch Cayman LP ("Big Catch"), a holding company based in the Cayman islands that is the ultimate holder of Bumble Bee's equity.

7. The Bumble Bee leveraged buyout from the private equity firm Centre Partners Management LLC on December 15, 2010 (the "Bumble Bee LBO") was the second investment of Lion Capital Fund III ("Fund III"), following its purchase of the French frozen-food firm Picard Surgeles earlier in 2010. (Paris Decl. Ex. L.) Fund III acquired Bumble Bee, valued at $980 million, in conjunction with members of Bumble Bee's senior management team, as well as one of the major Bumble Bee suppliers and then-current co-owners, FCF Fishery Company, Ltd. ("FCF"). Lion (Americas) conducted the pre-acquisition due diligence review, evaluation of available financing options, and assessment of purchase price and potential investment returns for the private-to-private leveraged buyout of Bumble Bee. Lion (Americas) had a sub-advisory arrangement with Lion Capital and provided non-discretionary investment advice to Lion Capital in respect of investments in North America that the latter considered making on behalf of the investment funds.

8. Using a sub-advisor to investment funds' general partner to evaluate and monitor portfolio companies is typical in the private equity industry. The Bumble Bee investment was one of several investments with respect to which Lion (Americas) sub-advised Lion Capital, and as of the end of 2011, it sub-advised approximately $290 million of assets on a non-discretionary basis. (Paris Decl. Ex. J.) For its advisory services, Lion (Americas) was authorized to charge a fee to Lion Capital equal to its expenses plus a specified percentage. (*Id.*)

9. I was retained by Sullivan & Cromwell LLP on behalf of Lion Capital, Lion (Americas), and Big Catch to review certain aspects of the private equity investment in Bumble Bee. Specifically, I was asked to provide an expert opinion on whether the investment in Bumble Bee by Fund III, the pre-investment due diligence performed by Lion (Americas), the degree of control exercised by Lion Capital and Lion (Americas) over Bumble Bee in managing the investment, and the extent of debt leverage assumed as part of the Bumble Bee LBO, each

were typical from the perspective of Lion Capital and Lion (Americas)' overall investment strategies, the Funds' portfolio investments, and the private equity industry in general. As a part of my assignment, I was asked to review and respond to opinions offered by certain Plaintiffs' experts who claimed that this investment was somehow unusual or atypical.

10. On December 9, 2022, I submitted an updated written expert report in this matter that includes a detailed review of the case-specific evidence and academic literature findings I used as the basis for my conclusions. This Declaration provides a summary of my expert opinions in support of Lion (Americas), Lion Capital and Big Catch's omnibus motion for summary judgment, filed herewith.

11. All the opinions and conclusions stated in this Declaration are my own. Neither my compensation, nor any compensation for staff assisting me at FTI Consulting, is contingent upon my opinions, testimony or the outcome of this matter.

**The Bumble Bee LBO Was Consistent with Lion Capital's Investment Strategy.**

12. The Funds have invested in consumer industry companies with well-established brand names ever since Lion Capital was formed in 2004. Fund I invested in such brands as Weetabix, Materne, Jimmy Choo, Wagamama, Orangina Schweppes, La Senza, Personna, Kettle Foods, and Russian Alcohol Group. Fund II investments included such consumer brands as Vaasan, HEMA, Nidan, AS Adventure Group, Aryzta, Ad Van Geloven, Findus Group, American Apparel, and Picard. While the Bumble Bee investment, with the acquisition price of $980 million, was one of the largest within Fund III, it was not the only portfolio investment in this Fund, which ultimately also included such consumer names as John Varvatos, Spence Diamonds, Alex and Ani, Picard, AllSaints, Alain Afflelou, ghd, Perricone MD, Pittarosso, Buscemi, and Authentic Brands Group.

Fund III's diversified portfolio was sourced over multiple years across a wide spectrum of consumer industry segments, and focused on well recognized brands with strong consumer bases. The proportional weight of the Bumble Bee investment in the Funds' portfolio is consistent with empirical evidence which shows that companies with enterprise value between $500 million and $1 billion take up approximately 10% of portfolio investments for a mid-size private equity fund such as Fund III. (Paris Decl. Ex. YY, Paul Gompers, Steven N. Kaplan and Vladamir Mukharlyamov, (2016), "What do private equity firms say they do?," Journal of Financial Economics, 121 (3), 449–476, Table 2.)

