1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION

This Document Relates To:

*Affiliated Foods, Inc. v. Tri-Union Seafoods LLC, et al.*, Case No. 3:15-cv-02787

*Associated Wholesale Grocers, Inc. v. Bumble Bee Foods LLC, et al.*, Case No. 3:18-cv-01014

Case No.:  15-MD-2670 DMS (MDD)

**CLASS ACTION**

**ORDER GRANTING STARKIST CO., DEL MONTE CORPORATION, AND DONGWON INDUSTRIES CO., LTD.'S MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING ALL CLAIMS FOR PURCHASES MADE PRIOR TO MAY 30, 2011**

**(ECF No. 2023)**

Pending before the Court in this multidistrict litigation is a partial motion for summary judgment filed by Defendants StarKist Company ("StarKist"), Del Monte Corporation ("Del Monte"), and Dongwon Industries Co., Ltd. ("Dongwon," collectively with StarKist and Del Monte, the "Defendants") against certain of the Direct Action Plaintiffs ("DAPs").[1]  Specifically, Defendants filed a motion seeking summary judgment

_____

[1] When the motion was filed, the specific DAPs at issue here were Associated Wholesale Grocers, Inc. ("AWG"), Affiliated Foods Midwest Cooperative, Inc. ("AFMC"), Winn-

on all DAP claims based on purchases made before May 30, 2011.  (Defs.' Mem. of P. & A. in Supp. of Mot. for Partial Summ. J., ECF No. 2021.)  The DAPs filed an opposition to the motion, (Pls.' Opp'n to Defs.' Mot., ECF No. 2119), and Defendants filed a reply brief.  (Reply Mem. of P. & A. in Further Supp. of Defs.' Mot., ECF No. 2230.)  The motion was fully briefed in December 2019, and remained fully briefed when these cases were reassigned to the undersigned judge in August 2021.  Since reassignment, the landscape of these cases has further shifted and settled.  In response to those changes, this Court has ordered two rounds of supplemental briefing on this motion, the first on the issue of joint and several liability, and the second to address newly obtained testimony from Stephen Hodge, Kenneth Worsham, and Scott Cameron, all of whom had previously invoked their Fifth Amendment rights not to testify in this case.  The parties have now submitted all of their supplemental briefs, and the motion is ready for disposition.  Having thoroughly reviewed the parties' briefs, the evidence in support, the record on file, and the relevant legal authorities, the Court now grants Defendants' motion.[2]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

Dixie Stores, Inc., Bi-Lo Holdings, LLC, and W. Lee Flowers & Co., Inc.  Since that time, W. Lee Flowers, Winn-Dixie, and Bi-Lo have dismissed their claims against Defendants.  Therefore, the present order applies only to the claims of AWG and AFMC.

[2] The issue of joint and several liability was raised in Plaintiffs' opposition to Defendants' motion.  Accordingly, the Court will not resolve that issue here.  Instead, the Court will resolve that issue in a separate order.

# I.

# BACKGROUND[3]

Among the many instances of allegedly unlawful conduct in this case, only three are at issue in the present motion:  (1) Defendants' 2008 decision to downsize their tuna cans, (2) Defendants' June 2008 decision to increase the list prices of their tuna products, and (3) Defendants' November 2010 decision to increase the net prices of their tuna products.[4] Defendants argue these three decisions did not violate Section 1 of the Sherman Act, and Defendants are therefore entitled to summary judgment on all claims arising out of purchases made prior to May 30, 2011.[5]

## A.   The Can Downsize

It is undisputed that Del Monte began a project to downsize its tuna cans by at least April 5, 2007.  (*See* Decl. of Belinda S. Lee in Supp. of Mot. ("Lee Decl."), Ex. 141, ECF

---

[3] Throughout their briefs, Defendants make a point to remind the Court that they are separate corporate entities and each Defendant's involvement in the conduct at issue in this motion varies considerably.  Defendants also point out that StarKist was the only corporate entity to plead guilty in the related criminal case, and that guilty plea has no bearing on the other Defendants.  The Court is aware that each of the Defendants is a separate corporate entity, (*see* March 1, 2022 Order Granting in Part and Denying in Part Del Monte Corporation's Motion for Partial Summary Judgment, ECF No. 2771), and that their respective involvement in the conduct at issue in this motion may vary.  Given the discussion that follows, the Court finds it unnecessary to address these specific arguments, and for the sake of ease and efficiency in this Order, sometimes refers to Defendants collectively rather than parsing them out.

[4] In their motion, Defendants also addressed a November 2008 price increase.  However, the DAPs do not appear to be basing any claims on that event.  Therefore, the Court will not address that event further.

[5] In the course of reviewing the record, the Court questioned whether May 30, 2011, was the appropriate cut-off date for this motion.  The parties addressed this issue during conferences and hearings with the Court, and in their supplemental briefs.  Having heard those arguments and having reviewed the evidence, the Court agrees that May 30, 2011, is the relevant date.  (*See* Decl. of Sang Hyun Lee in Supp. of Reply in Supp. of Supp. Br., ECF No. 3029-1) (explaining that evidence does not reflect any purchases by AWG or AFMC between May 23 and May 30, 2011).

No. 2021-9.)  On that date, Rodolfo Spielmann, the Vice President of Marketing of Del Monte's tuna business, sent an internal email to StarKist's Board attaching a Project Establishment Document ("PED") exploring the idea of converting all StarKist six ounce cans to five ounce cans.  (*Id.*)  In that email, Mr. Spielmann notes the continued increase of "every input cost we can think of[,]" and "an environment of rising costs[.]"  (*Id.*)  In the PED, Mr. Spielmann included a section entitled "Project qualification," which states, "A 'Discovery Driver Planning' approach will be used to confirm the following assumptions[,]" one of which is that "Competition will follow the can size conversion." (*Id.*)

That April email and the PED were followed by another email from Mr. Spielmann dated October 12, 2007.  (Lee Decl., Ex. 115, ECF No. 2021-7.)  In that email, Mr. Spielmann requests names of persons to serve on an Advisory Committee to assist with the downsizing effort.  (*Id.*)  It appears that Committee met on November 1, 2007, after which Mr. Spielmann sent out another email summarizing the "key agreements and next steps" for the project.  (Lee Decl., Ex. 140, ECF No. 2021-8.)

On November 6, 2007, the day after Mr. Spielmann's preceding email, there was a meeting between officials from Del Monte and Impress, Del Monte's can manufacturer. (Lee Decl., Ex. 10, ECF No. 2021-3.)  The minutes of that meeting reflect a project for downsizing Defendants' cans from six ounces to five ounces, with a "targeted production start of the downsize" in "July, 08."  (*Id.*)  The minutes also state, "This is a very large and complex initiative, and has the complete support of senior management at Del Monte." (*Id.*)

By late November/early December of 2007, Defendants Bumble Bee Foods, LLC ("Bumble Bee") and Tri-Union Seafoods LLC d/b/a Chicken of the Sea International ("COSI") had caught wind of Del Monte's downsizing project.  (*See* Decl. of Curtis Shank in Supp. of Opp'n to Mot. ("Shank Decl."), Ex. 32, ECF No. 2119-27; Lee Decl., Ex. 28, ECF No. 2021-3 (Affidavit of John DeBeer); Ex. 65, ECF No. 2021-6 (Affidavit of Barry Mills)).  At Bumble Bee, Ken Worsham, Senior Vice President of Trade Marketing, sent

4

an email to other Bumble Bee Executives on November 28, 2007, informing them of Del Monte's downsizing project, and asking one of them, Morrie Callaghan, Senior Vice President at Bumble Bee, to "check with your sources to see what you can learn?" (Shank Decl., Ex. 29, ECF No. 2119-24.)   Mr. Callaghan responded, "Doug, any word from Impress.   They would know." (*Id.*)   Christopher Lischewski, Bumble Bee's Chief Executive Officer, then asked, "If they do downsize, how do you guys want to react?   Stay at 6oz. or downsize with them?" (*Id.*)   Doug Hines, Bumble Bee's Chief Operating Officer, "[c]onfirmed" Del Monte's downsizing project in a subsequent email.   (*Id.*)   Mr. Lischewski then wrote, "If [StarKist] is going to downsize to 5oz – 142 grams – we need to decide if we follow or not (both U.S. and Canada)." (*Id.*)

Three days after that email exchange inside Bumble Bee, John DeBeer, COSI's Vice-President Operations – American Samoa, ran into Barry Mills, Vice President of StarKist Operations, while the two were in American Samoa,[6] and they discussed Del Monte's downsizing plan.   (*See* Lee Decl., Ex. 28, ECF No. 2021-3 (Affidavit of John DeBeer); Ex. 65, ECF No. 2021-6 (Affidavit of Barry Mills)).   Later that day, Mr. DeBeer sent an email to other COSI personnel, including COSI's Chief Executive Officer Shue Wing Chan and Senior Vice President of Sales and Marketing John Sawyer regarding his conversation with Mr. Mills.   (Shank Decl., Ex. 33, ECF No. 2119-28.)   In that email, Mr. DeBeer stated, "The soonest they would make the switch would be by May 1 – their new fiscal year, and the latest might be June 1.   They are planning for a partial April shutdown to fix the cannery, can runs, seamers, etc." (*Id.*)   Mr. DeBeer also stated, "He [Mr. Mills] was very willing to talk about this and hoped [ ] all 3 of the canners would switch." (*Id.*)

In a December 17, 2007 email to Mr. Chan, Mr. Sawyer and others, Mr. DeBeer stated, "According to our local Impress guy this will happen.   Reportedly Walmart is

/ / /

---

[6] Impress, Defendants' can manufacturer, also manufactured cans for COSI, and Impress's facility was in American Samoa.

claiming if one company changes everyone has to change." (Shank Decl., Ex. 38, ECF No. 2119-33.)

