Michael P. Lehmann (#77152)
Christopher L. Lebsock (#184546)
Debashish Bakshi (#311115)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel:    (415) 633-1908
Fax:    (415) 358-4980
E-mail: mlehmann@hausfeld.com
E-mail: clebsock@hausfeld.com
E-mail: dbakshi@hausfeld.com

Michael D. Hausfeld (*pro hac vice*)
Brittany L. Nyovanie (*pro hac vice*)
HAUSFELD LLP
888 16th Street NW, Suite 300
Washington, DC 20006
Tel:    (202) 540-7200
Fax:    (202) 540-7201
E-mail: mhausfeld@hausfeld.com
E-mail: bnieves@hausfeld.com

*Class Counsel for the Direct Purchaser Class*
*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No. 3:15-md-02670-DMS-MSB<br>MDL No. 2670<br><br>**PLAINTIFFS' OPPOSITION TO THE LION ENTITIES' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF No. 3036 |
| This document relates to:<br><br>ALL ACTIONS | DATE:     May 19, 2023<br>TIME:     1:30 p.m.<br>JUDGE:   Hon. Dana M. Sabraw<br>CTRM:    13A |

# **TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................................1

II.  FACTUAL BACKGROUND.........................................................................3

    A.  Lion Acquires Bumble Bee Despite Industry Problems and Clear
    References to the Conspiracy ...............................................................3

    B.  Lindberg Goes on "Owner-to-Owner" Tour to Further Facilitate the
    Conspiracy ...........................................................................................5

    C.  The Lion Entities Oversee and Support the Conspiracy Throughout Bumble
    Bee's Ownership..................................................................................8

    D.  The Whistle-blower Letter................................................................12

III.  LEGAL STANDARD ................................................................................14

IV.  ARGUMENT ..............................................................................................14

    A.  Principles of Corporate Independence Do Not Insulate the Lion Entities
    from Liability in this Case .................................................................17

    1.  There Is a Genuine Dispute of Material Fact as to Whether the Lion Entities
    Knowingly Joined Bumble Bee's Price-Fixing Conspiracy..............................19

        a.  The Lion Entities' Involvement in the Price-Fixing Conspiracy Makes
        Economic Sense..................................................................................19

        b.  The Lion Entities Knowingly Participated in the Conspiracy .................23

    2.  There is a Genuine Issue of Material Fact Concerning Whether the Lion
    Entities are Bound as Principals by Bumble Bee's Collusive Conduct ............26

        a.  Lion Americas is an Agent of Lion Capital .............................28

        b.  Bumble Bee was the Agent of Lion Capital and Lion Americas.............29

        c.  Lion Capital and Lion Americas Ratified Bumble Bee's Anticompetitive

Conduct...............................................................................................33

3.    Lion Capital, Lion Americas, and Bumble Bee Operated as a Single
Economic Unit ....................................................................................35

B.    Big Catch is Liable as the Alter Ego of Lion Capital..................................38

VI.    CONCLUSION ............................................................................................41

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
5      92 F.3d 781 (9th Cir. 1996) ................................................................... 26

6

*Anderson v. Liberty Lobby, Inc.*,
7      477 U.S. 242 (1986) ............................................................................ 14

8

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*,
9      900 F.3d 623 (9th Cir. 2018) ..................................................*passim*

10

*Bowoto v. Chevron Texaco Corp.*,
11      312 F. Supp. 2d 1229 (N.D. Cal. 2004) ............................................... 27

12

*British Marine PLC v. Aavanti Shipping & Chartering Ltd.*,
     No. 13 Civ. 0839, 2013 WL 6092821 (E.D.N.Y. Nov. 19, 2013) ....... 39

13

*Calabasas Luxury Motorcars, Inc. v. Gen. Motors LLC*,
14      No. CV 21-09566, 2022 WL 17348983 (C.D. Cal. Aug. 25, 2022) ... 35

15

*In re Citric Acid Litig.*,
16      191 F.3d 1090 (9th Cir. 1999) ........................................ 15, 16, 17, 22

17

*Contract Assocs. Office Interiors, Inc. v. Ruiter*,
18      No. CIV.S-07-00334, 2008 WL 2225702 (E.D. Cal. May 29, 2008) ... 34

19

*Daniels v. United States*,
20      No. 3:16-cv-02077, 2017 WL 3478765 (S.D. Cal. Aug. 11, 2017) ... 27, 28

21

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
     No. 18-cv-864, 2018 WL 6629250 (N.D. Ill. Oct. 22, 2018) .............. 19
22

23

*Dearborn v. Mar Ship Operations, Inc.*,
     113 F.3d 995 (9th Cir. 1997) ............................................................... 29
24

25

*Digby Adler Grp. LLC v. Image Rent a Car, Inc.*,
     79 F. Supp. 3d 1095 (N.D. Cal. 2015) ................................................. 40

26

*Doe v. Unocal Corp.*,
27      248 F.3d 915 (9th Cir. 2001) ............................................................... 19

28

*Dollar Tree Stores Inc. v. Toyama Partners LLC*,
    875 F. Supp. 2d 1058 (N.D. Cal. 2012) .................................................. 40

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
    No. 5:11-CV-03613, 2015 WL 365491 (N.D. Cal. Jan. 27, 2015) ...................... 16

*Henderson v. United Student Aid Funds, Inc.*,
    918 F.3d 1068 (9th Cir. 2019) ........................................................ 27, 34

*In re High-Tech Emp. Antitrust Litig.*,
    No. 11-cv-02509, 2014 WL 1283086 (N.D. Cal. Mar. 28, 2014) ........... 17, 20, 22

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    No. 17-cv-03301, ___ F. Supp. 3d___, 2022 WL 18399982 (N.D.
    Cal. Nov. 4, 2022) ...................................................................... 11

*Joint Equity Comm. of Invs. of Real Est. Partners, Inc. v. Coldwell
    Banker Real Est. Corp.*,
    281 F.R.D. 422 (C.D. Cal. 2012) ..................................................... 34

*Kristensen v. Credit Payment Servs. Inc.*,
    No. 2:12-cv-00528, 2015 WL 4477425 (D. Nev. July 20, 2015),
    *aff'd*, 879 F.3d 1010 (9th Cir. 2018) ................................................. 34

*Los Angeles Police Protective League v. Gates*,
    995 F.2d 1469 (9th Cir. 1993) .......................................................... 41

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .................................................................. 15, 16

*Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*,
    467 F. Supp. 841 (N.D. Cal. 1979) .................................................... 33

*N.L.R.B. v. Deena Artware, Inc.*,
    361 U.S. 398 (1960) ................................................................... 39

*People v. JTH Tax, Inc.*,
    212 Cal. App. 4th 1219 (2013) ........................................................ 27

*Phoenix Canada Oil Co. Ltd. v. Texaco Inc.*,
    842 F.2d 1466 (3d Cir. 1988) .......................................................... 30

*Poller v. Columbia Broad. Sys., Inc.*,
    368 U.S. 464 (1962) .......................................................................................... 17

*Siegel v. Warner Bros. Ent. Inc.*,
    581 F. Supp. 2d 1067 (C.D. Cal. 2008)............................................................ 39, 40

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    803 F.3d 1084 (9th Cir. 2015) ........................................................................ 17, 22

*Star Mountain Plan Tr. v. Titan Mining (US) Corp.*,
    No. 22-cv-01389, 2023 WL 2355916 (D. Ariz. Feb. 3, 2023)............................. 39

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    No. 07-MD-01819, 2010 WL 5138859 (N.D. Cal. Dec. 10, 2010) ..................... 33

*Stone Lion Capital Partners, L.P., v. Lion Capital LLP*,
    2013 WL 6006296 (C.A. Fed.)............................................................................ 37

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
    622 F. Supp. 2d 890 (N.D. Cal. 2009).......................................................... 27, 31

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. 10-4572, 2013 WL 6174683 (N.D. Cal. Nov. 20, 2013), *aff'd*,
    637 F. App'x 981 (9th Cir. 2016) ....................................................................... 15

*Tolan v. Cotton*,
    572 U.S. 650 (2014) .......................................................................................... 14

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ............................................................................. 16

*Trenz v. Sirius Xm Radio, Inc.*,
    No. 15-cv-0044, 2015 WL 11658715 (S.D. Cal. July 13, 2015) .................. 27, 33

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ....................................................................................... 18, 19

*United States v. Foster*,
    985 F.2d 466 (9th Cir. 1993) ............................................................................. 15

*United States v. Grasso*,
    724 F.3d 1077 (9th Cir. 2013), *cert. denied Grasso v. United States*,
    134 S. Ct. 484 (2013).......................................................................................... 15

*United States v. Lischewski*,
    18-cr-203-EMC (N.D. Cal. Dec. 2, 2019) ............................................................. 25

*USA v. Chen*,
    548 F. Supp. 3d 904 (N.D. Cal. 2021) ................................................................. 11

*ViacomCBS Inc. v. Great Divide Ins. Co.*,
    No. 2:21-cv-00400, 2022 WL 16857003 (C.D. Cal. Nov. 10, 2022) ................. 11

*Wolfe v. United States*,
    806 F.2d 1410 (9th Cir. 1986) ............................................................................. 39

*In re Wolverton Assocs.*,
    909 F.2d 1286 (9th Cir. 1990) ............................................................................. 35

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*,
    402 F. Supp. 262 (E.D. Pa. 1975) ....................................................................... 39

**Other Authorities**

Restatement (Third) Of Agency § 4.01 (2006) ......................................................... 33

S.E.C., Lion Capital to Acquire Bumble Bee Foods from Centre Partners,
https://www.sec.gov/Archives/edgar/data/1491594/000095012310101820/a57764e
xv99w1.htm (Nov. 4, 2010) .................................................................................... 30

Tracc Films, Lion Capital Wall Street Journal Film, YouTube (Sept.
    10, 2015), https://www.youtube.com/watch?v=XdRwC-rrQe0 ................... 30, 37

The Direct Purchaser Plaintiffs ("DPPs"), End Payer Plaintiffs ("EPPs"), Commercial Food Preparers ("CFPs"), and Direct Action Plaintiffs ("DAPs") (collectively, "Plaintiffs") hereby oppose the Motion for Summary Judgment filed by Lion Capital LLP, Lion (Americas), Inc. (collectively, the "Lion Entities"), and Big Catch Cayman LP ("Big Catch"). *See* ECF No. 3036-1 ("Mot.").[1]

## I.   INTRODUCTION

Lion Capital LLP ("Lion Capital"), Lion Capital (Americas) LLP ("Lion Americas"), and Big Catch Cayman LP contend that there are no genuine issues of material fact concerning their liability in this case, and that summary judgment of the claims against them is warranted. Their argument is completely unfounded.

With respect to Lion Capital and Lion Americas, the *undisputed* facts include, *but are not limited to*, the following: (1) Bumble Bee Foods LLC ("Bumble Bee"), StarKist Company ("StarKist"), and Chicken of the Sea International ("COSI") participated in a price-fixing conspiracy, (2) Eric Lindberg ("Lindberg"), a partner in Lion Capital *and* a director in Lion Americas was asked by Bumble Bee's CEO, Christopher Lischewski ("Lischewski"), to convey a *plainly anticompetitive message* to StarKist's owner, Dongwon Industries ("DWI"), that Bumble Bee would act rationally in the market, (3) Ken Worsham ("Worsham"), one of the participants in

---

[1] Plaintiffs separately opposed the Motions for Summary Judgment by Defendants Dongwon Industries ("DWI"), and Thai Union Group ("TUG"), and Lion Capital, Lion (Americas), Inc., and Big Catch Cayman LP (together, the "Lion Entities"), *see* ECF Nos. 1973 ("DWI Mot."), 1973-1 ("DWI MP&A"); 2001 ("TUG Mot."); 2001-1 ("TUG MP&A"); and 1998 ("Lion Mot."); 1998-1 ("Lion MP&A"), on November 7, 2019. *See* ECF Nos. 2139; 2143. The Court rendered the Lion Entities' Motion for Summary Judgment moot on September 8, 2022. ECF No. 2914. The TUG Mot. is now moot due to the settlement with TUG and its subsidiaries, including Chicken of the Sea. *See* ECF No. 3011. The DWI Mot. was recently withdrawn by DWI. ECF No. 3038. All citations to the Stein Declaration ("Stein Decl.") refer to the evidence already put forth to the Court in ECF No. 2143 and re-filed with Plaintiffs' current brief.

