Patrick J. Stueve (KS 13847)
Steve Six (KS 16141)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: 816-714-7100
Facsimile: 816-714-7101
stueve@stuevesiegel.com
six@stuevesiegel.com

*Counsel for Plaintiff Associated
Wholesale Grocers, Inc. and Affiliated
Foods Midwest Coop.*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION | Case No. 3:15-md-2670-DMS-MSB<br><br>MDL No. 2670<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR RECONSIDERATION OR FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(b)** |
| This Document Relates To:<br><br>(1) *Affiliated Foods, Inc. v. Tri-Union Seafoods, LLC et al.*, Case No. 3:15-cv-02787<br><br>(2) *Associated Wholesale Grocers, Inc. v. Bumble Bee Foods LLC, et al.*, Case No. 3:18-cv-01014 | |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II. FACTS ............................................................................................................... 1

A.  The Court should grant reconsideration of summary judgment to StarKist for the pre-conviction period. ......................................................... 2

1.  The Court improperly applied a heightened standard for summary judgment. ............................................................................. 3

2.  The evidence for the price-fixing conspiracy should be considered as a whole. ...................................................................... 5

3.  The Court clearly erred when it excused StarKist's direct communications with competitors. ................................................. 7

B.  Alternatively, the Court should allow an interlocutory appeal under 28 U.S.C. § 1292(b). ......................................................................... 15

1.  The Court's decision on summary judgment is a controlling question of law. ......................................................................... 15

2.  There are substantial grounds for differences of opinion about whether StarKist's direct communications can prove a conspiracy. ........................................................................ 16

3.  An immediate appeal may materially advance the ultimate termination of the litigation. ................................................ 16

# TABLE OF AUTHORITIES

## Cases

*Clevenger v. Riviana Foods Inc.*,
    2020 WL 2527948 (C.D. Cal. Apr. 7, 2020)......................................................16

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ..........................................................................................6

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
    2019 WL 1515231 (E.D.N.Y. Feb. 21, 2019) ...................................................9

*F.T.C. v. Wyndham Worldwide Corp.*,
    10 F. Supp. 3d 602 (D.N.J. 2014).....................................................................16

*Forest Guardians v. Bureau of Land Mgmt.*,
    188 F.R.D. 389 (D.N.M 1999) .........................................................................16

*Gray v. Shell Oil Co.*,
    469 F.2d 742 (9th Cir. 1972)............................................................................14

*Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*,
    527 F.Supp.2d 1257 (D. Kan. 2007) ..................................................................9

*Home Depot, U.S.A., Inc. v. E.I. Dupont de Nemours & Co.*,
    2019 WL 3804667 (Aug. 13, 2019) ..................................................... 3, 4, 10, 12

*Honey Bum, LLC v. Fashion Nova, Inc.*,
    63 F.4th 813 (9th Cir. 2023)............................................................................ 7, 13

*In re Baby Food Litig.*,
    166 F.3d 112 (3d Cir. 1999) ............................................................................11

*In re Blood Reagents Antitrust Litig.*,
    266 F.Supp.3d 750 (E.D. Pa. 2017)................................................... 6, 10, 14

*In re Cathode Ray Tube Antitrust Litig.*,
    2017 WL 11237000 (N.D. Cal. Mar. 9, 2017) ............................................ 5, 10

*In re Cement Antitrust Litig. (MDL No. 296)*,
    673 F.2d 1020 (9th Cir. 1981) .........................................................................15

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999) ............................................... 11, 12, 14

*In re Coordinated Pretrial Proceedings in Petroleum Prod.*,
    906 F.2d 432 (9th Cir. 1990) ...................................................10

*In re Currency Conversion Fee Antitrust Litig.*,
    773 F.Supp.2d 351 (S.D.N.Y. 2011) ........................................10

*In re Dealer Management Systems Antitrust Litig.*,
    581 F.Supp.3d 1029 (N.D. Ill. 2022).........................................9

*In re Domestic Drywall Antitrust Litig.*,
    163 F.Supp.3d 175 (E.D. Pa. 2016)..........................................12

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser*
    *Antitrust Litig.*,
    28 F.4th 42 (9th Cir. 2022).......................................................4

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
    681 F.Supp.2d 141 (D. Conn. 2009) ......................................10

*In re Korean Ramen Antitrust Litig.*,
    281 F.Supp.3d 892 (N.D. Cal. 2017)........................................10

*In re McCormick & Co., Inc.*,
    217 F.Supp.3d 124 (D.D.C. 2016) ..........................................4

*In re Musical Instruments and Equipment Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015)................................................13

*In re Polyurethane Foam Antitrust Litig.*,
    152 F.Supp.3d 968 (N.D. Ohio 2015) ........................... passim

