1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Case No.:  15-MD-2670 DMS (MSB)<br><br>**CLASS ACTION**<br><br>**ORDER GRANTING IN PART AND DENYING IN PART THE LION COMPANIES' MOTION FOR SUMMARY JUDGMENT**<br><br>**(ECF No. 3036)** |

Pending before the Court is a motion for summary judgment filed by Defendants Lion Capital (Americas), Inc., Lion Capital LLP, and Big Catch Cayman LP (collectively the "Lion Entities" or "Defendants").  (ECF No. 3036.)  The Direct Purchaser Class, End Payer Class, Commercial Food Preparer Class, and Direct Action Plaintiffs[1] (collectively "Plaintiffs") filed a joint opposition, (ECF No. 3068), and Defendants replied (ECF No. 3070).  For the reasons set forth below, the motion is granted as to claims against Big Catch Cayman LP.  The motion is denied in all other respects.

_____

[1]  Publix Direct Action Plaintiffs and Kroger Plaintiffs have since settled the claims at issue in this motion.  (*See* ECF Nos. 3088, 3089.)

# I.

## BACKGROUND

The general background and history of this litigation is well-known to the parties and has been set out in several prior orders of this Court.  In July 2015, the Antitrust Division of the United States Department of Justice ("DOJ") announced an investigation into the packaged tuna industry.  As a result of the investigation, the United States filed a number of criminal cases against the major corporate players in the industry, including Tri-Union Seafoods LLC d/b/a/ Chicken of the Sea International ("COSI"), Bumble Bee Foods, LLC ("Bumble Bee"), and StarKist Company ("StarKist"), as well as certain of their executives, charging them with price fixing in violation of 15 U.S.C. § 1, the Sherman Act.

In exchange for self-reporting its participation in the conspiracy and a pledge of full cooperation with the investigation, the DOJ issued a conditional leniency letter to COSI pursuant to the Corporate Leniency Program and the Antitrust Criminal Penalty Enhancement and Reform Act, 15 U.S.C. § 1 et seq.  In 2017, Walter Scott Cameron,[2] Bumble Bee's Senior Vice President of Sales, Kenneth Worsham, Bumble Bee's Senior Vice President of Trade Marketing, and Stephen L. Hodge, StarKist's Senior Vice President of Sales, pleaded guilty to participating in the conspiracy with representatives of other major packaged-seafood-producing firms with the purpose to fix, raise, and maintain the prices of shelf-stable tuna in violation of the Sherman Act. *See United States v. Cameron*, United States District Court for the Northern District of California, Case No. 16cr501-EMC; *United States v. Worsham*, United States District Court for the Northern District of California, Case No. 16cr535-EMC; *United States v. Hodge*, United States District Court for the Northern District of California, Case No. 17cr297-EMC.[3]  Bumble

---

[2]  Unless otherwise noted, individuals are referred to by full names only when first introduced.  Subsequently, they are referenced by last name only.

[3]  The Court takes judicial notice of the filings in the criminal cases. *See* Fed. R. Evid. 201.

Bee pleaded guilty to the same conspiracy on August 4, 2017. *See United States v. Bumble Bee Foods*, LLC, United States District Court for the Northern District of California, Case No. 17cr249-EMC. StarKist entered its guilty plea for the same conspiracy on November 14, 2018. *See United States v. StarKist Co.*, United States District Court for the Northern District of California, Case No. 18cr513-EMC.

On May 16, 2018, Defendant Christopher Lischewski, Bumble Bee's former President and Chief Executive Officer, was indicted for his role in the same conspiracy. *United States v. Lischewski*, United States District Court for the Northern District of California, Case No. 18cr203-EMC ("*United States v. Lischewski*"), ECF No. 1 ("Indictment"). The Indictment charged that "[b]eginning in or about November 2010 and continuing until in or about December 2013," Lischewski "and coconspirators knowingly entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing prices for packaged seafood sold in the United States." *Id.* Lischewski was tried by a jury, found guilty on December 3, 2019, *id.*, ECF No. 640 ("Verdict"), ECF No. 697 ("Judgment"), and his conviction was affirmed on appeal. *United States v. Lischewski*, 860 Fed. Appx. 512 (9th Cir. 2021.)

In the wake of the DOJ announcement of its investigation, dozens of plaintiffs initiated civil actions alleging price fixing against the three tuna producers and their parent companies, including Bumble Bee and the Lion Entities. The Lion Entities move for summary judgment on all claims asserted against them. They argue that Plaintiffs have no evidence to show that any Lion Entity directly participated in the price fixing conspiracy or can be held vicariously liable. They contend that by acquiring and managing an investment in a controlling share of Bumble Bee they only engaged in normal investment activities as a private equity firm.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses. Summary judgment or adjudication of issues

is appropriate if depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c)(1).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.[4]

The burden on the party moving for summary judgment depends on whether it bears the burden of proof at trial.  *Cf. C.A.R. Transp. Brokerage Co., Inc. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000); *Compare Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (moving party with the burden of proof at trial) *with Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1105-06 (9th Cir. 2000) (moving party without burden of proof at trial).

A moving party without the ultimate burden of persuasion at trial, as here,

> has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact.

*Nissan Fire*, 210 F.3d at 1102.

If the moving party carries its burden of production, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to

---

[4]  Unless otherwise noted, internal quotation marks, ellipses, brackets, citations, and footnotes are omitted from citations.

15-MD-2670 DMS (MSB)

interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. In this regard, the nonmoving party:

> must do more than simply show that there is some metaphysical doubt as to the material facts[, and] must come forward with specific facts showing that there is a genuine dispute for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

In ruling on a motion for summary judgment, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 651; *see also id*. at 657. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

### III.

### DISCUSSION

Lion Capital acquired Bumble Bee in December 2010 for $980 million. (Lindberg Decl. ¶ 13; Strebulaev Decl. ¶ 6.)[5] While the Lion Entities were considering the Bumble Bee acquisition, and continuing after the acquisition, Bumble Bee was participating in a

/ / /

---

[5] Defendants' evidence is found in the declarations of Graham Tester (ECF No. 3036-2), Eric Lindberg (ECF No. 3036-3), I-Wenn Jeff Chang (ECF No. 3036-4), Ilya A. Strebulaev (ECF No. 3036-5), and Adam S. Paris (ECF No. 3036-6). Plaintiffs' evidence is found in the declarations of Brittany L. Nyovanie (ECF No. 3069) and Samantha Stein (ECF Nos. 2143, 2145, 2147-55, 2889). Unless otherwise noted, exhibits are referenced as "Lion Ex." or "Pls' Ex." followed by the appropriate number or letter designation. On occasions when the same exhibit was filed by both sides, the Court references only one of the designations.

price-fixing conspiracy with StarKist and COSI.[6]  *See United States v. Lischewski,* Indictment (beginning "in or about November 2010 and continuing until in or about December 2013").)  The planned acquisition of Bumble Bee was announced on November 5, 2010, (Decl. of Samantha Stein in Supp. of Plaintiffs' Opp'n to Various Summ. J. Mots. and Mots. to Exclude ("Stein Decl."), Ex. 87, ECF No. 2149-8 at 5), and the transaction closed on December 15, 2010 (Lindberg Decl. ¶ 13; Strebulaev Decl. ¶ 6).  During the pre-acquisition due diligence, Defendants identified COSI's owner Thai Union Group PCL ("TUG") as a potential buyer when Lion Capital would be ready to exit the investment. (Lindberg Decl. ¶¶ 12, 42; Stein Decl., Ex. 191 ("Final Report") at 6, ECF No. 2152-15.)

In December 2014, Lion Capital publicly announced its agreement to sell Bumble Bee to TUG for $1.151 billion.  (Lindberg Decl. ¶ 43; Decl. of Brittany Nyovanie in Supp. of Plaintiffs' Opp'ns to Mot. for Summ. J. and Mot. to Exclude ("Nyovanie Decl."), Ex. J at 3, ECF No. 3069-10.)  The sale did not close because the Antitrust Division of the DOJ stopped it.  (Lindberg Decl. ¶ 45.)  The DOJ press release dated December 3, 2015, stated,

> Consumers are better off without this deal … .  Our investigation convinced us – and the parties knew or should have known from the get go – that the market is not functioning competitively today, and further consolidation would only make things worse.

