1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| IN RE: PACKAGED SEAFOOD PRODUCTS ANTITRUST LITIGATION <br><br> This Document Relates To: <br><br> ALL ACTIONS. | Case No.:  15-MD-2670 DMS (MSB) <br><br> **CLASS ACTION** <br><br> **ORDER DENYING DONGWON INDUSTRIES CO., LTD'S MOTION TO STRIKE** <br><br> **(ECF No. 3066)** |

18        Pending before the Court is Defendant Dongwon Industries Co., Ltd.'s ("DWI")
19   motion to strike certain reports prepared by Plaintiffs' experts Adoria Lim and Marianne
20   DeMario[1] (ECF No. 3066.) The End Payer, Commercial Food Preparer,[2] and Direct
21   Purchaser Plaintiff Classes opposed. (ECF No. 3074.) DWI filed a reply. (ECF No. 3076,
22   "Reply.") For the reasons set forth below, the motion is denied.

23
24
25

---

26   [1] Unless otherwise noted, individuals are referred to by full names only when first
27   introduced.  Subsequently, they are referenced by last name only.
     [2] The Commercial Food Preparer Class has since settled its claims against StarKist
28   Company and DWI.

# I.

# BACKGROUND

The general background and history of this litigation is well-known to the parties and has been set out in several prior orders of this Court. It is not repeated in detail here. On the heels of the announcement by the Antitrust Division of the United States Department of Justice ("DOJ") in July 2015 of an investigation into the packaged tuna industry and the filing of related indictments for price fixing in violation of antitrust laws, a number of civil lawsuits were filed against the major corporate players in the industry and their parent entities, including, StarKist Company ("StarKist") and DWI, respectively. During the pendency of this multidistrict litigation, StarKist and one of its executives pleaded guilty to participating in the price fixing conspiracy. Among other claims, Plaintiffs alleged that the parent entities should be held vicariously liable for their subsidiaries' participation in the conspiracy.

The parties have engaged in years of discovery, including designation of expert witnesses. As relevant here, the Direct Purchaser Plaintiff Class designated DeMario, and the End Payer Plaintiff Class designated Lim. Both experts were retained as forensic accountants. Lim and DeMario issued their initial reports on February 15, 2019 (*see* ECF Nos. 1982-10, "DeMario Report", 1982-3, "Lim Report"), and were subsequently deposed. DeMario was deposed on April 23, 2019 ("DeMario Dep. 1")[3] and Lim was deposed on May 1, 2019 ("Lim Dep. 1").[4]

After Lim and DeMario's depositions, DWI disclosed its experts, including Robert M. Daines, a law professor with a J.D. degree and an B.S. degree in economics. (ECF No.

---

[3] Excerpts from DeMario's April 23, 2019, deposition were filed at ECF Nos. 1982-11 and 2125-3 (collectively "DeMario Dep. 1").

[4] Excerpts from Lim's May 1, 2019, deposition were filed at ECF Nos. 1982-4 and 2125-1 (collectively "Lim Dep. 1").

1982-6, "Daines Report" at 1-2 & App'x A.) Daines was tasked to evaluate Lim and DeMario's opinions, among other things. (*Id.* at 3). He issued his report on May 10, 2019.

Thereafter, Plaintiffs served their rebuttal expert reports. DeMario and Lim's rebuttals of Daines were timely issued on July 2, 2019. (ECF Nos. 1982-13, "DeMario Rebuttal;" 1982-8, "Lim Rebuttal.") Lim and DeMario were deposed again. Lim was deposed on July 31, 2019 ("Lim Dep. 2")[5] and DeMario was deposed on August 15, 2019 ("DeMario Dep. 2").[6]

## II.

## MOTION TO STRIKE LIM'S REBUTTAL REPORT FOR DISCOVERY VIOLATIONS

The Lim Rebuttal is directed to two defense experts – Daines and Ilya A. Strebulaev, a private equity expert designated by Lion Capital (Americas), Inc., Lion Capital LLP ("Lion Capital"), and Big Catch Cayman LP ("Big Catch," collectively the "Lion Entities"). DWI's motion to strike the Lim Rebuttal is not limited to Lim's rebuttal of Daines, however, as DWI requests to strike Lim's Rebuttal in its entirety, including her rebuttal of Strebulaev. (*See* ECF No. 3066-1, "Mot." at 5; Reply at 1.) Strebulaev was not designated by DWI but by the Lion Entities, which filed their own motion to challenge Plaintiffs' experts, including Lim. (*See* ECF No. 3037.) DWI has provided no explanation for seeking to strike Lim's rebuttal of Strebulaev. As a general rule, federal courts only allow litigants to assert their own legal rights and interests, not the legal rights and interests

---

[5] Excerpts from Lim's July 31, 2019, deposition were filed at ECF Nos. 1982-9 and 2125-2 (collectively "Lim Dep. 2"). Although DWI cites to pages 13-23, 28-29, and 263-64 of this transcript (*see* Reply at 3), those pages were not provided to the Court.

[6] Excerpts from DeMario's August 15, 2019, deposition were filed at ECF Nos. 1982-12 and 2125-4 (collectively "DeMario Dep. 2").

