1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                   **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   IN RE: PACKAGED SEAFOOD            Case No.:  15-MD-2670 DMS (MSB)
     PRODUCTS ANTITRUST LITIGATION
12                                       **CLASS ACTION**
13   This Document Relates To:
                                         **ORDER GRANTING IN PART AND**
14   ALL ACTIONS.                        **DENYING IN PART THE LION**
                                         **COMPANIES' MOTION TO**
15                                       **EXCLUDE TESTIMONY OF**
                                         **ADORIA LIM AND MARIANNE**
16                                       **DEMARIO**
17
18                                       **(ECF No. 3037)**
19
20         Pending before the Court is a motion to exclude testimony of Plaintiffs' experts

21   Adoria Lim and Marianne DeMario[1] filed by Defendants Lion Capital (Americas), Inc.,

22   Lion Capital LLP, and Big Catch Cayman LP[2] (together, the "Lion Entities" or

23

24

25   ───────────────

26   [1]  Unless otherwise noted, individuals are referred to by their full names only when first
     introduced.  Subsequently, they are referenced by last name only.
27   [2]  Claims against Big Catch Cayman LP were dismissed on summary judgment. (*See* ECF
28   No. 3103.)

                                          1

"Defendants") (ECF No. 3037). The End Payer, Commercial Food Preparer,[3] and Direct Purchaser Plaintiff Classes (together, "Plaintiffs") filed an opposition (ECF No. 3064) and the Lion Entities replied (ECF No. 3071). For the reasons set forth below, the motion is granted in part and denied in part.

# I.

# BACKGROUND

The general background and history of this litigation is well known to the parties and has been set out in several prior orders of this Court. The non-expert evidence relevant to the pending motion is summarized and discussed in the Order Granting in Part and Denying in Part the Lion Companies' Motion for Summary Judgment. (ECF No. 3103.) It is not repeated in detail here.

On the heels of the announcement by the Antitrust Division of the United States Department of Justice ("DOJ") in July 2015 of an investigation into the packaged tuna industry and the filing of related indictments for price fixing in violation of antitrust laws, a number of civil lawsuits were filed against the major corporate players in the industry and their parent entities, including, Bumble Bee Foods, LLC ("Bumble Bee") and the Lion Entities, respectively. During the pendency of this multidistrict litigation, Bumble Bee and two of its executives pleaded guilty to participating in the price fixing conspiracy. Bumble Bee's former President and Chief Executive Officer was convicted after a jury trial of the same crime. In 2019, Bumble Bee declared bankruptcy. Among other claims, Plaintiffs alleged that the Lion Entities should be held directly and vicariously liable for participation in the conspiracy.

The parties have engaged in years of discovery, including designation of expert witnesses. As relevant here, the Direct Purchaser Plaintiff Class designated DeMario, and the End Payer and Commercial Food Preparer Plaintiff Classes designated Lim. Both

---

[3] The Commercial Food Preparer Class has settled its claims against the Lion Entities. (*See* ECF No. 3144.)

experts were retained as forensic accountants. Defendants designated, among others, Ilya A. Strebulaev, a finance and private equity professor with a Ph.D. in finance and M.A. in economics. (*See* ECF No. 1982-5 at 2 & App'x 1.) At issue in the pending motion are Lim and DeMario's reports prepared after discovery was reopened at Defendants' request. (*See* ECF Nos. 2879, 2914.)

Lim and DeMario each issued a report addressing certain aspects of the Lion Entities' acquisition of Bumble Bee, the resulting relationships among them, and economic impact on Bumble Bee. (ECF No. 3037-3, Paris Decl. Ex. 1, "Lim Report;" *id.* Ex. 3, "DeMario Report.") On the same date, Strebulaev issued his report. (*See* Paris Decl. Ex. 4, "DeMario Rebuttal" at 1.)  Lim and DeMario responded to the Strebulaev report in their rebuttals issued January 6, 2023. (Paris Decl. Ex. 2, "Lim Rebuttal;" *id.* Ex. 4, "DeMario Rebuttal.") Lim and DeMario were subsequently deposed.[4]

## II.

## DISCUSSION

Defendants move to exclude the DeMario Report and Rebuttal and portions of the Lim Report and Rebuttal based on Federal Rules of Evidence 702 and 403. They also argue that large portions of the experts' testimony should be excluded for usurping the fact finder's role.

**A.** **Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.***

Expert opinion is admissible under Rule 702 if:

(1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and

---

[4] Excerpts from DeMario's deposition were filed as ECF Nos. 3037-3 (Paris Decl. Ex. 6) and 3061-15 (together, "DeMario Dep."). Excerpts from Lim's deposition were filed as ECF Nos. 3037-3 (Paris Decl. Ex. 5) and 3061-16 (together, "Lim Dep.").

(5) the expert has reliably applied the relevant principles and methods to the facts of the case.

*Elosu v. Middlefork Ranch Inc.,* 26 F.4th 1017, 1023 (9th Cir. 2022) (citing Fed. R. Evid. 702).[5] The rule "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

> Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.

*Elosu,* 26 F.4th at 1024.

"*Daubert* discussed several reliability factors, including testing, peer review and publication, known or potential rate of error, and general acceptance in the relevant scientific community." *United States v. Valencia-Lopez,* 971 F.3d 891, 898 (9th Cir. 2020); *see Daubert,* 509 U.S. at 593-94. Although *Daubert* discussed reliability in the context of scientific evidence, the court's "gatekeeping obligation applies to all (not just scientific) expert testimony." *Valencia-Lopez,* 971 F.3d at 898; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-50 (1999)). However, "the reliability inquiry is a flexible one," granting the trial court latitude to determine "what factors in *Daubert*, if any, are relevant to the reliability determination." *Valencia-Lopez,* 971 F.3d at 898. The court "need not follow a 'definitive checklist or test.'" *Porter v. Martinez,* 68 F.4th 429, 444 (9th Cir. 2023), *cert. den.* 2024 WL 759806 (Feb. 26, 2024) (quoting *Kumho Tire*, 526 U.S. at 150). Instead, "the trial court has discretion to decide how to test an expert's reliability based on the particular circumstances of the particular case." *Elosu,* 26 F.4th at 1024.

/ / /

---

[5]   Unless otherwise noted, internal quotation marks, ellipses, brackets, citations, and footnotes are omitted from citations.

Unlike in *Daubert*, Lim and DeMario's expert opinions do not entail scientific evidence but are based on specialized knowledge in the field of forensic accounting. *Daubert* factors "are not applicable to [the] testimony[] whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life*, 373 F.3d 998, 1017 (9th Cir. 2004) (emph. in orig.); *Porter,* 68 F.4th at 444; *see also United States v. Hankey,* 201 F.3d 1160, 1169 (9th Cir. 2000). In such cases, the reliability inquiry may focus on the experts' knowledge or experience. *See Kumho Tire*, 526 U.S. at 150. To be reliable, an expert opinion must have "good grounds," *i.e.,* it is based on the knowledge and experience of the expert's discipline rather than on "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590; *see also Elosu,* 26 F.4th at 1026 ("factual grounds"); *United States v. Vallejo,* 237 F.3d 1008, 1020-21 (9th Cir. 2001) (review of relevant materials).