13. In its Form ADVs descriptions, Lion (Americas) discloses that it pursues strong brand portfolio investments that are diversified, feature comparatively low volatility, and provide a sustainable competitive advantage. The Bumble Bee investment fits well within this investment thesis. For example, conclusions contained in a series of late 2010 memos that I reviewed that were prepared by Lion (Americas) employees, and reviewed by Lion Capital's Investment Committee in consideration of the Bumble Bee investment, indicated that, "[t]he Bumble Bee brand does appear to have some real equity, with a loyal consumer that buys based on perceived brand differences and historical resonance with the brand." (Paris Decl. Ex. I at 2.) The memos stated that core brands (Bumble Bee and Clover Leaf) of the acquisition target were "iconic in US and Canada, respectively, with long heritages and resonance with consumers." Bumble Bee enjoyed a 67% unprompted brand awareness which was the best among three canned tuna brands, and Bumble Bee Foods was the "#1 player in shelf-stable seafood in North America; [with] leading market share across all product categories in Canada and in higher margin product categories in the US (albacore, sockeye salmon, sardines, clams and specialty seafood)." (*Id.* at 4.)

14. The Bumble Bee investment fits well within other dimensions of Lion Capital's stated investment approach. Lion Capital seeks to complement brand

strength with ability to formulate business strategy and streamline operations of its portfolio companies. In its Form ADV investment strategy description, Lion (Americas) emphasizes that its "investments are predicated on significant strategic or operational change in each portfolio company. During the due diligence process, Lion Capital LLP's executives formulate the high level plan that will be implemented post-acquisition either in partnership with the existing management team, or with a new team put in place by Lion Capital LLP." (Paris Decl. Ex. J at 4.)

15. The Fund III acquisition of Bumble Bee is consistent with this investment philosophy. For example, my review of Investment Committee memos indicates that Lion (Americas) identified the problem of underinvestment into marketing by Bumble Bee over the preceding more than ten years, without sufficient support for new product launches. To address this business strategy challenge, it recommended "tactical marketing support over an extended period of time to reposition brand could generate incremental top-line volume growth." (Paris Decl. Ex. I at 5.) Based on its review of Bumble Bee existing product lines and the market, Lion (Americas) contemplated "potential to extend brand into frozen category" with significant marketing support.

16. In its portfolio investments, Lion Capital is focused on equity value creation through its developed expertise in the consumer sector and its ability to use financial leverage to enhance returns on capital and improve operational efficiency. As stated in Lion (Americas) Form ADV investment strategy description which I reviewed, " . . . through a record of understanding consumer businesses and effecting lasting operational and strategic change, Lion Capital LLP has built a reputation as a constructive and valuable equity partner in transactions, bringing significant operational and strategic insight as well as the financial expertise to effectively manage leveraged capital structures." (Paris Decl. Ex. J at 3.) In this respect, the debt-financed acquisition of Bumble Bee by Fund III was no

different from other private equity firms' investments: according to the available academic research, a majority of such firms employ debt leverage mechanisms.

17. This value creation-driven investment paradigm is also apparent from the series of pre-acquisition memoranda prepared by Lion (Americas) in late 2010 in consideration of the purchase of Bumble Bee. For example, the memo prepared for the Lion Capital Investment Committee, circulated September 26, 2010, focused on achieving a 1.1% and 3.0% CAGR in Bumble Bee revenues and EBITDA, respectively, over the 2010-2015 time period, and taking the adjusted expected EBITDA from $130 million in 2010 to over $150 million five years later. (Paris Decl. Ex. I at 2, 50.) Based on its marketing and consumer research, Lion (Americas) considered introducing new types of products by Bumble Bee, for example, frozen seafood meals, to capitalize on brand recognition and to increase consumer base penetration. (Paris Decl. Ex. E at 5.)