Over the next couple of months, Del Monte continued making preparations for the downsize, to include sending pallets of "test trays" to Samoa for a trial run of the downsize, (Lee Decl., Ex. 62, ECF No. 2021-6), and holding additional meetings of the Advisory Committee.  (Lee Decl., Ex. 115, ECF No. 2021-7.)   Following those meetings, on December 28, 2007, Mr. Spielmann sent out an email in which he stated, "[w]e will start production the first week of May and start shipments the first week of August (all cans and pouches at the same time!)" (*Id.*)  That email also reflects that Defendants were planning to present the downsize to their customers "in mid January."  (*Id.*)  The Advisory Committee met again on January 17, 2008, and confirmed the dates set out in the previous meeting minutes, specifically the May 2008 production date, the August 2008 shipment date, and the mid-January date for customer presentations.  (Lee Decl., Ex. 12, ECF No. 2021-3.)   Subsequent emails from Mr. Spielmann and Catherine Craig, Del Monte's Customer Marketing Manager, also indicated the customer presentations were well received.  (Lee Decl., Ex. 141, ECF No. 2021-9 (Spielmann email); Lee Decl., Exs. 91, 92, ECF No. 2021-7 (Craig emails).)

Del Monte also had additional meetings with Impress to discuss the downsizing project.  Minutes from the January 8, 2008 meeting state, "SKS is planning to shut down weeks of 4/13 and 20 for hard conversion."  (Lee Decl., Ex. 11, ECF No. 2021-3.)  Those meeting minutes also state, "Plan is to make samples on January."  (*Id.*)  Minutes from the February 12, 2008 meeting confirm the project is on track.  (Lee Decl., Ex. 13, ECF No. 2021-3) ("Based on regular update meetings, project is on track for changeover during April shutdown.")

During this same timeframe, Bumble Bee and COSI were continuing to investigate and discuss Del Monte's downsizing project inside their respective companies, amongst themselves, and with others.  For instance, in a December 10, 2007 internal Bumble Bee / / /

email, Mr. Lischewski confirmed Defendants' plans, and stated, "COSI is prepared to follow the downsize." (Shank Decl., Ex. 35, ECF No. 2119-30.)

Later that month, in another internal email from Bumble Bee's Scott Cameron to Mr. Lischewski and others at Bumble Bee, Mr. Cameron stated that, in discussions with people "in the trade and thru other sources[,]" no one had heard of Defendants' downsizing plan. (Shank Decl., Ex. 36, ECF No. 2119-31.)  Mr. Cameron wrote:  "Folks at mid-level management in the DM organization have not been privy to these discussions nor have they been told to bounce these proposed forthcoming revisions off customers to gauge feedback.  At this point – nothing appears to be happening at SKST relative to a downsize." (*Id.*)  In response, Mr. Lischewski said he would "try to make direct contact with Del Monte to glean their intentions in early January."  (*Id.*)

On January 4, 2008, Donald Gallagher of Bumble Bee sent an email to Mr. Cameron and David Burt informing them of an upcoming meeting for Del Monte's sales teams, and that one of the agenda items for that meeting was "downsizing."  (Shank Decl., Ex. 37, ECF No. 2119-32.)  In response to that email, Mr. Lischewski wrote:

> SK has already commenced all work on downsizing and is trying to be ready for their new FY starting in May.  Both BB and COS will follow although we don't expect to be ready until Q4[.]  Please keep this info confidential but please also tell me what else you hear[.]

(*Id.*)

Meanwhile, employees at COSI were also investigating Del Monte's downsizing project, specifically through their connections at Impress.  For example, on January 16, 2008, Marty Belleville of Impress sent an email to Jim Cox of COSI regarding Defendants. (Shank Decl., Ex. 88, ECF No. 2119-82.)  In that email, Mr. Belleville states, "StarKist gave us clear and exact direction that they wish to move to a 307X105.5 can."  (*Id.*)  Mr. Belleville also stated that Defendants asked him "if the 'other' guys are going to move to this size too.  We have let them know that neither of the 'other' guys want to do this and all of 'their' marketing guys are against this idea."  (*Id.*)

/ / /

In a subsequent email, Mr. Chan wrote to others at Tri-Union and COSI that he learned from Impress that Defendants were going ahead with the downsize. (Shank Decl., Ex. 40, ECF No. 2119-35.)  In another email, Mr. Chan stated,

> We don't want to make the switch to 5oz if we don't have to as we have so far received no positive feedbacks from the major retailers that we talked to. … Bumble Bee is not sure if they want to make the switch. … If Bee makes the switch, we will have no choice but to follow.

(*Id.*)  In that same email, Mr. Chan stated, "Our strategy is to hold off the switch as long as we could.  So far, we are planning the switch without make any major investment commitment.  We are working on label change, inventory planning and line modification planning." (*Id.*)

Impress was also in touch with Bumble Bee during this time.  In a January 24, 2008 email, Impress's James Willich sent an email to Bumble Bee's Vice President of Procurement Mel Progar asking whether Bumble Bee intended to continue with its six ounce cans as opposed to following Defendants' downsize. (Shank Decl., Ex. 39, ECF No. 2119-34.)  Mr. Progar responded:

> Forward the message to Star Kist as soon as possible.  We do not want to change, and we don't believe this is the right thing to do for our industry. There will be a lot of imported products still on shelf in 6oz or more, and we'll be shooting ourselves in the foot…or possibly in the head.  Seriously, neither Bumble Bee nor Chicken intend to make the change.

(*Id.*)

Approximately one month later, Mr. DeBeer sent an email to others at COSI, indicating that, based on information from Impress, Bumble Bee appeared to be reconsidering the downsize.  (Shank Decl., Ex. 41, ECF No. 2119-36.)  Mr. Sawyer responded by asking COSI's Kevin McClain to "call Doug [Hines] or Chris [Lischewski] [at Bumble Bee] and see what they say[.]"  (*Id.*)  Mr. Chan then followed up by asking Mr. McClain to set up a meeting between Mr. Chan, Mr. Sawyer, Mr. Hines, and Mr. Lischewski.  (Shank Decl., Ex. 42, ECF No. 2119-37.)  That meeting was held on March 13, 2008, at Milton's Restaurant in Del Mar, California.  (Shank Decl., Ex. 34, ECF No.

8

2119-29.)  During that meeting, COSI and Bumble Bee agreed they would downsize their tuna cans.  (*Id.*; Lee Decl., Ex. 1, ECF No. 2021-2.)

In discovery in this case, COSI admitted that it entered into this agreement with Bumble Bee.  (Shank Decl., Ex. 59, ECF No. 2119-55; Lee Decl., Ex. 1, ECF No. 2021-2.)  COSI did not identify Defendants as party to that agreement.  (*Id.*)  In his recent deposition, Ken Worsham of Bumble Bee testified that Defendants "led" the downsizing initiative, (Decl. of Steve Six in Supp. of Pls.' Supp. Opp'n to Mot. ("Six Decl."), Ex. 5 at 169, ECF No. 3014-4), and that Bumble Bee was not coordinating the timing of its downsize with its competitors.  (*Id.* at 175.)  Mr. Cameron, also formerly of Bumble Bee, similarly denied reaching any agreements about downsizing with anyone at Del Monte, (Six Decl., Ex. 2 at 301, ECF No. 3014-2), and had no knowledge of anyone else at Bumble Bee reaching an agreement with Del Monte on downsizing.  (*Id.*)

**B.   The 2008 Price Increase**

On June 13, 2008, Del Monte announced a list price increase, effective July 21, 2008.  (Lee Decl., Ex. 30, ECF No. 2021-3; Shank Decl., Ex. 62, ECF No. 2119-58.)