1   the conspiracy, testified that the Lion Entities' executives, including Lindberg, would

2   have understood that Bumble Bee employees were speaking to the competition, (4)

3   during the conspiracy, Lion Capital received a "whistle-blower" letter, addressed to

4   Lindberg, that clearly discloses that senior executives at Bumble Bee, including

5   Worsham, were colluding to fix prices, and (5) Lindberg admits that the Lion Entities

6   did nothing to put an end to the illegal conduct that had been brought to his attention.

7          This undisputed evidence demonstrates that Lion Capital directly participated

8   in and/or authorized Bumble Bee to pursue its illegal price-fixing conspiracy. Indeed,

9   even a cursory inspection of the "whistle-blower" letter, and Lindberg's email to

10  Lischewski about it, demonstrates that Lion Capital and Lion Americas were not

11  concerned about allegations that, according to the whistle-blower, were putting the

12  entire company in "jeopard[y]." The collusion continued, Bumble Bee reaped illegal

13  profits, and Lion Capital's investment in Bumble Bee benefited significantly. That is

14  sufficient evidence—without more (and there is more, as set forth below)—to send

15  the question of whether the Lion Entities knowingly participated in the conspiracy,

16  are liable for the conspiracy as principals of Bumble Bee, or are liable for participating

17  in a "single enterprise" including the Lion Entities and Bumble Bee pursuant to the

18  holding of *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th

19  Cir. 2018) ("*Arandell*"), to the jury.

20         With respect to Big Catch, this entity has never been anything more than a shell

21  company, organized in the Cayman Islands, for the sole purpose of holding legal title

22  to Bumble Bee's shares.[2] The general partner is Lion/Big Catch Cayman Ltd., which

23

24

25  [2] According to the Lion/Big Catch Cayman L.P. Amended Agreement, Big Catch's
    owners included Lischewski, Cameron, and Worsham as Class B Limited Partners.
26  *See* Stein Decl., Ex. 78; Stein Decl., Ex. 219 (Lischewski Dep.) 236:12-238:4; Stein
    Decl., Ex. 218 (Capps Dep.) 362:3-24; Stein Decl., Ex. 216 (Lindberg Dep.) 408:9-
27  14.

28

---

is 100% owned by the Lion Capital Fund III partnerships ("Fund III").[3] Big Catch never held any share-holder meetings, its former principal place of business was listed as Lion Americas' office address in New York,[4] and it has never had any capital of its own beyond the shares in Bumble Bee that it held for the benefit of Bumble Bee's equitable owners. As Big Catch admits in the Motion, "Big Catch has no meaningful assets—it was formed to hold Fund III's equity interest in Bumble Bee . . . ."[5] On these facts, there is a genuine issue of material fact concerning Big Catch's liability as an alter ego of Lion Capital. Summary judgment should be denied in its entirety.

## II.    FACTUAL BACKGROUND

### A.    Lion Acquires Bumble Bee Despite Industry Problems and Clear References to the Conspiracy

Lion Capital, a private equity firm based in the United Kingdom, sought Bumble Bee as a potential asset for its Fund III in late 2010 and conducted due diligence on the company through its U.S.-based office, Lion Americas.[6] Lindberg (Partner, Lion Capital and Director, Lion Americas), Jacob Capps ("Capps") (Partner, Lion Capital and President, Lion Americas), and Jeff Chang ("Chang") (Partner, Lion Capital, and Principal, Lion Americas) served concurrently as both Lion Americas *and* Lion Capital directors and officers during the relevant time period, oversaw the Lion Entities' potential investment in Bumble Bee, and reported to Lyndon Lea ("Lea"), Founding Partner and Managing Partner at Lion Capital.[7]

Lion Capital had complete control over the work of its U.S.-based team and remained informed and involved in all major decisions. As testified to by Lea, Lion

---

[3] Stein Decl., Ex. 189.
[4] Stein Decl., Ex. 78.
[5] *See* Mot., at 41:18-19.
[6] ECF No. 3036-4 (Chang Decl.) ¶ 21.
[7] *See*, *e.g.*, Stein Decl., Ex. 216 (Lindberg Dep.) 26:23-27:7; 48:16-49:9; Stein Decl., Ex. 218 (Capps Dep.) 43:11-46:14.

Americas was wholly-owned by Lion Capital and managed all U.S.-based investments, with a member of the investment committee staying attached to the U.S.-based team throughout the life of the investment.[8] Lea specifically was part of the four-partner investment committee that approved Lion Capital's Bumble Bee investment in 2010,[9] and was personally involved in the due diligence process for the Bumble Bee transaction, attending management presentations with Bumble Bee's Lischewski and receiving and analyzing detailed investment committee memos.[10] During the due diligence process, the reports sent to the investment committee warned that: (1) tuna consumption had been declining for years; (2) there was a price ceiling on what consumers were willing to pay for tuna; (3) that the cost of skipjack and albacore had been climbing for more than a decade; and (4) that the cost increase was caused, in part, because fewer and smaller fish were being caught.[11] Indeed, Lion Capital's own consultant advised that the tuna industry lacked significant pricing power.[12] Yet, after a meeting and dinner with Bumble Bee's senior management, including Lischewski, Lion Capital's final Investment Committee Update reported that the "competitive dynamic among Bumble Bee, StarKist and Chicken of the Sea and private label *is rational and improving* from Bumble Bee's perspective."[13] The Update also reported that "StarKist is focused on pouch" and that "*both StarKist and Bumble Bee recognize and 'respect'* each other's core markets (pouch vs. albacore),"[14] which was later corroborated in StarKist's 2014 board minutes, in which

---

[8] Nyovanie Decl., Ex. A (Lea Dep.) 319:6-10; 89:5-90:7.

[9] Stein Decl., Ex. 216 (Lindberg Dep.) 58:3-14.

[10] Stein Decl., Ex. 65 at 3; Stein Decl., Ex. 217 (Chang Dep.) 48:17-57:9; Stein Decl., Ex. 218 (Capps Dep.) 114:7-22, 155:10-156:19.

[11] Stein Decl., Ex. 218 (Capps Dep.) 90:4-90:24; 107:11-109:13; 117:4-133:24; Stein Decl., Ex. 65.

[12] Stein Decl., Ex. 218 (Capps Dep.) 133:25-138:18; Stein Decl., Ex. 66.

[13] Stein Decl., Ex. 191 at LION_00040101 (emphases added).

[14] *Id*. at LION_00040111.

Pls.' Opp'n to Lion Entities' Mot. for Summ. Judg.          Case No. 15-md-2670-DMS-MSB

4

1   StarKist's former president and CEO, Sam Hwi Lee, stated that "StarKist and Bumble
2   Bee had an *implicit understanding* that they wouldn't attack each other's pouch and
3   WM segments."[15] With the understanding that Bumble Bee knew its competitors'
4   priorities and strategies moving forward—with no perceivable, lawful way to obtain
5   such information—Lion Capital proceeded with the investment.

6        **B.    Lindberg Goes on "Owner-to-Owner" Tour to Further Facilitate the**
7           **Conspiracy**

8        As early as November 2010, shortly before the close of Lion Capital's
9   acquisition of Bumble Bee in December, Lindberg made plans to meet with the
10  owners of Bumble Bee's competitors—Dongwon and Thai Union Group ("TUG").
11  Lischewski conveyed to Lindberg prior to the trip that the "key message" for Lindberg
12  during his 'owner-to-owner' tour was to "ensure Dong Won that *Lion will support*
13  *rationale [sic] market behavior by Bumble Bee*."[16] Capps, who was not copied,
14  testified that he would have considered such a request—or any other indication that
15  Bumble Bee's managers considered it acceptable to communicate with its competitors
16  about pricing—to be "red flags" prior to the close of the sale.[17] On November 12,
17  2010, StarKist's Joe Tuza reported to Don Binotto, StarKist's then CEO, that Bumble
18  Bee had expressed a concern that StarKist's "aggressive" prices would "sabotage the
19  category growth" and that Bumble Bee wanted to call a "truce to the irrational
20  behavior[.]"[18] Binotto responded: "Now I understand why [Bumble Bee]'s new owner
21  [Lion] made a point to meeting our chairman this week"—referring to a meeting
22  between Lindberg and Dongwon's Jae Chul Kim ("Chairman Kim"),[19] suggesting

---

[15] Stein Decl., Ex. 146 at DWI_000066649E.
[16] Stein Decl., Ex. 84 at LION_00028068 (emphases added).
[17] Stein Decl., Ex. 218 (Capps Dep.) 176:10-178:23.
[18] Stein Decl., Ex. 16.
[19] *Id.* In response to Tuza forwarding this email, StarKist's VP of Trade Marketing, Chuck Handford, noted that Bumble Bee's SVP of Sales (Scott Cameron) had called

that Lion and Dongwon would discuss reaching a "truce" during the meeting.

Lindberg met with Chairman Kim in New York on November 15, 2010 (approximately when Lischewski's indictment begins the conspiracy period).[20] While Lindberg denies discussing "antitrust related" topics with Chairman Kim, just four days after the meeting, Lischewski reported to Lindberg that Chairman Kim had fired Binotto and ranted during a StarKist Board meeting about StarKist's "extremely aggressive" pricing.[21] Rather than question how Lischewski came to know this information, Lindberg added to it, sharing that Chairman Kim had "made allusions to his displeasure" with Binotto during their meeting and noting that "[l]ess experienced management and [Chairman Kim's] stated displeasure at price cutting sounded good to me."[22] The meeting minutes, however, did not account for this—underscoring that the entirety of what Lindberg and Chairman Kim discussed was not consistently memorialized. Shortly after the November 5 meeting, on November 19, 2010, Lindberg met with Thiraphong Chansiri ("Chansiri") and Cheng Niruttinanon ("Han Seng"), the heads of TUG, for dinner in Bangkok, Thailand.[23] Though Lindberg denies reaching price-fixing agreements at the meeting, he admits he and Chansiri discussed the packaged tuna industry and ways to cooperate.[24]

---

him with the "same message" noting that BB's "new ownership has come with very high profit expectations and they are under extreme pressure to deliver." Stein Decl., Ex. 17 at SKC000177778.

[20] Stein Decl., Ex. 89; Stein Decl., Ex. 6 (Lischewski indictment).

[21] Stein Decl., Ex. 91.

[22] *Id.*

[23] Stein Decl., Ex. 92; Stein Decl., Ex. 216 (Lindberg Dep.) 126:17-127:15; Stein Decl., Ex. 222 (Chansiri Dep). 209:1-211:9, 215:5-7, 216:22-217:22).

[24] Stein Decl., Ex. 216 (Lindberg Dep.) 127:12-25. Lischewski also invoked his Fifth Amendment rights with respect to questions about Lindberg's meeting with Chansiri and Han Seng. Stein Decl., Ex. 219 (Lischewski Dep.) 119:25-123:4. *See also* Plaintiffs' Joint Opposition to the Parent Entities' Motion for Summary Judgment, ECF No. 2139 at 27 (discussing additional meeting with Chansiri in January 2011).

In December 2010, following Lindberg's tour (though Lindberg would go on to visit competitors several more times during Lion's ownership), Lion Capital purchased Bumble Bee for $980 million.[25] The acquisition was an investment of Lion Capital through Fund III. To structure the acquisition, Lion Capital formed Big Catch, a shell intermediary used to hold Bumble Bee's shares.[26] As Chang himself explained, Big Catch served as a "special purpose vehicle that was formed to hold the partnership interest that ultimately then made the investment in Bumble Bee."[27] Fund III owned



100% of Lion/Big Catch Cayman Ltd., Big Catch's general partner,[28] and Big Catch owned 100% of Bumble Bee Foods S.a.r.l., which in turn, owned 100% of Bumble

---

[25] Nyovanie Decl., Ex. B.

[26] *See* Stein Decl., Ex. 216 (Lindberg Dep.) 37:3-38:5, 408:1-6, 409:4-8; Stein Decl., Ex. 217 (Chang Dep.) 72:15-25, 131:12-132:3; Stein Decl., Ex. 79.

[27] Stein Decl., Ex. 217 (Chang Dep.) 95:22-96:4.

[28] Stein Decl., Ex. 189.

Bee.[29] Big Catch never held any share-holder meetings, had its own principal place of business,[30] or held any capital of its own beyond the shares in Bumble Bee that it held for the benefit of Bumble Bee's equitable owners.