*In re Publ'n Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012) .....................................................9

*In re Titanium Dioxide Antitrust Litig.*,
    959 F.Supp.2d 799 (D. Md. 2013) .........................................13

*In re Urethane Antitrust Litig.*,
    913 F.Supp.2d 1145 (D. Kan. 2012) ................................. 10, 11, 12, 15

*In re Urethane Antitrust Litig.*,
  2013 WL 2097346 (D. Kan. May 15, 2013) ........................................................14

*Kleen Products LLC v. Georgia-Pacific LLC*,
  910 F.3d 927 (7th Cir. 2018) ...........................................................................5

*Koby v. ARS Nat'l Servs., Inc.*,
  2010 WL 5249834 (S.D. Cal. Dec. 23, 2010) ....................................................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .........................................................................................8

*Mr. Dee's Inc. v. Inmar, Inc.*,
  2022 WL 825995 (M.D.N.C. Mar. 18, 2022) ................................................. 9, 11

*Ormond v. Anthem, Inc.*,
  2011 WL 3881042 (S.D. Ind. Sept. 2, 2011) ....................................................17

*Persian Gulf Inc. v. BP W. Coast Products LLC*,
  --- F.Supp.3d ---, 2022 WL 4830698 (S.D. Cal. Sept. 30, 2022)................ passim

*Prosterman v. American Airlines, Inc.*,
  747 Fed. App'x 458 (9th Cir. 2018) ..................................................................13

*Reese v. BP*,
  *Expl.*, 643 F.3d 681 (9th Cir. 2011)..................................................................16

*School Dist. No. IJ, Multnomah County, Oregon v. ACandS, Inc.*,
  5 F.3d 1255 (9th Cir. 1993) ..............................................................................2

*SourceOne Dental, Inc. v. Patterson Companies, Inc.*,
  310 F.Supp.3d 346 (E.D.N.Y. 2018)..................................................................10

*Stanislaus Food Products Co. v. USS-POSCO Industries*,
  803 F.3d 1084 (9th Cir. 2015) ...................................................................... 7, 13

*Texas v. Allan Constr. Co., Inc.*,
  851 F.2d 1526 (5th Cir. 1988)..........................................................................15

*W. Tenn. Chapter of Associated Builders & Contractors, Inc. v.
  City of Memphis*,
  138 F.Supp.2d 1015 (W.D. Tenn. 2000)............................................................16

*Youssofi v. Credit One Fin.*,
  2016 WL 6395086 (S.D. Cal. Oct. 28, 2016).........................................................15

## Statutes

28 U.S.C. § 1292(b) ............................................................................. *passim*

## I. INTRODUCTION

StarKist executives often communicated with Bumble Bee executives either directly or through its consultant, Robert Worsham. Neither StarKist nor Bumble Bee had legitimate reasons for these many interfirm communications. And these conversations allowed the conspirators to increase their prices and inflate their margins. Courts usually allow a jury to decide whether those communications are evidence of a larger price fixing conspiracy. That is true even without evidence that the conspirators concealed their communications. And it is true even when the same participants did not plead guilty to later price fixing. StarKist did both. A jury should therefore decide whether StarKist was member to a price fixing conspiracy for the pre-conviction period.

## II. FACTS

Although the Court is familiar with the facts of the case, these four sets of facts are especially pertinent to the Motion for Reconsideration:

1. Bumble Bee CEO Christopher Lischewski promised to "make direct contact with Del Monte" about the can downsize. Both Scott Cameron and Ken Worsham testified that meant he would reach out to Del Monte executives directly. Lischewski then announced that Bumble Bee was joining the can downsize. Because StarKist and Bumble Bee viewed each other as the main market players, they usually reached agreements independently from Chicken of the Sea. That is, Bumble Bee and StarKist would not move alone without mutual assurances. ECF 3015 at 5, 9, 12.

2. The two can downsize agreements were made by Lischewski: one with StarKist and the other with Chicken of the Sea. Those agreements only involved the highest-level executives at each company. For example, the Bumble Bee and Chicken of the Sea downsize agreement was executed between Lischewski and his

COO and CEO Shue Wing Chan and his COO.  ECF 3015 at 7.  In other words, neither downsizing agreement involved the lower-level C-suite executives like Cameron or Worsham.

3.      Robert (Bob) Worsham served as a longtime executive at StarKist. After retiring from that role, he worked as a consultant for the company.  He was responsible for StarKist's relationship with its most important customer, Walmart, which represented over half of StarKist's sales.  ECF 3015 at 12.  And although Bob Worsham was not "employed" directly by StarKist, the record reflects regular and frequent emails between Bob Worsham and high-level executives at StarKist including the CEO as well as communications with StarKist's competitors.  Both Steve Hodge and Scott Cameron testified that Ken Worsham used Bob Worsham as a conduit to pass and to receive confidential information throughout the conspiracy. ECF 3015 at 9-10, 12.