/ / /

/ / /

/ / /

/ / /

_____

[6]  The time period addressed in this Order falls outside the scope of the Order Granting StarKist Co., Del Monte Corporation, and Dongwon Industries Co., Ltd.'s Motion for Partial Summary Judgment Dismissing All Claims for Purchases Made Prior to May 30, 2011 ("StarKist Order").  (*See* ECF No. 3051.)  As noted in the StarKist Order, the underlying motion put at issue three instances of allegedly unlawful conduct, the last being the November 2010 net price increase.  (*Id.* at 3.)  The events resulting in the November 2010 price increase occurred at the latest in the spring of 2010.  (*Id.* at 10-11, 32-34.)  The timeline relevant to the present Order begins in the fall of 2010.

https://www.justice.gov/opa/pr/chicken-sea-and-bumble-bee-abandon-tuna-merger-after-justice-department-expresses-serious ("DOJ Press Release").[7]  It is undisputed that during and shortly prior to Lion Entities' ownership of Bumble Bee, Bumble Bee was involved in a price-fixing conspiracy with StarKist and COSI.  *See, e.g., United States v. Lischewski*.

Defendants dispute that Plaintiffs have any evidence to show that Lion Americas or Lion Capital participated in the conspiracy or, alternatively, can be held vicariously liable for Bumble Bee's conduct.  Defendants also dispute that Plaintiffs have any evidence to show that Big Catch, which is the holding company where Bumble Bee shares were held, was the alter ego of Lion Capital.

Both sides submitted voluminous evidence in support of their respective positions, including declarations, deposition transcripts, and contemporaneous documents such as email communications and corporate records.

**A.   The Lion Entities**

1.   Lion Capital LLP

Lion Capital LLP ("Lion Capital") was a British limited liability partnership.  (Tester Decl. ¶ 5; *see also* Stein Decl., Ex. 62 (Am. and Restated Limited Liability Partnership Deed Relating to Lion Capital LLP ("LLP Agreement"), ECF No. 2148-15.)  It created private equity investment funds focused on consumer products, selected investments for the funds, raised money from third-party investors, and was "exclusively responsible" for managing the funds.  (Tester Decl. ¶¶ 7, 12, 15.)

/ / /

/ / /

/ / /

---

[7]   Lion Capital ultimately exited the Bumble Bee investment through bankruptcy.  On November 21, 2019, Bumble Bee filed for bankruptcy protection.  *See In re: Bumble Bee Parent, Inc. et al.*, Case No. 19-12502-LSS (Bankr. D. Del.).  In January 2020, Bumble Bee's assets were sold to FCF Co. Ltd., Bumble Bee's top supplier and one of its minority shareholders.  (*See* ECF No. 3036-1 ("Mot.") at 14.)

Lion Capital created Lion Capital Fund III, LP ("Fund III" or the "Fund") in 2010.[8] (Tester Decl. ¶ 27.)  The fund was a limited partnership.  (*Id.*)  Its general partner was Lion Capital III GP Ltd., which delegated most of its responsibilities to Lion Capital.  (*Id.*)  Bumble Bee's Notice of Party with Financial Interest and Disclosure Statement filed in this action states that *Lion Capital* was Fund III's general partner.  (Stein Decl., Ex. 264, ECF No. 2143-21.)

Lion Capital was also the Fund III "managing agent."[9]  (Tester Decl. ¶¶ 26-27; *see also* ¶ 6.)  As the managing agent, Lion Capital received a management fee from the Fund. (*Id.* ¶ 9.)

Bumble Bee was an investment portfolio company Lion Capital acquired for Fund III.  (*Id.* ¶27.)  In its portfolio investments, Lion Capital aimed for "growth in the value of the underlying business."  (Strebulaev Decl. ¶ 22; *see also id.* ¶¶ 16-17 ("equity value creation")).  Lion Capital's objective was to sell Bumble Bee for a profit when its value was "optimized."  (Stein Decl., Ex. 216 ("Lindberg Dep.") at 35-36, ECF No. 2153-14.)[10]

Lion Capital's founder, Managing Partner, and majority owner[11] was Lydon Lea. (LLP Agreement §§ 1.1, 9.1; *see also* Stein Decl., Ex. 255, ECF No. 2143-14.)  He was one of the "active control people" at Lion Capital.  (Nyovanie Decl., Ex. A ("Lea Dep.")

---

[8]   The Fund was established in the United Kingdom with an address "c/o Lion Capital LLP."  It was registered with the Securities and Exchange Commission ("SEC") in the United States.  *See* https://sec.report/CIK0001498249.

[9]  The Court takes judicial notice of the SEC Form D, Stock/Securities Offering, filed Oct. 21, 2010, and Form D as amended, filed October 17, 2011, by Fund III (collectively "Form D"), found at https://sec.report/Document/0001498249-10-000001 and https://sec.report/Document/0001498249-11-000001, respectively.  Fed. R. Evid. 201. Form D identifies Lion Capital as "manager of Issuer[,]" and defines the "Issuer" as Fund III.

[10]  Excerpts from Lindberg's deposition were filed as Lion Ex. K and Pls.' Exs. 216 and X (collectively "Lindberg Dep.").

[11]   The Court takes judicial notice of Lion Americas' Form ADV dated March 30, 2018 ("Form ADV"), which was filed with the SEC.  Fed. R. Evid. 201.  Lea held a majority stake in Lion Capital.  Form ADV, Schedule B.

at 40, ECF No. 3069-1.)[12]  Eric Lindberg, Jacob Capps, and Jeff Chang were among Lion Capital's Members.  (LLP Agreement, Schedule 1.)  Lindberg and Capps were also Lion Capital Partners.  (Nyovanie Decl., Exs. K, L, ECF Nos. 3069-11, 3069-12.)  Chang was a Lion Capital Director.  (Nyovanie Decl., Ex. M, ECF No. 3069-13.)  Lindberg, Capps, and Lea were also among Lion Capital's Executive Officers.[13]

2. <u>Lion Capital (Americas), Inc.</u>

Lion Capital (Americas), Inc. ("Lion Americas") was a Delaware corporation and a wholly owned subsidiary of Lion Capital.  Form ADV, Schedule A.  By virtue of his majority stake in Lion Capital, Lea indirectly owned nearly all of Lion Americas' shares. Form ADV, Schedule B.

Lion Americas was an SEC-registered investment advisor with one client—Lion Capital.  (Form ADV, Items 1, 5-7; *see also* Tester Decl. ¶ 17.)  Lion Americas provided Lion Capital with advice concerning investments in North America.  (Tester Decl. ¶ 17.) Lion Capital delegated to Lion Americas some of its management duties for the funds, including Fund III, and paid Lion Americas on a "cost plus fee" basis.  (*See* Form ADV, Item 5; *see also* Tester Decl. ¶ 18; Chang Decl. ¶ 8.)  Lion Americas had no other source of income and was entirely dependent on Lion Capital.  Form ADV, Item 5.

As Lion Capital's investment advisor, Lion Americas performed due diligence reviews of potential Lion Capital investments to determine whether there was a sound basis for investing, *i.e.,* "a reason to believe that the company will likely increase in value between acquisition and exit."  (Chang Decl. ¶ 12.)  Lion Americas employees working on a potential acquisition were a "deal team."  (*Id.* ¶ 13.)  Lindberg, Chang, and Capps were

---

[12] Excerpts from Lea's deposition were filed as Lion Ex. WW and Pls' Ex. A (collectively "Lea Dep.").

[13] Form D lists Lindberg, Capps, and Lea, among others, as persons related to Fund III and identifies each as "Executive Officer ... of Lion Capital LLP[.]"  (Decl. of Adam Paris in Supp. of Lion Entities Renewed Mot. for Summ. J. ("Paris Decl."), Ex. QQ, ECF No. 3036-19) (defining "Executive Officer").

on the deal team evaluating Bumble Bee (the "Deal Team").[14]  (Tester Decl. ¶ 20; Paris Decl., Ex. VV ("Chang Dep.") at 44, ECF No. 3036-20.)[15]  The Deal Team reported to the Lion Capital Investment Committee regarding potential acquisition targets.  (Chang Decl. ¶ 13.)  The Lion Capital Investment Committee assigned a member to every deal team. (Lea Dep. at 89.)  Lea was assigned to the Deal Team working on the Bumble Bee acquisition.  (Lea Dep. at 90; see also Paris Decl., Ex. UU ("Capps Dep.") at 88-89, ECF No. 3036-20.)[16]  Accordingly, the Bumble Bee team included Lea, Lindberg, Capps, and Chang.  (Nyovanie Decl., Ex. J at 3, ECF No. 3069-10.)  Ultimately the Investment Committee decided whether to approve an investment for one of Lion Capital's funds. (Chang Decl. ¶ 13.)

If the Investment Committee approved an acquisition, the original deal team monitored the company and reported to the Investment Committee for the duration of the investment (Chang Decl. ¶ 33; Tester Decl. ¶ 17), and the Investment Committee member originally assigned to the deal team continued his involvement (Lea Dep. at 90).  To monitor and participate in the acquisition's governance, Lion Americas employees and an Investment Committee member were appointed to the acquisition's board of directors. (Tester Decl. ¶ 17; Lea Dep. at 90.)