15-MD-2670 DMS (MSB)

of third parties. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).[7] To the extent DWI's motion purports to attack Lim's rebuttal of Strebulaev, it is denied.

DWI seeks to strike the Lim Rebuttal under Federal Rule of Civil Procedure 37 for failure to comply with Rule 26(a)(2)(B)(i), which requires expert reports to "contain [¶] a complete statement of all opinions the witness will express and the basis and reasons for them[.]" DWI argues that the Lim Rebuttal violates this requirement because it contains additional opinions. Rule 26 allows for rebuttal reports "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party[.]" S*ee* Fed. R. Civ. Proc. 26(a)(2)(D)(ii). DWI argues that the Lim Rebuttal exceeds the scope of the Daines Report.

"The test whether an expert's opinion constitutes rebuttal or a 'new' opinion [is] whether a rebuttal attempts to put forward new theories outside the scope of the report it claims to rebut." *Huawei Technols, Co. v. Samsung Electronics,* 340 F. Supp. 3d 934, 996 (N.D. Cal. 2018). "The proper function of rebuttal evidence is to contradict, impeach, or defuse the impact of the evidence offered by the adverse party." *Id.* at 996.

In her Report, Lim opined that StarKist, a wholly owned subsidiary of DWI, engaged in financial transactions with DWI, including, but not limited to, dividend distributions and incurring debt (guaranteed by DWI) for stock buyback from DWI and others, which reduced StarKist's earnings and assets. (Lim Report at 3, 5-7.) She also noted that she "may be asked to respond to potential reports or testimony of other witnesses and experts in this matter." (Lim Report at 2.)

Daines opined, among other things, that (1) the transactions described in the Lim Report were "unremarkable and uncontroversial for large corporations and their subsidiaries" (Daines Report at 4, 43; *see also id.* at 5, 21 ("typical and appropriate corporate actions")); (2) Lim "mischaracterized" "mundane" dividend payment and stock

---

[7] Unless otherwise noted, internal quotation marks, ellipses, brackets, citations, and footnotes are omitted from citations.

repurchases (*id.* at 5); (3) DWI did not control StarKist board of directors (*id.* at 32-35); (4) DWI and DWE did not strip StarKist of its assets and StarKist was not left with high levels of debt as a result of its transactions with DWI and DWE (*id.* at 8, 42); (5) there was no evidence that these related-party transactions reduced StarKist's value (*id.* at 37); (6) DWI earned a negative internal rate of return on its investment in StarKist (*id.* at 12, 38); and (7) the transactions between StarKist and DWI were not improper and do not justify piercing the corporate veil between StarKist and DWI, or imposing alter ego liability on DWI (*id.* at 4, 32, 36-38; *see also id.* at 18, 39-43).

Lim's Rebuttal addressed these points. (*See* Lim Rebuttal at 3-32.) Regarding Daines opinions 3 and 4 above, Lim responded that the StarKist board of directors was controlled by directors from DWI-affiliated entities, which control was extensive, including active involvement in StarKist business, appointment of StarKist CEOs, and directing StarKist to invest in other companies, which benefitted DWI and its affiliated entities but not StarKist. (*Id.* at 4-17.) Regarding Daines opinions 1 and 2, Lim responded that the ill-gotten gains of StarKist participation in the conspiracy were used to pay dividends to DWI and make investments for DWI's benefit (*id.* at 19-23), and that these transfers and investments continued after StarKist came under DOJ investigation. (*Id.* at 25.) Regarding Daines opinions 4 and 5, Lim responded that StarKist cash transfers to DWI and investments for DWI's benefit left StarKist unable to pay regulatory fines and restitution sought in the criminal case and civil damages arising from the price-fixing conspiracy. (*Id.* at 17-26.) Regarding Daines opinion 6, Lim responded that his calculation of a negative internal rate of return was erroneous for failure to account for StarKist's exit value. (*Id.* at 27-32.)

Based on the foregoing, the Court finds that the Lim Rebuttal does not exceed the scope of the Daines Report and is therefore permissible under Rule 26(a)(2)(D)(ii). The Court rejects DWI's argument that the opinions expressed in the Lim Rebuttal were

required to be included in her initial Report. The Court therefore does not reach the issue of Rule 37 sanctions.[8]

### III.

### MOTION TO STRIKE PORTIONS OF LIM'S AND DEMARIO'S REPORTS ON EVIDENTIARY GROUNDS

DWI further moves to strike portions of the Lim Rebuttal, DeMario Report, and DeMario Rebuttal based on Federal Rules of Evidence 702, 704, and 403.

**A.** **Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.***

Expert opinion is admissible under Rule 702 if:

(1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case.

*Elosu v. Middlefork Ranch Inc.,* 26 F.4th 1017, 1023 (9th Cir. 2022) (citing Fed. R. Evid. 702). The rule "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

---

[8]  To the extent DWI claims prejudice, the issue would be relevant only to Rule 37 sanctions. *See* Fed. R. Civ. Proc. 37(c)(1) (sanctions awarded "unless the failure ... is harmless). Assuming only for the sake of argument that the Court had reached the issue of sanctions, the claimed prejudice was DWI's own doing. In September 2022, the Court granted the motion to reopen discovery filed by Lion Capital and Big Catch which DWI joined. (*See* ECF Nos. 2879, 2883, 2914.) Although Lion Capital and Big Catch requested a new round of expert reports and rebuttal reports, DWI joined only as to additional fact discovery and denied any interest in additional expert discovery. (ECF No. 2883.) Moreover, Lim was deposed twice after her Rebuttal Report -- at the end of July 2019 (*see* Lim Dep. 2) and again in February 2023 (*see* ECF No. 3037-3).

Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.

*Elosu,* 26 F.4th at 1024.

"To evaluate reliability, the district court must assess the expert's reasoning or methodology[.]" *Id. Daubert* discussed reliability in the context of scientific evidence. It suggested "several reliability factors, including testing, peer review and publication, known or potential rate of error, and general acceptance in the relevant scientific community." *United States v. Valencia-Lopez,* 971 F.3d 891, 898 (9th Cir. 2020); *see Daubert,* 509 U.S. at 593-94. Lim and DeMario's opinions do not entail scientific evidence but are based on knowledge, experience, and education in the field of forensic accounting. Nevertheless, the court's "gatekeeping obligation applies to all (not just scientific) expert testimony." *Valencia-Lopez,* 971 F.3d at 898; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-50 (1999)).

"[T]he reliability inquiry is a flexible one," granting the trial court latitude to determine "what factors in *Daubert*, if any, are relevant to the reliability determination." *Valencia-Lopez,* 971 F.3d at 898. The court "need not follow a 'definitive checklist or test[,]'" *Porter v. Martinez,* 68 F,4th 429, 444 (9th Cir. 2023) (quoting *Kumho Tire*, 526 U.S. at 150), but can "decide how to test an expert's reliability based on the 'particular circumstances of the particular case.'" *Elosu*, 26 F.4th at 1024 (quoting *Kumho Tire,* 526 U.S. at 150). For example, "the *Daubert* factors ... simply are not applicable to [the] testimony[] whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life*, 373 F.3d 998, 1017 (9th Cir. 2004) (emph. in orig.); *see also United States v. Hankey,* 201 F.3d 1160, 1169 (9th Cir. 2000).

"In evaluating proffered expert testimony, the trial court is a gatekeeper, not a fact finder." *Pyramid Technols., Inc. v. Hartford Cas. Ins.,* 752 F.3d 807, 813 (9th Cir. 2014).

"Ultimately, the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Elosu,* 26 F.4th at 1024. The Court "is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* It is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Ak. Rent-A-Car, Inc. v. Avis Budget Grp, Inc.,* 738 F.3d 960, 969 (9th Cir. 2013).

### 1.     Lim Rebuttal

Lim is a Certified Public Accountant ("CPA") with twenty years of experience in accounting and finance. She is accredited by the American Institute of Certified Public Accountants ("AICPA") in the field of business valuation and as a Certified Fraud Examiner ("CFE"). She has an M.B.A. and a B.A. in economics. (Lim Report at 1 & App'x A.) Lim has more than ten years of litigation experience including as a testifying expert and has been retained by DWI's counsel in the past. (*Id.* at 5.). Her past work includes issues of accounting fraud in the context of Securities and Exchange Commission ("SEC") and DOJ investigations as well as civil litigation. Specifically, her experience encompasses audits, examination of business entities' accounting practices and internal controls over financial reporting, consolidation and disclosure of related business entities, cash transfers among parent and subsidiary entities, reconstruction of accounting records including in the context of antitrust violations, analysis and allocation of gains from unlawful conduct, cost allocations among related business operations, and corporate diligence in mergers and acquisitions. (*Id.*)

As relevant here, Lim examined the relationships and transactions between StarKist and its parent and sister companies, *i.e.,* Dongwon, and identified examples of transactions which reduced the amount of StarKist's assets or earnings. (Lim Report at 2.)  "Dongwon" "refers to the Dongwon Group, including Dongwon Enterprise Co., Ltd. (DWE) and Dongwon Industries Co., Ltd. (DWI)." (Lim Rebuttal at 1.) As discussed in section II. above, she also responded to the Daines Report. (*See also* Lim Report at 2.)

a.   <u>Use of Terminology Outside the Area of Expertise</u>

Although DWI does not directly challenge Lim's qualifications,[9] it argues that her use of terms and phrases such as "control," "agent," "alter ego," and "benefits from the price-fixing conspiracy" are outside her area of expertise because she is not an attorney. DWI further contends that to the extent Lim's opinions rest on this legal terminology, they are unreliable.

Lim testified that she was not offering any legal opinions but offered opinions in her capacity as a forensic accountant. (Lim Dep. 2 at 173-74, 186-87.) Review of her rebuttal bears this out. Her discussion of Dongwon's benefits from the price-fixing conspiracy is based on an accounting rather than legal analysis (*see* Lim Rebuttal at 19-23) and her reference to StarKist as an agent of Dongwon cites to the Daines Report (*cf.* Daines Report at 18 ("I am unaware of a respected corporate governance paradigm, expert or viewpoint that would recommend that a subsidiary should act in anyone's interest other than its sole shareholder.") *with* Lim Rebuttal at 14 & n.61 ("Mr. Daines acknowledges that StarKist was an agent of Dongwon such that StarKist acted on behalf of Dongwon's interest, rather than having its own 'independent' interest.").).