"In evaluating proffered expert testimony, the trial court is a gatekeeper, not a fact finder." *Pyramid Technols., Inc. v. Hartford Cas. Ins.,* 752 F.3d 807, 813 (9th Cir. 2014). The court "is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Elosu,* 26 F.4th at 1024. "[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Ak. Rent-A-Car, Inc. v. Avis Budget Grp, Inc.,* 738 F.3d 960, 969 (9th Cir. 2013). "[W]hen an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony." *Pyramid Technols.*, 752 F.3d at 814.

### 1. DeMario

In her Report, DeMario focused on three issues: (1) the acquisition of Bumble Bee; (2) financing of the acquisition; and (3) how the financial structure of Bumble Bee increased its risk of default. (DeMario Report at 1-2.) DeMario summarized the financial and transaction documents of the 2010 leveraged buyout acquisition, including how the acquisition was financed, and described Bumble Bee's financial structure upon acquisition and after recapitalization in 2011. (*Id.* at 2-3, 5-6.)

Based on a comparison of Bumble Bee's debt-to-capital and interest coverage ratios to those of its peers, as well as the decline in Bumble Bee's credit rating in response to the planned 2011 recapitalization, DeMario concluded that after the acquisition, and even more so after the 2011 recapitalization, Bumble Bee was a highly leveraged company. (DeMario Report at 8, 9-16.) Although Bumble Bee was profitable, most of its earnings were used for debt service. (*Id.* 7, 10.) DeMario noted that highly leveraged companies are more vulnerable to failure in economically adverse circumstances because of the expensive debt service and difficulty refinancing a heavy debt load. (*Id.* at 6.)

DeMario observed that the decision to increase Bumble Bee's leverage was made by Lion Capital LLP ("Lion Capital"). (DeMario Report at 8 & n.25 (noting Strebulaev's agreement).) She concluded that Lion Capital benefitted from the increased leverage in two ways. First, by using debt in lieu of equity to finance a large part of the acquisition, and by further increasing debt and reducing equity with the 2011 recapitalization, Lion Capital limited its exposure to loss from Bumble Bee. (*Id.* at 5-6.) Second, a decrease in equity had the effect of increasing Lion Capital's calculated internal rate of return on the equity investment in Bumble Bee and therefore increased the potential to receive carried interest upon Bumble Bee sale. (*Id.* at 4-5 & nn.12, 13.)

Finally, DeMario evaluated the causes of Bumble Bee's bankruptcy in November 2019. (DeMario Report at 6-7.) In its bankruptcy filings, Bumble Bee disclosed debt totaling approximately $839 million.[6] (*Id.* at 16.) DeMario calculated that the 2011 recapitalization contributed $289 million of that amount, and opined that without the recapitalization, Bumble Bee's debt would have been lower and its ability to refinance and avoid bankruptcy better. (*Id*. at 15-16; *cf. id.* at 7 (Bumble Bee's debt obligations due 2019).) To the extent Defendants contend that the prospect of a large damage award in this proceeding was the reason for Bumble Bee's bankruptcy (*see id.* at 6 nn.19, 21), DeMario

---

[6] Sums are rounded to the nearest $1 million.

countered that the prospect of bankruptcy was enhanced by the extent of Bumble Bee's leverage and Lion Capital's failure to properly manage Bumble Bee's compliance with the law (*id.* at 6; *see also* DeMario Dep. at 90 ("Bumble Bee was overleveraged, and ... additional leverage eventually led to its bankruptcy.")).

In her Rebuttal, DeMario responded to Strebulaev's report by criticizing his methodology and the data he relied upon to conclude that Bumble Bee was not highly leveraged (DeMario Rebuttal at 2-7), arguing he failed to consider Lion Capital's incentive to take financial risks with the Bumble Bee investment and the effect of leverage on Bumble Bee's financial condition (*id.* at 7-8), and contending he failed to consider relevant facts regarding Lion Capital's involvement in Bumble Bee's management (*id.* at 8-10).

DeMario's opinions are based on her analysis of financial statements and reports of the relevant business entities, transaction documents, Securities and Exchange Commission ("SEC") filings, industry financial data, documents filed in the bankruptcy proceedings, published scholarly research, witness testimony, including deposition of Lion Capital's founder, majority owner, and managing partner Lydon Lea,[7] and Lion Capital's internal communications, among other things. For purposes of the pending motion, Defendants do not contend that any of this underlying evidence is inadmissible.

### a.    Qualifications

Defendants argue that DeMario is unqualified to offer any opinions she expressed in her Report and Rebuttal. They request that her testimony be excluded in its entirety. A testifying expert must be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Rule 702 "contemplates a *broad conception* of expert qualifications." *Hangarter*, 373 F.3d at 1018 (emph. in orig.).

DeMario is a certified public accountant with 30 years of experience in public accounting, forensic investigations, and financial analysis. She has an M.B.A. in finance

---

[7] Excerpts from Lea's deposition were filed as ECF Nos. 3037-3 (Paris Decl. Ex. 7), 3036-20, 3061, and 3069-1 (together, "Lea Dep.").

and a B.S. in accounting. She is accredited in financial forensics and business valuation. She is an accredited member of the American Society of Appraisers and a chartered financial analyst. DeMario has extensive experience leading and conducting forensic investigations into issues such as corporate governance, fraud, and antitrust violations, including price fixing. Her experience includes forensic investigation and valuation in the private equity context and in the context of complex multinational transactions, forensic analysis of partnerships, business acquisition analysis, and financial auditing. She specializes in forensic accounting and has been retained and testified in court as a forensic accounting expert numerous times. (DeMario Report at 1 & Ex. A; *see also* DeMario Dep. at 6-9, 14-18, 54-69.)

The foregoing lays "at least the minimal foundation" of knowledge, skill, experience, training, and education to give expert testimony on the issues addressed in DeMario's reports. *Hangarter,* 373 F.3d at 1016 (emph. omitted). The Court next turns to Defendants' challenges to DeMario's qualifications for specific opinions.

Defendants attack DeMario's qualifications for three opinions expressed in her Report: (1) had Lion Capital not recapitalized Bumble Bee in 2011, Bumble Bee would have had significantly less debt and would have been in a better position to refinance and avoid bankruptcy; (2) Lion Capital benefitted from Bumble Bee's assumption of debt in the 2010 leveraged buyout and 2011 recapitalization by reducing the amount of capital invested into Bumble Bee and increasing the potential to receive carried interest; and (3) Bumble Bee's leverage ratio after the leveraged buyout exceeded that of its peers. These opinions are based on DeMario's analysis of financial records and data, including Lion Capital's financial analyses and internal correspondence in preparation for the leveraged buyout and recapitalization, transaction documents, Bumble Bee's financial statements and reports, industry data, and Bumble Bee's bankruptcy filings. Comprehension and analysis of this evidence is well within DeMario's qualifications.