18. Based on my review of the record evidence and on my experience, my own research and knowledge of other substantial empirical research in the field of private equity investments, it is my opinion that the Bumble Bee investment by Fund III is very typical of a private equity investment in terms of the focus on equity value creation, use of financial leverage and a desire by the private equity sponsor to effect strategic and operational changes at the target portfolio company.

**Lion (Americas)' Due Diligence Was Typical.**

19. To the extent that private equity pre-acquisition due diligence is dictated by the need of potential investors to identify and confirm available sources of equity value creation at the target portfolio companies, due diligence review by itself will never provide complete transparency with respect to the target business, or identify all potential issues. That is not what the process is designed to accomplish. Large information asymmetries exist even in case of public mergers and acquisitions, and such asymmetries are amplified for leveraged private-to-private buyouts (such as the Bumble Bee LBO, sold from Centre Partners to Fund

III) due to the lack of public information about the target company. This is especially true for so-called "soft" information, which is information that cannot be learned or verified by analyzing company accounting, financial or business records. In addition, due diligence efforts are costly, and there is empirical evidence that there are diminishing returns in the relationship between improved private equity investment performance and additional due diligence review which, from the point of view of a private equity firm, determines an optimal amount of due diligence effort to undertake.

20.    Lion (Americas) was tasked by Lion Capital to conduct the due diligence for the Bumble Bee LBO.  In keeping with common practices within the private equity industry, Lion (Americas)' employees communicated the results of the pre-acquisition due diligence analyses to the Lion Capital Investment Committee, whose members made the final investment decision based on this advice.

21.    From my review of the record, I conclude that Lion (Americas) performed general industry and business due diligence and research on Bumble Bee and its competitors that was typical for private equity funds. For example, Lion (Americas) investigated major product lines of the target company and major competitive advantages, as well as business risks stemming from those product lines. According to its memos and related materials, Lion (Americas) sought to identify the key strengths of Bumble Bee.  Lion (Americas) identified one "[s]trength of [the] Bumble Bee brand in albacore, as evidenced by Chicken of the Sea's aforementioned long-term inability to take share from Bumble Bee, despite pricing below Bumble Bee (and private label) since 2003." (Paris Decl. Ex. G at 5.) According to the memos, "Bumble Bee's albacore business appears to be better insulated from private label [competition] and the Company has grown its volume and share over the past 7 years.  Additionally, Bumble Bee's close relationship with FCF (its largest supplier and current co-investor in the business) appears to be

a real competitive advantage." (Paris Decl. Ex. E at LION_00040002.) Furthermore, Lion (Americas) due diligence established that, "[u]nlike its competitors, Bumble Bee is less weighted towards lightmeat tuna which is significantly more exposed to volatility in input costs." (*Id.* at LION_00040004.) Business due diligence searched for deficiencies in marketing strategies or product mix of the target company, establishing, in particular that, "[c]ustomer-intercept work suggests value-added/convenience products are not being properly merchandised or supported from a marketing perspective, nevertheless, these products have seen the most significant growth in Bumble Bee's portfolio (10% volume CAGR over last 5 years), suggesting strong potential for incremental growth with appropriate resources." (*Id.* at LION_00040006.)

22. The business/industry/competitor due diligence performed by the Lion (Americas) deal team on Bumble Bee follows from its stated value-creation objective. It is also very common from the perspective of typical private equity industry practices. Gompers *et. al.* surveyed 79 private equity investors with combined assets under management of over $750 billion about their target selection practices and found that, "[t]he most important factor in choosing an investment is the business model or competitive position of the company." (Paris Decl. Ex. YY, at 464.) According to the same academic researchers, growth in the value of the underlying business is mentioned as a return driver by 100% of the private equity investors and is the highest-ranked return driver. (*Id.* at Table 22.) Operational improvements were found to rank second and mentioned by 97% of PE investors surveyed. (*Id.*)

23. Lion (Americas)' deal team also reviewed Bumble Bee's accounting records and financial results by retaining an established large accounting firm to verify and check the accuracy of the existing audited financials of Bumble Bee. Again, this is a common due diligence practice in the private equity industry, especially for sizeable acquisitions.

24. As is common for large private equity funds and relatively large potential investments like Bumble Bee, Lion (Americas) involved several other specialized third parties to conduct due diligence of specific aspects of Bumble Bee's operations and business.