Prior to that announcement, Bumble Bee's Senior Vice President for Trade Marketing Dan Nestojko emailed his team, including Mr. Worsham and Mr. Cameron, stating he:

> picked up a rumor today that the Star*Kist business unit is having an all hands on deck sales meeting on Friday featuring LM List Price changes.  Any insight or hard copy you guys pick up would be huge as we're trying to hit the street with a new price list consistent with downsize by the end of next week.

(Shank Decl., Ex. 55, ECF No. 2119-51.)  After Del Monte's announcement, Mr. Cameron sent an email to the sales and marketing team at Bumble Bee with information about StarKist's price increase.  (Shank Decl., Ex. 61, ECF No. 2119-57.)  In that email, Mr. Cameron wrote, "We need to keep our ear close to the ground in an effort to stay ahead and on top of these shifts. … Competitive intel is a must as there is a lot happening…." (*Id.*)

/ / /

On June 13, 2008, the day of Del Monte's announcement, COSI's Joe Clancy sent an email to Mr. Sawyer stating, "I understand that StarKist had a conference call today to discuss the Light Meat price increase." (Shank Decl., Ex. 56, ECF No. 2119-52.)  Mr. Clancy then set out the "unconfirmed" details, and stated, "I'll let you know if/when I can get confirmation/hard copy of the announcement." (*Id.*)  After the announcement, Mr. Clancy sent out another email with more "unofficial" pricing information from StarKist. (Shank Decl., Ex. 58, ECF No. 2119-54.)  As in his previous email, Mr. Clancy stated, "I would recommend that we wait to confirm this information before we make any revisions to our plans." (*Id.*)

On June 27, 2008, eleven days after the latter Bumble Bee and COSI emails identified above, Bumble Bee announced an increase in its list prices, effective September 29, 2008.  (Shank Decl., Ex. 25, ECF No. 2119-20.)  Less than a week later, COSI announced an increase to its list prices, effective September 1, 2008. (Shank Decl., Ex. 64, ECF No. 2119-60.)

In discovery in this case, COSI admitted that in June 2008 it entered into an agreement with Bumble Bee to increase the list price of its packaged tuna products.  (Shank Decl., Ex. 59, ECF No. 2119-55; Lee Decl., Ex. 1, ECF No. 2021-2.)  COSI did not identify Defendants as party to that agreement.  (*Id.*)  Mr. Cameron similarly denied that he reached any agreements with anyone at Del Monte regarding list price increases in 2008, (Six Decl., Ex. 2 at 301, ECF No. 3014-2), and was unaware of anyone else at Bumble Bee reaching such an agreement with Del Monte.  (*Id.* at 302.)

## C.  The 2010 Price Increase

On April 12, 2010, StarKist released promotional guidance to its third-party brokers, which included a net price increase.  (Lee Decl., Ex. 47, ECF No. 2021-5.)  More than a month later, on May 14, 2010, COSI announced a net price increase for its tuna products. (Shank Decl., Ex. 70, ECF No. 2119-66.)  A week later, on May 21, 2010, Bumble Bee announced a net price increase for its tuna products.  (Shank Decl., Ex. 71, ECF No. 2119-67.)

In discovery in this case, COSI admitted that it reached an agreement with Bumble Bee on the timing of these net price increases. (Lee Decl., Ex. 1, ECF No. 2021-2.) COSI did not identify Defendants as party to that agreement. (*Id.*)

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses. Summary judgment or adjudication of issues is appropriate if depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The burden on the party moving for summary judgment depends on whether it bears the burden of proof at trial.

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000); *see also Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) ("Where the moving party will have the burden of proof at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.").

On the other hand, if the moving party would *not* bear the burden at trial, it can meet its burden on summary judgment by "either of two methods:"

> produce affirmative evidence . . . negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may . .

11

. meet its initial burden of production by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1105–06 (9th Cir. 2000) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

If the moving party carries its burden of production, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. In this regard, the nonmoving party

must do more than simply show that there is some metaphysical doubt as to the material facts[, and] must come forward with specific facts showing that there is a genuine dispute for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In ruling on a motion for summary judgment, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 651; *see also id.* at 657. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

These well-established principles of summary judgment apply to antitrust cases in which the non-movant comes forward with direct evidence to support its claim. *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). "'[D]irect evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *County of Tuolomne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001) (quoting *In re Citric*

*Acid Litig.*, 191 F.3d 1090, 1093-94 (9th Cir. 1999)).  *See also In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 441 (9th Cir. 1990) (quoting *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988)) (stating direct evidence is evidence "where, in order to defeat a request for summary judgment, the nonmovant need only ask that his evidence 'be taken as true.'")  Direct evidence, however, "will be rarely available" in antitrust cases.  *Petroleum Prods.*, 906 F.2d at 439; *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F.Supp.2d 1166, 1192 (N.D. Cal. 2009).

Instead, antitrust plaintiffs are more likely to rely on circumstantial evidence, which "is the lifeblood of antitrust law."  *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 n.13 (1973).  Circumstantial evidence is evidence "in which a party asks that certain 'inferences be drawn in his favor[.]'"  *Petroleum Prods.*, 906 F.2d at 441 (quoting *McLaughlin*, 849 F.2d at 1208).  In cases based on circumstantial evidence, courts must incorporate the framework set out in *Matsushita*.

In *Matsushita*, the Court "began by reaffirming hornbook law that courts are obligated to construe the evidence in the light most favorable to the non-moving party, to give the non-moving party the benefit of all reasonable inferences, and to refrain from making credibility determinations."  *Citric Acid*, 191 F.3d at 1094.  "The Court cautioned, however, that, although plaintiffs are to be given the benefit of the doubt, they 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Id.* (quoting *Matsushita*, 475 U.S. at 588).  This is because "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  *Matsushita*, 475 U.S. at 588 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  "The Court warned that permitting the inference of conspiratorial behavior from evidence consistent with both lawful and unlawful conduct would deter pro-competitive conduct—an especially pernicious danger in light of the fact that the very purpose of the antitrust laws is to promote competition."  *Id.*

/ / /

Based on *Matsushita*, the Ninth Circuit "has outlined a two-part test to be applied whenever a plaintiff rests its case entirely on circumstantial evidence. First, the defendant can 'rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice.'" *Citric Acid*, 191 F.3d at 1094 (quoting *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987)). If the defendant meets its burden, "[t]he burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *Citric Acid*, 191 F.3d at 1094.[7]

To satisfy the second prong of the *Citric Acid* test, plaintiffs often rely on certain "plus factors," which "can bolster the inference of conspiracy." *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1093 (9th Cir. 2015). These factors are "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action[,]" *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015), and may include: (1) "[i]nterfirm communications, particularly among high-level executives," *Stanislaus*, 803 F.3d at 1093, (2) "[m]arket conditions during a period of alleged collusion[,]" *id.* at 1092 n.5, (3) price signaling, *In re Dynamic Random Access Memory Indirect Purchaser Litig.*, ___ F.Supp.3d ___, No. 4:18-CV-2518-JSW-KAW, 2020 WL 8459279, at *6 (N.D. Cal. Nov. 24, 2020) (*DRAM I*), *aff'd by* 28 F.4th 42 (9th Cir. 2022) (*DRAM II*), (4) motive to

---

[7] The DAPs seem to acknowledge this is the test in the Ninth Circuit. (Opp'n at 28, ECF No. 2119.) However, they also use language suggesting that a plaintiff need only show that an inference of conspiracy is "reasonable" to defeat a motion for summary judgment. (*Id.* at 30.) In antitrust cases, as in other cases, courts "must draw all reasonable inferences supported by the evidence in favor of the non-moving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). But, a showing that an inference is reasonable, in and of itself, does not require denial of a motion for summary judgment. The non-moving party must still produce evidence to meet its substantive burden, which in this case, is showing that Defendants were not engaged in permissible competitive behavior. To the extent the DAPs argue "reasonableness" is the touchstone of their substantive burden here, the Court rejects that argument.

conspire, (5) action against self-interest, (6) government investigation, and (7) parallel pricing. *Persian Gulf Inc. v. BP West Coast Prods. LLC*, 324 F.Supp.3d 1142, 1148 (S.D. Cal. 2018). However, "a § 1 violation cannot be inferred from parallel pricing alone, or from an industry's follow-the-leader pricing strategy." *Home Depot, U.S.A., Inc. v. E.I. DuPont de Nemours & Co.*, No. 16cv04865-BLF, 2019 WL 3804667, at *4 (N.D. Cal. Aug. 13, 2019 (citing *Citric Acid*, 191 F.3d at 1102). "The plus factors are examined individually and cumulatively to determine whether they provide sufficient context to infer that the defendants' behavior likely would not occur as independent responses to common market stimuli." *Persian Gulf*, 324 F.Supp.3d at 1148. *See also DRAM II*, 28 F.4th at 52 (stating plus factors "must be evaluated holistically to determine whether they state a conspiracy claim.")