At the suggestion of J.P. Morgan, Bumble Bee borrowed $150 million immediately after the sale, with the intention of that same amount being returned "up the chain as a return of capital to the partners of Lion/Big Catch Cayman, L.P."[31]

## C.    The Lion Entities Oversee and Support the Conspiracy Throughout Bumble Bee's Ownership

The Lion Entities put immediate pressure on Bumble Bee to increase its profitability.[32] StarKist, Bumble Bee, and COSI all announced coordinated price increases on tuna products throughout the conspiracy period—occurring on or around May/June 2011,[33] April 2012,[34] and July 2012.[35] During Bumble Bee board meetings, Lion executives—who made up the majority of the Board—would be informed of upcoming price increases, and importantly, would be told *in advance* that the competition would be implementing said increase as well. Board presentations included such explicit references as: "*Competitive intel indicates* a list price increase by StarKist on both Lightmeat and Albacore Tuna items effective 7/28," "We have announced a 4/1 Pouch list price increase *with both SK and COS following*," and

---

[29] Paris Decl. (ECF No. 3036-11), Ex. O at LION_00017490).

[30] Stein Decl., Ex. 78.

[31] Stein Decl., Ex. 67 at LION_00060041.

[32] *See* Stein Decl., Ex. 216 (Lindberg Dep.) 65:11-18, 418:18-419:23.

[33] *See* Plaintiffs' Joint Opposition to the Parent Entities' Motion for Summary Judgment, ECF No. 2139 at 29 (discussing list price increases effective May/June 2011).

[34] *Id*. at 35 (discussing list price increases effective April 2012).

[35] *Id*. at 39-40 (discussing list price increase effective July 2012).

others.[36] Kenneth Worsham,[37] Bumble Bee's Senior Vice-President of Trade Marketing, who typically presented to the Bumble Bee board during these meetings, himself testified: "I believe the board members," referring to such individuals as Lindberg and Capps, "were generally aware of the conversations [with competitors]."[38]

The Lion Entities provided instructions to Bumble Bee on price, were generally kept abreast of whether the price increases were successful, and took credit for that success. For example, in a July 2011 email, in response to an email from Lischewski reporting "bits and pieces coming out of SK's recent 4 day Board meeting with the Koreans," Lindberg instructed Capps to "call [Lischewski] directly" to stop Bumble Bee's planned attack on StarKist's pouch.[39] Lindberg wrote: "*[U]nder no circumstance do we want any negative price signaling*."[40] Following the 2011 price increase, Lischewski wrote to Lindberg and Capps about how although there had been "*rampant cheating*"—ostensibly on the conspiracy—"[a]ll three companies have announced a list price increase April 1 so hopefully it gets better."[41] And, in a 2012 Lion Capital Investor Letter, Lion Capital wrote to investors, "[t]he good news is *our price increases* will recover much of these costs in future periods and *our* two primary competitors in North America . . . are demonstrating a return to rational pricing following some very aggressive discounting last year."[42]

Lindberg remained deeply involved in the conspiracy's perpetuation for the duration of the Lion Entities' equitable ownership and remained in touch with

---

[36] *See* Nyovanie Decl., Ex. C at LION_00070590-591 (emphases added).
[37] Worsham admitted his participation in the conspiracy and pled guilty. *See* Nyovanie Decl., Ex. D (Worsham Plea Agreement).
[38] Nyovanie Decl., Ex. E (Worsham Dep.) 106:19-107:7.
[39] Nyovanie Decl., Ex. F.
[40] *Id.* (emphases added).
[41] Stein Decl., Ex. 123 (emphases added).
[42] Nyovanie Decl., Ex. G at LION_00070708 (emphases added).

competitors throughout.[43] For example, on August 23, 2011, Lindberg spoke to Chairman Kim and Ingu Park, Chairman Kim's brother-in-law and Vice-Chairman of Dongwon, about another meeting in Seoul to "*discuss our mutual interests*."[44] On September 2, 2011, Lindberg wrote to Chairman Kim that "I will not have an attorney with me; as last time, I consider this an 'owner to owner' meeting and will not discuss anything so specific about the US market that we should be concerned about anti-competitive/price collusion issues."[45] Yet, that same day, Lischewski emailed Scott Cameron ("Cameron") and Worsham—Bumble Bee's SVP of Sales and SVP of Trade Marketing respectively—about preparing Lindberg for that meeting by providing a "written update on shares, pricing, base vs promotional activity, etc.," so Lindberg could be briefed on the current competitive situation before he met with Dongwon.[46]

Lindberg and Capps ultimately met with Chairman Kim on November 28, 2011.[47] Capps testified that he could not recall whether Lindberg discussed the pricing of packaged seafood at the meeting, and could not recall why pricing and share related materials were provided to Lindberg in advance of the meeting.[48] However, in an email from Wen Hung Lee ("W.H. Lee"), CEO of FCF Co., Ltd.,[49] reporting the

---

[43] *See* Plaintiffs' Joint Opposition to the Parent Entities' Motion for Summary Judgment, ECF No. 2139 at 31-32.

[44] Stein Decl., Ex. 111 at LION_00045616 (emphases added).

[45] *Id*. at LION 00045615.

[46] Stein Decl., Ex. 112; *see also* Stein Decl., Ex. 18.

[47] Stein Decl., Ex. 114.

[48] Stein Decl., Ex. 218 (Capps Dep.) 256:10-18, 257:18-259:25.

[49] FCF had a 23 percent interest in Bumble Bee, having contributed $70 million to its acquisition in December 2010, Stein Decl. Ex. 189; Nyovanie Decl., Ex. H at 43, and additionally owned Besford Limited, which in turn owned approx. 17.945 percent of Big Catch, Stein Decl. Ex. 189. FCF and Bumble Bee also shared several joint ventures, *id*., generally working together as partners in the tuna industry. Given FCF's stake in Bumble Bee and the companies' relationship, W.H. Lee acted as an agent— for this meeting and others—during the conspiracy period, regularly reporting

details of the November 2011 meeting to Bumble Bee on November 30, Lee wrote, "[i]n our conversation with Eric last night, Mr[.] Kim clearly pass[ed] the message, SK not doing well now, all what they acted irrational in market place simply to reflect [] your attack to them on pouch and trying to steal their share," indicating that pricing—and the conspiracy—were discussed.[50] W.H. Lee added that in this same meeting, Chairman Kim explained that "they *agree it is nice to make reasonable margin* and *will act rational* if no one try to challenge their share."[51]

Lindberg also continued to have conversations with Chansiri, including for example in December 2011, when Chansiri complained to Lindberg that the "US canned tuna market this year is extremely competitive and I don't see how it could improve due to the manner of the players. *If you [Lindberg] have any idea to suggest of how we can work together on the owner level, please do let me know*."[52] In a response email, Lindberg added "I know that our management team is working with your people on the potential US manufacturing JV [joint venture] which we think may generate very attractive savings for both of us; as I have expressed previously, *I would*

---

competitor information and updates on the status of the conspiracy back to Bumble Bee. *See USA v. Chen*, 548 F. Supp. 3d 904, 908 (N.D. Cal. 2021) ("[S]tatements made to keep co-conspirators abreast of an ongoing conspiracy's activities" are considered "in furtherance" of a conspiracy for purposes of Fed. R. Evid. 801(d)(2)(E)).

[50] Nyovanie Decl., Ex. I. In the Ninth Circuit, "evidence that could be presented in an admissible form at trial may be considered on summary judgment." *ViacomCBS Inc. v. Great Divide Ins. Co.*, No. 2:21-cv-00400, 2022 WL 16857003, at *3 (C.D. Cal. Nov. 10, 2022); *see, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-cv-03301, ___ F. Supp. 3d___, 2022 WL 18399982, at *5 (N.D. Cal. Nov. 4, 2022) (noting that "[e]vidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form").

[51] Nyovanie Decl., Ex. I (emphasis added).

[52] Stein Decl., Ex. 118 (emphases added); *see also* Plaintiffs' Joint Opposition to the Parent Entities' Motion for Summary Judgment, ECF No. 2139 at 48-49.

---

*personally love to find other ways to work together with you.*"[53] Lindberg also met with Chansiri again in the spring of 2012 in Boston and Bangkok.[54] Lindberg testified that the focus of the meeting was a potential merger between Bumble Bee and Chicken of the Sea and could not recall whether they discussed other topics.[55] However, on May 29, 2012, Lindberg reported in an email to Lea and other Lion Capital partners that at a recent five-hour meeting with Chansiri in Bangkok, that "probably half" of that time was "spent discussing our COS/BB merger proposal."[56] The email does not report what other topics were discussed in the remaining 2.5 hours.[57]

### D.   The Whistle-blower Letter

In February 2012, prior to the April 2012 list price increase, Lindberg, Capps, and Chang received an anonymous letter from a Bumble Bee employee stating explicitly that there was "Potential Anticompetitive Activity: Emails, Meetings, [and] Phone Calls to Competitors Suggesting to Raise Prices" at Bumble Bee.[58] The envelope, specifically addressed to Lindberg at Lion Capital's New York address, also included a sender-address for Lion Capital's London office—demonstrating that the whistle-blower understood the connection between the two entities.[59] The letter expressly references the Sherman Act and lists by title the various Bumble Bee employees involved (including the Senior Vice President of Trade Marketing, and the

---

[53] Stein Dec., 118 (emphases added).
[54] Stein Decl., Ex. 222 (Chansiri Dep.) 243:3-6; 264:5-8, 265:15-17; Stein Decl., Ex. 216 (Lindberg Dep.) 150:2-18; 261:13-262:7, 262:21-24, 317:13-25; Stein Decl., Ex. 133 (Lindberg also planned to meet Lischewski right after his dinner with Chansiri to give him the "download on where things stand").
[55] Stein Decl., Ex. 216 (Lindberg Dep.) 256:19-272:5.
[56] Stein Decl., Ex. 138.
[57] *Id.*
[58] Stein Decl., Ex. 124 at LION_00049506. The Department of Justice identified the whistleblower as Charles Simmons.
[59] *Id.*

---

Senior Vice President of Sales), informing the Lion Entities that "[t]he entire company is being jeopardized."[60] Rather than interview Worsham or Cameron—who were listed on the letter—or do anything to investigate, Lindberg told Lischewski about the letter, describing the employee as "disgruntled," and did not bring it to Bumble Bee's General Counsel's attention.[61] Lindberg and Capps testified that they did not recall whether they told Lea about the letter, although Capps conceded that they "might have" sent it to Lea.[62] Lea testified that he had heard of the letter prior to Bumble Bee's agreed-upon sale to TUG,[63] but solely with respect to the letter's claim that "Lischewski was a poor manager and a drunk and drank expensive wine."[64] Bumble Bee and Lion took no action with respect to the letter and the conspiratorial price increases went forward.[65]

On July 30, 2012, Lea sent Lindberg an email advising that "Bumble Bee is [the] first Fund III asset to be written down," and asked for any positive news to share with the investors with whom Lea would be meeting.[66] In his reply, Lindberg wrote: "We have a very smart management team that is convinced that EBITDA performance during the first half of 2012 is a temporary dislocation driven by the industry's failure to raise retail prices to match the extremely rapid rise in fish prices during 2011-early 2012. Much of this pricing issue was caused by StarKist's dysfunctional management team, which was fired by Dongwon, and *they are now in*

---

[60] *Id.*

[61] *Id.* at LION_00037884; Stein Decl., Ex. 125; Stein Decl., Ex. 257 (Declaration of Bumble Bee's General Counsel); *see also* Stein Decl., Ex. 196.

[62] Stein Decl., Ex. 216 (Lindberg Dep.) 351:3-352:2; Stein Decl., Ex. 218 (Capps Dep.) 293:7-25. *See* Plaintiffs' Opposition to Parent Entities' Motion for Summary Judgment, ECF No. 2139 at 36 (discusses other failures by Chang and Capps to respond to the whistleblower letter).

[63] Nyovanie Decl., Ex. A (Lea Dep.) 218:4-6.

[64] Nyovanie Decl., Ex. A (Lea Dep.) 216:12-23.

[65] Stein Decl., Ex. 194.

[66] Stein Decl., Ex. 141.