4.      Before key pricing moves StarKist's Chuck Handford directly communicated with Bumble Bee's Don Gallagher.  ECF 2019 at 23.  Handford's emails in 2009 also show direct communications in furtherance of the conspiracy and he refused to answer questions about his calls and emails during that time.  *Id*. at 23-24.

A.    **The Court should grant reconsideration of summary judgment to StarKist for the pre-conviction period.**

"Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust or (3) if there is an intervening change in controlling law.'"  ECF 2781 (quoting *School Dist. No. IJ, Multnomah County, Oregon v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)).  Despite extensive evidence of competitor communications, the Court granted StarKist's motion for summary judgment on the

pre-conviction period.  The Court's decision turned on three clear errors: (1) it applied the heightened Third Circuit antitrust standard; (2) it cabined the evidence of the conspiracy to various parallel price increases; and (3) it discounted the direct communications between competitors.  The result is a decision that is likely at odds with every other court to consider similar proof at the summary judgment stage.

### 1.    The Court improperly applied a heightened standard for summary judgment.

The Court applied the heightened Third Circuit standard for summary judgment in antitrust cases.  But the Ninth Circuit and Third Circuit antitrust summary judgment standards "are significantly different." *Home Depot, U.S.A., Inc. v. E.I. Dupont de Nemours & Co.*, 2019 WL 3804667, at *4 (Aug. 13, 2019).  Unlike the Third Circuit, a plaintiff need not present evidence of a "smoking gun." *Id*.  The standards also differ in two other important respects: first, the district court may not weigh evidence; and second, the district court should consider the defendant's motive. *Id*.

Although the Court recognized that it should neither weigh evidence nor make inferences in StarKist's favor (ECF 3051 at 12), its decision belies that acknowledgment.  Indeed, the Court usually provided an innocent explanation for each piece of evidence. *See*, *e.g.*, ECF 3051 at 23 ("That is one inference that may be drawn from the email, but it is not the only one . . ."); *id*. at 24-25 (suggesting that StarKist may not have been the source of information).  It then combined those innocent explanations concluding that StarKist "made a unilateral decision to downsize cans," while Bumble Bee and Chicken of the Sea separately agreed to downsize. *Id*. at 26.  The evidence (with appropriately drawn inferences), however, reflects: (1) StarKist wanted to downsize; (2) StarKist identified certain obstacles it needed to overcome to downsize, including (a) its competitors needed to join and

(b) it needed to overcome customer opposition; (3) StarKist solved those obstacles by agreeing with Bumble Bee to downsize in early January; and (4) afterward Bumble Bee got Chicken of the Sea to agree to a downsize. ECF 3015 at 5. Although a jury could ultimately decide that StarKist made an independent business decision, AWG need not show that the "'conspiracy is reasonable'" even when all inferences are made in StarKist's favor. *Home Depot*, 2019 WL 3804667, at *4.

Likewise, the Court failed to adequately consider StarKist's motive to join the conspiracy. *See id*. Because "'implausible claims require a more 'persuasive' showing,'" "'the economic plausibility of a defendant's motivation to conspire play an explicit, central role in the standards set forth in *Matsushita*.'" *Id*. (citations omitted). Here, AWG "presents expert evidence that [StarKist] had motive to enter into a price-fixing conspiracy. The [packaged tuna] market is highly concentrated; [packaged tuna] is a commodity-like product with no substitutes; and there are substantial barriers to entry in the market." *Id*. at *8. StarKist also used the same reason used in the later conviction period—rising fish costs—for increasing prices. *See In re McCormick & Co., Inc.*, 217 F.Supp.3d 124, 132 (D.D.C. 2016) (pretextual statements provide circumstantial evidence of a conspiracy). As a result, AWG need not make a more persuasive showing to defeat summary judgment.

StarKist already pleaded guilty to price-fixing in the later period which featured the same oligopolistic market, featured the same group of conspirators, and used the same methods. Like the conviction period, StarKist typically led on the price increases. Even a conviction that "occurred approximately twenty years ago" supports the existence of a conspiracy. *Cf. In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 53 (9th Cir. 2022). That said, the Court dismisses StarKist's conviction as unsupportive of any can downsize agreement. ECF 3051 at 29. All the conspirators agreed, however, that a can

downsize is a type of price increase. And "inflexible" changes are more likely to require coordination. *Cf. Kleen Products LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 937-38 (7th Cir. 2018).