/ / /

/ / /

/ / /

/ / /

---

[14]  During the relevant time, Capps was Lion Americas' President, Lindberg a Director, and Chang was promoted from a Principal to a Director.  (Lindberg Decl. ¶ 8; Chang Decl. ¶ 10; Nyovanie Decl., Exs. K-M, ECF No. 3069-11, 3069-12, 3069-13.)

[15]  Excerpts from Chang's deposition were filed as Lion Ex. VV and Pls' Ex. 217 (collectively "Chang Dep.").

[16]  Excerpts from Capps' deposition were filed as Lion Ex. UU and Pls' Ex. 218 (collectively "Capps Dep.").

### 3.    Big Catch Cayman LP

Big Catch Cayman LP ("Big Catch")[17] was a Cayman Islands-based holding company organized as a limited partnership.  (Tester Decl. ¶ 22.)  It was formed in 2010 in connection with Fund III investment in Bumble Bee.  (*Id.* ¶ 23.)

The Big Catch general partner was Lion/Big Catch Cayman Ltd.  (Stein Decl., Ex. 78, ECF No. 2148-32 at 2, 57, 131, 140.)  Only Lion/Big Catch Cayman Ltd. as the general partner had voting rights.  (*See* Stein Decl., Ex. 78 (Lion/Big Catch Cayman L.P. Amended and Restated Agreement of Exempted Limited Partnership dated Dec. 15, 2010 ("Big Catch Partnership Agreement") § 3.1(b), ECF No. 2148-32.)  The general partner also had "the *exclusive right to manage and control* the business and affairs" of Big Catch.  (Big Catch Partnership Agreement § 5.2) (emphasis added).

Big Catch general partner Lion/Big Catch Cayman Ltd. was wholly owned by Fund III.  (Stein Decl., Ex. 189, ECF No. 2152-12 at 3.)  In its role as the Fund III managing agent, Lion Capital exercised "the Big Catch governance rights that [we]re owned indirectly by Fund III."  (Tester Decl. ¶ 25; *see also* Big Catch Partnership Agreement §§ 3.1(b), 5.2.)

Lion/Big Catch Cayman Ltd. held 68.58% of Bumble Bee shares, which were owned by Fund III investors.  (Stein Decl., Ex. 78 at 3, ECF No. 2148-32.)  Big Catch limited partners were Lion/Big Catch Coinvestors 1 LP, holding 22.84% of Bumble Bee shares owned by Bumble Bee's supplier FCF Co. Ltd., and Bumble Bee's management, including Lischewski, Cameron, and Worsham, who collectively owned 8.58% of Bumble Bee shares.  (Tester Decl. ¶ 23; Stein Decl., Ex. 78 at 3, 84, 105, 125, ECF No. 2148-32.)

Despite the convoluted ownership structure of Bumble Bee shares (*see* Stein Decl., Ex. 189, ECF No. 2152-10 at 3), Lion Capital considered itself a "shareholder" in the

_____

[17]  Big Catch was originally named Lion/Big Catch Cayman L.P.  (ECF No. 1995-7 at 2-8 ("Brown Decl.") ¶ 19.)  In 2017, its name was changed to Big Catch Cayman LP.  (Brown Decl. ¶ 19.)  The latter name is how Big Catch was named in this action.

Bumble Bee investment, having "ownership" of Bumble Bee, and ultimately being its seller. (Nyovanie Decl., Ex. J at 3, ECF No. 3069-10.) Lion Capital also represented itself to third parties as Bumble Bee's owner. (*See, e.g.,* Stein Decl., Ex. 75 (Aug. 4, 2011, letter from Capps on behalf of Lion Capital to Bank of America Merrill Lynch stating, "[g]iven our ownership of Bumble Bee Foods ... .", ECF No. 2148-29).

**B.   Summary of Arguments**

Defendants argue that they followed normal procedures for private equity fund managers, investment advisors, and holding companies. In support, they submitted a declaration of their private equity expert Ilya Strebulaev, who opined that the type and scope of Bumble Bee due diligence, financing of the acquisition, and post-acquisition management of the Bumble Bee investment were typical of the private equity industry. The Lion Entities deny that they had knowledge of Bumble Bee's participation in the price-fixing conspiracy until it came to light in DOJ antitrust review of the proposed sale to TUG. (Lindberg Decl. ¶ 45; Chang Decl. ¶ 47.)

Citing voluminous evidence, Plaintiffs dispute Defendants' assertions of lack of knowledge of or participation in the conspiracy. That certain procedures outlined in the Strebulaev declaration are standard in the private equity industry is not disputed. An abundance of standard procedures does not preclude liability if Defendants also knowingly engaged in anticompetitive conduct, and it is possible to facilitate ordinary investment goals with anticompetitive means. Plaintiffs further claim that Lion Capital's control of Big Catch subjects Big Catch to liability as Lion Capital's alter ego. Whether Lion Capital or Lion Americas knew of the conspiracy, played any part in it, or can be held vicariously liable, and whether Lion Capital controlled Big Catch so as to justify piercing the corporate veil between them are disputed issues.

/ / /

/ / /

/ / /

/ / /

**C.      Participation in the Conspiracy**

   1.      Sherman Act, Section 1

   Section 1 of the Sherman Act[18] dictates that "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  A defendant may be held liable under section 1 for its own acts in purposeful or knowing furtherance of an alleged price-fixing conspiracy.  A*randell v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 634, 629, 632 (9th Cir. 2018).

   Accordingly, a plaintiff must prove two elements to prevail.  The first element is that the defendant must have "independently participated" by "engag[ing] in anticompetitive conduct" in furtherance of the conspiracy.  *Id.* at 633.

> It is not necessary to find an express agreement, either oral or written, in order to find a conspiracy, but it is sufficient that a concert of action be contemplated and that defendants conform to the arrangement.  Any conformance to an agreed or contemplated pattern of conduct will warrant an inference of conspiracy.

*Id.* at 634.  "[A]ny conspiracy can ordinarily only be proved by inferences drawn from relevant and competent circumstantial evidence, including the conduct of the defendants charged."  *Id.*  This is "particularly true of price-fixing conspiracies[.]"  *Id.*

> Thus, even in the criminal context, the government need show neither direct contact nor explicit agreement among all of the alleged conspirators.  Nor must the government show that each defendant or all defendants must have participated in each act or transaction.

*Id.*

/ / /

---

[18]  Plaintiffs also assert state law claims against Defendants.  Defendants claim that the same standards apply to Plaintiffs' state and federal claims (*see* Mot. at 19 n.6), which Plaintiffs do not dispute.

The second element is that the defendant acted with the requisite state of mind -- "either with the knowledge that the action would have unreasonable anticompetitive effects or with the purpose of producing those effects." *Id.* at 629.  The requisite purpose may be imputed from coordinated actions of affiliate entities in a single enterprise.  *Id.* at 632 ("Reliant enterprise's alleged illegal purposes are imputed to CES's coordinated activities"); *see also id.* at 629-32, 633.

The Lion Entities were not competitors in the canned tuna market like Bumble Bee, Starkist, and COSI.  Nevertheless, they can be found liable for participating in the price fixing conspiracy along with Bumble Bee, provided that Plaintiffs submitted sufficient evidence of Defendants' requisite state of mind and anticompetitive conduct in furtherance of the conspiracy.  *See id.* at 623.

Defendants' motion therefore presents the question whether Plaintiffs submitted sufficient evidence to raise triable issues as to (1) whether any of the Lion Entities had the requisite knowledge or purpose to restrain trade, and (2) whether any of them engaged in anticompetitive conduct in furtherance of the conspiracy.  *Id.* at 629.

2.   Analysis of the Evidence

a.   *Pre-Acquisition Due Diligence*

Lion Capital was a sophisticated investment firm with "160 years of collective experience" in its senior leadership responsible for investment of more than 6 billion Euros of equity capital.  (*See, e.g.,* Stein Decl., Ex. 255, ECF No. 2143-14; Opp'n to Mot. at 30 n.126 (citing https://www.sec.gov/Archives/edgar/data/1491594/000095012310101820/a57764exv99w1.htm) ("Lion Capital Press Release").)  On behalf of Lion Capital, Lion Americas engaged in "exhaustive" due diligence of Bumble Bee before recommending the acquisition.  (Lindberg Dep. at 402, 53; *see also* Lea Dep. at 362 ("extremely comprehensive").)