The phrase "alter ego" is not mentioned in the Lim Report or Rebuttal. It does not appear that Lim offered any alter ego opinions, legal or otherwise, and DWI does not identify any.

As to "control," Lim was using the term as defined in the Accounting Standards Codification ("ASC") Master Glossary. (Lim Dep. 2 at 186; *see also id*. at 202, 211, 254; Lim Rebuttal at 3-4 & n.3.) By "control" Lim was referring to a reporting entity's, *i.e.,* Dongwon's, "power, through voting or similar rights, to direct the activities of a legal entity

---

[9] "Rule 702 contemplates a *broad conception* of expert qualifications." *Hangarter,* 373 F.3d at 1015 (emph. in orig.). Lim's education, experience, and knowledge qualify her to testify as a forensic accountant about the corporate and financial relationships and transactions among StarKist and Dongwon.

[, *i.e.*, StarKist] that most significantly impact the entity's economic performance and the reporting entity's exposure to the [legal] entity's losses or benefits." (Lim Rebuttal at 3-4.) It is not unusual for forensic accountants to consider issues of control between parent and subsidiary entities, which consideration includes analysis of financial statements. (*See* Lim Rebuttal at 3-4 & nn.3-6.)

Based on the foregoing, DWI's argument that Lim's opinions are unreliable for using legal terms outside her expertise is therefore rejected.

Separately, DWI argues that Lim is not qualified to opine about corporate governance. However, Lim does not offer any opinions about corporate governance. Her references are either in quotations from, or cite to, the Daines Report in the context of her opinion as a forensic accountant that Dongwon had exposure to StarKist's benefits and losses through loan guarantees and StarKist's dividend payments. (*See* Lim Rebuttal at 14, 16-17.) Accordingly, Lim has not offered any corporate governance opinions. To the extent her opinions as a forensic accountant indirectly touch on corporate governance, the Court finds them within her expertise.

b.    Basis for Opinions

DWI next argues that certain of Lim's rebuttal opinions are unreliable because they are not supported by a "recognizable methodology" or an "objective test." (Mot. at 12.) These arguments are first and foremost directed to Lim's opinions about Dongwon's control of StarKist, its return on investment, as well as the allocation of StarKist's profits from the price fixing conspiracy to payments to, and expenditures on behalf of, Dongwon. Assuming that the Court would agree, DWI further argues that Lim lacks any support for her opinions that Dongwon benefitted from StarKist's participation in the conspiracy or that StarKist's transactions with Dongwon were improper. Because the Court finds the underlying opinions about control, return on investment, and allocation of ill-gotten gains reliable, DWI's derivative arguments are rejected.

To assess reliability, a court must "determine whether an expert had sufficient factual grounds on which to draw conclusions[,]" *Elosu*, 26 F.4th at 1026, "whether the

reasoning or methodology underlying the testimony is valid and ... whether that reasoning or methodology properly can be applied to the facts in issue[,]" *Valencia-Lopez,* 971 F.3d at 900. This inquiry also "requires the district court to assure that the methods are adequately explained." *Id.*

### i.   Control

DWI argues that Lim's opinion about Dongwon's control of StarKist is unreliable because it is unclear how she reached the conclusion or what she meant by the term "control." The Court disagrees.

As noted in section a. above, Lim used the term "control" as described in the ASC Master Glossary in the context of an accounting consolidation analysis. (Lim Rebuttal at 3 n.3.)

> In a consolidation analysis, an accountant may consider factors which indicate that the reporting entity controls the legal entity, in particular, whether the reporting entity has the power, through voting rights, to direct the activities of a legal entity that most significantly impact the entity's economic performance and the reporting entity's exposure to the entity's losses and benefits.

(*Id.* at 3-4.) In applying these factors to the facts of this case, Lim explained her reasoning in detail. (Lim Rebuttal at 4-16.)

Next, DWI claims Lim's opinion is unreliable because she did not compare StarKist's financial ratios or dividend payments to other companies. Daines compared StarKist dividend payout ratio, current ratio (current assets compared to current liabilities), debt to equity ratio, and total debt/total asset ratio to similar companies in the Bloomberg index[10] to argue that StarKist's transactions with DWI were unremarkable and did not negatively impact StarKist. (Daines Report at 39-43 & Figs. 6, 8, 11-12.)

---

[10] Daines describes the index as "Bloomberg's index for its publicly-traded North American Packaged Food [companies who are StarKist] peers." (Daines Report at 39.) "This group is an equal-weighted basket" of "dozens of companies," including "the Campbell Soup

Lim did not make these comparisons. (Lim Dep. 2 at 172-73.) Instead, she looked to the factors relevant for purposes of consolidating financial statements when one company controls another as outlined in the ASC Master Glossary. (Lim Rebuttal at 3 n.4.) DWI does not dispute that these factors are relevant for a forensic accountant to apply to the relationship between StarKist and Dongwon. Indeed, Daines himself relied on the same factors to reach the same conclusion. (*See* Daines Report at 7 ("But of course a 100% shareholder has all the economic and control rights over a wholly-owned subsidiary.").) Accordingly, DWI's contention that Lim's reasoning leaves "too great an analytical gap between the data and the opinion offered" (Mot. at 12 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)) is wholly unsupported.