Lion Capital also attacks DeMario's opinion that "Lion Capital did not properly manage Bumble Bee's legal and regulatory compliance with U.S. law, including its

antitrust laws[.]" (DeMario Report at 6.) DeMario lacks qualifications to opine on compliance with antitrust law. (*See, e.g.,* DeMario Dep. at 19.) Accordingly, her opinion about Lion Capital's management of Bumble Bee's compliance is excluded.

Lion Capital's remaining attacks on DeMario's qualifications are not directed at her opinions, but background context and factual basis, for example, how private equity firms make money, how leveraged buyouts are structured, what interest coverage ratios analysts like to see, whether Lion Capital controlled Bumble Bee, and whether Lion Capital played an active role in Bumble Bee's management. DeMario relied on evidence, academic publications, and her own experience. (*See* DeMario Report at 4-5, 10-11, 14 and related footnotes; DeMario Rebuttal at 19 and related footnotes; DeMario Dep. at 57-66.)

Except for her opinion about Lion Capital's management of Bumble Bee's compliance with the law, Defendants' challenges are rejected insofar as DeMario is qualified to express the opinions stated in her reports, and the challenged background information and factual basis are not beyond her qualifications.

### b. Relevance

Lion Capital argues DeMario's opinions about Bumble Bee's financial condition, Lion Capital's contribution to Bumble Bee's financial decline, and the causes of Bumble Bee's bankruptcy are irrelevant to this litigation and should be excluded under Rule 702. To be relevant, expert opinions must have "a valid connection to the pertinent inquiry." *Elosu*, 26 F.4th at 1024.

Defendants argue that these opinions are irrelevant because Plaintiffs had abandoned their alter ego theory against the Lion Entities and are proceeding only on the theory that the Lion Entities participated in the price fixing conspiracy on their own behalf. This does not appear to be an accurate description of Plaintiffs' case. (*See, e.g.,* ECF No. 3068, Plaintiffs' Opposition to the Lion Entities' Motion for Summary Judgment (arguing vicarious liability).)

Whether Plaintiffs proceed only on direct liability theory or not, the Court finds relevant the opinions about Bumble Bee's financial condition, Lion Capital's contribution

15-MD-2670 DMS (MSB)

to Bumble Bee's decline, and the causes of Bumble Bee's bankruptcy. These opinions are part and parcel of the opinion about Lion Capital's financial incentives for risk taking with the Bumble Bee investment, which Defendants do not challenge as lacking relevance. Bumble Bee's financial condition and eventual bankruptcy tend to show that Lion Capital acted on its financial incentives and contributed to Bumble Bee's decline. They further tend to show the relationship between Lion Capital's risk taking and potential benefit. For example, while high leverage adversely affected Bumble Bee's financial condition, it benefitted Lion Capital. The analysis of Bumble Bee's bankruptcy tends to show that while the 2011 recapitalization increased Bumble Bee's leverage, it benefitted Lion Capital by reducing exposure to losses from $210 million to $108 million.

Further, the opinion about Bumble Bee's financial condition tends to show that Bumble Bee was profitable during its participation in the price fixing conspiracy and tends to rebut Defendants' contention that the conspiracy failed to generate profits for Bumble Bee. It also tends to show that due to high leverage, Bumble Bee spent most of its earnings on debt service, thus tending to rebut Defendants' contention that Bumble Bee went bankrupt because of this litigation. Defendants' relevancy arguments are rejected.

Although Defendants do not challenge the relevance of DeMario's other opinions, the Court has reviewed them and finds them relevant. Specialized knowledge is required to understand the financial, regulatory, and transaction records relating to the acquisition and recapitalization of Bumble Bee and the convoluted corporate structure created by Lion Capital to hold Bumble Bee stock. (*See* DeMario Dep. at 15-18.) This analysis is relevant to assist the trier of fact to understand the evidence.[8] *Elosu*, 26 F.4th at 1026 ("[T]he basic function of expert testimony [is] to help the trier of fact understand highly specialized issues that are not within common experience.").

---

[8]  The requirement of Rule 702(a) that expert testimony "help the trier of fact" goes primarily to relevance. *Primiano v. Cook,* 598 F.3d 558, 567 (9th Cir. 2010) (citing *Daubert,* 509 U.S. at 591).

15-MD-2670 DMS (MSB)

c. <u>Reliability</u>

Defendants challenge several assertions in DeMario's reports as unreliable opinions and request exclusion under Rule 702. DeMario's Report and Rebuttal are based on her specialized knowledge of forensic accounting. The reliability of such testimony depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it." *Hangarter*, 373 F.3d at 1017 (emph. in orig.); *Porter,* 68 F.4th at 444; *see also See Kumho Tire*, 526 U.S. at 150; *Hankey,* 201 F.3d at 1169. To be reliable, an expert opinion must be based on "good grounds," *i.e.,* it must be based on the knowledge and experience of the expert's discipline rather than on "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590. Accordingly, it must have "sufficient factual grounds on which to draw conclusions." *Elosu*, 26 F.4th at 1025-26. It must also be based on valid reasoning or methodology that can properly be applied to the facts in issue, and the reasoning or methodology must be adequately explained. *Valencia-Lopez,* 971 F.3d at 900. Review of relevant materials coupled with specialized knowledge can provide a reliable basis for opinion testimony. *Vallejo,* 237 F.3d at 1020-21.

First, Defendants challenge DeMario's opinion that Lion Capital acquired Bumble Bee. DeMario noted that Lion Capital, a private equity firm, acquired Bumble Bee through Lion Capital Fund III ("Fund III"), a limited partnership investment fund. (DeMario Report at 2-3 & n.3.) Lion Capital was its managing and general partner. *Id.* DeMario's opinion is based on the analysis of the ownership structure Lion Capital created to hold Bumble Bee shares. (*See id.* at 2-3, 7, 5-6; DeMario Dep. at 88-89.) Specifically, DeMario relied on the acquisition documents, financial statements and reports, as well as SEC filings. (DeMario Report at 2-3, 5-6 and related footnotes.) Her opinion is also supported by a statement made by Lion Capital partner Jacob Capps (DeMario Rebuttal at 9-10 & n.25 (quoting Capps stating that "Lion Capital owns a significant majority of Bumble Bee[.]").) Analysis of these facts in light of her expertise provides a sufficient foundation for her opinion.

To the extent Defendants argue that other facts contradict DeMario's opinion, this is not sufficient to exclude her testimony. "Rule 702's sufficient facts or data element requires

foundation, not corroboration." *Elosu*, 26 F.4th at 1025. Countervailing considerations such as other evidence in the record which could be viewed as contrary to the expert's views and arguments that the expert relied too heavily on interested party evidence, that the report is not sufficiently corroborated, or the expert is biased, "go to the weight of the testimony and its credibility, not its admissibility." *Id.* at 1028. Similarly, "alternative explanations that could lead to alternative outcomes" and competing interpretations do not render an expert opinion inadmissible. *Id.*

> Although a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered, Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage.