25. The record evidence reflects that the Lion (Americas) deal team met with Bumble Bee's senior management team in-person on at least two occasions; once in San Diego and again in New York. Lion (Americas) included details from its New York meeting in its October 12, 2010 pre-acquisition Memo to Investment Committee Re: Bumble Bee, stating that it "spent a half-day with the entire Bumble Bee senior management team in New York. Eric and Jake also had dinner with CEO Chris Lischewski and COO Doug Hines, which led to a very open and constructive dialogue on management rollover, views on the business and valuation." Conducting due diligence on the senior management of an acquisition target is another typical private equity industry-wide procedure.

26. Plaintiffs' expert Adoria Lim also conceded at her July 31, 2019 deposition that meetings with competitors do sometimes take place to discuss, for example, potential joint ventures. Joint ventures are not the only legitimate reasons for which a private equity firm might want to interact with its target's competitors. As I explained above, a private equity firm may want to get a sense of exit strategies and competitors are a natural source of buyers. Or else a private equity firm may wish to acquire one of the competitor firms in the future or to simply better understand industry trends.

27. Based on my review of the case materials produced in this matter, as well as transcripts of the depositions of the members of the Lion (Americas) investment team, and my knowledge of the private equity investment industry, it is my opinion that the type and scope of due diligence undertaken by Lion (Americas) prior to the Bumble Bee investment was very typical for the kind of private equity leveraged buyout at issue in this case.

**The Investment Valuation Methods Were Typical.**

28.     Based on my experience and my own empirical research, modeling and valuation methods employed by Lion (Americas) to establish fair value for the target company and investment attractiveness of Bumble Bee were typical of many other private equity investors. According to a comprehensive survey of private equity firms, these firms mostly rely on internal rates of return and multiples of invested capital. Furthermore, very few private equity investors explicitly use the capital asset pricing model (CAPM) to determine a cost of capital, and instead "typically target a 22% internal rate of return on their investments on average (with the vast majority of target rates of return between 20 and 25%)." (Paris Decl. Ex. YY at 450.) In keeping with this standard investment industry practice, the analysis of Bumble Bee is heavily based on assumed entry and exit EBITDA multiples, and Lion targeted 20.1% - 22.1% three- to five-year internal rates of return ("IRR") on the investment. Based on my review of the case documents and experience, the type of inputs to the financial modeling performed by Lion (Americas) in connection with the Bumble Bee acquisition appear typical and are commonly used within the private equity industry.

**The Post-Investment Debt Leverage Was Typical.**

29.     As is common for private equity leveraged investments in portfolio companies such as the Bumble Bee investment by Fund III, Lion (Americas) sought to refinance the existing debt of the target company and obtain additional debt funding to finance the acquisition. My review of the evidence suggests that the structure of such debt financing at the end of 2010 was dictated by the minimum 30% equity requirement imposed by the candidate financing banks. As the result of such requirement, all of the pre-acquisition valuation analyses for Bumble Bee were based on the assumption of a 30% equity investment.

30.     The Bumble Bee LBO was financed in December 2010 with $605 million of senior secured high yield debt notes maturing December 15, 2017, and

$110 million asset-backed long-term revolving credit facility (ABL) maturing December 15, 2015. Equity participation in the Bumble Bee LBO was comprised of $210.2 million investment by Fund III investors; a $26.3 million equity "rollover" by Bumble Bee's existing management; and a $70 million equity participation from FCF, the major Bumble Bee supplier and the then-current co-investor in Bumble Bee's business. This equity investment was initially recorded in the form of preferred equity certificates ("PECs") and convertible preferred equity certificates ("CPECs") issued by Bumble Bee Foods S.a.r.l. The economic substance of the transaction was to provide equity investment into the Bumble Bee business by Fund III and its co-investors.

31. To the extent that the initial post-investment equity share of 30 percent in a leveraged buyout was above the industry norms, Lion issued additional debt for Bumble Bee shortly after the acquisition to replace some of the equity and bring its share to 16-17 percent. Based on my experience and available empirical data from academic studies, the Bumble Bee resulting post-acquisition debt leverage was representative of private equity leveraged buyout industry norms.