In determining whether a plaintiff has met its burden, courts "must remember that often a fine line separates unlawful concerted action from legitimate business practices." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). This is especially true in oligopolistic markets, like the one at issue here.[8] *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 191 (3d Cir. 2017). The special problem posed by oligopolies "is the result of 'interdependence,' which occurs because 'any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms.'" *Id.* (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 359 (3d Cir. 2004)). As stated in *Valspar*:

> In a market with many firms, "the effects of any single firm's price and output decisions 'would be so diffused among its numerous competitors that they would not be aware of change.'" The opposite is true in an oligopoly, where any price movement "will have a noticeable impact on the market and on its rivals."

*Id.* (citations omitted).

---

[8] There is no dispute the canned tuna market is an oligopoly.

15-MD-2670 DMS (MDD)

This interdependence between firms often results in "conscious parallelism," which "is a phenomenon of oligopolistic markets in which firms 'might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions.'" *White v. R.M. Packer Co., Inc.*, 635 F.3d 571, 576 (1st Cir. 2011) (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)). This conscious parallelism, if conducted unilaterally, is not unlawful under section 1 of the Sherman Act, "even if it appears to restrain trade unreasonably." *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1152 (9th Cir. 1988).

Given the difficulties presented by parallel conduct, the Supreme Court has stated that "when allegations of parallel conduct are set out in order to make a §1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). *See also DRAM II*, 28 F.4th at 47 (quoting *Twombly*, 550 U.S. at 557 (stating "plus factors" may "serve as the 'something more' to place parallel conduct 'in a context that raises a suggestion of a preceding agreement.'")

With this framework in mind, the Court now turns to the evidence presented in this case, and whether Defendants are entitled to summary judgment on the DAPs' Section 1 claim based on purchases made prior to May 30, 2011.

### III.

### DISCUSSION

Section 1 of the Sherman Act dictates that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To prevail on a claim under section 1 of the Sherman Act, the DAPs must show: (1) the existence of an agreement, conspiracy, or combination between two or more entities; (2) the arrangement resulted in an unreasonable restraint of trade under either a per se rule of illegality or rule of reason analysis; and (3) that the restraint affected interstate commerce. *Am. Ad Mgmt.,*

*Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir. 1996); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F.Supp.2d 1166, 1191 (N.D. Cal. 2009). In the present motion, Defendants argue the DAPs have failed to come forward with sufficient evidence to support the first element, namely that Defendants were party to an agreement, conspiracy, or combination to restrain trade in the canned tuna market before May 30, 2011.

In Section 1 cases like this one, the "crucial question" in determining whether the first element is met is "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express[.]'" *Twombly*, 550 U.S. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). Section 1 "does not reach conduct that is wholly unilateral." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). As stated above, this "distinction presents a challenge in oligopolistic markets—markets dominated by a few companies—where 'companies base their actions in part on the anticipated reactions of their competitors.'" *DRAM I*, 2020 WL 8459279, at *4 (quoting *Musical Instruments*, 798 F.3d at 1193).

In this case, there are three agreements alleged to have taken place before May 30, 2011: (1) A 2008 agreement to downsize tuna cans, (2) a 2008 agreement to increase the list price of canned tuna, and (3) a 2010 agreement to increase the net price of canned tuna. Before turning to those specific allegations, the Court first addresses the nature of the evidence presented by the DAPs, i.e., whether they rely on direct or circumstantial evidence, to determine which analytical framework applies here.

The DAPs assert they have come forward with direct evidence. In support of this position, the DAPs cite several pieces of evidence. The first is the December 1, 2007 conversation between Mr. Mills and Mr. DeBeer. As set out above, Mr. DeBeer memorialized that conversation in a December 1, 2007 email to other COSI employees. (*See* Shank Decl., Ex. 33, ECF No. 2119-28.) That email reads:

> I spoke to Barry Mills today re the downsizing of the 6 oz. can to the 5 oz. can. They have not yet determined the exact can size because they are worried about head space requirements. They feel they are a little short right now and so do not want to do this again.

1    They are testing a 105, 105.5, and 106.

2
3    The soonest they would make the switch would be by May 1 – their new fiscal
4    year, and the latest might be June 1.  They are planning for a partial April
     shutdown to fix the cannery, can runs, seamers, etc.

5    He was very willing to talk about this and hoped [ ] all 3 of the canners would
6    switch.

7    Let me know with any more questions.

8    (*Id.*)  The DAPs assert this conversation is direct evidence that Defendants participated in

9    the conspiracy to downsize "because it is 'explicit and requires no inferences[,]'" (Opp'n

10   to Mot. at 34, ECF No. 2119) (quoting *Citric Acid*, 191 F.3d at 1094), but the Court

11   disagrees.  There is nothing in Mr. DeBeer's email about an agreement among the three

12   tuna manufacturers to downsize their cans.  Rather, the email reflects that StarKist was

13   planning to downsize its cans, and Mr. Mills "hoped" that all three manufacturers would

14   do the same.  That expression of hope, however, is not direct evidence that Defendants

15   entered into a conspiracy to downsize their cans.

16       Next, the DAPs suggest that the guilty pleas of StarKist and Steve Hodge are direct

17   evidence that Defendants entered into agreements to fix the prices of their packaged tuna

18   before May 30, 2011.  (*See id.* at 36-39.)  However, the DAPs later concede this evidence

19   of a post-2011 conspiracy is *not* direct evidence that Defendants were involved in a

20   conspiracy pre-2011.  (*See id.* at 38) (stating evidence of post-2011 conspiracy "at a

21   minimum *supports an inference* that StarKist participated in the very same conspiracy

22   before 2011.") (emphasis added).  Accordingly, the guilty pleas are not direct evidence that

23   Defendants entered into a conspiracy before May 30, 2011.

24       The DAPs discuss other pieces of evidence in their opposition brief, namely, COSI's

25   interrogatory responses, and phone calls between Bumble Bee and StarKist following an

26   in-person meeting between COSI and Bumble Bee executives, (*id.* at 39), but again, the

27   DAPs concede that evidence requires the drawing of inferences, and thus it cannot serve

28   as direct evidence of Defendants' involvement in any agreements before May 30, 2011.

The DAPs also assert that certain individuals from Bumble Bee and StarKist "all took the Fifth Amendment at their depositions and refused to testify about communications during this time frame." (*Id.* at 39-40.)[9]  The DAPs argue they are entitled to adverse inferences based on those invocations, but the very argument that they are entitled to adverse inferences negates any suggestion that the invocations themselves are direct evidence of Defendants' involvement in any agreement.  *See Citric Acid*, 191 F.3d at 1093-94 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) (stating direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted.")

Absent any direct evidence that Defendants were involved in any agreements before May 30, 2011, the Court must apply the two-part test set out in *Citric Acid*.  The first step of that test is determining whether Defendants can rebut the DAPs' allegations of conspiracy "'by showing a plausible and justifiable reason for [their] conduct that is consistent with proper business practice.'"  *Citric Acid*, 191 F.3d at 1094 (quoting *Richards*, 810 F.2d at 902).  If Defendants can make that showing, the burden shifts to the DAPs "to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior."  *Id.*

## A.    The Can Downsize

Turning first to the can downsize, Defendants assert they made a unilateral decision to downsize their tuna cans "because of rapidly rising costs, collapsing margins, and an unsustainable financial position." (Mem. of P. & A. in Supp. of Mot. at 8, ECF No. 2021.) Defendants' evidence supports that assertion.  (*See* Lee Decl., Ex. 85, ECF No. 2021-7)

---

[9] In their opposition brief, which was filed on November 7, 2019, the DAPs specifically identified Messrs. Lischewski, Hodge, and Worsham from Bumble Bee, and Messrs. Hodge and Handford from StarKist, as falling into this category.  Since that time, Messrs. Lischewski, Worsham, and Hodge testified in Mr. Lischewski's criminal trial, and Messrs. Hodge and Worsham have been deposed in this case.  Thus, the only witness against whom an adverse inference may be drawn is Mr. Handford.

(October 17, 2007 Del Monte Memo re: Downsizing Advisory Committee, which states "StarKist and Vegetables are working on separate downsizing projects as a way to address the significant cost pressures and margin compression we are experiencing in our businesses.")  Thus, Defendants have met their burden at step one.[10]

At step two, the burden shifts to the DAPs to "to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *Citric Acid*, 191 F.3d at 1094.  The DAPs have submitted numerous pieces of evidence in an attempt to meet that burden, but considered individually and together, that evidence does not show Defendants' decision to downsize their cans was not an exercise in permissible competitive behavior.