1    *lockstep with us in setting pricing rationally*."[67]

2        In line with Lindberg's statement, StarKist and Bumble Bee went on to have

3    what StarKist described as "a 'well-behaved' 2013."[68] In 2014, Bumble Bee's

4    adjusted EBITDA climbed to $148 million, "the highest level of EBITDA in the

5    company's history."[69] And that same year, TUG offered to purchase Bumble Bee

6    from Lion Capital for $1.51 billion.[70]

7    ## III.   LEGAL STANDARD

8        Federal Rule of Civil Procedure 56 empowers the Court to enter summary

9    judgment on factually unsupported claims or defenses. However, summary judgment

10   is solely appropriate where the evidence shows there is no genuine dispute as to any

11   material fact. Fed. R. Civ. P. 56(a), (c)(1). A fact is material when, under the

12   governing substantive law, it could affect the outcome of the case. *See Anderson v.*

13   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). A dispute about a

14   material fact is genuine if "the evidence is such that a reasonable jury could return a

15   verdict for the nonmoving party." *Id.*

16       In ruling on a motion for summary judgment, "courts may not resolve genuine

17   disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*,

18   572 U.S. 650, 656 (2014). Rather, "[t]he evidence of the non-movant is to be believed,

19   and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

20   "Credibility determinations, the weighing of the evidence, and the drawing of

21   legitimate inferences from the facts are jury functions, not those of a judge . . ." *Id.*

22   ## IV.   ARGUMENT

23       The Lion Entities argue that Plaintiffs must establish a genuine issue of material

24

25   ---

26   [67] *Id.* (emphasis added).
     [68] Stein Decl., Ex. 143 at 10.
27   [69] Nyovanie Decl., Ex. J at LION_00073763-764.
     [70] *Id.*
28

---

fact via either direct evidence that Defendants agreed to fix prices or circumstantial evidence from which a reasonable factfinder could infer that Defendants entered into an anticompetitive agreement. *In re Citric Acid Litig.*, 191 F.3d 1090, 1093 (9th Cir. 1999) ("*Citric Acid II*"). This standard, however, outlines the requirements for a plaintiff to prove the *existence* of a price-fixing conspiracy (*id.*)—which is not the case here. Bumble Bee already pleaded guilty to violations of the Sherman Act for the period of "as early as the first quarter of 2011 and continuing through at least as late as the fourth quarter of 2013."[71]

In a case such as this, in which the existence of a conspiracy has already been established, only a "slight connection" to the existing conspiracy is necessary to find the defendant liable. *United States v. Grasso*, 724 F.3d 1077, 1086 (9th Cir. 2013) ("Once the existence of the conspiracy is shown, evidence establishing . . . a knowing connection of the defendant with the conspiracy, even though the connection is slight, is sufficient to convict him of knowing participation in the conspiracy."), *cert. denied Grasso v. United States*, 134 S. Ct. 484 (2013); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 10-4572, 2013 WL 6174683, at *3 (N.D. Cal. Nov. 20, 2013), *aff'd*, 637 F. App'x 981 (9th Cir. 2016) (same).

Circumstantial evidence is sufficient to connect a defendant to a conspiracy in such cases. *United States v. Foster*, 985 F.2d 466, 469 (9th Cir. 1993), *on reh'g in part*, 995 F.2d 882 (9th Cir. 1993), *and amended*, 17 F.3d 1256 (9th Cir. 1994). Accordingly, the *Matsushita* standard Defendants rely upon in their motion is inapplicable in this case. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Rather, Plaintiffs must demonstrate that the Lion Entities knowingly participated in the undisputed price-fixing conspiracy that underpins this litigation, or that they are vicariously liable for Bumble Bee's conduct as principals

---

[71] Stein Decl., Ex. 1 at 2-3.

1    and/or pursuant to the single enterprise doctrine.

2        The evidence presented here more than meets that standard. But, even if the

3    Court follows *Matsushita* in this case—which Plaintiffs posit it should not, as there is

4    no conspiracy to prove—Plaintiffs need only provide enough evidence that "tends to

5    exclude the possibility that [defendants] acted independently," to establish their

6    liability for the conspiracy. *Matsushita Elec.*, 475 U.S. at 587-88. The "tends to

7    exclude" standard does not require plaintiffs to "exclude all possibility that the

8    manufacturers acted independently[.]" *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 934-

9    35 (7th Cir. 2000); *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, No. 5:11-CV-

10   03613, 2015 WL 365491, at *5 (N.D. Cal. Jan. 27, 2015) (denying summary judgment

11   because though "none of the evidence necessarily excludes the possibility that [the

12   defendant] arrived at decisions on its own . . . ., all that is necessary to avoid summary

13   judgment is evidence that reasonably tends to exclude that possibility"). Rather, the

14   "crucial question" for the Court is "whether all the evidence considered as a whole

15   can reasonably support the inference that [Defendants] conspired" to fix prices. *Citric

16   Acid II*, 191 F.3d at 1097 (emphasis added).

17       Indeed, *Matsushita* involved a group of American corporations that made or

18   sold consumer electronic products and claimed that their Japanese counterparts were

19   engaging in a 20-year conspiracy to price below cost in the United States in the hope

20   of expanding their market share sometime in the future. *Matsushita*, 475 U.S. at 577-

21   82. In reviewing a grant of summary judgment, the Supreme Court highlighted the

22   difficulty with the plaintiffs' theory—namely, that defendants had every incentive not

23   to engage in the alleged conduct, which required them to sustain losses for decades

24   with no foreseeable profits—and thus, because the plaintiffs could offer no "rational

25   motive to conspire" (*id*. at 597), the Court held that a reasonable jury could not return

26   a verdict for the plaintiffs and that summary judgment was appropriate. *Id*. at 587-88.

27   In other words, the claim involved was inherently implausible, and thus, a more

28

fulsome showing was required. That is not the case here, where Lion Capital, a private equity firm, bought Bumble Bee with the hope of flipping it in a few years' time. Mot. at 15 (noting Lion's objective to sell Bumble Bee "from the outset"). Lion Capital wanted to increase Bumble Bee's profits in the near term,[72] which plausibly aligns it with the price-fixing that was underway on its watch.

Pursuant to the Ninth Circuit's two-step framework, "the defendant[s] can 'rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice.'" *Citric Acid II*, 191 F.3d at 1094 (quoting *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987)). "[I]f the factual context renders [plaintiffs'] claim implausible—if the claim is one that simply makes no economic sense—[plaintiffs] must come forward with more persuasive evidence to support [their] claim than would otherwise be necessary.'" *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1089 (9th Cir. 2015) ("*Stanislaus*"). However, "[b]y contrast, broader inferences are permitted, and the 'tends to exclude' standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and 'the challenged activities could not reasonably be perceived as procompetitive.'" *In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-02509, 2014 WL 1283086, at *1 (N.D. Cal. Mar. 28, 2014) ("*In re High-Tech*").[73]

### A.    Principles of Corporate Independence Do Not Insulate the Lion Entities from Liability in this Case

The Lion Entities largely base their Motion on the well-established principle of limited corporate liability. Given Bumble Bee's guilty plea, they do not argue the

---

[72] *See* Stein Decl., Ex. 216 (Lindberg Dep.) 65:11-18, 418:18-419:23.

[73] The Supreme Court has also admonished that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962).

absence of an antitrust conspiracy, but only that liability for the wrongdoing is limited to Bumble Bee, or perhaps, Lion Americas, a subsidiary of Lion Capital that has little to no assets of its own. In this regard, the Lion Entities suggest that any wrongful conduct engaged in by Lindberg, Chang, and/or Capps was exclusively performed in their capacity as executives of Lion Americas, and not in their capacity as partners in Lion Capital, citing *United States v. Bestfoods*, 524 U.S. 51 (1998) ("*Bestfoods*").

But *Bestfoods* did not establish a bright-line rule that high-level executives of related entities serve only the interests of one of those entities. Instead, the Supreme Court described the principle as a "presumption" that "is strongest when the act is perfectly consistent with the norms of corporate behavior." *Bestfoods*, 524 U.S. at 70 n.13. Price-fixing, of course, is perfectly *inconsistent* with the norms of legitimate corporate behavior. Further, the *Bestfoods* presumption simply does not translate to situations where "complex relationships" are involved, including the complex and overlapping relationships between Lion Capital, Lion Americas, Big Catch, and Bumble Bee, created by the private equity ownership structure imposed on Bumble Bee by Lion Capital. *See Blecher v. Holy See*, No. 20-cv-3545, ___ F. Supp. 3d ___, 2022 WL 4537848, at *4 (S.D.N.Y. Sept. 28, 2022) (finding that Catholic bishop's conduct imputed to *both* the local diocese and the Holy See in Rome).

In *Arandell*, the Ninth Circuit concluded in an antitrust case that information of illegal conduct acquired by officers or agents in one entity was *simultaneously* imputed to other related entities in which the officers/agents held positions. 900 F.3d at 633 (evidence "permit[ted] a reasonable finding that CES's directors or officers acquired knowledge of Reliant's manipulative trading practices *while concurrently serving as directors or officers of other Reliant companies*" (emphasis added)); *see also* 3 Fletcher Cyc. Corp. § 790 (citing numerous federal authorities and California law for the same proposition). And, the Supreme Court, itself, identified an exception to the "presumption" in so-called situations of direct liability, where "the alleged

wrong can seemingly be traced to the parent through the conduit of its own personnel and management." *Bestfoods*, 524 U.S. at 64 (citations omitted).

Beyond the direct liability exception to the *Bestfoods* presumption relied upon by the Lion Entities, the Ninth Circuit has explained that an exception to corporate independence exists "if the parent and subsidiary are not really separate entities, *or one acts as an agent of the other*." *Doe v. Unocal Corp.*, 248 F.3d 915, 925-27 (9th Cir. 2001) (emphasis added) (abrogated on other grounds); *see also Bestfoods*, 524 U.S. at 71-72 (discussing agency theory of liability); *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-cv-864, 2018 WL 6629250, at *6 (N.D. Ill. Oct. 22, 2018) (finding that involvement beyond high-level oversight gives rise to agency relationship).

The Ninth Circuit also recognizes an exception to the principle of corporate independence unique to claims brought under the Sherman Act. Where two (or more) related entities engage in "coordinated activity," the entities are deemed to be a "single enterprise for purposes of § 1." *Arandell*, 900 F.3d at 630. In such cases, all of the related entities are liable for the coordinated conduct of the enterprise as a whole.

Each of these exceptions apply to the Lion Entities and their relationship with Bumble Bee.

## 1. There Is a Genuine Dispute of Material Fact as to Whether the Lion Entities Knowingly Joined Bumble Bee's Price-Fixing Conspiracy

### a. The Lion Entities' Involvement in the Price-Fixing Conspiracy Makes Economic Sense

The Lion Entities attempt to frame their acquisition of Bumble Bee as innocuous and commonplace, going so far as to argue that because the Lion Companies anticipated an eventual DOJ investigation for the COSI merger, that Plaintiffs' allegations that the Lion Entities were aware of the conspiracy prior to acquisition are "implausible." Mot. at 9-10. Yet the Lion Entities' acquisition makes

economic sense only *because* of the conspiracy—not in spite of it. *In re High-Tech*, 2014 WL 1283086, at *1 (recognizing that standard is lowered where conspiracy makes economic sense).

Lion Capital assigned its own partners—Lindberg, Capps, and Chang (the so-called "deal team")—to complete the due diligence process. It is important to note that these individuals were specifically Lion Capital partners *and* held additional roles as executives at Lion Americas—Lion Capital's U.S. agent. Lindberg was a Director at Lion Americas, Capps was President of Lion Americas, and Chang was a Principal at Lion Americas.[74] Within these dual roles, this "deal team" investigated whether Lion Capital should purchase Bumble Bee, with Lyndon Lea as part of the four-partner investment committee.[75] Lea served as the Founder Partner and Managing Director of Lion Capital and was personally involved in the due diligence process for the Bumble Bee transaction, attending management presentations and receiving and analyzing detailed investment committee memos.[76] During the due diligence process, the reports sent to the investment committee warned that: (1) tuna consumption had been declining for years; (2) there was a price ceiling on what consumers were willing to pay for tuna; (3) that the cost of skipjack and albacore had been climbing for more than a decade; and (4) that the cost increase was caused, in part, because fewer and smaller fish were being caught.[77] The Lion Entities' consultant specifically warned that the industry lacked significant pricing power.[78] Yet, despite a litany of reasons to not acquire Bumble Bee, Lion Capital proceeded with the purchase and immediately

---

[74] Nyovanie Decl., Ex. K; Nyovanie Decl., Ex. L; Nyovanie Decl., Ex. M.

[75] Stein Decl., Ex. 216 (Lindberg Dep.) 58:3-14.