Similarly, Chicken of the Sea's failure to identify StarKist does not create an inference that StarKist was absent from the conspiracy. *Cf. In re Polyurethane Foam Antitrust Litig.*, 152 F.Supp.3d 968, 995-96 (N.D. Ohio 2015) ("But nor does the scope of the guilty plea, alone or together with other evidence, defeat Direct Purchasers' claims."). Instead, the evidence shows that the conspiracy operated bilaterally with StarKist and Bumble Bee independently reaching agreements and sharing confidential information. *See In re Cathode Ray Tube Antitrust Litig.*, 2017 WL 11237000, at *7 (N.D. Cal. Mar. 9, 2017) ("As this Court has made plain in its recent summary judgment orders, lack of participation in one of the group meetings that formed the heart of the conspiracy is not equivalent to a free pass on summary judgment."); *see id.* ("Plaintiffs' evidence of bilateral meetings with admitted conspirators similarly creates a dispute of material fact here with respect to Mitsubishi's participation in the greater CRT conspiracy."). As a result, Chicken of the Sea's admissions simply dispel the notion that the packaged tuna market operated independently during the pre-conviction period.

### 2. The evidence for the price-fixing conspiracy should be considered as a whole.

AWG alleges that StarKist participated in an overarching conspiracy to fix packaged tuna prices. ECF 3015 at 18 ("StarKist claims Plaintiffs' price fixing allegations are cabined to three discrete advances. Not so, Plaintiffs pick out that price fixing, but identify other ways the conspirators fixed pricing."). Yet the Court considered only three parallel price increases from the pre-plea period: (1) the can downsize; (2) the 2008 list price increase; and (3) the 2010 net price increase. ECF

3051 at 3 ("Among the many instances of allegedly unlawful conduct in this case, only three are at issue . . ."); *id*. at 17. But the evidence shows that the conspirators continuously managed margins by sharing quarterly and promotional guidance and other pricing information used in customer negotiations throughout the dismissed period. ECF 3015 at 13-15; *see Polyurethane Foam*, 152 F.Supp.3d at 983 (using plaintiffs' quarterly analysis over the defendants' objections). Under these circumstances, the three parallel price increases are just "a relevant factor in addition to plus factors."[1] *Persian Gulf Inc. v. BP W. Coast Products LLC*, --- F.Supp.3d --- , 2022 WL 4830698, at *13 (S.D. Cal. Sept. 30, 2022).

In any event, the Court should not have "tightly compartmentalized" the evidence for each price increase. *In re Polyurethane Foam Antitrust Litig.*, 152 F.Supp.3d 968, 985 (N.D. Ohio 2015) (cleaned up). Said differently, the Court should not "'wipe the slate clean after scrutiny of each'" factual component. *In re Blood Reagents Antitrust Litig.*, 266 F.Supp.3d 750, 778-79 (E.D. Pa. 2017) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962). It should have considered the plus factors—like competitor communications— holistically. *See*, *e.g.*, *Persian Gulf Inc. v. BP W. Coast Products LLC*, --- F.Supp.3d ---, 2022 WL 4830698, at *13 (considering competitor communications as a whole); ECF 3051 at 29 (considering guilty plea for each price increase). All the same, the Court analyzed each piece of evidence in isolation.

---

[1] The Court should consider the frequent and continuous parallel events that occurred throughout the conspiracy (2008-2015) all together.

### 3. The Court clearly erred when it excused StarKist's direct communications with competitors.

StarKist often communicated directly with its competitors. And "atypical communications between alleged coconspirators can constitute a plus factor because such communications provide the opportunity to come to (and enforce) an illicit agreement." *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 823 (9th Cir. 2023); *see also Stanislaus Food Products Co. v. USS-POSCO Industries*, 803 F.3d 1084, 1093 (9th Cir. 2015) ("Interfirm communications, particularly among high-level executives,[2] are a 'plus factor' that can bolster the inference of conspiracy."). Still, the Court held that StarKist's direct communications were not sufficient evidence of the conspiracy. In doing so, the Court improperly made inferences in StarKist's favor and disregarded the nature of the communications.

To determine whether competitor communications show the existence of a conspiracy, courts usually consider: (1) "who is communicating and how frequently;" (2) "the proximity of the communications to pricing decisions;" and (3) "the context and content of the communications." *Persian Gulf*, 2022 WL 4830698, at *18; *see also Polyurethane Foam*, 152 F.Supp.3d at 983. Although a plaintiff need not establish each factor, the evidence shows that all are present here.

First, StarKist's "high-level executives" with "pricing authority" often exchanged information and those exchanges "'actually had an impact on pricing.'" *Persian Gulf*, 2022 WL 4830698, at *18. Indeed, those conversations began with the can downsize. For example, Bumble Bee CEO Christopher Lischewski promised his top executives that he would "try to make direct contact" with StarKist

---

[2] The Court resolved evidence in StarKist's favor discounting Bob Worsham as a retired part-time consultant far removed from the conspirators. ECF 3051 at 21, fn. 11. AWG's evidence strongly shows otherwise. ECF 3015 at 12. A jury may conclude as the Court did, but it is far from the only or most persuasive interpretation.