Throughout due diligence, the Deal Team was in direct contact with Bumble Bee senior management, including Lischewski.  (Capps Dep. at 92, 94-96, 98-99, 155-56; Lindberg Dep. at 62, 147; Chang Dep. at 44-45, 55-56; Final Report at 2, 4.)  Due diligence

14

included two substantial Bumble Bee management presentations which were attended by the Deal Team as well as Lea and Ken Smialek from Lion Capital Investment Committee. (Chang Dep. at 56; Capps Dep. at 155; Final Report at 2, 4.)  The Deal Team reported it "ha[d] been provided significant access and time with management."  (Stein Decl., Ex. 65 ("Update") at 2-3, ECF No. 2148-18.)

The Deal Team provided the Investment Committee with written reports.  (*See, e.g.,* Update; Final Report; *see also* Chang Dep. at 48-50; Capps Dep. at 108-09.)  The reports included input from Bumble Bee's management and the Deal Team's own research, analysis, and assumptions, as well as data and analysis from several third-party advisors. (Capps Dep. at 118, 125, 126, 130-33; Chang Dep. at 45-46, 89-90; Update at 3 (listing advisors).)

The Deal Team was impressed by Bumble Bee's "understanding of the competitive landscape and market dynamics, and their overall ability to exceed financial targets each year."  (Final Report at 2; *see also id.* at 4.)  Specifically, the Deal Team evaluated Bumble Bee's potential to generate growth and profits.  (Lindberg Dep. at 62-64, 69.)  They reviewed several years of Bumble Bee's internal financial records (Lindberg Dep. at 402; *see also, e.g.,* Update at 7, 47-51; Final Report at 31-36), and hired KPMG[19] to perform a "quality earnings assessment" (Lindberg Dep. at 403).  They noted Bumble Bee's impressive past performance.  (Update at 7 ("Bumble Bee has been able to increase EBITDA[20] consistently over the past decade [and] increased gross margins on both albacore and lightmeat [*sic*] tuna[21] over the past 5 years.").)  The Deal Team concluded

---

[19]  KPMG was one of Deal Team advisors.  (Chang Dep. at 46).

[20]  "EBITDA" stands for earnings before interest, taxes, depreciation, and amortization.  *See* https://www.investopedia.com/terms. (*See also* Paris Decl., Ex. B ("Cameron Dep.") at 68, ECF No. 3036-7 (excerpts from Cameron's deposition were filed as Lion Ex. B and Pls' Ex. N (collectively "Cameron Dep.")).

[21]  Bumble Bee sold two major types of tuna, skipjack, which is sometimes referred to as "light meat" tuna, and albacore, which is sometimes referred to as "white meat" tuna. (Capps Dep. at 120-21.)

15-MD-2670 DMS (MSB)

that Bumble Bee "[m]anagement ha[d] a track record of outperforming ... EBITDA budget by an average of 10.5% ... between 2008 and 2010."  (Final Report at 2.)

Bumble Bee's success was fueled in part by price increases.  (*See* Stein Decl., Ex. 66 ("Alix Report")[22] at 45, ECF No. 2148-19; *see also* Update at 46 (2006-2010 sales volume decreased but dollar sales increased).)  Bumble Bee intended to continue relying on price increases for its future growth.  (Alix Report at 111 (Bumble Bee identified increased pricing as one of the "four main drivers of profitable topline[23] growth.").)

The Deal Team assessed Bumble Bee's "ability to increase price."  (Capps Dep. at 165.)  They found that there was "a natural ceiling to the price at which retailers/consumers will accept canned tuna" (Capps Dep. at 119-20; Update at 29), and "[e]fforts to attract premium pricing in the shelf stable seafood category ha[d] been unsuccessful" (Alix Report at 111).  Moreover, consumer demand for shelf-stable seafood had been "in long-term decline [¶] with a steep drop starting in 2004[.]"  (Alix Report at 6, 16; *see also id.* at 12; Capps Dep. at 118-19; Update at 2, 6, 26.)  Bumble Bee's competitors were described as "formidable."  (Alix Report at 111.)

In a competitive market with decreasing demand, prices generally are not likely to increase.  Increasing prices likely would lead to a decrease in market share.  Nevertheless, despite formidable competitors and declining sales volume, Bumble Bee's U.S. dollar sales were rising.  (*See* Alix Report at 16-17.)

The Final Report listed "Margin Sustainability" as one of the "Key Outstanding Questions[.]"  (Final Report at 6.)  The report did not directly address the incongruency between decreasing demand and "formidable" competition on one hand, and sustainability of continued price increases on the other.  The issue was addressed indirectly under "Competitive Dynamics," where the Deal Team observed that "the competitive dynamic

---

[22] Alix Partners was one of Deal Team advisors.  (*See* Update at 3.)

[23] "Topline growth" is an increase in gross sales, *i.e.*, the revenue a company earns through its core business.  *See* https://www.investopedia.com/terms.

15-MD-2670 DMS (MSB)

among Bumble Bee, StarKist, Chicken of the Sea and private label is rational[24] and improving from Bumble Bee's perspective."   (Final Report at 5.)   The Deal Team elaborated,

> StarKist has become a significantly more predictable competitor under their new ownership [Dongwon].  ...  StarKist and Bumble Bee recognize and "respect" each other's core markets (pouch v. albacore).

(Final Report at 5, 15 ("Perspective on key competitors").)   Accordingly, the incongruency of Bumble Bee's success was explained by "predictable" competition and competitors' recognition of and "respect" for each other's markets.   Indeed, Bumble Bee could not have achieved its impressive earnings without price-fixing agreements.   (Cameron Dep. at 68.)

### b.   Lischewski's Guidance to Lindberg

After the Final Report and as the final part of due diligence, Lindberg met with Dongwon Enterprise Chairman Jae Chul Kim and Thai Union Chairman and CEO Thiraphong Chansiri because each was "the control party" of the large seafood businesses that owned StarKist and COSI, respectively.   (Lindberg Dep. at 98; Stein Decl., Ex. 84, ECF No. 2149-5.)

Before meeting with Kim and Chansiri, Lindberg sought Lischewski's input and received a detailed briefing.   (Stein Decl., Ex. 84, ECF No. 2149-5.)   Lischewski impressed on Lindberg that one "key message [wa]s to ensure Dong Won [*sic*] that Lion will support rationale [*sic*] market behavior by Bumble Bee."   (Stein Decl., Ex. 84, ECF No. 2149-5.)   In this litigation, Lindberg could "not recall whether [he] read that sentence, among many

---

[24]   References to "rational" and "irrational" competitor behavior have a specific meaning. *See, e.g.,* Chang Decl. ¶ 40 (irrational pricing is understood as product pricing at low levels such that the sellers "were not seeing a profit on those product sales"); Stein Decl., Ex. 96, ECF No. 2149-17 (aggressive pricing "at breakeven ... doesn't make sense"); Paris Decl., Ex. C ("Worsham Dep.") at 333, ECF No. 3036-7 (rational pricing protects the profit margin) (excerpts from Worsham's deposition were filed as Lion Ex. C and Pls.' Ex. E (collectively "Worsham Dep.")).

emails [he] received [and could] not recall it making any impression on [him] at the time." (Lindberg Decl. ¶ 22.)

Lindberg received Lischewski's guidance on November 2, 2010.  (Stein Decl., Ex. 84.)  On November 4, 2010, Lion Capital issued a press release announcing the planned acquisition of Bumble Bee.  (Lion Capital Press Release at 2.)

### c.    *Lindberg's Pre-Acquisition Meeting with Kim*

On November 15, 2010, shortly before the acquisition, Lindberg met with Kim.  (Lindberg Dep. at 120.)  In this regard, Lindberg acted on behalf of Lion Capital.  (*See* Stein Decl., Exs. 84 (Lindberg writing to Lischewski expressing preference for the meetings to be "entirely 'owner to owner'")[25], ECF No. 2149-5, 86 (Lindberg writing to Ingu Park at Dongwon, who was making meeting arrangements on Kim's behalf, "Thank you for accepting our invitation to hold a[] meeting between Dongwon and Lion Capital"), ECF No. 2149-7, 89 (Dongwon referring to Lindberg as "Partner of Lion Capital"), ECF No. 2149-10.)  The parties vigorously disagree whether pricing was discussed at this meeting.

Before the meeting, Kim inquired whether they would need antitrust counsel.  (Lindberg Decl. ¶ 27.)  Lindberg consulted an attorney "to ensure that the meeting[] would be permissible under the U.S. antitrust laws" (Lindberg Decl. ¶ 20) and emailed Park that there was no need for an antitrust attorney because "[p]rohibited topics under US competition laws are quite narrow, such as sharing detailed cost information and discussion of pricing strategy and collusion, and we certainly will not discuss those topics."  (Paris Decl., Ex. AA, ECF No. 3036-15.)