Based on the foregoing, Lim adequately explained the reasoning supporting her conclusion that Dongwon controlled StarKist. She possessed the requisite experience and expertise and based her conclusions on sufficient facts. The Court therefore finds her opinion reliable.

### ii.    Dongwon's Return on Investment

DWI contends that Lim's valuation of StarKist is unreliable because it was not a full analysis and is based on hypothetical assumptions. Lim testified that this argument misconstrues her opinion. (Lim Dep. 2 at 287.)

In her Rebuttal, Lim responded to Daines's opinion that as of 2018 DWI earned a negative internal rate of return on its investment in StarKist. (*Cf.* Lim Rebuttal at 27-32 *with* Daines Report at 12, 38 ("DWI approximately recovered its investments in StarKist, and no more, reflecting a negative internal rate of return on its initial capital for much of the time period analyzed."), 40 & Fig. 7.) Lim argued that the calculation of a negative internal rate of return ("IRR") was flawed because it failed to consider that Dongwon would receive an "exit value" when it sold StarKist. (Lim Rebuttal at 29 ("[W]hen

Company, The Hershey Company, The Kraft Heinz Company" and others. (*Id.* at 39-40 & n.161; hereafter the "Bloomberg index").)

calculating Dongwon's IRR on its StarKist investment, Mr. Daines fails to consider Dongwon's exit value and erroneously calculates a negative internal rate of return[.]").) As a demonstration of the effect of the exit value on the IRR calculation, Lim performed "a simple hypothetical valuation" of StarKist as of 2018.[11] (Lim Dep. 2 at 287-88 ("[T]he idea of this exercise was to ... demonstrate that if you included exit value in a calculation of IRR, that calculation would result in a substantially higher number."); Lim Rebuttal at 30 & Figs. 9, 10.) Lim relied on the formula typically used by private equity firms and applied the same EV/EBITDA[12] multiple Dongwon used when it acquired StarKist. (Lim Rebuttal at 30 & Fig. 9.)

DWI argues that Lim's valuation opinion is unreliable because it is hypothetical. It is not unusual for experts to opine based on hypothetical facts. *Ak. Rent-A-Car,* 738 F.3d at 968. Such opinions are reliable if supported by adequate methodology and qualifications. *Elosu,* 26 F.4th at 1025. DWI points to no defect in Lim's methodology, data, or qualifications. Moreover, Lim did not offer an opinion of StarKist value. (Lim Dep. 2 at 289.) The opinion she offered was that Daines's IRR calculation was erroneous. Lim's opinion in this regard is based on sufficient expertise, methodology, and facts to be reliable.

### iii.   Allocation of Ill-gotten Gains

In her Rebuttal, Lim opined,

Mr. Daines claims that "[p]aying dividends is entirely appropriate and expected." However, in this case, the payment of dividends from StarKist to

---

[11] Lim's valuation was hypothetical because it was based on a hypothetical sale of StarKist in 2018. (Lim Rebuttal at 30.) This was necessary because DWI still owned StarKist. To the extent DWI's argument is based on the assumptions Lim made in her hypothetical valuation (*see* Lim Rebuttal at 30), the issue does not go to the admissibility but to the weight to be given her testimony. *See Ak. Rent-A-Car,* 738 F.3d at 970 (countervailing considerations "go to the weight of the testimony and its credibility, not its admissibility); *see also Fortune Dynamic v. Victoria's Secret Stores Brand,* 618 F.3d 1025, 1036-38 (9th Cir. 2010).

[12] EV stands for "enterprise value" and EBITDA stands for "earnings before interest, taxes, depreciation, and amortization." (Lim Rebuttal at 30.)

Dongwon resulted in Dongwon's receipt of cash, *i.e.*, economic benefits, flowing from the alleged price-fixing conspiracy. StarKist also could have used ill-gotten gains from the alleged price-fixing conspiracy to help fund its purchase of Techpack, which benefitted Dongwon, not StarKist, and Silver Bay Seafoods, LLC[.]

(Lim Rebuttal at 19 (quoting Daines Report ¶ 17).) DWI argues this opinion is unreliable because Lim did not perform a tracing analysis to determine whether the dividends and investments were in fact paid from the ill-gotten gains rather than from other revenue sources and because she allocated all ill-gotten gains to the dividends and investments. DWI does not object to any other conclusions or calculations underpinning this opinion.

Lim thoroughly explained her analysis. Based on another expert's calculation of StarKist's total price overcharge resulting from the price-fixing conspiracy ("conspiracy overcharge"), and the assumption that StarKist's production and distribution expenses for the same period would have been the same absent price fixing, she opined that StarKist's increase in profits equaled the conspiracy overcharge (less increased tax obligations) and amounted to approximately $65 million for the same four-year period. (Lim Rebuttal at 19 & Fig. 1.)