*Id.* at 1025-26. Factual disputes should be addressed at trial by presentation of contrary evidence and cross-examination. *See, e.g., Scott v. Ross,* 140 F.3d 1275, 1286 (9th Cir. 1998); *see also* Fed. R. Evid. 705.

DeMario's opinion is based on sufficient facts and data, and her reasoning is adequately explained in light of her expertise to reliably opine that Lion Capital acquired Bumble Bee. *See Primiano v. Cook,* 598 F.3d 558, 568 (9th Cir. 2010) ("Given that the judge is a gatekeeper, not a factfinder, the gate could not be closed to this relevant opinion offered with sufficient foundation by one qualified to give it.")

Second, Defendants argue DeMario's assertion that Lion Capital controlled Bumble Bee is unsupported. (*See* DeMario Report at 14.) DeMario based some of her opinions on this assumption. In addition to the evidence she relied upon to opine that Lion Capital acquired Bumble Bee, she relied on the factual record in this case. For example, Lea testified that Lion Capital controlled Bumble Bee. (*See* Lea Dep. at 322-24 (cited in DeMario Report at 14); *see also* DeMario Rebuttal at 9-10 & n.25 (Capps' statement that "Lion Capital ... has complete control over [Bumble Bee's] governance[.]") Whether an expert's assumptions have a sufficient basis in facts or data speaks to the weight and not reliability of the opinion, provided that, as here, the expert has the requisite experience and

qualifications. *See Primiano*, 598 F.3d at 562-63, 566-68. Defendants' contention that the assumption is unsupported is therefore rejected.

Third, Defendants request exclusion of DeMario's assertion that Lion Capital took an active role in Bumble Bee's management. DeMario raised this issue in her Rebuttal to criticize Strebulalev's opinion that Lion Capital's involvement in Bumble Bee's management was in line with private equity norms. She argued that his opinion was contradicted by the facts and based on selective industry data. (*See* DeMario Rebuttal at 8-10 & nn.24-33.) Her position is based on the facts she cited. (*Id.*) To the extent DeMario and Strebulaev disagree which industry data is relevant and their views of the facts differ, this is not a reason to exclude DeMario's testimony. The gatekeeping role does not permit the Court to determine whether the expert's "hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record," *Elosu*, 26 F.4th at 1026, and where experts disagree, it is the job of the fact finder to determine which source is more credible and reliable. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014).

Fourth, Defendants challenge as lacking factual support DeMario's assertion that the decision to increase Bumble Bee's leverage was made by Lion Capital. (*See* DeMario Report at 8.) As discussed above, DeMario's position that Lion Capital acquired and controlled Bumble Bee is based on sufficient foundation. This alone provides adequate basis to state that Lion Capital controlled Bumble Bee's capital structure. Moreover, Defendants' own expert agrees that increasing leverage was Lion Capital's decision. (*Id.* n.25 (citing Strebulaev deposition testimony).) DeMario's observation is sufficiently supported. Defendants' argument that it is contradicted by other facts is a matter of impeachment rather than admissibility. *See Elosu*, 26 F.4th at 1024-25, 1028.

Fifth, Defendants seek to exclude DeMario's opinion that Lion Capital benefitted from leveraging Bumble Bee. DeMario opined that Lion Capital benefitted in two ways:

/ / /

/ / /

/ / /

(1) decreased risk of loss; and (2) increased likelihood of receiving carried interest.[9] Defendants argue these opinions should be excluded because they are based on unsupported assumptions and are contradicted by the evidence.

The opinion that leverage benefitted Lion Capital by decreasing capital at risk, (DeMario Report at 14), is supported by the relevant financial reports, (*see id.* at 5-6 & n.17), and statements made by Moody's in downgrading Bumble Bee's credit rating in response to Lion Capital's plan to recapitalize Bumble Bee in 2011. (*Id.* at 12 & n.32.) DeMario explained her reasoning. In 2010, Bumble Bee was acquired for $1 billion. (DeMario Report at 2 & n.2.) Lion Capital acquired a 68% share in exchange for a $210 million capital investment. (*Id.* at p.5 & n.14.) The rest was financed with $715 million in Bumble Bee debt -- $605 million in secured notes and $110 million in revolving credit. (*Id.* at 5 & n.14, p.8; DeMario Dep. at 119). With the 2011 recapitalization, Lion Capital increased Bumble Bee's debt by $150 million, used the borrowed funds to pay a $98 million dividend,[10] and distributed an additional $3 million from escrow created at the acquisition,[11] thus reducing the equity investment in Bumble Bee from $210 million to $108 million. (DeMario Report at 5-6 & nn.15-17; *see also id.* at 8 & n.26.) When Bumble Bee went bankrupt, the loss amounted to the net $108 million equity investment, and not $210 million invested at acquisition. (*Id.* at 6 n.17; *see also* ECF No. 3036-2, Tester Decl. at 7.) DeMario's opinion that increasing Bumble Bee's debt benefitted Lion Capital by

---

[9]  Another aspect of leverage which benefitted Lion Capital was that by using debt for the acquisition and payment of dividends, Lion Capital freed capital to invest in other companies. (DeMario Dep. at 106.)

[10]  Defendants dispute DeMario's statement that Lion Capital received dividends in the 2011 recapitalization. (*See, e.g.,* DeMario Report at 13.) DeMario explained that dividends were paid to Fund III rather than Lion Capital. (*See id.* at 5-6 & n.17.) However, the crux of Defendants' argument is the dispute whether Lion Capital controlled Bumble Bee. As discussed above, DeMario's position in this regard is sufficiently supported.

[11]  Other shareholders, consisting of Bumble Bee's managers and its prior owner FCF Co., Ltd., also received dividends and escrow distributions. (*Id.* at 5-6 & nn.15-16.)

reducing its exposure to loss is supported by the facts and sufficiently explained considering her expertise.

In addition, DeMario opined that Lion Capital benefitted because leveraging Bumble Bee increased the internal rate of return ("IRR") and the odds of receiving carried interest. (DeMario Report at 4-5.) Defendants claim this opinion lacks factual support and deny that Lion Capital could receive carried interest.

DeMario's position is based on Lion Capital's partnership agreement, Lea's testimony, and review of Fund III financial reports. (DeMario Report at 4 nn.12-13; DeMario Dep. at 88-89.) DeMario explained that Lion Capital managed Fund III investments on behalf of third-party passive investors, that Lion Capital also made its own investment in Fund III, and shared in the profits when a portfolio company was sold. (DeMario Report at 4 nn.12-13.) Its share of the profits is referred to as "carried interest." (*Id.*) Lion Capital received carried interest only if the IRR exceeded eight percent. (*Id.*)

For purposes of carried interest, the IRR "is calculated as the percentage increase of an investment over time – but it is measured only on the portion of investment financed with equity." (DeMario Report at 4.) DeMario explained the effect of leverage on the IRR as follows:

> For example, assume a private equity firm buys a company for $100 by contributing $10 in equity and borrowing the remaining $90. If, at the end of the year, the investment is sold for $110, the return on the investment is 10% but the IRR from the perspective of the private equity firm is 100%.