32. After the issuance of this additional debt, Fund III's remaining equity investment in Bumble Bee was $108.7 million. (Paris Decl. Ex. XX, 2011 Lion Capital Fund III (USD) L.P. Report.) On account of Bumble Bee's bankruptcy, Fund III lost this entire remaining investment.

**Lion (Americas)' Management of the Bumble Bee Investment Was Typical of the Industry and of Lion (Americas)' Practices.**

33. As is typical for the board of directors of private equity portfolio companies, the Bumble Bee Board was closely involved in considering exit strategies, and such strategies were representative of private equity industry norms. Specifically, even during the Fund III investment evaluation stage in late 2010, Lion Capital considered a sale of Bumble Bee at the end of its investment horizon to one of its strategic competitors in the canned tuna market. In particular, Thai

Union Group/Chicken of the Sea was viewed as a logical acquirer of Bumble Bee after Fund III's ownership of the company since Thai Union/Chicken of the Sea had previously expressed interest in buying Bumble Bee. Such a transaction would have provided significant synergies. In the end, four years later, a Bumble Bee sale to Thai Union Group was announced in December 2014 but, as I understand the evidence, the Department of Justice raised objections in 2015 and this potential transaction was abandoned.

34.   Based on my experience and my review of the deposition testimony and other documents produced in this matter, it is also my opinion that Lion (Americas)' post-acquisition strategic and operational involvement in Bumble Bee was representative of prevailing general practice in the private equity industry. Furthermore, its post-acquisition involvement in the Bumble Bee business was not unusual when compared to Lion (Americas)' involvement in other portfolio companies, where it routinely placed individuals on company boards, discussed operations and conducted strategic reviews – all in keeping with its Funds' explicit objective to implement significant strategic and operational changes at the target portfolio companies.

**The Relationship Between Lion Capital and Lion (Americas) in Connection with the Bumble Bee Transaction was Consistent with Industry Practices**

35.   In 2010, Lion Capital had an Investment Committee composed of four members, including Mr. Lea.  (Paris Decl. Ex. WW, October 26, 2022 Lea Dep. Tr. 40:13-41:1.)  The Investment Committee was responsible for significant matters involving Lion Capital and its members acted as the principal investment decision-makers for Lion Capital.  (*Id.* at 42:5-8; 89:8-10.)  Beneath the Investment Committee was a U.S. team and a European team.  The U.S. team (*i.e.*, Lion (Americas)) vetted transactions based in the U.S., such as Bumble Bee.  (*Id.* at 89:11-15.)

36. It was the practice of Lion Capital to have an Investment Committee member loosely attached to the deal team to address high-level items that might arise during the life of an investment. (*Id.* at 90:1-7.) With respect to the Bumble Bee investment, Mr. Lea served this role. (*Id.* at 90:9-12.) Mr. Lea was responsible for reviewing recommendations from the Lion (Americas) team and bringing those recommendations to the Investment Committee. After the Bumble Bee investment was made, Mr. Lea was also appointed a board member of Bumble Bee. (*Id.* at 190:17-20.) But Mr. Lea's responsibilities were distinct from the responsibilities of the Lion (Americas) team, in part because his purview extended beyond the Bumble Bee transaction—he was responsible for the holistic monitoring of the Lion Funds, which included investments in various portfolio companies, and he played a similar fund-level role in other portfolio companies as the one he played in connection with the Bumble Bee transaction. (*Id.* at 89:5-90:7; 191:14-192:8; 232:19-233:7.)

37. As a result, Mr. Lea attended several Bumble Bee board meetings and periodically reviewed Bumble Bee board packages, but left it to the Lion (Americas) board members of Bumble Bee to engage in more detailed monitoring of Bumble Bee. (*Id.* at 191:14-192:18.) Mr. Lea stayed "loosely attached to the deal team through the life of the investment as a sort of release valve for big questions, issues, strategic, direction or things that may come up over the life of that investment." (*Id.* at 90:3-7.)

38. There was nothing unusual about this arrangement and the various roles Mr. Lea and other Lion Capital personnel played—it is common practice in the private equity industry.

1  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this Declaration on this 23rd day of March, 2023 in Atherton, California.

_____
Ilya A. Strebulaev