Taking that evidence in chronological order, the first item is the April 5, 2007 PED regarding the downsizing project.  (Shank Decl., Ex. 26, ECF No. 2119-21.)  Notably, the DAPs do not dispute that Defendants began planning the downsizing project "as far back as 2007."  (Opp'n to Mot. at 50, ECF No. 2119.)  Instead, the DAPs rely on an "assumption" in the PED, namely that "[c]ompetition will follow the can size

---

[10] The DAPs take issue with Defendants' explanation for the downsize, as well as the two price increases, namely, that those actions were necessary in light of rising costs. Specifically, the DAPs argue Defendants offered these same reasons to justify their subsequent, unlawful conduct, which suggests the explanation for the conduct as issue here is simply a pretext.  The DAPs also assert that downsizing cans and raising prices in response to rising fish costs would have negatively affected Defendants' market share. Although both of these arguments could undermine Defendants' explanation for the downsizing of their cans and their price increases, undermining Defendants' explanation "does not, by itself, justify the inference that the conduct was therefore the result of a conspiracy." *H.L. Moore Drug Exch. v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir. 1981) (citations omitted). *See also Bruce Drug, Inc. v. Hollister, Inc.*, 688 F.2d 853, 857 (1st Cir. 1982) (stating "an affirmative finding of conspiracy is not to be supported simply by labelling a given reason pretextual.")  To justify that inference, the DAPs must come forward with specific evidence to show Defendants were not engaged in permissible competitive behavior, which is the inquiry posed by step two.  The Court continues to that step below.

conversion[,]" (Shank Decl., Ex. 26 at 5, ECF No. 2119-21), to argue that Defendants had an illegal agreement with the other tuna manufacturers to downsize. But that "assumption" falls far short of establishing an actual agreement under Section 1. This is especially so given the oligopolistic nature of the tuna market, where "follow the leader" behavior is commonplace. *DRAM I*, 2020 WL 8459279, at *4.

The next item of evidence the DAPs rely on is the November 28, 2007 email from Ken Worsham of Bumble Bee to other Bumble Bee Executives, which states, "[i]t has been reported that [StarKist] is working on a complete canned line down size." (Shank Decl., Ex. 29, ECF No. 2119-24.) The DAPs claim Ken Worsham received information about the downsize from his father Robert Worsham, a retired StarKist employee and part-time consultant for Del Monte,[11] based on phone records evidencing the father and son had a phone conversation earlier that day, (Shank Decl., Ex. 104 at 5735, ECF No. 2119-98), and Ken Worsham's subsequent invocation of his Fifth Amendment rights when asked whether he received information about the downsize from his father. (Shank Decl., Ex. 8 at 69-71, ECF No. 2119-111.)

Given that Ken Worsham has now been deposed, the Court declines to draw any adverse inferences based on his prior invocation of the Fifth Amendment.[12] Without that adverse inference, only the phone call remains, and although it is possible the Worshams discussed the downsize, it is equally possible they did not. But even drawing the inference in favor of the DAPs, and assuming Robert Worsham told his son about the downsize, that

---

[11] The DAPs describe Robert Worsham as "a StarKist executive." (Opp'n at 11, ECF No. 2119.) However, they fail to provide any evidence to support that description. Defendants' evidence, including Robert Worsham's deposition testimony, supports Defendants' position that he was a retired StarKist employee and part-time consultant for Del Monte. (*See* Decl. of Christopher J. Bower in Supp. of Reply, Ex. 1, ECF No. 2230-3; Ex. 4, ECF No. 2230-6.)

[12] Even if the Court could draw an adverse inference with respect to Mr. Worsham, he was an employee of Bumble Bee, not Defendants, and thus, no adverse inference could be drawn against Defendants.

15-MD-2670 DMS (MDD)

sharing of information does not evidence an agreement under Section 1.  *See Baby Food*, 166 F.3d at 126 (quoting *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1013 (3d Cir. 1994)) (holding "that communications between competitors do not permit an inference of an agreement to fix prices unless 'those communications rise to the level of an agreement, tacit or otherwise.'")

Next, the DAPs rely on the Mills-DeBeer meeting discussed above.  There is no dispute this meeting took place, and there is also no dispute that after the meeting Mr. DeBeer sent an email to other COSI employees recounting his conversation with Mr. Mills. (*See* Shank Decl., Ex. 33, ECF No. 2119-28.)  The DAPs infer from Mr. DeBeer's email that all three tuna manufacturers were contemplating a downsize.[13]  The only statement in the email that could possibly support this inference is Mr. DeBeer's statement that Mr. Mills "hoped [ ] all 3 of the canners would switch." (*Id.*)  However, Mr. Mills's expression of "hope" for a certain outcome does not give rise to an inference that the three tuna manufacturers were contemplating an agreement to downsize.  *See United States v. General Motors Corp.*, No. 38219, 1974 WL 926, at *9 (E.D. Mich. Sep. 26, 1974) ("In the absence of agreement, there is nothing unlawful or improper in a businessman's raising his prices in the hope that this action will encourage his competitors to go further or for the purpose of testing the marketplace to determine whether further unilateral action is possible.")  This is especially so given Mr. Mills's affidavit, in which he refutes the allegation "that [he] communicated with John DeBeer of [COSI] as part of some sort of effort to reach an agreement or understanding with [COSI] regarding Del Monte's plan to

---

[13] In making this argument, the DAPs attempt to bring this case within the confines of *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 634 (9th Cir. 2018).  In that case, the court stated that a conspiracy to restrain trade does not require a showing of an express agreement, and that "'it is sufficient that a concert of action be contemplated and that defendants conform to the arrangement.'"  *Id.* (quoting *Esco Corp. v. United States*, 340 F.2d 1000, 1008 (9th Cir. 1965)).  As explained below, the evidence in this case does not support the inference that all three tuna manufacturers were contemplating a coordinated downsize of their tuna cans.  Therefore, *Arandell* does not apply here.

reduce the size of StarKist brand packaged tuna from a 6-ounce can to a 5-ounce can." (Lee Decl., Ex. 65 ¶6, ECF No. 2021-6.)  Indeed, both Mr. Mills and Mr. DeBeer explained their meeting as "inadvertent", (*id.* ¶7, ECF No. 2021-6), and unplanned.  (Lee Decl., Ex. 103 ¶3, ECF No. 2021-7.)  Mr. Mills also goes on to say that he was "instructed to execute StarKist's can size reduction before December 2007 and well before the date of Mr. DeBeer's … email."  (Lee Decl., Ex. 65 ¶13, ECF No. 2021-6.)  This is consistent with Mr. DeBeer's "impression that Del Monte had already decided to reduce its can size from 6 ounces to 5 ounces before … December 1, 2007 and that regardless of what I had said or what COSI did, Del Monte would reduce its can size."  (Lee Decl., Ex. 103 ¶6, ECF No. 2021-7.)  Considered in this context, the Mills-DeBeer meeting does not give rise to a reasonable inference that the three tuna manufacturers had an agreement to downsize.

The next item of evidence cited by the DAPs is the December 10, 2007 email from Mr. Lischewski of Bumble Bee to others at Bumble Bee confirming Defendants' downsizing plan, and stating, "COSI is prepared to follow the downsize[.]" (Shank Decl., Ex. 35, ECF No. 2119-30.)  As with the Worsham email discussed above, the DAPs rely on this email to suggest that someone from Defendants was sharing information about the downsize with their competitors.  (Opp'n to Mot. at 13, ECF No. 2119.)  That is one inference that may be drawn from the email, but it is not the only one, especially since Impress, Defendants' can manufacturer, had knowledge of Defendants' downsizing plans by that date, (*see* Lee Decl., Ex. 10, ECF No. 2021-3), as did COSI.  Even drawing the inference in the DAPs' favor, the suggestion that Bumble Bee was in possession of information regarding Defendants' downsize "does not, at least in itself, tend to exclude legitimate competitive behavior." *Citric Acid*, 191 F.3d at 1103. *See also Baby Food*, 166 F.3d at 126 (quoting *Alvord-Polk, Inc.*, 37 F.3d at 1013) (holding "that communications between competitors do not permit an inference of an agreement to fix prices unless 'those communications rise to the level of an agreement, tacit or otherwise.'")