[76] Stein Decl., Ex. 65 at 3; Stein Decl., Ex. 217 (Chang Dep.) 48:17-57:9; Stein Decl., Ex. 218 (Capps Dep.) 114:7-22, 155:10-156:19.

[77] Stein Decl., Ex. 218 (Capps Dep.) 90:4-90:24; 107:11-109:13; 117:4-133:24; Stein Decl., Ex. 65.

[78] Stein Decl., Ex. 218 (Capps Dep.) 133:25-138:18; Stein Decl., Ex. 66.

pressured Bumble Bee to increase its profitability.[79]

Lion Capital's decision to acquire Bumble Bee in November 2010 was based on its understanding, as explained by Bumble Bee, that the "competitive dynamic" among Bumble Bee and its competitors was "*rational and improving*" and that Bumble Bee's main competitor, StarKist, "*recognize[d] and 'respect[ed]'*" Bumble Bee's core market."[80] Lion Capital proceeded with Bumble Bee's acquisition, despite all contrary market evidence discouraging Bumble Bee's purchase, *because* of these assurances and *because* Bumble Bee had the relationships necessary to ensure "predictab[ility]" with its competition.[81] None of the information Bumble Bee provided to Lion Capital regarding the industry's "competitive dynamic" was pro-competitive. To the contrary, each of Bumble Bee's statements clearly communicated to Lion Capital that Bumble Bee, through its interactions with its competitors, could soften the competitive landscape, and therefore enhance Lion Capital's probability of a profitable investment. Lion's use of Bumble Bee's assurances in its final presentation recommending the acquisition confirms that the 'deal team' understood the message.[82]

In addition, Lischewski explicitly asked Lindberg to participate in patently anticompetitive conduct—again underscoring that Lion was well-aware of the conspiracy and the economic benefit to be gained therefrom. In the weeks leading up to the sale, Lindberg met with both Dongwon and TUG executives, specifically on an 'owner-to-owner' basis, with the "*key message*" to "ensure Dongwon that Lion will support *rational*[] market behavior by Bumble Bee."[83] Put into the context of the guilty pleas in this case, Lischewski's criminal conviction for price-fixing, the

---

[79] *See* Stein Decl., Ex. 216 (Lindberg Dep.) 65:11-18, 418:18-419:23.
[80] Stein Decl., Ex. 191 at LION_00040111 (emphases added).
[81] *Id.*
[82] *Id.*
[83] Stein Decl., Ex. 84 at LION_00028067-68 (emphases added).

pressure Lion put on Bumble Bee to raise revenue regardless of the competitive dynamic of the market, and Lion Capital's general expertise and business acumen—this together creates more than a reasonable inference that Lion Capital actively supported, or at least recklessly disregarded, the ongoing conspiracy because doing so furthered Lion Capital's own short-term pecuniary interests.[84] *See Citric Acid II*, 191 F.3d at 1097.

The conspiracy ultimately led to increased profits for Bumble Bee, and by extension, it was a significant boon for the Lion Entities. As testified to by Bumble Bee's Worsham, Bumble Bee's price increases would not have been possible without collusive conduct, as no single entity could have increased prices unilaterally.[85] With supracompetitive prices and the increased revenue Bumble Bee gained from the conspiracy, Bumble Bee ultimately raised its market value such that in late 2014, Thai Union offered to pay $1.51 billion for Bumble Bee[86]—compared to the $980 million Lion Capital spent to purchase it just four years earlier.[87] *In re High-Tech*, 2014 WL 1283086, at *1 (recognizing that plaintiffs have presented sufficient evidence that "tends to exclude" where plaintiffs "show that the inference of conspiracy is reasonable in light of the competing inferences" and that "the conspiracy is economically sensible"); *Stanislaus*, 803 F.3d at 1089-90 (emphasizing the importance of "whether the alleged conspirators would have had a rational motivation to conspire"). The Lion Entities' short-term profit motivations demonstrate that its participation in, or ratification of, Bumble Bee's conspiratorial conduct was clearly

---

[84] *See* Stein Decl., Ex. 84 at LION_00028068.

[85] Nyovanie Decl., Ex. E (Worsham Dep.) 80:4-19; *see also* Nyovanie Decl., Ex. N (Cameron Dep.) 68:3-14.

[86] Nyovanie Decl., Ex. J at LION_00073763; Stein Decl., Ex. 216 (Lindberg Dep) 130:2-11 (also recalling Chansiri telling him "point blank, we will buy Bumble Bee from you and we will pay the highest price when we have the capital or resources to do so.").

[87] Stein Decl., Ex. 216 (Lindberg Dep) 87:19-21.

economically plausible.

### b. The Lion Entities Knowingly Participated in the Conspiracy

Even before the Lion Entities finalized their acquisition of Bumble Bee, Lindberg went on the owner-to-owner tour to "ensure Dong Won that Lion will support rationale [sic] market behavior by Bumble Bee."[88] While the minutes from Lindberg's initial meeting with Dongwon are incomplete, Binotto's assumption that Lindberg visited Chairman Kim specifically to discuss Bumble Bee's known call for a "truce" suggests this was discussed.[89] Similarly, Lindberg admitted that he and Chansiri discussed the packaged tuna industry and ways to cooperate during their initial meeting.[90] A year into the Lion Entities' acquisition of Bumble Bee, Lindberg again met with Chairman Kim in November 2011, and according to W.H. Lee, explicitly discussed pricing actions between Bumble Bee and StarKist.[91] According to Lee, Chairman Kim explicitly told Lindberg that StarKist would "act rational[ly] if no one try [sic] to challenge their share."[92] And while Lindberg could have had 'legitimate' reasons for meeting with Chansiri for merger purposes, this does not explain correspondences with Chansiri like, "If you [Lindberg] have any idea to suggest of how we can work together on the owner level, please do let me know," with Chansiri specifically complaining to Lindberg about competition in the market.[93] While Defendants argue that Lindberg's meetings and correspondences "reflect that Lindberg's meetings were about unrelated and legitimate business topics," Mot. at 24, communications such as these do not lend themselves to the inference that Chansiri and Lindberg only spoke about the COSI merger. Rather, such communications, as

---

[88] Stein Decl., Ex. 84 at LION_00028068 (emphases added).
[89] Stein Decl., Ex. 16.
[90] Stein Decl., Ex. 216 (Lindberg Dep.) 127:12-25.
[91] Nyovanie Decl., Ex. I.
[92] *Id.*
[93] Stein Decl., Ex. 118 at LION_00002422.

well as the repeated meetings with Chairman Kim, indicate that Lindberg's "owner-to-owner" relationships with these individuals included discussion of how to improve the market and increase profits. The existence of these repeated meetings and communications with competitors, *in conjunction with* their clearly inappropriate substance, "tends to exclude" the possibility of legitimate, above-board discussion.

Further, the Lion Entities became aware of allegations that Bumble Bee executives were engaged in potentially anticompetitive conduct during the course of the conspiracy via the whistle-blower letter sent to Lindberg/Lion Capital. The whistle-blower letter is not vague, nor is its message trivial. The letter's *first* sentence states that Bumble Bee employees "are *extremely concerned* about the capabilities and the direction of the management team."[94] It then proceeds to list employees' concerns, including a "toxic work environment," an unfocused CEO, and the explicit bulleted point: "*Potential Anticompetitive Activity*: *Emails, Meetings, [and] Phone Calls to Competitors Suggesting to Raise Prices*" at Bumble Bee.[95] The letter then expressly references the Sherman Act, lists the individuals involved in the antitrust violations—including the SVP of Sales (Scott Cameron) and the SVP of Trade Marketing (Kenneth Worsham), both of whom would ultimately plead guilty to their involvement in the price-fixing conspiracy several years later,[96] and the CEO (Chris Lischewski) who would later be found guilty of participating in the same conduct—and concludes the letter with the note "[t]he entire company is being jeopardized."[97]

Defendants argue that "Lion (Americas)' response to events, both on the face of the documents and taken in context, is 'consistent with proper business practice.'"

---

[94] Stein Decl., Ex. 124 at LION_00049506 (emphasis added).
[95] *Id*. (emphasis added)
[96] *See* Nyovanie Decl., Ex. D; Nyovanie Decl., Ex. O.
[97] Stein Decl., Ex. 124 at LION_00049506.

Mot. at 31.[98] This is clearly wrong. The letter's envelope shows that it was specifically sent to Lion Americas (with the return address purportedly from Lion Capital), and was written to Lion Capital Partner, "Eric Lindberg."[99] The response is that of the Lion Entities—not Lion Americas alone. The Lion Entities then ask the Court to view the letter as a facially insignificant message about "drunken frolicking." Mot. at 30-31. Nothing in the letter—particularly in in the context of all the other indications, references, presentations, and the like, indicating that Bumble Bee was involved in a price-fixing conspiracy—should have resulted in Lindberg sending a copy of the letter to Lischewski, characterizing the whistle-blower as a "disgruntled" employee, and doing *nothing* further.[100] Lindberg did not interview the named individuals in the letter or otherwise investigate its claims, raise the letter to any internal or outside counsel, or make any attempt to elevate the letter to a proper channel,[101] despite his awareness of the antitrust laws.[102] As argued by the Lion Entities themselves, the question of whether "Lion Capital's inaction in effect approved of the Conspiracy by not investigating or stopping it" is "a question for the Jury to resolve." *See* ECF No. 3037-1 at 16.

Moreover, Lindberg regularly attended Bumble Bee's board presentations and knew that the company regularly had information about competitors' future

---

[98] The Lion Entities go even further, hazarding that because the Government noted in its closing argument, in *United States v. Lischewski*, 18-cr-203-EMC (N.D. Cal. Dec. 2, 2019), that the conspiracy participants concealed the scheme from Lion Capital, that this mention in itself "exonerates" the Lion Companies. ECF No. 3036-1 at 8. This argument, however, is unremarkable. The DOJ has the right to try its case as it sees fit. Any statements made during the Government's closing argument are not supported by facts. Plaintiffs present more than enough evidence here to support their claims.

[99] Stein Decl., Ex. 124 at LION_00049508.

[100] *See* Stein Decl., Ex. 216 (Lindberg Dep.) 347:9-23; 351:3-15; 353:6-14.

[101] *Id.*

[102] *See* Stein Decl., Ex. 111 at LION_00045615.

intentions.[103] As attested to by Worsham, who was identified by title as a conspirator in the letter and who regularly presented competitive information to Lion Capital's board members, Lindberg would have been "aware of the conversations [with competitors]," given that the board presentations contained "references to pricing by competition, and that—kind of giving guidance without saying where the guidance came from . . ."[104] The references in these presentations, as explained by the individual who presented them, were sufficiently clear that Lindberg would have known that the information therein could not have come from any other source but the competition itself, including such notes as: "*Competitive intel indicates* a list price increase by StarKist on both Lightmeat and Albacore Tuna items effective 7/28," "We have announced a 4/1 Pouch list price increase *with both SK and COS following*," and others.[105]

With this background knowledge, Lindberg's decision to ignore the whistle-blower's accusations and suppress the letter raises triable questions about whether the Lion Entities knowingly participated in the collusion. *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 789 (9th Cir. 1996) (denying summary judgment where Plaintiff, relying on circumstantial evidence, "presented evidence of such a quantity and nature that a reasonable jury could conclude that [the defendant] did not [act] independently, but rather did so in agreement, conspiracy, and combination with the other [defendants]").

## 2. There is a Genuine Issue of Material Fact Concerning Whether the Lion Entities are Bound as Principals by Bumble Bee's Collusive Conduct

The fundamental tenet of an agency relationship is "the principal's right to

---

[103] *See*, *e.g.*, Nyovanie Decl., Ex. C.
[104] Nyovanie Decl., Ex. E (Worsham Dep.) 106:19-107:7.
[105] *See* Nyovanie Decl., Ex. C (emphases added).

control the activities of the agent." *People v. JTH Tax, Inc.*, 212 Cal. App. 4th 1219, 1242 (2013). The parent does not need to exercise its right of control nor does there need to be actual supervision of the agent's work for an agency relationship to exist— rather, "the existence of the right [of control] establishes the relationship." *Id.* (internal quotation marks omitted); *see Henderson v. United Student Aid Funds, Inc*., 918 F.3d 1068, 1073 (9th Cir. 2019) ("*Henderson*") (recognizing that whether an agency relationship exists "is for a court to decide based on an assessment of the facts of the relationship and not based on how the parties define their relationship").