(Del Monte) about the can downsize in early January. ECF 3015 at 7. His executives understood this to mean that he would speak with StarKist's management. *Id*. And sure enough, in early January, he reported that StarKist had "commenced all work on the downsizing" and that Bumble Bee would "follow." ECF 3051 at 25. At the time, even StarKist's mid-level management did not know about the planned can downsize (nor did the company's customers). ECF 3051 at 6-7. Thus, a reasonable inference is that Lischewski spoke with StarKist's leadership and reached an agreement to join the downsize.

Yet the Court decided that Lischewski's emails did not "permit an inference of an illegal agreement." ECF 3051 at 25. It reasoned that StarKist may not have been the source of the information.[3] *Id*. But the Court must make all inferences in favor of AWG. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Certainly, a reasonable inference is that StarKist provided the information.

The Court also concluded that Bumble Bee's "possession of that information" could not create "an inference of an illegal agreement." ECF 3051 at 25. The evidence, however, shows more than mere possession of competitive information.

---

[3] The Court noted in the background section that Bumble Bee's Ken Worsham testified "Bumble Bee was not coordinating the timing of its downsize with competitors." ECF 3051 at 9. That testimony is contradicted by Chicken of the Sea's admissions and the Milton's meeting. The Court also noted that Bumble Bee's Scott Cameron "denied reaching any agreements about downsizing with anyone" at StarKist and "had no knowledge" about any agreements to downsize. *Id*. But the evidence shows that the downsizing agreements were reached by the tuna companies' highest-level executives. For example, the Milton's meeting with Chicken of the Sea was attended by Bumble Bee's CEO and COO. It is no surprise then that neither Worsham nor Cameron were involved or had knowledge about the two bilateral agreements to downsize. And both executives along with StarKist's Hodge testified the companies were exchanging competitive information while other key players refused to testify. ECF 3015 at 8.

To the contrary, the emails—even if "ambiguous"[4]—suggest that StarKist "shared" its strategy for downsizing packaged tuna cans. *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012) (circumstantial evidence supported the conspiracy where presidents of two companies with pricing authority shared intentions to increase prices before those decisions had been publicly announced); *see also Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F.Supp.2d 1257, 1304 (D. Kan. 2007) (summary judgment denied because the defendants "communicated to each other (i.e., to their competitors) about their strategies."); *Polyurethane Foam*, 152 F.Supp.3d at 984 ("A direct and secret discussion between competitors is more probative of a conspiracy than are indirect and public communications. . .").

Still more, "exchanges of information between low-level employees can be probative of conspiracy where there is evidence that those employees routinely reported information up the chain-of-command." *Persian Gulf*, 2022 WL 4830698, at *18. And here, StarKist's Chuck Handford directly communicated with Bumble Bee about pricing before the conviction period. ECF 3015 at 11; *see also* ECF 3051 at 34 (acknowledging phone calls between Handford and Don Gallagher at Bumble Bee). So too did StarKist Senior Vice President of Marketing Joe Tuza with Lischewski. *Id.* Tuza then used this confidential information to set prices at the company. *Id.* Simply put, this mutual exchange of pricing information is strong circumstantial evidence of a conspiracy.[5] *See Persian Gulf*, 2022 WL 4830698, at

---

[4] *Mr. Dee's Inc. v. Inmar, Inc.*, 2022 WL 825995, at *9 (M.D.N.C. Mar. 18, 2022) ("'Ambiguous statements by competitors, taken as a whole, may support the inference of a price-fixing conspiracy.'") (citations omitted).

[5] Courts outside this circuit—including inside the Third Circuit—have reached the same conclusion. *See, e.g.*, *In re Dealer Management Systems Antitrust Litig.*, 581 F.Supp.3d 1029, 1060-61 (N.D. Ill. 2022) (collecting cases); *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 2019 WL 1515231, at *14-15 (E.D.N.Y. Feb. 21, 2019) (interfirm communication tended "to

*18 (traders exchanging potentially confidential information about oil production could show a conspiracy); *In re Korean Ramen Antitrust Litig.*, 281 F.Supp.3d 892, 912-13 (N.D. Cal. 2017) (summary judgment denied when purchasers presented evidence of communications between several manufactures in which they exchanged advance price information with their competitors); *Cathode Ray Tube*, 2017 WL 11237000, at *7 ("There is also sufficient evidence for a jury to find that Toshiba received pricing information from its competitors, shared its own pricing information, and was aware of its wrongdoing. Although Toshiba argues that its interactions with its competitors constituted nothing more than legitimate exchanges of information, such disputes regarding the interpretation of evidence are not appropriate for resolution on summary judgment."); *In re Coordinated Pretrial Proceedings in Petroleum Prod.*, 906 F.2d 432, 452 (9th Cir. 1990) ("By contrast, the evidence in the present case amply supports an inference that the exchange of price information by the appellees was done with the purpose and effect of allowing greater coordination and stabilization of prices."); *see also Home Depot*, 2019 WL 3804667, at *10 (even direct communications about topics other than pricing supported the existence of a conspiracy).