Dongwon prepared a detailed memo of the meeting summarizing each participant's statements as the meeting unfolded.  (Stein Decl., Ex. 89 ("Memo"), ECF No. 2149-10.)  At the beginning of the meeting, Lindberg stated that "as the industry's two most-leading

---

[25] Lindberg understood "owner to owner" to mean "[t]wo owners of the business meeting."  (Lindberg Dep. at 151.)

companies come together, there may be a concern that this violates the Anti-Trust Law." (Memo, ECF No. 2149-10 at 5.)  Lindberg then summarized the topics he wanted to discuss and closed with, "As a major shareholder, I will preface this meeting by saying ... there will be no mention of pricing or strategies."  (*Id.*)  Lindberg denies he discussed collusion or price agreements with Kim. (Lindberg Decl. ¶ 27.)

Plaintiffs point to other parts of the Memo and Lindberg's statements after the meeting to argue that pricing was discussed.  Kim asked Lindberg how Lion Capital was planning to increase Bumble Bee's value before divesting it[26] and suggested a preference for increasing prices rather than cutting costs, can downsizing, or reducing product quality. (Memo, ECF No. 2149-10 at 6-8.)  After the meeting, Lischewski informed Lindberg that Kim fired StarKist CEO Don Binotto and excoriated the management team for "extremely aggressive" pricing.  (Stein Decl., Ex. 91, ECF No. 2149-12.)  Lindberg responded, "He made allusions to his displeasure with Binotti (sp?) in my discussion Monday.[27]  [¶ H]is stated displeasure at price cutting sounded good to me...."  (Stein Decl., Ex. 91, ECF No. 2149-12.)

### d.   *Post-Acquisition Monitoring of Bumble Bee*

When the Bumble Bee acquisition closed on December 15, 2010 (Lindberg Decl. ¶13), "the control of [Bumble Bee's] operation" passed to Lion Capital.  (Stein Decl., Ex. 69, ECF No. 2148-23 at 5; Lea Dep. at 323-24 (Lion Capital had control of Bumble Bee)). The Deal Team monitored the investment (Chang Dep. at 102) and Lea continued to oversee it as a member of the Lion Capital Investment Committee.  (Lindberg Dep. at 304-05; Lea Dep. at 90.)  Lindberg was the "leader" of the Deal Team in charge of the Bumble

---

[26]  It was industry knowledge at the time that TUG wanted to acquire Bumble Bee.  (*See* Final Report at 6 ("Thai Union have been fairly direct in their desire to own Bumble Bee ... .  As such, they represent a logical acquirer for Bumble Bee post our ownership."); *see also* Lindberg Dep. at 152.)

[27]  The meeting took place on Monday, November 15, 2010.  (Lindberg Dep. at 120.)

15-MD-2670 DMS (MSB)

Bee asset and reported to Lea "for ultimate performance of [the] investment." (Lindberg Decl. ¶ 16; Lindberg Dep. at 337, 49.)

Lindberg was appointed Bumble Bee's Chairman of the Board. (Lindberg Dep. at 287, 409.) Chang and Capps became Directors. (Chang Dep. at 99-100; Capps at 199, 210.) Also on the Board were Lea and Lion Capital's COO Janet Dunlop. (Chang Dep. at 100; Lea Dep. at 190.) Lischewski continued to serve as the President and CEO. (Stein Decl., Ex. 68, ECF No. 2148-22.) Lion Capital and Lion Americas comprised the majority of the Bumble Bee board. (*See* Nyovanie Decl., Exs. P & Q, ECF Nos. 3069-16, 3069-17.)

As board members, Lea, Lindberg, Capps, and Chang received board materials, attended quarterly board meetings, and "provid[ed] strategic direction at the Board level." (Chang Dep. at 101, 103; Lea Dep. at 191-92, 232 (attended one or two meetings a year).) The Deal Team also had regular meetings with Bumble Bee management. (Chang Dep. at 103.) They had hour-long monthly calls to go over detailed financial reports from Bumble Bee CFO Kent McNeil and met in between as necessary. (Chang Dep. at 101, 103-04; Lindberg Dep. at 213; Stein Decl., Ex. 122, ECF No. 2150-14; Stein Decl., Ex. 77, ECF No. 2148-31 (monthly financial report).) Lischewski, McNeil, Cameron, and sometimes Bumble Bee General Counsel Jill Irvin represented Bumble Bee at the monthly calls. (Chang Dep. at 104.) The Deal Team also received "daily Hotsheet" emails with detailed sales reports. (Lindberg Dep. at 213-14; Stein Decl., Ex. 122, ECF No. 2150-14; Stein Decl., Ex. 76 (Hotsheet), ECF No. 2148-30.)

The Deal Team members worked in the same office. (Chang Dep. at 160.) Although they did not have formal meetings among themselves, their shared office "always led to discussions" about their work and they "would speak frequently." (Chang Dep. at 160, 186.) Finally, the Deal Team held weekly Monday morning video conferences with the Investment Committee to discuss "pertinent matters relating to existing investments." (Chang Dep. at 160-61; Capps Dep. at 317.)

/ / /

*e.       Lindberg's Involvement in Bumble Bee Pricing Decisions*

Lion Capital's investment philosophy was based on "partnering" with management teams.  (Stein Decl., Ex. 75 at 3, ECF No. 2148-29.)  Lion Capital described itself to potential investors as having a team of highly experienced executives capable of "*operating* consumer businesses[.]"  (Stein Decl., Ex. 255, ECF No. 2143-14 (emphasis added).)  Consistent with these representations, Lindberg was closely involved in Bumble Bee pricing strategy vis-a-vis its competitors.

Shortly after the acquisition closed, in a January 2011 email to Lischewski, Lindberg expressed a keen interest in the specifics of Bumble Bee's pricing.  (Stein Decl., Ex. 96, ECF No. 2149-17.)  Lischewski promised to provide answers.  (Stein Decl., Ex. 96, ECF No. 2149-17.)

On July 28, 2011, Lischewski shared with Lindberg, Capps, and Chang Cameron's concerns that Bumble Bee was losing market share to StarKist and COSI, commenting that their attacks on Bumble Bee were not rational.  (Stein Decl., Ex. 108, ECF No. 2149-30.)  Bumble Bee intended to counter-attack StarKist in their tuna pouch segment to "send a very strong signal ... and while that will have an impact on our margins, it will have a bigger impact on [StarKist]."  (Stein Decl., Ex. 108, ECF No. 2149-30.)  Lindberg immediately responded to stop Bumble Bee from cutting prices: "under no circumstances do we want any negative price signaling."  (Stein Decl., Ex. 108, ECF No. 2149-30.)

In August 2011, Lindberg reached out to Kim for another meeting, again stating "I consider this an 'owner to owner' meeting."  (Stein Decl., Ex. 114, ECF No. 2150-5.)  Ultimately, they met on November 28, 2011, with Capps and Lindberg representing Lion Capital.  (Stein Decl., Ex. 114, ECF No. 2150-5; Capps Dep. at 256-59.)  Lindberg had no further meetings with Kim.  (Lindberg Decl. ¶ 28.)  The parties again vigorously dispute whether pricing was discussed at the meeting.

Kim again inquired if Lindberg would "be accompanying a lawyer."  (Stein Decl., Ex. 114, ECF 2150-5.)  Lindberg responded he would not and noted they would "not discuss anything so specific about the US market that we should be concerned about anti-

competitive/price collusion issues." (*Id.*)  Lindberg denies that he discussed collusion or price agreements with Kim.  (Lindberg Decl. ¶ 28.)

Plaintiffs point to Lindberg's statements after the meeting to argue that competition was discussed.  The day after the meeting, Lindberg reported to the FCF CEO that Kim had told him StarKist would "act rational if no one try to challenge their share."[28] (Nyovanie Decl., Ex. I, ECF No. 3069-9.)  On March 30, 2012, Lindberg commented to Lea that although StarKist and COSI attacks had been "completely unreasonable[,] we may be on the verge of an important shift.  JaeChul Kim at Dongwon hinted at this when I met him in December."  (Stein Decl., Ex. 195, ECF No. 2152-19.)

### f.    *Whistleblower Letter*

Postmarked January 31, 2012, a Bumble Bee employee anonymously sent a letter to Lindberg addressed to him at Lion Capital in New York with a return address to Lion Capital in London.  (Stein Decl., Ex. 124, ECF No 2150-16.)  The letter charged, among other things,

> We are extremely concerned about the capabilities and direction of the management team[, including] Potential Anticompetitive Activity: Emails, Meetings, Phone Calls to Competitors Suggesting to Raise Prices[.]
>
> [¶] ... Growth was obtained due to dysfunctional competitors.  [¶]  In time you will learn what everyone knows.  You purchased a bad can of tuna. ... Fire the bums now.  We are totally mismanaged.  Bring in a new team that everyone will respect. ...
>
> Sherman Act:  Any person who shall attempt or combine or conspire with others [*sic*] person, or persons shall be deemed guilty of a felony.