During the same time period, StarKist paid $31.9 million in dividends to Dongwon, made a $56.5 million investment in Techpack, and a $12 million investment in Silver Bay, for a total of $102 million. (*Id.* at 20 & nn.83-84.) These outlays were made from StarKist's "'free' cash flows *i.e.,* cash not needed to fund immediate requirements for operating and financing expenditures of the company[.]" (*Id.* at 21.)

Lim testified it was not possible to trace which individual dollars from StarKist's revenue were earned from the conspiracy overcharge and which were not. It was therefore impossible to trace each of those dollars to specific payments. (Lim Dep. 2 at 270-71, 273, 276-77.) This was the reason she performed an allocation rather than a tracing analysis. (*Id.* at 270-71, 276-78.)

In making the allocation, Lim reasoned,

> Absent the conspiracy overcharge, StarKist would have had $65 million less cash coming in the door from 2011 through 2015. Therefore, I allocate $65 million of the $102 million of free cash flows that StarKist used to pay for the dividends, the Techpack investment, and the Silver Bay investment to funds gained from the conspiracy overcharge.

(Lim Rebuttal at 21 & Fig. 2.) In further support of her allocation, she cited the August 21, 2014, StarKist board minutes approving the Techpack investment because of the large amount ($93 million) of "year-end cash." (*Id.* at 21 n.85.)

Lim allocated the cumulative available "ill-gotten after-tax gains" to dividends and investments as they occurred. (*Id.* at 21 & Fig. 2.) To the extent the dividends and investments exceeded cumulative available "ill-gotten after-tax gains," the excess was allocated to other funding sources. (*Id.*) Her allocation of funding sources to dividends and investments is shown in Figure 3.

DWI's argument rests on the contention that StarKist had sufficient net income in addition to the conspiracy overcharge to fund $102 million in dividends and investments. (*See* Reply at 10.) In this regard, the Court's role is to determine the "validity of an expert's principles and methodology, not to determine whether their hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record. That is for the litigants to argue, and for the jury to decide." *Elosu,* 26 F.4th at 1026; *see also id.* at 1025 ("countervailing considerations were appropriate matters for impeachment, not admissibility") (discussing *Ak. Rent-A-Car*, 738 F.3d at 969-70); *Fortune Dynamic,* 618 F.3d at 1038.

Lim adequately explained her methodology and disclosed the facts on which she based her opinion. DWI does not question Lim's assessment that tracing was not possible or that she had the necessary qualifications to reliably perform the allocation, which the Court finds she had. Accordingly, the Court finds her opinion reliable.

## 2.    DeMario Report and Rebuttal

DeMario is a CPA with 25 years of experience in public accounting, forensic investigations, and financial analysis. She is accredited in business valuation and financial forensics. She is an accredited Member of the American Society of Appraisers and a chartered financial analyst. She has an M.B.A. in finance and a B.S. in accounting. DeMario has extensive experience leading and conducting forensic investigations involving analyses of company financial records for issues including corporate governance and fraud, as well as calculations and analyses related to antitrust violations. She specializes in forensic accounting and has been retained and testified in court as a forensic accounting expert numerous times. (DeMario Report at 1 & Ex. A.)

DeMario evaluated "the financial relationships between the StarKist affiliated group of companies." (*Id.* at 2.) She was asked to assess whether StarKist and DWI acted "as a single economic unit controlled to a high degree by [its] parent companies, for the benefit of the parent companies." (*Id.*) She opined that such characterization would be "fair and reasonable." (*Id.* at 2.) She also responded to defense expert reports, including the Daines Report. (DeMario Rebuttal at 3-14.)

### a.    Opinions Outside the Area of Expertise

As with Lim, DWI does not directly challenge DeMario's qualifications[13] but argues that her use of terms and phrases such as "control," "control to a high degree," "agent," "alter ego," and "single economic unit" are outside her area of expertise because she is not an attorney, and that to the extent her opinions rest on legal terms, they are unreliable. Further, DWI contends that DeMario is not qualified to give an informed opinion about corporate governance or critique defense economists' damage analysis. For the reasons stated below, these arguments are rejected.

---

[13] DeMario's education, experience, and knowledge qualify her to testify as a forensic accountant about the corporate and financial relationship among StarKist and its affiliated group of companies. *See Hangarter,* 373 F.3d at 1015.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*i.     Legal Terminology*

DeMario testified that she was not offering any legal opinions. (DeMario Dep. 1 at 35; DeMario Dep. 2 at 34; *see also id.* at 30, 33-34.) She used the objected-to terms and phrases as they are understood "in readily accessible English" and not as legal terms. (*See, e.g.,* DeMario Dep. 1 at 66, 75.) Her analysis was "conducted from the point of view of a forensic accountant" and not an attorney. (DeMario Dep. 1 at 35.) To the extent DWI objects to DeMario's use of the phrase "alter ego," DeMario referred to it in describing Plaintiffs' allegations and offered no opinions about it.

*ii.     Corporate Governance*

Similarly, DeMario's reports contain no opinions about corporate governance and DWI identifies none in its motion. DeMario's only mention of corporate governance is in a quote from the Daines Report to show that Daines and other defense experts raised legal issues. (DeMario Rebuttal at 3 n.1.) To the extent that any of DeMario's opinions indirectly touch on corporate governance, she has sufficient relevant knowledge, experience, and education to support her opinions. (*See* DeMario Dep. 1 at 38-39; DeMario Report Ex. A.)