(*Id.* at 4-5.)

DeMario analyzed two instances when Lion Capital leveraged Bumble Bee. First with the leveraged buyout in 2010 and second with the 2011 recapitalization. When a private equity company acquires a portfolio company mostly with debt, it need not invest as much equity. When the equity investment is smaller, any increase in the value of the portfolio company at the time of sale necessarily represents a larger percentage of the equity investment. (*Id.* at 4, 13 & nn.36-37; *see also* Lea Dep. at 149-50.) This increased

the likelihood that the IRR could exceed eight percent and that Lion Capital could gain carried interest. (*Id.* at 4.) Lion Capital's objective in recapitalizing Bumble Bee in 2011 was to increase the IRR. (*Id*. at 13 & nn.35-37 (citing internal Lion Capital correspondence and Lea testimony).) DeMario's opinion that Lion Capital benefitted from Bumble Bee's leverage because leverage increased the IRR and the prospect of carried interest is adequately supported by the facts and sufficiently explained considering her expertise. Defendants' argument that other evidence contradicts DeMario's opinion is unavailing. *See Elosu,* 26 F.4th at 1025-26, 1028.

Finally, Defendants seek to exclude DeMario's opinion that Bumble Bee was in poor financial condition because it was highly leveraged, which led to its bankruptcy. (DeMario Report at 8-10, 14-16.) DeMario's conclusion that Bumble Bee was highly leveraged is based on her analysis of Bumble Bee's financial statements over time and the leverage ratios of its peers (DeMario Report at 8-10 & n.26), as well as the response of credit rating agencies to Lion Capital's plan to recapitalize Bumble Bee in 2011. (*Id.* at 11-12 & nn.30-34.) Based on this analysis, DeMario concluded that although Bumble Bee was profitable, it expended almost all its operating income on debt service. (*Id.* at 10-11.) Based on this analysis, she opined that Bumble Bee was in poor financial condition. (*Id.* at 11.)

DeMario also analyzed transaction records and Bumble Bee's financial statements to calculate that the cumulative effect of the debt added in the 2011 recapitalization, including the additional debt, interest expense, fees, and increase in the interest rates due to pre-existing debt, amounted to $289 million at the time of bankruptcy. (*Id.* at 14-16.) Bumble Bee's bankruptcy filings disclosed a total $839 million in debt. (*Id.* at 16.) DeMario reasoned that had Lion Capital not recapitalized Bumble Bee, Bumble Bee would have been in a better position to repay or refinance its pre-existing debt and avoid bankruptcy. (*Id.*) Defendants' contention that other evidence contradicts DeMario's opinion is not a reason for exclusion of her testimony. *See Elosu,* 26 F.4th at 1025-26, 1028.

/ / /

15-MD-2670 DMS (MSB)

DeMario's opinions have a sufficient factual basis and her analysis is adequately explained. Given the subject matter and types of opinions she rendered and her knowledge and experience, DeMario's opinions are reliable under Rule 702.

**2.    Lim**

In her Report, Lim covers some of the same issues as DeMario. Because their approaches differ, Lim's Report is summarized below.

Lim was asked to address the issues of Lion Capital's control over Bumble Bee, Lion Capital's financial incentives relative to Bumble Bee, and how Lion Capital "benefitted or would have benefitted" from exercising its control. (Lim Report at 3.) Lim summarized the financial and transaction documents of the 2010 acquisition of Bumble Bee for Fund III and recapitalization in 2011. (*Id.* at 7-9.) She also described the resulting financial and ownership structure of Bumble Bee. (*Id.* at 8-10.) Finally, she summarized the financial and transaction documents and other evidence regarding Lion Capital's planned sale of Bumble Bee to Thai Union Group PCL ("TUG"), cancellation of the sale in 2015, and events leading to Bumble Bee's bankruptcy in 2019. (*Id.* at 10-11.)

Based on the structure of Bumble Bee stock ownership, Lion Capital's management of the Bumble Bee investment, its involvement in the management of Bumble Bee as a going concern, as well as Bumble Bee's financial documents and statements made by Lion Capital insiders, Lim opined that Lion Capital controlled Bumble Bee. (Lim at 6; *see also* discussion at 12-14, 16-8, 20, 25-37 and related footnotes.)

Lim further opined that Lion Capital was financially motivated to take risks with the Bumble Bee investment to maximize Bumble Bee's eventual sale price and gain carried interest. To receive any carried interest, Lion Capital had to secure a sale price greater than the capital invested plus eight percent. (Lim Report at 21-22; *see also id.* at 61 n.188 (application of the carried interest formula).) Lion Capital, as Fund III general partner ("Lion GP"), was financially incentivized to take risks because any resulting Fund III losses were capped at the capital investment while any benefits were not capped. (Lim Report at 6, 25, *see also* discussion at 18-25; Lim Dep. at 98-99.)

Lim opined that Lion Capital took risks with the Bumble Bee investment in two ways – leverage and turning a blind eye to Bumble Bee's participation in the price fixing conspiracy. (Lim Report at 25.) Lion Capital financed the acquisition mostly by borrowing against Bumble Bee, which increased Bumble Bee's leverage. (*Id.* at 38-39.) In the 2011 recapitalization, Lion Capital further increased Bumble Bee's leverage. (*Id.* at 39-49.) As a result, Bumble Bee was a highly leveraged company as compared to its leverage prior to the Lion Capital acquisition, the leverage of its peers in the industry, or the leverage of other Lion Capital investments. (*Id.* at 41-44.) Bumble Bee's own financial statements disclosed, "We are a highly leveraged company, and our liquidity requirements will be significant, primarily due to debt service requirements." (*Id.* at 42; *see also id.* at 43 (Lea).) The burden of high leverage was that Bumble Bee spent a significant part of its cash flow for debt service. (*Id.* at 42; *see also* discussion at 53-55.) This increased the risk of Bumble Bee's failure, as reflected in the downgrading of its credit rating from "highly speculative" at the time of the acquisition to "default imminent with little prospect of recovery" in 2017. (*Id.* at 46.)

While leverage increased the risk of Bumble Bee's failure, it benefitted Lion Capital. Lion Capital was able to acquire a 68 % share of Bumble Bee, a company valued at $1 billion, with a capital investment of $210 million and financing the rest with Bumble Bee debt. (Lim Report at 7.) With recapitalization, Lion Capital borrowed another $150 million against Bumble Bee and used the proceeds to distribute $101 million to Fund III as "return on capital," thus reducing capital investment in Bumble Bee and making capital available for other Fund III investments. (*Id.* at 9, 39-40.) This reduced Fund III exposure to losses on Bumble Bee investment from $210 million to $108 million. (*Id.* at 9 n.26; *see also id.* at 40.)