The DAPs also posit that Impress was acting as an intermediary between Defendants, COSI, and Bumble Bee.  (Opp'n to Mot. at 51, ECF No. 2119.)  In support of

this theory, the DAPs rely on the Mills-DeBeer meeting, a January 17, 2008 email between Impress and COSI, and a January 28, 2008 email between Bumble Bee and Impress. (*Id.*) The Mills-DeBeer meeting did not involve anyone from Impress, and thus it does not support the DAPs' theory. The emails, in the abstract, suggest Defendants, COSI, and Bumble Bee may have been using Impress to obtain information about what each was doing with respect to a downsize, (*see* Shank Decl., Ex. 39, ECF No. 2119-34; Ex. 88, ECF No. 2119-82), but not every exchange of information between competitors rises to the level of an illegal conspiracy. *Gray v. Shell Oil Co.*, 469 F.2d 742, 746 (9th Cir. 1972). Furthermore, that the manufacturers were communicating through Impress "undermines the existence of a conspiracy because conspirators would have no need to ask consultants about the specifics of their own conspiracy." *Valspar*, 873 F.3d at 199. And finally, the substance of the emails refutes the DAPs' theory that there was any agreement to downsize. As the DAPs explain, the January 17, 2008 email reflects Defendants asked Impress if COSI and Bumble Bee were going to downsize, (Shank Decl., Ex. 88, ECF No. 2119-82), and Impress responded that neither COSI nor Bumble Bee was interested. (*Id.*) The January 28, 2008 email also reflects COSI and Bumble Bee were not going to "make the change[,]" i.e., downsize their cans. (Shank Decl., Ex. 39, ECF No. 2119-34.) Rather than supporting the DAPs' theory that Defendants, COSI, and Bumble Bee were using Impress as an intermediary to carry out an alleged agreement to downsize, the evidence actually refutes that theory and the broader allegation that Defendants had an agreement with COSI or Bumble Bee to downsize their cans.

The DAPs also rely on Scott Cameron's December 27, 2007 email to Mr. Lischewski to advance their case. (*See* Shank Decl., Ex. 36, ECF No. 2119-31.) The DAPs read this email to suggest that Bumble Bee was receiving its downsize intelligence from Defendants' high-level executives. (*See* Opp'n to Mot. at 13, ECF No. 2119.) The email states that "mid-level management in the DM organization have not been privy to" the discussions about the downsize, (Shank Decl., Ex. 36, ECF No. 2119-31), but that does not mean Defendants were necessarily the source of Bumble Bee's information. (*Id.*) Indeed, Mr.

Cameron mentions three other possible sources of that information in his email: "folks" in the trade, "other sources," and "the can supplier[,]" i.e., Impress. (*Id.*)

The DAPs then turn to Mr. Lischewski's response to Mr. Cameron's email, wherein he states, "I will try to make direct contact with Del Monte to glean their intentions in early January." (*Id.*)  The DAPs assert Mr. Lischewski did just that based on his January 5, 2008 email, which states, "SK has already commenced all work on downsizing and is trying to be ready for their new FY starting in May.  Both BB and COS will follow although we don't expect to be ready until Q4." (Shank Decl., Ex. 37, ECF No. 2119-32.)  As with the emails above, the DAPs assert Mr. Lischewski's emails are evidence that Defendants were not only sharing information about the downsize with their competitors, (Opp'n to Mot. at 14, ECF No. 2119), they were also making entreaties to their competitors to downsize their products, as well.  But again, the emails do not identify the source of Mr. Lischewski's information, and even if Defendants were the source, Bumble Bee's possession of that information does not permit an inference of an illegal agreement. *Citric Acid*, 191 F.3d at 1103.  Moreover, even if Defendants were making entreaties to their competitors, "'[m]otivation to enter a conspiracy is never enough' to show an agreement." *In re Late Fee & Over-Limit Fee Litig.*, 528 F.Supp.2d 953, 964 (N.D. Cal. 2007) (quoting VI Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶1411, at 68 (2d ed. 2003)).

The DAPs then cite a series of emails between Impress and COSI, (*see* Shank Decl., Ex. 88, ECF No. 2119-82), Impress and Bumble Bee, (Shank Decl., Ex. 39, ECF No. 2119-27), and internal COSI emails, (*see* Shank Decl., Ex. 40, ECF No. 2119-35; Ex. 41, ECF No. 2119-36), all of which reflect that neither Bumble Bee nor COSI was going to downsize.

Thereafter, Bumble Bee and COSI exchanged a series of emails to set up a meeting to discuss the downsize. (Shank Decl., Exs. 43, ECF No. 2119-38; Ex. 44, ECF No. 2119-30; Ex. 45, ECF No. 2119-40.)  That meeting took place on March 13, 2008, and in attendance were Messrs. Chan and Sawyer of COSI and Lischewski and Hines of Bumble

Bee.  As a result of that meeting, COSI and Bumble Bee agreed they would downsize. (Shank Decl., Ex. 34 at 91-92, ECF No. 2119-29.)

The DAPs suggest this agreement between Bumble Bee and COSI was the realization of Defendants' original goal to have all three tuna manufacturers downsize their cans.  In effect, the DAPs use the agreement between COSI and Bumble Bee as a lens through which to view all of the preceding events, but that hindsight approach distorts the undisputed and actual evidence.  That evidence reflects the following: (1) Defendants made a unilateral decision to downsize their cans in at least April of 2007, and proceeded to implement that decision before COSI and Bumble Bee agreed between themselves to downsize their cans; (2) Defendants' decision to downsize was made known to Impress shortly after the decision was made, (Lee Decl., Ex. 10, ECF No. 2021-3), and the decision was made known to certain of Defendants' customers starting in January 2008, (Lee Decl., Ex. 141, ECF No. 2021-9; Exs. 91, 92, ECF No. 2021-7); (3) Initially, COSI and Bumble Bee were not interested in downsizing their cans; and (4) COSI and Bumble Bee subsequently decided between themselves to downsize their cans consistent with Defendants' earlier decision to do the same.  (Lee Decl., Ex. 1, ECF No. 2021-2 (COSI's interrogatory responses identifying March 2008 agreement *between COSI and BumbleBee only* "to reduce the size of cans from 6 oz to 5 oz for branded tuna products[.]"))

Rather than reflecting that the three tuna manufacturers had an illegal agreement to downsize their cans, this evidence reflects Defendants independently decided to downsize their cans with the hope that Bumble Bee and COSI would follow, and Bumble Bee and COSI subsequently decided between themselves to downsize their own cans.  This kind of follow-the-leader behavior does not give rise to an inference of a Section 1 violation.  *See Citric Acid*, 191 F.3d at 1102 ("A section 1 violation cannot, however, be inferred … from an industry's follow-the-leader" strategy.); s*ee also DRAM I*, 2020 WL 8459279, at *11 (stating "[a] 'follow the leader' strategy where the dominant market player increases prices or reduces output with the hope that others follow suit does not become conspiratorial simply because the other competitors do so.")

15-MD-2670 DMS (MDD)

Nevertheless, the DAPs rely on additional items of evidence to support their case. For instance, although Defendants were not involved in any of the planning emails for the March 13, 2008 meeting between Bumble Bee and COSI, or the meeting itself, the DAPs assert Defendants were part of this agreement because the day before the meeting David Burt of Bumble Bee called Robert Worsham, (Shank Decl., Ex. 103, ECF No. 2119-97), and four days after the meeting, Kenneth Worsham of Bumble Bee called his father Robert three times. (Shank Decl., Ex. 104, ECF No. 2119-98.) The mere fact of these phone calls, however, does not give rise to an inference that Defendants were involved in an agreement with COSI and Bumble Bee to downsize. Indeed, and as stated above, the emails preceding the meeting give rise to the opposite inference, namely, that there was no agreement. And, COSI's discovery responses in this case reflect that Bumble Bee and COSI were the only parties to that agreement to downsize their cans. (Lee Decl., Ex. 1, ECF No. 2021-2.)

Similarly, an April 10, 2008 email from COSI's parent company Thai Union Group ("TUG") to COSI executives, also fails to raise an inference that Defendants, COSI and Bumble Bee were involved in an agreement to downsize. In that email, TUG states, "I had a talk with Starkist last night and learned that Starkist Samoa is going to start first production of Chunk Light 5 oz. on April 11st (today in US time)." (Shank Decl., Ex. 47, ECF No. 2119-42.) The DAPs cite this portion of the email as support for their theory that the three tuna manufacturers had an agreement to downsize all along. According to the DAPs, Defendants:

> had not put the smaller cans on to store shelves – or even started production – until COSI and Bumble Bee had agreed to downsize at the Milton's meeting on March 13, ensuring Del Monte's original plan of the three-brand downsizing before consumers experienced the change, and eliminating the fear of any competitive effect on market share.

(Opp'n to Mot. at 17, ECF No. 2119.) But the DAPs fail to cite the next sentence of TUG's email, which states, "They [Starkist] also said decision was made in last December." (Shank Decl., Ex. 47, ECF No. 2119-42.) The DAPs also fail to account for the undisputed evidence that Defendants were working both in-house and with Impress to begin

production of the smaller cans before COSI and Bumble Bee agreed amongst themselves to downsize their cans, (*see*, *e.g.*, SUF ¶¶18-20; Lee Decl., Ex. 10 at 70, ECF No. 2021-3; Lee Decl. Ex. 115 at 53, ECF No. 2021-7; Lee Decl., Ex. 66, ECF No. 2021-3; Lee Decl., Ex. 90 at 154-56, ECF No. 2021-7; Lee Decl., Ex. 62, ECF No. 2021-6; Lee Decl., Ex. 11 at 83, ECF No. 2021-3), and that Defendants' decision to downsize was likely to require "months of lead time." (Lee Decl., Ex. 29 at 118:18-119:3, ECF No. 2021-3.)