Agency liability is generally established by: "(1) a manifestation by the principal that the agent shall act for him; (2) that the agent has accepted the undertaking; and (3) that there is an understanding between the parties that the principal is to be in control of the undertaking." *See Sun Microsystems Inc. v. Hynix Semiconductor Inc*., 622 F. Supp. 2d 890, 899 (N.D. Cal. 2009) ("*Sun Microsystems*"). These factors can be established expressly, via a showing of actual authority, or inferred, by finding apparent authority or ratification. *Trenz v. Sirius Xm Radio, Inc*., No. 15-cv-0044, 2015 WL 11658715, at *2 (S.D. Cal. July 13, 2015) ("*Trenz*") (citing RESTATEMENT (THIRD) OF AGENCY §§ 2.01, 2.03, 4.01). For example, if a principal learns of the agent's illegal actions and fails to act to disavow those acts, then a reasonable jury could find the principal ratified the agent's unlawful conduct. *Bowoto v. Chevron Texaco Corp*., 312 F. Supp. 2d 1229, 1248 (N.D. Cal. 2004). ("Where the acts by the agent were not within the scope of the agency relationship, if they are not disavowed by the principal, failure to disavow may constitute ratification.").[106]

---

[106] "Whenever the evidence conflicts regarding the existence of agency, the question must be submitted to the jury unless only one inference can reasonably be drawn from the evidence, and then it becomes a question of law for the court." *Daniels v. United States*, No. 3:16-cv-02077, 2017 WL 3478765, at *5 (S.D. Cal. Aug. 11, 2017) ("*Daniels*") (emphases added; quotations and internal marks omitted).

1

### a.  Lion Americas is an Agent of Lion Capital

2

As an initial matter, it is indisputable that Lion Capital always exercised its

3

right to control Lion Americas and that Lion Americas exists to act on behalf of Lion

4

Capital. Lion Americas is a wholly-owned subsidiary of Lion Capital.[107] Lindberg,

5

Capps, and Chang were partners of Lion Capital *at all relevant times*, in addition to

6

their positions at Lion Americas.[108] According to Lion Capital's website in 2013,

7

Lindberg and Capps were both Lion Capital partners and Chang was a Lion Capital

8

Managing Director.[109] Lion Americas itself admits that Lindberg, Capps, and Chang

9

were employees of Lion Capital from at least November 1, 2010 to at least March 1,

10

2015,[110] and Lion Capital asserted throughout the conspiracy period that Lindberg,

11

Capps, and Chang represented Lion Capital's interests to third parties.[111] The relevant

12

partnership agreements expressly require Lindberg, Capps, and Chang to act at all

13

times "on behalf of [Lion Capital] and its Associates."[112] Those agreements permitted

14

Lion Capital to expel Lindberg, Capps, or Chang as partners for any reason, and to

15

unilaterally structure their compensation, bonuses, and benefits.[113] Capps' job

16

description, as one example, explained that Lion Americas was involved in

17

"[s]ourcing, executing, and managing investments made on behalf of fund managed

18

by Lion Capital, LLP."[114] Even correspondences sent to Lindberg, Chang or Capps

19

needed to be sent to Lion Capital's London address.[115] Lion Capital and Lion

20

21

22
[107] Nyovanie Decl., Ex. (Lea Dep.) 319:6-10.

23
[108] Stein Decl., Ex. 62; *see also* Stein Decl., Ex. 216 (Lindberg Dep.) 24:24-25:4; Stein Decl., Ex. 217 (Chang Dep.) 35:20-36:5; Ex. 218 (Capps Dep.) 19:2-4.

24
[109] Nyovanie Decl., Ex. K-M; *see* Chang Dep. 24:16-22.

25
[110] Stein Decl., Ex. 13 at 5-6 (Request No. 9 to Request No. 11).

[111] Stein Decl., Ex. 75 at BB_Civil_001382954.

26
[112] Stein Decl., Ex. 62 at LINDBERG_0019.

[113] *Id.*

27
[114] Stein Decl., Ex. 63 at LION_00064767.

[115] Nyovanie Decl., Ex. A (Lea Dep.) 49:6-11.

28

Americas held weekly video conferences attended by both London and U.S. employees,[116] and in a report filed with the United States Securities and Exchange Commission ("SEC"), Lion Americas acknowledged that it is "controlled" by Lion Capital.[117] The Ninth Circuit has called a similar situation a "classic agency relationship." *See*, *e.g.*, *Dearborn v. Mar Ship Operations, Inc*., 113 F.3d 995, 999 (9th Cir. 1997) (considering the common law definition of agency and finding an agency relationship to exist where an entity operated a vessel on the government's behalf and subject to its "overall direction and control over the operation of the vessel"). Accordingly, as Lion Americas' principal, Lion Capital is also liable for the acts of its agent, which wholly acted in Lion Capital's interest and under Lion Capital's control for the duration of the period and more generally.

### b. Bumble Bee was the Agent of Lion Capital and Lion Americas

Lion Capital, Lion Americas, and Bumble Bee had a *general* agency relationship because the work that Lindberg, Chang, and Capps performed with respect to Bumble Bee was pursuant to a management services agreement between Bumble Bee and Lion Capital.[118] The agreement serves as a written manifestation by Lion Capital and Lion Americas that they would provide management and advisory services to Bumble Bee and that the parties consented to this arrangement.[119] But a more limited agency was also created with respect to Bumble Bee's pricing of

---

[116] Stein Decl., Ex. 217 (Chang Dep.) 160:16-161:11.
[117] Stein Decl., Ex. 262 (SEC form, Section 7.A(6)), Ex. 263 (emphasis omitted); *see* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, ECF No. 2139 at 107-108 (discusses SEC report and implications).
[118] *See*, *e.g.*, Stein Decl., Ex. 69; *see also* Stein Decl., Ex. 187 (noting that the "Manager" of Lion Capital Fund III is Lion Capital, not Lion Americas, and describing Manager's responsibilities).
[119] Stein Decl., Ex 69.

---

packaged tuna.[120] Following Bumble Bee's acquisition, the Lion Entities' partners/executives comprised the majority of Bumble Bee's board,[121] participated in and signed off on major Bumble Bee decisions,[122] and oversaw Bumble Bee's actions with respect to pricing and otherwise.[123] Bumble Bee sent Lion daily sales and monthly finance reports.[124] As Lea said in an interview: "If all [acquired companies] want is a check, there are plenty of private equity firms that are delighted to write you a check and let you get on with your business. That's not us . . . What we're good at doing is being your partner."[125] Lion's investment strategy" was to "work[] in partnership with the management of its companies to strategically transform the businesses in which it invests,"[126] and it touted a "philosophy [] based on partnering with management teams" through "integration of executives with operating experience throughout the sourcing, execution and management of the Firm's

---

[120] Agency need not be established for all purposes. "The parents and subsidiaries may fully maintain their separate corporate existences; yet, as any two unrelated companies, they might have entered into a limited agency relationship for a specific transaction. Whether this occurred here is a question of fact [.]" *Phoenix Canada Oil Co. Ltd. v. Texaco Inc.*, 842 F.2d 1466, 1478 (3d Cir. 1988).

[121] *See* Nyovanie Decl., Ex. P; Nyovanie Decl., Ex. Q.

[122] *See, e.g.*, Nyovanie Decl., Ex. R (Chang reaching out to Lyndon for signature on Board resolution for "transaction [Bumble Bee is] looking to complete on Monday morning"); Nyovanie Decl., Ex. S (team struggling to find meeting time with Lea for Project Maggie discussion in order for project to go forward); Nyovanie Decl., Ex. T (scheduling call with Lea and Bumble Bee "to run over budget numbers" and confirming Lea will "join the update/innovation review at Bumble Bee").

[123] Nyovanie Decl., Ex. U (Lea keeping track of Bumble Bee in the news and reaching out to Lischewski on human trafficking article).

[124] *See, e.g.*, Stein Decl., Ex. 216 (Lindberg Dep.) 212:24-214:8; Stein Decl., Ex. 217 (Chang Dep.) 102:24-104:17. *See also* Stein Decl., Ex. 76, 77.

[125] Tracc Films, Lion Capital Wall Street Journal Film, YouTube, https://www.youtube.com/watch?v=XdRwC-rrQe0 (Sept. 10, 2015).

[126] S.E.C., Lion Capital to Acquire Bumble Bee Foods from Centre Partners, https://www.sec.gov/Archives/edgar/data/1491594/000095012310101820/a57764ex v99w1.htm (Nov. 4, 2010).

---

portfolio companies[.]"[127] As recognized in Lion's publicized "approach," the Lion Entities "lead [their] businesses from the front" and ensure that their companies "execute the vision that [the Lion Entities] develop."[128] "[W]e never forget that the responsibility for successful outcomes in our companies rests with us."[129] And as recognized by Lea himself, Lion Capital "had control over" Bumble Bee.[130]

From the time of Bumble Bee's acquisition by Lion affiliated entities, Lion Capital burdened Bumble Bee with unreasonable amounts of debt, taking Bumble Bee from a debt-to-capital ratio of 60% in 2009 to over 90% following the acquisition.[131] Lion Capital decided in 2011 to have Bumble Bee Holdco. S.C.A., a company formed for the purpose of issuing $605 million in 9% Senior Secured Notes, issue an additional $150 million to Bumble Bee, with the proceeds distributed to Lion Capital and the other equity holders.[132] And despite Bumble Bee's profits during the conspiracy period, because Lion Capital decided to burden Bumble Bee with such high leverage, Bumble Bee had to expend nearly all of its operating income to service the debt.[133] Throughout the conspiracy period, Bumble Bee was wholly beholden to Lion Capital and a primary goal was to increase Bumble Bee's profits to pay the debt placed upon it.

The fact that Bumble Bee would act on the Lion Entities' behalf and Bumble Bee's understanding of that undertaking, *Sun Microsystems*, 622 F. Supp. 2d at 899, is clearly evinced in the companies' legal relationship to each other during the period at issue in this litigation, *and* in the way that they conducted themselves in the normal

---

[127] Stein Decl., Ex. 75 at BB_Civil_001382954; Stein Decl., Ex. 255.
[128] Nyovanie Decl., Ex. V.
[129] *Id*.
[130] Nyovanie Decl., Ex. A (Lea Dep.) 323:19-324:2.
[131] Nyovanie Decl., Ex. W (Expert Report of Marianne DeMario) at 8-9.
[132] *Id*. at 7.
[133] *Id*. at 10.

course of their business. As attested to by Lindberg, as early as 2011, the Lion Entities "wanted our [Bumble Bee] management team to stop reducing price on selected products which in our judgment at this point was causing a price war that was causing an environment in which these businesses were losing money in the marketplace, and as a fiduciary for our capital we needed to try to manage the business better."[134] As indicated by Lindberg's statement, the Lion Entities' execution of its "vision" included pricing actions. During the Lion Entities' tenure as equitable owner, Bumble Bee regularly kept Lindberg abreast of the competitive intel it was receiving and the pricing decisions it was making. For example, in a July 2011 email, in response to an email from Lischewski reporting "bits and pieces coming out of SK's recent 4 day Board meeting with the Koreans," Lindberg instructed Capps to "call [Lischewski] directly" to stop Bumble Bee's planned attack on StarKist's pouch.[135] Lindberg wrote: "*[U]nder no circumstance do we want any negative price signaling*."[136] And in March 2012, Lindberg wrote to Lischewski that Lischewski needed to "echo" StarKist's publicized comments about raising prices and "bang[] a *consistent public drum* for everyone's consumption that *pricing needs to become reasonable*[.]"[137]

Correspondences like this underscore the understanding between the parties as to their agency relationship and the magnitude of Lion Capital's control—obtaining clearly competitive information from Bumble Bee, making pricing decisions as to what Bumble Bee should do, and directly calling Bumble Bee's CEO to ensure Bumble Bee acted at *their* instruction and on *their* behalf with respect to pricing of packaged tuna. Furthermore, Lion Capital's control over Bumble Bee was no secret. Lion Capital explicitly described itself as the one making decisions for Bumble Bee.

---

[134] Nyovanie Decl., Ex. X (Lindberg Dep.) 186:22-187:3.
[135] Nyovanie Decl., Ex. F.
[136] *Id.* (emphasis added).
[137] Stein Decl., Ex. 129 (emphasis added).