---

exclude the possibility that the defendants acted independently"); *SourceOne Dental, Inc. v. Patterson Companies, Inc.*, 310 F.Supp.3d 346, 359 (E.D.N.Y. 2018) ("What is suspicious about these inter-firm communications, in addition to their quantity, is that competitors communicated information with each other when, absent assurances of mutual support, doing so would have put each company individually at a competitive disadvantage."); *In re Blood Reagents Antitrust Litig.*, 266 F.Supp.3d 750, 778 (E.D. Pa. 2017) ("explicit transfer of price information" raised inference of conspiracy); *Polyurethane Foam*, 152 F.Supp.3d at ("When the senior employees spoke with one another, they exchanged what a jury could conclude is sensitive business information[.]"); *In re Urethane Antitrust Litig.*, 913 F.Supp.2d 1145, 1154-54 (D. Kan. 2012) (competitor communications were evidence of a conspiracy); *In re Currency Conversion Fee Antitrust Litig.*, 773 F.Supp.2d 351, 368-371 (S.D.N.Y. 2011) (similar); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F.Supp.2d 141, 173-178 (D. Conn. 2009) (similar).

Even so, the Court excused all the direct competitor communications between StarKist and Bumble Bee. But it repeatedly relied on a case with few similarities to the present one. ECF 3051 at 22 (citing *In re Baby Food Litig.*, 166 F.3d 112, 124-126 (3d Cir. 1999); *id*. at 23 (citing same); *id*. at 28 (citing same); *id*. at 31 (citing same); *id*. at 34 (citing same). Unlike here, *Baby Food* only involved "sporadic exchanges of shop talk among field sales representatives." *In re Baby Food Litig.*, 166 F.3d 112, 124-26 (3d Cir. 1999). Unlike here, company executives did not instruct the sales representative to share information with competitors. *Id*. And unlike here, plaintiffs could only point to the defendant's possession of competitive intelligence. *Id*.; *see also In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) (possession of competitor price lists was not sufficient to establish a conspiracy). While companies have legitimate reasons to collect as much information on their rivals as possible, they rarely have legal reasons to exchange pricing information. Here, the evidence shows that confidential pricing information was *exchanged* by the conspirators. As a result, *Baby Food* says nothing about the legality of StarKist's interfirm communications.

Of course, StarKist denies any involvement in the conspiracy before its conviction. But those denials should be "unavailing, as the evidence must be viewed in plaintiffs' favor at summary judgment." *Urethane*, 913 F.Supp.2d at 1156. Take *Mr. Dee's* for example. There, the defendant company's president (just as Del Monte's CEO here, ECF 3051 at 32) submitted a declaration that no direct communications with any competitor took place. 2022 WL 825995, at *9. But the court recognized that it could "not weigh the evidence or make credibility determinations." *Id*. It therefore denied the defendant's motion for summary judgment.

StarKist is also not shielded from liability based on Cameron's refusal to use the term "agreement" for the pre-conviction period. ECF 3051 at 10. That labelling decision cannot preclude a jury from finding a tacit agreement to price fix. *Polyurethane Foam*, 152 F.Supp.3d at 986. Both Cameron and Worsham, moreover, admitted that they should have never communicated with StarKist. ECF 3015-1, Six Decl. ¶ 2 (Cameron Depo. 185) and ¶ 5 (Worsham Depo. 368-69, 370-72); *see Urethane*, 913 F.Supp.2d at 1155.

Second, StarKist regularly communicated with competitors close "to pricing decisions." *Persian Gulf*, 2022 WL 4830698, at *20. For instance, Lischewski communicated with StarKist before the can downsize was announced to customers. *See also* ECF 3015 *passim*.