---

[28]  Defendants point out that the email Plaintiffs submitted in support of this assertion is multiple hearsay.  (Reply at 8, ECF No. 3070.)  However, the party opposing summary judgment need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment."  *Celotex,* 477 U.S. at 324.  To the extent Defendants contend that Plaintiffs' Exhibit I should not be considered, their argument is rejected.

15-MD-2670 DMS (MSB)

(*Id.*)  The letter listed several executives, including Worsham ("SVP Trade Marketing") and Cameron ("SVP Sales"), suggesting they were involved in Sherman Act violations. (*Id.*)

Lindberg reviewed the letter and noted that the allegations about accounting, inventory, and distribution improprieties, which were also alleged in the letter, were "incorrect" and he "did not consider Lischewski to have a drinking problem," as also stated in the letter.  (Lindberg Decl. ¶ 39.)  He concluded the entire letter was not credible and "continued to believe that Bumble Bee management was operating lawfully." (Lindberg Decl. ¶ 39; Lindberg Dep. at 352.)

Lindberg forwarded the letter to Lischewski, copied to Chang and Capps, together with an inquiry about an unrelated issue.  (Stein Decl., Ex. 125, ECF No. 2150-17.)  His only comment about the letter was, "See attached from a disgruntled and grammar-challenged BB employee."  (*Id.*)  Capps testified he "had no reason to believe that any of these allegations were true" but thought that they "would have discussed this." (Capps Dep. at 293.)  Chang recalled nothing regarding the letter or any related discussion.  (Chang Dep. at 184-85.)

Lischewski responded without addressing the antitrust accusations in the letter but offered to speak to Lindberg.  (Stein Decl., Ex. 125, ECF No. 2150-17.)  Lindberg spoke with Lischewski but could only recall Lischewski "responded that the letter was not credible and offered a verbal rebuttal."  (Lindberg Decl. ¶ 41.)  Lindberg could not "recall in detail" what Lischewski said.  (Lindberg Decl. ¶ 41.)

Based on Lischewski's rebuttal and determination that the letter was not credible, Lindberg "took no further action."  (Lindberg Decl. ¶ 41.)  He did not try to further investigate or identify the employee who sent the letter.  (Lindberg Dep. at 353.)

The Bumble Bee whistleblower policy provided for such letters to be forwarded to Jill Irvin, Bumble Bee's General Counsel, who logged and investigated them.  (Stein Decl., Ex. 257 (Decl. of Jill Irvin ("Irvin Decl.") ¶¶ 2-4 & Exs. A – D; *see also* Irvin Decl. ¶ 6,

ECF No. 2155-18.)  Neither Lindberg, Capps, nor Chang reported the letter to Irvin.  (Irvin Decl. ¶¶11-13; Lindberg Dep. at 351.)

Defendants argue the letter should not be considered in opposition to their motion because it was excluded for purposes of Lischewski's trial.  (Mot. at 31; Reply at 10-11.)  Judge Chen excluded the letter pursuant to Federal Rule of Evidence 403.  (Paris Decl., Ex. OO (*United States v. Lischewski,* Aug. 27, 2019, Transcript of Proceedings ("Hearing Tr.") at 140, ECF No. 3036-19.)  The evidentiary ruling in *United States v. Lischewski* is not binding on this Court.  *See, e.g., Camreta v. Green*, 563 U.S. 692, 709 n.7 (2011).  Furthermore, Judge Chen concluded the letter had "some probative value" although it was not addressed to Lischewski and it was unclear if Lischewski had read it.  (*See* Hearing Tr. at 138.)  The circumstances in this case are different.  The letter is offered as tending to show that Lindberg was put on notice of Bumble Bee's collusion.  It is undisputed that Lindberg read it at the relevant time.  Defendants' argument is therefore rejected.

g.     *The Deal Team's Knowledge*

Members of the Deal Team and Lea received communications from Bumble Bee containing internal competitor information.  For example, on November 19, 2010, Lischewski told Lindberg that at the recent StarKist board meeting Kim fired StarKist CEO Don Binotto and "lit into the entire management team ... ranting about their pricing (which has been extremely aggressive) ... ."  (Stein Decl., Ex. 91, ECF No. 2149-12.)

In mid-January, effective late March or April 1, 2012, Bumble Bee, StarKist, and COSI announced price increases.  (Stein Decl., Exs. 119 (StarKist), ECF No. 2150-10, 120 (Bumble Bee), ECF No. 2150-12, 121(COSI), ECF No. 2150-13.)  On January 16, 2012, Chang emailed his teammates a "Brief Update re: BB" including a summary of his call with Lischewski and McNeil about monthly financials.  (Stein Decl., Ex. 122, ECF No. 2150-14.)  Lischewski's statements on the call indicated that he knew of StarKist's price increase before it was announced.  (*Id.*) ("SK is supposed to come out with a list price increase tmrw (effective 4/1), which BB will follow.").)  Lischewski and McNeil also shared specific financial information, including that "SK is spending $18mm on an ad

campaign for this year, which, on top of the $50mm earnings target they've set for themselves[.]" (Stein Decl., Ex. 122, ECF No. 2150-14.)

On January 26, 2012, Lischewski reported to Lindberg and Capps that StarKist was engaging in "rampant cheating" with its aggressive pricing campaigns. (Stein Decl., Ex. 123, ECF No. 2150-15.) Lischewski expressed hope that the announced price increases would improve the situation. (*Id.*)

On May 7, 2012, Bumble Bee held a board meeting. The meeting materials stated that "[c]ompetitive intel indicates a list price increase by StarKist on both Lightmeat and Albacore Tuna items effective 7/28[.]" (Nyovanie Decl., Ex. C at 10, ECF No. 3069-3.)

It was not only Bumble Bee management that conveyed internal competitor information to Defendants. Lindberg communicated such information to Lea. For example, on March 30, 2012, Lindberg informed Lea that the prior week Kim had "sent 15 Koreans including his son to take over SK's management team apparently with a mandate to raise prices and quality." (Stein Decl., Ex. 195, ECF No. 2152-19.) Again, on July 30, 2021, Lindberg informed Lea that "[much of this] pricing issue" in early 2012 "was caused by Starkist's [*sic*] dysfunctional management team which was fired by Dongwon, and they are now in lockstep with us in setting pricing rationally." (Stein Decl., Ex. 141, ECF No. 2151-2.)

Lindberg claims he "viewed any emails ... concerning competitors' pricing as ordinary competitive intelligence or management commentary or supposition." (Lindberg Decl. ¶¶ 16, 29.) Chang considered "Bumble Bee's competitors' anticipated strategies" as "routine, and ... continued to believe that Bumble Bee was operating lawfully." (Chang Decl. ¶ 43.) Defendants did not question how Bumble Bee management obtained StarKist internal financial information, price strategy, or what occurred at the board of directors meetings.

### h.   Economic Interest

It is undisputed that the purpose of Bumble Bee's acquisition was to resell it for a profit. (*See* Lindberg Dep. at 35-36 (Lion Capital's objective was to sell Bumble Bee for

a profit when its value was "optimized.") This goal was shared by Lion Americas. (*See* Chang Decl. ¶ 12 (Due diligence objective was to determine whether there was "a reason to believe that the company will likely increase in value between acquisition and exit.").)

As a private equity owner, Lion Capital exerted pressure on Bumble Bee management to increase its profitability. (Lindberg Dep. at 418-19.) Lion Capital made clear at the first post-acquisition board meeting, that it intended to hold Bumble Bee to its promise of high returns. (*See* Stein Decl., Ex. 97, ECF No. 2149-18.) "Throughout the investment[, Lindberg's] efforts were dedicated to trying to raise the value of Bumble Bee[.]" (Lindberg Dep. at 324; *see also id.* at 419.)

Price competition had an effect on Bumble Bee's EBITDA, which in turn had an effect on its sale value. (*See* Stein Decl., Ex. 194, ECF No. 2152-18; *see also* Paris Decl., Ex. U, ECF No. 3036-13.) Lea closely tracked Bumble Bee's EBITDA in comparison to projections at acquisition and the relation of any negative variance to "value creation." (Stein Decl., Ex. 194, ECF No. 2152-18.) An EBITDA multiple was used to negotiate the sale price with TUG. (*See* Stein Decl., Ex. 141, ECF No. 2151-2.)