*iii.     Critique of Defense Economists*

DeMario criticized defense economists' opinions "on issues related to accounting processes, including 'COGS' – an accounting term for Cost of Goods Sold and [their] use of COGS data in their damages analyses." (DeMario Rebuttal at 3.) The defense economists used COGS in their econometric regression calculations. DWI argues that DeMario's critique is beyond her expertise because she is not an economist or econometrician.

DeMario focused on the uncertain nature of the COGS as used in financial statements due to the lack of authoritative guidance in the generally accepted accounting principles for classification of certain expense line items, which could lead to inconsistencies among companies and over time. (*Id.* at 30-31.)  Because DeMario's discussion relates to accounting concepts, it is within her expertise.

15-MD-2670 DMS (MSB)

### b.   Basis for Opinions

Alternatively, DWI argues that DeMario's opinions are unreliable because they are not based on any recognized methodology or objective test. The arguments are directed to DeMario's opinions about control, single economic unit, and use of COGS in the defense economists' damage analysis. For the reasons stated below, these arguments are rejected.

### i.   Control

DWI claims that DeMario did not define the term "control" and provided no indication how she reached her opinion about parent companies' control of StarKist. DeMario testified that she was not using the term control either in the legal or accounting sense. (DeMario Dep. 2 at 33-34.) She was not using it in the "same sense that you would find it in accounting guidelines" because she was not asked to "determine whether StarKist should be consolidated into Dongwon Industries or Dongwon Enterprise."[14] (*Id.* at 33.)

In forming her opinions about control, DeMario considered majority stock ownership and "whether or not the parent company controls the decisions and is able to benefit from ownership of the company." (DeMario Dep. 1 at 53-54.) Like Lim, she relied on the same facts as Daines and reached the same conclusion. (*Cf.* Daines Report at 7 ("But of course a 100% shareholder has all the economic and control rights over a wholly-owned subsidiary.").) In addition, she performed a detailed analysis of StarKist's ownership structure and financial decisions of the StarKist board to benefit the Dongwon Group. (DeMario Report at 5-29.)

DeMario relied on sufficient facts and data, adequately explained her reasoning, and possessed sufficient experience and expertise to render a reliable opinion.

### ii.   Single Economic Unit

Based on "the financial relationship between the StarKist affiliated group of companies," DeMario opined that it was fair and reasonable to characterize StarKist and

---

[14] The quote incorporates corrections which can be found in ECF No. 2125-4 at 6.

15-MD-2670 DMS (MSB)

DWI as "act[ing] as a single economic unit controlled to a high degree by [the] parent companies, for the benefit of the parent companies." (DeMario Report at 2.) DWI attacks this opinion claiming that DeMario did not compare StarKist's financial ratios with the companies in the Bloomberg index like Daines did.

Daines compared StarKist's financial ratios or dividend payments to companies in the Bloomberg index to refute DeMario's opinion (*cf.* Daines Report at 4, 42 *with* DeMario Report at 2) and argue that StarKist's transactions with DWI did not strip StarKist of assets because they were either below or within the range of comparable companies and therefore unremarkable. (Daines Report at 39-43 & Figs. 6, 8, 11-12.)

DeMario did not make the comparisons. (DeMario Dep. 1 at 20-21.) She disagreed with Daines that such comparisons "serve as an objective or useful tool to evaluate whether StarKist's payments of dividends were appropriate or justified[,]" noting that Daines "fails to explain how an assessment of the [Bloomberg index] companies is relevant to this case." (DeMario Rebuttal at 7, 9.) For example, "if StarKist transferred funds to its parent company to avoid its creditors, then what [the Bloomberg index] companies paid in dividends is meaningless; what matters is what occurred with respect to StarKist." (*Id.* at 9.)

Instead of relying on comparisons, DeMario defined "single economic unit" as "a relationship where the parent has control over a subsidiary" and the parent "uses that control to benefit itself." (DeMario Dep. 1 at 65.) She explained that in her role as a forensic accountant she ascertained specific objective facts and compiled them in Table 4 of her report. (*Id.* at 123-24, 129; DeMario Report at 18 (Table 4 titled "StarKist Transferred Its Cash Flow to the Dongwon Group").) The facts she considered were dividend payments from StarKist to DWI, stock repurchases from DWI and Korea Development Bank, debt repayment to Dongwon entities, and investments for the benefit of Dongwon entities, all in relation to StarKist's contemporaneous income. (*See* DeMario Report at 18 (Table 4); *see also* DeMario Dep. 1 at 123-24.)

From these facts, DeMario concluded that StarKist transferred "substantially all of its cash flows (including conspiracy supracompetitive revenues) to DWI, thus conferring a "significant economic benefit" on DWI. (DeMario Report at 17.) The decisions enabling these transfers were "made by StarKist's Board of Directors, comprised of the owners and managers of the Dongwon Group." (*Id.* at 19; *see also id.* at 5-9 (organizational structure of the Dongwon Group and StarKist).)