Lion Capital's other risky activity was to turn a blind eye to Bumble Bee's price fixing. (Lim Report at 25.) Based on the record in the case, including witness testimony, due diligence documents, internal communications, and a whistleblower letter to Lion Capital, Lim assumed that Lion Capital was on notice of Bumble Bee's participation in

15-MD-2670 DMS (MSB)

price fixing. (*Id*. at 30-37; Lim Dep. at 180-81; *see also id.* at 165-69.) Based on the report of Plaintiffs' expert David Sunding, calculating the amount of Bumble Bee's "conspiracy overcharge," Lim concluded that price fixing increased Bumble Bee's earnings. (*Id*. at 60, 63 n.190.) Bumble Bee's earnings before interest, taxes, depreciation, and amortization ("EBITDA") were the basis for calculating its sale price. (Lim Report at 57-59.) Lim further assumed, based on the financial incentives, witness testimony, and internal correspondence, that (1) Lion Capital set Bumble Bee's EBITDA targets as necessary to gain carried interest on the eventual sale (*id.* at 58-59); (2) that Lion Capital's EBITDA targets could not be met without price fixing (*id.* at 57 & n.188, p.59 & n.184); and (3) that to the extent Bumble Bee was meeting the targets, Lion Capital did not interfere with how Bumble Bee met them (*id.* at 37 & nn.136-37 (Lea)), in each instance citing evidence in support of her assumptions. In 2014, Lion Capital agreed to sell Bumble Bee to TUG for $1.5 billion. (Lim Report at 10, 59.) Based on Lion Capital's projections, Lim calculated that Lion GP was poised to gain $48 million in carried interest and that Fund III passive investor limited partners ("LPs") would receive a total distribution of $359 million from the sale. (*Id.* at 6, 59-62.)

To show that Bumble Bee's price fixing benefitted Lion Capital, Lim analyzed a hypothetical sale of Bumble Bee to TUG with the assumption that Bumble Bee had not engaged in price fixing, *i.e.*, without Sunding's conspiracy overcharge. (Lim Report at 60-61.) Under this scenario, Lion GP would gain $2 million in carried interest rather than $48 million, and the LPs would receive a total distribution of $155 million rather than $359 million. (*Id.* at 61-62.)

Finally, based largely on Bumble Bee's bankruptcy filings, Lim opined that Lion Capital's risk-taking ultimately caused Bumble Bee's bankruptcy. (Lim Report at 6, 62-63, 65 and related footnotes.) The sale to TUG was cancelled in 2015 when the DOJ discovered the price fixing conspiracy. She reasoned that the DOJ investigation reduced Bumble Bee's cash flow from price fixing; however, Bumble Bee's liquidity requirements for debt service remained the same. (*Id.* at 63.) In addition to pre-existing debt service,

Bumble Bee also incurred regulatory fines and litigation costs in the criminal and civil proceedings. (*Id.*) Bumble Bee filed for bankruptcy when it was facing "imminent default on its debt obligations" as it had exceeded the maximum leverage permitted under its loan agreement, which it was unable to refinance. (*Id.* at 63-64.) In bankruptcy, Fund III's losses for the Lion GP and LPs combined were limited to their combined $108 million capital investment. (*Id.* at 6, 64 & n.199.)

In her Rebuttal, Lim responded to certain issues raised in Strebulaev's report. (Lim Rebuttal at 2.) She disagreed with Strebulaev on several points, most notably: (1) his interpretation of the evidence regarding Lion Capital (Americas), Inc.'s ("Lion Americas"), as opposed to Lion Capital's, participation in Bumble Bee management (*id.* at 7-10); (2) opinion that the information gathered during Bumble Bee due diligence about competitive dynamics was typical (*id.* at 3, 10-12); (3) reliance on Bumble Bee's auditor Ernst & Young and Lion Capital's due diligence consultant KPMG's failure to discover Bumble Bee's price fixing (*id.* at 12-14); (4) methodology of assessing the extent of Bumble Bee's leverage (*id.* at 14-29); and (5) characterization of her opinions (*id.* at 30-31). Lim also addressed Strebulaev's criticism of her leverage methodology and reliance on Sunding's conspiracy overcharge calculation. (*Id.* at 14-30.)

Lim's opinions are based on her analysis of financial statements and reports of the relevant business entities, transaction documents, SEC filings, court filings in these, criminal, and bankruptcy proceedings, analysis of industry financial data, professional standards and literature, published scholarly research, witness testimony, and other evidence, including testimony and internal correspondence of Lion Capital and Bumble Bee insiders. For purposes of the pending motion, Defendants do not contend that any of this underlying evidence is inadmissible.

a. Qualifications

Although Defendants do not challenge Lim's qualifications, the Court reviewed them and finds her qualified. Lim is a certified public accountant with twenty years of experience in accounting and finance. She has an M.B.A. and a B.A. in economics. She is

accredited by the American Institute of Certified Public Accountants in the field of business valuation and as a Certified Fraud Examiner. (Lim Report at 1 & App'x A.) Her past work includes issues of accounting fraud in the context of SEC and DOJ investigations as well as civil litigation. Specifically, her experience encompasses audits, due diligence, and valuation in the context of mergers and acquisitions, examination of business entities' accounting practices and internal controls over financial reporting, investigations of fraudulent financial reporting, consolidation and disclosure of related business entities, reconstruction of accounting records including in the context of antitrust violations, and analysis and allocation of gains from unlawful conduct. (*Id.* App'x A; *see also* Lim Report at 1, 31; Lim Rebuttal at 13.) Lim has extensive litigation experience including as a testifying expert. (Lim Report App'x A.) Lim's education, experience, and knowledge lay "at least the minimal foundation" necessary to give expert opinion on the issues addressed in her reports. *See Hangarter*, 373 F.3d at 1016 (emph. omitted).

>           b.    Relevance

Defendants argue that Lim's opinions about Bumble Bee's weak financial condition, Lion Capital's contribution to Bumble Bee's financial decline, and the causes of bankruptcy are irrelevant and should be excluded under Rule 702. The Court finds these opinions relevant for the same reasons as DeMario's opinions. *See* Section 1.b. above.

>           c.    Reliability

Defendants request exclusion of several portions of Lim's Report and Rebuttal as unreliable. In reaching her opinions, Lim relied on her specialized knowledge of forensic accounting. The relevant legal standards are set out in Section 1.c. above and are not repeated here.

First, Defendants contend Lim's opinion that Lion Capital acquired or owned Bumble Bee is not based on sufficient facts or data. This argument misconstrues Lim's Report, which states that while Lion Capital's investment committee made the decision to acquire Bumble Bee, the acquisition was made on behalf of Fund III. (*See, e.g.,* Lim Report at 7, 12, 16, 21.)