The DAPs then cite an April 11, 2008 phone call between Steve Hodge of StarKist and Chuck Handford of Bumble Bee, (Shank Decl., Ex. 106, ECF No. 2119-100), and Bumble Bee and COSI's possession of an April 11, 2008 presentation created by Defendants, (Shank Decl., Ex. 49-1, ECF No. 2119-44; Ex. 49-2, ECF No. 2119-45; Ex. 52, ECF No. 2119-48), as evidence that Defendants were continuing to provide information about the downsize to their competitors. (Opp'n to Mot. at 18, ECF No. 2119.) None of that evidence, however, reflects an agreement among the three tuna manufacturers to downsize. *Citric Acid*, 191 F.3d at 1103; *Baby Food*, 166 F.3d at 126 (stating possession of competitor information and communications with competitors does not exclude the possibility of independent conduct).

Next, the DAPs argue StarKist and Hodge's admissions to criminal conduct post-May 30, 2011, raise an inference of an illegal agreement to downsize in 2008.[14] Defendants attempt to cabin this evidence to the time period set out in those documents and testimony, namely from at least 2011 through 2013, but evidence of a defendant's prior or subsequent conduct may be relevant to whether the defendant committed the same conduct during the time period in question. *See In re Urethane Antitrust Litig.*, 913 F.Supp.2d 1145, 1157 (D. Kan. 2012) ("evidence of a conspiracy existing in 2000 at least allows for the reasonable inference that the conspiracy was ongoing at that point."); *see*

---

[14] These admissions come in the form of guilty pleas on the part of StarKist and Hodge, interrogatory responses in this litigation, and deposition testimony taken in this litigation. (*See*, *e.g.*, Opp'n to Mot. at 36-37, ECF No. 2119.)

*also DRAM II*, 28 F.4th at 53 (stating district courts in the Ninth Circuit "have found prior conspiracy convictions to support an inference of subsequent conspiracy, particularly when the prior conspiracy and the alleged subsequent conspiracy have factual overlap or involve the same actors."); *Garside v. Everest & Jennings Int'l*, 586 F.Supp. 389, 391 (E.D. Cal. 1984) (explaining evidence of defendant's acts and statements occurring prior to relevant time period may constitute substantial evidence of agreement during relevant time period). Nevertheless, the admissions the DAPs rely on do not include product downsizing. (*See* Opp'n to Mot. at 4-5, ECF No. 2119) (setting out price increases and non-production of product as acts underlying conspiracy). Therefore, although the admissions may support the DAPs' argument on the 2008 and 2010 price increases, they do not assist the DAPs on their product downsizing claim.

Considering all of the evidence discussed above, both individually and as a whole, the DAPs have failed to come forth with "specific evidence tending to show that [Defendants were] not engaging in permissible competitive behavior" with respect to the downsizing of their tuna cans. *Citric Acid*, 191 F.3d at 1094. Rather, the evidence supports a finding of follow-the-leader behavior, which does not give rise to an inference of a Section 1 violation. *Id.* at 1102. Accordingly, Defendants are entitled to summary judgment on the DAPs' claims concerning the can downsize.[15]

**B.    The Price Increases**

The only other alleged violations at issue in this motion are Defendants' June 2008 list price increase and their April 2010 net price increase. As with the can downsize, Defendants argue the DAPs do not have sufficient evidence to support a finding that Defendants conspired with COSI and Bumble Bee on these price increases.

/ / /

---

[15] In the absence of a showing that Defendants were involved in a conspiracy to downsize their cans, the Court rejects the DAPs' argument that the downsize and the 2008 price increase were connected.

15-MD-2670 DMS (MDD)

1          1.      The 2008 Price Increase

2          The parties agree that Defendants announced their list price increase on June 13,

3   2008, with an effective date of July 21, 2008.  (Reply Separate Statement of Undisputed

4   Material Fact in Further Supp. of Mot., Fact No. 23, ECF No. 2230-1.)  Starting with step

5   one of the *Citric Acid* test, Defendants have shown they had a plausible and justifiable

6   reason for this price increase that is consistent with proper business practice, namely,

7   increased fish costs and other financial considerations.  (*See*, *e.g.*, Lee Decl., Ex. 146, ECF

8   No. 2021-9 (string of April 2008 emails concerning dwindling fish supply and increasing

9   costs)).  Having made that showing, the Court turns to *Citric Acid* step two.

10         To meet their burden at step two, the DAPs rely on the same types of evidence

11  discussed above, namely Defendants' internal documents, emails, phone calls, StarKist and

12  Hodge's admissions to criminal conduct post-2010, and Hodge and Handford's invocations

13  of their Fifth Amendment rights.

14         As above, Defendants' internal documents, and emails and phone calls between the

15  tuna manufacturers do not assist the DAPs in meeting their burden.  For instance, the DAPs

16  rely on Defendants' June 13, 2008 internal presentation about its upcoming price increase.

17  (*See* Shank Decl., Ex. 48, ECF No. 2119-43.)  Specifically, the DAPs rely on Defendants'

18  statement in that presentation that "[w]e expect Bumble Bee and Chicken of the Sea to

19  broadly follow both actions."  (*Id.* at 26.)  The DAPs argue this expectation was the result

20  of communication among the three tuna manufacturers before June 13.  (Opp'n to Mot. at

21  19, ECF No. 2119.)  In support of that argument, the DAPs cite a June 11, 2008 internal

22  Bumble Bee email from Dan Nestojko to Messrs. Cameron, Ken Worsham and Handford,

23  where Nestojko writes:

24         I picked up a rumor today that the Star*Kist business unit is having an all
           hands on deck sales meeting on Friday featuring LM List Price changes.  Any
25         insight or hard copy you guys pick up would be huge as we're trying to hit the
26         street with a new price list consistent with downsize by the end of next week.

27  (Shank Decl., Ex. 55, ECF No. 2119-51.)  The DAPs also rely on a phone call from Ken

28  Worsham to his father Robert Worsham the following day, June 12.

None of this evidence, however, gives rise to a reasonable inference that Defendants were not engaging in permissible competitive behavior. Defendants' internal presentation is similar to the PED on the can downsize, and simply reflects Defendants' expectation that Bumble Bee and COSI would follow Defendants' lead on the price increase. Nestojko's email also fails to further the DAPs' case. Indeed, Nestojko's reliance on rumor and his request for information from other members of his team suggests there was no coordination or agreement between Defendants and Bumble Bee to raise prices. The phone call between Ken and Robert Worsham also fails to give rise to a reasonable inference of an agreement. *See Baby Food*, 166 F.3d at 126 (competitor communications do not exclude the possibility of independent conduct).

Evidence of events *after* the price increase was announced similarly fails to advance the DAPs' case. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1034 (8th Cir. 2000) (stating "[c]ommon sense dictates that a conspiracy to fix a price would involve one company communicating with another company *before* the price quotation to the customer.") Those emails also describe Defendants' price increases as "unconfirmed" and "unofficial," (*see* Shank Decl., Ex. 56, ECF No. 2119-52 (June 13, 2008 internal COSI email); Ex. 58, ECF. No. 2119-54 (June 16, 2008 internal COSI email); Ex. 61, ECF No. 2119-57 (June 17, 2008 internal Bumble Bee email)), and subject to confirmation. (Shank Decl., Ex. 56, ECF No. 2119-56; *see also* Shank Decl., Ex. 61, ECF No. 2119-57 (stating "[w]e need to keep our ear close to the ground in an effort to stay ahead and on top of these shifts. … Competitive intel is a must as there is a lot happening….")) COSI's interrogatory responses are also unhelpful as they reflect an agreement between COSI and Bumble Bee only. (Shank Decl., Ex. 5, ECF No. 2119-4.)

The DAPs also rely on Hodge's refusal to answer questions about Defendants' participation in an agreement to raise prices in 2008, and argue they are entitled to an adverse inference based on that invocation. However, Mr. Hodge has since been deposed in this case, and thus there is no basis for drawing any adverse inference. Furthermore, the evidence reflects Hodge played no part in Defendants' decision to raise prices in 2008.