In its 2012 Investor Letter, Lion Capital described Bumble Bee's price increases as "*our* price increases" and Bumble Bee's competitors as "*our* two primary competitors."[138] Following the December 2014 agreement to sell Bumble Bee to TUG, Lion Capital updated its Board that during its ownership, Lion Capital had "[m]aintained and grew gross margins through *disciplined pricing actions*, leading to adjusted EBITDA climbing to $148 million in 2014, the highest level of EBITDA in the company's history" in addition to a number of other actions.[139] While Bumble Bee engaged in the details of putting these coordinated price increases into action itself, these price increases—and the price-fixing more generally—were done on Lion Capital's behalf.

### c. Lion Capital and Lion Americas Ratified Bumble Bee's Anticompetitive Conduct

The evidence presented in the preceding section is sufficient to establish an agency relationship via a showing of actual authority, however, this is not necessary. An agency relationship can also be inferred by a finding of ratification, which here, is undeniable. *See Trenz*, 2015 WL 11658715, at *2 ("[a]gency can be established expressly, via a showing of actual authority, or it can be inferred, by finding apparent authority or ratification"); Restatement (Third) Of Agency § 4.01 (2006) ("ratification may create a relationship of agency when none existed between the actor and the ratifier at the time of the act"); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979) ("[p]articipation [in an antitrust

---

[138] Nyovanie Decl., Ex. G at LION_00070708 (emphases added); *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-MD-01819, 2010 WL 5138859, at *6 (N.D. Cal. Dec. 10, 2010) (where there was "evidence that [] executives and other managers with influence or ultimate authority over pricing had knowledge of competitive price and production information . . . . a reasonable factfinder could infer that the information impacted pricing").

[139] Nyovanie Decl., Ex. J at LION_00073763-764.

---

violation] may be found not solely on the basis of direct action but may also consist of knowing approval or ratification of unlawful acts"). A principal can ratify an agent's behavior via affirmative consent or through "willful ignorance," which requires showing that although the principal may have not known the material facts, the principal "ratified with awareness that such knowledge was lacking." *Henderson*, 918 F.3d at 1073 (citing Restatement (Third) Of Agency § 4.01 cmt. d). Here, there is more than enough evidence to reasonably infer that Lion Capital ratified Bumble Bee's price-fixing conduct.

Lindberg's review and subsequent inaction following receipt of the whistle-blower letter alone meets this bar. *Joint Equity Comm. of Invs. of Real Est. Partners, Inc. v. Coldwell Banker Real Est. Corp.*, 281 F.R.D. 422, 433 (C.D. Cal. 2012) (recognizing that "willful blindness or an unreasonable failure to investigate, may be sufficient to establish liability"). The Lion Entities were explicitly notified of potential antitrust violations at Bumble Bee and completely failed to adequately respond. "[W]here ignorance of the facts arises from the principal's own failure to investigate and the circumstances are such as to put a reasonable man on inquiry . . . he may be held to have ratified despite lack of full knowledge." *Id.* at 433; *see Kristensen v. Credit Payment Servs. Inc.*, No. 2:12-cv-00528, 2015 WL 4477425, at *4 (D. Nev. July 20, 2015) ("to be consciously ignorant a defendant must fail to investigate after becoming aware of specific reasons to be suspicious"), *aff'd*, 879 F.3d 1010 (9th Cir. 2018).

Lindberg chose to suppress the letter, refusing to notify counsel or interview the individuals explicitly listed as having been involved—despite having more than enough additional evidence of the conspiracy (*i.e.*, correspondences from Lischewski, references to anticompetitive information made in Bumble Bee presentations, etc.) to investigate and stop Bumble Bee's actions. But, instead, Lion Capital silently accepted this knowledge, stuck its head in the sand, and proceeded to reap the benefits

of its agent's actions on its behalf. *See Contract Assocs. Office Interiors, Inc. v. Ruiter*, No. CIV.S-07-00334, 2008 WL 2225702, at *2 (E.D. Cal. May 29, 2008) ("a reasonable jury could readily infer that [the principal] had acquired the requisite knowledge of [its agent's] illicit conduct, effectively triggering its duty to disaffirm her acts"); *see also In re Wolverton Assocs.*, 909 F.2d 1286, 1298 (9th Cir. 1990) (where company "retained the benefits of [its employee's] conduct even after confronted with evidence of foul play . . . [this] conduct on [company's] part supported the court's finding of ratification"). Lion Capital after learning of Bumble Bee's illicit conduct and doing nothing—in other words, ratifying Bumble Bee's collusion through, at minimum, willful ignorance—is in itself sufficient to establish ratification and resulting liability.

### 3. <u>Lion Capital, Lion Americas, and Bumble Bee Operated as a Single Economic Unit</u>

"[T]he rule that a parent and subsidiary are categorically one entity, for antitrust purposes, is based on the parent company's inherent power to 'assert full control at any moment if the subsidiary fails to act in the parent's best interests.'" *Calabasas Luxury Motorcars, Inc. v. Gen. Motors LLC*, No. CV 21-09566, 2022 WL 17348983, at *2 (C.D. Cal. Aug. 25, 2022) (citing *Arandell*, 900 F.3d at 630).

Lion Capital attempts to distance itself from its wholly-owned U.S. based subsidiary,[140] whose *sole purpose* is to further Lion Capital's investments in North America.[141] *Arandell*, 900 F.3d at 632 ("[a] wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the

---

[140] Nyovanie Decl., Ex. A (Lea Dep.) 319:3-7 (recognizing that Lion Americas "is a wholly owned subsidiary of Lion Capital, LLP").
[141] *Id*. at 171:20-172:4; 362:3-9; *see* Mot. at 12 (noting that Lion Americas is "a Delaware corporation that provides advice to Lion LLP regarding potential and ongoing investments in North America").

purposes of the single 'economic unit' of which it is a part"). Knowledge of the illegal conduct by one company within the enterprise is sufficient to find all of the relevant entities liable for the actions of the single economic unit. *Id.* ("[s]uch anticompetitive 'purpose' can sustain liability under the Sherman Act with or without an additional finding of 'knowledge[]'").

A little over one year ago, this Court expressly ruled that Plaintiffs' "allegations of Lion Capital's knowledge and the coordinated activity with Lion Americas in furtherance of the conspiracy are sufficient under *Arandell* to raise a reasonable inference of Lion Capital's own participation in the conspiracy." *See* ECF No. 2781 ("Third Lion Order") at 19. Now, at summary judgment, the evidence supports that there is (at minimum) a triable issue of fact as to whether Lion Capital, Lion Americas, and/or Bumble Bee were a "single economic unit" under *Arandell*. With respect to the "knowledge" element, Bumble Bee clearly knew about its illegal conduct. Lion Capital and Lion Americas also knew of Lischewski's directive to reassure Dongwon's chairman that Bumble Bee would act rationally in the market, the whistle-blower letter, and other suspicious statements made at Bumble Bee's board meetings, all as described above.

As for coordinated activity, Lion Capital and Lion Americas were inextricably intertwined in their operations. As discussed above (*supra* IV.A.2.a.), (1) Lion Capital had complete control over the work of Lion Americas, its U.S team, and remained informed and involved in all major decisions;[142] (2) Lion Capital used Lion Americas to further Lion Capital's investments in North America;[143] and (3) multiple executives reporting to Lea served concurrently as officers and directors for the two entities

---

[142] Stein Decl., Ex. 62; *see also* Chang Dep. 24:16-22; Lindberg Dep. 24:24-25:4; Capps Dep. 35:20-23.

[143] *See* Nyovanie Decl., Ex. A (Lea Dep.) 171:20-172:4; 362:3-9; *see* Mot. at 12.

during the relevant time period.[144] Lion Capital and Lion Americas had complementary roles and "operat[ed] as a single unit."[145] Even Lischewski, in an interview praising Bumble Bee's work with Lion Capital, did not distinguish between Lion Capital and Lion Americas—consistently referring to "Lion" as a single entity.[146] And even internally, Lion Capital used the same @lioncapital.com email extension for *all* employees.[147] As explained by Lion Capital in a separate litigation, Lion Americas was simply Lion Capital's "New York office."[148]

Moreover, Lea was part of the four-partner investment committee that approved Lion Capital's Bumble Bee investment in 2010,[149] and was personally involved in the due diligence process for the Bumble Bee transaction, attending management presentations with Bumble Bee's Lischewski and receiving and analyzing detailed investment committee memos.[150] As noted above, Lion Capital represents to its own investors that it "lead[s] [their] businesses from the front" and ensures that their portfolio companies "execute the vision that [Lion] develop[s]."[151] Indeed, the Lion Entities were directly involved in providing pricing guidance to Bumble Bee's Lischewski to ensure that there would be no negative price-signaling to Bumble Bee's competitors, and Lion Capital, itself, described Bumble Bee's pricing actions as its own. Bumble Bee and the Lion Entities all shared the common

---

[144] *See, e.g.*, Stein Decl., Ex. 216 (Lindberg Dep.) 26:23-27:7; 48:16-49:9; Stein Decl., Ex. 218 (Capps Dep.) 43:11-46:14.

[145] Nyovanie Decl., Ex. Y (DeMario Dep.) 79:15-25.

[146] Tracc Films, Lion Capital Wall Street Journal Film, YouTube (Sept. 10, 2015), https://www.youtube.com/watch?v=XdRwC-rrQe0.

[147] *See, e.g.*, Stein Decl., Ex. 18; Stein Decl. Ex. 84.

[148] Corrected Non-Confidential Brief of Appellee, *Stone Lion Capital Partners, L.P., v. Lion Capital LLP*, 2013 WL 6006296 (C.A. Fed.) at 4.

[149] Stein Decl., Ex. 216 (Lindberg Dep.) 58:3-14.

[150] Stein Decl., Ex. 65 at 3; Stein Decl., Ex. 217 (Chang Dep.) 48:17-57:9; Stein Decl., Ex. 218 (Capps Dep.) 114:7-22, 155:10-156:19).

[151] Nyovanie Decl., Ex. V.

objective of increasing packaged tuna revenues to service Bumble Bee's debt, and to position Bumble Bee to be flipped within a few years of its acquisition by Lion related entities.

Despite this evidence, Lion Capital seeks to insulate itself from Lion Americas and Bumble Bee by pointing out that—technically speaking—Lion Capital did not hold legal title to Bumble Bee's shares, which were actually held by a series of shell companies that had no separate business purpose other than to own the shares. But it, and its affiliated entities, *were* the equitable owners of Bumble Bee, and the *evidence* supports that the Lion Entities and their partners/executives held themselves out as the "owners" of Bumble Bee in the ordinary course of their business and made no effort to distinguish between the precise Lion entity that technically owned Bumble Bee. As just one example, on September 2, 2011, Lindberg wrote to Dongwon's Chairman Kim describing his planned meeting with Dongwon as an "owner-to-owner" meeting (with Lindberg representing the Lion entities as owner of Bumble Bee, and Chairman Kim representing Dongwon as owner of StarKist).[152]

Furthermore, the single-enterprise doctrine is founded on the notion of control. *Arandell*, 900 F.3d at 630 (explaining rationale of the doctrine because "the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests") (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771-72 (1984)). Here, it is undisputed that the Lion Entities "controlled" Bumble Bee. Accordingly, sufficient facts exist to sustain a liability claim under the single-entity doctrine that encompasses the coordinated activity of Lion Capital, Lion Americas *and* Bumble Bee.

**B.    Big Catch is Liable as the Alter Ego of Lion Capital**

In addition to Plaintiffs' other vicarious liability claims, Plaintiffs also allege

---

[152] Stein Decl., Ex. 111.