StarKist and Bumble Bee also often used Bob Worsham as a conduit for high-level executives to pass information during times of price increases.[6] *Compare* ECF 3051 at 21-22; *id.* at 27; *id.* at 30-31 (holding the use of Bob Worsham as a conduit is not evidence of a conspiracy) *with Home Depot*, 2019 WL 3804667, at *10 ("Indeed, Home Depot suggest that Mr. Fisher may have been used as an intermediary by the alleged conspirators."); *see also In re Domestic Drywall Antitrust Litig.*, 163 F.Supp.3d 175, 243, 248 (E.D. Pa. 2016) (denying defendants' motion for summary judgment where third-party research analysts "directly communicated information shared by one Defendant with another Defendant either directly ... or indirectly (e.g., by quoting a manufacturer in an analyst report [verbatim] and then circulating those reports among Defendants)"); *Polyurethane Foam*, 152 F.Supp.3d at 984 ("generally saw one Defendant pass to another

---

[6] The conspirators testified that Bob Worsham did not only present an "opportunity" to pass confidential information; he did. ECF 3015 at 9-10; *Citric Acid*, 191 F.3d at 1103 ("Varni does not offer any specific details with regard to illegal discussions, but instead merely asks us to infer participation in the conspiracy from the opportunity to do so.").

(including through conduits)" pricing information); *In re Titanium Dioxide Antitrust Litig.*, 959 F.Supp.2d 799, 829 (D. Md. 2013) (denying defendants' motion for summary judgment where third-party consultant was alleged to directly siphon anticompetitive information between defendants—regarding, for example, their relative inventory and pricing levels). Besides, close proximity to pricing decisions is not necessary. *Compare* ECF 3051 at 33 ("The majority of these emails are from April through June of 2009, nearly one year before the pricing action at issue, and are therefore, unhelpful.")[7] *with Persian Gulf*, 2022 WL 4830698, at *20 (plaintiffs did "not point to any evidence of specific price increases, supply reductions, or other concerted activity in proximity to [the defendants'] exchanges of information.").

What's more, Dr. Colin Carter detected a measurable effect from repeated competitor communications. *Cf. Stanislaus*, 803 F.3d at 1093 (no evidence communications affected prices). This is no surprise. After all, those communications allowed the conspirators to manage promotional and quarterly pricing and to know each other's pricing when negotiating with customers on discounts allowing them to keep pricing up. See ECF No. 3015 at 13-14 (the Court did not consider this evidence when it focused only on the three distinct pricing actions StarKist identified).

Third, the context and content of these competitor communications show that they went well "beyond the 'standard fare' of business and trade-association practice."[8] *Honey Bum*, 63 F.4th at 823. StarKist and Bumble Bee had no legitimate

---

[7] It is only by attributing the direct communications to discrete events—the can downsize or the 2008 list price increase—and then wiping the slate clean that the 2009 emails become too remote and "therefore, unhelpful." That approach, however, is contrary to Supreme Court precedent. *See* Section II.A.2.

[8] *See also Prosterman v. American Airlines, Inc.*, 747 Fed. App'x 458, 462 (9th Cir. 2018) (membership in trade organization is not evidence of collusion); *In re Musical Instruments and*

reason for communicating on this scale. They had no customer-supplier relationship. *Cf. Polyurethane Foam*, 152 F.Supp.3d at 984 (defendants sometimes had a supplier-customer relationship). Nor did they have reason to believe they had a legal obligation to exchange information. *See Gray v. Shell Oil Co.*, 469 F.2d 742, 746-747 (9th Cir. 1972). And they stood to directly benefit from the information exchanged. *Id*. Simply put, the competitors shared information that is not "the kind reasonably shared in the context of legitimate business interactions." *Persian Gulf*, 2022 WL 4830698, at *21.

\* \* \*

StarKist's communications:

> occurred during price increase periods, in private, and sometimes (as described below) were coupled with affirmative attempts to keep the fact of the communications secret; joined Defendants' most senior employees in conversations about price; display a level of repetition and structure distinguishing the conversations from random chats between competitors; involve the exchange of future pricing information and price increases that had been published to customers but not yet implemented; match the communication patterns described by the Cooperating Defendants [ ], each to some extent admitted price fixers; and expressly caused Defendants to modify pricing decisions. 'The inference of concerted rather than interdependent action is therefore stronger.'

*Polyurethane Foam*, 152 F.Supp.3d at 989.

StarKist's "[a]cts of concealment are circumstantial evidence of a conspiracy's existence." *In re Urethane Antitrust Litig.*, 2013 WL 2097346, at *11 (D. Kan. May 15, 2013) (cleaned up) *see also Blood Reagents*, 266 F.Supp.3d at 777 (highlighting efforts to conceal). To establish concealment, AWG must show evidence that StarKist used some affirmative "trick or contrivance tending to

---

*Equipment Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (same); *Citric Acid*, 191 F.3d at 1097-1099 (same).

exclude suspicion and prevent inquiry." *Texas v. Allan Constr. Co., Inc.*, 851 F.2d 1526, 1529 (5th Cir. 1988). Here, "the conspirators tried to hide their activities by: (1) hiding sources of collusion; (2) using coded words and language; (3) communicating and routing pricing information [through] Bob Worsham; (4) deleting emails; (5) communicating verbally to avoid a paper trail; and (6) avoid asking about collusion." ECF 3015 at 15; *see Urethane*, 913 F.Supp.2d at 1154-56 (document destruction and oral communications between direct competitors was evidence of a conspiracy). The Court weighed nothing in AWG's favor on the conspirators' concealment including during the period it dismissed.