As an investment manager, Lion Capital suffered negative consequences, including "reputational damage and a negative impact on fundraising efforts," if one of its investments lost value. (Tester Decl. ¶ 32.) Such consequences would affect Lion Capital earnings because Lion Capital's investment funds paid a management fee "calculated as a percentage of the amount of capital committed in, or invested by, the Fund at a given time." (*Id.* ¶ 9.) Lion Americas was wholly dependent on advisory fees it received from Lion Capital. (*See* section III.A.2. *supra*.)

Pre-acquisition, Lion Capital learned that despite decreasing demand, one of the ways Bumble Bee intended to maintain its performance record was by continued price increases. (*See* Alix Report at 45, 111.) This was possible due to "predictable" competition and competitors' recognition of and "respect" for each other's market. (*See* Final Report at 5, 15.)

15-MD-2670 DMS (MSB)

Lion Capital was poised in December 2014, to reap the benefit of Bumble Bee's increase in value during the period of Lion Capital's ownership, while Bumble Bee is known to have colluded with its competitors. Lion Capital announced to Fund III investors,

> [W]e are pleased to announce our sale of Bumble Bee Foods to Thai Union ... at an enterprise value of $1.51 billion .... The sale will generate expected proceeds to Fund III of approximately $440 million ..., which implies a 38% [internal rate of return] and 4.6x multiple on Fund III's $108.7 million ... investment. ...
>
> ... With respect to earnings development under our ownership, Bumble Bee maintained and grew gross margins through *disciplined pricing actions*, leading to adjusted EBITDA climbing to over $150 million this year, the highest level EBITDA in the company's history.

(Paris Decl., Ex. U (emphasis added), ECF No. 3036-13.)

Defendants maintain that participating in Bumble Bee's collusion was not in their interest because neither Lion Capital nor Lion Americas "owned any financial interest in Bumble Bee." (Reply at 5.) Nevertheless they allow that, Defendants "wanted Bumble Bee to profit[.]" (*Id.*) Further, they argue that they knew since the outset that reselling Bumble Bee to TUG "would likely require DOJ antitrust review." (Lindberg Decl. ¶ 44.) Finally, they point out that Fund III lost its $108 million equity investment in Bumble Bee when Bumble Bee filed for bankruptcy. (Tester Decl. ¶ 31.)

### 3. Legal Analysis

On summary judgment, "the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Id.* at 588. "[C]onduct as consistent with permissible competition as with conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.*

To survive a motion for summary judgment, a plaintiff "must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Id.*

Accordingly, when a plaintiff "rests its case entirely on circumstantial evidence,"

the defendant can rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice. The burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior.

*In re Citric Acid Litig.,* 191 F.3d 1090, 1094 (9th Cir. 1999).

The Court must evaluate the evidence in its factual context. *Matsushita*, 475 U.S. at 587. Furthermore, antitrust claims should be resolved "on a case-by-case basis, focusing on the particular facts disclosed by the record." *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 467 (1992).

With these procedural standards in mind, the Court turns to the issue whether Plaintiffs submitted sufficient evidence to raise a triable issue regarding Defendants' participation in Bumble Bee's conspiracy with its competitors. As noted, Plaintiffs must meet two elements, Defendants' knowledge and anticompetitive conduct in furtherance of the conspiracy. *See Arandell*, 900 F.3d at 629, 633.

> a. *Economic Motive*

Before turning to these elements, the Court first addresses Defendants' arguments that their motion should be granted because Plaintiffs' claim against them makes no economic sense. If a plaintiff's antitrust claim "makes no economic sense," it could be rendered implausible. *Matsushita*, 475 U.S. at 587; *see also id.* at 596-97. This, however, does not mean that, "if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting actual market, it is entitled to summary judgment." *Eastman Kodak*, 503 U.S. at 468. The requirement that a plaintiff's claim make economic sense is merely an aspect of the summary judgment rule that the inferences drawn in the opposing party's favor be reasonable. *Id.*

Defendants claim that participating in Bumble Bee's conspiracy would make no economic sense because Lion Capital and Lion Americas had no financial interest in Bumble Bee. This argument is insufficient to grant Defendants' motion because the record

taken as a whole shows that (1) Lion Capital held itself out as Bumble Bee's owner and majority shareholder; (2) Defendants admitted that an investment loss would damage their ability to raise funds, which would impact their ability to earn management fees in the future; (3) Lion Capital and Lion Americas knew from the outset that "predictable" competition and recognition of and "respect" among competitors for each other's market contributed to the sustainability of Bumble Bee's profit margins, and (4) Bumble Bee's participation in the conspiracy helped increase its profits and ultimate sale value, a development that was to Lion Capital's benefit. This evidence is sufficient to raise a triable issue regarding Defendants' economic motive.

Defendants also point out that they knew from the outset that a sale to TUG could be subject to DOJ review, and that Fund III lost its investment when Bumble Bee was sold in bankruptcy after its collusion had been discovered. They posit it would make no economic sense for them to participate in Bumble Bee's conspiracy. This argument does not address the economic reality that Bumble Bee's participation in the conspiracy benefitted Lion Capital and Lion Americas. That the benefit was lost because the conspiracy was discovered does not negate that Defendants stood to benefit.

### b. Knowledge

Plaintiffs submitted evidence tending to show that Lindberg and the Deal Team were put on notice multiple times starting before Lion Capital's ownership of Bumble Bee that Bumble Bee was colluding with its competitors: (1) the Deal Team's own observation that StarKist had become a more "predictable" competitor and that competitors "recognize and respect" each other's markets; (2) Lischewski's guidance to Lindberg to assure Dongwon that Lion Capital would support Bumble Bee's "rational[] market behavior;" (3) receipt of the whistleblower letter, which accused Bumble Bee and its executives of violating the Sherman Act; and (4) receipt, before and after the whistleblower letter, of communications from Bumble Bee management and board of directors materials sharing internal competitor information, including competitors' future price decisions.

15-MD-2670 DMS (MSB)

As to Lindberg, Lischewski's guidance for his first meeting with Kim on its face conveys that (1) Bumble Bee was willing to communicate with its competitors about pricing; (2) Lischewski encouraged Lindberg to do the same; and (3) Lischewski encouraged Lion Capital to support Bumble Bee's "rational market behavior" toward a competitor. Capps, who was not copied on Lischewski's email to Lindberg, testified that had he "learned that Chris Lischewski had asked a member of the deal team to convey to Dongwon that Lion will support rational market behavior by Bumble Bee," he "would have considered that a red flag." (Capps Dep. at 178.)

In this litigation, Lindberg could not recall if he read the relevant sentence in Lischewski's email. (Lindberg Decl. ¶ 22.) Lindberg sent an email response to Lischewski, including comments about the planned meetings. (Stein Decl., Ex. 84, ECF No. 2149-5.) Plaintiffs also submitted evidence of Lindberg's post-meeting email to Lischewski and the Memo of the meeting, suggesting that price strategy was discussed. The content of Lischewski's email, the meeting Memo, and Lindberg's comment after the meeting are sufficient to raise a triable issue whether Lindberg knew of Bumble Bee's collusion.

As to the entire Deal Team, the whistleblower letter expressed suspicion that Cameron and Worsham, who subsequently pleaded guilty, participated in Sherman Act violations, including communications with competitors suggesting to raise prices. (Stein Decl., Ex. 124, ECF No. 2150-16.) The letter was consistent with numerous communications the Deal Team received from Bumble Bee management before the letter, suggesting that Bumble Bee knew of its competitors' future price increases which were not publicly known (*see, e.g.,* Stein Decl., Ex. 122, ECF No. 2150-14) and accusing competitors of "rampant cheating" (Stein Decl., Ex. 123, ECF No. 2150-15). The plain

/ / /

/ / /

/ / /

/ / /

meaning of "cheating" implies a preexisting agreement, and in the context of Lischewski's email, a preexisting price agreement.[29]

Capps testified that evidence that Bumble Bee managers considered it acceptable to communicate with its competitors about pricing would be a "red flag." (Capps Dep. at 177.) Worsham testified he believed that Lindberg and Capps were aware of collusive communications between Bumble Bee and its competitors because of references in board presentations to competitors' pricing and forward-looking guidance about StarKist. (Worsham Dep. at 106-07.)

Defendants contend they found Bumble Bee communications routine, the letter not credible, and Lindberg found Lischewski's "rebuttal" sufficient for reasons he could not recall. The whistleblower letter and communications suggesting that the accusations were true, because Bumble Bee managers considered it acceptable to communicate with its competitors about pricing, are sufficient to raise a triable issue whether the Deal Team knew of Bumble Bee's collusion.

    c.    *Anticompetitive Conduct in Furtherance of the Conspiracy*

Lindberg met with Kim because he was the "control party" of the large seafood businesses that owned StarKist. (Lindberg Dep. at 98; Stein Decl., Ex. 84, ECF No. 2149-5.) The Memo of the first meeting and Lindberg's subsequent email to Lischewski indicate that price strategy was discussed at the meeting consistent with Lischewski's guidance to reassure Kim on Lion Capital's support of Bumble Bee's "rational" behavior.