DeMario's opinion is based on facts and financial data. She adequately explained her reasoning, including why she considered Bloomberg index comparisons irrelevant, and identified the factors that influenced her opinion. DWI's disagreement is only with DeMario's rejection of Daines's approach and DWI does not otherwise attack her methodology. Accordingly, the Court finds her opinion reliable. DWI's argument goes to the weight rather than admissibility of her opinion. *See Ak Rent-A-Car,* 738 F.3d at 970 ("Given that the judge is a gatekeeper, not a fact finder, the gate could not be closed to this relevant opinion offered with sufficient foundation by one qualified to give it.").

### iii.    Cost of Goods Sold

DWI argues that DeMario's criticism of defense experts' use of COGS in their damages analyses is unreliable because she did not review their regression models. DeMario did not review specific regression models. (DeMario Dep. 2 at 133.) Instead, she reviewed the relevant data used by the defense experts. (*Id.* at 132-33; DeMario Rebuttal at 31 (citing example that some Defendants included shipping and handling in COGS while others did not).) DeMario's review of Defendants' data is sufficient to provide a reliable basis for her opinion that the use of COGS in a regression analysis may present problems because of the inconsistencies among companies and over time.

## B.    Federal Rule of Evidence 704(a)

Pointing to Lim and DeMario's opinions about control and "single economic unit" as well as references to terms such as "agent" and "alter ego," DWI argues Lim and DeMario's reports should be stricken to the extent they opined on ultimate legal issues. The Court finds that exclusion of evidence is unwarranted.

15-MD-2670 DMS (MSB)

Rule 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Nevertheless,

> an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court. [A] witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms.

*Hangarter*, 373 F.3d at 1016-17 (emph. in orig.). Specifically,

> if the terms used by an expert witness do not have a specialized meaning in law and do not represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case, the testimony is not an impermissible legal conclusion.

*United States v. Diaz,* 876 F.3d 1194, 1199 (9th Cir. 2017). It is "sometimes impossible for an expert to render his or her opinion on a subject without resorting to language that recurs in the applicable legal standard." *Id.* at 1198-99 (upholding admission of expert opinion that a doctor's prescriptions were "outside the usual course of professional practice," which was an element of the charged crime).

This is the case here. Neither Lim nor DeMario offered any legal opinions and did not use the words and phrases to which DWI objects as legal terms but "in their ordinary, everyday sense." *Id.* at 1199. Although the same words are used in the legal standards on the issues of corporate vicarious liability, Lim and DeMario do not purport to instruct the jury that DWI should be held vicariously liable for StarKist's wrongdoing. DWI's contention that Lim and DeMario improperly opined on ultimate legal issues is rejected.

## C.   **Federal Rule of Evidence 403**

Finally, DWI argues that to the extent Lim and DeMario's opinions use terms and phrases like "control," "single economic unit," "agent," or "alter ego," they should be excluded because they have "dual meanings" and run a high risk of confusing the jury.

(Mot. at 11.) DWI also contends that Lim and DeMario's opinions are prejudicial, misleading, and of limited relevance because they are outside their area of expertise.

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403. This rule, which applies to expert testimony, *see Daubert,* 509 U.S. at 595, "favors admissibility, while concomitantly providing the means of keeping distracting evidence out of the trial[,]" *Hankey,* 203 F.3d at 1172.

DWI's contention that Lim and DeMario opined outside the scope of their expertise is rejected for the reasons stated in section A. above. Their opinions are relevant to the issues of vicarious liability and will assist the trier of fact in understanding the evidence of the corporate relationship between StarKist and its affiliated companies, as well as the complex financial transactions between them. *See Elosu,* 26 F.4th at 1026 ("[T]he basic function of expert testimony [is] to help the trier of fact understand highly specialized issues that are not within common experience."). To be excluded, their evidence must be *substantially* outweighed by a danger of confusion, prejudice or misleading the jury. Fed. R. Evid. 403.

The Court rejects the contention that Lim and DeMario's use of words and phrases that are also used in legal standards will confuse the jury. Any confusion can be averted by inquiry into the bases for their opinions at trial.

DWI also contends that Lim's opinion about StarKist's transfer of ill-gotten gains to DWI is misleading and prejudicial because it suggests that "there was something improper about StarKist's transactions." (Mot. at 14.) Relevant evidence is "inherently prejudicial." *Hankey,* 203 F.3d at 1172. To be excluded under Rule 403, the prejudice must be unfair, which means having "undue tendency to suggest decision on an improper basis[.]" *Id.*

Lim's opinion is not presented in a vacuum. StarKist admitted criminal liability for participating in a price-fixing conspiracy. The characterization that gains from criminal

activity were "ill-gotten" is therefore neither unfair nor misleading. To the extent DWI's argument is directed to the opinion that DWI benefitted, Lim's opinion is based on relevant evidence – StarKist's financial records and board minutes. DWI has failed to show that Lim's opinion is either unfair or misleading. As discussed above, DWI's recourse is cross-examination and impeachment at trial rather than exclusion of evidence.

## IV.

## CONCLUSION

For the foregoing reasons, DWI's motion is denied.

**IT SO ORDERED.**

Dated:  January 29, 2024

Hon. Dana M. Sabraw, Chief Judge
United States District Court

15-MD-2670 DMS (MSB)