Second, Defendants argue Lim's opinion that Lion Capital controlled Bumble Bee is unreliable because "control" is a legal term outside her area of expertise, and her opinion is contradicted by the evidence. As a factual basis for her opinion, Lim relied on admissions in Bumble Bee's financial statements, correspondence among Lion Capital insiders, and SEC filings. (*See, e.g.,* Lim Report at 25 n.84 (citing Capps stating in an internal email that "Lion Capital owns a significant majority Bumble Bee and has complete control over the governance and liquidity rights."), 28 n.99 (citing Bumble Bee financial statements disclosing "control of our operations by Lion Capital"); *see also id.* at 12 n.35 (citing Lion Capital 2012 Form ADV Brochure).) Accordingly, Lim's opinion rests on a sufficient factual foundation. Countervailing considerations, such as other evidence in the record and alternative interpretations, go to the weight and credibility of Lim's testimony rather than its admissibility. *See Elosu,* 26 F.4th at 1028; *see also id.* at 1025-26.

Defendants' argument that Lim improperly offered legal opinions and testified outside her area of expertise is rejected. Lim did not offer legal opinions. (Lim Dep. at 16, 49. 181.) She used the word "control" as it is defined in the Accounting Standards Codification Master Glossary. (Lim Report at 3 & n.6; *see also* Lim Dep. at 48-49 ("from an accountant's perspective").)

> [A]ccountants often assess whether and how one entity controls another [by considering], among other things, whether the reporting entity [*i.e.,* Lion Capital] has the power, through voting rights or similar rights, to direct the activities of a legal entity [*i.e.,* Bumble Bee] that most significantly impact the entity's economic performance and the reporting entity's exposure to the [legal] entity's losses or benefits.

(Lim Report at 3.) Lim applied this definition to the facts, followed the standards of her profession, and explained her reasoning. (*See id.* at 12-13, 25-41 and related footnotes.) Accordingly, she applied a recognizable methodology within her area of expertise.

Third, Defendants claim Lim improperly opined that Lion Americas was Lion Capital's agent and that this opinion is beyond her area of expertise. Although Lim makes this statement in her Report (Lim Report at 13 ("Lion Americas was completely

economically dependent on Lion Parent, and effectively an agent of Lion Parent.")), this observation is not an opinion. Lim opined that there was "little operational separation" between Lion Capital and Lion Americas regarding Fund III marketing and management. (*Id.* at 5, 13.) This opinion is based on the Lion Entities' SEC filings, Lion Capital partnership agreement, and Lea's deposition testimony. (*Id.* at 12-14 and related footnotes.) Whether Lion Americas was an agent of Lion Capital is not necessary to support this or any other of Lim's opinions. Lim's opinion about the lack of operational separation is sufficiently supported by the facts, adequately explained, and grounded in her expertise.

Fourth, Defendants argue Lim's opinion that Lion Capital stood to receive carried interest from the sale of Bumble Bee is unsupported by facts or methodology. This is a generalization of Lim's opinion, as Lim distinguished between Lion Capital and Lion GP. (*See, e.g.,* Lim Report at 6, 60-61.) As with Lim's opinion about control, Defendants' argument is ultimately based on a factual dispute. Lim relied on the relationship between Lion Capital and Fund III based on SEC filings, Fund III financial statements, private placement memoranda, and Lea's testimony. She concluded that in relation to Fund III, a limited partnership, Lion Capital was its manager and general partner. (Lim Report at 12-13 & n.40 (Lion Capital 2012 Form ADV Brochure), 14 & nn.44, 46 (Lion Capital 2015 Fund Private Placement Memorandum, Fund III 2011 Annual Report), 20 & n.67 (Lea Dep. at 149-51)); *see also* Lim Dep. at 37-38.) Fund III limited partners, *i.e.*, LPs, were passive investors. (Lim Report at 13 & n.40.) When a portfolio company such as Bumble Bee was sold, the Lion GP and LPs divided the proceeds. (*Id.* at 21-22 & nn.75-76 (Fund III 2015 Annual Report; Lea Dep. at 322, 149).) Lion GP's share was known as "carried interest." (*Id.*) In light of the factual foundation for her opinion, Defendants' reliance on countervailing facts is not a valid ground to exclude her testimony. *See Elosu,* 26 F.4th at 1025-26, 1028. Further, her review of relevant evidence and explanation of reasoning provide a reliable basis for her testimony.

Fifth, Defendants contend Lim's opinion that Lion Capital benefitted from the 2011 recapitalization of Bumble Bee is unreliable because Lion Capital did not receive the $101

million dividend distributed as part of the recapitalization. Defendants' argument is based on a misunderstanding of Lim's Report. Lim stated that $101 million was distributed to Fund III (and not Lion Capital) as a return on capital, which Lion Capital as Fund III manager could invest in other Fund III acquisitions. (Lim Report at 9, 39-40 & n.145 (Lea Dep. at 156-57), 53 & nn.168-69 (internal Lion Capital communications, Lea Dep. at 156).)

Lim opined that Lion Capital benefitted from recapitalization by (1) reducing the capital investment in Bumble Bee from $210 million to $108 million and thus reduced the amount at risk in case of Bumble Bee failure (Lim Report at 9-10 & n.26 (Fund III 2011 Annual Report), 53 & n.170 (Lion Capital's letter to Fund III investors), 64 & n.199 (Lea Dep. at 246)); and (2) increasing the IRR (*id.* at 24 & n.82 (Lea Dep. at 150), 52-53) in case of a successful Bumble Bee sale.[12] Lim's opinion that Lion Capital benefitted from recapitalization of Bumble Bee has a sufficient factual basis and is adequately explained considering her qualifications.

Finally, Defendants claim Lim's opinions about Bumble Bee's weak financial condition and bankruptcy are unreliable because she ignored contrary facts and did not employ reliable methods. Lim's opinion is based on Bumble Bee's financial reports and statements, industry data, data about Lion Capital's other investments, statements made by third-party credit rating agencies, and Bumble Bee bankruptcy filings. (*See* Lim Report at 10-11, 42-47, 53-56, 62-64 and related footnotes.) Defendants' claim that other facts contradict her opinions does not justify exclusion. *See Elosu,* 26 F.4th at 1025-26, 1028. Considering the factual basis and thorough explanation of reasoning in light of her qualifications, Lim's opinions rest on a reliable basis.

Lim's opinions have a sufficient factual basis and her analysis, based on her expertise, is adequately explained. Given the subject matter and types of opinions rendered

---

[12]  Lion Capital also benefitted by emphasizing the high Bumble Bee IRR in fundraising for its other funds. (Lim Report at 62 & n.189 (Lion Capital 2015 Fund Private Placement Memorandum).)

in her Report and Rebuttal and her knowledge and experience, Lim's opinions are reliable under Rule 702.