(*See* Six Decl., Ex. 4 at 344, ECF No. 3014-3) (Hodge denying that he had any authority to set list prices for tuna in 2007 and 2008); Lee Decl., Ex. 138, ECF No. 2021-8) (Decl. of Rodolfo Spielmann in Supp. of Mot. ¶16 (stating Hodge was "a low level field sales person" who lacked "authority to set list prices[,]" and that he played no part in Spielmann's decision to raise prices in 2008)); Lee Decl., Ex. 141, ECF No. 2021-9 (Decl. of Geoff Tanner in Supp. of Mot. ¶21 (stating Hodge had no decision-making authority to raise Defendants' prices in 2008)).

This leaves only Defendants' admissions to price fixing post-May 30, 2011. As discussed above, those admissions may be relevant to whether Defendants' decision to increase prices in June 2008 was also part of an illegal agreement to restrain trade. *See In re Urethane Antitrust Litig.*, 913 F.Supp.2d at 1157; *DRAM II*, 28 F.4th at 53; *Garside*, 586 F.Supp. at 391. However, either alone or in combination with the other evidence discussed above, those admissions are insufficient to satisfy the DAPs' burden at step two of *Citric Acid*. *See In re Urethane Antitrust Litig.*, 913 F.Supp.2d at 1157 (finding evidence of a conspiracy at one point in time, "by itself, would likely not be sufficient to support the existence of a conspiracy" at a later point in time); *cf. DRAM II*, 28 F.4th at 53 ("a single plausible plus factor allegation that weakly tips in the plaintiffs' favor, without some further factual support, is not enough to open the floodgates to discovery in antitrust cases.") Because DAPs have not come forward with "specific evidence tending to show that [Defendants were] not engaging in permissible competitive behavior[,]" the Court grants Defendants' motion for summary judgment on the DAPs' claims arising out of the June 2008 price increase.

### 2. The 2010 Price Increase

The only other price increase at issue here is Defendants' Spring 2010 net price increase. Defendants assert this price increase was first published on April 9, 2010, and released to Defendants' third-party brokers on April 12, 2010, and the evidence supports those assertions. (Lee Decl., Exs. 46, 47, ECF No. 2021-5.) The DAPs dispute the April 12, 2010 release date, but fail to provide any evidence that contradicts Defendants'

assertions.  Instead, they assert Defendants raised their prices on May 3, 2010.  (Separate Statement of Facts in Opp'n to Mot. for Partial Summ. J., Fact No. 83, ECF No. 2119-2.)  However, the evidence supports Defendants' assertion that the pricing guidance was released prior to that date.  (*See* Shank Decl., Ex. 69, ECF No. 2119-65) (stating pricing guidance had been "previously communicated[.]")  Although the DAPs dispute when Defendants released their price increase, the undisputed evidence reflects that price increase was communicated to Defendants' employees on April 9, 2010, and disseminated to Defendants' third-party brokers on April 12, 2010.  With those dates in mind, the Court turns to the *Citric Acid* framework.

As with the 2008 price increase, Defendants argue the 2010 price increase was the result of rising fish costs, and again, the evidence supports that assertion.  (Lee Decl., Ex. 82, ECF No. 2021-7.)  This satisfies Defendants' burden at step one.  Therefore, the Court turns to *Citric Acid* step two.

Here, the DAPs rely again on emails, phone calls, and adverse inferences to show Defendants were not engaging in permissible competitive behavior.  The majority of these emails are from April through June of 2009, nearly one year before the pricing action at issue, and are therefore, unhelpful.  (*See* Shank Decl., Ex. 72, ECF No. 2119-68; Ex. 73, ECF No. 2119-69.)  One email was circulated around the time Defendants released their pricing guidance, but that email does not evidence an agreement with Defendants to raise prices.  (*See* Shank Decl., Ex. 74, ECF No. 2119-70.)  On the contrary, that internal COSI email reflects that as of April 8, 2010, COSI understood that neither of the other tuna manufacturers had increased their prices, and COSI did not "want to be the first to do so given our share loss last go around."  (*Id.*)  The other email was sent on April 23, 2010, eleven days *after* Defendants released their pricing guidance to third-party brokers.  (*See* Lee Decl., Ex.  49, ECF No. 2021-5.)  The DAPs rely specifically on a statement in that email that "customers don't have this information" to suggest that the information about Defendants' pricing must have come from Defendants.  (Opp'n to Mot. at 25, ECF No. 2119.)  However, the DAPs fail to acknowledge that by that time Defendants' pricing

guidance had already been released to Defendants' third-party brokers, and thus Defendants' were no longer the only sources of that information.

The DAPs also rely on phone calls between Handford and Don Gallagher at Bumble Bee to support their showing at step two of *Citric Acid*, but as discussed above, "communications between competitors do not permit an inference of an agreement to fix prices unless 'those communications rise to the level of an agreement, tacit or otherwise.'" *Baby Food*, 166 F.3d at 126 (quoting *Alvord-Polk, Inc.*, 37 F.3d at 1013). Here, there is no evidence of such an agreement.

The DAPs also argue they are entitled to an adverse inference based on Handford's invocation of his Fifth Amendment rights in response to questions about emails dated May 8, 2009, and May 11, 2009. However, those emails, which were sent in May 2009, are too far removed to show an agreement to raise prices in the Spring of 2010. Furthermore, the substance of the emails fails to show any kind of agreement among the tuna manufacturers to raise prices. Indeed, the emails simply reflect competitive intelligence gathering, which by itself, does not "exclude legitimate competitive behavior." *Citric Acid*, 191 F.3d at 1103. Absent any independent evidence of an agreement to raise prices in the Spring of 2010, the Court declines to draw an adverse inference from Handford's invocation of his Fifth Amendment rights in response to questions about the May 2009 emails. *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000) (stating "adverse inference can only be drawn when independent evidence exists of the fact to which the party refuses to answer.")

The final category of evidence the DAPs rely on to meet their burden at step two is expert testimony, specifically, testimony from AWG's expert witness Dr. Colin Carter and Winn-Dixie's expert witness Dr. Gareth Macartney.[16]     Both experts discuss the

---

[16] Defendants filed a separate Motion to Exclude Fact-Finding Testimony and Legal Conclusions of Plaintiffs' Economists, including Drs. Carter and Macartney. The Court will address that motion in a separate order.

characteristics of the packaged tuna market, including the lack of substitutes, inelastic demand, and domination of the market by Defendants, COSI, and Bumble Bee, and based on those characteristics, both opine that the packaged tuna market was susceptible to collusion. (*See* Shank Decl., Ex. 63 at 37-39, ECF No. 2119-59 (Dr. Carter Report); Shank Decl., Ex. 93 at 5-6, ECF No. 2119-87 (Dr. Macartney Report)).[17]

Allegations that a market is susceptible to collusion or that it provided Defendants with incentive to collude is simply another way of saying that a market is interdependent. *In re German Auto. Mfrs. Antitrust Litig.*, 612 F.Supp.3d 967, 983 (N.D. Cal. 2020). "Interdependence, however, does not entail collusion, as interdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement." *Musical Instruments*, 798 F.3d at 1195. "Because of the competing inferences that can be drawn from this market structure," this kind of economic evidence does "not tend to exclude the possibility of independent action." *Kleen Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 935 (7th Cir. 2018). Considered alone or together with the evidence discussed above, the DAPs' expert evidence is insufficient to satisfy the DAPs' burden to show Defendants were not engaged in permissible competitive behavior. Accordingly, Defendants are entitled to summary judgment on the DAPs' claims arising out of the 2010 price increase.

/ / /

/ / /

---

[17] Dr. Macartney goes one step further and concludes that collusion occurred. (Shank Decl., Ex. 93 at 6, ECF No. 2119-87) (stating "that the Packaged Tuna industry was conducive to collusion supports the conclusion that the alleged collusion occurred and was successful in raising the prices paid by the Plaintiffs.") Given that Winn-Dixie has settled its case against Defendants, Dr. Macartney's opinions may no longer be in issue. But even if they were, this particular opinion, which serves "to do nothing more than tell the jury what result it should reach," *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1060 (9th Cir. 2008) (quoting *Kostelecky v. NL Acme Tool/NL Indus., Inc.*, 837 F.2d 828, 830 (8th Cir.1988), is improper, and the Court does not consider it in deciding the present motion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.

## CONCLUSION

1.     For the foregoing reasons, Defendants' motion for partial summary judgment is granted.

2.     The DAPs and Defendants shall file unredacted versions of their briefs (ECF Nos. 2023, 2123) and related statements of undisputed facts, oppositions, exhibits, as well as the response thereto (ECF No. 2231).[18]

**IT IS SO ORDERED**.

Dated:  April 21, 2023

Hon. Dana M. Sabraw, Chief Judge
United States District Court

---

[18] The Parties shall identify these documents on the docket as "unredacted" versions of their prior filings and in each instance reference the docket number of the previous "redacted" version.

36

15-MD-2670 DMS (MDD)