1   that Big Catch is liable as an alter ego of Lion Capital—a claim that is equitable in
2   nature given that liability here serves solely as a remedy. *Star Mountain Plan Tr. v.*
3   *Titan Mining (US) Corp.*, No. 22-cv-01389, 2023 WL 2355916, at *4 (D. Ariz. Feb.
4   3, 2023) (recognizing alter ego claim as equitable where alter ego claim was not a
5   standalone action, but rather was solely to recover damages from the alter ego); *see*
6   *Siegel v. Warner Bros. Ent. Inc.*, 581 F. Supp. 2d 1067, 1071 (C.D. Cal. 2008)
7   ("*Siegel*"). Here, Plaintiffs' alter ego claim against Big Catch derives from federal
8   common law under the Sherman Act and Clayton Act. *See Wolfe v. United States*, 806
9   F.2d 1410, 1411 (9th Cir. 1986) ("The determination of whether to apply state or
10  federal alter ego doctrine depends on the degree to which the subject matter of the
11  case implicates federal interests.") (citations omitted).
12          Piercing of the corporate veil is justified as an equitable remedy, permitted
13  under federal common law, where: "(1) a corporation uses its alter ego status to
14  perpetrate a fraud or (2) where it so dominates and disregards its alter ego's corporate
15  form that the alter ego was actually carrying on the controlling corporation's business
16  instead of its own." *British Marine PLC v. Aavanti Shipping & Chartering Ltd.*, No.
17  13 Civ. 0839, 2013 WL 6092821, at *5 (E.D.N.Y. Nov. 19, 2013) (citation omitted).
18  "[T]he general principle guiding courts in determining whether to pierce the corporate
19  veil has been that liability is imposed when doing so would achieve an equitable
20  result." *Id.* at *5 (quoting *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d
21  Cir. 2008)) (emphases added). A significant inquiry is "whether in fact the economic
22  enterprise is one, the corporate forms being largely paper arrangements that do not
23  reflect the business realities." *N.L.R.B. v. Deena Artware, Inc.*, 361 U.S. 398, 403
24  (1960). Affiliated companies that "hold themselves out to the public as a single entity
25  that is conveniently departmentalized" may be the alter egos of one another. *Zenith*
26  *Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 402 F. Supp. 262, 328 (E.D. Pa.
27  1975) (concerning claims brought under the Sherman Act). Because Plaintiffs' alter
28

1   ego claim is equitable in nature, it will be tried to the Court rather than the jury. *Siegel*,

2   581 F. Supp. 2d at 1076.

3          Here, Big Catch is the shell entity organized by Lion Capital for the purpose of

4   purchasing and holding Bumble Bee's shares.[153] Big Catch has no offices—with its

5   principal place of business listed as Lion Americas' former New York address—and

6   no employees.[154] It is owned by Big Catch Cayman Ltd., which is ultimately owned

7   by one of Lion Capital's funds and controlled by Lion Capital,[155] and its limited

8   partners (who are also shareholders) have only non-voting interests.[156] Only the

9   general partner—Lion/Big Catch Cayman Ltd. (which is 100% owned by the Lion

10  Capital Fund III partnerships)—has the "exclusive right to manage and control the

11  business and affairs of the Partnership.[157] As confirmed by Lea, Big Catch is "in

12  essence, a holding company which owns the shares of Bumble Bee," with "no

13  substantive operations."[158] Pursuant to the Ninth Circuit factors, Big Catch is clearly

14  a "mere conduit for the affairs" of Lion Capital, with no offices, employees, or

15  directors of its own, and no independent business purpose. *Digby Adler Grp. LLC v.*

16  *Image Rent a Car, Inc*., 79 F. Supp. 3d 1095, 1107 (N.D. Cal. 2015). Big Catch is also

17  undercapitalized, with no assets beyond its Bumble Bee shares—clearly unable to

18  take any action without the financial assistance of Lion Capital. *Dollar Tree Stores*

19  *Inc. v. Toyama Partners LLC*, 875 F. Supp. 2d 1058, 1078 (N.D. Cal. 2012) (citing

20  *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854

21  F.2d 1538, 1544 (9th Cir.1988)).

22         In 2011, during the course of the conspiracy, Bumble Bee Holdco S.C.A.

23

---

24  [153] Nyovanie Decl., Ex. A (Lea Dep.) 176:8-11; 177:2-4.
25  [154] Stein Decl., Ex. 78; Nyovanie Decl., Ex. A (Lea Dep.) 179:2-3.
    [155] Stein Decl., Ex. 264.
26  [156] Stein Decl., Ex. 78 at LION_00014795.
27  [157] Stein Decl., Ex. 78 at LION_00014804-05; *see* Stein Decl., Ex. 189.
    [158] Nyovanie Decl., Ex. A (Lea Dep.) 177:2-4; 179:10-14.
28

("BBHS") (the holding company which owns Bumble Bee)[159] took on $150 million of new debt in the form of Senior PIK Toggle Notes, of which $142.8 million of the proceeds were distributed to Big Catch.[160] Also in 2011, BBHS distributed an additional $5.3 million to Big Catch that had been held in escrow from the 2010 purchase transaction.[161] In other words, during the heart of the conspiracy, Bumble Bee paid Big Catch, and therefore Lion Fund III and others, nearly $150 million, while Lion Capital caused Bumble Bee to assume significant debts, ultimately leading to Bumble Bee's bankruptcy in November 2019.[162]

Given the clear lack of any separation between Big Catch and Lion Capital, there is a triable issue of material fact as to whether Big Catch should be found to be the alter ego of Lion Capital; however, the timing of the trial on the alter ego claim should wait until the conclusion of the jury's resolution of the primary claims against Lion Capital when the parties and the Court will have better insight into how collection of any damages award involving the Lion Entities (or their related entities) will proceed. *See Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) (recognizing that where legal claims and equitable claims are based on the same facts, the trial judge must "follow the jury's implicit or explicit factual determinations" (internal citations omitted)).

## VI.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny the Lion Entities' Motion for Summary Judgment in full.

---

[159] BBHS is wholly-owned by Lion/Big Catch Cayman LP, as demonstrated in the ownership chart. *See supra* II.B., at 7.

[160] *See* Stein Decl., Ex. 231 (Hughes Dep.) 19:14-24, 22:12-23:11. Stein Decl., Ex. 190 at LION_00002942.

[161] Stein Decl., Ex. 190 at LION_00002947.

[162] Nyovanie Decl., Ex. W (Expert Report of Marianne DeMario) at 6; *see* Nyovanie Decl., Ex. A (Lea Dep.) 123:7-21 (agreeing that Bumble Bee is a "highly leveraged company").

---

1

2    Dated: May 5, 2023               Respectfully submitted,

3

4                               *s/ Christopher L. Lebsock*

Michael P. Lehmann (#77152)

5                               Christopher L. Lebsock (#184546)

Debashish Bakshi (#311115)

6                               600 Montgomery Street

Suite 3200

7                               San Francisco, CA  94111

8                               Tel: (415) 633-1908

Fax: (415) 358-4980

9                               E-mail: clebsock@hausfeld.com

10                             E-mail: mlehmann@hausfeld.com

E-mail: dbakshi@hausfeld.com

11

12                             Michael D. Hausfeld (*pro hac vice*)

13                             Brittany L. Nyovanie (*pro hac vice*)

HAUSFELD LLP

14                             888 16th Street NW, Suite 300

15                             Washington, DC 20006

Tel: (202) 540-7200

16                             Fax: (202) 540-7201

17                             E-mail: mhausfeld@hausfeld.com

E-mail: bnieves@hausfeld.com

18

19                             ***Lead Counsel for Direct Purchaser***

***Plaintiffs***

20

21

22

23

24

25

26

27

28

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: *s/ Betsy C. Manifold*
Betsy C. Manifold, Esquire
Fred Isquith, Esquire
Rachele R. Byrd, Esquire
Alex J. Tramontano, Esquire
Symphony Towers
750 B Street, Suite 2770
San Diego, CA  92101
Tel: (619) 239-4599
Fax: (619) 234-4599
E-mail: manifold@whafh.com
isquith@whafh.com
byrd@whafh.com
tramontano@whafh.com

Thomas H. Burt, Esquire
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
E-mail: burt@whafh.com

***Lead Counsel for Indirect
Purchaser End Payer Plaintiffs***

KAPLAN FOX & KILSHEIMER LLP

By: *s/ Laurence D. King*
Laurence D. King
(SBN 206423)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: (415) 772-4700
Facsimile: (415) 772-4707
Email: lking@kaplanfox.com

Robert N. Kaplan
Gregory K. Arenson

KENNY NACHWALTER, P.A.

By: *s/ William J. Blechman*
Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Kevin J. Murray, Esquire
Douglas H. Patton, Esquire
Samuel J. Randall, Esquire
1441 Brickell Avenue, Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
E-mail: rarnold@knpa.com
wblechman@knpa.com
kmurray@knpa.com
dpatton@knpa.com
srandall@knpa.com

***Liaison Counsel for Direct Action
Plaintiffs***

CUNEO GILBERT & LADUCA LLP

By: *s/ Jonathan W. Cuneo*
Jonathan W. Cuneo, Esquire
Joel Davidow, Esquire
Blaine Finley, Esquire
4725 Wisconsin Avenue, N.W.
Suite 200
Washington, D.C.  20002
Tel: (202) 789-3960
Fax: (202) 589-1813
E-mail: jonc@cuneolaw.com
joel@cuneolaw.com
bfinley@cuneolaw.com

***Lead Counsel for Indirect Purchaser
Commercial Food Preparer Plaintiffs***

NUSSBAUM LAW GROUP, P.C.

1   Elana Katcher
    Matthew P. McCahill
2   800 Third Avenue, 38th Floor
    New York, NY 10022
3   Telephone: (212) 687-1980
    Facsimile: (212) 687-7714
4   Email: rkaplan@kaplanfox.com
    Email: garenson@kaplanfox.com
5   Email: ekatcher@kaplanfox.com
    Email: mmccahill@kaplanfox.com
6
7
8   ALSTON & BIRD LLP
9
10  Valarie C. Williams
    560 Mission Street, Suite 2100
11  San Francisco, CA 91405
    Telephone: (415) 243-1058
12  Email: valarie.williams@alston.com
13  B. Parker Miller
    1201 West Peachtree Street
14  Atlanta, GA 30309
    Telephone: (404) 881-7000
15  Facsimile: (404) 881-7777
    Email: parker.miller@alston.com
16
17  THE COFFMAN LAW FIRM
18
19  Richard L. Coffman
    3355 West Alabama, Suite 240
20  Houston, TX 77098
    Telephone: (713) 528-6700
21  Facsimile: (866) 835-8250
    Email: rcoffman@coffmanlawfirm.com
22
23  MARCUS & SHAPIRA LLP
24
25  Bernard D. Marcus
    Moira Cain-Mannix
26  Erin Gibson Allen
    One Oxford Center, 35th Floor
27  Pittsburgh, PA 15219
28

Linda P. Nussbaum
Susan R. Schwaiger
1211 Avenue of the Americas
40th Floor
New York, NY 10036
Telephone: (917) 438-9189
Email: lnussbaum@nussbaumpc.com
Email: sschwaiger@nussbaumpc.com

***Attorneys for Direct Action Plaintiffs
Wegmans Food Markets, Inc. and
Krasdale Foods, Inc.***

STUEVE SIEGEL HANSON LLP

*s/ Steve N. Six*
Patrick J. Stueve (KS 13847)
Steve N. Six (KS 16151)
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: 816-714-7100
Facsimile: 816-714-7101
stueve@stuevesiegel.com
six@stuevesiegel.com

***Counsel for Plaintiff Associated
Wholesale Grocers, Inc. and Affiliated
Foods Midwest Cooperative***

---

Telephone: (412) 471-3490
Facsimile: (412) 391-8758
Email: marcus@marcus-shapira.com
Email: cain-mannix@marcus-shapira.com
Email: allen@marcus-shapira.com

L&G LAW GROUP, LLP

Eric R. Lifvendahl
175 W. Jackson Blvd., Suite 950
Chicago, IL 60604
Telephone: (312) 364-2500
Facsimile: (312) 364-1003
Email: elifvendahl@lgcounsel

***Attorneys for Direct Action Plaintiffs Affiliated Foods Inc., Alex Lee, Inc., Associated Foods Stores, Inc., Associated Grocers of New England, Inc., Associated Grocers, Inc., Bashas' Inc., Big Y Foods, Inc., Brookshire Brothers, Inc., Brookshire Grocery Company, Certco, Inc., CVS Pharmacy, Inc., Dollar Tree Distribution. Inc., Greenbrier International, Inc., Family Dollar Stores, Inc., Family Dollar Services, LLC., Fareway Stores, Inc., The Golub Corporation, Giant Eagle, Inc., Kmart Corporation, K-VA-T Food Stores, Inc., Mark Glassman, Inc., McLane Company, Inc., Meadowbrook Meat Company, Inc., Merchants Distributors, LLC., Schnuck Markets, Inc., SpartanNash Company, URM Stores, Inc., Western Family Foods, Inc., Woodman's Food Market, Inc., and 99 Cents Only Stores LLC***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I certify that on May 5, 2023, I filed the foregoing document and supporting papers with the Clerk of the Court for the United States District Court, Southern District of California, by using the Court's CM/ECF system. I also served counsel of record via this Court's CM/ECF system.

*s/ Christopher L. Lebsock*
Christopher L. Lebsock

---