## B.     Alternatively, the Court should allow an interlocutory appeal under 28 U.S.C. § 1292(b).

Under 28 U.S.C. § 1292(b), the Court may certify an order for interlocutory appeal where the order "(1) involves a controlling question of law; (2) to which there is substantial ground for difference of opinion; and (3) an immediate appeal may materially advance the ultimate termination of the litigation." *Koby v. ARS Nat'l Servs., Inc.*, 2010 WL 5249834, at *3 (S.D. Cal. Dec. 23, 2010).

### 1.     The Court's decision on summary judgment is a controlling question of law.

Whether StarKist's direct communications can prove a conspiracy is "controlling" because its "resolution on appeal could have a material effect on the outcome of the case in the district court." *Youssofi v. Credit One Fin.*, 2016 WL 6395086, at *2 (S.D. Cal. Oct. 28, 2016); *see also In re Cement Antitrust Litig. (MDL No. 296)*, 673 F.2d 1020, 1026 (9th Cir. 1981) ("[A]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court."). A reversal of the Court's ruling on summary judgment would revive AWG's antitrust claims for the

pre-plea period against StarKist. Thus, AWG's proposed appeal presents a controlling question of law.

### 2. There are substantial grounds for differences of opinion about whether StarKist's direct communications can prove a conspiracy.

The requirement that there be "substantial ground for difference of opinion" is satisfied "when 'reasonable judges might differ' on the correct outcome of an issue and such 'uncertainty provides a credible basis for a difference of opinion.'" *Clevenger v. Riviana Foods Inc.*, 2020 WL 2527948, at *3 (C.D. Cal. Apr. 7, 2020) (quoting *Reese v. BP Expl.*, 643 F.3d 681, 687 (9th Cir. 2011)). And here, numerous district courts have reached a different conclusion than this Court. This Court's decision discounting direct competitor communications is an outlier.

### 3. An immediate appeal may materially advance the ultimate termination of the litigation.

An immediate appeal would also "materially advance the ultimate termination" of this case as required by 28 U.S.C. § 1292(b). To "materially advance the ultimate termination of the litigation," an interlocutory appeal need not eliminate all claims and end the case. *See*, *e.g.*, *F.T.C. v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 635 (D.N.J. 2014), *aff'd*, 799 F.3d 236 (3d Cir. 2015). Rather, § 1292(b) is met if an appeal could "save time for the district court, and time and expense for the litigants." *Forest Guardians v. Bureau of Land Mgmt.*, 188 F.R.D. 389, 397 (D.N.M 1999); *W. Tenn. Chapter of Associated Builders & Contractors, Inc. v. City of Memphis*, 138 F.Supp.2d 1015, 1026 (W.D. Tenn. 2000) ("Interlocutory appeal is favored where reversal would substantially alter the course of the district court proceedings")

A delay in the appeal, and subsequent reversal of this Court's decision, would result in the parties practically re-litigating and potentially re-trying this same matter.[9] An appeal may not only simplify the case, but it would "inject immediate certainty" into a dispute "where, literally, hundreds of millions of dollars hang in the balance." *See*, *e.g.*, *Ormond v. Anthem, Inc.*, 2011 WL 3881042, at *6–7 (S.D. Ind. Sept. 2, 2011) (explaining that if the Seventh Circuit affirmed the court's order, the case would return to the court for trial as scheduled, "meaning, in effect, 'no harm no foul'").

---

[9] Lischewski will be tried for conspiring during the pre-conviction period and thus trimming StarKist's period of liability is particularly inefficient here.

Dated: May 22, 2023

Respectfully Submitted,

**STUEVE SIEGEL HANSON LLP**

*/s/ Steve Six*

Patrick J. Stueve (KS 13847)
Steve N. Six (KS 16151)
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: 816-714-7100
Facsimile: 816-714-7101
stueve@stuevesiegel.com
six@stuevesiegel.com

*Counsel for Plaintiff Associated Wholesale Grocers, Inc and Affiliated Foods Midwest Coop.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 22, 2023, I filed the foregoing document with the Clerk of the Court for the United States District Court, Southern District of California, by using the Court's CM/ECF System, which sends notifications of such filings to all counsel of record.

*/s/ Steve Six*
Steve Six
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: 816-714-7100
Facsimile: 816-714-7101
six@stuevesiegel.com