---

[29] It is undisputed that Bumble Bee was a party to a prior price fixing agreement which was included in Bumble Bee's guilty plea and Lischewski's conviction. *See United States v. Lischewski*, Indictment at 2 (alleging conspiracy "[b]eginning in or about November 2010"); Verdict; Judgment; Stein Decl., Ex. 1 at 3 (Bumble Bee Am. Plea Agreement) (admitting participation in price fixing conspiracy "beginning at least as early as the first quarter of 2011"), ECF No. 2143-1; "SK Summ. J. Order" at 15-25, ECF No. 2750; *see also* Stein Decl., Exs. 101 (Bumble Bee), ECF No. 2149-22, 26 (StarKist), ECF No. 2145-17, 102 (COSI), ECF No. 2149-24.)

1    Lindberg's request for a second meeting with Kim came on the heels of blocking

2    Lischewski's plan to attack StarKist's market share by lowering prices.   Lindberg's

3    statements about the second meeting imply that prices were again discussed.

4    Despite Lindberg's denials, this evidence is sufficient to raise a genuine issue

5    whether Lindberg and Kim discussed prices.   Discussing prices with a competitor in the

6    context of this case is an act in furtherance of Bumble Bee's price-fixing conspiracy.

7    In addition, Lindberg received the whistleblower letter accusing Bumble Bee of

8    collusion with competitors.   He shared the letter with Capps and Chang.   It is undisputed

9    that Lindberg, Capps, and Chag failed to notify Bumble Bee's general counsel, as required

10   by Bumble Bee's whistleblower policy, did not investigate other than forwarding the letter

11   to Lischewski and accept his rebuttal, and did nothing to prevent Bumble Bee's collusive

12   behavior in the future.

13   Lion Capital had the authority to stop Bumble Bee's anticompetitive behavior.

14   (Lindberg Dep. at 287-88 (Lion Capital, like "[a] majority shareholder of any business[,

15   had] the ability to do anything they want with that business and the personnel with it,"

16   including directing the management on how to pursue pricing strategies.); *see also* Lea

17   Dep. at 323-24 (Lion Capital was in control of Bumble Bee").)   Accordingly, turning a

18   blind eye to Bumble Bee's collusion enabled the conspiracy to continue.   "Participation

19   may be found not solely on the basis of direct action but may also consist of knowing

20   approval or ratification of unlawful acts.   *Murphy Tugboat Co. v. Shipowners & Merchants*

21   *Towboat Co., Ltd.,* 467 F.Supp. 841, 852 (N.D. Cal. 1979.   Plaintiffs provided sufficient

22   evidence of Defendants' economic motive to allow the conspiracy to continue.

23   Based on the foregoing, Plaintiffs' evidence tends to exclude the possibility that Lion

24   Capital and/or Lion Americas acted on their own and separate from Bumble Bee's

25   conspiracy.   If believed, Plaintiffs' evidence is not consistent with permissible competition

26   and is sufficient to support a rational inference of participation in the conspiracy.

27   / / /

28   / / /

### d.    Lion Capital Liability

The Court next turns to the question whether Lion Capital is implicated by Plaintiffs' evidence.  As a Lion Capital Partner and Lion Americas Director, Lindberg was a dual agent.  This does not automatically expose Lion Capital to liability for Lindberg's actions. *United States v. Bestfoods,* 524 U.S. 51, 69-70 (1998).  It is not inappropriate for parent entity personnel to hold important positions with the subsidiary and "change hats to represent the two corporations separately, despite their common ownership." *Id.* at 69. The courts generally presume that an act is taken on behalf of the corporation for whom the officer claims to act.  *Id.* at 69-70 & n.13.  Here, Lindberg unequivocally stated to Lischewski and Dongwon that he was acting on behalf of Lion Capital as Bumble Bee's owner.  Furthermore, the whistleblower letter was sent to Lindberg addressed at Lion Capital with a return address at Lion Capital.  (Stein Decl., Ex. 124, ECF No. 2150-16.) This was not surprising, as Lion Capital was holding itself out as Bumble Bee's owner.

Based on the foregoing, Plaintiffs have submitted sufficient evidence to raise a triable issue whether Lindberg acted as a Lion Capital Partner when he met with Kim and in his handling of the whistleblower letter.

### e.    Lack of Prosecution and the Government's Closing Arguments

Finally, Defendants argue their motion should be granted because they were not prosecuted like Bumble Bee, StarKist, and their executives.  This argument is unavailing because "the Government retains broad discretion as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985).  "Such decisions are normally made as a result of careful professional judgment as to the strength of the evidence, the availability of resources, the visibility of the crime and the likely deterrent effect on the particular defendant and others similarly situated." *United States v. F.S.J.*, 265 F.3d 764, 769 (9th Cir. 2001); *see also Wayte*, 470 U.S. at 607.  Accordingly, the prosecutor's decision to concentrate on the most visible protagonists rather than charge any of the Lion Entities has no bearing on their exposure to civil liability.

Defendants also argue they should be dismissed based on the Government's statements in closing argument at Lischewski's trial that Lischewski concealed the conspiracy from Lion Capital. (Paris Decl., Ex. H (*United States v. Lischewski*, Trial Tr. at 3200, 3214), ECF No. 3036-8.) The argument is rejected because neither in criminal nor civil trials do closing arguments constitute evidence. 9th Cir. Model Cr. Jury Instr. 1.4; 9th Cir. Model Civ. Jury Instr. 1.10.

### 4. Conclusion

For the foregoing reasons, Plaintiffs have submitted sufficient evidence to raise triable issues whether Lion Capital and Lion Americas participated in Bumble Bee's price-fixing conspiracy with its competitors. Defendants' motion is denied insofar as it seeks summary adjudication of claims against Lion Capital and Lion Americas. The Court therefore need not also consider Plaintiffs' theory that Lion Capital and/or Lion Americas can be held vicariously liable.

## D. Alter Ego

Plaintiffs oppose summary judgment on their claims against Big Catch, arguing it should be held liable as an alter ego of Lion Capital. Defendants do not dispute the elements for piercing the corporate veil as stated in Plaintiffs' opposition: "Federal common law allows piercing of the corporate veil where (1) a corporation uses its alter ego status to perpetrate a fraud or (2) where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own." *British Marine PLC v. Aavanti Shipping & Chartering Ltd.,* No. 13 Civ. 0839(BMC), 2013 WL 6092821, at *5 (E.D.N.Y. Nov. 19, 2013). "[T]he general principle guiding courts in determining whether to pierce the corporate veil has been that liability is imposed when doing so would achieve an equitable result." *Id.*.

It is undisputed that Big Catch was a holding company and that, other than holding Bumble Bee shares after the acquisition, it had no "substantive" operations. (*See* Lea Dep. at 178-79.) Plaintiff submitted evidence that Lion Capital, in its role as Fund III's managing agent and by means of Fund III's sole ownership of the Big Catch general

15-MD-2670 DMS (MSB)

partner, had exclusive control of Big Catch.   (*See* discussion *supra* at section III.A.1 and 3.)  This evidence is sufficient to raise a genuine issue regarding Lion Capital's control of Big Catch.

Plaintiffs, however, do not articulate a theory showing that Lion Capital used Big Catch to perpetrate fraud or that holding Big Catch liable is necessary to achieve an equitable result in this case.  Plaintiffs point to Bumble Bee's 2011 recapitalization whereby Bumble Bee took on $150 million in new debt with almost all the proceeds of the transaction distributed to Fund III through Big Catch.  (*See* Opp'n at 41 and evidence cited therein.)  These facts are undisputed.  (*Cf.* Tester Decl. ¶ 30.)

The recapitalization is concerning in light of Bumble Bee's subsequent bankruptcy.  However, Plaintiffs have submitted no evidence nor articulated any argument to show the transaction was fraudulent or used to perpetrate fraud.  Plaintiffs have also submitted no evidence or stated any argument to show that the recapitalization was related to the price fixing conspiracy such that imposing liability on Big Catch would be necessary to achieve an equitable result in this litigation.

Accordingly, insofar as Defendants seek summary adjudication of Plaintiffs' claims against Big Catch, their motion is granted.

## IV.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment on Plaintiffs' claims against Big Catch is granted.  The motion is denied in all other respects.

**IT IS SO ORDERED**.

Dated:  August 18, 2023

Hon. Dana M. Sabraw, Chief Judge
United States District Court

15-MD-2670 DMS (MSB)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

15-MD-2670 DMS (MSB)