**B.    Whether the Experts Usurped the Fact Finder's Role**

Alternatively, Defendants request exclusion arguing that Lim and DeMario engaged in improper fact-finding. Defendants' arguments focus on areas such as: (1) Lion Capital's control over Bumble Bee; (2) Lim's assumption that references to "rational" market behavior or pricing were allusions to price fixing; and (3) interpretation of lay witness testimony and Defendants' internal correspondence.[13]

First, Defendants argue for exclusion of opinions about Lion Capital's control of Bumble Bee. Assuming for the sake of argument that control is an ultimate issue in the case, it is not automatically excludable. "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). However,

> an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court. [A] witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms.

*Hangarter*, 373 F.3d at 1016-17 (emph. in orig.). Specifically,

> if the terms used by an expert witness do not have a specialized meaning in law and do not represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case, the testimony is not an impermissible legal conclusion.

*United States v. Diaz,* 876 F.3d 1194, 1199 (9th Cir. 2017). It is "sometimes impossible for an expert to render his or her opinion on a subject without resorting to language that recurs

---

[13]  To the extent Defendants suggest that Lim or DeMario testified as to witness state of mind, the contention finds no support in review of their reports or deposition testimony.

in the applicable legal standard." *Id.* at 1198-99 (upholding admission of expert opinion that a doctor's prescriptions were "outside the usual course of professional practice," which was an element of the charged crime).

Neither Lim nor DeMario offered any legal opinions. (DeMario Dep. at 19; Lim Dep. at 16, 49. 181.) Lim used the term "control" as it is defined in the accounting literature, and DeMario used it in its ordinary, everyday sense. Although the same word may be used in the legal standards on the issue of corporate vicarious liability, Lim and DeMario do not purport to opine or instruct the jury that Lion Capital should be held liable for Bumble Bee's wrongdoing. Defendants' request to exclude Lim and DeMario's testimony about Lion Capital's control of Bumble Bee is denied.

Second, Lim relied on Plaintiffs' representation that "rational" market behavior or pricing was used by Defendants as a euphemism for collusive pricing. (*See* Lim Report at 30; *see also* Lim Dep. at 130, 145-47, 149-50.) She also relied on her experience with due diligence in mergers and acquisitions and as a fraud examiner. (Lim Report at 31-32; Lim Dep. at 144-45, 151, 153-54.) Whether "rational" was a euphemism for price fixing is a disputed issue of fact. At trial, Defendants will be able to present their evidence to contradict Lim and cross-examine her. *See* Fed. R. Evid. 705. The trier of fact will weigh this evidence and decide the meaning of "rational." This may affect the credibility and weight of Lim's opinions. Accordingly, Lim did not usurp the fact finder's role.

Last, Defendants claim that Lim and DeMario's interpretation of the evidence such as lay witness testimony and Defendants' correspondence will deprive the Court and jury of their fact-finding role on disputed factual issues. Examples are whether Lion Capital controlled Bumble Bee, the extent to which Lion Capital played an active role in Bumble Bee's management, whether Lion Capital pressured Bumble Bee to increase earnings, and whether Lion Capital was on notice that Bumble Bee participated in price fixing. Lim and DeMario relied on evidence to provide factual bases for their opinions. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of[.]") Defendants object because they disagree with the experts' view of the

15-MD-2670 DMS (MSB)

evidence they relied on. At trial, Defendants will be able to present contrary evidence and cross-examine the experts, including on the factual bases for their opinions. *See* Fed. R. Evid. 705. The trier of fact will decide the disputed facts and the weight to give expert testimony. The experts' discussion of their factual basis does not deprive the fact finder of its function.

## C. **Federal Rule of Evidence 403**

Finally, Defendants argue for exclusion under Rule 403 claiming that portions of Lim and DeMario's reports lack probative value, and are misleading, unfairly prejudicial, or confusing. "Even when expert testimony is otherwise admissible, the district court may exclude it under Rule 403." *Vallejo,* 237 F.3d at 1021; *see also Daubert,* 509 U.S. at 595.

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403. This rule "favors admissibility, while concomitantly providing the means of keeping distracting evidence out of the trial[.]" *Hankey,* 203 F.3d at 1172.

The objected-to portions of DeMario and Lim's reports are probative. In part, Defendants object to the reports where they discuss lay evidence on disputed issues such as the extent to which Lion Capital played an active role in Bumble Bee's management, whether Lion Capital pressured Bumble Bee to increase earnings, and whether Lion Capital turned a blind eye to Bumble Bee's price fixing. The discussion of these issues is relevant to the experts' opinions, including about Lion Capital's financial incentives for risk-taking with the Bumble Bee investment. Although these opinions are largely based on the experts' analysis of the corporate and financial documents relating to the ownership structure of Bumble Bee stock, the capital structure of the Bumble Bee investment, and projections for the sale of Bumble Bee to TUG, the experts also relied on witness testimony and insider correspondence to provide factual bases for their opinions. The experts' discussion of their factual bases is relevant to understanding their opinions. Defendants also object to the

15-MD-2670 DMS (MSB)

opinions about Bumble Bee's financial decline and bankruptcy. The relevance of these opinions is discussed in Section A.1.b. above. Although Defendants object to the experts' discussion of Lion Capital's control over Bumble Bee, they do not claim it lacks probative value.

To be excluded under Rule 403, the probative value of relevant evidence must be substantially outweighed by, as pertinent here, unfair prejudice, danger of confusing the issues, or misleading the jury. Fed. R. Evid. 403. Relevant evidence is "inherently prejudicial." *Hankey,* 203 F.3d at 1172. To warrant exclusion, the prejudice must be unfair, which means having "undue tendency to suggest decision on an improper basis[.]" *Id.*

Defendants object to the discussion of witness testimony and correspondence. The Court has previously found that Plaintiffs' reliance on the same evidence was sufficiently reasonable to survive summary judgment. (*See* ECF No. 3103.) Accordingly, the experts' reliance on the same evidence is neither unfairly prejudicial nor misleading.

Defendants also object to the experts' discussion of Bumble Bee's bankruptcy, claiming it is unfairly prejudicial and confusing because it could suggest that bankruptcy is indicative of Lion Capital's knowledge of the price fixing conspiracy. Based on the experts' reports and deposition testimony, the Court finds this argument unsupported.

Finally, the Court also rejects the contention that Lim and DeMario's use of the word "control" will confuse the jury. Any confusion can be averted by inquiry into the bases for their opinions at trial. Defendants' request for exclusion of expert testimony based on Rule 403 is denied.

## IV.

## CONCLUSION

For the foregoing reasons, Defendants' motion is granted insofar as the opinion of Plaintiffs' expert Marianne DeMario that "Lion Capital did not properly manage Bumble

///

///

15-MD-2670 DMS (MSB)

Bee's legal and regulatory compliance with U.S. law, including its antitrust laws" (DeMario Report at 6) is excluded. In all other respects, the motion is denied.

**IT IS SO ORDERED.**

Dated:  March 25, 2024

Hon. Dana M. Sabraw, Chief Judge
United States District Court

15-MD-2670 DMS (MSB)